## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Rental Car Intermediate Holdings, LLC,[1] | Case No. 20-11247 (MFW) |
| Reorganized Debtor. | (Jointly Administered) |
| | **Ref. Case No. 20-11218, D.I. 5875 & 5898** |

### RESPONSE TO REORGANIZED DEBTORS' TWENTY-FIRST OMNIBUS (NON-SUBSTANTIVE) OBJECTION TO FALSE POLICE REPORT CLAIMANTS' (I) AMENDED AND SUPERSEDED CLAIMS, (II) DUPLICATIVE CLAIMS, AND (III) LATE CLAIMS

The False Police Report Claimants,[2] by and through their applicable undersigned counsel,[3] hereby respond (this "Response") to the *Reorganized Debtors' Twenty-First Omnibus (Non-Substantive) Objection to False Police Reports Claimants' (I) Amended and Superseded*

---

[1]   The last four digits of the tax identification number of Reorganized Debtor Rental Car Intermediate Holdings, LLC ("RCIH") are 2459.  The location of the Reorganized Debtors' service address is 8501 Williams Road, Estero, FL 33928.  On September 28, 2021, the Court entered a final decree closing each of the chapter 11 cases for The Hertz Corporation and its affiliated reorganized debtors (the "Reorganized Debtors") other than RCIH's chapter 11 case. Commencing on September 28, 2021, all motions, notices, and other pleadings relating to any of the Reorganized Debtors shall be filed in RCIH's chapter 11 case, Case No. 20-11247 (MFW).

[2]   As used herein, the "False Police Report Claimants" or "Claimants" are those individuals whose claims are subject of the Reorganized Debtors' 21st and 22nd Omnibus Objections to Claims [Case No. 20-11218, D.I. 5898 & 5899], all of whom have been unjustifiably implicated, arrested, imprisoned and/or prosecuted on account of the false police reports filed by or on behalf of the Debtors.

[3]   The Law Firm Francis Alexander represents all of the False Police Report Claimants. Susman Godfrey LLP jointly represents the False Police Report Claimants listed in Exhibit A1 attached to the Claimants' response to the 22nd Omnibus Objection.  Faegre Drinker Biddle & Reath LLP are Bankruptcy Counsel representing all False Police Report Claimants.  Ciardi Ciardi & Astin are Bankruptcy Counsel representing all False Police Report Claimants.  Farnan LLP is local Delaware counsel in the Delaware Superior Court action.

*Claims, (II) Duplicative Claims, and (III) Late Claims* [Case No. 20-11218, D.I. 5898] (the

"Objection")[4].  In support of this Response, the Claimants respectfully represent as follows:

## PRELIMINARY STATEMENT[5]

1.      For years, The Hertz Corporation (together with its affiliates, collectively,

"Hertz") has been falsely reporting its customers for car theft, throwing them in jail on felony

charges, prosecuting them, burdening them with criminal records that impact their livelihoods,

and separating them from their family and loved ones.  But in each case, there was no theft.

Each of the False Police Report Claimants paid for their car and was authorized to use the rental.

Hertz nonetheless filed false and materially misleading police reports that threw the Claimants'

lives into a tailspin.

2.      Why does Hertz transform what at worst might be a civil payment issue into a

life-altering criminal offense?  Hertz's computer and inventory tracking systems are broken, and

its internal procedures for validating and verifying police reports are ignored.  It has decided that

upgrading computer systems and verifying theft reports would be too expensive.  Hertz has

instead decided to report its own customers to the police without verification or even the slightest

concern for their customers' welfare, effectively using the police, criminal justice system, and

taxpayers to subsidize inventory control for a private corporation.

3.      Through the Objection, the Reorganized Debtors now seek to disallow and

expunge certain claims filed by the False Police Report Claimants that the Reorganized Debtors

---

[4]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed
to them in the Objection.

[5]     Capitalized terms used but not otherwise defined in this Preliminary Statement shall have
the meanings ascribed to them in the body of this Response.

characterize as Late Claims[6]—putting front and center the issue of inadequate notice (of the bankruptcy proceedings generally, and the General Bar Date specifically) to those Claimants that Hertz actually *knew* it had falsely reported to the police.  (Though as discussed further below, the subject claims are entitled to allowance and distribution in any event by operation of sections 502(b)(9) and 726(a)(3) of the Bankruptcy Code, given that the Debtors' chapter 11 plan provides for payment of post-petition interest and distributions to equity.)

4.      On information and belief, at all relevant times Hertz had in its possession specific records showing that these Claimants were the subject of police reports filed by Hertz. And it was certainly on notice that its theft reporting practices were systemically inaccurate and led to false police reports.  Individuals exposed to systematically tortious conduct pre-petition— whose names and contact information are contained in a chapter 11 debtor's books and records— plainly are "known" creditors who are entitled to actual notice, rather than mere publication notice, in a chapter 11 bankruptcy proceeding.

5.      As discussed further below, the Court should overrule the Objection as to the so-called Late Claims—or, as appropriate, permit discovery and evidentiary hearings before ruling on the timeliness of the claims—to promote the just resolution of these contested matters.

## **RELEVANT BACKGROUND**

### I.      **Rental Process Background**

6.      The Reorganized Debtors are in the rental car business, operating under the Hertz name, among others.  When a customer initially rents a car from Hertz, he or she provides a credit or debit card to Hertz so that Hertz can charge for any costs associated with the rental.  At

---

[6]    The Objection also deals with certain claims characterized by the Reorganized Debtors as Amended and Superseded Claims and Duplicative Claims, which are addressed further in the body of this Response.

the time of the initial rental, Hertz puts something called an "authorization hold" on the customer's card.   An authorization hold is not a permanent charge, it simply checks the customer's account to see if it is valid and has funds.  This temporary charge does not appear on any monthly billing statements and is not itself a bill or payment.

7.      If the customer later extends the rental, Hertz also places another authorization hold on the customer's card.  This can be done over the phone or in person at a local branch. Again, this is not a final billing or payment.  Only at the end of the rental, after the rental is closed out, does Hertz charge the customer's card for payment on the full rental.  Although an authorization hold may be denied during the rental for a variety of reasons, such as a low balance (in a checking account) or available credit (on a credit card account), this says nothing about whether the final billing charge will go through.

8.      Denials of authorization holds—often due to a low balance or available credit in a customer account—is generally what leads Hertz to file a theft report with the police.  Hertz has a major systemic failure that results in the filing false theft reports.  Theft reports come in two varieties: missing inventory and overdue rentals.

9.      When a vehicle is missing or is allegedly overdue, Hertz Vehicle Control generates what Hertz calls a "theft package" that purports to detail all contact with the renter, payment information, the rental due date, extensions made by the renter, and the renter's prior rental history.  This theft package is then given to the police to initiate a theft report.

10.     Missing inventory reports are self-explanatory, and generally result when a vehicle is allegedly missing from a Hertz location without permission and Hertz does not know what happened to the vehicle.  In these cases, Hertz reports only the car stolen and does not name a customer in the theft report.  However, when an individual is arrested in connected with one of

these reports, law enforcement and prosecutors contact Hertz to inform it of vehicle recovery and the arrest/possible prosecution. Exhibit 1, Malofiy Decl., attachment E (Declaration of Steven P. Wood).[7]

11. Overdue rental reports occur when the renter has allegedly kept the rental past the due date and has not extended or contacted the company. In these cases, Hertz personally names the renter as having stolen the car.

