# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Rental Car Intermediate Holdings, LLC,[1] Reorganized Debtors. | Case No. 20-11247 (MFW) |
| | (Jointly Administered) |
| | **Hearing Date: November 4, 2021 @ 10:30 a.m. E.T.** |
| | **Objection Deadline: Oct. 20, 2021** |
| | **Ref. Case No. 20-11218, D.I. 5875, 5899** |

## FALSE POLICE REPORT CLAIMANTS' RESPONSE TO 22nd OMNIBUS OBJECTIONS

The individual claimants described as the False Police Report Claimants and the False Police Report Class Claimants (collectively, "Claimants")—by and through their applicable undersigned counsel[2]—submit this response to the *Reorganized Debtors' Twenty-Second Omnibus (Substantive) Objection to False Police Report Claimants' Non-Compliant, Unsubstantiated, and Class Claims, and Request for a Limited Waiver of Local Rule 3007-1(f)(III), to the Extent Such Rule May Apply* [Case No. 20-11218, D.I. 5899] (the "Objection"). The False Police Report ("FPR") Claimants include FPR Group 1, comprising 26 individuals, FPR Group 2, comprising

---

[1] The last four digits of the tax identification number of reorganized debtor Rental Car Intermediate Holdings, LLC ("RCIH") are 2459. The location of the reorganized debtor's service address is 8501 Williams Road, Estero, FL 33928. On September 28, 2021, the Court entered a final decree closing each of the chapter 11 cases for The Hertz Corporation and its reorganized debtors (referred to herein as the "Reorganized Debtors," the "Debtors," or "Hertz") other than RCIH's chapter 11 case. Commencing on September 28, 2021, all motions, notices and other pleadings relating to any of the Reorganized Debtors shall be filed in RCIH's chapter 11 case, Case No. 20-11247 (MFW).

[2] The law firm Francis Alexander represents all False Police Report Claimants. Susman Godfrey LLP jointly represents the False Police Report Claimants listed in Exhibit A1. Faegre Drinker Biddle & Reath LLP are Bankruptcy Counsel representing all False Police Report Claimants. Ciardi Ciardi & Astin are Bankruptcy Counsel representing all False Police Report Claimants. Farnan LLP is local Delaware counsel in the Delaware Superior Court action.

110 individuals, and FPR Group 3, comprising 29 individuals. This response relates to each of the claims identified in Schedules 1, 2, and 3 of the Reorganized Debtors' Proposed Order. *See* Case No. 20-11218, D.I. 5899–2.

## INTRODUCTION

1.      Two of the fundamental rights established by the United States Constitution are liberty and due process. For the False Police Reports Claimants, Hertz has already robbed them of their liberty through false arrests. Now, Hertz seeks to circumvent their due process rights by asking the Court to forever bar the Claimants from seeking justice for Hertz's practice of having innocent customers arrested and jailed. Hertz has demonstrated zero remorse for its actions and continues this unconscionable practice. Now, Hertz attempts to sweep these claims under the rug claiming, of all things, that giving the Claimants their day in court will violate *Hertz's* due process rights—even though the substance of these claims was known to Hertz pre-petition and during the bankruptcy proceedings. Fortunately for the Claimants, the facts and law are on their side and they respectfully request that the Court deny Hertz's Objections.

2.      It is the height of irony that Hertz complains about violations of its due process rights given that, on a systemic basis, Hertz has denied individuals their own due process by filing false auto theft reports against them. And furthering the irony, Hertz is using its own bankruptcy—from which it is emerging unimpaired—to attempt to shield itself from liability from unsuspecting customers who, at worst, *might* have owed Hertz some money. It is abundantly clear that Hertz is also attempting to use its bankruptcy to enable it to continue committing the same conduct into the future with no intention of fixing its broken systems and flawed practices. Worse, Hertz seeks to deny Claimants even the ability to prove their claims on the merits—despite the fact that Hertz has

known the nature of the claims since prior to bankruptcy and has used that understanding throughout this bankruptcy.

3.      For years, Hertz has been falsely reporting customers for car theft, throwing them in jail on felony charges, prosecuting them, burdening them with criminal records that have caused Claimants to lose their livelihoods, homes, and freedom, and separating them from their family and loved ones. The Claimants or their insurance carriers each paid for their cars and were authorized to use the rentals. Hertz has admitted that it does not correct false police reports because "if you report a crime, and you later say it didn't happen, then law enforcement tends not to believe you if you retract it or say you were mistaken." In other words, Hertz places its own ability to keep lying above the falsehoods it spins to police about its customers that result in their arrest and imprisonment. But Hertz's failures are so widespread that some law enforcement agencies no longer accept Hertz theft reports.

4.      Hertz lost two trials for malicious prosecution and/or intentional infliction of emotional distress in 2017 stemming from the exact same systemic issues that are now before this Court. Despite having indisputable notice of these issues for years, Hertz has refused to fix anything. Predictably, as Hertz knew would happen and was warned about for years, many more victims have now come forward having spent combined more than a thousand days in jail and decades of time facing criminal prosecution.

5.      Not only is Hertz aware of this problem, some of its own policies foster it, while other preventative policies are ignored. On top of that, Hertz—intentionally, knowingly, or grossly negligently—deletes the actual rental records that wholly undermine Hertz's theft reports. The result? Hertz reports its own customers to the police without verification or even the slightest

concern for their customers' freedom, effectively using the police, criminal justice system, and taxpayers to subsidize Hertz's inventory control.

6.      Why does Hertz transform what at worst might be a civil payment issue into a life-altering criminal offense? Hertz's computer and inventory tracking systems are broken, and its internal procedures for validating and verifying police reports are ignored. Hertz has decided that upgrading computer systems and verifying theft reports would be too expensive. Instead, it conscripts the police and the law enforcement system as its own repossession force to find cars it has lost, shifting its inventory control costs to the taxpayers. As the expert declarations of Former Police Chief Guy Sapp and Former Delaware Department of Justice Deputy Attorney General Steve Wood demonstrate, Hertz's conduct fails to satisfy even the most basic standards of care. *See* Exhibit 1, Malofiy Decl., attachment 6 (Declaration of Guy Sapp), attachment 7 (Declaration of Steven Wood).

7.      In its Objection, Hertz offers a kitchen sink of technical bankruptcy arguments sounding in "due process" to prevent former customers from seeking justice. Even more aggressively, Hertz seeks to prohibit those claimants from obtaining any discovery, presenting evidence and testimony in support of their claims, or even amending those claims to cure any purported technical defects. And in the process, Hertz pleads ignorance to the substance of the claims while omitting that it has had actual notice of the claims for years and ignoring extensive evidence supporting these claims already in the bankruptcy record.

8.      Claimants are amenable to efficient resolution of their claims. At each instance since filing bankruptcy, however, Hertz's handling of these claims has been predicated on obfuscation and delay, not on a misapprehension of the issues. In typical bankruptcies, the debtors seek to ferret out creditors' claims and try to reach resolution. In this case, Hertz has repeatedly

avoided dealing with Claimants—other than to object to their motions for relief from the automatic

stay. Hertz has taken this approach because it has always known what waits within Pandora's box.

That is why Hertz has refused to engage. That is why Hertz seeks to escape the claims on

procedural grounds. But this Court should not be tricked into thinking that Hertz lacks notice of

these claims. And Claimants recently have learned that Hertz is forcing potential claimants to drop

their cases, even though they had no notice and even though their claim accrued after the bar date.

*See* Exhibit 1, Malofiy Decl, Attachment T (Decl. of Krystal Carter and James Tolen).[3]

9.      This Court should not countenance Hertz's abuse of the bankruptcy process and, as

such, the Claimants respectfully request that the Court overrule Hertz's Objection in full. In the

alternative, the Claimants request that the Court permit discovery and evidentiary hearings before

ruling on the substance of the claims and/or permit the Claimants to amend their proofs of claim

to promote the efficient and just resolution of these matters.

## FACTUAL BACKGROUND

### A.    The Rental Process and "Payment Authorization Holds"

10.     Hertz is in the rental car business. To differentiate its offerings, Hertz markets many

of its rentals to low-income individuals who often pay for rentals with debit cards. As a result,

Hertz is fully aware that the billing process will be more involved, needs extra attention, and

involves more risk. For example, when customers initially rent a car from Hertz, they provide a

credit or debit card to Hertz so that Hertz can charge for any costs associated with the rental. At

---

[3] Currently pending before this court is: (1) James Tolen's Motion for Allowance of Administrative Expense Claim (D.I. 5932) and (2) James Tolen's Motion for Retroactive Annulment and Prospective Relief from Automatic Stay and Injunctive Provisions of Debtors' Plan of Reorganization. (D.I. 5934). These motions are scheduled for hearing on October 26, 2021 at 10:30 a.m.

the time of the initial rental, Hertz puts something called a "payment authorization hold" on the customer's card. An authorization hold is not a permanent charge. It simply checks the customer's account to see if it is valid and has sufficient funds or credit limits. This temporary charge does not appear on any monthly billing statements and is not a bill or payment, and no money is taken out of the customer's account.

11.     If the customer later extends the rental either by phone or in person at a local branch, Hertz again places an authorization hold on the customer's card. Again, this is not a final billing or payment. It is simply a query at a given moment in time whether the customer has funds in the bank account to pay the final bill when it becomes due. Only at the end of the rental, after the rental is closed out, does Hertz typically charge the customer's card for payment on the full rental.

B.     **Hertz's Practices Lead to Systemically False Police Reports**

12.     To date, Claimants' efforts have revealed five main problems with Hertz's theft-reporting procedures: (a) Hertz deletes customer extensions and backdates due dates; (b) Hertz tells the police there has been no payment, then secretly charges customer and does not update police; (c) Hertz presents an incomplete theft report to police, does not verify theft reports, and deliberately instructs employees to skip this verification step; (d) Hertz deletes records relevant to criminal prosecutions it is supposed to keep for seven years; and (e) Hertz never actually participates in prosecutions, nor does it withdraw them.

13.     What connects all of Hertz's alleged overdue rental thefts is that every report is triggered not by failure to return a vehicle, but instead because Hertz receives a denied payment authorization hold, even though this is nothing more than a *potential* future billing dispute. For an allegedly overdue rental, the two most critical factors are payment and time. As is explained below, both are willfully misrepresented by Hertz in all of its police reports. Furthermore, Hertz refuses

6

to produce or reveal the exculpatory information—its own phone and banking records—which would clear the customer's name

14.    A typical situation is as follows. Customer A extends the rental for one week and is told to return the car a week later. Customer A, knowing he or she secured the extension, continues to use the car and intends to return it in a week and fully pay for the rental when the car is returned. Unbeknownst to Customer A, after confirming the extension with the customer, Hertz runs an authorization hold on their debit account for an amount not disclosed to Customer A. At that moment, Customer A's account does not have funds sufficient to cover the authorization hold amount. Hertz, without informing the customer, deletes the extension. Indeed, the deletion is so complete that Hertz's own employees cannot see that there was a canceled extension or customer contact. The customer fully and rightfully believes they have authorization to have the vehicle. Any future extensions by Customer A are secretly erased out of Hertz's systems after being approved. Hertz then, again without notice to the customer that the extension was erased, files a police report claiming that the car is stolen. The police report states that there was no customer extension or contact; in fact, as described *infra*, the report by design omits any contact the renter had with the location, the corporate rental extension 1-800 number, billing, or roadside (for towing). Customer A, who rightfully believes he or she is driving an authorized rental, is now, according to the police and Hertz, driving a stolen car and is subject to a felony arrest warrant. Customer A only learns of this when he or she is pulled over by the police and arrested in the same manner and with the same force as a true criminal who stole a car from a mall parking lot.

15.    Further, when Hertz filed the police report it tells the police the renter did not pay, provided a bad card, or owes a "Net Due." Hertz does not tell the police that Hertz simply has not charged the customer yet; after finalizing the theft report for police, Hertz only then closes out the

rental and force charges the renter. A forced charge allows Hertz to charge the account, and receive the funds, regardless of the balance of the customer's account. Consequently, Hertz misleadingly tells the police it has not been paid when it knows it is going to force a charge and get paid immediately after filing the police report (and in some cases, after printing but before filing the report). This practice of filing theft reports and then charging cards, somewhat incredibly, is laid out in Hertz internal police W7-02(D) Theft Reporting Policy. *See* Case No. 20-11218, D.I. 5032–2, at 9 (W7–02 Theft Reporting Policy). This bears repeating: Hertz's official, codified policy is to file a police report omitting the fact that the customer's card is about to be force charged and Hertz paid in full.

16.    Further, Hertz does not update the police report once filed or otherwise inform the police that the customer's card has been successfully charged and the customer has effectively paid in full. The result is the police are on the look-out for a suspected felon, who actually is a law-abiding citizen driving a paid-for rental car.

17.    Apart from false police reports filed for valid extensions, Hertz also files police reports for vehicles it claims are missing from its inventory but that it actually rented to customers. In these cases, Hertz reports only the car stolen and does not name a customer in the theft report. The result, however, is no different. Because Hertz makes no effort to verify missing inventory and has sloppy records, individuals who lawfully rent cars from Hertz are arrested for stealing a car because Hertz did not realize the alleged missing car was not missing at all and, in fact, Hertz rented the car to a customer.

18.    Remarkably, some of the Claimants are Hertz Club Gold members—a rewards program for frequent renters—and are (or were) on a first name basis with their local Hertz agent.

8

This highlights yet another bad act by Hertz: Despite internal policies requiring all police reports to be verified by the local field office, Hertz by-passes this step and goes straight to the police.

19.    These practices have ruined many lives with false accusations and have led to hundreds of needless days in jail, lost jobs and salaries, myriad health issues, at least one heart attack, at least one miscarriage, and immeasurable time away from family. Each of the Claimants has had his or her own terrifying experience because of Hertz's misconduct. Claimants are ready and willing to present as many witnesses who have been harmed by Hertz's policies as the Court wishes to hear from at this preliminary juncture. The following is but a small sampling:

   a.   Group 1 Claimant Nicole Stevens is a 38-year-old mother of ten. Exhibit 2, Stevens Decl. ¶ 3.[4] A Hertz Gold Club member, she rented from a Hertz location in Jersey Village, Texas, on April 18, 2018. *Id.* ¶ 4. She extended her rental several times using a 1-800 number for Hertz. *Id.* ¶ 5. In late May or early June 2018, she called Hertz to report suffering a flat tire near Chicago. *Id.* ¶ 6. Hertz confirmed that it would retrieve the vehicle, so Stevens continued on to her destination. *Id.* ¶¶ 6–8. Hertz charged her $1,101.25 for the rental. *Id.* ¶ 9. However, Hertz filed a police report on Jun 27, 2018, claiming that the car had not been returned, that the return date was April 25, 2018, and that they had not been able to contact her since the rental—none of that was true. *Id.* ¶ 12. (It also claimed that she owed $1,101.25 for the rental, *id.* ¶ 13.) In fact, Stevens had repeatedly extended the rental and spoken with corporate and local Hertz employees after that the alleged "return" date. *Id.* ¶ 14. Stevens was arrested for theft in October 2018 in Minnesota after being pulled over for incorrect seatbelt usage. *Id.*

---

[4] The Declaration of Nicole Stevens may also be found at Case No. 20-11218, D.I. 3604, 50–54.

¶ 16. She spent 29 days in jail in gross and humiliating conditions, was sexually assaulted in prison, and was transported back to Texas through five different jails. *Id.* ¶¶ 17–19.

b. Group 1 Claimant Hanna "John" Ayoub rented from the Hertz location in Wilmington, DE at the Amtrak Station in early April 2019. Exhibit 3 (Ayoub Decl.), ¶3.[5] He had rented many times before. On April 15, 2019, Ayoub called the Wilmington location, as was his routine, to extend for another week. *Id.* Thereafter, he extended the rental by calling Hertz corporate at the 1-800 number because the Wilmington location was not being responsive. *Id.* at ¶¶4–5. He has detailed phone records showing phone calls with Hertz corporate every seven days extending the rental through June 2019. *Id.* at ¶¶3 & 7. Unknown to Ayoub, Hertz reported the truck he was renting stolen on May 28, 2019. *Id.* at ¶8. Hertz had falsely told the police that Ayoub never paid for the rental, that it was due on April 15, 2019, and that he had not extended. *Id.* at ¶¶9–10. As a result, Ayoub was arrested, jailed, and prosecuted. *Id.* at ¶¶8 & 11. All charges against Ayoub have since been dismissed. *Id.* at ¶¶12–13.

c. Group 2 Claimant Akilah Brackett rented from Hertz's Hawthorne, California location in conjunction with her work as a Lyft driver on July 28, 2019. Exhibit 4, Brackett Decl. ¶ 2.[6] She extended and confirmed the extension of the rental every week with Hertz and Lyft. *Id.* ¶ 3. In October, she brought the car back to the Hertz location, but the location convinced her to continue renting the car. *Id.* ¶ 4. On Thanksgiving Day,

---

[5] The Declaration of Hanna Ayoub may also be found at Case No. 20-11218, D.I. 3604, 50 –54.

