# ATTACHMENT V

# EXHIBIT 8

Case ID: 151103380
Control No.: 17090690

United States Courts
Southern District of Texas
FILED

JAN 2 0 2017

David J. Bradley, Clerk of Court

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION**

| | | |
|---|---|---|
| MICHAEL GRAY | § | |
| | § | |
| *Plaintiff,* | § | |
| VS. | § | CIVIL ACTION NO. 3:15-CV-92 |
| | § | |
| THE HERTZ CORPORATION | § | |
| | § | |
| *Defendant*. | § | |
| | § | |

**JURY CHARGE**

MEMBERS OF THE JURY:

It is my duty and responsibility to instruct you on the law you are to apply in this case. The law contained in these instructions is the only law you may follow. It is your duty to follow what I instruct you the law is, regardless of any opinion that you might have as to what the law ought to be.

If I have given you the impression during the trial that I favor either party, you must disregard that impression. If I have given you the impression during the trial that I have an opinion about the facts of this case, you must disregard that impression. You are the sole judges of the facts of this case. Other than my instructions to you on the law, you should disregard anything I may have said or done during the trial in arriving at your verdict.

You should consider all of the instructions about the law as a whole and regard each instruction in light of the others, without isolating a particular statement or paragraph.

The testimony of the witnesses and other exhibits introduced by the parties constitute the evidence. The statements of counsel are not evidence; they are only arguments. It is important for you to distinguish between the arguments of counsel and the evidence on which those arguments rest. What the lawyers say or do is not evidence. You may, however, consider their arguments in light of the evidence that has been admitted and determine whether the evidence admitted in this trial supports the

1

Case ID: 151103380
Control No.: 17090690

arguments. You must determine the facts from all the testimony that you have heard and the other evidence submitted. You are the judges of the facts, but in finding those facts, you must apply the law as I instruct you.

You are required by law to decide the case in a fair, impartial, and unbiased manner, based entirely on the law and on the evidence presented to you in the courtroom. You may not be influenced by passion, prejudice, or sympathy you might have for the plaintiff or the defendant in arriving at your verdict. A corporation and all other persons are equal before the law and must be treated as equals in a court of justice.

## A. Burden of Proof

Except as otherwise instructed, Plaintiff has the burden of proving his case by a preponderance of the evidence. To establish by a preponderance of the evidence means to prove something is more likely so than not so. If you find that Plaintiff has failed to prove any element of their claim by a preponderance of the evidence, then he may not recover on that claim.

For certain claims, Plaintiff has the burden of proving their case by clear and convincing evidence. Clear and convincing evidence is evidence that produces in your mind a firm belief or conviction as to the truth of the matter sought to be established.

## B. Evidence

The evidence you are to consider consists of the testimony of the witnesses, the documents and other exhibits admitted into evidence, and any fair inferences and reasonable conclusions you can draw from the facts and circumstances that have been proven.

Generally speaking, there are two types of evidence. One is direct evidence, such as testimony of an eyewitness. The other is indirect or circumstantial evidence. Circumstantial evidence is evidence that proves a fact from which you can logically conclude another fact exists. As a general rule, the law makes no distinction between direct and circumstantial evidence, but simply requires that you find the facts from a preponderance of all the evidence, both direct and circumstantial.

Case ID: 151103380
Control No.: 17090690

Case 2:19-cv-00347-Document 85-3 Filed 10/21/21   Page 5 of 10

## C. Witnesses

You alone are to determine the questions of credibility or truthfulness of the witnesses. In weighing the testimony of the witnesses, you may consider the witness's manner and demeanor on the witness stand, any feelings or interest in the case, or any prejudice or bias about the case, that he or she may have, and the consistency or inconsistency of his or her testimony considered in the light of the circumstances. Has the witness been contradicted by other credible evidence? Has he or she made statements at other times and places contrary to those made here on the witness stand? You must give the testimony of each witness the credibility that you think it deserves.

Even though a witness may be a party to the action and therefore interested in its outcome, the testimony may be accepted if it is not contradicted by direct evidence or by any inference that may be drawn from the evidence, if you believe the testimony.

You are not to decide this case by counting the number of witnesses who have testified on the opposing sides. Witness testimony is weighed; witnesses are not counted. The test is not the relative number of witnesses, but the relative convincing force of the evidence. The testimony of a single witness is sufficient to prove any fact, even if a greater number of witnesses testified to the contrary, if after considering all of the other evidence, you believe that witness.

## D. No Inference from Filing Suit.

The fact that a person brought a lawsuit and is in court seeking damages creates no inference that the person is entitled to a judgment. Anyone may make a claim and file a lawsuit. The act of making a claim in a lawsuit, by itself, does not in any way tend to establish that claim and is not evidence.

## E. Duty to Deliberate; Notes

It is now your duty to deliberate and to consult with one another in an effort to reach a verdict. Each of you must decide the case for yourself, but only after an impartial consideration of the evidence with your fellow jurors. During your deliberations, do not hesitate to re-examine your own opinions and change your mind if you are convinced that you were wrong. But do not give up on your honest beliefs because the other jurors think differently, or just to finish the case.

3

Case ID: 151103380
Control No.: 17090690

Remember at all times, you are the judges of the facts. You have been allowed to take notes during this trial. Any notes that you took during this trial are only aids to memory. If your memory differs from your notes, you should rely on your memory and not on the notes. The notes are not evidence. If you did not take notes, rely on your independent recollection of the evidence and do not be unduly influenced by the notes of other jurors. Notes are not entitled to greater weight than the recollection or impression of each juror about the testimony.

When you go into the jury room to deliberate, you may take with you a copy of this charge, the exhibits that I have admitted into evidence, and your notes. You must select a jury foreperson to guide you in your deliberations and to speak for you here in the courtroom. Please do not write on the exhibits.

Your verdict must be unanimous. After you have reached a unanimous verdict, your jury foreperson must fill out the answers to the written questions on the verdict form and sign and date it. After you have concluded your service and I have discharged the jury, you are not required to talk with anyone about the case.

If you need to communicate with me during your deliberations, the jury foreperson should write the inquiry and give it to the court security officer. After consulting with the attorneys, I will respond either in writing or by meeting with you in the courtroom. Keep in mind, however, that you must never disclose to anyone, not even to me, your numerical division on any question.

You may now proceed to the jury room to begin your deliberations.

Case ID: 151103380
Control No.: 17090690

# QUESTION NUMBER 1

Did the Hertz Corporation maliciously prosecute Michael Gray?

"Malicious prosecution" occurs when one person initiates or procures, with malice, and without probable cause at the time the prosecution is commenced, the prosecution of an innocent person.

"Initiates" means that a person makes a formal charge to law enforcement authorities.

"Procures" means that a person's actions caused the prosecution and the prosecution would not have occurred but for its actions.

"Malice" means such gross indifference to the rights of others as to amount to a willful or wanton act.

"Probable cause" means the existence of such facts and circumstances as would excite belief in a person of reasonable mind, acting on the facts or circumstances within his knowledge at the time the prosecution was commenced, that the other person was guilty of a criminal offense. The probable cause determination asks whether a reasonable person would believe that a crime had been committed given the facts as the complainant honestly and reasonably believed them to be before the criminal proceedings were instituted. Whether the person failed to fully and fairly disclose all material information or knowingly provided false information to the authorities is irrelevant to determining whether probable cause existed.

Answer "Yes" or "No."

Answer: _____Yes_____

5

Case ID: 151103380
Control No.: 17090690

## QUESTION NUMBER 2

Did the Hertz Corporation defame Michael Gray?

Defamation occurs when the Defendant publishes false defamatory statements concerning the Plaintiff while acting with actual malice.

"Publish" means to communicate the matter to a person other than Michael Gray who is capable of understanding its meaning.

"False" means that the statements are not substantially true. A statement is "substantially true" if it varies from the literal truth in only minor details or if, in the mind of the average person, the gist of the statement is no more damaging to the person affected by it than a literally true statement would have been.

"Defamatory" means an ordinary person would interpret the statements in a way that tends to injure a living person's reputation and thereby expose the person to public hatred, contempt or ridicule, or financial injury or to impeach the person's honesty, integrity, virtue, or reputation.

In deciding whether statements are defamatory, you must construe the statements as a whole and in light of the surrounding circumstances based upon how a person of ordinary intelligence would perceive them.

"Actual malice" means that you find by clear and convincing evidence that, at the time the Hertz Corporation made the statements in question

(1) The Hertz Corporation knew they were false as they related to Michael Gray, or

(2) The Hertz Corporation made the statements with a high degree of awareness that they were probably false, to an extent that the Hertz Corporation in fact had serious doubts as to the truth of the statements.

"Clear and convincing evidence" is that measure or degree of proof that will produce in the mind of the jury a firm belief or conviction as to the truth of the allegations sought to be established.

Answer: _____NO_____

6

Case ID: 151103380
Control No.: 17090690

Case 2:19-cv-00027-Document 85-3   Filed 10/31/21   Page 9 of 10

## CONSIDER DAMAGES ONLY IF NECESSARY

If the Plaintiff has proved his claim against the Defendant by a preponderance of the evidence, you must determine the damages to which the Plaintiff is entitled. You should not interpret the fact that I am giving instructions about the Plaintiff's damages as an indication in any way that I believe that the Plaintiff should, or should not, win this case. It is your task to decide whether the Defendant is liable. I am instructing you on damages only so that you will have guidance in the event you decide that the Defendant is liable and that the Plaintiff is entitled to recover money from the Defendant.

Answer Question Number 3 only if you answered "Yes" to either Question Number 1 or Question Number 2.

Case ID: 151103380
Control No.: 17090690

## QUESTION NUMBER 3

What sum of money, if paid now in cash, would fairly and reasonably compensate Plaintiff Michael Gray for the injuries, if any, that resulted from the Hertz Corporation's conduct?

Consider the elements of damages listed below and none other. Consider each element separately. Do not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss. That is, do not compensate twice for the same loss, if any. Do not include interest on any amount of damages you find.

You are instructed that any monetary recoveries for compensatory damages sought by Plaintiff Michael Gray are not subject to federal or state income taxes.

Answer separately, in dollars and cents, for damages, if any.

1. Mental anguish sustained by Plaintiff Michael Gray in the past.

    Answer: _____ 50,000.00 _____

2. Mental anguish that, in reasonable probability, Plaintiff Michael Gray will sustain in the future.

    Answer: _____ 0 _____

3. Economic loss.

    Answer: _____ 6049.13 _____

8

Case ID: 151103380
Control No.: 17090690

Answer Questions Number 4 and Number 5 only if you answered "Yes" to Question Number 1. Otherwise, do not answer Question No. 4 or Question Number 5.

### QUESTION NUMBER 4

Do you find by clear and convincing evidence that the harm to the Plaintiff resulted from malice or gross negligence on the part of The Hertz Corporation?

"Clear and convincing evidence" is the evidence that produces in your mind a firm belief or conviction as to the truth of the matter sought to be established.

"Malice" means a specific intent by the Hertz Corporation to cause substantial injury to Michael Gray.

"Gross Negligence" means an act or omission by the Hertz Corporation,

1. Which when viewed objectively from the standpoint of the Hertz Corporation at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

2. Of which the Hertz Corporation has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

In answering this Question, you are instructed that you cannot consider harm to persons other than the Plaintiff.

Answer: _____YES_____

9

Case ID: 151103380
Control No.: 17090690

## QUESTION NUMBER 5

What sum of money, if any, should be assessed against The Hertz Corporation and awarded to Michael Gray as exemplary damages for the conduct found in response to Question Number 4?

"Exemplary damages" means any damages awarded as a penalty or by way of punishment but not for compensatory purposes. Exemplary damages include punitive damages.

Factors to consider in awarding exemplary damages, if any, are—

      a.    The nature of the wrong.
      b.    The character of the conduct involved.
      c.    The degree of culpability of the wrongdoer.
      d.    The situation and sensibilities of the parties concerned.
      e.    The extent to which such conduct offends a public sense of justice and propriety.

The purpose of exemplary damages is to punish and deter, not to compensate. Exemplary damages serve to punish a defendant for malicious or reckless conduct and, by doing so, to deter others from engaging in similar conduct in the future. You are not required to award exemplary damages. If you do decide to award exemplary damages, you must use sound reason in setting the amount. Your award of exemplary damages must not reflect bias, prejudice, or sympathy toward any party. It should be presumed that Plaintiff has been made whole by compensatory damages, so exemplary damages should be awarded only if The Hertz Corporation's misconduct is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence.

You are instructed that any award of exemplary damages must bear a reasonable relationship to the harm, if any, caused to the Plaintiff.

Answer in dollars and cents, if any.

Answer: _____ $120,000.00

10

Case ID: 151103380
Control No.: 17090690

### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### GALVESTON DIVISION

| | | |
|---|---|---|
| **MICHAEL GRAY,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **CAUSE NO. 3:15-cv-00092** |
| | § | |
| | § | |
| **THE HERTZ CORPORATION,** | § | |
| **Defendant.** | § | |

### PLAINTIFF MICHAEL GRAY'S FIRST AMENDED COMPLAINT

Plaintiff Michael Gray ("Plaintiff") files this his First Amended Complaint against Defendant The Hertz Corporation ("Defendant") as set forth below:

### I.     PARTIES

1.     Plaintiff, Michael Gray, is an individual who resides in Galveston County at 2284 Azahar Court, League City, Texas 77573.

2.     Defendant, The Hertz Corporation, is a foreign corporation doing business in the State of Texas. Defendant has answered and appeared herein. Therefore, no service of process is required.

### II.     JURISDICTION AND VENUE

3.     This case was removed to this Court by Defendant, and Jurisdiction is based on diversity of citizenship under 28 U.S.C. §1332. The amount in controversy exceeds the sum of $75,000.00, exclusive of interest and cost.

4.     Venue in this District is proper under Civil Practice and Remedies Code §15.017 a suit for defamation damages can only be maintained in the county in which the Plaintiff resided at the time of the accrual of the cause of action because Defendant is a non-resident of the state

Case ID: 151103380
Control No.: 17090690

of Texas.

### III.    FACTUAL BACKGROUND

5.      On or about October 7, 2014, Plaintiff and his fiancé landed at Miami International Airport after returning from vacation in the Bahamas.  While exiting the plane in Miami, Plaintiff was detained by law enforcement authorities who informed Plaintiff that a "nationwide" warrant had been issued for Plaintiff's arrest.  Plaintiff was immediately taken into custody and transported to jail in Miami.  Plaintiff was processed, fingerprinted, strip searched and placed in a jail cell.

6.      As a result of Plaintiff's incarceration, Plaintiff's mother and fiancé were required to hire counsel to defend Plaintiff from the criminal charges levied against him.  The law firm of Hager & Schwartz was retained to represent Plaintiff.  After investigation, the law firm of Hager & Schwartz determined that the arrest warrant was issued on May 20, 2014, by a court in Shreveport, Louisiana.  The incident report which caused the May 20, 2014, warrant to be issued was filed by Defendant and/or Defendant's agents/subsidiaries alleging that Plaintiff had rented a car owned by Defendant and failed to return the automobile pursuant to the rental agreement. On or about October 8th, Plaintiff appeared at a videotaped hearing where it was determined that Plaintiff was a victim of identity theft and the Court set a $5,000 bond for Plaintiff's release. Detective Angela Willis of the Shreveport Police Department was immediately contacted by Plaintiff's attorney who sent documentation proving that Plaintiff was not the individual who stole the Hertz rental car and Detective Willis agreed to recall the arrest warrant on October 8, 2014.

2

Case ID: 151103380
Control No.: 17090690

7.      Prior to Plaintiff's arrest, October 7, 2014, Plaintiff received correspondence from Dollar Thrifty Rent A Car ("Dollar") dated March 31, 2014.   The Dollar March 31st correspondence stated that Plaintiff had rented a car on or about March 11, 2014, and had not returned the car.   The correspondence provided a telephone number for Plaintiff to call in order to discuss the matter. Plaintiff immediately contacted Dollar and informed the representative that Plaintiff had never rented a car from Dollar.   After Plaintiff's discussion with the Dollar representative, it was clear that the only information that was correct on the Dollar rental agreement was Plaintiff's name, address and date of birth.   Plaintiff was informed that the phone number, e-mail address, Texas driver's license number listed on the rental agreement did not match any of Plaintiff's personal information.   On April 18, 2014, Plaintiff filed a police report that claimed identity theft.   On April 21, 2014, Plaintiff executed an "ID Theft Affidavit" stating that a Dollar vehicle was rented in Plaintiff's name, but Plaintiff did not rent the Dollar vehicle. An arrest warrant was never issued due to the fact that Dollar contacted Plaintiff prior to taking any legal action against Plaintiff.   Unfortunately for Plaintiff, Defendant failed to exercise the same due diligence before filing a police report with Shreveport, Louisiana authorities causing an arrest warrant to be issued against Plaintiff.

8.      Particularly troubling, is the fact that Defendant merged with Dollar on or about November 2012. Therefore, Defendant's subsidiary had determined months before that Plaintiff's identity had been stolen but Defendant still filed criminal charges against Plaintiff which caused an arrest warrant to be issued May 2014.

Case ID: 151103380
Control No.: 17090690

## IV.    CAUSES OF ACTION

### A.    DEFAMATION

9.    Plaintiff incorporates by reference all the allegations set forth in paragraphs 1-8 as if fully set forth herein. The law of defamation embodies the public policy that an individual should be free to enjoy his or her reputation unimpaired by false and defamatory attacks, and an action for libel and/or slander is based on a violation of this right.  The right of a citizen to defend his reputation and good name from libelous publications is zealously guarded.

10.    Under Texas law, defamation involves:

- A false statement

- About a person

- Communicated to third party

- That damages the person's reputation or exposes him to public hatred, contempt, ridicule, or financial injury.

11.    In this case, Plaintiff will prove that the Defendant's filing of a police report accusing Plaintiff of stealing Defendant's property was false.  In addition, Defendant knew or should have known that Defendant's filing of a police report accusing Plaintiff of stealing Defendant's property was false.  As a result of Defendant filing the false police report, Plaintiff was arrested for a crime he did not commit, exposing Plaintiff to public contempt and ridicule and caused Plaintiff financial injury.

### B.    DEFAMATION *PER SE*

12.    Plaintiff incorporates by reference all the allegations set forth in paragraphs 1-11 as if fully set forth herein. Moreover, Texas law recognizes the notion of Defamation *per se*.

4

Case ID: 151103380
Control No.: 17090690

Defamation *per se* includes, but is not limited to, the allegation that the subject of the defamation committed a crime. In this case, Defendant accused Plaintiff of felony theft which is a crime in Texas and Plaintiff was arrested as a result of Defendant's defamatory statements.

13.     When a Defendant commits defamation *per se*, the Plaintiff no longer needs to prove damage to his reputation – damages are assumed under the law.

## VI.    MALICIOUS PROSECUTION

14.     Plaintiff incorporates by reference all the allegations set forth in paragraphs 1-13 as if fully set forth herein. As a result of Defendant filing a defamatory police report which resulted in warrant being issued for Plaintiff's arrest, Plaintiff was arrested on or about October 7, 2014. Defendant initiated and/or procured prosecution by filing a police report with the Shreveport, Louisiana law enforcement officials falsely accusing Plaintiff of committing felony theft. This police report filed on or about April 15, 2014, resulted in a nationwide warrant being issued for Plaintiff's arrest. The defamatory police report resulted in the arrest, processing and detention of Plaintiff. During Plaintiff's processing and detention, Plaintiff was fingerprinted; strip searched, subjected to DNA testing and forced to be held against Plaintiff's will in a Miami jail cell. Defendant's allegations to Shreveport, Louisiana law enforcement authorities were knowingly false and the arrest of Plaintiff would not have occurred without Defendant's false statements. Plaintiff was released from jail after it was determined that Defendant's defamatory police report was false. Plaintiff was innocent of Defendant's criminal complaint and would not have been arrested but for Defendant filing the defamatory and false police report with Shreveport, Louisiana law enforcement authorities.

5

Case ID: 151103380
Control No.: 17090690

## VII.  NEGLIGENCE

15.    Plaintiff incorporates by reference all the allegations set forth in paragraphs 1-14 as if fully set forth herein. Defendant's conduct constitutes negligence under Texas law because Defendant owed a duty to Plaintiff not to file a police report alleging Plaintiff committed theft until Defendant made contact with Plaintiff.  Defendant breached this duty by filing a false police report and filing such report before contacting Plaintiff.  Defendant's breach of this duty proximately caused damages to Plaintiff that he still suffers from today and will suffer in the future.

## VIII.  GROSS NEGLIGENCE/MALICE

16.    Plaintiff incorporates by reference all the allegations set forth in paragraphs 1-15 as if fully set forth herein. Defendant's actions described above were done with malicious intent to cause injury to Plaintiff and constitute gross negligence/malice under Texas law.  Defendant by deliberately filing a defamatory and false police report with actual knowledge that Plaintiff would be arrested and incarcerated constitutes gross negligence/malice under Texas law. Defendant's gross negligence/ malice have proximately caused harm to Plaintiff and Plaintiff hereby seeks all damages he is entitled to under Texas law.

## IX.  DAMAGES

### A.    ACTUAL DAMAGES

17.    Plaintiff will show that the defamatory, negligent, gross negligence and malicious prosecution conduct of Defendant complained of in paragraphs 7 through 18 herein were a producing and a proximate cause of the following damages sustained by Plaintiff:

a.    Damage to reputation.

6

Case ID: 151103380
Control No.: 17090690

b.     Damage to credibility amongst the community, clients and business associates.

c.     Damage to finances which have resulted in the necessity to hire criminal counsel in Texas and Florida.

d.     Economic damages sustained in past and future.

## B.    MENTAL ANGUISH

18.    Plaintiff would further show that the defamatory, negligent, gross negligence, malicious prosecution, acts and/or omissions described in paragraphs 5 through 17 hereinabove were committed knowingly by Defendant or Defendant knew or should have known the falsity of the police report filed with the Shreveport, Louisiana law enforcement authorities filed on or about April 15, 2014.  As a result of such acts and/or omissions contained in paragraphs 5 through 17, Plaintiff sustained a high degree of mental pain and distress of such nature, duration and severity that would permit the recovery of damages for mental anguish for which Plaintiff hereby sues in an amount in excess of the minimum jurisdictional limits of this Court.

## C.    EXEMPLARY DAMAGES

19.    Defendant's intentional, reckless and malicious conduct contained in paragraphs 5 through 18 allow Plaintiff to recover exemplary damages in accordance with Texas law.

## D.    ATTORNEY'S FEES

20.    Request is made for all costs and reasonable and necessary attorney's fees incurred by or on behalf of Plaintiff herein, including all fees necessary in the event of an appeal of this cause to the Court of Appeals and the Supreme Court of Texas, as the Court deems equitable and just.

Case ID: 151103380
Control No.: 17090690

## X.    PRAYER

**WHEREFORE, PREMISES CONSIDERED,** Plaintiff, Michael Gray, respectfully prays that the Defendant be cited to appear and answer herein, and that upon a final hearing of the cause, judgment be entered for the Plaintiff against Defendant, jointly and severally, for actual monetary damages requested hereinabove in an amount in excess of $1,000,000, together with prejudgment and post-judgment interest at the maximum rate allowed by law, attorney's fees, costs of court, and such other and further relief to which the Plaintiff may be entitled at law or in equity, whether pled or unpled.

Dated: December 23, 2015

Respectfully submitted,

PROVOST ★ UMPHREY
LAW FIRM, L.L.P.
490 Park Street
P. O. Box 4905
Beaumont, Texas  77704
Phone: (409) 835-6000
Fax:  (409) 813-8625
gfisher@pulf.com
Attorney for Plaintiff

By:    /s/ Guy G. Fisher
Guy G. Fisher
Texas Bar No. 07051010

Case ID: 151103380
Control No.: 17090690

**CERTIFICATE OF SERVICE**

    I HEREBY CERTIFY that on this 23rd day of December, 2015, I electronically filed the foregoing with the Clerk of the Court by using CM/ECF system, which will send a notice of electronic filing to all counsel of record.

                          /s/ Guy G. Fisher_____
                          Guy G. Fisher

Case ID: 151103380

Control No.: 17090690

Court of Common Pleas of Philadelphia County
Trial Division - Civil
**TRIAL WORK SHEET**

Judge's Name:                    Judge's I.D.:                    Signature:

**PAULA  PATRICK**              J519

Caption:                                                    Case Type:            Program:

**GRADY VS THE HERTZ CORPORATION ETAL**    MISC SUMMONS    MAJOR JURY-
                                                                             EXPEDITED

Court Term and Number:        If Consolidated, Court Term and Number:

**#1511-03380**

| Trial Date: | | Total Amount: | Number of Days: | Disposition Date: | Date Sheet Prepared: |
|---|---|---|---|---|---|
| | **X** Jury | | | | |
| 07-SEP-2017 | Non-Jury | $100,000.00 | 7 | 15-SEP-2017 | 18-SEP-2017 |

Full Description of Disposition (to be entered Verbatim on the Docket)

Jury Verdict in favor of Plaintiff, Kelly A. Grady against Defendant, The Hertz Corporation in the amount of $62,500 for the claim of Intentional Infliction of Emotional Distress and in the amount of $37,500 for the claim of Malicious Prosecution.

|  |  |  |
|---|---|---|
| ☐ Default Judgment/Court Ordered | **X** Jury Verdict for Plaintiff | ☐ Other (explain) |
| ☐ Directed Verdict | ☐ Jury Verdict for Defendant | |
| ☐ Discontinuance Ordered | ☐ Mistrial | Grady Vs The Hertz Corp-WSJVP |
| ☐ Transferred to binding arbitration | ☐ Hung Jury | |
| ☐ Finding for Defendant (Non-Jury) | ☐ Non-Pros entered | 15110338000331 |
| ☐ Finding for Plaintiff (Non-Jury) | ☐ Non-Suit entered | |
| ☐ Damages Assessed | ☐ Settled prior to assignment for trial (Team Leaders, only) | **DOCKETED COMPLEX LIT CENTER** |
| ☐ Judgment entered by agreement | ☐ Settled after assignment for trial | SEP 1 9 2017 |
| ☐ Judgment entered | ☐ prior to jury selection | **J. STEWART** |
| ☐ Judgment satisfied | ☐ after jury sworn | |

COPIES SENT PURSUANT TO Pa.R.C.P. 236(b)  J. STEWART  09/20/2017

| KELLY A. GRADY | : | COURT OF COMMON PLEAS |
|  | : | PHILADELPHIA COUNTY |
|  | : | |
| v. | : | NOVEMBER TERM, 2015 |
| THE HERTZ CORPORATION; | : | NO.: 3380 |
| HERTZ RENT-A-CAR PHILADELPHIA | : | |
| INTL. AIRPORT; | : | |
| JOHN DOE(s) | : | |

## VERDICT SHEET

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Question #1

Based upon the evidence presented in this case, do you find that the Plaintiff, Kelly A. Grady, has proven that it is more likely than not that Defendant, The Hertz Corporation, intentionally or recklessly conducted itself in an extreme and outrageous manner toward Plaintiff?

Yes: ✓          No:____

If the answer is Yes, continue to Question #2.

If the answer is No, Plaintiff has not proven her claim for intentional infliction of emotional distress and cannot recover.  You must find in favor of the Defendant for this claim.  Continue to Question #3.

Question #2

If, and only if, you have answered Yes to Question 1, state the amount of damages, if any, sustained by Plaintiff.

$ 62,500

Continue to Question #3.

## MALICIOUS PROSECUTION

Question #3

Based upon the evidence presented in this case, do you find that the Plaintiff, Kelly A. Grady, has proven that it is more likely than not that Defendant, The Hertz Corporation, instituted and/or continued criminal proceedings of said claim without probable cause, against Plaintiff for the theft of its rental vehicle?

Yes: ✓         No: ____

If the answer is Yes, continue to Question #4.

If the answer is No, Plaintiff has not proven her claim for malicious prosecution and cannot recover. You must find in favor of the Defendant for this claim. Continue to Question #5.

Question #4

If, and only if, you have answered Yes to Questions 3, state the amount of damages, if any, sustained by Plaintiff.

$ 37,500

Continue to Question #5.

## FALSE IMPRISONMENT

Question #5

Based upon the evidence presented in this case, do you find that the Plaintiff, Kelly A. Grady, proved her claim for false imprisonment?

Yes: ✓         No: ____

If the answer is Yes, continue to Question #6.

If the answer is No, Plaintiff has no valid claim for false imprisonment and cannot recover. You must find in favor of the Defendant for this claim. You have reached a verdict.

Question #6

Based upon the evidence presented do you find her claim for false imprisonment was filed within the statute of limitations?

Yes:_____          No: ✓____

Question #7

If, and only if, you have answered Yes to Question 5 and 6 state the amount of damages, if any, sustained by Plaintiff.

$___N/A_____

You have reached a verdict.

9/15/2017____
DATE

_____ Juror 9
FOREPERSON

# ATTACHMENT W

Court of Common Pleas of Philadelphia County
Trial Division - Civil
**TRIAL WORK SHEET**

| Judge's Name: | Judge's I.D.: | Signature: |
|---|---|---|
| **PAULA  PATRICK** | J519 | |

| Caption: | Case Type: | Program: |
|---|---|---|
| **GRADY VS THE HERTZ CORPORATION ETAL** | MISC SUMMONS | MAJOR JURY-EXPEDITED |

Court Term and Number:       If Consolidated, Court Term and Number:

**#1511-03380**

| Trial Date: | | Total Amount: | Number of Days: | Disposition Date: | Date Sheet Prepared: |
|---|---|---|---|---|---|
| | X Jury | | | | |
| 07-SEP-2017 | Non-Jury | $100,000.00 | 7 | 15-SEP-2017 | 18-SEP-2017 |

Full Description of Disposition (to be entered Verbatim on the Docket)

Jury Verdict in favor of Plaintiff, Kelly A. Grady against Defendant, The Hertz Corporation in the amount of $62,500 for the claim of Intentional Infliction of Emotional Distress and in the amount of $37,500 for the claim of Malicious Prosecution.

| | | |
|---|---|---|
| ☐ Default Judgment/Court Ordered | X Jury Verdict for Plaintiff | ☐ Other (explain) |
| ☐ Directed Verdict | ☐ Jury Verdict for Defendant | |
| ☐ Discontinuance Ordered | ☐ Mistrial | Grady Vs The Hertz Corp-WSJVP |
| ☐ Transferred to binding arbitration | ☐ Hung Jury | |
| ☐ Finding for Defendant (Non-Jury) | ☐ Non-Pros entered | **15110338000331** |
| ☐ Finding for Plaintiff (Non-Jury) | ☐ Non-Suit entered | |
| ☐ Damages Assessed | ☐ Settled prior to assignment for trial (Team Leaders, only) | **DOCKETED COMPLEX LIT CENTER** |
| ☐ Judgment entered by agreement | ☐ Settled after assignment for trial | SEP 1 9 2017 |
| ☐ Judgment entered | ☐ prior to jury selection | **J. STEWART** |
| ☐ Judgment satisfied | ☐ after jury sworn | |

TRIALWS REV 6/5/17

COPIES SENT PURSUANT TO Pa.R.C.P. 236(b)  J. STEWART  09/20/2017

| KELLY A. GRADY | : | COURT OF COMMON PLEAS |
| | : | PHILADELPHIA COUNTY |
| | : | |
| v. | : | NOVEMBER TERM, 2015 |
| THE HERTZ CORPORATION; | : | NO.: 3380 |
| HERTZ RENT-A-CAR PHILADELPHIA | : | |
| INTL. AIRPORT; | : | |
| JOHN DOE(s) | : | |

## VERDICT SHEET

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Question #1

Based upon the evidence presented in this case, do you find that the Plaintiff, Kelly A. Grady, has proven that it is more likely than not that Defendant, The Hertz Corporation, intentionally or recklessly conducted itself in an extreme and outrageous manner toward Plaintiff?

Yes: ✓          No:_____

If the answer is Yes, continue to Question #2.

If the answer is No, Plaintiff has not proven her claim for intentional infliction of emotional distress and cannot recover. You must find in favor of the Defendant for this claim. Continue to Question #3.

Question #2

If, and only if, you have answered Yes to Question 1, state the amount of damages, if any, sustained by Plaintiff.

$ 62,500

Continue to Question #3.

## MALICIOUS PROSECUTION

Question #3

Based upon the evidence presented in this case, do you find that the Plaintiff, Kelly A. Grady, has proven that it is more likely than not that Defendant, The Hertz Corporation, instituted and/or continued criminal proceedings of said claim without probable cause, against Plaintiff for the theft of its rental vehicle?

Yes: ✓        No:____

If the answer is Yes, continue to Question #4.

If the answer is No, Plaintiff has not proven her claim for malicious prosecution and cannot recover. You must find in favor of the Defendant for this claim. Continue to Question #5.

Question #4

If, and only if, you have answered Yes to Questions 3, state the amount of damages, if any, sustained by Plaintiff.

$ 37,500

Continue to Question #5.

## FALSE IMPRISONMENT

Question #5

Based upon the evidence presented in this case, do you find that the Plaintiff, Kelly A. Grady, proved her claim for false imprisonment?

Yes: ✓        No:____

If the answer is Yes, continue to Question #6.

If the answer is No, Plaintiff has no valid claim for false imprisonment and cannot recover. You must find in favor of the Defendant for this claim. You have reached a verdict.

Question #6

Based upon the evidence presented do you find her claim for false imprisonment was filed within the statute of limitations?

Yes:_____        No: ✓____

Question #7

If, and only if, you have answered Yes to Question 5 and 6 state the amount of damages, if any, sustained by Plaintiff.

$____N/A_____

You have reached a verdict.

9/15/2017
_____
DATE

_____ Juror 9
FOREPERSON

ATTACHMENT X

The Court of Common Pleas
Montgomery County, Ohio

---

| | |
|---|---|
| Henry B. Essick III | Civil Action No.: |
| *(1313 Harvard Blvd., Dayton, OH 45406)* | |
| *Plaintiff* | Causes of Action: |
| vs. | 1. Mal. Pros./Abuse of Process |
| | 2. Int. Infl. of Emo. Distress |
| The Hertz Corporation | 3. Negligence/Gross Neg. |
| *(14501 Hertz Quail Springs Parkway, Oklahoma City, OK 73126-9033)*; | |
| Byers Car Rentals, LLC | *Jury Trial Demanded* |
| *(736 West National Road, Dayton (Vandalia) , Ohio  45377)*; | |
| *Defendants* | |

---

## CIVIL ACTION COMPLAINT

### INTRODUCTION

1.     Plaintiff Henry Essick III was arrested, thrown in jail, and prosecuted by The Hertz Corporation and its franchisee Byers Car Rental LLC (collectively "Hertz") after Hertz falsely reported him to the police for grand theft auto, despite the fact that at all times he was authorized to have the rental, extended the rental, and paid for the rental car in question.

2.     Unfortunately, Mr. Essick was the victim of severe corporate mis and malfeasance. For many years now Hertz has been reporting customers to the police across the nation without verifying whether they have actually stolen cars. In particular, Hertz is egregiously bad at keeping track of whether customers have extended their rentals.

3.     Their computer systems do not communicate between the corporate and branch locations, and the corporate security division is extremely bad at sharing information with the rest of corporate and the locations actually renting the vehicles.

4.     Hertz knows about these failures, but has actually instructed its corporate security employees not to follow its own written policies (which mandate investigations on the local level to confirm whether the car was stolen or the renter has been in touch) which safeguard against false police reports. Hertz has admitted this is because it has been cutting costs and personnel in its corporate security department.

5.     Instead of following its own policies, and taking basic steps to ensure accurate police reports, Hertz has been mass reporting its own customers for theft without verifying

whether they committed a crime because it has made the cold calculation that it is more cost effective to use the nation's police forces, prosecutors, and judges as a taxpayer funded repo service—at the expense of the lives of its innocent customers are caught in the middle.

6.      Several police departments have stopped entering police reports by Hertz in the NCIC due to their lack of reliability.

7.      Mr. Essick is the victim of a nationwide crisis which Hertz has caused and refuses to fix.

THE INITIAL RENTAL AND EXTENSIONS

8.      Plaintiff Henry B. Essick III is thirty-four year old man living in Montgomery County, Ohio. His wife is named Avone A. Essick, who is thirty-eight years old.

9.      On February 5, 2018, Mr. Essick rented a vehicle from the Hertz Car Rental location at the Dayton International Airport location in Vandalia, OH, while Ms. Essick was present. A rental reservation receipt was sent to Mr. Essick's gmail account. See Exhibit 1.

10.      During the rental, Mr. Essick presented an American Express card, ending in '8053, to Hertz. Hertz used that card to bill the rental. This included initially putting pursuant to the initial rental contract's language: "At the time of rental, an authorization hold in an amount that may be greater than the estimated charges may be secured on the credit/debit card provided, to cover the estimated charges and any additional charges that may be incurred." Exhibit 1 - Initial Rental. It is only after the rental that the charges are actually put through.

11.      The initial rental was until February 12, 2018.

12.      The Hertz Vandalia airport location called on or around February 12, 2018, and asked if the Essicks were going to return or extend the rental. Mr. Essick extended the rental one more week.

13.      After that week, Mrs. Essick then extended the rental until March 2, 2018. At all points the Essicks were in close contact with Hertz, Hertz knew they had the car, and Hertz authorized the Essicks to have the rental.

14.      Specifically, the Essicks spoke with the Vandalia location several times, including most often an employee Mrs. Essick believes was named Tiffany. During this time Ms. Essick told Hertz that the company was holding almost all the available money on the applicable '8053 card in pending charges. The employees said that they could not do anything about that but that once the car was returned a total charge would be put through and the pending/hold charges would disappear.

15.     At no point did any Hertz employee during these phone calls ever inform the Essicks there was a problem with the rental, nor did Hertz ever call (or email) the Essicks about a problem with the rental.

16.     The Essicks returned the rental on the due date of March 2, 2018. On March 5, 2018, Hertz sent them an email stating "Thank you for renting with Hertz. You will find your eReceipt attached for your convenience." See Exhibit 2 - Email and Receipt. The receipt stated that the payment had been made for $566.78. On March 8, 2018, the final bill for $566.78 hit Mr. Essick's card ending in '8053 and all the holds and pending charges disappeared—as the Hertz employees said would happen. See Exhibit 3 - Banking Record.

17.     On March 7, 2018, Mr. Essick received a customer service email from Hertz Rent-A-Car which stated "At Hertz we're committed to making your experience as enjoyable as possible." See Exhibit 4.

18.     On or around March 9, 2018, the Hertz Vandalia location called the Essicks and asked them if they wanted to return the rental or extend it. The person on the phone sounded annoyed and was speaking in a terse, short manner. Ms. Essick informed Hertz that the car had already been returned on March 2, 2018, and that the Essicks had already received a receipt and been billed. The person on the other end did not ask any follow up questions, but instead hung up. At no point were the Essicks told of any problems with the rental.

19.     Again, on March 11, 2018, the Essicks received a customer service email from Hertz asking Mr. Essick to take a customer experience survey.  See Exhibit 5.

### THE FALSE POLICE REPORT AND WRONGFUL ARREST

20.     Despite the fact that Plaintiff had extended the rental, contacted Hertz repeatedly, returned it, and paid for the rental in full, bizarre events were in motion inside Hertz.

21.     Hertz somehow had no idea that Plaintiff had extended the rental until March 2, 2018. Hertz's internal records still said the car was due on February 12, 2018.

22.     Furthermore, despite Hertz sending a receipt for the rental to the Essicks on March 5, 2018, and a customer service survey on March 7, 2018, the Hertz employee who called the Essicks on or around March 9, 2018 appeared to be completely ignorant the car had already been returned.

23.     It is apparent that Hertz does a recklessly poor job of keeping records.

24.     Totally unknown to the Essicks, Hertz reported Mr. Essick for grand theft auto on March 15, 2018, for allegedly stealing the rental car between the dates of February 12 and March 2, 2018. Mr. Essick was indicted on April 9, 2018, unbeknownst to him. Hertz falsely told the

police that they had no contact from the Essicks between February 12 and March 2, 2018. This was completely untrue.

25.    Despite the fact that Hertz had been in contact with the Essicks both during and after the rental, never once had they contacted the Essicks about the car being allegedly stolen or overdue. In fact, they had repeatedly extended the rental for Mr. Essick.

26.    The police report shows that Hertz knew that Mr. Essick had returned the vehicle on March 2, 2018, but still reported him for theft. The fact the car was returned alone shows that he did not have any intent to steal the car, as did the fact that he paid for the rental.

27.    Setting aside that Hertz knew or should have known that Essick had extended his rental, *why was Hertz reporting a customer who had returned and paid for the rental for grand theft auto without even speaking with the renter*?

28.    Simply put, this was not a criminal case and the reporting of Mr. Essick for car theft is inexcusable and was at all points without probable cause.

29.    Hertz's conduct in this matter was negligent, grossly negligent, reckless, intentional, malicious, outrageous, and showcased a manifest indifference to the safety and rights of the Essicks.

30.    On or around April 24, 2018, Mr. Essick and his wife were sitting in a car outside Mr. Essick's father's house. Without warning they were surrounded by police accusing Mr. Essick of grand theft auto and he was hauled off to jail without either Mr. Essick or Mrs. Essick having any idea why.

31.    It must be noted that being arrested for felony grand theft auto is a matter of the utmost seriousness. People die in such situations, especially Black Americans.

### WRONGFUL PROSECUTION AND DISMISSAL OF CHARGES

32.    After being let out of jail on April 27, 2018, the Essicks tried to figure what could have possibly happened, and why Mr. Essick had been falsely accused and arrested for stealing a rental vehicle he had extended, returned, paid for, and obviously never intended to steal.

33.    Due to confusion during the prosecution, the Court actually issued another arrest warrant for Mr. Essick causing him to be jailed yet again for three more days due to Hertz's completely false police report.

34.    At no point was there probable cause for Hertz to report Mr. Essick for any crime or to institute criminal proceedings against him.

35.    Finally, after repeatedly pointing out to the Court that Mr. Essick had rental and credit card records which obviously showed he did not steal the vehicle—and after Hertz refused

to show its face in court to defend the police report it made—the Court dismissed the charges against Mr. Essick on July 24, 2018.

## HERTZ'S LONG HISTORY OF MAKING FALSE POLICE REPORTS

36.     Hertz has known for years that it has a serious problem with false police reports but has done nothing to stop it.

37.     In 2017, Hertz lost two jury trials for falsely reporting customers. One was in Texas, where a jury found that Hertz was liable for malicious prosecution and assessed punitive damages for Hertz's outrageous conduct.

38.     Another was in Pennsylvania, where Hertz also lost a jury trial for malicious prosecution and intentional infliction of emotional distress. After the jury's verdict, the trial judge ruled that Hertz had to also face a punitive damages trial.

39.     There are in fact many, many more customers who were falsely reported around the nation.

40.     Attached to this complaint is a motion for punitive damages from the Pennsylvania case which details with police records from around the nation just how deficient Hertz's conduct has been, that they have known about the issue for years, and that even Hertz's employees admit that the company is doing a poor job keep tracking of vehicles. See Exhibit 7 - Motion for Punitive Damages.

41.     There have been false reports in Pennsylvania, Texas, Kentucky, Florida, Nevada, Arkansas, Wisconsin, Indiana, Ohio, and others.

42.     In a May 2019 ABC 5 news report detailing several Hertz rental failures, Hertz commented that "*Our process for determining when a vehicle is reported stolen has multiple steps to ensure accuracy, and in the rare instance an error within our control has occurred we take responsibility. We conduct thorough investigations and make every effort to remedy the situation. We have consistently made changes to improve our processes and we will continue to do so throughout all areas of our business to provide customers with the exceptional experience they expect from Hertz.*" https://www.news5cleveland.com/news/local-news/investigations/hertz-customers-detained-arrested-after-rental-vehicles-mistakenly-reported-stolen.

43.     All of this is entirely false. Hertz has known for years that it has this problem, and its only response has been to ignore the situation. It has plainly made the calculation that the money saved by mass reporting customers and having the police return the vehicles, far outweighs the costs it will incur from it falsely reporting customers.

44.     As a direct and proximate result of Defendants' acts and omissions, Plaintiff has incurred severe and substantial damages and actual harm. These damages include but are not limited to:

    a.    Monetary damages

    b.    Attorneys' Fees for a Criminal Attorney

    c.    Severe mental distress, as well as severe emotional distress, mental suffering, mental anguish, sleeplessness, restlessness, anxiety, and depression

    d.    Loss of reputation.

    e.    Loss of the time he spent unjustly incarcerated.

    f.    Harm to personal, social, and professional relationships.

    g.    Emotional pain and suffering.

    h.    Lost wages.

*****

# Parties

**Plaintiff Henry B. Essick III**

45.    Plaintiff Henry B. Essick is a citizen of Ohio who resides in Dayton, OH.

**Defendant The Hertz Corporation**

46.    Defendant The Hertz Corporation is a Delaware corporation.

47.    The Hertz Corporation operates a rental car location in Dayton (Vandalia, OH) at the Dayton International Airport.

48.    The Hertz Corporation is liable to Mr. Essick on all claims both directly for its own conduct as its highly flawed corporate systems and policies were used to falsely report Mr. Essick for car theft, and also because it is vicariously liable for the actions of its franchisee.

49.    The Dayton location is technically a franchisee of the corporation. However, Hertz is liable for the conduct of this franchisee, as a franchisor, due to its close control over the day to day operations of the franchisee.

50.    This control includes:

    a.    standardized employee hiring policies,

    b.    standardized and required training by The Hertz Corporation for franchisee employees,

    c.    company-wide standards for car rental,

    d.    company-wide standards for reporting cars stolen, including W7-02;

    e.    company-wide standard hours of operation and staffing,

    f.    company-wide customer service policies and systems;

    g.    the use of national corporate systems, policies, and software—and personnel—to rent cars, keep track of inventory, and make police reports.

    h.    standardized appearances of vehicles, employee uniforms, and buildings,

    i.    a mandated electronic communication system,

    j.    company-wide strict rules of operation,

    k.    the ability to cancel franchise agreements if rules are violated,

    l.    the right to regularly inspect franchisees, and

    m.    franchisee must adhere to Hertz national price guidelines.

**Defendant Byers Car Rental LLC**

51.     Upon information and belief, defendant Byers Car Rental LLC is a franchisee of defendant The Hertz Corporation and operates a rental car service at the Dayton International Airport.

*****

# Jurisdiction & Venue

52.     Jurisdiction over the parties in the Courts of the State of Ohio is proper because Defendants have overwhelming jurisdictional contacts in the State of Ohio by virtue of carrying on of a continuous and systematic part of its general business within this State. Defendants transacted business in this State and caused harm and compensable injury to Plaintiff by acts or omissions committed in State that are the subject of the present complaint.

53.     Venue is proper in the Montgomery County Court of Common Pleas under Ohio Rule of Civil Procedure 3 inasmuch as Defendants reside in and regularly conduct business in Montgomery County, and inasmuch as the cause of action arose and/or a majority of the harm, occurrences, and transactions regarding Plaintiff's cause of action arose and/or took place at least in part in Montgomery County.

*****

# COUNT I – Malicious Prosecution/Abuse of Process

*Henry B. Essick III*

*v.*

*The Hertz Corporation; Byers Car Rental LLC*

54.    Plaintiff incorporates by reference and realleges the preceding paragraphs of this complaint.

55.    The elements of malicious prosecution are that Defendants (1) maliciously instituted prior proceedings against the plaintiff by Defendants, (2) Defendants lacked probable cause to initiate proceedings against, (3) termination of the prior proceedings in plaintiff's favor, and (4) seizure of plaintiff's person or property during the course of the prior proceedings.

56.    A defendant is liable for abuse of process when the proceedings are used by the Defendants for a purpose or objective other than bringing the person to justice.

57.    Defendants initiated criminal proceedings against Plaintiff on or around March 15, 2018, by filing a false criminal complaint against Plaintiff with the Dayton Police Department, alleging that Plaintiff had stolen a car from Defendants from the period of February 12, 2018 to March 2, 2019.

58.    As a direct and eminently foreseeable result, Plaintiff was arrested and imprisoned two different times, while being prosecuted as a result of Hertz's actions. The charges were dismissed in plaintiff's favor on July 24, 2018.

59.    The initiation of the criminal proceedings against Plaintiff by Defendants was done without probable cause as Defendants knew that Plaintiff had a valid rental contract, had extended the rental with Defendants, that he had paid for the rental, and that he was otherwise authorized to be driving the car.

60.    Defendants acted maliciously and/or for a purpose other than bringing plaintiff to justice as they knew or should have known when they filed the criminal complaint against Plaintiff that he was authorized to use the car and had not stolen it.

61.    Hertz knew that Plaintiff and his wife had extended the rental with Hertz until March 2, 2018, returned the rental on March 2, 2018, and paid all bills charged by Hertz for the rental.  Plaintiff and his wife repeatedly spoke with Hertz during and after the rental and were never informed that anything was wrong.

62.    Hertz is not using the criminal justice system for the legitimate purpose of bringing an alleged criminal to justice, but instead as a free taxpayer funded repo service to cut

costs. Hertz knows that it has routinely been falsely reporting customers for theft, but has taken no steps to correct the problem.

63.     Defendants made this false complaint carelessly and/or negligently and/or recklessly and/or knowingly and/or intentionally and/or maliciously. Hertz failed to follow, and in fact deliberately disregarded, its own basic standard operating procedures and protocols designed to prevent false police reports, including Hertz national policy W7-02.

64.     Defendants' failure to withdraw the criminal complaint they initiated against Plaintiff was careless and/or negligent and/or reckless and/or knowing and/or intentional and/or malicious.

65.     As a direct and proximate result of Defendants' conduct in initiating a criminal complaint and failing to withdraw the criminal complaint as set forth above, Plaintiff has suffered severe damages, including but not limited to monetary damages, severe emotional distress, mental suffering, mental anguish, sleeplessness, restlessness, anxiety, and depression.

66.     As a direct and proximate result of Defendants using the criminal justice system for an objective other than bringing Plaintiff to justice, Plaintiff has suffered severe damages, including but not limited to monetary damages, severe emotional distress, mental suffering, mental anguish, sleeplessness, restlessness, anxiety, and depression

67.     Plaintiff also requests punitive damages due to the outrageous behavior of Hertz, its reckless disregard for Plaintiff's rights and life, and because Defendants have had years of notice that the company is wrongly reporting innocent customers for car theft but has done nothing to fix the problems but instead continued to make false and unverified police reports.

*****

## COUNT II –   Intentional Infliction of Emotional Distress

*Henry B. Essick III*

*v.*

*The Hertz Corporation; Byers Car Rental LLC*

68.   Plaintiff incorporates by reference and realleges the preceding paragraphs of this complaint.

69.   The elements of intentional infliction of emotional distress are that Defendants (1) acted intentionally or recklessly, (2) acts and omissions were extreme and outrageous, (3) Plaintiff suffered severe emotional distress, and (4) Plaintiff's emotional distress was a result of Defendants' conduct.

70.   Defendants initiated criminal proceedings against Plaintiff on March 15, 2018, by filing a false criminal complaint against Plaintiff with the Dayton Police Department, alleging that Plaintiff had stolen a car from Defendants from the period of February 12, 2018 to March 2, 2019.

71.   As a direct and eminently foreseeable result, Plaintiff was arrested and imprisoned two different times, while being prosecuted as a result of Hertz's actions.

72.   This initiation of the criminal proceedings against Plaintiff was done without probable cause as Defendants knew that Plaintiff had a valid rental contract, had extended the rental with Defendants, knew that he had paid for the rental, and knew that he was otherwise authorized to be driving the car.

73.   Defendants acted maliciously and/or for a purpose other than bringing plaintiff to justice as they knew or should have known when they filed the criminal complaint against Plaintiff that he was authorized to use the car and had not stolen it.

74.   This includes because Plaintiff and his wife extended the rental with Hertz until March 2, 2018, returned the rental on March 2, 2018, and paid all bills charged by Hertz for the rental.

75.   Defendants made this false complaint recklessly and/or knowingly and/or intentionally and/or maliciously.

76.   Defendants' failure to withdraw the criminal complaint they initiated against Plaintiff was careless and/or negligent and/or reckless and/or knowing and/or intentional and/or malicious.

77.   As a direct and proximate result of Defendants' conduct in initiating a criminal complaint and failing to withdraw the criminal complaint as set forth above, Plaintiff has

suffered severe damages, including but not limited to monetary damages, severe emotional distress, mental suffering, mental anguish, sleeplessness, restlessness, anxiety, and depression.

78.    Defendants' failure to withdraw the criminal complaint they initiated against Plaintiff was intentional and/or reckless.

79.    The acts and omissions of Defendants were extreme and outrageous in a civilized society.

80.    The use of the criminal justice system is of the utmost seriousness and innocent individuals who have done nothing wrong should not be thrown in prison without warning and prosecuted for felonies, nor should their name be associated with extremely damaging felonious charges they did not commit.

81.    Plaintiff suffered severe damages as a result of Defendants' conduct, including in initiating the criminal complaint and also in failing to withdraw the criminal complaint.

82.    As a result of the intentional and/or reckless conduct of Defendants, punitive damages are demanded of all defendants, individually and collectively.

*****

## COUNT III –     Negligence/Gross Negligence

*Henry B. Essick III*

*v.*

*The Hertz Corporation; Byers Car Rental LLC*

83.    Plaintiff incorporates by reference and realleges the preceding paragraphs of this complaint.

84.    The elements of negligence are that Defendants (1) duty, (2) breach, (3) causation, and (4) damages.

85.    The defendants in this action owed Plaintiff a duty not to falsely report him to the police because they rented him the car at issue, and because it was foreseeable that filing a false police report that he stole the car would result in damages.

86.    At all points Defendants had notice that they had a serious problem with making false police reports, and tracking car rentals accurately, but at no point corrected these issues or ceased making the reports.

87.    The defendants in this action breached the duty of care when they reported Plaintiff to the police for grand theft auto, despite knowing or should have knowing that Plaintiff had extended the rental until March 2, 2018, had returned the car on March 2, 2018, had paid for the car on March 5, 2018, and had multiple conversations with Hertz personnel both during and after the rental. At no point was Plaintiff ever informed of any problems with the rental despite Hertz having and calling his phone number, and despite Hertz having and using his email address.

88.    The conduct of Defendants was not only careless, but also malicious, reckless, willful, wanton, and demonstrated a total indifference to the lives of Defendants' customers including Plaintiff. Defendants exhibited a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm.

89.    Due to Defendants tortious conduct and omissions, they directly and/or proximately caused him monetary damages, falsely arrested him, falsely imprisoned him, and falsely prosecuted him. He has been falsely labeled a car thief, and has suffered severe emotional distress, mental suffering, mental anguish, sleeplessness, restlessness, anxiety, and depression.

90.    Due to the outrageous, malicious, reckless, and intentional nature of Defendants' conduct, punitive damages are requested.

*****

## **RELIEF REQUESTED**

**WHEREFORE**, Plaintiff demands judgment in its favor and against Defendants, jointly and severally, on all counts and claims compensatory damages in an amount in excess of this court's jurisdictional limitations, thereby guaranteeing Plaintiff a jury trial, exclusive of interests and costs, and an award of punitive damages, as well as prejudgment interest, post judgment interest, delay damages, costs, and such equitable relief as the Court deems necessary; and requests that this Court determine and declare that Plaintiff be awarded for all counts:

a.    Compensatory damages, inclusive of any and all harm attributable to Defendants' actions or inaction;

b.    Punitive damages to punish the Defendants for their outrageous conduct, self-interest, and duplicitous behavior;

c.    Exemplary damages to set an example for others;

d.    Attorneys' fees and court costs;

e.    the loss of time and opportunity;

f.    Delay damages; and

g.    Such other and further relief and/or equitable relief that this Court deems just and/or necessary.

*****

*Respectfully submitted,*

WALTON + BROWN, LLP
*/s/*_____
Sean L. Walton, Jr. Esquire
395 E Broad St #200,
Columbus, OH 43215
T: (614) 636-3476
*Law Firm/Lawyer for Plaintiff*
*/d/   July 24, 2019_____*


FRANCIS ALEXANDER, LLC
*/s/*_____
Alfred J. Fluehr, Esquire
PA. Attorney ID No.:  316503
280 N. Providence Road | Suite 1
Media, PA 19063
T:  (215) 341-1063
F:  (215) 500-1005

*Law Firm / Lawyer for Plaintiff*
*Moving for Pro Hac Vice Admission*
*/d/  July 24, 2019_____*

## SPOLIATION NOTICE -- PRESERVATION OF EVIDENCE

Plaintiff hereby demands and requests that Defendants take necessary actions to ensure the preservation of all documents, records, communications, whether electronic or otherwise, items and things in their possession or control, or any entity over which any party to this action has control, or from whom any party to this action has access to, any documents, items, or things which may in any manner be relevant to or relate to the subject matter of the causes of action and/or the allegations of this complaint.

## JURY TRIAL DEMAND

Plaintiff hereby demands a 12-person jury trial.

*****
*Respectfully submitted,*

WALTON + BROWN, LLP

*/s/*_____
Sean L. Walton, Jr. Esquire
395 E Broad St #200,
Columbus, OH 43215
T: (614) 636-3476
*Law Firm/Lawyer for Plaintiff*
*/d/  July 24, 2019_____*


FRANCIS ALEXANDER, LLC
*/s/  AJ Fluehr_____*
Alfred J. Fluehr, Esquire
PA. Attorney ID No.:  316503
280 N. Providence Road | Suite 1
Media, PA 19063
T:  (215) 341-1063
F:  (215) 500-1005
*Law Firm / Lawyer for Plaintiff*
*Moving for Pro Hac Vice Admission*
*/d/  July 24, 2019_____*

# CERTIFICATE OF SERVICE

I hereby state that a true and correct copy of the foregoing CIVIL ACTION COMPLAINT will

be served by personal service:

The Hertz Corporation
14501 Hertz Quail Springs Parkway,
Oklahoma City, OK 73126-9033

Byers Car Rental, LLC
736 West National Road
Dayton (Vandalia), Ohio  45377

*****

*Respectfully submitted,*

WALTON + BROWN, LLP
*/s/*_____
Sean L. Walton, Jr. Esquire
395 E Broad St #200,
Columbus, OH 43215
T: (614) 636-3476
*Law Firm/Lawyer for Plaintiff*
*/d/  July 24, 2019*_____

FRANCIS ALEXANDER, LLC
*/s/ AJ Fluehr*_____
Alfred J. Fluehr, Esquire
PA. Attorney ID No.:  316503
280 N. Providence Road | Suite 1
Media, PA 19063
T:  (215) 341-1063
F:  (215) 500-1005
*Law Firm / Lawyer for Plaintiff*
*Moving for Pro Hac Vice Admission*
*/d/  July 24, 2019*_____

ATTACHMENT Y

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT IN AND FOR
HILLSBOROUGH COUNTY, FLORIDA

| | |
|---|---|
| BRENT D. WILLIAMS, SR.<br><br>*Plaintiff*<br><br>vs.<br><br>THE HERTZ CORPORATION;<br><br>MARK PAUL FRISSORA;<br><br>JULIE WILKERSON<br><br>*Defendants* | Civil Action No.:<br><br><br><br>CAUSES OF ACTION:<br>1. Malicious Prosecution<br>2. Abuse of Proc.<br>3. Int./Neg. Infl. of Emo. Dist.<br>4. Negligence/Gross Negligence<br><br>*Jury Trial Demanded* |

## CIVIL ACTION COMPLAINT

### INTRODUCTION

1.      Defendant The Hertz Corporation has been falsely reporting untold numbers of customers for car theft, throwing them in jail on felony charges for months, prosecuting them, causing them to lose their jobs, giving them criminal records, losing their homes, and separating them from their family and loved ones. These customers have paid for their cars and are authorized to use the rentals.

2.      The company's computer and inventory tracking systems are broken. However, the top corporate officers have decided that verifying theft reports, and fixing their computers, would be too expensive.

3.      Defendant Hertz has instead decided—at the very highest level—to mass report its own customers to the police without verification, effectively using the police, criminal justice system, and taxpayers to subsidize inventory control for a private corporation.

4.      This plan is as brilliant as it is evil, saving the company millions upon millions of dollars it would otherwise have to spend updating its broken systems and paying corporate security personnel to verify the thousands of theft reports it makes.

5.      As a result of this routine and systemic mass reporting, without verification or investigation, many innocent customers have been wrongfully detained, arrested, thrown in prison, prosecuted, and had their lives destroyed.

6.      This is not some sort of error. The company and its leadership have known about these problems for many years after customers and police agencies notified Hertz corporate

about these serious issues. Hertz did nothing to address these problems, instead deliberately placing the Almighty Dollar before the lives and safety of their customers, including Plaintiff.

7.    Hertz has even been sued and lost lawsuits for intentional infliction of emotional distress and malicious prosecution for the same conduct at issue in this case—but has continued to falsely report customers for theft, calculating that it will make more money if it does not fix the problem.

8.    Plaintiff Brent D. Williams, Sr. was arrested, thrown in jail, and prosecuted by defendant The Hertz Corporation in 2015 after being falsely reported for stealing a car he had rented in 2007. He spent one month in prison, and another hellish 10-day van ride from Pennsylvania to Tampa, FL where Hertz had filed the case against him.

9.    Hertz and its employees falsely and incompetently told the police in 2007 that Plaintiff had stolen the car when he actually paid $6,000 for the rental and was always authorized to use the car.

10.    When he was arrested and appeared in court in 2008, Hertz never showed up and he thought the matter was essentially over. To his shock, Hertz had never dropped the case and seven years later he was held in prison *for over one month* in 2015. When it finally came time for the first hearing, the case was nolle prossed because Hertz failed to show and no paperwork existed to demonstrate what he was being accused of.

11.    As a result of Hertz's ongoing malfeasance, Hertz recklessly filed a materially false and erroneous police report against plaintiff Williams—failing to even do a minimal amount of fact checking before reporting him—showing a wanton and cruel indifference to Plaintiff's rights.

12.    In addition to damages, Mr. Williams is requesting that this Court enter an injunction prohibiting Hertz from renting cars to the maximum extent of the Court's jurisdiction, until the Hertz Corporation addresses and fixes this nationwide scandal which is destroying the lives of Hertz's unsuspecting, innocent customers.

### PLAINTIFF RENTS A CAR IN TAMPA, FL

13.    Plaintiff Williams had been renting from Hertz since 2000, often renting cars for 1.5 months or more because his job involved a good deal of travel. He supervised 35 employees for a company which sold magazines. He had no problems with Hertz during this time period.

14.    All of this changed in 2007 or 2008 when he rented a Shelby GT convertible from the Hertz Tampa Airport location for work all around Florida. At the Tampa location the original rental rate was $900 but he was given a deal by a female representative for $600 per week.

15.    As he always did, he gave Hertz a valid credit card—a Visa - Wachovia (First Union)—to be charged for the rental. Hertz also had his phone number, the same one that he had always given Hertz for the previous seven years.

16.    Plaintiff had the rental for around 1.5 months. At one point, he parked the rental at the Orlando airport since he needed to travel back to Pennsylvania for the birth of his child. Upon arriving in Philadelphia and going to Hertz to rent another car, the representative told him he was a on a "do not rent" list.

17.    Mr. Williams informed her that there must be a mistake because he was in the middle of a Hertz rental in Florida. The representative then rented him a car so he could see the birth of his child.

18.    Following a few weeks stay in Pennsylvania, he traveled back to Orlando and resumed driving the Shelby GT convertible around Florida. At no point during this time did he receive a call from Hertz regarding his Florida rental.

## HERTZ REPORTS PLAINTIFF FOR CAR THEFT WITHOUT PROBABLE CAUSE THEN FAILS TO APPEAR AT HIS COURT HEARING

19.    When he was driving in Monroe County for he was pulled over and to his shock arrested for car theft. Unbeknownst to him, Hertz had reported the car stolen and falsely claimed he had not paid for the rental.

20.    He was utterly baffled. His credit card had been charged by Hertz for $6,000, and he was a longtime customer.

21.    He was held for the night and then released on bail. One of his employees had to bail him of jail, which was humiliating and hard to explain.

22.    Mr. Williams then called Hertz corporate for an explanation. He spoke with a man he believes was named Leo or Lou Getz who worked at Hertz's Oklahoma City corporate office. Mr. Williams explained that he was a longtime customer and that he paid Hertz a huge amount of money for the rental; he explained that this was obviously a mistake. This man, possibly an attorney, stubbornly told Mr. Williams that Hertz did not care and would prosecute him anyway—although for what and why was unclear.

23.    A few weeks later Mr. Williams had to fly back to Monroe County for the court hearing, however, no one from Hertz showed up and he received no more notices from the courts concerning the case.

24.    Around the time of that hearing Hertz kept calling Plaintiff asking where the Shelby GT rental car was located, despite the fact that it was seized by police.

25.    For some reason Hertz could correctly dial his number after they arrested him, but could not call his phone during the rental before they reported him to the police. It was apparent to Mr. Williams that the company was taking a recklessly "report first, figure it out later" approach..

26.    In fact, by complete coincidence, Mr. Williams knew where the Shelby rental was located. When he was flying into Miami for the Monroe County court hearing, Mr. Williams saw the same Shelby he rented sitting *at the Hertz location at the Miami Airport*, presumably where the police had had the car towed after he had been arrested.

27.    Egregiously, Hertz not only reported a paying, valid customer to the police without contacting him, but did not even know that the car they were looking for had been sitting on a Hertz lot for several weeks. The company's record keeping is totally broken.

28.    Despite his anger, Mr. Williams told Hertz that the police had seized the car but that he had seen it at the Miami Airport Hertz location.

29.    To state the obvious: there was never any probable cause to have Mr. Williams arrested nor was there any probable cause to continue with the prosecution once he notified Hertz of the false report.

30.    As a result of Hertz's false police report, his life underwent some significant changes. Most notably he stopped working in a travel heavy job, despite his success, and settled down in Pennsylvania. Being accused of car theft and dragged through the Court system takes a mental and emotional toll.

31.    Unfortunately, this was not the end of his ordeal, and things got much worse.

### HERTZ NEVER WITHDREW THE PROSECUTION - PLAINTIFF WAS ARRESTED AND IMPRISONED FOR OVER ONE MONTH IN 2015

32.    From 2008 to 2015, he thought this incident was over, although he never forgot about it given how he had been treated and jailed like a criminal back in 2008.

33.    It was only in 2015, in Bethlehem, PA that the incident resurfaced.

34.    Plaintiff was arrested by police in Bethlehem who said that there was an active warrant out for his arrest in Tampa, FL for car theft. He was told he was being extradited to Florida.

35.    Plaintiff's bail was set at $50,000, but no bail bondsman would take the case because they were required to transport him to Florida within 72 hours. What this meant is that Plaintiff was effectively being held without bail, unable to be released.

36.     Williams was in disbelief that a car rental he had paid $6,000 for almost a decade ago could result in the Orwellian hell he found himself in.

37.     Hertz was told and given all the information necessary in 2007-2008 to know that the police report was erroneous and false and without probable cause, but did nothing to withdraw the baselessly prosecution in the intervening 8 years.

38.     Absurdly, Williams was held for 1 month in a Pennsylvania prison (in Allentown, PA) for a false 2007 police report that Hertz never pursued in 2007 and 2008—and never withdrew.

### HERTZ'S LONG HISTORY OF MAKING FALSE POLICE REPORTS

39.     Hertz has known for years that it has a serious, nationwide problem with false police reports but has done nothing to stop it.

40.     Hertz's top corporate officials have known for years that it has a serious, nationwide problem with false police reports but has done nothing to stop it.

41.     For instance, in 2015 the Louisville, KY airport police informed Defendants that the company was making false police reports in circumstances similar to what happened to Plaintiff. The company did nothing in response.

42.     In 2015 and 2016 customers sued Hertz for malicious prosecution, false imprisonment, and false arrest for the same conduct which caused Plaintiff to be detained in 2017. Again, the company did nothing in response, despite losing two malicious prosecution trials in 2017 and punitive damages being assessed.

43.     Upon information and belief, Hertz has known about the false reporting issues since before 2007 but has done nothing to address the problem.

44.     Note that Hertz's corporate policies *require* that a local investigation be done before any theft report is made to verify that the report is accurate. The policy reads:

> Corporate/Country Security Manager Investigations - Every theft/conversion/disappearance must be promptly investigated by the Corporate/Country Security Manager responsible for the location from which the related Theft Vehicle Report is filed. All employees are required to cooperate fully with such an investigation.

Exhibit 1 - W7-02 RAC(a)(17).[1] An investigation and verification that the report is accurate is also required by Florida law prohibiting false police reports for crimes that do not exist. See Fla. Statute § 837.05.

---

[1] This policy, or one that was substantially similar, was in place in 2007 during Plaintiff's car rental.

45.    Furthermore, the policy states that "Location; Maintenance, Area, Country Head Office and. OKC Management ***must ensure compliance to this procedure***." See Exhibit 1, at p.1.

46.    Despite this policy, Hertz's corporate officers have instructed its employees not to follow this policy.

47.    A Hertz corporate designee testified in a Pennsylvania lawsuit that no checks or investigations are ever done at the local, branch level before a police report is filed. <u>See</u> Exhibit 3 - Motion for Punitive Damages [Exhibit 11 to Motion for Punitive Damages, at p.70).

48.    A Hertz corporate security designee further stated that, despite corporate policies, no investigations are performed because of "marching orders" from Hertz corporate:

| | |
|---|---|
| COUNSEL: | Is it your testimony that you don't go to the location and question any of the Hertz employees when you receive a theft package? |
| MR. LIVINGSTON: | That's my testimony, yes. |
| COUNSEL: | Why? |
| MR. LIVINGSTON: | Because I mean the package has been completed, all the reports have been reviewed, I guess, by OKC. **And my marching orders are to report the car stolen** when I get the -- again, I do look at it for everything being accurate, as far as I can tell, within the report itself. |
| COUNSEL: | Yeah. *But you don't do any independent investigation?* |
| MR. LIVINGSTON: | *I do not.* |
| COUNSEL: | *You don't do any check?* |
| MR. LIVINGSTON: | *I do not.* |

Exhibit 3 [Exhibit 8 to Motion for Punitive Damages, at p.252] (emphasis added).

49.    At the trial, the Hertz corporate designee in charge of theft reporting and recovery for the entire company, defendant Julie Wilkerson, was forced to admit that Hertz had egregiously failed to protect its customers:

| | |
|---|---|
| COUNSEL: | And here's what I'm getting at and where I'm going with this, it says near the last line: "Location, maintenance, area, country, head office, and OKC management must ensure compliance with this procedure." Do you see that? |
| MS. WILKERSON: | Yes. |
| COUNSEL: | Is it your job to ensure compliance with this procedure? |

| MS. WILKERSON: | Yes. |
|---|---|
| COUNSEL: | And you're the person in charge of 700,000 cars to make sure as the regulator that these . . . procedures are followed, correct? |
| MS. WILKERSON: | Correct. |
| COUNSEL: | Now, when it says "location," that means in this instance the Philadelphia location, correct? |
| MS. WILKERSON: | Correct. |
| COUNSEL: | **In fact, this is a procedure that you follow to make sure that innocent people aren't wrongfully arrested for accidental reporting to the police, correct?** |
| MS. WILKERSON: | **Correct.** |
| COUNSEL: | And it's important these policies and procedures are followed by Hertz Corporation, correct? |
| MS. WILKERSON: | Correct. |
| COUNSEL: | **And if Hertz doesn't follow this problem -- this procedure, that would be a failure on the part of Hertz, correct?** |
| MS. WILKERSON: | **Correct.** |

See Exhibit 2, at p.28-47 (emphasis added).

50.    Instead of ensuring compliance with this procedure, all Defendants have been deliberately circumventing it—despite it being a safeguard which prevents false reports, such as the one that harmed Plaintiff and her son.

51.    Hertz has admitted this is because it has been cutting costs and personnel in its corporate security department. Mr. Livingston, Hertz's corporate security designee, testified that Hertz, in 2015, had made "**a corporate decision to lay off a large group of people at that time for cost savings**" within the corporate security department. Exhibit 3 [Exhibit 8 to Motion for Punitive Damages, at p.54]). It is the corporate security department that performs the local investigations mandated by W7-02.

52.    On information and belief, Hertz was cutting costs in it security department as early as 2007.

53.    Cutting these positions in corporate security further exacerbated Hertz's failure to comply with W7-02 and other theft reporting policies, and directly signaled that Hertz's top corporate officials had no intent of complying with W7-02. These layoffs were implemented

with the intent and purpose to cut costs and increase profits, at the expense of the lives of their customers.

54.     Instead of following its own policies, and taking basic steps to ensure accurate police reports, Hertz has been routinely mass reporting its own customers for theft without verifying whether they committed a crime because it has made the cold calculation that it is more cost effective to use the nation's police forces, prosecutors, and judges as a taxpayer funded repo service—at the expense of the lives of its innocent customers who are caught in the middle—like Plaintiff.

55.     Attached to this complaint is a motion for punitive damages from the Pennsylvania case which details with police records from around the nation just how deficient Hertz's conduct has been, that they have known about the issue for years, and that even Hertz's employees admit that the company is doing a poor job keeping track of vehicles. See generally Exhibit 3 - Motion for Punitive Damages. Indeed, certain police departments stopped taking Hertz police reports (unless there was an extra level of verification) after a Hertz employee admitted that the company had serious inventory control and tracking issues. Id. [Exhibit 7 to Motion for Punitive Damages].

56.     Since that motion was filed, there have been a steady stream of continuing false reports across the nation, in Pennsylvania, Texas, Kentucky, Florida, Nevada, Arkansas, Louisiana, Virginia, Wisconsin, Indiana, Ohio, California, and many others.

57.     These cases are in many respects almost identical to the false report that resulted in the unjust imprisonment and prosecution of plaintiff Brent Williams.

58.     In a May 2019 ABC 5 news report in Ohio which detailed several Hertz rental failures, Hertz commented that "Our process for determining when a vehicle is reported stolen has multiple steps to ensure accuracy, and in the rare instance an error within our control has occurred we take responsibility. We conduct thorough investigations and make every effort to remedy the situation. We have consistently made changes to improve our processes and we will continue to do so throughout all areas of our business to provide customers with the exceptional experience they expect from Hertz." https://www.news5cleveland.com/news/local-news/investigations/hertz-customers-detained-arrested-after-rental-vehicles-mistakenly-reported-stolen.

59.     All of this is entirely false. Hertz has known for years that it has this problem, and its only response has been to ignore the situation. It has plainly made the calculation that the money saved by mass reporting customers, and having the police return the vehicles, far

outweighs the costs it will incur from it falsely reporting customers and making unverified police reports.

60.    Also in May 2019, ABC Actions News - WFTS out of Florida reported that Hertz was throwing innocent customers in jail and wrongfully prosecuting them. https://www.abcactionnews.com/news/local-news/i-team-investigates/hertz-has-a-pattern-of-mistakenly-reporting-cars-stolen-leaving-customers-arrested-attorney-says.

61.    In May 2018, 6 ABC out of Philadelphia reported that Hertz had wrongfully arrested and imprisoned two customers, one in Philadelphia and another in Wisconsin. https://6abc.com/business/hertz-customers-arrested-after-vehicles-mistakenly-reported-stolen/3487977/.

62.    On information and belief, these problems at Hertz date back to at least 2007. Hertz had effectively the same policies and procedures in place at the time of Plaintiff's rental, the police report, his arrest, and his prosecution.

### HERTZ'S FALSE POLICE REPORT SEVERELY HARMED PLAINTIFF

63.    Spending a month in prison for a crime Plaintiff did not commit was a brutal assault on Plaintiff's mental and emotional health. However, the actual extradition itself was a 10 day nightmare.

64.    For the extradition, Williams was forced to ride in a prison transport van operated by a private company. The van crisscrossed the United States *for ten days* making stops at various prisons.

65.    This ride, for which he shackled next to hardened criminals, was pure torture. The van was disgusting, packed to the gills with 15 grown men.

66.    The shackles dug into his skin and bone and tightened every time he moved. He loathed his prison cell, but even the cell was better than the van ride.

67.    Men who have been sentenced to 10 and 20 years, for crimes such as stabbing, complained that they had never been treated so poorly in the prison system.

68.    Upon arriving in Florida, he sat in a holding cell for a day. The next day he appeared in front of a judge and, to his horror, the judge wanted to keep him in jail. To his relief he was allowed to pay bail of $2,500 and was finally released. His hearing was set for December 17, 2015.

69.    He then had to fly home, and then fly back for the hearing several weeks later.

70.    Yet, when he arrived for the hearing, the prosecutor said he had no idea why the case was still active, that there was no paperwork, and that he did not know why Mr. Williams

was even required to come back to Florida. The charges were nolle prossed on December 17, 2015.

71.     He was bluntly told by everyone involved that what had happened to him was laughable and absurd and that no paperwork even existed to support a prosecution.

72.     Mr. Williams followed all applicable rules and regulations and paid for the car rental as directed by Hertz. He was a regular Hertz customer. For his trouble he was subjected a nightmare spanning almost eight years.

73.     At no point did Hertz withdraw the prosecution or otherwise attempt to exonerate Mr. Williams despite the fact that Hertz was actually notified of the erroneous report in 2007-2008, for which no probable cause existed,

74.     Defendants' acts and omissions that are the subject of this complaint were knowing and/or careless and/or negligent and/or reckless and/or intentional and/or malicious.

75.     As a direct and proximate result of Defendants' acts and omissions, Plaintiff has incurred severe and substantial damages and actual harm. These damages include but are not limited to:

        a.      Monetary damages
        b.      Money spent on Bail
        c.      Attorneys' Fees for a Criminal Attorney
        d.      Severe mental distress, as well as severe emotional distress, mental suffering, mental anguish, sleeplessness, restlessness, anxiety, and depression
        e.      Loss of reputation.
        f.      Loss of the time he spent unjustly incarcerated.
        g.      Harm to personal, social, and professional relationships.
        h.      Emotional pain and suffering.
        i.      Lost wages.

                                    *****

# PARTIES

**Plaintiff Brent D. Williams, Sr.**

76.    Plaintiff Brent D. Williams, Sr. is a resident of Bethlehem, PA and citizen of Pennsylvania. He can be reached at 280 N. Providence Road, Suite 1, Media, PA, 19063.

**Defendant The Hertz Corporation**

77.    Defendant The Hertz Corporation is a Delaware corporation, headquartered in Estero, Florida. It is a citizen of Florida.[2]

78.    The Hertz Corporation has operated a rental car location at the Tampa Airport at all pertinent times, including in 2007 at the time Plaintiff rented his car.

79.    At all points in time all Hertz employees, agents, and representatives were acting within the course and scope of their employment for The Hertz Corporation.

80.    Hertz is vicariously liable for the conduct of its employees, including all defendants, as their conduct was not only foreseeable to Hertz but done with Hertz's approval and at Hertz's direction.

81.    Any reference to Hertz also includes all Hertz employees and agents, unless otherwise stated.

82.    Hertz and its employees all owed Plaintiff a duty for several reasons, including that Plaintiff rented a car from Hertz, had a relationship with the company, and because Hertz and its employees undertook to report its cars stolen knowing full well that an incorrect report could lead to the harm caused to Plaintiff.

83.    Hertz and the individual defendants are liable for punitive damages because they are guilty of both intentional misconduct and/r gross negligence.

84.    All Defendants had actual knowledge the police reports being filed by the company were unverified and untruthful—and violated the companies' policies designed to safeguard against false reports—but instead permitted and encouraged that the false reports be filed knowing that there was a high probability innocent customers would be harmed, including Plaintiff.

---

[2] A famous Supreme Court case in 2010 ruled that Hertz's headquarters were in New Jersey, but the company moved its headquarters to Estero, FL in 2013.

85.     All Defendants' conduct was also so reckless and wanting in care that that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct.

86.     At all points, Hertz's officers, directors, managers, and employees actively and knowingly participated in such conduct. Furthermore the officers, directors, managers, and employees knowingly condoned, ratified, and consented to Hertz's deficient conduct.

**Defendant Mark Paul Frissora**

87.     Defendant Frissora was president and CEO of the Hertz Corporation from 2006 to 2014.

88.     Defendant Frissora was in charge of Hertz policy, procedures, and practices related to the false police report at issue in this case.

89.     This includes the creation of and also compliance with Hertz policies W7-02 RAC (reporting vehicle thefts and conversions), W9-18 (prior to reporting thefts to the police, controlling vehicle physical inventories), W7-03 RAC (recovery of converted or stolen vehicles), W1-06 (records retention and management program), W1-75 (protection of assets and confidential materials), and other policies.

90.     He set Hertz policy during the relevant time period and knew or should have known about the massive problems afflicting Hertz's police reporting, inventory management, and vehicle tracking.

91.     Hertz corporate and Frissora have in fact known about these problems for many years.

92.     Not only have Frissora and Hertz done nothing to address Hertz's severe problems, but they have instead instituted policies and practices which promote and guarantee that false reports will be made, all to cut costs and increase profits.

93.     Hertz is not only vicariously liable for its corporate officers' actions and omissions, but Frissora is also personally liable to Plaintiff for his actions and omissions. He owed Plaintiff a duty to make correct police reports, a duty to devise effective policies which accurately track vehicles, a duty not to instruct Hertz employees to circumvent safeguards designed to prevent false police reports, a duty to address problems brought to her attention, and a duty to otherwise prevent false police reports. He also owed Plaintiff a duty not to use the criminal justice system for an improper purpose.

94.     Frissora and Hertz have grievously breached those duties.

95.     Hertz and Frissora have decided to use the criminal justice system as a free repo service, instead of following their own policies and comporting themselves in accordance with basic corporate ethics and Florida law. They have participated in, encouraged, and approved the use of the criminal justice system by Hertz for an improper purpose, namely as a repo service to recover vehicles and customer rentals that Hertz has lost track of due to incompetent record keeping and vehicle tracking.

96.     Frissora has sufficient contacts with Florida to confer jurisdiction over him because he caused Hertz to do extensive business in Florida, and because under his direction and supervision the false police report was made in Florida, leading to Plaintiff's prosecution in Florida. In addition, defendant Frissora caused Hertz to move its corporate headquarters to Florida while Plaintiff's prosecution was pending in Florida.

**Defendant Julie Wilkerson**

97.     Defendant Julie Wilkerson was the supervisor of theft and recovery at defendant Hertz during the time period in question. Wilkerson not only supervised all such reporting, but devised and implemented Hertz policies and practices on reporting vehicles.

98.     Hertz acts by and through Julie Wilkerson, and Wilkerson is also personally liable to Plaintiff for her conduct.

99.     Wilkerson has a duty to make sure Hertz complies with its own policies and the law when making police reports.

100.    Wilkerson and Hertz have known for many years that Hertz has routinely been filing false police reports against customers.

101.    As noted above and incorporated here, at the time of Plaintiff's rental and the false police report Wilkerson supervised theft reporting and recovery for the entire corporation, including in Florida.

102.    At all points Hertz, Wilkerson and other Hertz employees involved in this process knew that Hertz's overall theft reporting was broken, and that the theft report lacked probable cause.

103.    Contrary to Hertz policy, no local investigation took place in this case before the theft report was filed. As defendant Wilkerson has already admitted under oath, this is a manifest failure on Hertz's part.

104.    In fact, under her direction, theft reports are routinely made without investigation, including in this case.

105.    Although Wilkerson and Hertz have at all points in time known about Hertz's massive false reporting problem, they have taken no steps to resolve the issue and have in fact encouraged Hertz's reckless and outrageous reporting practices to continue without changes.

106.    Wilkerson and Hertz and the other Defendants are using the criminal justice system for an improper purpose.

107.    Wilkerson has sufficient contacts with Florida given that she supervises Hertz personnel in Florida, she supervised the theft report in question which was made under her supervision and direction in Florida, corporate policy mandates that she ensure compliance with police reports made in Florida, and Plaintiff was prosecuted in Florida because of Wilkerson's actions and omissions. Furthermore, Hertz moved its headquarters to Florida while Plaintiff's prosecution was pending, meaning that Wilkerson had many contacts with headquarters.

*****

## JURISDICTION & VENUE

108.    Jurisdiction over the parties in the Courts of the State of Florida is proper pursuant Florida law. Specifically, jurisdiction as to the Defendants is proper by reason of Defendant Hertz being a citizen of Florida and carrying on a continuous and systematic part of its general business within the State. All Defendants transacted business in Florida and caused harm and compensable injury to Plaintiff by acts or omissions committed in Florida that are the subject of the present complaint.

109.    Venue is proper in this court inasmuch as Defendant regularly conducts business in this jurisdiction and inasmuch as the cause of action arose and/or a majority of the harm, occurrences, and transactions regarding Plaintiff's cause of action arose and/or took place at least in part in this jurisdiction.

## COUNT I – Malicious Prosecution

*Brent D. Williams, Sr.*

*v.*

*The Hertz Corporation; Mark Paul Frissora; Julie Wilkerson*

110.     Plaintiff incorporates by reference and realleges the preceding paragraphs of this complaint.

111.     The elements of malicious prosecution are (1) Defendant maliciously instituted prior proceedings against the plaintiff, (2) Defendant lacked probable cause to initiate proceedings against Plaintiff, (3) termination of the prior proceedings in plaintiff's favor, and (4) seizure of plaintiff's person or property during the course of the prior proceedings.

112.     A defendant is liable for abuse of process when the proceedings are used by the Defendant for a purpose or objective other than bringing the person to justice.

113.     Defendants initiated criminal proceedings against Plaintiff in 2007 by filing a false criminal complaint against Plaintiff in Tampa, FL, alleging that Plaintiff had stolen a car from Defendant Hertz and had not paid for it.

114.     As a direct and eminently foreseeable result, Plaintiff was arrested and jailed in 2007-08 in Southern Florida. When Plaintiff then incredulously explained to Hertz that he had paid $6,000 for the rental and was authorized to have it, Hertz's representative did not care and continued the prosecution. However, at the hearing in Monroe County, Hertz never showed up and Mr. Williams figured this was behind him.

115.     Many years later, Mr. Williams was arrested again in Bethlehem, Pa. To his surprise, Hertz had never withdrawn the car theft case and it was still active. He was held for one month awaiting extradition to Florida, and spent 10 days in a hellish prison van ride down the East Coast.

116.     At that point he was released and his court date was set for December 17, 2015.

117.     However, when he showed up in Court, again Hertz was not present. This time the prosecutors dismissed the case against him, and said that the case against him was laughable and there was not even any paperwork indicating he had done anything wrong.

118.     The initiation of the criminal proceedings against Plaintiff by Defendants was done without probable cause. Furthermore, there was no probable cause at any point during those proceedings and Hertz should have withdrawn the prosecution at all points.

119.    Hertz is not using the criminal justice system for the legitimate purpose of bringing an alleged criminal to justice, but instead as a free taxpayer funded repo service to cut costs. Hertz knows that it has routinely been falsely reporting innocent customers for theft, but has taken no steps to correct the problem. See Exhibit 6.

120.    Defendant made this false complaint carelessly and/or negligently and/or recklessly and/or knowingly and/or intentionally and/or maliciously. Hertz failed to follow, and in fact deliberately disregarded, its own basic standard operating procedures and protocols designed to prevent false police reports, including Hertz national policy W7-02.

121.    Defendants' failure to withdraw the criminal complaint it initiated against Plaintiff was careless and/or negligent and/or reckless and/or knowing and/or intentional and/or malicious.

122.    As a direct and proximate result of Defendants' conduct in initiating a criminal complaint without probable cause and failing to withdraw the criminal complaint as set forth above, Plaintiff has suffered severe damages, including but not limited to monetary damages, loss of freedom, severe emotional distress, mental suffering, mental anguish, sleeplessness, restlessness, anxiety, and depression.

123.    As a direct and proximate result of Defendants using the criminal justice system for an objective other than bringing Plaintiff to justice, Plaintiff has suffered severe damages, including but not limited to monetary damages, loss of freedom, severe emotional distress, mental suffering, mental anguish, sleeplessness, restlessness, anxiety, and depression.

124.    Plaintiff also requests punitive damages due to the outrageous behavior of Hertz, its reckless disregard for Plaintiff's rights and life, and because Defendants have had years of notice that the company is wrongly reporting innocent customers for car theft but has done nothing to fix the problems but instead continued to make false and unverified police reports.

*****

## COUNT II – Abuse of Process

*Brent D. Williams, Sr.*

*v.*

*The Hertz Corporation; Mark Paul Frissora; Julie Wilkerson*

125.    Plaintiff incorporates by reference and realleges the preceding paragraphs of this complaint.

126.    A defendant is liable for abuse of process when the proceedings are used by the Defendant for a purpose or objective other than bringing the person to justice.

127.    Defendants initiated criminal proceedings against Plaintiff in 2007 by filing a false criminal complaint against Plaintiff in Tampa, FL, alleging that Plaintiff had stolen a car from Defendant Hertz and had not paid for it.

128.    As a direct and eminently foreseeable result, Plaintiff was arrested and jailed in 2007-08 in Southern Florida. When Plaintiff then incredulously explained to Hertz that he had paid $6,000 for the rental and was authorized to have it, Hertz's representative did not care and continued the prosecution. However, at the hearing in Monroe County, Hertz never showed up and Mr. Williams figured this was behind him.

129.    Many years later, Mr. Williams was arrested again in Bethlehem, Pa. To his surprise, Hertz had never withdrawn the car theft case and it was still active. He was held for one month awaiting extradition to Florida, and spent 10 days in a hellish prison van ride down the East Coast.

130.    At that point he was released and his court date was set for December 17, 2015.

131.    However, when he showed up in Court, again Hertz was not present. This time the prosecutors dismissed the case against him, and said that the case against him was laughable and there was not even any paperwork indicating he had done anything wrong.

132.    The initiation of the criminal proceedings against Plaintiff by Defendants was done without probable cause. Furthermore, there was no probable cause at any point during those proceedings and Hertz should have withdrawn the prosecution at all points.

133.    Hertz is not using the criminal justice system for the legitimate purpose of bringing an alleged criminal to justice, but instead as a free taxpayer funded repo service to cut costs. Hertz knows that it has routinely been falsely reporting innocent customers for theft, but has taken no steps to correct the problem. See Exhibit 6.

134.    Defendant made this false complaint carelessly and/or negligently and/or recklessly and/or knowingly and/or intentionally and/or maliciously. Hertz failed to follow, and

in fact deliberately disregarded, its own basic standard operating procedures and protocols designed to prevent false police reports, including Hertz national policy W7-02.

135.    Defendants' failure to withdraw the criminal complaint it initiated against Plaintiff was careless and/or negligent and/or reckless and/or knowing and/or intentional and/or malicious.

136.    As a direct and proximate result of Defendants' conduct in initiating a criminal complaint without probable cause and failing to withdraw the criminal complaint as set forth above, Plaintiff has suffered severe damages, including but not limited to monetary damages, loss of freedom, severe emotional distress, mental suffering, mental anguish, sleeplessness, restlessness, anxiety, and depression.

137.    As a direct and proximate result of Defendants using the criminal justice system for an objective other than bringing Plaintiff to justice, Plaintiff has suffered severe damages, including but not limited to monetary damages, loss of freedom, severe emotional distress, mental suffering, mental anguish, sleeplessness, restlessness, anxiety, and depression.

138.    Plaintiff also requests punitive damages due to the outrageous behavior of Hertz, its reckless disregard for Plaintiff's rights and life, and because Defendants have had years of notice that the company is wrongly reporting innocent customers for car theft but has done nothing to fix the problems but instead continued to make false and unverified police reports

****

# COUNT III        Intentional/Negligent Infliction of Emotional Distress

*Brent D. Williams, Sr.*

*v.*

*The Hertz Corporation; Mark Paul Frissora; Julie Wilkerson*

139.    Plaintiff incorporates by reference and realleges the preceding paragraphs of this complaint.

140.    The elements of intentional infliction of emotional distress are that Defendant (1) intentionally or recklessly caused mental suffering, (2) acts and omissions were extreme and outrageous, (3) Plaintiff suffered serious emotional distress, and (4) the distress was severe.

141.    The elements of negligent infliction are that (1) the Defendant was negligent, (2) the plaintiff suffered serious emotional distress, and (3) Defendant's negligence was a substantial factor in causing the serious emotional distress.

142.    Defendant initiated criminal proceedings against Plaintiff in 2007, falsely claiming that he stole a car.

143.    As a direct and eminently foreseeable result, Plaintiff was arrested and imprisoned for one month in 2015, and also suffered a 10-day prison van ride to Florida—in addition to being prosecuted from 2007 to 2015.

144.    His experiences while incarcerated were horrific.

145.    This initiation of the criminal proceedings against Plaintiff was done without probable cause as Defendants knew that Plaintiff had a valid rental contract and had paid $6,000 for the rental.

146.    Defendants acted maliciously and/or negligently and/or for a purpose other than bringing plaintiff to justice as it knew or should have known when they filed the criminal complaint against Plaintiff.

147.    Defendants made this false complaint recklessly and/or knowingly and/or intentionally and/or maliciously and/or negligently and/or grossly negligently. Defendants acted with negligence and/or reckless disregard of the probability that Plaintiff (and many other customers across the country) would suffer severe emotional distress as result of its actions and omissions.

148.    Defendants' failure to withdraw the criminal complaint it initiated against Plaintiff was careless and/or negligent and/or reckless and/or knowing and/or intentional and/or malicious. Defendants acted with negligent and/or reckless disregard of the probability that

Plaintiff (and many other customers across the country) would suffer severe emotional distress as result of its actions and omissions.

149.    As a direct and proximate result of Defendants' conduct in initiating a criminal complaint and failing to withdraw the criminal complaint as set forth above, Plaintiff has suffered severe damages, including but not limited to monetary damages, severe emotional distress, mental suffering, mental anguish, shame, humiliation, worry, shock, sleeplessness, restlessness, anxiety, and depression. Defendant's conduct was a substantial factor in causing Plaintiff serious and severe emotional distress. Any reasonable person would be unable to cope with a 1.5 month wrongful imprisonment and prosecution for a serious crime they did not commit.

150.    Defendants' failure to withdraw the criminal complaint they initiated against Plaintiff was intentional and/or reckless and/or negligent.

151.    The acts and omissions of Defendant were extreme and outrageous in a civilized society.

152.    The use of the criminal justice system is of the utmost seriousness and innocent individuals who have done nothing wrong should not be thrown in prison without warning and prosecuted for felonies, nor should their name be associated with extremely damaging felonious charges they did not commit.

153.    Plaintiff suffered severe damages as a direct result of Defendant's conduct, including by initiating the criminal complaint and also in failing to withdraw the criminal complaint.

154.    As a result of the intentional and/or reckless conduct of Defendant, punitive damages are demanded of Defendant.

*****

# COUNT IV        Negligence/Gross Negligence

*Brent D. Williams, Sr.*

*v.*

*The Hertz Corporation; Mark Paul Frissora; Julie Wilkerson*

155.    Plaintiff incorporates by reference and realleges the preceding paragraphs of this complaint.

156.    The elements of negligence are (1) duty, (2) breach, (3) causation, and (4) damages.

157.    The defendant in this action owed Plaintiff a duty because he rented a car from the company. It had a duty not to falsely report Plaintiff to the police because it rented him the car at issue, and because it undertook to file a police report with respect to this person, and because it was foreseeable that filing a false police report that he stole the car would result in severe damages.

158.    At all points Defendant had notice that Hertz had a serious problem with making false police reports, and tracking rental payments accurately, but at no point corrected these issues or ceased making the reports.

159.    The defendant in this action breached the duty of care when it reported Plaintiff to the police for car theft, despite knowing or should have knowing that Plaintiff had extended the rental and paid for the rental.

160.    The conduct of Defendant was not only careless, but also malicious, reckless, willful, wanton, and demonstrated a total indifference to the lives of Defendant Hertz's customers including Plaintiff. Defendant exhibited a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm.

161.    Due to Defendant's tortious conduct and omissions, it directly and/or proximately caused Plaintiff's monetary damages, arrested him, imprisoned him, and prosecuted him for crimes and conduct he had not done. He has been falsely labeled a car thief, and has suffered severe emotional distress, loss of freedom, monetary damages, mental suffering, mental anguish, sleeplessness, restlessness, anxiety, and depression.

162.    Due to the outrageous, malicious, reckless, and intentional nature of Defendant's conduct, punitive damages are requested.

*****

## **RELIEF REQUESTED**

**WHEREFORE**, Plaintiff demands judgment in its favor and against Defendants, jointly and severally, on all counts and claims compensatory damages in an amount in excess of this court's jurisdictional limitations, thereby guaranteeing Plaintiff a jury trial, exclusive of interests and costs, and an award of punitive damages, as well as prejudgment interest, post judgment interest, delay damages, costs, and such equitable relief as the Court deems necessary; and requests that this Court determine and declare that Plaintiff be awarded for all counts:

a.   Compensatory damages, inclusive of any and all harm attributable to Defendants' actions or inaction, including loss of freedom;

b.   Lost earnings;

c.   Injunctive relief,

d.   Punitive damages to punish the Defendants for their outrageous conduct, self-interest, and duplicitous behavior;

e.   Exemplary damages to set an example for others;

f.   Attorneys' fees and court costs;

g.   the loss of time and opportunity;

h.   Delay damages; and

i.   Such other and further relief and/or equitable relief that this Court deems just and/or necessary.

Respectfully submitted,

By: /S/ MICHAEL WALSH
FBN: 0172138
MICHAEL WALSH, P.A.
5301 North Federal Highway, Suite 215
Boca Raton, Florida 33487
(561) 584-4939 Phone
(305) 763-3976
Mwalsh7700@gmail.com
Fdiaz4109@gmail.com
*Attorney for Defendant*

DATE: December 13, 2019

## SPOLIATION NOTICE -- PRESERVATION OF EVIDENCE

Plaintiff hereby demands and requests that Defendants take necessary actions to ensure the preservation of all documents, records, communications, whether electronic or otherwise, items and things in their possession or control, or any entity over which any party to this action has control, or from whom any party to this action has access to, any documents, items, or things which may in any manner be relevant to or relate to the subject matter of the causes of action and/or the allegations of this complaint.

JURY TRIAL DEMAND

Plaintiff hereby demands a 12-person jury trial.


Respectfully submitted,

By: /S/ MICHAEL WALSH
FBN: 0172138
MICHAEL WALSH, P.A.
5301 North Federal Highway, Suite 215
Boca Raton, Florida 33487
(561) 584-4939 Phone
(305) 763-3976
Mwalsh7700@gmail.com
Fdiaz4109@gmail.com
*Attorney for Defendant*

DATE: December 13, 2019

# CERTIFICATE OF SERVICE

I hereby state that a true and correct copy of the foregoing CIVIL ACTION COMPLAINT is being served pursuant to the Florida Rules:

**THE HERTZ CORPORATION**
*(1209 Orange St.,*
*Wilmington DE 19801)*

**MARK PAUL FRISSORA**
*(██ █████████ ███*
*Boulder CO 80304)*

**JULIE WILKERSON**
*(14501 Hertz Quail Springs Pkwy,*
*Oklahoma City, OK 73120)*

Respectfully submitted,

By: /S/ MICHAEL WALSH
FBN: 0172138
MICHAEL WALSH, P.A.
5301 North Federal Highway, Suite 215
Boca Raton, Florida 33487
(561) 584-4939 Phone
(305) 763-3976
Mwalsh7700@gmail.com
Fdiaz4109@gmail.com
*Attorney for Defendant*

DATE: December 13, 2019

# ATTACHMENT Z

VIRGINIA:

IN THE FAUQUIER COUNTY CIRCUIT COURT

**Ryan Smits**
*(5719 Crescents Point Drive, Orange,*
*VA)*
       Plaintiff,

At Law No. *CL19-547*

v.

**The Hertz Corporation;**
*(1209 Orange St., Wilmington DE 19801)*
**Kathryn V. Marinello;**
*(8501 Williams Rd., Estero, FL 33928)*
**Julie Wilkerson;**
*(14501 Hertz Quail Springs Pkwy,*
*Oklahoma City, OK 73120)*
**Kemal Basar;**
*(44074 Mercure Circle, Sterling, VA*
*20166)*

       Defendants.

False Arrest, Abuse of Process, Malicious
Prosecution, Intentional Infliction of
Emotional Distress, Negligence

***JURY TRIAL DEMANDED***

**Also Serve:**

## COMPLAINT

    COMES NOW the plaintiff, by counsel, and files this Complaint and asks that

judgment be rendered against the defendants for the reasons stated herein and the plaintiff

states as follows:

    1.    Defendant The Hertz Corporation has been falsely reporting untold numbers

of customers for car theft, throwing them in jail on felony charges for months, prosecuting

them, causing them to lose their jobs, giving them criminal records, losing their homes, and

separating them from their family and loved ones. These customers have paid for their cars

and are authorized to use the rentals.

FILED AT _____ M
NOV 2 2 2019
GAIL H. BARB, CLERK
BY: _____ D.C.

2.      The company's computer and inventory tracking systems are broken. However, the top corporate officers have decided that verifying theft reports, and fixing their computers, would be too expensive.

3.      Defendant Hertz has instead decided—at the very highest level—to mass report its own customers to the police without verification, effectively using the police, criminal justice system, and taxpayers to subsidize inventory control for a private corporation.

4.      This plan is as brilliant as it is evil, saving the company millions upon millions of dollars it would otherwise have to spend updating its broken systems and paying corporate security personnel to verify the thousands of theft reports it makes.

5.      As a result of this routine and systemic mass reporting, without verification or investigation, many innocent customers have been wrongfully detained, arrested, thrown in prison, prosecuted, and had their lives destroyed.

6.      This is not some sort of error. The company and its leadership have known about these problems for many years—since at the latest 2015—after falsely imprisoned customers and police agencies notified Hertz corporate about these serious issues. Hertz did nothing to address these problems, instead deliberately placing the Almighty Dollar before the lives and safety of their customers, including Plaintiff.

7.      Hertz has even been sued and lost lawsuits for intentional infliction of emotional distress and malicious prosecution for the same conduct at issue in this case—but has continued to falsely report customers for theft calculating that it will make more money if it does not fix the problem.

8.      Hertz's corporate representatives testified in those lawsuits that their "marching orders" are to routinely disregard the standard operating procedures designed to

safeguard against and prevent false reports *as part of cost saving measures imposed by Hertz corporate*.

9.      Plaintiff Ryan Smits and his mother Nancy Cullen-Smits[1] were two of the many individuals victimized by Defendants' corporate malfeasance. Despite paying for a rental and being authorized to use it they were detained by police due to a false police report made by defendant The Hertz Corporation in 2017.

10.      Plaintiff and his mother even directly notified CEO, defendant Kathryn Marinello, about what had happened to them, but the response from Hertz and Marinello was indifference—despite Defendants being well aware for the past several years that innocent customers were being arrested.

11.      There is no excuse for this conduct. The criminal justice system does not exist to be used as a repo service for a massive multinational company worth billions of dollars which cannot be bothered to track its vehicles and rentals. No company should be mass filing unverified police reports, especially when those false reports endanger the freedom and safety of its customers.

12.      Hertz should be enjoined from filing theft reports based on their failure to follow their own standard operating procedures, failure to fix their broken computer systems, and reckless indifference to human life.

### Plaintiff Rents a Car from Hertz

13.      On September 12, 2017 plaintiff's mother, Nancy Cullen-Smits, rented a 2017 Hyundai Sonata from the Fredericksburg, VA Hertz location.

14.      Ms. Cullen-Smits is a pharmaceutical rep, and her company was paying for the rental due to the large amount of traveling she had to do every day.

---

[1] Nancy Cullen-Smits is filing a concurrent lawsuit.

15.    For the first two months of her rental, she believed that everything was fine with the rental.

## A Mother and Child are Detained and Accused of Car Theft by Police Because Hertz Falsely Reported their Rental Car Stolen

16.    However, on November 22, 2017, the day before Thanksgiving, everything changed. Nancy was driving with her 19-year old son, plaintiff Ryan Smits, in the car.

17.    Suddenly, as they were driving, plaintiff and his mother looked up in the mirror and saw that there was a police car with lights flashing. After pulling over, and giving the officer her license, Nancy and Ryan sat there terrified wondering why in the world she had been pulled over.

18.    Eventually the officer returned after 20 minutes and accused her, to their shock, of stealing the vehicle.

19.    Cullen-Smits desperately explained to the officer that she had a valid rental.

20.    They were absolutely stunned to learn that Hertz had reported the car they was driving as stolen (grand larceny; auto theft - §18.2-95(ii)) on November 3, 2017.

21.    Cullen-Smits showed the officer all of her paperwork confirming that it was a valid rental.

22.    This terrifying encounter took 2 to 3 hours, and Plaintiff was not free to leave during this law enforcement stop.

23.    According to Hertz's broken computer systems the vehicle should have been at Ronald Reagan International Airport; the system did not show that it had ever been in Fredericksburg or that it had been rented to Cullen-Smits.

24.    Hertz had then, without any investigation or attempts to locate the car, reported the car stolen without any evidence it had actually been stolen.

25.     The police closed the investigation on November 27, 2017, stating that the theft report by Defendants was "unfounded."

26.     Hertz policy W7-02 RAC mandates that an investigation by the Corporate Security Manager at the local level take place before any theft report is made, for the express purpose of preventing false police reports. The policy also expressly requires that all Hertz employees ensure compliance with this policy.

27.     Defendant Kemal Basar is the Hertz corporate security manager for the Atlantic region in question, and works out of the Sterling, VA Hertz office. He supervises the process of making police reports in the Washington DC/Virginia area, and also supervised the actual making of this police report.

28.     The Defendants in this case deliberately ignored the Hertz policy requiring an investigation at the local level, and instead reported the car stolen without any investigation, verification, or evidence it was stolen.

### The False Report was the Result of Deliberate Illegal and Unethical Behavior by Defendants

29.     Hertz's top corporate officials have known for years that it has a serious, nationwide problem with false police reports but has done nothing to stop it.

30.     For instance, in 2015 the Louisville, KY airport police informed Defendants that the company was making false police reports in circumstances similar to what happened to Plaintiff. The company did nothing in response.

31.     In 2015 and 2016 customers sued Hertz for malicious prosecution, false imprisonment, and false arrest for the same conduct which caused Plaintiff to be detained in 2017. Again, the company did nothing in response, despite losing two malicious prosecution trials in 2017 and punitive damages being assessed.

32.     Hertz's corporate policies *require* that a local investigation be done before any theft report is made to verify that the report is accurate. The policy reads:

> Corporate/Country Security Manager Investigations - Every theft/conversion/disappearance must be promptly investigated by the Corporate/Country Security Manager responsible for the location from which the related Theft Vehicle Report is filed. All employees are required to cooperate fully with such an investigation.

Exhibit 1 - W7-02 RAC(17). An investigation and verification that the report is accurate is also required by the Virginia law prohibiting false police reports. See Code of Virginia § 18.2-461.

33.     Furthermore, the policy states that "Location; Maintenance, Area, Country Head Office and. OKC Management *must ensure compliance to this procedure*." See Exhibit 1, at p.1.

34.     Despite this policy, Hertz's corporate officers have instructed its employees not to follow this policy.

35.     A Hertz corporate designee testified in a prior Pennsylvania lawsuit that no checks or investigations are ever done at the local, branch level before a police report is filed. See Exhibit 4 - Motion for Punitive Damages [Exhibit 11 to Motion for Punitive Damages, at p.70).

36.     A Hertz corporate security designee for the Atlantic region further stated that, despite corporate policies, no investigations are performed because of "marching orders" from Hertz corporate:

> COUNSEL:        Is it your testimony that you don't go to the location and question any of the Hertz employees when you receive a theft package?
>
> MR. LIVINGSTON:   That's my testimony, yes.
>
> COUNSEL:        Why?

| MR. LIVINGSTON: | Because I mean the package has been completed, all the reports have been reviewed, I guess, by OKC. And my marching orders are to report the car stolen when I get the -- again, I do look at it for everything being accurate, as far as I can tell, within the report itself. |
| COUNSEL: | Yeah. *But you don't do any independent investigation?* |
| MR. LIVINGSTON: | *I do not.* |
| COUNSEL: | *You don't do any check?* |
| MR. LIVINGSTON: | *I do not.* |

Exhibit 4 [Exhibit 8 to Motion for Punitive Damages, at p.252] (emphasis added).

37.    At the trial, the Hertz corporate designee in charge of theft reporting and recovery for the entire company, defendant Julie Wilkerson, was forced to admit that Hertz had egregiously failed to protect its customers:

| COUNSEL: | And here's what I'm getting at and where I'm going with this, it says near the last line: "Location, maintenance, area, country, head office, and OKC management must ensure compliance with this procedure." Do you see that? |
| MS. WILKERSON: | Yes. |
| COUNSEL: | Is it your job to ensure compliance with this procedure? |
| MS. WILKERSON: | Yes. |
| COUNSEL: | And you're the person in charge of 700,000 cars to make sure as the regulator that these . . . procedures are followed, correct? |
| MS. WILKERSON: | Correct. |
| COUNSEL: | Now, when it says "location," that means in this instance the Philadelphia location, correct? |
| MS. WILKERSON: | Correct. |
| COUNSEL: | In fact, this is a procedure that you follow to make sure that innocent people aren't wrongfully arrested for accidental reporting to the police, correct? |
| MS. WILKERSON: | Correct. |

| COUNSEL: | And it's important these policies and procedures are followed by Hertz Corporation, correct? |
| MS. WILKERSON: | Correct. |
| COUNSEL: | And if Hertz doesn't follow this problem -- this procedure, that would be a failure on the part of Hertz, correct? |
| MS. WILKERSON: | Correct. |

See Exhibit 2, at p.28-47 (emphasis added).

38.     Instead of ensuring compliance with this procedure, all Defendants have been deliberately circumventing it—despite it being a safeguard which prevents false reports, such as the one that harmed Plaintiff and his mother.

39.     Hertz has admitted this is because it has been cutting costs and personnel in its corporate security department. Mr. Livingston, Hertz's corporate security designee, testified that Hertz, in 2015, had made "**a corporate decision to lay off a large group of people at that time for cost savings**" within the corporate security department. Exhibit 4 [Exhibit 8 to Motion for Punitive Damages, at p.54]). It is the corporate security department that performs the local investigations mandated by W7-02.

40.     Cutting these positions in corporate security further exacerbated Hertz's failure to comply with W7-02 and other theft reporting policies, and directly signaled that Hertz's top corporate officials had no intent of complying with W7-02. These layoffs were implemented with the intent and purpose to cut costs and increase profits, at the expense of the lives of their customers.

41.     Instead of following its own policies, and taking basic steps to ensure accurate police reports, Hertz has been routinely mass reporting its own customers for theft without verifying whether they committed a crime because it has made the cold calculation that it is more cost effective to use the nation's police forces, prosecutors, and judges as a

taxpayer funded repo service—at the expense of the lives of its innocent customers who are caught in the middle—like Plaintiff.

42.     Attached to this complaint is a motion for punitive damages from the Pennsylvania case which details with police records from around the nation just how deficient Hertz's conduct has been, that they have known about the issue for years, and that even Hertz's employees admit that the company is doing a poor job keeping track of vehicles. See generally Exhibit 4 - Motion for Punitive Damages. Indeed, certain police departments stopped taking Hertz police reports (unless there was an extra level of verification) after a Hertz employee admitted that the company had serious inventory control and tracking issues. Id. [Exhibit 7 to Motion for Punitive Damages].

43.     Since that motion was filed, there have been a steady stream of continuing false reports across the nation, in Pennsylvania, Texas, Kentucky, Florida, Nevada, Arkansas, Louisiana, Virginia, Wisconsin, Indiana, Ohio, California, and many others.

44.     In a May 2019 ABC 5 news report in Ohio which detailed several Hertz rental failures, Hertz commented that "Our process for determining when a vehicle is reported stolen has multiple steps to ensure accuracy, and in the rare instance an error within our control has occurred we take responsibility. We conduct thorough investigations and make every effort to remedy the situation. We have consistently made changes to improve our processes and we will continue to do so throughout all areas of our business to provide customers with the exceptional experience they expect from Hertz." https://www.news5cleveland.com/news/local-news/investigations/hertz-customers-detained-arrested-after-rental-vehicles-mistakenly-reported-stolen.

45.     All of this is entirely false. Hertz has known for years that it has this problem, and its only response has been to ignore the situation. It has plainly made the calculation

that the money saved by mass reporting customers, and having the police return the vehicles, far outweighs the costs it will incur from it falsely reporting customers and making unverified police reports.

46.    Also in May 2019, ABC Actions News - WFTS out of Florida reported that Hertz was throwing innocent customers in jail and wrongfully prosecuting them. https://www.abcactionnews.com/news/local-news/i-team-investigates/hertz-has-a-pattern-of-mistakenly-reporting-cars-stolen-leaving-customers-arrested-attorney-says.

47.    In May 2018, 6 ABC out of Philadelphia reported that Hertz had wrongfully arrested and imprisoned two customers, one in Philadelphia and another in Wisconsin. https://6abc.com/business/hertz-customers-arrested-after-vehicles-mistakenly-reported-stolen/3487977/.

## Plaintiff was Terrified and Humiliated Because of Hertz

48.    Being pulled over by police and accused of being in the possession of a stolen vehicle was terrifying for both Plaintiff and his mother.

49.    It was humiliating to be ordered to clean out the vehicle, have the vehicle stripped from them like they did something wrong, be forced to wait in cold weather for hours with no winter clothes, and have a family member drive 60 miles to pick up Nancy and Ryan.

50.    To this day, when Plaintiff sees a police car he seizes up and is hit with waves of anxiety.

## Hertz Denies the Severity of Its Conduct and Refuses to Provide Plaintiff with the Rental File

51.    Despite weeks of follow up with Hertz, the company failed to take the matter seriously. Plaintiff and his mother therefore sent the issue directly to defendant CEO

Kathryn Marinello. Marinello, however, was apparently unconcerned. A Hertz customer service associate responded instead and professed ignorance about Plaintiff''s complaint— despite the fact that Plaintiff and Cullen-Smits had been complaining for weeks to other officials in the company and the complaint should have been easily found. See Exhibit 3. Thereafter, Hertz continued to treat the incident like it was not a serious problem.

52.     The severity of the error and the potential consequences to the customer made it obvious to Plaintiff that something is seriously broken within the company.

53.     When Plaintiff and Cullen-Smits asked Hertz for her rental records, *Hertz refused to turn them over*, an indication that the incident was being treated far more seriously within the company than their outward attempts to dismiss it suggested.

54.     Hertz is under a duty to preserve all records related to the rental, the rental car, and the police report pursuant to Hertz policies, standard operating procedures, and Virginia law.

55.     As a direct and proximate result of Defendants' acts and omissions, Plaintiff has incurred severe and substantial damages and actual harm. These damages include but are not limited to:

        a.      Monetary damages;

        b.      Severe mental distress, as well as severe emotional distress, mental suffering, mental anguish, sleeplessness, restlessness, anxiety, and depression;

        c.      Loss of reputation;

        d.      Harm to personal, social, and professional relationships;

        e.      Emotional pain and suffering;

        f.      Lost wages.

# PARTIES

**Plaintiff Ryan Smits**

56.    Plaintiff Ryan Smits is a citizen of Virginia and resides in Orange, VA.

57.    At all points in time it was foreseeable to Defendants that Ryan Smits, son of the renter Nancy Cullen-Smits, would be riding in the vehicle. It was further foreseeable to defendants that a false police report would result in the illegal detention of not only the renter but also any family members riding in the vehicle with the renter.

**Defendant the Hertz Corporation**

58.    Defendant The Hertz Corporation is a Delaware corporation, headquartered in Florida.

59.    The Hertz Corporation operates a rental car location in Fredericksburg, VA, another at Ronald Reagan International Airport in Arlington, VA, and also an office in Sterling, VA. Hertz submitted the police report in Virginia.

60.    At all points in time all Hertz employees, agents, and representatives were acting within the course and scope of their employment for The Hertz Corporation.

61.    Hertz is vicariously liable for the conduct of its employees, including all defendants, as their conduct was not only foreseeable to Hertz but done with Hertz's approval and at Hertz's direction.

62.    Any reference to Hertz also includes all Hertz employees and agents, unless otherwise stated.

63.    Hertz and its employees all owed Plaintiff a duty for several reasons, including that Plaintiff's family member rented a car from Hertz, had a relationship with the company, and because Hertz and its employees undertook to report its cars stolen knowing full well that an incorrect report could lead to the harm caused to Plaintiff.

**Defendants Kathryn V. Marinello**

64.     Defendant Marinello is the president and CEO of The Hertz Corporation and is in charge of Hertz policy, procedures, and practices related to the false police report at issue in this case.

65.     This includes compliance with Hertz policies W7-02 RAC (reporting vehicle thefts and conversions), W9-18 (prior to reporting thefts to the police, controlling vehicle physical inventories), W7-03 RAC (recovery of converted or stolen vehicles), W1-06 (records retention and management program), W1-75 (protection of assets and confidential materials), and other policies.

66.     She sets Hertz policy and knew or should have known about the massive problems afflicting Hertz's police reporting, inventory management, and vehicle tracking.

67.     Hertz corporate and Marinello have in fact known about these problems for many years, including by way of lawsuits filed in 2015 and police agencies informing Hertz corporate of the false reports in 2015.

68.     Not only have Marinello and Hertz done nothing to address Hertz's severe problems, but they have instead instituted policies and practices which promote and guarantee that false reports will be made, all to cut costs and increase profits.

69.     Hertz is not only vicariously liable for its corporate officers' actions and omissions, but Marinello is also personally liable to Plaintiff for her actions and omissions. She owed Plaintiff a duty to make correct police reports, a duty to devise effective policies which accurately track vehicles, a duty not to instruct Hertz employees to circumvent safeguards designed to prevent false police reports, a duty to address problems brought to her attention, and a duty to otherwise prevent false police reports. She also owed Plaintiff a duty not to use the criminal justice system for an improper purpose.

70.     Marinello and Hertz have grievously breached those duties.

71.     Hertz and Marinello have decided to use the criminal justice system as a free repo service, instead of following their own policies and comporting themselves in accordance with basic corporate ethics and Virginia law. They have participated in, encouraged, and approved the use of the criminal justice system by Hertz for an improper purpose, namely as a repo service to recover vehicles and customer rentals that Hertz has lost track of due to incompetent record keeping and vehicle tracking.

72.     Marinello has sufficient contacts with Virginia to confer jurisdiction over her because she causes Hertz to do extensive business in Virginia, and because under her direction and supervision the false police report was made in Virginia, leading to Plaintiff's detainment in Virginia.

**Defendant Julie Wilkerson**

73.      Defendant Julie Wilkerson was the supervisor of theft and recovery at defendant Hertz during the time period in question. Wilkerson not only supervised all such reporting, but devised and implemented Hertz policies and practices on reporting vehicles.

74.     Hertz acts by and through Julie Wilkerson, and Wilkerson is also personally liable to Plaintiff for her conduct.

75.     Wilkerson and Hertz have known for many years, since at the latest 2015, that Hertz has routinely been filing false police reports against customers. See Exhibit 2; Exhibit 4.

76.     As noted above and incorporated here, at the time of Plaintiff's rental and the false police report Wilkerson supervised theft reporting and recovery for the entire corporation, including in Virginia.

77.     At all points Hertz, Wilkerson and other Hertz employees involved in this process knew that Hertz's overall theft reporting was broken, and that the theft report lacked probable cause.

78.     Contrary to Hertz policy, no local investigation took place in this case before the theft report was filed. As defendant Wilkerson has already admitted under oath, this is a manifest failure on Hertz's part.

79.     In fact, under her direction, theft reports are routinely made without investigation, including in this case.

80.     Although Wilkerson and Hertz have at all points in time known about Hertz's massive false reporting problem, they have taken no steps to resolve the issue and have in fact encouraged Hertz's reckless and outrageous reporting practices to continue without changes.

81.     Wilkerson and Hertz and the other Defendants are using the criminal justice system for an improper purpose.

82.     Wilkerson has sufficient contacts with Virginia given that she supervises Hertz personnel in Virginia, she supervises the theft report in question which was made under her supervision and direction in Virginia, corporate policy mandates that she ensure compliance with Hertz corporate policy in Virginia, and Plaintiff was detained in Virginia because of Wilkerson's actions.

**Defendants Kemal Basar**

83.     Defendant Basar is a corporate security manager for the Hertz Atlantic region based out of Sterling, VA. Basar is a resident of Sterling and citizen of Virginia.

84.     Hertz acts by and through Basar, and Basar is also personally liable for his conduct.

85.     As the corporate security manager for the Hertz Atlantic region covering Virginia, Basar supervises all police reports in Virginia, including the police report made in this instance regarding the car rented by Plaintiff and his family.

86.     Basar has a duty to ensure compliance with W7-02, as do all other Hertz employees.

87.     Basar had to investigate and approve the police report made for the car Plaintiff was riding in. Furthermore, Basar and his office are instrumental is determining how theft reports are handled in general, including whether they are adequately investigated on a local level as mandated by Hertz policies.

88.     Basar has allowed and approved and encouraged the making of false reports of theft for inventory that Hertz has lost track of, knowing full well—due to Hertz's poor record keeping—that there is no evidence that the vehicles are actually stolen.

89.     Basar has participated in, encouraged, and approved the use of the criminal justice system by Hertz for an improper purpose, namely as a repo service to recover vehicles and customer rentals Hertz's poor record keeping has left behind.

90.     Basar failed to engage in the mandated local investigation.

91.     Basar had a duty to Plaintiff when filing police reports, knowing that his and Hertz's customers will be detained, arrested, and prosecuted.

92.     In this case, no investigation was done and Basar breached his duty to Plaintiff when the police report was made without verification or investigation.

93.     At all points in time the report supervised by Basar was false. Plaintiff and his mother had validly rented the car and Hertz should have never reported the vehicle was stolen.

*****

## Jurisdiction and Venue

94.     Jurisdiction is appropriate over all Defendants in this case in this court because all Defendants have sufficient minimum contacts with this forum related to the conduct at issue to confer personal jurisdiction over them.

95.     Venue is appropriate in Fauquier County because the cause of action arose in that county, specifically Plaintiff was improperly detained in this county as a result of Defendants' false police report.

*****

## COUNT I – False Imprisonment/False Arrest

*Ryan Smits*

*v.*

*The Hertz Corporation, Kathryn V. Marinello; Julie Wilkerson; Kemal Basar*

96.     Plaintiff incorporates by reference and realleges all other paragraphs of this complaint.

97.     False imprisonment or false arrest occurs when a defendant causes the restraint of another person, impinging on their physical liberty, without adequate legal justification.

98.     Defendants rented a car to Cullen-Smits and also knew or should have known that her family, including plaintiff Ryan Smits, would be riding in the vehicle with her.

99.     Hertz caused the restraint of Plaintiff when it reported the vehicle he and his mother were using stolen, leading to them being detained by the police. Plaintiff and his mother were not permitted to leave for several hours and their physical liberty was absolutely impaired. Furthermore, they were stripped of their vehicle, treated like criminals, and forced to stand in the cold weather while waiting for someone to drive 60 miles to pick them up.

100.     There was manifestly no adequate legal justification for Defendants' conduct. Instead of complying with Hertz policies (including W7-02), which requires a local investigation by the corporate security manager (Basar) before making a police report, Hertz simply filed a theft report with the police despite not having any evidence the car was stolen.

101.     All defendants were mandated by W7-02 to ensure compliance with W7-02. Instead, all defendants deliberately ignored the policy and filed a false police report in violation of Virginia law.

102.    Defendants made this false complaint negligently, recklessly, maliciously, wantonly, with conscious disregard, and/or intentionally. There was never any probable cause for the police report Hertz made.

103.    The fact that Hertz refused to produce the rental file in question to Plaintiff and his mother indicates that Hertz knows that it committed serious misconduct and is attempting to cover it up.

104.    In addition to Hertz being directly liable and vicariously liable for the harm caused to Plaintiff, the individual defendants are also personally liable given that they have promulgated policies and practices which directly resulted in this false police report, and also failed to properly supervise the false report. As explained throughout this complaint, all individual defendants owed Plaintiff a duty not to falsely cause them to be imprisoned and/or arrested and to ensure compliance with Hertz policies on theft reporting.

105.    Keep in mind that Hertz knew about this problem for years before 2017, but did nothing to address or fix it.

106.    As a direct and proximate result of Defendants' conduct as set forth above, Plaintiff and his mother have suffered severe damages, including but not limited to monetary damages, severe emotional distress, mental suffering, mental anguish, sleeplessness, restlessness, anxiety, and depression.

107.    Due to the extreme and outrageous conduct of Defendants not acceptable in a civilized society—including wanton and willful negligence, conscious disregard, and reckless indifference of and to Plaintiff's rights—Plaintiff demands punitive damages from all Defendants, jointly and severally.

*****

## COUNT II –        Abuse of Process

*Ryan Smits*

*v.*

*The Hertz Corporation, Kathryn V. Marinello; Julie Wilkerson; Kemal Basar*

108.    Plaintiff incorporates by reference and realleges all other paragraphs of this complaint.

109.    An abuse of process occurs when a defendant uses process to accomplish a purpose not warranted by law and harms the plaintiff.

110.    Here, Defendants are using the criminal justice system and police reports not to file accurate theft reports, but instead to use the police as a taxpayer funded repo service.

111.    Voluminous evidence from around the country shows that Hertz and the individual defendants are mass filing theft reports without doing any investigation/verification, as even mandated by Hertz's own policies.

112.    All Defendants are required to ensure compliance with Hertz theft reporting policies, including W7-02.

113.    The evidence shows that Hertz and its corporate officers and senior employees have made a deliberate decision not to conduct required local investigations and verify that theft reports are accurate before submitting the report to police, including in this instance.

114.    This is directly contrary to both the admonition in W7-02 that a local investigation be performed, and the admonition in W7-02 that the head office (Marinello), OKC Management (Wilkerson), and location management (Basar) must ensure compliance with the procedure.

115.    Furthermore, Virginia law prohibits the making of false police reports either knowingly, or without just cause if there is an intent to interfere with police operations. See Code of Virginia § 18.2-461.

116.    Defendants are violating both W7-02 and section 18.2-461 by using the criminal justice system to subsidize their vehicle recovery efforts with knowingly false theft reports. This is a use of the criminal justice system to accomplish a purpose not warranted by law.

117.    As a direct result of Hertz and the individual defendants' abuse of process, Plaintiff and his mother were wrongfully detained while driving a car they had validly rented and were authorized to use.

118.    When Plaintiff and his mother contacted Hertz and demanded to see their rental file, Hertz refused to provide it to them. This is evidence of consciousness of guilt.

119.    Defendants all acted negligently, recklessly, maliciously, wantonly, with conscious disregard, and/or intentionally. The individual defendants are personally liable for the reasons explained throughout this complaint.

120.    As a direct and proximate result of Defendants' conduct in initiating a criminal complaint and failing to withdraw the criminal complaint as set forth above, Plaintiff has suffered severe damages, including but not limited to monetary damages, severe emotional distress, mental suffering, mental anguish, sleeplessness, restlessness, anxiety, and depression.

121.    Due to the extreme and outrageous conduct of Defendants not acceptable in a civilized society—including wanton and willful negligence, conscious disregard, and reckless indifference of and to Plaintiff's rights—Plaintiff demands punitive damages from all Defendants, jointly and severally.

## COUNT III –    Malicious Prosecution

*Ryan Smits*

*v.*

*The Hertz Corporation, Kathryn V. Marinello; Julie Wilkerson; Kemal Basar*

122.    Plaintiff incorporates by reference and realleges all paragraphs of this complaint.

123.    The elements of malicious prosecution are that (1) Defendants' conduct was malicious, (2) Defendants initiated the charges or cooperated in doing so, (3) Defendants had no probable cause to initiate or pursue the case, and (4) the case terminated not unfavorably for Plaintiff.

124.    Here, Defendants caused the theft report in question to be issued by making the false police report.

125.    Defendants acted negligently, recklessly, maliciously, wantonly, with conscious disregard, and/or intentionally as they knew or should have known when they filed the criminal complaint that the car was not stolen.

126.    At no point was there probable cause to report the car stolen. Furthermore, it was manifestly foreseeable that reporting the car stolen would result in the detainment of Plaintiff. The police closed the investigation on November 27, 2017, stating that theft report was "unfounded."

127.    Hertz had no information to indicate that the car was stolen, and also knew that it had awful inventory tracking practices. Furthermore, at the direction of Hertz and Hertz's officers and senior employees, the other defendants failed to conduct the required and mandated local investigation designed to prevent false police reports.

128.    As described throughout this complaint, this is a feature, not a bug, of Hertz's conduct. They have made the cold decision that they save money by this course of conduct, even if it means putting the lives and freedom of its customers at risk.

129.    All Defendants owed Plaintiff a duty to ensure compliance with Hertz policies, and to make verified and accurate theft reports—they manifestly breached those duties. Hertz is vicariously liable, and all Defendants are also personally liable.

130.    As a direct and proximate result of Defendants' conduct in initiating a criminal complaint and failing to withdraw the criminal complaint as set forth above, Plaintiff has suffered severe damages including but not limited to monetary damages, severe emotional distress, mental suffering, mental anguish, sleeplessness, restlessness, anxiety, and depression.

131.    Due to the extreme and outrageous conduct of Defendants not acceptable in a civilized society—including wanton and willful negligence, conscious disregard, and reckless indifference of and to Plaintiff's rights—Plaintiff demands punitive damages from all Defendants, jointly and severally.

*****

## COUNT IV –    Intentional/Negligent Infliction of Emotional Distress

*Ryan Smits*

*v.*

*The Hertz Corporation, Kathryn V. Marinello; Julie Wilkerson; Kemal Basar*

132.    Plaintiff incorporates by reference and realleges all other paragraphs of this complaint.

133.    The elements of intentional infliction of emotional distress are that Defendants (1) Defendants acted intentionally or recklessly, (2) Defendants' acts and omissions were extreme and outrageous, (3) Plaintiff suffered severe emotional distress, and (4) Plaintiff's emotional distress was a result of Defendants' conduct.

134.    Here, Defendants caused the theft report in question to be issued.

135.    Defendants acted negligently, recklessly, maliciously, wantonly, with conscious disregard, and/or intentionally as they knew or should have known when they filed the criminal complaint that the car was not stolen.

136.    At no point was there probable cause to report the car stolen. Furthermore, it was manifestly foreseeable that reporting the car stolen would result in the detainment of Plaintiff.

137.    Hertz had no information to indicate that the car was stolen, and also knew that it had awful inventory tracking practices. Furthermore, at the direction of Hertz and Hertz's officers and senior employees, the other defendants failed to conduct the required and mandated local investigation designed to prevent false police reports. In fact, all the Defendants were required to ensure compliance with Hertz's policies requiring a local investigation.

138.    As described throughout this complaint, this is a feature, not a bug, of Hertz's conduct. They have made the cold decision that they save money by this course of conduct, even if it means putting the lives and freedom of its customers at risk.

139.    The use of the criminal justice system is of the utmost seriousness and innocent individuals who have done nothing wrong should not be detained and harassed for merely renting a vehicle.

140.    As a direct and proximate result of Defendants' conduct in initiating a criminal complaint and failing to withdraw the criminal complaint as set forth above, Plaintiff has suffered severe damages, including but not limited to monetary damages, severe emotional distress, mental suffering, mental anguish, sleeplessness, restlessness, anxiety, and depression.

141.    The severe emotional distress suffered by Plaintiff was as a result of the intentional and/or reckless extreme and outrageous conduct of Defendants and was certain to occur, was foreseeable, and was a manifestly reasonable reaction under the circumstances.

142.    Due to the extreme and outrageous conduct of Defendants not acceptable in a civilized society—including wanton and willful negligence, conscious disregard, and reckless indifference of and to Plaintiff's rights—Plaintiff demands punitive damages from all Defendants, jointly and severally.

*****

## COUNT IV –    Negligence/Gross Negligence

*Ryan Smits*

*v.*

*The Hertz Corporation, Kathryn V. Marinello; Julie Wilkerson; Kemal Basar*

143.    Plaintiff incorporates by reference and realleges all other paragraphs of this complaint.

144.    The elements of negligence are (1) duty, (2) breach, (3) causation, and (4) damages.

145.    The defendants in this action owed Plaintiff a duty because they rented a car to his mother, Cullen-Smits, and it was foreseeable that her family, including Plaintiff, would be using the car. Defendants had a duty to Plaintiff because they rented them the car, and also had a duty  not to falsely report the car Plaintiff was riding in as stolen, and because it was foreseeable that filing a false police report that that the car was stolen would result in severe damages to Plaintiff. They further had a duty to Plaintiff to implement and practice safe police report procedures. They also had a duty to ensure compliance with Hertz policy W7-02, which is specifically meant to protect against false police reports, to investigate and verify the theft report as accurate, and to otherwise supervise the theft report properly.

146.    Defendants had these duties to Plaintiff as a company, and also personally.

147.    At all points Defendants had notice that Hertz had a serious problem with making false police reports, and tracking inventory, but at no point corrected these issues or ceased making the reports. See Exhibit 2: Exhibit 4.

148.    The defendants in this action breached the duty of care when they violated Hertz's policies and reported Plaintiff's rental car stolen without verification or investigation, despite knowing or should have knowing that Plaintiff was authorized to use the rental and that the car in question was not stolen.

149.   The conduct of Defendants was not only careless, but also malicious, reckless, willful, intentional, wanton, and demonstrated a total indifference to the lives of Defendant Hertz's customers including Plaintiff. Defendants exhibited a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm.

150.   Due to Defendants' tortious conduct and omissions, it directly and/or proximately caused Plaintiff monetary damages and his detainment by police authorities for crimes he had not committed. They have suffered severe emotional distress, loss of freedom, monetary damages, mental suffering, mental anguish, sleeplessness, restlessness, anxiety, and depression.

151.   Due to the extreme and outrageous conduct of Defendants not acceptable in a civilized society—including wanton and willful negligence, conscious disregard, and reckless indifference of and to Plaintiff's rights—Plaintiff demands punitive damages from all Defendants, jointly and severally.

*****

# Claims for Damages

WHEREFORE, on each and every count alleged, Plaintiff claims **compensatory damages** of $500,000, by which the Defendants are jointly and severally liable.

WHEREFORE, on each and every count, Plaintiff claims **punitive damages** of $350,000, by which the Defendants are jointly and severally liable.

# CLAIMS FOR RELIEF

Wherefore, Plaintiff demands judgment in his favor on all Counts and against Defendants, jointly and severally, for an amount well in excess of the jurisdictional amount required to guarantee a jury trial. Plaintiff request that this Court determine and declare that Plaintiff is additionally awarded and afforded on all Counts:

    (a)     Injunctive relief;

    (b)     Compensatory damages, inclusive of any and all harm attributable to Defendant's actions or inaction, including for loss of freedom, emotional damage, monetary damage, and lost wages;

    (c)     Punitive damages to punish the Defendant for its outrageous conduct, self-interest, and duplicitous behavior;

    (d)     Punitive and exemplary damages to punish Defendant and especially to deter other companies from acting in such a manner;

    (e)     Exemplary damages to set an example for others;

    (f)     Attorneys' fees and court costs;

    (g)     the loss of time and opportunity;

    (h)     Delay damages; and

    (i)     Such other and further relief and/or equitable relief that this Court deems just and/or necessary;

    (j)     Restitutionary disgorgement of all profits Defendant obtained as a result of unlawful, unfair, and/or fraudulent business practices;

    (k)     Mental and emotional pain and suffering;

    (l)     Costs and attorney's fees,; and

    (m)    Prejudgment interest;

    (n)     Such other and further relief as the Court deems just, necessary, and appropriate under the circumstances or allowed by statute.

TRIAL BY JURY IS DEMANDED ON ALL ISSUES.

DATED:

Ryan Smits
**By Counsel**

Kevin L. Locklin, Esquire VSB: 21081
Brian P. Coleman, Esquire VSB: 78378
LOCKLIN & COLEMAN, PLLC
9253 Mosby Street, Suite 100
Manassas, Virginia 20110
(703) 392-6686 Phone
(703) 393-7999 Fax
*Counsel for Plaintiff*


*/s/ AJ Fluehr*
Alfred J. Fluehr, Esquire
FRANCIS ALEXANDER, LLC
Attorney ID No.:  316503
280 N. Providence Road | Suite 1
Media, PA 19063
T:  (215) 341-1063
F:  (215) 500-1005
*Law Firm / Lawyer for Plaintiff*
*(Moving for Admission Pro Hac Vice)*

# SPOLIATION CLAUSE

Plaintiff demands that Defendants take necessary actions to ensure the preservation of all documents and things related to the case—in any format   hardcopy, electronic, audio, and visual.

Defendants are also put on further notice to preserve all things including but not limited to information, materials, communications, or other content/data related to the averments in this case.

\*\*\*\*\*

ATTACHMENT AA

Court of Common Pleas of Philadelphia County
Trial Division

# Civil Cover Sheet

For Prothonotary Use Only (Docket Number)

**MAY 2020**

E-Filing Number: 2005030374

001362

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| ROULA VANGELIS | HERTZ GLOBAL HOLDINGS, INC. |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| 644 WEST END WALK<br>MEDIA PA 19063 | CORPORATION TRUST COMPANY 1209 ORANGE ST.<br>WILMINGTON DE 19801 |

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| ALEXANDROS GIDER | THE HERTZ CORPORATION |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| 644 WEST END WALK<br>MEDIA PA 19063 | CORPORATION TRUST COMPANY 1209 ORANGE ST.<br>WILMINGTON PA 19801 |

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| CHRISTINA GIDER | HERTZ VEHICLES LLC |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| 644 WEST END WALK<br>MEDIA PA 19063 | CORPORATION TRUST COMPANY 1209 ORANGE ST.<br>WILMINGTON PA 19801 |

| TOTAL NUMBER OF PLAINTIFFS | TOTAL NUMBER OF DEFENDANTS | COMMENCEMENT OF ACTION |
|---|---|---|
| 3 | 9 | ☒ Complaint    ☐ Petition Action    ☐ Notice of Appeal<br>☐ Writ of Summons    ☐ Transfer From Other Jurisdictions |

| AMOUNT IN CONTROVERSY | COURT PROGRAMS | | | |
|---|---|---|---|---|
| ☐ $50,000.00 or less<br>☒ More than $50,000.00 | ☐ Arbitration<br>☒ Jury<br>☐ Non-Jury<br>☐ Other: | ☐ Mass Tort<br>☐ Savings Action<br>☐ Petition | ☐ Commerce<br>☐ Minor Court Appeal<br>☐ Statutory Appeals | ☐ Settlement<br>☐ Minors<br>☐ W/D/Survival |

CASE TYPE AND CODE

2O - PERSONAL INJURY - OTHER

STATUTORY BASIS FOR CAUSE OF ACTION

RELATED PENDING CASES (LIST BY CASE CAPTION AND DOCKET NUMBER)

**FILED
PRO PROTHY**

MAY **21** 2020

**A. SILIGRINI**

IS CASE SUBJECT TO
COORDINATION ORDER?
YES          NO

TO THE PROTHONOTARY:

Kindly enter my appearance on behalf of Plaintiff/Petitioner/Appellant: ROULA VANGELIS , ALEXANDROS GIDER , CHRISTINA GIDER

Papers may be served at the address set forth below.

| NAME OF PLAINTIFF'S/PETITIONER'S/APPELLANT'S ATTORNEY | ADDRESS |
|---|---|
| FRANCIS MALOFIY | FRANCIS ALEXANDER, LLC<br>280 N. PROVIDENCE ROAD<br>SUITE 1<br>MEDIA PA 19063 |

| PHONE NUMBER | FAX NUMBER | |
|---|---|---|
| (215)500-1000 | (215)500-1005 | |

| SUPREME COURT IDENTIFICATION NO. | E-MAIL ADDRESS |
|---|---|
| 208494 | francis@francisalexander.com |

| SIGNATURE OF FILING ATTORNEY OR PARTY | DATE SUBMITTED |
|---|---|
| *FRANCIS MALOFIY* | Thursday, May 21, 2020, 11:49 pm |

FINAL COPY (Approved by the Prothonotary Clerk)

**COMPLETE LIST OF DEFENDANTS:**

1. HERTZ GLOBAL HOLDINGS, INC.
   CORPORATION TRUST COMPANY 1209 ORANGE ST.
   WILMINGTON DE 19801
2. THE HERTZ CORPORATION
   CORPORATION TRUST COMPANY 1209 ORANGE ST.
   WILMINGTON PA 19801
3. HERTZ VEHICLES LLC
   CORPORATION TRUST COMPANY 1209 ORANGE ST.
   WILMINGTON PA 19801
4. JULIE WILKERSON
   14601 HERTZ QUAIL SPRINGS PKWY
   OKLAHOMA CITY OK 73120
5. RICHARD W. LIVINGSTON
   1 ARRIVALS ROAD
   PHILADELPHIA PA 19153
6. KENNETH GRAEBER
   420 LABRADOR TRL
   MULLICA HILL NJ 08062
7. JOSEPH JAUSSI
   37 HARPER BLVD
   RIVERSIDE NJ 08075
8. KYLE EBERT
   1 ARRIVALS ROAD
   PHILADELPHIA PA 19153
9. SCOTT FUNK
   8 DIPRINZIO DR.
   POTTSTOWN PA 19464

Francis Alexander, LLC
Francis Malofiy, Esquire
Alfred (AJ) Fluehr, Esquire
280 N. Providence Road | Suite 1
Media, PA 19063
T: (215) 500-1000
F: (215) 500-1005
*Law Firm / Lawyer for Plaintiffs*



*Filed and Attested by the
Office of Judicial Records
21 MAY 2020 11:49 pm
A. SILIGRINI*

# The Court of Common Pleas
## Philadelphia County, Pennsylvania

---

Alexandros Gider, a minor, by his mother and natural guardian Roula Vangelis

Christina Gider, a minor, by her mother and natural guardian Roula Vangelis

and similarly situated Plaintiffs

    *Plaintiffs*

       vs.

Hertz Global Holdings Inc.;
The Hertz Corporation;
Hertz Vehicles LLC;
Julie Wilkerson;
Richard W. Livingston;
Ken Graeber;
Diana Speer;
Scott Funk;
Kyle Ebert

    *Defendants*

---

Civil Action No.:

**Related Action:**
151103380 (*Before The Hon. Paula Patrick*)

**Causes of Action:**
1. Negligence
2. False Imprisonment
3. Mal. Abuse of Process
4. Malicious Prosecution
5. Int./Neg. Infl. of Emo. Dist.

*Jury Trial Demanded*

---

# Civil Action Complaint

**NOTICE**

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after the complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

PHILADELPHIA BAR ASSOCIATION
Lawyer Referral and Information Service
1101 Market Street, 11th Floor
Philadelphia, Pennsylvania 19107
(215) 238-1701

**AVISO**

Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas en las páginas siguientes, usted tiene veinte (20) días de plazo al partir de la fecha de la demanda y la notificación. Hace falta asentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomará medidas y puede continuar la demanda en contra suya sin previo aviso o notificación. Además, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.

LLEVE ESTA DEMANDA A UN ABOGADO INMEDIATAMENTE. SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO, VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.

ASOCIACIÓN DE LICENCIADOS DE FILADELFIA
Servicio De Referencia E Información Legal
1101 Market Street, 11th Floor
Filadelfia, Pennsylvania 19107
(215) 238-1701

Case ID: 200501362

Francis Alexander, LLC
Francis Malofiy, Esquire
Alfred (AJ) Fluehr, Esquire
280 N. Providence Road | Suite 1
Media, PA 19063
T:  (215) 500-1000
F:  (215) 500-1005
*Law Firm / Lawyer for Plaintiffs*

## The Court of Common Pleas
## Philadelphia County, Pennsylvania

---

| | |
|---|---|
| Alexandros Gider, a minor, by his mother and natural guardian Roula Vangelis<br><br>Christina Gider, a minor, by her mother and natural guardian Roula Vangelis<br><br>and similarly situated Plaintiffs<br><br>　　*Plaintiffs*<br><br>　　　　vs.<br><br>Hertz Global Holdings Inc.;<br>The Hertz Corporation;<br>Hertz Vehicles LLC;<br>Julie Wilkerson;<br>Richard W. Livingston;<br>Ken Graeber;<br>Diana Speer;<br>Scott Funk;<br>Kyle Ebert<br>　　*Defendants* | Civil Action No.:<br><br>**Related Action:**<br>151103380 (*Before The Hon. Paula Patrick*)<br><br>**Causes of Action:**<br>1. Negligence<br>2. False Imprisonment<br>3. Mal. Abuse of Process<br>4. Malicious Prosecution<br>5. Int. /Neg. Infl. of Emo. Dist.<br><br>*Jury Trial Demanded* |

---

## Civil Action Complaint

### Introduction

1.　　This case concerns a serious nationwide problem with Hertz Rent A Car which has been serially falsely reporting customers for car theft.[1] Hertz already lost a malicious prosecution and intentional infliction of emotional distress jury trial in 2017 regarding the very same incident at issue in this case (case no. 151103380, before The Honorable Paula Patrick). A punitive damages trial was later ordered in that case, but the matter resolved prior to the trial.

---

[1] For more information on this developing corporate scandal go to: www.truthhertz.net.

Case ID: 200501362

2.      Plaintiffs Alexandros and Christina Gider (then 9 and 8 years old) were in the backseat of a Hertz rental vehicle with their mother, Roula Vangelis, and close family friend Kelly Grady, on their way home from vacation on July 22, 2013 when they were suddenly pulled over and surrounded by police with guns drawn.

3.      The police ordered Vangelis and Grady to get out of the car on a loudspeaker. Scared and unsure what was happening Vangelis and Grady pled with police that there were young children in the vehicle. The Gider children were terrified as Vangelis and Grady were detained at gunpoint.

4.      Eventually, the police told Vangelis and Grady that Hertz had accused Grady of stealing the rental car. Grady was shocked and adamant that she was authorized to the use the car and had always extended, including with one employee named John she knew by name.

5.      The police reached Hertz and were able to confirm that the police report was a mistake and that at most there was a civil payment dispute between Grady and Hertz (in fact Grady had paid).

6.      To experience such a sudden and shocking event at such a young age caused tremendous damage to both children who were 8 and 9 years old.

7.      Previously, Grady filed suit against Hertz for this incident in 2015 after Hertz continued to prosecute her and imprisoned her for 12 days. She alleged malicious prosecution and intentional infliction of emotional distress. Hertz was found liable in a September 2017 trial. Later, in November 2017, the Court ordered a trial on punitive damages against Hertz.

8.      However, what was unknown at that time is that the false report that led to the July 22, 2013 stop, was the result of systemic problems affecting Hertz's rental and theft reporting policies and procedure. Hertz has a nationwide problem with false theft reports, which has affected many customers.

9.      Plaintiffs now bring suit to recover for the same conduct for which Hertz was found liable in the Grady case.

10.     Furthermore, it is suspected that many other customers from the Hertz family of companies (Hertz, Dollar, Thrifty) have been subjected to similar mistreatment in Pennsylvania.[2] The intent is to file a motion to establish a mass tort as soon as practicably possible.

---

[2] Plaintiffs also intends to add additional responsible Hertz managers.

Case ID: 200501362

## Plaintiffs were Left Terrified after Hertz Filed a False Police Report against Kelly Grady

11.     Kelly A. Grady, was a 35-year old woman with no criminal history when she rented a Chevy Yukon from the Philadelphia Airport Hertz location on April 17, 2013.

12.     Ms. Grady followed all applicable rules and regulations and paid for the car rental as directed by Hertz.

13.     Ms. Grady contacted Hertz repeatedly in 2013, spoke with a Hertz employee she knew named John, and was assured that there were no issues with her rental. Grady has voluminous phone records showing that she spent hours on the phone with Hertz. She was also charged $2,444.94 on July 15, 2013.

14.     Grady and Vangelis decided to take plaintiffs Alexandros and Christina, ages 9 and 8 at the time, on a vacation to Williamsport, PA.  Before leaving, Grady returned to the Hertz location on July 18, 2013, and got permission to keep the truck until July 22, 2013.

15.     No one told Grady that Hertz was reporting the car stolen, and told police that she had not spoken with the company since April, had not extended, that she had not paid, and that she was otherwise had stolen the car.

16.     In reality, Grady had been paying and extending her rental the entire time, which is shown in the record, and had even returned to the rental location on July 18 to check in on the status of her rental.

17.     Out of nowhere, on their way home from Williamsport to drop off the rental car, their vehicle was pulled over on July 22, 2013, by State Police. This was not a routine stop. There were several police cars, and the police ordered Ms. Grady and Plaintiffs' mother out of the vehicle over a loudspeaker. Their guns were drawn.

18.     As Vangelis and Grady were held at gunpoint by the State Police who believed the women were car thieves, they sobbed as they desperately screamed that there were two young children in the back of the vehicle. The fear was that if the police started shooting they would hit the kids.

19.     It was at this point that State Trooper Randy Kemmerling told the two women that the car had been reported stolen. Ms. Vangelis stated, "That's ridiculous, she has a contract with Hertz." Id.

Case ID: 200501362

20.     At this point, the officer retrieved the contract from the vehicle. It was then that the two women implored Trooper Kemmerling to call John—the Hertz customer representative that she rented the car from—to confirm that Ms. Grady had not stolen the car. Id.

21.     When the officer called Hertz corporate he was in fact told by Hertz that Grady had not stolen the vehicle. The police records confirm this:

> **Synopsis:**
> This incident occurred as Hertz Rental Company reported a vehicle as stolen. The vehicle was stopped at the above location and all occupants were identified. Upon calling Hertz Rental Company and the Philadelphia Police Department, it was determined this is a civil issue regarding late payment and the vehicle was not stolen.

> HERTZ Rental Company was contacted and advised that the credit card listed on the contract with the suspect had returned with insufficient funds and as a result the account was overdue. As a result they reported the vehicle stolen. HERTZ advised they would prefer the vehicle to be towed and picked up by a representative and would handle the civil tort regarding payment with the suspect.

> **Conclusion/Recommendation:**
> I recommend this investigation be terminated due to the fact that Hertz Rental Company will be handling this situation through civil action. It was found that the vehicle was reported as stolen from the Philadelphia Airport rental terminal after a miscommunication regarding an overcharged credit card as part of a Hertz Rental Car contract. Philadelphia PD has been provided all requested documentation and was advised the vehicle was towed/recovered.

> 8. INCIDENT DETAILS
> This incident occurred as a GMC YUKON was reported stolen by Hertz Rental Company. The vehicle was traveling southbound at the above location when the incident was reported. A traffic stop was conducted on SR 322, in Dauphin County, PA. Upon making contact with the operator of the vehicle and contacting Hertz, it was determined that this is a civil issue relating to late payment on a rental contract.

22.     As a result, the officers took no action against Ms. Grady and she was never given any sort of ticket or citation.

23.     This ordeal was traumatic for the Plaintiffs and they now seek redress for their grievances.

### THE PRIOR GRADY CASE AGAINST HERTZ REVEALED THAT HERTZ HAS A SERIOUS, NATIONWIDE THEFT REPORTING PROBLEM

24.     Kelly Grady brought suit against The Hertz Corporation in 2015 for her ordeal.

25.     In that case, it quickly became aware that Hertz had no legitimate excuse for what it did to Grady and the Gider children.

26.     Hertz's corporate designees were forced to admit that Hertz has serious issues in how it handles theft reports.

27.     Among these problems are that:

Case ID: 200501362

a.   Hertz's disregards its own policies and instructions employees not to perform investigation and verification of theft report

b.   Hertz routinely uses false payment information in police reports to make it look like the renter is refusing to pay

c.   Hertz's computer systems do not accurately record renter contact with the company, and the company falsely tells police the renter refuses to talk to the company or extend the rental

d.   Hertz's deletes the rental records of customers it reports for theft to hide evidence that contradicts its theft reports.

28.    The Grady case helped illustrate that Hertz's top corporate officials have known for years that it has a serious, nationwide problem with false police reports but has done nothing to stop it.

## HERTZ DOES NOT INVESTIGATE OR VERIFY THEFT REPORTS IN VIOLATION OF HERTZ'S VERY OWN STANDARD OPERATING PROCEDURES

29.    Hertz's corporate policies *require* that a local investigation be done before any theft report is made to verify that the report is accurate. The policy reads:

> Corporate/Country Security Manager Investigations - Every theft/conversion/disappearance must be promptly investigated by the Corporate/Country Security Manager responsible for the location from which the related Theft Vehicle Report is filed. All employees are required to cooperate fully with such an investigation.

Exhibit 1 - W7-02 RAC(17). An investigation and verification that the report is accurate is also required by laws prohibiting false police reports.

30.    Furthermore, the policy states that "Location; Maintenance, Area, Country Head Office and. OKC Management *must ensure compliance to this procedure*." Id. (emphasis added).

31.    Despite this policy, Hertz's corporate officers have instructed its employees not to follow this policy.

32.    A Hertz corporate security designee, defendant Livingston, stated that, despite corporate policies, no investigations are performed because of "marching orders" from Hertz corporate:

| COUNSEL: | Is it your testimony that you don't go to the location and question any of the Hertz employees when you receive a theft package? |
|---|---|
| MR. LIVINGSTON: | That's my testimony, yes. |
| COUNSEL: | Why? |
| MR. LIVINGSTON: | Because I mean the package has been completed, all the reports have been reviewed, I guess, by OKC. **And my marching orders are to report the car stolen** when I get the -- again, I do look at it for everything being accurate, as far as I can tell, within the report itself. |
| COUNSEL: | Yeah. *But you don't do any independent investigation?* |
| MR. LIVINGSTON: | *I do not.* |
| COUNSEL: | *You don't do any check?* |
| MR. LIVINGSTON: | *I do not.* |

Exhibit 2, at p.252] (emphasis added).

33.    This was confirmed by another designee, a manager for the company:

| COUNSEL: | We deposed Mr. Rich Livingston Tuesday. He indicated that he doesn't put the package together. He just gets it from Oklahoma City and then basically just couriers it to the police. Is it your understanding that the corporate security manager or assistant corporate security manager actually puts the theft package together? Or is it your understanding that the theft package is put together in Oklahoma City and then sent to the corporate security manager at the location where the car was allegedly taken from? |
|---|---|
| MR. JAUSSI: | *So it's my understanding that Oklahoma City generates the packet and all the pertaining documents within it, feeds Ken Graeber or Rich Livingston, right, and Ken Graeber or Rich Livingston essentially print, file, and go seek a police report claim or case number.* |
| COUNSEL: | Okay. *So the theft package is already completed in Oklahoma City before it's sent to the corporate security manager at the Hertz location* where the car was allegedly taken from, correct? |
| MR. JAUSSI: | *That's my understanding, correct.* |

Case ID: 200501362

<u>See</u> Exhibit 3 - Jaussi Testimony, at pp. 69-70 (emphases added) (objections omitted).

34.    According to Livingston, corporate security personnel do not even have access to rental information to verify the accuracy of theft reports:

| COUNSEL: | Do you have access to phone logs to determine when a renter called in? |
|---|---|
| MR. LIVINGSTON: | I do not. |
| COUNSEL: | Do you have access to any kind of logs that determine the contacts the renter had with Hertz? |
| MR. LIVINGSTON: | Do not. |

Exhibit 2, at p. 205.

35.    The assistant corporate security manager, defendant Graeber, who actually delivered the paper theft package to the Philadelphia Police, also testified that he had no role in investigating or providing the information in the theft package, but that he instead saw himself as a "custodian of records" who just reports the car stolen:

> I was custodian of records and I didn't personally provide that information [in the theft package]. It was sent to me [by Vehicle Control], and I just reported it stolen as per Hertz policies

Graeber Deposition, at p.19.

36.    Julie Wilkerson, Hertz's national supervisor for Vehicle Control (and trial designee), dissembled about whether Hertz expects its corporate security managers to conduct a local investigation

| COUNSEL: | In fact, this is a procedure [W7-02(a)(17)] that you follow to make sure that innocent people aren't wrongfully arrested for accidental reporting to the police, correct? |
|---|---|
| WILKERSON: | Correct. |
| . . . . | |
| COUNSEL: | Now, it says here that the question was asked of [Livingston] or anyone working for him or working with him, if they did any check and his response was no, not on his side of the fence. Do you see that? |
| WILKERSON: | I do see that. |
| COUNSEL: | Now, you just testified that he would have checked the computer system of some sort, right? |

Case ID: 200501362

| | |
|---|---|
| WILKERSON: | *He should have checked the computer system*. |

Exhibit 4 - Wilkerson Testimony, at pp. 37-46 (objections omitted) (emphases added)

37.    She was then constrained to admit that the failure to conduct local investigations violated Hertz's policy W7-02(a)(17) in thousands of cases.

| | |
|---|---|
| COUNSEL: | How many theft reports have come out of Philadelphia? |
| MR. EDELSTEIN: | When? |
| COUNSEL: | In 2013-2014, ma'am. |
| WILKERSON: | A lot. |
| COUNSEL: | A lot? |
| WILKERSON: | Yes. |
| COUNSEL: | And what would you say? |
| WILKERSON: | Maybe 2000. |
| COUNSEL: | *Do you know — excuse me. Mr. Livingston testified that he's gone into court and handled about 400 of these and he's never done a local investigation to determine the truth and veracity of those theft packages?* |
| WILKERSON: | No, I didn't know that. |
| COUNSEL: | *That would fall well below the policies and procedures of even Hertz Corporate policies, correct?* |
| WILKERSON: | *Yes.* |

Exhibit 4 - Wilkerson Testimony, at pp. 37-46 (objections omitted) (emphases added). In reality, Vehicle Control, Wilkerson's department, had told Livingston and the other corporate security managers not to conduct any investigation.

38.    Wilkerson, was forced to admit that Hertz had egregiously failed to protect its customers:

| | |
|---|---|
| COUNSEL: | And here's what I'm getting at and where I'm going with this, it says near the last line: "Location, maintenance, area, country, head office, and OKC management must ensure compliance with this procedure." Do you see that? |
| MS. WILKERSON: | Yes. |

| | |
|---|---|
| COUNSEL: | Is it your job to ensure compliance with this procedure? |
| MS. WILKERSON: | Yes. |
| COUNSEL: | And you're the person in charge of 700,000 cars to make sure as the regulator that these . . . procedures are followed, correct? |
| MS. WILKERSON: | Correct. |
| COUNSEL: | Now, when it says "location," that means in this instance the Philadelphia location, correct? |
| MS. WILKERSON: | Correct. |
| COUNSEL: | **In fact, this is a procedure that you follow to make sure that innocent people aren't wrongfully arrested for accidental reporting to the police, correct?** |
| MS. WILKERSON: | **Correct.** |
| COUNSEL: | And it's important these policies and procedures are followed by Hertz Corporation, correct? |
| MS. WILKERSON: | Correct. |
| COUNSEL: | **And if Hertz doesn't follow this problem -- this procedure, that would be a failure on the part of Hertz, correct?** |
| MS. WILKERSON: | **Correct.** |

See Exhibit 4, at p.28-47 (emphases added).

39.    Instead of ensuring compliance with this procedure, all Defendants have been deliberately circumventing it—despite it being a safeguard which prevents false reports, such as the one that harmed Plaintiffs.

40.    Hertz has admitted this is because it has been cutting costs and personnel in its corporate security department. Mr. Livingston, Hertz's corporate security designee, testified that Hertz, in 2015, had made "**a corporate decision to lay off a large group of people at that time for cost savings**" within the corporate security department. Livingston Depo., at p.54. It is the corporate security department that performs the local investigations mandated by W7-02.

41.    Cutting these positions in corporate security further exacerbated Hertz's failure to comply with W7-02 and other theft reporting policies, and directly signaled that Hertz's top corporate officials had no intent of complying with W7-02. These layoffs were implemented with

Case ID: 200501362

the intent and purpose to cut costs and increase profits, at the expense of the lives of their customers. At trial in the Grady case, Hertz stipulated that it was in fact cutting costs.

## Hertz Falsifies Payment Information in Police Reports to Secure Illegal Arrests & Prosecutions

42.     In every theft report there are two implicit variables: payment and time.

43.     If the rental vehicle is paid, or the renter has provided Hertz a valid form of credit (e.g., a credit card number), it should be clear that the renter does not intend to steal the car. Indeed, in any type of consumer theft report, the determinative factor is payment.

44.     Hertz routinely provides false information to the police in its theft packages about customer payment to secure criminal charges against the renter. To understand how and why, some background is needed on Hertz's billing process.

45.     When a customer initially rents a car from Hertz, they provide a credit card to Hertz as a letter of credit so that Hertz can charge for any costs associated with the rental.

46.     At the time of the initial rental, Hertz puts something called an "authorization hold" on the customer's card. An authorization hold is not a permanent charge, it simply checks the customer's account to see if it is valid and has funds. This temporary charge does not appear on any monthly billing statements, and is not a bill or payment.

47.     If the customer later extends the rental, Hertz also places an authorization hold on the customer's card. Again, this is not a final billing or payment.

48.     Only at the end of the rental, after the rental is closed out, does Hertz actually charge the customer's card for payment on the full rental.

49.     Although, an authorization hold may be denied during the rental for a variety of reasons, such as a low balance, ***this says nothing about whether the final billing charge will go through***.

50.     When filing theft reports, Hertz first finalizes and prints out paper theft packages compiled in Oklahoma City which claim that the customer never paid for the rental and that the card was "denied." However, when the theft package is printed out, ***the customer has not yet been billed***. The paper theft packages state that the customer owes the full balance of the rental. Then and only then, after the theft package is printed out, does Hertz charge the customer for the car rental. The final billing charge is almost always successful.

Case ID: 200501362

51.    Yet, despite having just charged the customer and received payment, Hertz then gives the now out-of-date paper theft package to the police claiming that the renter never paid, has an outstanding balance of many thousands of dollars, and that the renter provided an invalid card.

52.    At no point does Hertz inform the police that the customer has been charged.

53.    As is immediately obvious, this means that many if not all overdue Hertz police report contains materially false information.

54.    Incredibly, this is not the result of some sort of massive error, but instead has been deliberately written into Hertz's policy since at least 2007:



Exhibit 1 - W7-02 Theft Reporting Policy.

55.    The reason the policy is written in this manner is because Hertz knows that if police were aware that Hertz had charged the customer, and always had a letter of credit to bill the customer at its discretion, the theft report would not be accepted.

56.    Indeed, when the customers provide proof of payment to the prosecutors, the prosecutions are dismissed.

57.    Hertz has known about this issue for many years but has stubbornly refused to revise the policy. Given that Hertz files at least 10,000 police reports a year, and this policy has been in place since at least 2007, the number of affected individual is huge.

58.    Every named Plaintiff reported for overdue rental theft was billed by Hertz after the theft report was printed out; in no cases were the police were told about the payments.

Case ID: 200501362

59.     This policy is at a minimum reckless, it is a corporate device to obtain police action against customers where there is otherwise no probable cause to do so. There is no legitimate or valid reason for such a policy.

60.     All corporate Hertz defendants and their employees, the named defendant directors, and the named defendant officers were aware of this policy and refused to change it or otherwise take action.

61.     In September 2017 Hertz lost a malicious prosecution trial in Philadelphia. As with Plaintiffs' cases explained in this Complaint, Hertz had given a theft package to the police which said she owed $2,445, when in reality Hertz had received payment of $2,445 a week before the police report.

62.     Hertz's national supervisor for Vehicle Control, Julie Wilkerson, attempted to dissemble on the witness standard about whether Hertz had told the police about Grady's payment:

| COUNSEL: | Do you believe if there's -- I think you testified if there's omitted facts, they should be corrected, correct? |
|---|---|
| WILKERSON: | Yes. |
| COUNSEL: | Eventually did Hertz become aware of additional facts in regards to Ms. Grady's rental that should have been provided to the police? |
| WILKERSON: | Which facts? |
| COUNSEL: | Well, the payment of $2400. |
| WILKERSON: | **That was actually in the theft package. The police had that information.** |
| COUNSEL: | **The police had that information?** |
| WILKERSON: | **Yes, it's in the billing page of the theft package.** |

Exhibit 4 - Wilkerson Testimony, at pp. 5-6 (emphasis added).

63.     This testimony was untrue. Wilkerson supervised Hertz vehicle control for many years, and she was—and is—well aware that a theft package provided to the police never contains payment information for the simple reason that the renter is charged only after the theft package is generated and taken to police. See Exhibit 1 - W7-02(D).

Case ID: 200501362

64.     When she later tried to repeat her misstatement, she was impeached and ultimately forced to admit that her testimony was untrue:

| | |
|---|---|
| COUNSEL: | Ma'am, I'm asking you was 2445 paid, yes or no? |
| WILKERSON: | Yes. |
| COUNSEL: | And that information was never updated to the police, correct? |
| WILKERSON: | No. |
| COUNSEL: | It was not corrected, correct? It was not updated to the police, correct? |
| WILKERSON: | **They had the information**. |
| COUNSEL: | I'm asking you if the information that it was paid was updated to the police, yes or no? |
| WILKERSON: | **The police actually have the theft package and this was in the theft package**. |
| COUNSEL: | Ma'am, you just identified that that is not a payment for 2445, it's what is owed. Do you understand the difference between -- |
| WILKERSON: | Yes. |
| COUNSEL: | -- money in your bank account -- |
| WILKERSON: | Yes. |
| COUNSEL: | -- and what is owed to you? It's the difference between an asset and a liability, right? |
| WILKERSON: | Yes. |
| COUNSEL: | Okay. Understand the difference? |
| WILKERSON: | Yes. |
| COUNSEL: | You deal with this every day? |
| WILKERSON: | Yes. |
| *COUNSEL:* | *So let's be clear. The police didn't know $2445 was paid before they signed an affidavit of probable cause allowing Ms. Grady to be arrested, correct? Correct, ma'am?* |
| *WILKERSON:* | *Correct.* |

Case ID: 200501362

COUNSEL:          No further questions.

Exhibit 4 - Wilkerson Testimony, at pp. 54-55 (emphases added).

65.    Wilkerson's evasive testimony demonstrates that she and Defendants were always well aware that it is impossible for theft packages to show renter payments; Hertz policy mandates that the renter's credit card be charged after the theft package is generated

## Hertz Erases Rental Extensions and Backdates the Rental Due Date

66.    As noted, every rental theft report is based on two main variables: payment and time. In addition to misrepresenting payment, Hertz also utterly botches the time component of the overdue vehicle theft reports.

67.    In sum and substance, after renters extend the rental period, Hertz's computer systems outrageously deletes the customer extensions *without notice to the customer*.

68.    When a customer calls in to Hertz to extend the rental, the renter can call the location or Hertz corporate's 1800 extension number. When the customer extends, Hertz then places an authorization hold on the card. If the authorization hold is approved by the bank, then the extension appears on Hertz's records.

69.    However, if the authorization hold is denied, Hertz's computer systems at Vehicle Control erase the extension and backdate the due date of the rental. Not only is the customer not informed of the voided extension, but the deletion is also not apparent to Hertz employees.[3]

70.    To be very clear, when the Plaintiffs allege that Hertz erases the extension what they mean is that Hertz's computer programs completely erase any evidence not only that the renter ever extended, but that the renter ever attempted to contact Hertz in the first place.

71.    The problem is immediately apparent to even the most cursory observer. The renter has been told that he is authorized to use the car for an extended period, yet Hertz has secretly canceled the extension and erased any evidence it ever existed.

72.    It is one thing if Hertz wants a new form of payment and lets the customer know; it is something else entirely if Hertz memory holes the rental extension. In some cases, the renter

---

[3] Although the extension is erased, the Contract Notebook which contains a history of the rental contacts (which is not consulted by Vehicle Control), can retain information showing that the renter had contacted Hertz.

Case ID: 200501362

has extended over 10 times and each time, without notice to the renter, Hertz secretly erased the extensions.

73. Hertz then reports the customer to the police claiming that the due date of the rental was months before and that the renter never extended or contacted Hertz about the rental. This information not only goes directly to whether the renter extended and was authorized to use the vehicle, but also is vital information about whether the renter had actually absconded with an intent to steal the vehicle. No exculpatory information from the Contract Notebook is given to the police.

74. Instead of following its own policies, and taking basic steps to ensure accurate police reports, Hertz has been routinely mass reporting its own customers for theft without verifying whether they committed a crime because it has made the cold calculation that it is more cost effective to use the nation's police forces, prosecutors, and judges as a taxpayer funded repo service—at the expense of the lives of its innocent customers who are caught in the middle—like Plaintiffs.

75. Significantly, Hertz knows that when it reports customers to the police it has a duty to preserve that customer's rental information. Specifically, Hertz officials testified that the company has to keep those records for 7 years.

76. However, in the Grady case, rather than turn over the records in question, Hertz admitted that it "purged" and destroyed all of Grady's rental records. As a result of this blatant spoliation, the trial court granted negative inferences against Hertz.

77. Hertz did so because the rental records contradicted Hertz's blatantly false theft report. For instance, the Pa. State Police report made it clear that Hertz knew that the Grady had not stolen the vehicle, that it had been extended, and that there had been renter contact. The Hertz employee also made it clear that the only issue was a possible civil billing dispute.

78. Restated, the Hertz employee the police spoke to was looking at records very different than the false narrative included in the theft report.

79. Yet, instead of turning of over this exculpatory evidence, Hertz never gave it to the police/prosecutors, never gave it to Grady during the criminal case, and destroyed it rather than give it to Grady in the civil case.

Case ID: 200501362

80.    After the jury found that Hertz acted in an atrocious, extreme, and outrageous manner that has no place in a civilized society, this Court held that Hertz was liable for punitive damages.

81.    Defendants' acts and omissions that are the subject of this complaint were knowing and/or careless and/or negligent and/or reckless and/or intentional and/or malicious.

82.    The systemic failures of The Hertz Corporation have affected thousands of Hertz customers around the world, and defendant Hertz's directors, officers, employees, and agents were on notice that this was a serious problem that needed to be addressed and fixed.

83.    As a direct and proximate result of Defendants' acts and omissions, Plaintiffs have incurred severe and substantial damages and actual harm. These damages include but are not limited to:

      a.      Monetary damages;

      b.      Attorneys' fees;

      c.      Severe mental distress, as well as severe emotional distress, mental suffering, mental anguish, sleeplessness, restlessness, anxiety, and depression;

      d.      Harm to social relationships;

      e.      Emotional pain and suffering.

*****

Case ID: 200501362

# PARTIES

## PLAINTIFF ALEXANDROS GIDER, A MINOR, BY HIS MOTHER AND NATURAL GUARDIAN ROULA VANGELIS

84.    Plaintiff Alexandros Gider is a minor (17 years of age), and a resident of Delaware County, PA. His mother's address is 644 West End Walk, Media, PA 19063.

## PLAINTIFF CHRISTINA GIDER, A MINOR, BY HER MOTHER AND NATURAL GUARDIAN ROULA VANGELIS

85.    Plaintiffs Christina Gider is a minor (15 years of age), and a resident of Delaware County, PA. Her mother's address is 644 West End Walk, Media, PA 19063.

## SIMILARLY SITUATED PLAINTIFFS

86.     Plaintiffs intend to file a motion for mass tort certification due to the widespread false police reports being submitted by Hertz across the country, and in the Commonwealth of Pennsylvania.

87.     Common issues of fact and law will predominate.

## DEFENDANT THE HERTZ CORPORATION

88.    Defendant The Hertz Corporation is a Delaware corporation.

89.    The Hertz Corporation operates a rental car location in Philadelphia, PA at either 1 Arrivals Road, Philadelphia, PA 19153 or 8800 Essington Ave., Philadelphia, PA 19153, or both.

90.    The Hertz Corporation is headquartered at 8501 Williams Road, Estero, FL, 33928.

## DEFENDANT HERTZ GLOBAL HOLDINGS INC.

91.    Defendant Hertz Global Holdings Inc. is a Delaware corporation.

92.    Hertz Global Holdings Inc. is headquartered at 8501 Williams Road, Estero, FL, 33928.

## DEFENDANT HERTZ VEHICLES LLC

93.    Hertz Vehicles LLC is a subsidiary of Hertz Global Holdings, Inc. and is a Delaware corporation. Hertz Vehicles LLC owned the car that was reported stolen. The car was reported stolen on its behalf.

94.    Hertz Vehicles LLC is headquartered at 8501 Williams Road, Estero, FL, 33928.

## DEFENDANT JULIE WILKERSON

Case ID: 200501362

95.    Defendant Wilkerson was at all relevant times the national supervisor for vehicle control for Hertz.

96.    She is believed to be a citizen of Oklahoma.

97.    Defendant Wilkerson supervised the theft reporting process for Hertz overall at all relevant times, and supervised the theft reporting process for the rental at issue in Philadelphia, PA.

98.    Because Wilkerson caused a false theft report to be made in Philadelphia, and supervised thousands of theft reports made by the Philadelphia Airport location, she has a specific nexus to Pennsylvania sufficient to confer personal jurisdiction upon her in this State.

**Defendant Richard W. Livingston**

99.    Defendant Richard W. Livingston is a mid-Atlantic region Corporate Security Manager for Hertz whose territory encompasses the Philadelphia Airport Location.

100.    He is believed to be a citizen of New Jersey.

101.    By virtue of his position, Hertz policy imposed a duty on Livingston to ensure compliance with W7-02 (Reporting Vehicle Thefts and Conversions): "Location, Maintenance, Area, Country Head Office and OKC Management must ensure compliance to this procedure."

102.    W7-02(a)(17) also imposes on Livingston a duty to investigate and verify all theft reports being made from the Philadelphia airport location are true, accurate, correct, and complete.

103.    Livingston, along with the rest of Hertz management, did not ensure compliance with this procedure.

104.    Livingston testified that he had marching orders from Hertz corporate that he and his staff, including defendant Graeber, were not to perform the (a)(17) investigation, and that they were instead to simply courier every theft package they received from Vehicle Control without changes to the police.

105.    Livingston testified that in the thousands of cases his office had handled, the local investigation was never performed.

**Defendant Ken Graeber**

106.    Defendant Ken Graeber was an Assistant Corporate Security Manager for Hertz.

107.    He is believed to be a citizen of New Jersey.

Case ID: 200501362

108.    Graeber was the Hertz employee who actually couriered the theft package from Vehicle Control in Oklahoma City to the Philadelphia Police regarding the rental at issue.

109.    By virtue of his position, Hertz policy imposed a duty on Graeber to ensure compliance with W7-02 (Reporting Vehicle Thefts and Conversions): "Location, Maintenance, Area, Country Head Office and OKC Management must ensure compliance to this procedure."

110.    W7-02(a)(17) also imposes on Graeber a duty to investigate and verify all theft reports being made from the Philadelphia airport location are true, accurate, correct, and complete.

111.     Graeber testified that he instead viewed his role merely as a records custodian who was to ferry Vehicle Control's theft package over to the police without verification.

**Defendant Joseph Jaussi**

112.    Defendant Jaussi was a location manager at the Philadelphia Airport Hertz.

113.    He is believed to be a citizen of New Jersey.

114.     By virtue of his position, Hertz policy imposed a duty on Jaussi to ensure compliance with W7-02 (Reporting Vehicle Thefts and Conversions): "Location, Maintenance, Area, Country Head Office and OKC Management must ensure compliance to this procedure."

115.    W7-02(a)(17) also imposes on Jaussi a duty to investigate and verify all theft reports being made from the Philadelphia airport location are true, accurate, correct, and complete.

**Defendant Kyle Ebert**

116.    Defendant Kyle Ebert was at the time of the incident a Senior Location Manager for Hertz at the Philadelphia location.

117.    Ebert is a citizen and resident of Pennsylvania.

118.    By virtue of his position, Hertz policy imposed a duty on Ebert to ensure compliance with W7-02 (Reporting Vehicle Thefts and Conversions): "Location, Maintenance, Area, Country Head Office and OKC Management must ensure compliance to this procedure."

119.    This includes making sure that locations investigate and verify theft reports to ensure they are true, accurate, correct, and complete.

120.    Ebert, along with the rest of Hertz management, did not ensure compliance with this procedure.

Case ID: 200501362

**DEFENDANT SCOTT FUNK**

121.    Defendant Scott Funk was at the time of the incident a Senior Location Manager at the Hertz Philadelphia Airport location.

122.    Funk is a citizen and resident of Pennsylvania.

123.    Funk's duties included driving cost saving and revenue generating initiatives.

124.    By virtue of his position, Hertz policy imposed a duty on Funk to ensure compliance with W7-02 (Reporting Vehicle Thefts and Conversions): "Location, Maintenance, Area, Country Head Office and OKC Management must ensure compliance to this procedure."

125.    This includes making sure that locations investigate and verify theft reports to ensure they are true, accurate, correct, and complete.

126.    Funk, along with the rest of Hertz management, did not ensure compliance with this procedure.

127.    All Defendants owed a duty to Grady and to Plaintiffs (individuals it was foreseeable would be in the car and harmed by a false report).

128.    All Defendants owed a duty to Plaintiffs to conduct the rental reasonably and appropriately.

129.    All Defendants had knowledge of W7-02(a)(17) and also knew that Hertz was not complying with its own written policy safeguards which were designed to prevent false reports. All Defendants had knowledge that W7-02(D) would result in falsified payment information being provided to the police.

130.    All Defendants knew that police reports have to be true, accurate, correct, and complete, and that the police reports being submitted by Hertz did not meet this standard—including the one at tissue.

131.    All Defendants had the ability to intervene and take corrective action, but failed to do so.

132.    The failure of the Hertz corporate defendants and managers to address these issues is undeniable. The corporate and individual defendants are directly liable for these failures because they (1) participated in developing and implementing the theft reporting process, (2) knew about the problems with Hertz's theft reporting process and did nothing, and (3) negligently supervised and managed the theft reporting process. The Defendants have a duty to

Case ID: 200501362

ensure that Hertz's procedures are safe, effective, comply with the law, and comply with industry standards.

133.    All corporate defendants (jointly known as "Hertz") are alleged to be vicariously liable for the actions and omissions of their employees, including the individual Defendants.

*****

Case ID: 200501362

# Jurisdiction & Venue

134.    Jurisdiction over the parties in the Courts of the Commonwealth of Pennsylvania is proper pursuant to the provisions of 42 Pa. C.S. § 5301 *et seq.* Specifically, jurisdiction as to the Defendants is proper via residence, or pursuant to 42 Pa. C.S. § 5301 (a)(3)(iii) by reason of "carrying on of a continuous and systematic part of its general business within this Commonwealth." Defendants transacted business in this Commonwealth and caused harm and compensable injury to Plaintiffs by acts or omissions committed in the Commonwealth of Pennsylvania that are the subject of the present complaint.

135.    Venue is proper in the Philadelphia County Court of Common Pleas under Pennsylvania Rules of Civil Procedure 2130 and 1006 inasmuch as Defendants regularly conducted business in Philadelphia County and inasmuch as the cause of actions arose and/or a majority of the harm, occurrences, and transactions regarding Plaintiffs' cause of actions arose and/or took place at least in part in Philadelphia County.

Case ID: 200501362

# COUNT I – Negligence

*Alexandros Gider and Christina Gider, minors,*
*by and through their parent and natural guardian Roula Vangelis,*
*and, Similarly Situated Plaintiffs*
*v.*

*The Hertz Corporation; Hertz Global Holdings Inc; Hertz Vehicles LLC; Julie Wilkerson; Richard*
*W. Livingston; Joseph Jaussi; Ken Graeber; Scott Funk; Kyle Ebert*

136.     Plaintiffs incorporate by reference and reallege the preceding paragraphs of this complaint pursuant to Pa. RCP 1019(g).

137.     The elements of negligence are duty, breach, causation, and damages.

138.      Defendants have a duty to those who renter their cars. This duty extends to every Hertz customer and every reasonably foreseeable passenger who enters their rental vehicles. Plaintiffs were reasonably foreseeable passengers because they were the children of the renter's best friend and were using the rental for a vacation trip.

139.      Defendants breached their duty to Plaintiffs when they failed to track extensions, failed track renter contact, failed to track payment, failed to investigate and verify the theft report, and otherwise filed a false police report with police which falsely accused Grady of car theft.

140.     Defendants breached their duty to Plaintiffs when they turned a civil issue of payment into a criminal matter, putting the lives of everyone in the car in jeopardy.

141.     The failure of the Hertz corporate defendants and managers to address these issues is undeniable and breached the duty of care. The corporate and individual defendants are directly liable for these failures because they (1) participated in developing and implementing the theft reporting process, (2) knew about the problems with Hertz's theft reporting process and did nothing, and (3) negligently supervised and managed the theft reporting process. The Defendants have a duty to ensure that Hertz's procedures are safe, effective, comply with the law, and comply with industry standards.

142.     All corporate defendants (jointly known as "Hertz") are alleged to be vicariously liable for the actions and omissions of their employees, including the individual Defendants

143.     As a direct and proximate result of Defendants' acts and omissions, Plaintiffs have incurred severe and substantial damages and actual harm. These damages include but are not

Case ID: 200501362

limited to severe mental distress, as well as severe emotional distress, mental suffering, mental anguish, sleeplessness, restlessness, anxiety, and depression.

*****

Case ID: 200501362

## Count II - False Arrest/Imprisonment

*Alexandros Gider and Christina Gider, minors,*
*by and through their parent and natural guardian Roula Vangelis,*
*and, Similarly Situated Plaintiffs*
*v.*

*The Hertz Corporation; Hertz Global Holdings Inc; Hertz Vehicles LLC; Julie Wilkerson; Richard*
*W. Livingston; Joseph Jaussi; Ken Graeber; Scott Funk; Kyle Ebert*

144.    Plaintiffs incorporate by reference and realleges the preceding paragraphs of this complaint pursuant to Pa. RCP 1019(g).

145.    Defendants filed a false complaint against Grady with the Philadelphia Police Department falsely alleging that she had stolen a car from Defendants.

146.    Defendants made this false complaint carelessly and/or negligently and/or recklessly and/or knowingly and/or intentionally and/or maliciously.

147.    As a direct and eminently foreseeable result of Defendants' actions in filing a criminal complaint against Grady, Plaintiffs were falsely arrested/imprisoned as they were detained by police.

148.    The failure of the Hertz corporate defendants and managers to address these issues is undeniable. The corporate and individual defendants are directly liable for these failures because they (1) participated in developing and implementing the theft reporting process, (2) knew about the problems with Hertz's theft reporting process and did nothing, and (3) negligently supervised and managed the theft reporting process. The Defendants have a duty to ensure that Hertz's procedures are safe, effective, comply with the law, and comply with industry standards.

149.    All corporate defendants (jointly known as "Hertz") are alleged to be vicariously liable for the actions and omissions of their employees, including the individual Defendants.

150.    As a direct and proximate result of Defendants' conduct as set forth above, Plaintiffs have suffered severe damages, including but not limited to severe mental distress, as well as severe emotional distress, mental suffering, mental anguish, sleeplessness, restlessness, anxiety, and depression.

****

Case ID: 200501362

## COUNT III –   MALICIOUS ABUSE OF PROCESS

*Alexandros Gider and Christina Gider, minors,*
*by and through their parent and natural guardian Roula Vangelis,*
*and, Similarly Situated Plaintiffs*
*v.*

*The Hertz Corporation; Hertz Global Holdings Inc; Hertz Vehicles LLC; Julie Wilkerson; Richard*
*W. Livingston; Joseph Jaussi; Ken Graeber; Scott Funk; Kyle Ebert*

151.    Plaintiffs incorporate by reference and reallege the preceding paragraphs of this complaint pursuant to Pa. RCP 1019(g).

152.    The elements of malicious abuse of process are that Defendants (1) used a legal process against plaintiff, (2) primarily to accomplish a purpose for which the process was not designated, and (3) harm has been caused to Plaintiff.

153.    Defendants filed a false criminal complaint with the Philadelphia Police on August 27, 2013, alleging that Grady had stolen a car from Defendants.

154.    This criminal complaint was a legal process used against Plaintiffs by Defendants.

155.    This false criminal complaint was made so that Grady would be arrested, imprisoned, and prosecuted. This purpose was improper as Grady and Plaintiffs had done nothing wrong; the criminal justice system's purpose is not to arrest, incarcerate, and prosecute innocent and law-abiding citizens.

156.    Defendants made this false complaint carelessly and/or negligently and/or recklessly and/or knowingly and/or intentionally and/or maliciously. Defendants knew or should have known when they filed the criminal complaint against Grady that she was authorized to use the car and had not stolen it.

157.    This is manifestly obvious as the state trooper who pulled over Grady and Plaintiffs on July 22, 2013, believed to be named Kemmerling, spoke with Defendants on that date and Defendants assured him that Grady was authorized to use the car. Grady was not arrested by Trooper Kemmerling and was let go.

158.    As a direct and eminently foreseeable result of Defendants' actions in filing a criminal complaint against Grady, Plaintiffs were falsely imprisoned while they were detained by police on the side of the road.

159.    Defendants' failure to withdraw the criminal complaint they initiated against Grady was careless and/or negligent and/or reckless and/or knowing and/or intentional and/or malicious.

Case ID: 200501362

160.    The failure of the Hertz corporate defendants and managers to address these issues is undeniable. The corporate and individual defendants are directly liable for these failures because they (1) participated in developing and implementing the theft reporting process, (2) knew about the problems with Hertz's theft reporting process and did nothing, and (3) negligently supervised and managed the theft reporting process. The Defendants have a duty to ensure that Hertz's procedures are safe, effective, comply with the law, and comply with industry standards.

161.    All corporate defendants (jointly known as "Hertz") are alleged to be vicariously liable for the actions and omissions of their employees, including the individual Defendants

162.    As a direct and proximate result of Defendants' conduct in initiating a criminal complaint and failing to withdraw the criminal complaint as set forth above, Plaintiffs has suffered severe damages, including but not limited to monetary damages, severe emotional distress, mental suffering, mental anguish, sleeplessness, restlessness, anxiety, and depression.

*****

## COUNT IV – Malicious Prosecution

*Alexandros Gider and Christina Gider, minors,*
*by and through their parent and natural guardian Roula Vangelis,*
*and, Similarly Situated Plaintiffs*

*v.*

*The Hertz Corporation; Hertz Global Holdings Inc; Hertz Vehicles LLC; Julie Wilkerson; Richard*
*W. Livingston; Joseph Jaussi; Ken Graeber; Scott Funk; Kyle Ebert*

163.     Plaintiffs incorporate by reference and reallege the preceding paragraphs of this complaint pursuant to Pa. RCP 1019(g).

164.     The elements of malicious prosecution are that Defendants (1) initiated a criminal proceedings against plaintiff, (2) the criminal proceedings ended in Plaintiffs' favor, (3) the proceedings were initiated without probable cause, and (4) the defendant acted maliciously or for a purpose other than bringing Plaintiffs to justice.

165.     Defendants initiated criminal proceedings against Plaintiffs on by filing a false criminal complaint against Grady with the Philadelphia Police, alleging that Grady had stolen a car from Defendants.

166.     As a direct and eminently foreseeable result, Plaintiffs were detained by armed police on the side of the road who had their guns drawn.

167.     This initiation of the criminal proceedings was done without probable cause as Defendants knew that Grady had valid contracts with Defendants for the car she had rented, knew that she had paid for the rental, and knew that she was otherwise authorized to be driving the car.

168.     Defendants acted maliciously and/or for a purpose other than bringing Grady to justice, and knew when they filed the criminal complaint against Grady that she was authorized to use the car and had not stolen it.

169.     This is manifestly obvious as the state trooper who pulled over Grady and Plaintiffs on July 22, 2013, named Kemmerling, spoke with Defendants on that date and Defendants assured him that Grady was authorized to use the car.

170.     Defendants made this false complaint carelessly and/or negligently and/or recklessly and/or knowingly and/or intentionally and/or maliciously.

171.     Defendants' failure to withdraw the criminal complaint they initiated against Grady, which harmed Plaintiffs, was careless and/or negligent and/or reckless and/or knowing and/or intentional and/or malicious.

Case ID: 200501362

172.    The failure of the Hertz corporate defendants and managers to address these issues is undeniable. The corporate and individual defendants are directly liable for these failures because they (1) participated in developing and implementing the theft reporting process, (2) knew about the problems with Hertz's theft reporting process and did nothing, and (3) negligently supervised and managed the theft reporting process. The Defendants have a duty to ensure that Hertz's procedures are safe, effective, comply with the law, and comply with industry standards.

173.    All corporate defendants (jointly known as "Hertz") are alleged to be vicariously liable for the actions and omissions of their employees, including the individual Defendants

174.    As a direct and proximate result of Defendants' conduct in initiating a criminal complaint and failing to withdraw the criminal complaint as set forth above, Plaintiffs have suffered severe damages, including but not limited to monetary damages, severe emotional distress, mental suffering, mental anguish, sleeplessness, restlessness, anxiety, and depression.

*****

Case ID: 200501362

# COUNT V –   Intentional/Negligent Infliction of Emotional Distress

*Alexandros Gider and Christina Gider, minors,*
*by and through their parent and natural guardian Roula Vangelis,*
*and, Similarly Situated Plaintiffs*
*v.*

*The Hertz Corporation; Hertz Global Holdings Inc; Hertz Vehicles LLC; Julie Wilkerson; Richard W. Livingston; Joseph Jaussi; Ken Graeber; Scott Funk; Kyle Ebert*

175.    Plaintiffs incorporate by reference and reallege the preceding paragraphs of this complaint pursuant to Pa. RCP 1019(g).

176.    The elements of intentional infliction of emotional distress are that Defendants (1) Defendants acted intentionally or recklessly, (2) Defendants' acts and omissions were extreme and outrageous, (3) Plaintiffs suffered severe emotional distress, and (4) Plaintiffs' emotional distress was a result of Defendants' conduct.

177.    Defendants initiated criminal proceedings against Grady on August 27, 2013, by filing a false criminal complaint against Grady with the Philadelphia Police Department, alleging that Grady had stolen a car from Defendants.

178.    As a direct and eminently foreseeable result of Defendants' conduct, Plaintiffs were detained at gunpoint by police on the side of the road.

179.    Defendants acted intentionally and/or recklessly as they knew or should have known when they filed the criminal complaint against Grady that she was authorized to use the car and had not stolen it.

180.    This is manifestly obvious as the state trooper who pulled over Grady and Plaintiffs on July 22, 2013, believed to be named Kemmerling, spoke with Defendants on that date and Defendants assured him that Grady was authorized to use the car. Grady was not arrested by Trooper Kemmerling.

181.    Defendants' failure to withdraw the criminal complaint they initiated against Grady was intentional and/or reckless.

182.    The acts and omissions of Defendants were extreme and outrageous in a civilized society.

183.    The use of the criminal justice system is of the utmost seriousness and innocent individuals who have done nothing wrong should not be detained at gunpoint.

Case ID: 200501362

184.    The failure of the Hertz corporate defendants and managers to address these issues is undeniable. The corporate and individual defendants are directly liable for these failures because they (1) participated in developing and implementing the theft reporting process, (2) knew about the problems with Hertz's theft reporting process and did nothing, and (3) negligently supervised and managed the theft reporting process. The Defendants have a duty to ensure that Hertz's procedures are safe, effective, comply with the law, and comply with industry standards.

185.    All corporate defendants (jointly known as "Hertz") are alleged to be vicariously liable for the actions and omissions of their employees, including the individual Defendants.

186.    As a direct and proximate result of the defendants' conduct as set forth above, Plaintiffs, young children, were subjected to a terrifying experience and have suffered severe emotional distress, mental suffering, mental anguish, sleeplessness, restlessness, anxiety, depression, and monetary damages.

187.    The severe emotional distress suffered by Plaintiffs was as a result of the intentional and/or reckless extreme and outrageous conduct of Defendants and was certain occur, was foreseeable, and manifestly reasonable reaction under the circumstances.

*****

# RELIEF REQUESTED

**WHEREFORE**, Plaintiffs demand judgment in its favor and against Defendants, jointly and severally, on all counts and claims compensatory damages in an amount in excess of this court's jurisdictional limitations, thereby guaranteeing Plaintiffs a jury trial, exclusive of interests and costs, and an award of punitive damages, as well as prejudgment interest, post judgment interest, delay damages, costs, and such equitable relief as the Court deems necessary; and requests that this Court determine and declare that Plaintiffs be awarded for all counts:

a.    Compensatory damages, inclusive of any and all harm attributable to Defendants' actions or inaction;

b.    Expectation, consequential (lost earnings, lost profits, lost opportunity), restitution, and reliance damages;

c.    Punitive damages to punish the Defendants for their outrageous conduct, self-interest, and duplicitous behavior;

d.    Exemplary damages to set an example for others;

e.    Attorneys' fees and court costs;

f.    the loss of time and opportunity;

g.    Delay damages; and

h.    Such other and further relief and/or equitable relief that this Court deems just and/or necessary.

\*\*\*\*\*

*Respectfully submitted,*

Francis Alexander, LLC

*/s/ Francis Malofiy*

Francis Malofiy, Esquire
Alfred (AJ) Fluehr, Esquire
Attorney ID No.:  208494
280 N. Providence Road | Suite 1
Media, PA 19063
T:  (215) 500-1000
F:  (215) 500-1005
*Law Firm / Lawyer for Plaintiffs*
*/d/ May 21, 2020*

Case ID: 200501362

## Spoliation Notice -- Preservation of Evidence

Plaintiffs hereby demand and request that Defendants take necessary actions to ensure the preservation of all documents, records, communications, whether electronic or otherwise, items and things in their possession or control, or any entity over which any party to this action has control, or from whom any party to this action has access to, any documents, items, or things which may in any manner be relevant to or relate to the subject matter of the causes of action and/or the allegations of this complaint.

Case ID: 200501362

## Jury Trial Demand

Plaintiffs hereby demand a 12-person jury trial.

*****

*Respectfully submitted,*

Francis Alexander, LLC

*/s/ Francis Malofiy*

Francis Malofiy, Esquire
Alfred (AJ) Fluehr, Esquire
Attorney ID No.:  208494
280 N. Providence Road | Suite 1
Media, PA 19063
T:  (215) 500-1000
F:  (215) 500-1005
*Law Firm / Lawyer for Plaintiffs*
*/d/ May 21, 2020*

Case ID: 200501362

## Verification

I, Roula Vangelis, hereby verify that that I have read the foregoing Complaint and that the facts set forth herein are true and correct to the best of my knowledge, information, and belief. I further understand that the statements herein are made subject to the penalties of 18 Pa. Cons. Stat. Ann. § 4904 relating to unsworn falsification to authorities.

/s/   *Roula Vangelis*

Roula Vangelis

/d/      *5/21/2020*

Date

Case ID: 200501362

## CERTIFICATE OF SERVICE

I hereby state that a true and correct copy of the foregoing CIVIL ACTION COMPLAINT will be served on the Defendants pursuant to the Pennsylvania rules:

*****

*Respectfully submitted,*

FRANCIS ALEXANDER, LLC

*/s/ Francis Malofiy*

Francis Malofiy, Esquire
Alfred (AJ) Fluehr, Esquire
Attorney ID No.:  208494
280 N. Providence Road | Suite 1
Media, PA 19063
T:  (215) 500-1000
F:  (215) 500-1005
*Law Firm / Lawyer for Plaintiffs*

*/d/ May 21, 2020*

Case ID: 200501362



*Filed and Attested by the*
*Office of Judicial Records*
*21 MAY 2020 11:49 pm*
*A. SILIGRINI*

# EXHIBIT 1

**Procedure Owner:**    Senior Executive Vice President, Chief Administrative Officer and General Counsel

**Process Owner:**    Vice President, Corporate Operations

Executive Summary

- This Worldwide procedure applies to the Rent-A-Car (RAC) Division of The Hertz Corporation and includes requirements for reporting vehicle thefts and conversions.
- All Hertz vehicle thefts and conversions must be documented on the Theft/Recovery Vehicle Report.
- All vehicle thefts from customers must also be documented on the Vehicle Theft from Customer Report.
- Location, Maintenance, Area, Country Head Office and OKC Management must ensure compliance to this procedure.

Key Revisions

   Section G covering retail car sales repossession was added.

# Procedure



| No. | Subject | | | | Date |
|---|---|---|---|---|---|
| **W7-02 RAC:** | **REPORTING    VEHICLE    THEFTS    AND CONVERSIONS** | | | | **July 23, 2015** |

**Scope:**    This Worldwide Procedure applies to the North American Rent-A-Car (RAC) Division, including Canada and Puerto Rico/St. Thomas.

**Purpose:**    To provide the guidelines for reporting and processing retail car sales.

**Index:**
   A.    General
   B.    Distribution of Initial Theft/Conversion Report
   C.    Vehicle Thefts from Customers
   D.    Closing Associated Rental Agreements
   E.    Reconciling Open Theft/Conversion Files to CARRENT and VISION
   F.    Distribution of Completed Theft/Conversion Report
   G.    Retail Car Sales Repossession

Case.ID: 200501362

**Procedure:**

A. <u>General</u>

1. All thefts, conversions and disappearances of Hertz vehicles must be reported to the police as soon as discovered and management must assist the police with both their investigation and the recovery of the vehicle.

   a. <u>Conversions</u> - Report conversions to police no later than 60 days from the original or extended due date (considered the date and time stolen) or earlier if research indicates that the vehicle is not likely to be returned (phone numbers given are no good, mail is returned "Addressee Unknown," etc.).

   b. <u>Fraudulent ID, Stolen ID, Theft from Premises</u> - Report rentals involving fraudulent or stolen credit cards or ID and vehicles reported missing from Hertz premises, to police upon detection.

2. The Theft/Recovery Vehicle Report (Form 702003P - available in i-Forms) must be utilized to report each incident.

   a. <u>Vandalism</u> - The theft, conversion or disappearance of parts from a rental vehicle while the vehicle is out on rent or in control by a person not employed by Hertz is considered vandalism and reported in accordance with Procedure W7-01, Reporting Vehicle Accidents.

   b. <u>Unauthorized Access</u> - Unauthorized access to Hertz property when Hertz vehicles are stolen must be reported on a Worldwide Breach of Security Report, in accordance with Procedure W1-41, Breaches of Security.

3. There are four (4) vehicle theft categories:

   - Theft by Conversion - refer to Procedure W1-12 RAC, Controlling Overdue Rentals

   - Theft by Fraud - refer to Procedure W1-12 RAC, Controlling Overdue Rentals

   - Theft from Hertz Premises - refer to Procedure W9-18 RAC, Controlling Vehicle Physical Inventories

   - Theft from Customer - refer to Section C of this Procedure

4. <u>Prior to Reporting Thefts to Police</u> - Ensure requirements outlined in Procedures W1-12 and W9-18 were followed, prior to reporting a vehicle missing from inventory and reporting thefts to police. In addition, a Missing Vehicle Checklist has been developed and must be completed by the specific individuals conducting research of missing vehicles, prior to reporting thefts to the police (refer to Procedure W9-18).

5. <u>Complaints or Warrants</u> - In jurisdictions that require a complaint or warrant be lodged against the renter prior to alarming the car, the responsible Corporate/Country Security Manager (North America/Brazil) or an appointed designee has a maximum of ten (10) additional days from receipt of the file to complete research before reporting the conversion (refer to Procedure W1-12 RAC).

6. <u>Authorizing Arrests or Prosecution</u> - No level of management will authorize an arrest or prosecution on behalf of Hertz, nor will any employee sign any criminal complaint against an individual on behalf of Hertz, without the express approval of 1) the

Case ID: 200501362

responsible Corporate/Country Security Manager or a lawyer in the Law or Human Resources Department, Park Ridge/ Legal and Corporate Affairs Department, HEL and 2) in the case of the arrest, prosecution or filing of a criminal complaint against a current or recently terminated employee, the express approval of the Senior Vice President, Labor Relations and HR Practices, Park Ridge.

Note: The only allowable exception is for the reporting of personally witnessed vehicle thefts, where the employee who witnessed the vehicle theft may cooperate with the law enforcement authorities, if requested, but must immediately advise the responsible Area/Location Manager.

7.   Police Removal of Hertz Property - If in connection with a theft/conversion/disappearance, the police remove any property from Hertz premises, custody or control, it is the responsibility of the Area/Location Manager (or delegate) to obtain a receipt from the police, if one is customarily given.

8.   Timely Notification of Theft Information - Individuals who are advised of a theft must notify the Hertz personnel responsible for preparing the Theft Vehicle Report (refer to Section B.1 below) of alarm/report details (date reported, reported to, alarm number, etc.) within one (1) work day of receipt of information from the reporting police agency so that the Theft Vehicle Report can be completed and distributed timely (refer to Section F).

a.   North America (only) - Send all relevant theft information/documentation to OKC Vehicle Control at OKCtheftandrecovery@hertz.com.

9.   Police Refusal to File Report - If for any reason the police are unwilling to file a report of theft/conversion/disappearance, indicate this fact on the Theft Vehicle Report, in the police file or alarm/report number section. Immediately contact the Corporate/Country Security Manager responsible for the location where the vehicle was rented or missing, who will work with the Corporate Legal Department to resolve issues.

10.   Thefts from Customers - All thefts and disappearances of vehicles from a customer while on rent must be reported to the police authorities by the customer (refer to Section C).

11.   Updating Systems for Vehicle Hot Status - Once alarm/complaint information on reported thefts, conversions or disappearances has been received, the OKC Vehicle Control Department (North America), Owning Country Car Control Manager (Europe), National Fleet Accounting Manager (Australia) will enter all initial alarm information and change the vehicle status to "H" (Hot) in the CARRENT Theft and Conversion system (Brazil and New Zealand must be updated in VISION) and also their applicable counter system (i.e., ASAP/"G" (Theft), "H" (Stolen) or "W" (True Conversion) in CARS+, etc.).

Note:   In Canada, refer to System Information & Training Bulletin #5835, Car Control Hold Codes in CARS+.

12.   Preventing Rentals of Hot/Stolen Vehicles - Every attempt must be made to prevent Hot/Stolen vehicles from being rented or incurring non-revenue moves.

Case ID: 200501362

a. Once the vehicle "Hot" status is entered in the applicable rental counter system (ASAP, HLES, TAS, CARS+, HTZRENT), this will assist in systematically preventing the rental of a stolen vehicle until alarm cancellations are processed.

b. When counter systems are inoperable or do not automatically prevent the rental of vehicles in a Hot Status a manual status check must be performed, by either physically checking the status codes in CARRENT (at the time of rent) or by checking the CARRENT "Hot," "Legal" and "Safety" hold list provided by the responsible Region/Pool/Car Control Manager. Listings must be updated and issued by Car Control Management, (at a minimum) weekly.

c. For Non-automated locations, a manual "user created" equivalent OLQ report or manually created report using active theft file data (for non CARRENT Countries of Brazil and New Zealand) must be distributed by the responsible management to ensure these locations are not renting vehicles reported stolen.

d. CARRENT Countries - Utilize the CARRENT "Daily Police Report" (North America - report ID FSCC0011, Europe - report ID FSCC0045, and Australia - report ID FSCC0070) to identify vehicles in hot status which are now being re-rented. Refer to W7-03 RAC, Recovery of Converted or Stolen Vehicles, for further details.

13. <u>Internal Audit Reporting</u> - If the theft/conversion/disappearance involves loss of rental vehicles as the result of a theft ring, conspiracy or other concerted criminal activity, a copy of the completed Theft Vehicle Report must be forwarded to the Senior Vice President, Audit and Chief Risk Officer who must further distribute to the following officers of The Hertz Corporation:

- Chairman and Chief Executive Officer
- Group President responsible for the affected Division
- Senior Executive Vice President and Chief Financial Officer
- Executive Vice President, General Counsel and Secretary
- Senior Vice President and Chief Accounting Officer

14. <u>Write-Off of Stolen Vehicles</u> - When a vehicle remains "converted" or "stolen" for a period of one (1) year (six (6) months in Brazil) from the "date converted/stolen" (as noted on the monthly VISION RAC Aging of Conversion Report, available from RDS, or similar report (i.e., Report ID VCAP0027 in North America)) it must be written-off.

| Country | Responsible for Performing Write-Off |
|---|---|
| North America (includes US, Canada, Puerto Rico and St. Thomas) and Brazil | Vehicle Control Department, OKC |
| EMEA and Asia Pacific | International Fleet Accounting, OKC |

15. <u>Confirming Theft Details in VISION</u> - If the initial Theft or Conversion is not processed in VISION by OKC Fleet Accounting (North America), International Fleet Accounting (Europe and Australia) or Head Office (Brazil) this will appear as a

Case ID: 200501362

reconciling item on the Suspend Hold list. Refer to Procedure W6-18 Fleet Suspensions/Deletions for requirements.

16. <u>Vehicle Title Documents</u> - Vehicle titles must be handled in accordance with Procedure W1-18 RAC, Control of Vehicle Titles, and for all other countries their minimum legal requirement.

17. <u>Corporate/Country Security Manager Investigations</u> - Every theft/conversion/disappearance must be promptly investigated by the Corporate/Country Security Manager responsible for the location from which the related Theft Vehicle Report is filed. All employees are required to cooperate fully with such an investigation.

18. <u>Follow-Up Correspondence</u> - All follow up correspondence pertaining to Theft Vehicle Reports must be sent to the responsible Corporate/Country Security Manager, who will distribute copies to other appropriate individuals, with a copy retained in the Vehicle Theft/Conversion file.

19. <u>Retention</u> - The following report/files included in this procedure must be retained as required by Procedure W1-06, Record Retention & Management Program:

- VISION RAC Aging of Conversion Report
- Theft Vehicle Reports and all related documentation
- Owning City/Country Theft/Conversion File - Each Owning City/Country Car Control Manager (or designee) must maintain a "Vehicle Theft/Conversion" file, containing all documents pertaining to each reported vehicle theft or conversion, including vehicles that are on active alarm or have been reported as recovered.

**B.**    <u>Distribution of Initial Theft/Conversion Report</u>

1.    The Theft/Conversion Report must be prepared and then reported to the police by the responsible management stated below:

| Type of Theft | Responsible for Preparing the Theft/Conversion Report | Responsible for Reporting to Police |
|---|---|---|
| Theft – Conversion | <u>North America</u><br>OKC Vehicle Control Department - prepares theft package and forwards to Renting City. | Renting City |
| Theft – Fraud | <u>Brazil</u><br>Car Control Department | Renting City |
| Theft from Renter (1) | <u>Europe, Australia and New Zealand</u><br>Location/Branch Manager - prepares theft package and forwards to Renting City. | Customer or Renting City |
| Theft from Hertz Premises (2) | | Last Known Hertz Location |
| (1) Requires the Customer to complete the Vehicle Theft from Customer Report (Form 702005P). Refer to Section C.<br>(2) The theft package must be forwarded to the last known Hertz location to have possession of the vehicle. | | |

Case ID: 200501362

2. The Theft/Conversion Report must be completed as follows:

- Check "Initial Report" and then identify the type of theft (as stated in table above);

- The report must be typed and all the required information (unit, description, serial, license numbers, etc.) recorded in the "Vehicle Description" section. All information must be accurate to ensure reporting police agency records and alarms the correct vehicle. Whenever possible, record vehicle information from a copy of vehicle's registration and attach a copy to the 702003P being presented to the police.

- Note:    Odometer reading - is the Vehicle's last recorded mileage before the theft occurred, if stolen from lot. If on rental, the actual "out" mileage recorded on the RA.

- Enter the information required in the "Rental Information" area. If the vehicle was not on rental when stolen, leave this section blank and indicate in "Summary of What Happened" section that the vehicle was not rented and the exact circumstances of theft (last known date, mileage, etc.).

- Enter all available information about the renter (if applicable).

- Enter all alarm information (police authority reported to, date reported, location of vehicle at time of theft, etc.). In the case of Conversions, enter the due date as the "Date & Time Stolen." If the vehicle was stolen from a renter, the "Date & Time Stolen" is generally the date the vehicle was discovered missing. If the vehicle was stolen from Hertz' premises, the "Date & Time Stolen" is the date of the last movement, unless the theft was actually witnessed. This date appears on the Depreciation Run, the VISION RAC Aging of Conversion Report and is used by OKC Fleet Accounting to determine the write-off date if the vehicle is not recovered.

- Where a conversion has occurred and the Counter Representative remembers the description of the customer, or if the theft was witnessed, enter it in "Description of Renter or Suspect" section (where applicable).

- Use summary section to document any additional facts obtained pertinent to the Theft/Conversion being reported.

- Signature of the responsible Hertz management employee completing the report, including the date.

C. Vehicle Thefts from Customers

1. Whenever a customer calls or is present at the rental counter and reports that the vehicle has been stolen from them, advise the customer that to the extent possible, they are responsible for reporting the theft to the police.

   a. Whenever a customer indicates they reported the theft to the police, obtain all required information (date reported, agency reported to, police complaint number, etc.) and contact the police to confirm the theft details.

Case ID: 200501362

    b.   If not reported, advise the customer to immediately report the incident to the police and call Hertz back with the required facts.

    c.   If the customer is unable or refuses to report the theft to the Police, the Theft Vehicle Report (702005P, available in iForms) is prepared by the individuals outlined in Section B. and forwarded to the a location in the area/jurisdiction where the customer claims the theft occurred.

Note: In U.S Cities which have access to Department of Motor Vehicle (DMV) files, management can confirm alarm status by entering the full serial number into the DMV system.

2.   Regardless of whether reported by the customer or subsequently by Hertz, document <u>all</u> details of the occurrence (date, time, location of vehicle at time of theft, etc.) on a Vehicle Theft from Customer Report (an equivalent local language translation can be used where required) and in all cases, every attempt must be made to have the customer sign the form. Whenever possible, have a Manager speak with the customer to record this information.

3.   If the customer was overdue from their original rental due date and is now reporting the vehicle has been stolen from them, contact the OKC Vehicle Control Department (North America), Car Control Department (Europe and Brazil), Fleet Accounting Manager (Australia), Insurance Manager (New Zealand). It is possible that "Locators" or "Retrieval" services were utilized to repossess the vehicle from the customer and therefore, it must not be reported stolen.

4.   Have the customer turn in or send in the keys and rental documentation to the vehicle. If it is determined that the customer left the keys in the vehicle prior to being stolen or any of the details surrounding the theft are unusual, refer to Procedure W7-42, Do Not Rent and immediately contact the responsible Corporate/Country Security Manager.

5.   The completed Vehicle Theft from Customer Report must be forwarded immediately to the Responsible Manager (i.e., Area Manager of the Renting City (North America and Brazil), Country Security Managers Delegate (Europe), National Fleet Accounting (Australia)) who must then ensure it is forwarded to those identified in Section B. in order for the Theft/Conversion Report to be prepared. Additionally:

- The OKC Vehicle Control Department (North America)/Car Control Department (Brazil) must immediately verify information with the police, upon receipt.

- Australia Locations must verify with the police <u>before</u> sending to National Fleet Accounting, once received a scanned copy must be forwarded to International Fleet Accounting, OKC to enter into VISION.

- All vehicle thefts from customers and incidents of vandalism must be reported to the First Notice of Loss (FNOL) Office (North America) or the responsible HCM/Country Claims Department (all other Countries) daily.

Case ID: 200501362

**D.**   **Closing Associated Rental Agreements**

1. The OKC Vehicle Control Department (North America), Car Control Department (Brazil), Location/Branch Manager (Europe, Australia and New Zealand) must close the RA after verifying the Theft Vehicle Report with police. Therefore, North America and Brazil rental locations must not close the RA or perform an exchange on the RA.

2. Once confirmed that the theft/conversion has been reported to the police, the responsible management (as listed above) must Close RAs in the ASAP/TAS/CARS+/HTZRENT Post Return or BCHCLOSE applications by:

   - Entering an approximate 'mileage in', estimating 70 miles/100 kilometers per day.
   - Recording the date the vehicle was reported stolen in the 'return date and time' field.
   - Ensuring the Rent and Return locations are the same.
   - Applying the 'best' or lowest rate available.
   - Providing background information (e.g., theft from renter, date reported, etc.), in the 'remarks' section.

   Note:   If determined that a charge card was used fraudulently and the true card holder did not rent, close out the RA and only bill for the amount authorized by the card company at time of rental. On cash rentals later confirmed to be fraudulent rentals (e.g., stolen passport, stolen company ID, other) the bill must be no greater than the amount of actual deposit taken, so the final net due equals zero.

**E.**   **Reconciling Open Theft/Conversion Files to CARRENT and VISION**

1. It is critical that every open Theft/Conversion Vehicle Report at each reporting City/Country be properly recorded as such, both in CARRENT (except for Brazil and New Zealand where CARRENT is not currently utilized) and in VISION.

2. To verify this, each Owning City/Country Car Control Manager, Fleet Manager (North America, Brazil and Europe)/Fleet Accounting Manager (Australia) or designated employee must perform a monthly reconciliation of all active Theft/Conversion files.

   a.   Compare all open Theft Vehicle Reports to the monthly VISION RAC Aging of Conversion Report. All open thefts/conversions must appear on this report with a Depreciation status code of "C" (Active Conversions).

   b.   All open Theft/Conversion Vehicle Reports must also appear in CARRENT with a status code of "H" (Hot). Responsible Management must either compare all files to the CARRENT Theft and Conversion By Unit Report or to a user created OLQ report that lists all "H" status vehicles.

   c.   Investigate any active Theft/Conversion files that are not appearing as such on the VISION RAC Aging of Conversion Report (or equivalent country report) or in CARRENT. Document notations of variances, related research and resolutions on reports. Contact OKC, Vehicle Control (North America) /OKC Fleet Accounting (other Countries) directly for items not appearing on the

Case ID: 200501362

VISION RAC Aging of Conversion Report.  Add any active Theft/Conversion files not appearing in CARRENT immediately.

Note:  Whenever functional, RDS Reports must be reviewed on line, annotated as required above in Document Direct and retained in RDS.

F.  Distribution of Completed Theft/Conversion Report

On completion of the Theft Vehicle Report, and after confirming theft details with the police, distribute immediately as follows:

| Copy | North America | Brazil | Europe | Australia | New Zealand |
|------|---------------|--------|--------|-----------|-------------|
| 1 | OKC Vehicle Control Department (1) | OKC Fleet Accounting (1) | OKC Fleet Accounting (1) | OKC Fleet Accounting (1) | OKC Fleet Accounting (1) |
| 2 | HCM – First Notice of Loss (FNOL) Department, Dallas | Country Insurance Department | Country HCM Department | Country Insurance Department | Country Insurance Manager |
| 3 | Owning Area Car Control Manager | Owning Country Car Control Manager | Owning Country Car Control Manager | Owning Country Car Control & State Distribution Manager | Island Car Control & Operations Manager |
| 4 | Responsible Corporate Security Manager | Responsible Corporate Security Manager | Responsible Country Security Manager | Responsible Corporate Security Manager | Responsible Corporate Security Manager |

(1) Faxed/scanned copy of Initial Theft Report only - OKC Fleet Accounting must update vehicle depreciation status in VISION.

G.  Retail Car Sales Repossession

1.  When a financial institution rejects funding of a Retail Deal, and the customer has taken possession of vehicle, store management should immediately begin search for alternative funding
    a.  Alternative funding found- resign deal
    b.  Unable to find alternative funding- notify GM by phone to discuss.  GM notifies Director of situation

2.  Store Management should attempt phone contact with customer to return vehicle
    a.  Car returned proceed to step VII
    b.  Vehicle not returned contact GM, Director and Corporate team and update situation
    c.  If a Trade is involved contact OKC, Retail Processing

3.  Corporate team forwards store Default Letter and strategy for handling going forward

4.  Store mails Default letter to customer following individual state guidelines.  Letter should be sent both regular and certified mail.

5.  If the car is returned proceed to step VII.  If not, conduct follow-up per state guidelines

6.  If car still remains out contact GM, Director and Corporate Team for decision on repossession
    a.  If Corporate Team decides on repossession they should email Sr. Director Corporate Security to initiate repossession procession
    b.  Corporate security will assign local region security manager to handle.  If no region security mgr in area security will then provide Corporate Car Sales team with a Repossession vendor to handle

Case ID: 200501362

    c.   Corporate Team emails Vehicle Control to create 723 and monitor vehicle

7.    If car is returned, inspect for damage. Decide whether or not to repair and sell vehicle

8.    OKC Retail Processing will send Notice of Sale and re-Title vehicle per state guidelines

Case ID: 200501362

**Executive Summary**

- This Worldwide procedure applies to the Rent-A-Car (RAC) Division of The Hertz Corporation and includes requirements for reporting vehicle thefts and conversions.
- All Hertz vehicle thefts and conversions must be documented on the Theft/Recovery Vehicle Report.
- All vehicle thefts from customers must also be documented on the Vehicle Theft from Customer Report.
- Location, Maintenance, Area, Country Head Office and OKC Management must ensure compliance to this procedure.

**Key Revisions**

This procedure has been reissued to advise that the specific actions required to be taken prior to reporting a vehicle missing from inventory and reporting thefts to the police, are included in Procedure W9-18, Controlling Vehicle Physical Inventories (Section A.4). In addition, a Missing Vehicle Checklist has been developed and must be completed by the specific individuals conducting research of missing vehicles, prior to reporting thefts to the police (refer to Procedure W9-18).

# Procedure



| No. | Subject | Date |
|---|---|---|
| W 7 - 0 2<br>R A C : | REPORTING VEHICLE THEFTS AND<br>CONVERSIONS | **August 21, 2009** |

**Scope:**   This Worldwide Procedure applies to the Rent-A-Car (RAC) Division of The Hertz Corporation.

**Purpose:**   To provide requirements for reporting thefts, conversions or the disappearance of Hertz vehicles.

**Index:**   A. General
B.   Distribution of Initial Theft/Conversion Report
C.   Vehicle Thefts From Customers
D.   Closing Associated Rental Agreements
E.   Reconciling Open Theft/Conversion Files to CARRENT and VISION
F.   Distribution of Completed Theft/Conversion Report

**Procedure:**

**To open a specific Section, click on the arrow.  To open all Sections, click either  Shift+ or**

Case ID: 200501362

**View/Expand All Sections on the Menu Bar**

A.  General

1.  All thefts, conversions and disappearances of Hertz vehicles must be reported to the police as soon as discovered and management must assist the police with both their investigation and the recovery of the vehicle.

    a.  Conversions - Report conversions to police no later than 60 days from the original or extended due date (considered the date and time stolen) or earlier if research indicates that the vehicle is not likely to be returned (phone numbers given are no good, mail is returned "Addressee Unknown," etc.).

    b.  Fraudulent ID, Stolen ID, Theft from Premises - Report rentals involving fraudulent or stolen credit cards or ID and vehicles reported missing from Hertz premises, to police upon detection.

2.  The Theft/Recovery Vehicle Report (Form 702003P - available in i-Forms) must be utilized to report each incident.

    a.  Vandalism - The theft, conversion or disappearance of parts from a rental vehicle while the vehicle is out on rent or in control by a person not employed by Hertz is considered vandalism and reported in accordance with Procedure W7-01, Reporting Vehicle Accidents.

    b.  Unauthorized Access - Unauthorized access to Hertz property when Hertz vehicles are stolen must be reported on a Worldwide Breach of Security Report, in accordance with Procedure W1-41, Breaches of Security.

3.—There are four (4) vehicle theft categories:

    • Theft by Conversion - refer to Procedure W1-12, Controlling Overdue Rentals

    • Theft by Fraud - refer to Procedure W1-12, Controlling Overdue Rentals

    • Theft from Hertz Premises - refer to Procedure W9-18, Controlling Vehicle Physical Inventories

    • Theft from Customer - refer to Section C of this Procedure

4.  Prior to Reporting Thefts to Police - Ensure requirements outlined in Procedures W1-12 and W9-18 were followed, prior to reporting a vehicle missing from inventory and reporting thefts to police.   In addition, a Missing Vehicle Checklist has been developed and must be completed by the specific individuals conducting research of missing vehicles, prior to reporting thefts to the police (refer to Procedure W9-18).

5.  Complaints or Warrants - In jurisdictions that require a complaint or warrant be lodged against the renter prior to alarming the car, the responsible Corporate/Country Security Manager (North America/Brazil) or an appointed designee has a maximum of ten (10) additional days from receipt of the file to complete research before reporting the

Case ID: 200501362

conversion (refer to Procedure W1-12).

6. <u>Authorizing Arrests or Prosecution</u> - No level of management will authorize an arrest or prosecution on behalf of Hertz, nor will any employee sign any criminal complaint against an individual on behalf of Hertz, without the express approval of 1) the responsible Corporate/Country Security Manager or a lawyer in the Law or Human Resources Department, Park Ridge/ Legal and Corporate Affairs Department, HEL and 2) in the case of the arrest, prosecution or filing of a criminal complaint against a current or recently terminated employee, the express approval of the Vice President, Global Labor Relations and HR Practices, Park Ridge.

   Note: The only allowable exception is for the reporting of personally witnessed vehicle thefts, where the employee who witnessed the vehicle theft may cooperate with the law enforcement authorities, if requested, but must immediately advise the responsible Area/Location Manager.

7. <u>Police Removal of Hertz Property</u> - If in connection with a theft/conversion/disappearance, the police remove any property from Hertz premises, custody or control, it is the responsibility of the Area/Location Manager (or delegate) to obtain a receipt from the police, if one is customarily given.

8. <u>Timely Notification of Theft Information</u> - Individuals that are advised of a theft must notify the Hertz personnel responsible for preparing the Theft Vehicle Report (refer to B.1) of alarm/report details (date reported, reported to, alarm number, etc.) within one (1) work day of receipt of information from the reporting agency so the Theft Vehicle Report can be completed and distributed timely (refer to Section F).

9. <u>Police Refusal to File Report</u> - If for any reason the police are unwilling to file a report of theft/conversion/disappearance, indicate this fact on the Theft Vehicle Report, in the police file or alarm/report number section. Immediately contact the Corporate/Country Security Manager responsible for the location where the vehicle was rented or missing, who will work with the Corporate Legal Department to resolve issues.

10. <u>Thefts from Customers</u> - All thefts and disappearances of vehicles from a customer while on rent must be reported to the police authorities by the customer (refer to Section C).

11. <u>Updating Systems for Vehicle Hot Status</u> - Once alarm/complaint information on reported thefts, conversions or disappearances has been received, the OKC Vehicle Control Department (North America), Owning Country Car Control Manager (Europe), National Fleet Accounting Manager (Australia) will enter all initial alarm information and change the vehicle status to "H" (Hot) in the CARRENT Theft and Conversion system (Brazil and New Zealand must be updated in VISION) and also their applicable counter system (i.e., ASAP/"G" (Theft), "H" (Stolen) or "W" (True Conversion) in CARS+, etc.).

   Note:   In Canada, refer to System Information & Training Bulletin #5835, Car Control Hold Codes in CARS+.

12. <u>Preventing Rentals of Hot/Stolen Vehicles</u> - Every attempt must be made to prevent Hot/Stolen vehicles from being rented or incurring non-revenue moves.

Case ID: 200501362

a. Once the vehicle "Hot" status is entered in the applicable rental counter system (ASAP, HLES, TAS, CARS+, HTZRENT), this will assist in systematically preventing the rental of a stolen vehicle until alarm cancellations are processed.

b. When counter systems are inoperable or do not automatically prevent the rental of vehicles in a Hot Status a manual status check must be performed, by either physically checking the status codes in CARRENT (at the time of rent) or by checking the CARRENT "Hot," "Legal" and "Safety" hold list provided by the responsible Region/Pool/Car Control Manager. Listings must be updated and issued by Car Control Management, (at a minimum) weekly.

c. For Non-automated locations, a manual "user created" equivalent OLQ report or manually created report using active theft file data (for non CARRENT Countries of Brazil and New Zealand) must be distributed by the responsible management to ensure these locations are not renting vehicles reported stolen.

d. CARRENT Countries - Utilize the CARRENT "Daily Police Report" (North America - report ID FSCC0011, Europe - report ID FSCC0045, and Australia - report ID FSCC0070) to identify vehicles in hot status which are now being re-rented. Refer to W7-03 RAC, Recovery of Converted or Stolen Vehicles, for further details.

13. <u>Internal Audit Reporting</u> - If the theft/conversion/disappearance involves loss of rental vehicles as the result of a theft ring, conspiracy or other concerted criminal activity, a copy of the completed Theft Vehicle Report must be forwarded to the Staff Vice President, Internal Audit who must further distribute to the following officers of The Hertz Corporation:

- Chairman and Chief Executive Officer

- Executive Vice President responsible for the affected Division

- Executive Vice President and Chief Financial Officer

- Senior Vice President, General Counsel and Secretary

- Senior Vice President, Finance and Corporate Controller

14. <u>Write-Off of Stolen Vehicles</u> - When a vehicle remains "converted" or "stolen" for a period of one (1) year (North America)/six (6) months (Brazil, Europe & Australia) from the "date converted/stolen" (as noted on the monthly VISION RAC Aging of Conversion Report or similar report, available from RDS (ie., North America use Report ID VCAP0027)) it must be written-off.

| Country | Responsible for Performing Write-Off |
|---|---|
| • North America (includes US, Canada, Puerto Rico and St. Thomas) | • Vehicle Control Department, OKC |
| • Brazil, Europe and Australia | • International Fleet Accounting, OKC |

Case ID: 200501362

15. Confirming Theft Details in VISION - If the initial Theft or Conversion is not processed in VISION by OKC Fleet Accounting (North America), International Fleet Accounting (Europe and Australia) or Head Office (Brazil) this will appear as a reconciling item on the Suspend Hold list.  Refer to Procedure W6-18 Fleet Suspensions/Deletions for requirements.

16. Vehicle Title Documents - Must be handled in accordance with Procedure W1-18, Control of Vehicle Titles, and for all other countries their minimum legal requirement.

17. Corporate/Country Security Manager Investigations - Every theft/conversion/disappearance must be promptly investigated by the Corporate/Country Security Manager responsible for the location from which the related Theft Vehicle Report is filed.  All employees are required to cooperate fully with such an investigation.

18. Follow-Up Correspondence - All follow up correspondence pertaining to Theft Vehicle Reports must be sent to the responsible Corporate/Country Security Manager, who will distribute copies to other appropriate individuals, with a copy retained in the Vehicle Theft/Conversion file.

19. Retention - The following report/files included in this procedure must be retained as required by Procedure W1-06, Record Retention & Management Program:

   • VISION RAC Aging of Conversion Report

   • Theft Vehicle Reports and all related documentation

   • Owning City/Country Theft/Conversion File - Each Owning City/Country Car Control Manager (or designee) must maintain a "Vehicle Theft/Conversion" file, containing all documents pertaining to each reported vehicle theft or conversion, including vehicles which are on active alarm or have been reported as recovered.

B. Distribution of Initial Theft/Conversion Report

   1. The Theft/Conversion Report must be prepared and then reported to the police by the responsible management stated below:

| Type of Theft | Responsible for Preparing the Theft/Conversion Report | Responsible for Reporting to Police |
|---|---|---|
| Theft - Conversion | North America<br>• OKC Vehicle Control Department - prepares theft package and forwards to Renting City. | Renting City |
| Theft - Fraud | Brazil | Renting City |
| Theft - from Renter (1) | • Car Control Department<br>Europe, Australia and New Zealand | Customer or Renting City |
| | • Location/Branch Manager - prepares | |

Case ID: 200501362

| Theft - from Hertz Premises (2) | <u>North America</u><br>• OKC Vehicle Control Department - prepares theft package and forwards to Renting City.<br><br><u>Brazil</u><br>    • Car Control Department<br><u>Europe, Australia and New Zealand</u><br>• Location/Branch Manager - prepares theft package and forwards to Renting City. | Last known Hertz location |
|---|---|---|

(1) Requires the Customer to complete the Vehicle Theft from Customer Report (Form 702005P)  (Refer to Section C )
(2) The theft package must be forwarded to the last known Hertz location to have possession of the vehicle

2.    The Theft/Conversion Report must be completed as follows:

- Check "Initial Report" and then identify the type of theft (as stated in table above);

- The report must be typed and all the required information (unit, description, serial, license numbers, etc.) recorded in the "Vehicle Description" section. All information must be accurate to ensure reporting police agency records and alarms the correct vehicle.  Whenever possible, record vehicle information from a copy of vehicle's registration and attach a copy to the 702003P being presented to the police.

  > Note:    Odometer reading - is the Vehicle's last recorded mileage before the theft occurred, if stolen from lot.  If on rental, the actual "out" mileage recorded on the RA.

- Enter the information required in the "Rental Information" area.  If the vehicle was not on rental when stolen, leave this section blank and  indicate in "Summary of What Happened" section that the vehicle was not rented and the exact circumstances of theft (last known date, mileage, etc.).

- Enter all available information about the renter (if applicable).

- Enter all alarm information (police authority reported to, date reported, location of vehicle at time of theft, etc.).  In the case of Conversions, enter the due date as the "Date & Time Stolen."  If the vehicle was stolen from a renter, the "Date & Time Stolen" is generally the date the vehicle was discovered missing.  If the vehicle was stolen from Hertz' premises, the "Date & Time Stolen" is the date of the last movement, unless the theft was actually witnessed.  This date appears on the Depreciation Run, the VISION RAC Aging of Conversion Report and is used by OKC Fleet Accounting to determine the write-off date if the vehicle is not recovered.

- Where a conversion has occurred and the Counter Representative remembers the description of the customer or if the theft was witnessed enter it in "Description of Renter or Suspect" section (where applicable).

- Use summary section to document any additional facts obtained pertinent to the Theft/Conversion being reported.

Case ID: 200501362

- Signature of the responsible Hertz management employee completing the report, including the date.

C. Vehicle Thefts from Customers

1. Whenever a customer calls or is present at the rental counter and reports that the vehicle has been stolen from them, advise the customer that to the extent possible, they are responsible for reporting the theft to the police.

   a. Whenever a customer indicates they reported the theft to the police, obtain all required information (date reported, agency reported to, police complaint number, etc) and contact the police to confirm the theft details.

   b. If not reported, advise the customer to immediately report the incident to the police and call Hertz back with the required facts.

   c. If the customer is unable or refuses to report the theft to the Police, the Theft Vehicle Report (702005P, available in iForms) is prepared by the individuals outlined in Section B. and forwarded to the a location in the area/jurisdiction where the customer claims the theft occurred.

   Note:    In U.S Cities which have access to Department of Motor Vehicle (DMV) files, management can confirm alarm status by entering the full serial number into the DMV system.

2. Regardless of whether reported by the customer or subsequently by Hertz, document all details of the occurrence (date, time, location of vehicle at time of theft, etc.) on a Vehicle Theft from Customer Report (an equivalent local language translation can be used where required) and in all cases, every attempt must be made to have the customer sign the form.  Whenever possible, have a Manager speak with the customer to record this information.

3. If the customer was overdue from their original rental due date and is now reporting the vehicle has been stolen from them, contact the OKC Vehicle Control Department  (North America), Car Control Department (Europe and Brazil), Fleet Accounting Manager (Australia), Insurance Manager (New Zealand).  It is possible that "Locators" or "Retrieval" services were utilized to repossess the vehicle from the customer and therefore, it must not be reported stolen.

4. Have the customer turn in or send in the keys and rental documentation to the vehicle.  If it is determined that the customer left the keys in the vehicle prior to being stolen or any of the details surrounding the theft are unusual, refer to Procedure W7-42, Do Not Rent and immediately contact the responsible Corporate/Country Security Manager.

5. The completed Vehicle Theft from Customer Report must be forwarded immediately to the Responsible Manager (ie., Area Manager of the Renting City (North America and Brazil), Country Security Managers Delegate (Europe), National Fleet Accounting (Australia)) who must then ensure it is forwarded to those identified in Section B. in order for the Theft/Conversion Report to be prepared. Additionally;

Case ID: 200501362

- The OKC Vehicle Control Department (North America)/Car Control Department (Brazil) must immediately verify information with the police, upon receipt.

- Australia Locations must verify with the police before sending to National Fleet Accounting, once received a scanned copy  must be forwarded to International Fleet Accounting, OKC to enter into VISION.

- All vehicle thefts from customers and incidents of vandalism must be reported to the First Notice of Loss (FNOL) Office (North America) or the responsible HCM/Country Claims Department (all other Countries) daily.

D.  Closing Associated Rental Agreements

1.  The OKC Vehicle Control Department (North America), Car Control Department (Brazil), Location/Branch Manager (Europe, Australia and New Zealand) must close the RA after verifying the Theft Vehicle Report with police.  Therefore, North America and Brazil rental locations must not close the RA or perform an exchange on the RA.

2.  Once confirmed the theft/conversion has been reported to the police, the responsible management (as listed above) must Close RAs in the ASAP/TAS/CARS+/HTZRENT Post Return or BCHCLOSE applications by:

- Entering an approximate 'mileage in', estimating 70 miles/100 kilometers per day.

- Recording the date the vehicle was reported stolen in the 'return date and time' field.

- Ensuring the Rent and Return locations are the same.

- Applying the 'best' or lowest rate available.

- Providing  background information (e.g, theft from renter, date reported, etc), in the 'remarks' section.

Note:    If determined that a charge card was used fraudulently and the true card holder did not rent, close out the RA and only bill for the amount authorized by the card company at time of rental. On cash rentals later confirmed to be fraudulent rentals (e.g., stolen passport, stolen company ID, other) the bill must be no greater than the amount of actual deposit taken, so the final net due equals zero.

E.  Reconciling Open Theft/Conversion Files to CARRENT and VISION

1.  It is critical that every open Theft/Conversion Vehicle Report at each reporting City/Country be properly recorded as such, both in CARRENT (except for Brazil and New Zealand where CARRENT is not currently utilized) and in VISION.

2.  To verify this, each Owning City/Country Car Control Manager, Fleet Manager (North America, Brazil and Europe)/Fleet Accounting Manager (Australia) or designated employee must perform a monthly reconciliation of all active Theft/Conversion files.

a.  Compare all open Theft Vehicle Reports to the monthly VISION RAC Aging of Conversion Report.  All open thefts/conversions must appear on this report with a

Case ID: 200501362

Depreciation status code of "C" (Active Conversions).

b.  All open Theft/Conversion Vehicle Reports must also appear in CARRENT with a status code of "H" (Hot). Responsible Management must either compare all files to the CARRENT Theft and Conversion By Unit Report or to a user created OLQ report that lists all "H" status vehicles.

c.  Investigate any active Theft/Conversion files that are not appearing as such on the VISION RAC Aging of Conversion Report (or equivalent country report) or in CARRENT. Document notations of variances, related research and resolutions on reports. Contact OKC, Vehicle Control (North America) /OKC Fleet Accounting (other Countries) directly for items not appearing on the VISION RAC Aging of Conversion Report. Add any active Theft/Conversion files not appearing in CARRENT immediately.

Note:  Whenever functional, RDS Reports must be reviewed on line, annotated as required above in Document Direct and retained in RDS.

F.  Distribution of Completed Theft/Conversion Report

On completion of the Theft Vehicle Report, and after confirming theft details with the police, distribute immediately as follows:

| Copy | North America | Brazil | Europe | Australia | New Zealand |
|---|---|---|---|---|---|
| 1 | OKC Vehicle Control Department (1) | OKC Fleet Accounting (1) | OKC Fleet Accounting (1) | OKC Fleet Accounting (1) | OKC Fleet Accounting (1) |
| 2 | HCM - First Notice of Loss (FNOL) Department, Dallas | Country Insurance Department | Country HCM Department | Country Insurance Department | Country Insurance Manager |
| 3 | Owning Area Car Control Manager | Owning Country Car Control Manager | Owning Country Car Control Manager | Owning Country Car Control & State Distribution Manager | Island Car Control & Operations Manager |
| 4 | Responsible Corporate Security Manager | Responsible Corporate Security Manager | Responsible Country Security Manager | Responsible Corporate Security Manager | Responsible Corporate Security Manager |

(1) Faxed/scanned copy of Initial Theft Report only - OKC Fleet Accounting must update vehicle depreciation status in VISION.

Case ID: 200501362

# EXHIBIT 2

Case ID: 200501362

RICHARD LIVINGSTON

Page 1

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA

- - -

| | | |
|---|---|---|
| KELLY A. GRADY, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | NOVEMBER TERM, 2015 |
| | : | |
| vs. | : | |
| | : | NO. 151103380 |
| | : | |
| THE HERTZ CORPORATION; HERTZ | : | |
| RENT-A-CAR PHILADELPHIA INTL. | : | |
| AIRPORT; JOHN DOE(s), | : | |
| | : | |
| Defendant. | | |

- - -

Oral sworn testimony of RICHARD

LIVINGSTON, held at ZANARAS REPORTING & VIDEO, 1845

Walnut Street, Suite 938, Philadelphia, Pennsylvania,

taken on Tuesday, October 4, 2016, commencing at 10:08

a.m., before Lynda DiGrazio-Smith, a NJ Certified

Court Reporter (Lic. #30XI002212), Certified Livenote

Reporter, Licensed CaseViewNet Realtime Provider and

Notary Public for the State of New Jersey.


ZANARAS REPORTING & VIDEO

Registered Professional Reporters

1845 Walnut Street, Suite 9382112 Bay Avenue

Philadelphia, PA 19103        Ocean City, NJ 08226

215.790.7857                  877.GO.DEPOS

Case ID: 200501362

RICHARD LIVINGSTON

Page 53

1          THE WITNESS:  Yeah.  I can't tell

2    you.  I just don't know.

3    BY MR. MALOFIY:

4          Q.   So you recall you being the person

5    required to go to court from May 2010, until a

6    certain point.  Then it was Mr. Graeber; right?

7          A.   Yes.  Right.

8          Q.   And then it was a Mr. Lomis?

9          A.   Yes.

10          Q.   Or was there someone else?

11          A.   No.  Mr. Lomis.

12          Q.   Okay.  What's Mr. Lomis's title?

13          A.   Assistant corporate security manager.

14          Q.   How long has he been at Hertz?

15          A.   Since February of 2016.

16          Q.   Okay.  Mr. Graeber is still with Hertz?

17          A.   No.

18          Q.   Or no?

19          A.   He's not.

20          Q.   When did he stop -- did he no longer --

21    was he no longer employed at Hertz after

22    February 2016?

23          A.   No.  He was not.  He left somewhere in

24    the summer.  I am going to say July of 2015.  Again,

Case ID: 200501362

RICHARD LIVINGSTON

Page 54

1    that's an approximate.

2              Q.    I understand.  Why did he leave?

3              A.    He got laid off.

4              Q.    Okay.  Do you understand the

5    circumstances regarding his being laid off?

6              A.    My understanding was, it was just a

7    corporate decision to lay off a large group of

8    people at that time for cost savings.

9              Q.    Okay.  What was his role?

10             A.    Assistant corporate security manager.

11             Q.    So they laid him off and they hired on

12   another corporate security manager roughly six

13   months later?

14             A.    Yes.

15             Q.    What was the reason for that?

16             A.    They found out that they made a mistake

17   in laying him off.

18             Q.    Did they ask for him to come back?

19             A.    They did.

20             Q.    And what was his response?

21             A.    He's already obtained other employment.

22             Q.    Do you know where he's now employed?

23             A.    With the federal government, but I don't

24   know exactly what the job is.

Case ID: 200501362

RICHARD LIVINGSTON

Page 108

1          A.   I'd be at the airport.

2          Q.   So which police officers would you give

3     it to?

4          A.   Whoever arrived to take the report.

5          Q.   How would they know to pick up a report?

6          A.   I'd call them on the phone.

7          Q.   So first, you would receive this theft

8     package from Oklahoma City?

9          A.   Right.

10          Q.   You wouldn't review the theft package.

11     Correct?

12          A.   I'd look at it to make sure that

13     everything is in order.

14          Q.   What does that mean?  All the pieces of

15     the sandwich are there?

16          A.   The dates are right and everything

17     was -- there's numerous copies of the same

18     information.  Make sure everything is correct on it.

19          Q.   How would you determine if it's correct,

20     if you didn't have the factual knowledge relating to

21     it?

22          A.   Well, I can look at all the pages on

23     that and make sure that they have it throughout the

24     report is the same.

Case ID: 200501362

RICHARD LIVINGSTON

Page 109

1        Q.   You would look through the report for
2    basic typos.  Is that right?
3        A.   In most cases, yes.
4        Q.   Would you do any other determination,
5    other than looking for typos within the theft
6    package itself?
7        A.   No.
8        Q.   Would you check any Hertz systems?
9        A.   No.
10       Q.   Okay.  So your investigation or your
11   review of the theft package was solely strictly the
12   pages contained within the theft package itself?
13       A.   That's correct.
14       Q.   So then once you received it, how would
15   you receive it?  E-mail?  Fax?
16       A.   At one time it was faxed, now it's
17   e-mailed.
18       Q.   Okay.  How many of these things do you
19   receive a day?
20           MR. WOLF:  At what point?
21   BY MR. MALOFIY:
22       Q.   At any point.  Does it change?
23       A.   I don't receive any anymore.
24       Q.   Why not?

Case ID: 200501362

RICHARD LIVINGSTON

Page 115

1    was the car stolen, yes.

2            Q.    Okay.  Would they ask you questions or

3    do the interview at that point?

4            A.    No.  They would not interview me.

5            Q.    What's the form?  7548?

6            A.    I'm sorry?

7            Q.    Are you familiar with the 75 --

8            A.    I'm not -- yeah, the 48 is what

9    Philadelphia uses.

10            Q.    Yes.

11            A.    Yes.

12            Q.    You're familiar with that form?

13            A.    Yes.

14            Q.    Do you recall being interviewed by the

15    police, when you turned in the theft package?

16            A.    No.

17            Q.    No.  When you put in the theft package,

18    what were the checks done to confirm the information

19    was correct?  When I say, What were the checks done,

20    I mean what, as the corporate security manager, did

21    you do to confirm that the information was true,

22    accurate and correct, if anything?

23            A.    I went through the form to make sure

24    that everything was in order.

Case ID: 200501362

RICHARD LIVINGSTON

Page 116

1          Q.    When you say, Everything was --

2          A.    Well, for example, for the State, you

3     need like a certified mailing, make sure that the

4     mailing was included in the theft report.

5          Q.    Besides, I mean, from my testimony, it

6     sounds like you didn't do anything as far as checks

7     and balances, to confirm the information was

8     correct, other than making sure the pieces in the

9     theft package were there?

10         A.    Right.

11         Q.    And then, also, checking for typos.  Is

12    that accurate?

13                MR. WOLF:  Well, I'll just object to

14    his testimony speaks for itself.  And it's not

15    counsel's characterization of the testimony.

16                MR. MALOFIY:  Well, there's no

17    characterization there.  It was crystal clear.

18                MR. WOLF:  The record will speak for

19    itself.

20                MR. MALOFIY:  Right.  And I can ask a

21    question and build it with foundation with prior

22    facts for prior things he's testified to.

23    BY MR. MALOFIY:

24         Q.    Now, my understanding, sir, is that when

Case ID: 200501362

RICHARD LIVINGSTON

Page 117

1    you received this theft package, your testimony is

2    that you didn't do any independent investigation,

3    other than looking at the package itself and then

4    you would check to see if there were typos --

5              A.    Right.  My company would --

6              Q.    -- and make sure -- hold on a second.

7              A.    I'm sorry.

8              Q.    And make sure that the different parts

9    that were supposed to comprise the theft package

10   were there.  Correct?

11             A.    Yes.

12             Q.    Okay.  What parts are supposed to

13   comprise the theft package?

14             A.    Well, what the police actually require,

15   which is a certified mailing.

16             Q.    Okay.  What else?

17             A.    Car information.

18             Q.    What else?

19             A.    That's probably just about it.

20             Q.    Okay.

21             A.    They might require more in court, but...

22             Q.    Now, it says here, Submitted DNR 14 A,

23   do you know what that means, on this Exhibit 32,

24   page 3?

Case ID: 200501362

RICHARD LIVINGSTON

Page 137

1          Q.   You'd agree with me that -- oh, you

2     don't even know if 1805 was charged on Ms. Grady's

3     card.  Correct?

4          A.   I'm sorry?

5          Q.   I am going back to page 4 of 16 of

6     Exhibit 32.  You don't even know if 1805 was charged

7     on the card, correct, on Ms. Grady's card?

8          A.   No.  I do not.

9          Q.   But it says it here.  Correct?

10          A.   Okay.

11          Q.   I'm reading that correctly; right?

12     Credit card authorization would be 1805?

13          A.   That's the estimated charge, yes.

14          Q.   Okay.

15          A.   I don't know if that was charged to the

16     card or not.

17          Q.   Now, you did no investigation to

18     determine whether or not it was charged to the card?

19          A.   Absolutely not.

20          Q.   Okay.  Let's go to page 7 of 16.

21               Before I do that -- strike that.

22               Am I correct that page 4, 5 and 6 are

23     part of the Hertz contract?

24          A.   Yes.

Case ID: 200501362

RICHARD LIVINGSTON

Page 195

1    A.    No.  No.  You have mechanics.  You have

2    mechanic bays.  You have probably ten mechanic bays

3    in the back of the building.  Maintenance, but I

4    don't deal with them.  Most of the people there are

5    on a regional basis.

6    Q.    Okay.  Besides you in, you know,

7    corporate security and besides Mr. Lomis,

8    Mr. Graeber, Mr. -- who you already identified

9    yourself, is there anyone else that's involved in

10   corporate security or vehicle location tracking?

11   A.    For the Philadelphia area?

12   Q.    Yeah.

13   A.    No.

14   Q.    And that would be at all relevant times

15   that we're talking about.  Correct?

16   A.    Yes.

17   Q.    Is it your testimony that you don't go

18   to the location and question any of the Hertz

19   employees when you receive a theft package?

20   A.    That's my testimony, yes.

21   Q.    Why?

22   A.    Because I mean the package has been

23   completed, all the reports have been reviewed, I

24   guess, by OKC.  And my marching orders are to report

Case ID: 200501362

RICHARD LIVINGSTON

Page 196

1   the car stolen when I get the -- again, I do look at

2   it for everything being accurate, as far as I can

3   tell, within the report itself.

4           Q.    Yeah.   But you don't do any independent

5   investigation?

6           A.    I do not.

7           Q.    You don't do any check?

8           A.    I do not.

9           Q.    How far away is your office from the

10  Philadelphia Hertz office?

11          A.    From the airport?

12          Q.    Yeah.   Philadelphia Airport Hertz

13  office?

14          A.    Half a mile, three-quarters of a mile.

15          Q.    So how long would it take you to get

16  there by car?

17          A.    Five minutes.

18          Q.    Okay.   Is it your testimony that when

19  you receive a theft package that deals with the

20  Philadelphia Hertz Airport location, you wouldn't go

21  and speak to individuals there regarding the theft

22  package?

23              MR. WOLF:   Asked and answered, but

24  you can answer.

Case ID: 200501362

RICHARD LIVINGSTON

Page 197

1          THE WITNESS:  In reference to?

2     BY MR. MALOFIY:

3          Q.   Receiving a theft package and doing any

4     kind of inquiry, you wouldn't do that normally?

5          MR. WOLF:  Asked and answered, but

6     you can answer.

7          THE WITNESS:  A conversion has

8     nothing to do with the people that wrote the

9     contract or anything like that.  No, I would not.

10    BY MR. MALOFIY:

11         Q.   Would you have to speak to the rental

12    representative who was?

13         A.   I don't know who -- what are you talking

14    about as far as a rental representative.

15         Q.   The person who rented the car to the

16    renter.

17         A.   All right.

18         Q.   Did you ever speak to them in regards to

19    a theft or a conversion or a stolen vehicle?

20         A.   Possibly if there was fraudulent

21    paperwork submitted to them, I might.

22         Q.   But it wouldn't be your practice to do

23    that.  Correct?  To enter --

24         A.   Not in the normal course of business

Case ID: 200501362

RICHARD LIVINGSTON

Page 205

1          A.    I have never been deposed for Hertz.

2          Q.    Okay.  Are you aware of any lawsuits

3     against Hertz for improperly reporting a car stolen

4     when it was not?

5          A.    I am not.

6          Q.    Okay.  Have you ever complained that the

7     Hertz computer systems are not -- strike that.

8               Do you have access to phone logs to

9     determine when a renter called in?

10         A.    I do not.

11         Q.    Do you have access to any kind of logs

12    that determine the contacts the renter had with

13    Hertz?

14         A.    Do not.

15               MR. MALOFIY:  I want to take a half

16    hour break for lunch and finish up?

17               MR. WOLF:  Do you need a break?

18               THE WITNESS:  I need to go.

19               MR. WOLF:  Let's finish.

20               MR. MALOFIY:  We're going to be a few

21    hours.

22               MR. WOLF:  A few more hours?

23               MR. MALOFIY:  Absolutely.  Yeah.  I

24    got a lot of documents to go through.  If you want a

Case ID: 200501362

RICHARD LIVINGSTON

Page 215

1    changes between the contract and that sheet.  What

2    exactly transpired to make that happen, I don't

3    know.

4         Q.    Okay.  At any point would -- as a

5    corporate security manager or anyone in your

6    division of one other person, I mean -- I don't mean

7    to make that --

8         A.    It is all right.

9         Q.    -- let me strike that.

10              As a corporate security manager for

11   Hertz for this area or anyone working with you or

12   for you, would they have done any independent

13   investigation in to what payments are made with the

14   car before filing a police report?

15        A.    Not on my side of the fence.  On OKC's

16   side possibly.

17        Q.    Okay.

18        A.    We're still the same company.  I just

19   don't know what they do, possibly do to investigate

20   that further.

21        Q.    That's one of the questions I had.  Who

22   does this investigation if you don't, the corporate

23   security manager?

24        A.    As far as I know, vehicle control does

Case ID: 200501362

RICHARD LIVINGSTON

Page 216

1    all that paperwork.

2         Q.   Well, you said paperwork --

3         A.   Well --

4         Q.   -- what do you mean by that?

5         A.   Whatever they do to glean the

6    information that they put down in the theft package.

7         Q.   Do you know how that process is done?

8         A.   I do not.

9         Q.   If you don't know, who would know?

10        A.   Vehicle control would know.

11        Q.   Do you know if someone is testifying

12   from vehicle control?

13        A.   I do not know.

14        Q.   Did anyone from vehicle control talk to

15   you in regards to this case?

16        A.   No.

17        Q.   Did anyone from Hertz internally talk to

18   you in regards to this case?

19        A.   No.

20        Q.   Do you know anyone in vehicle control or

21   investigation that does the investigations for

22   vehicle control?

23        A.   All vehicle control does different tasks

24   within it but I don't know who does what.

Case ID: 200501362

RICHARD LIVINGSTON

Page 374

1    recovered the vehicle?

2            A.   They know it.  They had to take it out

3    of the system.

4            Q.   Did you ever tell police that Ms. Grady

5    was -- were you aware that Ms. Grady was released?

6            A.   I didn't even know she was arrested.

7            Q.   So you didn't know she was detained?

8            A.   Correct.

9            Q.   What procedure was in place to notify

10   the police that Ms. Grady had made a payment of

11   $2,000?

12           A.   It has no bearing on the case

13   whatsoever.

14           Q.   I didn't ask --

15           A.   There's no procedure.

16           Q.   I didn't ask you --

17           A.   There's no procedure --

18           Q.   -- whether or not it's your judgment --

19               MR. WOLF:  He's answering the

20   question.

21               THE WITNESS:  -- in place.

22   BY MR. MALOFIY:

23           Q.   Let me ask it again so we have a clean

24   answer.  What procedure was in place at Hertz to

Case ID: 200501362

RICHARD LIVINGSTON

Page 375

1    inform the police that Hertz had made a charge that

2    went through on her bank for $2,500 days before the

3    report of the car stolen, which was not included in

4    the theft package or any information previously

5    provide to the police?

6              A.    There is no procedure in place because

7    it's not relevant.

8              Q.    So it's Hertz's position that payment

9    for a vehicle, pursuant to an agreement with Hertz,

10   is not relevant to prosecuting a young lady for a

11   theft of a vehicle?

12             A.    Hertz is only trying to recover even a

13   fraction of their loss from them not having the car

14   back when it was contracted to be back.

15             Q.    Isn't it true that she had an agreement

16   to the end of July and she paid the $2,500 pursuant

17   to that agreement?

18             A.    As far as the paperwork I see, no.

19             Q.    Why was the $2,500 paid to Hertz by Ms.

20   Grady on the same credit card and on the same rental

21   contract?

22                   MR. WOLF:  Same objection.  That's

23   been noted throughout the course of today.  He's

24   already testified he has nothing to do with billing.

Case ID: 200501362

RICHARD LIVINGSTON

Page 376

1    He doesn't know it.  Joe Jaussi is the proper

2    individual to be answering that question.

3                    It's outside this witness' area of

4    expertise.

5    BY MR. MALOFIY:

6         Q.   I'm asking the context of corporate

7    security and also notifying the correct law

8    enforcement of changes to the facts and the scenario

9    relating to a criminal complaint filed on behalf of

10   Hertz against a renter.  That's the context the

11   question is being asked.

12        A.   Money paid prior to the car being stolen

13   is strictly a contractual thing prior to.  After

14   it's reported stolen, it becomes restitution.

15        Q.   Where in any of the documents do you see

16   the updated information that Hertz had received a

17   payment of $2,500?

18        A.   I haven't seen it in any of the

19   documents there.  That's because it is not relevent.

20                MR. WOLF:  Relevant.

21                MR. MALOFIY:  I understand.

22                THE WITNESS:  Thank you.

23   BY MR. MALOFIY:

24        Q.   Where in the documentation do you see

Case ID: 200501362

RICHARD LIVINGSTON

Page 377

1       anywhere where Ms. Grady kept in constant contact
2       with Hertz?
3              A.   I don't.
4              Q.   Okay.  And what investigation did you
5       do, if any, to determine whether or not she was in
6       constant contact with Hertz during the course of the
7       rental?
8              A.   I personally didn't.  I imagine the OKC
9       did, but I can't...
10             Q.   You don't know that information.
11      Correct, sir?
12             A.   That's correct.
13             Q.   All right.  And you don't know what OKC
14      did; right?
15             A.   I don't know what exact steps they took,
16      no.
17             Q.   Right.  And as you came here today and
18      also the discovery you produced, you didn't produce
19      the actual procedure to follow in regards to the
20      theft.  Correct?
21             A.   That was my mistake, I apologize.
22                  MR. WOLF:  We have already been over
23      this.
24                  MR. MALOFIY:  And you will supplement

Case ID: 200501362

# EXHIBIT 3

Case ID: 200501362

JOSEPH MICHAEL JAUSSI

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

FIRST JUDICIAL DISTRICT OF PENNSYLVANIA

- - -

| | |
|---|---|
| KELLY A. GRADY, | : |
| | : CIVIL ACTION |
| | : NOVEMBER TERM, 2015 |
| Plaintiff, | : |
| | : NO. 151103380 |
| vs. | : |
| | : |
| THE HERTZ CORPORATION; HERTZ | : |
| RENT-A-CAR PHILADELPHIA INTL. | : |
| AIRPORT; JOHN DOE(s), | : |
| | : |
| Defendants. | : |


- - -

October 16, 2016

- - -

Oral deposition of JOSEPH MICHAEL JAUSSI, taken pursuant to notice, held at 1845 Walnut Street, Suite 938, Philadelphia, Pennsylvania, commencing at 11:56 a.m., on the above date, before Jennifer P. Miller, RPR, CCR, CRR, and Notary Public for the Commonwealth of Pennsylvania, State of Delaware and the State of New Jersey.

Case ID: 200501362

JOSEPH MICHAEL JAUSSI

Page 69

1  theft package and all the overdue notes

2  associated with the transaction.

3      Q.   Do you know the name of the

4  individuals who were involved with putting

5  together the theft package regarding Ms. Kelly

6  Grady?

7      A.   Say -- state the question again.

8      Q.   Name the individuals who are involved

9  in putting together the theft package relating

10  to Ms. Kelly Grady?

11      A.   It's my understanding that Rich

12  Livingston was on vacation at the time.  Ken

13  Graeber put the package together after he

14  received all the pertaining information within

15  the package for Oklahoma City.

16      Q.   We deposed Mr. Rich Livingston

17  Tuesday.  He indicated that he doesn't put the

18  package together.  He just gets it from

19  Oklahoma City and then basically just couriers

20  it to the police.

21              Is it your understanding that

22  the corporate security manager or assistant

23  corporate security manager actually puts the

24  theft package together?  Or is it your

Case ID: 200501362

JOSEPH MICHAEL JAUSSI

Page 70

1    understanding that the theft package is put

2    together in Oklahoma City and then sent to the

3    corporate security manager at the location

4    where the car was allegedly taken from?

5              MR. WOLF:  I'm going to object

6         to the characterization.  His testimony

7         will speak for itself.

8              You can answer.

9              THE WITNESS:  So it's my

10        understanding that Oklahoma City generates

11        the packet and all the pertaining

12        documents within it, feeds Ken Graeber or

13        Rich Livingston, right, and Ken Graeber or

14        Rich Livingston essentially print, file,

15        and go seek a police report claim or case

16        number.

17   BY MR. MALIFOY:

18        Q.   Okay.  So the theft package is

19   already completed in Oklahoma City before it's

20   sent to the corporate security manager at the

21   Hertz location where the car was allegedly

22   taken from, correct?

23        A.   That's my understanding, correct.

24        Q.   So who specifically by name do you

Case ID: 200501362

# EXHIBIT 4

Case ID: 200501362

1

```
 1              IN THE COURT OF COMMON PLEAS
         FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
 2                 CIVIL TRIAL DIVISION
                      - - -
 3
   KELLY GRADY,                    : NOVEMBER TERM, 2015
 4              Plaintiff         :
        vs.                       :
 5                               :
   THE HERTZ CORPORATION;        :
 6   HERTZ RENT-A-CAR PHILADELPHIA :
   INTL AIRPORT,                  :
 7              Defendants        : NO. 3380

 8                      - - -

 9              Thursday, September 14, 2017
                 Afternoon Session
10
                      - - -
11
                 Courtroom 475
12                 City Hall
             Philadelphia, Pennsylvania
13
                      - - -
14
   BEFORE:  THE HONORABLE PAULA A. PATRICK, J., and a
15         Jury

16                      - - -

17

18

19

20

21

22

23

24

25
```

*Danielle O'Connor, RPR, CRR 215-683-8023*

Case ID: 151103380
Control No.: 17093136

2

1   APPEARANCES:

2       FRANCIS ALEXANDER, LLC
        BY:  FRANCIS MALOFY, ESQUIRE
3             ALFRED JOSEPH FLUEHR, ESQUIRE
        280 N. Providence Road
4       Media, PA  19063
        Counsel for Plaintiff

5

6       EDELSTEIN LAW, LLP
        BY:  JAY L. EDELSTEIN, ESQUIRE
7             CHRISTOPHER LEEDS, ESQUIRE
        230 S. Broad Street, Suite 900
8       Philadelphia, PA  19102
        Counsel for the Defendants

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

*Danielle O'Connor, RPR, CRR 215-683-8023*

---

3

1              **INDEX**

2

   **WITNESS**           **DR   CR   RDR   RCR**
3
   Julie Wilkerson       --    4    55    56
4
   John Cocklin          57   64    --    --
5  (Voir Dire)

6  John Cocklin          68   97    --    --

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

*Danielle O'Connor, RPR, CRR 215-683-8023*

---

4

1              - - -
2        (The following occurred in open court
3   outside the presence of the jury:)
4              - - -
5        THE COURT:  Is there anything we need
6   to discuss before the jury comes in?
7        MR. MALOFY:  No, Your Honor.
8        THE COURT:  Are you sure?
9        MR. MALOFY:  Yes, Your Honor.
10             - - -
11       (Whereupon, the jury entered the
12   courtroom at 1:22 p.m.)
13             - - -
14       THE COURT:  Welcome back, ladies and
15   gentlemen.  We'll proceed now with the
16   cross-examination of the Hertz representative.
17       MR. MALOFY:  Thank you.
18   May I proceed, Your Honor?
19       THE COURT: Yes, go ahead.
20       MR. MALOFY:  Thank you.
21             - - -
22       CROSS-EXAMINATION
23             - - -
24   BY MR. MALOFY:
25   Q.    A few questions.  And thank you for being

*Danielle O'Connor, RPR, CRR 215-683-8023*

---

5

1   here.  I know you were here the whole time.
2        My understanding is you flew in from
3   Florida.  Are you from Oklahoma or Florida?  I'm
4   confused.
5   A.    **I'm from Oklahoma.  I do work down in Florida.**
6   Q.    Okay.  I see.  A few things.
7        You would agree as the corporate
8   designee here on behalf of the Hertz Corporation
9   that prior to a report to the police -- and if a
10  report is made, you would agree with me that it must
11  be true?
12  A.    **Correct, yes.**
13  Q.    And you'd agree with me that it must be
14  accurate?
15  A.    **Yes.**
16  Q.    And you'd agree with me that it also must be
17  correct?
18  A.    **Yes.**
19  Q.    And would you also agree with me that if
20  there's omissions in the facts, that there's a duty
21  that Hertz corrects those omissions?
22  A.    **Yes.**
23  Q.    Did Hertz do that in this case?
24       MR. EDELSTEIN:  Objection, Your Honor.
25       THE COURT:  Overruled.  She can

*Danielle O'Connor, RPR, CRR 215-683-8023*

Control No.: 17093136

**6**

1   answer.
2        THE WITNESS:  I'm not sure what
3   omissions you're talking about.
4   BY MR. MALOFIY:
5   Q.   Do you believe there were any omissions in the
6   information provided to the police, yes or no?
7   A.   At what time?
8   Q.   At any time.
9   A.   We gave them what we had at -- what
10  information we had.  We handed the theft report off
11  to the police, the information that we had, and then
12  that was given to the police.  And what they did
13  from there is up to them.
14  Q.   Do you believe if there's -- I think you
15  testified if there's omitted facts, they should be
16  corrected, correct?
17  A.   Yes.
18  Q.   Eventually did Hertz become aware of
19  additional facts in regards to Ms. Grady's rental
20  that should have been provided to the police?
21  A.   Which facts?
22  Q.   Well, the payment of 2400.
23  A.   That was actually in the theft package.  The
24  police had that information.
25  Q.   The police had that information?
             *Danielle O'Connor, RPR, CRR 215-683-8023*

**7**

1   A.   Yes, it's in the billing page of the theft
2   package.
3   Q.   What page is that, ma'am?
4   A.   We went over it this morning.
5        MR. MALOFIY:  Court's indulgence.
6        (Pause.)
7        MR. MALOFIY:  I need the date on this.
8   BY MR. MALOFIY:
9   Q.   Ma'am, do you know when this was completed,
10  this document that you had reviewed with counsel?
11  A.   It's on there.
12  Q.   Okay.
13  A.   July the 12th, 2013.  It says, "process date."
14       MR. EDELSTEIN:  You're writing on my
15  document.
16       MR. MALOFIY:  I don't mean to do that.
17  That's why...
18       MR. EDELSTEIN:  Okay.
19  BY MR. MALOFIY:
20  Q.   I want to go to something, ma'am.
21       This was July the 12th you said it was
22  created?
23  A.   July the 12th, 2013, I believe is when it said
24  the rental was closed.  We had to close the rental
25  out --
             *Danielle O'Connor, RPR, CRR 215-683-8023*

**8**

1   Q.   Yes.
2   A.   -- in order to report it stolen.
3   Q.   I understand.  If I could make sure?  Let me
4   confirm that, ma'am.
5        MR. MALOFIY:  Can I approach the
6   witness?
7        THE COURT:  Ginelle, can you give that
8   to the witness?
9        THE WITNESS:  So it says "date, time
10  posted, July 12th, 2013, at 12:34 p.m."
11  BY MR. MALOFIY:
12  Q.   Okay.
13  A.   We closed it back to May 31st, because that's
14  all the authorization we got at time of rent.  And
15  it says right there, "bill to auth plus 15 percent
16  Vehicle Control, Alicia Brown."
17  Q.   I see.
18       MR. MALOFIY:  Can I have that document
19  back?
20  BY MR. MALOFIY:
21  Q.   Can we put up P-6?  That document was created
22  on 7/12, correct?
23  A.   What?
24  Q.   7/12, that was your testimony, correct?
25  A.   When the rental was closed, correct.
             *Danielle O'Connor, RPR, CRR 215-683-8023*

**9**

1   Q.   And when the payment went down, I'd like to
2   blow this up for the benefit of the jury and also
3   for Ms. Wilkerson -- Mrs. Wilkerson or Ms.?
4   A.   Mrs. Wilkerson.
5   Q.   Mrs. Wilkerson, my apologies.
6        The payment was put through and Hertz
7   was paid 2445 on 7/15, correct?
8   A.   Right.  So we closed it and it went through
9   the process to force charge through the bank.
10  Q.   Isn't it a fact that the car was paid?
11  A.   No.
12  Q.   It wasn't?
13  A.   It wasn't paid in full.
14  Q.   Well, I'm sorry --
15       MR. MALOFIY:  Objection.
16       MR. EDELSTEIN:  Objection to what?
17       THE COURT:  Okay.  But you asked the
18  question, so now she answered it.
19  BY MR. MALOFIY:
20  Q.   The car -- let's be clear.  Hertz received
21  1805, correct?
22  A.   At time of rent we received 1805
23  authorization.
24  Q.   Did Hertz receive and put in their bank
25  account $1805, yes or no?
             *Danielle O'Connor, RPR, CRR 215-683-8023*

CRR 215-683-8023380
09/14/2017 08:38:32 PM
Control No.: 17093136

10

1  A.  Yes.  But then we force charged 2,444.94
2  cents, but the car wasn't actually picked up
3  until -- we didn't recover our car until September
4  11th, 2013.
5  Q.  That's a different issue, when you recovered
6  your car.  We can move to that and I will.  But
7  let's go to the payment.
8      You don't dispute that you received --
9  Hertz put in their bank account $1805, correct?
10  A.  Correct.
11  Q.  And you don't dispute that Hertz put in Hertz'
12  bank account $2,444.94, correct?
13  A.  Correct.
14  Q.  And you don't dispute that when you produce
15  this theft package and the report to the police that
16  was completed on 7/12, correct?
17  A.  Correct, but --
18  Q.  Hold on.
19  A.  But it wasn't paid in full.
20  Q.  And this payment was 7/15/2013, days later,
21  correct?
22  A.  It has to go through the process.
23  Q.  Is that correct, ma'am?
24  A.  Yes.
25  Q.  Yes, it is correct.

*Danielle O'Connor, RPR, CRR 215-683-8023*

11

1  A.  But it still wasn't paid in full.
2  Q.  I think what we're going at is because you
3  didn't receive it until September --
4      THE COURT:  Counsel, do you want to go
5  into that?  Because I made a ruling on that
6  earlier.
7      MR. MALOFIY:  Fair enough, Your Honor.
8      THE COURT:  It's up to you if you want
9  to go into it.
10  BY MR. MALOFIY:
11  Q.  Let's be clear.  OnStar, correct, was called?
12  A.  They were called, but not by Hertz.
13  Q.  When OnStar was called, did Hertz know where
14  their vehicle was?
15  A.  Not at that time.
16  Q.  Oh, Hertz --
17  A.  The police had to notify us.
18  Q.  Well, Hertz actually spoke to the police on
19  7/22, correct?
20  A.  Correct.
21  Q.  You don't dispute that Hertz representatives
22  spoke to the police in regards to Ms. Grady's
23  rental, correct?
24  A.  And told her she wasn't authorized to keep the
25  car.

*Danielle O'Connor, RPR, CRR 215-683-8023*

12

1  Q.  Hold on a second.  They also told her she did
2  not steal the car, correct?
3  A.  That's what they said.
4  Q.  Are you disputing what they said, Trooper
5  Kemmerling?
6  A.  No, no.
7  Q.  So you accept the representation from Trooper
8  Kemmerling and the state police report that said
9  Hertz had said the car was not stolen, correct?
10  A.  Correct.  But he let -- he did not let her
11  take our car and our asset.  And Trooper Kemmerling
12  also told her she could be -- Philadelphia PD might
13  go after her.
14  Q.  Well, he said "might," and there's dispute as
15  to that and that's for the jury to decide.
16  A.  Okay.
17  Q.  Let me move to something else.
18      You admit and you accept the
19  representation that Hertz said the car was not
20  stolen, correct, on that day?  On 7/22, when a Hertz
21  representative was contacted, Hertz said the car was
22  not stolen?
23  A.  Someone at Hertz said that, yes.
24  Q.  Who was that?
25  A.  I have no idea.

*Danielle O'Connor, RPR, CRR 215-683-8023*

13

1  Q.  Well, if there was a call and there was a
2  situation and someone called the number, they would
3  have called up and it would have got directed right
4  to you, right?
5  A.  That's correct, but they weren't directed
6  right to me.
7  Q.  And was it you who said the car was not stolen
8  or was it someone else?
9  A.  It was not me.
10  Q.  Well, where are the notes to indicate who said
11  that, ma'am?
12  A.  There are no notes because we don't know who
13  said that.
14  Q.  I'm sorry?
15  A.  I don't know who said that.
16  Q.  Did you ask?
17  A.  Ask who?
18  Q.  Well, ask anyone at Hertz who said that.
19  A.  No.
20  Q.  Did you do that?
21  A.  No.
22  Q.  You could have done that, right?
23  A.  I could have.
24  Q.  You could have got an e-mail, put a global
25  message out to everyone in the corporate global --

*Danielle O'Connor, RPR, CRR 215-683-8023*

Control No.: 17093136

14

1  Hertz corporate global and said, I need to know who
2  said that, that is a serious matter, I have to
3  testify in court under oath; you could have done
4  that, right?
5  A.    Well, we didn't actually have our car back at
6  that time.
7  Q.    No, no.  I'm asking before you took the stand
8  today, before you testified to this jury, you could
9  have sent an e-mail to everyone at Hertz saying, I
10  need this information, who spoke to the police
11  officers on this date and said Ms. Grady was
12  authorized, correct?
13  A.    Someone at Hertz could have said that, yes.
14  Q.    But you didn't do that as you took the stand
15  here today, correct?
16  A.    No.
17  Q.    And you don't have any notes in your system to
18  indicate -- you don't have any notes in your system
19  that records that phone call where the Hertz
20  representative said it, right?
21  A.    Well, first of all, they don't document what
22  Hertz representative they spoke to in the notes at
23  the police, nor do they say what phone call they
24  called.  So it's a little difficult for me to
25  understand who Officer Kemmerling called and who he

*Danielle O'Connor, RPR, CRR 215-683-8023*

15

1  exactly spoke to.  Usually, we would get that
2  information if they spoke to us.
3  Q.    But Trooper Kemmerling testified he spoke to
4  Hertz, he called the number, was routed to the 800,
5  gave the information on the contract and that would
6  have gone, you said, to I believe it was Oklahoma
7  City Vehicle Control, correct?
8  A.    Correct.
9  Q.    That's where it should have gone, correct?
10  A.    Where it should have gone.
11  Q.    And if it should have gone in the right place
12  and things happened the right way, they should have
13  filed procedure and that phone call should have been
14  documented in the notes, correct?
15  A.    Correct.
16  Q.    And it wasn't, correct?
17  A.    But Officer Kemmerling didn't say what phone
18  number he called.
19  Q.    And it wasn't documented in the notes,
20  correct?
21  A.    Correct.
22  Q.    Thank you.  Now, let me get to another point.
23  Ms. Grady brought her phone record in this case,
24  TD -- excuse me -- Bank record, correct?
25  A.    Yes.

*Danielle O'Connor, RPR, CRR 215-683-8023*

16

1  Q.    Are you familiar with bank statements?
2  A.    Yes.
3  Q.    You are.  Do you work with them?
4  A.    No, I don't work with them.
5  Q.    You're familiar with them?
6  A.    Yes.
7  Q.    Have you seen them before?
8  A.    Yes.
9  Q.    Now, does Hertz have a bank account?
10  A.    Yes.
11  Q.    It does.  Who does it bank with?
12  A.    I can't give you the exact name.
13  Q.    Well, you could have done an investigation and
14  looked at Hertz' bank statements to determine and
15  confirm the 1805 and the $2445, correct?
16  A.    It's actually on the document we already
17  presented to you this morning.
18  Q.    The one before the charges went through,
19  correct?
20  A.    The 1805, when she rented, and then when we
21  closed out the contract on July 12th, the force
22  charge is the two charges.
23  Q.    I understand.  We'll get to the force charge
24  in a minute.  You could have brought your bank
25  records here today.  You're here as a fact witness

*Danielle O'Connor, RPR, CRR 215-683-8023*

17

1  for Hertz.  You're here as a corporate designee to
2  bind the corporation; do you understand that?
3  A.    Yes.
4  Q.    And you're here and what you say binds the
5  corporation to Hertz.
6         Did Hertz bring any corporate bank
7  statements here today to go over and look at the
8  bank's statement to determine what was paid or what
9  was not?
10  A.    Well --
11  Q.    Yes, it did or no, it didn't, ma'am, and then
12  you can explain.
13  A.    It's in the theft package what was billed.
14  The 1805 and the 2444 are actually on the closed --
15  Q.    I'm sorry.  Maybe I'm not clear.  My question
16  was a little different.
17         Did you bring the bank records to this
18  court here today, yes or no?
19  A.    No, we have securities.  I can't just pop up a
20  bank record.
21  Q.    We asked for it in discovery I'll represent as
22  an officer of the court.
23         MR. EDELSTEIN:  Objection, Your Honor.
24         THE COURT:  You object to that?
25         MR. EDELSTEIN:  I object to that

*Danielle O'Connor, RPR, CRR 215-683-8023*

Control No.: 17093136

**18**

1    editorialization, yes.
2              THE COURT:  All right.  It's
3    sustained.
4              MR. EDELSTEIN:  The jury has heard it,
5    so it doesn't matter.
6    BY MR. MALOFIY:
7    Q.    Let me go to Exhibit 13.
8              MR. MALOFIY:  Do you have that, Mr.
9    Segal?
10   BY MR. MALOFIY:
11   Q.    Now, do you know who Kenneth Graeber is?
12   A.    **The assistant corporate security at the time.**
13   Q.    Of where?
14   A.    **Hertz, Philadelphia.**
15   Q.    Did you ever speak to him?
16   A.    **Yes.**
17   Q.    You know who he is, right?
18   A.    **Yes.**
19   Q.    Do you know he gave an interview in this case?
20   A.    **Yes.**
21   Q.    Did you review that interview?
22   A.    **Yes.**
23   Q.    It says here, the interview was taken, if I'm
24   not mistaken, on 7/23/2013.  Do you see that?
25   A.    **Yes.**

*Danielle O'Connor, RPR, CRR 215-683-8023*

**19**

1    Q.    Now, if you go down here, it says --
2              MR. MALOFIY:  And if you go to the
3         second page, Mr. Segal, blow this portion up
4         for the benefit of the jury.  Bring that up.
5    BY MR. MALOFIY:
6    Q.    When he was questioned by the police officer,
7    Officer Ianoconne took the stand here, the question
8    was asked of Kenneth Graeber:  "How much of a
9    payment was received from the renter?"
10             "ANSWER:  We received 1805 for the
11        contracted rental and a deposit."
12             MR. EDELSTEIN:  Judge --
13   BY MR. MALOFIY:
14   Q.    Do you see --
15             MR. EDELSTEIN:  Just for the record,
16        although I have no problem with the actual
17        question, the questions are being asked of --
18        as to what the actual statement says, not as to
19        what the officer said when he was in the
20        courtroom --
21             THE COURT:  Okay.
22             MR. EDELSTEIN:  -- as I understand it.
23             MR. MALOFIY:  That's correct.
24             MR. EDELSTEIN:  Okay.
25             THE COURT:  All right.

*Danielle O'Connor, RPR, CRR 215-683-8023*

**20**

1    BY MR. MALOFIY:
2    Q.    Do you see that?
3    A.    **What was the question?**
4    Q.    It says here in the interview that was
5    conducted by and between Officer Ianoconne and
6    Kenneth Graeber, who's the assistant corporate
7    security manager of the Philadelphia branch at the
8    time, correct?
9    A.    **Yes.**
10   Q.    And the question was asked of him in his
11   interview on 7/23/2013:  "How much of a payment was
12   received from the renter, Question.
13             "ANSWER:  We received 1805 for the
14        contracted rental and a deposit."
15             Do you see that?
16   A.    **Yes.**
17   Q.    Why wasn't any additional information provided
18   to Officer Ianoconne?
19   A.    **It was.  The whole theft package was given to**
20   **him.**
21   Q.    The theft package you showed does not have the
22   payment of 2445, ma'am; isn't that correct?
23   A.    **No, it does.**
24   Q.    It was made on 7/12, ma'am; isn't that true?
25   A.    **Yes, but the interview was 7/23.**

*Danielle O'Connor, RPR, CRR 215-683-8023*

**21**

1    Q.    Right, but you don't have the payment --
2    there's no -- there's no indication that the
3    additional 2445 was paid by Ms. Grady before a
4    police interview was taken, correct?
5    A.    **It was in the theft package that Mr. Graeber**
6    **handed to the detective questioning him.**
7    Q.    What you showed me is as identifying 2445 was
8    the rate that Ms. Grady was supposed to get; isn't
9    that correct?
10   A.    **No.**
11   Q.    It's not?
12   A.    **20 --**
13   Q.    Isn't it true that the payment was on 7/15, we
14   just looked at that on TD Bank records, you didn't
15   dispute that, ma'am, right?
16   A.    **Right.  It was closed out on 7/12 and it went**
17   **through the cycle as a force charge on 7/15.**
18   Q.    Right.  So why didn't -- Officer Ianoconne,
19   why wasn't he provided with that information in the
20   interview?
21   A.    **He was provided the theft package.**
22   Q.    The theft package did not identify a payment,
23   ma'am.
24   A.    **In the theft package, there does have the 1805**
25   **in the payment.  If he had looked at the theft**

*Danielle O'Connor, RPR, CRR 215-683-8023*

Control No.: 17093136

22

1  **package, it was right there.**
2  Q.   Let me go to another -- I understand your
3  testimony.  But let's go to something else so we can
4  make this clear.  Exhibit 3 --
5        MR. EDELSTEIN:  Your Honor, let me
6     just object to that editorialization again.
7     It's clear.  She testified that the theft
8     package showed it.  So whether it's clear to
9     Mr. Malofiy --
10       THE COURT:  Objection is sustained.
11    Her testimony is what it is.
12       MR. EDELSTEIN:  We're supposed to do
13    this without editorializing.
14       THE COURT:  We're supposed to,
15    correct.
16       MR. MALOFIY:  Mr. Edelstein has done
17    it quite a bit.
18       THE COURT:  You didn't object.
19       MR. MALOFIY:  I know I didn't.  I was
20    giving him some leeway.  I thought he would do
21    the same.
22       MR. EDELSTEIN:  I appreciate it, and
23    I'll give you some leeway.
24  BY MR. MALOFIY:
25  Q.   If we could go to Exhibit 3, paragraph 20.

24

1  Q.   Isn't it true that Hertz also received a
2  payment of 2445 --
3        MR. EDELSTEIN:  Objection, Your Honor.
4     There's testimony it was a force charge, not a
5     payment made by Ms. Grady.
6        MR. MALOFIY:  I would appreciate if
7     the witness testified.
8        THE COURT:  He objected based upon a
9     characterization of the question.  You just
10    have to rephrase the question.
11  BY MR. MALOFIY:
12  Q.   Ma'am, isn't it true that this Answer 20 did
13  not identify all the payments that Hertz had
14  received in regards to Ms. Grady's rental?
15       MR. EDELSTEIN:  Just note my
16    objection.  That wasn't the question that was
17    asked, Your Honor.
18       THE COURT:  Overruled.  Go ahead.
19       THE WITNESS:  So we received one
20    payment that she authorized of 1805, the other
21    payment of $2400 and some change was a force
22    charge.
23  BY MR. MALOFIY:
24  Q.   Let me ask you something about force charge.
25  You received the payment, did you not?

23

1  Let me see it real quick.
2        Did you review interrogatories that
3  were signed under oath in this case, verified
4  answers to interrogatories?
5  A.   No.
6  Q.   You didn't.  Let me go to Exhibit 3.  These
7  were the interrogatories that were propounded upon
8  Hertz.  Could we pull that up for the jury?
9        Can you see that, ma'am?
10  A.   Yes.
11  Q.   Now, to be clear, these were the
12  interrogatories in this case, these are the answers
13  from Hertz.
14        You didn't have a chance to review
15  these?
16  A.   I did see that.  I'm sorry.
17  Q.   And it said here on 20:  "Describe in detail
18  all payments, including date, time, amount, and
19  payment method Kelly Grady made for the rental of
20  the Chevy Yukon."  Do you see that?
21  A.   Yes.
22  Q.   And the answer was:  "One payment on April
23  17th, 2013, at 1:57 p.m. for 1805 to a Visa card
24  ending in 0583."  Do you see that?
25  A.   Yes.

25

1  A.   We didn't receive any authorization from TD
2  Bank, so she has up to six months to dispute the
3  charge.
4  Q.   You received the payment, ma'am, correct?
5  A.   Yes.
6  Q.   You received the payment and did Ms. Grady
7  ever deny that charge?
8  A.   No.
9  Q.   And did Ms. Grady ever send you a letter to
10  corporate saying I deny this charge?
11  A.   No.
12  Q.   And did you have any evidence whatsoever that
13  she called up and she said no, this charge can't go
14  through?
15  A.   She would dispute the charge with her bank,
16  not with Hertz.
17  Q.   I'm asking if she called Hertz and you have
18  any evidence whatsoever in this world to say she
19  ever disputed that charge?
20  A.   She didn't dispute with Hertz.  She would have
21  to dispute with her credit card company.
22  Q.   And you have nothing in Hertz' file to
23  indicate she disputed this in any way, shape, or
24  form, correct?
25  A.   That's correct.

CRR 215-683-40233380
Control No.: 17093136

26

1   Q.    So, to be clear, you would agree -- you would
2   agree with me that Hertz received 1805 on 4/27/2013,
3   correct?
4   A.    **As an authorization, correct.**
5   Q.    And she provided you her credit card when she
6   initially rented the car, correct?
7   A.    **At time of rent.**
8   Q.    She did that?
9   A.    **Yes.**
10  Q.    Did she ever withdraw her authorization to
11  you, yes or no?
12  A.    **No.**
13  Q.    Have you ever had billing issues or
14  communications issues as Hertz has had with its bank
15  or with someone else's bank?
16  A.    **Yes, we have billing issues.**
17  Q.    Sometimes there's problems with banks talking
18  to other people's banks and there's issues, correct?
19  A.    **Correct.**
20  Q.    You don't dispute that, that's not unusual,
21  that there might be a problem with a wire or
22  communications between the two banking institutions,
23  correct?
24  A.    **No, not at all.**
25  Q.    Did you do any investigation to determine --

*Danielle O'Connor, RPR, CRR 215-683-8023*

27

1   I'll withdraw the question.
2               Let me move forward to this:  My
3   understanding, if I understand your testimony
4   correctly, is that if someone calls in and the card
5   isn't -- you call it Block status?
6   A.    **Yes, it's blocked in Pick Up status.**
7   Q.    And it would go right to you or someone in
8   your office, correct?
9   A.    **In the Vehicle Control area.**
10  Q.    How many people are in that office?
11  A.    **Seventy.**
12  Q.    Seventy people?
13  A.    **Yes.**
14  Q.    That's a lot of people handling this.  How
15  many cars does Hertz have?
16  A.    **Currently or in 2013?**
17  Q.    Let's go with 2013.
18  A.    **At the time we had approximately 700,000 cars.**
19  Q.    700,000?
20  A.    **Uh-huh, in North America.**
21  Q.    And, you know, my understanding, and correct
22  me if I'm wrong, is that you've worked for Vehicle
23  Control for over ten years; is that correct?
24  A.    **Yes.**
25  Q.    And my understanding also is that you're the

*Danielle O'Connor, RPR, CRR 215-683-8023*

28

1   supervisor?
2   A.    **Yes.**
3   Q.    And my understanding also, it's actually part
4   of your job to make sure those overdue vehicle
5   investigations are done properly, correct?
6   A.    **Yes.**
7   Q.    And it's your job to manage a fleet of
8   $700,000 cars?
9   A.    **Yes.**
10  Q.    And, basically, you regulate all the stealing
11  off of Hertz' lot?
12  A.    **Well, we handle four different types of
13  thefts.**
14  Q.    Well, that's one type -- any type of theft,
15  you represent the stealing off of Hertz' property?
16  A.    **Yes.**
17  Q.    I'm a little confused as to what factual
18  knowledge you have about this case.  I know you're
19  testifying here as a corporate designee, but I have
20  a few questions for you.
21  A.    **Okay.**
22  Q.    Do you recall ever speaking to Ms. Grady?
23  A.    **No.**
24  Q.    Would you remember speaking to Ms. Grady if
25  you did?

*Danielle O'Connor, RPR, CRR 215-683-8023*

29

1   A.    **It would be in the notes.**
2   Q.    Ma'am, you didn't bring any notes here today,
3   did you?
4   A.    **I did.**
5   Q.    Do you have the notes of the police officer?
6   A.    **I have the theft package --**
7   Q.    I'm asking --
8   A.    **-- with the notes.**
9   Q.    -- when the police officer called on 7/22 and
10  let this young lady go, do you have notes of that
11  conversation in your records?
12  A.    **No.**
13  Q.    No, you don't.  Sometimes notes aren't taken,
14  correct?
15  A.    **Correct.**
16  Q.    In this case you've heard the testimony of
17  Joseph Jaussi, it was read in, correct?
18  A.    **Yes.**
19  Q.    He said the records were purged in regards to
20  Ms. Grady.  Do you remember that?
21  A.    **Yes.**
22  Q.    Do you dispute his testimony which was under
23  oath and bound the Hertz Corporation?
24  A.    **Well, it's the definition --**
25  Q.    I would ask for you --

*Danielle O'Connor, RPR, CRR 215-683-8023*

Control No: 17093136

30

1   A.    -- definition of purged.
2         MR. EDELSTEIN: Objection, Your Honor.
3   He asked the question.
4   BY MR. MALOFIY:
5   Q.    Do you dispute it, ma'am, yes or no, and then
6   you can explain?
7         MR. EDELSTEIN: Your Honor, he asked
8   the open-ended question.
9         THE COURT: He did. So that's
10  sustained. Rephrase the question. What you
11  just asked is fine.
12  BY MR. MALOFIY:
13  Q.    Ma'am, do you dispute Joseph Jaussi's
14  testimony that the records were purged, yes or no?
15  A.    No. Can I give the definition of purged,
16  though?
17  Q.    I think it's subjective to a degree, but maybe
18  your counsel can follow up with you.
19  A.    Sure.
20  Q.    You see hundreds of packages every day,
21  correct, hundreds of theft packages?
22  A.    Yes.
23  Q.    And I think you were testifying that in the
24  months of -- in the months of July and the summer
25  months, it gets real busy?

*Danielle O'Connor, RPR, CRR 215-683-8023*

31

1   A.    Yes.
2   Q.    Real busy?
3   A.    During the summer months.
4   Q.    And I imagine when someone calls on the phone
5   and they're trying to get ahold of a representative,
6   then they get routed to another department, that
7   would happen, right?
8   A.    Right.
9   Q.    And then they would sit on the phone for a
10  long time and they get routed to another department
11  because you're very busy, right?
12  A.    We're busy, but when we have a theft that
13  comes through, it's routed to us. We have someone
14  available to take those calls.
15  Q.    You're supposed to have someone available,
16  correct?
17  A.    We do have someone available.
18  Q.    Okay.
19  A.    It's a theft package. It's our asset, we want
20  it back.
21  Q.    So your goal in this instance was to get your
22  asset back, correct?
23  A.    Correct.
24  Q.    On 7/22, you knew that your asset was no
25  longer with Ms. Grady, correct?

*Danielle O'Connor, RPR, CRR 215-683-8023*

32

1   A.    We didn't have it back.
2   Q.    I'm asking you, did you know, yes or no, that
3   your asset was no longer with Ms. Grady on 7/22?
4   A.    Somebody at Hertz did.
5   Q.    Right. Now, who at Hertz knew?
6   A.    I'm not sure, because the police officer
7   didn't tell me what phone number or who he spoke to.
8   Q.    Well, you mean the police officer -- you mean
9   there's no notes here today that indicate that,
10  correct?
11  A.    Correct.
12  Q.    You do what, about a hundred theft packages
13  per day; is that about right?
14  A.    Some days.
15  Q.    So in the course of you've been sitting here,
16  maybe 400, 500 theft packages went out, correct?
17  A.    Yes.
18  Q.    Basically, this is a mechanical process, you
19  pretty much just approve them?
20  A.    No.
21  Q.    No?
22  A.    No.
23  Q.    Isn't it sort of automated, or you actually do
24  a hundred theft packages a day that are this big? I
25  mean --

*Danielle O'Connor, RPR, CRR 215-683-8023*

33

1   A.    So every night that I left here, I went back
2   to my hotel and reviewed theft packages, page by
3   page by page.
4   Q.    You did?
5   A.    I did.
6   Q.    How many did you review since you've been
7   here?
8   A.    About 380.
9   Q.    I see. Now, let's be clear, you're here to
10  testify as to the policies and procedures of Hertz
11  Rental Car Corporation, correct?
12  A.    Yes.
13  Q.    And you're here also to discuss this policy
14  W7-02, correct?
15  A.    Yes.
16  Q.    Are you familiar with that policy?
17  A.    Yes.
18  Q.    And you're familiar with that policy because
19  that's a policy that you work with, correct?
20  A.    Yes.
21  Q.    And that's a policy which basically regulates
22  all the stealing off of Hertz' lot, correct?
23  A.    Yes.
24  Q.    Did you help draft that?
25  A.    No.

*Danielle O'Connor, RPR, CRR 215-683-8023*

Control No.: 17093136

34

1  Q.  You didn't.  Who helped draft that document?

2  A.  **Corporate counsel.**

3  Q.  Lawyers?

4  A.  **Yes.**

5  Q.  I see.  Are you technically an officer of the

6  Hertz Corporation?

7  A.  **No.**

8  Q.  Are you just strictly an employee?

9  A.  **I am an employee.**

10  Q.  So no officers of the Hertz Corporation came

11  to this court today, correct, or at any point during

12  this trial, correct?

13  A.  **No.**

14  Q.  Any board members came?

15  A.  **No.**

16          MR. MALOFIY:  And can we pull up

17      W7-02?  Mr. Segal, do you know that number?  Is

18      it P-9?  Thank you.

19  BY MR. MALOFIY:

20  Q.  You're familiar with this document, correct?

21  A.  **Yes.**

22          MR. MALOFIY:  I want to go up here and

23      I want to blow up -- right here, let's blow

24      this up, Mr. Segal.

25  BY MR. MALOFIY:

*Danielle O'Connor, RPR, CRR 215-683-8023*

36

1  A.  **Yes.**

2  Q.  Is it your job to ensure compliance with this

3  procedure?

4  A.  **Yes.**

5  Q.  And you're the person in charge of 700,000

6  cars to make sure as the regulator that these cars

7  and these -- excuse me -- procedures are followed,

8  correct?

9  A.  **Correct.**

10  Q.  Now, when it says "location," that means in

11  this instance the Philadelphia location, correct?

12  A.  **Correct.**

13  Q.  Just to make this clear, this here says:

14  "W7-02 RAC, reporting vehicle thefts and

15  conversions, August 21st, 2009."  Did I read that

16  correctly?

17  A.  **Yes.**

18  Q.  That's the policy in effect at the time Ms.

19  Grady was arrested and policy in effect at the time

20  of 2013-2014, correct?

21  A.  **Yes.**

22  Q.  The purpose of this standard operating

23  procedure, correct, was to provide requirements for

24  reporting thefts, conversions, or the disappearance

25  of Hertz vehicles, correct?

*Danielle O'Connor, RPR, CRR 215-683-8023*

35

1  Q.  Mrs. Wilkerson, can you see that?

2  A.  **Yes.**

3          MR. MALOFIY:  Thank you, Mr. Segal.

4      Can we elevate that?

5  BY MR. MALOFIY:

6  Q.  "Executive summary, this worldwide procedure

7  applies to the rent-a-car division of the Hertz

8  Corporation and includes requirements for reporting

9  vehicle thefts and conversions."  Did I read that

10  correctly?

11  A.  **Yes.**

12  Q.  It says:  "All vehicle theft and conversions

13  must be documented on a theft recovery vehicle

14  report."  Did I read that correctly?

15  A.  **Yes.**

16  Q.  Then it says:  "All vehicle thefts from

17  customers must also be documented on the vehicle

18  theft from customer report."  Did I read that

19  correctly?

20  A.  **Yes.**

21  Q.  And here's what I'm getting at and where I'm

22  going with this, it says near the last line:

23  "Location, maintenance, area, country, head office,

24  and OKC management must ensure compliance with this

25  procedure."  Do you see that?

*Danielle O'Connor, RPR, CRR 215-683-8023*

37

1  A.  **Correct.**

2          MR. MALOFIY:  Pull that back, Mr.

3      Segal.  Can we go to the next page?  Page 3 --

4      page 4.  Excuse me.  With the court's

5      indulgence?  Try page 5.  There also.

6  BY MR. MALOFIY:

7  Q.  All right.  You're intimately familiar with

8  this whole theft package correct -- excuse me, this

9  whole procedure, correct?

10  A.  **Yes.**

11  Q.  You use it on a daily basis?

12  A.  **Yes.**

13  Q.  In fact, this is a procedure that you follow

14  to make sure that innocent people aren't wrongfully

15  arrested for accidental reporting to the police,

16  correct?

17  A.  **Correct.**

18  Q.  And it's important these policies and

19  procedures are followed by Hertz Corporation,

20  correct?

21  A.  **Correct.**

22  Q.  And if Hertz doesn't follow this problem --

23  this procedure, that would be a failure on the part

24  of Hertz, correct?

25  A.  **Correct.**

*Danielle O'Connor, RPR, CRR 215-683-8023*

Control No.: 17093136

**38**

1     MR. MALOFIY:  Now, I'd like to blow up
2     17 for the benefit of the jury.
3  BY MR. MALOFIY:
4  Q.    "Corporate/country security manager
5  investigations, every theft conversion disappearance
6  must be promptly investigated by the
7  corporate/country security manager responsible for
8  the location" --
9     MR. MALOFIY:  Can you highlight
10     "location," Mr. Segal?
11  BY MR. MALOFIY:
12  Q.    -- "from which the related theft vehicle
13  report is filed."  In this instance, the location
14  would be Philadelphia, correct?
15  A.    Correct.
16  Q.    Now, it goes on to say -- and I want to
17  highlight this, too, Mr. Segal -- "all employees are
18  required to cooperate fully with such an
19  investigation."  Did I read that correctly?
20  A.    Yes.
21  Q.    Now, it also says there must be promptly
22  investigated.  Do you see that?
23  A.    Yes.
24  Q.    Now, in this instance --
25     MR. EDELSTEIN:  You sound like Darth

*Danielle O'Connor, RPR, CRR 215-683-8023*

**39**

1     Vader.
2     MR. MALOFIY:  I do, really?  Do I need
3     new batteries?  I'm sorry.
4     Is it okay?
5  BY MR. MALOFIY:
6  Q.    In this instance, you've heard the testimony
7  of Richard Livingston, correct?
8  A.    Yes.
9  Q.    And Richard Livingston is, I believe,
10  currently, the corporate security manager, not the
11  assistant security manager of Philadelphia, but the
12  corporate security manager of Philadelphia, correct?
13  A.    Yes.
14  Q.    You've worked with him many times, correct?
15  A.    Yes.
16  Q.    Now, Mr. Livingston testified under oath that
17  he does no investigation whatsoever at the local
18  level.  Did you hear that?
19  A.    I heard that, but he does check, check to make
20  sure that the VIN is correct, check to make sure
21  that there's no movement, or check to make sure that
22  the car hasn't been returned.
23  Q.    I'm sorry.  Do a typo check on the VIN.  What
24  else?
25  A.    Make sure that there's no further movement on

*Danielle O'Connor, RPR, CRR 215-683-8023*

**40**

1  the vehicle.
2  Q.    Uh-huh.
3  A.    And then make sure that the car has not been
4  returned.  He has to make sure the car has hot been
5  returned.
6  Q.    Returned?
7  A.    Returned.  By the renter.
8  Q.    How would he do that?
9  A.    He goes into the system and check.
10  Q.    What system, ma'am?
11  A.    His vehicle movement system.
12  Q.    Oh, I see.  Well, if he didn't do that, that
13  would be a failure, correct?
14  A.    Yes.
15  Q.    And he would not be following Hertz' policies
16  and procedures, correct?
17  A.    Correct.
18  Q.    Now, let me go to Mr. Livingston's deposition
19  testimony which was read into the record.  And I'm
20  going to go to page P8-54, top right-hand quadrant,
21  which is page 215.
22     MR. MALOFIY:  Mr. Segal, I got some
23     psychedelic thing going on on my computer.
24     Okay.  Thank you.
25     Now, if we could, for the benefit of

*Danielle O'Connor, RPR, CRR 215-683-8023*

**41**

1     Mrs. Wilkerson, could we blow up 10 to 16,
2     lines 10 through 16 on page 215?
3  BY MR. MALOFIY:
4  Q.    Question was asked:  "As a corporate security
5  manager for Hertz for this area or anyone working
6  with you or for you, would they have done any
7  independent investigation and what payments are made
8  with the car before filing a police report?
9     His answer:  "No, not on my side of
10     the fence."
11     Should he have checked to see if any
12  additional payments were made on that car?
13  A.    Mr. Livingston didn't report this car stolen.
14  Q.    I'm just asking you, he said specifically,
15  ma'am, he's the manager of Philadelphia, right,
16  security manager?
17  A.    Correct.
18  Q.    And he still is the security manager, correct?
19  A.    Right, but he also --
20  Q.    Hold on.  He was the very big guy.
21     MR. EDELSTEIN:  She's answering the
22     question, Your Honor.
23     THE COURT:  She was.
24     THE WITNESS:  It's okay.
25  BY MR. MALOFIY:

*Danielle O'Connor, RPR, CRR 215-683-8023*

Control No.: 17093136

42

1  Q.    I'm sorry.  I stepped on your words.  Go
2  ahead.
3  **A.    Go ahead.  What's the question?**
4  Q.    Mr. Livingston is the awfully big guy, he's
5  like 7 feet tall, right?
6  **A.    Yes.**
7  Q.    He's the corporate security manager for Hertz
8  Rental Car Corporation here in Philadelphia,
9  correct?
10 **A.    Correct.**
11 Q.    Now, it says here that the question was asked
12 of him or anyone working for him or working with
13 him, if they did any check and his response was no,
14 not on his side of the fence.  Do you see that?
15 **A.    I do see that.**
16 Q.    Now, you just testified that he would have
17 checked the computer system of some sort, right?
18 **A.    He should have checked the computer system.**
19 Q.    If he failed to check the computer system, he
20 would have failed to follow the policies and
21 procedures of Hertz which must be followed, correct,
22 ma'am?
23 **A.    Correct.  But he also in the thing that you**
24 **read, testimony that you read, it said he didn't**
25 **file police reports.**

*Danielle O'Connor, RPR, CRR 215-683-8023*

43

1  Q.    Ma'am, Mr. Livingston is the head of a two-man
2  department, correct?
3  **A.    Correct.**
4  Q.    Let's be clear.  It's him and one other
5  person, right?
6  **A.    Yes.**
7  Q.    And that one other person was Mr. Graeber,
8  correct?
9  **A.    At the time, yes.**
10 Q.    And then Mr. Graeber was let go.  Do you
11 remember why?
12 **A.    Yes.**
13 Q.    He was let go why?
14 **A.    I'm not sure.**
15 Q.    He was let go, according to Mr. Livingston's
16 testimony, because Hertz wanted to cut costs.  Do
17 you remember that?
18 **A.    No.**
19       MR. MALOFIY:  Well, let's pull it up.
20       MR. EDELSTEIN:  We'll stipulate that
21       was the testimony, Judge.
22 BY MR. MALOFIY:
23 Q.    Hertz --
24       THE COURT:  It's been stipulated to.
25       All right.

*Danielle O'Connor, RPR, CRR 215-683-8023*

44

1  BY MR. MALOFIY:
2  Q.    Hertz Corporation wanted to cut the costs so
3  they let Mr. Graeber go, correct?
4  **A.    If you say so, yes.**
5  Q.    And by doing so, they're basically cutting
6  costs at the local investigation at the local level
7  to prevent innocent people from being wrongfully
8  accused of car theft, correct?
9        MR. EDELSTEIN:  Objection, Your Honor.
10       THE COURT:  Sustained.
11 BY MR. MALOFIY:
12 Q.    Ma'am, does Hertz global -- excuse me, Hertz
13 Corporation, are they able to do a local
14 investigation on every case?
15 **A.    Well, that's the reason why we have Oklahoma**
16 **City specialized in doing the investigation.  We**
17 **have specialized people that work for us and also**
18 **that's why we hire the private investigator to go**
19 **out and assist us and also get the repossession**
20 **company involved, to show what investigation we need**
21 **to do.  We work hand-in-hand with both of those**
22 **companies.  We try to do our due diligence before we**
23 **report a car stolen.**
24 Q.    How many theft reports have come out of
25 Philadelphia?

*Danielle O'Connor, RPR, CRR 215-683-8023*

45

1        MR. EDELSTEIN:  When?
2  BY MR. MALOFIY:
3  Q.    After daily basis in 2013-2014, ma'am.
4  **A.    A lot.**
5  Q.    A lot?
6  **A.    Yes.**
7  Q.    And what would you say?
8  **A.    Maybe 2000.**
9  Q.    Do you know -- excuse me.  Mr. Livingston
10 testified that he's gone into court and handled
11 about 400 of these and he's never done a local
12 investigation to determine the truth and veracity of
13 those theft packages?
14 **A.    No, I didn't know that.**
15 Q.    And that would be falling well below the
16 standard of care even by Hertz' own policies and
17 procedures?
18       MR. EDELSTEIN:  Objection to the
19       leading conclusion.
20       THE COURT:  Sustained.  You have to
21       rephrase.
22       MR. MALOFIY:  I'll rephrase it.  Thank
23       you.
24 BY MR. MALOFIY:
25 Q.    That would fall well below the policies and

*Danielle O'Connor, RPR, CRR 215-683-8023*

Control No.: 17093136

46

1  procedures of even Hertz Corporate policies,
2  correct?
3  **A.    Yes.**
4  Q.    Do you think it's acceptable for 400 cases to
5  go to court and no local investigation to be done
6  whatsoever?
7          MR. EDELSTEIN:  Objection, Your Honor.
8  The testimony was that Mr. Livingston didn't
9  actually do it, not no investigation was done.
10         THE COURT:  Overruled.  I'll let her
11  answer.
12         THE WITNESS:  Yeah.  We have
13  investigated it.  We investigate each overdue
14  renter.  Each theft is investigated.
15         MR. MALOFIY:  Ma'am, read back my
16  question for the witness, please.  Sorry.
17                  - - -
18         (Whereupon, the court reporter read
19  the record as requested.)
20                  - - -
21         THE WITNESS:  By Mr. Livingston?
22  BY MR. MALOFIY:
23  Q.    By the two people in that office who handle
24  the 400 cases that went to court and no local
25  investigation was done, that's what I'm referring

*Danielle O'Connor, RPR, CRR 215-683-8023*

47

1  to, ma'am.
2  **A.    There is some investigation being done.**
3  Q.    Check for typos and the VIN number, correct?
4  **A.    And movement.**
5  Q.    On the system, right, on the computer system?
6  **A.    Yes.**
7  Q.    Let's go to that computer system right now.
8  Let's talk about that.
9          Now, you indicated that it was Mr.
10  Graeber who made the police report on behalf of
11  Hertz to Detective -- to Officer Ianoconne, he was
12  the one who gave the interview, correct?
13  **A.    Correct.**
14  Q.    And it wasn't Mr. Livingston?
15  **A.    Correct.**
16  Q.    Both those two people work in one office,
17  correct?
18  **A.    Yes.**
19  Q.    And Mr. Graeber answers to Mr. Livingston,
20  correct?
21  **A.    Correct.**
22  Q.    Now, let's go to combination 8 of P-3, which
23  is the interrogatory, the question to defendant and
24  the answer of defendant's.  Can we pull that combo
25  up for the benefit of the jury and also for Ms.

*Danielle O'Connor, RPR, CRR 215-683-8023*

48

1  Wilkerson -- Mrs. Wilkerson, excuse me, ma'am.
2          It says here, 8, this was a question
3  posed to Hertz Corporation:  "Identify the computer
4  systems that the Hertz employees identified in the
5  immediately preceding interrogatory consulted while
6  on the phone with the police on July 22nd, 2013, and
7  what information was on that system regarding Ms.
8  Grady."
9          The answer:  "Objection.  This
10  interrogatory assumes a computer system was
11  consulted with during Mr. Graeber's conversation
12  with Officer Brighter.  Mr. Graeber" -- I'd like to
13  highlight this, Mr. Segal -- "Mr. Graeber did not
14  utilize any computer system while speaking with
15  Officer Brighter on July 22nd, 2013."  Do you see
16  that, ma'am?
17  **A.    Yes, I see it.**
18  Q.    And these sworn interrogatories, where we
19  asked whether or not a computer system was used, the
20  sworn answers verified answers from Hertz
21  Corporation by Mr. Livingston was that no computer
22  system was used?
23         MR. EDELSTEIN:  Objection, Your Honor.
24  BY MR. MALOFIY:
25  Q.    Do you understand that?

*Danielle O'Connor, RPR, CRR 215-683-8023*

49

1          MR. EDELSTEIN:  The question in the
2  interrogatory was what was used while on the
3  phone with the police.  That's the question.
4          MR. MALOFIY:  I'm asking a follow-up
5  question, not this specific question, but a
6  follow-up question.
7          THE WITNESS:  So basically --
8          THE COURT:  No, I have to rule on the
9  objection.
10         The objection at this time is
11  sustained only because you can't change what
12  the interrogatories are saying.  If it's a
13  separate question, that's fine.
14         MR. MALOFIY:  I'm asking a follow-up
15  question, a different question.  I already
16  asked that question.  Maybe the confusion is on
17  the screen.  So we can block that out now.
18  Thank you.
19  BY MR. MALOFIY:
20  Q.    Isn't it true that Mr. Graeber utilized no
21  computer system whatsoever in regards to before he
22  reported this to the police?
23  **A.    No.  It actually says "while speaking."  So
24  while he was speaking to the detective, he wasn't on
25  the computer system.  That's the verbiage in what**

*Danielle O'Connor, RPR, CRR 215-683-8023*

Control No.: 17093136

50

1  you just read me.
2        MR. MALOFIY:  Let me be more specific
3     with the court's indulgence.
4        Let me move to 21, combo 21.  Do you
5     have that, Mr. Segal?
6  BY MR. MALOFIY:
7  Q.    You looked at the questions which we
8  propounded upon Hertz, which we served on Hertz and
9  the answers, correct?
10  A.    Yes.
11  Q.    And you saw that Mr. Livingston had signed
12  these under oath, correct?
13  A.    Yes.
14  Q.    We had asked of Hertz Corporation:  "Describe
15  in detail all actions/steps taken and communications
16  the Hertz manager identified in the complaint as
17  filing the August 2013 police report regarding Kelly
18  Grady."  That's Ken Graeber, correct?
19  A.    Yes.
20  Q.    So let's read this again:  "Describe in detail
21  all actions/steps taken and communications the Hertz
22  manager" -- I'll insert Ken Graeber -- "took before
23  reporting the Chevy Yukon stolen on around July
24  22nd, 2013, including identifying all employees he
25  communicated with and the contents of the

*Danielle O'Connor, RPR, CRR 215-683-8023*

51

1  communication, identifying all employees he
2  communicated with and the contents of the
3  communication."  I think that was twice.  I
4  apologize if I read that twice.  I think it was
5  written twice.  "Identifying all computer systems he
6  consulted and the program names and reasons for
7  doing so."
8        MR. MALOFIY:  Highlight this bottom
9     line, "identifying all computer systems he
10     consulted and the program names and reasons for
11     doing so."
12  BY MR. MALOFIY:
13  Q.    The answer, there was an objection lodged.
14  And then it said:  "The police report was not filed
15  by a Hertz manager in August 2013.  Mr. Graeber
16  reviewed the rental contract, investigation
17  performed, and had communications with individuals
18  in Hertz' Vehicle Control Department in Oklahoma
19  City, Oklahoma.  A theft package was put together
20  and reported to the airport police."  Do you see
21  that?
22  A.    Yes.
23  Q.    Now, it doesn't identify all computer systems
24  he consulted and the program names and reason for
25  doing so, does it?

*Danielle O'Connor, RPR, CRR 215-683-8023*

52

1  A.    No, but he was on the phone with Hertz Vehicle
2  Control.
3  Q.    I'm just asking you, verified answer said that
4  that was produced in discovery.
5  A.    Okay.
6  Q.    Right, ma'am?
7  A.    Yes.
8  Q.    And even if he was on the phone, he didn't
9  consult any computer systems, right?
10  A.    Well, we're speaking about it over the phone.
11  Q.    But he personally did not consult any computer
12  systems, correct?
13  A.    No, he didn't put his fingers on the keyboard.
14  Q.    And then a day after this, he went to the
15  police and told them the only payment was 1805,
16  correct?
17  A.    In a deposit, yes.
18  Q.    Ma'am, I'm going to put this back up to you,
19  this document.  Do you see that document?
20  A.    Yes.
21  Q.    Now, you say, oh, the 2445 was identified on a
22  document, right?
23  A.    Yes.
24  Q.    And you'd agree that that document was created
25  7/12/13, correct?

*Danielle O'Connor, RPR, CRR 215-683-8023*

53

1  A.    Yes.
2  Q.    And you agree the payment went through on
3  7/15, three days later, correct?
4  A.    Yes, correct.
5  Q.    And you'd agree with me that wasn't actually
6  the payment identified, it was what was owed,
7  correct?
8  A.    No.
9  Q.    Doesn't it indicate what was owed and not what
10  was paid on 7/12, ma'am?
11  A.    No.
12  Q.    What does it say?
13  A.    It says that we had to close the vehicle out
14  to 5/31/2013 because we didn't have anymore
15  authorization.  It's on this form right here.
16  Q.    I'm sorry.  Maybe my question wasn't clear.  I
17  asked you a different question.
18        Isn't it true that it doesn't show
19  that the payment of 2445 was made on that document?
20  A.    Yeah, it shows it was --
21  A.    It was owed?
22  A.    It was owed at the time.
23  Q.    And it was not paid, correct?
24  A.    Not on 7/12.
25  Q.    Right.  And three days later it was paid,

*Danielle O'Connor, RPR, CRR 215-683-8023*

Control No.: 17093136

54

1  correct, ma'am?

2  A.    Not in full.

3  Q.    Ma'am, I'm asking you was 2445 paid, yes or

4  no?

5  A.    Yes.

6  Q.    And that information was never updated to the

7  police, correct?

8  A.    No.

9  Q.    It was not corrected, correct?  It was not

10  updated to the police, correct?

11  A.    They had the information.

12  Q.    I'm asking you if the information that it was

13  paid was updated to the police, yes or no?

14  A.    The police actually have the theft package and

15  this was in the theft package.

16  Q.    Ma'am, you just identified that that is not a

17  payment for 2445, it's what is owed.  Do you

18  understand the difference between --

19  A.    Yes.

20  Q.    -- money in your bank account --

21  A.    Yes.

22  Q.    -- and what is owed to you?  It's the

23  difference between an asset and a liability, right?

24  A.    Yes.

25  Q.    Okay.  Understand the difference?

*Danielle O'Connor, RPR, CRR 215-683-8023*

55

1  A.    Yes.

2  Q.    You deal with this every day?

3  A.    Yes.

4  Q.    So let's be clear.  The police didn't know

5  2445 was paid before they signed an affidavit of

6  probable cause allowing Ms. Grady to be arrested,

7  correct?  Correct, ma'am?

8  A.    Correct.

9        MR. MALOFIY:  No further questions.

10       THE COURT:  Any redirect?

11       MR. EDELSTEIN:  Just two.  I promise.

12            - - -

13       REDIRECT EXAMINATION

14            - - -

15  BY MR. EDELSTEIN:

16  Q.    Mr. Graeber, the assistant corporate manager

17  who worked for Mr. Livingston --

18  A.    Yes.

19  Q.    -- he did the investigation?

20  A.    Yes.

21  Q.    And he would have -- in an effort to find car

22  movement, how would he have determined that, meaning

23  was the car back in Hertz' possession?

24  A.    Yes, so he would have gone into a specialized

25  system that shows all cars that have been checked in

*Danielle O'Connor, RPR, CRR 215-683-8023*

56

1  or have an idle sighting at the location to prove

2  that the car was back in Hertz' possession.

3  Q.    And, again, when did the car come back to your

4  possession?

5  A.    September 11th, 2013.

6        MR. EDELSTEIN:  Thank you.  That's all

7  I have.

8        THE COURT:  Anything else, Counsel?

9        MR. MALOFIY:  No.  One second, Your

10  Honor.  Court's indulgence.

11       (Pause.)

12            - - -

13       RECROSS-EXAMINATION

14            - - -

15  BY MR. MALOFIY:

16  Q.    Help my confusion.  Did you actually fly in

17  from Florida?

18  A.    I -- yes.

19  Q.    You flew in from Florida to here?

20  A.    I took a special route, yes.

21       MR. MALOFIY:  No further questions.

22       THE COURT:  Anything else?

23       MR. EDELSTEIN:  No, Your Honor.

24       THE COURT:  Thank you, ma'am.  Watch

25  your step.

*Danielle O'Connor, RPR, CRR 215-683-8023*

57

1            - - -

2        (Witness excused.)

3            - - -

4        THE COURT:  Who's your next witness?

5        MR. EDELSTEIN:  Mr. Cocklin.

6        THE COURT:  That's the expert.

7        Step up.

8        THE COURT CRIER:  State your full

9  name.

10       THE WITNESS:  John Cocklin,

11  C-O-C-K-L-I-N.

12            - - -

13       ...JOHN COCKLIN, having been duly

14  sworn/affirmed, was examined and testified as

15  follows:

16            - - -

17       THE COURT:  Your witness.

18            - - -

19  DIRECT EXAMINATION ON VOIR DIRE

20            - - -

21  BY MR. EDELSTEIN:

22  Q.    Good afternoon, Mr. Cocklin.

23  A.    Good afternoon.

24  Q.    How are you today?

25  A.    Okay.

*Danielle O'Connor, RPR, CRR 215-683-8023*

Control No.: 17093136

# ATTACHMENT AB

FILED
06 SEP 2017 10:27 pm
Civil Administration
E. MASCUILLI

THE COURT OF COMMON PLEAS
PHILADELPHIA COUNTY, PENNSYLVANIA

| | |
|---|---|
| KELLY A. GRADY<br><br>*Plaintiff*<br><br>vs.<br><br>THE HERTZ CORPORATION;<br>HERTZ RENT-A-CAR PHILADELPHIA INTL. AIRPORT;<br>JOHN DOE(S)[1]<br><br>*Defendants* | ACTION COMMENCED BY:<br>WRIT OF SUMMONS ON:<br>NOVEMBER 23, 2015<br><br>NOVEMBER TERM, 2015<br><br>CIVIL ACTION NO.:<br>151103380<br><br>COMPLAINT FILED:<br>FEBRUARY 22, 2016<br><br>CAUSES OF ACTION:<br>MALICIOUS PROSECUTION<br>FALSE IMPRISONMENT<br>INT. INFLICTION OF<br>EMOTIONAL DISTRESS<br><br>*JURY TRIAL DEMANDED* |

# ORDER

AND NOW, this _____ day of September, 2017, upon consideration of PLAINTIFF'S MOTION FOR RECONSIDERATION ON PUNITIVE DAMAGES, any response thereto, and the record as a whole, said Motion is GRANTED.

Punitive damages are reinstated to the Complaint and Plaintiff shall be permitted to offer testimony, evidence, and argument to the jury regarding the applicability of punitive damages.

_____
THE HONORABLE PAULA PATRICK

_____

[1] Manager(s) at Hertz Rent-A-Car Philadelphia Intl. Airport from March 2013 to June 2014.

Case ID: 151103380
Control No.: 17090690

# Relief Requested

WHEREFORE,  Plaintiff demands judgment in his favor and against Defendants, jointly and severally, on all Counts and claims compensatory damages in an amount in excess of this court's jurisdictional limitations, thereby guaranteeing plaintiff a jury trial, exclusive of interests and costs, and an award of punitive damages, as well as prejudgment interest, post judgment interest, and delay damages; and requests that this Court determine and declare that Plaintiff be awarded for all Counts:

(1) Compensatory damages;

(2) Punitive damages to punish the Defendant for his outrageous conduct, self-interest, duplicitous behavior, and dirty-dealings;

(3) Exemplary damages to set an example and deter such future conduct; and

(4) Such other and further relief that this Court deems just, necessary, and appropriate.

Case ID: 151103380
Control No.: 17090690

FRANCIS ALEXANDER, LLC
Francis Malofiy, Esquire
Attorney ID No.: 208494
280 N. Providence Road | Suite 1
Media, PA 19063
T: (215) 500-1000
F: (215) 500-1005
*Law Firm / Lawyer for Plaintiff*

THE COURT OF COMMON PLEAS
PHILADELPHIA COUNTY, PENNSYLVANIA

| | |
|---|---|
| KELLY A. GRADY<br><br>*Plaintiff*<br><br>vs.<br><br>THE HERTZ CORPORATION;<br><br>HERTZ RENT-A-CAR PHILADELPHIA INTL. AIRPORT;<br><br>JOHN DOE(s)<br><br>*Defendants* | ACTION COMMENCED BY:<br>WRIT OF SUMMONS ON:<br>NOVEMBER 23, 2015<br><br>NOVEMBER TERM, 2015<br><br>CIVIL ACTION NO.:<br>151103380<br><br>COMPLAINT FILED:<br>FEBRUARY 22, 2016<br><br>CAUSES OF ACTION:<br>  MALICIOUS PROSECUTION<br>  FALSE IMPRISONMENT<br>  INT. INFLICTION OF<br>  EMOTIONAL DISTRESS<br><br>*JURY TRIAL DEMANDED* |

## PLAINTIFF'S MOTION FOR RECONSIDERATION ON PUNITIVE DAMAGES

This is a malicious prosecution, false imprisonment, and intentional infliction of emotional distress lawsuit against The Hertz Corporation who filed a false car theft report against Plaintiff Kelly A. Grady and had her thrown in jail for 12 days and prosecuted for 11 months.

Plaintiff has recently discovered overwhelming evidence that Hertz—**with an absolute reckless indifference to the rights of its customers**—has been concealing that it has a nationwide problem falsely reporting its paying customers to police for car theft. Hertz does little

to no investigation before reporting its customers to the authorities and, worse, its employees are told to disregard Hertz's standard operating procedures—specifically designed to prevent false police reports and false arrests of its customers—which mandate that an investigation take place. Tragically, this is a serious nationwide problem—***concealed by Hertz throughout this litigation***[2]—and multiple police departments have had to confront Hertz concerning this serious issue. Hertz needs to suspend all vehicle theft reports in light of these serious revelations.

None of this was disclosed by Hertz despite Hertz being asked in discovery if erroneous reports were a known issue, and was only recently uncovered through sedulous and intense investigation by Plaintiff. Given that punitive damages were dismissed without explanation at summary judgment, see Exhibit 9, this new evidence warrant reconsideration and reinstatement of punitive damages. In addition, Plaintiff has requested a negative inference against Hertz for admitting to outrageously purging all of Grady's rental and payment information (which proved she did not steal the car); if and when such an inference is granted—an issue not before the summary judgment judge—it is also grounds for reconsideration of the dismissal of punitive damages.

Hertz, driven by a profit motive, acted maliciously, willfully, intentionally, and recklessly in flouting its very own standard operating procedures designed to prevent throwing innocent people in jail. This is a nationwide problem being dealt with by multiple police departments in at least five different states: **Pennsylvania, Indiana, Wisconsin, Kentucky,** and **Texas**.

The same problems have caused all of the incidents, including Ms. Grady's:

---

[2] Please Note: none of this information could have been discovered before the punitive damages claims were dismissed on January 19, 2017.

Case ID: 151103380
Control No.: 17090690

(1)     Failure to do adequate investigations;

(2)     Failure to follow standard operating procedures to prevent false police reports;

(3)     Failure to share critical information between corporate, branch, and security;

(4)     Failure to accurately keep records and track inventory.

Hertz's reckless and malicious conduct, where it has failed to correct known and serious problems for the purpose of protecting its bottom line, is exactly the type of conduct which warrants punitive damages and the reconsideration of the prior order dismissing punitive damages at summary judgment.

## HERTZ FALSELY REPORTS INNOCENT WOMAN FOR CAR THEFT

*LOCATION: INDIANAPOLIS, INDIANA*

> ➢ She Was Authorized to Have the Vehicle.
> ➢ Paid for the Rental;
> ➢ Contacted Hertz by Phone, and had
> ➢ Visited Hertz Location with Vehicle
> ➢ Exactly as What Happened in Plaintiff's Case
> ➢ Hertz concealed this from Plaintiff

A woman named Ramanda Van Pay rented a car with Hertz in Green Bay and, after getting a flat tire, exchanged the vehicle for a new one in Indianapolis. See Exhibit 1 - Affidavit of Ramanda Van Pay. Van Pay was given an exchange form, and the exchange was noted in Hertz's rental system. See Exhibit 2. Van Pay called and visited the Green Bay location after exchanging the car in Indianapolis for a Hyundai Elantra as directed by Hertz, and was assured her rental was fine by her contact in Green Bay, Hertz representative Ryan Hogan. Id. However, outrageously, the Indianapolis Hertz falsely reported the Elantra given to Van Pay as stolen, having totally failed to record and share Van Pay's updated rental information—and having failed to conduct any real investigation before making the report. See Exhibit 3 - Indianapolis Police Report; Exhibit 5 - Fond Du Lac Sheriff's Records; Exhibit 6 - Additional Fond Du Lac Sheriff's Records. Despite Hertz corporate issuing a theft report for the car, Green Bay never knew nor was informed that the car given to Van Pay was reported stolen or told her anything was wrong, demonstrating a serious gap or error in Hertz's computer systems and policies.

As a result of Hertz's reckless and outrageous conduct, Van Pay was arrested without any probable cause and thrown in jail for three days. See Exhibit 1; Exhibit 3; Exhibit 4 - Criminal Docket; Exhibit 5; Exhibit 6. Once the prosecutor in Fond du Lac County and the

Case ID: 151103380
Control No.: 17090690

police in Indianapolis realized that Van Pay had done nothing wrong and had valid rental documents, they immediately dropped the prosecution. See Exhibit 1; Exhibit 2; Exhibit 4.

The Indianapolis police have reported a systemic problem with Hertz car theft reports, they have stated that a businessman was also wrongfully arrested in Pennsylvania due to a false Hertz theft report, and they have also stopped entering Hertz police reports in the NCIC due to their unreliability. See Exhibit 1. Plaintiff believes there are additional false reports by Hertz at the Indianapolis branch and other locations.

## Jury Found Hertz Liable in January 2017 for Malicious Prosecution and Punitive Damages After Falsely Reporting and Imprisoning Man for Car Theft

*Location: Galveston, Texas*

> ➢ Hertz Concealed this Lawsuit and Verdict from Plaintiff

A man named Michael Gray had his identity stolen and the thief used his information to rent a car from Hertz in March 2014. See Exhibit 8 - Punitive Damages Jury Verdict and Complaint Against Hertz. Gray reported the theft of his identity to Hertz in April 2014 and made it clear that he had not rented the car. However, outrageously, Hertz reported Gray to the police for car theft in May 2015 anyway, resulting in Gray's wrongful arrest and imprisonment. Plainly, Hertz's record keeping, record sharing, and investigation of car thefts is severely and knowingly deficient. The jury returned a verdict of $50,000 for the one night Mr. Gray spent in jail, and $120,000 in punitive damages.

Just as in Ms. Grady's case, Hertz corporate knew that Grady had not stolen the car, but a local Hertz branch went and reported Ms. Grady and Mr. Gray to the police anyway.

## Louisville Regional Airport Police Refuse to Accept Hertz Theft Reports Because They Are Unreliable and Inaccurate

*Location: Louisville, Kentucky*

> ➢ Hertz concealed these false reports from Plaintiff

> ➢ Hertz concealed that police specifically contacted Hertz's Corporate Security Division to complain about the false police reports.

The Louisville Regional Airport Authority has also stopped inputting Hertz police reports into the NCIC due to their unreliability. See Exhibit 7 - Louisville Regional Airport Authority Records. In 2015, Hertz in Louisville reported several vehicles missing as stolen from their inventory. However, Hertz was then forced to admit that they had then found the vehicles sitting on their own lots and had simply lost vehicles due to poor record keeping and information sharing. Remember, this is the exact same problem why Ms. Van Pay was arrested, and intimately related to Ms. Grady's false arrest.

Case ID: 151103380
Control No.: 17090690

Astonishingly, a Hertz employee in Nashville informed the Louisville Regional Airport Authority that **Hertz internally knew that it has a major problem with losing vehicles and falsely reporting those vehicles as stolen but had not addressed it**. Id.

It cannot be overlooked that all of this evidence was concealed by Hertz despite Plaintiff specifically asking Hertz this information in discovery. Hertz repeatedly claimed in its answer to the complaint, its summary judgment motion, and in discovery that it had no internal theft reporting issues or errors, but that if Hertz had erroneously reported Grady to the police that it was just a one-time "glitch." These systemic false police reports, which are only the ones that Plaintiff has been able to find, conclusively demonstrate that Hertz knows that it has a serious problem but concealed the issue in discovery.[3] In addition, a negative inference should be granted against Hertz for concealing these incidents.

Plaintiff notes for the Court that the failures of Hertz present in the newly discovered false theft reports from across the nation, are also present in the material facts of this case which that Hertz's conduct was outrageous, intentional, reckless, and needlessly put Ms. Grady's life in jeopardy:

   a. **First,** Hertz told the Pennsylvania state police that Ms. Grady had not stolen the car, that the police report was "miscommunication," and that to the extent there was an issue it was civil in nature—but Hertz nevertheless continued to have the Philadelphia police and district attorney's office arrest, imprison, and prosecute Ms. Grady despite admitting there was no probable cause to do so. See generally MSJ Exhibit 7 - State Trooper Kemmerling's Report.

---

[3] This case closely mirrors the recent Burgos v. Philabundance case. See Attached Order of the Superior Court. That was a malicious prosecution case in the Philadelphia Court of Common Pleas, in front of The Honorable John Younge where the defendant had (1) done no investigation prior to reporting to the police, (2) provided false information to the police, and (3) omitted important facts from the police report (the same as in this case). All these failures amounted to recklessness, malice, lack of probable cause, and punitive damages. Punitive damages were heard and assessed by the jury, then affirmed by the Superior Court, for a total verdict of $500,000. Where there are causes of action like malicious prosecution, where the legal standard is nearly equivalent as punitive damages, the question of punitive damages should be left to the jury.

Case ID: 151103380
Control No.: 17090690

b.   **Second**, Hertz admits that it ***routinely*** reports its customers to the police for felonies without conducting any investigation at the branch level. See MSJ Exhibit 8 - Livingston Depo., at p.252; MSJ Exhibit 11 - Jaussi Depo., at p.70.

c.   **Third,** Hertz has written policies mandating that its corporate security managers conduct investigations at the branch level (showing that Hertz knows it should not be reporting customers to the police without investigation), but Hertz's designees admitted that they have "marching orders" to ignore the written policies. See MSJ Exhibit 8 - Livingston Depo.; MSJ Exhibit 9 - Hertz Theft Reporting Procedures. Hertz even admitted that its only redundancy to prevent falsely reporting customers was the written policies—which it testified it routinely ignores. See MSJ Exhibit 3 - Hertz Discovery Answers, at ¶36.

d.   **Fourth**, Ms. Grady's phone and bank records demonstrate that she was in constant contact with Hertz and had paid on two separate occasions a total of over $4,200 for the rental. This directly contradicts Hertz headquarters's "theft package" given to the police which stated Grady had not contacted Hertz or paid for the rental since April 17, 2013. See MSJ Exhibit 5 - Grady Phone Records; MSJ Exhibit 6 - Grady TD Bank Records.

e.   **Fifth**, Grady physically returned to the Philadelphia Airport Hertz location on or around July 18, 2013, and was authorized to leave the Hertz location with the Yukon. See MSJ Exhibit 2 - Grady Interrogatory Answers, at¶6. Hertz's designees admit that they have no information whatsoever to dispute this fact. See MSJ Exhibit 11 - Jaussi Deposition, at p.203 (stating that Hertz did no investigation to determine whether Grady returned to the Hertz location on July 18, 2013, and had no reason to dispute Grady's statement).

f.   **Sixth**, Hertz's corporate security team in fact conducted no investigation concerning Ms. Grady and the Yukon at the branch level before reporting her to the police for car theft. See MSJ Exhibit 3 - Hertz Discovery Answers, at ¶17, 21.

g.   **Seventh,** at no point following July 22, 2013, until the case against Ms. Grady was dismissed in June 2014, did Hertz withdraw the criminal complaint it had lodged against Ms. Grady—and which Hertz had already admitted to the State Police was not correct or make any attempt to correct the false statements and material omissions. See MSJ Exhibit 4 - Grady Criminal Docket.

h.   **Eighth,** Hertz admitted that it "purged" all Grady's rental information, including her payments on the rental contract, without any explanation despite the fact that it initiated a criminal case against her for car theft. See MSJ Exhibit 11 - Jaussi Deposition, at p.37-38. A negative inference should be granted against Hertz by the trial judge for this outrageous destruction of evidence designed to prejudice Plaintiff's case.

Both Hertz's egregious and reckless conduct that is the subject of this case, its

destruction of Grady's critical rental records, and the new evidence recently uncovered and

concealed by Hertz, establish that there is a jury question on punitive damages because Hertz is recklessly making car theft police reports it knows are not true.

## I. Punitive Damages Are Warranted and Should Be Decided by a Jury

2.     This malicious prosecution, false imprisonment, and intentional infliction of emotional distress lawsuit was commenced by Plaintiff on November 23, 2015, against Defendant for falsely reporting her to the police for car theft and imprisoning her for 12 days and prosecuting for 11 months.

3.     Punitive damages are warranted when a defendant has shown an outrageous and reckless indifference for the rights of others. Hertz knows when reporting its own customers to the police cart theft that many of those reports are false and will result in a wrongful and false incarceration.

4.     During this litigation, Hertz has hid that it has a nationwide problem falsely reporting customers to police authorities for car theft, while trying to convince this court that its error was just a one-time "glitch." This motion details the discovery of multiple Hertz customers falsely arrested for car theft establishing that Hertz has a huge and serious problem it has fraudulently concealed.

5.     Please note that during this litigation Hertz purged all of Grady's rental records to avoid turning them over to Plaintiff. Hertz's own designee had to get the records from the police because the company destroyed all evidence of its insidious conduct. These records, had they been properly produced in 2016, would have conclusively revealed Hertz's broken theft reporting system and possibly kept additional customers from across the nation being arrested and imprisoned.

Case ID: 151103380
Control No.: 17090690

6.      Note that the following information is taken from Ms. Grady's personal records and police reports; Hertz did not produce a single piece of information about Grady's rental from its own systems.

**a.      Ms. Grady Rented and Paid for A Chevy Yukon from Hertz's Philadelphia Airport Branch**

7.      On April 17, 2013, plaintiff Kelly Grady went to the Philadelphia International Airport Hertz location and rented a 2013 Chevrolet Yukon at 1:57 pm. MSJ Exhibit 2 - Plaintiff's Interrogatory Answers; MSJ Exhibit 3 - Plaintiff's Interrogatories and Hertz's Answers.[4]

8.      It is undisputed that that Ms. Grady paid $1,805.00 for the rental on April 17, 2013, from a credit card ending '0583. See MSJ Exhibit 3 - Hertz Discovery Answers, at ¶20.

9.      Ms. Grady was rented the car by a heavy-set, dark-skinned male (not African-American) with an afro. See MSJ Exhibit 2 - Grady Interrogatory Answers, at ¶6.

10.      In addition, another Hertz customer service employee named "John" helped Ms. Grady with the rental. Id.

11.      John was helpful in securing the rental for Ms. Grady, and he provided his direct number to Ms. Grady if there were any rental issues which was (610) 528-6528. See MSJ Exhibit 2 - Grady Interrogatory Answers.

12.      After this point, over the next several months, Ms. Grady spent hours on the phone with Hertz—both corporate phone lines and with the Philadelphia branch—renewing her rental and confirming that she was authorized to possess the rental.

---

[4] All exhibits referenced as "MSJ Exhibit" are referring to the exhibits Plaintiff used and docketed with her motion for summary judgment and response to Hertz's motion for summary judgment.

Case ID: 151103380
Control No.: 17090690

13.    This is indicated clearly by Ms. Grady's phone records, which show constant contact with Hertz between April and July 2013:

| Call Date | Hertz Num. Called | Grady Number | Time | Duration |
|-----------|-------------------|--------------|------|----------|
| 4/17/2013 | 215-492-7205 | 610-716-3500 | 12:22 AM | 19 Mins |
| 4/17/2013 | 215-492-7205 | 610-716-3500 | 1:16 AM | 7 Mins |
| 5/14/2013 | 800-704-4473 | 610-256-9457 | 3:32 PM | 8 Mins |
| 5/16/2013 | 215-492-7205 | 610-290-6957 | 9:35 PM | 12 Mins |
| 5/16/2013 | 215-492-7205 | 610-290-6957 | 9:55 PM | 7 Mins |
| 5/29/2013 | 215-492-7205 | 610-290-6957 | 8:50 PM | 2 Mins |
| 5/29/2013 | 215-492-7205 | 610-290-6957 | 9:07 PM | 4 Mins |
| 5/29/2013 | 800-654-4173 | 610-256-9457 | 8:52 PM | 15 Mins |
| 5/30/2013 | 215-492-7205 | 610-290-6957 | 10:56 AM | 3 Mins |
| 5/30/2013 | 215-492-7205 | 610-290-6957 | 1:11 PM | 2 Mins |
| 5/30/2013 | 215-492-7205 | 610-290-6957 | 1:12 PM | 7 Mins |
| 5/31/2013 | 215-492-7205 | 610-290-6957 | 11:11 AM | 4 Mins |
| 5/31/2013 | 215-492-7200 | 610-256-9457 | 3:35 PM | 5 Mins |
| 6/19/2013 | 800-654-3131 | 610-290-6957 | 1:47 PM | 19 Mins |
| 7/22/2013 | 610-529-6528 | 610-290-6957 | 4:51 PM | 2 Mins |
| 7/22/2013 | 610-529-6528 | 610-290-6957 | 5:00 PM | 1 min |
| 7/22/2013 | 215-492-7205 | 610-290-6957 | 6:47 PM | 3 Mins |
| 7/22/2013 | 215-492-7205 | 610-290-6957 | 7:20 PM | 11 Mins |
| 7/22/2013 | 215-492-7205 | 610-290-6957 | 7:35 PM | 1 Min |
| 7/29/2013 | 215-492-7205 | 610-290-6957 | 6:52 PM | 3 Mins |

MSJ Exhibit 5 - Grady Phone Records.

14.    Moreover, Ms. Grady also frequently texted Hertz employee John, who helped her renew the rental and make sure she was authorized to use the rental. See MSJ Exhibit 2 - Grady Interrogatory Answers, at ¶6.

15.    John in particular informed Ms. Grady by text that after three months of rental she had to return to the Hertz location in person. Id.

16.    On July 15, 2013, Hertz charged Ms. Grady's debit card ending in '0583 an additional $2,444.94 for her rental of the Chevrolet Yukon—the same debit card they charged the for the initial $1,805. See MSJ Exhibit 6 - Grady TD Bank Records.

Case ID: 151103380
Control No.: 17090690

17.     Hertz's designee admitted in sworn testimony that Hertz had nothing to dispute

that Hertz charged Ms. Grady the $2,444.94:

| COUNSEL: | Do you have anything in your possession or control to dispute the fact that Hertz in fact charged her card $2,444.94, on 7/15, the card ending in 0583 and that Hertz in fact did retain that full amount of the money for the rental? |
| MR. LIVINGSTON: | I don't have any documentation to show that payment, no. |
| COUNSEL: | You don't have any documentation to dispute that payment either, do you? |
| MR. LIVINGSTON: | No. No. |

MSJ Exhibit 8 - Livingston Deposition, at p.252.

18.     Another Hertz designee explained that Hertz had no records for Grady because

Hertz had outrageously and illegally purged all of Grady's rental contract information, including

her rental payments:

| COUNSEL: | So you're telling me, as you sit here today, you're speaking, just so you know, as Hertz's voice. You're the corporate designee, the person most knowledgeable from Hertz to testify as to certain things. You've been identified as someone to speak to and you've identified that there was and an email, that you, as general manager, sent to Oklahoma City billing to determine whether or not the 2500 on 7/15 was a final bill, partial payment, full payment or what it is, correct? |
| JAUSSI: | Correct. |
| COUNSEL: | And as you sit here today, you're telling me that you personally do not know whether or not that payment was a final payment, or that payment was authorized, or that payment cleared, or that payment was a partial payment or a full payment, correct? |
| JAUSSI: | Correct. All they stated from my recollection is that it was **_purged_**. It's been **_purged_**. There's no further information that could be provided because **_that contract has been_** |

Case ID: 151103380
Control No.: 17090690

*purged*.

<u>See</u> MSJ Exhibit 11 - Jaussi Deposition, at p.37-38 (emphases added).

19.    In the evening on or about July 18, 2013, Ms. Grady in fact took the rental Chevrolet Yukon to the Philadelphia Airport Hertz location as John had told her to do because the three-month rental period was up. <u>See</u> MSJ Exhibit 2 - Grady Interrogatory Answers, at ¶6.

20.    At the Hertz rental location, Ms. Grady was first helped by a new hire, a 19-20 year old white male who was thin. However, Ms. Grady was quickly able to tell that this customer service associate could not help her due to his inexperience. <u>Id.</u>

21.    Ms. Grady then texted John, and John told her to speak to the shift supervisor. The shift supervisor was far more helpful. He was a short, heavy-set black man with pockmarks and pimples on his face and short curly hair. <u>Id.</u>

22.    Ms. Grady explained that she was going on vacation to Williamsport for the next week and that she did not want any issues with her rental. <u>Id.</u>

23.    The Hertz shift supervisor stated that he understood the situation, that he had notated all of this in the Hertz computer system, that there was no problem with her rental contract, and that she could return the Yukon following her vacation. <u>Id.</u>

24.    Subsequently, Ms. Grady went to drive the Yukon out of the Hertz lot. <u>Id.</u>

25.    However, before doing so she needed to stop at the checkout booth. It is impossible to leave a Hertz car rental lot without authorization because Hertz has retractable tire spikes guarding the exits. <u>Id.</u>

26.    A white woman, who was 40 years old with curly blond hair, checked Ms. Grady's contract and verified with the shift supervisor that Ms. Grady's rental was authorized. <u>Id.</u>

Case ID: 151103380
Control No.: 17090690

27.     Ms. Grady was then allowed by Hertz to leave the Hertz lot with the Chevrolet Yukon. Id.

28.     Hertz's corporate designee, Philadelphia Airport branch location manager Joseph Jaussi, admitted that Hertz had no information to dispute that Plaintiff had returned to the Hertz location on July 18, 2013, with the Yukon and was allowed by Hertz to leave—in fact Hertz did no investigation whatsoever to ascertain whether Grady had returned with the Yukon:

> COUNSEL:         As Hertz's corporate designee and the person most knowledgeable, you don't have any testimony to -- you don't have any factual testimony to indicate that that -- that an investigation was done to determine the truth or falsity of the statement that she entered and exited the [Philadelphia Airport] location on that date [July 18, 2013], correct?
>
> MR. JAUSSI:      Correct.

MSJ Exhibit 11 - Jaussi Deposition, at p.203. This is a case of the defendant preferring willful ignorance to the truth.

**b.      Hertz Falsely Reports Grady for Stealing the Car Resulting in Her Arrest and Imprisonment**

29.     Just 7 days after Ms. Grady paid Hertz $2,444 for the rental, and just 4 days after Ms. Grady visited the Hertz location, Hertz shockingly went to the Philadelphia Police on July 22, 2013, and reported Ms. Grady to the police for theft. See MSJ Exhibit 12 - Police Affidavit.

30.     Hertz falsely claimed on July 22, 2013, in a "theft package," put together by Hertz staff in Oklahoma City, that Ms. Grady had not contacted Hertz since April 17, 2013, and had stolen the Yukon. See MSJ Exhibit 10 - Theft Package.

31.     As the phone records, bank records, and visits to the Hertz location show, this was simply untrue—Grady was at all times authorized to use the Yukon as Hertz knew or should have known. See, e.g., MSJ Exhibit 5; MSJ Exhibit 6.

Case ID: 151103380
Control No.: 17090690

32.    GMC's OnStar service quickly located the vehicle and the State Police pulled Ms. Grady over as she was returning from her vacation in Williamsport, PA—and was in fact on her way to the Philadelphia Airport Hertz location. See MSJ Exhibit 12 - Police Affidavit.

33.    This was not a routine stop: upon being pulled over by several police cars, the police ordered Ms. Grady and her friend Roula Vangelis out of Yukon over a loudspeaker. Their guns were drawn. See MSJ Exhibit 2, at ¶6.

34.    Ms. Grady and Ms. Vangelis were held at gunpoint by the State Police who believed that they were car thieves. Ms. Grady was sobbing and Ms. Vangelis was desperately screaming that her two young children were in the back of the SUV. Id.

35.    It was at this point that State Trooper Randy Kemmerling told the two women that the car had been reported stolen. Ms. Vangelis stated, "That's ridiculous, she has a contract with Hertz." Id.

36.    At this point, the officer retrieved the contract from the Yukon. It was then that the two women implored Trooper Kemmerling to call John—the Hertz customer representative that she rented the car from—to confirm that Ms. Grady had not stolen the car. Id.

37.    John was called and a message was left. John called back and told the police that Ms. Grady was authorized to have the car but that he was not at work and that an 800 number at Hertz should be called. Id.

38.    The police called the 800 number and confirmed that Ms. Grady was authorized to have the car. Id.

Case ID: 151103380
Control No.: 17090690

39.     As a result, the State Police did not arrest Ms. Grady, did not issue her a ticket, and did not issue her a summons or citation; instead they ferried her to a Hardy's location to await a ride from a friend. The police however impounded the car pursuant to protocol. Id.

40.     A report written and submitted Trooper Kemmerling makes it clear that he was advised *by Hertz* on or after July 22, 2013, that there had been a "miscommunication" on Hertz's end, that the car was not stolen, and *that Ms. Grady had done nothing criminal and that Hertz would instead seek civil restitution for any overdue rental bills*:

---

**Synopsis:**
This incident occurred as Hertz Rental Company reported a vehicle as stolen. The vehicle was stopped at the above location and all occupants were identified. Upon calling Hertz Rental Company and the Philadelphia Police Department, it was determined this is a civil issue regarding late payment and the vehicle was not stolen.

---

HERTZ Rental Company was contacted and advised that the credit card listed on the contract with the suspect had returned with insufficient funds and as a result the account was overdue. As a result they reported the vehicle stolen. HERTZ advised they would prefer the vehicle to be towed and picked up by a representative and would handle the civil tort regarding payment with the suspect.

---

**Conclusion/Recommendation:**
I recommend this investigation be terminated due to the fact that Hertz Rental Company will be handling this situation through civil action. It was found that the vehicle was reported as stolen from the Philadelphia Airport rental terminal after a miscommunication regarding an overcharged credit card as part of a Hertz Rental Car contract. Philadelphia PD has been provided all requested documentation and was advised the vehicle was towed/recovered.

---

8. INCIDENT DETAILS
This incident occurred as a GMC YUKON was reported stolen by Hertz Rental Company. The vehicle was traveling southbound at the above location when the incident was reported. A traffic stop was conducted on SR 322, in Dauphin County, PA. Upon making contact with the operator of the vehicle and contacting Hertz, it was determined that this is a civil issue relating to late payment on a rental contract.

---

MSJ Exhibit 7 - State Police Trooper Kemmerling Report.

41.     There was not even a civil tort against Ms. Grady; Ms. Grady had most recently paid $2,444 for the rental on July 15, 2013, and specifically obtained authorization in person on July 18, 2013, to possess and use the rental.

Case ID: 151103380
Control No.: 17090690

42.     Indeed, Ms. Grady was always authorized to use the rental by Hertz.

43.     Hertz's inexcusable conduct has continued during this lawsuit. When Plaintiff asked Hertz to identify all communications it had with the police, Hertz deliberately omitted from its answers that it told Trooper Kemmerling that Ms. Grady had not stolen the car. See generally MSJ Exhibit 3 - Hertz Discovery Answers.

44.     This concealment of evidence and statements by Hertz, discovered only by subpoenaing police records, demonstrates consciousness of guilt on the part of Hertz.

45.     Moreover, the miscommunication referred to was in fact a direct result of defendant Hertz's reckless policies used in reporting customers to the police, described infra.

46.     As a result of Hertz's actions, the Philadelphia Police filed an affidavit accusing her of theft. See MSJ Exhibit 12.

47.     On October 25, 2013, Ms. Grady was driving in New Jersey completely unaware that Hertz had accused her of car theft. She was pulled over during a routine traffic stop. See MSJ Exhibit 2, at ¶6.

48.     The police officer ran Ms. Grady's driver's license and then, upon seeing a warrant from Pennsylvania, immediately arrested her for "fraud." See MSJ Exhibit 14 - New Jersey Police and Prison Records.

49.     Ms. Grady was then imprisoned in New Jersey and Philadelphia until being released on November 5, 2013. See MSJ Exhibit 15 - New Jersey Police and Prison Records.

50.     While imprisoned in New Jersey in Burlington County, Ms. Grady was sexually assaulted and battered. See MSJ Exhibit 2, at ¶6.

Case ID: 151103380
Control No.: 17090690

51.     Following this, at Hertz's behest, the Philadelphia DA's Office then prosecuted Ms. Grady for eight months. See MSJ Exhibit 4.

52.     However, after nine preliminary hearings, the court finally dismissed the charges against Ms. Grady for lack of prosecution until June 2014. Id.

      c.    **Hertz Admits that it Conducts No Investigation Before Reporting Customers for Theft, which is Highly Reckless Conduct that Shows Indifference to the Rights of Its Own Customers**

53.     Hertz maintains written policies governing how cars must be reported to the police for thefts. See Exhibit 9 - Theft Reporting Procedure.

54.     The policy is explicit that the local corporate security manager who receives a theft report must investigate the alleged theft of a car and that all branch employees are ***required*** to cooperate with the investigation:

> 17.   Corporate/Country Security Manager Investigations - Every theft/conversion/disappearance must be promptly investigated by the Corporate/Country Security Manager responsible for the location from which the related Theft Vehicle Report is filed. All employees are required to cooperate fully with such an investigation.

Id.

55.     However, Hertz's designees admit that such an investigation is, in reality, ***never conducted***.

56.     The corporate security manager for defendant Hertz in the Philadelphia area is an employee named Rich Livingston. Mr. Livingston was deposed in this case as Hertz's corporate designee, who binds the corporation with his answers, who is most knowledgeable about the allegations in the complaint.

Case ID: 151103380
Control No.: 17090690

57.     Livingston explained that corporate security managers receive "theft packages" from Hertz's corporate headquarters in Oklahoma City and then report customers to the police **without doing any investigation or "independent check" whatsoever**.

58.     There was a theft package sent to Mr. Livingston's office from Oklahoma City regarding Ms. Grady, which stated that Ms. Grady had not contacted the Hertz office since April 17, 2013. This was, of course, wrong, as a cursory investigation would have revealed that Ms. Grady was in constant contact with Hertz, that she had paid over $4,200 for the rental, and that she had personally visited the Hertz location on July 18, 2013, to obtain authorization to use the vehicle.

59.     Mr. Livingston's assistant corporate security manager, Kenneth Graeber, was the individual that reported Ms. Grady to the police. See MSJ Exhibit 3 - Hertz Discovery Answers, at ¶21.

60.     However, Mr. Livingston admitted that Hertz itself has given him and his office "marching orders," in direct contravention of Hertz's written policy, to never conduct an investigation into potential thefts before reporting customers to the police:

| | |
|---|---|
| COUNSEL: | Is it your testimony that you don't go to the location and question any of the Hertz employees when you receive a theft package? |
| MR. LIVINGSTON: | That's my testimony, yes. |
| COUNSEL: | Why? |
| MR. LIVINGSTON: | Because I mean the package has been completed, all the reports have been reviewed, I guess, by OKC. **And my marching orders are to report the car stolen** when I get the -- again, I do look at it for everything being accurate, as far as I can tell, **within the report itself**. |
| COUNSEL: | Yeah. But you don't do any independent investigation? |

Case ID: 151103380
Control No.: 17090690

| MR. LIVINGSTON: | **I do not**. |
| COUNSEL: | You don't do any check? |
| MR. LIVINGSTON: | **I do not**. |

<u>See</u> MSJ Exhibit 8 - Livingston Deposition, at p.252 (emphases added).

61.    Again, Mr. Livingston admitted under oath, as corporate designee on security for Hertz, that his "marching orders" from Hertz are to simply take the theft package he receives from headquarters, ***assume it is accurate***, and then report Hertz's customers to the police without any investigation and with no actual knowledge if the customers have stolen anything—in direct violation of Hertz's own written policies.

62.    Hertz's written policies demonstrate that Hertz ***knows*** that an investigation at the branch level where the car was actually rented, before going to the police, is vital and necessary. Yet, Hertz's designee shockingly admitted in his deposition that his "orders" from Hertz are to refrain from conducting any investigation and that he instead simply acts as a courier between Hertz headquarters and the Philadelphia Police.

63.    Indeed, when Plaintiff asked Hertz to identify what redundancies it has in place to make sure customers are not wrongfully reported to the police, Hertz directed Plaintiff to look at its written theft reporting policies including the policy which mandates an investigation by the corporate security manager (<u>see</u> Exhibit 3 - Hertz Discovery Answers, at ¶36 referencing W7-02)—the same policies which Hertz's designee testified that he has been instructed he has been given "marching orders" to ignore.

64.    Due to the outrageous lack of investigation, Hertz's local security manager literally had no idea when reporting Grady to the police on July 22, 2013, that she had paid $2,444 for the rental on July 15, 2013.

Case ID: 151103380
Control No.: 17090690

65.     This is a systemic, reckless, and outrageous failure by Hertz regarding its basic duties to its customers, which obviously include not falsely reporting them for crimes they did not commit.

66.     Mr. Livingston's testimony is consistent with that of Hertz's other corporate designee, Joseph Jaussi, the branch location manager at the Hertz Philadelphia location, who confirmed that Hertz's **local** **security** **staff** **conducts** **no** **investigation** in direct violation of Hertz's written policies:

> MR. JAUSSI:        So it's my understanding that Oklahoma City generates the [theft] packet and all the pertaining documents within it, feeds Ken Graeber or Rich Livingston, right, and Ken Graeber or Rich Livingston *essentially print, file, and go seek a police report claim or case number*.
>
> MR. MALOFIY:       Okay. So the theft package is already completed in Oklahoma City before it's sent to the corporate security manager at the Hertz location where the car was allegedly taken from, correct?
>
> MR. JAUSSI:        That's my understanding, correct.

MSJ Exhibit 11 - Deposition of Joseph Jaussi, at p.70.

67.     Hertz's interrogatory answers also admit that there was no internal communications by the Hertz local security managers, and hence no investigation, of Ms. Grady's case before she was reported to the police by Hertz assistant security manager Kenneth Graeber. See MSJ Exhibit 3 - Hertz Discovery Answers, at ¶¶20, 37; MSJ Exhibit 11 - Jaussi Deposition, at p.66-67.

68.     The fact of the matter is that Hertz does not have the personnel to actually investigate the theft reports it makes, and thus knowingly chooses to submit incomplete, out of date, and false reports. Hertz's corporate designee on security admitted that Hertz was attempting to cut corners and costs in its security department and even made a "*corporate*

Case ID: 151103380
Control No.: 17090690

*decision to lay off a large group of people at that time for costs savings.*" MSJ Exhibit 8, at p.53-54.

69.    Unconscionably, with no excuse for its conduct, Hertz has instead blamed the Philadelphia Police and District Attorney's Office for what happened to Ms. Grady, ignoring that the police and prosecutors were only relying in good faith on what Hertz told them. See MSJ Exhibit 3 - Hertz Discovery Answers, at ¶41 (stating that police authorities are liable for allegations in the complaint).

70.    A company cannot use the failure to conduct an appropriate investigation as an excuse for why it filed a false police report. Wainauskis v. Howard Johnson Co., 488 A.2d 1117, 1122-23 (Pa. Super. 1985) (stating that "The reasonable ground of suspicion, however, must not be based upon an inadequate and unreasonable investigation of the circumstances concerning the alleged criminal conduct."); Burgos v. Morgan, Lewis & Bockius LLP, NO. 735 EDA 2015 (Jan. 5, 2017).

71.    Note that the police detective who filed the criminal affidavit against Ms. Grady, based on what Hertz told him, admitted in his deposition that he would not have filed the affidavit of probable cause had he been aware of her phone records and payments, which contradict Hertz's allegations that Ms. Grady stole the car on April 17, 2013. See MSJ Exhibit 15 - Wojciechowski Depo., at p.116-19. He certainly would not have filed the affidavit of probable cause if he knew that Hertz admitted to the State Police on July 22, 2013, that Grady had not stolen the car.

72.    There are seven paramount undisputed material facts which establish that Hertz acted outrageously and with reckless indifference to Ms. Grady's rights, resulting in her

Case ID: 151103380
Control No.: 17090690

imprisonment, in her being physically and sexually assaulted, and in her being unjustly prosecuted:

a.   **First**, Hertz told the Pennsylvania state police that Ms. Grady had not stolen the car, that it was a "miscommunication," and that to the extent there was an issue it was civil in nature—but Hertz continued to have the Philadelphia police and district attorney's office arrest, imprison, and prosecute Ms. Grady despite admitting there was no probable cause to do so. <u>See generally</u> MSJ Exhibit 7 - State Trooper Kemmerling's Report.

b.   **Second**, Hertz admits that it ***routinely*** reports its customers to the police for felonies without conducting any investigation at the branch level. <u>See</u> MSJ Exhibit 8 - Livingston Depo., at p.252; MSJ Exhibit 11 - Jaussi Depo., at p.70.

c.   **Third,** Hertz has written policies mandating that its corporate security managers conduct investigations at the branch level (showing that Hertz knows it should not be reporting customers to the police without investigation), but Hertz's designees admitted that they have "marching orders" to ignore the written policies. <u>See</u> MSJ Exhibit 8 - Livingston Depo.; MSJ Exhibit 9 - Hertz Theft Reporting Procedures. Hertz even admitted that its only redundancy to prevent falsely reporting customers was the written policies—which it testified it routinely ignores. <u>See</u> MSJ Exhibit 3 - Hertz Discovery Answers, at ¶36.

d.   **Fourth,** Ms. Grady's phone and bank records demonstrate that she was in constant contact with Hertz and had paid on two separate occasions a total of over $4,200 for the rental. This directly contradicts Hertz headquarters's "theft package" given to the police which stated Grady had not contacted Hertz or paid for the rental since April 17, 2013. <u>See</u> MSJ Exhibit 5 - Grady Phone Records; MSJ Exhibit 6 - Grady TD Bank Records.

e.   **Fifth,** Grady physically returned to the Philadelphia Airport Hertz location on or around July 18, 2013, and was authorized to leave the Hertz location with the Yukon. <u>See</u> MSJ Exhibit 2 - Grady Interrogatory Answers, at¶6. Hertz's designees admit that they have no information whatsoever to dispute this fact. <u>See</u> MSJ Exhibit 11 - Jaussi Deposition, at p.203 (stating that Hertz did no investigation to determine whether Grady returned to the Hertz location on July 18, 2013, and had no reason to dispute Grady's statement).

f.   **Sixth**, Hertz's corporate security team in fact conducted no investigation concerning Ms. Grady and the Yukon at the branch level before reporting her to the police for car theft. <u>See</u> MSJ Exhibit 3 - Hertz Discovery Answers, at ¶17, 21.

g.   **Seventh,** at no point following July 22, 2013, until the case against Ms. Grady was dismissed in June 2014, did Hertz withdraw the criminal complaint it had lodged against Ms. Grady—and which Hertz had already admitted to the State Police was

Case ID: 151103380
Control No.: 17090690

not correct or make any attempt to correct the false statements and material omissions. <u>See</u> MSJ Exhibit 4 - Grady Criminal Docket.

h. **Eighth,** Hertz admitted that it "purged" all Grady's rental information, including her payments on the rental contract, without any explanation despite the fact that it initiated a criminal case against her for car theft. <u>See</u> MSJ Exhibit 11 - Jaussi Deposition, at p.37-38. A negative inference should be granted against Hertz by the trial judge for this outrageous destruction of evidence designed to prejudice Plaintiff's case.

## II.  LEGAL STANDARD

73.    In light of the outrageous and duplicitous nature of Defendant's conduct Plaintiff now moves to reconsider the prior decision dismissing punitive damages and/or amend his complaint to add punitive damages to the ad damnum clause. Pennsylvania law permits the recovery of punitive damages against a defendant who engages in conduct that is "outrageous, because of the defendant's reckless indifference of the rights of others." <u>FHV Coal, Inc. v. Continental Grain Company</u>, 587 A.2d 702, 704 (Pa. 1991).

74.    Reckless indifference means that "the actor has intentionally done an act of an unreasonable character, in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow." <u>Evans v. Philadelphia Transportation Company</u>, 418 Pa. 567, 574, 212 A.2d 440, 443 (Pa. 1965); <u>see also</u> <u>Smith v. Brown</u>, 283 Pa. Super. 116, 423 A.2d 743 (Pa. Super. 1980).

75.    Where there is sufficient evidence for a jury to reasonably conclude that a defendant has engaged in outrageous and reckless conduct, the question of whether the defendant is liable for punitive damages is properly decided by the jury.  <u>Martin v. Johns-Manville Corporation</u>, 494 A.2d 1088 (Pa. 1985).

76.    A prior decision may be reconsidered if the prior decision was plainly erroneous and/or new facts are uncovered and/or there is a change in the law. <u>See</u> <u>Baker v. Cambridge</u>

Case ID: 151103380
Control No.: 17090690

Chase, Inc., 1999 PA Super 9, P65 (Pa. Super. Ct. 1999).

77.    Defendant's conduct was outrageous and reckless—as the evidence presented above clearly demonstrates—and whether punitive damages should be assessed must be decided by a jury. Moreover, Hertz concealed evidence from plaintiff and the court to fraudulently obtain the dismissal of Plaintiff's punitive damages claim in the first place.

III.    APPLICATION - NEW EVIDENCE DEMONSTRATES THAT HERTZ KNEW OR SHOULD HAVE KNOWN THAT ITS RECORD KEEPING, INVENTORY TRACKING, INTERNAL COMMUNICATIONS, AND THEFT INVESTIGATIONS WERE SEVERELY DEFICIENT

a.    **Prior Decision was Plainly Erroneous Given How Recklessly Hertz Acted and the Known Consequences of False Police Reports**

78.    The prior decision dismissing punitive damages was plainly erroneous on the record at summary judgment because Hertz admitted that it deliberately does not conduct investigations required by company policy necessary to insure that its customers were not falsely reported to the police for car theft. This is highly reckless conduct in and of itself, which creates a question of fact for a jury on punitive damages. Furthermore, the evidence indicating that Hertz knowingly and falsely reported Grady to the police for cart theft on July 23, 2013, despite having told the Pa. State Police on July 22, 2013, she had not stolen the car. This was not some simple oversight, but the product of a reckless course of conduct which would assuredly result in false police reports.

79.    This case closely mirrors the recent Burgos v. Philabundance case. See Attached Order of the Superior Court. That was a malicious prosecution case in the Philadelphia Court of Common Pleas, in front of The Honorable John Younge where the defendant had (1) done no investigation prior to reporting to the police, (2) provided false information to the police, and (3)

Case ID: 151103380
Control No.: 17090690

omitted important facts from the police report (the same as in this case). All these failures amounted to recklessness, malice, lack of probable cause, and punitive damages. Punitive damages were heard and assessed by the jury, then affirmed by the Superior Court, for a total verdict of $500,000. Where there are causes of action like malicious prosecution, where the legal standard is nearly equivalent as punitive damages, the question of punitive damages should be left to the jury.

> **b.    The Prior Decision Should be Reconsidered Because the Negative Inference Against Hertz for Destroying Ms. Grady's Rental Records had Not Yet Been Decided at Summary Judgment**

80.     The prior decision should also be reconsidered because, at summary judgment, the Court did not decide whether a negative inference should be assessed against Hertz for admittedly destroying Plaintiff's rental records. This is a determination left for the trial judge.

81.     Because this inference is left for the trial judge, if this court decides that a negative inference and spoliation instruction is warranted—as it is here—then that negative spoliation inference constitutes new evidence warranting reconsideration of the prior order. Plaintiff has a pending motion in limine on this issue which Plaintiff incorporates by reference. See also MSJ Exhibit 11 - Jaussi Deposition, at p.37-38

82.     When Hertz's absurd and outrageous conduct leading to Grady's prosecution and imprisonment are taken into account, and then considered in combination with the intentional destruction of Grady's rental records, a clear triable issue of fact exists for the jury on punitive damages.

> **c.    New Evidence Concealed by Hertz Indicates that Hertz has a Nationwide, Systemic Problem with False Police Reports and that Ms. Grady's Imprisonment is Predictable Result of Hertz's Outrageously Deficient Conduct**

Case ID: 151103380
Control No.: 17090690

83.     In addition to these reasons for reconsideration, Plaintiff has uncovered new evidence of a systemic, nationwide problem Hertz has reporting customers to the police for car theft and wrongly reporting cars stolen. This new evidence proves that Hertz dysfunctional company procedures and policies often result in false police reports and that Ms. Grady's case is not simply some one-off mistake.

84.     Hertz outrageously concealed this nationwide issue and refuses to correct the problem, despite having been told by multiple police departments that the company needs to fix its policies and practices immediately.

85.     Hertz repeatedly denied in the answer to the complaint, in depositions, and in its summary judgment motion that false police reporting had ever happened at Hertz. In fact, Hertz characterized the issue as, at worst, a one-time "glitches in the [computer] system that did not alert Hertz that the renter had called or payed [sic] for the vehicle" and stated "such a potential glitch does not amount to malice." See Hertz Motion for Summary Judgment, at ¶59-62.

86.     Hertz successfully argued that punitive damages should be dismissed at summary judgment because there no evidence that Hertz disregarded "a risk known to [it] or so obvious that he must be taken have been aware of it, and so great as to make highly probable that harm would follow." See id.

87.     Since the dismissal of punitive damages on January 19, 2017, Plaintiff has discovered proof that Hertz has a nationwide problem falsely reporting customers to the police for car theft and that, given how widespread the problem is, it absolutely had to have known that it was systematically filing false police reports in 2013. This also explains why Grady's rental records were destroyed.

88.     Specifically, the new evidence is that Plaintiff has discovered that Hertz has falsely reported at least three other customers to the police, as well as multiple vehicles, and that these false police reports are the result of the same knowingly defective and dysfunctional police reporting procedures at issue in this case. Several police authorities have simply stopped taking Hertz theft reports because they are so unreliable.

89.     The common themes connecting each case, and Ms. Grady's case, are:

(1)   a complete failure within the company to share critical information between corporate, branch, and security locations,

(2)   a complete failure to accurately keep records and track inventory,

(3)   a willful effort to ignore and circumvent Hertz's own theft reporting procedures designed to prevent false police, and

(4)   nonexistent or highly inadequate investigations.

90.     The locations of these false police reports are:

a.   Galveston, TX

b.   Indianapolis, IN/Madison, WI

c.   Louisville, Kentucky

d.   Pennsylvania (in addition to Ms. Grady)

**Jury Found Hertz Liable in January 2017 in Texas for Malicious Prosecution and Punitive Damages After Falsely Reporting and Imprisoning Man for Car Theft; Hertz Concealed this Lawsuit and Verdict from Plaintiff**

91.     In Texas a jury found in January 2017 that Hertz was liable for malicious prosecution for falsely reporting a man to the police for car theft. This jury verdict was $50,000 in compensatory damages for the man's one night in jail, and another $120,000 in punitive damages. See Exhibit 8 - Punitive Damages Jury Verdict and Complaint from Texas Malicious Prosecution Case Against Hertz.

Case ID: 151103380
Control No.: 17090690

92.    The verdict in the Texas case was returned on January 20, 2017, after the summary judgment ruling in this case. Id.

93.    The arrested man had his identity stolen and the identify thief used the man's identity to rent a car at a Hertz subsidiary in March 2014. The man called Hertz and notified Hertz in April 2014 that it was not him, that he had not rented the car, and that his identity was stolen. Id.

94.    However, even after notifying Hertz that his identity was stolen, a local Hertz employee nevertheless went to the police in May 2014 and reported this innocent man for car theft, resulting in his arrest and imprisonment for one night. Id.

95.    No one at Hertz corporate had taken any steps to make sure that this man's identity theft report was promulgated throughout the company, and plainly the Hertz employee who made the report had done either no investigation or a thoroughly inadequate investigation.

96.    This is exactly the same thing that happened in this case to Ms. Grady. Just as with Ms. Grady, Hertz knew that this man had not stolen the car (in Ms. Grady's case, Hertz even told the State Police she had not stolen the car and that the initial police report was a mistake).

97.    Nevertheless, because of Hertz's deficient procedures and failure to properly investigate the customers it reports to the police, this totally innocent man spent a night jail because Hertz local security office reported him to the police anyway.

98.    Note that Hertz's corporate designee falsely denied in a deposition in October 2016—while the 2015 Texas case was pending—that he knew of any other cases where Hertz had been sued for malicious prosecution:

Case ID: 151103380
Control No.: 17090690

| | |
|---|---|
| MR. MALOFIY: | Fourteen: Any information concerning Hertz having been sued for false imprisonment, malicious prosecution, potential infliction of emotional distress, or any other causative action stemming from Hertz reporting a rental car as having been taken, possessed without authorization by a customer? |
| JAUSSI | I'm not aware of any of those scenarios. |
| MR. MALOFIY: | Okay. Are you aware of Hertz being sued for improperly reporting a renter to police? |
| MR. WOLF: | Besides the present case? |
| MR. MALIFOY: | Yes. |
| JAUSSI: | Besides the present case, been at Hertz 12 years, never heard of it. |
| MR. MALOFIY: | Okay. Fifteen: Any information regarding Hertz having been accused of improperly reporting rental car as having been taken or possessed without authorization by customer? |
| JAUSSI: | Not that I'm aware of, outside of this case. |

See MSJ Exhibit 11 - Jaussi Deposition, at p.56-57.

99. Jaussi also falsely denied any knowledge of "malfunctions" with Hertz computer systems concerning the input of customer data or information:

| | |
|---|---|
| MR. MALOFIY: | Do you have any information regarding Number 3; documents, communications or things, electronic, paper, or any other format in your possession, access, control, including but not limited to texts, emails, faxes, voice mail, letters, notes, contracts, calendars, phone records, signed documents, that concern, errors, malfunctions, anomalies, or incorrect data input with the computer programs and systems used by Hertz Corporation, including but not limited to, errors, malfunctions, or other anomalies concerning the programs and systems that contain information related to Kelly Grady? |
| DESIGNEE: | Not that I recall or know of. |
| MR. MALOFIY: | Do you know of any errors or malfunctions in the Hertz computer systems which inputs customer data or information? |
| DESGINEE: | Not that I'm aware of. |

See MSJ Exhibit 11 - Jaussi Deposition, at p.48-49.

Case ID: 151103380
Control No.: 17090690

100.    Hertz's sworn interrogatory answers also denied there were any errors or malfunctions:

> 26.    Identify any errors, malfunctions, or other anomalies with the computer programs and systems run by The Hertz Corporation, including but not limited to errors, malfunctions, and/or other anomalies concerning the programs and systems that contain information relating to Kelly Grady.
>
>> Response to 26. None.

See MSJ Exhibit 3 - Plaintiff's Interrogatories and Hertz Answers.

101.    There is no way that Hertz could have failed to have known in 2016 when Jaussi testified and Hertz answered the interrogatories, based on the Texas case alone, that (1) it had serious debilitating internal communications failures between corporate, location, and security locations, (2) extremely poor record keeping and inventory tracking, and (3) that it was not conducting sufficient investigations before reporting innocent individuals to the police.

102.    There is no way that Hertz and its attorneys did not know about this Texas case, and later about the verdict against Hertz for malicious prosecution and punitive damages. Despite knowing about the case, and the later verdict, Hertz gave false deposition answers and never updated or supplemented it discovery answers or deposition answers.

103.    Moreover, as discussed *infra*, police departments in at least Indianapolis and Louisville have reached out to Hertz in 2015 and 2016 to inform them that they are making false reports; none of this was disclosed by Hertz, and was only uncovered through sedulous and intense investigation by Plaintiff.

104.    Given that the Texas malicious prosecution and punitive damages verdict came after the summary judgment opinion, and given that Hertz concealed this Texas case, this is new evidence which creates a triable issue of fact for the jury on whether punitive damages should be

Case ID: 151103380
Control No.: 17090690

imposed and warrants the reinstatement of Plaintiff's claim for punitive damages.

105.    Hertz knows that it has a huge problem across the country but is obstinately and stubbornly refusing to fix it, which is putting additional customers at a huge risk. Punitive damages are needed to deter Hertz from continuing its outrageous and dangerous course of conduct.

**Hertz Falsely Reports Innocent Woman for Car Theft in Indianapolis When She Was Authorized to Have the Vehicle, Paid for the Rental, was in Contact with Hertz by Phone, and had Visited the Location with Vehicle—Exactly as What Happened in Plaintiff's Case; This was Concealed from Plaintiff**

106.    In the Indianapolis/Madison incident, Hertz's conduct was even worse than in Texas.

107.    A woman named Ramanda Van Pay rented a car from Hertz in Green Bay, WI. See Exhibit 1 - Affidavit of Ramanda Van Pay. During her rental she got a flat tire and took the car to the Hertz location at the Indianapolis Airport near where the flat occurred. Exhibit 1; Exhibit 2 - Van Pay Rental Documents Proving She Was Authorized to Possess Car. The Indianapolis Hertz location gave her a different car, a Hyundai Elantra, as part of her rental and told her when she got home to Wisconsin to check in with the Green Bay branch to make sure everything was okay.

108.    A vehicle exchange form was filled out at Hertz, identifying Van Pay's new vehicle. See Exhibit 2. Hertz's Rental Agreement System contains "rental notes" indicating that "Mechanical exchange in Indianapolis on 8/18 because of flat tire. New Unit # 1 293356. Indy gave customer vehicle exchange addendum form." Id.

**109.    Note that Ms. Grady saw the Hertz representative enter "rental notes" on her rental contract when she returned to the location on July 18, 2013, stating that she**

Case ID: 151103380
Control No.: 17090690

**would be returning the rental on July 22, 2013. These rental contract notes, and everything else relating to the rental, were destroyed and purged by Hertz. See MSJ Exhibit 2, at ¶6.**

110.    Ms. Van Pay did check in with the Green Bay branch, who told her to keep the car for the remainder of her rental. Exhibit 2. Ms. Van Pay, like Ms. Grady, repeatedly called both the local and corporate numbers to make sure she was authorized to have the car. Id. Like Ms. Grady, Van Pay visited the Hertz location to make sure her rental was okay on or around November 3, 2016. Like Ms. Grady, Van Pay had paid for the rental. Id.

111.    Van Pay also has screen shots of her phone showing the call she made to Hertz about her rental—just as the State Trooper Randy Kemmerling observed Grady had records on her phone showing she called Hertz the week before she was pulled over. See MSJ Exhibit 7 - State Police Report.

112.    Unbeknownst to Van Pay, the Indianapolis Hertz had reported the Elantra she was renting stolen approximately one month before. See Exhibit 3 - Indianapolis Police Report; Exhibit 4 - Criminal Docket for Van Pay; Exhibit 5 - Fond du Lac Sheriff's Records; Exhibit 6 - Additional Fond du Lac Sheriff's records.

113.    Despite having physically visited and called a Hertz location on or around November 3, 2016, Van Pay was pulled over and arrested on November 5, 2016. The Hertz location in Green Bay never told her the car was flagged or reported stolen; indeed, they told her that her rental was fine. Exhibit 1.

114.    Despite official Hertz notes in Hertz's computer system stating that Van Pay had switched her car to the Elantra, Hertz's dysfunctional record keeping system failed to share this information between corporate, local branches, and corporate security. See Exhibits 1-6.

Case ID: 151103380
Control No.: 17090690

115.    Please keep in mind that this is the same type of "failure to communicate" within Hertz that occurred in both Grady's case and the Texas case. Like Van Pay, Grady returned to the Hertz lot—in addition to contacting Hertz by phone—but Hertz's branch location failed to realize that there were allegedly issues with Van Pay or Grady's rental vehicles and that they had actually been reported stolen by hertz. It is outrageous and absurd that Hertz cannot even keep track of its vehicles and renters and reliably communicated between branches.

116.    Hertz needs to immediately suspend all vehicle theft reports in the wake of these revelations.

117.    As a result of Hertz's terrible record keeping and information sharing, the Indianapolis Hertz location told the police that the car Van Pay had been given had been stolen off the lot, an egregious misapprehension of the truth.

118.    Again, the reporting Hertz employee did no investigation to make sure that the police report was accurate, despite the Indianapolis location having given Van Pay the car, had her fill out the exchange form, and noted this fact in the rental system.

119.    It is know from the testimony of Hertz's designees in this case that Hertz locations do not conduct required investigations before reporting cars to the police.

120.    It is simply astounding that the Indianapolis Hertz could have given Van Pay a rental car, but then reported that same car stolen shortly thereafter.

121.    To recap, just as in Ms. Grady's case, no one at Hertz in the Green Bay branch or anywhere else realized that (1) the car Van Pay was renting had been reported stolen by Hertz, and (2) that Van Pay had returned to a Hertz location with the very rental vehicle considered stolen and also communicated by phone but was never told the vehicle was considered stolen.

Case ID: 151103380
Control No.: 17090690

122.    Note that Hertz is claiming in this case that all locations would know through the computer system when a car is flagged; plainly the Van Pay and Grady cases show this is not true.

123.    Hertz knows that its system is wildly dysfunctional and not accurately keeping track of its inventory, yet is pretending that everything is fine.

124.    As a result of Hertz's dysfunctional and reckless conduct, Van Pay was arrested and spent three days in prison.

125.    The charges were dismissed when the prosecutor in Madison, WI and the police in Indianapolis, IN realized that Hertz had completely screwed up that and that Van Pay had not stolen the car. Exhibit 4.

126.    The Indianapolis Airport Police have indicated that Van Pay is not the only false police report by Hertz. See Exhibit 1.

127.    The Airport Police have indicated that a businessman was arrested in Pennsylvania because of a false Hertz car theft police report, as well as others.

128.    As a result, the Indianapolis Airport Police no longer consider Hertz theft reports valid and reliable and refuse to enter them on the NCIC. See Exhibit 1.

**Louisville Regional Airport Police Refuse to Accept Hertz Theft Reports Because They Are Unreliable and Inaccurate; Hertz Not Only Concealed these False Reports from Plaintiff, but also Concealed that the Police Specifically Contacted Hertz's Corporate Security Division to Complain about the False Police Reports**

129.    The Louisville Regional Airport Police also have experienced the same problems with Hertz, concerning its dysfunctional and broken information sharing and record keeping. See Exhibit 7.

130.    Police records shows that the Hertz location in Louisville reported multiple cars stolen off its lot. Several of these reported cars were later reported found on Hertz lots, meaning

Case ID: 151103380
Control No.: 17090690

Hertz had simply lost the cars in their own inventory. See Exhibit 7.

131.    Note that this is exactly why Van Pay was arrested in Wisconsin, because Hertz reported a car stolen that it improperly not kept track of. Note that Hertz also failed to keep track of Grady's car when she returned to the Hertz lot on July 18, 2013.

132.    Not only does this show a total and complete failure of record keeping and information sharing between corporate, branch, and security locations, but it demonstrates that Hertz is barely, if at all, investigating its car theft reports before they are submitted to the police.

133.    The total record keeping failure, internal communication failure, failure to track inventory, and failure to investigate are the same reasons Grady was falsely reported.

134.    Hertz is using the police as a repo service, willfully and recklessly ignoring that these false police reports will result in the arrest and imprisonment of their own customers.

135.    A Hertz employee in Nashville, Tennessee told the Louisville Regional Airport Police in June 2015 that Hertz ***internally knows of the problem*** that branch locations cannot keep track of inventory and are making false police reports without proper investigation:

> Off. Hairgrove spoke to a Hertz sales rep in Nashville who confirmed they received a car from a customer that was originally rented in Louisville back in March. It sat. on his lot for 60 days until it was sold 6/6 to a car lot in Hopkinsville, KY. We took a report on 3/25 from Hertz that this was stolen missing from their inventory.
>
> After that, we did a complete search online of all VIN #'sin the stolen auto database and got a return Of 2 more Hertz autos believed to have been sold or scrapped. **The Nashville Hertz rep commented that Louisville office is horrible with their paperwork and vehicle tracking**.
>
> Until Hertz corporate takes some action with their Louisville lot and personnel, I recommend that we suspend taking stolen auto reports for Hertz for "missing inventory" unless they physically see someone steal an auto, have evidentiary proof of such or obviously non returns that warrants have been taken. Hairgrove has reached out to their Corporate Security office.

Case ID: 151103380
Control No.: 17090690

See Exhibit 7 (emphasis added).

136.    Needless to say, this explosive fact that Hertz has known internal problems when falsely reporting cars stolen was not disclosed in discovery in 2016.

137.    Hertz's designee and attorneys never disclosed this fact. Plaintiff had no way to obtain this information until after the summary judgment order in January 2017.

138.    The Louisville Regional Airport Police, just like their Indianapolis counterparts, now also refuse to enter Hertz theft reports into the NCIC because of these repeated false reports.

139.    All of this is brand new information which Hertz concealed from Plaintiff, and which creates a triable issue of fact for a jury on punitive damages.

140.    Plaintiff also notes that the initial decision to dismiss punitive damages was clearly erroneous given the unambiguous testimony of Hertz's designees that Hertz does not conduct required investigations before going to the police.

141.    What is happening to Hertz's customers is no accident, and is not the result of a one-time glitch. Hertz has known for quite some time that it is making entirely unsupportable police reports based on nonexistent and deficient investigations, coupled with outrageously poor record keeping and information sharing within the company.

142.    When a company operates like Hertz does, false police reports such as what happened to Ms. Grady and Ms. Van Pay are inevitable. Hertz is playing Russian Roulette with its customers' lives.

143.    Punitive damages are warranted not only to deter future conduct, but also to punish Hertz for its duplicitous and dishonest behavior in attempting to cover up this massive,

Case ID: 151103380
Control No.: 17090690

nationwide problem.

WHEREFORE, Plaintiff respectfully requests this Honorable Court grant Plaintiff's Motion for Punitive Damages.

*****

*Respectfully submitted,*

FRANCIS ALEXANDER, LLC

*/s/ Francis Malofiy*

Francis Malofiy, Esquire
Attorney ID No.: 208494
280 N. Providence Road | Suite 1
Media, PA 19063
T:  (215) 500-1000
F:  (215) 500-1005
*Law Firm / Lawyer for Plaintiffs*

*/d/ September 6, 2017*

Case ID: 151103380
Control No.: 17090690

Francis Alexander, LLC
Francis Malofiy, Esquire
Attorney ID No.: 208494
280 N. Providence Road | Suite 1
Media, PA 19063
T: (215) 500-1000
F: (215) 500-1005
*Law Firm / Lawyer for Plaintiff*

The Court of Common Pleas
Philadelphia County, Pennsylvania

|  |  |
|---|---|
| Kelly A. Grady<br><br>    *Plaintiff*<br><br>      vs.<br><br>The Hertz Corporation;<br><br>Hertz Rent-A-Car Philadelphia Intl. Airport;<br><br>John Doe(s)[5]<br><br>    *Defendants* | Action Commenced By:<br>Writ of Summons On:<br>November 23, 2015<br><br>November Term, 2015<br><br>Civil Action No.:<br>151103380<br><br>Complaint filed:<br>February 22, 2016<br><br>Causes of Action:<br>  Malicious Prosecution<br>  False Imprisonment<br>  Int. Infliction of<br>  Emotional Distress<br><br>*Jury Trial Demanded* |

## Plaintiff's Memorandum in Support of Motion for Reconsideration on Punitive Damages

This is a malicious prosecution, false imprisonment, and intentional infliction of emotional distress lawsuit against The Hertz Corporation who filed a false car theft report against Plaintiff Kelly A. Grady and had her thrown in jail for 12 days and prosecuted for 11 months.

Plaintiff has recently discovered overwhelming evidence that Hertz—**with an absolute**

---

[5] Manager(s) at Hertz Rent-A-Car Philadelphia Intl. Airport from March 2013 to June 2014.

Case ID: 151103380
Control No.: 17090690

**reckless indifference to the rights of its customers**—has been concealing that it has a nationwide problem falsely reporting its paying customers to police for car theft. Hertz does little to no investigation before reporting its customers to the authorities and, worse, its employees are told to disregard Hertz's standard operating procedures—specifically designed to prevent false police reports and false arrests of its customers—which mandate that an investigation take place. Tragically, this is a serious nationwide problem—*concealed by Hertz throughout this litigation*[6]—whereby multiple police departments had to confront Hertz concerning this serious issue. Hertz needs to suspend all vehicle theft reports in light of these serious revelations.

None of this was disclosed by Hertz despite Hertz being asked in discovery if this was a known issue, and was only recently uncovered through sedulous and intense investigation by Plaintiff. Given that punitive damages were dismissed without explanation at summary judgment, see Exhibit 9, this new evidence warrant reconsideration and reinstatement of punitive damages. In addition, Plaintiff has requested a negative inference against Hertz for admitting to outrageously purging all of Grady's rental and payment information (which proved she did not steal the car); if and when such an inference is granted—an issue not before the summary judgment judge—it is also grounds for reconsideration of the dismissal of punitive damages.

Hertz, driven by a profit motive, acted maliciously, willfully, intentionally, and recklessly in flouting its very own standard operating procedures designed to prevent throwing innocent people in jail. This is a nationwide problem being dealt with by multiple police departments in at least five different states: **Pennsylvania, Indiana, Wisconsin, Kentucky,** and **Texas**.

---

[6] Please Note: none of this information could have been discovered before the punitive damages claims were dismissed on January 19, 2017.

Case ID: 151103380
Control No.: 17090690

The same problems have caused all of the incidents, including Ms. Grady's:

(1)    Failure to do adequate investigations;

(2)    Failure to follow standard operating procedures to prevent false police reports;

(3)    Failure to share critical information between corporate, branch, and security;

(4)    Failure to accurately keep records and track inventory.

Hertz's reckless and malicious conduct, where it has failed to correct known and serious problems for the purpose of protecting its bottom line, is exactly the type of conduct which warrants punitive damages and the reconsideration of the prior order dismissing punitive damages at summary judgment.

## HERTZ FALSELY REPORTS INNOCENT WOMAN FOR CAR THEFT

### LOCATION: INDIANAPOLIS, INDIANA

> ➢ She Was Authorized to Have the Vehicle.
> ➢ Paid for the Rental;
> ➢ Contacted Hertz by Phone, and had
> ➢ Visited Hertz Location with Vehicle
> ➢ Exactly as What Happened in Plaintiff's Case
> ➢ Hertz concealed this from Plaintiff

A woman named Ramanda Van Pay rented a car with Hertz in Green Bay and, after getting a flat tire, exchanged the vehicle for a new one in Indianapolis. See Exhibit 1 - Affidavit of Ramanda Van Pay. Van Pay was given an exchange form, and the exchange was noted in Hertz's rental system. See Exhibit 2. Van Pay called and visited the Green Bay location after exchanging the car in Indianapolis for a Hyundai Elantra as directed by Hertz, and was assured her rental was fine by her contact in Green Bay, Hertz representative Ryan Hogan. Id. However, outrageously, the Indianapolis Hertz falsely reported the Elantra given to Van Pay as stolen, having totally failed to record and share Van Pay's updated rental information—and having failed to conduct any real investigation before making the report. See Exhibit 3 - Indianapolis Police Report; Exhibit 5 - Fond Du Lac Sheriff's Records; Exhibit 6 - Additional Fond Du Lac Sheriff's Records. Despite Hertz corporate issuing a theft report for the car, Green Bay never knew nor was informed that the car given to Van Pay was reported stolen or told her anything was wrong, demonstrating a serious gap or error in Hertz's computer systems and policies.

As a result of Hertz's reckless and outrageous conduct, Van Pay was arrested without any

Case ID: 151103380
Control No.: 17090690

probable cause and thrown in jail for three days. See Exhibit 1; Exhibit 3; Exhibit 4 - Criminal Docket; Exhibit 5; Exhibit 6. Once the prosecutor in Fond du Lac County and the police in Indianapolis realized that Van Pay had done nothing wrong and had valid rental documents, they immediately dropped the prosecution. See Exhibit 1; Exhibit 2; Exhibit 4.

The Indianapolis police have reported a systemic problem with Hertz car theft reports, they have stated that a businessman was also wrongfully arrested in Pennsylvania due to a false Hertz theft report, and they have also stopped entering Hertz police reports in the NCIC due to their unreliability. See Exhibit 1. Plaintiff believes there are additional false reports by Hertz at the Indianapolis branch and other locations.

## Jury Found Hertz Liable in January 2017 for Malicious Prosecution and Punitive Damages After Falsely Reporting and Imprisoning Man for Car Theft

### Location: Galveston, Texas

> ➤ Hertz Concealed this Lawsuit and Verdict from Plaintiff

A man named Michael Gray had his identity stolen and the thief used his information to rent a car from Hertz in March 2014. See Exhibit 8 - Punitive Damages Jury Verdict and Complaint Against Hertz. Gray reported the theft of his identity to Hertz in April 2014 and made it clear that he had not rented the car. However, outrageously, Hertz reported Gray to the police for car theft in May 2015 anyway, resulting in Gray's wrongful arrest and imprisonment. Plainly, Hertz's record keeping, record sharing, and investigation of car thefts is severely and knowingly deficient. The jury returned a verdict of $50,000 for the one night Mr. Gray spent in jail, and $120,000 in punitive damages.

Just as in Ms. Grady's case, Hertz corporate knew that Grady had not stolen the car, but a local Hertz branch went and reported Ms. Grady and Mr. Gray to the police anyway.

## Louisville Regional Airport Police Refuse to Accept Hertz Theft Reports Because They Are Unreliable and Inaccurate

### Location: Louisville, Kentucky

> ➤ Hertz concealed these false reports from Plaintiff

> ➤ Hertz concealed that police specifically contacted Hertz's Corporate Security Division to complain about the false police reports.

The Louisville Regional Airport Authority has also stopped inputting Hertz police reports into the NCIC due to their unreliability. See Exhibit 7 - Louisville Regional Airport Authority Records. In 2015, Hertz in Louisville reported several vehicles missing as stolen from their inventory. However, Hertz was then forced to admit that they had then found the vehicles sitting on their own lots and had simply lost vehicles due to poor record keeping and information sharing. Remember, this is the exact same problem why Ms.

Case ID: 151103380
Control No.: 17090690

Van Pay was arrested, and intimately related to Ms. Grady's false arrest.

Astonishingly, a Hertz employee in Nashville informed the Louisville Regional Airport Authority that **Hertz internally knew that it has a major problem with losing vehicles and falsely reporting those vehicles as stolen but had not addressed it**. Id.

It cannot be overlooked that all of this evidence was concealed by Hertz despite Plaintiff specifically asking Hertz this information in discovery. Hertz repeatedly claimed in its answer to the complaint, its summary judgment motion, and in discovery that it had no internal theft reporting issues or errors, but that if Hertz had erroneously reported Grady to the police that it was just a one-time "glitch." These systemic false police reports, which are only the ones that Plaintiff has been able to find, conclusively demonstrate that Hertz knows that it has a serious problem but concealed the issue in discovery.[7] In addition, a negative inference should be granted against Hertz for concealing these incidents.

Plaintiff notes for the Court that the failures of Hertz present in the newly discovered false theft reports from across the nation, are also present in the material facts of this case which that Hertz's conduct was outrageous, intentional, reckless, and needlessly put Ms. Grady's life in jeopardy:

a. **First**, Hertz told the Pennsylvania state police that Ms. Grady had not stolen the car, that the police report was "miscommunication," and that to the extent there was an issue it was civil in nature—but Hertz nevertheless continued to have the Philadelphia police and district attorney's office arrest, imprison, and prosecute

---

[7] This case closely mirrors the recent <u>Burgos v. Philabundance</u> case. See Attached Order of the Superior Court. That was a malicious prosecution case in the Philadelphia Court of Common Pleas, in front of The Honorable John Younge where the defendant had (1) done no investigation prior to reporting to the police, (2) provided false information to the police, and (3) omitted important facts from the police report (the same as in this case). All these failures amounted to recklessness, malice, lack of probable cause, and punitive damages. Punitive damages were heard and assessed by the jury, then affirmed by the Superior Court, for a total verdict of $500,000. Where there are causes of action like malicious prosecution, where the legal standard is nearly equivalent as punitive damages, the question of punitive damages should be left to the jury.

Case ID: 151103380
Control No.: 17090690

Ms. Grady despite admitting there was no probable cause to do so. <u>See generally</u> MSJ Exhibit 7 - State Trooper Kemmerling's Report.

b.    **Second**, Hertz admits that it ***routinely*** reports its customers to the police for felonies without conducting any investigation at the branch level. <u>See</u> MSJ Exhibit 8 - Livingston Depo., at p.252; MSJ Exhibit 11 - Jaussi Depo., at p.70.

c.    **Third,** Hertz has written policies mandating that its corporate security managers conduct investigations at the branch level (showing that Hertz knows it should not be reporting customers to the police without investigation), but Hertz's designees admitted that they have "marching orders" to ignore the written policies. <u>See</u> MSJ Exhibit 8 - Livingston Depo.; MSJ Exhibit 9 - Hertz Theft Reporting Procedures. Hertz even admitted that its only redundancy to prevent falsely reporting customers was the written policies—which it testified it routinely ignores. <u>See</u> MSJ Exhibit 3 - Hertz Discovery Answers, at ¶36.

d.    **Fourth,** Ms. Grady's phone and bank records demonstrate that she was in constant contact with Hertz and had paid on two separate occasions a total of over $4,200 for the rental. This directly contradicts Hertz headquarters's "theft package" given to the police which stated Grady had not contacted Hertz or paid for the rental since April 17, 2013. <u>See</u> MSJ Exhibit 5 - Grady Phone Records; MSJ Exhibit 6 - Grady TD Bank Records.

e.    **Fifth,** Grady physically returned to the Philadelphia Airport Hertz location on or around July 18, 2013, and was authorized to leave the Hertz location with the Yukon. <u>See</u> MSJ Exhibit 2 - Grady Interrogatory Answers, at¶6. Hertz's designees admit that they have no information whatsoever to dispute this fact. <u>See</u> MSJ Exhibit 11 - Jaussi Deposition, at p.203 (stating that Hertz did no investigation to determine whether Grady returned to the Hertz location on July 18, 2013, and had no reason to dispute Grady's statement).

f.    **Sixth**, Hertz's corporate security team in fact conducted no investigation concerning Ms. Grady and the Yukon at the branch level before reporting her to the police for car theft. <u>See</u> MSJ Exhibit 3 - Hertz Discovery Answers, at ¶17, 21.

g.    **Seventh,** at no point following July 22, 2013, until the case against Ms. Grady was dismissed in June 2014, did Hertz withdraw the criminal complaint it had lodged against Ms. Grady—and which Hertz had already admitted to the State Police was not correct or make any attempt to correct the false statements and material omissions. <u>See</u> MSJ Exhibit 4 - Grady Criminal Docket.

h.    **Eighth,** Hertz admitted that it "purged" all Grady's rental information, including her payments on the rental contract, without any explanation despite the fact that it initiated a criminal case against her for car theft. See MSJ Exhibit 11 - Jaussi Deposition, at p.37-38. A negative inference should be granted against Hertz by the trial judge for this outrageous destruction of evidence designed to prejudice Plaintiff's case.

Both Hertz's egregious and reckless conduct that is the subject of this case, its destruction of Grady's critical rental records, and the new evidence recently uncovered and concealed by Hertz, establish that there is a jury question on punitive damages because Hertz is recklessly making car theft police reports it knows are not true.

## I.  Legal Standard for Punitive Damages and Reconsideration

In light of the outrageous and duplicitous nature of Defendant's conduct Plaintiff now moves to reconsider the prior decision dismissing punitive damages and/or amend his complaint to add punitive damages to the ad damnum clause. Pennsylvania law permits the recovery of punitive damages against a defendant who engages in conduct that is "outrageous, because of the defendant's reckless indifference of the rights of others." FHV Coal, Inc. v. Continental Grain Company, 587 A.2d 702, 704 (Pa. 1991).

Reckless indifference means that "the actor has intentionally done an act of an unreasonable character, in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow." Evans v. Philadelphia Transportation Company, 418 Pa. 567, 574, 212 A.2d 440, 443 (Pa. 1965); see also Smith v. Brown, 283 Pa. Super. 116, 423 A.2d 743 (Pa. Super. 1980).

Where there is sufficient evidence for a jury to reasonably conclude that a defendant has engaged in outrageous and reckless conduct, the question of whether the defendant is liable for punitive damages is properly decided by the jury.  Martin v. Johns-Manville Corporation, 494 A.2d 1088 (Pa. 1985).

A prior decision may be reconsidered if the prior decision was plainly erroneous and/or new facts are uncovered and/or there is a change in the law. See Baker v. Cambridge Chase, Inc.,

Case ID: 151103380
Control No.: 17090690

1999 PA Super 9, P65 (Pa. Super. Ct. 1999).

Defendant's conduct was outrageous and reckless—as the evidence presented above clearly demonstrates—and whether punitive damages should be assessed must be decided by a jury. Moreover, Hertz concealed evidence from plaintiff and the court to fraudulently obtain the dismissal of Plaintiff's punitive damages claim in the first place.

## II.    APPLICATION – THE EVIDENCE CLEARLY DEMONSTRATES OUTRAGEOUS AND RECKLESS CONDUCT ON THE PART OF DEFENDANT WARRANTING PUNITIVE DAMAGES

### a.    Prior Decision was Plainly Erroneous Given How Recklessly Hertz Acted and the Known Consequences of False Police Reports

The prior decision dismissing punitive damages was plainly erroneous on the record at summary judgment because Hertz admitted that it deliberately does not conduct investigations required by company policy necessary to insure that its customers were not falsely reported to the police for car theft. This is highly reckless conduct in and of itself, which creates a question of fact for a jury on punitive damages. Furthermore, the evidence indicating that Hertz knowingly and falsely reported Grady to the police for cart theft on July 23, 2013, despite having told the Pa. State Police on July 22, 2013, she had not stolen the car. This was not some simple oversight, but the product of a reckless course of conduct which would assuredly result in false police reports.

This case closely mirrors the recent Burgos v. Philabundance case. See Attached Order of the Superior Court. That was a malicious prosecution case in the Philadelphia Court of Common Pleas, in front of The Honorable John Younge where the defendant had (1) done no investigation prior to reporting to the police, (2) provided false information to the police, and (3) omitted important facts from the police report (the same as in this case). All these failures amounted to recklessness, malice, lack of probable cause, and punitive damages. Punitive damages were heard

Case ID: 151103380
Control No.: 17090690

and assessed by the jury, then affirmed by the Superior Court, for a total verdict of $500,000. Where there are causes of action like malicious prosecution, where the legal standard is nearly equivalent as punitive damages, the question of punitive damages should be left to the jury.

**b.      The Prior Decision Should be Reconsidered Because the Negative Inference Against Hertz for Destroying Ms. Grady's Rental Records had Not Yet Been Decided at Summary Judgment**

The prior decision should also be reconsidered because, at summary judgment, the Court did not decide whether a negative inference should be assessed against Hertz for admittedly destroying Plaintiff's rental records. This is a determination left for the trial judge.

Because this inference is left for the trial judge, if this court decides that a negative inference and spoliation instruction is warranted—as it is here—then that negative spoliation inference constitutes new evidence warranting reconsideration of the prior order. Plaintiff has a pending motion in limine on this issue which Plaintiff incorporates by reference. See also MSJ Exhibit 11 - Jaussi Deposition, at p.37-38.

When Hertz's absurd and outrageous conduct leading to Grady's prosecution and imprisonment are taken into account, and then considered in combination with the intentional destruction of Grady's rental records, a clear triable issue of fact exists for the jury on punitive damages.

**c.      New Evidence Concealed by Hertz Indicates that Hertz has a Nationwide, Systemic Problem with False Police Reports and that Ms. Grady's Imprisonment is Predictable Result of Hertz's Outrageously Deficient Conduct**

In addition to these reasons for reconsideration, Plaintiff has uncovered new evidence of a systemic, nationwide problem Hertz has reporting customers to the police for car theft and wrongly reporting cars stolen. This new evidence proves that Hertz dysfunctional company

Case ID: 151103380
Control No.: 17090690

procedures and policies often result in false police reports and that Ms. Grady's case is not simply some one-off mistake.

Hertz outrageously concealed this nationwide issue and refuses to correct the problem, despite having been told by multiple police departments that the company needs to fix its policies and practices immediately. Hertz repeatedly denied in the answer to the complaint, in depositions, and in its summary judgment motion that false police reporting had ever happened at Hertz. In fact, Hertz characterized the issue as, at worst, a one-time "glitches in the [computer] system that did not alert Hertz that the renter had called or payed [sic] for the vehicle" and stated "such a potential glitch does not amount to malice." See Hertz Motion for Summary Judgment, at ¶59-62.

Hertz successfully argued that punitive damages should be dismissed at summary judgment because there no evidence that Hertz disregarded "a risk known to [it] or so obvious that he must be taken have been aware of it, and so great as to make highly probable that harm would follow." See id. Since the dismissal of punitive damages on January 19, 2017, Plaintiff has discovered proof that Hertz has a nationwide problem falsely reporting customers to the police for car theft and that, given how widespread the problem is, it absolutely had to have known that it was systematically filing false police reports in 2013. This also explains why Grady's rental records were destroyed.

Specifically, the new evidence is that Plaintiff has discovered that Hertz has falsely reported at least three other customers to the police, as well as multiple vehicles, and that these false police reports are the result of the same knowingly defective and dysfunctional police reporting procedures at issue in this case. Several police authorities have simply stopped taking

Case ID: 151103380
Control No.: 17090690

Hertz theft reports because they are so unreliable.

The common themes connecting each case, and Ms. Grady's case, are:

    (1)    a complete failure within the company to share critical information between corporate, branch, and security locations,

    (2)    a complete failure to accurately keep records and track inventory,

    (3)    a willful effort to ignore and circumvent Hertz's own theft reporting procedures designed to prevent false police, and

    (4)    nonexistent or highly inadequate investigations.

The locations of these false police reports are:

    i.    Galveston, TX

    j.    Indianapolis, IN/Madison, WI

    k.    Louisville, Kentucky

    l.    Pennsylvania (in addition to Ms. Grady)

**Jury Found Hertz Liable in January 2017 in Texas for Malicious Prosecution and Punitive Damages After Falsely Reporting and Imprisoning Man for Car Theft; Hertz Concealed this Lawsuit and Verdict from Plaintiff**

In Texas a jury found in January 2017 that Hertz was liable for malicious prosecution for falsely reporting a man to the police for car theft. This jury verdict was $50,000 in compensatory damages for the man's one night in jail, and another $120,000 in punitive damages. See Exhibit 8 - Punitive Damages Jury Verdict and Complaint from Texas Malicious Prosecution Case Against Hertz. The verdict in the Texas case was returned on January 20, 2017, after the summary judgment ruling in this case. Id.

The arrested man had his identity stolen and the identify thief used the man's identity to rent a car at a Hertz subsidiary in March 2014. The man called Hertz and notified Hertz in April 2014 that it was not him, that he had not rented the car, and that his identity was stolen. Id.

Case ID: 151103380
Control No.: 17090690

However, even after notifying Hertz that his identity was stolen, a local Hertz employee nevertheless went to the police in May 2014 and reported this innocent man for car theft, resulting in his arrest and imprisonment for one night. Id.

No one at Hertz corporate had taken any steps to make sure that this man's identity theft report was promulgated throughout the company, and plainly the Hertz employee who made the report had done either no investigation or a thoroughly inadequate investigation. This is exactly the same thing that happened in this case to Ms. Grady. Just as with Ms. Grady, Hertz knew that this man had not stolen the car (in Ms. Grady's case, Hertz even told the State Police she had not stolen the car and that the initial police report was a mistake).

Nevertheless, because of Hertz's deficient procedures and failure to properly investigate the customers it reports to the police, this totally innocent man spent a night jail because Hertz local security office reported him to the police anyway. Note that Hertz's corporate designee falsely denied in a deposition in October 2016—while the 2015 Texas case was pending—that he knew of any other cases where Hertz had been sued for malicious prosecution:

> MR. MALOFIY:      Fourteen: Any information concerning Hertz having been sued for false imprisonment, malicious prosecution, potential infliction of emotional distress, or any other causative action stemming from Hertz reporting a rental car as having been taken, possessed without authorization by a customer?
>
> JAUSSI             I'm not aware of any of those scenarios.
>
> MR. MALOFIY:      Okay. Are you aware of Hertz being sued for improperly reporting a renter to police?
>
> MR. WOLF:         Besides the present case?
>
> MR. MALIFOY:      Yes.
>
> JAUSSI:            Besides the present case, been at Hertz 12 years, never heard of it.
>
> MR. MALOFIY:      Okay. Fifteen: Any information regarding Hertz having been

Case ID: 151103380
Control No.: 17090690

> accused of improperly reporting rental car as having been taken or possessed without authorization by customer?
>
> JAUSSI:          Not that I'm aware of, outside of this case.

See MSJ Exhibit 11 - Jaussi Deposition, at p.56-57.

Jaussi also falsely denied any knowledge of "malfunctions" with Hertz computer systems concerning the input of customer data or information:

> MR. MALOFIY:     Do you have any information regarding Number 3; documents, communications or things, electronic, paper, or any other format in your possession, access, control, including but not limited to texts, emails, faxes, voice mail, letters, notes, contracts, calendars, phone records, signed documents, that concern, errors, malfunctions, anomalies, or incorrect data input with the computer programs and systems used by Hertz Corporation, including but not limited to, errors, malfunctions, or other anomalies concerning the programs and systems that contain information related to Kelly Grady?
>
> DESIGNEE:        Not that I recall or know of.
>
> MR. MALOFIY:     Do you know of any errors or malfunctions in the Hertz computer systems which inputs customer data or information?
>
> DESGINEE:        Not that I'm aware of.

See MSJ Exhibit 11 - Jaussi Deposition, at p.48-49. Hertz's sworn interrogatory answers also denied there were any errors or malfunctions:

> 26.   Identify any errors, malfunctions, or other anomalies with the computer programs and systems run by The Hertz Corporation, including but not limited to errors, malfunctions, and/or other anomalies concerning the programs and systems that contain information relating to Kelly Grady.
>
> Response to 26. None.

See MSJ Exhibit 3 - Plaintiff's Interrogatories and Hertz Answers.

There is no way that Hertz could have failed to have known in 2016 when Jaussi testified and Hertz answered the interrogatories, based on the Texas case alone, that (1) it had serious

debilitating internal communications failures between corporate, location, and security locations, (2) extremely poor record keeping and inventory tracking, and (3) that it was not conducting sufficient investigations before reporting innocent individuals to the police.

There is no way that Hertz and its attorneys did not know about this Texas case, and later about the verdict against Hertz for malicious prosecution and punitive damages. Despite knowing about the case, and the later verdict, Hertz gave false deposition answers and never updated or supplemented it discovery answers or deposition answers. Moreover, as discussed *infra*, police departments in at least Indianapolis and Louisville have reached out to Hertz in 2015 and 2016 to inform them that they are making false reports; none of this was disclosed by Hertz, and was only uncovered through sedulous and intense investigation by Plaintiff.

Given that the Texas malicious prosecution and punitive damages verdict came after the summary judgment opinion, and given that Hertz concealed this Texas case, this is new evidence which creates a triable issue of fact for the jury on whether punitive damages should be imposed and warrants the reinstatement of Plaintiff's claim for punitive damages. Hertz knows that it has a huge problem across the country but is obstinately and stubbornly refusing to fix it, which is putting additional customers at a huge risk. Punitive damages are needed to deter Hertz from continuing its outrageous and dangerous course of conduct.

**Hertz Falsely Reports Innocent Woman for Car Theft in Indianapolis When She Was Authorized to Have the Vehicle, Paid for the Rental, was in Contact with Hertz by Phone, and had Visited the Location with Vehicle—Exactly as What Happened in Plaintiff's Case; This was Concealed from Plaintiff**

In the Indianapolis/Madison incident, Hertz's conduct was even worse than in Texas. A woman named Ramanda Van Pay rented a car from Hertz in Green Bay, WI. See Exhibit 1 - Affidavit of Ramanda Van Pay. During her rental she got a flat tire and took the car to the Hertz

Case ID: 151103380
Control No.: 17090690

location at the Indianapolis Airport near where the flat occurred. Exhibit 1; Exhibit 2 - Van Pay Rental Documents Proving She Was Authorized to Possess Car. The Indianapolis Hertz location gave her a different car, a Hyundai Elantra, as part of her rental and told her when she got home to Wisconsin to check in with the Green Bay branch to make sure everything was okay.

A vehicle exchange form was filled out at Hertz, identifying Van Pay's new vehicle. See Exhibit 2. Hertz's Rental Agreement System contains "rental notes" indicating that "Mechanical exchange in Indianapolis on 8/18 because of flat tire. New Unit # 1 293356. Indy gave customer vehicle exchange addendum form." Id. **Note that Ms. Grady saw the Hertz representative enter "rental notes" on her rental contract when she returned to the location on July 18, 2013, stating that she would be returning the rental on July 22, 2013. These rental contract notes, and everything else relating to the rental, were destroyed and purged by Hertz. See MSJ Exhibit 2, at ¶6.**

Ms. Van Pay did check in with the Green Bay branch, who told her to keep the car for the remainder of her rental. Exhibit 2. Ms. Van Pay, like Ms. Grady, repeatedly called both the local and corporate numbers to make sure she was authorized to have the car. Id. Like Ms. Grady, Van Pay visited the Hertz location to make sure her rental was okay on or around November 3, 2016. Like Ms. Grady, Van Pay had paid for the rental. Id. Van Pay also has screen shots of her phone showing the call she made to Hertz about her rental—just as the State Trooper Randy Kemmerling observed Grady had records on her phone showing she called Hertz the week before she was pulled over. See MSJ Exhibit 7 - State Police Report.

Unbeknownst to Van Pay, the Indianapolis Hertz had reported the Elantra she was renting stolen approximately one month before. See Exhibit 3 - Indianapolis Police Report;

Case ID: 151103380
Control No.: 17090690

Exhibit 4 - Criminal Docket for Van Pay; Exhibit 5 - Fond du Lac Sheriff's Records; Exhibit 6 - Additional Fond du Lac Sheriff's records. Despite having physically visited and called a Hertz location on or around November 3, 2016, Van Pay was pulled over and arrested on November 5, 2016. The Hertz location in Green Bay never told her the car was flagged or reported stolen; indeed, they told her that her rental was fine. Exhibit 1. Despite official Hertz notes in Hertz's computer system stating that Van Pay had switched her car to the Elantra, Hertz's dysfunctional record keeping system failed to share this information between corporate, local branches, and corporate security. See Exhibits 1-6.

Please keep in mind that this is the same type of "failure to communicate" within Hertz that occurred in both Grady's case and the Texas case. Like Van Pay, Grady returned to the Hertz lot—in addition to contacting Hertz by phone—but Hertz's branch location failed to realize that there were allegedly issues with Van Pay or Grady's rental vehicles and that they had actually been reported stolen by hertz. It is outrageous and absurd that Hertz cannot even keep track of its vehicles and renters and reliably communicated between branches.

Hertz needs to immediately suspend all vehicle theft reports in the wake of these revelations. As a result of Hertz's terrible record keeping and information sharing, the Indianapolis Hertz location told the police that the car Van Pay had been given had been stolen off the lot, an egregious misapprehension of the truth.

Again, the reporting Hertz employee did no investigation to make sure that the police report was accurate, despite the Indianapolis location having given Van Pay the car, had her fill out the exchange form, and noted this fact in the rental system.

It is know from the testimony of Hertz's designees in this case that Hertz locations do not

Case ID: 151103380
Control No.: 17090690

conduct required investigations before reporting cars to the police. It is simply astounding that the Indianapolis Hertz could have given Van Pay a rental car, but then reported that same car stolen shortly thereafter.

To recap, just as in Ms. Grady's case, no one at Hertz in the Green Bay branch or anywhere else realized that (1) the car Van Pay was renting had been reported stolen by Hertz, and (2) that Van Pay had returned to a Hertz location with the very rental vehicle considered stolen and also communicated by phone but was never told the vehicle was considered stolen. Note that Hertz is claiming in this case that all locations would know through the computer system when a car is flagged; plainly the Van Pay and Grady cases show this is not true. Hertz knows that its system is wildly dysfunctional and not accurately keeping track of its inventory, yet is pretending that everything is fine. As a result of Hertz's dysfunctional and reckless conduct, Van Pay was arrested and spent three days in prison.

The charges were dismissed when the prosecutor in Madison, WI and the police in Indianapolis, IN realized that Hertz had completely screwed up and that Van Pay had not stolen the car. Exhibit 4. The Indianapolis Airport Police have indicated that Van Pay is not the only false police report by Hertz. See Exhibit 1.

The Airport Police have indicated that a businessman was arrested in Pennsylvania because of a false Hertz car theft police report, as well as others. As a result, the Indianapolis Airport Police no longer consider Hertz theft reports valid and reliable and refuse to enter them on the NCIC. See Exhibit 1.

**Louisville Regional Airport Police Refuse to Accept Hertz Theft Reports Because They Are Unreliable and Inaccurate; Hertz Not Only Concealed these False Reports from Plaintiff, but also Concealed that the Police Specifically Contacted Hertz's Corporate Security Division to Complain about the False Police Reports**

Case ID: 151103380
Control No.: 17090690

The Louisville Regional Airport Police also have experienced the same problems with Hertz, concerning its dysfunctional and broken information sharing and record keeping. See Exhibit 7. Police records shows that the Hertz location in Louisville reported multiple cars stolen off its lot. Several of these reported cars were later reported found on Hertz lots, meaning Hertz had simply lost the cars in their own inventory. See Exhibit 7.

Note that this is exactly why Van Pay was arrested in Wisconsin, because Hertz reported a car stolen that it improperly not kept track of. Note that Hertz also failed to keep track of Grady's car when she returned to the Hertz lot on July 18, 2013. Not only does this show a total and complete failure of record keeping and information sharing between corporate, branch, and security locations, but it demonstrates that Hertz is barely, if at all, investigating its car theft reports before they are submitted to the police.

The total record keeping failure, internal communication failure, failure to track inventory, and failure to investigate are the same reasons Grady was falsely reported. Hertz is using the police as a repo service, willfully and recklessly ignoring that these false police reports will result in the arrest and imprisonment of their own customers.

A Hertz employee in Nashville, Tennessee told the Louisville Regional Airport Police in June 2015 that Hertz ***internally knows of the problem*** that branch locations cannot keep track of inventory and are making false police reports without proper investigation:

> Off. Hairgrove spoke to a Hertz sales rep in Nashville who confirmed they received a car from a customer that was originally rented in Louisville back in March. It sat. on his lot for 60 days until it was sold 6/6 to a car lot in Hopkinsville, KY. We took a report on 3/25 from Hertz that this was stolen missing from their inventory.
>
> After that, we did a complete search online of all VIN #'sin the stolen auto database and got a return Of 2 more Hertz autos believed to have been sold or scrapped. **The Nashville Hertz rep commented that Louisville office**

Case ID: 151103380
Control No.: 17090690

is horrible with their paperwork and vehicle tracking.

Until Hertz corporate takes some action with their Louisville lot and personnel, I recommend that we suspend taking stolen auto reports for Hertz for "missing inventory" unless they physically see someone steal an auto, have evidentiary proof of such or obviously non returns that warrants have been taken. Hairgrove has reached out to their Corporate Security office.

See Exhibit 7 (emphasis added).

Needless to say, this explosive fact that Hertz has known internal problems when falsely reporting cars stolen was not disclosed in discovery in 2016. Hertz's designee and attorneys never disclosed this fact. Plaintiff had no way to obtain this information until after the summary judgment order in January 2017.

The Louisville Regional Airport Police, just like their Indianapolis counterparts, now also refuse to enter Hertz theft reports into the NCIC because of these repeated false reports. All of this is brand new information which Hertz concealed from Plaintiff, and which creates a triable issue of fact for a jury on punitive damages.

Plaintiff also notes that the initial decision to dismiss punitive damages was clearly erroneous given the unambiguous testimony of Hertz's designees that Hertz does not conduct required investigations before going to the police. What is happening to Hertz's customers is no accident, and is not the result of a one-time glitch. Hertz has known for quite some time that it is making entirely unsupportable police reports based on nonexistent and deficient investigations, coupled with outrageously poor record keeping and information sharing within the company.

When a company operates like Hertz does, false police reports such as what happened to Ms. Grady and Ms. Van Pay are inevitable. Hertz is playing Russian Roulette with its customers' lives. Punitive damages are warranted not only to deter future conduct, but also to punish Hertz

Case ID: 151103380
Control No.: 17090690

for its duplicitous and dishonest behavior in attempting to cover up this massive, nationwide problem.

## b. Conclusion

Therefore there is a plethora of new facts in the record demonstrating that Defendant Attorney acted outrageously and recklessly with respect to Plaintiff's rights and that a jury must determine whether punitive damages should be imposed.

*****

*****

*Respectfully submitted,*

Francis Alexander, LLC

*/s/ Francis Malofiy*

Francis Malofiy, Esquire
Attorney ID No.: 208494
280 N. Providence Road | Suite 1
Media, PA 19063
T:  (215) 500-1000
F:  (215) 500-1005
*Law Firm / Lawyer for Plaintiffs*
*/d/ September 6, 2017*

Case ID: 151103380
Control No.: 17090690

# CERTIFICATE OF SERVICE

I hereby state that a true and correct copy of the foregoing PLAINTIFF'S MOTION FOR RECONSIDERATION ON PUNITIVE DAMAGES was served on opposing counsel via the electronic filing system:

Jay L. Edelstein, Esquire
Edelstein Law, LLP
230 South Broad Street | Suite 900
Philadelphia, PA 19102
T: (215) 893-9311
F: (215) 893-9310
E: JEdelstein@Edelsteinlaw.com
*Attorneys for The Hertz Corporation*

*****

*Respectfully submitted,*
FRANCIS ALEXANDER, LLC
*/s/ Francis Malofiy*
Francis Malofiy, Esquire
Attorney ID No.:  208494
280 N. Providence Road | Suite 1
Media, PA 19063
T:  (215) 500-1000
F:  (215) 500-1005
*Law Firm / Lawyer for Plaintiff*
*/d/   September 6, 2017*

Case ID: 151103380
Control No.: 17090690