## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:

Rental Car Intermediate Holdings, LLC,[1]

        Reorganized Debtor.

Chapter 11

Case No. 20-11247 (MFW)

(Jointly Administered)

**Ref. Case No. 20-11218, D.I. 5261**

Status Conference Date: January 4, 2022 at 2:00 p.m. ET
Hearing Date: To Be Determined
Objection Deadline: December 20, 2021 at 4:00 p.m. ET

### GROUP 4 FALSE POLICE REPORT CLAIMANTS' MOTION FOR RELIEF FROM THE CONFIRMATION ORDER TO PURSUE CLAIMS OUTSIDE OF BANKRUPTCY OR, IN THE ALTERNATIVE, FOR EXTENSION OF GENERAL AND ADMINISTRATIVE BAR DATES UNDER RULES 3003(c) AND 9006(b) AND RELATED RELIEF

Twenty-six individuals affected by the Debtors' systemic practices leading to false police reports (collectively, the "Group 4 False Police Report Claimants," or "Movants"),[2] by and through their undersigned counsel, hereby file this motion (the "Motion") for entry of an order (i) granting

---

[1]    The last four digits of the tax identification number of Reorganized Debtor Rental Car Intermediate Holdings, LLC ("RCIH") are 2459. The location of the Reorganized Debtors' service address is 8501 Williams Road, Estero, FL 33928. On September 28, 2021, the Court entered a final decree closing each of the chapter 11 cases for The Hertz Corporation and its affiliated reorganized debtors (collectively, the "Reorganized Debtors") other than RCIH's chapter 11 case. Commencing on September 28, 2021, all motions, notices, and other pleadings relating to any of the Reorganized Debtors shall be filed in RCIH's chapter 11 case, Case No. 20-11247 (MFW).

[2]    The Group 4 False Police Report Claimants are represented by certain of the same counsel as the "Group 1, "Group 2," and "Group 3" False Police Report Claimants whose claims are the subject of the Reorganized Debtors' 21st and 22nd Omnibus Objections to Claims [Case No. 20-11218, D.I. 5898 & 5899]. As the Court will recall: (i) the "Group 1" claimants had pending litigation against one or more Debtors prepetition and filed proofs of claim by the October 21, 2020, general claims bar date; (ii) the "Group 2" claimants had no prior pending litigation and filed proofs of claim by the bar date; and (iii) the "Group 3" claimants had no prior pending litigation and filed proofs of claim on June 10, 2021. With the exception of James Tolen, as noted below, the Group 4 False Police Report Claimants were not previously represented by counsel and have not previously appeared in these chapter 11 cases, and they have not filed any claims, pending the outcome of this Motion.

relief from the Confirmation Order,[3] insofar as it implements the discharge, release, and injunctive

provisions of the Plan,[4] so as to permit the Movants to pursue and collect their claims against the

Reorganized Debtors and others outside of bankruptcy, or (ii) in the alternative, (A) extending the

General Bar Date and Administrative Bar Date (as defined below) so as to permit the Movants to

assert claims against the Reorganized Debtors under the applicable processes set forth in the Plan,

and (B) deeming the Movants to have timely "opted out" of the Plan's third-party release

provisions. In support of this Motion, the Movants respectfully represent as follows:

## PRELIMINARY STATEMENT[5]

1.      For years, The Hertz Corporation (together with its affiliates, collectively, "Hertz"

or the "Debtors") has been falsely reporting its customers for car theft, throwing them in jail on

felony charges, prosecuting them, burdening them with criminal records that impact their

livelihoods, and separating them from their family and loved ones. But in each case, there was no

theft. Each of the Movants paid for their car and was authorized to use the rental (other than two

Movant who has *never* rented from Hertz, one of whom is still is facing charges from the

company). Hertz nonetheless filed false and materially misleading police reports that threw the

Movants' lives into a tailspin.

2.      The facts of the declarations filed by the Movants speak for themselves. The

Movants' experiences are summarized below at paragraphs 17–40 and recounted more fully in

---

[3]      The *Order (I) Confirming Second Modified Third Amended Joint Chapter 11 Plan of Reorganization of The Hertz Corporation and its Debtor Affiliates, and (II) Granting Related Relief* [Case No. 20-11218, D.I. 5261].

[4]      The *Second Modified Third Amended Joint Chapter 11 Plan of Reorganization of The Hertz Corporation and its Debtor Affiliates* [Case No. 20-11218, D.I. 5178].

[5]      Capitalized terms used but not otherwise defined in this Preliminary Statement shall have the meanings ascribed to them in the body of this Motion.

their attached declarations. Taken together—especially in conjunction with the Declarations already in front of the Court—they reveal Hertz consistently causing grievous injury to innocent victims by filing false police reports and refusing to correct reports once filed. Hertz knows the consequences of its reporting often lead to arrest, jail time, and ruined reputations. Yet Hertz refuses to change its practices. Hertz's illegal activity continued well past the petition date of this bankruptcy. Indeed, many victims remain under prosecution. And while Hertz knows the identities of those who it falsely named to the police, many times the victims themselves do not. Each of these false reports is a ticking time bomb waiting to go off and threatening to destroy a victim. It is long past time to hold Hertz accountable for how it has injured hundreds of its own innocent customers. And evidently Hertz does not see the need—let alone the urgency—of fixing its systems so that it is not making false reports and upending the lives of those whose only crime was to rent from Hertz.

3.      Despite Hertz's knowledge of its systemic practices leading to false police reports and the civil liability to the Movants that would likely result, and despite Movants' identities being known or reasonably ascertainable to Hertz, Hertz nonetheless failed to provide the Movants with direct notice of (i) the General Bar Date, (ii) the Plan, Confirmation Hearing, or deadline to file objections to the Plan, or (iii) the Administrative Bar Date as required by due process. And even assuming *arguendo* that the Movants were "unknown" to Hertz, the publication notice of the foregoing fell well short of the requirements of due process under the particular circumstances of this case, as discussed below. Accordingly, under well-settled precedent, the Confirmation Order's provisions implementing the Plan's discharge, release, and injunctive provisions are not properly enforceable against the Movants, and the Movants should be granted leave from the Confirmation Order to pursue their claims against the Reorganized Debtors and the Released Parties in other

fora. Alternatively, should the Court determine that the Confirmation Order and Plan are properly enforceable against the Movants, the Court should extend the General Bar Date and the Administrative Bar Date, as applicable, for the Movants and deem them to have "opted out" of the Plan's third-party release provisions.

## JURISDICTION & VENUE

4.     This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 1334 and 157 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012. This Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(1) and the Court may enter a final order consistent with Article III of the United States Constitution.[6] Venue is proper before this Court pursuant to 28 U.S.C. § 1409. The statutory and procedural predicates for the relief requested herein are section 105(a) of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), and Federal Rules 9024, 3003, and 9006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## RELEVANT BACKGROUND

### I.    Hertz Falsely Implicates Customers in Car Theft

5.     The Reorganized Debtors are in the rental car business, operating under the Hertz name, among others. When a customer initially rents a car from Hertz, he or she provides a credit or debit card to Hertz so that Hertz can charge for any costs associated with the rental. At the time of the initial rental, Hertz puts something called an "authorization hold" on the customer's card. An authorization hold is not a permanent charge, it simply checks the customer's account to see if

---

[6]    If it is determined that the Court, absent consent of the parties, cannot enter a final order on this Motion consistent with Article III of the United States Constitution, the Movants consent to the Court's entry of such an order. For the avoidance of doubt, the Movants reserve all other rights with respect to their claims, including the right to contest the Court's authority to determine any other issue relating to such claims and to demand a trial by jury.

it is valid and has funds. This temporary charge does not appear on any monthly billing statements and is not itself a bill or payment. (Customers, however, can see the temporary charge hitting the bank account and be led to believe that everything is fine with the rental because Hertz is billing their account.)

6.      If the customer later extends the rental, Hertz also places another authorization hold on the customer's card. This can be done over the phone or in person at a local branch. Again, this is not a final billing or payment. Only at the end of the rental, after the rental is closed out, does Hertz charge the customer's card for payment on the full rental. Although an authorization hold may be denied during the rental for a variety of reasons, such as a low balance (in a checking account) or available credit (on a credit card account), this says nothing about whether the final billing charge will go through. Indeed, it often occurs that an account balance may ebb and flow over months—such as, for example, when a paycheck is received or when a credit card balance is not yet repaid but will be by the end of the month.

7.      Denials of authorization holds—often due to a low balance or available credit in a customer account—is generally what leads Hertz to file a theft report with the police.  Hertz calls this class of false police reports overdue rentals.

8.      There is a second class of false police reports: missing inventory.  Missing inventory reports are self-explanatory, and generally result when a vehicle is allegedly missing from a Hertz location without permission and Hertz does not know what happened to the vehicle. In these cases, Hertz reports only the car stolen and does not name a customer in the theft report. However, when an individual is arrested in connected with one of these reports, law enforcement

and prosecutors contact Hertz to inform it of vehicle recovery and the arrest/possible prosecution. *See* Attachment T (Wood Decl.).[7]

9.      Systematic practices cause Hertz's theft reports to contain false and misleading information that routinely accuse customers of theft when there is no probable cause. First, for the overdue rental class of reports, the theft reports inform police that the renter never paid and provided a denied card. ***Hertz nonetheless fully charges the customer just after printing, and often before filing, the police report.*** Hertz never updates the police with the payment information, even though customers routinely pay in full. This practice, somewhat incredibly, is laid out in internal policy W7-02(D). [*See* Case No. 20-11218, D.I. 5032–2, at 9] (W7–02 Theft Reporting Policy). And Hertz told one recent customer this policy explicitly: "We have reported [the car] as stolen to the authorities. Our process once a contract is severely overdue is to close the contract and charge the customer while we continue to work on recovering our property." Attachment L (Meado Decl.) ¶ 33.

10.      Second, as described above for reports for overdue rentals, customers extend rentals in person or by phone. After a customer has been told that the rental has been extended, Hertz will delete the extension if the authorization on the customer's card is denied. Then Hertz will backdate the reported "due date" on the vehicle to before the start of any extension on the theft report. In other words, a customer can call and be told that their rental has been extended (and hence there is no need to return the car), but the police will be told that there is a theft because car was due *in the past* and has not been returned. Customers are not informed that their rental extension has been deleted.

---

[7]      Unless otherwise noted, all citations to "Attachment [*X*]" refer to attachments to the Declaration of Francis Malofiy attached as <u>Exhibit B</u> hereto.

11.     Third, Hertz makes minimal effort—and in some cases, *no* effort—to verify the contents and reliability of a theft report, whether for overdue rentals or missing inventory, before filing it. Moreover, theft reports are often filed in cases where theft is totally implausible, including for renters with detailed and extensive rental histories, who provided accurate personal contact information at the time of rental, who have repeatedly extended their rentals and contacted Hertz, whose insurance companies first rented them the car, and who have provided valid cards for payment that have previously authorized charges on that rental, and/or who rent in connection with ride-sharing companies like Uber or Lyft.

12.     When a vehicle is missing or is allegedly overdue, Hertz Vehicle Control generates what Hertz calls a "theft package" that purports to detail all contact with the renter, payment information, the rental due date, extensions made by the renter, and the renter's prior rental history. This theft package is then given to the police to initiate a theft report. The theft package hides and falsifies information relating to the systemic problems identified above, including the deletion of extensions of the vehicle, the customer's payment (or forthcoming payment) for the vehicle, and the complete lack of investigation into the status of the vehicle.

## II.    Hertz Had Significant Notice of the Underlying Pattern of Tortious Conduct

13.     Hertz had significant knowledge and understanding of these claims before filing for bankruptcy. It had faced multiple adverse verdicts connected to malicious prosecution, it had received complaints from law enforcement, it had seen media reports outlining the systemically flawed conduct, and countless customers had explained to Hertz that they had been falsely reported for serious crimes (both formally and via lawsuits). Moreover, counsel for creditors had offered extensive evidence of Hertz's systemic problems, including a series of prepetition letters, memos, and briefs providing detailed explanations of why Hertz's practices repeatedly lead to well-

meaning customers' being arrested at gunpoint and imprisoned. And for each Claimant, the Debtors have (or destroyed) records showing the details of the underlying rental and theft report, which would demonstrate that the theft report was unfounded.

14.     Although the Debtors have made every effort to ignore the substance of these claims—and have made no apparent pre- or post-petition efforts to resolve the underlying issues— there is evidence that the Debtors have taken internal steps to prepare for these claims. The Movants have submitted evidence that a Hertz customer-service employee told Earl Holland (another victim) that false-police-reporting problems were "a known problem with the company," and were "so pervasive that Hertz had established a special fund to compensate the victims" of false police reports, [Case No. 20-11218, D.I. 1081, Ex. A., Declaration of Earl Holland]. And they have submitted evidence that Hertz uses third-party claims administrators "ESIS, Lambda, and Lambda GCL" to track legal claims based on Debtors' false arrest/theft reports, including maintaining internal spreadsheets that catalogue such claims, [*see* Case No. 20-11218, D.I. 1071, Ex. A, Declaration of Frederick Jekel at 4]. Significantly, ESIS is a subsidiary of Chubb, Debtors' insurer, which strongly suggests that the Debtors were working with their insurance providers to account for false police report claims. And a corporate security manager for Hertz named Richard Livingston told a claimant that "Hertz had an internal list of customers who were reported for theft." Attachment AP (Murray Decl.) ¶ 13. Despite all this, the Debtors did nothing to give those it had falsely reported for theft notice of these proceedings beyond publishing legally deficient notice once deep in a handful of newspapers. And as evidenced by some of the descriptions below, this conduct has continued unabated even after Hertz filed for bankruptcy protection in this Court.

15.     As evidenced by the Movants' stories, this conduct has continued unabated even after Hertz filed for bankruptcy protection in this Court. Indeed, almost a dozen Movants suffered

harms based on police reports or rentals that occurred post-petition. In fact, the conduct continues unabated to date. Movant Carmen Bosko was arrested after the effective date of the Plan and jailed for 40 days at a time when she had a two-month-old child (she faces pending charges to this day). Movant ReJeana Meado was told just days ago that Hertz/Thrifty filed a theft report against her that was almost certainly filed after the effective date of the Plan. And nonmovant Manuel Garcia was reported for theft after the November 4 hearing. Manuel's story is alarming: He had rented a long-term vehicle in January 2021 in Doral, Florida, and he continued to extend the vehicle while making payments at the end of every month. *See* Attachment C (Garcia Decl.). When Manuel noticed that a payment wasn't deducted from his account at the end of October 2021, he called the local Hertz branch on November 3. He spoke with an employee at the branch and told him he would like to renew for 3–4 months; the employee said he would note the renewal on his account and that Manuel should come in the next week so. Manuel learned, however, that Hertz filed a theft report against him on November 10, 2021 (when the vehicle was towed), even though Hertz had never called to ask him to return the vehicle, Hertz had his card to continue charges for the monthly rental, he had called the location earlier that week to say he wanted to extend the rental, and the location said he was okay to keep the car on November 3. Manuel subsequently reached out to Hertz to try to resolve the situation, but just days ago, on December 1, 2021, Hertz responded in an email that "we are not empowered to dismiss the police report that was filed with the authorities. Therefore, you must address this matter through the court system." *Id.* ¶ 24. Manuel is now preparing to be arrested and prosecuted at any moment because of the false and baseless theft report that Hertz not only filed but refuses to withdraw, correct, or take any steps to prevent from harming Manuel.

16.    Every day that goes by, more innocent persons are being grievously, horrifically, and baselessly harmed by the Debtors. Despite active litigation on false-police-report claims, the Debtors have seemingly made no efforts to fix these problems or accept responsibility for their conduct. These bad acts must stop in order to protect others from the same harms, and holding the Debtors accountable for their conduct likely is the only way to stop it. The below movants—along with False Police Report Claimants Nos. 1, 2, and 3—appear to be only a fraction of those harmed by the Debtors' callous actions. Counsel continue to investigate potential claims from other persons with similar experiences, and likely will file similar motions on behalf of those persons on a rolling basis.