12. Systematic practices cause both types of theft reports to contain false and misleading information that routinely accuse customers of theft when there is no probable cause. First, the theft reports inform police that the renter never paid and provided a denied card. ***Hertz nonetheless fully charges the customer just after printing, but before filing, the police report.*** Hertz never updates the police with the payment information, even though customers routinely pay in full. This practice, somewhat incredibly, is laid out in internal policy W7-02(D). [*See* Case No. 20-11218, D.I. 5032–2, at 9] (W7–02 Theft Reporting Policy).

13. Second, as described above, customers extend rentals in person or by phone. After a customer has been told that the rental has been extended, Hertz will delete the extension if the authorization on the customer's card is denied. Then Hertz will backdate the reported "due date" on the vehicle to before the start of any extension on the theft report. In other words, a customer can call and be told that their rental has been extended (and hence there is no need to return the car), but the police will be told that there is a theft because car was due *in the past* and has not been returned.

---

[7] Unless otherwise noted, citations to brief exhibits and attachments thereto refer to the exhibits filed with the Claimants' response to the Reorganized Debtors' 22nd Omnibus Objection to Claims.

ACTIVE.134461832.05

14.    Third, Hertz makes minimal effort—and in some cases, *no* effort—to verify the contents and reliability of a theft report before filing it.  Moreover, theft reports are often filed in cases where theft is totally implausible, including for renters with detailed and extensive rental histories, who provided accurate personal contact information at the time of rental, who have repeatedly extended their rentals and contacted Hertz, and who have provided valid cards for payment that have previously authorized charges on that rental.

## II.    <u>The Prepetition Litigation</u>

15.    As a direct consequence of Hertz's false reporting practices, innocent Hertz customers have been unjustifiably arrested, imprisoned and/or prosecuted, collectively spending no less than 2,332 days in jail and enduring 64,220 days of false prosecution that the Claimants' counsel are aware of.  Additional, similarly situated customers continue to come forward each day.

16.    Prior to the Petition Date, a number of these individuals commenced state court litigation against Hertz (the "<u>State Court Proceedings</u>"), asserting causes of action for, among other things, malicious prosecution, abuse of process, false arrest, false imprisonment, fraud, fraud in the inducement, intentional infliction of emotional distress, negligent infliction of emotional distress, negligence, negligent misrepresentation, defamation, invasion of privacy false light, breach of contract, breach of implied contractual warranties, false advertising, spoliation, civil conspiracy, and civil RICO.

17.    Beyond those legal filings, Hertz has had actual notice of the pattern of misconduct underlying each Claimant's claims for many years.  To highlight a few examples: (1) in January 2017, a federal jury in Galveston, Texas issued a verdict against Hertz for related conduct and in favor of Hertz customer Michael Gray. Exhibit 1, Malofiy Decl., Attachment V,

Jury Charge and Verdict Form; (2) in September 2017, a Philadelphia jury issued a six-figure verdict against Hertz for related conduct in a case brought by Hertz customer Kelly Grady, Exhibit 1, Malofiy Declaration, Attachment W, Verdict Form, including findings of spoliation and the ordering of a punitive damages trial; (3) beyond the case filed by the Claimants, other cases were filed across the country, Exhibit 1, Malofiy Decl., Attachments X–AA; (4) there has been extensive news media coverage on Hertz's practices[8]; (5) Hertz employees have said that false police reports were "a known problem" and that the company had established "a special fund to compensate the victims," Case No. 20-11218, D.I. 1081, Ex. A., Declaration of Earl Holland; and (6) Hertz has disclosed in discovery in another case that it maintains an internal spreadsheet detailing claims against the company for false arrest/theft reports, *see* Case No. 20-11218, D.I. 1071, Ex. A, Declaration of Frederick Jekel, Esq. at 4.

18.    Moreover, counsel for the Claimants had extensive contacts prior to the bankruptcy process detailing the systemic nature of Hertz's problems with a focus on his clients at the time. *See generally* Exhibit 1 (Malofiy Decl.). These contacts include (1) a September 6, 2017 motion for punitive damages in the *Grady* case, *Id.,* Attachment AB; (2) a November 14, 2017 letter to Hertz's then general counsel and executive vice president Richard Frecker detailing Hertz's problems, *Id.*, Attachment AC; (3) an October 18, 2018 letter to Hertz counsel,

---

[8]    *See, e.g.,* Laura Layden, "As it nears bankruptcy exit, Hertz still faces lawsuits alleging wrongful arrests for rental car theft," Fort Myers News-Press (June 11, 2021); Marine Glisovic, "Hertz still wrongfully accusing customers of stealing rental cars, attorney says," ABC7 (2021); Laura Layden, "Hertz Accused of Falsely Reporting that Customers Stole Rental Cars," Naples Daily News/USA Today (July 23, 2020); Chad Pradelli and Cheryl Mettendorf, "Action News Investigation: Customers sue Hertz for False Theft Claims," 6ABC Phila. (July 7, 2020); Sarah Buduson, "Hertz customers detained, arrested after rental vehicles mistakenly reported stolen," 5ABC Cleve. (May 21, 2019); Katie LaGrone, "Hertz has a pattern of mistakenly reporting cars stolen leaving customers arrested, attorney says," ABC Action News - WFTS Tampa Bay (May 9, 2019); Chad Pradelli and Cheryl Mettendorf, "Investigation: Hertz customers arrested after rental vehicles mistakenly reported stolen," 6ABC Phila. (May 18, 2018).

Exhibit 1, Attachment AE; (4) a February 2020 Demand letter detailing systemic issues and a number of individual cases, *see* Case No. 20-11218, D.I. 762, at 4, and Exhibit 1, Attachment AF; (5) a March 2020 letter and conference with Hertz's counsel Winston and Strawn, Exhibit 1, Attachment AG; (6) several briefs detailing systemic issues sent to Hertz counsel Winston and Strawn on April 27, 2021, Exhibit 1, Attachments P, AH, AI; (7) a May 4, 2020 memorandum describing Claimant Thomas Channell's case, Exhibit 1, Attachment M; (8) a May 4, 2020 memorandum describing Claimant Arthur Stepanyan's case, Exhibit 1, Attachment N; and (9) the May 2020 complaint filed in Delaware extensively detailing the systemic problems and many specific claimant profiles Case No. 20-11218, D.I. 589–1.

19.    These systemic forms of notice dovetail with notice regarding each Claimants' case, as explained by former Delaware Deputy Attorney General Steven P. Wood.  See Exhibit 1 (Malofiy Decl.), Attachment E, ¶¶27–28 (Wood Decl.).  After reviewing the materials in this case, Wood attested:

> [I]t is common practice for law enforcement and prosecutors to alert complaining parties when persons are arrested in connection with theft reports they have filed, and as the criminal case proceeds through the criminal justice system. This would include initial notification as well as close communication after a charging decision was made, after charges were filed, and concerning any court dates involving the matter. In many states, communication between the police, prosecutors, and "victims" of a crime is mandated by statute. In Delaware, the Victims Bill of Rights (11 Del. C. § 9401 *et. seq.*) establishes the obligation of the police and prosecutors to provide crime victims with notice as the case progresses through the system. Consequently, it is virtually certain that Hertz received multiple notices about each of the cases described in the Complaint and similar cases alerting it to the fact that a prosecution had commenced and was progressing. In Delaware, and in many states, the pre-trial custody status of the arrestee would be routinely provided to the victim. And, of course, notice that an arrest had occurred would be a natural part of returning the vehicle to Hertz.