[6] The Declaration of Akilah Brackett may also be found at Case No. 20-11218, D.I. 3604, 73–74.

2019, Brackett was arrested at gunpoint by police in Carson, California, in conjunction with a theft report filed by Hertz. *Id.* ¶¶ 5, 9. She spent 15 days in prison and away from her children, but all charges were dismissed in April 2020. *Id.* ¶¶ 6–7.

d.   Group 1 Claimant Arthur Stepanyan was a "Gold Club" customer of Hertz at the Charlotte airport location, which he had frequented for years. Exhibit 1, Malofiy Declaration, Attachment A, Stepanyan Decl. ¶ 3. In early March 2019, Stepanyan rented a Silver Dodge Ram from the airport location, which he returned on March 14, 2019. *Id.* at ¶ 4. On March 16, he reserved a rental for a Ford F-150, but upon seeing that it lacked a trailer hitch, airport employees convinced him to instead re-rent the Dodge Ram. *Id.* The rental paperwork was reviewed by two Hertz employees before Stepanyan left in the Ram. *Id.* at ¶ 6. However, Hertz erroneously listed that Stepanyan rented the Ford F-150. *Id.* at ¶ 7. Hertz subsequently reported the Dodge Ram stolen. *Id.* at ¶¶ 26–27. Nobody contacted Stepanyan before or after Hertz reported his vehicle stolen. *Id.* at ¶ 6. On August 5, 2019, the police followed Stepanyan to his home. *Id.* at ¶ 8. He was surrounded by several police cars and arrested at gunpoint. *Id.* He had no idea why he was being arrested and was shocked when the police accused him of car theft. *Id.* at ¶¶ 9–10. Despite Stepanyan's showing them his rental agreement, the police could not contact anyone at the Hertz location. *Id.* at ¶¶ 13–14. The police tried to reach Hertz for three hours. When they finally did, Hertz stated it could not find any record in the system but said to arrest the driver if the car was listed as stolen. *Id.* at ¶ 15. After posting bail, Stepanyan contacted his local office, as well as the national office and Hertz's Corporate Security Office, all of which told him there was nothing they could do. *Id.* at ¶¶ 19–24. But after Hertz ignored requests from prosecutors, all charges

against Stepanyan were dropped because "victim/business does not want to cooperate." *Id.* at ¶31.

e.  Group 1 Claimants Michael Channel and Thomas Channel rented a Chevy Malibu from Hertz in November 2017 on a specially approved multi-month rental. Exhibit 5, M. Channel Decl.,[7] Towards the end of each month, Hertz would charge Michael Channel for the rental. *Id.* at p.1. In January of 2018, Channel exchanged the Malibu for a Toyota Camry on the same month-to-month basis. *Id.* Unknown to Michael, however, Hertz botched the exchange and reported to the police that a different contract expired on February 22, 2018, and that the car was stolen. *Id.* at p.2. Hertz did no investigation or check of its systems, and such a check would have immediately revealed the specially approved multi-month contract. On May 12, 2018, however, while Michael's father Thomas Channel was driving the Camry, the police pulled them over. *Id.* at 43. Thomas was told to lie on the ground and held by the police at gunpoint, accused of being a car thief. *Id.* Thomas Channel tried desperately to explain to the police it was a rental car. *Id.* Suddenly, Thomas Channel began suffering a massive heart attack and was rushed to the emergency room for emergency heart surgery. *Id.*

f.  Group 3 Claimant Paula Murray is a grandmother who rented a vehicle from the Parkview rental location in Chesapeake, VA, in late 2016. Exhibit 1, Malofiy Decl., Attachment C, Murray Decl. ¶¶ 2, 3. She extended the rental every week. *Id.* ¶ 3. Once when she called for an extension, the location asked her to return the vehicle because it had been more than 30 days; she returned the car immediately. *Id.* ¶ 4. The day after

---

[7] The Declaration of Michael Channel may also be found at Case No. 20-11218, D.I. 3604, 42–44.

12

she returned the vehicle, a Hertz investigator called her threatening to report her for theft. *Id.* ¶ 5. Murray explained that she had returned the vehicle, and the investigator confirmed the return a few days later over text message. *Id.* ¶¶ 5, 6. The rental was complete. But years later, in 2021, Murray was selected for a position as a police dispatcher. *Id.* ¶ 8. When she arrived with her grandchildren for her January 4, 2021 intake appointment, however, she was arrested based on an outstanding warrant tracing to a Hertz theft report filed for the vehicle she returned in 2016. *Id.* ¶¶ 10–11. She was handcuffed and hauled away. *Id.* ¶ 11. Murray contested her charges, and they were ultimately dismissed on March 30, 2021. *Id.* ¶¶ 11, 18.

20.     As demonstrate by the stories above, Hertz does nothing to assist the customer after the customer is arrested and ignores the prosecution. Hertz turns its back on the customers and forces the customer to fight the prosecutors and prove his or her innocence. According to Hertz, it cannot admit its mistakes because that would make Hertz less credible with police:

> Hertz has no mechanism to withdraw a criminal referral because, the company spokesperson said, it has to maintain a relationship of "integrity and responsibility" with law enforcement.

> "In the rare instances this happens, if you report a crime, and you later say it didn't happen, then law enforcement tends not to believe you if you retract it or say you were mistaken," the spokesperson said. "Hertz's continued good relationship with law enforcement is important."

Sam Wood, "Bankrupt Hertz Is Still Wrongly Accusing Customers of Stealing Cars," Page A1, Philadelphia Inquirer (Aug. 3, 2020), available at https://www.inquirer.com/business/retail/hertz-stolen-car-grand-theft-auto-malofiy-bankruptcy-lawsuit-20200803.html.

21.     Despite Hertz's slanted efforts to maintain credibility with police, certain law enforcement agencies have recognized the systemic deficiencies underlying Hertz's theft reporting. In June 2015, Captain Josh Grimes of the Louisville Airport Department of Public safety

wrote to his superior: "Until Hertz corporate takes some action with their Louisville lot and personnel, I recommend that we suspend taking stolen auto reports for Hertz for 'missing inventory' unless they physically see someone steal an auto, have evidentiary proof of such or obviously non returns that warrants have been taken." Case No. 20-11218, D.I. 5032-6. Officers from the Louisville Airport Police later contacted Hertz's Corporate Security office. *Id*. In November 2016, the Indianapolis Airport Police similarly imposed restrictions on Hertz theft reports due to false reports leadings to the wrongful arrests of customers. Exhibit 1 (Malofiy Decl.), ¶20 and Attachment U, Ramanda Van Pay Affidavit. What these officers did not know is that Hertz's failures are not limited to Louisville and Indianapolis—they permeate the company nationwide.

22.    A further overview of the facts at issue appears in Claimants' Motion for Relief from Stay, Case No. 20-11218, D.I. 5656 at 1-13, which details how (a) Hertz policy mandates that the company report the customer for theft to the police before charging the customer for the rental and then does not tell the police about the subsequent payment; (b) Hertz has admitted that it does no local investigation to verify theft reports, in violation of Hertz's own theft reporting policies; (c) Hertz erases rental extensions and backdates rental due dates; (d) Hertz does not withdraw the prosecution when the customer has returned the vehicle, and indeed either erases the rental records or does not inform Hertz of all customer contact that would exonerate the customer; and (e) Hertz loses cars on its own lots, then reports those cars as stolen while renting them to unsuspecting customers who are later arrested for driving in that "stolen" car.

## C.    Hertz Has Had Actual Notice of the Problems and Claims for Years

23.    Hertz has had actual notice of the pattern of misconduct underlying each Claimant's claims for many years. To highlight a few examples: (1) in January 2017, a federal jury in

Galveston, Texas issued a verdict against Hertz for related conduct and in favor of Hertz customer

Michael Gray (Exhibit 1, Malofiy Decl., Attachment V, Jury Charge and Verdict Form); (2) in

September 2017, a Philadelphia jury issued a six-figure verdict against Hertz for related conduct

in a case brought by Hertz customer Kelly Grady (Exhibit 1, Malofiy Declaration, Attachment W,

Verdict Form) including findings of spoliation and the ordering of a punitive damages trial;

(3) beyond the case filed by the Claimants, other cases were filed across the country, Exhibit 1,

Malofiy Decl., Attachments X–AA; (4) there has been extensive news media coverage on Hertz's

practices[8]; (5) Hertz employees have said that false police reports were "a known problem" and

that the company had established "a special fund to compensate the victims," Case No. 20-11218,

D.I. 1081, Ex. A., Declaration of Earl Holland; and (6) Hertz has disclosed in discovery in another

case that it maintains an internal spreadsheet detailing claims against the company for false

arrest/theft reports, *see* Case No. 20-11218, D.I. 1071, Ex. A, Declaration of Frederick Jekel, Esq.

at 4.

      24.    Moreover, counsel for the Claimants had extensive contacts prior to the bankruptcy

process detailing the systemic nature of Hertz's problems with a focus on his clients at the time.

*See generally* Exhibit 1 (Malofiy Decl.). These contacts include (1) a September 6, 2017 motion

---

[8] *See, e.g.,* Laura Layden, "As it nears bankruptcy exit, Hertz still faces lawsuits alleging wrongful arrests for rental car theft," Fort Myers News-Press (June 11, 2021); Marine Glisovic, "Hertz still wrongfully accusing customers of stealing rental cars, attorney says," ABC7 (2021); Laura Layden, "Hertz Accused of Falsely Reporting that Customers Stole Rental Cars," Naples Daily News/USA Today (July 23, 2020); Chad Pradelli and Cheryl Mettendorf, "Action News Investigation: Customers sue Hertz for False Theft Claims," 6ABC Phila. (July 7, 2020); Sarah Buduson, "Hertz customers detained, arrested after rental vehicles mistakenly reported stolen," 5ABC Cleve. (May 21, 2019); Katie LaGrone, "Hertz has a pattern of mistakenly reporting cars stolen leaving customers arrested, attorney says," ABC Action News - WFTS Tampa Bay (May 9, 2019); Chad Pradelli and Cheryl Mettendorf, "Investigation: Hertz customers arrested after rental vehicles mistakenly reported stolen," 6ABC Phila. (May 18, 2018).

for punitive damages in the *Grady* case, Exhibit 1, Attachment AB; (2) a November 14, 2017 letter to Hertz's then general counsel and executive vice president Richard Frecker detailing Hertz's problems, Exhibit 1, Attachment AC; (3) an October 17, 2018 letter to Hertz counsel, Exhibit 1, Attachment AE; (4) a February 2020 Demand letter detailing systemic issues and a number of individual cases, *see* Case No. 20-11218, D.I. 762, at 4, and Exhibit 1, Attachment AF; (5) a March 2020 letter and conference with Hertz's counsel Winston and Strawn, Exhibit 1, Attachment AG; (6) briefs detailing four systemic issues sent to Hertz counsel Winston and Strawn on April 27, 2021, Exhibit 1, Attachments P, AH, and AI; (7) a May 4, 2020 memorandum describing Claimant Thomas Channell's case, Exhibit 1, Attachment M; (8) a May 4, 2020 memorandum describing Claimant Arthur Stepanyan's case, Exhibit 1, Attachment N; and (9) the May 2020 complaint filed in Delaware extensively detailing the systemic problems and many specific claimant profiles Case No. 20-11218, D.I. 589–1.

25.     This is not to mention that the systematic allegations of the Group 2 and Group 3 Claimants were materially similar, if not identical, to those extensively detailed by the Group 1 Claimants. The Claims share a common identifier—"False Police Report Plaintiffs"—and are numbered in a series. They predominately attached a damages matrix referencing the members of all three groups. They include similar language and are represented by similar counsel. And counsel repeatedly described that the claims were based on the same pattern of misconduct by Hertz. *See, e.g.,* Group 2 Motion for Relief, Case No. 20-11218, D.I. 2593 (Group 2 brings claims "similar to those presented by another group of False Police Report Plaintiffs, who are the subject of another motion for relief pending. *See* Case No. 20-11218, D. I. 589. Simply put, the twenty-six (26) plaintiffs that are the subject of Case No. 20-11218, D.I. 589 were just the tip of the iceberg."); Case No. 20-11218, D.I. 5656 (similar for Group 3).

26.    Throughout this litigation, Hertz has acknowledged that it understands that each of the False Police Report Claims draws on this pattern of false police reporting. In fact, Hertz itself has tried to impute knowledge from one group of FPR Claimants to another group. *See* Case No. 20-11218, D.I 2848, at 2 ("Movants are plainly aware of these facts, since they share the same counsel as defendants in that proceeding."). Hertz thus has recognized that each claimant makes allegations similar to the 2017 Grady case, *see* Case No. 20-11218, D.I. 5703 at 4, and has reviewed the extensive systemic allegations contained in the Delaware complaint, Case No. 20-11218, D.I. 589–1. Further, Hertz understands the nature of the claims enough to argue whether they are personal injury claims, *see* Aug. 19, 2020 Hrg. Tr. at 84, argue whether insurance policies would cover those claims, *id.* at 88, and characterize the allegations in those claims, *see* Apr. 22, 2021 Hrg. Tr. at 15 ("[T]hey are all alleging pre or post-petition injury as a result of an alleged Hertz policy. They make serious allegations.").

27.    In light of the foregoing, Hertz's complaint that it lacks notice is completely untenable.

## PROCEDURAL HISTORY

28.    The Objections relate to four categories of claimants: Group 1, Group 2, Group 3, and the Class Claims. Group 1 Claimants filed prepetition civil actions against the debtors and related parties. Prior to the bar date, Group 1 Claimants filed proofs of claim against many of the debtor entities. The Claimants compiled similar, individual claims onto a single proof of claim form filed against each debtor. Since that time, the Group 1 Claimants have voluntarily withdrawn claims against almost 15 debtors and amended several others. Group 2 consists predominately of individuals who filed proofs of claim before the bar date, but did not have prepetition litigation

pending against the debtors.[9] Like Group 1, Group 2 compiled similar, individual claims on common proof of claim forms against each debtor. And further like Group 1, most of their claims were amended or voluntarily withdrawn prior to plan confirmation. Group 3 consists of individuals who filed claims after the bar date, but before plan confirmation. These claims, too, were filed on "group" proof of claim forms. They have not been amended. The Class Claims were proofs of claim filed on behalf of an unnamed class against each debtor entity before the bar date.

29.    The False Police Report Claimants have been engaged and good-faith participants in the bankruptcy process. Group 1 sought relief from the automatic stay on June 25, 2020. *See* Case No. 20-11218, D.I. 589. Hertz responded by filing an adversary proceeding to stay all pending litigation. *See* Case No. 20-ap-50761. On February 2, 2021, Group 2 sought relief from the Automatic Stay. *See* Case No. 20-11218, D.I. 2593. The Court denied these motions without prejudice on May 11, 2021. *See* Case No. 20-11218, D.I. 4616.On June 1, 2021, Group 1 Claimants, Group 2 Claimants, and the Class objected to the Chapter 11 Plan. See Case No. 20-11218, D.I. 5032. They withdrew their objections, however, based on their understanding (which was expressly confirmed by the Court) that (i) they were "opted out" of the Plan's release provisions, (ii) they "will have a chance to prove [their] allegations of the alleged illegal practices" of Hertz, and (iii) "all [their] rights are preserved." *See* June 10, 2021 Hrg. Tr. at 14:8-17:16.

30.    On August 4, 2021, following the Effective Date of the Plan, certain of the Claimants filed a motion for relief from the stay and the plan (the "Stay Relief Motion"), seeking to pursue all legal and equitable claims in the forum of their choice to liquidate their claims, to recover against all applicable insurance policies, and to pursue all co-defendants regardless of

---

[9] Three Group 2 Claimants had prepetition litigation. *See Williams, et al. v. Dollar Rent a Car, Inc., et al.*, Case No. A-19-803924-C (D. Ct. Clark Cty., Nevada 2019).

relationship to the Debtors. *See* Case No. 20-11218, D.I. 5656. The Court denied the Stay Relief Motion without prejudice at the August 18, 2021 hearing and by order dated September 15, 2021, and set forth a briefing schedule in connection with the Reorganized Debtors' preliminary objections to the Claimants' proofs of claim. Case No. 20-11218, D.I. 5875.