## III.    The Movants

17.    **Nirbhay Agarwal**: Nirbhay rented a car from Hertz on February 12, 2021 from a location at San Jose International Airport. A few hours after obtaining the rental, he and friend Saurabh Rathi were pulled over, arrested at gunpoint for possession of a stolen vehicle, and detained for an hour. Nirbhay was released when the police confirmed with Hertz that he had rented the vehicle just hours before; in other words, Hertz had rented him a vehicle that it had reported stolen to the police. Tellingly, Hertz did not charge him for the rental when he returned it the next day. *See* Attachment A (Agarwal Decl.).

18.    **Saurabh Rathi**: Saurabh was riding with Nirbhay and was also pulled over, handcuffed at gunpoint, and informed that he was in possession of a stolen vehicle. Once again, Hertz had rented Nirbhay the "stolen" vehicle just hours before. *See* Attachment B (Rathi Decl.).

19.    **Jessica Andolino**: Jessica Andolino, also known as Jessy Taylor, is a well-known social media influencer, actress, and singer. She began a five-day rental from Hertz's Los Angeles International Airport location starting on March 21, 2021. On March 23, she was stopped by police

and told the car was stolen. Jessica was arrested, manhandled violently (putting her in a wheelchair for three days), and held in jail overnight. She appeared in Court on September 14, 2021, and all charges against her for this absurd accusation of theft were dropped. *See* Attachment AT (Andolino Decl.).

20.     **Carmen Bosko**: Carmen was a returning renter and Hertz Gold plus member. She rented a car from a Mary Esther, Florida Hertz location on January 20, 2021. Carmen returned the car on or around April 12, 2021 to a Morrow, Georgia location after being given permission to do so by Hertz corporate. Carmen heard nothing more from Hertz, but Hertz force-charged her almost $4,000 later that month. In June 2021, a detective visited her parents claiming that Carmen had stolen the car; Carmen called the detective around June 10, 2021 and left a message, but he never returned her call. Carmen later gave birth to a child on June 12. But on August 9, 2021, Carmen was arrested for car theft in connection with the long-returned rental. She spent 40 days in jail, often separated from her newborn child and in horrid conditions, and she is currently being prosecuted based on Hertz's false theft report. *See* Attachment E (Bosko Decl.).

21.     **Reginald Brown**: Reginald rented a car through Lyft's partnership with Hertz on May 3. 2019 for the Roosevelt Hertz location in College Park, Georgia. He returned the vehicle on August 23, 2019 (taking a picture of the return), and Lyft confirmed that the vehicle was fully paid. But in September, a Hertz investigator called to ask about the vehicle, and Reginald informed them he returned the vehicle on August 23 and had received confirmation from Lyft. Yet in late September 2019, Reginald was summonsed to court to answer a warrant for Theft by Conversion; upon arrival in October, he was arrested and jailed overnight. Hertz had falsely said the car had not been returned and was due back on July 25, 2019 (this was not true because Lyft specifically confirmed that he was good to continue with the rental on July 27, 2019). The prosecution

repeatedly reached out to Hertz because Reginald contested the report, but Hertz never showed up and the charges were dropped on September 29, 2021. *See* Attachment F (Brown Decl.).[8]

22.    **Mary Lindsay Flannery**: Lindsay is an Air-Force veteran of 11 years who was honorably discharged in 2013; she is 90% disabled from injuries sustained during her service. Lindsay rented from a Hertz location at Dallas-Fort Worth International Airport on April 19, 2020; she extended multiple times and was never told there were any issues. In September 2020, she was charged $3,976.57 and believed the rental was fine based on the charge. But she was shocked when she was pulled over in October 2020 and told by police that she was driving a stolen car. The

---

[8]  The Movants also include two persons with claims that counsel recognize are more likely to be subject to statute of limitations issues. If the Court grants leave to proceed in another forum or to proceed in this Court, counsel will further evaluate any potential statute of limitations questions for these claims:

**Della Davis**: Della rented a car in 2003 through her insurer (Geico). During that time, the police impounded the vehicle for improper tags; Della was in weekly contact with Hertz describing the situation and the police told her they would return the car. In December 2003, Della and her insurer paid for the rental in full. But in 2005, Della was arrested, jailed for one month, prosecuted for almost one year because Hertz had reported the car stolen. The charges were dropped on September 14, 2006 after her attorney presented evidence that this was not a theft. *See* Attachment G (Davis Decl.).

**Cynthia Vaughn**: Cynthia rented a Hertz car for 2.5 months from August 28, 2007, to November 15, 2007, since her job with NASA was moving to Johnson Space Center. It was a one-way rental from Panama City, FL to Webster, TX. She extended at all points in time. She then returned the car and fully paid. To her shock, she learned weeks later that Hertz had reported the car stolen despite the fact that she had done nothing wrong. She contacted Hertz and the location who knew her was ignorant. She then called the District Office in Daytona Beach. The employee said it was reported stolen because she had not returned it to Panama City. She refused to listen when Cynthia pointed out it was a one-way rental to Webster, TX. Cynthia was arrested and spent 8 weeks in jail. She was told that if she did not plead, she would be kept in jail indefinitely. Desperate to be released she pled and was released that day. Two years later, after going on a probation approved mission trip to Mexico, she was stopped at the border and then released. Yet, despite the facts she had done nothing wrong, she was then rearrested, and spent another 108 days in jail. When she finally got in front of a judge in Florida, he apologized to her, told her that he had reviewed the file and that she should never have been allowed to plead in the first place, lifted her supervision, and sealed her case. Hertz destroyed her life, jailed her for 171 days, and made her life hell for 5 years. *See* Attachment AO (Vaughn Decl.).

officer did not arrest her when she showed him her payments to Hertz. After the interaction, she repeatedly called Hertz demanding answers, but never heard back. When Lindsay went to retrieve a friend's car from an impound lot, she was arrested and put in Oklahoma County jail. Lindsay was jailed for 15 days in horrific conditions—including being physically assaulted and suffering cardiac events—that triggered her PTSD from her time in the Air Force. After extradition to Texas, she showed Texas prosecutors her invoice and that her nearly $4,000 payment had been omitted from the theft report. Prosecutors immediately dropped the charges against her in January 2021. *See* Attachment AQ (Flannery Dec.).

23.    **Dedrick Jackson**: Dedrick rented a car from Hertz in Bremerton, Washington in early 2020. When the vehicle had tire problems, Dedrick called Hertz and asked for a tow from his home. The car was towed one or two days later. But on June 29, 2021, Dedrick was crossing the Mexico-United States border and gave his passport to the border agents. The agents said he was a fugitive with a warrant for his arrest, arrested him, and took him to San Diego County jail. Apparently, Hertz had accused him of theft around May 20, 2020 and charges were pending against him in Washington. Dedrick understands that those charges, as well as the related charges in California, were dismissed shortly after his arrest. *See* Attachment H (Jackson Decl.).

24.    **Larryelle Magee**: Larryelle rented a car from Hertz in League City, Texas through State Farm (the insurer) on or around October 2017. State Farm told her it would handle the rental, and about one month into the rental Larryelle returned to the location, where she was told by Hertz employees to keep the car and that the rental would proceed through State Farm. But just two weeks later, Larryelle was arrested in Lamarque, Texas. The police told her the car was stolen. She spent the next 12 days in jail in horrible conditions. Larryelle was prosecuted for the next three years for Unauthorized Use of a Motor Vehicle in Galveston County, Texas. Larryelle refused a

plea and was acquitted of all charges at trial in November 2020—even though Hertz sent an employee to testify against her and repeat the false facts in the theft report the company had filed against Larryelle. This experience has ruined Larryelle's life, as the baseless charges drove her into homelessness, joblessness, and bankruptcy. *See* Attachment I (Magee Decl.).

25. **Christian Mangano**: Christian works for NASA's Jet Propulsion Laboratory, which rented a vehicle for Christian during an assignment in Florida. The rental started on January 2, 2020 from the Orlando Airport Hertz location and was supposed to continue until July 24, 2020. But, without any basis, Hertz reported the vehicle stolen on April 24, 2020. Christian was arrested at gunpoint in front of his coworkers on April 26. After more than two hours handcuffed in the back of a police car, Christian was released after the police reached Hertz and confirmed that the rental was valid until July 24—two months *after* Hertz filed a police report accusing Christian of theft. The officers apologized and later relayed that "this wasn't the first time that [they were] called because of a false report by Hertz." Christian demanded payment from Hertz in late April 2020 because of the false theft report, and Hertz offered him a paltry $2,000. Despite a back-and-forth on this unresolved claim, Hertz never gave Christian Notice of the bankruptcy. *See* Attachment J (Mangano Decl.).

26. **Kellan McClellan**: Kellan rented a vehicle from Hertz at 7030 South Cicero Ave (a Pep Boys) in Chicago, Illinois on October 7, 2019 via the Uber app. He provided his debit card and received a contract extending one week, until October 14. But on October 12—just five days into the rental—Kellan was arrested at gunpoint in Chicago, put in jail, and held overnight. After securing a bond and leaving jail, he called Hertz on October 13 and demanded an explanation— the Hertz employee confirmed that the rental *still was not due*. When Kellan arrived at his scheduled court date on November 19 on charges of Criminal Trespass, Hertz did not appear and

he was told that the case was dismissed. Kellan sent prepetition demand letters and spoke with Hertz attorneys based on this incident, but did not receive notice of any bar date. *See* Attachment K (McClellan Decl.).

27.    **ReJeana Meado**: ReJeana rented a car in Houston at the George Bush International Airport Thrifty location on May 13, 2021 to attend a wedding. She informed the location that she would need to return the car after hours, and was told to leave the car in the lot with keys in the car. She did just that at 2:50am on May 16, confirming the procedure with a security guard on location and taking a time-stamped picture of her rental receipt. But on June 2, she got a letter claiming that she had to return the car or legal action would be taken. She called a 1-800 number on the letter, informed Hertz/Thrifty that she had returned the car, and was told that Hertz/Thrifty would handle it. On August 2, an investigator called her; ReJeana spoke with the investigator and told her she had returned the car. On September 7, 2021, ReJeana received a letter dated August 31 threatening to report her for theft if the car was not returned. ReJeana called Hertz/Thrifty and was told the rental was closed and that she had received the letter in error. After receiving yet another letter in September, she called Hertz/Thrifty again and was again assured that the situation was taken care of and there were no issues. On September 13, she was charged more than $5,000— she called to dispute the charge and was told that Hertz/Thrifty "recovered" the vehicle on July 15, 2021. She even filled out a "theft from customer" report at Hertz's direction and explained her whole story via email to a theft and recovery unit at Hertz. After seeing news reports of Hertz filing false theft reports, however, ReJeana grew concerned that a theft report might have been filed against her. She was several times given responses suggesting that there was no theft report, including a December 3 email saying "Please be advised Hertz/Thrifty did not file a theft report." Attachment L (Meado Decl.) ¶ 30. But the very next day, after she pressed more, she received

another email saying "According to our records the vehicle has not been recovered to date and we have reported it as stolen to the authorities. Our process once a contract is severely overdue is to close the contract and charge the customer while we continue to work on recovering the property." *Id.* ¶ 33. This email contradicted the email the day before saying that no theft report was filed, and the earlier conversations admitting that the vehicle was "recovered" on July 15. ReJeana is now terrified that she will be arrested, jailed, and/or prosecuted because of Hertz/Thrifty's baseless theft report.[9]

28.    **John Prawat**: John rented a vehicle on or around January 23, 2014 in the Atlanta area at a Hertz location. He repeatedly extended the rental with both the corporate number and the local office. In mid-February, Hertz called to request that he return the rental, and he agreed to do so the following week. He became ill later in the rental and called the branch knowing that he would have trouble returning the car (he was a regular renter and had been a customer for years). Hertz repossessed the car from John on April 9, at which point he learned that Hertz had reported the car stolen on April 1. The theft report included a litany of problems, including (1) saying that the rental was closed on February 2 (which would block his extension requests with the local office without his knowing); (2) that John had provided a bad credit card (his credit card was fine and was charged on March 12); (3) that the rental was due January 30 (the local branch said he could keep the car past that time); (4) failure to disclose that Hertz never talked to the local branch (which subsequently emailed headquarters saying "When I last spoke to [John] before the vehicle was

---

[9]    As can be seen from this description, most of ReJeana's claims arise after the effective date of the plan, which is almost certainly when Hertz filed the theft report and is definitely when ReJeana became aware of it. ReJeana joins this motion to the limited extent of any (mis)conduct before the effective date and in case information in Hertz's possession or the Court's legal interpretation leads to some of her claims' arising before the effective date of the Plan.

reported stolen, he had every intention of returning the rental as soon as he could" but could not "due to personal illness," Attachment T (Prawat Decl.) ¶ 11); and (5) that John provided no phone number and that a number Hertz tried was disconnected (John's phone was active the whole time and Hertz had long had his number). After John and the local Branch Manager reached out to Hertz to explain what happened, he figured the problem was resolved. But on February 8, 2015, John was arrested and jailed for four days. When John's lawyer presented John's evidence to the prosecutor, the case was dropped on July 13, 2015. The prosecutor said: "Hertz does this all the time with us. They use the criminal justice system to handle what are essentially civil matters." Prawat Decl. ¶ 31.

29.     **Jenelle Reece-Williams**: Jenelle rented a vehicle from the McCarran International Airport location in Las Vegas, Nevada on September 15, 2018. She extended the rental each week using the corporate number and was using the vehicle to relocate to North Carolina. Near the beginning of November 2018, Hertz charged $2,100 and figured everything was fine with the rental. But on November 6, she was arrested for theft based on a false Hertz theft report and jailed for two weeks in solitary confinement. In mid-January 2019, she learned that the charges had been dismissed, but she ended up homeless and her life was destroyed based on the false report. Hertz eventually refunded about $2,000 of charges relating to the rental. *See* Attachment M (Reece-Williams Decl.).

30.     **Tonia Rich**: Tonia rented a vehicle from the Covington Pike Hertz location in Memphis, Tennessee in November 2020. Tonia extended the vehicle weekly and paid at all times during the rental; she was a regular renter and was also in close contact with an employee at the location. In February 2021, she was charged $2,800. In March, Tonia no longer needed to rent so called to arrange for its return on March 15, 2021. But on March 13, her boyfriend (Darnay Taper)

was pulled over and arrested at gunpoint while driving the vehicle based on a Hertz theft report—he was prosecuted for 8 months before charges were dismissed. Tonia repeatedly called Hertz to discuss the false police report and help resolve Darnay's prosecution, but Hertz never did anything to resolve the situation. Tonia likely was named in the theft report and is at risk of wrongful arrest and/or prosecution at any time based on that baseless report. *See* Attachment N (Rich & Taper Decl.).

31.    **Darnay Taper**: Darnay is Tonia's boyfriend. While driving the car Tonia had validly rented, extended, and paid for, Darnay was arrested at gunpoint on March 13, 2021, jailed for two days, and prosecuted for Grand Theft Auto for about 8 months until charges were dismissed on November 17, 2021 after Hertz never showed up to prosecute the (meritless) case. Despite Tonia's attempts to contact Hertz, Hertz did nothing during the course of Darnay's prosecution to withdraw the baseless report. *See* Rich & Taper Decl.

32.    **Andrew Seaser**: Drew is a real-estate appraiser who lives in Colorado. Unknown to Drew, Hertz filed theft report claiming he stole a vehicle in Georgia on November 9, 2020. Drew has never rented from Hertz. To his shock, Drew was arrested on August 9, 2021 while attempting to fly to Mexico to celebrate his daughter's high-school graduation. Drew was then transported to jail, strip searched, and held. On August 10, the next day, charges were dismissed because Drew did not rent the car. Amazingly, with basic investigation, it was *Hertz* that determined and told prosecutors that Drew did not rent the vehicle and was not a thief. In other words, Hertz filed the police report accusing Drew of theft *before* investigating, and upon

investigation was easily able to determine that Drew was not a thief.[10] *See* Attachment AU (Seaser Decl.).