*Id.* ¶27. For that reason, Wood concluded that "The fact that Hertz would have received the notice as described [above], when coupled with the information in its possession pertaining to its credit card billings and full lease payments in each of the cases described in the Complaint means that Hertz had actual knowledge, or at least should have known, that each of the defendants in each prosecution described in the Complaint were being wrongfully prosecuted for theft. The same would be true for others with similar fact patterns." *Id.* ¶28.

20.    Hertz was on notice of the systemic failure resulting in the repeated false reporting of its customers, and categorically on notice of the facts underlying each Claimants' claims.

**III.    <u>Notice of the General Bar Date</u>**

21.    According to the affidavits of service [Case No. 20-11218, D.I. 1354 & 1376], the Bar Date Order and Bar Date Notice were served on the "False Police Report Claimants" through Ciardi, Ciardi & Astin and Francis Alexander, LLC (collectively, the "<u>Firms</u>") on September 10, 2020 and September 16, 2020, respectively.    On September 17, 2020, the Debtors' claims and noticing agent published the Publication Notice (as defined in the Bar Date Order) in various news publications.  *See* Obj. ¶ 15.

22.    As of September 17, 2020, the Firms were counsel of record in the Chapter 11 Cases to 26 individuals [*see* Case No. 20-11218, D.I. 375 (Counsel's Rule 2019 Statement)], as follows:

| | |
|---|---|
| Hannah Ayoub | Cheryl Young |
| Nicole Stevens | Stephanie Keene |
| Shontrell Higgs | James Keene |
| Julius Burnside | Barbara Fernandez |

| | |
|---|---|
| Magalie Sterlin | Thomas John Channell |
| Arthur Stepanyan | Michael Channell |
| Howard Junious | Jessica Gurumendi |
| Laketa Collins | Roula Vangelis on behalf of her minor child A.G. |
| Michelle Johnson | Roula Vangelis on behalf of her minor child C.G. |
| Brian Steinberg | Brent Williams |
| Antwone Person | Nancy Cullen Smits |
| Michael Koss | Ryan Smits |
| Amanda Koss | Henry B. Essick III |

These individuals (the "<u>Group 1 Claimants</u>") were party to the State Court Proceedings commenced against various Debtors in various jurisdictions.

23.    Despite the fact that the Debtors have in their possession specific records identifying customers other than the Group 1 Claimants who were implicated by police reports, the Debtors did not serve the Bar Date Order or the Bar Date Notice on such customers.

24.    In October 10 and 11, 2020, the Group 1 Claimants and certain other Hertz customers who had been subjected to false police reports prepetition and had associated with the Firms prior to the General Bar Date  (the "<u>Group 2 Claimants</u>"[9]), filed timely proofs of claim against the Debtors.[10]  On June 10, 2021, certain other customers who had been subjected to false police reports prepetition but who had not associated with the Firms until after the General

---

[9]    The Group 2 Claimants are certain individuals who were the subject of false police reports prior to the Petition Date, but had not commenced litigation against Hertz.

[10]    The Reorganized Debtors mischaracterize these claims as "pooled" claims (Obj. ¶ 18), which is a contrivance to support their pending substantive objection to these claims.  The allegedly "pooled" nature of the claims is not relevant to the Objection at hand, so the Claimants will not address the issue here.

ACTIVE.134461832.05

Bar Date (the "Group 3 Claimants"), filed additional proofs of claim against the Debtors, which are the so-called "Late Claims" for purposes of the Objection.

25.     At the Confirmation Hearing that day, the Group 1, Group 2, and Group 3 Claimants were represented by their counsel, and withdrew their objections to confirmation of the Plan based on their understanding (which was expressly confirmed by the Court) that (i) they were "opted out" of the Plan's release provisions, (ii) they "will have a chance to prove [their] allegations of the alleged illegal practices" of Hertz, and (iii) "all [their] rights are preserved." (*See* Hr'g Tr. June 10, 2021 at 14:8-17:16.[11]).

26.     On August 4, 2021, following the Effective Date of the Plan, certain of the Claimants filed the *Motion of False Police Reports Claimants No. 3 for Relief from Any Stay and Plan Injunction* [Case No. 20-11218, D.I. 5656] (the "Stay Relief Motion"), seeking to pursue all legal and equitable claims in the forum of their choice to liquidate their claims, to recover against all applicable insurance policies, and to pursue all co-defendants regardless of relationship to the Debtors.  The Court denied the Stay Relief Motion without prejudice by order dated September 15, 2021, and set forth a briefing schedule [Case No. 20-11218, D.I. 5875] (the "Scheduling Order") in connection with the Reorganized Debtors' preliminary objections to the Claimants' proofs of claim (each a "Claim" and collectively, the "Claims").

27.     On September 20, 2021, in accordance with the Scheduling Order, the Reorganized Debtors filed the Objection.  Through the Objection, the Reorganized Debtors seek to disallow and expunge certain claims they characterize as (i) amended and superseded by a subsequently filed proof of claim by or on behalf of the same claimants (the "Amended and Superseded Claims"); (ii) duplicative of a proof of claim filed by or on behalf of the same

[11]    A true and correct copy of the Transcript is attached hereto as **Exhibit A**.

claimants, in the same amount and priority, on account of the same alleged liability, and against

the same Debtor (the "<u>Duplicative Claims</u>"); and (iii) filed after the General Bar Date (the so-

called "<u>Late Claims</u>").

<b><u>ARGUMENT</u></b>

I.    <b><u>"Expungement" of Amended and Superseded Claims, Duplicate Claims is
Unnecessary and Unfounded</u></b>

28.    The Claimants do not object to disallowance of the Amended and Superseded

Claims and Duplicate Claims on Schedules 1 and 2 of the proposed order attached to the

Objection in favor of the respective "Remaining Claims" identified therein.  However, to the

extent the Reorganized Debtors seek "expungement" of any claims filed by the Claimants from

the record of these Chapter 11 Cases, such relief is unnecessary and without any statutory or

procedural basis in the Bankruptcy Code, Bankruptcy Rules, or Local Rules.  Even if they are

properly noted as "disallowed" on the official claims register in these Chapter 11 Cases, the

Amended and Superseded Claims and Duplicative Claims should remain of record for all other

purposes (*e.g.*, should it become necessary to refer to one of them in the context of consideration

of another claim or contested matter).