31.     In connection with that scheduling order, Hertz filed the attached "preliminary" objections on September 20, 2021. The Claimants served preliminary discovery requests relating to notice on September 28, 2021 and a related request for a preliminary 30(b)(6) deposition on September 30, 2021. The Claimants requested responses to interrogatories and requests for admission by October 12, responses to requests for production by October 19, and designation of a corporate representative on October 11 for a deposition on October 25. Hertz has not responded to any of these discovery requests as of the filing of this brief.

## SUMMARY OF THE ARGUMENT

32.     Hertz lodges a bevy of technical objections that lack merit. These technical objections invoke notice and due process, but Hertz has had extensive notice of these claims both inside and outside the bankruptcy process. To start, Hertz files its objection under Bankruptcy Rule 3007(d)(6), which permits omnibus objections to claims that "were presented in a form that does not comply with applicable rules, [where] the objection states that the objector is unable to determine the validity of the claim because of the noncompliance" (emphasis added). But Hertz abuses that rule by ignoring extensive information relating to these claims in the bankruptcy record and its own books and records. In other words, Hertz has not made any good faith effort to "determine the validity" of the claims as required by the rule. This provides an independent basis to overrule the Objection in full.

33.    The legal arguments underlying Hertz's 3007(d)(6) objection also lack merit for additional reasons. First, Hertz contends that these claims were impermissibly filed by "groups." That is false. Here, individuals with similarly situated claims filed those claims on a single proof of claim form against each debtor, rather than *thousands* of proofs of claim each representing one individual's claims against one debtor. This commonsense practice not only complies with all relevant bankruptcy rules, but also has been endorsed by other bankruptcy courts and promotes the efficient completion of the bankruptcy process.

34.    Second, Hertz argues that most of the proofs of claim should be disallowed because they are not styled as exhaustive legal complaints. This Court lacks authority to determine whether personal injury tort claimants have satisfied a substantive burden of production under the Third Circuit's burden shifting approach to resolving contested proofs of claim. *See In re Allegheny International, Inc.*, 954 F.2d 167 (3rd Cir. 1992). In any event, Hertz has misconstrued the pertinent legal framework. There is no legal requirement that the four corners of a proof of claim independently state a complete, prima facie claim to be allowed; and there is consequently no basis for disallowing a claim because the proof of claim itself lacks fulsome factual development. *See, e.g., In re Kincaid*, 388 B.R. 610, 614 (Bankr. E.D. Pa. 2008). Indeed, to the contrary, Rule 3001(f) provides that a properly filed proof of claim itself constitutes *prima facie* evidence of the validity and amount of a claim—an unremarkable proposition that follows logically from section 502(a)'s deemed allowance of a proof of claim until a party in interest objects. But the evidentiary presumption under Rule 3001(f), which satisfies a claimant's initial burden of production in the actual determination of his claim, is not a prerequisite to the allowance of the claim—if a claim for some reason fails qualify for the presumption, the claimant is free to otherwise meet his "initial burden of proving that the claim exists and the amount of that claim." *In re Cluff*, 313 B.R. 323,

20

337 (Bankr. D. Utah 2004). Only the subsequent "[f]ailure to fulfill this burden results in the disallowance of a creditor's claim." *Id.*

35.    It is thus premature to consider the Claimants' theoretical ability to satisfy their ultimate burden of production in a subsequent trial on the merits. Hertz's Objection in this regard is out of step with the Court's tiered resolution process requesting only preliminary objections at this juncture. *See* Case No. 20-11218, D.I. 5875, at 2. And it is inappropriate for Hertz to seek to quash these claims for an alleged failure of the Claimants to meet a burden of *production* of evidence while Hertz has refused at every turn to *produce* anything in discovery to date. The Claimants seek a fulsome opportunity for discovery and an adequate opportunity to present their evidence relating to each and every Claimant before the court disallows their claims on the basis of a burden of production, whether in this Court or in a different venue. *See In re Tribune Co.*, 2013 WL 1909617, at *2 (Bankr. D. Del. May 2, 2013) (offering "an evidentiary hearing to present evidence").

36.    Hertz's next line of attack attempts to sneak federal pleading standards from *Twombly* and *Iqbal* into the bankruptcy process—something that its own authorities recognize the Third Circuit has not done. See *In re Nortel Networks, Inc.*, 469 B.R. 478, 497 (Bankr. D. Del. 2012) ("[T]he U.S. Court of Appeals for the Third Circuit [has] not imposed the federal pleading standards on those seeking to file proofs of claim …"). Instead, the proper inquiry—after discovery and a fulsome opportunity to present evidence—turns on notice. *See, e.g., In re F-Squared Investment Mgmt, LLC*, 546 B.R. 538 (D. Del. 2016).

37.    Here, Hertz has notice in spades. The Claimants have alleged in their proofs of claim that Hertz engaged in a pattern of filing false theft reports ensnaring each of them in baseless criminal proceedings, including arrest warrants, arrests, imprisonment, and prosecution. And they

have provided countless declarations substantiating the facts of individual cases and illustrating a pattern of malicious and culpable conduct by Hertz. Similarly, Hertz had extensive and documented notice and evidence of these claims—and the pattern of conduct underlying the claims—both inside and outside the bankruptcy process. As such, to the extent the Court tests these claims on the merits before the claimants have had an opportunity to engage in discovery or to address the evidentiary basis for their claims before the Court, the Court should find the burden of production satisfied.

38.    The second part of Hertz' complaint-related argument bemoans that claims that were filed against several debtors. Once again, Hertz attempts to smuggle federal pleading standards into the bankruptcy process without a basis for doing so. Either way, the proofs of claim here seek to hold each Debtor accountable for its own conduct. Counsel have already withdrawn all claims against almost 15 debtors upon a fuller understanding of Hertz's corporate structure and have an open offer to further streamline the claims to which Hertz has not responded.

39.    Hertz then takes aim at the class proofs of claim filed before the bar date. Hertz seeks to raise procedural barriers that had to be satisfied before filing the proofs of claim—namely seeking permission to apply Rule 7023 to a contested matter. These artificial procedural barriers conflict with the relevant bankruptcy rules—including Rule 9014(c), which permits the Court to apply Rule 7023 "at any stage in a particular [contested] matter" and became relevant once the omnibus objection created these contested matters—and disregards the past practice of this Court and many others, *see, e.g.*, *In re Kaiser Group International, Inc.*, 278 B.R. 58 (Bankr. D. Del. 2002) (Walrath, J.). Hertz's belated efforts to create novel and nonsensical legal barriers to class claims should be rejected.

40.     Finally, Hertz asks the Court to grant its objection with prejudice, and thereby prohibit the Claimants from curing any purported technical deficiencies in their claims. But claim amendments are assessed under the liberal pleading standards associated with the Supreme Court's decision in *Foman* v. *Davis*, 371 U.S. 178, 182 (1962) and Federal Rule of Civil Procedure 15(a)(2). Here, justice overwhelmingly requires that the Claimants—who were deprived of liberty based on Hertz's pattern of filing false and baseless reports of criminal theft—be permitted to amend their claims against Hertz to correct any purported deficiencies. Such amendments would not prejudice Hertz and certainly would not prejudice other claimants, as unsecured debts have emerged unimpaired from the bankruptcy plan. And those amendments would plainly relate back to the original proofs of claim by stating the "original claim[s] with greater particularity [and] amplify[ing] the factual circumstances surrounding the pertinent conduct." *Bensel v. Allied Pilots Ass'n*, 387 F.3d 298, 310 (3d Cir. 2004). This is especially so here, where the plan is post-confirmation, all creditors are emerging unimpaired, and Claimants could not vote on the plan because they were deemed unimpaired. Hertz has not cited a single case denying a proof of claim with prejudice when the plain is unimpaired and post-confirmation. Indeed, such a rule here would run directly counter to the equities of any bankruptcy.

## ARGUMENT

41.     Hertz's Objections fail as a matter of law and fact. And to the extent the Court disagrees, any defects in the subject proofs of claim can be easily remedied within this Court's discretion and without any prejudice to Hertz.

## A.     Hertz's Rule 3007(d)(6) Objections Should Be Rejected

42.     Hertz objects under Bankruptcy Rule 3007(d)(6), which permits omnibus objections to claims that "were presented in a form that does not comply with applicable rules,

[where] the objection states that the objector is unable to determine the validity of the claim because of the noncompliance." Obj. 12. Any objection made under the provision on which Hertz relies plainly must demonstrate in addition to some non-compliance with applicable rules, that the objector genuinely "is unable to determine the validity of the claims" as a result. Hertz has not even attempted to meet that standard.

43.    Hertz makes shockingly little effort to explain why or how it was unable to determine the validity of the underlying claims beyond an unsupported, conclusory, conspicuously vague, and passively-voiced statement by a non-employee that "[t]he proofs of claim subject to the Objection were carefully reviewed and analyzed in good faith using due diligence." Doc. 5899–3, at 2. Even a cursory examination of the bankruptcy record demonstrates the paucity of Hertz's assertions. Indeed, Hertz's blanket contention that it "is unable to determine the validity of the claims" strains credulity given the fulsome record and Hertz's actual notice of the nature of the claims. Similarly, Hertz does not state that it checked with its claims administrator or searched its internal systems for information on the Claimants. The Objection should be rejected in whole based on the complete failure to comply with Rule 3007(d)(6).

44.    Hertz's argument that the Group 1 Claimants choice to file a "group" proof of claim—specifically, a single proof of claim form documenting all their claims rather than 26 separate proofs, one for each claimant—highlights what little effort Hertz put into determining the validity of the claims. Group 1 includes claimants who previously filed complaints in court against one or more of the debtors. These complaints were specifically referenced and cited in the Group 1 proofs of claim. *See, e.g.*, Case No. 20-11218, D.I. 589–1 (Delaware Complaint). These complaints detailed the systemic issues with Hertz's investigations and reporting and the particular details relating to the claimant's injuries, like those of John Ayoub. Hertz may well think that it is

24

not liable for these claims, but it is incredible for Hertz to be unable "to determine the validity" of claims that have been exhaustively pleaded, documented, and discussed between counsel for the parties. Notably, later in its briefing, Hertz does not label many of these claims as "unsubstantiated claims."

45.     Further, Hertz's submission that it could not "determine the validity" of the group 1 claims contradicts its earlier submissions to this Court. In July 17, 2020 complaint in related Adversary Proceeding No. 20-50761-MFW, Hertz argued: "Hertz immediately began investigating Mr. Malofiy's claims [representing the Group 1 Claimants]. By the time it finished its investigation one month later, Hertz had determined that Mr. Malofiy's clients' false arrest claims were generally meritless and his claims of systematic failures were baseless," D.I. 1, at ¶23. In other words, Hertz has already admitted that it can "determine the validity" of many these claims. Its belief that the claims lack merit is simply not a basis for an omnibus objection under Rule 3007(d)(6). And its blanket assertion that it cannot determine the validity of any claims does not reflect any of its actual efforts to do so.

46.     Moreover, Rule 3007(d)(6) requires attestation that a debtor was "unable to determine the validity of the claim *because of* the noncompliance" (emphasis added). In other words, Hertz asserts that it cannot determine the validity of the claims detailed in previously filed complaints *because* the claims were filed together on a single claim form. As explained below, multiple individuals can group their claims onto a single proof of claim form. But even if that were not permissible, a debtor acting in good faith should not have any difficulty determining the validity of claims simply because the same information was included on a single form rather than many separate forms. This assertion by Hertz, too, fails the smell test.

25

47.    Hertz's violation of Rule 3007(d)(6) and demonstrable lack of effort to determine the validity of claims likewise is evident by looking at Group 2. Hertz has extensive contact and experience with the claims of many Group 2 claimants. For instance, the "Martin Declaration" admits that three members of Group 2—Michael Williams, Mindy Arney, and Ryan Chamberlain—filed a prepetition lawsuit against the Debtors. Doc. 5899–3, at 2 n.3. Yet Hertz seeks to strike their claims without differentiation because of a purported inability to determine the validity of their claims because of the claims' alleged non-compliance. Likewise, the declaration admits that counsel identified Michelle Jones, another member of Group 2, to the debtors prepetition. Hertz ignores this fact and has made no apparent effort to ascertain Ms. Jones's claims or differentiate them within its briefing. Another Group 2 Claimant, Brandon White, filed a declaration that he sent a preservation letter to Hertz and had been contacted by Hertz assistant general counsel Adam Schloss and corporate security director Paul Polombo about his claims. Case No. 20-11218, D.I. 3604, at 84–85. In each of these examples—where Hertz plainly has information about the claims—Hertz has made no discernable effort to determine the validity of these claims using the information it had available.

48.    Along similar lines, many Claimants in Group 2 signed declarations explaining the facts underlying their claims that were already part of the bankruptcy record. *See* Declaration of A. Ciardi, Case No. 20-11218, D.I. 3604. Take, for example, the signed declaration of Daiyon Davis. Exhibit 7, Davis Decl.[10]  Davis declared that he: (1) "rented from Hertz since 2015, almost continuously, and spent approximately $60,000 with Hertz during that time period. Each Rental [Davis] would rent for 62 days, then renew for another 62 days." *Id.* at ¶2; (2) "Approximately

---

[10] The Declaration of Daiyon Davis may also be found at Case No. 20-11218, D.I. 3604, 99–101.

26

50% of his rentals with Hertz were at the Rockford, IL location. … His contact there was Zach McGee, the manager of the area. … He also knew Amber, who was an employee at Rockford and the airport." *Id.* at ¶3; (3) "In July 2019, he started a rental at the Rockford, IL HLE location, with a Dodge Charger. The rental period was for 62 days, as usual." *Id.* at ¶4; (4) "Daiyon drove 2 hours from Iowa to the airport location and requested [the location manager] Tom. Tom did the key switch, put a new sticker on the key FOB, and took the mileage. . . . Tom told Daiyon he would extend the contract." *Id.* at ¶7; (5) "Daiyon drove to Atlanta and 6 days after visiting the Hertz location $2,700 was taken out of his account. … As he was driving a police car pulled a U-turn and pulled him. He was told it was stolen. This was October 18, 2019." *Id.* at ¶¶ 8–9; (6) "The police were skeptical that Daiyon had stolen the car, and thus spent 45 minutes trying to contact [location manager] Tom." *Id.* at ¶10; (7) "Amber told police that if the car was reported stolen, the police should seize it" *Id.*; (8) "Daiyon's family called the Hertz location and [Hertz employee] Amber, once she realized who Daiyon was, profusely apologized." *Id.* at ¶12; (9) "[W]hen Zach found out, he called Hertz and spoke with [location manager] Tom and Amber, utterly furious. Tom has since been fired." *Id.* at ¶¶ 13–14; (10) "However, despite the fact that Hertz knows that Daiyon did not steal a car, he is still being prosecuted."[11] *Id.* at ¶14; (11) "Mr. Davis had a pristine record before this; this false theft accusation is ruining his life." *Id.* at ¶15; (12) "As a direct and proximate result of Hertz's conduct, Daiyon was falsely arrested and imprisoned for 2 days, was falsely prosecuted, was subject to extreme mental and emotional distress, and had his reputation destroyed." *Id.* at ¶16; (13) "There was no probable cause for Hertz to report Daiyon for theft." *Id.*

---

[11] Finally, nearly two years after his arrest, all charges against Davis were *nolle prossed* due to insufficient evidence on October 4, 2021. *See* Exhibit 1, Malofiy Decl., Attachment R, and Case No. 20-11218, Doc. 3604, at 100.

at ¶17 at 99–101. Other claimants, such as Laketa Collins, provided similar information and even included the date of the false police report and the name of the Hertz employee that filed that report. Exhibit 8, Collins Decl.[12]   Hertz offers no information suggesting that it even attempted to assess these declarations in good faith in conjunction with the Group 2 claims—quite the opposite, its declaration suggests that it has "no record of the alleged facts asserted in nearly all of the Unsubstantiated Claims aside from the proofs of claim themselves." D.I. 5899-3, Martin Decl. ¶5.

49.     Hertz has also resisted Claimants' efforts to determine whether it actually understood the validity of the claims. Hertz's own books and records undoubtedly contain ample information about these claims. On information and belief, the debtors maintain records of past rentals, renters, and police reports that would permit them to assess the validity of these claims and promote their prompt and just resolution. Likewise, similar records were obtained in the *Grady* case. Put simply, Hertz cannot suggest that it has "no record of the alleged facts" relating to Group 2 and 3 Claimants who rented cars from Hertz, were implicated in theft reports filed by Hertz, were (in most cases) prosecuted in connection with Hertz, and typically had post-arrest contact with Hertz to contest false charges and theft allegations.