33.    **Jeffrey Smith**: Jeffrey rented a vehicle on March 8, 2019 from a Hertz location on Cypress Creek Parkway in Houston, Texas. He extended the rental at all times and could see money being taken from his account each week. But on or around April 25, he was charged $2,417.12. That same day, he called Hertz to extend the rental and return the car on April 29—Hertz never told him it needed to be returned sooner. But later on April 25, 2019, Jeffrey was arrested at gunpoint for possession of a stolen vehicle. He spent the next 68 days in jail. He was threatened by the local district attorney with the maximum sentence possible, so he ultimately accepted a plea deal for probation after months in jail. Hertz's false report destroyed his life. *See* Attachment O (J. Smith Decl.).

34.    **Melinda Smith**: Melinda rented a vehicle from Hertz at 6868 Florida Blvd, Baton Rouge, Louisiana on February 22, 2021. Melinda regularly extended her rental in four-week increments. During the rental, she often spoke with Hertz and visited the local branch twice—she was never told of any problems with the rental or need to return the car. Indeed, Hertz sent her letters in connection with a red-light camera ticket, but nothing about an allegedly overdue rental. On June 3, 2021 she was billed more than $3,000 by Hertz on the card she provided. And on June 15, 2021, Melinda was arrested at gunpoint for possession of a stolen vehicle and jailed for two days. Although she is now out of jail, she is currently being prosecuted in connection with Hertz's baseless theft report. *See* Attachment AS (M. Smith Decl.).

---

[10]    Because Drew's arrest occurred after the Effective Date of the Plan, most of Drew's claims likely are nonbankruptcy claims. Drew joins this motion to the limited extent of any pre-arrest claims and out of an abundance of caution to the extent that any of his claims are deemed to have arisen prior to the Effective Date.

35.    **Edward Solis**: Edward rented a car in mid-April 2019 from a Hertz location in Pico Rivera, California. Lyft would deduct money each week from his earning to pay for the vehicle. In late May 2019, Hertz contacted Edward to complain of underpayment, and Edward directed Hertz to talk with Lyft; Edward had a similar interaction in June. In late July 2019, Edward was arrested at gunpoint and spent two days in jail. While in jail, however, he showed a detective that Lyft was regularly paying Hertz for the rental; the DA declined to press charges because any payment disputes were a civil matter, not a theft. *See* Attachment P (Solis Decl.).

36.    **Edward Sturkie, Jr.**: Edward rented a car in June 2016 from a Gilbert, Arizona Hertz location through State Farm. Edward was a State Farm employee and State Farm was extending his rental. Hertz, however, reported to the police that Edward had stolen the vehicle as of June 16, 2016, despite never reaching out to State Farm or Edward. Edward was charged with theft. He called Hertz during his prosecution to explain that he did not steal the car and that it was an insurance rental, but the lawyer for Hertz did nothing to help despite saying that it sounded "like a big misunderstanding." Edward agreed to deferred prosecution, and the charges were dismissed on September 13, 2021. *See* Attachment Q (Sturkie Decl.).

37.    **James Tolen**: James's fiancée, Krystal Carter, rented a car from a 9150 South Main St., Houston, Texas Hertz location in October 2020, and extended the rental through December 30 of that year. James was listed as an authorized driver. James was driving the vehicle on December 23, 2020 when he was pulled over in Houston. He was arrested at gunpoint; the officers claimed he was driving a stolen vehicle. At the station, the officers briefly investigated and realized that Hertz had reported the vehicle stolen in September 2020, before Krystal even rented the vehicle in October. James was allowed to leave and (obviously) no charges were further pressed against him. *See* Attachment D (Tolen & Carter Decl.). Tolen pursued claims his claims against Hertz as spoke

in January 2021 with Hertz counsel and Herts's claims administrator. *Id.* ¶¶ 13–15. At no point during these interactions did counsel for Hertz or ESIS inform counsel, Carter, or Tolen of the pending bankruptcy proceedings or their ability to file an proof of claim administrative claim. *Id.* Quite the opposite, only after the administrative bar date had passed did Hertz send a letter threatening sanctions if pending litigation was not immediately withdrawn. *See* Attachment AM (letter to counsel). After local counsel filed a nonsuit, the Hertz assistant general counsel emailed counsel for Carter and Tolen to gloat, "Didn't hertz so much after all I guess." Tolen & Carter Decl., ex. 5, at 4.[11]

38.    **Krystal Carter**: Krystal was rented the vehicle that James Tolen was driving when he was arrested. Hertz had reported the vehicle stolen before renting it to Krystal. *See* Tolen & Carter Decl.

39.    **Dr. Tederhi Usude**: Dr. Usude is a dentist in Santa Clarita, California. He rented a vehicle on June 11, 2020 from the Santa Clarita-Bouquet Canyon Hertz HLE location. He used to vehicle to get to a job in rural Northern California. The initial rental was one week, but Dr. Usude called the location to extend many times, and the location always said he was good to keep the car. In December 2020, the location called to inform Dr. Usude that it would report the vehicle stolen if he did not return it; Dr. Usude informed the employee that he was quarantining based on a COVID-19 outbreak at the rural hospital until December 14, but that he would return the vehicle shortly thereafter. But on December 16 Hertz charged his account about $3,500, bringing his total

---

[11]    Currently pending before this Court are: (1) *James Tolen's Motion for Allowance of Administrative Expense Claim* [Case No. 20-11218, D.I. 5932]; and (2) *James Tolen's Motion for Retroactive Annulment and Prospective Relief from Automatic Stay and Injunctive Provisions of Debtors' Plan of Reorganization* [Case No. 20-11218, D.I. 5934]. James also filed Claim No. 15615 on September 27, 2021.

payments around $7,000 for the rental. And on December 18, 2020, Dr. Usude was arrested at gunpoint by 7–8 squad cars and jailed overnight. He received a summons to appear in court on January 15, 2021, but called the court and the court said it had no record of his case. He does not know whether he is currently being prosecuted or will be prosecuted based on the baseless theft report. *See* Attachment R (Usude Decl.).

40.      **Steven Robinson Valdes**: Steven had his identity stolen and that person rented cars from multiple rental companies in his name, including Avis-Budget and Hertz. Avis-Budget called Steven when it couldn't find the vehicle and realized that he was a victim of identity theft. Hertz, however, never contacted Steven and filed a theft report false accusing him of theft. Thus, even though Steven never rented a car from Hertz, he was arrested for car theft on June 25, 2021 and spent two days in jail. He repeatedly called Hertz Corporate and the local office on June 27 to demand answers and withdrawal of the false theft report. But Hertz corporate did nothing and did not drop the report; the local office claimed that there were no records for the rental in their system—as if they had all been deleted. Steven is currently being prosecuted based on the false theft report, despite never even having rented from Hertz. *See* Attachment S (Valdes Decl.).

## IV.    Notice

41.      According to the affidavits of service [Case No. 20-11218, D.I. 1354, 1376, 1447, 4573 & 5274], the Bar Date Order[12] and Bar Date Notice[13] were not served on the Movants. On September 17, 2020, the Debtors' claims and noticing agent published the Publication Notice (as

---

[12]    *Order Establishing Bar Dates and Related Procedures for Filing Proofs of Claim, Including Claims Arising Under Section 503(b)(9) of the Bankruptcy Code, and Approving the Form and Manner of Notice Thereof* dated September 9, 2020 [Case No. 20-11218, D.I. 1240].

[13]    *Notice of Deadlines for Filing Proofs of Claim, Including Claims Arising Under Section 503(b)(9) of the Bankruptcy Code, Against Debtors* dated September 9, 2020 [Case No. 20-11218, D.I. 1376 Ex. C].

defined in the Bar Date Order) in various news publications. [Case No. 20-11218, D.I. 1396 (affidavit of publication).]

42.     Based on the affidavits of service [Case No. 20-11218, D.I. 4314, 4520, 4529, 4861, 4953, 5147, 5222, 5877], it appears that notice[14] of the Plan and hearing to consider confirmation thereof (the "Confirmation Hearing") was not served on any of the Movants (who were not represented by the below-signed counsel until after the Confirmation Hearing). On April 30, 2021 and May 4, 2021, a version of the Confirmation Hearing Notice was published in 12 newspapers. [Case No. 20-11218, D.I. 4619 (affidavit of publication).]

43.     According to the affidavits of service [Case No. 20-11218, Docket Nos. 5512, 5550, 5576, 5872, and 5887 and Case No. 20-11247, Docket Numbers 15, 37, 95, and 170], notice of the Administrative Claims Bar Date was not served on any of the Movants (who were not represented by the below-signed counsel until after the Administrative Claims Bar Date).[15] According to a Certificate of Publication, notice of the Administrative Claims Bar Date was published in two newspapers on July 7, 2021. [Case No. 20-11218, D.I. 5524.]

44.     Despite the fact that the Debtors have in their possession specific records identifying customers who were implicated by its false police reports, the Debtors did not serve the Bar Date Order, the Bar Date Notice, the Confirmation Hearing Notice, or the Administrative Bar Date Notice on the Movants. Consequently, the Movants did not know to (and thus, did not)

---

[14]    *Notice of (I) Approval of Disclosure Statement, (II) Establishment of Voting Record Date, (III) Hearing on Confirmation of the Plan, (IV) Procedures for Objecting to the Confirmation of the Plan, and (V) Procedures and Deadline for Voting on the Plan* [Case No. 20-11218, D.I. 4138] (the "Confirmation Hearing Notice").

[15]    [Case No. 20-11218, D.I. 5550] lists a Reginald T. Brown—the Reginald Brown bringing this motion has middle initial L. The same documents lists eight persons named Jeffrey Smith (or variants of the name), with "address on file." *Id.* 5550-4, at 1689. Counsel does not believe that Movant Jeffrey Smith was served as part of that list.

file proofs of claim on account of any prepetition claims, opt out of the Plan's third-party release provisions or otherwise object to the Plan, or file requests for payment of an administrative expense on account of any post-petition claims.

## V.   **The Plan and Confirmation Order**

45.     The Plan was confirmed on June 10, 2021, and went effective on June 30, 2021 (the "Effective Date"). Regarding discharge, the Plan provides, in pertinent part, that on the Effective Date,

> the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims . . . of any nature whatsoever . . . whether known or unknown, against . . . the Debtors or any of their assets . . . that arose before the Effective Date . . . whether or not (i) a Proof of Claim based upon such debt . . . is Filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim . . . based upon such debt is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the Holder of such Claim . . . has voted to accept the Plan.

(Plan Art. VIII.B.)  The Plan provides further that "[t]he Confirmation Order shall be a judicial determination of the discharge of all Claims . . . ."  (*Id.*)

46.     Regarding third-party releases, the Plan provides, in pertinent part, that each "Releasing Party" (defined in Art. I.A.321 to include "Holders of Unimpaired Claims . . . who do not File a timely objection to the third party releases provided for in Article VIII.D")

> shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived and discharged each Debtor, Reorganized Debtor, and other Released Party from any and all Claims . . . , whether known or unknown, foreseen or unforeseen, existing or hereinafter [*sic*] arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, the Debtors . . . or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing.

(Plan Art. VIII.D.) The term "Released Party" is defined to include, among others, all of the Debtors' current and former directors, officers, and affiliates, as well as the affiliates' current and former directors and officers. (Plan Art. I.A.320.)

47. The Plan's injunctive provision provides, in pertinent part, as follows:

> ALL ENTITIES THAT HAVE HELD, HOLD, OR MAY HOLD CLAIMS . . . THAT HAVE (1) BEEN RELEASED PURSUANT TO . . . <u>ARTICLE VIII.D</u>, [OR] (2) SHALL BE [*SIC*] DISCHARGED PURSUANT TO ARTICLE VIII.B OF THE PLAN . . . ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE DEBTORS, THE REORGANIZED DEBTORS, [OR] THE RELEASED PARTIES . . . : (I) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR RESPECT TO ANY SUCH CLAIMS . . . ; AND (V) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR RESPECT TO ANY SUCH CLAIMS . . . RELEASED OR SETTLED PURSUANT TO THE PLAN.

(Plan Art. VIII.F.)

48. Paragraph 15 of the Confirmation Order provides that each of the foregoing provisions of the Plan is "hereby approved and will be effective immediately on the Effective Date without further order or action by the Court . . . ." Thus, absent relief from the Confirmation Order, the Movants understand they would be prohibited from commencing suit against the Reorganized Debtors or any of the enumerated "Released Parties," prosecuting such a suit, or collecting any judgment that may result. Accordingly, while the Movants do not believe these provisions of the Confirmation Order and Plan are properly enforceable against them for want of proper notice, they

thought it most prudent and appropriate to seek relief from the Confirmation Order from this Court, and to proceed on parallel track with the motion filed by "Group 3" claimants [D.I. 190] (the "Group 3 Motion"), which raises many of the same factual and legal issues presented by this Motion.

## RELIEF REQUESTED

49.    By this Motion, the Movants seek entry of an order substantially in the form attached as Exhibit A hereto (the "Proposed Order") granting relief from the Confirmation Order, insofar as it implements the discharge, release, and injunctive provisions of the Plan, so as to permit the Movants to pursue and collect their claims against the Reorganized Debtors and others outside of bankruptcy based on their lack of notice of the Plan and Confirmation Hearing. In the alternative, and only if the Court is not inclined to grant the relief provided in the Proposed Order, the Movants request entry of an order (i) extending the General Bar Date and Administrative Bar Date so as to permit the Movants to assert claims against the Reorganized Debtors under the applicable processes set forth in the Plan, and (ii) deeming the Movants to have timely "opted out" of the Plan's third-party release provisions.[16]

50.    Counsel recognizes that the January hearing date will not be a substantive hearing to dispose of this motion, but instead a hearing to schedule appropriate next steps. The Movants request a hearing—after full discovery—in March, concurrent with the hearing on any other related motion on the central due process arguments described below. In the Class Motion filed concurrently herewith, counsel outlines a proposed schedule to keep these claims moving forward expeditiously.

---

[16]    The Movants have not included a proposed form of order on this alternative relief, but will do so if and when the circumstances require.

## SUMMARY OF ARGUMENT

51.     The Movants seek relief on several bases. First, they seek relief from the Confirmation Order and related provisions of the Plan that prevent them from bringing suit in other Courts. The Movants were not given constitutionally required notice of the General Bar Date, Confirmation Hearing, and Administrative Claims Bar Date, and therefore cannot be constitutionally bound by the Plan.

52.     First, the Movants are known creditors for purposes of the relevant bar dates. Even without discovery, the Movants have identified substantial, internal efforts to track police reports and claims related to police reports in connection with third-party insurers. This follows from common sense: of course a company should keep track of those it accuses of serious crimes. *See, e.g.*, *In re J.A. Jones, Inc.*, 492 F.3d 242, 251–253 (4th Cir. 2007) (accident victims were known creditors based, in part, on debtor's reporting potential claims to an insurer, investigating the possibility of similar claims, and retaining counsel in connection with those possible claims). Moreover, the Debtors had overwhelming knowledge of the systemic issues underlying their theft reporting, including from law enforcement, news media, many individuals, many lawsuits, and extensive prepetition contact with some of the below-signed counsel—not to mention likely ample records relating to each individual (which will be revealed with discovery). These facts put the Movants comfortably within the known creditor group. *See, e.g.*, *In re Motors Liquidation Co.*, 829 F.3d 135, 159–161 (2nd Cir. 2016); *Fogel v. Zell*, 221 F.3d 955 (7th Cir. 2000). In fact, most of the Movants even specifically put the Debtors on notice that false police report had been filed, sent demand letters, or threatened litigation, but even these Movants were not given notice of the relevant bankruptcy dates.