II.    <b><u>The Objection to the So-Called "Late Claims" Must be Overruled</u></b>

A.    <b>The Objection is Deficient as to Group 3 Claimants under Sections 502(b)(9) and
726(a)(2)(C) Due to the Insufficiency of Notice</b>

29.    With the exception of Claim No. 15248, which was filed in error and will be

withdrawn, each of the so-called Late Claims was filed on behalf of the Group 3 Claimants, who,

as stated in the proofs of claim themselves, "did not receive notice of the bankruptcy to bring

claims against the Debtors."  (See Claim Nos. 15245, 15256, 15257, 15261, 15265, 15268,

15276, 15277, 15278, 15282.)  The matrix attached to each of these proofs of claim makes clear

that the number of individuals described as Group 3 Claimants far exceeds the 26 individuals for

12

whom the Firms were counsel of record at the time the Debtors served the Bar Date Order and the Bar Date Notice.  In fact, none of the Group 3 Claimants received notice of the Bar Date Order or the Bar Date Notice.  [*See* Case No. 20-11218, D.I. 1354 & 1376 (affidavits of service).[12]]

30.     As the Objection itself acknowledges, disallowance of Group 3 Claimants' claims as untimely under section 502(b)(9) of the Bankruptcy Code requires that the Claimants received adequate notice of the General Bar Date.  *See* Obj. ¶ 25 (acknowledging that the General Bar Date "bars all prepetition claimants *who received the requisite notice*" (quoting *In re Trans World Airlines, Inc.*, 96 F.3d 687, 690 (3d Cir. 1996) (emphasis added))); *cf. Chemetron Corp. v. Jones*, 72 F.3d 341, 346 (3d Cir. 1995) ("Inadequate notice is a defect which precludes discharge of a claim in bankruptcy.").  Indeed, by its terms section 502(b)(9) of the Bankruptcy Code applies to untimely-filed claims "*except to the extent tardily filed as permitted* under paragraph (1), (2), or (3) of section 726(a) of this title *or* under the Federal Rules of Bankruptcy Procedure." (emphasis added).[13]  And section 726(a)(2) applies to, and requires distributions to be made on account of,

> any allowed unsecured claim, . . . proof of which is . . . (C) tardily filed under section 501(a) of this title, if—(i) the creditor that holds such claim did not have notice or actual knowledge of the case in time for timely filing of a proof of claim under section 501(a) of this title; and (ii) proof of such claim is filed in time to permit payment of such claim.

---

[12]   The affidavits of service are voluminous and are not attached hereto, as the Claimants believe that the Reorganized Debtors would stipulate that service upon the Firms was the only direct notice that was provided to any customers who were subject to police reports.

[13]   The Debtors do not discuss (or even cite) this statutory language in their Objection, and to the extent they were aware of it at all, they seem to have overlooked that it sets forth a *disjunctive* test, where tardy filing is permitted *either* by section 726(a)(1)-(3) *or* by the Bankruptcy Rules.  The Objection focuses entirely on whether the so-called Late Claims are permissible under Bankruptcy Rule 3003 and/or Federal Rule of Civil Procedure 15, which is beside the point in light of the clear statutory language as discussed further herein.

31.     "For notice purposes, bankruptcy law divides claimants into two types, 'known' and 'unknown.'" *Chemetron*, 72 F.3d at 346 (citing *In re Charter Co.,* 125 B.R. 650, 654 (M.D. Fla. 1991)).    "Known creditors must be provided with actual written notice of a debtor's bankruptcy filing and bar claims date.  For unknown claimants, notification by publication will generally suffice."  *Id.* (citations omitted).

## B. The Group 3 Claimants Are Known Creditors Who Did Not Receive Actual, Written Notice

32.     As characterized by the Supreme Court, a "known" creditor is one whose identity is either known or "reasonably ascertainable by the debtor."  *Tulsa Pro. Collection Serv., Inc. v. Pope,* 485 U.S. 478, 490 (1988); *see In re Arch Wireless, Inc.*, 534 F.3d 76, 81 (1st Cir. 2008) ("[I]n order for a claim to be reasonably ascertainable, the debtor must have in his possession . . . some specific information that reasonably suggests both the claim for which the debtor may be liable and the entity to whom he would be liable.") (quoting *In re Crystal Oil Co.*, 158 F.3d 291, 297 (5th Cir. 1998)); *In re J.A. Jones, Inc.*, 492 F.3d 242, 250 (4th Cir. 2007) ("[A] creditor is 'reasonably ascertainable' if the debtor can uncover the identity of that creditor through 'reasonably diligent efforts.'") (quoting *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 798 n. 4 (1983)).   An "unknown" creditor, on the other hand, is one whose "interests are either conjectural or future or, although they could be discovered upon investigation, do not in due course of business come to knowledge [of the debtor]."  *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 317 (1950).

33.     In bankruptcy, "a debtor must make reasonably diligent efforts to uncover the identities of those who have claims against it . . . ."  *In re Thomson McKinnon Secs., Inc.*, 130 B.R. 717, 720 (Bankr. S.D.N.Y. 1991) (citing *Charter Crude Oil Co. v. Petroleos Mexicanos (In re Charter Co.)*, 125 B.R. 650, 655 (M.D. Fla. 1991)); *accord Trans World Airlines*, 96 F.3d at

690 ("[T]he debtor must undertake a careful examination and diligent search of its own books and records." (citing *Chemetron*, 72 F.3d at 346-47)).   And "[i]f the debtor knows, or should know, of its potential liability to a specific creditor, that creditor is a known creditor entitled to actual notice."   *Thomson McKinnon Secs.*, 130 B.R. at 720 (citing *Atlantic Richfield Co. v. Sharon Steel Corp. (In re Sharon Steel Corp.*), 110 B.R. 205, 206 (Bankr. W.D. Pa. 1990)).

34.     The Group 3 Claimants are known claimants who required actual notice of the Debtors' bankruptcy cases (and the General Bar Date), but received none.   The Debtors acknowledge that they maintain the Books and Records in the ordinary course, and upon information and belief, they have in their possession specific records showing that the individuals described as Group 3 Claimants were implicated by police reports filed by Hertz.   To date, the Claimants have obtained information that "Hertz had an internal list of customers who were reported for theft."   Exhibit 1 (Malofiy Decl.), Attachment C at 3 (Murray Decl.).   Moreover, the bankruptcy record already contains evidence that Hertz has established "a special fund to compensate the victims" of false police reports, [Case No. 20-11218, D.I. 1081, Ex. A., Declaration of Frank Holland].   And another declaration attests that Hertz has disclosed in discovery in another case that it maintains an internal spreadsheet detailing claims against the company for false arrest/theft reports, [*see* Case No. 20-11218, D.I. 1071, Ex. A, Declaration of Frederick Jekel at 4].[14]

35.     Moreover, the Debtors certainly had notice that their theft reporting practices were systemically inaccurate and led to false reports against a number of Hertz's customers.   The

---

[14] The Claimants served preliminary discovery relating to notice on Hertz on September 28, 2021 and requested replies by October 12 and productions by October 19 so that any discovery could be incorporated into this response.   Hertz declined to provide any discovery relating to notice before the due date of this brief.   Counsel therefore anticipate supplementing this portion of the briefing based on anticipated discovery responses.

ACTIVE.134461832.05

facts underlying those systemic forms of notice are detailed above at ¶¶ 17–18, *supra*. Moreover, for the facts of typical individual Claimants like those described in the prepetition Delaware Complaint, and based on his experience with prosecution and law enforcement and his review of the materials, former Deputy Attorney General of Delaware Steve Wood concluded that "Hertz had actual knowledge, or at least should have known, that each of the defendants in each prosecution described in the Complaint were being wrongfully prosecuted for theft. The same would be true for others with similar fact patterns." Exhibit 1 (Malofiy Decl.), Attachment E, ¶ 28 (Wood Decl.); see also ¶ 19, *supra*.

36.     Moreover, upon information and belief, the Debtors had records containing contact information for persons implicated by its police reports.  Recall that those persons had rented vehicles from Hertz, which requires providing contact information and billing information associated with the rental.  Nonetheless, the Debtors only served the Bar Date Order and the Bar Date Notice on 26 individuals (not even directly, but through the Firms).