50.     And Hertz's internal tracking of similar cases makes it even less believable that Hertz's internal books and records lack information about these claims. Group 3 Claimant Paula Murray spoke with a corporate security manager for Hertz, Richard Livingston, who told her that "Hertz had an internal list of customers who were reported for theft." Exhibit 1, Attachment C, Murray Decl., at ¶3. Moreover, the bankruptcy record already contains evidence that Hertz has established "a special fund to compensate the victims" of false police reports, Case No. 20-11218,

---

[12] The Declaration of Laketa Collins may also be found at Case No. 20-11218, D.I. 3604, 37–41.

D.I. 1081, Ex. A., Holland Decl. And another declaration attests that Hertz has disclosed in discovery in another case that it maintains an internal spreadsheet detailing claims against the company for false arrest/theft reports, *see* Case No. 20-11218, D.I. 1071, Ex. A, Jekel Decl., at 4.

51.    Hertz has obviously made no effort to assess the "validity" of the many claims involving sworn declarations with significant facts. Perhaps, with good-faith efforts, Hertz would be unable to locate pertinent records in its own possession to assess the claims of an individual who has filed a declaration. But Hertz's assertion that it was unable to determine the validity of *even one* of the Group 2 claims simply is not plausible. *See* B.R. 3007(d) (objections can state that a claim should be disallowed "in part").

52.    Nor has it ever once—in the many months since these claims were initially filed—expressed any dissatisfaction or objection with the form or substance of the claims. Hertz professes to think that these are "serious allegations," D.I. 5032, April 22, 2021 Hrg. Tr. at 15:5, but has at every turn refused to engage Claimants on the merits. Instead, Hertz chose to obfuscate and delay, force Claimants to wait, bide its time, and then raise a medley of technical objections, argue that it is too late to cure the alleged deficiencies, and hope to escape scot-free from its pattern of misconduct in the name of Due Process.

53.    Hertz likewise has opposed Claimants' requests to proceed outside the bankruptcy context. *See* Case No. 20-11218, D.I. 589, 762, 2593, 2848, 5656, 5703. In seeking relief from the automatic stay, Claimants described the nature of their injury at Hertz's hands and argued that lifting the stay would not prejudice Hertz and that the balancing of hardships favored lifting the stay. *See, e.g.*, Case No. 20-11218, D.I. 589 at 10-11. Claimants sought to have their personal injury claims heard in the forum of their choosing. In response, Hertz argued that lifting the stay would prejudice the Debtors' estates while maintaining the stay would not prejudice Claimants.

According to Hertz, "the underlying actions are all in their early stages, and Movants have not stated any imminent harm to them that would arise from the stay" and "Movants can assert their claims through the claims process and thus avoid any allegedly prejudicial delay that would arise from the stay." Case No. 20-11218, D.I. 762, at 2. Now Hertz seeks to have the Court dismiss the claims without even beginning to engage on the merits.

54. In sum, in its zeal to get rid of these claims, Hertz astoundingly makes the blanket assertion that it could not "determine the validity" of even a single claim as required by Rule 3007(d)(6). This assertion by itself demonstrates exactly why this Court should deny the objection in full. Hertz made an omnibus objection on the basis of a declaration that is demonstrably untrue. Thus, as a threshold matter, this Court should thus overrule Hertz's omnibus objections in whole for failure to comply with Rule 3007(d)(6).

## B. "Group" Proofs of Claim Are Permissible and Promote Efficient Administration

55. Hertz's arguments must be independently rejected. Hertz first argues that the proofs of claim should be disallowed because "[t]he Bankruptcy Code, the Bankruptcy Rules and the Bar Date Order require claims to be filed on behalf of individual claimants, not groups." Obj. 2; *see also id.* at 13–16. This objection fails because none of the Code, Rules, or Bar Date Order prohibits multiple individuals from filing their claims on a single proof of claim form. Quite the opposite, this practice of "group" proofs of claim encourages the efficient resolution of the bankruptcy process.

56. Hertz's objection boils down to an effort to misconstrue the FPR Claimants' claims. Hertz argues that the Code prohibits these claims because a group is not an enumerated party that can file a claim. Obj. 14 (extensively arguing that each FPR group is not a "person," "individual," "union," or "unincorporated association"). This is incorrect.

57.     Hertz recognizes that the relevant claims are individual claims that were grouped into proofs of claim for each debtor. Obj. 16 ("The claims seek individual relief for each of the individuals identified"). And the FPR "groups" are simply shorthand references to a large number of individuals with individual claims. Contrary to Hertz's argument, there is no applicable rule prohibiting the FPR Claimants from consolidating their individual claims onto a single proof of claim form.

58.     Courts have rejected Hertz's argument against "group" proofs of claim. In *In re Great Western Cities, Inc. of New Mexico*, 107 B.R. 116 (N.D. Tex. 1989), for example, the court considered whether "proofs of claim were invalid because they were filed on behalf of several individuals." *Id.*, at 118. The court concluded that there was no prohibition on such claims because "[n]either section 501 nor Rule 3001 prohibits an agent with authority from filing claims on behalf of a large group of individuals." *Id.*, at 119. Bankruptcy courts have reasonably followed *Great Western*'s lead. *See, e.g.*, *In re Tronox Inc.*, No. 09-10156 (MEW), 2015 WL 3799702, at *11 (Bankr. S.D.N.Y. June 17, 2015) ("a 'group' proof of claim was acceptable"; citing *Great Western*); *In re FIRSTPLUS Financial, Inc.*, 248 B.R. 60, 65 n.1 (Bankr. N.D. Tex. 2000) (permitting the filing of group claims; citing *Great Western*).

59.     Grouping similar claims on a single proof of claim form is eminently reasonable and promotes efficient administration of the estate. As the court observed in *Great Western*, a contrary rule would lead to an "absurd practice" that would "inundate[e]" courts with thousands of proofs of claim "rather than one or more documents that expressly identify each creditor." 107 B.R., at 119. Put simply, "there was no plausible rational for insisting on such a requirement." *Id.* Here, the FPR Claimants reasonably grouped similar claims onto a handful of claims filed against certain debtors, rather than at least 165 claims filed against each of those debtors, which would

result in inundating the Court with thousands upon thousands of total proofs of claim. This practice will make it far less burdensome for the parties and the Court to administer the bankruptcy process. *Cf.* B.R. 1001 (rules should be interpreted "to secure the just, speedy, and inexpensive determination of every case and proceeding."). And no debtor suffers any legitimate prejudice from this practice.

60.     Hertz has not identified a single case prohibiting the filing of proofs of claim in this manner. Each inapposite case Hertz cites involves a party lacking authority to file a claim on behalf of another party. See *In re N. Bay Gen. Hosp., Inc.*, 404 B.R. 443, 458–463 (Bankr. S.D. Tex. 2009) (an unsecured creditor agent lacked agency authority to file claims on behalf of certain creditors); *In re Cont'l Airlines Corp.*, 64 B.R. 874, 880 (Bankr. S.D. Tex. 1986) (unions "failed to show authorization to file bankruptcy claims"); *In re Standard Metals Corp.*, 48 B.R. 778, 784 (Bankr. D. Colo. 1985) ("Sheftelman has demonstrated no agency relationship between himself and any other bondholders"). There is no basis for extending cases about claims filed for third parties without authorization to a broad rule prohibiting the filing of "group" claims with authorization from each individual in the group. And here, by contrast to the cases Hertz identifies, there is no dispute that the Bankruptcy Code and Rules permit each individual FPR Claimant to file a proof of claim through his or her attorney acting as an agent. *See generally* 11 U.S.C. § 501(a); B.R. 3001(b).

61.     Hertz next argues that several texts describe "a creditor," rather than "creditors." This textual argument ignores basic rules of interpretation. Most obviously, 11 U.S.C. § 102(7) provides that, within the Bankruptcy Code, "the singular includes the plural." So do the Dictionary Act, see 1 U.S.C. § 1, and background principles of legal interpretation, see A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 130–131 (2012) ("The [singular/plural] rule is

simply a matter of common sense and everyday linguistic experience."). Therefore, § 501(a)'s language that "[a] creditor" may file a proof of claim equally permits multiple "creditors" to do so. Hertz's reading is so contrived that, on its view, the text of § 501(a) would prohibit a creditor from filing multiple proofs of claim because it says "a proof of claim" not "proofs of claim." The singular/plural rule equally resolves Hertz's parallel arguments about the text of Bankruptcy Rule 3001, the Bar Date Order, and the Instructions for Official Form 410, none of which prohibit multiple creditors from filing their claims on a group proof of claim merely by use of the terms "a creditor" or "any creditor."

62.    What is more, Hertz takes each of these texts out of context. Section 501(a) plainly describes *who* may file a proof of claim or a proof of interest, not whether similar claims can be grouped. Rule 3001(a) describes what a proof of claim is, not whether several claimants can use a single proof of claim form for their claims. And that rule specifically provides that proofs of claim must only "conform substantially to the appropriate Official Form," all but calling for commonsense practices like grouping similar claims onto a single form for ease of administration—a practice encouraged by Rule 1001's direction to interpret the Rules "to secure the just, speedy, and inexpensive determination of every case and proceeding." The pertinent language in the instructions to Form 410—guidance written for claimants unfamiliar with bankruptcy, not a rule—simply explains that the term "creditor" includes "[a] person," and specifically notes that "exceptions to these general rules may apply." Official Form 410, Instructions for Proof of Claim 1, 2. And the specified language in the Bar Date Order simply clarifies that all creditors must comply with the Bar Date, not whether those creditors can file group proofs of claim. *See* Bar Date Order, Case No. 20-11218, D.I. 1240, ¶¶ 3, 7. None of these writings implicitly or explicitly prohibits the FPR Claimants from using one claim form.

33

63.     Hertz's attempt to analogize proofs of claim to civil complaints similarly fails. Obj.

14. The civil rules specifically permit group pleading. As the *Great Western* court described:

> A group claim, on the other hand, is similar in all pertinent respects to a district
> court civil action in which there are numerous named plaintiffs represented by a
> single law firm. Each plaintiff may have identical or similar causes of action
> resulting in varying amounts of alleged damages. So long as the plaintiffs are
> properly joined as parties, see Fed. R. Civ. P. 20(a), they may prosecute their action
> as a group.

107 B.R., at 118. And Rule 20 welcomes plaintiffs with claims involving "any [common] question

of law or fact" to file a single complaint. Just as Rule 20 promotes efficiency in civil litigation, the

FPR Claimants' filing of proofs of claim in groups improves the efficiency of this bankruptcy

process.

64.     Even if there were merit to Hertz one-claimant-per-proof rule—and there is not—

this objection would provide no basis for disallowing the claims. Filing a proof of claim on behalf

of multiple claimants while listing each of those claimants provides the same level of notice as if

each of those claims had been filed on separate documents. *See supra*. And any purported defect

could easily be cured by furcating the claims by order, *see* 11 U.S.C. § 105, or by permitting them

to be amended, *see* Part E, *infra*. And to the extent that Hertz even hints at prejudice from the claim

filings, its arguments revolve around a perceived lack of substance within the proofs of claim

themselves. The Claimants respond to that argument in Part C, *infra*.

65.     In furtherance of its kitchen sink approach, Hertz also makes the untenable assertion

that the Claimants lack Article III standing to bring traditional, common-law tort claims. See Obj.

13, 15 (citing *Warth v. Seldin*, 422 U.S. 490, 499 (1975)). But this is just an attempt to obfuscate

important and timely filed claims, and the individual FPR claimants obviously have Article III

standing. They assert a variety of traditional, common-law claims against the debtors, and those

claims involve assertions of injuries caused by the debtors that can be redressed, at a minimum, by

34

a monetary award. *See generally TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203–2209 (2021). Hertz's discussion of associational standing is likewise a red herring. See Obj. 15. The FPR "groups" are not separate legal entities that seek payments in their own right, but simply collective terms referring to the individuals bringing claims and demanding individual payment.

### C. **Hertz Offers No Basis for Disallowing the Contested Claims**

66.    Hertz's next set of objections go directly to the merits of the underlying legal claims. In two parts, Hertz argues that Claimants proofs of claim do not meet the appropriate pleading standard and that Claimants cannot file claims against multiple defendants. Neither objection has merit. As a threshold point, however, this court lacks jurisdiction to resolve such objections.

#### 1.    **This Court Lacks Authority to Consider Hertz's Objections**

67.    "A bankruptcy court must have statutory authority and constitutional authority to enter a final judgment on a claim." *In re Trib. Media Co.*, 902 F.3d 384, 393 (3d Cir. 2018). On the statutory front, Hertz asserts that "[t]his is a core proceeding under 28 U.S.C. § 157(b)." Obj. 4. Not so. Section 157(b)(2)(B) explicitly excludes "the liquidation or estimation of contingent or unliquidated personal injury tort … claims against the estate for purposes of distribution in a case under title 11" from the list of core proceedings. This text makes crystal clear that "when it comes time to determine the claims for purposes of distribution, section 157(b)(2)(B) lets it be known that this is not a core matter, and that the determination for purposes of distribution must be undertaken by the district court." 1 Richard Levin & Henry J. Sommer, Collier on Bankruptcy § 3.06 (16th ed. 2021); *In re Mason*, 514 B.R. 852, 857 (Bankr. E.D. Ky. 2014) (rule applies in the "objection to claim context").

35

68.     Here, the claimants bring qualifying personal injury tort claims against the estate. *See, e.g.,* "Personal Injury," *Black's Law Dictionary* (11th ed. 2019) ("Any invasion of a personal right, including mental suffering and false imprisonment."); *In re Mason*, 514 B.R. at 859 ("The Restatement (Second) of Torts recognizes false imprisonment, defamation, and malicious prosecution as torts although they do not necessarily result in bodily injuries."); *Anthony v. Baker (In re Baker)*, 86 B.R. 234, 236 (D. Colo. 1988) (holding that malicious prosecution is a personal injury tort); *In re Von Volkmar*, 217 B.R. 561, 562–63 (Bankr. N.D. Ill. 1998) (arrest qualified as a personal injury tort under any definition); *Pagano v. Hadley*, 553 F. Supp. 171, 177 (D. Del. 1982) ("[A] cause of action for malicious prosecution is in the nature of a personal injury claim.").

69.     Part II of Hertz's objection—titled "The Unsubstantiated Claims Fail to State Claims under Third Circuit Law"—plainly seeks an impermissible determination of the merits of the underlying personal injury claims.[13] Hertz relies primarily on *In re Allegheny International, Inc.*, 954 F.2d 167 (3rd Cir. 1992). While Hertz misconstrues the import of that case, *see infra* ¶¶70–75, there can be no doubt that *Allegheny* sets forth a substantive, burden-shifting framework for analyzing the merits of a claim. Specifically, it assesses how "the burden of proof … rests on different parties at different times." 954 F.2d, at 173. And it guides factfinders and courts in resolving disputes about those claims. Determining whether certain Claimants have satisfied a "burden of proof" with respect to their claims plainly exceeds this Court's statutory and constitutional authority over those claims. *See* Local Rule 3007-1(f)(vi) ("The Court will not consider any substantive Objection to personal injury or wrongful death claims that would be in

---

[13] The claimants equally object on constitutional grounds to the adjudication of their claims by a non-Article III court. See generally *Stern v. Marshall*, 564 U.S. 462 (2011). For purposes of this preliminary response, however, they rely primarily on their statutory objection.

violation of 28 U.S.C. § 157(b)(2)(B)"). Instead, the Claimants have specifically requested and continue to specifically request that their claims relating to this adversary proceeding be resolved in a state court, 28 U.S.C. § 157(b)(5), and by a jury, 28 U.S.C. § 1411(a). At minimum, to the extent this Court does not allow the claims to proceed in state court, authority to resolve the underlying claims resides in an Article III court.

### 2.   Hertz Overlooks the Applicable Law Regarding Burdens of Proof

70.     Hertz's first argument is directed to pleading. Hertz argues that claims must be disallowed—or, at least, the proofs of claim amended—if the four corners of the relevant proofs of claims lack sufficient detail to prove a claim on their own. Obj. 16–24 That is not the law. Instead, claimants are welcome to offer other forms of evidence to prove their claims even where a proof of claim does not comprehensively allege a prima facie right to payment.

71.     By default, a claim filed under § 501 will be deemed allowed unless a party objects. 11 U.S.C. §502(a). Upon objection, a court must "determine the amount of such claim" and "allow such claim in such amount" unless the claim is disallowed for an enumerated reason. See §502(b). Section 502(b) provides the exclusive list of reasons for disallowing a claim. *See Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450 (2007); *In re Cluff*, 313 B.R. 323, 331–332 (Bankr. D. Utah 2004) (explaining why the enumerated reasons for disallowance are exclusive).