53.    Even if the Movants were not known creditors, the Debtors' publication notice in this case fell far short of the standards put forward by the Supreme Court in *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 317 (1950). The Third Circuit has made clear that publication notice to unknown creditors is a fact-intensive inquiry not subject to blanket rules. *Wright v. Owens Corning*, 679 F.3d 101, 107–08 (3d Cir. 2012). Here, notice was published only once buried deep in a handful of newspapers. There were many other means of reaching unknown creditors, means that are inexpensive and easily available, but the Debtors took none of those options and made no apparent efforts to investigate the best means of informing unknown creditors. In fact, the published notices were missing pieces of information—such as *the name of each debtor*—that are required by the Code and the Bankruptcy Rules. These paltry efforts fell well short of those required by the Fifth Amendment and illustrated in other cases in this District.

54.    To the extent the Court denies any relief based on the due process arguments outlined above and discussed below, the Movants alternately seek extensions of the General and Administrative Claims Bar Dates, as applicable, under Bankruptcy Rules 3003(c)(3) and 9006, and section 503(a) of the Bankruptcy Code. At a minimum, the *Pioneer* excusable neglect factors for such relief, especially in light of the full-pay plan, the fact that these claims were encompassed by timely filed class claims, the lack of actual awareness of the bar dates on the Movants part, the lack of impact on the larger bankruptcy proceedings now that a plan has been confirmed, and the good-faith nature of these claims. *See Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993).

## BASIS FOR RELIEF REQUESTED

**I.** **Relief from the Confirmation Order is Appropriate Because Movants Are Not Properly Subject to the Plan.**

55. Federal Rule of Civil Procedure 60(b), applicable to these proceedings by Bankruptcy Rule 9024, provides, in pertinent part, that

> [o]n motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:
>> (1) mistake, inadvertence, surprise, or excusable neglect;
> . . .
>> (4) the judgment is void; . . . [or]
>> (6) any other reason that justifies relief.

Fed. R. Civ. P. 60(b)(1), (4) & (6).

56. Lack of notice to an interested party that constitutes a due process violation is grounds for relief from an order under Rule 60(b), and the Court has broad discretion to fashion an appropriate remedy. *See, e.g.*, *In re Polycel Liquidation, Inc.*, Case No. 00-62780, 2006 Bankr. LEXIS 4545, *34 (Bankr. D.N.J. Apr. 18, 2006) (granting movant who lacked notice of section 363 sale motion relief from final sale order as to the asset in question, but leaving the sale order otherwise undisturbed), *aff'd*, Civ. Act. No. 06-2183, 2007 U.S. Dist. LEXIS 955 (D.N.J. Jan. 8, 2007). And it is well-settled that the discharge of a creditor's claim under a chapter 11 plan without reasonable notice of the confirmation hearing violates due process and renders the discharge void as to that creditor. *See Reliable Electric Co. v. Olson Constr. Co.*, 726 F.2d 620, 623 (10th Cir. 1984) ("A fundamental right guaranteed by the Constitution is the opportunity to be heard when a property interest is at stake. Specifically, the reorganization process depends upon all creditors and interested parties being properly notified of all vital steps in the proceeding so they may have the opportunity to protect their interests. *See In re Harbor Tank* [*Storage*, 385 F.2d 111, 115 (3d Cir. 1967)]. ("We will not require Olson to subject its claim to a confirmed reorganization plan it had

no opportunity to dispute."). Accordingly, for the reasons discussed further below, the Court should grant the Movants relief from the Confirmation Order to the extent necessary to pursue and collect their claims against the Reorganized Debtors and others outside of bankruptcy.

### A. The Due Process Clause Prohibits the Plan from Preventing the Movants from Proceeding Outside of Bankruptcy.

57.    The Due Process Clause requires notice of any proceedings that affect property rights, including bankruptcy proceedings. "Absent such notice" of, for example, a claims bar date, a "suit may proceed" to recover on otherwise-dischargeable debts outside of bankruptcy. *Chemetron* Corp. *v. Jones*, 72 F.3d 341, 345 (3d Cir. 1995). Indeed, "[i]nadequate notice … 'precludes discharge of a claim in bankruptcy'" and necessarily other prohibitive aspects of a plan injunction. *Wright v. Owens Corning*, 679 F.3d 101, 107 (3d Cir. 2012) (quoting *Chemetron*, 72 F.3d, at 346); *see Harbor Tank Storage*, 385 F.2d at 114 (holding that, where creditor lacked notice of the plan and confirmation hearing, it had an "absolute right" to assert its claim against the debtor irrespective of the bar date and plan confirmation order). None of the Movants received notice of the General Bar Date, the Confirmation Hearing, or the Administrative Claims Bar Date sufficient to comply with due process. Accordingly, the Due Process Clause permits them to proceed in other fora to collect on claims against the Reorganized Debtors and the Released Parties. *Cf. In re CareMatrix Corp.*, 306 B.R. 478, 484 (Bankr. D. Del. 2004) (rejecting debtor's request for preliminary injunction against parties that received no notice but were covered by plan injunction and related contempt order).

58.    "For notice purposes, bankruptcy law divides claimants into two types, 'known' and 'unknown.'" *Chemetron*, 72 F.3d at 346 (citing *In re Charter Co.*, 125 B.R. 650, 654 (M.D. Fla. 1991)). "Known creditors must be provided with actual written notice of a debtor's bankruptcy filing and bar claims date." *Id.* (citations omitted). As characterized by the Supreme Court, a

"known" creditor is one whose identity is either known or "reasonably ascertainable by the debtor." *Tulsa Pro. Collection Serv., Inc. v. Pope,* 485 U.S. 478, 490 (1988); *see In re Arch Wireless, Inc.*, 534 F.3d 76, 81 (1st Cir. 2008) ("[I]n order for a claim to be reasonably ascertainable, the debtor must have in his possession . . . some specific information that reasonably suggests both the claim for which the debtor may be liable and the entity to whom he would be liable.") (quoting *In re Crystal Oil Co.*, 158 F.3d 291, 297 (5th Cir. 1998)); *In re J.A. Jones, Inc.*, 492 F.3d 242, 250 (4th Cir. 2007) ("[A] creditor is 'reasonably ascertainable' if the debtor can uncover the identity of that creditor through 'reasonably diligent efforts.'") (quoting *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 798 n. 4 (1983)). An "unknown" creditor, on the other hand, is one whose "interests are either conjectural or future or, although they could be discovered upon investigation, do not in due course of business come to knowledge [of the debtor]." *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 317 (1950).

59.     In bankruptcy, "a debtor must make reasonably diligent efforts to uncover the identities of those who have claims against it … ." *In re Thomson McKinnon Secs., Inc.*, 130 B.R. 717, 720 (Bankr. S.D.N.Y. 1991) (citing *Charter Crude Oil Co. v. Petroleos Mexicanos (In re Charter Co.)*, 125 B.R. 650, 655 (M.D. Fla. 1991)); *accord Trans World Airlines*, 96 F.3d at 690 ("[T]he debtor must undertake a careful examination and diligent search of its own books and records." (citing *Chemetron*, 72 F.3d at 346-47)). Moreover, "[s]ituations may arise when creditors are 'reasonably ascertainable,' although not identifiable through the debtor's books and records." *Chemetron*, 72 F.3d, at 347 n.2. And "[i]f the debtor knows, or should know, of its ***potential liability*** to a specific creditor, that creditor is a known creditor entitled to actual notice." *Thomson McKinnon Secs.*, 130 B.R. at 720 (emphasis added) (citing *Atlantic Richfield Co. v. Sharon Steel Corp. (In re Sharon Steel Corp.)*, 110 B.R. 205, 206 (Bankr. W.D. Pa. 1990)); *see also In re Trans*

*World Airlines, Inc.*, 96 F.3d 687, 690 (3d Cir. 1996) ("a diligent search of TWA's records by its bankruptcy counsel would, *or at least should*, have revealed the Berger claims." (emphasis added)).

60.     "Determining the adequacy of publication notice is a fact-intensive analysis that 'depends on the circumstances of a particular case.'" *In re Weiand Auto. Indus.*, 612 B.R. 824, 851 (Bankr. D. Del. 2020) (quoting *Wright v. Corning*, 679 F.3d 101, 108 (3d Cir. 2012)). The Supreme Court has made clear that, even in the bankruptcy context, "[n]otice by publication is a poor and sometimes a hopeless substitute for actual service of notice. Its justification is difficult at best." *City of New York v. New York, N. H. & H. R. Co.*, 344 U.S. 293, 296 (1953). Accordingly, "[a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane*, 339 U.S., at 314. "The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it." *Id.*

### A.     The Movants Are Known Creditors Who Did Not Receive Actual, Written Notice.

61.     The Movants are known creditors who required actual notice of the General Bar Date, the Plan and Confirmation Hearing, and the Administrative Bar Date, as applicable, but who received none. The Debtors acknowledge that they maintain books and records in the ordinary course, and upon information and belief, they have in their possession specific records showing that Movants were implicated by police reports filed by Hertz. Moreover, the Debtors had extensive awareness of the issues underlying these claims, including, in some instances, systematic destruction of rental extensions and other records that would substantiate the claim. To be clear: the Movants have not received any discovery relating to these matters, and they believe that discovery—including but not limited to the pending discovery—is fully appropriate on these

factual inquiries. But even without discovery, the Movants have shown that the Debtors had extensive knowledge of systemic issues that caused tremendous injury to a known, and limited, group of individuals who had been accused or arrested based on the Debtors' theft reporting. Yet the Debtors took no steps whatsoever to inform those individuals that their rights in the bankruptcy proceedings would be affected by the General Bar Date or the Plan. That falls well short of what due process requires. *See Harbor Tank Storage*, 385 F.2d at 115 ("Although notice by publication may be deemed to satisfy the requirements of the [Bankruptcy] Act in some situations, certainly such notice is insufficient where, as here, the trustee knows both the existence and address of a creditor.").

### i. The Debtors Had Ample Information Regarding These False Police Report Claims.

62.     *First*, on information and belief, the Debtors made internal efforts to track potential and actual false-police-report creditors. Even without the benefit of discovery and to date, the Movants have offered evidence that a corporate security manager for Hertz named Richard Livingston told a claimant that "Hertz had an internal list of customers who were reported for theft." Attachment AP (Murray Decl.) ¶ 13. Moreover, they have submitted evidence that a Hertz customer-service employee told Earl Holland (another victim) that false-police-reporting problems were "a known problem with the company," and were "so pervasive that Hertz had established a special fund to compensate the victims" of false police reports, [Case No. 20-11218, D.I. 1081, Ex. A., Declaration of Earl Holland]. And they have submitted evidence that Hertz uses third-party claims administrators "ESIS, Lambda, and Lambda GCL" to track legal claims based on Debtors' false arrest/theft reports, including maintaining internal spreadsheets that catalogue such claims, [*see* Case No. 20-11218, D.I. 1071, Ex. A, Declaration of Frederick Jekel at 4]. Significantly, ESIS is a subsidiary of Chubb, Debtors' insurer, which strongly suggests that the Debtors were working

with their insurance providers to account for false police report claims. The Movants anticipate that discovery will reveal further efforts to track and catalogue victims of these practices.

63.     These practices of systematically maintaining internal lists of affected customers, creating "a special fund to compensate victims" based on a "known problem," and hiring third-party administrators to track liabilities based on that specific problem make the victims of that systemic issue, including the Movants, known creditors. In *In re J.A. Jones, Inc.*, for example, the Fourth Circuit determined that "the known creditor analysis must properly focus on the totality of the circumstances in each case," because "[w]hat is reasonable depends on the particular facts of each case." 492 F.3d 242, at 250–51 (internal quotation marks omitted). Applying that standard, the Court found that tort victims were known creditors based on the debtors' familiarity with the harms underlying a particular mass tort and contacts between the debtors and their insurer in connection with the potential torts, *id.* at 251–52—in other words, the very sorts of internal recordkeeping and litigation preparation activities Hertz engaged in above.

64.     *Second*, the Debtors had extensive notice that their theft reporting practices were systemically inaccurate and led to false reports against many customers. Hertz has had actual notice of the pattern of misconduct underlying each Movant's claims for many years. To highlight just a few examples:

     A.  In January 2017, a federal jury in Galveston, Texas found that Hertz maliciously prosecuted Michael Gray. Mr. Gray had sued Hertz for the same conduct at issue in the present claims. Attachment U.

     B.  In September 2017, a jury in Philadelphia, Pennsylvania reached a verdict in favor of Kelly Grady, finding Hertz culpable of intentional infliction of emotional distress, malicious prosecution, and false imprisonment. Ms. Grady

had sued Hertz for the same conduct at issue in the present claims. Attachment V. Further, in November 2017, the trial court in Ms. Grady's case granted her motion to seek punitive damages and set a trial date on that issue. *See* Attachments W, X; *see also* Case No. 20–11218; D.I. 762, at ¶ 6; D.I. 893, at pp.3-4, ¶ 6. In that Motion, Ms. Grady alleged that what happened to her was the product of a systemic deficiencies affecting Hertz business nationwide. Hertz settled with Ms. Grady in December 2017 in order to avoid a looming trial on punitive damages.

C. Beyond the case filed by the Movants, other cases alleging false theft reports were filed across the country. *See* Attachments AI, AJ, AK, AL. Further evidence of these cases and allegations would be contained in the spreadsheets referenced above and revealed upon discovery.

D. There was extensive news coverage of Hertz's theft-reporting problems before it sent notices of the General Bar Date.[17] In May 2018, for example, ABC6 Action News reported how Hertz customers had been wrongly arrested. Investigative reporter Chad Pradelli identified six customers who had their rental cars reported stolen, including Ms. Grady and Ms. Van Pay. According to the news outlet, it reached out to Hertz "but the company declined to

---

[17]    *See, e.g.*, Laura Layden, "Hertz Accused of Falsely Reporting that Customers Stole Rental Cars," Naples Daily News/USA Today (July 23, 2020); Chad Pradelli and Cheryl Mettendorf, "Action News Investigation: Customers sue Hertz for False Theft Claims," 6ABC Phila. (July 7, 2020); Sarah Buduson, "Hertz customers detained, arrested after rental vehicles mistakenly reported stolen," 5ABC Cleve. (May 21, 2019); Katie LaGrone, "Hertz has a pattern of mistakenly reporting cars stolen leaving customers arrested, attorney says," ABC Action News - WFTS Tampa Bay (May 9, 2019); Chad Pradelli and Cheryl Mettendorf, "Investigation: Hertz customers arrested after rental vehicles mistakenly reported stolen," 6ABC Phila. (May 18, 2018).

participate" in the story. Similarly, in March 2019, Matthew Mershon of ABC7 in Little Rock, Arkansas reported on the ordeal suffered by Hertz customer Jonathan Olivares, who was arrested and jailed improperly. The story states that the day after Olivares's release, he received a phone call from Hertz corporate offices, explaining they were aware of the incident, were looking into how it happened and that they would quickly get him his belongings that were confiscated with the car by the police. According to Olivares, "Same lady called back said we're going to take full responsibility for this." As part of the story, ABC7 reached out to Hertz for comment, "but both a phone call and email went unreturned."

E. From just this subset of 26 Movants bringing this motion, paragraphs 75–76, *infra*, detail contacts in individual cases demonstrating the pattern of false theft reports—undoubtedly there are countless more contacts from other individuals relaying specific complaints and allegations relating to false police reporting, including those outlined in the Group 3 Motion (at ¶¶ 75.A–K).

F. Law enforcement agencies have recognized these systemic issues and informed Hertz of the problems. In June 2015, for example, Captain Josh Grimes of the Louisville Airport Department of Public safety wrote to his superior: "Until Hertz corporate takes some action with their Louisville lot and personnel, I recommend that we suspend taking stolen auto reports for Hertz for 'missing inventory' unless they physically see someone steal an auto, have evidentiary proof of such or obviously non returns that warrants have been taken." [Case No. 20-11218, D.I. 5032-6]. Officers from the Louisville Airport Police later

contacted Hertz's Corporate Security office. *Id.* In November 2016, the Indianapolis Airport Police similarly imposed restrictions on Hertz theft reports due to false reports leadings to the wrongful arrests of customers. *See* Attachment Y (Van Pay Affidavit); Exhibit 4 ¶27 (detailing conversation with Indianapolis Airport Police Department). What these officers did not know is that Hertz's failures are not limited to Louisville and Indianapolis—they permeate the company nationwide.