37.     The circumstances of particular Group 3 Claimants offer an even sharper picture of why their claims were "known" to Hertz. Consider Group 3 Claimant Zanders Pace.[15]  As described in his declaration attached as **Exhibit B** hereto, Zanders rented a vehicle from a Hertz location on JFK Boulevard near a Houston Airport (IAH Airport is nearby).  On July 12, 2019, Zanders was in a car accident and the car was towed to a body shop.  Zanders contacted Hertz corporate, the local office (where he spoke with "Simone"), and his insurer about the accident.  On July 19 and 24, Zanders received texts stating that he had to return the car.  Zanders responded on July 24 that the car was in an accident and was in the shop; he repeated that

---

[15]   With the exception of Claim No. 15248 (filed behalf of Group 1 Claimants), each of the Late Filed Claims identifies Zanders Pace as a Group 3 Claimant.  *See* Claim Nos. 15245, 15256, 15257, 15261, 15265, 15268, 15276, 15277, 15278 & 15282.

ACTIVE.134461832.05

information on July 25.  On July 31, the body shop contacted Hertz Emergency Roadside and notified them that the car was impounded and should be collected; Hertz told the shop it would pick up the car within a day or two.  It never did.  In August, 2019, BNY Mellon Trust Company notified Hertz that it should pick up the impounded vehicle.  *See* **Exhibit C** hereto (BNY Mellon emails to Hertz).

38.     Despite all this, Zanders learned that Hertz had filed a police report and that a felony warrant was issued for his arrest on September 13, 2019.  Zanders repeatedly called and emailed Hertz at Emergency Roadside and Vehicle Control.  These phone calls are recorded. Take the September 17, 2019, call at 2:58 pm.  In the recording, Zanders calmly offers details of the body shop, his rental, and the story of what happened.  He explains repeatedly that he has been falsely reported for theft, that the vehicle is in the body shop, and that he paid for a 45-day rental.  Hertz Emergency Roadside admitted that Hertz's system recorded the July 2019 accident and impoundment.  After this time, the body shop again called customer service and said that the theft report was deceptive and that the car was in the shop—the customer service representative said "I'm with you."  Two years later, Hertz has not withdrawn the false police report or done anything to prosecute the case or clear Zanders's name.  The arrest warrant remains pending. And importantly for present purposes, Hertz never gave Zanders notice of the bankruptcy.

39.     It is plain that Zanders is a known creditor.  Hertz filed a police report against him that contained materially false information and has led to a warrant for Zanders's arrest.  Hertz not only has significant information that the theft report was baseless—the body shop, the bank, and Zanders repeatedly told Hertz, before and after the report, that the car was in the repair shop and was not stolen—but also was specifically notified by Zanders that the police report was false and that he had not stolen the car. *See In re Arch Wireless, Inc.*, 534 F.3d, at 81–82 (customer

was known creditor based on correspondence indicating disputes relating to product sales). Moreover, Hertz's extensive, actual notice of systemic problems with its theft reporting would only give further reason to treat Zanders as a known claimant. As for means of providing notice, Hertz has Zanders's phone number, email, and physical address, which could easily be used to provide him notice of the bankruptcy.

40.      Unfortunately for these victims, Zanders is not alone. Their injuries stem from Hertz's systemic practices. Other examples abound.  Consider Group 3 Claimant Paula Murray, whose declaration recounts the following facts.[16] *See* Exhibit 1 (Malofiy Decl.), Attachment C (Murray Decl.). Paula is a grandmother who rented a vehicle from the Parkview rental location in Chesapeake, VA, in late 2016. She extended the rental every week and returned it when Hertz called and asked her to do so. Murray Decl. 1.  In 2021, during the pendency of the Chapter 11 Cases, Paula was selected for a position as a police dispatcher. When she arrived for intake, however, she was arrested based on an outstanding warrant for her arrest for stealing a Hertz vehicle.  She was hauled away in handcuffs with her grandchildren present. Paula contested her charges in case number GC21000059-00 and was released on bail.  Despite Paula's alerting Hertz that it had filed a police report, that she had been charged with a crime, and that the accusations were false, Hertz gave her no notice of the bankruptcy proceedings.  Paula's charges were dismissed in March 2021.

41.      Consider Group 3 Claimant Sean Hurt.[17]  As recounted in his declaration, which is attached as **Exhibit D** hereto, Sean rented a truck from Dollar at the Dallas-Fort Worth Airport

---

[16]   With the exception of Claim No. 15248 (filed behalf of Group 1 Claimants), each of the Late Filed Claims identifies Paula Murray as a Group 3 Claimant.  *See* Claim Nos. 15245, 15256, 15257, 15261, 15265, 15268, 15276, 15277, 15278 & 15282.

[17]   With the exception of Claim No. 15248 (filed behalf of Group 1 Claimants), each of the Late Filed Claims identifies Sean Hurt as a Group 3 Claimant.  *See* Claim Nos. 15245, 15256,

ACTIVE.134461832.05

in January 2020.  During his one-week, paid-in-advance rental, the car was stolen from him.  He immediately reported the theft to Hertz and to the Police.  Sean filled out an affidavit for Hertz detailing what had happened.  Hertz stated that, if it needed him further, it would reach out to him.  Nonetheless, Hertz reported him for car theft in March 2020 and charged him more than $2,500 for the rental.  Sean contacted Hertz and demanded that they stop billing him because the car had been stolen months earlier.  Sean was arrested in November 2020—after the bar date— and criminally charged based Hertz's theft report, but the charges were dropped in May 2021.  Here, again, Hertz plainly has records that it reported Sean for theft, plainly had ample notice that Sean contested that he stole the car (including his affidavit given to Hertz and his contacts to contest further charges).  This alone is enough to qualify Sean as a known creditor.  Moreover, in the ordinary course and as may be revealed by discovery, it is almost certain that the police or prosecution would have informed Hertz that it had arrested and charged Sean *based on a police report Hertz filed*.  See Exhibit 1 (Malofiy Decl.), Attachment E, ¶ 27 (Wood Decl.).  That information, coupled with the extensive knowledge of claims of systemic false police reporting, plainly makes Sean a known claimant to whom notice must be provided.  But Hertz never made any attempt to inform Sean of the bankruptcy.

42.    Now consider Group 3 Claimant Heather Kasdan.[18]  As recounted in her declaration, which is attached as **Exhibit E** hereto, Heather rented a car from a Buffalo, New York, Airport location on July 7, 2019, and paid for insurance coverage on that rental.  That same day, Heather was hit by another driver.  Police were called to the accident; Heather notified Hertz and Hertz Roadside said that it would tow the vehicle.  On July 8, 2019, incident report

15257, 15261, 15265, 15268, 15276, 15277, 15278,& 15282.

[18]  With the exception of Claim No. 15248 (filed behalf of Group 1 Claimants), each of the Late Filed Claims identifies Heather Kasdan as a Group 3 Claimant.  *See* Claim Nos. 15245, 15256, 15257, 15261, 15265, 15268, 15276, 15277, 15278 & 15282.

19

#0190203582 was submitted to Hertz.  Heather never saw the vehicle again.  Despite all this, Hertz (1) kept the rental open and (2) on October 9, 2019, filed a false report to the police claiming that Heather had stolen the vehicle.  Heather has spoken to Hertz many times to explain what happened, to contest the charges, and to provide information that would directly contradict the false police report.  Despite all this information in Hertz's possession indicating that Heather has likely claims relating to the filing of a false police report, Hertz never served Heather with notice of the bankruptcy.