72.     The Third Circuit's *Allegheny* decision creates a burden-shifting procedure for resolving the merits of claims in bankruptcy. Under that procedure, the claimant bears an "initial obligation to go forward," also known as a burden of production. (Satisfying that burden shifts a burden of production on the objecting party to refute an essential element of that claim.) Rule 3001(f) offers one means of satisfying a claimant's initial obligation to go forward; that rule

provides, "A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim." *Allegheny* recognizes that, via Rule 3001(f), a proof of "claim that alleges facts sufficient to support a legal liability to the claimant satisfies the claimant's initial obligation to go forward." 954 F.2d, at 173. That makes sense: each allegation counts as a piece of evidence supporting a prima facie right to payment. If the allegations cover the waterfront, the prima facie case is made.[14]

73.    But giving allegations evidentiary weight under Rule 3001(f) is not the only means of satisfying a claimant's burden of production. On the contrary, when a proof of claim lacks allegations making out a complete, prima facie case, the claimant can otherwise meet his "initial burden of proving that the claim exists and the amount of that claim." *In re Cluff*, 313 B.R. 323, 337 (Bankr. D. Utah 2004). Only the subsequent "[f]ailure to fulfill this burden results in the disallowance of a creditor's claim." *Id.* Put another way, the lack of allegations comprising a full, prima facie case within a proof of claim that can be used under Rule 3001(f) is <u>not</u> an independent basis for disallowing a claim, as Hertz suggests. "Section 502(b) enumerates the grounds on which a proof of claim may be disallowed, and non-compliance with Rule 3001 is not one of them." *In re Sears*, 863 F.3d 973, 979 (8th Cir. 2017) (explaining the consequences of failing to bring a prima facie proof of claim); *see In re Heath*, 331 B.R. 424, 435–437 (9th Cir. BAP 2005)

---

[14] In *Allegheny*, the Third Circuit did state that "[i]nitially, the claimant must allege facts sufficient to support the claim." *In re Allegheny Int'l*, 954 F.2d at 173. In the proper context of the opinion, however, this line reflects the idea that a claimant must allege facts to support his or her prima facie case to shift the burden to produce evidence to the debtor under Rule 3001(f). It certainly does not create an atextual, substantive rule that a claim must be disallowed if the facts alleged do not cover every jot and tittle of a prima facie claim. *See In re Kincaid*, 388 B.R. 610, 614 (Bankr. E.D. Pa. 2008).

(explaining why a lack of a prima facie case in a proof of claim is not a basis for disallowing a

claim). Instead, a claimant is welcome to satisfy the burden of production with other evidence.

74.    Judge Sigmund in the Eastern District of Pennsylvania explained a similar point in

the context of a failure to provide adequate documentation supporting a proof of claim under the

*Allegheny* framework:

> The law is well settled that failure to [satisfy the requirements of Rule 3001 is] not
> grounds for disallowance of a claim as § 502(b) supplies the exclusive basis for
> claim disallowance. Rather where the proof of claim does not adhere to the
> requirements of Rule 3001 by providing the facts and documents necessary to
> support the claim, it is not entitled to the presumption of prima facie validity. *E.g.,
> Heath v. American Express Travel Related Services (In re Heath)*, 331 B.R. 424,
> 433 (9th Cir. BAP 2005); *Dove–Nation v. eCast Settlement Corp. (In re Dove–
> Nation)*, 318 B.R. 147, 152 (8th Cir. BAP 2004); *In re Moreno*, 341 B.R. 813, 817
> (Bankr. S.D. Fla. 2006) (citing cases*); In re Shank*, 315 B.R. 799, 810 (Bankr. N.D.
> Ga. 2004) (quoting *In re Stoecker*, 5 F.3d 1022, 1028 (7th Cir.1993)). Absent the
> application of the presumption, the burden of going forward and proving its claim
> by a preponderance of the evidence remains on the claimant. *In re Porter*, 374 B.R.
> 471, 483 (Bankr. D. Conn. 2007); *In re Tran*, 369 B.R. 312, 317–18 (S.D. Tex.
> 2007).

*In re Kincaid*, 388 B.R. 610, 614 (Bankr. E.D. Pa. 2008). And many courts beyond those cited in

*Kincaid* have reached the same conclusion. *See, e.g., In re Live Primary, LLC*, 626 B.R. 171, 188–

89 (Bankr. S.D.N.Y. 2021) ("When, however, a proof of claim fails to comply with Bankruptcy

Rule 3001 and Official Form 410, the proof of claim loses its prima facie validity and the claimant

must come forward with sufficient evidence of the claim's validity and amount in response to the

objecting party."); *In re Hight*, 393 B.R. 484, 493, n.7 (Bankr. S.D. Tex. 2008) ("[F]ailure to

comply with Bankruptcy Rule 3001(c) merely renders a claim to not constitute 'prima facie

evidence of the validity and amount of the claim.'" (internal citation omitted)); *In re Armstrong*,

320 B.R. 97, 104 (Bankr. N.D. Tex. 2005) ("In cases where the creditor has not met the standards

of Bankruptcy Rule 3001 and Official Form 10, the claim is not automatically disallowed; rather,

it is deprived of the prima facie validity which it could otherwise have obtained."); *id.*, at 108

(without prima facie validity, "the creditor would have the burden of proof to establish its claim

by a preponderance of the evidence").[15]

75.     Accordingly, Hertz's argument that the proofs of claim fail to independently state

a prima facie claim under Rule 3001(f) cannot be grounds for disallowing the claims. Instead,

assuming *arguendo* that Hertz is correct that the proofs of claim do not state a complete, prima

facie case under Rule 3001(f), the Claimants merely retain a burden of production that can be

satisfied with other evidence.

### 3.     The FPR Claimants Have Met Their Burden

76.     Hertz argues that—for the majority of their claims—the Claimants have failed to

satisfy their burden of production. Obj. 16-17. Hertz misconstrues the applicable legal standards,

ignores the bankruptcy record, and attempts to knock out factual issues without ever engaging in

discovery.

77.     Hertz stumbles out of the gate by applying the wrong legal standard. Hertz relies

heavily on the *Twombly* and *Iqbal* standards for federal complaints, but those pleading standards

do not apply here. Indeed, the very first case Hertz cites explains that "the U.S. Court of Appeals

for the Third Circuit [has] not imposed the federal pleading standards on those seeking to file

proofs of claim," *In re Nortel Networks, Inc.*, 469 B.R. at 497. Nor have the Bankruptcy Rules.

Instead, courts assessing bankruptcy claims apply a much lower standard looking for "fair notice"

---

[15] Hertz's own authorities also emphasize this point. *See In re DePugh*, 409 B.R. 84, 108 (Bankr. S.D. Tex. 2009) ("The consequence of this ruling is that LVNV's claims are not prima facie valid, and that LVNV bears the burden of proving the validity of its claims by a preponderance of the evidence under Texas law. In order to meet this burden, LVNV must rely on its original proofs of claim and any evidence adduced at the May 21, 2009 hearing.").

and whether a court can "glean an actionable claim." *In re F-Squared Investment Mgmt, LLC*, 546 B.R., at 544; *In re Smurfit-Stone Container Corp.*, 444 B.R. 111, 117 (Bankr. D. Del. 2011) (describing the proof of claim requirements as a "relatively low threshold"); *see also In re Hanlin Grp., Inc.*, 185 B.R. 703, 707 (Bankr. D.N.J. 1995) ("The purpose of a proof of claim is to apprise the debtor and any other interested creditors of the existence of claims and the claim holders' intention to hold the estate liable for debts."); *Adair v. Sherman*, 230 F.3d 890, 896 (7th Cir. 2000) ("The purpose of the proof of claim is to alert the court, trustee, and other creditors, as well as the debtor, to claims against the estate."). As discussed below, the proofs at issue easily meet that relatively low threshold.

78.    Further, unlike a typical civil complaint, a bankruptcy court can (and should) consider any evidence in the record in addition to any allegations in the proof of claim. *See, e.g., In re Kincaid*, 388 B.R. 610, 614 (Bankr. E.D. Pa. 2008); *In re Live Primary, LLC*, 626 B.R. 171, 188–89 (Bankr. S.D.N.Y. 2021); *In re Armstrong*, 320 B.R. 97, 108 (Bankr. N.D. Tex. 2005). Thus, contrary to Hertz's position, a claimant's initial burden of production under *Allegheny* can be satisfied by "information included in the proof of claim, or other evidence in the bankruptcy case record." *In re Umstead*, 490 B.R. 186, 196 (Bankr. E.D. Pa. 2013); *see also In re Tribune Co.*, 2013 WL 1909617 at *2 (offering "an evidentiary hearing to present evidence" and an opportunity for "taking discovery" so that other evidence could be considered under *Allegheny*).

79.    Even at this juncture and without benefit of discovery, there is bountiful evidence in the bankruptcy record. The contested proofs of claim plainly allege that each of the Claimants was harmed because of Hertz's actions—most specifically by "falsely reporting said individual customers for car theft." *See, e.g.,* Claim # 15246 (Group 2 claim against The Hertz Corporation). Most claims provide each claimant's name and detail whether they were detained or arrested,

whether they were jailed (and for how long), whether they were prosecuted (and for how long), and whether they suffered damages from reputational harm, expungement, or credit repair.[16] They allege a specific monetary amount for each claimant. And the proofs of claim detail a pattern of conduct by alleging 165 instances of "falsely reporting said individual customers for car theft."

80.     One of Hertz's chosen causes of action—malicious prosecution—illustrates how the proofs of claim and bankruptcy record contain substantial evidence meeting the burden of production. By way of example, malicious prosecution in Delaware requires: "(1) prior institution or continuation of some regular judicial proceedings against plaintiff in this action; (2) such former proceedings must have been by, or at the instance of the defendant in this action; (3) the former proceedings must have terminated in favor of the plaintiff herein; (4) there must have been malice in instituting the former proceedings; (5) there must have been a lack of probable cause for the institution of the former proceedings; [and] (6) there must have been injury or damage to plaintiff from the former proceedings." *McCoy v. Favata*, 2019 WL 1429570, at *13 (D. Del. Mar. 29, 2019).[17]

81.     The bankruptcy record already contains ample information setting forth malicious prosecution claims. Take the case of Brett McDowell. Exhibit 9, McDowell Decl. ¶ 3.[18]. As

---

[16] Some of the "unsubstantiated" claims were inadvertently not amended to include the damages matrix attached to many of the other claims. *See*, *e.g.*, Claims 10777, 10898, 11113, 11116, 11364, 11449, 11452, 11470. In the context of the record—where an identical spreadsheet was attached to many claims filed in conjunction with one another—Claimants do not believe this to be material or affect Hertz's notice in any way.

[17] For avoidance of any doubt, the FPR Claimants do not argue or concede at this juncture that Delaware law applies to all claims or any particular claim under a proper choice of law analysis. Delaware law is used simply for illustrative purposes and for the Court's convenience (as Hertz does in its own briefing).

[18] The Declaration of Brett McDowell may also be found at Case No. 20-11218, D.I. 3604, 209–210.

detailed in his declaration, Mr. McDowell properly rented two cars from Hertz locations in Lakeland and Longwood, Florida, *id.* at ¶¶2–3; he properly exchanged those cars for other vehicles at the Orlando Airport Hertz location. *Id.* (Elements 1 & 2) Hertz, without investigation, filed police reports alleging that both cars of the cars received via exchange had been stolen, and Brett was prosecuted based on those reports. *Id.* at ¶¶ 6–7. Those charges have since been "*nolle prossed* or a no information" has been returned. *Id.* at ¶8 (Element 3). The theft reports were filed (Element 5) without probable cause given that he had properly rented and exchanged the vehicles with Hertz the day and month before his respective arrests and given Hertz's "faulty computer systems," *id.* at ¶10, and (Element 6) Brett was arrested twice in two days for purportedly stealing cars from Hertz locations, spent time in jail, and spent money hiring a lawyer to defend him. *Id* at ¶¶ 4–5, & 9.

82.    As for malice (Element 4), in Delaware, "malice" in malicious prosecution is "an improper motive or wanton disregard of the rights of that person against whom the act is directed." *Blue Hen Mech., Inc. v. Christian Bros. Risk Pooling Tr.*, 117 A.3d 549, 561 (Del. 2015) (citation omitted). Wanton disregard can be seen by the extensive pattern of conduct detailed in the many dozens of sworn declarations detailing false arrest reports attached to the Ciardi Declaration, Case No. 20-11218, D.I. 3604, in the extensive corporate testimony unveiled in the *Grady* case and demonstrated by other testimony and exhibits already in the bankruptcy record, *see, e.g.,* attachments to Case No. 20-11218, D.I. 5032.

83.    Or take the case of Daiyon Davis. Davis's Cobb County, Ga, charges—tracing to Hertz's theft report—were just recently *nolle prossed* for lack of evidence. *See* Exhibit 1, Malofiy Decl., Attachment R. This happened, in part, because Davis submitted a sworn declaration from a former Hertz district manager that Davis "regulatory rented cars for long periods of time," "always

paid on time," "never kept a car longer than he was supposed to," "returned the cars in perfect condition," and "had a regular practice of calling the branch and extending the contract over the phone." See Exhibit 1, Malofiy Decl., Attachment S, (Declaration of Zachary McGee). Against this backdrop, there could not possibly be "probable cause" to suspect Davis of theft and doing so was the product of "wanton disregard" for his rights (especially considering the pattern of conduct).

84.     Further, as discussed above, Hertz has had actual notice of the nature of these claims for years.

- In January 2017, a federal jury in Galveston, Texas found that Hertz maliciously prosecuted Michael Gray and awarded him damages, including punitive damages, of over $150,000. Mr. Gray had sued Hertz for the same conduct at issue in the present claims. Exhibit 1, Malifoy Decl., Attachment V. This exhibit was previously made part of the bankruptcy record at Case No. 20-11218, D.I. 589-1, at p.28, ¶128 (Delaware State Complaint); D.I 5032, at p.32, ¶144

- In September 2017, a jury in Philadelphia, Pennsylvania reached a verdict in favor of Kelly Grady, finding Hertz culpable of intentional infliction of emotional distress, malicious prosecution, and false imprisonment and awarded $100,000 in damages, which did not include punitive damages. Ms. Grady had sued Hertz for the same conduct at issue in the present claims Exhibit 1, Malifoy Decl., Attachment AJ. Further, in November 2017, the trial court in Ms. Grady's case granted her motion to seek punitive damages and set a trial date on that issue. Exhibit 1, Malifoy Decl., Attachment W and Attachment O. In that Motion, Grady alleged that what happened to her was the product of a systemic deficiencies affecting Hertz business nationwide. Hertz settled with Ms. Grady in December 2017 in order to avoid a looming trial on punitive damages. The *Grady* trial and exhibits therefore have been referenced throughout the bankruptcy record. *See, e.g.*, at Case No. 20-11218, D.I. 589-1, at p.28, ¶129; D.I. 5032, at p.17-20, 22-23, 29-30, 32-33, D.I. 5032-2; 5032-3; 5032-4; 5032-5; 5032-6; 5032-7.

- In October 2018, counsel for a Hertz customer sent Mr. Frecker another letter on behalf of his client seeking redress for wrongful arrest and prosecution. Counsel noted the customer "had a valid contract and Hertz was charging his card, but, nonetheless Hertz decided to report him for grand theft auto, have him arrested, and put him in jail." Exhibit 1, Malofiy Decl., Attachment AE. Counsel described to Hertz's General Counsel how the customer rented a car in February 2018 and had his credit charged for over $3,000.00 and was still reported as stealing the car. *Id*.

In fact, Hertz falsely reported the customer to the authorities approximately one month after charging his card, meaning that Hertz likely misrepresented the payment status to the police.

- On August 6, 2019, counsel for Claimant Ayoub spoke with Kelly Singleton, Deputy Attorney General for the Delaware Department of Justice about Mr. Ayoub's case. Counsel provided Ms. Singleton with Mr. Ayoub's call history, information related to the Grady case, Mr. Ayoub's rental receipt showing a $2,300 Hertz charge, and his credit card receipt showing the same charge. On August 9, 2019, Ms. Singleton said that she needed to reach out to Hertz for answers, id., and a week later, Ms. Singleton stated that she would be entering a *nollo prosequi* in the case. Exhibit 1, Malifoy Decl., ¶39. The Ayoub case and exhibits therefrom were previously made part of the bankruptcy record previously made part of the bankruptcy record at D.I. 589-1, at p.47-48, ¶261-73; D.I. 893, at p.10-11; D.I. 5032, at p.15, 25-27; D.I. 5032-8; 5032-9; 5032-10; 5032-11; 5032-12.