65.     Furthermore, counsel for the Movants had extensive contacts prior to the bankruptcy process detailing the systemic nature of Hertz's problems with a focus on his clients at the time. These contacts include:

A.  On September 6, 2017, counsel filed a motion for punitive damages in the *Grady* case that extensively outlined evidence of Hertz's systemic problems. *See* Attachment Z.

B.  In October 2018, counsel sent another letter on behalf of a client seeking redress for wrongful arrest and prosecution. Counsel explained that the customer offered a valid card and had paid for the rental at all times, but that Hertz nonetheless had him arrested for car theft. *See* Attachment AA. Counsel described to Hertz's General Counsel how the customer rented a car in February 2018 and had his credit charged for over $3,000.00 and was still reported as stealing the car. *Id.*

C.  In December 2019, Movants' counsel sent Hertz's counsel an email advising of forthcoming lawsuits regarding several Hertz customers for the same pattern of malfeasance involved in prior cases. Movants' counsel told Hertz counsel,

consistent with the later-filed claims, that Hertz "fails to follow their own standard operating procedures, refuses to fix broken computer systems, cuts out corporate security managers because they cost too much, and routinely throws good paying customers in jail." Movants' counsel also noted Hertz's "reckless indifference to the rights of others." [Case No. 20-11218, D.I. 5032-12, at p.7–9].

D. On February 13, 2020, Movants' counsel wrote another letter to Hertz counsel as well as Hertz's CEO. Movants' counsel began by reminding Hertz about his years' long efforts at seeking redress for falsely arrested customers. Counsel also attached brief summaries of 23 of his clients' ordeals, and again identified the basis for the claims: "Hertz's computer systems are—*obviously*—broken and outdated. The company can't keep track of inventory, doesn't know when rentals are extended or returned, can't account for payments, and isn't doing the local investigations mandated in its theft reporting standard operating procedure W7-02(A)(17). Compounding matters, the locations, [a corporate office], and corporate security have no idea what each other are doing. In some cases, Hertz bizarrely rents cars to customers that Hertz reported stolen before the rental began." Attachment AB, at 1. Counsel reminded Hertz that "six months ago I submitted to your company a list of clients detailing how they had been wrongfully detained, jailed, and prosecuted. These customers had paid, extended, and event returned their rentals." *Id.*; [Case No. 20-11218, D.I. 5032-12, at 8 (describing an "avalanche" of persons with claims based on these systemic issues)].

E. On April 28, 2020, Movants' counsel served several briefs on Hertz counsel Winston and Strawn regarding Hertz's systemic failures and summarizing the harm to some of his clients. *See* Attachments AE, AF, AG, AH:

   i. The first memo describes how Hertz improperly destroys its rental records. Attachment AE. It details how Hertz "has admitted that various files, voice recordings, contract notes, and phone records of customers are purged from its system without regard for the fact that a case may go to suit and has been reported to the police as a crime." *Id.* at p.2.

   ii. A second memo describes Hertz's practice of deleting rental extensions and backdating the vehicles' due dates. Attachment AF. The focus of the memo was Hanna Ayoub's case, and how Hertz's systems deleted all record of Mr. Ayoub calling Hertz and extending his rental. As the memo states, "The implications of this failure are wide-reaching. Hertz has been denying that the renters at issue have extended their rentals-claiming that the theft packages are complete-but in reality Hertz is systematically deleting any record of the extensions which confirm that the renters have been advised by Hertz of the continued authorization to use the vehicles. This evidence undercuts every theft report that Hertz has ever submitted for an overdue rental." *Id.* at p.2.

   iii. The third memo focuses on Hertz's policy of charging a customer's card after submitting a police report. Attachment AG. Hertz recognizes that law enforcement agencies are less likely to act on a theft report if the rental has been paid. Accordingly, Hertz's stated policy is to file the police report

without telling the police that it is about to charge the card. In some instances, Hertz tells the police that the customer's card has been denied, which is clearly a misrepresentation. Of course, the prosecutors and police reasonably view payment as a key piece of information.

    iv.   The fourth memo highlights Hertz's failure to investigate the potential thefts before filing the report. Attachment AH. The memo explains how "Hertz policy W7-02(a)(17) mandates that all theft reports be independently investigated and verified by Hertz location corporate security managers. However, in 100% of the cases, Hertz does not perform this required investigation. Multiple Hertz corporate designees testified in the Grady case that Hertz corporate has given them marching orders, that theft packages compiled by Vehicle Control in OKC are to be immediately delivered by location personnel to the police *with no independent verification* and no inquiry into whether payment has been made, the vehicle returned, the rental period extended, the inventory lost, or any other facts that might be critical to the decision to accuse a customer of having stolen a Hertz vehicle." *Id.* at 1-2.

F.  On May 4, 2020, Movants' counsel served several briefs on Hertz counsel Winston and Strawn regarding Hertz's systemic failures and summarizing the harm to some of his clients. *See, e.g.*, Attachments AC, AD.

G.  Counsel filed, prepetition, a May 21, 2020 complaint in Delaware extensively detailing the systemic problems and presenting cases on behalf of many individual Movants. [Case No. 20-11218, D.I. 589–1].

66.     These facts required Hertz, under any standard of reasonableness, to identify and notify persons harmed by its systematic misconduct (or, in Hertz's view, extensive allegations thereof). This is particularly true in light of internal records documenting theft reports, arrests, and legal claims based on allegations of false theft reports.

67.     *Third*—to the extent that having records of persons affected by widespread, systemic issues having consistent and crushing effects on a small, defined, and known subset of individuals is not already enough to qualify those persons as known Movants—the Debtors, upon information and belief, had specific information in their records underlying each claim. The full scope of these records will become clearer with discovery. As a general matter, however, the Debtors would have in their books and records rental contracts, information relating to the rented vehicle's prior and post-report history, records of the customer's address and contact information, records of contacts with the customer and third parties relating to the rental and theft report, records of payments from the customer, records of any investigation (or lack thereof) done into the rental, records of the theft report that was filed; and records of any communications from or with police or prosecutors relating to subsequent arrests, charges, and prosecutions; and records of internal communications regarding each claimant's claim. These records—especially when combined with the Debtors' systemic practices of deleting rental extensions, failing to investigate missing vehicles before filing theft reports, failing to indicate payments in theft reports, and failure to retrieve vehicles, among other systemic problems—would reveal upon any reasonable investigation that the Movants had claims against the debtors.[18]

---

[18]    The reasonableness of any investigation should be measured against the significant and devastating injuries suffered by those harmed by Hertz's false theft reporting practices. This is not a dispute about dollars and cents, but about real peoples' lives and wellbeing.

68.     Further, former Delaware Deputy Attorney General Steven P. Wood examined the facts of these cases and reached certain conclusions regarding Hertz's knowledge of the underlying cases. *See* Wood Decl. ¶¶27–28. After reviewing the materials in connection with the Delaware Complaint, Wood attested:

> [I]t is common practice for law enforcement and prosecutors to alert complaining parties when persons are arrested in connection with theft reports they have filed, and as the criminal case proceeds through the criminal justice system. This would include initial notification as well as close communication after a charging decision was made, after charges were filed, and concerning any court dates involving the matter. In many states, communication between the police, prosecutors, and "victims" of a crime is mandated by statute. In Delaware, the Victims Bill of Rights (11 Del. C. § 9401 *et. seq.*) establishes the obligation of the police and prosecutors to provide crime victims with notice as the case progresses through the system. Consequently, it is virtually certain that Hertz received multiple notices about each of the cases described in the Complaint and similar cases alerting it to the fact that a prosecution had commenced and was progressing. In Delaware, and in many states, the pre-trial custody status of the arrestee would be routinely provided to the victim. And, of course, notice that an arrest had occurred would be a natural part of returning the vehicle to Hertz.

*Id.* ¶ 27. For that reason, Wood concluded that "The fact that Hertz would have received the notice as described [above], when coupled with the information in its possession pertaining to its credit card billings and full lease payments in each of the cases described in the Complaint means that Hertz had actual knowledge, or at least should have known, that each of the defendants in each prosecution described in the Complaint were being wrongfully prosecuted for theft. The same would be true for others with similar fact patterns." *Id.* ¶ 28. The fact patterns of the Movants track those alleged in the Delaware Complaint.

### ii.  Precedent Confirms that the Movants were Known Creditors.

69.     Precedent amply supports a finding that the Movants were known creditors based on the above factual circumstances, let alone on whatever else additional discovery may uncover.

The facts here track the Seventh Circuit's decision in *Fogel v. Zell*, 221 F.3d 955, 963 (7th Cir. 2000). There, a pipe manufacturer had sold potentially defective pipe to a reasonably large number of customers. Some of those pipes had already burst, leading to "multimillion dollar claims" filed by some other purchasers of the pipe. The court held that another purchaser of the pipe—who had not yet suffered a pipe failure by the bar date—was a "known" claimant and had to be given actual notice. The debtor's books and records contained information that the claimant had purchased "a large quantity of the defective pipe." *Id.* at 963. And the claims failed against the debtor by similarly situated third parties demonstrated that other pipe purchasers might have claims to bring, and thus notice was required for holders of these potential "mass tort claims." *Id.* at 961. To be sure, some of those purchasers may never have actually suffered a pipe failure. But the fact that this group of purchasers were likely to have such claims was sufficient to require notice to the purchasers. In this case, like in *Fogel*, the debtors had knowledge of systemic issues leading to "mass tort claims," and had records detailing those affected by the systemic problems. But they made no apparent efforts to notify those individuals of the bar date or investigate whether those individuals have claims.

70.     Consider next the Second Circuit's decision in *In re Motors Liquidation Co.*, 829 F.3d 135, 159–161 (2d Cir. 2016); *id.* at 159 (relying on the Third Circuit's *Chemetron* decision to provide the legal standard for known Movants). There, the Second Circuit concluded that purchasers of certain cars were known Movants because "Old GM know of defects in its cars" and would also have known "the identity of a significant number of affected" persons. *Id.*, at 159. The facts "paint[ed] a picture that Old GM did nothing, even as it knew that the ignition switch defect impacted consumers." *Id.* That knowledge, the Court found, could be inferred from (1) "various complaints"; (2) "[n]ews outlet report[s]"; (3) approaches from regulators, including "a police

report"; and (4) internal discussions of the issue. *Id.* at 160. Like Old GM, Hertz plainly had actual knowledge of the systemic issues undergirding its theft reporting practices, based on complaints, ¶¶ 64.A–C, 65.G, news reports, ¶ 64.D, and notice from law enforcement, ¶ 64.F. Indeed, Hertz's notice is even stronger, given the extensive details of notice described above even before discovery, ¶¶ 62, 64.E, 65.A–F. Coupled with books and records containing the identities of persons affected by these issues, Hertz was obligated to treat the Movants as known Movants.

71.    The Second Circuit also offered an alternative rationale that applies here with equal force. Even if Old GM didn't have actual knowledge of the systemic defects in the ignition switches, the Second Circuit continued, "Old GM—if reasonably diligent—surely *should have known* about the defect" because its employees and agents "should have followed up when they learned their ignition switch did not initially pass certain technical specifications," "should have followed up when they heard disturbing reports" of issues, and "should have followed up when" it internally identified an issue; put simply, "[i]f any of these leads had been diligently pursued in the seven years between 2002 and 2009, Old GM likely would have learned that the ignition switch defect posed a hazard for vehicle owners." 829 F.3d, at 160. The company's "reckless disregard of the facts [was] sufficient to satisfy the requirement of knowledge," especially where the company "knew about [problems] and should have revealed those facts in bankruptcy." *Id.* (internal quotation marks omitted); *see also In re Geo Specialty Chemicals Ltd.*, 577 B.R. 142, 190–192 (Bankr. D.N.J. 2017) (victims of a price-fixing conspiracy were known creditors because debtor knew of the conspiracy and "knew or should have known about" the victims, even though they were "'not identifiable through the debtor's books and records.'" (quoting *Chemetron*, 72 F.3d, at 347 n.2)). Here, too, the extensive complaints and instances of false police reporting, at

the very least, put Hertz in a position where it should have known and should have investigated in ways that would have led to the discovery of the Movants' claims.

72.     *In re Thomson McKinnon Securities Inc.*, 130 B.R. 717 (S.D.N.Y. 1991), is also instructive. In that case, the debtor securities firm had sold securities to an individual (Robinson) prepetition but never delivered them. *Id.* After the bankruptcy court established a bar date, the debtor published notice of the bar date and sent mailed notice of the bar date to those of its former customers "who had made inquiries about customer property"—but not to Robinson, who had not yet inquired about his securities at the time the bar date notice was mailed. *Id.* at 718. On Robinson's motion for leave to file a late proof of claim, the bankruptcy court concluded that Robinson was not bound by the bar date because he was a known creditor who was entitled to actual notice from the debtor, finding:

> There is no question that the debtor knew that Robinson was a former customer who had purchased from the debtor the securities for which he paid $10,009.94. Additionally, the debtor had a record of Robinson's address. . . . The debtor took his money and then did not give him actual notice of the deadline for filing claims because Robinson did not ask what happened to his money or the securities he purchased.
>
> Obviously, it was to the debtor's financial advantage not to make an effort to ferret out customers who paid the debtor for securities which it failed to deliver, but had not inquired as to their nondelivered securities. Accordingly, notwithstanding the absolute duty imposed on a debtor under 11 U.S.C. § 521(1) to file a list of creditors, this debtor chose to limit its efforts as to customers who did not receive delivery of securities purchased and who inquired as to their property held by the debtor.

*Id.* at 719-20.

73.     As with the customers in *Fogel*, *Motors Liquidation*, and *Thompson McKinnon Securities*, the Movants' identities were available to the Debtors, and the Debtors had access to ample information showing that they had potential liability to the Movants on account of their

systemic problems with filing false, misleading, and unsubstantiated police reports. Indeed, here, the Debtors almost certainly also had specific books and records relating to each Movant's claim. But they took no steps to provide actual notice of the General Bar Date, Plan, or Confirmation Hearing to these Movants, thus violating their due process rights.

74.     Each of the Movants reserves the right to supplement and modify these factual arguments in any way based on subsequent discovery.[19] But given the facts presented above, it is already clear that the Movants were known creditors.

**B. Hertz Received Specific Notice that Certain Movants Were Known Creditors.**

75.     A claimant can be a known creditor based on statements to the debtor that would reveal the claim to the debtor. *See, e.g.*, *In re Arch Wireless, Inc.*, 534 F.3d, at 81–82 (customer was known creditor based on correspondence indicating disputes relating to product sales). Based on information currently available, the Debtors were specifically put on notice that the following Movants were harmed by their systemic false-police-reporting problems:

A. **Reginald Brown**: In September 2019, Reginald told a Hertz investigator specifically when he had returned the car that was reported stolen and had confirmation from Lyft to prove it. Brown Decl. ¶¶ 6–10. Further, the

---

[19]     As the *en banc* Third Circuit made clear in *In re Grossman's Inc.*, "[w]hether a particular claim has been discharged by a plan of reorganization depends on factors applicable to the particular case," including "the circumstances of the initial exposure to [the tortious conduct], whether and/or when the claimants were aware of their vulnerability to [such conduct], whether the notice of the claims bar date came to their attention, whether the claimants were known or unknown creditors, whether the claimants had a colorable claim at the time of the bar date, and other circumstances specific to the parties . . . ." 607 F.3d 114, 127 (3d Cir. 2010). Thus, to the extent the Movants' legal arguments regarding the categorical inapplicability of the discharge to false-police-reporting claims do not prevail, each of the Movants must be afforded an opportunity to establish the inapplicability of the discharge based on the particular circumstances relevant to his or her claims. *See id.* (remanding to the lower courts for consideration whether discharge of the appellants' claims was consistent with due process based on the particular circumstances).

prosecution in his case repeatedly reached out to Hertz because Reginald contested his charges. *Id.* ¶ 17.