43.    Hertz asks the Court to disallow these claims, and others, *en masse* as untimely filed.[19]  Facts true of Group 3 Claimants and of other similarly situated claimants (including those who have not yet come forward) as a whole show that they are clearly "known" creditors to Hertz.  Moreover, as the above facts illustrate, Group 3 Claimants have given Hertz substantial notice that they could bring claims in these bankruptcy proceedings, both before and during the Confirmation Hearing.

---

[19] Declarations by Group 2 Claimants—who filed claims before the bar date but are not listed as receiving actual notice before the bar date—illustrate just how aggressively Hertz avoided providing notice to holders of these claims.  Brandon White is perhaps the most stunning example.  As set forth in his declaration, which is attached as **Exhibit F** hereto, Brandon obtained an insurance rental through Geico from the Columbia Missouri location off I-70 on December 30, 2019. He diligently extended the rental, but the car was seized on February 28, 2020. A warrant was issued for his arrest in June 2020—he was subsequently arrested, thrown in jail, and prosecuted, but all charges have since been dismissed.

Relevant to the known claimant question, on March 11, 2020, Brandon faxed a preservation letter to Hertz demanding that it not destroy any evidence relating to his case. In June or July 2020, White spoke with Anthony Rivera, a Hertz employee at the location of the rental.  And on August 5, 2020, Brandon spoke with Hertz Assistant General Counsel Adam Schloss and Corporate Security Director Paul Polobo about the false police report. These officials not only did nothing to resolve Brandon's then-ongoing criminal proceedings, but also these interactions just months before notice of the bankruptcy was due—a preservation letter, a conversation with a local employee, and a conversation with top corporate executives—plainly qualify Brandon as a known claimant.  Yet, to counsels' knowledge, no effort was made to inform Brandon of the bankruptcy proceedings.

ACTIVE.134461832.05

44.     The facts here track the Seventh Circuit's decision in *Fogel v. Zell*, 221 F.3d 955, 963 (7th Cir. 2000).   There, a pipe manufacturer had sold potentially defective pipe to a reasonably large number of customers.   Some of those pipes had already burst, leading to "multimillion dollar claims" filed by some other purchasers of the pipe.   The court held that another purchaser of the pipe—who had not yet suffered a pipe failure by the bar date—was a "known" claimant and had to be given actual notice.   The debtor's books and records contained information that the claimant had purchased "a large quantity of the defective pipe." *Id.* at 963. And the other claims showed that all such purchases might have claims to bring, and thus notice was required for holders of these potential "mass tort claims." *Id.* at 961.   To be sure, many of those purchasers may never have suffered a pipe defect.   But the fact that many members of this group of purchasers were *likely* to have such claims was sufficient to require notice to the purchasers.

45.     *In re Thomson McKinnon Securities Inc.*, 130 B.R. 717 (S.D.N.Y. 1991), is also instructive.   In that case, the debtor securities firm had sold securities to an individual (Robinson) prepetition but never delivered them. *Id.*   After the bankruptcy court established a bar date, the debtor published notice of the bar date and sent mailed notice of the bar date to those of its former customers "who had made inquiries about customer property"—but not to Robinson, who had not yet inquired about his securities at the time the bar date notice was mailed. *Id.* at 718. On Robinson's motion for leave to file a late proof of claim, the bankruptcy court concluded that Robinson was not bound by the bar date because he was a known creditor who was entitled to actual notice from the debtor, finding:

> There is no question that the debtor knew that Robinson was a former customer who had purchased from the debtor the securities for which he paid $10,009.94.   Additionally, the debtor had a record of Robinson's address. . . .   The debtor took his money and

then did not give him actual notice of the deadline for filing claims because Robinson did not ask what happened to his money or the securities he purchased.

Obviously, it was to the debtor's financial advantage not to make an effort to ferret out customers who paid the debtor for securities which it failed to deliver, but had not inquired as to their nondelivered securities. Accordingly, notwithstanding the absolute duty imposed on a debtor under 11 U.S.C. § 521(1) to file a list of creditors, this debtor chose to limit its efforts as to customers who did not receive delivery of securities purchased and who inquired as to their property held by the debtor.

*Id.* at 719-20.

46.    As with the customers in *Fogel* and *Thompson McKinnon Securities*, the Group 3 Claimants' identities and contact information were available to the Debtors here, and the Debtors had access to ample information showing that they had potential liability to the Group 3 Claimants on account of the police reports. Because the Group 3 Claimants were known creditors who were not provided notice of the General Bar Date, but who nonetheless filed their claims in time to permit payment under the Plan, the Debtors' objection to their claims under section 502(b)(9) must be overruled by operation of section 726(a)(2)(C). *See In re Feldman*, 261 B.R. 568, 575-79 (Bankr. E.D.N.Y. 2001) (applying 726(a)(2)(C) to allow late-filed claim by creditor who did not receive notice of the chapter 7 filing or bar date, but who, based on its prepetition correspondence with the debtor, was readily ascertainable by the debtor and thus a "known" creditor who was entitled to actual notice of the bankruptcy).

**C.  Notice Was Inadequate Even if the Group 3 Claimants Were "Unknown" Creditors**

47.    Even if the Court determines that some or all of the Group 3 Claimants were unknown creditors, Hertz's marginal efforts to provide notice fail due process. The Claimants understand that Hertz relies only upon notice by publication to satisfy its statutory responsibilities and the constitutional rights of those persons implicated in its police reports who,

ACTIVE.134461832.05

like the Group 3 Claimants, were not sent actual notice of these proceedings.  In 1995, the Third Circuit held that notice by publication will "generally suffice" for what are called "unknown" claimants.  But that does not mean that notice by publication necessarily suffices for what are termed "unknown" claimants in all circumstances.  Due Process cannot be boiled down to rigid categories.  Instead, *Mullane* and other Due Process jurisprudence must underlie any inquiry.

48.     The Supreme Court has made clear that, even in the bankruptcy context, "[n]otice by publication is a poor and sometimes a hopeless substitute for actual service of notice.  Its justification is difficult at best." *City of New York v. New York, N. H. & H. R. Co.*, 344 U.S. 293, 296 (1953).  Notice by publication should only be resorted to as a matter of "plain necessity." *Id.*  Indeed, *Mullane* itself explains that "[i]t would be idle to pretend that publication alone … is a reliable means of acquainting interested parties of the fact that their rights are before the courts." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 315 (1950).  The adequacy of any notice publication must be "weigh[ed against] equivalence with actual notice." *Id.*  And that is because "outside the area of the newspaper's normal circulation the odds that the information will never reach [a claimant] are large indeed." *Id.*  (In 2021, the same can be said of the area *inside* the newspaper's normal circulation, especially for lay claimants without extensive business dealings.)

49.     Returning to Due Process basics, "[a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane*, 339 U.S., at 314.  "The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it." *Id.*  Regardless of how the Group 3 Claimants are classified, it is plain

ACTIVE.134461832.05

that Hertz's publication falls far short of the efforts that would be undertaken by one "desirous of actually informing" those who may be interested in these proceedings of the bar date.