- In December 2019, Claimant's counsel sent Hertz's counsel an email advising of forthcoming lawsuits regarding several Hertz customers for the same pattern of malfeasance involved in prior cases. Claimants' counsel told Hertz counsel, consistent with the later-filed claims, that Hertz "fails to follow their own standard operating procedures, refuses to fix broken computer systems, cuts out corporate security managers because they cost too much, and routinely throws good paying customers in jail." Claimant's counsel also noted Hertz's "reckless indifference to the rights of others." These exhibits were previously made part of the bankruptcy record at D.I. 5032-12, at p.7-9.

- In February 2020, Claimant's counsel wrote another letter to Hertz counsel as well as Hertz's CEO. Claimant's counsel began by reminding Hertz about his years' long efforts at seeking redress for falsely arrested customers. Counsel also attached brief summaries of 23 Claimants' ordeals, and again identified the basis for the claims: "Hertz's computer Hertz's computer systems *are-obviously-broken* and outdated. The company can't keep track of inventory, doesn't know when rentals are extended or returned, can't account for payments, and isn't doing the local investigations mandated in its theft reporting standard operating procedure W7-02(A)(17). Compounding matters, the locations, OKC, and corporate security have no idea what each other are doing. In some cases, Hertz bizarrely rents cars to customers that Hertz reported stolen ***before*** the rental began." Counsel reminded Hertz that "six months ago I submitted to your company a list of clients detailing how they had been wrongfully detained, jailed, and prosecuted. These customers had paid, extended, and event returned their rentals." *Id*. In response to Counsel's letter, Hertz's counsel conveyed that he had spoken to his client "in some detail" and that Hertz was doing its "due diligence to quickly obtain pertinent information on each claim." These exhibits were previously made part of the bankruptcy record at D.I. 763; D.I. 5032, at p.7-8, ¶21-22; 5032-12, at p.2-9.

- Between April and June 2020, Claimants' counsel served several briefs regarding Hertz's systemic failures and summarizing the harm to some of his clients. See, e.g., Exhibit 1, Malofiy Decl, Attachment M (Channell Brief); *Id.*, Attachment N (Stepanyan Brief); & *Id.*, Attachment L (Missing Documents Brief).

85.    Given this background, Hertz cannot credibly shrug its shoulders and complain about lack of notice or understanding of the claims. Hertz knows exactly who it filed police reports for theft by conversion and knew that systemic issues had been raised about its practices. Yet it made no attempt to provide them with notice during the entirety of the bankruptcy process and has ignored Claimants since the day of filing. Now, after Hertz has emerged unimpaired, Hertz seeks to use its own failure to provide notice as grounds to strike these claims.

86.    In addition to this direct knowledge, Hertz certainly must have been aware of the news coverage of its deficiencies. In May 2018, ABC6 Action News reported how Hertz customers had been wrongly arrested. Investigative reporter Chad Pradelli identified six customers who had their rental cars reported stolen, including Ms. Grady and Ms. Van Pay. According to the news outlet, it reached out to Hertz "but the company declined to participate" in the story. *Id.* Similarly, in March 2019, Matthew Mershon of ABC7 in Little Rock, Arkansas reported on the ordeal suffered by Hertz customer Jonathan Olivares, who was arrested and jailed improperly. The story states that the day after Olivares's release, he received a phone call from Hertz corporate offices, explaining they were aware of incident, were looking into how it happened and that they would quickly get him his belongings that were confiscated with the car by the police. *Id.* According to Olivares, "Same lady called back said we're going to take full responsibility for this." *Id.* As part of the story, ABC7 reached out to Hertz for comment, "but both a phone call and email went unreturned." *See* note 7, *supra*.

87.     The majority of the foregoing is in the record. Indeed, the record in this case is rife with descriptions of the claims and Hertz's misconduct, which package the Groups together. *See, e.g.,* Case No. 20-11218, D.I. 894 n.3 (noting that "Counsel has been contacted on an almost daily basis by additional plaintiffs with similar claims. The number of False Police Report Plaintiffs will continue to grow. As of the filing of this Brief, counsel is vetting an additional fifty claims, some of which have both pre- and post-petition conduct and some for which all conduct occurred post-petition."); Case No. 20-11218, D.I. 2593 (Group 2 Motion for Relief from Stay: "Movants seek relief from the automatic stay to file and prosecute claims against the Debtors (collectively herein referred herein as "Hertz") similar to those presented by another group of False Police Report Plaintiffs, who are the subject of another motion for relief pending. *See* [Case No. 20-11218,] D.I. 589. Simply put, the twenty-six (26) plaintiffs that are the subject of D.I. 589 were just the tip of the iceberg. Hertz has continued post-petition the harmful and illegal conduct complained of by the first group of False Police Report Plaintiffs."); Case No. 20-11218, D.I. 5656 (Same as to Group 3). This is in addition to the proofs themselves that alone provide Hertz with reasonable notice based on: (1) the title "False Police Report Plaintiffs" and numbering them in series, making it clear that this is all stemming from the same issues, (2) a Damages Matrix attached to most proofs for Groups 1, 2, and 3, which makes it clear that this is a unified problem, (3) that most of the proofs of claim for Groups 1, 2, and 3 provided a single damages figure that incorporates all the groups, (4) the allegations in the Group 1 Amended Proofs of Claim make it clear that all 165 relate to the same issues and are to be considered in aggregate, *e.g.*, Claim 15263 ¶¶3–7, (5) Paragraph 1 of the Group 2 Amended Proofs of Claim makes it clear that this is the same false report problem as alleged in the Group 1 pre-petition civil complaints, *e.g.,* Claim 15275, and (6) Paragraph 2 lists the same main causes of action as in the Group 1 civil suits, *e.g., id.*.

47

88.     Also made part of the record are "memos" created by Counsel for Claimants to chronicle and describe the failures within Hertz that have caused Claimants' injuries. *See, e.g.*, Exhibit 1, Malofiy Decl., Attachment J (Memorandum on destruction of documents). The first memo describes how Hertz improperly destroys its rental records, and that Hertz "has admitted that various files, voice recordings, contract notes, and phone records of customers are purged from its system without regard for the fact that a case may go to suit and has been reported to the police as a crime." *Id.* at p.2. Hertz's destruction of records given the baseless criminal cases it has initiated is appalling. *See* Exhibit 1, Malofiy Decl., Attachment E.

89.     A second memo describes Hertz's practice of deleting rental extensions and back-dating the vehicles' due dates. Exhibit 1, Malofiy Decl., Attachment P (Memorandum on erasure of rental extensions). The focus of the memo was Hanna Ayoub's case, and how Hertz's systems deleted all record of Mr. Ayoub calling Hertz and extending his rental. As the memo states, "The implications of this failure are wide-reaching. Hertz has been denying that the renters at issue have extended their rentals-claiming that the theft packages are complete-but in reality Hertz is systematically deleting any record of the extensions which confirm that the renters have been advised by Hertz of the continued authorization to use the vehicles. This evidence undercuts every theft report that Hertz has ever submitted for an overdue rental." *Id.* at p.2.

90.     A third memo focuses on Hertz's policy of charging a customer's card after submitting a police report. Exhibit 1, Malofiy Decl., Attachment AH (Memorandum on false payment information). Hertz recognizes that law enforcement agencies are less likely to act on a theft report if the rental has been paid. Accordingly, Hertz's stated policy is to file the police report without telling the police that it is about to charge the card. In some instances, Hertz tells the police

48

that the customer's card has been denied, which is clearly a misrepresentation. Of course, the prosecutors and police reasonably view payment as a key piece of information.

91.     The fourth memo highlights Hertz's failure to investigate the potential thefts before filing the report. Exhibit 1, Malofiy Decl., Attachment AI (Memorandum on failure to investigate). The memo explains how "Hertz policy W7-02(a)(17) mandates that all theft reports be independently investigated and verified by Hertz location corporate security managers. However, in 100% of the cases, Hertz does not perform this required investigation. Multiple Hertz corporate designees testified in the *Grady* case that Hertz corporate has given them marching orders, that theft packages compiled by Vehicle Control in OKC are to be immediately delivered by location personnel to the police ***with no independent verification*** and no inquiry into whether payment has been made, the vehicle returned, the rental period extended, the inventory lost, or any other facts that might be critical to the decision to accuse a customer of having stolen a Hertz vehicle."

92.     Finally, the record contains dozens of declarations by Group 1 and Group 2 Claimants describing their ordeals. Case No. 20-11218, D.I. 3604. Those declarations take up over 275 pages of the record. Hertz overlooks these declarations—filed before plan confirmation—completely.

93.     Hertz itself has repeatedly discussed the claims in a manner that reflects their recognition and appreciation of the claims. For example, in response to Group 2's motion for relief from the automatic stay, Hertz said, "On June 25, 2020, a group of 26 plaintiffs, calling themselves the 'False Police Report Plaintiffs,' filed a motion for relief from the automatic stay with respect to several pending prepetition lawsuits against the Debtors, their current and former officers and directors, and other parties [D.I. 589]. A full seven months later—and more than eight months since the Petition Date—the False Police Report Plaintiffs' counsel filed the Motion on behalf of

an additional 115 purported plaintiffs ("Movants"), 112 of whom seek to commence new lawsuits against the Debtors and their officers and directors in state courts across the country." Case No. 20-11218, D.I. 2848 at ¶1. Hertz also asked that the injunction it requested in the adversary action against Group 1 also be applied to Group 2, showing that even Hertz knew they were directly related. *Id.* at ¶3. And in its August 11, 2021 Response to Group 3's Motion, Hertz declared that "liquidating Movants' claims in numerous other courts would require the Reorganized Debtors to defend what Movants argue is ***essentially the same issue*** in various separate proceedings." Case No. 20-11218, D.I. 5703 at 9, ¶ 17 (emphasis added).

94.     Hertz has likewise known enough about the claims at issue in these cases to argue about (and against) them at hearings before this Court. During an August 19, 2020 hearing, counsel for Hertz argued that "we don't believe these are personal injury claims that this Court can't liquidate" and added that the "policies that we've laid out or the ones that we've produced to them are the ones that we believe that are relevant and applicable to these particular claims." Case No. 20-11218, D.I. 1091 at 84, 88. Counsel for Hertz also complained about "other potential claimants" and questioned the relevance of additional claimants: "I don't think you really heard a proffer as to why that's relevant, other than this vague notion that the equities of the case would require Your Honor to allow these particular plaintiffs to go forward because the debtors may have treated other potential claimants in an adverse way." *Id*. at 88-89.

95.     Similarly, during a hearing on April 22, 2021, Hertz's counsel described the claims of 131 claimants as "serious accusations" and understood that "they are all alleging pre- or post-petition injury as a result of an alleged Hertz policy." Case No. 20-11218, D.I. 5032, at 15. Hertz's counsel also described the misconduct at issue:

> At the end of the day these are all claims against the debtors. The policies that they're talking about wanting to change are the policies of the debtors that on the effective date isn't going to be the old debtor. There is going to be new equity holders. There is going to be a new board. And to the extent that new entities, the reorganized debtor, commits acts against customers or, more appropriately said, files reports that cause police to take action against customers that is not getting -- that is not what we need to be doing.

*Id.* at 21. In fact, in conjunction with that hearing, Hertz drafted a proposed order, ultimately signed by the Court, Case No. 20-11218, D.I. 4616, that treats the Group 1 and Group 2 Claimants identically, conclusively proving that Hertz knew what the Group 2 claims were about. If Hertz can treat Group 2 the same as Group 1 for its opposition to relief from the stay, it can treat Group 2 (and 3) the same for purposes of proofs of claim.

96.    At the June 10, 2021 confirmation hearing, counsel for Hertz listened to Claimants' counsel argue that Hertz had not acted in good faith as to the FPR Claimants, listened to Claimants' counsel describe how more and more claimants were coming forward each day "not because the debtor gave notice, but because they have heard from other victims of Hertz that we are representing them," and "the debtor has ignored our issues for over four years and tomorrow there will be another false report filed." Case No. 20-11218, D.I. 5278 at 14-15. Claimants' counsel added that "there has not been proper notice nor has there been good faith." *Id*. at 15. In response, the Court confirmed that Claimants' claims are preserved. *Id*. at 17.

97.    Hertz ignores all of this and buries its head in the sand, but this evidence negates Hertz's feigned unawareness and so-called "due process" arguments. The undeniable fact is that Hertz has had actual notice, and given the record, the proofs of claim provide sufficient notice from which the Court can "glean an actionable claim," and easily meet the "relatively low threshold." *In re F-Squared Investment Mgmt, LLC*, 546 B.R. at 546; *In re Smurfit-Stone Container Corp.*, 444 B.R. at 117 (describing the proof of claim requirements as a "relatively low threshold").

98.    Hertz's briefing and hearing argument also arguably also trigger judicial estoppel. In *Ryan Operations G.P. v. Santiam–Midwest Lumber Co.,* 81 F.3d 355, 358 (3d Cir. 1996), the Third Circuit explained: "[t]he basic principle of judicial estoppel ... is that absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory." *Id.* In *Montrose Medical Group Participating Savings Plan v. Bulger,* 243 F.3d 773, 779-80 (3rd Cir. 2001), the court identified certain criteria for determining when seemingly inconsistent litigation stances justify application of the doctrine:

> "First, the party to be estopped must have taken two positions that are *irreconcilably inconsistent.* Second, judicial estoppel is unwarranted unless the party *changed his or her position "in bad faith* –i.e., with intent to play fast and loose with the court." Finally, a district court may not employ judicial estoppel unless it is "tailored to address the harm identified" and *no lesser sanction would adequately remedy the damage* done by the litigant's misconduct.

(Emphasis in original); *see also New Hampshire v. Maine*, 532 U.S. 742, 121 S.Ct. 1808, 1815, (2001) (stating that it is a primary consideration whether "the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped").

99.    In this case, Hertz derived benefit from its earlier arguments to the Court that reflected an understanding of Claimants' allegations and a desire to treat all groups identically. Hertz cannot now pretend the groups are separate or that the allegations are somehow unclear. Before it filed its Objections, Hertz was able to brief, argue, try, settle, and respond to claims like the ones brought by Claimants. Now, Hertz omits this actual notice and complains that the absence of notice creates a due process issue for the multi-national company. Employing judicial estoppel

to overrule the Objections would constitute a narrowly tailored remedy to address the harm identified.

### 4.     A Proof of Claim Can Be Directed at Multiple Debtors

100.    In the second part of its pleading-based argument, Hertz argues that the "unsubstantiated claims" should be disallowed because similar claims were filed against many debtors. Obj. 21. This argument is largely misdirection. A different proof of claim was filed by each Claimant group against each Debtor, asserting that the specific Debtor named in the proof of claim is liable for the harms caused to the named claimants. Indeed, Hertz specifically requests that its objection to each claim "shall constitute a separate contested matter." Obj. ¶ 70. And each of those contested matters involves claims filed against only a single debtor. "Group pleading" cases assessed under *Twombly* and *Iqbal* are simply inapposite.[19] And contrary to its obligations under Bankruptcy Rule 3007(d)(6), Hertz does not identify any "applicable rul[e]" that prohibits claimants from filing proofs of claim against multiple debtors alleging the same tort causes of action. (There is none.)

101.    On September 6, 2021, Hertz's counsel reached out to Claimants' counsel in a further effort to narrow the universe of Debtors. In particular, Hertz proposed that Claimants withdraw their claims against the Debtor entities that do not rent cars. Claimants' counsel advised that Claimants would be amenable to that proposal provided Hertz (1) confirms that the Debtor entities to be dropped are in fact not involved in any way with any conduct related to the claims

---

[19] *See, e.g., In re PennySaver USA Publishing, LLC*, 602 B.R. 256, 268 (Bankr. D. Del. 2019) (dismissing a fraudulent transfer complaint under Rule 12(b)(6) *without prejudice* because the complaint did not allege which of three parties had received the transfer); *In re Conex Holdings, LLC*, 514 B.R. 405, 414 (Bankr. D. Del. 2014) (Rule 12(b)(6) ruling that "conclusory statements" failed to plausibly allege "with any specificity … how any of the individual defendants breached any fiduciary duty").

and defenses of the False Police Report Plaintiffs; (2) agrees not to rely on corporate formalities to challenge any judgment or deny collectability; and (3) agrees not to rely on corporate formalities to oppose discovery, *i.e.*, by arguing that certain information or documents are in the possession, custody, and control of a dismissed entity. That offer was sent on September 9, 2021. Hertz counsel responded that they would "discuss [Claimants'] request" with the Hertz's "team and will follow up if we were amenable to them." *Id*. Hertz never followed up.[20]

102.    The Claimants remain ready and willing to voluntarily withdraw even more claims against Debtors that, on a reasonable view of the facts, should not be subject to a claim. But the Debtors are part of a dizzying web of corporate relationships. *See, e.g.,* Case No. 20-11218, D.I. 1, at 25 (chart of corporate structure with Debtor entities). The information necessary to answer those questions is in Hertz's possession, and Hertz has opposed discovery at every turn. Indeed, Hertz cites a case making a similar point. See *In re Innovative Commc'n Corp.*, 2010 WL 1728536, at *4 (D. V.I. 2010) (noting that "the trustee is in control of the Innovative Communication entities and I think at least they are [sic] required to show whether on the books and records if ... there is some information regarding whether or not there is a claim owed").