B. **Mary Lindsay Flannery**: Lindsay, her mother, and Hertz spoke on a 3-way call in early January 2021 where Lindsay and her mother told Hertz "that it was a false police report." Flannery Decl. ¶ 20. Further, the Texas prosecutors contacted Hertz before dismissing the case in January 2021. *Id.* ¶ 22.

C. **Dedrick Jackson**: Dedrick called Hertz to report a blown tire and arranged for Hertz to tow his vehicle—which Hertz did a day or two later—at a time that is believed to be prepetition and before the theft report was filed. Jackson Decl. ¶ 4. (Postpetition, Dedrick also called Hertz once the case against him was dismissed (around July 1, 2021) and demanded to know why a false theft report was filed. *Id.* ¶ 12.)

D. **Larryelle Magee**: Hertz was amply aware that Larryelle claimed the report filed against her was false as it prosecuted her for more than two years prepetition while Larryelle contested the charges. Magee Decl. ¶¶ 12–22. (Larryelle was further acquitted at trial in November 2020, which Hertz surely knew.)

E. **Christian Mangano**: Recall that Hertz admitted to reporting stolen Christian's vehicle during the course of the rental contract. After his arrest, and following other correspondence, on April 29, 2020 Christian emailed Hertz to demand at least $30,000 in payment for "being stopped by multiple police vehicles, ordered to step out of my vehicle at gunpoint with hands up and shirt pulled up, ordered to my knees while the officers forced me to my stomach to place

handcuffs tightly around my wrists and ushered to the back of the police cruiser for over an hour while the matter was investigated." Mangano Decl. ¶ 20. On May 15, 2020, a Hertz Senior Vice President responded to the email and subsequently offered $2,000 to compensate him for his harms. *Id.* ¶ 21; *see also id.* ¶¶18–19; 22–26.

F.  **Kellan McClellan**: Kellan—who was arrested at gunpoint during the original duration of his one-week rental—sent Hertz notices of loss on January 2 and 8, 2020, as well as a formal demand letter on February 3, 2020, extensively laying out his claims, his intent to seek compensation, and offering to settle the case for about $1.4 million. McClellan Decl. ¶¶ 14–19. Kellan corresponded with Hertz, Hertz attorneys, and a claims agent for Hertz at Chubb/ESIS. *Id.* On July 2, a Hertz attorney sent him a letter that it had declared bankruptcy and promising to inform him of the general claims process, but Kellan never received any subsequent notice from Hertz. *Id.* ¶¶ 20–23.

G.  **John Prawat**: John explained to multiple employees in mid-April 2014, in person, that the theft report filed against him was false. Prawat Decl. ¶ 19. Around that time, the branch manager also emailed Hertz to say that he knew John would return the car, that there were extenuating health circumstances, and that John was in contact with him at the time. *Id.* ¶ 20. Further, John's charges were dismissed in 2015. *Id.* ¶ 30.

H.  **Jenelle Reece-Williams**:  Jenelle was charged with possession of a stolen vehicle based on a false theft report from November 2018 to January 2019. Jenelle "called Hertz likely over 100 times from November 2018 to mid-

January 2019 demanding to know what happened. She threatened litigation, told them what happened was wrong, and told them they had to fix this." Reece-Williams Decl. ¶ 22. Further, Jenelle's charges were dropped around mid-January 2019, which Hertz surely knew. *Id.* ¶ 25.

I.  **Jeffrey Smith**: Shortly after spending 68 days in jail because of a baseless theft report, Jeffrey called Hertz in July 2019 to ask Hertz why it had filed a false police report claiming that he did not pay for the vehicle, when he had in fact paid. J. Smith Decl. ¶ 15.

J.  **Edward Solis**: Edward had extensive contacts with Hertz before his arrest in which he told Hertz that Lyft was paying for the vehicle and to direct any inquiries to Lyft. Solis Decl. ¶¶ 5, 8–9, 20. Prosecutors did not press charges against him.

K.  **Edward Sturkie, Jr.**: Edward called Hertz during his 2016–2017 court case and "told Hertz that he did not steal the car and it was an insurance rental. A lawyer from Hertz told him that it sounded like a big misunderstanding, but did not provide any help." Sturkie Decl. ¶ 15.

L.  **Dr. Tederhi Usude**: Dr. Usude specifically told Hertz that he would return the car upon completing his COVID-19 quarantine and returning to Santa Clara just weeks before he was arrested at gunpoint. Hertz had ample information to know that there was no basis for the theft report it filed.

M.  **Cynthia Vaughn**: Cynthia called the Hertz branch to tell the company that she had been falsely reported for theft in late 2007. Vaught Decl. ¶ 10–11.

76.     Above and beyond the previously described forms of notice, the following Movants also provided post-petition notice to the Debtors sufficient to make them known holders of administrative claims:

A. **Nirbhay Agarwal & Saurabh Rathi**: The police called Hertz when they arrested Nirbay and Saurabh and confirmed that Nirbhay had rented the "stolen" vehicle just hours earlier. Agarwal Decl. ¶¶ 10–13. And Hertz tellingly did not charge Nirbhay for the rental when he returned it the next day. *Id.* ¶ 16. Moreover, Saurabh contacted Hertz customer care on February 14, 2021 to complain about being falsely arrested. Rathi Decl. ¶ 19. Hertz promised that a manager would return the call, but that never happened. *Id.*

B. **ReJeana Meado**: To the extent any of ReJeana's claims are deemed to arise before the effective date of the plan, Rejeana specifically informed Hertz/Thrifty when and where she returned the car after Hertz claimed that the car was missing on or shortly after June 2, 2021. Meado Decl. ¶ 5. She also spoke with an investigator and another employee on August 2, 2021, again explaining that she had returned the car, not stolen it. *Id.* ¶¶ 6–8, 10.

C. **Tonia Rich & Darnay Taper**: Tonia called Hertz's corporate number in May and June 2021 to complain about the false theft report that had been filed with respect to a vehicle she rented. Rich Decl. ¶ 19. One June 12, 2021, a Hertz employee called and said he would reach out to Hertz's legal department about the report, but he never got back to her. *Id.* ¶ 20–21. On July 1, 2021, Tonia emailed Hertz Customer Relations to say: "My name is Tonia Rich I rented a vehicle from Hertz my rental agreement number is 591619000. My boyfriend

was pulled over in the vehicle in March and he is being charged with Grand Theft Auto for a vehicle I rented and paid for. I am unsure of what the employee at the location were doing but I was told everything was fine. I spoke with Joshua Boles on June 12 the concerning the matter. He told me he was going to reach out to the legal department and I have yet to hear back. I would like for someone to please call me back it is very urgent I have left him numerous messages. My phone number is (901) 364-8300.  Thank you." *Id.* ¶ 22. She received no response, and Darnay's prosecution continued for months afterwards. *Id.* ¶ 23–24.

D. **James Tolen & Krystal Carter**: Krystal contacted Hertz's Executive Customer Service on December 27, 2020 and described the incident that took place just days before (when James was arrested). Tolen & Carter Decl. ¶ 9. The company tried to get them to sign a release and waiver of claims in order to refund the rental. *Id.* ¶ 10. Counsel for Tolen & Carter further interacted with counsel for Hertz on January 8, 2021 and Hertz's claim administrator ESIS on January 14, 2021, but was never told of the bankruptcy or the administrative claims bar date. *Id.* ¶ 13–15. Quite the opposite, only after the administrative claims bar date were Tollen and Carter told of the bankruptcy—and taunted by counsel for Hertz.

E. **Steven Robinson Valdes**: Steven was arrested on June 25, 2021 and is currently being prosecuted despite having never rented a vehicle from Hertz. He called Hertz corporate and local offices repeatedly starting on June 27, 2021

"demanding answers and the withdrawal the false theft report." Valdes Decl. ¶¶

7–8, 13.

**C.  The Debtors' "Publication Notice" Fails Due Process.**

77.      The Movants anticipate that the Reorganized Debtors will argue that publication

notice satisfied due process for some or all of the Movants. (Recall that the Debtors published

notice of the General Bar Date in 13 newspapers, notice of the Confirmation Hearing in 12

newspapers, and notice of the Administrative Claims Bar Date in 2 newspapers.) These publication

notices were inadequate. To start, the publication of a generic notice in newspapers falls

significantly short of what due process requires in the particular circumstances of these cases, as

discussed below. Morevoever, the actual content of the published notices were inadequate—most

obviously because they failed to identify all but one of the Debtors to which the applicable

deadlines applied.[20]

**i.  The Debtors' "Publication Notice" Was Inadequate Under *Mullane*.**

78.      The Debtors' publication notices fell well short of constitutional standards.

"Determining the adequacy of publication notice is a fact-intensive analysis that 'depends on the

circumstances of a particular case.'" *In re Weiand Auto. Indus.*, 612 B.R. 824, 851 (Bankr. D. Del.

2020) (quoting *Wright v. Corning*, 679 F.3d 101, 108 (3d Cir. 2012)). True,

> publication in national newspapers is [generally] sufficient to satisfy
> the requirements of due process, particularly if it is supplemented
> by notice in local newspapers. But whether adequate notice has been
> provided depends on the circumstances of a particular case. … Due
> process requires notice reasonably calculated, under all the
> circumstances, to apprise interested parties of the pendency of the
> action … As the Supreme Court has repeatedly emphasized, the very

---

[20]   For the notice of the Plan and Confirmation Hearing, where unpacking the definition of
"Released Parties" would have required a reader to know who the "Debtors" were, this was
particularly problematic.

> nature of due process negates any concept of inflexible procedures
> universally applicable to every imaginable situation.

*Wright v. Owens Corning*, 679 F.3d 101, 107–08 (3d Cir. 2012) (internal quotation marks, citations omitted).[21]

79.    The Supreme Court has made clear that, even in the bankruptcy context, "[n]otice by publication is a poor and sometimes a hopeless substitute for actual service of notice. Its justification is difficult at best." *City of New York v. New York, N. H. & H. R. Co.*, 344 U.S. 293, 296 (1953). Notice by publication should only be resorted to as a matter of "plain necessity." *Id.* Indeed, *Mullane* itself explains that "[i]t would be idle to pretend that publication alone … is a reliable means of acquainting interested parties of the fact that their rights are before the courts." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 315 (1950). The adequacy of any notice publication must be "weigh[ed against] equivalence with actual notice." *Id.* And that is because "outside the area of the newspaper's normal circulation the odds that the information will never reach [a claimant] are large indeed." *Id.* (In 2020, the same can be said of the area *inside* a print newspaper's normal circulation, especially for lay Movants.)

80.    Returning to due process basics, "[a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane*, 339 U.S., at 314. "The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it." *Id.* Regardless whether the Movants are classified as known or unknown creditors,

---

[21]    It bears mention that the publication notice of the Administrative Claims Bar Date in only two national newspapers fell short of even that general standard.

it is plain that Hertz's publication falls far short of the efforts that would be undertaken by one "desirous of actually informing" those who may be interested in these proceedings of the bar date.

81.     The publication notices in this case fell short of those due-process standards with respect to the false-police-report Movants (assuming *arguendo* they are not known creditors) for at least three reasons: (1) the manner of publication; (2) the content of publication (beyond the legal defects identified above); and (3) the Debtors' conduct surrounding the publication notice.

82.     *First*, the Debtors adopted insufficient means to provide publication notice in the circumstances of this case. There are two ways to approach publication notice. The first would be to consider what means are most likely to inform interested parties of the ongoing proceedings affecting their rights and to make genuine efforts to give notice accordingly. The second is to ask what is the *minimum* notice that can be given that plausibly checks the "publication notice" box. The Constitution requires the first approach, but the Debtors here took the second.

83.     Publication as a concept does not mean publication in newspapers, it means providing information to third parties. And no person actually desirous of informing the public of important information in 2020 would do so exclusively with small-typeface ads published once deep in print newspapers—especially when the target audience is lay persons who rent cars. (The Movants invite Hertz to share what percentage of its advertising budget—showing its efforts to reach those same consumers when it has actual financial incentives to do so—is allocated to print newspaper advertisements; it won't be high.[22]) To be sure, newspaper publications have an historic place in bankruptcy law, tracing to a time when newspapers commanded a more significant share

---

[22]   Halliday, *Car Rental Companies Shift More Ad Budget to Web* (Oct. 27, 2003) (reflecting trend away from print advertisements in 2003).

of the media landscape.[23] And it is even now possible for a good-faith debtor to design a publication campaign that relies heavily on print media. *See In re Energy Future Holdings Corp.*, 949 F.3d 806, 822–23 (3d Cir. 2020) (debtor "employed a noticing expert, 'follow[ed] the principles in the Federal Judicial Center's ... illustrative model forms of plain language notices' … and published notice in seven consumer magazines, 226 local newspapers, three national newspapers, forty-three Spanish-language newspapers, eleven union publications, and five Internet outlets."). But the Supreme Court's due process test—"notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action" in the way of one "desirous of actually informing" interested parties—remains the core of the inquiry and applies in the present day. And the debtors' antediluvian newspaper campaign was plainly a box-checking exercise rather than a genuine effort to bring interested parties to the table.

84.     These publication efforts are particularly pallid given the extensive knowledge that there was a substantial group of persons (assuming *arguendo* that those persons were not known creditors) severely affected by the Debtors' known, systemic problems that would not be receiving actual notice of the bankruptcy. Despite that, the Debtors made no apparent efforts to tailor publication notice to those persons.

85.     Requiring notice beyond small-print publication in a handful of newspapers is particularly salient in the mass tort context. A leading bankruptcy treatise states this as an obvious: "For example, in cases, including mass tort cases, in which there are a large number of unknown creditors, it may be necessary to publish notice of a bar date so as to reach the widest audience

---

[23] Pew Research, Newspapers Fact Sheet, available at https://www.pewresearch.org/journalism/fact-sheet/newspapers/ (showing ~60% decline in newspaper circulation between 1995 (year of *Chemetron* decision) and 2020 (year of publication notice in this case)).

possible. **Such a publication campaign will inevitably involve print and electronic media**." 10 Collier on Bankruptcy § 9008.01 (16th ed. 2021) (emphasis added). There are many different, and inexpensive, means of informing those implicated in police reports of the bankruptcy aside from mailed notice. *See generally* Alan N. Resnick, *Bankruptcy As a Vehicle for Resolving Enterprise-Threatening Mass Tort Liability*, 148 U. Pa. L. Rev. 2045, 2079 (2000) (suggesting "press releases," "notices" given to "targeted groups of product users" and "other media advertisements"). Some obvious examples targeted emails, letters, texts, or recorded phone calls to known contact information for those implicated in police reports or press releases. (Indeed, emails could easily be sent to all Hertz customers using ordinary listservs *at essentially no cost*.) And all these means would have been trivially easy given that Hertz tracks those implicated in police reports—and its customers more generally—and has their contact information.

86.     The only possible downside to these inexpensive (especially relative to the billions of dollars at stake in this bankruptcy) means of bringing interested parties to the table would be alerting *too many* people about the bankruptcy. But a claimant's due-process challenge cannot be defeated because an inexpensive and far more effective means of alerting him of the bankruptcy would be over inclusive. (For that matter, publication notice is far more over inclusive than any targeted notice described above.)