50.    Here, there were plainly other means of cheaply alerting the Group 3 claimants. *See generally* Alan N. Resnick, *Bankruptcy As A Vehicle for Resolving Enterprise-Threatening Mass Tort Liability*, 148 U. Pa. L. Rev. 2045, 2079 (2000) (suggesting "press releases," "notices" given to "targeted groups of product users" and "other media advertisements").   Some obvious examples targeted emails, letters, texts, or recorded phone calls to known contact information for those implicated in police reports or press releases.   (Indeed, emails could easily be sent to all Hertz customers *at essentially no cost*.)   The only possible downside would be alerting *too many* people about the bankruptcy.   But a claimant's due process challenge cannot be defeated because an inexpensive and far more effective means of alerting him of the bankruptcy would be overinclusive.     (For that matter, publication notice is far more overinclusive than any targeted notice described above.)   Due process requires employing means demonstrating an actual desire to provide notice to those whose rights might be affected by a proceeding; Hertz's notice by publication in this case was not "more than a feint" in that direction with respect to those implicated by its police reports.   *Mullane*, 339 U.S., at 315.

51.    To be sure, notice to unknown claimants by publication alone sometimes— perhaps even most of the time—*is* a matter of "plain necessity" in bankruptcy.   *City of New York*, 344 U.S. at 296.   Funds are limited, the list of unknown claimants is potentially massive and unknowable in a literal sense, and the addresses of those claimants are difficult to find.   But none of that is true for the False Police Report Claimants in this bankruptcy.   The Debtors had ample funds to provide fulsome notice. The list of those implicated by its theft reports is limited and contained in the debtor's own books and records. The Debtors had contact information for the

ACTIVE.134461832.05

victims of its police reports via the rental process and subsequent contacts. And dozens of similarly situated Claimants had already brought legal claims—some of which were successful—alleging problems that would affect all such theft reports. Even if formal, mailed notice and service would not be required, other efficient means of notification using information already in the debtors' possession are required.

52.    The Debtors' conduct with respect to notice and these claimants provides additional reason to find publication notice inadequate. Indeed, "[t]he facts of this case demonstrate the prudence of not having the rule regarding publication always satisfy due process requirements." *Tillman ex rel. Est. of Tillman v. Camelot Music, Inc.*, 408 F.3d 1300, 1308 (10th Cir. 2005). In *Tillman*, the debtors had taken precautions to prevent potential claimants from filing claims. The Claimants have evidence that Hertz has engaged in similar conduct here to prevent potential claimants from filing claims. For example, Krystal Carter rented a car from the 9150 Main Street Hertz location in Houston, TX in October 2020 and extended that vehicle through December 30, 2020. *See* **Exhibit G** hereto (hereinafter cited as "Tolen & Carter Decl.") ¶ 3. James Tolen was listed as an authorized driver. *Id.* On December 23, 2020, police pulled Tolen with guns drawn and arrested him—saying that he was driving a vehicle Hertz had reported stolen. *Id.* ¶¶ 4–6. Police contacted Hertz at that time, and Carter contacted Hertz the next day to explain what happened. *Id.* ¶¶ 7–9. On January 8, 2021, counsel for Carter was contacted by a Hertz assistant general counsel, and on January 14, 2021 counsel was contacted by ESIS, Hertz's claim administrator. ¶¶13–15. At no point during these interactions did counsel for Hertz or ESIS inform counsel, Carter, or Tolen of the pending bankruptcy proceedings or their ability to file a proof of claim. *Id.* Quite the opposite, before filing suit and without acknowledging the bankruptcy, Hertz tried to get Carter and Tolen to release all claims

25

in exchange for a refund of the rental fee. *Id.* ex. 3. And after Carter and Tolen filed suit on July 30, 2021, Hertz sent a letter threatening sanctions if it was not immediately withdrawn. *See* **Exhibit H** hereto (Hertz Tolen Letter). After local counsel filed a nonsuit, the Hertz assistant general counsel emailed counsel for Carter and Tolen to gloat, "Didn't hertz so much after all I guess." Tolen & Carter Decl., ex. 5, at 4.[20]

53.    Additional plus factors are also present here. For example, the Debtors conspicuously failed to give notice even to potential false-police-report claimants with documented, extensive contacts with the company, like Zanders Pace, ¶ 37, Paula Murray, ¶40, Sean Hurt, ¶ 41, Heather Kasdan, ¶ 42, and Brandon White, n. 19. Hertz has faced spoliation sanctions relating to records involved in its theft reporting practices. *See, e.g.*, **Exhibit I** hereto (*Grady* spoliation orders). It has brazenly admitted to refusing to withdraw criminal theft reports—even when the lives of innocent persons are being destroyed by false charges based on the debtors' accusations—or provide any assistance to those wrongfully charged. See Sam Wood, "Bankrupt Hertz is Still Wrongly Accusing Customers of Stealing Cars," Page A1, Philadelphia Inquirer (Aug. 3, 2020), available at https://www.inquirer.com/business/retail/hertz-stolen-car-grand-theft-auto-malofiy-bankruptcy-lawsuit-20200803.html. ("Hertz has no mechanism to withdraw a criminal referral because, the company spokesperson said, it has to maintain a relationship of 'integrity and responsibility' with law enforcement. 'In the rare instances this happens, if you report a crime, and you later say it didn't happen, then law enforcement tends not to believe you if you retract it or say you were mistaken,' the

---

[20]    Currently pending before this Court are: 1) *James Tolen's Motion for Allowance of Administrative Expense Claim* [Case No. 20-11218, D.I. 5932]; and 2) *James Tolen's Motion for Retroactive Annulment and Prospective Relief from Automatic Stay and Injunctive Provisions of Debtors' Plan of Reorganization* [Case No. 20-11218, D.I. 5934]. Both of these motions are scheduled for hearings on October 26, 2021 at 10:30 a.m. (ET).

ACTIVE.134461832.05

spokesperson said. 'Hertz's continued good relationship with law enforcement is important.'"). This is flatly contrary to its "legal and moral" duty to update reports with incomplete or false information. Exhibit 1 (Malofiy Decl.), Attachment E, ¶ 24 (Wood Decl.).   And upon information and belief, Hertz continues these ruinous practices post-petition and post-confirmation.

54.     Perhaps most significantly, after reviewing the materials, former Delaware Deputy Attorney General Steven P. Wood determined that the "question of whether Hertz's conduct amounts to criminal conduct is worthy of a criminal investigation to determine whether Hertz should be prosecuted for its misconduct" based on the facts alleged in the Delaware prepetition complaint. *Id.* ¶ 29. In particular, he determined that, assuming the allegations in the Delaware complaint to be true, "there is more probable cause to conclude that Hertz committed a crime than there is probable cause to conclude that any Claimant committed a crime." *Id.* ¶ 30. In these circumstances, the Due Process Clause calls for more than "burying the lead" deep in a few newspapers such that equity holders emerge from bankruptcy with value, but persons grievously harmed by the Debtors lose their ability to seek justice because they too infrequently read the New York Times.

55.     Even if the Court classifies some or all Group 3 Claimants as "unknown" creditors, it should find that those Claimants did not receive adequate notice under the Due Process Clause.