---

[20] These good faith efforts roundly distinguish this case from the allegations in *Mallinckrodt*. In *Mallinckrodt*, for example, claims allegedly were filed "with actual knowledge that either no claim existed or likely existed at all," 7/23/21 Trans. at 141:25–142:1, whereas the FPR Claimants have voluntarily withdrawn their claims against 14 different debtors upon knowledge that no claim would lie. See Case No. 20-11218, D.I. 4322-1. In *Mallinckrodt*, the claimants purportedly aimed to "caus[e]" destruction … to the debtor's plan of reorganization process," *id.* at 142: 5–6, whereas the FPR Claimants have been careful not to obstruct what has been, by all accounts, a very successful reorganization. In *Mallinckrodt*, the claimants allegedly withdrew discovery requests that could have helped winnow their claims, whereas the FPR Claimants have actively pursued discovery that has been denied. And, overall, the oral *Mallinckrodt* decision appears to be have boiled down to a determination that the claimants had proceeded in bad faith. By contrast, the FPR Claimants have proceeded in good faith and simply seek justice for the severe and real harms caused by Hertz's false police reporting practices.

103.   Even playing in Hertz's sandbox, however, there is no just (let alone lawful) basis for penalizing the Claimants for proceeding with separate claims against different debtors. The Claimants have engaged in a good faith effort to file claims against debtors liable for their injuries. To that end—as Hertz acknowledges—the Claimants have previously withdrawn claims against debtors when there appeared to be no continuing basis for that claim.

104.   To be sure, Hertz makes a weak effort to differentiate debtors with direct "consumer rental car operations" from other debtors, but it offers no evidence whether the other debtors have any connection to the policies and actions that underlie the systemic false police reporting at issue in these cases, such as record deletion or call logging. And it is plainly the case that any debtors acting in concert may be held jointly and severally liable for these claims. *See, e.g., In re Pacor*, 110 BR 686, 688 (E.D. Pa. 1990) ("No logical reason exists to distinguish co-debtors from joint tortfeasors. … Joint and several liability is not substantively different from co-debtor, guarantor or surety relationships. A liability is joint and several where a creditor can seek payment from any or all of the debtors.").

105.   For these reasons, the "group pleading" arguments are inapplicable to this case and offer no basis for disallowing the claims (and especially the claims against The Hertz Corporation). Debtors' objection on that ground must be overruled.

### 5.   Claimants Are Entitled to Discovery and Evidentiary Presentation

106.   Hertz's challenge to Claimants' ability to satisfy the burden of production also is premature and inconsistent with this Court's scheduling order, which called for only "preliminary objections" at this juncture. Case No. 20-11218, D.I. 5875, at 2. If the Court feels it is now appropriate to test the Claimants' evidence against a prima facie standard, however, the Claimants request an opportunity to engage in discovery relating to the merits of the underlying claims.

107.    On information and belief, the Claimants believe that Hertz has in its possession substantial amounts of information relating each of the underlying individual Claimants. *See* ¶¶23–24, 26, *supra*. These include at least (1) phone records; (2) billing records; (3) rental records; (4) records of police reports filed against the Claimants or concerning cars the Claimants had properly rented; (5) internal documents discussing and analyzing the various incidents; and (6) communications with the claimants and law enforcement. Moreover, the Claimants anticipate that substantial amounts of discoverable information are in the Debtors' possession relating to systemic failures in its investigation, rental extension, and reporting systems. Counsel for the Claimants previously obtained similar information in the *Grady* case. There is no reason to think that similar information does not exist relating to the other Claimants. Importantly, the Claimants have not delayed in seeking this information. They filed initial discovery requests near the beginning of these proceedings, which the Court denied without prejudice. Case No. 20-11218, D.I. 1266. The Claimants have abided by that order and waited for the bankruptcy to proceed. Now that Hertz has challenged the merits of these claims, Claimants are entitled to an opportunity to engage in discovery to obtain additional information to further support their claims.

108.    *In re Tribune Co.*, 2013 WL 1909617, on which Hertz relies, illustrates the point. In that case, a claimant filed a proof of claim containing very little information substantiating a right to payment. The debtor objected that the claimant had failed to carry her burden of production under *Allegheny*. The Court did not simply scrutinize the proof of claim. Instead, "the Court offered the parties the opportunity to participate in an evidentiary hearing to present evidence" about the claim and asked the parties to "establish[h] deadlines and procedures for taking discovery in connection with the contested claim." 2013 WL 1909617 at *2. The Claimants respectfully request the same opportunity to discover and present evidence here, especially if the Court is inclined to

56

reach this issue and believes that additional evidence is necessary to meet any particular claimant's burden of production.

### D.    No Rule Prohibits the FPR Claimants from Moving to Certify A Class

109.    In Part III of the Objection, Hertz challenges the notion of class proofs of claim and argues that "[b]efore filing a class [proof of] claim, the proponent '(1) must make a motion to extend the application of [Fed. R. Civ. P.] 23 to some contested matter, (2) satisfy the requirements of Rule 23, and (3) show that the benefits derived from the use of the class claim device are consistent with the goals of bankruptcy.'" Obj. 25 (quoting *In re Musicland Holding Corp.*, 362 B.R. 644, 651 (Bankr. S.D.N.Y. 2007)). Hertz's categorical approach requiring these steps *before filing a claim* fails as a matter of law, precedent, and common sense. Put simply, "there is no *per se* rule prohibiting class certification" after the bar date where a putative "class proof of claim was filed before the applicable bar date." *In re F-Squared Inv. Mgmt., LLC*, 546 B.R., at 547.[21]

110.    Hertz alludes to, but declines to press, a wholesale objection to class proofs of claim. *See* Obj., at 24–25, n.17; see *Federal Trade Commission v. AbbVie Inc.*, 976 F.3d 327, 368 n.3 (3d Cir. 2020) ("Arguments raised in passing (such as, in a footnote), but not squarely argued, are forfeited" (internal quotation marks omitted)). In all events, this Court has already rejected that argument, *see In re Kaiser Grp. Int'l, Inc.*, 278 B.R. 58, 62–64 (Bankr. D. Del. 2002) (Walrath, J.) (granting motion to certify class), and noted that "[t]he vast majority of courts have concluded that class proofs of claim are permissible in bankruptcy proceedings, pursuant to Bankruptcy Rules

---

[21] Hertz suggests that the class proofs of claim may not still be alive. For avoidance of doubt, the Claimants continue to press their class proofs of claim and, at this juncture, anticipate filing a motion for class certification. Hertz similarly notes, but does not press as an independent ground for objection, that the class proofs of claim "name no putative lead plaintiff." Obj. 24 n.16. But any of the Claimants, or some group of them, could serve as class representatives. The appropriate time to resolve class representation issues will be in the context of a request to certify the class.

7023 and 9014," *id.* That remains true today. Compare *Gentry v. Siegel*, 668 F.3d 83, 88–90 (4th Cir. 2012) (permitting class proofs of claim); *Birting Fisheries v. Lane*, 92 F.3d 939, 939 (9th Cir. 1996) (same); *In re Charter Co.*, 876 F.2d 866, 869 (11th Cir. 1989) (same); *Reid v. White Motor Corp.*, 886 F.2d 1462, 1469–70 (6th Cir. 1989) (same); and *In re Am. Reserve Corp.*, 840 F.2d 487, 488 (7th Cir. 1988) (same); with *In re Standard Metals Corp.*, 817 F.2d 625, 630 (10th Cir. 1987) (rejecting class proofs of claim).

111.    Bankruptcy Rule 7023 specifically provides that "Rule 23 F. R. Civ. P. applies in adversary proceedings." The class proofs of claim at issue here, however, are not "adversary proceedings." *See* Bankruptcy Rule 7001. Instead, Rule 9014(c) permits courts to "direct that one or more of the other rules in Part VII," including Rule 7023, "shall apply" in contested matters like the objected-to class proofs of claim. Contrary to Hertz's argument that claimants cannot seek to extend Rule 23 prior to filing a proof of claim, Rule 9014(c) specifically provides that courts may direct application of "other rules in Part VII," such as Rule 7023, "at any stage in a particular [contested] matter."

112.    Hertz's categorical approach, moreover, elides that Rule 9014—and hence the formal mechanism for applying Rule 23 outside of an adversary proceeding—applies only to "contested matters." "Merely filing a proof of claim is insufficient to initiate a contested matter." *In re Trans World Airlines, Inc.*, 280 B.R. 806, 807 (Bankr. D. Del. 2002). Instead, Hertz initiated these contested matters when it filed its omnibus objections on September 20, 2021. See *id.* ("However, if a proof of claim is objected to, the claim will be considered a contested matter between the debtor and claimant"); Bankruptcy Rule 3007, Adv. Comm. Notes ("The contested matter *initiated* by an objection to a claim is governed by rule 9014" (emphasis added)). As the Eleventh Circuit has explained, "Prior to [the objection], invocation of Rule 23 procedures [via

58

Rule 9014] would not be ripe, because there is neither an adversary proceeding nor a contested matter." *In re Charter Co.*, 876 F.2d 866, 874 (1989). Hertz's proposal to require 9014(c) motions before the filing of proofs of claim—and necessarily before that proof of claim becomes a contested matter—is inconsistent with Rule 9014.

113.    Following the plain text of the rules, "courts have certified a class proof of claim post-confirmation where, as here, the class proof of claim was filed before the applicable bar date." *In re F-Squared Inv. Mgmt., LLC*, 546 B.R. at 547; *id.* at 547, n.54 (collecting examples); *see also Gentry v. Siegel*, 668 F.3d 83, 91 (4th Cir. 2012) ("[I]nsofar as the bankruptcy court ruled that claimants could not file class proofs of claim without first obtaining an order under Rule 9014, we reverse the ruling."). Most significantly, this Court permitted that approach in *In re Kaiser Group International, Inc.*, in which it granted a motion for class certification filed 13 months after filing of the class proof of claim, 9 months after plan confirmation, and 2.5 months after objection to the class proof of claim, 278 B.R. at 61-62 (Walrath, J.).

114.    This approach makes sense. Hertz's rule would compress substantive briefing into a remarkably short timeline. Proofs of claim will generally be filed by the bar date, which in this case was only 35 days after notice was mailed to certain claims holders (although notice was not mailed to the Claimants). It is unrealistic to expect a Rule 9014(c) motion to be filed, litigated, and ruled upon in that slim window.[22] Courts have also recognized "practical … reasons why it might be premature for a class claimant to seek to certify the class prior to objection," *In re Charter Co.*, 876 F.2d, at 874 n.13. One significant advantage is the possibility of settlement—or simply a lack

---

[22] Hertz's references to the Moretti class certification motion illustrate the point. That initial motion was a 39-page brief to which Hertz took almost four months to reply. Compare Case No. 20-11218, D.I. 1748 (filed 11/13/20), with Case No. 20-11218, D.I. 3158 (filed 3/10/21). It is unrealistic to cram that process into the short window before the bar date.

of an objection—without the need for a contested proceeding. *Id.* Indeed, in this very case the Claimants understand that Hertz settled a class claim before this Court ruled on a contested 9014(c) motion. *See* Case No. 20-11218, D.I. 5904 (Moretti Settlement Agreement).

115.    Hertz's cited authorities do not erect the *per se* rule Hertz proposes. Hertz first cites *Musicland* to say that "[b]efore filing a class claim, the proponent must" take all steps to certify the class. 22nd Omnibus Obj., at 25. But *Musicland* does not say that; on the contrary, it specifically considered a request for class certification filed long after the proof of claim, noting that the timing of the motion merely "bears on the exercise of the discretion whether to apply Rule 23." 362 B.R., at 652; *see also In re Computer Learning Centers, Inc.*, 344 B.R. 79, 89 (Bankr. E.D. Va. 2006) ("Rule 9014 establishes no deadline for filing a Rule 7023 motion"; timeliness "depend[s] on the circumstances of the case"); *In re Craft*, 321 B.R. 189, 198–199 (Bankr. N.D. Tex. 2005) (considering timing as one of several factors guiding the court's discretion).[23] Hertz's other citations affirmatively reject its approach. One case held that "the debtor's objection to a class proof of claim is a necessary stage in a contested matter within the meaning of Bankruptcy Rule 9014." *In re Thomson McKinnon Sec. Inc.*, 133 B.R. 39, 41 (Bankr. S.D.N.Y. 1991) (citing *In re Chateaugay Corp.*, 104 B.R. 626, 634 (S.D.N.Y. 1989)). Another that "a motion under Rule 9014 to make Rule 7023 applicable in matters involving contested proofs of claim … rightfully should have been filed … soon after the Debtor filed its Omnibus Objection to Claims." *In re FIRSTPLUS*

---

[23] Hertz identifies an offhand remark made by Judge Dorsey as part of the *Mallinckrodt* litigation. See June 29, 2021 Transcript at 20:17-19, *In re Mallinckrodt plc*, Case No. 20-12522 (JTD) (Bankr. D. Del. June 30, 2021) (D.I. 3074) ("As debtor points out, the proper procedure would be for claimants to first seek permission to file class proofs of claim before filing those claims."). But Judge Dorsey declined to rule on that basis and instead considered motions filed after the purported class proofs of claim under the *Musicland* factors. *Id.* at 19–29. This offhand remark—offered without legal reasoning—does not support Hertz's categorical rule or alter the plain meaning of the Bankruptcy Rules.

*Fin., Inc.*, 248 B.R. 60, 72 (Bankr. N.D. Tex. 2000). To be sure, some courts have permitted parties to seek application of Rule 23 to a purported class claim before an objection to that claim—in some tension with the text of the Bankruptcy Rules—but that is a far cry from the categorical approach Hertz would use to quash the class claims at issue here.

116.    In sum, there is no rule prohibiting any forthcoming motion to certify the class claims. Hertz's objection on that ground must be overruled.

**E.**    **In the Alternative, the Court Should Permit Claimants to Cure Any Alleged Defects**

117.    Should the Court credit any of Hertz's arguments, Claimants respectfully request the Court's leave to amend the proofs of claim pursuant to Article VII, Paragraph H of the Confirmed Plan, see Doc. 5261-1, at 79, and, if necessary, through this Court's application of Bankruptcy Rule 7015. *See* Bankruptcy Rule 9014(c). Although amending the proofs of claim is not necessary for the reasons explained above, the Claimants believe that doing so would likely facilitate the "just, speedy, and inexpensive determination" of these proceedings. B.R. 1001.

**1.**    **The Claimants Should Be Granted Leave to Amend**

118.    "The decision to allow amendments to a proof of claim is within the discretion of the Bankruptcy Court." *In re Ben Franklin Hotel Assocs.*, 186 F.3d 301, 309 (3d Cir. 1999). Courts generally consider motions for leave to amend under the standards under Federal Rule of Civil Procedure 15. *See, e.g., id.*; *In re Omega Optical, Inc.*, 476 BR 157 (E.D. Pa. 2012); *In re Quinn*, 423 B.R. 454, 463 (Bankr. D. Del. 2009).