87.     These efforts also fall far short of those employed in other bankruptcies in this district with respect to tort claims. In *In re Boy Scouts of America*, for example, the Debtors were required, under the guidance of a noticing expert, to publish (1) emails of English and Spanish notice to all relevant persons who had provided email addresses since 1999; (2) 6-7 weeks of television broadcast advertisements on national networks; (3) 4 weeks of advertising on streaming services; (4) 4-5 weeks of radio advertisements in English and Spanish; (4) publication in 8

magazines and 10 Spanish-language newspapers; (5) 89 million gross impressions worth of internet advertising; (6) social media distribution; (7) military advertising; (8) distribution of a targeted press release to 5,400 media outlets and 4,000 websites; and (9) a community outreach campaign. Case No. 20-10343 (LSS), D.I. 695 (bar date order); 556 (describing supplemental notice plan).  In *In re Catholic Diocese of Wilmington, Inc.*, an older case, the bar date order required publication notice (i) once in English in the national edition of *USA Today*, (ii) twice each in English and Spanish in several local and regional newspapers in Delaware, Maryland, Virginia, and Pennsylvania. (iii) twice in both English and Spanish in the Diocese of Wilmington's newspaper *The Dialog*, (iv) bi-weekly, in English, in the bulletins promulgated by the various parishes within the Diocese of Wilmington, and (v) bi-weekly, in Spanish, in the bulletins promulgated by those parishes having a large number of Spanish-speaking parishioners.  Case No. 09-13560 (CSS), D.I. 308 at ¶ 13. The Debtors' minimal, perfunctory efforts in this case fall far short of those cases.

88.    *Second*, the contents of the notice were insufficient. As above, the Debtors had extensive notice that a substantial group of persons severely impacted by their systemically flawed theft-reporting practices. But they made no tailored efforts to inform those persons of the Bankruptcy and Bar Date. The Third Circuit has specifically reserved the possibility that "if a debtor's records revealed the existence—but not the identities—of persons with claims against the debtor, due process would require that the nature of those claims be announced in the relevant notices." *Sweeney v. Alcon Lab'ys*, 856 F. App'x 371, 375 (3d Cir. 2021). To the extent the Movants were unknown Movants, this is just such a case: the debtors' known, systemic issues caused a mass tort on behalf of lay persons who did not receive mailed notice of the bar date.

89.     Further, "[t]he [claimant's] degree of sophistication is an issue that is relevant to the adequacy of the notice of bankruptcy proceedings they received." *Jones v. Chemetron Corp.*, 212 F.3d 199, 205 n.6 (3d Cir. 2000). Here, the wording of the notice was littered with complex bankruptcy terms and concepts—for example, "a claim … against the Debtors that arose, or is deemed to have arisen, prior to the Petition Date, no matter how remote or contingent such right to payment or equitable remedy may be," No. 20-11218, D.I. 1240-3, at 2—and even practitioners can reach difficulties interpreting the *Grossman's* standard for when claims "arose." Therefore, "[e]ven if we assume that they read the bar date notice, the movants would have been hard pressed to determine what action, if any, should be taken with regard to the notice. The bar date notice … couched with legalese, is a complex legal document, and clearly is not easily comprehensible by a lay-person." *In re Grand Union Co.*, 204 B.R. 864, 873 (Bankr. D. Del. 1997) (cited with approval in *Jones*, 212 F.3d, at n.6). And here, the false police report Movants were lay persons with no legal training or background.

90.     *Third,* the Debtors' conduct with respect to notice and false-police-report Movants provides additional reason to find publication notice inadequate. Indeed, "[t]he facts of this case demonstrate the prudence of not having the rule regarding publication always satisfy due process requirements." *Tillman ex rel. Est. of Tillman v. Camelot Music, Inc.*, 408 F.3d 1300, 1308 (10th Cir. 2005). In *Tillman*, the debtors had taken precautions to prevent potential Movants from filing claims. The Movants have evidence that Hertz has engaged in similar conduct here to prevent potential Movants from filing claims. For example, Krystal Carter rented a car from the 9150 Main Street Hertz location in Houston, Texas in October 2020 and extended that vehicle through December 30, 2020. *See* Tolen & Carter Decl. ¶ 3. James Tolen was listed as an authorized driver. *Id.* On December 23, 2020, police pulled Tolen with guns drawn and arrested him—saying that he

was driving a vehicle Hertz had reported stolen. *Id.* ¶¶ 4–6. Police contacted Hertz at that time, and Carter contacted Hertz the next day to explain what happened. *Id.* ¶¶ 7–9. On January 8, 2021, counsel for Carter was contacted by a Hertz assistant general counsel, and on January 14, 2021 counsel was contacted by ESIS, Hertz's claim administrator. ¶¶13–15. At no point during these interactions did counsel for Hertz or ESIS inform counsel, Carter, or Tolen of the pending bankruptcy proceedings or their ability to file a proof of claim. *Id.* Quite the opposite, before suit was filed and without acknowledging the bankruptcy, Hertz tried to get Carter and Tolen to release all claims in exchange for a refund of the rental fee. *Id.* And after Carter and Tolen filed suit on July 30, 2021, Hertz sent a letter threatening sanctions if it was not immediately withdrawn. *See* Attachment AM. After local counsel filed a nonsuit, the Hertz assistant general counsel emailed counsel for Carter and Tolen to gloat, "Didn't hertz so much after all I guess." Tolen & Carter Decl., ex. 5, at 4.

91.     Additional "plus factors" are also present here. For example, the Debtors conspicuously failed to give notice even to potential false-police-report Movants with documented, extensive contacts with the company, like those of Kellan McClellan (who sent a formal demand) and others. *See*, *supra*, ¶¶ 75–76 (describing stories). There was simply a lack of desire to take steps to inform victims of false police reports. Further, Hertz has faced spoliation sanctions relating to records involved in its theft reporting practices. *See, e.g.*, Attachment AN (*Grady* spoliation orders). It has brazenly admitted to refusing to withdraw criminal theft reports—even when the lives of innocent persons are being destroyed by false charges—or provide any assistance to those wrongfully charged. *See* Garcia Decl. ¶ 24 (December 1, 2021 Hertz email saying "we are not empowered to dismiss the police report that was filed with the authorities. Therefore, you must address this matter through the court system."); Sam Wood, "Bankrupt Hertz is Still Wrongly

Accusing Customers of Stealing Cars," Page A1, Philadelphia Inquirer (Aug. 3, 2020), available

at        https://www.inquirer.com/business/retail/hertz-stolen-car-grand-theft-auto-malofiy-

bankruptcy-lawsuit-20200803.html ("Hertz has no mechanism to withdraw a criminal referral

because, the company spokesperson said, it has to maintain a relationship of 'integrity and

responsibility' with law enforcement. 'In the rare instances this happens, if you report a crime, and

you later say it didn't happen, then law enforcement tends not to believe you if you retract it or say

you were mistaken,' the spokesperson said. 'Hertz's continued good relationship with law

enforcement is important.'"). This is flatly contrary to its "legal and moral" duty to update police

reports with incomplete or false information. Wood Decl. ¶ 24. And it is extraordinary that Hertz

admits to "instances" where false police reports occur, but it does nothing about them as a matter

of policy. Worse still, the Reorganized Debtor continues these ruinous practices post-petition and

post-confirmation, as demonstrated by many of the Movants' experiences and those of Manuel

Garcia.

      92.    Moreover, former Delaware Deputy Attorney General Steven P. Wood determined

that the "question of whether Hertz's conduct amounts to criminal conduct is worthy of a criminal

investigation to determine whether Hertz should be prosecuted for its misconduct" based on the

facts alleged in the Delaware prepetition complaint. Wood Decl. ¶ 29. In particular, he determined

that, assuming the allegations in the Delaware complaint to be true, "there is more probable cause

to conclude that Hertz committed a crime than there is probable cause to conclude that any

Claimant committed a crime." *Id.* ¶ 30. In these circumstances, the Due Process Clause calls for

more than "burying the lead" deep in a few newspapers such that equity holders emerge from

bankruptcy with value, but persons grievously harmed by the Debtors lose their ability to seek

justice because they too infrequently read the New York Times.

93.     The bottom line is that the Debtors employed the minimum means that could even plausibly count as publication notice, not means demonstrating an actual desire to provide notice to those whose rights might be affected by these proceedings. These efforts, in light of the facts of these claims and the Debtors' surrounding conduct, fell far short of what due process requires; Hertz's notice by publication in this case was not "more than a feint" in that direction with respect to those implicated by its false and misleading theft reporting practices. *Mullane*, 339 U.S., at 315. And the Movants' Due Process Clause rights therefore prohibit disallowing their claims as untimely based on the General Bar Date about which they received no notice.

### ii.     The Debtors' "Publication Notice" Was Inadequate as a Matter of Law.

94.     Many questions raised in the instant filing turn on questions of fact that are likely to entail discovery and evidentiary hearings. Facts aside, the Debtors' published notice of the bar date was inadequate as a matter of law. The Debtors published an identical written notice of the General Bar Date in 13 newspapers, or the Confirmation Hearing in 12 newspapers, and of the Administrative Claims Bar Date in 2 newspapers. The published notices can be viewed in the various affidavits for publication. *See*, *e.g.*, Case No. 20-11218, D.I. 1396, at 4 (lower left-hand corner of page B6 of the 9/17/2020 edition of *The Globe and Mail*). The published notices were inadequate under the Bankruptcy Code, the Bankruptcy Rules, and the Due Process Clause. Bankruptcy Rule 2002 governs notice. Subpart (n) applies to publication notice, which is a "notice given under this rule" by virtue of subpart (*l*). Bankruptcy Rule 2002(n) provides, "The caption of every notice given under this rule shall comply with Rule 1005. The caption of every notice required to be given by the debtor to a creditor shall include the information required to be in the notice by §342(c) of the Code." The debtors' published notices lacked the information required by this rule and consequently lack legal effect under the Code, the Rules, and the Due Process Clause. *See Chemetron*, 72 F.3d at 346 ("Due process requires notice that is reasonably calculated to reach

all interested parties, reasonably conveys *all the required information*, and permits a reasonable time for a response." (emphasis added)).

95.     To start, the published notices did not "include the information required to be in the notice by § 342(c) of the Code." Fed. R. Bankr. P. 2002(n). Section 342(c)(1) provides, "notice shall contain the name, address, and last 4 digits of the taxpayer identification number of the debtor." 11 U.S.C. § 342(c)(1). As to every Debtor but The Hertz Corporation, the notices did not include the debtor's name or the last 4 digits of the Debtor's taxpayer identification number.[24] Quite the opposite, the notices openly admit that "a complete list of debtors and the last four digits of their federal tax identification numbers is not provided herein." [*E.g.*, Case No. 20-11218, D.I. 1396, at 4]. The notice therefore does not comply with Rule 2002(n). And under the plain terms of section 342(g)(1), the notice "shall not be effective notice," as least as to each Debtor other than The Hertz Corporation.

96.     Moreover, the notices at issue did not "comply with Rule 1005" for any debtor. Fed. R. Bankr. P. 2002(n). Bankruptcy Rule 1005 provides, "The caption of a petition commencing a case under the Code shall contain the name of the court, the title of the case, and the docket number. The title of the case shall include the following information about the debtor: name, employer identification number, last four digits of the social-security number or individual debtor's taxpayer-identification number, any other federal taxpayer-identification number, *and all other names used within eight years before filing the petition*" (emphasis added). For every debtor but The Hertz Corporation, the published notice did not comply with Rule 1005 because it did not list the requisite "information about the debtor." And even for The Hertz Corporation, the notice (let

---

[24]    The Confirmation Hearing Notice indirectly mentions "Rental Car Intermediate Holdings, LLC" as an applicable entity when describing voting rights. Case No. 20-11218, D.I. 4111-5, at 4. That fails Rule 2002(n) because the information was not included in "the caption" of the notice.

alone the caption) fails to contain "all other names used within eight years before filing the petition." Those names—listed as required on The Hertz Corporation's "petition commencing a case" (the origin of the Rule 1005 requirement incorporated by Rule 2002(n))—are "Firefly, Hertz Car Sales, Hertz Rent-A-Car, Thrifty, Dollar Rent A Car, Thrifty Car Rental." [*See* Case No. 20-11218, D.I. 1 (petition listing, per Rule 1005, "[a]ll other names debtor used in the last 8 years")]. The published notices, therefore, failed to comply with the Bankruptcy Rules with respect to each Debtor.

97.    The Bankruptcy Code and Rules require that notices contain this information for good reason. Unquestionably, the single most important piece of information to provide in a notice of the general bar date is the *name of the debtors* at issue. Case in point: the first and most prominent piece of information on the *mailed* notice of the General Bar Date is a list of each Debtor in the bankruptcy. [*See* Case No. 20-11218, D.I. 1240-1 (Bar Date Notice)]. But the Debtors failed to include this critical information in the *published* bar date notice. Likewise, there are very good reasons why published notice should include other "names used within eight years before filing the petition," as those names can be essential in alerting potential creditors of their claims and the need to file in order to preserve them.

98.    In sum, the relevant rules are plain and plainly stated; the Debtors designed the publication notice and now must bear the consequences of failing to comply with the Code and Rules in so doing. Section 342(g)(1) offers a clear command that noncompliant notice "shall not be effective notice," and the Rule 1005 requirements, too, are strictly construed even for mailed notice. *See Ellett v. Stanislaus*, 506 F.3d 774, 781 (9th Cir. 2007) (individual debtor's mailed notice without legal effect because, contrary to Rule 1005, he erroneously replaced a "3" with a "6" in the last four digits of his SSN). Here, the rules should be applied with equal force, as the

Reorganized Debtors cannot rely on a legal fiction to extinguish other individuals' interests without even satisfying the basic prerequisites for using that legal fiction. The failure to include these legally and logically required pieces of information fails under the Rules, the Code, and due process.

II.   **In the Alternative, the Movants Should Be Permitted to File Claims.**

99.   If the Court rejects the Movants' due process arguments,[25] recounted above, then the Movants move under Bankruptcy Rules 9006 and 3003(c)(3) and 11 U.S.C. § 503(a), as applicable, for the acceptance of claims filed after the General Bar Date and Administrative Bar Date.

A.   **The Movants Bring both Prepetition and Postpetition Claims.**

100.   Many of the Movants' claims arose in whole or in part post-petition, and therefore some may be treated as general, unsecured post-petition claims or administrative claims. Although the law in this area is unsettled, this section briefly outlines which claims are likely to arise post-petition.

101.   As a general matter and to the extent necessary, a Debtor's post-petition torts may be treated as administrative claims in the bankruptcy process.[26] *See Reading Co. v. Brown*, 391 U.S. 471 (1968) (tort claims count as administrative claims under the Bankruptcy Act); *Ellis v.*

---

[25]   The failure to provide notice required under the Due Process Clause of the Fifth Amendment gives rise to "an absolute right to file and prove [one's] claim in the proceeding, despite the fact that the bar date ha[s] passed and the plan was confirmed." *In re Harbor Tank Storage Co.*, 385 F.2d 111, 114 (3d Cir. 1967). If the Court finds a due process violation but, for whatever reason, determines that the relief requested in Part I, *supra*, is inappropriate, then the Movants expressly reincorporate their due process arguments, described above, and in the alternative seek permission to file claims and requests for payment of administrative expenses based on that due process violation.

[26]   To the Movants' knowledge, there was—and still is—no legal barrier to filing general unsecured claims that arose post-petition in these bankruptcy proceedings. *Cf.* Group 3 Motion ¶¶ 49-50.

*Westinghouse Elec. Co., LLC*, 11 F.4th 221, 230 (3d Cir. 2021) (applying *Reading* to the Bankruptcy Code).

102.    The Third Circuit addressed the date on which a claim accrues in its *en banc* decision in *Grossman's*, which overruled *In re M. Frenville Co.*, 744 F.2d 332 (3d Cir. 1984). *See JELD_WEN, Inc. v. Van Brunt (In re Grossman's Inc.)*, 607 F.3d 114, 117 (3d Cir. 2010). The *Frenville* court had adopted an "accrual" test for determining when a "claim" arises for bankruptcy purposes, finding that an accounting firm's third-party claims for common-law indemnity and contribution against the debtor in connection with a lawsuit filed against the firm did not arise until the lawsuit was filed post-petition because the firm had no "right to payment" under applicable state law until that time.  744 F.2d at 336-37. In *Grossman's*, which considered whether an asbestos personal injury tort claim arose prepetition so as to be subject to a chapter 11 discharge injunction, the court aligned with the overwhelming weight of authority rejecting the *Frenville* accrual test, and held that "a 'claim' arises when an individual is exposed pre-petition to a product or other conduct giving rise to an injury, which underlies a 'right to payment' under the Bankruptcy Code." *Grossman's*, 607 F.3d at 125. This test focuses not on the conduct underlying the claim, but rather on the individual's exposure to that conduct. *Id.* at 121–25. So, for example, an asbestos-exposure claim arises when the victim is exposed to the asbestos, not earlier when the asbestos is manufactured/installed or later when the injury caused by the exposure manifests itself.