**D.      Regardless of the Sufficiency of Notice, the Objection to all So-Called "Late Filed" Claims is Deficient Under Sections 502(b)(9) and 726(a)(3) Given the Distribution Posture of the Plan**

56.     Hertz's 502(b)(9) objection also fails on the plain text of the Bankruptcy Code. As noted above, section 502(b)(9) of the Bankruptcy Code applies to untimely-filed claims "*except to the extent tardily filed as permitted* under paragraph (1), (2), or (3) of section 726(a)

27

of this title *or* under the Federal Rules of Bankruptcy Procedure." (emphasis added).    And section 726(a)(3) applies to, and requires distributions to be made on account of, "any allowed unsecured claim proof of which is tardily filed under section 501(a) of this title *other than* a claim of the kind specified in paragraph 2(C) of this subsection"—*i.e.*, where the claimant lacked notice, as discussed above.  11 U.S.C. § 726(a)(3) (emphasis added).  Thus, by its terms, section 726(a)(3) applies to tardily filed claims of creditors *without regard to* the sufficiency of notice to them.  And consequently, by its terms, section 502(b)(9) provides no basis for disallowing claims permissibly filed after the bar date under section 726(a)(3).  Hertz's objection must be denied based on the plain language of the statute.

57.    The plain meaning of the text tracks the structure of related provisions in the Bankruptcy Code.  Section 726(a) sets forth the Bankruptcy Code's general distribution scheme. Priority claims under section 507—including, under certain circumstances, *tardily filed* priority claims—are paid first before any distributions are made to general unsecured creditors.  *See* 11 U.S.C. § 726(a)(1).  If funds are left over, then general unsecured creditors whose claims were timely filed, or who lacked notice but tardily filed their claims in time to receive payment, are paid the full amount of their claims (exclusive of any post-petition interest or punitive/exemplary damages) before any distributions are made to others.  *See* 11 U.S.C. § 726(a)(2).  If funds are left over, then other general unsecured creditors whose claims were tardily filed are paid the full amount of their claims (exclusive of any post-petition interest or punitive/exemplary damages) before any distributions are made to others.  *See* 11 U.S.C. § 726(a)(3).  If (and only if) funds are left over, then distributions are made to creditors on account of any punitive/exemplary damages, then to creditors in payment of post-petition interest, and then to the debtor's equity holders.  *See* 11 U.S.C. § 726(a)(4)-(6).  Thus, taken together, section 502(b)(9) and 726(a)(1)-(3) evince a

clear policy favoring full compensation of creditors' prepetition claims—regardless of timing considerations—before any post-petition interest, punitive/exemplary damages, or equity distributions are made.

58.     Here, as the Court well knows, the Plan provided for the payment in full of general unsecured claims (with post-petition interest) and substantial distributions to the Debtors' prepetition equity holders.[21]   Under these circumstances,[22] the False Police Report Claimants respectfully submit that tardily filed claims are "permitted under paragraph . . . (3) of section 726(a)" within the meaning of section 502(b)(9).   Therefore, the Objection must be overruled as to the so-called "Late Claims" completely independent from any of the notice considerations discussed above.

**E.     In the Alternative, Any Late Claims Are a Product of Excusable Neglect**

59.     In the event the Court concludes that the Group 3 Claimants' claims are subject to disallowance under section 502(b)(9) absent leave of the Court under Bankruptcy Rule 9006(b), it should nonetheless permit late-filed claims for excusable neglect.   *See Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380 (1993).   For the reasons detailed above and in the Claimants' 22nd Omnibus Objection response ¶¶ 117–132, allowing these claims would be

---

[21]   Hertz attempts to blame Group 3 Claimants for not obtaining "a Final Order, on or before the Confirmation Hearing."  Obj. 13 (citing Plan, art. VII.G).  That argument has no bearing on the scope or proper interpretation of the Bankruptcy Code.  But it bears mention that these claims were filed *on the date of the Confirmation Hearing*, which plainly would not allow any opportunity to obtain a final order—requiring full briefing and consideration—before that time.

[22]   As noted by the Fifth Circuit Court of Appeals in *In re Waindel*, 65 F.3d 1307 (1995), which discussed the interplay of section 726(a)(3) and allowance of tardy claims under section 502 in a chapter 13 case prior to the enactment of the current section 502(b)(9), application of section 726(a)(3) is rare because "[t]here will hardly ever be surplus funds available to the estate after payments to the first two tiers of creditors [i.e., under sections 726(a)(1) and (2)] . . . so as to enable payments upon untimely general unsecured claims pursuant to section 726(a)(3)."  *Id.* at 1310.  But of course, the rarity of application of section 726(a)(3) in practice does not detract from its dispositiveness in the rare situation, such as here, where it does apply.

ACTIVE.134461832.05

appropriate under the *Pioneer* framework because (i) there would be no prejudice Hertz, (ii) the delay in filing was minimal, and allowing the claims would not substantially delay the proceedings, (iii) the proximate reason for the delay was Hertz's failure to provide actual notice of the bar date to the Claimants, which was not in the Claimants' reasonable control, and (iv) the Claimants have acted in good faith, including by attempting to pursue their claims outside of the bankruptcy process. The Third Circuit has liberally interpreted the excusable neglect standard, and it is satisfied here. *See In re O'Brien Env't Energy, Inc.*, 188 F.3d 116, 124–130 (3d Cir. 1999).

## **RESERVATION OF RIGHTS**

60.    The False Police Report Claimants reserve the right to amend, supplement, or otherwise modify this Response and to file and present evidence further supporting their proofs of claim and/or responsive to further argument from the Reorganized Debtors.

*[Remainder of Page Intentionally Left Blank]*

ACTIVE.134461832.05

## CONCLUSION

WHEREFORE Claimants respectfully request that the Court enter an order consistent with this Response, and grant any such other and further relief as the Court deems just and proper.

Dated: October 20, 2021

**FRANCIS ALEXANDER, LLC**
Francis Malofiy
280 N. Providence Road, Suite 1
Media, PA 19063
Telephone: (215) 500-1000
Facsimile: (215) 500-1005
Email:  francis@francisalexander.com

**SUSMAN GODFREY LLP**
Justin A. Nelson (TX Bar No. 24034766)
John P. Lahad (TX Bar No. 24068095)
1000 Louisiana, Suite 5100
Houston, TX 77002-5096
Telephone:  (713) 651-9366
Facsimile:  (713)654-6666
Emails:  jnelson@susmangodfrey.com
         jlahad@susmangodfrey.com

**FARNAN LLP**
Brian E. Farnan
919 N Market Street
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile:  (302) 777-0301
Email:  bfarnan@farnanlaw.com

**FAEGRE DRINKER**
**BIDDLE & REATH LLP**

*/s/ Patrick A. Jackson*
Patrick A. Jackson (Bar No. 4976)
Ian J. Bambrick (Bar No. 5455)
Jaclyn C. Marasco (Bar No. 6477)
222 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telephone:  (302) 467-4200
Facsimile: (302) 467-4201
Emails:  patrick.jackson@faegredrinker.com
         ian.bambrick@faegredrinker.com
         jaclyn.marasco@faegredinker.com

**CIARDI CIARDI & ASTIN**
Albert A. Ciardi, III, Esquire
Walter W. Gouldsbury III, Esquire
1905 Spruce Street
Philadelphia, PA 19103
Telephone:  (215) 557-3550
Facsimile:  (215) 557-3551
Emails:  aciardi@ciardilaw.com
         wgouldsbury@ciardilaw.com

*Co-Counsel for the False Police Report Claimants[23]*

---

[23]  *See supra*, note 3.

ACTIVE.134461832.05