119.    The Federal Rules make clear that courts "should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). In interpreting that rule, the Supreme Court has emphasized that "freely given" means what it says: "[i]f the underlying facts or circumstances relied upon by a plaintiff *may* be a proper subject of relief, he ought to be afforded an opportunity

to test his claim on the merits." *Foman* v. *Davis*, 371 U.S. 178, 182 (1962) (emphasis added). Absent a compelling reason not to grant leave, "the leave sought should, as the rules require, be 'freely given.'" *Id.*

120.    On that standard "amendment of a [proof of] claim … should be granted where the purpose is to cure a defect in the claim as originally filed, to describe the claim with greater particularity or to plead a new theory of recovery on the facts set forth in the original claim." *In re Trans World Airlines, Inc.*, 145 F.3d 124, 141 (3d Cir. 1998) (citing *Hatzel & Buehler, Inc. v. Station Plaza Assocs.*, 150 B.R. 560, 562 (Bankr. D. Del. 1993)). "In general, the Third Circuit follows a policy of liberality in allowing amendments, especially when a debtor had notice of the substance of a creditor's claim." *In re Quinn*, 423 B.R. 454, 463 (Bankr. D. Del. 2009), on reconsideration in part, 425 B.R. 136 (Bankr. D. Del. 2010). In this instance, the FPR Claimants would amend the challenged proofs of claim to "describe the claim with greater particularity" and, if the Court finds a technical defect, to cure that defect.

121.    Justice overwhelmingly demands permitting an amendment to these claims. Hertz's wishes to use a variety of technical objections to rid itself of very serious claims. It purports to ground its objections in Due Process. But it is the Claimants who were deprived of liberty— accused, stopped, arrested, jailed, and prosecuted—because of systemic failures leading to, if not encouraging, false theft reports. Thomas Channel suffered a heart attack; Julius Burnside spent seven months in prison; Shontrell Higgs spent 171 days imprisoned and miscarried during that time; the stories are powerful and horrifying. And it would be uniquely unjust to disallow these claims on procedural and technical objections when the approved plan has allowed all unsecured creditors to emerge from bankruptcy unimpaired. The FPR claimants have now heard Hertz's technical objections for the first time. They should be given an opportunity to cure any possible

procedural deficiencies so that they can have the opportunity to demonstrate the truth of their claims on the merits. This is especially true where Hertz has known the sum and substance of these allegations since prior to bankruptcy and the objections are form over substance.

122.    The factors that can counsel against granting leave to amend, including "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment," *Foman*, 371 U.S., at 182, do not remotely apply here. For instance, any prospective amendments are not a product of "undue delay," "bad faith," or a "dilatory motive." The FPR Claimants have diligently advanced their claims throughout the bankruptcy proceedings, most notably in their efforts to adjudicate these claims outside of bankruptcy. Because they sought to proceed outside of bankruptcy, the Claimants filed claims noticing the Debtors on the causes of action they intended to pursue and the relevant damages, but always with the intent to file comprehensive complaints and proceed with these cases outside of the bankruptcy process. This Court described the level of detail required for that process under the *Rexene* standard—"unless the claim, itself, is patently frivolous on its face, I typically find that a statement of the what the claim is, is sufficient to meet the first prong for relief form the stay purposes. ... [I]f you want to submit a brief declaration of some or all of your claimants that just outline that the claim is; that would be sufficient." Aug. 19, 2020 Hearing Transcript, at p.99. The Claimants, in accordance with the Court's suggestion, submitted dozens upon dozens of declarations. See Case No. 20-11218, D.I. 3604 (compiling declarations).

123.    During the April 22, 2021 hearing, the Court understood the nature of claims. *Id.* at 32 ("THE COURT: … That is not to minimize the allegations of the serious harm that they assert was done to them, to their families by these alleged acts having been arrested when, in fact they

had valid agreements pending."). And at the time, the Court stated that it was not prepared to rule on whether any of the Group 1 or Group 2 claims belonged in bankruptcy court. *Id*. ("I am not prepared today to decide whether or not these claims must be decided in bankruptcy court."). It was not until later—after confirmation—that the Court decided it would take up the claims. That time should not be taxed against Claimants.

124.     The Court resolved those motions (without prejudice) at the August 18, 2021 hearing and the subsequent written order of September 15, 2021, which denied without prejudice Claimants' motion to proceed in state court. Likewise, Hertz brought substantive objections to the claims for the first time on September 20, 2021. Doc. 5875. To the extent that this Court now finds the detail lacking, it is completely reasonable for the FPR Claimants to seek leave to amend their claims just weeks after it became clear that (1) the claims would proceed in bankruptcy and (2) Hertz for the first time objected to those claims. And as this Court noted during the June 2021 confirmation hearing, these claims are "preserved."

125.     The other *Foman* factors point in the same direction. Hertz repeatedly argues that amendment should be denied because the claims have been amended once and still have "flouted the rules." But there is no "*repeated* failure to cure deficiencies by amendments previously allowed." *Foman*, 371 U.S., at 182 (emphasis added). This argument is emblematic of Hertz's "Heads I Win, Tails You Lose" approach. Claimants have attempted at every turn to comply with the bankruptcy process, only to be ignored by Hertz. Now Hertz attempts to use Claimants' attempts to engage with Debtors as grounds to allege procedural violations that would disqualify the claims entirely without even any presentation of evidence.

126.     In any event, many of the contested claims have not been amended at all—most notably those claims filed by Group 3—and there is no reason to prejudice claims that have not

been amended because other claims have been amended. And the pertinent claims that have been amended were amended only once and that was before Hertz raised any objection to or purported technical deficiencies in the claims. To be clear, the FPR Claimants believe that the proofs of claim are fully adequate as filed. But an amendment following an initial round of substantive objections is an ordinary aspect of the adversary process—*cf.* Fed. R. Civ. P. 15(a)(1)(B)—and a single past amendment certainly does not show a "repeated" problem or a "failure to cure" alleged deficiencies that had not yet been raised by Hertz. Likewise, Hertz's arguments described above—if accepted— at least raise arguments on which the Claimants had good faith and reasonable bases for disagreeing with. The Claimants have not "flouted" the rules or "repeatedly" failed to cure any perceived problems long before they were identified.

127.    What is more, Hertz does not allege—nor would Hertz suffer—any prejudice from an amendment. These claims were initially filed within the Bar Date and gave plain notice of the nature of the claims being asserted. And each allegation relates to a specific rental transaction execution by one or more of the debtors and a police report filed by one of more of the debtors. As in *Trans World Airlines*, the previous filings plainly put Hertz "on notice that an unsecured claim had been made against it and could be pursued." 145 F.3d at 141. At bottom, the only prejudice that could be asserted is "the reorganized debtor's loss of a windfall. Thus, [there is] no real prejudice in this fact pattern." *In re O'Brien Env't Energy, Inc.*, 188 F.3d 116, 128 (3d Cir. 1999) (assessing prejudice in context of excusable neglect for late filing).

128.    Finally, Hertz does not and could not argue that an amendment would be futile. On the contrary, Hertz *does not even object* to the sufficiency of the Group 1 claims filed against many of the debtors in relation to previously filed complaints. The contested proofs of claim could be amended to include structural allegations akin to those in the complaints underlying the proofs of

claim filed by Group 1 and the specific facts offered with respect to each claimant in Groups 2 and 3 in their declarations.

129.    Hertz argues in the alternative that any possible amendment to these proofs of claim would not relate back to the existing proofs of claim. That is not true. The Claimants are not attempting to circumvent the Bar Date by filing new claims at this juncture. Instead, they would simply add additional and thorough factual allegations to "describe" the claims in the initial proofs of claim "with greater particularity." The standard for relating back comes from Civil Procedure Rule 15(c)(2), which provides that a claim must "ar[i]se out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." While the original filings were not fashioned as a complaint, they plainly "attempted to … set out" "conduct" by Hertz— namely, the filing of false police reports—that led to significant damages to the claimants. Many of these facts and allegations are already in the bankruptcy record—whether via signed declarations from the claimants or via complaints that others have filed—and they could easily be included in the proofs themselves to facilitate resolution of the claims and unlock the benefits of Bankruptcy Rule 3001(f). See *Bensel v. Allied Pilots Ass'n*, 387 F.3d 298, 310 (3d Cir. 2004) ("[A]mendments that restate the original claim with greater particularity or amplify the factual circumstances surrounding the pertinent conduct, transaction or occurrence in the preceding pleading fall within Rule 15(c)").

130.    Further, the touchstone of the Rule 15(c) inquiry is "whether the opposing party has had fair notice of the general fact situation and legal theory upon which the amending party proceeds." *Id.* The proofs of claim plainly set forth the "general fact situation" *and* specifically identified the "legal theor[ies]" that the claimants indented to pursue. Moreover, Hertz had abundant, actual notice of the claims that would be pursued as described above. *See* ¶¶84–92,

*supra*. And Hertz's own books and records contain significant information relating to and substantiating each of the relevant claims. In short, the FPR Claimants plainly can amend their proofs of claim to flesh out the factual circumstances underlying the claims without running afoul of the relation back standard.[24]

131.    Finally, the Claimants note that if the Court sees any possible deficiencies in the proofs of claim as filed, the proofs of claim at the very least qualify under the Third Circuit's test for informal proofs of claim, and could be amended as such. A document can qualify as an informal proof of claim if it is "in writing, contains a demand by the creditor on the bankruptcy estate, expresses an intent to hold the debtor liable for the debt, and the document is filed with the bankruptcy court." *In re Am. Classic Voyages Co.*, 405 F.3d 127, 131 (3d Cir. 2005); *see also In re SemCrude LP*, 443 BR 472 (D. Del. 2011) (citing *Agassi v. Planet Hollywood*, 269 BR 543 (D Del 2001); *In re Spansion*, 2013 WL 5730575 (D Del Oct. 22, 2013). Those requirements are plainly met here. Thus, "the bankruptcy court must determine whether, given the particular surrounding facts of the case, it would be equitable to treat the document as a proof of claim." *Id.* Such treatment would clearly be justified given the facts and equities of this case. The content requirements for such informal proofs of claim from a notice perspective are minimal: "the alleged

---

[24] Hertz's citations offer no support for its relation-back argument. *In re Exide Techs.*, 601 B.R. 271, 294 (Bankr. D. Del. 2019), explained that "[t]he touchstone for relation back is fair notice," *id.* at 291, and found that claims based on "new violations and claims" relating to "different regulations" and a different "timeframe" that would "more than double" the claimed amount did not relate back to a "limited and specific" original proof of claim, *id.* at 294. By contrast, any amendments here would add detail to those claims set forth in the original proofs of claim, but would not add new claims. Similarly, the cited passage from *Glover* v. *FDIC*, 698 F.3d 139, 146 (3rd Cir. 2012), simply repeats the above-quoted language from *Bensel*—which the claimants emphatically have satisfied—and specifically contrasts amendments based on fair notice with "amendments that significantly alter the nature of a proceeding by injecting new and unanticipated claims are treated far more cautiously," *id.* Any amendments would not inject "new and unanticipated claims" into the bankruptcy process.

demand must be sufficient to put the debtor and/or the court on notice as to the existence, nature and amount of the claim (if ascertainable)." *Am. Classic Voyages*, 405 F.3d, at 132. The contested claims clearly meet that threshold—they stated that legal claims exist, relate to false arrest reports, involve specific injuries to each claimant, and roughly estimate the amount of those claims. Claimants should be permitted to further expand on the informal proofs, if necessary.

**2.    In the Alternative, Any Late Claims Are a Product of Excusable Neglect**

132.    Hertz argues that any amendments should be assessed as late-filed claims. Obj. 28. That is wrong for the reasons set forth above. *See* ¶¶117–131, *supra*. But if the Court accepts that argument, it should permit late-filed claims for excusable neglect. *See Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380 (1993). For the reasons detailed above, allowing these claims would be appropriate under the Pioneer framework because (i) there would be no prejudice Hertz, (ii) the delay in filing was minimal, and allowing the claims would not substantially delay the proceedings, (iii) the proximate reason for the delay was Hertz's failure to provide actual notice of the bar date to the Claimants, which was not in the Claimants' reasonable control, and (iv) the Claimants have acted in good faith, including by attempting to pursue their claims outside of the bankruptcy process. The Third Circuit has liberally interpreted the excusable neglect standard, and it is satisfied here. See *In re O'Brien Env't Energy, Inc.*, 188 F.3d 116, 124–130 (3d Cir. 1999).

**F.    The Claimants Reserve the Right to Object Under Local Rule 3007–1(f)(iii).**

133.    The Court's order ruled that "[t]he Reorganized Debtors will timely file *all* preliminary objections to the False Police Report Claimants' proofs of claim … by no later than September 20, 2021." Case No. 20-11218, D.I. 5875, at 2. Claimants have no objection to the Court's waiving of Local Rule 3007–1(f)(iii) to the extent it is inconsistent with the Court's scheduling order. See Del. Bankr. L.R. 1001-1(c). But to the extent that Hertz seeks to raise in a

subsequent filing an objection that properly should have been raised in the 22nd Omnibus Objection—which had to include "all" preliminary objections—Claimants reserve all rights to object to any improper filings under Local Rule 3007–1(f)(iii), the scheduling order, or otherwise.

### REQUEST FOR HEARING

134.    Claimants respectfully request an evidentiary hearing at which they plan to call a significant number of witnesses via Zoom, including but not limited to the Claimants, experts, adverse witnesses from Hertz, and potentially local car rental employees. *In re Tribune Co.*, 2013 WL 1909617. The Claimants accordingly request that the Court schedule a hearing of an appropriate length, and with sufficient notice, that will permit Claimants to present their evidence and witnesses. *See* Local Rule 3007-1(i) ("When the Court determines that the hearing on a particular claim Objection will require substantial time for the presentation of argument and/or evidence, then the Court, in its discretion, may reschedule the hearing on that claim for a different hearing date and time. The parties may also request that a separate hearing on an Objection(s) based on substantive grounds be separately scheduled for a date and time convenient to the Court and the parties."). Given that there are more than 100 claimants involved in these proceedings, the Claimants anticipate that substantive evidentiary hearings will take a very significant amount of time. The Claimants' Counsel are happy to work with Hertz and the Court to schedule an appropriate hearing date.

### RESERVATION OF RIGHTS

135.    Claimants expressly reserve the right to amend, modify, or supplement this preliminary objection response for any reason. As just one example, Hertz has thus far not produced any discovery, including in response to several preliminary requests filed shortly after the objection.

## CONCLUSION

136.    Claimants are amenable to efficient resolution of their claims. But the fact is that there are likely 1,000's of other victims of Hertz's shoddy systems and indifferent procedures who have endured the same wrongs as the False Report Claimants currently before the Court—arrest, imprisonment, helplessness, and physical, mental, and emotional injury. Like Claimants, Hertz has not given any of these victims notice of their claims even though Hertz certainly has some idea of the potential claimants, *i.e.*, those who have been the subject of theft reports. Yet, Hertz is still trying to euthanize these claims by pointing to notice by publication and other procedural niceties. But when a person's freedom, livelihood, health, and family are at stake, a newspaper ad is not enough. Hertz must be held accountable for its life-altering acts and should not be permitted to avoid liability by setting traps using the bankruptcy rules.

## PRAYER FOR RELIEF

WHEREFORE, the False Police Report Claimants respectfully request that the Court overrule and deny Hertz's 22nd Omnibus Objections in full and, if necessary, grant leave to amend the proofs of claim subject to that objection.

Dated: October 20, 2021

**FRANCIS ALEXANDER, LLC**
Francis Malofiy
280 N. Providence Road, Suite 1
Media, PA 19063
Telephone: (215) 500-1000
Facsimile: (215) 500-1005
Email:  francis@francisalexander.com

**SUSMAN GODFREY LLP**
Justin A. Nelson (TX Bar No. 24034766)
John P. Lahad (TX Bar No. 24068095)
1000 Louisiana, Suite 5100
Houston, TX 77002-5096
Telephone:  (713) 651-9366
Facsimile:  (713)654-6666
Emails:  jnelson@susmangodfrey.com
          jlahad@susmangodfrey.com

**FARNAN LLP**
Brian E. Farnan
919 N Market Street
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile:  (302) 777-0301
Email:  bfarnan@farnanlaw.com

**FAEGRE DRINKER
BIDDLE & REATH LLP**

*/s/ Patrick A. Jackson*
Patrick A. Jackson (Bar No. 4976)
Ian J. Bambrick (Bar No. 5455)
Jaclyn C. Marasco (Bar No. 6477)
222 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telephone:  (302) 467-4200
Facsimile: (302) 467-4201
Emails:  patrick.jackson@faegredrinker.com
          ian.bambrick@faegredrinker.com
          jaclyn.marasco@faegredinker.com

**CIARDI CIARDI & ASTIN**
Albert A. Ciardi, III, Esquire
Walter W. Gouldsbury III, Esquire
1905 Spruce Street
Philadelphia, PA 19103
Telephone:  (215) 557-3550
Facsimile:  (215) 557-3551
Emails:  aciardi@ciardilaw.com
          wgouldsbury@ciardilaw.com

*Co-Counsel for the False Police Report Claimants[25]*

---

[25] *See* supra, note 2.