103.    If the Court grants leave to file claims (rather than proceed outside of bankruptcy), the Movants will asserts causes of action similar to those asserted by the movants in the Group 3 Motion, including: (1) malicious prosecution; (2) abuse of process; (3) false arrest; (4) false imprisonment; (5) negligence; (6) gross negligence; (7) intentional infliction of emotional distress; (8) negligent infliction of emotional distress; (9) defamation; (10) civil conspiracy; and (11) unfair

and/or deceptive trade practices. These claims arise for bankruptcy purposes when the Claimant is "exposed" to the Debtors' tortious conduct. For each of the above claims but defamation, exposure occurs when there is some connection between the false theft report and the Claimant.[27] In many cases, the exposure to the Debtors' conduct first occurs upon arrest, although in some cases individuals we impacted by the theft report prior to arrest.

104.    Further, many of the Movants also bring claims relating to the Debtors' conduct in failing to withdraw or remedy the false theft reports while prosecutions or warrants were pending. For many Movants whose prosecutions extended after the petition date, these ongoing failures include post-petition conduct and necessarily post-petition claims. Specifically, those Movants allege that the Debtors had (and the reorganized entities, for that matter, continue to have) a "legal and moral" duty to update theft reports containing incomplete or false information when there are charges pending against an individual reported for theft. Wood Decl. ¶ 24. The Debtors however, openly admit that "Hertz has no mechanism to withdraw a criminal referral because, the company spokesperson said, it has to maintain a relationship of 'integrity and responsibility' with law enforcement. 'In the rare instances this happens, if you report a crime, and you later say it didn't happen, then law enforcement tends not to believe you if you retract it or say you were mistaken,' the spokesperson said. 'Hertz's continued good relationship with law enforcement is important.'" Sam Wood, "Bankrupt Hertz is Still Wrongly Accusing Customers of Stealing Cars," Page A1, Philadelphia Inquirer (Aug. 3, 2020), available at https://www.inquirer.com/business/retail/hertz-stolen-car-grand-theft-auto-malofiy-bankruptcy-lawsuit-20200803.html; *see also* Garcia Decl. ¶ 24. The continued breach of that ongoing duty, as well as the continued, malicious prosecution

---

[27]    The defamation claim most naturally arises when to the statement is made to a third party—in many cases, the date of the false arrest report—at which point the reputational injury has occurred.

of cases after the petition date and until the Effective Date are administrative claims, while the continued breach of that duty after the Effective Date of the plan is not a claim in bankruptcy at all.[28]

105.    On this understanding of the law, the following Movants anticipate bringing claims that may arise post-petition and before the Effective Date[29]:

   A. **Nirbhay Agarwal**: Nirbhay was arrested just hours after validly renting a car based on an earlier police report filed by Hertz. Nirbhay's rental and arrest occurred post-petition, so all of his claims arise post-petition.

   B. **Saurabh Rathi**: Saurabh's claims arise at the same time as Nirbhay's claims.

   C. **Jessica Andolino**: Jessica was arrested just days into a valid rental, almost certainly because Hertz had rented her a car it had previously reported stolen. Her rental and arrest were post-petition, so her claims are post-petition claims. Her prosecution continued after the effective date of the Plan, so she may also possess nonbankruptcy claims.

   D. **Carmen Bosko**: Carmen was arrested on August 9, 2021, after the effective date of the plan. To the extent Carmen's claims do not arise after the effective date of the plan, they arise post-petition because Carmen did not even rent the vehicle in January 2021.

---

[28]    The Movants reserve the right to bring post-effective-date claims based on the Reorganized Debtors' failure to correct false police reports for any activity that has continued after the effective date.

[29]    All Movants reserve the right, where appropriate, to bring in other courts claims arising after the effective date of the Plan.

E. **Reginald Brown**: Some of Reginald's claim arise post-petition because Hertz did not withdraw the false theft report and continued to press baseless charges against Reginald post-petition until they were dismissed on September 29, 2021.

F. **Mary Lindsay Flannery**: The theft report filed against Lindsay and her arrest occurred post-petition from September to December 2020; charges were dismissed in January 2021. Accordingly, all Lindsay's claims arise post-petition.

G. **Dedrick Jackson**: Based on information available to date, Hertz seemingly falsely reported Dedrick for theft on May 20, 2020 (two days before the bankruptcy petitions), but Dedrick was not arrested until June 29, 2021 (one day before the effective date of the plan). Dedrick's claims likely arise post-petition upon his arrest.

H. **Larryelle Magee**: Some of Larryelle's claims arise post-petition because Hertz continued to press a baseless case against her until she was acquitted post-petition at trial in November 2020.

I. **ReJeana Meado**: ReJeana rented a car on May 13, 2021 and returned it on May 16. ReJeana's claims primarily arise after the effective date, when counsel believes on information obtained to date that Hertz reported her for theft and (finally) admitted it had done so. ReJeana joins this motion to the limited extent of Hertz's tortious conduct prior to the effective date of the plan and in an abundance of caution in case any of her claims is deemed to have arisen before the effective date of the plan (including based on information in Hertz's possession).

J.  **Tonia Rich & Darnay Taper**: Tonia & Darnay's claims trace to a November 2020 rental and March 13, 2021 arrest of Darnay. To the extent that any claims do not arise after the effective date of the plan,[30] their claims arise post-petition.

K.  **Andrew Seaser**: Drew did not rent from Hertz, but was evidently reported for theft post-petition and arrested after the effective date of the Plan. To the extent that any of his claims do not arise after the effective date of the plan, Drew's claims arise post-petition.

L.  **Jeffrey Smith**: Jeffrey's probation extended post-petition and he may bring claims based on Hertz's continued failure to right the record in connection with its baseless theft report.

M.  **Melinda Smith**: Melinda's rental and arrest occurred post-petition, so many of her claims arise post-petition. Melinda remains under prosecution and may have nonbankruptcy claims that arise after the effective date of the Plan.

N.  **Edward Sturkie, Jr.**: Edward's deferred prosecution resulted in charges being dismissed after the effective date of the Plan. He may have post-petition claims based on Hertz's failure to right the record and correct its false theft report after the petition date.

O.  **James Tolen and Krystal Carter**: Krystal rented the vehicle that resulted in James's arrest post-petition, in October 2020, so their claims arise post-petition.[31]

---

[30]  Darnay's prosecution continued until November 17, 2021, and he likely has non-bankruptcy claims based on Hertz's conduct after the effective date of the Plan. Tonia fears future arrest and prosecution, and does not know if there are charges/warrants against her at the present time.

[31]  Tolen and Carter reserve the right to bring additional, nonbankruptcy claims based on Hertz's conduct after the effective date of the Plan.

P. **Dr. Tederhi Usude**: Dr. Usude rented the vehicle post-petition on June 11, 2020, was arrested on December 18 that year. All of his claims likely arise post-petition. To the extent any charges against him remain (or remained) pending after the effective date of the plan, Dr. Usude may have nonbankruptcy claims.

Q. **Steven Robinson Valdes**: Steven (who never rented a vehicle from Hertz) was arrested June 25, 2021 and is currently being prosecuted based on a false theft report filed by Hertz. His claims that do not arise after the effective date certainly arise post-petition.

**B. The Court Should Permit the Late-Filed Claims for Excusable Neglect.**

106.    "[T]he Bankruptcy Court must accept late-filed proofs of claim under Federal Rule of Bankruptcy 3003(c)(3) for 'cause shown.' Fed. R. Bankr. P. 3003(c)(3). That 'flexible' standard is met when the 'danger of prejudice to the debtor' is low; the claimant shows good 'reason for the delay'; and the 'length of the delay' does not have outsize 'impact on [the] judicial proceedings.' *In re Energy Future Holdings Corp*, 949 F.3d 806, 823 (3d Cir. 2020) (quoting *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993)).  Under that standard, late claims may also be rejected for bad faith.  *Id.* at 824, n.11; *see also Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993) (excusable neglect factors include "the danger of prejudice to the debtor, the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith.").

107.    Similarly, section 503(a) of the Bankruptcy Code provides that an entity "may tardily file [a] request [for payment of an administrative expense claim] if permitted by the court for cause." At a minimum, this provision permits tardy filings upon a showing of excusable

neglect. *Cf. Ellis v. Westinghouse Elec. Co., LLC*, 11 F.4th 221, 233 n.6 (3d Cir. 2021) (referencing that "courts have often relied on the 'excusable neglect' standard to determine whether to allow a tardily filed request for payment of an administrative claim" (internal quotation marks omitted)); *In re Promise Healthcare Grp., LLC*, No. 18-12491 (CTG), 2021 WL 4528461, at *9 (Bankr. D. Del. Oct. 4, 2021) ("[T]he disallowance of Figueroa's claim on the ground that she missed the administrative claims bar date would provide a windfall to the estate. Figueroa alleges that she suffered personal injuries as a result of the debtors' negligence during the bankruptcy case. … Leaving Figueroa with no means to pursue such a claim would clearly be prejudicial to her interests and would permit the estate to avoid an obligation that it would otherwise be required to bear under applicable legal principles.").[32]

108.   These factors support permitting the Movants' claims that were filed after the General Bar Date or Administrative Claims Bar Date, as applicable. To start, there is no prejudice to the Debtor by accepting these proofs filed after any bar date. This is true for several reasons. For instance, there were class proofs of claim filed on behalf of a class of all false police report Movants, which would include the Movants making this motion. Therefore, the Plan was negotiated and confirmed with full awareness that false-police-report claims would be part of the bankruptcy, and accepting the claims when filed could "not alter the expectations the parties had at the time they agreed to the" plan. *In re Energy Future Holdings Corp*, 949 F.3d 806, 823 (3d Cir. 2020); *see also In re Kaiser Grp. Int'l, Inc.*, 278 B.R. 58, 64 (Bankr. D. Del. 2002) (Walrath, J.) ("The Debtors are not prejudiced by [class members' having claims], since the Debtors had

---

[32]   On the plain language of the Code, there is nothing limiting the "for cause" language in section 503(a) only to excusable neglect. Even if the Court concludes that the *Pioneer* factors are not met, it may find cause based on similar considerations, including the plain interests of justice for the Movants and the relative equitable positions of the parties with respect to the alleged conduct.

notice of the existence of the class claim before the bar date."). Also, these claims will have no impact on the proceedings of this bankruptcy. The Plan provides for unimpaired treatment of unsecured claims like those of the Movants, and there are plenty of resources available to pay these claims (which, though substantial for the Movants, are a very small portion of the total value of this bankruptcy).[33]

109.    Second, the reason for the delay traces back to a lack of actual notice. Even if the Court concludes that that publication notice was adequate—which it should not do—each of the Movants was not aware of the General and Administrative Bar Dates, or the need to file claims in these cases, until the bar dates had elapsed. And each of the Movants cannot bear outsized fault for failing to take action based on publication notice that the Supreme Court has acknowledged is "a poor and sometimes a hopeless substitute for actual service of notice." *City of New York v. New York, N. H. & H. R. Co.*, 344 U.S. 293, 296 (1953); *Pioneer*, 507 U.S., at 398 (creditor's failure to file claim before bar date constituted excusable neglect based, in part, on "peculiar and inconspicuous placement" of the notice). The Third Circuit made a similar point in *In re Orthopedic Bone Screw Prod. Liab. Litig.*, where a "seven[-]month delay" traced to "the minimal constructive notice provided" and it would have, "absent actual notice mailed to [the movant's] address," been "incongruous … to find [the movant] culpable for his failure to note a small advertisement run once on page 50 of a newspaper he does not receive." 246 F.3d 315, 326 (3d Cir. 2001) (applying *Pioneer* factors). The same is true of the 13 newspaper advertisements run

---

[33]    The Movants specifically reserve the right to respond to any factual evidence of prejudice that the Reorganized Debtor wishes to offer.  *See In re O'Brien Env't Energy, Inc.*, 188 F.3d, at 127 (holding "prejudice is not an imagined or hypothetical harm; a finding of prejudice should be a conclusion based on facts in evidence").

once in middling pages of newspapers that none of the Movants receive (let alone reach the fine print in the back pages each day).

110.    Next, consider "the length of the delay and its impact on the judicial proceedings." *In re O'Brien Env't Energy, Inc.*, 188 F.3d 116, 129 (3d Cir. 1999). It is now about 13 months since the General Bar Date and 4 months since the Administrative Claims Bar Date. These time periods, and especially the four-month delay since the Administrative Claims Bar Date, comport with precedent. In *Energy Futures*, the Third Circuit held that this factor "cu[t] in favor of granting … Rule 3003(c)(3) motions" where "bankruptcy proceedings … concluded with [a] Confirmation Order" despite a "substantial delay" that could be many years long for certain latent asbestos claims. 949 F.3d, at 824. In this case, the confirmed and effective Plan similarly makes this factor cut in favor of the Movants. Moreover, the plan leaves general, unsecured claims unimpaired and pays administrative claims in full (and there are ample funds to pay additional claims), so there is no reason why the timing of the claims would impact the judicial proceedings or why additional claims would throw the plan off course.

111.    Finally, the Movants have proceeded in good faith. They were not aware of the relevant bankruptcy deadlines and there was no plausible benefit to any delay in filing. Further, they did not engage counsel until after the relevant deadlines. Exhibit B ¶ 50.

112.    For these reasons, and solely in the event the Court does not enter the Proposed Order providing more general relief from the Confirmation Order, the Movants request that the Court afford them a time certain to file claims against the Reorganized Debtors with this Court notwithstanding the General Bar Date and Administrative Claims Bar Date, and deem them to have opted out of the Plan's third-party release provisions.

## **RESERVATION OF RIGHTS**

113.    The Movants reserve the right to amend, supplement, or otherwise modify this Motion and to file and present evidence further supporting it upon discovery and/or responsive to further argument from the Reorganized Debtors.

## **NOTICE**

114.    Notice of this Motion has been provided to (a) the Reorganized Debtors; (b) the Office of the United States Trustee for the District of Delaware; and (c) all parties requesting notice in these chapter 11 cases pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, the Movants submit that no additional notice need be given.

*[Remainder of page intentionally left blank]*

## CONCLUSION

WHEREFORE Movants respectfully request that the Court enter the Proposed Order and

grant any such other and further relief as the Court deems just and proper.

Dated: December 6, 2021

**FRANCIS ALEXANDER, LLC**
Francis Malofiy
280 N. Providence Road, Suite 1
Media, PA 19063
Telephone: (215) 500-1000
Facsimile: (215) 500-1005
Email: francis@francisalexander.com

**SUSMAN GODFREY LLP**
Justin A. Nelson (*pro hac vice*)
John P. Lahad (*pro hac vice*)
Taylor C. Hoogendoorn (*pro hac vice*)
1000 Louisiana, Suite 5100
Houston, TX 77002-5096
Telephone: (713) 651-9366
Facsimile: (713)654-6666
Emails: jnelson@susmangodfrey.com
           jlahad@susmangodfrey.com
     thoogendoorn@susmangodfrey.com

**FAEGRE DRINKER**
**BIDDLE & REATH LLP**

*/s/ Patrick A. Jackson*
Patrick A. Jackson (Bar No. 4976)
Ian J. Bambrick (Bar No. 5455)
Jaclyn C. Marasco (Bar No. 6477)
222 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telephone: (302) 467-4200
Facsimile: (302) 467-4201
Emails: patrick.jackson@faegredrinker.com
           ian.bambrick@faegredrinker.com
           jaclyn.marasco@faegredrinker.com

*Co-Counsel for the Group 4 False Police Report Claimants*