# ATTACHMENT AA



**FRANCIS ALEXANDER LLC**

October 17, 2018

Richard Frecker, Esquire
THE HERTZ CORPORATION
8501 Williams Rd
Estero, FL 33928
T: (239) 301-7000
F: (866) 888-3765
E: rfrecker@hertz.com

Jay L. Edelstein, Esquire
Christopher Leeds, Esquire
EDELSTEIN LAW, LLP
230 South Broad Street | Suite 900
Philadelphia, PA 19102
T: (215) 893-9311
F: (215) 893-9310
E: JEdelstein@Edelsteinlaw.com

Dear Mr. Frecker,

Mr. Trammell had rented a car from Hertz in Cleveland, Ohio, and had just started a new job as a correctional officer in Nebraska, with the hopes of becoming a State Trooper. Mr. Trammell has no criminal record. At all points in time he had paid for the rental, and at all points in time the credit card he used for the rental was active and valid. In fact, throughout the rental Hertz kept putting charge/holds on his card to make sure it was active and valid.

Despite Mr. Trammell having a valid card tied to the rental, Hertz inexplicably had him arrested for felony theft on April 21, 2018, thrown in jail, and prosecuted. He never received any communication from Hertz prior to the arrest at his address and it is clear that Hertz is indiscriminately and improperly using the police for inventory recovery. As is well known at this point, Hertz fails to follow its own standard operating procedures and fails to conduct the requisite investigation at the local level before filing police theft reports en mass, and often do not even communicate with headquarters—leading to paying customers being wrongfully arrested.

The initial rental was on February 7, 2018 where he paid $360, and Mr. Trammell's credit card was hit for $1,728 on March 8, 2018, and another $1,156.97 on March 27, 2018. In fact, Hertz was charging Mr. Trammell's card even in May 2018, indicating that something is very wrong internally. Given my knowledge of Hertz's internal procedures for reporting cars stolen, and the April 21, 2018 arrest date, Hertz must have started the stolen report just days after the March 27 payment! Why is Hertz reporting a customer to the police just days after Hertz charged his credit card a total of $3,244.97 for the rental?

PAGE 2

The consequences of Hertz's failures could not have been more immediate and severe for Mr. Trammell. In jail he received racial insults, harassment, and was assaulted/battered. All of this was vastly exacerbated because he was the only black, gay man in the Nebraska jail. To make matters worse, his new job immediately fired him on April 25, 2018 due to the felony accusation and because he could not show up for work. A letter was placed in his file, essentially blocking his rehire. He was forced to move back to Ohio and, because his arrest was reported in the news online, his record and reputation are permanently stained. He was turned down from multiple jobs because of the pending felony. His goal of becoming a State Trooper is essentially dead, and he must now make a living scrapping metal. His life was destroyed, personally and financially, and he also lost his partner.

On August 21, 2018, the Nebraska court dropped all charges. However, for the time period before that the police repeatedly urged Mr. Trammell to take a plea deal—a deal he refused because he knew that he had done nothing wrong. To say that Mr. Trammell is incensed at his treatment, when he was a loyal Hertz customer without any problems, fails to convey the gravity of this problem.



With every good wish, I am,

Francis Malofiy, Esquire

Encl.: Press Release – Philadelphia Lawyer Returns $44.35 Million Result:
*** 1st Largest Verdict & Judgment in Pennsylvania ***

# ATTACHMENT AB



**LAW FIRM**

**FRANCIS ALEXANDER**
— LIMITED —

FEBRUARY 13, 2020

Kathryn V. Marinello, CEO
THE HERTZ CORPORATION
8501 Williams Rd.
Estero, FL 33928
*E: kvmarinello@hertz.com*

Jay L. Edelstein, Esquire
EDELSTEIN LAW, LLP
230 South Broad Street | Suite 900
Philadelphia, PA 19102
T: (215) 893-9311
*E: JEdelstein@Edelsteinlaw.com*

Re:    **WIDESPREAD FALSE POLICE REPORTS BY HERTZ**

Dear Ms. Marinello and Counsel:

For several years now I have been warning Hertz—after winning a jury trial against it in 2017 for malicious prosecution, and settling two other cases—that the company has been systematically filing false police reports against innocent customers across the nation. The problem is now a major public safety crisis. I have attached demands from *23 clients* victimized by Hertz. The falsely accused come from all walks of life, but are *overwhelmingly* blacks and minorities. The signal this sends to your customers, and the public, is that you don't think Black Lives Matter.

I know, and you know, that Hertz's computer systems are—*obviously*—broken and outdated. The company can't keep track of inventory, doesn't know when rentals are extended or returned, can't account for payments, and isn't doing the local investigations mandated in its theft reporting standard operating procedure W7-02(A)(17). Compounding matters, the locations, OKC, and corporate security have no idea what each other are doing. In some cases, Hertz bizarrely rents cars to customers that Hertz reported stolen *before* the rental began.

Given the number of people who have approached me, six months ago I submitted to your company a list of clients detailing how they had been wrongfully detained, jailed, and prosecuted. These customers had paid, extended, and even returned their rentals. Since then, more customers have come forward.

As I previously shared, some were still in jail and others were locked in criminal cases—all of them terrified by what was happening. I pleaded with you to act quickly, not only for their and their families' sake, but also so that other customers would not have their lives destroyed.

Instead of taking this alarming problem seriously, their complaints were treated as a low-level concern. Hertz falsely told the public these cases were "rare." Those in jail remained in jail. The others have had to cope with what happened, some of them now homeless. Hertz's broken systems have remained broken, and the false reports have continued. In short, the alacrity Hertz showed in addressing wronged customers following the 2017 verdict has demonstrably waned.

My clients are tired of having their polite entreaties fall on deaf ears. They are making one last plea, on video, for someone within Hertz to do the right thing: https://bit.ly/37mvaZ1. I have enclosed with this letter a draft complaint for Nicole Stevens, which will be filed before the end of the month.

If you think you can continue to ignore this problem, you have made a grave miscalculation. I routinely handle large, complicated cases, and have tried them to verdict throughout the country—11 years undefeated in jury trials. I regularly post some of the largest verdicts and settlements in the country, including recently winning a $44.35 million verdict and judgment where the jury returned a $20.25 million punitive damages award (this was a top 100 verdict in the US). Not only do I know how to win these cases against Hertz—because I already have—but I have the resources to litigate every case to verdict.

In the prior case I tried against Hertz, I established that Hertz will be found liable for punitive damages given its conduct. The corporation has known about these problems for many years and yet continues to file false police reports, routinely violating its very own standard operating procedures. No jury will turn a blind-eye to a corporation which decided that cutting costs to increase profits was acceptable—especially when it is being done with reckless indifference to the human lives Hertz is harming. A company worth $2.5 billion that generates $10 billion in revenue cannot afford serial punitive damages verdicts against its reputation and goodwill.

That said, my goal is to come to an amicable resolution so we can fairly compensate my clients and protect your customers. Nothing that my clients are requesting is unreasonable. For peace to be brokered we need to address the following: (1) the points in the attached Addendum to ensure the safety of Hertz's customers, and (2) how to justly address my clients' injuries. I need a written response by Tuesday, February 18th and an in-person meeting with Hertz's corporate officers no later than Monday, February 24, 2020.

If Hertz does not timely address these issues which have been plaguing the company, then my firm will be forced to start filing the lawsuits through local counsel. Please ensure that all data and records concerning these customers are preserved.

Note that because some of the demands exceed Hertz's self-insured limit of $10 million per occurrence, you should notify your excess coverage insurer. Moreover, to the extent that Hertz's insurance does not cover those alleged to be individually liable, you should notify those officers and employees to immediately retain personal counsel.

Kathryn, tell me how we fix this; tell me how we make this right. The time has come to bridge our division and make sure that more customers do not have their lives destroyed.

Your move.

With every good wish, I am,



Francis Malofiy, Esquire

Cc:    M. David Galainena, Esquire - *Exec. Vice President, General Counsel*
       Richard McEvily, Esquire - *Senior Vice President, Deputy General Counsel*
       Clark Dubin - *Vice President, Risk Management & Claims*
       Christopher P. Morales - *Director, Technical Claims*

Encl:  ADDENDUM I      Points of Discussion for Proposed Meeting
       ADDENDUM II     Hertz Victims
       ADDENDUM III    News Coverage of Hertz Victims and Conduct
       Video           Hertz Victim Video No. 1 - https://bit.ly/37mvaZ1
       Complaint        Proposed Nicole Stevens Complaint

# ADDENDUM I

# POINTS OF DISCUSSION:

## PROPOSED MEETING WITH THE
## CORPORATE OFFICERS OF HERTZ

- Hertz will review cases which I present and assign a dollar value within 30 days.

- Hertz will review cases which I present on an expedited basis where the client is still being prosecuted or is incarcerated, with next steps identified (e.g., recantation or withdrawal).

- Hertz will enter into tolling agreements where the statute of limitations is approaching on cases in the process of being resolved.

- During the theft reporting process, Hertz will take into consideration whether Hertz's dispute with the customer is truly criminal or civil in nature.

- Hertz will update its tracking and rental systems so that rental extensions and payments are communicated to all areas of the company, including location, OKC, and corporate security.

- Hertz will fully comply with its theft reporting policy W7-02 RAC(A)(17), which mandates an independent investigation by the corporate security manager at the location level to safeguard against inaccurate reports.

- Hertz will stop reporting customers to the police for theft *before* Hertz has charged the customers' cards. Hertz policy W7-02 RAC (D) will accordingly be revised.

- Hertz will take steps to ensure compliance with W7-02 RAC (E) so that vehicles reported stolen by Hertz are identified in Hertz's rental systems as "reported stolen," to ensure that "stolen" vehicles are not rented to customers.

- Hertz will stop reporting vehicles stolen which were already returned by the customer, and will withdraw prosecutions where the company discovers the vehicle was returned by the customer.

- Hertz will stop reporting "lost inventory" as "stolen" unless there is first-hand knowledge that the vehicle was actually stolen or there are other indicia of criminal activity.

- Hertz will implement and mandate monthly reviews of all ongoing prosecutions to determine if material facts were omitted from a theft report or police report to determine whether the prosecution needs supplemental data (e.g. payment data, rental extensions, or vehicle returns); and determine whether the police report needs to be corrected, supplemented, or withdrawn completely.

- Hertz will ascertain whether a customer being reported is on probation/parole, and will double check all such theft reports given that reports against those customers will result in them being jailed without the ability to bail or bond-out.

- Hertz will compensate each client for bail, attorneys' fees, expungement, and other expenses.

*****

# ADDENDUM II
# HERTZ VICTIMS

### 1.  NICOLE PATRICE STEVENS

**Date:** Released from Prison in Nov. 2018, Case dismissed June 21, 2019

**Location:** Harris County, TX (arrested in Minnesota)

**Summary:** Her case was nolle prossed for lack of probable cause.

In April 2018 she rented a car from the Jersey Village Hertz and returned it on May 16, 2018. She fully paid for the car.

One and a half months after the car was returned, on June 27, 2018, Hertz called the police and they issued a warrant for her arrest for felony theft of a vehicle. Hertz outrageously told the police she had not returned or paid for the car.

She was arrested in October 2018 in Minnesota for a warrant she did not know was issued. She was then extradited from Minnesota to Texas on a hellish van ride over many days. Upon arriving in Harris County, she was kept for several more days before being released.

She was then prosecuted for over half a year, despite the fact that she obviously had done nothing wrong. She was repeatedly told to plead guilty, but refused to do so. During the prosecution she miscarried, was rejected from jobs, and her family became homeless.

Only on June 21, 2019, did the prosecution eventually move to dismiss the case, finding that there was no probable cause because the rental had been returned before the police report was even made.

**Damages: Spent one-month in jail and taken away from 10 kids. She was prosecuted for over half a year. Became homeless. Miscarried. Severe ongoing emotional issues.**

**Demand: $15 million.**

## 2.  SHONTRELL HIGGS

**Date**: April 2019 to present, Criminal Proceedings Ongoing

**Location**: Broward, FL

**Summary**: She was forced to plead no contest. Her appeal of her motion to withdraw plea is pending.

Ms. Higgs rented car from the Ft. Lauderdale location on February 28, 2019, and then extended the rental three separate times for a final due date of April 10, 2019. Hertz Rental records *show the extended due date*, phone records show the phone calls to extend, and bank records show the rental payments.

Ms. Higgs was even texting with a Hertz employee about being overbilled on the day she was arrested, April 9, 2019.

Even though Higgs has objective proof she spoke with Hertz, and extended the rental, Hertz falsely told the police they never heard from her after the initial rental and that she had never extended nor paid for the rental. None of this was true.

After spending 37 days in jail she was forced to plead no contest as she had two small children, she then immediately moved to withdraw the plea. While that motion was pending, she was arrested for minor probation violations in September 2019 (including not paying Hertz restitution for a rental she had already paid for), and then jailed for many more months without any chance to bond out. While in prison, Hertz was asked to intervene, but no response was received.

**Damages: Spent 37 days in jail while pregnant, and forced to plead no contest to something she had not done. She later miscarried. She missed graduation from nursing school, lost job, and then spent many more months in prison while her motion to withdraw pela was pending.**

**Demand: Immediately recant accusation against her. Make all efforts to support Higgs' Motion to Withdraw Plea/Vacate Charges. Her demand is $15 million.**

### 3.   JULIUS BURNSIDE

**Date:** January 2018 to December 2019

**Location:** Norcross, GA

**Summary:** He pled guilty, but was allowed to withdraw his plea. The charges were then nolle prossed.

Mr. Burnside's insurance company rented a car for him from the Norcross, GA location in January 2018. He took over the rental in February 2018, and extended weekly on the corporate extension number. When he would extend, Hertz would place $320 authorization holds on his account. His last extension was until April 1, 2018.

Inexplicably, Hertz charged his card $2,343 on March 26, 2018, and then reported him for car theft the following day, saying that he had never extended or paid for the rental. Oblivious, Burnside returned the rental on April 1, 2018, as agreed with the company.

To his shock, he was told later in April 2018 there was a warrant out for his arrest. He turned himself in expecting that this was a clerical mistake because he had paid for and returned the rental more than a week earlier. He was kept in jail for several hours, and then bonded out, expecting this to go away. Instead, Hertz never withdrew the charges, and he missed a court hearing. He was then arrested and held in jail for 7.5 months.

Eventually he was forced to plead guilty after he was told he was looking at another year in prison just to get to trial, and his family begged him to swallow his pride. After getting out of prison he then filed a motion to withdraw his guilty plea. When the prosecutor looked at what Hertz had done, she immediately consented to the motion. The Court allowed the plea to be withdrawn, and dismissed all charges.

**Damages: He spent 7.5 months in jail and had his life utterly destroyed.**

**Demand: $15 million**

### 4.  VINCENT BOYD

**Date:** December 2018 to present

**Location:** Norcross, GA

**Summary**: Mr. Boyd is still being prosecuted, but is innocent.

Mr. Boyd regularly rented from Hertz. He usually rented from the Dunwoody location, but for this rental rented from Norcross on December 13, 2018.

After 1 week, he called the 1800 number to extend the rental for 1 week. He then dropped the car off on January 3, 2019, at the overnight drop off at the Norcross location.

He was therefore baffled when a police officer called him on January 4, 2019, and asked him about a stolen car. He told the officer that he had returned the car, and heard nothing more.

Unknown to him, Hertz reported Mr. Boyd for car theft one month later on January 31, 2019. In July 2019, he got into a fender bender, and the officer who responded said he had a warrant out for his arrest.

As a result of this false police report he spent 3 months in jail, and is still being prosecuted to this day. He obtained his receipt and invoice, which shows that he returned the rental and owes nothing. Hertz still refuses to drop the case.

Hertz's false police report has ruined his life. In addition to being jailed, he was supposed to have full time with his daughter and she was supposed to be home schooled. Now, he has lost all of this

**Damages: Three months in jail, and a continuing prosecution. His relationship with his daughter was destroyed.**

**Demand: Immediately recant all allegations against Mr. Boyd. His demand is $7.5 million.**

5.   MAGALIE STERLIN

**Date**: April 2017, Criminal Proceedings Ongoing

**Location**: Broward, FL

**Summary**: The case is ongoing.

Ms. Sterlin rented a car from Hertz at the end of April 2017. She extended the rental each week until late May 2017. On May 24, 2019, Hertz corporate called Ms. Sterlin and told her that she had to exchange the car because of a coming registration expiration. It was agreed she would return the car on May 29, 2017.

On May 26, 2017, Ms. Sterlin paid Hertz $1,500 from her Chase bank account. To her surprise, Hertz then had her arrested on May 28, 2017. She spent 24 hours in jail, and became homeless afterwards as a result of the pending charges.

To this day, the charges are still pending and Hertz has not withdrawn the case.

**Damages: She spent 24 hours in jail, and became homeless as a result. She has been prosecuted years.**

**Demand: Recant the accusation and have the prosecution dismissed. Her demand is $3 million.**

6. HENRY ESSICK III

Mr. Essick is litigating a civil case against The Hertz Corporation and its franchisee for the Dayton, OH Airport location (Vandalia) in Montgomery County, OH. The demand for Mr. Essick's case will be sent to Hertz's local counsel in that case.

### 7.   BRENT WILLIAMS, SR.

**Date**: 2007-08, but criminal proceedings until Dec. 2015

**Location**: Tampa, FL

**Summary**:  The case was nolle prossed. A civil suit has been filed.

Mr. Williams routinely rented cars around the country for months at a time for his job. He supervised 35 employees for a company which sold magazines. In 2007 he commenced a rental out of Tampa for his work in Florida. At all times he had paid for and extended the rental in 2007-08, paying a total of $6,000.

About 1.5 months into the rental, he was pulled over in Monroe County and told that the vehicle was stolen. He spent the night in jail and had to be bailed out by an employee, which was embarrassing. When he showed up for the hearing, Hertz was a no show and he was not told anything further by the court.

He thought the experience was behind him. Except he was then arrested *seven years later* in Pennsylvania, in late 2015 and held pending extradition to Florida. He was kept in the prison system for 1 month and transported by a hellish 10-day van ride down to Tampa, FL.

When he got there, he had to bail out. When he returned for a hearing in December 2015, the case was dismissed because Hertz did not have any evidence against him.

Hertz did not respond to a request for a tolling agreement, so he filed a lawsuit in Florida which has not yet been served.

**Damages: Spent one month in prison, and 10 days in hellish van ride to Florida. Was prosecuted for months in Florida. Also had to pay bail of $1,000, and $2,500 for a lawyer in Florida. He lost around $6,000 in wages.**

**Demand: $5 million.**

8.  **ARTHUR STEPANYAN**

**Date:** March 2019 to late 2019

**Location:** Charlotte, NC

**Summary:** The case was nolle prossed.

Mr. Stepanyan was a Gold Club Member at the Charlotte, NC Airport location and had rented there many, many times. He was known to the employees who staffed the Hertz VIP lounge, including a woman named Jordetta. If there was ever a problem with his rental, they simply called him. His charge card was on file.

In March 2019, he rented a Silver Dodge Ram. He then brought it back after a day or two, and decided to exchange it for another vehicle. However, after looking around, Hertz convinced him to re-rent the same Silver Dodge Ram. Hertz did the paperwork, he was checked out at the booth, and he went on his way.

As far as he knew his rental proceeded normally. On August 5, 2019, he noticed a police car following him, he thought because of a seat belt violation. By the time he got to his house, there was a full squadron of more than 10 police cars cornering him. He was ordered out of the car at gun point in front of his neighbors, screamed at, and cuffed.

The police repeatedly accused him of stealing the car, which shocked him. The police said the car itself had been reported stolen, but that Stepanyan's name wasn't on the report. He pleaded with them to look at his rental paperwork. Mr. Stepanyan also gave the police the phone number of the Hertz VIP associate at the Charlotte Airport Hertz location, Jordetta. When they called, she hung up when they explained the situation. The police called back from multiple numbers but she did not pick up.

When the police finally got in touch with Hertz corporate, they were told to proceed with the arrest. Stepanyan then spent 24 miserable hours in a freezing jail cell. The cuffs had been so tight on his hands that he now has permanent nerve damage and his thumb feels like a piece of plastic.

Subsequently, Mr. Stepanyan was prosecuted for months. It was later learned that when Mr. Stepanyan returned the Silver Dodge Ram, Hertz checked it back into the system. However, when he rented it again a few minutes later, instead of recording a rental of the Dodge Ram, Hertz employees inexplicably listed him as having rented a F150.

When the Hertz employees at the Charlotte location could not find the Silver Dodge Ram, they then reported it stolen despite having no information it was stolen. They did not even call the last known renter, Mr. Stepanyan, to determine if he had the car before filing the police report.

When Stepanyan talked to multiple location and corporate security managers (David Nipper and Tim Burrell), he was outrageously lied to by each one and told they could not withdraw the false police report or stop the prosecution. After many months the charges were dropped, with the prosecution stating: "Victim/business does not want to cooperate."

Mr. Stepanyan was jailed, permanently injured, lost business, has been severely damaged emotionally and mentally, and does not feel as if he can continue living in a neighborhood that thinks he stole a car.

**Damages: Jailed overnight, prosecuted, physically injured, lost business, loss of reputation.**

**Demand: $3 million**

9.  # HOWARD JUNIOUS

**Date:** January 2018 to Nov./Dec. 2018

**Location:** Bakersfield, CA

**Summary:** The case was nolle prossed.

Mr. Junious's insurance company rented him a car in early 2018, and he then took over the rental payments a few weeks into the rental. When he took over the rental payments, he told Hertz it was for an indefinite period. The employees indicated this was fine, since he had provided a credit card. He spoke with Hertz during the rental, and Hertz placed authorization holds on his card throughout the rental. Hertz also charged, and he paid, $1,375.94 for the rental.

Hertz then reported his rental stolen, and falsely told the police that he had never paid for it or spoke with the company. He was then held for 2 months in jail. One month into his jail stint, a Hertz employee falsely testified under oath at a preliminary hearing that Junious had not paid for the rental.

Junious was told to take a plea repeatedly, which he refused. Shortly before the trial in November 2018, Hertz obliviously submitted a restitution request to the prosecutors which admitted that Junious had in fact made a $1,375.94 payment for the rental. Shortly later, the prosecution then dropped the case.

**Damages: Spent two months in prison and was prosecuted for several more months.**

**Demand: $7.5 million**

### 10. HANNA AYOUB

**Date:** 2019

**Location:** Accused in Wilmington (arrested and prosecuted in NJ, and prosecuted in New Castle, DE)

**Summary:** Both prosecutions in NJ and DE were nolle prossed.

Mr. Ayoub regular rented vehicles with Hertz and was getting Gold Plus Rewards with the company. He rented a truck from the Wilmington Amtrak Station location in April 2019. Every week, like clockwork, he extended the rental until late May 2019 (April 15, April 22, April 29, May 6, May 13, May 20, and May 28). He has phone records showing weekly rental extensions, bank records showing his authorization holds, bank records showing his payment, and numerous Hertz rental documents supporting his rental.

During the rental Ayoub was contacted by a Hertz investigator who said that the rental was overdue—despite the fact that Mr. Ayoub was in weekly contact with Hertz extending the rental. Mr. Ayoub confirmed with the Wilmington location, corporate, and the investigator that he was authorized to have the rental. He then extended the rental several more times with Hertz corporate in May 2019, without issue. He was charged and paid $2,309.44 for the rental.

Unbeknownst to him, Hertz filed a theft report against him which claimed that the rental was due April 16, 2019. It also falsely claimed that Ayoub had ceased contact with Hertz in early May 2019. It outrageously omitted that Ayoub had verified with Hertz's investigator that Ayoub was authorized to have the rental in early May, and that he had extended the rental through late May 2019.

Ayoub, not knowing Hertz has filed a false police report, was then arrested in New Jersey and held in jail in June 2019. He was prosecuted in New Jersey and Delaware. However, when the New Jersey and Delaware prosecutor were shown the evidence that Ayoub was innocent, they immediately dismissed all charges.

**Damages: Arrested and imprisoned for a short time in NJ. Prosecuted in two states.**

**Demand: $1.5 million**

11.  LAKETA COLLINS

**Date:** 2018-2019

**Location:** Rented from Clearwater, FL

**Summary:** Case was nolle prossed.

The insurance company started the rental for her in July 2018 and extended it once. Then she took over the rental and extended it. What she did not know was that Hertz never recorded the extensions, *even from the insurance company*.

She called Hertz Roadside to pick up the rental in August 2018. They gave her a claim number and the next day the car was picked up in late August 2018, so she thought everything was fine (in fact, the police had recovered it). No one ever told her the car was reported stolen. She paid $2,300 on August 29, 2018.

Ridiculously, Hertz filed the report against her 5 months later in January 2019. She was arrested on Valentine's Day 2019, six months after the rental. She was kept overnight in the jail, away from her two children.

**Damages: She spent several hours in jail, had to bond out, and overall went through hell.**

**Demand: $1.75 million.**

## 12. MICHELLE JOHNSON

Date: Arrested in 2019, cased dismissed in Jan. 2020

**Location:** Rented and Arrested in Indiana

**Summary:** Her case was nolle prossed.

She was visiting from California, taking care of her invalid mother.  She had been renting cars for about a year with Thrifty, with many different rentals. In December 2018 she rented a car from the Thrifty in Indianapolis, through Hotwire.

She spoke with Hertz throughout the rental, but was suddenly hit on 2/13 with a charge for $3,578.20. This was a huge overcharge. She called Thrifty to complain, and was told her complaint was being "escalated."

Then, over the next several months, she was told by Thrifty personnel that she should not return the car because it would make it hard to "close out" her rental and impossible to give her a credit. She was utterly confused, because this was unlike all her prior rentals: however, she followed their directions over the next several months.

Without telling her the car was being reported stolen, Hertz had her arrested in July 2019 and said that she had stolen the car in January 2019. She was taken to jail, and then prosecuted until January 2020 when the case was dismissed. Her life was destroyed because of this, including a foreclosure and loss of her home.

**Damages: She was arrested, and prosecuted for half a year. Her life in California and Indiana were destroyed because of Hertz's actions.**

**Demand: $3 million.**

### 13.  BRIAN STEINBERG

**Date**: February/March 2018

**Location**: Henderson, NV

**Summary**: He was detained for several hours before being cleared by the police.

Mr. Steinberg was on vacation in Las Vegas and rented a car from Hertz on March 2, 2018. He stopped at the Flamingo for 30 minutes and when he came back to his car, he was detained, interrogated, and searched for 2 hours by police who said it was stolen.

Apparently, Hertz had reported car stolen in Henderson, NV, on February 26, 2018, along with several other cars. The car was input into the NCIC.

On March 2, 2018, Hertz obliviously rented the "stolen" car to Steinberg from the Henderson location.

**Damages: He was detained for several hours and his two week prepaid vacation ruined.**

**Demand: $750,000**

## 14. ANTWONE PERSON

**Date**: 2019

**Location**: Chicago, IL

**Summary**: He was detained and held at a jail for several hours. A case may be pending against him.

Mr. Person rented a vehicle on April 29, 2019, with an initial due date of June 6, 2019. He extended the rental.

Yet, on June 10, 2019, Hertz reported it stolen and told the police that he had rented the vehicle on April 17, and was supposed to return it on April 30, 2019. This bore no relation to reality, as he did not even start renting the car until April 29, 2019.

Mr. Person was pulled over and detained at gun point on June 14, 2019.He was arrested, and was taken to the police station. He gave the police his rental documents. He was then released but told nothing about why he was being released.

**Damages: He was detained and arrested, spending several hours in jail. He is in limbo, wondering if he is going to be prosecuted.**

**Demand: Any prosecution must be withdrawn. His demand is $1.5 million.**

15.  MICHAEL AND AMANDA KOSS

**Date**: 2013 to present

**Location**: Seattle, WA and Oklahoma City, OK

**Summary**: The cases against them are still pending.

They rented a car from the Seattle Tacoma Airport. They were moving from Washington to Oklahoma City to be near family. He is a retired Marine and contractor who did 4 tours in Iraq and Afghanistan, and regularly rented with Hertz for many years. When the Kosses rented the car at the Sea-Tac location the power was out, so they filled out paper forms.

As he had done dozens of times Mr. Koss gave Hertz his credit card and told them it was a long-term rental. The Hertz employee said "let's do an open ended rental."

A couple months later in OKC, Mr. Koss pulled into his father's house for dinner. A police officer had followed him and asked if the car was his, and he said it was a rental. The officer then arrested him on the spot without warning. When his wife Amanda said they had a rental contract she was also arrested. Because he is a retired marine who owned guns the police then said he had used a gun in the commission of a felony. It was like a nightmare they could not wake up from.

All of this played out in front of neighbors from his childhood, and his sick father, for several hours. His grandmother arrived in the middle of the fiasco. They were taken to jail overnight and spent a hellish 12 hours there, forced to stand the whole time, before bonding out. When they went for their arraignments several times, their names were never called by the court.

The cases still remain pending and have never been dismissed.

To this day, these pending charges still show up on their background checks, preventing them from finding better employment. He previously had tremendous earning potential and contacts, which Hertz's false accusation ruined. He lost approximately $100,000 a year in earnings because of Hertz. In addition, his entire neighborhood thinks he stole a car, his wife's family thinks he's a car thief, and his grandmother died refusing to believe his denials.

This false report utterly ruined their lives.

**Damages: They were held in prison overnight, humiliated, and are currently being prosecuted. They were arrested in front of their neighbors and family, who all believed they stole a car. Michael's grandmother died not believing his denials. They cannot move or get new jobs because these charges remain pending and they constantly worried they will be arrested.**

**Demand: Recant and cooperate in withdrawing the charges. Their demand is $5 million.**

### 16. CHERYL YOUNG

**Date:** May 2018 to January 2020

**Location:** Manteca, California

**Summary:** The case was nolle prossed.

Ms. Young rented a car in May 2019 from Hertz, and gave them a valid Mastercard. For the first three weeks she extended with the location, and even went in because she wanted to exchange a vehicle—which she ultimately decided not to do. After the first three weeks she then started extending with the 1800 number.

She then got a call from a woman named Carey Wells, who said she was from the recovery unit. Young informed Wells that the rental had been extended and had a return date. Wells told her to return the car anyway, which Young did in August 2018. Wells verified the car had been returned.

Outrageously, despite doing exactly what Hertz said, and paying her bill (including getting a refund for overpayment), Hertz reported Young for car theft in San Joaquin County on September 13, 2018.

When applying for jobs, she found out that there was a pending case against her in 2019. She turned herself in. She was then prosecuted for several months until the case was finally dropped.

Bizarrely, when she texted a Hertz number in November 2019 during her prosecution, they verified she had returned the car on August 10, 2018. Yet, when she asked for help getting the criminal case dropped, the Hertz employee responded "I have nothing to do with that" and that Young should "Google OKC."

Besides being put through hell by Hertz, which clearly did not care about the false report, she was also rejected from multiple jobs. Ms. Young works as an administrator in healthcare.

**Damages: She was prosecuted and rejected from multiple jobs.**

**Demand: $2 million**

### 17. NANCY CULLEN-SMITS AND RYAN SMITS

**Date**: 2017

**Location**: Virginia

**Summary**: They were detained for several hours after being treated like car thieves.

They were detained and then let go when the police determined the report was "unfounded." Civil lawsuits have been filed.

Ms. Cullen-Smits regularly rents cars for her job as a pharmaceutical sales rep. She therefore rented a car from the Hertz location in Fredericksburg, VA in September 2017.

On November 22, 2017, the day before Thanksgiving, she was driving with her son Ryan when police cars pulled them over. The police then accused them of having a stolen car, and detained them. According to the officer, Hertz had reported the car stolen on November 3, 2017.

Inexcusably, Hertz's records showed that the last location of the car was at the Ronald Reagan International Airport branch. According to Hertz the car had never been at the Fredericksburg location where it was actually rented to Cullen-Smits months earlier. When Hertz could not find the lost inventory, employees reported the car stolen despite not having any idea whether it was stolen, and without checking whether it had been rented to another customer.

Cullen-Smits and her son were detained in the cold, stripped of the rental car, forced to clean out all her work material and belongings like she was a criminal, and made to wait hours for a ride to pick them up.

Mr. Cullen-Smits emailed Hertz's CEO, Kathryn Marinello, but was shunted off to customer service personnel, who treated what her and her son had been through as a minor problem. Eventually, they had no choice but to file suits in Virginia, which are currently pending but have not yet been served.

**Damages: They were detained for several hours, Thanksgiving was ruined, and they were treated like criminals.**

**Demand: $1.5 million.**

## 18. JAMES AND STEPHANIE KEENE

**Date**: August 2019

**Location**: Clearwater, FL

**Summary**: He was detained at gun point, until finally cleared by the police.

Mr. Keene's insurance company rented him a car from the Clearwater Hertz on a Tuesday night in August 2019. On Wednesday morning Mr. Keene took the car to work. On the way back from work, Mr. Keene was dropping an employee off at her apartment and was on Facetime with his wife, Stephanie.

As he pulled into the apartment complex, multiple police officers pulled him over with guns out. His wife drove to where he was and watched as her husband was detained. The police accused him of stealing the car. He insisted that he had just rented the car the day before and that was impossible. He gave them his rental paperwork.

He was detained for over 1.5 hours while the police were on the phone with Hertz. Eventually the police let him go, as it was clear he did not steal the car. It was later learned a car with that license plate was reported stolen by Hertz out of Jacksonville, FL *before* Mr. Keene even rented the car, one year prior. Hertz then obliviously transferred the license plate to a new car, unaware they had reported the plate stolen.

Following this experience, the Keenes tried to contact a district manager but could not get a hold of anyone. They then got a customer service call asking them if they were satisfied with their rental. They said they were furious.

They then spoke with a manager at the Clearwater location who said that this happens because the corporate and local computer systems do not talk to each other and are separated.

**Damages: Mr. Keene was detained for several hours, terrified, in front of his wife and employee.**

**Demand: $1 million**

19. BARBARA FERNANDEZ

**Date**: 2017 to 2020

**Location**: Gainesville and Miami, FL

**Summary**: Her case was nolle prossed.

Ms. Fernandez and her husband rented a car from the Gainesville, FL Hertz in February 2017 because they were moving to Miami. They told the employees it would be a long-term rental, provided a valid credit card, and they gave the employees the address of the hotel they were staying at in Miami. There was no problem with any of this.

She called every week to extend the rental. When she extended, an authorization hold would appear on her card. On May 1, 2017, she paid Hertz $2,304.73. After the payment she continued to extend the rental with Hertz, and arranged to return the rental in mid-June 2017 in Miami.

Then, without warning on June 6, 2017, a tow truck tried to take the rental. Ms. Fernandez demanded the police be called, and to her surprise she was told the car was reported stolen. Hertz had told the police Ms. Fernandez had not paid for the rental or extended it. Barbara then showed her continuing rental payments to the police, who let her go and told her that it was illegal for Hertz to have reported the car stolen.

Unknown to her, Hertz then secured charges against her *after* the Miami police had cleared her. In 2019, her daughter was pulled over by police and told her that the car's owner, Barbara, had a warrant out for her arrest for car theft. Barbara and her husband could not believe this had not been resolved years ago, and trekked to Gainesville expecting to be told this was a mistake. Instead Barbara spent a terrifying night in a jail cell, while her husband waited nervously for 13 hours in the parking lot wondering what was happening.

She was then prosecuted until January 2020, right up until her trial was supposed to begin. She was told that she was going to go to jail and should plead guilty. She refused, but was terrified that she was facing real jail time. Then, without explanation, the prosecutors dismissed the case.

**Damages: She was detained once and cleared in 2017, and then arrested and held overnight in a jail cell two years after her rental in 2019. She was then prosecuted for half a year and threatened with jail time and a serious criminal record, before the case was mysteriously dropped. This caused her and her family untold pain and suffering.**

**Demand: $2.5 million**

## 20. MICHELLE JONES

**Date**: 2009

**Location**: Georgia

**Summary**: Ms. Jones was forced to plead no contest by Hertz. This still remains on her record.

In March 2009, she rented a car for three weeks. After three weeks, she converted the rental to a monthly rental, and extended it two additional times. She returned the rental in June 2009, after three months, and paid $2,123.27.

Unbeknownst to her, Hertz reported her for car theft in June 2009 telling the police she had stolen the vehicle. She was arrested and jailed in three different lockups over 5 days. She was then prosecuted for several months.

She had no idea what was going on, but was told by a public defender that if she didn't plead no contest to the allegations that she could be imprisoned again. Confused and terrified she was forced to plead no contest.

The entire ordeal was humiliating, degrading, and has had a lasting emotional and mental impact—not to mention gave her a criminal record.

It was only in 2019 that, upon seeing news reports about Hertz's conduct, she realized that she was one of many victims, and that she had to step forward to make sure this did not happen to other people.

**Damages: She was held in jail for 5 days, prosecuted, and forced to plead no contest to a crime she did not commit.**

**Demand: Hertz must recant its accusations and make all efforts to vacate her plea. Her demand is $1 million.**

*****

# ADDENDUM III

## NEWS COVERAGE DOCUMENTING
## HERTZ VICTIMS AND CONDUCT

**Hertz has a pattern of mistakenly reporting cars stolen leaving customers arrested, attorney says**

**Source**: https://www.abcactionnews.com/news/local-news/i-team-investigates/hertz-has-a-pattern-of-mistakenly-reporting-cars-stolen-leaving-customers-arrested-attorney-says

**Date**: May 2019

---

**Hertz Customers Detained and Arrested After Rental Vehicles Mistakenly Reported Stolen**

**Source**:    https://www.news5cleveland.com/news/local-news/investigations/hertz-customers-detained-arrested-after-rental-vehicles-mistakenly-reported-stolen

**Date:** May 2019

---

**Investigation: Hertz customers arrested after rental vehicles mistakenly reported stolen**

**Source:** https://6abc.com/business/hertz-customers-arrested-after-vehicles-mistakenly-reported-stolen/3487977/

**Date:** May 2018

---

**People Are Being Arrested and Jailed Due to Hertz Erroneously Reporting Rental Cars Stolen: Report**

**Source:** https://www.thedrive.com/news/27976/people-are-being-arrested-and-jailed-due-to-hertz-erroneously-reporting-rental-cars-stolen-report

**Date:** May 2019

---

**A Hertz Customer Rented Her Car Legitimately. Then She Was Confronted By Police**
Lawyers say Hertz has a computer glitch that falsely marks cars as stolen. Hertz says something very different. For any business, it's really not a good idea to get a customer arrested.

**Source:** https://www.inc.com/chris-matyszczyk/hertz-customers-are-being-arrested-even-though-theyre-legitimate-renters.html

**Date**: May 2019

---

**People Are Being Arrested After Hertz Keeps Mistakenly Reporting Cars Stolen**

**Source:** https://www.powernationtv.com/post/people-are-being-arrested-after-hertz-keeps-mistakenly-reporting-cars-stolen

**Date**: May 2019

---

**Hertz Falsely Reported Rental Vehicles Stolen, Ordered To Compensate Arrested Customers**

**Source:** https://www.ibtimes.com/hertz-falsely-reported-rental-vehicles-stolen-ordered-compensate-arrested-customers-2682108

**Date**: May 2018

\*\*\*\*\*

| | |
|---|---|
| **From:** | Francis Alexander Malofiy |
| **To:** | AJ Fluehr ; command4 |
| **Cc:** | Francis Alexander Malofiy |
| **Subject:** | FW: *** HERTZ DEMAND LETTER - VICTIMS (No. 1 - 23) *** |
| **Date:** | Friday, February 14, 2020 1:55:26 PM |
| **Attachments:** | DEMAND LETTER - HERTZ VICTIMS (No. 1 - 23).pdf |
| | ATT00001.htm |

**From:** Jay Edelstein [mailto:JEdelstein@edelsteinlaw.com]
**Sent:** Friday, February 14, 2020 1:19 PM
**To:** Clark Dubin <cdubin@hertz.com>
**Cc:** rmcevily@hertz.com; Adam Schloss <aschloss@hertz.com>; cmorales@hertz.com; Francis Alexander Malofiy <francis@francisalexander.com>
**Subject:** Fwd: *** HERTZ DEMAND LETTER - VICTIMS (No. 1 - 23) ***

Make sure you view the video. We need to confirm internally these allegations. As you see from the video his angle is clear..

Sent from my iPhone

Begin forwarded message:

> **From:** Francis Alexander Malofiy <francis@francisalexander.com>
> **Date:** February 13, 2020 at 5:04:57 PM EST
> **To:** Jay Edelstein <JEdelstein@edelsteinlaw.com>, Clark Dubin <cdubin@hertz.com>,
> "Christopher P. Morales" <CMorales@hertz.com>, "rmcevily@hertz.com"
> <RMcEvily@hertz.com>, "kvmarinello@hertz.com" <kvmarinello@hertz.com>,
> "dave.galainena@hertz.com" <dave.galainena@hertz.com>
> **Cc:** Francis Alexander Malofiy <francis@francisalexander.com>, AJ Fluehr
> <aj@francisalexander.com>
> **Subject: RE:  *** HERTZ DEMAND LETTER - VICTIMS (No. 1 - 23) *****

> Dear Jay,

> This is not going to work. Why would I give you 30 days to address 23 client demands, when you could not even address a single one over the last six months? I even gave you Hertz's own rental data exonerating Shontrell Higgs while she rotted in prison, and **Hertz did absolutely nothing with it!**

> People are being thrown in jail and arrested at gun point. This is happening as we speak. Hertz needs to act immediately. For Hertz, this needs to be an all hands on deck, crisis management moment. I guarantee that if you continue to ignore 23 client demands, then the fall out is going to be far worse than anything they can imagine.

> I suggest you read my demand letter again **and watch the video**.

> I sent you 9 client demands **half a year ago**. Since then you and your client have

shockingly done _**nothing**_!

- Hertz has never put a number on a single case,

- Hertz has never entered into any tolling agreement

- Hertz has never recanted a single false police report—while my clients remanded in jail and were prosecuted, and more people have been arrested.

In stark contrast, Hertz is quick to pull the trigger when throwing someone in jail. The company does not even stop to verify if the information they're giving to the police is remotely correct.

Regrettably, I do not think that you have the capability to properly address the magnitude of this scandal; nor do I think that your client is aware of the legal, financial, and other jeopardies they are facing. You and your client are walking off of a cliff, while ignoring the lifeline I have already extended them.

We reject any extension of 30 days. I reiterate that we need a formal written response by Hertz and Ms. Marinello by Tuesday, February 18, 2020 on how they desire to address the issues and proceed. Further, we require a meeting with Hertz's corporate officers by Monday, February 24, 2020. If this is not possible, then you have been so warned.

To the extent that there is any flexibility in the above timeline, Hertz can make a showing of sincerity and willingness to cooperate by setting aside $10 million in a trust account for the purpose of resolving these claims. Absent this small token, there is little left to discuss. However, this would be a start.

Without these assurances and signs of good faith, then I will proceed with my plans.

Jay, let's be clear, the difference between me and the rest of the world, is that when I say I'm going to do something: I do it. And, when I give you my word, it means something. The same can't be said for Hertz and because of this your words and Hertz words have little meaning to me. I demand action; not words.


*****

With every good wish, I am,

Francis Malofiy, Esquire
Francis Alexander, LLC
280 N. Providence Road | Suite 1
Media, PA 19063
T: (215) 500-1000
F: (215) 500-1005
E: francis@francisalexander.com


■·■·■·■·■·■·■·■·■·■·■·■·■·■·■·■·■·■·■·■·■·■·■·■·■·■·■·

**From:** Jay Edelstein [mailto:JEdelstein@edelsteinlaw.com]
**Sent:** Thursday, February 13, 2020 12:36 PM

**To:** Francis Alexander Malofiy <francis@francisalexander.com>
**Subject:** Hertz Demand Letter

Francis,

   Good afternoon.. I am acknowledging your recent demand letter adding an additional 11 claims to your list. .I have spoken to my client in some detail and rest assured they are doing their due diligence to quickly obtain pertinent information on each claim so that they may evaluate….I'm of the opinion that this should take approximately thirty (30) days at which time I will reach out to you again to discuss.. I am available you 24/7 to discuss these matters and look forward to a follow up meeting….If you have any questions please advise…

---

**From:** Francis Alexander Malofiy
**Sent:** Thursday, February 13, 2020 3:41 AM
**To:** Jay Edelstein <JEdelstein@edelsteinlaw.com>; Clark Dubin <cdubin@hertz.com>; Christopher P. Morales <CMorales@hertz.com>; rmcevily@hertz.com; kvmarinello@hertz.com; dave.galainena@hertz.com
**Cc:** Francis Alexander Malofiy <francis@francisalexander.com>; AJ Fluehr <aj@francisalexander.com>
**Subject:** RE: *** HERTZ DEMAND LETTER - VICTIMS (No. 1 - 23) ***

Dear Ms. Marinello and Counsel:

For several years now I have been warning Hertz—after winning a jury trial against it in 2017 for malicious prosecution, and settling two other cases—that the company has been systematically filing false police reports against innocent customers across the nation. The problem is now a major public safety crisis. I have attached demands from **23 clients** victimized by Hertz. The falsely accused come from all walks of life, but are **overwhelmingly** blacks and minorities. The signal this sends to your customers, and the public, is that you don't think Black Lives Matter.

Given the number of people who have approached me, six months ago I submitted to your company a list of clients detailing how they had been wrongfully detained, jailed, and prosecuted. These customers had paid, extended, and even returned their rentals. Since then, more customers have come forward. Instead of taking this alarming problem seriously, their complaints were treated as a low-level concern.

My clients are tired of having their polite entreaties fall on deaf ears**. They are making one last plea, on video, for someone within Hertz to do the right thing:** https://bit.ly/37mvaZ1. A draft complaint for Nicole Stevens is enclosed (https://bit.ly/2Hk9eTP) and will be filed before the end of the month.

If you think you can continue to ignore this problem, you have made a grave miscalculation. No jury will turn a blind-eye to a corporation which decided that cutting costs to increase profits was acceptable—when it is being done with reckless indifference to the human lives Hertz is harming. A company worth $2.5 billion that

generates $10 billion in revenue cannot afford serial punitive damages verdicts against its reputation and goodwill.

That said, my goal is to come to an amicable resolution so we can fairly compensate my clients and protect your customers. Nothing that my clients are requesting is unreasonable. For peace to be brokered we need to address the following: (1) the points in the attached Addendum to ensure the safety of Hertz's customers, and (2) how to justly address my clients' injuries. I need a written response by Tuesday, February 18th and an in-person meeting with Hertz's corporate officers no later than Monday, February 24, 2020. If Hertz does not timely address these issues which have been plaguing the company, then my firm will be forced to start filing the lawsuits through local counsel.

Kathryn, tell me how we fix this; tell me how we make this right. The time has come to bridge our division and make sure that more customers do not have their lives destroyed.

Your move.

*****

With every good wish, I am,

Francis Malofiy, Esquire
Francis Alexander, LLC
280 N. Providence Road | Suite 1
Media, PA 19063
T: (215) 500-1000
F: (215) 500-1005
E: francis@francisalexander.com

---

**From:** Jay Edelstein [mailto:JEdelstein@edelsteinlaw.com]
**Sent:** Thursday, December 05, 2019 3:10 PM
**To:** Clark Dubin <cdubin@hertz.com>; Francis Alexander Malofiy <francis@francisalexander.com>; Christopher P. Morales <CMorales@hertz.com>; rmcevily@hertz.com
**Subject:** Fwd: HERTZ - RE: Brent Williams v. Hertz our file 840.040

FYI. Great meeting you and thanks for the loyalty. It's a pleasure doing Hertz work and has been for some time. Happy Holidays.

Sent from my iPhone

Begin forwarded message:

> **From:** Francis Alexander Malofiy <francis@francisalexander.com>
> **Date:** December 5, 2019 at 3:07:57 PM EST
> **To:** Jay Edelstein <JEdelstein@edelsteinlaw.com>

**Cc:** Francis Alexander Malofiy <francis@francisalexander.com>
**Subject: HERTZ - RE: Brent Williams v. Hertz our file 840.040**

Dear Jay,

If you're at Hertz today, do me the favor and give me a call.

I've done everything in my power to attempt to negotiate these cases in good faith but it's time to have real discussions.

My clients have decided that they would rather file their cases and share the horrors of their stories with the press.

I cannot hold my clients off any longer nor do I think Hertz is treating this seriously because: 1) there have been no real settlement negotiations and no numbers have been discussed; 2) no tolling agreements have been entered into.

As a result, and as I shared with you, and as you understood, it would be necessary for me to file complaints in those actions absent tolling agreements—and this is exactly what I had to do.

The longer Hertz delays, the louder the cacophony of disaster will sound.

I am leaving on Tuesday, December 10, 2019 and will spend roughly two weeks on the road, meeting my Hertz clients who want to share their stories with the press to keep this from happening to more customers. Some of my clients are sitting in jail. I can assure you—as I have in the past—that no one is fluffing.

If Hertz wants to continue treating this a low level concern; perhaps they will feel more comforted battling me and my clients not only in the court of law but also in the press. As you and Hertz are well aware, there have been serious failures in corporate responsibility within the corporation—at the highest levels including the CEO and corporate board. A company which fails to follow their own standard operating procedures, refuses to fix broken computer systems, cuts out corporate security managers because they cost too much, and routinely throws good paying customers in jail—because of corporate greed and lack of corporate responsibility—is the exact reason why other corporations have imploded in recent years.

Hertz knows of its failures and refuses to fix or address them; as a result they are throwing good people in jail—this is the epitome of a corporate culture which shows a reckless indifference to the rights of others. Hertz will lose both the legal cases and in the court of public opinion, leading to

another avalanche of clients hiring me to seek redress of their harms.

Perhaps there can be an amicable resolution to this before bad situation turns into ugly. I demand a sit down with the top corporate officers of Hertz to discuss the issues, present my cases, with the intent and purpose to resolve the ongoing problems and negotiate in good faith to resolve my clients' tragedies.

This meeting needs to occur before the end of the year.

Please share this communication with your client.


*****

With every good wish, I am,

Francis Malofiy, Esquire
Francis Alexander, LLC
280 N. Providence Road | Suite 1
Media, PA 19063
T: (215) 500-1000
F: (215) 500-1005
E: francis@francisalexander.com

# ATTACHMENT AC



# Hertz's Botched Theft Report Caused Thomas Channell's Heart Attack

## I.  Introduction

Thomas Channell had a heart attack in May 2018 because Hertz had him arrested at gun point after the company submitted a false theft report to the police.

The error on Hertz's part is unambiguous. Hertz reported the car the Channells were renting as stolen on April 4, 2018, claiming it was rented on January 6, and due back on February 22, 2018, but had not been returned. Hertz failed to realize that the Channells were on an approved multi-month rental that started in 2017 and ended in June 2018; Hertz's own rental records show that the rental was extended month-after-month on February 22 and March 23—*after* the due date inserted in Hertz's theft report.

This was the result of Hertz's failure to investigate, Hertz's abysmal record-keeping practices, and Hertz's dysfunctional computer systems.

## II.  Hertz Ignored that the Channells had a Continuing and Specially Approved Multi-Month Contract; Hertz Botched a Vehicle Exchange Leading to the False Report

### a.  The Channells Entered into a Multi-Month Rental in November 2017 with a Malibu, but Exchanged the Malibu in January 2018 for a Camry; the Rental was Effective until June 2018

The Channells initially rented a Chevy Malibu in late 2017 on an approved multi-month rental contract. It was supposed to be continuing until June 2018. Hertz001080-89. On or around the 22nd of each month, the month-over-month rental would renew for the next month. Id.

In or around January 2018 the Channells exchanged the Malibu for a Toyota Camry with plate number JBLI54, as this addendum to the multi-month contract shows:



Hertz001090. As far as the Channells knew, the multi-month rental continued as normal.

Following the vehicle exchange, on February 22, 2018, Hertz issued the Channells an extension on the multi-month rental for another month, as these invoices show:

| **Hertz** | | | | | |
|---|---|---|---|---|---|
| Direct All Inquiries To: | | | | | |
| **Hertz Multi Month Rental Program** | Rental Record No: | 997681241 | | | |
| P.O. Box 25722 | Billed From | | Billed To | | |
| Oklahoma City, OK 73125 | 02/22/2018 00:00 | | 03/23/2018 23:59 | | |
| 1-800-654-7788 | Rate Cls | | Rate Plan | Veh Cls | |
| | F | | MMR2 | F | |
| **BILLED TO:** | Miles IN | 0 | Day 0 X | 0.00 = | 0.00 |
| MICHAEL CHANNELL | Miles OUT | 0 | Week 0 X | 0.00 = | 0.00 |
| 11746 PRESERVATION LN | Miles Driven | 0 | Month 1 X | 692.50 = | 692.50 |
| BOCA RATON, FL  33498 | | | | | |

| **RENTAL DETAILS** | |
|---|---|
| Rate Plan: | IN: MMR2    OUT: MMR2 |
| Rented On: | 02/22/2018 00:00  LOC# 746410 |
| | BOCA RATON, FL |
| Returned On: | 03/23/2018 23:59  LOC# 746410 |
| | BOCA RATON, FL |
| Car Description: | JBLI54 |
| Veh. No.: | 7715337 |
| CAR CLASS Charged: | F        MILEAGE    In: |
| Rented: | F                    Out: |
| Reserved: | F                    Driven: |

See Hertz001083, 1088. The Channells paid every month for the prior 30 days of rental charges, with no issues.

As planned, the multi-month rental was then renewed again on March 24, 2018, for another month (in accordance with the prior renewals under the multi-month contract):

| **Hertz** | | | | | |
|---|---|---|---|---|---|
| Direct All Inquiries To: | | | | | |
| **Hertz Multi Month Rental Program** | Rental Record No: | 998040326 | | | |
| P.O. Box 25722 | Billed From | | Billed To | | |
| Oklahoma City, OK 73125 | 03/24/2018 00:00 | | 03/30/2018 07:43 | | |
| 1-800-654-7788 | Rate Cls | | Rate Plan | Veh Cls | |
| | F | | MMR2 | F | |
| **BILLED TO:** | Miles IN | 0 | Day 2 X | 26.73 = | 53.46 |
| MICHAEL CHANNELL | Miles OUT | 0 | Week 0 X | 0.00 = | 0.00 |
| 11746 PRESERVATION LN | Miles Driven | 0 | Month 0 X | 0.00 = | 0.00 |
| BOCA RATON, FL  33498 | | | | | |

```
RENTAL DETAILS
Rate Plan:          IN: MMR2    OUT: MMR2
Rented On:          03/24/2018 17:06   LOC# 746410
                    BOCA RATON, FL
Returned On:        03/30/2018 07:43   LOC# 746410
                    BOCA RATON, FL
Car Description:    JBLI54
Veh. No.:           7715337
CAR CLASS Charged:     F          MILEAGE   In:
          Rented:      F                    Out:
          Reserved:    F                    Driven:
```

Hertz001084, 1089. To the Channells' knowledge everything was fine, and their rental was continuing until June 2018. However, for no apparent reason and without any explanation or notice to the Channells, Hertz closed out the Channells' rental contract on March 30, 2018.

> **b. Hertz Botched the Vehicle Exchange and Reported the Car Stolen, Failing to Realize Due to Lack of Investigation that the Channells were in Possession of a Vehicle on a Continuing Multi-Month Rental Contract**

Hertz Vehicle Control erroneously believed that the Channells' rented vehicle was due back on February 22, 2018, and that the rental contract had not been extended or renewed. As can be seen from Hertz's own invoices, this was not the case. At some point, Hertz began treating the exchange addendum contract from January 2018 as a new contract, and failed to realize that it was merely an addendum to a *continuing* multi-month contract.

Hertz therefore compiled a theft package claiming the Channells had stolen the Camry with plate JBLI54 by not returning it on February 22, 2018:

| Unit No. | Year | Make | Model |
|---|---|---|---|
| 0007715337 | 2018 | TOYOTA | CAMRY |
| Lic Plate YR | Lic ST | Lic NO. | Odometer Out |
| 2018 | FL | JBLI54 | 5262 |
| Date & Time Rented | Rented From | | Due Date |
| 01/06/2018 14.17.00 | 01320-11 | | 02/22/2018 17.08.00 |

Hertz001094. While the theft package was being compiled, no one at Hertz investigated or verified any allegations contained therein. At best, Hertz failed to realize (1) that there was an ongoing multi-month rental, (2) that the exchange addendum to the multi-month rental was not a separate contract, and (3) that the information in the theft package itself was highly inconsistent regarding the start and end dates of the rental.

In fact, it appears that there was little to no human involvement at all in the drafting of the Channells' theft package, and that it was generated almost entirely by Hertz's compromised

computer systems. The theft package also failed to note that the Channells had paid many thousands of dollars for this rental.

Then, without any warning or notice to the Channells, Hertz finalized and printed the theft package on March 29, and then closed out the rental on March 30, 2018:

> Prepared Date:  3/29/2018
>
> Printed Date:    3/29/2018 2:05:11 PM

Hertz001094.

The theft package also falsely claimed that Hertz had performed a rigorous check of all its systems to safeguard against any type of mistaken report:

> THE VEHICLE APPEARED ON THE OVERDUE REPORT. THE PHONE NUMBER ON THE RENTAL WAS CALLED. ALL AVAILABLE SYSTEMS HAVE BEEN CHECKED. NO ADDITIONAL INFORMATION HAS BEEN FOUND.

Hertz001094. This is boilerplate language that Hertz places in its theft packages, even though the company has acknowledged that it performs no such check.

Note that because the theft package was closing out a rental contract for the Camry with plate JBLI54 on March 30, 2018, this also had the simultaneous effect of closing out the continuing multi-month contract that was linked to the same car—*unbeknownst to the Channells and Hertz*. This is why the multi-month rental documents show that the Channells' March monthly renewal contract with a start date of March 24 (for the next 30 days) abruptly ended in less than a week.

The Channells, however, did not know this and believed everything was fine.

The April 4, 2018 police report reflects that a Hertz employee falsely told the police that the rental had started on January 6 and was due back on February 22, 2018, plainly doing no more than reading the face page of the theft package to the police. PLT000606. There was no mention of the multi-month rental, the February and March renewals, the vehicle exchange, that the rental was supposed to end in June 2018, or the thousands of dollars that the Channells had paid Hertz for the rental. Id.

Not only was there no investigation pursuant to W7-02(a)(17), or by Hertz vehicle control, but no one at Hertz even checked the report to ascertain whether the information the package contained was internally consistent (e.g., that this was a multi-month contract, and that the dates of rental provided in the theft package were wrong).

### c. Thomas Channell is Pulled Over for Car Theft and has a Heart Attack

As a result of Hertz's false report, the car was recorded as stolen, and the car being driven by Mr. Channell was pulled over on May 12, 2018. Mr. Channell was arrested at gun point, and he immediately suffered a heart attack.

He had to undergo emergency heart surgery, and his and his family's life life has drastically changed as a result.

Hertz apologized to Channell's son, Michael, while Thomas was undergoing surgery.

## III.   Conclusion

Hertz claims to be "Number 1" in customer service. Hertz has to match words to deeds and make amends for what it did to the Channells. One of its regularly-paying customers was pulled over at gun point and had a heart attack due to Hertz's gross incompetence and recklessness.

The nostrum that the Channels share any blame for what happened, or that Hertz can attempt to ignore its liability, is preposterous. The case illustrates that Hertz's lack of investigation is a serious, systemic problem. It also illustrates that Hertz's computer systems and departments do not communicate with each other, and that Hertz's theft reports often vary wildly from the information in Hertz's possession and the facts of the case.

The fact that many of Hertz's theft reports are so inaccurate undercuts every assertion Hertz has made about the adequacy of its theft reporting processes and the reliability of its computer software. Given that Hertz deletes vital rental records that demonstrate that its theft reports contain inaccurate information, this also raises truly monumental concerns about the motives behind Hertz's document destruction.

Lastly, this case shows that even after being notified in 2017 by customers such as Michael Gray (Texas), Kelly Grady (Pennsylvania), and Nancy Cullen-Smits (Virginia) of these very real problems and their consequences, Hertz has steadfastly refused to make reforms.

# ATTACHMENT AD



**FRANCIS ALEXANDER LLC**

# Hertz Botched Stepanyan's Rental Contract, Failed to Investigate, and Prosecuted Him with False Data

## I.    Introduction

Hertz identified the wrong car in Arthur Stepanyan's rental contract, never called him about the error, and then reported the car he was driving stolen without a full investigation. Once Hertz realized after Stepanyan's arrest that the company had made a major error, the company **sent false documents** to the police to have Stepanyan prosecuted for a nonexistent crime to cover up its errors.

In March 2019 Arthur Stepanyan rented a silver Dodge Ram from the Charlotte Airport location for two weeks. At the end of the two weeks, on March 14, he returned the vehicle. However, he had a change of mind and rented it again. Upon checkout, Hertz incorrectly put a F150 on the contract, instead of the Dodge Ram Stepanyan was driving. Hertz then cleared him out of the lot, failing to realize he was not in a F150. This caused Hertz to think the Dodge Ram Stepanyan was driving was missing from inventory when in actuality Mr. Stepanyan was renting it (the facts of this case are very similar to those of the Cullen-Smits case that Hertz has already agreed to mediate).

Then, instead of simply calling the last known renter to see if he had the vehicle (as Hertz policy and common sense require), Hertz reported the car stolen. After Stepanyan was arrested, and Hertz realized there had been an error, Hertz then sent false documents to the police to justify an illegitimate prosecution of Stepanyan to cover up the botched rental. This was happening even as Stepanyan desperately asked Hertz managers to help him get the prosecution stopped, but was told they could do nothing.

Mr. Stepanyan routinely rented with the company and was well-known at the local Hertz office. The notion that one of Hertz's good customers intended to steal a car is absurd in and of itself.

## II.    Hertz Rented the Wrong Truck to Longtime Customer Arthur Stepanyan and then Fabricated Rental Documents to Cover Up the Error and Justify His Prosecution

### a.    Hertz Identifies the Wrong Vehicle on Stepanyan's Rental Contract

Arthur Stepanyan is a longtime Hertz customer who rented multiple times with Hertz, including several times in the months before the rental at issue.

Stepanyan was well-known at the Hertz Charlotte airport location. Mr. Stepanyan rented a Dodge Ram for two weeks in early March 2019, in connection with the rental contract ending in number 5791. Hertz records show that he returned the vehicle and checked back in on March 14, 2019. Hertz000431. However, after looking at an F150, Stepanyan decided to rent the Dodge Ram again.

Mr. Stepanyan was then checked out at the counter and given a new contract ending in 1203, which was then inspected at the booth. Personnel at both the counter and the checkout booth apparently failed to realize that Stepanyan's rental receipt erroneously reflected that Stepanyan was renting a Ford F150, and not the Dodge Ram he was actually driving. PLT00280.

Mr. Stepanyan spoke with Hertz several times after leaving the location and was not informed of any issues on Hertz's end. Furthermore, in the past, whenever there was an issue or an extension was needed, the Charlotte location would call him. He also knew that his valid credit card was on file and, pursuant to Hertz practice, would be charged when he returned the car (he had never had a problem before this during his many rentals). However, none of these steps were taken because Hertz failed to accurately record the truck he was renting on his contract.

**b. Hertz Reports Stepanyan's Rental Car as Missing from Inventory/Stolen, but Never Calls The Last Known Renter During its Investigation; Theft Notes Indicate Hertz was Eager to Have Stepanyan Arrested**

Hertz went to the police on August 1, 2019, and told them that the car was missing from their inventory after last being returned by Mr. Stepanyan on March 14, 2019:

VEHICLE CONTROL WAS NOTIFIED OF THE ABOVE THEFT LOT INFORMATION ON 05/31/2017, THE LAST DOCUMENTED MOVEMENT ON THIS VEHICLE WAS A CHECK-IN UNDER RENTAL RECORD# 40240579 TO THE C1880- 12 LOCATION. THE VEHICLE WAS RETURNED BY THE LAST RENTER, STEPANYAN /ARTHUR TO THE ABOVE LOCATION PRIOR TO THE THEFT. THERE IS NO RECORD OF THIS VEHICLE BEING RENTED AND/OR TRANSPORTED TO ANOTHER LOCATION AFTER THE 03/14/2019 CHECK-IN.

Hertz000431. As a result, Stepanyan was arrested on August 5, 2019.

Hertz gave us a Power Point presentation claiming that it has the best policies and practices, including a checklist that has to be followed for each theft report. On that checklist it quite sensibly states that before any theft report can be made, Hertz has to call the last known renter:

8    Confirmation with Last Known Renter - Contact last known renter to 1) confirm the make, model & color of vehicle rented/returned. 2) determine if the vehicle was actually returned to a Hertz facility & specifically which facility, 3) review the return process. 4) obtain a customer description of the location and the name of the employee who assisted them, and 5) ask about any problems or concerns with the vehicle's condition.

In violation of its own policy, however, Hertz never attempted contact with Stepanyan. Had Hertz done so, the problem would have been cleared up without a theft report and subsequent arrest. This case illustrates what can happen if a full checklist pursuant to W7-02(a)(4) is not completed.

This case has other troubling aspects. For instance, the theft package shows that Hertz knew Stepanyan had the vehicle and that, instead of calling him (the last known renter), they

wanted him arrested:

> US 2019-07-30 09:37:21.301 19073000000 DTC3038  EMAIL FROM GM Bryce Kent any chance we can get the theft package today? We have good information?on who has this vehicle and the the police are just waiting for us to report it. thanks

Hertz000432. Instead of calling the last known renter to see what the issue was, or hiring a repossession service, Hertz's goal was instead to report the car stolen and arrest the customer.

This attitude—and palpable eagerness—to use the police to arrest a longtime and well-known customer, without even an attempt to contact him, is baffling.

### c.  After Stepanyan is Arrested, and Hertz Realized the Last Known Renter was in Possession of the Vehicle, Hertz Fabricated Documents to Cover Up the Error and Justify Prosecuting Stepanyan

This car was initially reported to the police as lost inventory and the theft package expressly acknowledged that Stepanyan had returned the car on March 14, 2019, in connection with the contract ending in 5791. Hertz000431. Instead of conducting an internal investigation to determine why the last known renter still had the car after returning it, Hertz engaged in a cover up.

In particular, Hertz had the police charge Stepanyan with a felony for "fail[ure] to return at the end of a rented period." PLT000282. There was just one problem: Hertz knew from its theft package that the Dodge Ram was in fact *returned by Stepanyan on March 14 and fully paid for*:

> VEHICLE CONTROL WAS NOTIFIED OF THE ABOVE THEFT LOT INFORMATION ON 05/31/2017. THE LAST DOCUMENTED MOVEMENT ON THIS VEHICLE WAS A CHECK-IN UNDER RENTAL RECORD# 40240579 TO THE 01880- 12 LOCATION. THE VEHICLE WAS RETURNED BY THE LAST RENTER, STEPANYAN/ARTHUR TO THE ABOVE LOCATION PRIOR TO THE THEFT. THERE IS NO RECORD OF THIS VEHICLE BEING RENTED AND/OR TRANSPORTED TO ANOTHER LOCATION AFTER THE 03/14/2019 CHECK-IN.

Hertz000431. The truck was then rented out to Stepanyan again but recorded incorrectly on his new contract, something Hertz knew or should have known had it simply performed a basic investigation before or after Stepanyan's arrest.

Later, on August 14, Hertz doubled down on prosecution. It sent a false Overdue Vehicle Report to the police alleging that Stepanyan had never returned the rental after renting it on March 1, 2019, and that it was overdue when Stepanyan was arrested. This Overdue Vehicle Print Report was not in the original theft package and was modified on August 14, 2018. It also claimed that Stepanyan's credit card was denied and that he had never rented with Hertz before:

| Work Sheet ID | Status | Time Created |
|---|---|---|
| 19031402438 | Cled | 2019/03/14 05:35 |
| **Last Updated DT** | **Updated By** | **First/Last Name** |
| 2019/08/14 11:34 | TTROUPB1 | ARTHUR STEPANYAN |
| **Address1** | **City** | **ST Ctry** |
| 11071 PAINTED TREE RD | CHARLOTTE | NC US |
| **Phone1** | **Phone2** | **# Prior Rntls** |
| 7044510055 | | 0 |
| **RA Number** | **Days OD** | **Status** |
| 402405791 | 2 | P |
| **Area/Loc** | **Report DT** | **Due Date/Time** |
| 01880/12 | 2019/03/14 | 2019/03/13 20:58 |
| **Res ID** | **Res Type** | **Res Date** |

| Credit Card # | FOP | FMT | Restr? | Aprv Stat |
|---|---|---|---|---|
| XXXXXXXXXXXX9145 | PC | CR | N | DENIED |

Hertz000443-444. In reality, Hertz knew Stepanyan had returned the car on March 14, 2019, and that claiming the rental on contract 5791 was overdue was simple false. Hertz also knew that the rental was paid for and that Stepanyan's card was not denied. Lastly, Stepanyan had rented with Hertz many times and was well known at the location. Hertz's "overdue report" document appears to have been fabricated/altered after the fact to make it appear as though Stepanyan failed to return the vehicle and pay for the rental.

It defies logic that Hertz would attempt to make it appear as if a longtime renter whom Hertz *knew* had returned the rental on March 14 and paid for it, (1) had never returned it, (2) had used a bad card and did not pay for it, and (3) was a first-time renter.

This overdue report was actually sent to the police/prosecutors by Hertz for the purpose of prosecuting Stepanyan and finding him guilty of serious crimes Hertz knew he never committed:

Overdue Notes for the worksheet ID: 19031402438

| User ID | Time |
|---|---|
| TTROUPE1 | 2013/08/14 11:04 |

Note

**1689-7990617 Charlotte Mecklenburg PD 4153 Wilkinson Blvd, Charlotte, NC

Hertz000443-444. Why this matter was treated as an overdue rental after Stepanyan's arrest— when it was immediately apparent Hertz had made an error—is astounding and troubling.

Note that while Hertz was creating and sending this false document to the police, Stepanyan personally spoke with someone at the Hertz location (this employee apologized to him), David Nipper (the Area Manager), and Tim Burrell (the corporate security manager) *asking them to please drop the case*. They responded that they were powerless to help him or stop the prosecution.

After Stepanyan hired a lawyer to fight what was happening to him, Hertz refused to cooperate further with prosecutors, leading to the dismissal of the charges:

☒  5. Other: *(specify)*          ☐ See additional information on reverse.
Victim business no longer cooperative.

PLT000284.

Given that Hertz has a duty to withdraw continuing prosecutions it knows no longer have probable cause, it is particularly egregious that, upon making the decision not to pursue the case, it would stop cooperating with prosecutors instead of dropping the case and making amends to Stepanyan.

## III.  Conclusion

The simple fact of this matter is that Hertz was, at best, grossly negligent when it identified the wrong car in Stepanyan's rental contract and failed to catch the error at the booth. It was, at best, reckless and malicious for Hertz to report the Dodge Ram stolen without even calling the last known renter—a basic investigative step mandated by Hertz policy—despite believing that Stepanyan (a longtime renter) was in possession of the vehicle.

It was, at best, knowing and malicious when Hertz, after Stepanyan's arrest, altered documents and pursued a prosecution of Stepanyan on grounds the company's own records proved were inaccurate.

Making matters even worse, when Stepanyan contacted Hertz managers and asked them to withdraw the prosecution, Hertz refused. The case was only dropped after Hertz ceased cooperating with the prosecution after Stepanyan hired a lawyer to fight what was happening.

# ATTACHMENT AE



# Hertz Improperly Destroys Its Records

**SOP:**　　　　W1-06: [LEGL-3.1] – <u>Records Retention Policy</u>

W1-06(E)(2) – <u>Issuance of a Litigation Hold Due to Anticipated or Actual Governmental Investigations, Subpoenas, or Civil Litigation</u>

Destruction of Records in contemplation of governmental investigations or civil litigation is illegal in most jurisdictions and can potentially expose the Company to severe sanctions and the affected employees to criminal penalties including imprisonment. Beyond that, some jurisdictions, including the United States, require the Company to take the appropriate measures to preserve any and all Records in connection with the subject matter of the investigation or litigation (hereinafter "Relevant Records") as soon as such proceedings can reasonably be expected.

Destruction, disposal, alteration, mutilation or concealment of any Relevant Records is strictly prohibited once notification of a Litigation Hold has been provided. The issuance of a Litigation Hold automatically suspends the Records Retention Schedule for Records subject to the Litigation Hold. If there are questions, do not discard. Any questions regarding whether a Record relates to (1) any relevant government investigation, inquiry, litigation, or subpoena; or (2) any such investigation, inquiry, or litigation that is threatened or anticipated, should be directed to the Legal Department.

No Records in question may be destroyed or discarded until after such question is answered.

**SCOPE:**　　　This Worldwide Procedure applies to all Divisions and Subsidiaries of the Hertz Corporation.

**COMPLIANCE:**　Hertz Legal Department

**OWNER:**　　　Executive    Vice    President    and    General    Counsel

## I.   Introduction

The preparation of a theft package for delivery to the police triggers a duty on Hertz to preserve all relevant documents, data, voice recordings, and any other potentially incriminatory or

exculpatory evidence. This "duty to preserve" is well-established in the law and detailed in Hertz policy W1-06(E)(2) [LEGL-3.1] which, unfortunately, is routinely violated by Hertz. Hertz has admitted that various files, voice recordings, contract notes, and phone records of customers are purged from its system without regard for the fact that a case may go to suit and has been reported to the police as a crime. To purge information which could save an innocent person from being prosecuted and imprisoned is, at best, improper.

Hertz's conduct in connection with this policy resulted in censure in the *Grady* case, where the court granted spoliation sanctions against Hertz after Hertz admitted that it had destroyed Ms. Grady's file. Note that Hertz admitted in its April 9 phone call with us that no litigation hold had been placed on relevant bank records, phone records, and voice recordings. Under applicable law and Hertz's own record retention policy, Hertz had a duty to preserve all such records. Given this conduct, the same spoliation sanctions granted in *Grady* will likely be granted in each of the 21 matters we are currently handling.

## II.    It is Illegal and Against Hertz Policy to Destroy Relevant Documents and Records in Contemplation of Governmental Investigation

Hertz policy W1-06(E)(2) [LEGL-3.1] provides that destroying records in contemplation of governmental action is illegal. This means that the moment Hertz begins compiling a theft package, it has a duty to preserve all records that bear upon the matter at hand. There exists factual evidence that Hertz knowingly violated and violates this policy.

**First**, Hertz's own record retention policy proscribes the destruction of records once a governmental investigation is contemplated. The policy then goes on to state: "Destruction, disposal, alteration, mutilation or concealment of any Relevant Records is strictly prohibited once notification of a Litigation Hold has been provided." (*See* W1-06(E)(2) [LEGL-3.1]).

**Second**, according to state law and the Restatement (Second) of Torts, Hertz has a continuing duty to withdraw any police action that it learns lacks probable cause.[1] Further, Hertz is required to supplement theft reports with information that exonerates the accused or that contradicts information provided to police in the theft report. The fact that Hertz destroys this information instead of providing it to police further aggravates Hertz's inappropriate treatment of relevant records in cases where it has accused a renter of theft.

**Third**, Hertz corporate security designee Richard Livingston testified in *Grady* that Hertz has a seven-year retention policy for criminal prosecutions. *See* Exhibit 3 - Livingston Deposition, at pp. 78-79. We request that the retention schedule identified in Bates No. 1610 be provided.

---

[1] For 117 years it has been the law of Pennsylvania that malicious prosecution lies not only when criminal proceedings are initiated without probable cause, but also when they are continued without probable cause. Wenger v. Philips, 195 Pa. 214, 45 A. 927 (1900); Zamos v. Stroud, 87 P. 3d 802 (Cal. 2004) ("[S]o far as our research reveals, the rule in every other state [including Pennsylvania] that has addressed the question is, and in many states has long been, that the tort of malicious prosecution does include continuing to prosecute a lawsuit discovered to lack probable cause."); Arquette v. State, 290 P. 3d 493, FN12 (Haw. 2012) (accord); Shannahan v. Gigray, 962 P. 2d 1048, 1052 (Idaho 1998) ("This Court has held that probable cause must be present when a proceeding is initiated, and it must be present in order to continue the proceeding."); *see also* Restatement (Second) of Torts § 674.

## III.  Hertz has Admitted Destroying Records in the 21 Cases Currently Being Addressed

Hertz claims that rental notes, recordings, and records for all 21 matters that we are currently discussing were destroyed within 90 days to six months after the renter's account was closed. Notably, these rental notes and recordings are the best evidence of the renter's contacts and extensions with Hertz and are indispensable.

That Hertz claims it destroyed these records after initiating criminal prosecution is without any justification—especially since Hertz has been on notice for years that it has been making materially inaccurate police reports for years.

Furthermore, in some cases we contacted Hertz within six months of the rental, such as for Shontrell Higgs. The fact that Hertz destroyed these records provides additional evidence that Hertz acted with a motivation other than to destroy files in the ordinary course: there is no justification why Higgs's— or any other criminally-accused renter's—records should have been deleted.

It appears to us that, at a minimum, Hertz's failures in this category will lead to serious civil spoliation sanctions.

## IV.  The Court Granted Spoliation Sanctions against Hertz in *Grady* for Its Failure to Preserve Grady's Rental Records; These Cases Are no Different

In the *Grady* case, when the plaintiff requested production of her rental information to prove that she had been contacting Hertz and extending her rental contract, Hertz failed to produce any information.

Hertz designee Joseph Jaussi admitted in testimony that Hertz purged and destroyed Grady's rental file, despite her being reported for car theft.

| | |
|---|---|
| COUNSEL: | So you're telling me, as you sit here today, you're speaking, just so you know, as Hertz's voice. You're the corporate designee, the person most knowledgeable from Hertz to testify as to certain things. You've been identified as someone to speak to and you've identified that there was and an email, that you, as general manager, sent to Oklahoma City billing to determine whether or not the 2500 on 7/15 was a final bill, partial payment, full payment or what it is, correct? |
| JAUSSI: | Correct. |
| COUNSEL: | And as you sit here today, you're telling me that you personally do not know whether or not that payment was a final payment, or that payment was authorized, or that payment cleared, or that payment was a partial payment or a full payment, correct? |

> JAUSSI:  Correct. All they stated from my recollection is that it was _purged_. It's been _purged_. There's no further information that could be provided because _that contract has been purged_.

*See* Exhibit 1 - Jaussi Deposition, at pp. 37-38 (emphases added). Hertz corporate security designee Richard Livingston testified in *Grady* that Hertz has a seven-year retention policy for criminal prosecutions. *See* Exhibit 3 - Livingston Deposition, at pp. 78-79.

Due to the obvious illegality of destroying such evidence without any justification—and also hiding and attempting to improperly influence witnesses—the Court in *Grady* imposed serious spoliation sanctions against Hertz.

Kindly note that when Ms. Grady was pulled over, and the police called Hertz, a Hertz employee told the State Police that the overdue theft report against Grady had been a mistake and that this was solely a civil billing dispute:

---

**Synopsis:**
This incident occurred as Hertz Rental Company reported a vehicle as stolen. The vehicle was stopped at the above location and all occupants were identified. Upon calling Hertz Rental Company and the Philadelphia Police Department, it was determined this is a civil issue regarding late payment and the vehicle was not stolen.

---

HERTZ Rental Company was contacted and advised that the credit card listed on the contract with the suspect had returned with insufficient funds and as a result the account was overdue. As a result they reported the vehicle stolen. HERTZ advised they would prefer the vehicle to be towed and picked up by a representative and would handle the civil tort regarding payment with the suspect.

---

**Conclusion/Recommendation:**
I recommend this investigation be terminated due to the fact that Hertz Rental Company will be handling this situation through civil action. It was found that the vehicle was reported as stolen from the Philadelphia Airport rental terminal after a miscommunication regarding an overcharged credit card as part of a Hertz Rental Car contract. Philadelphia PD has been provided all requested documentation and was advised the vehicle was towed/recovered.

---

8. INCIDENT DETAILS
This incident occurred as a GMC YUKON was reported stolen by Hertz Rental Company. The vehicle was traveling southbound at the above location when the incident was reported. A traffic stop was conducted on SR 322, in Dauphin County, PA. Upon making contact with the operator of the vehicle and contacting Hertz, it was determined that this is a civil issue relating to late payment on a rental contract.

---

It is obvious that the Hertz representative mentioned above could see the rental had been extended and therefore stated this was just a civil issue (she was later arrested after Hertz corporate security insisted that the Philadelphia police continue the prosecution). These events provide additional proof that Hertz destroyed the rental records showing that Grady's rental had been extended.

We feel strongly that the courts will take into account that Hertz has known about this systemic failure for at least three years (the time of the 2017 *Grady* trial), but has done nothing to correct it.

## V.    CONCLUSION

According to Hertz's record retention policy and controlling case law, Hertz acts illegally when it destroys records related to an alleged car theft; i.e. when a governmental investigation is contemplated. Every time Hertz compiles a theft package, it must reasonably contemplate – in fact, it *intends* – governmental intervention; it knows that it is constrained to preserve the renter's records.

Hertz's records-destruction practices in connection with cases in which it has filed theft reports – cases in which it *seeks out and intends* government intervention – is inexplicable.  This failure is even more striking in light of: the fact that Hertz has had notice for years that its theft reports are materially inaccurate; and the fact that Hertz has already suffered spoliation sanctions for its failure to maintain records.

Based on the systemic failures permeating Hertz's record retention practices, we feel strongly that any attempt by Hertz to defend against the current cases, by asserting that the renter did not extend the rental and/or failed to contact Hertz, will be undermined by virtue of Hertz's intentional destruction of exonerating information.

# ATTACHMENT AF



FRANCIS ALEXANDER LLC

# Hertz Erases Rental Extensions and Backdates the Vehicle Due Date

## I.    Introduction

Every rental theft report is based on two main variables: payment and time. Many renters have come to us adamant that they extended their rental, and that they had permission to use the car. Yet Hertz's theft reports instead claim that Hertz was unable to contact the renter, or that the renter had refused to return the vehicle, with no mention of extensions. We have discovered that, for whatever reason, Hertz does not provide written confirmation of rental period extensions to its customers.

The evidence we have collected demonstrates that Hertz's systems often automatically delete any record of extensions from the rental systems. This happens when an authorization hold on a customer's card is denied. Hertz **only** bills customers at the end of the rental, but during the rental it checks to make sure the card is active and that there is available credit on the card to pay the rental (this is called an "authorization hold"). When an authorization hold is denied by the credit card company, as can be seen in the theft package overdue vehicle print reports, Hertz simply deletes any record of the extension without notice to its employees or its customers. The theft report omits any record of the customer's contact with Hertz as well as any record of the rental period extension which permitted the renter to use the vehicle.

One example of this practice is in a case that Hertz has already agreed to mediate: Hanna Ayoub. Hanna has provided us phone recordings evidencing that Hertz erased his agreed-to extension and deleted it from the system as if it never happened. These recordings are significant in that they call into question the validity of every Hertz overdue theft report prepared with current systems in place.

It is clear that Hertz's systems are compromised, and that Hertz's claims to the police that certain renters had not extended their vehicle return dates or contacted the company are false. At all points Hertz has known about this issue since (at the latest) the *Grady* trial, but has apparently not yet addressed it.

## II.    Hanna Ayoub's Records Show that Hertz's Practice is to Erase Any Record of Rental Extensions Hertz Agrees To, and then Fail to tell the Police about the Extensions or the Contemporaneous Customer Contact

Each time a renter extends with Hertz, the company initiates an "authorization hold" on the customer's card. This is akin to an "exploratory charge" that allows Hertz to confirm that the card in question is active and will be available for a charge at the end of the rental period. The

authorization hold is not a final billing and is not actually payment. Hertz through policy and practice bills its customers after the rental is closed out. See Hertz001445.

In this category of cases, the problem arises when the renter extends his or her return date with Hertz, but the authorization hold initiated by Hertz is denied. When that happens, Hertz's systems apparently delete any record of the extension without notifying Hertz's employees or the Hertz customer, who is under the impression that the return date for the rented vehicle has been extended. As a result, the theft reports compiled by Hertz Vehicle Control often completely omit renter contact and extensions, despite the renter actuality having had multiple contacts with Hertz, and believing that the extension remains in effect.

This is precisely what happened in the Ayoub case. There, Hertz advised the police that Mr. Ayoub's rental was due on April 16, 2019, while Ayoub maintains that he extended through June. Mr. Ayoub has provided us a phone recording from April 15, 2019, on which he can be heard extending his rental with Hertz Wilmington until April 22, 2019. See Exhibit 1. In fact, Mr. Ayoub received notice of an authorization hold for $308 on April 15, 2019. See Exhibit 2. He then received a second charge for $55. Exhibit 2.

The next day on April 16, 2019, Hertz Wilmington left a message about the rental, and he called back. Exhibit 3. As the recording demonstrates, Hertz told Ayoub that his car was overdue and asked if he wanted to extend. He was baffled, as he knew he had extended the day before on the 15th. Although Ayoub kept insisting that he had extended, the Hertz employee was adamant that no record of the extension appeared in Hertz's systems, the charge to Ayoub's card, nor was the employee aware of Mr. Ayoub's telephonic communications with Hertz.

Ayoub eventually grew fed up with Hertz Wilmington on April 16, 2019, and called Hertz corporate, which extended the rental several times over the next 1 1/2 months. Not only is there no mention of the April 16, 2019 discussion in Hertz's theft package, but none of Ayoub's many other contacts with Hertz corporate and Wilmington after that date (pursuant to which Mr. Ayoub was given authorization to use the car through June 2019) were noted.

The implications of this failure are wide-reaching. Hertz has been denying that the renters at issue have extended their rentals—claiming that the theft packages are complete—but in reality Hertz is systematically deleting any record of the extensions which confirm that the renters have been advised by Hertz of the continued authorization to use the vehicles. This evidence undercuts every theft report that Hertz has ever submitted for an overdue rental. By erasing any record of the agreed-to extensions (and then backdating rental due dates), Hertz once again transforms a civil dispute into a criminal matter. This practice allows Hertz to avoid expensive arbitration, use the police as a repo service, charge the rental, and make an insurance claim for the full cash value of the vehicle thereby maximizing its income, asset's value, and reducing costs.

## III.  OTHER RENTERS HAVE PROOF OF ERASED EXTENSIONS

Other Hertz renters have provided evidence demonstrating that this is another systemic failure on Hertz's end:

**Laketa Collins** - GEICO rented Ms. Collins a car in early July 2018, which was initially due back July 11, 2018. Hertz told the police that the return date for the rented car had not been

extended past July 11, 2018. In fact, GEICO has confirmed that it extended the rental through July 18, 2018, whereupon Collins took over the rental and extended again. In essence, Hertz's system *erased extensions by the insurance company and the renter*.  GEICO also confirmed that it routinely has problems with Hertz.

**Shontrell Higgs** - Higgs rented a car in early March 2019, and then claims that her rental was extended several times. Hertz, on the other hand, advised the police that the car was due back March 8, 2019. But Hertz's own theft reports show that Higgs claimed that she had extended her rental beyond March 8, 2019. Furthermore, Hertz's production shows that Higgs provided Hertz a new charge card on March 21, 2019, and that Hertz initiated two authorization holds on that card. Hertz001445. Obviously, Hertz would only have initiated an authorization hold on the new card had the rental been extended. But nothing about a new card, or an agreed rental extension on March 21, appears anywhere in the theft package or in Hertz's production; the multiple extensions and renter contacts by Higgs are omitted and not documented in the theft report or anywhere else that we can see.

**Grady -** In the *Grady* case, Ms. Grady engaged in hours of phone calls with Hertz after the alleged rental due date, none of which were documented in Hertz's theft report. Furthermore, Hertz told the Pennsylvania State Police when Grady was pulled over that, according to Hertz's systems, the police report was a mistake and that there was only a civil payment dispute outstanding. In other words, Hertz employees looking at one Hertz system could see that Grady's rental had been extended, but the Hertz Vehicle Control employee who compiled the theft report could not.

Based on renters' records, we believe that many other renters experienced similar issues, such as:

- Michelle Jones
- Julius Burnside
- Howard Junious
- Antwone Person
- Nicole Stevens
- Cheryl Young
- Barbara Fernandez

## IV. The Grady *Case* Revealed that Hertz has been on Notice for Years that there are Serious Failures in Its Rental Systems

As noted above, Hertz advised the police that Ms. Grady kept her rental months past its due date and had stopped contacting the company. The problems for Hertz were that: (1) her phone records showed voluminous contact over that time span to extend the vehicle, extensions which were not documented in Hertz's theft report; and (2) when Grady was pulled over, a Hertz

employee told the State Police that the overdue report had been a mistake and that all that was at issue was a billing dispute:

> **Synopsis:**
> This incident occurred as Hertz Rental Company reported a vehicle as stolen. The vehicle was stopped at the above location and all occupants were identified. Upon calling Hertz Rental Company and the Philadelphia Police Department, it was determined this is a civil issue regarding late payment and the vehicle was not stolen.

> HERTZ Rental Company was contacted and advised that the credit card listed on the contract with the suspect had returned with insufficient funds and as a result the account was overdue. As a result they reported the vehicle stolen. HERTZ advised they would prefer the vehicle to be towed and picked up by a representative and would handle the civil tort regarding payment with the suspect.

> **Conclusion/Recommendation:**
> I recommend this investigation be terminated due to the fact that Hertz Rental Company will be handling this situation through civil action. It was found that the vehicle was reported as stolen from the Philadelphia Airport rental terminal after a miscommunication regarding an overcharged credit card as part of a Hertz Rental Car contract. Philadelphia PD has been provided all requested documentation and was advised the vehicle was towed/recovered.

> 8. INCIDENT DETAILS
> This incident occurred as a GMC YUKON was reported stolen by Hertz Rental Company. The vehicle was traveling southbound at the above location when the incident was reported. A traffic stop was conducted on SR 322, in Dauphin County, PA. Upon making contact with the operator of the vehicle and contacting Hertz, it was determined that this is a civil issue relating to late payment on a rental contract.

In fact, Grady had paid for her rental at this point, which Hertz's employee declined to tell the police. Obviously, the Hertz employee stated to the State Police that Grady's was just a civil issue because the employee could tell that Grady's rental contract had been extended. All of the foregoing notwithstanding, Ms. Grady was arrested at a later date after Hertz corporate security insisted that the Philadelphia Police Department continue the prosecution, without revealing what Hertz had earlier told the State Police.

What this apparently tells us is that the Vehicle Control employee who compiled the theft package was accessing a computer system that had no record of Grady's rental extensions or contacts with Hertz, while the employee who spoke with the State Police could see the continuing renter contact and extensions.

It is clear that Hertz's systems do not share information effectively and are inexplicably erasing customer extensions, resulting in backdated due dates. In Grady, Hertz claimed that it had destroyed and purged all of the Grady's renter data, and was then sanctioned by the court for having spoliated evidence

## V. CONCLUSION

Hanna Ayoub's phone recordings show that Hertz's computer programs are deleting records of valid rental extensions. The evidence we have collected shows that this is happening on a widespread basis and has affected many renters.

Each time a renter extends with Hertz, the company initiates an "authorization hold" against the customer's charge card. This is a type of "exploratory charge" the purpose of which is to confirm that the customer's card is active and that the customer's account may be debited. The authorization hold is not an actual billing or debiting of the customer's account: Hertz only actually charges customers' accounts after the rental is closed out.

The problem is that when the renter extends with Hertz, but the preauthorization is denied, Hertz's systems delete any record of the extension without so notifying its employees or its customer. As a result, the theft reports compiled by Vehicle Control often omit information concerning contacts with customers and agreed-to extensions, despite the renter in actuality having had voluminous contact with Hertz and having been given authorization to extend the rental and return the vehicle at a later date.

Furthermore, the evidence shows that Hertz has known for years about the issue but has done nothing to address the problem. The facts of the *Grady* case demonstrate that Hertz is deleting information (much of it exculpatory), failing to reveal to police that it had been contacted by the renter about the vehicle in question, and operating with computer systems that are not tracking and maintaining critical information.

The seriousness of this failure, which converts simple disputes about payment into serious criminal cases, is self-evident. It, too, undercuts the reliability of Hertz's overdue vehicle reports.

# ATTACHMENT AG



FRANCIS ALEXANDER LLC

# Hertz Falsifies Payment Information in Police Reports to Secure Illegal Arrests & Prosecutions

**SOP:**   W7-02 RAC: [SCTY-4.1] - <u>Reporting Vehicle Thefts and Conversions</u>

W7-02(D) - <u>Closing Associated Rental Agreements</u>

The OKC Vehicle Control Department ... must close the RA after verifying the Theft Vehicle Report with police.... *Once confirmed that the theft/conversion has been reported to the police*, the responsible management must Close RAs by inter alia: Applying the 'best' or lowest rate available.

**SCOPE:**   This Worldwide Procedure applies to the North American Rent-A-Car (RAC) Division

**COMPLIANCE:**   Location, Maintenance, Area, Country Head Office and OKC Management must ensure compliance to this procedure.

**OWNER:**   High Level Corporate Officers and General Counsel

## I. Introduction

Every rental theft report is based on two variables: payment and time. When Hertz misrepresents one of these variables to the police, its report is already 50% inaccurate. Payment is the single most important factor in a consumer theft report, making Hertz's misrepresentations material.

The theft packages Hertz provides to the police in 100% of the cases contain false representations that the renter has not paid for the rental. However, in all of these cases, the renter has paid: after printing out the theft package and delivering it to the police for the purpose of initiating a criminal prosecution, Hertz charges the renter's card—*but never tells the police or prosecutors* that it has received payment. The customer is then prosecuted based on manipulated information apparently designed to ensure the arrest and criminal prosecution of an innocent individual.

During our April 9 and April 17, 2020 phone calls, Hertz and its attorneys outlined the steps Hertz takes in connection with preparation and delivery of a theft package: Hertz *first*

charges the customer for the rental, and then it generates the theft package; it always advises the police that the customer's credit card has been charged.

This is simply not true. Hertz has engaged in a contrary practice for many years, and this practice has been codified as an element of Hertz policy. W7-02(D).

## II. Hertz Policy Mandates that the Company Report the Customer for Theft to the Police *Before* Charging the Customer for the Rental; the Police are Never Told about the Payment — *Even After the Hertz Representative Charges the Customer's Card*

In every theft report there are two implicit variables: payment and time. If the rental vehicle is paid, or the renter has provided Hertz a valid form of credit (e.g., a credit card number), it should be clear that the renter does not intend to steal the car. Indeed, in any type of consumer theft report, the determinative factor is payment. As indicated in each of the reported thefts, it is a denied credit card authorization hold that triggers the theft reporting process. An authorization hold is a check that Hertz sends to verify the card is valid and has funds; it is not a final billing. The case where Hertz believes it has a valid card for a rental for which return date has passed, but reports the car stolen in any event, **does not exist.**

The police are less likely (or will simply refuse) to act on a Hertz theft report if the rental has been paid. Hertz policy therefore mandates that theft packages be printed out and given to the police *before* the customer is charged:

Hertz001471. The theft package contains a line item indicating that the customer still has a "net due" to Hertz and that the customer's card has been "denied." Nothing that Hertz provides to the police communicates that Hertz intends to charge the customer (a charge which is usually accepted by the credit card or bank card company) as soon as the theft package has been delivered to the authorities.

For this reason, Hertz purposely fails to disclose these facts to police and law enforcement, in effect transforming a civil dispute into a criminal matter, as the police are led to believe that the renter intends to steal the vehicle and has provided a stolen, fraudulent or invalid card. Hertz knows that this policy guarantees that a theft package contains no proof the customer was charged

and the rental was paid. ***We have never seen a case where Hertz supplemented payment information to the police***, or told the police that Hertz was going to charge the customer.

Hertz's omission of payment confers numerous legal and financial advantages upon Hertz. The omission enables Hertz to use the police as a taxpayer-funded repo service, it allows Hertz to avoid arbitration with customers, and it allows Hertz to collect insurance monies (the claim for which requires the filing of a police theft report). In essence, Hertz is getting the monies from the charge *and* the full asset value from its insurance claim. It then closes out the rental contract with its accounting department.

When Hertz told its attorneys and Plaintiffs that it first charges the customer, then closes out the rental, and then reports the customer—and that the police have been made aware of the payment—it was not being candid or accurate. As noted, Hertz policy actually mandates the preparation and delivery of the theft report to police and ***only then*** closing out the rental customer. *See* W7-02(D) (stating that OKC "must close the RA after verifying the Theft Vehicle Report with police."). This is further confirmed by Hertz's production, where in September 2019 a Hertz employee explains the process to a corporate security manager in the Higgs case:

> WE AUTHORIZED THE FOLLOWING:  THESE ARE AUTHORIZATION HOLDS ONLY, NOT BILLINGS  WE ONLY BILL THE CREDIT CARD/ DEBIT CARD WHEN THE RENTAL IT IS CLOSED OUT. WE ONLY RECEIVED TWO APPROVALS OUT OF THE ATTEMPTS AND THEN

Hertz0001445. As can be seen, a Hertz employee plainly states "we only bill the credit card/debit card when the rental it is closed out." Id.

This policy ensures that ***every one of Hertz's theft reports across the nation is incorrect***. As will be seen below, this is the procedure that was followed with every overdue rental report at issue—it is not an anomaly.

Hertz knows within a day or two whether its charge was successfully put through, and it also knows that most charges are successful. Yet, in each of our cases, Hertz conveys to the police that the rental payment has not been made.

## III.   THE EVIDENCE SHOWS THAT HERTZ CHARGES THE CUSTOMER AFTER THE POLICE REPORT IS DELIVERED

There is overwhelming proof that Hertz is submitting police reports which omit any mention of its receipt of renter payments.

**First,** policy W7-02(D) spells out that theft reports (which are based on the information in Hertz's theft package) are to be completed and delivered to the police ***before*** the rental is closed out and the customer's account is charged.

**Second**, the theft packages that we have seen simply fail to communicate that the renter has paid for the rental, or that a charge is pending. In fact, it is improbable that any theft package contains such information, because W7-02(D) dictates that the package is to be printed out and delivered to the police before the customer's card is charged.

**Third**, we have not identified any document in Hertz's productions where Hertz advised the police that it had charged the customer's card, or that a charge was going to be made or was pending.

**Fourth**, the standard theft package contains a billing summary page which states that the renter owes a "net due" amount:



| VEH LIC COST RECOVERY | 92.96 |
|---|---|
| NET DUE | 2309.44 |
| GPR POINTS | 2,068 |

*See* Hertz00009 (Ayoub), 328 (Person), 532 (Stevens), 978 (Young), 1100 (Channell), 1320 (Fernandez), 1340 (Higgs), and 1741 (Sterlin). In all of these cases, the renter's account was charged after the theft report was printed out and taken to the police, but the police report was never supplemented to reflect the charge. For these renters, there was no "Net [amount] Due," contrary to the information Hertz provided to the police.

**Fifth**, the standard theft package contains an overdue rental print out which states that the charge to the renter's card was "denied:"

| Credit Card # | FOP | FMT | Restr? | Aprv Stat |
|---|---|---|---|---|
| XXXXXXXXXXXX4306 | MC | LB | N | DENIED |

*See* Hertz000013 (Ayoub), 130 (Junious), 353 (Person), 443 (Stepanyan), 497 (Sterlin), 521 (Stevens), 966 (Young), 1042 (Burnside), 1095 (Channell), 1177 (Collins), and 1376 (Higgs). In fact, this "denial" refers to Hertz's attempts to place an authorization hold on the credit card during the rental. The fact that an authorization hold has been denied does not in any way mean that a charge will be denied. In fact, almost all of the charges in our cases were approved. Unfortunately for the Hertz customer, however, the police are under the continuing impression that Hertz has never received payment, because Hertz never advises the police of its post-theft package charge.

Nothing that Hertz has told its attorneys about the post-police report charging procedure comports with Hertz's actual practice or the evidence.

## IV. THE PROSECUTORS AND POLICE CONSIDER PAYMENT TO BE KEY INFORMATION IN ANY CONSUMER THEFT CASE

In any consumer theft case, whether the customer has paid or intends to pay for the services or goods is a critical fact in the probable cause determination, and it provides evidence of the renter's intent to commit theft. It goes without saying that any misrepresentation or omission about payment will seriously affect a customer's rights.

Indeed, as we will show, when the renters present the prosecutor or police with proof of payment, the cases are invariably dropped. The fact that 100% of cases have been dropped after the

customer provides proof of payment (which proof was withheld from police by Hertz) should alert (and should have alerted) Hertz to the gravity of its failure to update the information provided in theft reports. Below are some cases that illustrate the problem with Hertz's practice:

**Burnside** - In this case, a police report based upon the theft package provided by Hertz states: "As of March 27, 2018 Mr. Burnside had not paid for or returned the vehicle to said business." PLT000108. In fact, Burnside had been charged $2,343.02 on March 26, 2018, one day *before* the police report was completed. As in all known cases, Hertz falsely told the police that the renter had not paid and Hertz never corrected this information.

When Burnside was allowed to withdraw his guilty plea, the prosecutor simultaneously nolle prossed the case. She did so stating that there was no probable cause because, after reporting the car stolen, "Hertz subsequently closed out the rental and charged the defendant $2,343.02, which covered the rental cost from December 26, 2017 through March 26, 2018." PLT000125. There is no need to mince words: If Hertz tells the police that the customer owes $2,343.02 and omits that the customer's card has been – or shortly will be – charged, then Hertz has included a material misstatement of fact in its police report.

**Junious** - In the Junious case, both a police report dated March 15, 2018 (PLT000326) and the probable cause declaration dated March 21, 2018 state that "Junious has not made a payment since 01-23-18." PLT000289. Yet Junious had actually been charged $1,375.94 on March 13, 2018. PLT000356.

Not only did Hertz fail to supplement the payment information, but a Hertz employee gave false testimony during the case about that payment. On June 7, 2018, a preliminary hearing was held— while Junious had remained imprisoned since his arrest on May 1, 2018. The topic of payment was a major subject—as it is in all consumer theft cases—and Hertz manager James Nichols testified as follows:

> Prosecutor:      You testified earlier that the due date of the vehicle was January 29th, 2018. Had you received any payment for the vehicle after that date?
>
> Mr. Nichols:     No.

PLT000303-04. Nichols then clarified that State Farm had paid for part of Junious's rental, but reiterated that Junious had never paid anything since January 23, 2018. Put simply, this sworn testimony was false. At best, Hertz employee Nichols was looking at the false theft package and never bothered to actually check Hertz's systems to ascertain whether Nichols had extended the rental or made a payment. Based on Mr. Nichols's testimony, Junious remained in jail another month and his case remained active until November 2018. The case was eventually dropped.

**Young** - Similarly, in the Young case, the police report notes Hertz's claim that Young had not paid for the rental. Hertz000989-90. In fact, Ms. Young's card was overcharged for $3,932.47 (Hertz000951), and Hertz later reduced the amount of these charges. PLT000498.

**Ayoub** - When the prosecutor was approached with proof that Ayoub had extended his rental contract, her first question was whether Ayoub had paid for the rental. PLT000378-80. Upon learning that he had paid for the rental, she dropped the charges within days. *Id.*

There are many other cases where the renter was billed but the authorities were not told, including Johnson, Collins, Stevens, Sterlin, Fernandez, Channell, Jones, Higgs, Williams, Person,

and Essick. In all of these cases (except Jones, Sterlin, and Higgs), the charges were eventually dropped because the prosecutor was shown proof of payment.

## V.   The Grady Case Established that Hertz has Long had Notice of this Payment Issue

This is not the first time that Hertz has been less than forthcoming about its having received payment. In the <u>Grady</u> case tried in September 2017, Hertz's theft package had been printed on July 12, 2013, and Grady's card was charged for $2,445 on July 15, 2013. Grady was reported to the police with an outdated and incorrect theft package on July 22, 2013.

Julie Wilkerson, Hertz's vehicle control supervisor for all of the United States (who sat at the defense table for the entire trial as Hertz's representative), falsely testified during trial that the July 12, 2013 theft package given to the police showed Grady's $2,445 payment:

| | |
|---|---|
| COUNSEL: | Do you believe if there's -- I think you testified if there's omitted facts, they should be corrected, correct? |
| WILKERSON: | Yes. |
| COUNSEL: | Eventually did Hertz become aware of additional facts in regards to Ms. Grady's rental that should have been provided to the police? |
| WILKERSON: | Which facts? |
| COUNSEL: | Well, the payment of $2400. |
| WILKERSON: | **That was actually in the theft package. The police had that information.** |
| COUNSEL: | **The police had that information?** |
| WILKERSON: | **Yes, it's in the billing page of the theft package.** |

Wilkerson Testimony, at pp. 5-6 (emphasis added). This testimony was untrue. Wilkerson supervised Hertz vehicle control for decades, and she was—and is—well aware that a theft package provided to the police never contains payment information for the simple reason that the renter is charged only after the theft package is generated and taken to police. *See* W7-02(D).

When she later tried to repeat her misstatement, she was ultimately forced to admit that her testimony was untrue:

| | |
|---|---|
| COUNSEL: | Ma'am, I'm asking you was 2445 paid, yes or no? |
| WILKERSON: | Yes. |
| COUNSEL: | And that information was never updated to the police, correct? |

| | |
|---|---|
| WILKERSON: | No. |
| COUNSEL: | It was not corrected, correct? It was not updated to the police, correct? |
| WILKERSON: | **They had the information**. |
| COUNSEL: | I'm asking you if the information that it was paid was updated to the police, yes or no? |
| WILKERSON: | **The police actually have the theft package and this was in the theft package**. |
| COUNSEL: | Ma'am, you just identified that that is not a payment for 2445, it's what is owed. Do you understand the difference between -- |
| WILKERSON: | Yes. |
| COUNSEL: | -- money in your bank account -- |
| WILKERSON: | Yes. |
| COUNSEL: | -- and what is owed to you? It's the difference between an asset and a liability, right? |
| WILKERSON: | Yes. |
| COUNSEL: | Okay. Understand the difference? |
| WILKERSON: | Yes. |
| COUNSEL: | You deal with this every day? |
| WILKERSON: | Yes. |
| *COUNSEL:* | *So let's be clear. The police didn't know $2445 was paid before they signed an affidavit of probable cause allowing Ms. Grady to be arrested, correct? Correct, ma'am?* |
| *WILKERSON:* | *Correct.* |
| COUNSEL: | No further questions. |

Wilkerson Testimony, at pp. 54-55 (emphases added).

Note that not only does this show that Hertz knew as of September 2017 that the theft packages do not show payment, and that the police were not being told about renter payments, but Wilkerson's evasive testimony demonstrates that she was always well aware that it is impossible

for theft packages to show renter payments because the renter's credit card is charged after the theft package is generated.

## VI.  CONCLUSION

Payment is the critical factor in any consumer theft report and is obviously the focus of both the police and prosecutors. The denied authorization is what triggers the filing of the theft report, because Hertz fears that it might not get paid and does not want to lose rental income on a car that is outstanding without a good credit card to process payment. Yet, the plain language of Hertz policy W7-02(D) compels results in the delivery of inaccurate information to the police: it requires that the theft report be delivered to police before the customer's credit card is charged. Hertz's failure to advise the police that the rental was paid leads directly to the arrest and prosecution of an innocent individual.

To the police and prosecutors, the theft report indicates that Hertz is still owed a "net due" amount of money for the customer's use of its rental vehicle and that the customer failed to make payment because the card was "denied." However, nothing Hertz provides to law enforcement communicates that Hertz—in practice or in policy—will in fact charge the customer's card for the full amount of money *after it files the police report.* Hertz knows that law enforcement is focused on whether or not the renter has paid for the use of the rental vehicle; it is obviously "convenient," for Hertz's purposes, to shield this information from the authorities.

Never does Hertz tell law enforcement that the renter has a card on file and that Hertz is authorized to use and charge the card for the full amount of the rental. The fact that a renter has a card on file that acts as a blank check or letter of credit, indicates—at the very least—that the renter does not intend to steal Hertz's car. However, Hertz knowingly omits this payment information and instead misrepresents to the police that a "denied" authorization hold is a "denied" charge for payment of the rental—which it is not.

For this reason, Hertz purposely fails to disclose these facts to police and law enforcement, in effect transforming a civil dispute into a criminal matter, as the police are led to believe that the renter intends to steal the vehicle and has provided Hertz a stolen, fraudulent, or invalid card.

Hertz's omission of payment information confers numerous legal and financial advantages upon Hertz: it enables Hertz to claim that innocent customers are thieves, so that Hertz can use the police as a taxpayer-funded repo service; it allows Hertz to avoid costly arbitration with customers; and it provides the mechanism which ultimately allows Hertz to collect insurance monies (the claim for which requires a police theft report).

In essence, Hertz is getting the monies from the post-police report charge and the full asset value from the insurance claim. It then closes out the rental contract with the accounting department, after having accounted for the income from the post-police report charge and the asset cash value from the insurance claim.

Through practice and policy, Hertz maximizes its income (post-police report charge) and asset value (insurance claim) while reducing prohibitive costs such as private repo and arbitration.

# ATTACHMENT AH



FRANCIS ALEXANDER llc

# Hertz's Failure to Investigate Any Theft Reports Results in Illegal Arrests and Prosecutions

**SOP:**     W7-02 RAC: [SCTY-4.1] - <u>Reporting Vehicle Thefts and Conversions</u>

W7-02(a)(17) – <u>Corporate/County Security Manager Investigations</u>
Every theft/conversion/disappearance must be promptly investigated by the Corporate/Country Security Manager responsible for the location from which the related Theft Vehicle Report is filed. All employees are required to cooperate fully with such an investigation.

**SCOPE:**     This Worldwide Procedure applies to the North American Rent-A-Car (RAC) Division

**COMPLIANCE:**     Location, Maintenance, Area, Country Head Office and OKC Management must ensure compliance with this procedure.

**OWNER:**     High Level Corporate Officers and General Counsel

## I. Introduction

Every rental theft report is based on two main variables: payment and time. The theft packages Hertz provides to the police are unverified in 100% of the cases, because Hertz has failed to follow its very own standard operating procedures. These procedures require an investigation, before the submission of police reports, to verify that the information contained therein is accurate. When Hertz misrepresents one of these variables to the police, the report is already 50% wrong. The failure to investigate means that Hertz routinely misrepresents both variables. The police would never accept and act on these theft reports if they knew that the reports were unverified and that Hertz was habitually violating its own policies.

Hertz policy W7-02(a)(17) mandates that all theft reports be independently investigated and verified by Hertz location corporate security managers. However, in 100% of the cases, Hertz does not perform this required investigation. Multiple Hertz corporate designees testified in the *Grady* case that Hertz corporate has given them "marching orders" that theft packages compiled by Vehicle Control in OKC are to be immediately delivered by location personnel to the police ***with no independent verification*** and no inquiry into whether payment has been made, the vehicle

returned, the rental period extended, the inventory lost, or any other facts that might be critical to the decision to accuse a customer of having stolen a Hertz vehicle.

At a minimum, Hertz should confirm in every case whether payment was made, a rental extension was procured, or whether the car has been returned. What we have learned, however, is that the local security manager does not even perform this minimal check in any of the cases. The failure to perform any investigation as required by Hertz standard operating procedures is inherently designed to result in the unlawful arrest and prosecution of innocent individuals.

Hertz corporate security designee Richard Livingston stated that he and his personnel *are not even given access to rental information in order to allow them to perform a check*, and that in the hundreds of cases he has personally handled he never performed the W7-02(a)(17) investigation. Joseph Jaussi, another designee, has confirmed that Livingston and his assistants do not perform the (a)(17) investigation and that their role is restricted to ferrying theft packages from Vehicle Control to the police. When Hertz vehicle control supervisor Julie Wilkerson testified at trial, she was constrained to admit that Livingston's admissions indicated practices that fell far below Hertz's own policies and procedures.

Although Wilkerson claimed that Livingston and the other CSMs should be performing the (a)(17) investigation—and admitted that not doing so violated Hertz policy—she was providing false testimony at the same time. Hertz's own training manuals, the content of which is controlled and managed by Wilkerson, state explicitly that theft packages prepared by Vehicle Control are to be immediately taken to the police by location staff upon receipt with no (a)(17) investigation—confirming Livingston and Jaussi's testimony.

Compounding matters, W7-02(a)(4) mandates that missing vehicle checklists be completed to insure that all options have been exhausted before the filing of a theft report for overdue rentals and missing inventory. During our recent telephone discussions, Hertz admitted that this procedure is almost never followed. In addition, Hertz is supposed to hire private repo services to find and tow the vehicles well before a police report is filed. Yet, we have been provided no evidence that any such tow companies were hired for the 21 cases we are currently handling.

This means that 100% of Hertz theft reports are unverified. Hertz does not follow its own theft-reporting policies. Had this investigation actually been conducted, most—if not all—of the theft reports we have reviewed would never have been made. This deviation from policy has the effect of transforming a civil payment dispute into a criminal matter. It enables Hertz to claim that innocent customers are thieves, so Hertz can use the police as a taxpayer funded repo service, avoid what would otherwise be a costly and inefficient arbitration process (N.B.: a process that Hertz imposes on its customers) and collect insurance monies (the claim for which requires a police theft report). In essence, Hertz is getting the monies from the forced charge and the full asset value from the insurance claim. It then disposes of the rental contract with its accounting department, after having accounted for the income from the forced charge and the cash value of the vehicle from the insurance claim.

Hertz admitted in the *Grady* trial that the reason for cutting corners on the investigations is to implement cost-cutting measures in its corporate security department. Instead of verifying the theft reports, Hertz is filing the unverified reports and letting the police sort things out—even if innocent customers are jailed and prosecuted in the process.

## II.    IN VIOLATION OF ITS OWN THEFT REPORTING POLICIES, HERTZ HAS ADMITTED THAT IT PERFORMS NO LOCAL INVESTIGATION TO VERIFY THEFT REPORTS

Hertz Theft Reporting Policy W7-02 requires that the corporate security manager for each location investigate each theft report for accuracy:

> Corporate/Country Security Manager Investigations - Every theft/conversion/disappearance must be promptly investigated by the Corporate/Country Security Manager responsible for the location from which the related Theft Vehicle Report is filed. All employees are required to cooperate fully with such an investigation.

*See* Exhibit 1. This is a national policy with which all employees and managers must comply and in which they must participate.

However, Hertz's designee for corporate security testified that he and his office's "marching orders" were to not verify the reports:

| | |
|---|---|
| COUNSEL: | Is it your testimony that you don't go to the location and question any of the Hertz employees when you receive a theft package? |
| MR. LIVINGSTON: | That's my testimony, yes. |
| COUNSEL: | Why? |
| MR. LIVINGSTON: | Because I mean the package has been completed, all the reports have been reviewed, I guess, by OKC. **And my marching orders are to report the car stolen** when I get the -- again, I do look at it for everything being accurate, as far as I can tell, within the report itself. |
| COUNSEL: | Yeah. *But you don't do any independent investigation?* |
| MR. LIVINGSTON: | *I do not.* |
| COUNSEL: | *You don't do any check?* |
| MR. LIVINGSTON: | *I do not.* |

Exhibit 2 - Livingston Testimony, at p.194-96, 115-117 (emphasis added) (objections omitted). This was confirmed by another designee, a manager for the company:

| | |
|---|---|
| COUNSEL: | We deposed Mr. Rich Livingston Tuesday. He indicated that he doesn't put the package together. He just gets it from Oklahoma City and then basically just couriers it to the police. Is it your understanding that the corporate security manager or assistant corporate security manager actually puts the theft |

|  | package together? Or is it your understanding that the theft package is put together in Oklahoma City and then sent to the corporate security manager at the location where the car was allegedly taken from? |
|---|---|
| MR. JAUSSI: | *So it's my understanding that Oklahoma City generates the packet and all the pertaining documents within it, feeds Ken Graeber or Rich Livingston, right, and Ken Graeber or Rich Livingston essentially print, file, and go seek a police report claim or case number.* |
| COUNSEL: | Okay. *So the theft package is already completed in Oklahoma City before it's sent to the corporate security manager at the Hertz location* where the car was allegedly taken from, correct? |
| MR. JAUSSI: | *That's my understanding, correct.* |

*See* Exhibit 3 - Jaussi Testimony, at pp. 69-70 (emphases added) (objections omitted). According to Livingston, corporate security personnel do not even have access to rental information to verify the accuracy of theft reports:

| COUNSEL: | Do you have access to phone logs to determine when a renter called in? |
|---|---|
| MR. LIVINGSTON: | I do not. |
| COUNSEL: | Do you have access to any kind of logs that determine the contacts the renter had with Hertz? |
| MR. LIVINGSTON: | Do not. |

Exhibit 2, at p. 205. He also confirmed he does not attempt to ascertain whether a customer was billed, nor does he engage in any discussion with the location employees about the rental or the renter.

Hertz's recent production contains the "marching orders" Livingston and Jaussi testified about, which mandate that the W7-02(a)(17) investigation not be performed:

d.  Renting Location Responsibilities

    1)  Immediately report the theft to local law enforcement upon receipt of the theft package.

Hertz001485. This practice stands in stark contrast to the requirement of W7-02(a)(17).

Julie Wilkerson, Hertz's national supervisor for Vehicle Control (and trial designee), dissembled about whether Hertz expects its corporate security managers to conduct a local investigation:

| COUNSEL: | In fact, this is a procedure [W7-02(a)(17)] that you follow to make sure that innocent people aren't wrongfully arrested for accidental reporting to the police, correct? |
|---|---|
| WILKERSON: | Correct. |
| . . . . | |
| COUNSEL: | Now, it says here that the question was asked of [Livingston] or anyone working for him or working with him, if they did any check and his response was no, not on his side of the fence. Do you see that? |
| WILKERSON: | I do see that. |
| COUNSEL: | Now, you just testified that he would have checked the computer system of some sort, right? |
| WILKERSON: | *He should have checked the computer system.* |

Exhibit 4 - Wilkerson Testimony, at pp. 37-46 (objections omitted) (emphases added). In fact, Hertz had told Livingston and all other US personnel not to check the computer system nor do any other sort of investigative check.

She was then constrained to admit that the failure to conduct local investigations violated Hertz's policy W7-02(a)(17) in thousands of cases.

| COUNSEL: | How many theft reports have come out of Philadelphia? |
|---|---|
| MR. EDELSTEIN: | When? |
| COUNSEL: | In 2013-2014, ma'am. |
| WILKERSON: | A lot. |
| COUNSEL: | A lot? |
| WILKERSON: | Yes. |
| COUNSEL: | And what would you say? |
| WILKERSON: | Maybe 2000. |
| COUNSEL: | *Do you know – excuse me. Mr. Livingston testified that he's gone into court and handled about 400 of these and he's never done a local investigation to determine the truth and veracity of those theft packages?* |
| WILKERSON: | No, I didn't know that. |

| COUNSEL: | *That would fall well below the policies and procedures of even Hertz Corporate policies, correct?* |
| WILKERSON: | *Yes.* |

Exhibit 4 - Wilkerson Testimony, at pp. 37-46 (objections omitted) (emphases added). In fact, Hertz's own training manuals instruct vehicle control and corporate security employees ***not*** to do the investigation. In any case, Hertz has known about the issue since at least 2017 but has done nothing to correct the problem.

Essentially, Hertz has W7-02(a)(17) in place as window dressing so it can point to the policy and claim that it has a rigorous theft reporting process if anyone inquires—exactly as Hertz did on the first phone call with its Power Point presentation. In reality, Hertz actively disregards this policy which is supposed to safeguard against false reports.

## III. Hertz Does Not Complete Required Missing Vehicle Checklists, Nor Does It Hire a Private Towing Service During the Theft Reporting Process

In addition to performing no local investigation, Hertz cuts other corners in the theft reporting process. For instance, W7-02(a)(4) mandates that a missing vehicle checklist be completed before reporting all overdue rentals or missing inventory. In fact, Hertz presented a Vehicle Control checklist to us in its initial Power Point presentation. Yet no checklists have been produced by Hertz, and Hertz admitted on our recent phone calls that a checklist is almost never filled out by Hertz. This failure constitutes yet another violation of Hertz's policies and provides another indication that many of Hertz's rigorous investigative steps exist only on paper.

Furthermore, Hertz's documents are replete with references to hiring a private repo service to find and tow the vehicle as part of an exhaustive process aimed at avoiding the preparation and delivery of a theft report. Hertz's policies provide that if a car is recovered, then the car is no longer overdue and the matter is concluded. Yet, not a single record has been produced by Hertz showing a private tow company was ever hired to locate and tow the vehicle before the filing of a theft report, despite the fact that many of the vehicles in question were equipped with OnStar.

## IV. Hertz's Motives - Profits and Cost Savings

Like any corporation, Hertz is motivated to cut costs while increasing profits—but it should not do so at the expense of basic human rights. Hertz's designee testified that Hertz was engaging in "cost savings" in the corporate security area in 2015:

| COUNSEL | Okay. Do you understand the circumstances regarding [another corporate security manager] being laid off? |
| MR. LIVINGSTON | My understanding was, it was just a corporate decision to lay off a large group of people at that time for cost savings. |

Exhibit 2 - Livingston Testimony, at p. 54. Hertz stipulated at trial that Hertz had implemented layoffs in corporate security for cost savings in 2015:

| | |
|---|---|
| COUNSEL: | [A corporate security manager] was let go, according to Mr. Livingston's testimony, because Hertz wanted to cut costs. Do you remember that? |
| WILKERSON: | No. |
| COUNSEL: | Well, let's pull it up. |
| MR. EDELSTEIN: | *We'll stipulate that was the testimony, Judge.* |
| THE COURT: | *It's been stipulated to. All right.* |
| COUNSEL: | Hertz Corporation wanted to cut the costs so they let Mr. Graeber go, correct? |
| WILKERSON: | If you say-so, yes. |
| COUNSEL: | And by doing that, they're basically cutting cost at the local investigation -- at the local investigation preventing innocent people from being accused of car theft, correct? |
| MR. EDELSTEIN: | Objection, Your Honor. |
| THE COURT: | Sustained. |

Exhibit 4, at pp. 44-45.

Hertz knows that were it to actually adhere to its own rigorous policies and verify the tens of thousands of police reports it makes across the United States, the result would be the investment of enormous amount of time and money. This is apparently why Hertz does not comply with W7-02 and do a local investigation, complete the checklists, or hire a private repossession service; it is apparently why W7-02(D) is written to require that Hertz employees charge the customer's credit card after the theft package is delivered to the police.  Hertz's actual practice is to file unverified reports omitting critical payment information: this allows Hertz to pass off its inventory control costs to the police, prosecutors, and courts.

Hertz receives the following benefits as part of its scheme:

- Hertz can avoid hiring corporate security personnel to investigate purported thefts
- Hertz does not have to pay existing corporate security personnel to investigate and complete theft reports
- Police recover the car for Hertz so it can rent it out again
- Hertz charges the customer for the rental but does not tell the police
- Hertz gets restitution from the prosecution of the customer

- Hertz files an insurance claim for the "stolen" car and receives full cash value for the asset.
- Hertz does not have to engage in costly, time-consuming, and inefficient arbitration in thousands of cases around the country

## V. Due to Lack of Investigation, All Theft Reports are Unverified and False, and Adversely Affect All Customers

As noted, in 100% of the cases Hertz performs no local investigation. What this means is that in almost all cases the theft report is incomplete, out of date, and materially inaccurate.

The lack of investigation is particularly acute in the lost inventory cases, where Hertz lost track of vehicles, reported them stolen, and then rented these "stolen" vehicles to unsuspecting customers. It is obvious that, had Hertz conducted a local investigation, the arrests arising from vehicles "lost" by Hertz would have been prevented.

Furthermore, in almost all cases of alleged overdue rentals, the lack of investigation resulted in the submission of false police reports that were defective in another way: the reports omit any acknowledgment that the renter had extended his/her contract term, that payment had been made, and/or that there had been verbal contact and interaction with the customer. Some examples are:

- **Ayoub** - Lack of investigation resulted in failure to ascertain multiple extensions; extensive renter contact; payments by the renter; and extensive renter history.

- **Stepanyan** - Lack of investigation resulted in failure to ascertain that Hertz had identified the wrong car on the rental contract, failure to speak with location personnel who knew the last known renter was a faithful customer; failure to contact the last known renter; and failure to realize that Hertz records showed the customer was a frequent renter. Had the vehicle control checklist been utilized (which requires contact with last known renter), the car Stepanyan was driving would never have been reported stolen.

- **Channell** - Lack of investigation resulted in failure to ascertain that renter was actually on a multi-month contract that he was renewing monthly; that payments were ongoing; and that the alleged due date given to the police was contradicted by Hertz's own records. Had the vehicle control checklist been utilized (which requires verification that the renter is not a multi-month contract) the police report should never have been prepared.

- **Stevens** - Lack of investigation resulted in failure to ascertain that car had been towed and was sitting on a lot waiting to be picked up; and that customer's credit card was charged.

- **Higgs** - Lack of investigation resulted in failure to realize that rental extensions had been arranged; extensive customer contact existed; the customer had provided a new credit card to Hertz for the extensions; and payment for the rental was made.

- **Johnson** - Lack of investigation resulted in failure to realize that customer was a longtime Hertz customer; that she had been charged over $3,400 by Hertz and had contacted Hertz about billing issues; that she had been communicating with Hertz about returning the car; and that she and her insurance company had contacted Hertz about the car.

- **Junious** - Lack of investigation resulted in failure to realize that the due date given to police was inaccurate and that the renter had paid, which resulted in a Hertz employee giving false testimony under oath.

Again, in every one of these cases, Hertz simply failed to include in its theft reports any mention of actual payments or verbal contact with the renter. Note that there is ample evidence in the record demonstrating that the renters had contact with various Hertz departments (e.g., Hertz's billing department), but no mention of these contacts appears in the theft package. A local investigation would have revealed these contacts, thereby rendering the resulting police reports inaccurate and unreliable.

## VI. The *Grady* Case Reveals that Hertz Has Not Been Complying with W7-02(a)(17) for Many Years

As the testimony and corporate documents presented above show, it is apparent that location corporate security managers never conduct the (a)(17) investigation mandated by Hertz policy. In fact, according to Richard Livingston, corporate security personnel are not even able to access renter records—in effect, Hertz prevents these personnel from completing the investigation that Hertz policy requires they perform. Exhibit 2, at p.205.

It is also apparent that Hertz corporate has long been aware of this fact, yet Hertz continued to direct employees not to comply with corporate policy, instead passing its recovery costs off on to the police and taxpayers.

Hertz has known for years that its conduct and cost-cutting measures continue to cause serious problems with its theft reporting, but has done nothing to fix these problems.

## VII. Conclusion

Hertz policy requires a local investigation when Hertz believes that a rental has not been timely paid or a car has passed its return date. Yet Hertz instructs its location employees not to investigate and verify theft packages. At a minimum, Hertz should confirm, for every theft report, whether payment has been made, an extension has been procured, or whether the vehicle in question has actually been returned. The failure to perform any investigation as set forth in Hertz's standard operating procedures is inherently designed to secure the arrest and prosecutions of innocent individuals.

The result of these failures is to turn a civil payment dispute (if at all) into a criminal matter. It enables Hertz to claim that innocent customers are thieves, so Hertz can use the police as a taxpayer-funded repo service, avoid arbitration with customers, and collect insurance monies (the claim for which requires a police theft report).

In essence, Hertz is getting the monies from the forced charge and the full asset value from its insurance claim. It then disposes of the rental contract with its accounting department, after having accounted for the income from the forced charge and the cash value of the vehicle from the insurance claim.

# ATTACHMENT AI

The Court of Common Pleas
Montgomery County, Ohio

| | |
|---|---|
| Henry B. Essick III | Civil Action No.: |
| *(1313 Harvard Blvd., Dayton, OH 45406)* | |
| *Plaintiff* | Causes of Action: |
| vs. | 1. Mal. Pros./Abuse of Process |
| | 2. Int. Infl. of Emo. Distress |
| The Hertz Corporation | 3. Negligence/Gross Neg. |
| *(14501 Hertz Quail Springs Parkway, Oklahoma City, OK 73126-9033)*; | |
| Byers Car Rentals, LLC | *Jury Trial Demanded* |
| *(736 West National Road, Dayton (Vandalia) , Ohio  45377)*; | |
| *Defendants* | |

## CIVIL ACTION COMPLAINT

### INTRODUCTION

1.     Plaintiff Henry Essick III was arrested, thrown in jail, and prosecuted by The Hertz Corporation and its franchisee Byers Car Rental LLC (collectively "Hertz") after Hertz falsely reported him to the police for grand theft auto, despite the fact that at all times he was authorized to have the rental, extended the rental, and paid for the rental car in question.

2.     Unfortunately, Mr. Essick was the victim of severe corporate mis and malfeasance. For many years now Hertz has been reporting customers to the police across the nation without verifying whether they have actually stolen cars. In particular, Hertz is egregiously bad at keeping track of whether customers have extended their rentals.

3.     Their computer systems do not communicate between the corporate and branch locations, and the corporate security division is extremely bad at sharing information with the rest of corporate and the locations actually renting the vehicles.

4.     Hertz knows about these failures, but has actually instructed its corporate security employees not to follow its own written policies (which mandate investigations on the local level to confirm whether the car was stolen or the renter has been in touch) which safeguard against false police reports. Hertz has admitted this is because it has been cutting costs and personnel in its corporate security department.

5.     Instead of following its own policies, and taking basic steps to ensure accurate police reports, Hertz has been mass reporting its own customers for theft without verifying

whether they committed a crime because it has made the cold calculation that it is more cost effective to use the nation's police forces, prosecutors, and judges as a taxpayer funded repo service—at the expense of the lives of its innocent customers are caught in the middle.

6.      Several police departments have stopped entering police reports by Hertz in the NCIC due to their lack of reliability.

7.      Mr. Essick is the victim of a nationwide crisis which Hertz has caused and refuses to fix.

### THE INITIAL RENTAL AND EXTENSIONS

8.      Plaintiff Henry B. Essick III is thirty-four year old man living in Montgomery County, Ohio. His wife is named Avone A. Essick, who is thirty-eight years old.

9.      On February 5, 2018, Mr. Essick rented a vehicle from the Hertz Car Rental location at the Dayton International Airport location in Vandalia, OH, while Ms. Essick was present. A rental reservation receipt was sent to Mr. Essick's gmail account. See Exhibit 1.

10.      During the rental, Mr. Essick presented an American Express card, ending in '8053, to Hertz. Hertz used that card to bill the rental. This included initially putting pursuant to the initial rental contract's language: "At the time of rental, an authorization hold in an amount that may be greater than the estimated charges may be secured on the credit/debit card provided, to cover the estimated charges and any additional charges that may be incurred." Exhibit 1 - Initial Rental. It is only after the rental that the charges are actually put through.

11.      The initial rental was until February 12, 2018.

12.      The Hertz Vandalia airport location called on or around February 12, 2018, and asked if the Essicks were going to return or extend the rental. Mr. Essick extended the rental one more week.

13.      After that week, Mrs. Essick then extended the rental until March 2, 2018. At all points the Essicks were in close contact with Hertz, Hertz knew they had the car, and Hertz authorized the Essicks to have the rental.

14.      Specifically, the Essicks spoke with the Vandalia location several times, including most often an employee Mrs. Essick believes was named Tiffany. During this time Ms. Essick told Hertz that the company was holding almost all the available money on the applicable '8053 card in pending charges. The employees said that they could not do anything about that but that once the car was returned a total charge would be put through and the pending/hold charges would disappear.

15.     At no point did any Hertz employee during these phone calls ever inform the Essicks there was a problem with the rental, nor did Hertz ever call (or email) the Essicks about a problem with the rental.

16.     The Essicks returned the rental on the due date of March 2, 2018. On March 5, 2018, Hertz sent them an email stating "Thank you for renting with Hertz. You will find your eReceipt attached for your convenience." See Exhibit 2 - Email and Receipt. The receipt stated that the payment had been made for $566.78. On March 8, 2018, the final bill for $566.78 hit Mr. Essick's card ending in '8053 and all the holds and pending charges disappeared—as the Hertz employees said would happen. See Exhibit 3 - Banking Record.

17.     On March 7, 2018, Mr. Essick received a customer service email from Hertz Rent-A-Car which stated "At Hertz we're committed to making your experience as enjoyable as possible." See Exhibit 4.

18.     On or around March 9, 2018, the Hertz Vandalia location called the Essicks and asked them if they wanted to return the rental or extend it. The person on the phone sounded annoyed and was speaking in a terse, short manner. Ms. Essick informed Hertz that the car had already been returned on March 2, 2018, and that the Essicks had already received a receipt and been billed. The person on the other end did not ask any follow up questions, but instead hung up. At no point were the Essicks told of any problems with the rental.

19.     Again, on March 11, 2018, the Essicks received a customer service email from Hertz asking Mr. Essick to take a customer experience survey.  See Exhibit 5.

### THE FALSE POLICE REPORT AND WRONGFUL ARREST

20.     Despite the fact that Plaintiff had extended the rental, contacted Hertz repeatedly, returned it, and paid for the rental in full, bizarre events were in motion inside Hertz.

21.     Hertz somehow had no idea that Plaintiff had extended the rental until March 2, 2018. Hertz's internal records still said the car was due on February 12, 2018.

22.     Furthermore, despite Hertz sending a receipt for the rental to the Essicks on March 5, 2018, and a customer service survey on March 7, 2018, the Hertz employee who called the Essicks on or around March 9, 2018 appeared to be completely ignorant the car had already been returned.

23.     It is apparent that Hertz does a recklessly poor job of keeping records.

24.     Totally unknown to the Essicks, Hertz reported Mr. Essick for grand theft auto on March 15, 2018, for allegedly stealing the rental car between the dates of February 12 and March 2, 2018. Mr. Essick was indicted on April 9, 2018, unbeknownst to him. Hertz falsely told the

police that they had no contact from the Essicks between February 12 and March 2, 2018. This was completely untrue.

25.     Despite the fact that Hertz had been in contact with the Essicks both during and after the rental, never once had they contacted the Essicks about the car being allegedly stolen or overdue. In fact, they had repeatedly extended the rental for Mr. Essick.

26.     The police report shows that Hertz knew that Mr. Essick had returned the vehicle on March 2, 2018, but still reported him for theft. The fact the car was returned alone shows that he did not have any intent to steal the car, as did the fact that he paid for the rental.

27.     Setting aside that Hertz knew or should have known that Essick had extended his rental, *why was Hertz reporting a customer who had returned and paid for the rental for grand theft auto without even speaking with the renter*?

28.     Simply put, this was not a criminal case and the reporting of Mr. Essick for car theft is inexcusable and was at all points without probable cause.

29.     Hertz's conduct in this matter was negligent, grossly negligent, reckless, intentional, malicious, outrageous, and showcased a manifest indifference to the safety and rights of the Essicks.

30.     On or around April 24, 2018, Mr. Essick and his wife were sitting in a car outside Mr. Essick's father's house. Without warning they were surrounded by police accusing Mr. Essick of grand theft auto and he was hauled off to jail without either Mr. Essick or Mrs. Essick having any idea why.

31.     It must be noted that being arrested for felony grand theft auto is a matter of the utmost seriousness. People die in such situations, especially Black Americans.

### WRONGFUL PROSECUTION AND DISMISSAL OF CHARGES

32.     After being let out of jail on April 27, 2018, the Essicks tried to figure what could have possibly happened, and why Mr. Essick had been falsely accused and arrested for stealing a rental vehicle he had extended, returned, paid for, and obviously never intended to steal.

33.     Due to confusion during the prosecution, the Court actually issued another arrest warrant for Mr. Essick causing him to be jailed yet again for three more days due to Hertz's completely false police report.

34.     At no point was there probable cause for Hertz to report Mr. Essick for any crime or to institute criminal proceedings against him.

35.     Finally, after repeatedly pointing out to the Court that Mr. Essick had rental and credit card records which obviously showed he did not steal the vehicle—and after Hertz refused

to show its face in court to defend the police report it made—the Court dismissed the charges against Mr. Essick on July 24, 2018.

## HERTZ'S LONG HISTORY OF MAKING FALSE POLICE REPORTS

36.     Hertz has known for years that it has a serious problem with false police reports but has done nothing to stop it.

37.     In 2017, Hertz lost two jury trials for falsely reporting customers. One was in Texas, where a jury found that Hertz was liable for malicious prosecution and assessed punitive damages for Hertz's outrageous conduct.

38.     Another was in Pennsylvania, where Hertz also lost a jury trial for malicious prosecution and intentional infliction of emotional distress. After the jury's verdict, the trial judge ruled that Hertz had to also face a punitive damages trial.

39.     There are in fact many, many more customers who were falsely reported around the nation.

40.     Attached to this complaint is a motion for punitive damages from the Pennsylvania case which details with police records from around the nation just how deficient Hertz's conduct has been, that they have known about the issue for years, and that even Hertz's employees admit that the company is doing a poor job keep tracking of vehicles. See Exhibit 7 - Motion for Punitive Damages.

41.     There have been false reports in Pennsylvania, Texas, Kentucky, Florida, Nevada, Arkansas, Wisconsin, Indiana, Ohio, and others.

42.     In a May 2019 ABC 5 news report detailing several Hertz rental failures, Hertz commented that "*Our process for determining when a vehicle is reported stolen has multiple steps to ensure accuracy, and in the rare instance an error within our control has occurred we take responsibility. We conduct thorough investigations and make every effort to remedy the situation. We have consistently made changes to improve our processes and we will continue to do so throughout all areas of our business to provide customers with the exceptional experience they expect from Hertz.*" https://www.news5cleveland.com/news/local-news/investigations/hertz-customers-detained-arrested-after-rental-vehicles-mistakenly-reported-stolen.

43.     All of this is entirely false. Hertz has known for years that it has this problem, and its only response has been to ignore the situation. It has plainly made the calculation that the money saved by mass reporting customers and having the police return the vehicles, far outweighs the costs it will incur from it falsely reporting customers.

44.    As a direct and proximate result of Defendants' acts and omissions, Plaintiff has incurred severe and substantial damages and actual harm. These damages include but are not limited to:

    a.    Monetary damages

    b.    Attorneys' Fees for a Criminal Attorney

    c.    Severe mental distress, as well as severe emotional distress, mental suffering, mental anguish, sleeplessness, restlessness, anxiety, and depression

    d.    Loss of reputation.

    e.    Loss of the time he spent unjustly incarcerated.

    f.    Harm to personal, social, and professional relationships.

    g.    Emotional pain and suffering.

    h.    Lost wages.

*****

# Parties

**Plaintiff Henry B. Essick III**

45.     Plaintiff Henry B. Essick is a citizen of Ohio who resides in Dayton, OH.

**Defendant The Hertz Corporation**

46.     Defendant The Hertz Corporation is a Delaware corporation.

47.     The Hertz Corporation operates a rental car location in Dayton (Vandalia, OH) at the Dayton International Airport.

48.     The Hertz Corporation is liable to Mr. Essick on all claims both directly for its own conduct as its highly flawed corporate systems and policies were used to falsely report Mr. Essick for car theft, and also because it is vicariously liable for the actions of its franchisee.

49.     The Dayton location is technically a franchisee of the corporation. However, Hertz is liable for the conduct of this franchisee, as a franchisor, due to its close control over the day to day operations of the franchisee.

50.     This control includes:

    a.  standardized employee hiring policies,

    b.  standardized and required training by The Hertz Corporation for franchisee employees,

    c.  company-wide standards for car rental,

    d.  company-wide standards for reporting cars stolen, including W7-02;

    e.  company-wide standard hours of operation and staffing,

    f.  company-wide customer service policies and systems;

    g.  the use of national corporate systems, policies, and software—and personnel—to rent cars, keep track of inventory, and make police reports.

    h.  standardized appearances of vehicles, employee uniforms, and buildings,

    i.  a mandated electronic communication system,

    j.  company-wide strict rules of operation,

    k.  the ability to cancel franchise agreements if rules are violated,

    l.  the right to regularly inspect franchisees, and

    m.  franchisee must adhere to Hertz national price guidelines.

**Defendant Byers Car Rental LLC**

51.    Upon information and belief, defendant Byers Car Rental LLC is a franchisee of defendant The Hertz Corporation and operates a rental car service at the Dayton International Airport.

*****

# Jurisdiction & Venue

52.     Jurisdiction over the parties in the Courts of the State of Ohio is proper because Defendants have overwhelming jurisdictional contacts in the State of Ohio by virtue of carrying on of a continuous and systematic part of its general business within this State. Defendants transacted business in this State and caused harm and compensable injury to Plaintiff by acts or omissions committed in State that are the subject of the present complaint.

53.     Venue is proper in the Montgomery County Court of Common Pleas under Ohio Rule of Civil Procedure 3 inasmuch as Defendants reside in and regularly conduct business in Montgomery County, and inasmuch as the cause of action arose and/or a majority of the harm, occurrences, and transactions regarding Plaintiff's cause of action arose and/or took place at least in part in Montgomery County.

*****

# COUNT I – Malicious Prosecution/Abuse of Process

*Henry B. Essick III*

*v.*

*The Hertz Corporation; Byers Car Rental LLC*

54.    Plaintiff incorporates by reference and realleges the preceding paragraphs of this complaint.

55.    The elements of malicious prosecution are that Defendants (1) maliciously instituted prior proceedings against the plaintiff by Defendants, (2) Defendants lacked probable cause to initiate proceedings against, (3) termination of the prior proceedings in plaintiff's favor, and (4) seizure of plaintiff's person or property during the course of the prior proceedings.

56.    A defendant is liable for abuse of process when the proceedings are used by the Defendants for a purpose or objective other than bringing the person to justice.

57.    Defendants initiated criminal proceedings against Plaintiff on or around March 15, 2018, by filing a false criminal complaint against Plaintiff with the Dayton Police Department, alleging that Plaintiff had stolen a car from Defendants from the period of February 12, 2018 to March 2, 2019.

58.    As a direct and eminently foreseeable result, Plaintiff was arrested and imprisoned two different times, while being prosecuted as a result of Hertz's actions. The charges were dismissed in plaintiff's favor on July 24, 2018.

59.    The initiation of the criminal proceedings against Plaintiff by Defendants was done without probable cause as Defendants knew that Plaintiff had a valid rental contract, had extended the rental with Defendants, that he had paid for the rental, and that he was otherwise authorized to be driving the car.

60.    Defendants acted maliciously and/or for a purpose other than bringing plaintiff to justice as they knew or should have known when they filed the criminal complaint against Plaintiff that he was authorized to use the car and had not stolen it.

61.    Hertz knew that Plaintiff and his wife had extended the rental with Hertz until March 2, 2018, returned the rental on March 2, 2018, and paid all bills charged by Hertz for the rental.  Plaintiff and his wife repeatedly spoke with Hertz during and after the rental and were never informed that anything was wrong.

62.    Hertz is not using the criminal justice system for the legitimate purpose of bringing an alleged criminal to justice, but instead as a free taxpayer funded repo service to cut

costs. Hertz knows that it has routinely been falsely reporting customers for theft, but has taken no steps to correct the problem.

63.    Defendants made this false complaint carelessly and/or negligently and/or recklessly and/or knowingly and/or intentionally and/or maliciously. Hertz failed to follow, and in fact deliberately disregarded, its own basic standard operating procedures and protocols designed to prevent false police reports, including Hertz national policy W7-02.

64.    Defendants' failure to withdraw the criminal complaint they initiated against Plaintiff was careless and/or negligent and/or reckless and/or knowing and/or intentional and/or malicious.

65.    As a direct and proximate result of Defendants' conduct in initiating a criminal complaint and failing to withdraw the criminal complaint as set forth above, Plaintiff has suffered severe damages, including but not limited to monetary damages, severe emotional distress, mental suffering, mental anguish, sleeplessness, restlessness, anxiety, and depression.

66.    As a direct and proximate result of Defendants using the criminal justice system for an objective other than bringing Plaintiff to justice, Plaintiff has suffered severe damages, including but not limited to monetary damages, severe emotional distress, mental suffering, mental anguish, sleeplessness, restlessness, anxiety, and depression

67.    Plaintiff also requests punitive damages due to the outrageous behavior of Hertz, its reckless disregard for Plaintiff's rights and life, and because Defendants have had years of notice that the company is wrongly reporting innocent customers for car theft but has done nothing to fix the problems but instead continued to make false and unverified police reports.

*****

# COUNT II –        Intentional Infliction of Emotional Distress

*Henry B. Essick III*

*v.*

*The Hertz Corporation; Byers Car Rental LLC*

68.    Plaintiff incorporates by reference and realleges the preceding paragraphs of this complaint.

69.    The elements of intentional infliction of emotional distress are that Defendants (1) acted intentionally or recklessly, (2) acts and omissions were extreme and outrageous, (3) Plaintiff suffered severe emotional distress, and (4) Plaintiff's emotional distress was a result of Defendants' conduct.

70.    Defendants initiated criminal proceedings against Plaintiff on March 15, 2018, by filing a false criminal complaint against Plaintiff with the Dayton Police Department, alleging that Plaintiff had stolen a car from Defendants from the period of February 12, 2018 to March 2, 2019.

71.    As a direct and eminently foreseeable result, Plaintiff was arrested and imprisoned two different times, while being prosecuted as a result of Hertz's actions.

72.    This initiation of the criminal proceedings against Plaintiff was done without probable cause as Defendants knew that Plaintiff had a valid rental contract, had extended the rental with Defendants, knew that he had paid for the rental, and knew that he was otherwise authorized to be driving the car.

73.    Defendants acted maliciously and/or for a purpose other than bringing plaintiff to justice as they knew or should have known when they filed the criminal complaint against Plaintiff that he was authorized to use the car and had not stolen it.

74.    This includes because Plaintiff and his wife extended the rental with Hertz until March 2, 2018, returned the rental on March 2, 2018, and paid all bills charged by Hertz for the rental.

75.    Defendants made this false complaint recklessly and/or knowingly and/or intentionally and/or maliciously.

76.    Defendants' failure to withdraw the criminal complaint they initiated against Plaintiff was careless and/or negligent and/or reckless and/or knowing and/or intentional and/or malicious.

77.    As a direct and proximate result of Defendants' conduct in initiating a criminal complaint and failing to withdraw the criminal complaint as set forth above, Plaintiff has

suffered severe damages, including but not limited to monetary damages, severe emotional distress, mental suffering, mental anguish, sleeplessness, restlessness, anxiety, and depression.

78.     Defendants' failure to withdraw the criminal complaint they initiated against Plaintiff was intentional and/or reckless.

79.     The acts and omissions of Defendants were extreme and outrageous in a civilized society.

80.     The use of the criminal justice system is of the utmost seriousness and innocent individuals who have done nothing wrong should not be thrown in prison without warning and prosecuted for felonies, nor should their name be associated with extremely damaging felonious charges they did not commit.

81.     Plaintiff suffered severe damages as a result of Defendants' conduct, including in initiating the criminal complaint and also in failing to withdraw the criminal complaint.

82.     As a result of the intentional and/or reckless conduct of Defendants, punitive damages are demanded of all defendants, individually and collectively.

*****

## **COUNT III –    Negligence/Gross Negligence**

*Henry B. Essick III*

*v.*

*The Hertz Corporation; Byers Car Rental LLC*

83.     Plaintiff incorporates by reference and realleges the preceding paragraphs of this complaint.

84.     The elements of negligence are that Defendants (1) duty, (2) breach, (3) causation, and (4) damages.

85.     The defendants in this action owed Plaintiff a duty not to falsely report him to the police because they rented him the car at issue, and because it was foreseeable that filing a false police report that he stole the car would result in damages.

86.     At all points Defendants had notice that they had a serious problem with making false police reports, and tracking car rentals accurately, but at no point corrected these issues or ceased making the reports.

87.     The defendants in this action breached the duty of care when they reported Plaintiff to the police for grand theft auto, despite knowing or should have knowing that Plaintiff had extended the rental until March 2, 2018, had returned the car on March 2, 2018, had paid for the car on March 5, 2018, and had multiple conversations with Hertz personnel both during and after the rental. At no point was Plaintiff ever informed of any problems with the rental despite Hertz having and calling his phone number, and despite Hertz having and using his email address.

88.     The conduct of Defendants was not only careless, but also malicious, reckless, willful, wanton, and demonstrated a total indifference to the lives of Defendants' customers including Plaintiff. Defendants exhibited a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm.

89.      Due to Defendants tortious conduct and omissions, they directly and/or proximately caused him monetary damages, falsely arrested him, falsely imprisoned him, and falsely prosecuted him. He has been falsely labeled a car thief, and has suffered severe emotional distress, mental suffering, mental anguish, sleeplessness, restlessness, anxiety, and depression.

90.     Due to the outrageous, malicious, reckless, and intentional nature of Defendants' conduct, punitive damages are requested.

*****

## **RELIEF REQUESTED**

**WHEREFORE**, Plaintiff demands judgment in its favor and against Defendants, jointly and severally, on all counts and claims compensatory damages in an amount in excess of this court's jurisdictional limitations, thereby guaranteeing Plaintiff a jury trial, exclusive of interests and costs, and an award of punitive damages, as well as prejudgment interest, post judgment interest, delay damages, costs, and such equitable relief as the Court deems necessary; and requests that this Court determine and declare that Plaintiff be awarded for all counts:

a.    Compensatory damages, inclusive of any and all harm attributable to Defendants' actions or inaction;

b.    Punitive damages to punish the Defendants for their outrageous conduct, self-interest, and duplicitous behavior;

c.    Exemplary damages to set an example for others;

d.    Attorneys' fees and court costs;

e.    the loss of time and opportunity;

f.    Delay damages; and

g.    Such other and further relief and/or equitable relief that this Court deems just and/or necessary.

*****

*Respectfully submitted,*

WALTON + BROWN, LLP
/s/_____
Sean L. Walton, Jr. Esquire
395 E Broad St #200,
Columbus, OH 43215
T: (614) 636-3476
*Law Firm/Lawyer for Plaintiff*
/d/  July 24, 2019_____


FRANCIS ALEXANDER, LLC
/s/_____
Alfred J. Fluehr, Esquire
PA. Attorney ID No.:  316503
280 N. Providence Road | Suite 1
Media, PA 19063
T:  (215) 341-1063
F:  (215) 500-1005

*Law Firm / Lawyer for Plaintiff*
*Moving for Pro Hac Vice Admission*
*/d/   July 24, 2019_____*

## SPOLIATION NOTICE -- PRESERVATION OF EVIDENCE

Plaintiff hereby demands and requests that Defendants take necessary actions to ensure the preservation of all documents, records, communications, whether electronic or otherwise, items and things in their possession or control, or any entity over which any party to this action has control, or from whom any party to this action has access to, any documents, items, or things which may in any manner be relevant to or relate to the subject matter of the causes of action and/or the allegations of this complaint.

# JURY TRIAL DEMAND

Plaintiff hereby demands a 12-person jury trial.

*****

*Respectfully submitted,*

WALTON + BROWN, LLP

*/s/*_____
Sean L. Walton, Jr. Esquire
395 E Broad St #200,
Columbus, OH 43215
T: (614) 636-3476
*Law Firm/Lawyer for Plaintiff*
*/d/  July 24, 2019*_____

FRANCIS ALEXANDER, LLC

*/s/  AJ Fluehr*_____
Alfred J. Fluehr, Esquire
PA. Attorney ID No.:  316503
280 N. Providence Road | Suite 1
Media, PA 19063
T:  (215) 341-1063
F:  (215) 500-1005
*Law Firm / Lawyer for Plaintiff*
*Moving for Pro Hac Vice Admission*
*/d/  July 24, 2019*_____

# CERTIFICATE OF SERVICE

I hereby state that a true and correct copy of the foregoing CIVIL ACTION COMPLAINT will be served by personal service:

The Hertz Corporation
14501 Hertz Quail Springs Parkway,
Oklahoma City, OK 73126-9033

Byers Car Rental, LLC
736 West National Road
Dayton (Vandalia), Ohio  45377

*****

*Respectfully submitted,*

WALTON + BROWN, LLP
*/s/*_____
Sean L. Walton, Jr. Esquire
395 E Broad St #200,
Columbus, OH 43215
T: (614) 636-3476
*Law Firm/Lawyer for Plaintiff*
*/d/ _July 24, 2019_____*


FRANCIS ALEXANDER, LLC
*/s/ AJ Fluehr_____*
Alfred J. Fluehr, Esquire
PA. Attorney ID No.:  316503
280 N. Providence Road | Suite 1
Media, PA 19063
T:  (215) 341-1063
F:  (215) 500-1005
*Law Firm / Lawyer for Plaintiff*
*Moving for Pro Hac Vice Admission*
*/d/  July 24, 2019_____*

# ATTACHMENT AJ

In the Circuit Court of the Thirteenth Judicial Circuit in and for
Hillsborough county, Florida

| | Civil Action No.: |
|---|---|
| Brent D. Williams, Sr. | |
| *Plaintiff* | |
| vs. | Causes of Action: |
| | 1. Malicious Prosecution |
| The Hertz Corporation; | 2. Abuse of Proc. |
| | 3. Int./Neg. Infl. of Emo. Dist. |
| Mark Paul Frissora; | 4. Negligence/Gross Negligence |
| Julie Wilkerson | |
| *Defendants* | *Jury Trial Demanded* |

# Civil Action Complaint

## Introduction

1.     Defendant The Hertz Corporation has been falsely reporting untold numbers of customers for car theft, throwing them in jail on felony charges for months, prosecuting them, causing them to lose their jobs, giving them criminal records, losing their homes, and separating them from their family and loved ones. These customers have paid for their cars and are authorized to use the rentals.

2.     The company's computer and inventory tracking systems are broken. However, the top corporate officers have decided that verifying theft reports, and fixing their computers, would be too expensive.

3.     Defendant Hertz has instead decided—at the very highest level—to mass report its own customers to the police without verification, effectively using the police, criminal justice system, and taxpayers to subsidize inventory control for a private corporation.

4.     This plan is as brilliant as it is evil, saving the company millions upon millions of dollars it would otherwise have to spend updating its broken systems and paying corporate security personnel to verify the thousands of theft reports it makes.

5.     As a result of this routine and systemic mass reporting, without verification or investigation, many innocent customers have been wrongfully detained, arrested, thrown in prison, prosecuted, and had their lives destroyed.

6.     This is not some sort of error. The company and its leadership have known about these problems for many years after customers and police agencies notified Hertz corporate

about these serious issues. Hertz did nothing to address these problems, instead deliberately placing the Almighty Dollar before the lives and safety of their customers, including Plaintiff.

7.    Hertz has even been sued and lost lawsuits for intentional infliction of emotional distress and malicious prosecution for the same conduct at issue in this case—but has continued to falsely report customers for theft, calculating that it will make more money if it does not fix the problem.

8.    Plaintiff Brent D. Williams, Sr. was arrested, thrown in jail, and prosecuted by defendant The Hertz Corporation in 2015 after being falsely reported for stealing a car he had rented in 2007. He spent one month in prison, and another hellish 10-day van ride from Pennsylvania to Tampa, FL where Hertz had filed the case against him.

9.    Hertz and its employees falsely and incompetently told the police in 2007 that Plaintiff had stolen the car when he actually paid $6,000 for the rental and was always authorized to use the car.

10.    When he was arrested and appeared in court in 2008, Hertz never showed up and he thought the matter was essentially over. To his shock, Hertz had never dropped the case and seven years later he was held in prison *for over one month* in 2015. When it finally came time for the first hearing, the case was nolle prossed because Hertz failed to show and no paperwork existed to demonstrate what he was being accused of.

11.    As a result of Hertz's ongoing malfeasance, Hertz recklessly filed a materially false and erroneous police report against plaintiff Williams—failing to even do a minimal amount of fact checking before reporting him—showing a wanton and cruel indifference to Plaintiff's rights.

12.    In addition to damages, Mr. Williams is requesting that this Court enter an injunction prohibiting Hertz from renting cars to the maximum extent of the Court's jurisdiction, until the Hertz Corporation addresses and fixes this nationwide scandal which is destroying the lives of Hertz's unsuspecting, innocent customers.

## PLAINTIFF RENTS A CAR IN TAMPA, FL

13.    Plaintiff Williams had been renting from Hertz since 2000, often renting cars for 1.5 months or more because his job involved a good deal of travel. He supervised 35 employees for a company which sold magazines. He had no problems with Hertz during this time period.

14.    All of this changed in 2007 or 2008 when he rented a Shelby GT convertible from the Hertz Tampa Airport location for work all around Florida. At the Tampa location the original rental rate was $900 but he was given a deal by a female representative for $600 per week.

15.     As he always did, he gave Hertz a valid credit card—a Visa - Wachovia (First Union)—to be charged for the rental. Hertz also had his phone number, the same one that he had always given Hertz for the previous seven years.

16.     Plaintiff had the rental for around 1.5 months. At one point, he parked the rental at the Orlando airport since he needed to travel back to Pennsylvania for the birth of his child. Upon arriving in Philadelphia and going to Hertz to rent another car, the representative told him he was a on a "do not rent" list.

17.     Mr. Williams informed her that there must be a mistake because he was in the middle of a Hertz rental in Florida. The representative then rented him a car so he could see the birth of his child.

18.     Following a few weeks stay in Pennsylvania, he traveled back to Orlando and resumed driving the Shelby GT convertible around Florida. At no point during this time did he receive a call from Hertz regarding his Florida rental.

### HERTZ REPORTS PLAINTIFF FOR CAR THEFT WITHOUT PROBABLE CAUSE THEN FAILS TO APPEAR AT HIS COURT HEARING

19.     When he was driving in Monroe County for he was pulled over and to his shock arrested for car theft. Unbeknownst to him, Hertz had reported the car stolen and falsely claimed he had not paid for the rental.

20.     He was utterly baffled. His credit card had been charged by Hertz for $6,000, and he was a longtime customer.

21.     He was held for the night and then released on bail. One of his employees had to bail him of jail, which was humiliating and hard to explain.

22.     Mr. Williams then called Hertz corporate for an explanation. He spoke with a man he believes was named Leo or Lou Getz who worked at Hertz's Oklahoma City corporate office. Mr. Williams explained that he was a longtime customer and that he paid Hertz a huge amount of money for the rental; he explained that this was obviously a mistake. This man, possibly an attorney, stubbornly told Mr. Williams that Hertz did not care and would prosecute him anyway—although for what and why was unclear.

23.     A few weeks later Mr. Williams had to fly back to Monroe County for the court hearing, however, no one from Hertz showed up and he received no more notices from the courts concerning the case.

24.     Around the time of that hearing Hertz kept calling Plaintiff asking where the Shelby GT rental car was located, despite the fact that it was seized by police.

25.     For some reason Hertz could correctly dial his number after they arrested him, but could not call his phone during the rental before they reported him to the police. It was apparent to Mr. Williams that the company was taking a recklessly "report first, figure it out later" approach..

26.     In fact, by complete coincidence, Mr. Williams knew where the Shelby rental was located. When he was flying into Miami for the Monroe County court hearing, Mr. Williams saw the same Shelby he rented sitting *at the Hertz location at the Miami Airport*, presumably where the police had had the car towed after he had been arrested.

27.     Egregiously, Hertz not only reported a paying, valid customer to the police without contacting him, but did not even know that the car they were looking for had been sitting on a Hertz lot for several weeks. The company's record keeping is totally broken.

28.     Despite his anger, Mr. Williams told Hertz that the police had seized the car but that he had seen it at the Miami Airport Hertz location.

29.     To state the obvious: there was never any probable cause to have Mr. Williams arrested nor was there any probable cause to continue with the prosecution once he notified Hertz of the false report.

30.     As a result of Hertz's false police report, his life underwent some significant changes. Most notably he stopped working in a travel heavy job, despite his success, and settled down in Pennsylvania. Being accused of car theft and dragged through the Court system takes a mental and emotional toll.

31.     Unfortunately, this was not the end of his ordeal, and things got much worse.

### HERTZ NEVER WITHDREW THE PROSECUTION - PLAINTIFF WAS ARRESTED AND IMPRISONED FOR OVER ONE MONTH IN 2015

32.     From 2008 to 2015, he thought this incident was over, although he never forgot about it given how he had been treated and jailed like a criminal back in 2008.

33.     It was only in 2015, in Bethlehem, PA that the incident resurfaced.

34.     Plaintiff was arrested by police in Bethlehem who said that there was an active warrant out for his arrest in Tampa, FL for car theft. He was told he was being extradited to Florida.

35.     Plaintiff's bail was set at $50,000, but no bail bondsman would take the case because they were required to transport him to Florida within 72 hours. What this meant is that Plaintiff was effectively being held without bail, unable to be released.

36.     Williams was in disbelief that a car rental he had paid $6,000 for almost a decade ago could result in the Orwellian hell he found himself in.

37.     Hertz was told and given all the information necessary in 2007-2008 to know that the police report was erroneous and false and without probable cause, but did nothing to withdraw the baselessly prosecution in the intervening 8 years.

38.     Absurdly, Williams was held for 1 month in a Pennsylvania prison (in Allentown, PA) for a false 2007 police report that Hertz never pursued in 2007 and 2008—and never withdrew.

HERTZ'S LONG HISTORY OF MAKING FALSE POLICE REPORTS

39.     Hertz has known for years that it has a serious, nationwide problem with false police reports but has done nothing to stop it.

40.     Hertz's top corporate officials have known for years that it has a serious, nationwide problem with false police reports but has done nothing to stop it.

41.     For instance, in 2015 the Louisville, KY airport police informed Defendants that the company was making false police reports in circumstances similar to what happened to Plaintiff. The company did nothing in response.

42.     In 2015 and 2016 customers sued Hertz for malicious prosecution, false imprisonment, and false arrest for the same conduct which caused Plaintiff to be detained in 2017. Again, the company did nothing in response, despite losing two malicious prosecution trials in 2017 and punitive damages being assessed.

43.     Upon information and belief, Hertz has known about the false reporting issues since before 2007 but has done nothing to address the problem.

44.     Note that Hertz's corporate policies *require* that a local investigation be done before any theft report is made to verify that the report is accurate. The policy reads:

> Corporate/Country Security Manager Investigations - Every theft/conversion/disappearance must be promptly investigated by the Corporate/Country Security Manager responsible for the location from which the related Theft Vehicle Report is filed. All employees are required to cooperate fully with such an investigation.

Exhibit 1 - W7-02 RAC(a)(17).[1] An investigation and verification that the report is accurate is also required by Florida law prohibiting false police reports for crimes that do not exist. See Fla. Statute § 837.05.

---

[1] This policy, or one that was substantially similar, was in place in 2007 during Plaintiff's car rental.

45.    Furthermore, the policy states that "Location; Maintenance, Area, Country Head Office and. OKC Management *must ensure compliance to this procedure*." See Exhibit 1, at p.1.

46.    Despite this policy, Hertz's corporate officers have instructed its employees not to follow this policy.

47.    A Hertz corporate designee testified in a Pennsylvania lawsuit that no checks or investigations are ever done at the local, branch level before a police report is filed. <u>See</u> Exhibit 3 - Motion for Punitive Damages [Exhibit 11 to Motion for Punitive Damages, at p.70).

48.    A Hertz corporate security designee further stated that, despite corporate policies, no investigations are performed because of "marching orders" from Hertz corporate:

| | |
|---|---|
| COUNSEL: | Is it your testimony that you don't go to the location and question any of the Hertz employees when you receive a theft package? |
| MR. LIVINGSTON: | That's my testimony, yes. |
| COUNSEL: | Why? |
| MR. LIVINGSTON: | Because I mean the package has been completed, all the reports have been reviewed, I guess, by OKC. **And my marching orders are to report the car stolen** when I get the -- again, I do look at it for everything being accurate, as far as I can tell, within the report itself. |
| COUNSEL: | Yeah. *But you don't do any independent investigation?* |
| MR. LIVINGSTON: | *I do not*. |
| COUNSEL: | *You don't do any check?* |
| MR. LIVINGSTON: | *I do not*. |

Exhibit 3 [Exhibit 8 to Motion for Punitive Damages, at p.252] (emphasis added).

49.    At the trial, the Hertz corporate designee in charge of theft reporting and recovery for the entire company, defendant Julie Wilkerson, was forced to admit that Hertz had egregiously failed to protect its customers:

| | |
|---|---|
| COUNSEL: | And here's what I'm getting at and where I'm going with this, it says near the last line: "Location, maintenance, area, country, head office, and OKC management must ensure compliance with this procedure." Do you see that? |
| MS. WILKERSON: | Yes. |
| COUNSEL: | Is it your job to ensure compliance with this procedure? |

| MS. WILKERSON: | Yes. |
|---|---|
| COUNSEL: | And you're the person in charge of 700,000 cars to make sure as the regulator that these . . . procedures are followed, correct? |
| MS. WILKERSON: | Correct. |
| COUNSEL: | Now, when it says "location," that means in this instance the Philadelphia location, correct? |
| MS. WILKERSON: | Correct. |
| COUNSEL: | **In fact, this is a procedure that you follow to make sure that innocent people aren't wrongfully arrested for accidental reporting to the police, correct?** |
| MS. WILKERSON: | **Correct.** |
| COUNSEL: | And it's important these policies and procedures are followed by Hertz Corporation, correct? |
| MS. WILKERSON: | Correct. |
| COUNSEL: | **And if Hertz doesn't follow this problem -- this procedure, that would be a failure on the part of Hertz, correct?** |
| MS. WILKERSON: | **Correct.** |

See Exhibit 2, at p.28-47 (emphasis added).

50.    Instead of ensuring compliance with this procedure, all Defendants have been deliberately circumventing it—despite it being a safeguard which prevents false reports, such as the one that harmed Plaintiff and her son.

51.    Hertz has admitted this is because it has been cutting costs and personnel in its corporate security department. Mr. Livingston, Hertz's corporate security designee, testified that Hertz, in 2015, had made "**a corporate decision to lay off a large group of people at that time for cost savings**" within the corporate security department. Exhibit 3 [Exhibit 8 to Motion for Punitive Damages, at p.54]). It is the corporate security department that performs the local investigations mandated by W7-02.

52.    On information and belief, Hertz was cutting costs in it security department as early as 2007.

53.    Cutting these positions in corporate security further exacerbated Hertz's failure to comply with W7-02 and other theft reporting policies, and directly signaled that Hertz's top corporate officials had no intent of complying with W7-02. These layoffs were implemented

with the intent and purpose to cut costs and increase profits, at the expense of the lives of their customers.

54.    Instead of following its own policies, and taking basic steps to ensure accurate police reports, Hertz has been routinely mass reporting its own customers for theft without verifying whether they committed a crime because it has made the cold calculation that it is more cost effective to use the nation's police forces, prosecutors, and judges as a taxpayer funded repo service—at the expense of the lives of its innocent customers who are caught in the middle—like Plaintiff.

55.    Attached to this complaint is a motion for punitive damages from the Pennsylvania case which details with police records from around the nation just how deficient Hertz's conduct has been, that they have known about the issue for years, and that even Hertz's employees admit that the company is doing a poor job keeping track of vehicles. See generally Exhibit 3 - Motion for Punitive Damages. Indeed, certain police departments stopped taking Hertz police reports (unless there was an extra level of verification) after a Hertz employee admitted that the company had serious inventory control and tracking issues. Id. [Exhibit 7 to Motion for Punitive Damages].

56.    Since that motion was filed, there have been a steady stream of continuing false reports across the nation, in Pennsylvania, Texas, Kentucky, Florida, Nevada, Arkansas, Louisiana, Virginia, Wisconsin, Indiana, Ohio, California, and many others.

57.    These cases are in many respects almost identical to the false report that resulted in the unjust imprisonment and prosecution of plaintiff Brent Williams.

58.    In a May 2019 ABC 5 news report in Ohio which detailed several Hertz rental failures, Hertz commented that "Our process for determining when a vehicle is reported stolen has multiple steps to ensure accuracy, and in the rare instance an error within our control has occurred we take responsibility. We conduct thorough investigations and make every effort to remedy the situation. We have consistently made changes to improve our processes and we will continue to do so throughout all areas of our business to provide customers with the exceptional experience they expect from Hertz." https://www.news5cleveland.com/news/local-news/investigations/hertz-customers-detained-arrested-after-rental-vehicles-mistakenly-reported-stolen.

59.    All of this is entirely false. Hertz has known for years that it has this problem, and its only response has been to ignore the situation. It has plainly made the calculation that the money saved by mass reporting customers, and having the police return the vehicles, far

outweighs the costs it will incur from it falsely reporting customers and making unverified police reports.

60.    Also in May 2019, ABC Actions News - WFTS out of Florida reported that Hertz was throwing innocent customers in jail and wrongfully prosecuting them. https://www.abcactionnews.com/news/local-news/i-team-investigates/hertz-has-a-pattern-of-mistakenly-reporting-cars-stolen-leaving-customers-arrested-attorney-says.

61.    In May 2018, 6 ABC out of Philadelphia reported that Hertz had wrongfully arrested and imprisoned two customers, one in Philadelphia and another in Wisconsin. https://6abc.com/business/hertz-customers-arrested-after-vehicles-mistakenly-reported-stolen/3487977/.

62.    On information and belief, these problems at Hertz date back to at least 2007. Hertz had effectively the same policies and procedures in place at the time of Plaintiff's rental, the police report, his arrest, and his prosecution.

### HERTZ'S FALSE POLICE REPORT SEVERELY HARMED PLAINTIFF

63.    Spending a month in prison for a crime Plaintiff did not commit was a brutal assault on Plaintiff's mental and emotional health. However, the actual extradition itself was a 10 day nightmare.

64.    For the extradition, Williams was forced to ride in a prison transport van operated by a private company. The van crisscrossed the United States *for ten days* making stops at various prisons.

65.    This ride, for which he shackled next to hardened criminals, was pure torture. The van was disgusting, packed to the gills with 15 grown men.

66.    The shackles dug into his skin and bone and tightened every time he moved. He loathed his prison cell, but even the cell was better than the van ride.

67.    Men who have been sentenced to 10 and 20 years, for crimes such as stabbing, complained that they had never been treated so poorly in the prison system.

68.    Upon arriving in Florida, he sat in a holding cell for a day. The next day he appeared in front of a judge and, to his horror, the judge wanted to keep him in jail. To his relief he was allowed to pay bail of $2,500 and was finally released. His hearing was set for December 17, 2015.

69.    He then had to fly home, and then fly back for the hearing several weeks later.

70.    Yet, when he arrived for the hearing, the prosecutor said he had no idea why the case was still active, that there was no paperwork, and that he did not know why Mr. Williams

was even required to come back to Florida. The charges were nolle prossed on December 17, 2015.

71.     He was bluntly told by everyone involved that what had happened to him was laughable and absurd and that no paperwork even existed to support a prosecution.

72.     Mr. Williams followed all applicable rules and regulations and paid for the car rental as directed by Hertz. He was a regular Hertz customer. For his trouble he was subjected a nightmare spanning almost eight years.

73.     At no point did Hertz withdraw the prosecution or otherwise attempt to exonerate Mr. Williams despite the fact that Hertz was actually notified of the erroneous report in 2007-2008, for which no probable cause existed,

74.     Defendants' acts and omissions that are the subject of this complaint were knowing and/or careless and/or negligent and/or reckless and/or intentional and/or malicious.

75.     As a direct and proximate result of Defendants' acts and omissions, Plaintiff has incurred severe and substantial damages and actual harm. These damages include but are not limited to:

      a.    Monetary damages

      b.    Money spent on Bail

      c.    Attorneys' Fees for a Criminal Attorney

      d.    Severe mental distress, as well as severe emotional distress, mental suffering, mental anguish, sleeplessness, restlessness, anxiety, and depression

      e.    Loss of reputation.

      f.    Loss of the time he spent unjustly incarcerated.

      g.    Harm to personal, social, and professional relationships.

      h.    Emotional pain and suffering.

      i.    Lost wages.

*****

# PARTIES

**Plaintiff Brent D. Williams, Sr.**

76.    Plaintiff Brent D. Williams, Sr. is a resident of Bethlehem, PA and citizen of Pennsylvania. He can be reached at 280 N. Providence Road, Suite 1, Media, PA, 19063.

**Defendant The Hertz Corporation**

77.    Defendant The Hertz Corporation is a Delaware corporation, headquartered in Estero, Florida. It is a citizen of Florida.[2]

78.    The Hertz Corporation has operated a rental car location at the Tampa Airport at all pertinent times, including in 2007 at the time Plaintiff rented his car.

79.    At all points in time all Hertz employees, agents, and representatives were acting within the course and scope of their employment for The Hertz Corporation.

80.    Hertz is vicariously liable for the conduct of its employees, including all defendants, as their conduct was not only foreseeable to Hertz but done with Hertz's approval and at Hertz's direction.

81.    Any reference to Hertz also includes all Hertz employees and agents, unless otherwise stated.

82.    Hertz and its employees all owed Plaintiff a duty for several reasons, including that Plaintiff rented a car from Hertz, had a relationship with the company, and because Hertz and its employees undertook to report its cars stolen knowing full well that an incorrect report could lead to the harm caused to Plaintiff.

83.    Hertz and the individual defendants are liable for punitive damages because they are guilty of both intentional misconduct and/r gross negligence.

84.    All Defendants had actual knowledge the police reports being filed by the company were unverified and untruthful—and violated the companies' policies designed to safeguard against false reports—but instead permitted and encouraged that the false reports be filed knowing that there was a high probability innocent customers would be harmed, including Plaintiff.

---

[2] A famous Supreme Court case in 2010 ruled that Hertz's headquarters were in New Jersey, but the company moved its headquarters to Estero, FL in 2013.

85.    All Defendants' conduct was also so reckless and wanting in care that that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct.

86.    At all points, Hertz's officers, directors, managers, and employees actively and knowingly participated in such conduct. Furthermore the officers, directors, managers, and employees knowingly condoned, ratified, and consented to Hertz's deficient conduct.

**Defendant Mark Paul Frissora**

87.    Defendant Frissora was president and CEO of the Hertz Corporation from 2006 to 2014.

88.    Defendant Frissora was in charge of Hertz policy, procedures, and practices related to the false police report at issue in this case.

89.    This includes the creation of and also compliance with Hertz policies W7-02 RAC (reporting vehicle thefts and conversions), W9-18 (prior to reporting thefts to the police, controlling vehicle physical inventories), W7-03 RAC (recovery of converted or stolen vehicles), W1-06 (records retention and management program), W1-75 (protection of assets and confidential materials), and other policies.

90.    He set Hertz policy during the relevant time period and knew or should have known about the massive problems afflicting Hertz's police reporting, inventory management, and vehicle tracking.

91.    Hertz corporate and Frissora have in fact known about these problems for many years.

92.    Not only have Frissora and Hertz done nothing to address Hertz's severe problems, but they have instead instituted policies and practices which promote and guarantee that false reports will be made, all to cut costs and increase profits.

93.    Hertz is not only vicariously liable for its corporate officers' actions and omissions, but Frissora is also personally liable to Plaintiff for his actions and omissions. He owed Plaintiff a duty to make correct police reports, a duty to devise effective policies which accurately track vehicles, a duty not to instruct Hertz employees to circumvent safeguards designed to prevent false police reports, a duty to address problems brought to her attention, and a duty to otherwise prevent false police reports. He also owed Plaintiff a duty not to use the criminal justice system for an improper purpose.

94.    Frissora and Hertz have grievously breached those duties.

95.     Hertz and Frissora have decided to use the criminal justice system as a free repo service, instead of following their own policies and comporting themselves in accordance with basic corporate ethics and Florida law. They have participated in, encouraged, and approved the use of the criminal justice system by Hertz for an improper purpose, namely as a repo service to recover vehicles and customer rentals that Hertz has lost track of due to incompetent record keeping and vehicle tracking.

96.     Frissora has sufficient contacts with Florida to confer jurisdiction over him because he caused Hertz to do extensive business in Florida, and because under his direction and supervision the false police report was made in Florida, leading to Plaintiff's prosecution in Florida. In addition, defendant Frissora caused Hertz to move its corporate headquarters to Florida while Plaintiff's prosecution was pending in Florida.

**Defendant Julie Wilkerson**

97.     Defendant Julie Wilkerson was the supervisor of theft and recovery at defendant Hertz during the time period in question. Wilkerson not only supervised all such reporting, but devised and implemented Hertz policies and practices on reporting vehicles.

98.     Hertz acts by and through Julie Wilkerson, and Wilkerson is also personally liable to Plaintiff for her conduct.

99.     Wilkerson has a duty to make sure Hertz complies with its own policies and the law when making police reports.

100.    Wilkerson and Hertz have known for many years that Hertz has routinely been filing false police reports against customers.

101.    As noted above and incorporated here, at the time of Plaintiff's rental and the false police report Wilkerson supervised theft reporting and recovery for the entire corporation, including in Florida.

102.    At all points Hertz, Wilkerson and other Hertz employees involved in this process knew that Hertz's overall theft reporting was broken, and that the theft report lacked probable cause.

103.    Contrary to Hertz policy, no local investigation took place in this case before the theft report was filed. As defendant Wilkerson has already admitted under oath, this is a manifest failure on Hertz's part.

104.    In fact, under her direction, theft reports are routinely made without investigation, including in this case.

105.     Although Wilkerson and Hertz have at all points in time known about Hertz's massive false reporting problem, they have taken no steps to resolve the issue and have in fact encouraged Hertz's reckless and outrageous reporting practices to continue without changes.

106.     Wilkerson and Hertz and the other Defendants are using the criminal justice system for an improper purpose.

107.     Wilkerson has sufficient contacts with Florida given that she supervises Hertz personnel in Florida, she supervised the theft report in question which was made under her supervision and direction in Florida, corporate policy mandates that she ensure compliance with police reports made in Florida, and Plaintiff was prosecuted in Florida because of Wilkerson's actions and omissions. Furthermore, Hertz moved its headquarters to Florida while Plaintiff's prosecution was pending, meaning that Wilkerson had many contacts with headquarters.

*****

## JURISDICTION & VENUE

108.    Jurisdiction over the parties in the Courts of the State of Florida is proper pursuant Florida law. Specifically, jurisdiction as to the Defendants is proper by reason of Defendant Hertz being a citizen of Florida and carrying on a continuous and systematic part of its general business within the State. All Defendants transacted business in Florida and caused harm and compensable injury to Plaintiff by acts or omissions committed in Florida that are the subject of the present complaint.

109.    Venue is proper in this court inasmuch as Defendant regularly conducts business in this jurisdiction and inasmuch as the cause of action arose and/or a majority of the harm, occurrences, and transactions regarding Plaintiff's cause of action arose and/or took place at least in part in this jurisdiction.

# COUNT I – Malicious Prosecution

*Brent D. Williams, Sr.*

*v.*

*The Hertz Corporation; Mark Paul Frissora; Julie Wilkerson*

110.    Plaintiff incorporates by reference and realleges the preceding paragraphs of this complaint.

111.    The elements of malicious prosecution are (1) Defendant maliciously instituted prior proceedings against the plaintiff, (2) Defendant lacked probable cause to initiate proceedings against Plaintiff, (3) termination of the prior proceedings in plaintiff's favor, and (4) seizure of plaintiff's person or property during the course of the prior proceedings.

112.    A defendant is liable for abuse of process when the proceedings are used by the Defendant for a purpose or objective other than bringing the person to justice.

113.    Defendants initiated criminal proceedings against Plaintiff in 2007 by filing a false criminal complaint against Plaintiff in Tampa, FL, alleging that Plaintiff had stolen a car from Defendant Hertz and had not paid for it.

114.    As a direct and eminently foreseeable result, Plaintiff was arrested and jailed in 2007-08 in Southern Florida. When Plaintiff then incredulously explained to Hertz that he had paid $6,000 for the rental and was authorized to have it, Hertz's representative did not care and continued the prosecution. However, at the hearing in Monroe County, Hertz never showed up and Mr. Williams figured this was behind him.

115.    Many years later, Mr. Williams was arrested again in Bethlehem, Pa. To his surprise, Hertz had never withdrawn the car theft case and it was still active. He was held for one month awaiting extradition to Florida, and spent 10 days in a hellish prison van ride down the East Coast.

116.    At that point he was released and his court date was set for December 17, 2015.

117.    However, when he showed up in Court, again Hertz was not present. This time the prosecutors dismissed the case against him, and said that the case against him was laughable and there was not even any paperwork indicating he had done anything wrong.

118.    The initiation of the criminal proceedings against Plaintiff by Defendants was done without probable cause. Furthermore, there was no probable cause at any point during those proceedings and Hertz should have withdrawn the prosecution at all points.

119. Hertz is not using the criminal justice system for the legitimate purpose of bringing an alleged criminal to justice, but instead as a free taxpayer funded repo service to cut costs. Hertz knows that it has routinely been falsely reporting innocent customers for theft, but has taken no steps to correct the problem. See Exhibit 6.

120. Defendant made this false complaint carelessly and/or negligently and/or recklessly and/or knowingly and/or intentionally and/or maliciously. Hertz failed to follow, and in fact deliberately disregarded, its own basic standard operating procedures and protocols designed to prevent false police reports, including Hertz national policy W7-02.

121. Defendants' failure to withdraw the criminal complaint it initiated against Plaintiff was careless and/or negligent and/or reckless and/or knowing and/or intentional and/or malicious.

122. As a direct and proximate result of Defendants' conduct in initiating a criminal complaint without probable cause and failing to withdraw the criminal complaint as set forth above, Plaintiff has suffered severe damages, including but not limited to monetary damages, loss of freedom, severe emotional distress, mental suffering, mental anguish, sleeplessness, restlessness, anxiety, and depression.

123. As a direct and proximate result of Defendants using the criminal justice system for an objective other than bringing Plaintiff to justice, Plaintiff has suffered severe damages, including but not limited to monetary damages, loss of freedom, severe emotional distress, mental suffering, mental anguish, sleeplessness, restlessness, anxiety, and depression.

124. Plaintiff also requests punitive damages due to the outrageous behavior of Hertz, its reckless disregard for Plaintiff's rights and life, and because Defendants have had years of notice that the company is wrongly reporting innocent customers for car theft but has done nothing to fix the problems but instead continued to make false and unverified police reports.

*****

# COUNT II – Abuse of Process

*Brent D. Williams, Sr.*

*v.*

*The Hertz Corporation; Mark Paul Frissora; Julie Wilkerson*

125.    Plaintiff incorporates by reference and realleges the preceding paragraphs of this complaint.

126.    A defendant is liable for abuse of process when the proceedings are used by the Defendant for a purpose or objective other than bringing the person to justice.

127.    Defendants initiated criminal proceedings against Plaintiff in 2007 by filing a false criminal complaint against Plaintiff in Tampa, FL, alleging that Plaintiff had stolen a car from Defendant Hertz and had not paid for it.

128.    As a direct and eminently foreseeable result, Plaintiff was arrested and jailed in 2007-08 in Southern Florida. When Plaintiff then incredulously explained to Hertz that he had paid $6,000 for the rental and was authorized to have it, Hertz's representative did not care and continued the prosecution. However, at the hearing in Monroe County, Hertz never showed up and Mr. Williams figured this was behind him.

129.    Many years later, Mr. Williams was arrested again in Bethlehem, Pa. To his surprise, Hertz had never withdrawn the car theft case and it was still active. He was held for one month awaiting extradition to Florida, and spent 10 days in a hellish prison van ride down the East Coast.

130.    At that point he was released and his court date was set for December 17, 2015.

131.    However, when he showed up in Court, again Hertz was not present. This time the prosecutors dismissed the case against him, and said that the case against him was laughable and there was not even any paperwork indicating he had done anything wrong.

132.    The initiation of the criminal proceedings against Plaintiff by Defendants was done without probable cause. Furthermore, there was no probable cause at any point during those proceedings and Hertz should have withdrawn the prosecution at all points.

133.    Hertz is not using the criminal justice system for the legitimate purpose of bringing an alleged criminal to justice, but instead as a free taxpayer funded repo service to cut costs. Hertz knows that it has routinely been falsely reporting innocent customers for theft, but has taken no steps to correct the problem. See Exhibit 6.

134.    Defendant made this false complaint carelessly and/or negligently and/or recklessly and/or knowingly and/or intentionally and/or maliciously. Hertz failed to follow, and

in fact deliberately disregarded, its own basic standard operating procedures and protocols designed to prevent false police reports, including Hertz national policy W7-02.

135.    Defendants' failure to withdraw the criminal complaint it initiated against Plaintiff was careless and/or negligent and/or reckless and/or knowing and/or intentional and/or malicious.

136.    As a direct and proximate result of Defendants' conduct in initiating a criminal complaint without probable cause and failing to withdraw the criminal complaint as set forth above, Plaintiff has suffered severe damages, including but not limited to monetary damages, loss of freedom, severe emotional distress, mental suffering, mental anguish, sleeplessness, restlessness, anxiety, and depression.

137.    As a direct and proximate result of Defendants using the criminal justice system for an objective other than bringing Plaintiff to justice, Plaintiff has suffered severe damages, including but not limited to monetary damages, loss of freedom, severe emotional distress, mental suffering, mental anguish, sleeplessness, restlessness, anxiety, and depression.

138.    Plaintiff also requests punitive damages due to the outrageous behavior of Hertz, its reckless disregard for Plaintiff's rights and life, and because Defendants have had years of notice that the company is wrongly reporting innocent customers for car theft but has done nothing to fix the problems but instead continued to make false and unverified police reports

****

## COUNT III        Intentional/Negligent Infliction of Emotional Distress

*Brent D. Williams, Sr.*

*v.*

*The Hertz Corporation; Mark Paul Frissora; Julie Wilkerson*

139.    Plaintiff incorporates by reference and realleges the preceding paragraphs of this complaint.

140.    The elements of intentional infliction of emotional distress are that Defendant (1) intentionally or recklessly caused mental suffering, (2) acts and omissions were extreme and outrageous, (3) Plaintiff suffered serious emotional distress, and (4) the distress was severe.

141.    The elements of negligent infliction are that (1) the Defendant was negligent, (2) the plaintiff suffered serious emotional distress, and (3) Defendant's negligence was a substantial factor in causing the serious emotional distress.

142.    Defendant initiated criminal proceedings against Plaintiff in 2007, falsely claiming that he stole a car.

143.    As a direct and eminently foreseeable result, Plaintiff was arrested and imprisoned for one month in 2015, and also suffered a 10-day prison van ride to Florida—in addition to being prosecuted from 2007 to 2015.

144.    His experiences while incarcerated were horrific.

145.    This initiation of the criminal proceedings against Plaintiff was done without probable cause as Defendants knew that Plaintiff had a valid rental contract and had paid $6,000 for the rental.

146.    Defendants acted maliciously and/or negligently and/or for a purpose other than bringing plaintiff to justice as it knew or should have known when they filed the criminal complaint against Plaintiff.

147.    Defendants made this false complaint recklessly and/or knowingly and/or intentionally and/or maliciously and/or negligently and/or grossly negligently. Defendants acted with negligence and/or reckless disregard of the probability that Plaintiff (and many other customers across the country) would suffer severe emotional distress as result of its actions and omissions.

148.    Defendants' failure to withdraw the criminal complaint it initiated against Plaintiff was careless and/or negligent and/or reckless and/or knowing and/or intentional and/or malicious. Defendants acted with negligent and/or reckless disregard of the probability that

Plaintiff (and many other customers across the country) would suffer severe emotional distress as result of its actions and omissions.

149.    As a direct and proximate result of Defendants' conduct in initiating a criminal complaint and failing to withdraw the criminal complaint as set forth above, Plaintiff has suffered severe damages, including but not limited to monetary damages, severe emotional distress, mental suffering, mental anguish, shame, humiliation, worry, shock, sleeplessness, restlessness, anxiety, and depression. Defendant's conduct was a substantial factor in causing Plaintiff serious and severe emotional distress. Any reasonable person would be unable to cope with a 1.5 month wrongful imprisonment and prosecution for a serious crime they did not commit.

150.    Defendants' failure to withdraw the criminal complaint they initiated against Plaintiff was intentional and/or reckless and/or negligent.

151.    The acts and omissions of Defendant were extreme and outrageous in a civilized society.

152.    The use of the criminal justice system is of the utmost seriousness and innocent individuals who have done nothing wrong should not be thrown in prison without warning and prosecuted for felonies, nor should their name be associated with extremely damaging felonious charges they did not commit.

153.    Plaintiff suffered severe damages as a direct result of Defendant's conduct, including by initiating the criminal complaint and also in failing to withdraw the criminal complaint.

154.    As a result of the intentional and/or reckless conduct of Defendant, punitive damages are demanded of Defendant.

*****

## COUNT IV          Negligence/Gross Negligence

*Brent D. Williams, Sr.*

*v.*

*The Hertz Corporation; Mark Paul Frissora; Julie Wilkerson*

155.    Plaintiff incorporates by reference and realleges the preceding paragraphs of this complaint.

156.    The elements of negligence are (1) duty, (2) breach, (3) causation, and (4) damages.

157.    The defendant in this action owed Plaintiff a duty because he rented a car from the company. It had a duty not to falsely report Plaintiff to the police because it rented him the car at issue, and because it undertook to file a police report with respect to this person, and because it was foreseeable that filing a false police report that he stole the car would result in severe damages.

158.    At all points Defendant had notice that Hertz had a serious problem with making false police reports, and tracking rental payments accurately, but at no point corrected these issues or ceased making the reports.

159.    The defendant in this action breached the duty of care when it reported Plaintiff to the police for car theft, despite knowing or should have knowing that Plaintiff had extended the rental and paid for the rental.

160.    The conduct of Defendant was not only careless, but also malicious, reckless, willful, wanton, and demonstrated a total indifference to the lives of Defendant Hertz's customers including Plaintiff. Defendant exhibited a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm.

161.    Due to Defendant's tortious conduct and omissions, it directly and/or proximately caused Plaintiff's monetary damages, arrested him, imprisoned him, and prosecuted him for crimes and conduct he had not done. He has been falsely labeled a car thief, and has suffered severe emotional distress, loss of freedom, monetary damages, mental suffering, mental anguish, sleeplessness, restlessness, anxiety, and depression.

162.    Due to the outrageous, malicious, reckless, and intentional nature of Defendant's conduct, punitive damages are requested.

*****

## **RELIEF REQUESTED**

**WHEREFORE**, Plaintiff demands judgment in its favor and against Defendants, jointly and severally, on all counts and claims compensatory damages in an amount in excess of this court's jurisdictional limitations, thereby guaranteeing Plaintiff a jury trial, exclusive of interests and costs, and an award of punitive damages, as well as prejudgment interest, post judgment interest, delay damages, costs, and such equitable relief as the Court deems necessary; and requests that this Court determine and declare that Plaintiff be awarded for all counts:

a. Compensatory damages, inclusive of any and all harm attributable to Defendants' actions or inaction, including loss of freedom;

b. Lost earnings;

c. Injunctive relief,

d. Punitive damages to punish the Defendants for their outrageous conduct, self-interest, and duplicitous behavior;

e. Exemplary damages to set an example for others;

f. Attorneys' fees and court costs;

g. the loss of time and opportunity;

h. Delay damages; and

i. Such other and further relief and/or equitable relief that this Court deems just and/or necessary.

Respectfully submitted,

By: /S/ MICHAEL WALSH
FBN: 0172138
MICHAEL WALSH, P.A.
5301 North Federal Highway, Suite 215
Boca Raton, Florida 33487
(561) 584-4939 Phone
(305) 763-3976
Mwalsh7700@gmail.com
Fdiaz4109@gmail.com
*Attorney for Defendant*

DATE: December 13, 2019

## SPOLIATION NOTICE -- PRESERVATION OF EVIDENCE

Plaintiff hereby demands and requests that Defendants take necessary actions to ensure the preservation of all documents, records, communications, whether electronic or otherwise, items and things in their possession or control, or any entity over which any party to this action has control, or from whom any party to this action has access to, any documents, items, or things which may in any manner be relevant to or relate to the subject matter of the causes of action and/or the allegations of this complaint.

JURY TRIAL DEMAND

Plaintiff hereby demands a 12-person jury trial.

Respectfully submitted,

By: /S/ MICHAEL WALSH
FBN: 0172138
MICHAEL WALSH, P.A.
5301 North Federal Highway, Suite 215
Boca Raton, Florida 33487
(561) 584-4939 Phone
(305) 763-3976
Mwalsh7700@gmail.com
Fdiaz4109@gmail.com
*Attorney for Defendant*

DATE: December 13, 2019

# CERTIFICATE OF SERVICE

I hereby state that a true and correct copy of the foregoing CIVIL ACTION COMPLAINT is

being served pursuant to the Florida Rules:


**THE HERTZ CORPORATION**
*(1209 Orange St.,*
*Wilmington DE 19801)*


**MARK PAUL FRISSORA**
*(*
*Boulder CO 80304)*


**JULIE WILKERSON**
*(14501 Hertz Quail Springs Pkwy,*
*Oklahoma City, OK 73120)*

Respectfully submitted,

By: /S/ MICHAEL WALSH
FBN: 0172138
MICHAEL WALSH, P.A.
5301 North Federal Highway, Suite 215
Boca Raton, Florida 33487
(561) 584-4939 Phone
(305) 763-3976
Mwalsh7700@gmail.com
Fdiaz4109@gmail.com
*Attorney for Defendant*

DATE: December 13, 2019

# ATTACHMENT AK

VIRGINIA:

### IN THE FAUQUIER COUNTY CIRCUIT COURT

**Ryan Smits**
*(5719 Crescents Point Drive, Orange,*
*VA)*
      Plaintiff,

v.

**The Hertz Corporation;**
*(1209 Orange St., Wilmington DE 19801)*
**Kathryn V. Marinello;**
*(8501 Williams Rd., Estero, FL 33928)*
**Julie Wilkerson;**
*(14501 Hertz Quail Springs Pkwy,*
*Oklahoma City, OK 73120)*
**Kemal Basar;**
*(44074 Mercure Circle, Sterling, VA*
*20166)*

      Defendants.

At Law No. *CL19-547*

False Arrest, Abuse of Process, Malicious
Prosecution, Intentional Infliction of
Emotional Distress, Negligence

***JURY TRIAL DEMANDED***

**Also Serve:**

### COMPLAINT

COMES NOW the plaintiff, by counsel, and files this Complaint and asks that judgment be rendered against the defendants for the reasons stated herein and the plaintiff states as follows:

1.    Defendant The Hertz Corporation has been falsely reporting untold numbers of customers for car theft, throwing them in jail on felony charges for months, prosecuting them, causing them to lose their jobs, giving them criminal records, losing their homes, and separating them from their family and loved ones. These customers have paid for their cars and are authorized to use the rentals.

FILED AT _____ M

NOV 2 2 2019

GAIL H. BARB, CLERK
BY: _____ D.C.

2.    The company's computer and inventory tracking systems are broken. However, the top corporate officers have decided that verifying theft reports, and fixing their computers, would be too expensive.

3.    Defendant Hertz has instead decided—at the very highest level—to mass report its own customers to the police without verification, effectively using the police, criminal justice system, and taxpayers to subsidize inventory control for a private corporation.

4.    This plan is as brilliant as it is evil, saving the company millions upon millions of dollars it would otherwise have to spend updating its broken systems and paying corporate security personnel to verify the thousands of theft reports it makes.

5.    As a result of this routine and systemic mass reporting, without verification or investigation, many innocent customers have been wrongfully detained, arrested, thrown in prison, prosecuted, and had their lives destroyed.

6.    This is not some sort of error. The company and its leadership have known about these problems for many years—since at the latest 2015—after falsely imprisoned customers and police agencies notified Hertz corporate about these serious issues. Hertz did nothing to address these problems, instead deliberately placing the Almighty Dollar before the lives and safety of their customers, including Plaintiff.

7.    Hertz has even been sued and lost lawsuits for intentional infliction of emotional distress and malicious prosecution for the same conduct at issue in this case—but has continued to falsely report customers for theft calculating that it will make more money if it does not fix the problem.

8.    Hertz's corporate representatives testified in those lawsuits that their "marching orders" are to routinely disregard the standard operating procedures designed to

safeguard against and prevent false reports *as part of cost saving measures imposed by Hertz corporate.*

9.       Plaintiff Ryan Smits and his mother Nancy Cullen-Smits[1] were two of the many individuals victimized by Defendants' corporate malfeasance. Despite paying for a rental and being authorized to use it they were detained by police due to a false police report made by defendant The Hertz Corporation in 2017.

10.      Plaintiff and his mother even directly notified CEO, defendant Kathryn Marinello, about what had happened to them, but the response from Hertz and Marinello was indifference—despite Defendants being well aware for the past several years that innocent customers were being arrested.

11.      There is no excuse for this conduct. The criminal justice system does not exist to be used as a repo service for a massive multinational company worth billions of dollars which cannot be bothered to track its vehicles and rentals. No company should be mass filing unverified police reports, especially when those false reports endanger the freedom and safety of its customers.

12.      Hertz should be enjoined from filing theft reports based on their failure to follow their own standard operating procedures, failure to fix their broken computer systems, and reckless indifference to human life.

## Plaintiff Rents a Car from Hertz

13.      On September 12, 2017 plaintiff's mother, Nancy Cullen-Smits, rented a 2017 Hyundai Sonata from the Fredericksburg, VA Hertz location.

14.      Ms. Cullen-Smits is a pharmaceutical rep, and her company was paying for the rental due to the large amount of traveling she had to do every day.

---

[1] Nancy Cullen-Smits is filing a concurrent lawsuit.

15. For the first two months of her rental, she believed that everything was fine with the rental.

## A Mother and Child are Detained and Accused of Car Theft by Police Because Hertz Falsely Reported their Rental Car Stolen

16. However, on November 22, 2017, the day before Thanksgiving, everything changed. Nancy was driving with her 19-year old son, plaintiff Ryan Smits, in the car.

17. Suddenly, as they were driving, plaintiff and his mother looked up in the mirror and saw that there was a police car with lights flashing. After pulling over, and giving the officer her license, Nancy and Ryan sat there terrified wondering why in the world she had been pulled over.

18. Eventually the officer returned after 20 minutes and accused her, to their shock, of stealing the vehicle.

19. Cullen-Smits desperately explained to the officer that she had a valid rental.

20. They were absolutely stunned to learn that Hertz had reported the car they was driving as stolen (grand larceny; auto theft - §18.2-95(ii)) on November 3, 2017.

21. Cullen-Smits showed the officer all of her paperwork confirming that it was a valid rental.

22. This terrifying encounter took 2 to 3 hours, and Plaintiff was not free to leave during this law enforcement stop.

23. According to Hertz's broken computer systems the vehicle should have been at Ronald Reagan International Airport; the system did not show that it had ever been in Fredericksburg or that it had been rented to Cullen-Smits.

24. Hertz had then, without any investigation or attempts to locate the car, reported the car stolen without any evidence it had actually been stolen.

25.    The police closed the investigation on November 27, 2017, stating that the theft report by Defendants was "unfounded."

26.    Hertz policy W7-02 RAC mandates that an investigation by the Corporate Security Manager at the local level take place before any theft report is made, for the express purpose of preventing false police reports. The policy also expressly requires that all Hertz employees ensure compliance with this policy.

27.    Defendant Kemal Basar is the Hertz corporate security manager for the Atlantic region in question, and works out of the Sterling, VA Hertz office. He supervises the process of making police reports in the Washington DC/Virginia area, and also supervised the actual making of this police report.

28.    The Defendants in this case deliberately ignored the Hertz policy requiring an investigation at the local level, and instead reported the car stolen without any investigation, verification, or evidence it was stolen.

### The False Report was the Result of Deliberate Illegal and Unethical Behavior by Defendants

29.    Hertz's top corporate officials have known for years that it has a serious, nationwide problem with false police reports but has done nothing to stop it.

30.    For instance, in 2015 the Louisville, KY airport police informed Defendants that the company was making false police reports in circumstances similar to what happened to Plaintiff. The company did nothing in response.

31.    In 2015 and 2016 customers sued Hertz for malicious prosecution, false imprisonment, and false arrest for the same conduct which caused Plaintiff to be detained in 2017. Again, the company did nothing in response, despite losing two malicious prosecution trials in 2017 and punitive damages being assessed.

32.    Hertz's corporate policies *require* that a local investigation be done before

any theft report is made to verify that the report is accurate. The policy reads:

> Corporate/Country Security Manager Investigations - Every theft/conversion/disappearance must be promptly investigated by the Corporate/Country Security Manager responsible for the location from which the related Theft Vehicle Report is filed. All employees are required to cooperate fully with such an investigation.

Exhibit 1 - W7-02 RAC(17). An investigation and verification that the report is accurate is also required by the Virginia law prohibiting false police reports. See Code of Virginia § 18.2-461.

33.    Furthermore, the policy states that "Location; Maintenance, Area, Country Head Office and. OKC Management *must ensure compliance to this procedure*." See Exhibit 1, at p.1.

34.    Despite this policy, Hertz's corporate officers have instructed its employees not to follow this policy.

35.    A Hertz corporate designee testified in a prior Pennsylvania lawsuit that no checks or investigations are ever done at the local, branch level before a police report is filed. See Exhibit 4 - Motion for Punitive Damages [Exhibit 11 to Motion for Punitive Damages, at p.70).

36.    A Hertz corporate security designee for the Atlantic region further stated that, despite corporate policies, no investigations are performed because of "marching orders" from Hertz corporate:

> COUNSEL:          Is it your testimony that you don't go to the location and question any of the Hertz employees when you receive a theft package?
>
> MR. LIVINGSTON:   That's my testimony, yes.
>
> COUNSEL:          Why?

| | |
|---|---|
| MR. LIVINGSTON: | Because I mean the package has been completed, all the reports have been reviewed, I guess, by OKC. And my marching orders are to report the car stolen when I get the -- again, I do look at it for everything being accurate, as far as I can tell, within the report itself. |
| COUNSEL: | Yeah. *But you don't do any independent investigation?* |
| MR. LIVINGSTON: | *I do not.* |
| COUNSEL: | *You don't do any check?* |
| MR. LIVINGSTON: | *I do not.* |

Exhibit 4 [Exhibit 8 to Motion for Punitive Damages, at p.252] (emphasis added).

37.     At the trial, the Hertz corporate designee in charge of theft reporting and

recovery for the entire company, defendant Julie Wilkerson, was forced to admit that Hertz

had egregiously failed to protect its customers:

| | |
|---|---|
| COUNSEL: | And here's what I'm getting at and where I'm going with this, it says near the last line: "Location, maintenance, area, country, head office, and OKC management must ensure compliance with this procedure." Do you see that? |
| MS. WILKERSON: | Yes. |
| COUNSEL: | Is it your job to ensure compliance with this procedure? |
| MS. WILKERSON: | Yes. |
| COUNSEL: | And you're the person in charge of 700,000 cars to make sure as the regulator that these . . . procedures are followed, correct? |
| MS. WILKERSON: | Correct. |
| COUNSEL: | Now, when it says "location," that means in this instance the Philadelphia location, correct? |
| MS. WILKERSON: | Correct. |
| COUNSEL: | In fact, this is a procedure that you follow to make sure that innocent people aren't wrongfully arrested for accidental reporting to the police, correct? |
| MS. WILKERSON: | Correct. |

| COUNSEL: | And it's important these policies and procedures are followed by Hertz Corporation, correct? |
| MS. WILKERSON: | Correct. |
| COUNSEL: | And if Hertz doesn't follow this problem -- this procedure, that would be a failure on the part of Hertz, correct? |
| MS. WILKERSON: | Correct. |

See Exhibit 2, at p.28-47 (emphasis added).

38.    Instead of ensuring compliance with this procedure, all Defendants have been deliberately circumventing it—despite it being a safeguard which prevents false reports, such as the one that harmed Plaintiff and his mother.

39.    Hertz has admitted this is because it has been cutting costs and personnel in its corporate security department. Mr. Livingston, Hertz's corporate security designee, testified that Hertz, in 2015, had made "**a corporate decision to lay off a large group of people at that time for cost savings**" within the corporate security department. Exhibit 4 [Exhibit 8 to Motion for Punitive Damages, at p.54]). It is the corporate security department that performs the local investigations mandated by W7-02.

40.    Cutting these positions in corporate security further exacerbated Hertz's failure to comply with W7-02 and other theft reporting policies, and directly signaled that Hertz's top corporate officials had no intent of complying with W7-02. These layoffs were implemented with the intent and purpose to cut costs and increase profits, at the expense of the lives of their customers.

41.    Instead of following its own policies, and taking basic steps to ensure accurate police reports, Hertz has been routinely mass reporting its own customers for theft without verifying whether they committed a crime because it has made the cold calculation that it is more cost effective to use the nation's police forces, prosecutors, and judges as a

taxpayer funded repo service—at the expense of the lives of its innocent customers who are caught in the middle—like Plaintiff.

42.    Attached to this complaint is a motion for punitive damages from the Pennsylvania case which details with police records from around the nation just how deficient Hertz's conduct has been, that they have known about the issue for years, and that even Hertz's employees admit that the company is doing a poor job keeping track of vehicles. See generally Exhibit 4 - Motion for Punitive Damages. Indeed, certain police departments stopped taking Hertz police reports (unless there was an extra level of verification) after a Hertz employee admitted that the company had serious inventory control and tracking issues. Id. [Exhibit 7 to Motion for Punitive Damages].

43.    Since that motion was filed, there have been a steady stream of continuing false reports across the nation, in Pennsylvania, Texas, Kentucky, Florida, Nevada, Arkansas, Louisiana, Virginia, Wisconsin, Indiana, Ohio, California, and many others.

44.    In a May 2019 ABC 5 news report in Ohio which detailed several Hertz rental failures, Hertz commented that "Our process for determining when a vehicle is reported stolen has multiple steps to ensure accuracy, and in the rare instance an error within our control has occurred we take responsibility. We conduct thorough investigations and make every effort to remedy the situation. We have consistently made changes to improve our processes and we will continue to do so throughout all areas of our business to provide customers    with    the    exceptional    experience    they    expect    from    Hertz." https://www.news5cleveland.com/news/local-news/investigations/hertz-customers-detained-arrested-after-rental-vehicles-mistakenly-reported-stolen.

45.    All of this is entirely false. Hertz has known for years that it has this problem, and its only response has been to ignore the situation. It has plainly made the calculation

that the money saved by mass reporting customers, and having the police return the vehicles, far outweighs the costs it will incur from it falsely reporting customers and making unverified police reports.

46.    Also in May 2019, ABC Actions News - WFTS out of Florida reported that Hertz was throwing innocent customers in jail and wrongfully prosecuting them. https://www.abcactionnews.com/news/local-news/i-team-investigates/hertz-has-a-pattern-of-mistakenly-reporting-cars-stolen-leaving-customers-arrested-attorney-says.

47.    In May 2018, 6 ABC out of Philadelphia reported that Hertz had wrongfully arrested and imprisoned two customers, one in Philadelphia and another in Wisconsin. https://6abc.com/business/hertz-customers-arrested-after-vehicles-mistakenly-reported-stolen/3487977/.

### Plaintiff was Terrified and Humiliated Because of Hertz

48.    Being pulled over by police and accused of being in the possession of a stolen vehicle was terrifying for both Plaintiff and his mother.

49.    It was humiliating to be ordered to clean out the vehicle, have the vehicle stripped from them like they did something wrong, be forced to wait in cold weather for hours with no winter clothes, and have a family member drive 60 miles to pick up Nancy and Ryan.

50.    To this day, when Plaintiff sees a police car he seizes up and is hit with waves of anxiety.

### Hertz Denies the Severity of Its Conduct and
### Refuses to Provide Plaintiff with the Rental File

51.    Despite weeks of follow up with Hertz, the company failed to take the matter seriously. Plaintiff and his mother therefore sent the issue directly to defendant CEO

Kathryn Marinello. Marinello, however, was apparently unconcerned. A Hertz customer service associate responded instead and professed ignorance about Plaintiff's complaint—despite the fact that Plaintiff and Cullen-Smits had been complaining for weeks to other officials in the company and the complaint should have been easily found. See Exhibit 3. Thereafter, Hertz continued to treat the incident like it was not a serious problem.

52.     The severity of the error and the potential consequences to the customer made it obvious to Plaintiff that something is seriously broken within the company.

53.     When Plaintiff and Cullen-Smits asked Hertz for her rental records, *Hertz refused to turn them over*, an indication that the incident was being treated far more seriously within the company than their outward attempts to dismiss it suggested.

54.     Hertz is under a duty to preserve all records related to the rental, the rental car, and the police report pursuant to Hertz policies, standard operating procedures, and Virginia law.

55.     As a direct and proximate result of Defendants' acts and omissions, Plaintiff has incurred severe and substantial damages and actual harm. These damages include but are not limited to:

      a.     Monetary damages;

      b.     Severe mental distress, as well as severe emotional distress, mental suffering, mental anguish, sleeplessness, restlessness, anxiety, and depression;

      c.     Loss of reputation;

      d.     Harm to personal, social, and professional relationships;

      e.     Emotional pain and suffering;

      f.     Lost wages.

# PARTIES

**Plaintiff Ryan Smits**

56.    Plaintiff Ryan Smits is a citizen of Virginia and resides in Orange, VA.

57.    At all points in time it was foreseeable to Defendants that Ryan Smits, son of the renter Nancy Cullen-Smits, would be riding in the vehicle. It was further foreseeable to defendants that a false police report would result in the illegal detention of not only the renter but also any family members riding in the vehicle with the renter.

**Defendant the Hertz Corporation**

58.    Defendant The Hertz Corporation is a Delaware corporation, headquartered in Florida.

59.    The Hertz Corporation operates a rental car location in Fredericksburg, VA, another at Ronald Reagan International Airport in Arlington, VA, and also an office in Sterling, VA. Hertz submitted the police report in Virginia.

60.    At all points in time all Hertz employees, agents, and representatives were acting within the course and scope of their employment for The Hertz Corporation.

61.    Hertz is vicariously liable for the conduct of its employees, including all defendants, as their conduct was not only foreseeable to Hertz but done with Hertz's approval and at Hertz's direction.

62.    Any reference to Hertz also includes all Hertz employees and agents, unless otherwise stated.

63.    Hertz and its employees all owed Plaintiff a duty for several reasons, including that Plaintiff's family member rented a car from Hertz, had a relationship with the company, and because Hertz and its employees undertook to report its cars stolen knowing full well that an incorrect report could lead to the harm caused to Plaintiff.

**Defendants Kathryn V. Marinello**

64.    Defendant Marinello is the president and CEO of The Hertz Corporation and is in charge of Hertz policy, procedures, and practices related to the false police report at issue in this case.

65.    This includes compliance with Hertz policies W7-02 RAC (reporting vehicle thefts and conversions), W9-18 (prior to reporting thefts to the police, controlling vehicle physical inventories), W7-03 RAC (recovery of converted or stolen vehicles), W1-06 (records retention and management program), W1-75 (protection of assets and confidential materials), and other policies.

66.    She sets Hertz policy and knew or should have known about the massive problems afflicting Hertz's police reporting, inventory management, and vehicle tracking.

67.    Hertz corporate and Marinello have in fact known about these problems for many years, including by way of lawsuits filed in 2015 and police agencies informing Hertz corporate of the false reports in 2015.

68.    Not only have Marinello and Hertz done nothing to address Hertz's severe problems, but they have instead instituted policies and practices which promote and guarantee that false reports will be made, all to cut costs and increase profits.

69.    Hertz is not only vicariously liable for its corporate officers' actions and omissions, but Marinello is also personally liable to Plaintiff for her actions and omissions. She owed Plaintiff a duty to make correct police reports, a duty to devise effective policies which accurately track vehicles, a duty not to instruct Hertz employees to circumvent safeguards designed to prevent false police reports, a duty to address problems brought to her attention, and a duty to otherwise prevent false police reports. She also owed Plaintiff a duty not to use the criminal justice system for an improper purpose.

70.    Marinello and Hertz have grievously breached those duties.

71.    Hertz and Marinello have decided to use the criminal justice system as a free repo service, instead of following their own policies and comporting themselves in accordance with basic corporate ethics and Virginia law. They have participated in, encouraged, and approved the use of the criminal justice system by Hertz for an improper purpose, namely as a repo service to recover vehicles and customer rentals that Hertz has lost track of due to incompetent record keeping and vehicle tracking.

72.    Marinello has sufficient contacts with Virginia to confer jurisdiction over her because she causes Hertz to do extensive business in Virginia, and because under her direction and supervision the false police report was made in Virginia, leading to Plaintiff's detainment in Virginia.

**Defendant Julie Wilkerson**

73.    Defendant Julie Wilkerson was the supervisor of theft and recovery at defendant Hertz during the time period in question. Wilkerson not only supervised all such reporting, but devised and implemented Hertz policies and practices on reporting vehicles.

74.    Hertz acts by and through Julie Wilkerson, and Wilkerson is also personally liable to Plaintiff for her conduct.

75.    Wilkerson and Hertz have known for many years, since at the latest 2015, that Hertz has routinely been filing false police reports against customers. See Exhibit 2; Exhibit 4.

76.    As noted above and incorporated here, at the time of Plaintiff's rental and the false police report Wilkerson supervised theft reporting and recovery for the entire corporation, including in Virginia.

77.     At all points Hertz, Wilkerson and other Hertz employees involved in this process knew that Hertz's overall theft reporting was broken, and that the theft report lacked probable cause.

78.     Contrary to Hertz policy, no local investigation took place in this case before the theft report was filed. As defendant Wilkerson has already admitted under oath, this is a manifest failure on Hertz's part.

79.     In fact, under her direction, theft reports are routinely made without investigation, including in this case.

80.     Although Wilkerson and Hertz have at all points in time known about Hertz's massive false reporting problem, they have taken no steps to resolve the issue and have in fact encouraged Hertz's reckless and outrageous reporting practices to continue without changes.

81.     Wilkerson and Hertz and the other Defendants are using the criminal justice system for an improper purpose.

82.     Wilkerson has sufficient contacts with Virginia given that she supervises Hertz personnel in Virginia, she supervises the theft report in question which was made under her supervision and direction in Virginia, corporate policy mandates that she ensure compliance with Hertz corporate policy in Virginia, and Plaintiff was detained in Virginia because of Wilkerson's actions.

**Defendants Kemal Basar**

83.     Defendant Basar is a corporate security manager for the Hertz Atlantic region based out of Sterling, VA. Basar is a resident of Sterling and citizen of Virginia.

84.     Hertz acts by and through Basar, and Basar is also personally liable for his conduct.

85.    As the corporate security manager for the Hertz Atlantic region covering Virginia, Basar supervises all police reports in Virginia, including the police report made in this instance regarding the car rented by Plaintiff and his family.

86.    Basar has a duty to ensure compliance with W7-02, as do all other Hertz employees.

87.    Basar had to investigate and approve the police report made for the car Plaintiff was riding in. Furthermore, Basar and his office are instrumental is determining how theft reports are handled in general, including whether they are adequately investigated on a local level as mandated by Hertz policies.

88.    Basar has allowed and approved and encouraged the making of false reports of theft for inventory that Hertz has lost track of, knowing full well—due to Hertz's poor record keeping—that there is no evidence that the vehicles are actually stolen.

89.    Basar has participated in, encouraged, and approved the use of the criminal justice system by Hertz for an improper purpose, namely as a repo service to recover vehicles and customer rentals Hertz's poor record keeping has left behind.

90.    Basar failed to engage in the mandated local investigation.

91.    Basar had a duty to Plaintiff when filing police reports, knowing that his and Hertz's customers will be detained, arrested, and prosecuted.

92.    In this case, no investigation was done and Basar breached his duty to Plaintiff when the police report was made without verification or investigation.

93.    At all points in time the report supervised by Basar was false. Plaintiff and his mother had validly rented the car and Hertz should have never reported the vehicle was stolen.

*****

## Jurisdiction and Venue

94.    Jurisdiction is appropriate over all Defendants in this case in this court because all Defendants have sufficient minimum contacts with this forum related to the conduct at issue to confer personal jurisdiction over them.

95.    Venue is appropriate in Fauquier County because the cause of action arose in that county, specifically Plaintiff was improperly detained in this county as a result of Defendants' false police report.

*****

## COUNT I – False Imprisonment/False Arrest

*Ryan Smits*

*v.*

*The Hertz Corporation, Kathryn V. Marinello; Julie Wilkerson; Kemal Basar*

96.     Plaintiff incorporates by reference and realleges all other paragraphs of this complaint.

97.     False imprisonment or false arrest occurs when a defendant causes the restraint of another person, impinging on their physical liberty, without adequate legal justification.

98.     Defendants rented a car to Cullen-Smits and also knew or should have known that her family, including plaintiff Ryan Smits, would be riding in the vehicle with her.

99.     Hertz caused the restraint of Plaintiff when it reported the vehicle he and his mother were using stolen, leading to them being detained by the police. Plaintiff and his mother were not permitted to leave for several hours and their physical liberty was absolutely impaired. Furthermore, they were stripped of their vehicle, treated like criminals, and forced to stand in the cold weather while waiting for someone to drive 60 miles to pick them up.

100.     There was manifestly no adequate legal justification for Defendants' conduct. Instead of complying with Hertz policies (including W7-02), which requires a local investigation by the corporate security manager (Basar) before making a police report, Hertz simply filed a theft report with the police despite not having any evidence the car was stolen.

101.     All defendants were mandated by W7-02 to ensure compliance with W7-02. Instead, all defendants deliberately ignored the policy and filed a false police report in violation of Virginia law.

102.    Defendants made this false complaint negligently, recklessly, maliciously, wantonly, with conscious disregard, and/or intentionally. There was never any probable cause for the police report Hertz made.

103.    The fact that Hertz refused to produce the rental file in question to Plaintiff and his mother indicates that Hertz knows that it committed serious misconduct and is attempting to cover it up.

104.    In addition to Hertz being directly liable and vicariously liable for the harm caused to Plaintiff, the individual defendants are also personally liable given that they have promulgated policies and practices which directly resulted in this false police report, and also failed to properly supervise the false report. As explained throughout this complaint, all individual defendants owed Plaintiff a duty not to falsely cause them to be imprisoned and/or arrested and to ensure compliance with Hertz policies on theft reporting.

105.    Keep in mind that Hertz knew about this problem for years before 2017, but did nothing to address or fix it.

106.    As a direct and proximate result of Defendants' conduct as set forth above, Plaintiff and his mother have suffered severe damages, including but not limited to monetary damages, severe emotional distress, mental suffering, mental anguish, sleeplessness, restlessness, anxiety, and depression.

107.    Due to the extreme and outrageous conduct of Defendants not acceptable in a civilized society—including wanton and willful negligence, conscious disregard, and reckless indifference of and to Plaintiff's rights—Plaintiff demands punitive damages from all Defendants, jointly and severally.

*****

## COUNT II –    Abuse of Process

*Ryan Smits*

*v.*

*The Hertz Corporation, Kathryn V. Marinello; Julie Wilkerson; Kemal Basar*

108.    Plaintiff incorporates by reference and realleges all other paragraphs of this complaint.

109.    An abuse of process occurs when a defendant uses process to accomplish a purpose not warranted by law and harms the plaintiff.

110.    Here, Defendants are using the criminal justice system and police reports not to file accurate theft reports, but instead to use the police as a taxpayer funded repo service.

111.    Voluminous evidence from around the country shows that Hertz and the individual defendants are mass filing theft reports without doing any investigation/verification, as even mandated by Hertz's own policies.

112.    All Defendants are required to ensure compliance with Hertz theft reporting policies, including W7-02.

113.    The evidence shows that Hertz and its corporate officers and senior employees have made a deliberate decision not to conduct required local investigations and verify that theft reports are accurate before submitting the report to police, including in this instance.

114.    This is directly contrary to both the admonition in W7-02 that a local investigation be performed, and the admonition in W7-02 that the head office (Marinello), OKC Management (Wilkerson), and location management (Basar) must ensure compliance with the procedure.

115.    Furthermore, Virginia law prohibits the making of false police reports either knowingly, or without just cause if there is an intent to interfere with police operations. See Code of Virginia § 18.2-461.

116.    Defendants are violating both W7-02 and section 18.2-461 by using the criminal justice system to subsidize their vehicle recovery efforts with knowingly false theft reports. This is a use of the criminal justice system to accomplish a purpose not warranted by law.

117.    As a direct result of Hertz and the individual defendants' abuse of process, Plaintiff and his mother were wrongfully detained while driving a car they had validly rented and were authorized to use.

118.    When Plaintiff and his mother contacted Hertz and demanded to see their rental file, Hertz refused to provide it to them. This is evidence of consciousness of guilt.

119.    Defendants all acted negligently, recklessly, maliciously, wantonly, with conscious disregard, and/or intentionally. The individual defendants are personally liable for the reasons explained throughout this complaint.

120.    As a direct and proximate result of Defendants' conduct in initiating a criminal complaint and failing to withdraw the criminal complaint as set forth above, Plaintiff has suffered severe damages, including but not limited to monetary damages, severe emotional distress, mental suffering, mental anguish, sleeplessness, restlessness, anxiety, and depression.

121.    Due to the extreme and outrageous conduct of Defendants not acceptable in a civilized society—including wanton and willful negligence, conscious disregard, and reckless indifference of and to Plaintiff's rights—Plaintiff demands punitive damages from all Defendants, jointly and severally.

## COUNT III –    Malicious Prosecution

*Ryan Smits*

*v.*

*The Hertz Corporation, Kathryn V. Marinello; Julie Wilkerson; Kemal Basar*

122.    Plaintiff incorporates by reference and realleges all paragraphs of this complaint.

123.    The elements of malicious prosecution are that (1) Defendants' conduct was malicious, (2) Defendants initiated the charges or cooperated in doing so, (3) Defendants had no probable cause to initiate or pursue the case, and (4) the case terminated not unfavorably for Plaintiff.

124.    Here, Defendants caused the theft report in question to be issued by making the false police report.

125.    Defendants acted negligently, recklessly, maliciously, wantonly, with conscious disregard, and/or intentionally as they knew or should have known when they filed the criminal complaint that the car was not stolen.

126.    At no point was there probable cause to report the car stolen. Furthermore, it was manifestly foreseeable that reporting the car stolen would result in the detainment of Plaintiff. The police closed the investigation on November 27, 2017, stating that theft report was "unfounded."

127.    Hertz had no information to indicate that the car was stolen, and also knew that it had awful inventory tracking practices. Furthermore, at the direction of Hertz and Hertz's officers and senior employees, the other defendants failed to conduct the required and mandated local investigation designed to prevent false police reports.

128.    As described throughout this complaint, this is a feature, not a bug, of Hertz's conduct. They have made the cold decision that they save money by this course of conduct, even if it means putting the lives and freedom of its customers at risk.

129.    All Defendants owed Plaintiff a duty to ensure compliance with Hertz policies, and to make verified and accurate theft reports—they manifestly breached those duties. Hertz is vicariously liable, and all Defendants are also personally liable.

130.    As a direct and proximate result of Defendants' conduct in initiating a criminal complaint and failing to withdraw the criminal complaint as set forth above, Plaintiff has suffered severe damages including but not limited to monetary damages, severe emotional distress, mental suffering, mental anguish, sleeplessness, restlessness, anxiety, and depression.

131.    Due to the extreme and outrageous conduct of Defendants not acceptable in a civilized society—including wanton and willful negligence, conscious disregard, and reckless indifference of and to Plaintiff's rights—Plaintiff demands punitive damages from all Defendants, jointly and severally.

*****

## COUNT IV –      Intentional/Negligent Infliction of Emotional Distress

*Ryan Smits*

*v.*

*The Hertz Corporation, Kathryn V. Marinello; Julie Wilkerson; Kemal Basar*

132.    Plaintiff incorporates by reference and realleges all other paragraphs of this complaint.

133.    The elements of intentional infliction of emotional distress are that Defendants (1) Defendants acted intentionally or recklessly, (2) Defendants' acts and omissions were extreme and outrageous, (3) Plaintiff suffered severe emotional distress, and (4) Plaintiff's emotional distress was a result of Defendants' conduct.

134.    Here, Defendants caused the theft report in question to be issued.

135.    Defendants acted negligently, recklessly, maliciously, wantonly, with conscious disregard, and/or intentionally as they knew or should have known when they filed the criminal complaint that the car was not stolen.

136.    At no point was there probable cause to report the car stolen. Furthermore, it was manifestly foreseeable that reporting the car stolen would result in the detainment of Plaintiff.

137.    Hertz had no information to indicate that the car was stolen, and also knew that it had awful inventory tracking practices. Furthermore, at the direction of Hertz and Hertz's officers and senior employees, the other defendants failed to conduct the required and mandated local investigation designed to prevent false police reports. In fact, all the Defendants were required to ensure compliance with Hertz's policies requiring a local investigation.

138.    As described throughout this complaint, this is a feature, not a bug, of Hertz's conduct. They have made the cold decision that they save money by this course of conduct, even if it means putting the lives and freedom of its customers at risk.

139.    The use of the criminal justice system is of the utmost seriousness and innocent individuals who have done nothing wrong should not be detained and harassed for merely renting a vehicle.

140.    As a direct and proximate result of Defendants' conduct in initiating a criminal complaint and failing to withdraw the criminal complaint as set forth above, Plaintiff has suffered severe damages, including but not limited to monetary damages, severe emotional distress, mental suffering, mental anguish, sleeplessness, restlessness, anxiety, and depression.

141.    The severe emotional distress suffered by Plaintiff was as a result of the intentional and/or reckless extreme and outrageous conduct of Defendants and was certain to occur, was foreseeable, and was a manifestly reasonable reaction under the circumstances.

142.    Due to the extreme and outrageous conduct of Defendants not acceptable in a civilized society—including wanton and willful negligence, conscious disregard, and reckless indifference of and to Plaintiff's rights—Plaintiff demands punitive damages from all Defendants, jointly and severally.

*****

## COUNT IV –     Negligence/Gross Negligence

*Ryan Smits*

*v.*

*The Hertz Corporation, Kathryn V. Marinello; Julie Wilkerson; Kemal Basar*

143.    Plaintiff incorporates by reference and realleges all other paragraphs of this complaint.

144.    The elements of negligence are (1) duty, (2) breach, (3) causation, and (4) damages.

145.    The defendants in this action owed Plaintiff a duty because they rented a car to his mother, Cullen-Smits, and it was foreseeable that her family, including Plaintiff, would be using the car. Defendants had a duty to Plaintiff because they rented them the car, and also had a duty not to falsely report the car Plaintiff was riding in as stolen, and because it was foreseeable that filing a false police report that that the car was stolen would result in severe damages to Plaintiff. They further had a duty to Plaintiff to implement and practice safe police report procedures. They also had a duty to ensure compliance with Hertz policy W7-02, which is specifically meant to protect against false police reports, to investigate and verify the theft report as accurate, and to otherwise supervise the theft report properly.

146.    Defendants had these duties to Plaintiff as a company, and also personally.

147.    At all points Defendants had notice that Hertz had a serious problem with making false police reports, and tracking inventory, but at no point corrected these issues or ceased making the reports. See Exhibit 2: Exhibit 4.

148.    The defendants in this action breached the duty of care when they violated Hertz's policies and reported Plaintiff's rental car stolen without verification or investigation, despite knowing or should have knowing that Plaintiff was authorized to use the rental and that the car in question was not stolen.

149.    The conduct of Defendants was not only careless, but also malicious, reckless, willful, intentional, wanton, and demonstrated a total indifference to the lives of Defendant Hertz's customers including Plaintiff. Defendants exhibited a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm.

150.    Due to Defendants' tortious conduct and omissions, it directly and/or proximately caused Plaintiff monetary damages and his detainment by police authorities for crimes he had not committed. They have suffered severe emotional distress, loss of freedom, monetary damages, mental suffering, mental anguish, sleeplessness, restlessness, anxiety, and depression.

151.    Due to the extreme and outrageous conduct of Defendants not acceptable in a civilized society—including wanton and willful negligence, conscious disregard, and reckless indifference of and to Plaintiff's rights—Plaintiff demands punitive damages from all Defendants, jointly and severally.

*****

# Claims for Damages

WHEREFORE, on each and every count alleged, Plaintiff claims **compensatory damages** of $500,000, by which the Defendants are jointly and severally liable.

WHEREFORE, on each and every count, Plaintiff claims **punitive damages** of $350,000, by which the Defendants are jointly and severally liable.

# CLAIMS FOR RELIEF

Wherefore, Plaintiff demands judgment in his favor on all Counts and against Defendants, jointly and severally, for an amount well in excess of the jurisdictional amount required to guarantee a jury trial. Plaintiff request that this Court determine and declare that Plaintiff is additionally awarded and afforded on all Counts:

(a)   Injunctive relief;

(b)   Compensatory damages, inclusive of any and all harm attributable to Defendant's actions or inaction, including for loss of freedom, emotional damage, monetary damage, and lost wages;

(c)   Punitive damages to punish the Defendant for its outrageous conduct, self-interest, and duplicitous behavior;

(d)   Punitive and exemplary damages to punish Defendant and especially to deter other companies from acting in such a manner;

(e)   Exemplary damages to set an example for others;

(f)   Attorneys' fees and court costs;

(g)   the loss of time and opportunity;

(h)   Delay damages; and

(i)   Such other and further relief and/or equitable relief that this Court deems just and/or necessary;

(j)   Restitutionary disgorgement of all profits Defendant obtained as a result of unlawful, unfair, and/or fraudulent business practices;

(k)   Mental and emotional pain and suffering;

(l)   Costs and attorney's fees,; and

(m)   Prejudgment interest;

(n)   Such other and further relief as the Court deems just, necessary, and appropriate under the circumstances or allowed by statute.

TRIAL BY JURY IS DEMANDED ON ALL ISSUES.

DATED:

Ryan Smits
**By Counsel**

Kevin L. Locklin, Esquire VSB: 21081
Brian P. Coleman, Esquire VSB: 78378
LOCKLIN & COLEMAN, PLLC
9253 Mosby Street, Suite 100
Manassas, Virginia 20110
(703) 392-6686 Phone
(703) 393-7999 Fax
*Counsel for Plaintiff*

*/s/ AJ Fluehr*
Alfred J. Fluehr, Esquire
FRANCIS ALEXANDER, LLC
Attorney ID No.: 316503
280 N. Providence Road | Suite 1
Media, PA 19063
T:  (215) 341-1063
F:  (215) 500-1005
*Law Firm / Lawyer for Plaintiff*
*(Moving for Admission Pro Hac Vice)*

29

# SPOLIATION CLAUSE

Plaintiff demands that Defendants take necessary actions to ensure the preservation of all documents and things related to the case—in any format   hardcopy, electronic, audio, and visual.

Defendants are also put on further notice to preserve all things including but not limited to information, materials, communications, or other content/data related to the averments in this case.

*****

# ATTACHMENT AL

Court of Common Pleas of Philadelphia County
Trial Division

# Civil Cover Sheet

For Prothonotary Use Only (Docket Number)

**MAY 2020**

E-Filing Number: 2005030374

**001362**

| | |
|---|---|
| **PLAINTFF'S NAME**<br>ROULA VANGELIS | **DEFENDANT'S NAME**<br>HERTZ GLOBAL HOLDINGS, INC. |
| **PLAINTFF'S ADDRESS**<br>644 WEST END WALK<br>MEDIA PA 19063 | **DEFENDANT'S ADDRESS**<br>CORPORATION TRUST COMPANY 1209 ORANGE ST.<br>WILMINGTON DE 19801 |
| **PLAINTFF'S NAME**<br>ALEXANDROS GIDER | **DEFENDANT'S NAME**<br>THE HERTZ CORPORATION |
| **PLAINTFF'S ADDRESS**<br>644 WEST END WALK<br>MEDIA PA 19063 | **DEFENDANT'S ADDRESS**<br>CORPORATION TRUST COMPANY 1209 ORANGE ST.<br>WILMINGTON PA 19801 |
| **PLAINTFF'S NAME**<br>CHRISTINA GIDER | **DEFENDANT'S NAME**<br>HERTZ VEHICLES LLC |
| **PLAINTFF'S ADDRESS**<br>644 WEST END WALK<br>MEDIA PA 19063 | **DEFENDANT'S ADDRESS**<br>CORPORATION TRUST COMPANY 1209 ORANGE ST.<br>WILMINGTON PA 19801 |

| TOTAL NUMBER OF PLAINTFFS | TOTAL NUMBER OF DEFENDANTS | COMMENCEMENT OF ACTION |
|---|---|---|
| 3 | 9 | [X] Complaint  [ ] Petition Action  [ ] Notice of Appeal<br>[ ] Writ of Summons  [ ] Transfer From Other Jurisdictions |

| AMOUNT IN CONTROVERSY | COURT PROGRAMS | | | |
|---|---|---|---|---|
| [ ] $50,000.00 or less<br>[X] More than $50,000.00 | [ ] Arbitration<br>[X] Jury<br>[ ] Non-Jury<br>[ ] Other: | [ ] Mass Tort<br>[ ] Savings Action<br>[ ] Petition | [ ] Commerce<br>[ ] Minor Court Appeal<br>[ ] Statutory Appeals | [ ] Settlement<br>[ ] Minors<br>[ ] W/D/Survival |

**CASE TYPE AND CODE**

2O - PERSONAL INJURY - OTHER

**STATUTORY BASIS FOR CAUSE OF ACTION**

| RELATED PENDING CASES (LIST BY CASE CAPTION AND DOCKET NUMBER) | IS CASE SUBJECT TO COORDINATION ORDER? |
|---|---|
| **FILED**<br>**PRO PROTHY**<br>MAY **21** 2020<br>**A. SILIGRINI** | YES        NO |

**TO THE PROTHONOTARY:**

Kindly enter my appearance on behalf of Plaintiff/Petitioner/Appellant: ROULA VANGELIS , ALEXANDROS GIDER , CHRISTINA GIDER

Papers may be served at the address set forth below.

| NAME OF PLAINTFF'S/PETITIONER'S/APPELLANT'S ATTORNEY<br>FRANCIS MALOFIY | ADDRESS<br>FRANCIS ALEXANDER, LLC<br>280 N. PROVIDENCE ROAD<br>SUITE 1<br>MEDIA PA 19063 |
|---|---|
| PHONE NUMBER<br>(215)500-1000 | FAX NUMBER<br>(215)500-1005 | |
| SUPREME COURT IDENTIFICATION NO.<br>208494 | E-MAIL ADDRESS<br>francis@francisalexander.com |
| SIGNATURE OF FILING ATTORNEY OR PARTY<br>*FRANCIS MALOFIY* | DATE SUBMITTED<br>Thursday, May 21, 2020, 11:49 pm |

FINAL COPY (Approved by the Prothonotary Clerk)

**COMPLETE LIST OF DEFENDANTS:**

1. HERTZ GLOBAL HOLDINGS, INC.
   CORPORATION TRUST COMPANY 1209 ORANGE ST.
   WILMINGTON DE 19801
2. THE HERTZ CORPORATION
   CORPORATION TRUST COMPANY 1209 ORANGE ST.
   WILMINGTON PA 19801
3. HERTZ VEHICLES LLC
   CORPORATION TRUST COMPANY 1209 ORANGE ST.
   WILMINGTON PA 19801
4. JULIE WILKERSON
   14601 HERTZ QUAIL SPRINGS PKWY
   OKLAHOMA CITY OK 73120
5. RICHARD W. LIVINGSTON
   1 ARRIVALS ROAD
   PHILADELPHIA PA 19153
6. KENNETH GRAEBER
   420 LABRADOR TRL
   MULLICA HILL NJ 08062
7. JOSEPH JAUSSI
   37 HARPER BLVD
   RIVERSIDE NJ 08075
8. KYLE EBERT
   1 ARRIVALS ROAD
   PHILADELPHIA PA 19153
9. SCOTT FUNK
   8 DIPRINZIO DR.
   POTTSTOWN PA 19464

Francis Alexander, LLC
Francis Malofiy, Esquire
Alfred (AJ) Fluehr, Esquire
280 N. Providence Road | Suite 1
Media, PA 19063
T: (215) 500-1000
F: (215) 500-1005
*Law Firm / Lawyer for Plaintiffs*



*Filed and Attested by the
Office of Judicial Records
21 MAY 2020 11:49 pm
A. SILIGRINI*

# The Court of Common Pleas
## Philadelphia County, Pennsylvania

---

| | |
|---|---|
| Alexandros Gider, a minor, by his mother and natural guardian Roula Vangelis<br><br>Christina Gider, a minor, by her mother and natural guardian Roula Vangelis<br><br>and similarly situated Plaintiffs<br><br>*Plaintiffs*<br><br>vs.<br><br>Hertz Global Holdings Inc.;<br>The Hertz Corporation;<br>Hertz Vehicles LLC;<br>Julie Wilkerson;<br>Richard W. Livingston;<br>Ken Graeber;<br>Diana Speer;<br>Scott Funk;<br>Kyle Ebert<br><br>*Defendants* | Civil Action No.:<br><br>Related Action:<br>151103380 (*Before The Hon. Paula Patrick*)<br><br>Causes of Action:<br>1. Negligence<br>2. False Imprisonment<br>3. Mal. Abuse of Process<br>4. Malicious Prosecution<br>5. Int./Neg. Infl. of Emo. Dist.<br><br>*Jury Trial Demanded* |

---

# Civil Action Complaint

**NOTICE**

You have been sued in court  If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after the complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you   You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by plaintiff  You may lose money or property or other rights important to you

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE  IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP

PHILADELPHIA BAR ASSOCIATION
Lawyer Referral and Information Service
1101 Market Street, 11th Floor
Philadelphia, Pennsylvania 19107
(215) 238-1701

**AVISO**

Le han demandado a usted en la corte   Si usted quiere defenderse de estas demandas expuestas en las páginas siguientes, usted tiene veinte (20) días de plazo al partir de la fecha de la demanda y la notificación  Hace falta asentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona  Sea avisado que si usted no se defiende, la corte tomará medidas y puede continuar la demanda en contra suya sin previo aviso o notificación  Además, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda   Usted puede perder dinero o sus propiedades u otros derechos importantes para usted

LLEVE ESTA DEMANDA A UN ABOGADO INMEDIATAMENTE   SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO, VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL

ASOCIACIÓN DE LICENCIADOS DE FILADELFIA
Servicio De Referencia E Información Legal
1101 Market Street, 11th Floor
Filadelfia, Pennsylvania 19107
(215) 238-1701

Case ID: 200501362

Francis Alexander, LLC
Francis Malofiy, Esquire
Alfred (AJ) Fluehr, Esquire
280 N. Providence Road | Suite 1
Media, PA 19063
T:  (215) 500-1000
F:  (215) 500-1005
*Law Firm / Lawyer for Plaintiffs*

The Court of Common Pleas
Philadelphia County, Pennsylvania

---

| | |
|---|---|
| Alexandros Gider, a minor, by his mother and natural guardian Roula Vangelis<br><br>Christina Gider, a minor, by her mother and natural guardian Roula Vangelis<br><br>and similarly situated Plaintiffs<br><br>　　　*Plaintiffs*<br><br>　　　　vs.<br><br>Hertz Global Holdings Inc.;<br>The Hertz Corporation;<br>Hertz Vehicles LLC;<br>Julie Wilkerson;<br>Richard W. Livingston;<br>Ken Graeber;<br>Diana Speer;<br>Scott Funk;<br>Kyle Ebert<br>　　　*Defendants* | Civil Action No.:<br><br>**Related Action:**<br>151103380 (*Before The Hon. Paula Patrick*)<br><br>**Causes of Action:**<br>1.  Negligence<br>2.  False Imprisonment<br>3.  Mal. Abuse of Process<br>4.  Malicious Prosecution<br>5.  Int. /Neg. Infl. of Emo. Dist.<br><br>*Jury Trial Demanded* |

---

# Civil Action Complaint

## Introduction

1.　　This case concerns a serious nationwide problem with Hertz Rent A Car which has been serially falsely reporting customers for car theft.[1] Hertz already lost a malicious prosecution and intentional infliction of emotional distress jury trial in 2017 regarding the very same incident at issue in this case (case no. 151103380, before The Honorable Paula Patrick). A punitive damages trial was later ordered in that case, but the matter resolved prior to the trial.

---

[1] For more information on this developing corporate scandal go to: www.truthhertz.net.

Case ID: 200501362

2.    Plaintiffs Alexandros and Christina Gider (then 9 and 8 years old) were in the backseat of a Hertz rental vehicle with their mother, Roula Vangelis, and close family friend Kelly Grady, on their way home from vacation on July 22, 2013 when they were suddenly pulled over and surrounded by police with guns drawn.

3.    The police ordered Vangelis and Grady to get out of the car on a loudspeaker. Scared and unsure what was happening Vangelis and Grady pled with police that there were young children in the vehicle. The Gider children were terrified as Vangelis and Grady were detained at gunpoint.

4.    Eventually, the police told Vangelis and Grady that Hertz had accused Grady of stealing the rental car. Grady was shocked and adamant that she was authorized to the use the car and had always extended, including with one employee named John she knew by name.

5.    The police reached Hertz and were able to confirm that the police report was a mistake and that at most there was a civil payment dispute between Grady and Hertz (in fact Grady had paid).

6.    To experience such a sudden and shocking event at such a young age caused tremendous damage to both children who were 8 and 9 years old.

7.    Previously, Grady filed suit against Hertz for this incident in 2015 after Hertz continued to prosecute her and imprisoned her for 12 days. She alleged malicious prosecution and intentional infliction of emotional distress. Hertz was found liable in a September 2017 trial. Later, in November 2017, the Court ordered a trial on punitive damages against Hertz.

8.    However, what was unknown at that time is that the false report that led to the July 22, 2013 stop, was the result of systemic problems affecting Hertz's rental and theft reporting policies and procedure. Hertz has a nationwide problem with false theft reports, which has affected many customers.

9.    Plaintiffs now bring suit to recover for the same conduct for which Hertz was found liable in the Grady case.

10.    Furthermore, it is suspected that many other customers from the Hertz family of companies (Hertz, Dollar, Thrifty) have been subjected to similar mistreatment in Pennsylvania.[2] The intent is to file a motion to establish a mass tort as soon as practicably possible.

---

[2] Plaintiffs also intends to add additional responsible Hertz managers.

Case ID: 200501362

## Plaintiffs were Left Terrified after Hertz Filed a False Police Report against Kelly Grady

11.    Kelly A. Grady, was a 35-year old woman with no criminal history when she rented a Chevy Yukon from the Philadelphia Airport Hertz location on April 17, 2013.

12.    Ms. Grady followed all applicable rules and regulations and paid for the car rental as directed by Hertz.

13.    Ms. Grady contacted Hertz repeatedly in 2013, spoke with a Hertz employee she knew named John, and was assured that there were no issues with her rental. Grady has voluminous phone records showing that she spent hours on the phone with Hertz. She was also charged $2,444.94 on July 15, 2013.

14.    Grady and Vangelis decided to take plaintiffs Alexandros and Christina, ages 9 and 8 at the time, on a vacation to Williamsport, PA.  Before leaving, Grady returned to the Hertz location on July 18, 2013, and got permission to keep the truck until July 22, 2013.

15.    No one told Grady that Hertz was reporting the car stolen, and told police that she had not spoken with the company since April, had not extended, that she had not paid, and that she was otherwise had stolen the car.

16.    In reality, Grady had been paying and extending her rental the entire time, which is shown in the record, and had even returned to the rental location on July 18 to check in on the status of her rental.

17.    Out of nowhere, on their way home from Williamsport to drop off the rental car, their vehicle was pulled over on July 22, 2013, by State Police. This was not a routine stop. There were several police cars, and the police ordered Ms. Grady and Plaintiffs' mother out of the vehicle over a loudspeaker. Their guns were drawn.

18.    As Vangelis and Grady were held at gunpoint by the State Police who believed the women were car thieves, they sobbed as they desperately screamed that there were two young children in the back of the vehicle. The fear was that if the police started shooting they would hit the kids.

19.    It was at this point that State Trooper Randy Kemmerling told the two women that the car had been reported stolen. Ms. Vangelis stated, "That's ridiculous, she has a contract with Hertz." Id.

Case ID: 200501362

20.    At this point, the officer retrieved the contract from the vehicle. It was then that the two women implored Trooper Kemmerling to call John—the Hertz customer representative that she rented the car from—to confirm that Ms. Grady had not stolen the car. Id.

21.    When the officer called Hertz corporate he was in fact told by Hertz that Grady had not stolen the vehicle. The police records confirm this:

**Synopsis:**
This incident occurred as Hertz Rental Company reported a vehicle as stolen. The vehicle was stopped at the above location and all occupants were identified. Upon calling Hertz Rental Company and the Philadelphia Police Department, it was determined this is a civil issue regarding late payment and the vehicle was not stolen.

HERTZ Rental Company was contacted and advised that the credit card listed on the contract with the suspect had returned with insufficient funds and as a result the account was overdue. As a result they reported the vehicle stolen. HERTZ advised they would prefer the vehicle to be towed and picked up by a representative and would handle the civil tort regarding payment with the suspect.

**Conclusion/Recommendation:**
I recommend this investigation be terminated due to the fact that Hertz Rental Company will be handling this situation through civil action. It was found that the vehicle was reported as stolen from the Philadelphia Airport rental terminal after a miscommunication regarding an overcharged credit card as part of a Hertz Rental Car contract. Philadelphia PD has been provided all requested documentation and was advised the vehicle was towed/recovered.

8. INCIDENT DETAILS
This incident occurred as a GMC YUKON was reported stolen by Hertz Rental Company. The vehicle was traveling southbound at the above location when the incident was reported. A traffic stop was conducted on SR 322, in Dauphin County, PA. Upon making contact with the operator of the vehicle and contacting Hertz, it was determined that this is a civil issue relating to late payment on a rental contract.

22.    As a result, the officers took no action against Ms. Grady and she was never given any sort of ticket or citation.

23.    This ordeal was traumatic for the Plaintiffs and they now seek redress for their grievances.

### THE PRIOR GRADY CASE AGAINST HERTZ REVEALED THAT HERTZ HAS A SERIOUS, NATIONWIDE THEFT REPORTING PROBLEM

24.    Kelly Grady brought suit against The Hertz Corporation in 2015 for her ordeal.

25.    In that case, it quickly became aware that Hertz had no legitimate excuse for what it did to Grady and the Gider children.

26.    Hertz's corporate designees were forced to admit that Hertz has serious issues in how it handles theft reports.

27.    Among these problems are that:

Case ID: 200501362

a.  Hertz's disregards its own policies and instructions employees not to perform investigation and verification of theft report

b.  Hertz routinely uses false payment information in police reports to make it look like the renter is refusing to pay

c.  Hertz's computer systems do not accurately record renter contact with the company, and the company falsely tells police the renter refuses to talk to the company or extend the rental

d.  Hertz's deletes the rental records of customers it reports for theft to hide evidence that contradicts its theft reports.

28.    The Grady case helped illustrate that Hertz's top corporate officials have known for years that it has a serious, nationwide problem with false police reports but has done nothing to stop it.

## Hertz Does Not Investigate or Verify Theft Reports in Violation of Hertz's Very Own Standard Operating Procedures

29.    Hertz's corporate policies *require* that a local investigation be done before any theft report is made to verify that the report is accurate. The policy reads:

> Corporate/Country Security Manager Investigations - Every theft/conversion/disappearance must be promptly investigated by the Corporate/Country Security Manager responsible for the location from which the related Theft Vehicle Report is filed. All employees are required to cooperate fully with such an investigation.

Exhibit 1 - W7-02 RAC(17). An investigation and verification that the report is accurate is also required by laws prohibiting false police reports.

30.    Furthermore, the policy states that "Location; Maintenance, Area, Country Head Office and. OKC Management *must ensure compliance to this procedure*." Id. (emphasis added).

31.    Despite this policy, Hertz's corporate officers have instructed its employees not to follow this policy.

32.    A Hertz corporate security designee, defendant Livingston, stated that, despite corporate policies, no investigations are performed because of "marching orders" from Hertz corporate:

Case ID: 200501362

| COUNSEL: | Is it your testimony that you don't go to the location and question any of the Hertz employees when you receive a theft package? |
| --- | --- |
| MR. LIVINGSTON: | That's my testimony, yes. |
| COUNSEL: | Why? |
| MR. LIVINGSTON: | Because I mean the package has been completed, all the reports have been reviewed, I guess, by OKC. **And my marching orders are to report the car stolen** when I get the -- again, I do look at it for everything being accurate, as far as I can tell, within the report itself. |
| COUNSEL: | Yeah. *But you don't do any independent investigation?* |
| MR. LIVINGSTON: | *I do not.* |
| COUNSEL: | *You don't do any check?* |
| MR. LIVINGSTON: | *I do not.* |

Exhibit 2, at p.252] (emphasis added).

33.    This was confirmed by another designee, a manager for the company:

| COUNSEL: | We deposed Mr. Rich Livingston Tuesday. He indicated that he doesn't put the package together. He just gets it from Oklahoma City and then basically just couriers it to the police. Is it your understanding that the corporate security manager or assistant corporate security manager actually puts the theft package together? Or is it your understanding that the theft package is put together in Oklahoma City and then sent to the corporate security manager at the location where the car was allegedly taken from? |
| --- | --- |
| MR. JAUSSI: | *So it's my understanding that Oklahoma City generates the packet and all the pertaining documents within it, feeds Ken Graeber or Rich Livingston, right, and Ken Graeber or Rich Livingston essentially print, file, and go seek a police report claim or case number.* |
| COUNSEL: | Okay. *So the theft package is already completed in Oklahoma City before it's sent to the corporate security manager at the Hertz location* where the car was allegedly taken from, correct? |
| MR. JAUSSI: | *That's my understanding, correct.* |

Case ID: 200501362

See Exhibit 3 - Jaussi Testimony, at pp. 69-70 (emphases added) (objections omitted).

34.    According to Livingston, corporate security personnel do not even have access to rental information to verify the accuracy of theft reports:

| COUNSEL: | Do you have access to phone logs to determine when a renter called in? |
|---|---|
| MR. LIVINGSTON: | I do not. |
| COUNSEL: | Do you have access to any kind of logs that determine the contacts the renter had with Hertz? |
| MR. LIVINGSTON: | Do not. |

Exhibit 2, at p. 205.

35.    The assistant corporate security manager, defendant Graeber, who actually delivered the paper theft package to the Philadelphia Police, also testified that he had no role in investigating or providing the information in the theft package, but that he instead saw himself as a "custodian of records" who just reports the car stolen:

> I was custodian of records and I didn't personally provide that information [in the theft package]. It was sent to me [by Vehicle Control], and I just reported it stolen as per Hertz policies

Graeber Deposition, at p.19.

36.    Julie Wilkerson, Hertz's national supervisor for Vehicle Control (and trial designee), dissembled about whether Hertz expects its corporate security managers to conduct a local investigation

| COUNSEL: | In fact, this is a procedure [W7-02(a)(17)] that you follow to make sure that innocent people aren't wrongfully arrested for accidental reporting to the police, correct? |
|---|---|
| WILKERSON: | Correct. |
| . . . . | |
| COUNSEL: | Now, it says here that the question was asked of [Livingston] or anyone working for him or working with him, if they did any check and his response was no, not on his side of the fence. Do you see that? |
| WILKERSON: | I do see that. |
| COUNSEL: | Now, you just testified that he would have checked the computer system of some sort, right? |

Case ID: 200501362

| WILKERSON: | *He should have checked the computer system.* |

Exhibit 4 - Wilkerson Testimony, at pp. 37-46 (objections omitted) (emphases added)

37.     She was then constrained to admit that the failure to conduct local investigations violated Hertz's policy W7-02(a)(17) in thousands of cases.

| COUNSEL: | How many theft reports have come out of Philadelphia? |
| MR. EDELSTEIN: | When? |
| COUNSEL: | In 2013-2014, ma'am. |
| WILKERSON: | A lot. |
| COUNSEL: | A lot? |
| WILKERSON: | Yes. |
| COUNSEL: | And what would you say? |
| WILKERSON: | Maybe 2000. |
| COUNSEL: | *Do you know – excuse me. Mr. Livingston testified that he's gone into court and handled about 400 of these and he's never done a local investigation to determine the truth and veracity of those theft packages?* |
| WILKERSON: | No, I didn't know that. |
| COUNSEL: | *That would fall well below the policies and procedures of even Hertz Corporate policies, correct?* |
| WILKERSON: | *Yes.* |

Exhibit 4 - Wilkerson Testimony, at pp. 37-46 (objections omitted) (emphases added). In reality, Vehicle Control, Wilkerson's department, had told Livingston and the other corporate security managers not to conduct any investigation.

38.     Wilkerson, was forced to admit that Hertz had egregiously failed to protect its customers:

| COUNSEL: | And here's what I'm getting at and where I'm going with this, it says near the last line: "Location, maintenance, area, country, head office, and OKC management must ensure compliance with this procedure." Do you see that? |
| MS. WILKERSON: | Yes. |

| | |
|---|---|
| COUNSEL: | Is it your job to ensure compliance with this procedure? |
| MS. WILKERSON: | Yes. |
| COUNSEL: | And you're the person in charge of 700,000 cars to make sure as the regulator that these . . . procedures are followed, correct? |
| MS. WILKERSON: | Correct. |
| COUNSEL: | Now, when it says "location," that means in this instance the Philadelphia location, correct? |
| MS. WILKERSON: | Correct. |
| COUNSEL: | **In fact, this is a procedure that you follow to make sure that innocent people aren't wrongfully arrested for accidental reporting to the police, correct?** |
| MS. WILKERSON: | **Correct.** |
| COUNSEL: | And it's important these policies and procedures are followed by Hertz Corporation, correct? |
| MS. WILKERSON: | Correct. |
| COUNSEL: | **And if Hertz doesn't follow this problem -- this procedure, that would be a failure on the part of Hertz, correct?** |
| MS. WILKERSON: | **Correct.** |

See Exhibit 4, at p.28-47 (emphases added).

39.    Instead of ensuring compliance with this procedure, all Defendants have been deliberately circumventing it—despite it being a safeguard which prevents false reports, such as the one that harmed Plaintiffs.

40.    Hertz has admitted this is because it has been cutting costs and personnel in its corporate security department. Mr. Livingston, Hertz's corporate security designee, testified that Hertz, in 2015, had made "**a corporate decision to lay off a large group of people at that time for cost savings**" within the corporate security department. Livingston Depo., at p.54. It is the corporate security department that performs the local investigations mandated by W7-02.

41.    Cutting these positions in corporate security further exacerbated Hertz's failure to comply with W7-02 and other theft reporting policies, and directly signaled that Hertz's top corporate officials had no intent of complying with W7-02. These layoffs were implemented with

the intent and purpose to cut costs and increase profits, at the expense of the lives of their customers. At trial in the Grady case, Hertz stipulated that it was in fact cutting costs.

## Hertz Falsifies Payment Information in Police Reports to Secure Illegal Arrests & Prosecutions

42.      In every theft report there are two implicit variables: payment and time.

43.      If the rental vehicle is paid, or the renter has provided Hertz a valid form of credit (e.g., a credit card number), it should be clear that the renter does not intend to steal the car. Indeed, in any type of consumer theft report, the determinative factor is payment.

44.      Hertz routinely provides false information to the police in its theft packages about customer payment to secure criminal charges against the renter. To understand how and why, some background is needed on Hertz's billing process.

45.      When a customer initially rents a car from Hertz, they provide a credit card to Hertz as a letter of credit so that Hertz can charge for any costs associated with the rental.

46.      At the time of the initial rental, Hertz puts something called an "authorization hold" on the customer's card. An authorization hold is not a permanent charge, it simply checks the customer's account to see if it is valid and has funds. This temporary charge does not appear on any monthly billing statements, and is not a bill or payment.

47.      If the customer later extends the rental, Hertz also places an authorization hold on the customer's card. Again, this is not a final billing or payment.

48.      Only at the end of the rental, after the rental is closed out, does Hertz actually charge the customer's card for payment on the full rental.

49.      Although, an authorization hold may be denied during the rental for a variety of reasons, such as a low balance, ***this says nothing about whether the final billing charge will go through***.

50.      When filing theft reports, Hertz first finalizes and prints out paper theft packages compiled in Oklahoma City which claim that the customer never paid for the rental and that the card was "denied." However, when the theft package is printed out, ***the customer has not yet been billed***. The paper theft packages state that the customer owes the full balance of the rental. Then and only then, after the theft package is printed out, does Hertz charge the customer for the car rental. The final billing charge is almost always successful.

Case ID: 200501362

51.     Yet, despite having just charged the customer and received payment, Hertz then gives the now out-of-date paper theft package to the police claiming that the renter never paid, has an outstanding balance of many thousands of dollars, and that the renter provided an invalid card.

52.     At no point does Hertz inform the police that the customer has been charged.

53.     As is immediately obvious, this means that many if not all overdue Hertz police report contains materially false information.

54.     Incredibly, this is not the result of some sort of massive error, but instead has been deliberately written into Hertz's policy since at least 2007:

Exhibit 1 - W7-02 Theft Reporting Policy.

55.     The reason the policy is written in this manner is because Hertz knows that if police were aware that Hertz had charged the customer, and always had a letter of credit to bill the customer at its discretion, the theft report would not be accepted.

56.     Indeed, when the customers provide proof of payment to the prosecutors, the prosecutions are dismissed.

57.     Hertz has known about this issue for many years but has stubbornly refused to revise the policy. Given that Hertz files at least 10,000 police reports a year, and this policy has been in place since at least 2007, the number of affected individual is huge.

58.     Every named Plaintiff reported for overdue rental theft was billed by Hertz after the theft report was printed out; in no cases were the police were told about the payments.

Case ID: 200501362

59.    This policy is at a minimum reckless, it is a corporate device to obtain police action against customers where there is otherwise no probable cause to do so. There is no legitimate or valid reason for such a policy.

60.    All corporate Hertz defendants and their employees, the named defendant directors, and the named defendant officers were aware of this policy and refused to change it or otherwise take action.

61.    In September 2017 Hertz lost a malicious prosecution trial in Philadelphia. As with Plaintiffs' cases explained in this Complaint, Hertz had given a theft package to the police which said she owed $2,445, when in reality Hertz had received payment of $2,445 a week before the police report.

62.    Hertz's national supervisor for Vehicle Control, Julie Wilkerson, attempted to dissemble on the witness standard about whether Hertz had told the police about Grady's payment:

| COUNSEL: | Do you believe if there's -- I think you testified if there's omitted facts, they should be corrected, correct? |
|---|---|
| WILKERSON: | Yes. |
| COUNSEL: | Eventually did Hertz become aware of additional facts in regards to Ms. Grady's rental that should have been provided to the police? |
| WILKERSON: | Which facts? |
| COUNSEL: | Well, the payment of $2400. |
| WILKERSON: | **That was actually in the theft package. The police had that information.** |
| COUNSEL: | **The police had that information?** |
| WILKERSON: | **Yes, it's in the billing page of the theft package.** |

Exhibit 4 - Wilkerson Testimony, at pp. 5-6 (emphasis added).

63.    This testimony was untrue. Wilkerson supervised Hertz vehicle control for many years, and she was—and is—well aware that a theft package provided to the police never contains payment information for the simple reason that the renter is charged only after the theft package is generated and taken to police. See Exhibit 1 - W7-02(D).

64.    When she later tried to repeat her misstatement, she was impeached and ultimately forced to admit that her testimony was untrue:

| | |
|---|---|
| COUNSEL: | Ma'am, I'm asking you was 2445 paid, yes or no? |
| WILKERSON: | Yes. |
| COUNSEL: | And that information was never updated to the police, correct? |
| WILKERSON: | No. |
| COUNSEL: | It was not corrected, correct? It was not updated to the police, correct? |
| WILKERSON: | **They had the information.** |
| COUNSEL: | I'm asking you if the information that it was paid was updated to the police, yes or no? |
| WILKERSON: | **The police actually have the theft package and this was in the theft package.** |
| COUNSEL: | Ma'am, you just identified that that is not a payment for 2445, it's what is owed. Do you understand the difference between -- |
| WILKERSON: | Yes. |
| COUNSEL: | -- money in your bank account -- |
| WILKERSON: | Yes. |
| COUNSEL: | -- and what is owed to you? It's the difference between an asset and a liability, right? |
| WILKERSON: | Yes. |
| COUNSEL: | Okay. Understand the difference? |
| WILKERSON: | Yes. |
| COUNSEL: | You deal with this every day? |
| WILKERSON: | Yes. |
| *COUNSEL:* | *So let's be clear. The police didn't know $2445 was paid before they signed an affidavit of probable cause allowing Ms. Grady to be arrested, correct? Correct, ma'am?* |
| *WILKERSON:* | *Correct.* |

Case ID: 200501362

COUNSEL:            No further questions.

Exhibit 4 - Wilkerson Testimony, at pp. 54-55 (emphases added).

65.    Wilkerson's evasive testimony demonstrates that she and Defendants were always well aware that it is impossible for theft packages to show renter payments; Hertz policy mandates that the renter's credit card be charged after the theft package is generated

## Hertz Erases Rental Extensions and Backdates the Rental Due Date

66.    As noted, every rental theft report is based on two main variables: payment and time. In addition to misrepresenting payment, Hertz also utterly botches the time component of the overdue vehicle theft reports.

67.    In sum and substance, after renters extend the rental period, Hertz's computer systems outrageously deletes the customer extensions *without notice to the customer*.

68.    When a customer calls in to Hertz to extend the rental, the renter can call the location or Hertz corporate's 1800 extension number. When the customer extends, Hertz then places an authorization hold on the card. If the authorization hold is approved by the bank, then the extension appears on Hertz's records.

69.    However, if the authorization hold is denied, Hertz's computer systems at Vehicle Control erase the extension and backdate the due date of the rental. Not only is the customer not informed of the voided extension, but the deletion is also not apparent to Hertz employees.[3]

70.    To be very clear, when the Plaintiffs allege that Hertz erases the extension what they mean is that Hertz's computer programs completely erase any evidence not only that the renter ever extended, but that the renter ever attempted to contact Hertz in the first place.

71.    The problem is immediately apparent to even the most cursory observer. The renter has been told that he is authorized to use the car for an extended period, yet Hertz has secretly canceled the extension and erased any evidence it ever existed.

72.    It is one thing if Hertz wants a new form of payment and lets the customer know; it is something else entirely if Hertz memory holes the rental extension. In some cases, the renter

---

[3] Although the extension is erased, the Contract Notebook which contains a history of the rental contacts (which is not consulted by Vehicle Control), can retain information showing that the renter had contacted Hertz.

Case ID: 200501362

has extended over 10 times and each time, without notice to the renter, Hertz secretly erased the extensions.

73.     Hertz then reports the customer to the police claiming that the due date of the rental was months before and that the renter never extended or contacted Hertz about the rental. This information not only goes directly to whether the renter extended and was authorized to use the vehicle, but also is vital information about whether the renter had actually absconded with an intent to steal the vehicle. No exculpatory information from the Contract Notebook is given to the police.

74.     Instead of following its own policies, and taking basic steps to ensure accurate police reports, Hertz has been routinely mass reporting its own customers for theft without verifying whether they committed a crime because it has made the cold calculation that it is more cost effective to use the nation's police forces, prosecutors, and judges as a taxpayer funded repo service—at the expense of the lives of its innocent customers who are caught in the middle—like Plaintiffs.

75.     Significantly, Hertz knows that when it reports customers to the police it has a duty to preserve that customer's rental information. Specifically, Hertz officials testified that the company has to keep those records for 7 years.

76.     However, in the Grady case, rather than turn over the records in question, Hertz admitted that it "purged" and destroyed all of Grady's rental records. As a result of this blatant spoliation, the trial court granted negative inferences against Hertz.

77.     Hertz did so because the rental records contradicted Hertz's blatantly false theft report. For instance, the Pa. State Police report made it clear that Hertz knew that the Grady had not stolen the vehicle, that it had been extended, and that there had been renter contact. The Hertz employee also made it clear that the only issue was a possible civil billing dispute.

78.     Restated, the Hertz employee the police spoke to was looking at records very different than the false narrative included in the theft report.

79.     Yet, instead of turning of over this exculpatory evidence, Hertz never gave it to the police/prosecutors, never gave it to Grady during the criminal case, and destroyed it rather than give it to Grady in the civil case.

Case ID: 200501362

80.    After the jury found that Hertz acted in an atrocious, extreme, and outrageous manner that has no place in a civilized society, this Court held that Hertz was liable for punitive damages.

81.    Defendants' acts and omissions that are the subject of this complaint were knowing and/or careless and/or negligent and/or reckless and/or intentional and/or malicious.

82.    The systemic failures of The Hertz Corporation have affected thousands of Hertz customers around the world, and defendant Hertz's directors, officers, employees, and agents were on notice that this was a serious problem that needed to be addressed and fixed.

83.    As a direct and proximate result of Defendants' acts and omissions, Plaintiffs have incurred severe and substantial damages and actual harm. These damages include but are not limited to:

a.    Monetary damages;

b.    Attorneys' fees;

c.    Severe mental distress, as well as severe emotional distress, mental suffering, mental anguish, sleeplessness, restlessness, anxiety, and depression;

d.    Harm to social relationships;

e.    Emotional pain and suffering.

*****

Case ID: 200501362

# Parties

**Plaintiff Alexandros Gider,** a minor, by his mother and natural guardian Roula Vangelis

84.    Plaintiff Alexandros Gider is a minor (17 years of age), and a resident of Delaware County, PA. His mother's address is 644 West End Walk, Media, PA 19063.

**Plaintiff Christina Gider,** a minor, by her mother and natural guardian Roula Vangelis

85.    Plaintiffs Christina Gider is a minor (15 years of age), and a resident of Delaware County, PA. Her mother's address is 644 West End Walk, Media, PA 19063.

**Similarly Situated Plaintiffs**

86.     Plaintiffs intend to file a motion for mass tort certification due to the widespread false police reports being submitted by Hertz across the country, and in the Commonwealth of Pennsylvania.

87.     Common issues of fact and law will predominate.

**Defendant The Hertz Corporation**

88.    Defendant The Hertz Corporation is a Delaware corporation.

89.    The Hertz Corporation operates a rental car location in Philadelphia, PA at either 1 Arrivals Road, Philadelphia, PA 19153 or 8800 Essington Ave., Philadelphia, PA 19153, or both.

90.    The Hertz Corporation is headquartered at 8501 Williams Road, Estero, FL, 33928.

**Defendant Hertz Global Holdings Inc.**

91.    Defendant Hertz Global Holdings Inc. is a Delaware corporation.

92.    Hertz Global Holdings Inc. is headquartered at 8501 Williams Road, Estero, FL, 33928.

**Defendant Hertz Vehicles LLC**

93.    Hertz Vehicles LLC is a subsidiary of Hertz Global Holdings, Inc. and is a Delaware corporation. Hertz Vehicles LLC owned the car that was reported stolen. The car was reported stolen on its behalf.

94.    Hertz Vehicles LLC is headquartered at 8501 Williams Road, Estero, FL, 33928.

**Defendant Julie Wilkerson**

Case ID: 200501362

95.    Defendant Wilkerson was at all relevant times the national supervisor for vehicle control for Hertz.

96.    She is believed to be a citizen of Oklahoma.

97.    Defendant Wilkerson supervised the theft reporting process for Hertz overall at all relevant times, and supervised the theft reporting process for the rental at issue in Philadelphia, PA.

98.    Because Wilkerson caused a false theft report to be made in Philadelphia, and supervised thousands of theft reports made by the Philadelphia Airport location, she has a specific nexus to Pennsylvania sufficient to confer personal jurisdiction upon her in this State.

**Defendant Richard W. Livingston**

99.    Defendant Richard W. Livingston is a mid-Atlantic region Corporate Security Manager for Hertz whose territory encompasses the Philadelphia Airport Location.

100.    He is believed to be a citizen of New Jersey.

101.    By virtue of his position, Hertz policy imposed a duty on Livingston to ensure compliance with W7-02 (Reporting Vehicle Thefts and Conversions): "Location, Maintenance, Area, Country Head Office and OKC Management must ensure compliance to this procedure."

102.    W7-02(a)(17) also imposes on Livingston a duty to investigate and verify all theft reports being made from the Philadelphia airport location are true, accurate, correct, and complete.

103.    Livingston, along with the rest of Hertz management, did not ensure compliance with this procedure.

104.    Livingston testified that he had marching orders from Hertz corporate that he and his staff, including defendant Graeber, were not to perform the (a)(17) investigation, and that they were instead to simply courier every theft package they received from Vehicle Control without changes to the police.

105.    Livingston testified that in the thousands of cases his office had handled, the local investigation was never performed.

**Defendant Ken Graeber**

106.    Defendant Ken Graeber was an Assistant Corporate Security Manager for Hertz.

107.    He is believed to be a citizen of New Jersey.

Case ID: 200501362

108.    Graeber was the Hertz employee who actually couriered the theft package from Vehicle Control in Oklahoma City to the Philadelphia Police regarding the rental at issue.

109.    By virtue of his position, Hertz policy imposed a duty on Graeber to ensure compliance with W7-02 (Reporting Vehicle Thefts and Conversions): "Location, Maintenance, Area, Country Head Office and OKC Management must ensure compliance to this procedure."

110.    W7-02(a)(17) also imposes on Graeber a duty to investigate and verify all theft reports being made from the Philadelphia airport location are true, accurate, correct, and complete.

111.    Graeber testified that he instead viewed his role merely as a records custodian who was to ferry Vehicle Control's theft package over to the police without verification.

## Defendant Joseph Jaussi

112.    Defendant Jaussi was a location manager at the Philadelphia Airport Hertz.

113.    He is believed to be a citizen of New Jersey.

114.    By virtue of his position, Hertz policy imposed a duty on Jaussi to ensure compliance with W7-02 (Reporting Vehicle Thefts and Conversions): "Location, Maintenance, Area, Country Head Office and OKC Management must ensure compliance to this procedure."

115.    W7-02(a)(17) also imposes on Jaussi a duty to investigate and verify all theft reports being made from the Philadelphia airport location are true, accurate, correct, and complete.

## Defendant Kyle Ebert

116.    Defendant Kyle Ebert was at the time of the incident a Senior Location Manager for Hertz at the Philadelphia location.

117.    Ebert is a citizen and resident of Pennsylvania.

118.    By virtue of his position, Hertz policy imposed a duty on Ebert to ensure compliance with W7-02 (Reporting Vehicle Thefts and Conversions): "Location, Maintenance, Area, Country Head Office and OKC Management must ensure compliance to this procedure."

119.    This includes making sure that locations investigate and verify theft reports to ensure they are true, accurate, correct, and complete.

120.    Ebert, along with the rest of Hertz management, did not ensure compliance with this procedure.

Case ID: 200501362

## DEFENDANT SCOTT FUNK

121.    Defendant Scott Funk was at the time of the incident a Senior Location Manager at the Hertz Philadelphia Airport location.

122.    Funk is a citizen and resident of Pennsylvania.

123.    Funk's duties included driving cost saving and revenue generating initiatives.

124.    By virtue of his position, Hertz policy imposed a duty on Funk to ensure compliance with W7-02 (Reporting Vehicle Thefts and Conversions): "Location, Maintenance, Area, Country Head Office and OKC Management must ensure compliance to this procedure."

125.    This includes making sure that locations investigate and verify theft reports to ensure they are true, accurate, correct, and complete.

126.    Funk, along with the rest of Hertz management, did not ensure compliance with this procedure.

127.    All Defendants owed a duty to Grady and to Plaintiffs (individuals it was foreseeable would be in the car and harmed by a false report).

128.    All Defendants owed a duty to Plaintiffs to conduct the rental reasonably and appropriately.

129.    All Defendants had knowledge of W7-02(a)(17) and also knew that Hertz was not complying with its own written policy safeguards which were designed to prevent false reports. All Defendants had knowledge that W7-02(D) would result in falsified payment information being provided to the police.

130.    All Defendants knew that police reports have to be true, accurate, correct, and complete, and that the police reports being submitted by Hertz did not meet this standard— including the one at tissue.

131.    All Defendants had the ability to intervene and take corrective action, but failed to do so.

132.    The failure of the Hertz corporate defendants and managers to address these issues is undeniable. The corporate and individual defendants are directly liable for these failures because they (1) participated in developing and implementing the theft reporting process, (2) knew about the problems with Hertz's theft reporting process and did nothing, and (3) negligently supervised and managed the theft reporting process. The Defendants have a duty to

Case ID: 200501362

ensure that Hertz's procedures are safe, effective, comply with the law, and comply with industry standards.

133.    All corporate defendants (jointly known as "Hertz") are alleged to be vicariously liable for the actions and omissions of their employees, including the individual Defendants.

*****

Case ID: 200501362

# Jurisdiction & Venue

134.    Jurisdiction over the parties in the Courts of the Commonwealth of Pennsylvania is proper pursuant to the provisions of 42 Pa. C.S. § 5301 *et seq.* Specifically, jurisdiction as to the Defendants is proper via residence, or pursuant to 42 Pa. C.S. § 5301 (a)(3)(iii) by reason of "carrying on of a continuous and systematic part of its general business within this Commonwealth." Defendants transacted business in this Commonwealth and caused harm and compensable injury to Plaintiffs by acts or omissions committed in the Commonwealth of Pennsylvania that are the subject of the present complaint.

135.    Venue is proper in the Philadelphia County Court of Common Pleas under Pennsylvania Rules of Civil Procedure 2130 and 1006 inasmuch as Defendants regularly conducted business in Philadelphia County and inasmuch as the cause of actions arose and/or a majority of the harm, occurrences, and transactions regarding Plaintiffs' cause of actions arose and/or took place at least in part in Philadelphia County.

Case ID: 200501362

## COUNT I – NEGLIGENCE

*Alexandros Gider and Christina Gider, minors,*
*by and through their parent and natural guardian Roula Vangelis,*
*and, Similarly Situated Plaintiffs*
*v.*

*The Hertz Corporation; Hertz Global Holdings Inc; Hertz Vehicles LLC; Julie Wilkerson; Richard*
*W. Livingston; Joseph Jaussi; Ken Graeber; Scott Funk; Kyle Ebert*

136.    Plaintiffs incorporate by reference and reallege the preceding paragraphs of this complaint pursuant to Pa. RCP 1019(g).

137.    The elements of negligence are duty, breach, causation, and damages.

138.    Defendants have a duty to those who renter their cars. This duty extends to every Hertz customer and every reasonably foreseeable passenger who enters their rental vehicles. Plaintiffs were reasonably foreseeable passengers because they were the children of the renter's best friend and were using the rental for a vacation trip.

139.    Defendants breached their duty to Plaintiffs when they failed to track extensions, failed track renter contact, failed to track payment, failed to investigate and verify the theft report, and otherwise filed a false police report with police which falsely accused Grady of car theft.

140.    Defendants breached their duty to Plaintiffs when they turned a civil issue of payment into a criminal matter, putting the lives of everyone in the car in jeopardy.

141.    The failure of the Hertz corporate defendants and managers to address these issues is undeniable and breached the duty of care. The corporate and individual defendants are directly liable for these failures because they (1) participated in developing and implementing the theft reporting process, (2) knew about the problems with Hertz's theft reporting process and did nothing, and (3) negligently supervised and managed the theft reporting process. The Defendants have a duty to ensure that Hertz's procedures are safe, effective, comply with the law, and comply with industry standards.

142.    All corporate defendants (jointly known as "Hertz") are alleged to be vicariously liable for the actions and omissions of their employees, including the individual Defendants

143.    As a direct and proximate result of Defendants' acts and omissions, Plaintiffs have incurred severe and substantial damages and actual harm. These damages include but are not

Case ID: 200501362

limited to severe mental distress, as well as severe emotional distress, mental suffering, mental anguish, sleeplessness, restlessness, anxiety, and depression.

*****

Case ID: 200501362

# Count II - False Arrest/Imprisonment

*Alexandros Gider and Christina Gider, minors,*
*by and through their parent and natural guardian Roula Vangelis,*
*and, Similarly Situated Plaintiffs*
*v.*

*The Hertz Corporation; Hertz Global Holdings Inc; Hertz Vehicles LLC; Julie Wilkerson; Richard*
*W. Livingston; Joseph Jaussi; Ken Graeber; Scott Funk; Kyle Ebert*

144.    Plaintiffs incorporate by reference and realleges the preceding paragraphs of this complaint pursuant to Pa. RCP 1019(g).

145.    Defendants filed a false complaint against Grady with the Philadelphia Police Department falsely alleging that she had stolen a car from Defendants.

146.    Defendants made this false complaint carelessly and/or negligently and/or recklessly and/or knowingly and/or intentionally and/or maliciously.

147.    As a direct and eminently foreseeable result of Defendants' actions in filing a criminal complaint against Grady, Plaintiffs were falsely arrested/imprisoned as they were detained by police.

148.    The failure of the Hertz corporate defendants and managers to address these issues is undeniable. The corporate and individual defendants are directly liable for these failures because they (1) participated in developing and implementing the theft reporting process, (2) knew about the problems with Hertz's theft reporting process and did nothing, and (3) negligently supervised and managed the theft reporting process. The Defendants have a duty to ensure that Hertz's procedures are safe, effective, comply with the law, and comply with industry standards.

149.    All corporate defendants (jointly known as "Hertz") are alleged to be vicariously liable for the actions and omissions of their employees, including the individual Defendants.

150.    As a direct and proximate result of Defendants' conduct as set forth above, Plaintiffs have suffered severe damages, including but not limited to severe mental distress, as well as severe emotional distress, mental suffering, mental anguish, sleeplessness, restlessness, anxiety, and depression.

****

Case ID: 200501362

## COUNT III –   MALICIOUS ABUSE OF PROCESS

*Alexandros Gider and Christina Gider, minors,*
*by and through their parent and natural guardian Roula Vangelis,*
*and, Similarly Situated Plaintiffs*
*v.*

*The Hertz Corporation; Hertz Global Holdings Inc; Hertz Vehicles LLC; Julie Wilkerson; Richard*
*W. Livingston; Joseph Jaussi; Ken Graeber; Scott Funk; Kyle Ebert*

151.    Plaintiffs incorporate by reference and reallege the preceding paragraphs of this complaint pursuant to Pa. RCP 1019(g).

152.    The elements of malicious abuse of process are that Defendants (1) used a legal process against plaintiff, (2) primarily to accomplish a purpose for which the process was not designated, and (3) harm has been caused to Plaintiff.

153.    Defendants filed a false criminal complaint with the Philadelphia Police on August 27, 2013, alleging that Grady had stolen a car from Defendants.

154.    This criminal complaint was a legal process used against Plaintiffs by Defendants.

155.    This false criminal complaint was made so that Grady would be arrested, imprisoned, and prosecuted. This purpose was improper as Grady and Plaintiffs had done nothing wrong; the criminal justice system's purpose is not to arrest, incarcerate, and prosecute innocent and law-abiding citizens.

156.    Defendants made this false complaint carelessly and/or negligently and/or recklessly and/or knowingly and/or intentionally and/or maliciously. Defendants knew or should have known when they filed the criminal complaint against Grady that she was authorized to use the car and had not stolen it.

157.    This is manifestly obvious as the state trooper who pulled over Grady and Plaintiffs on July 22, 2013, believed to be named Kemmerling, spoke with Defendants on that date and Defendants assured him that Grady was authorized to use the car. Grady was not arrested by Trooper Kemmerling and was let go.

158.    As a direct and eminently foreseeable result of Defendants' actions in filing a criminal complaint against Grady, Plaintiffs were falsely imprisoned while they were detained by police on the side of the road.

159.    Defendants' failure to withdraw the criminal complaint they initiated against Grady was careless and/or negligent and/or reckless and/or knowing and/or intentional and/or malicious.

Case ID: 200501362

160.    The failure of the Hertz corporate defendants and managers to address these issues is undeniable. The corporate and individual defendants are directly liable for these failures because they (1) participated in developing and implementing the theft reporting process, (2) knew about the problems with Hertz's theft reporting process and did nothing, and (3) negligently supervised and managed the theft reporting process. The Defendants have a duty to ensure that Hertz's procedures are safe, effective, comply with the law, and comply with industry standards.

161.    All corporate defendants (jointly known as "Hertz") are alleged to be vicariously liable for the actions and omissions of their employees, including the individual Defendants

162.    As a direct and proximate result of Defendants' conduct in initiating a criminal complaint and failing to withdraw the criminal complaint as set forth above, Plaintiffs has suffered severe damages, including but not limited to monetary damages, severe emotional distress, mental suffering, mental anguish, sleeplessness, restlessness, anxiety, and depression.

*****

Case ID: 200501362

## COUNT IV – Malicious Prosecution

*Alexandros Gider and Christina Gider, minors,*
*by and through their parent and natural guardian Roula Vangelis,*
*and, Similarly Situated Plaintiffs*
*v.*

*The Hertz Corporation; Hertz Global Holdings Inc; Hertz Vehicles LLC; Julie Wilkerson; Richard*
*W. Livingston; Joseph Jaussi; Ken Graeber; Scott Funk; Kyle Ebert*

163.    Plaintiffs incorporate by reference and reallege the preceding paragraphs of this complaint pursuant to Pa. RCP 1019(g).

164.    The elements of malicious prosecution are that Defendants (1) initiated a criminal proceedings against plaintiff, (2) the criminal proceedings ended in Plaintiffs' favor, (3) the proceedings were initiated without probable cause, and (4) the defendant acted maliciously or for a purpose other than bringing Plaintiffs to justice.

165.    Defendants initiated criminal proceedings against Plaintiffs on by filing a false criminal complaint against Grady with the Philadelphia Police, alleging that Grady had stolen a car from Defendants.

166.    As a direct and eminently foreseeable result, Plaintiffs were detained by armed police on the side of the road who had their guns drawn.

167.    This initiation of the criminal proceedings was done without probable cause as Defendants knew that Grady had valid contracts with Defendants for the car she had rented, knew that she had paid for the rental, and knew that she was otherwise authorized to be driving the car.

168.    Defendants acted maliciously and/or for a purpose other than bringing Grady to justice, and knew when they filed the criminal complaint against Grady that she was authorized to use the car and had not stolen it.

169.    This is manifestly obvious as the state trooper who pulled over Grady and Plaintiffs on July 22, 2013, named Kemmerling, spoke with Defendants on that date and Defendants assured him that Grady was authorized to use the car.

170.    Defendants made this false complaint carelessly and/or negligently and/or recklessly and/or knowingly and/or intentionally and/or maliciously.

171.    Defendants' failure to withdraw the criminal complaint they initiated against Grady, which harmed Plaintiffs, was careless and/or negligent and/or reckless and/or knowing and/or intentional and/or malicious.

Case ID: 200501362

172.    The failure of the Hertz corporate defendants and managers to address these issues is undeniable. The corporate and individual defendants are directly liable for these failures because they (1) participated in developing and implementing the theft reporting process, (2) knew about the problems with Hertz's theft reporting process and did nothing, and (3) negligently supervised and managed the theft reporting process. The Defendants have a duty to ensure that Hertz's procedures are safe, effective, comply with the law, and comply with industry standards.

173.    All corporate defendants (jointly known as "Hertz") are alleged to be vicariously liable for the actions and omissions of their employees, including the individual Defendants

174.    As a direct and proximate result of Defendants' conduct in initiating a criminal complaint and failing to withdraw the criminal complaint as set forth above, Plaintiffs have suffered severe damages, including but not limited to monetary damages, severe emotional distress, mental suffering, mental anguish, sleeplessness, restlessness, anxiety, and depression.

*****

Case ID: 200501362

## COUNT V –    INTENTIONAL/NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

*Alexandros Gider and Christina Gider, minors,*
*by and through their parent and natural guardian Roula Vangelis,*
*and, Similarly Situated Plaintiffs*
*v.*

*The Hertz Corporation; Hertz Global Holdings Inc; Hertz Vehicles LLC; Julie Wilkerson; Richard W. Livingston; Joseph Jaussi; Ken Graeber; Scott Funk; Kyle Ebert*

175.    Plaintiffs incorporate by reference and reallege the preceding paragraphs of this complaint pursuant to Pa. RCP 1019(g).

176.    The elements of intentional infliction of emotional distress are that Defendants (1) Defendants acted intentionally or recklessly, (2) Defendants' acts and omissions were extreme and outrageous, (3) Plaintiffs suffered severe emotional distress, and (4) Plaintiffs' emotional distress was a result of Defendants' conduct.

177.    Defendants initiated criminal proceedings against Grady on August 27, 2013, by filing a false criminal complaint against Grady with the Philadelphia Police Department, alleging that Grady had stolen a car from Defendants.

178.    As a direct and eminently foreseeable result of Defendants' conduct, Plaintiffs were detained at gunpoint by police on the side of the road.

179.    Defendants acted intentionally and/or recklessly as they knew or should have known when they filed the criminal complaint against Grady that she was authorized to use the car and had not stolen it.

180.    This is manifestly obvious as the state trooper who pulled over Grady and Plaintiffs on July 22, 2013, believed to be named Kemmerling, spoke with Defendants on that date and Defendants assured him that Grady was authorized to use the car. Grady was not arrested by Trooper Kemmerling.

181.    Defendants' failure to withdraw the criminal complaint they initiated against Grady was intentional and/or reckless.

182.    The acts and omissions of Defendants were extreme and outrageous in a civilized society.

183.    The use of the criminal justice system is of the utmost seriousness and innocent individuals who have done nothing wrong should not be detained at gunpoint.

Case ID: 200501362

184.    The failure of the Hertz corporate defendants and managers to address these issues is undeniable. The corporate and individual defendants are directly liable for these failures because they (1) participated in developing and implementing the theft reporting process, (2) knew about the problems with Hertz's theft reporting process and did nothing, and (3) negligently supervised and managed the theft reporting process. The Defendants have a duty to ensure that Hertz's procedures are safe, effective, comply with the law, and comply with industry standards.

185.    All corporate defendants (jointly known as "Hertz") are alleged to be vicariously liable for the actions and omissions of their employees, including the individual Defendants.

186.    As a direct and proximate result of the defendants' conduct as set forth above, Plaintiffs, young children, were subjected to a terrifying experience and have suffered severe emotional distress, mental suffering, mental anguish, sleeplessness, restlessness, anxiety, depression, and monetary damages.

187.    The severe emotional distress suffered by Plaintiffs was as a result of the intentional and/or reckless extreme and outrageous conduct of Defendants and was certain occur, was foreseeable, and manifestly reasonable reaction under the circumstances.

*****

Case ID: 200501362

# RELIEF REQUESTED

**WHEREFORE**, Plaintiffs demand judgment in its favor and against Defendants, jointly and severally, on all counts and claims compensatory damages in an amount in excess of this court's jurisdictional limitations, thereby guaranteeing Plaintiffs a jury trial, exclusive of interests and costs, and an award of punitive damages, as well as prejudgment interest, post judgment interest, delay damages, costs, and such equitable relief as the Court deems necessary; and requests that this Court determine and declare that Plaintiffs be awarded for all counts:

a.  Compensatory damages, inclusive of any and all harm attributable to Defendants' actions or inaction;

b.  Expectation, consequential (lost earnings, lost profits, lost opportunity), restitution, and reliance damages;

c.  Punitive damages to punish the Defendants for their outrageous conduct, self-interest, and duplicitous behavior;

d.  Exemplary damages to set an example for others;

e.  Attorneys' fees and court costs;

f.  the loss of time and opportunity;

g.  Delay damages; and

h.  Such other and further relief and/or equitable relief that this Court deems just and/or necessary.

*****

*Respectfully submitted,*

FRANCIS ALEXANDER, LLC

*/s/ Francis Malofiy*

Francis Malofiy, Esquire
Alfred (AJ) Fluehr, Esquire
Attorney ID No.:  208494
280 N. Providence Road | Suite 1
Media, PA 19063
T:  (215) 500-1000
F:  (215) 500-1005
*Law Firm / Lawyer for Plaintiffs*
*/d/ May 21, 2020*

Case ID: 200501362

## Spoliation Notice -- Preservation of Evidence

Plaintiffs hereby demand and request that Defendants take necessary actions to ensure the preservation of all documents, records, communications, whether electronic or otherwise, items and things in their possession or control, or any entity over which any party to this action has control, or from whom any party to this action has access to, any documents, items, or things which may in any manner be relevant to or relate to the subject matter of the causes of action and/or the allegations of this complaint.

Case ID: 200501362

## Jury Trial Demand

Plaintiffs hereby demand a 12-person jury trial.

\*\*\*\*\*

*Respectfully submitted,*

Francis Alexander, LLC

*/s/ Francis Malofiy*

Francis Malofiy, Esquire
Alfred (AJ) Fluehr, Esquire
Attorney ID No.:  208494
280 N. Providence Road | Suite 1
Media, PA 19063
T:  (215) 500-1000
F:  (215) 500-1005
*Law Firm / Lawyer for Plaintiffs*
*/d/ May 21, 2020*

Case ID: 200501362

## Verification

I, Roula Vangelis, hereby verify that that I have read the foregoing Complaint and that the facts set forth herein are true and correct to the best of my knowledge, information, and belief. I further understand that the statements herein are made subject to the penalties of 18 Pa. Cons. Stat. Ann. § 4904 relating to unsworn falsification to authorities.

/s/   *Roula Vangelis*
Roula Vangelis

/d/     *5/21/2020*
Date

Case ID: 200501362

# Certificate of Service

I hereby state that a true and correct copy of the foregoing Civil Action Complaint will be served on the Defendants pursuant to the Pennsylvania rules:

*****

Respectfully submitted,

Francis Alexander, LLC

*/s/ Francis Malofiy*

Francis Malofiy, Esquire
Alfred (AJ) Fluehr, Esquire
Attorney ID No.:  208494
280 N. Providence Road | Suite 1
Media, PA 19063
T:  (215) 500-1000
F:  (215) 500-1005
*Law Firm / Lawyer for Plaintiffs*
*/d/ May 21, 2020*

Case ID: 200501362



*Filed and Attested by the
Office of Judicial Records
21 MAY 2020 11:49 pm
A. SILIGRINI*

# EXHIBIT 1

**Procedure Owner:** Senior Executive Vice President, Chief Administrative Officer and General Counsel

**Process Owner:** Vice President, Corporate Operations

Executive Summary

- This Worldwide procedure applies to the Rent-A-Car (RAC) Division of The Hertz Corporation and includes requirements for reporting vehicle thefts and conversions.

- All Hertz vehicle thefts and conversions must be documented on the Theft/Recovery Vehicle Report.

- All vehicle thefts from customers must also be documented on the Vehicle Theft from Customer Report.

- Location, Maintenance, Area, Country Head Office and OKC Management must ensure compliance to this procedure.

Key Revisions

Section G covering retail car sales repossession was added.

# Procedure



| No. W7-02 RAC: | Subject REPORTING VEHICLE THEFTS AND CONVERSIONS | | | | Date July 23, 2015 |
|---|---|---|---|---|---|

**Scope:** This Worldwide Procedure applies to the North American Rent-A-Car (RAC) Division, including Canada and Puerto Rico/St. Thomas.

**Purpose:** To provide the guidelines for reporting and processing retail car sales.

**Index:**
    A. General
    B. Distribution of Initial Theft/Conversion Report
    C. Vehicle Thefts from Customers
    D. Closing Associated Rental Agreements
    E. Reconciling Open Theft/Conversion Files to CARRENT and VISION
    F. Distribution of Completed Theft/Conversion Report
    G. Retail Car Sales Repossession

Case ID: 200501362

**Procedure:**

A.    Underline{General}

1.    All thefts, conversions and disappearances of Hertz vehicles must be reported to the police as soon as discovered and management must assist the police with both their investigation and the recovery of the vehicle.

    a.    Conversions - Report conversions to police no later than 60 days from the original or extended due date (considered the date and time stolen) or earlier if research indicates that the vehicle is not likely to be returned (phone numbers given are no good, mail is returned "Addressee Unknown," etc.).

    b.    Fraudulent ID, Stolen ID, Theft from Premises - Report rentals involving fraudulent or stolen credit cards or ID and vehicles reported missing from Hertz premises, to police upon detection.

2.    The Theft/Recovery Vehicle Report (Form 702003P - available in i-Forms) must be utilized to report each incident.

    a.    Vandalism - The theft, conversion or disappearance of parts from a rental vehicle while the vehicle is out on rent or in control by a person not employed by Hertz is considered vandalism and reported in accordance with Procedure W7-01, Reporting Vehicle Accidents.

    b.    Unauthorized Access - Unauthorized access to Hertz property when Hertz vehicles are stolen must be reported on a Worldwide Breach of Security Report, in accordance with Procedure W1-41, Breaches of Security.

3.    There are four (4) vehicle theft categories:

- Theft by Conversion - refer to Procedure W1-12 RAC, Controlling Overdue Rentals

- Theft by Fraud - refer to Procedure W1-12 RAC, Controlling Overdue Rentals

- Theft from Hertz Premises - refer to Procedure W9-18 RAC, Controlling Vehicle Physical Inventories

- Theft from Customer - refer to Section C of this Procedure

4.    Prior to Reporting Thefts to Police - Ensure requirements outlined in Procedures W1-12 and W9-18 were followed, prior to reporting a vehicle missing from inventory and reporting thefts to police. In addition, a Missing Vehicle Checklist has been developed and must be completed by the specific individuals conducting research of missing vehicles, prior to reporting thefts to the police (refer to Procedure W9-18).

5.    Complaints or Warrants - In jurisdictions that require a complaint or warrant be lodged against the renter prior to alarming the car, the responsible Corporate/Country Security Manager (North America/Brazil) or an appointed designee has a maximum of ten (10) additional days from receipt of the file to complete research before reporting the conversion (refer to Procedure W1-12 RAC).

6.    Authorizing Arrests or Prosecution - No level of management will authorize an arrest or prosecution on behalf of Hertz, nor will any employee sign any criminal complaint against an individual on behalf of Hertz, without the express approval of 1) the

Case ID: 200501362

responsible Corporate/Country Security Manager or a lawyer in the Law or Human Resources Department, Park Ridge/ Legal and Corporate Affairs Department, HEL and 2) in the case of the arrest, prosecution or filing of a criminal complaint against a current or recently terminated employee, the express approval of the Senior Vice President, Labor Relations and HR Practices, Park Ridge.

Note: The only allowable exception is for the reporting of personally witnessed vehicle thefts, where the employee who witnessed the vehicle theft may cooperate with the law enforcement authorities, if requested, but must immediately advise the responsible Area/Location Manager.

7.  Police Removal of Hertz Property - If in connection with a theft/conversion/disappearance, the police remove any property from Hertz premises, custody or control, it is the responsibility of the Area/Location Manager (or delegate) to obtain a receipt from the police, if one is customarily given.

8.  Timely Notification of Theft Information - Individuals who are advised of a theft must notify the Hertz personnel responsible for preparing the Theft Vehicle Report (refer to Section B.1 below) of alarm/report details (date reported, reported to, alarm number, etc.) within one (1) work day of receipt of information from the reporting police agency so that the Theft Vehicle Report can be completed and distributed timely (refer to Section F).

    a.  North America (only) - Send all relevant theft information/documentation to OKC Vehicle Control at OKCtheftandrecovery@hertz.com.

9.  Police Refusal to File Report - If for any reason the police are unwilling to file a report of theft/conversion/disappearance, indicate this fact on the Theft Vehicle Report, in the police file or alarm/report number section. Immediately contact the Corporate/Country Security Manager responsible for the location where the vehicle was rented or missing, who will work with the Corporate Legal Department to resolve issues.

10. Thefts from Customers - All thefts and disappearances of vehicles from a customer while on rent must be reported to the police authorities by the customer (refer to Section C).

11. Updating Systems for Vehicle Hot Status - Once alarm/complaint information on reported thefts, conversions or disappearances has been received, the OKC Vehicle Control Department (North America), Owning Country Car Control Manager (Europe), National Fleet Accounting Manager (Australia) will enter all initial alarm information and change the vehicle status to "H" (Hot) in the CARRENT Theft and Conversion system (Brazil and New Zealand must be updated in VISION) and also their applicable counter system (i.e., ASAP/"G" (Theft), "H" (Stolen) or "W" (True Conversion) in CARS+, etc.).

    Note: In Canada, refer to System Information & Training Bulletin #5835, Car Control Hold Codes in CARS+.

12. Preventing Rentals of Hot/Stolen Vehicles - Every attempt must be made to prevent Hot/Stolen vehicles from being rented or incurring non-revenue moves.

Case ID: 200501362

a. Once the vehicle "Hot" status is entered in the applicable rental counter system (ASAP, HLES, TAS, CARS+, HTZRENT), this will assist in systematically preventing the rental of a stolen vehicle until alarm cancellations are processed.

b. When counter systems are inoperable or do not automatically prevent the rental of vehicles in a Hot Status a manual status check must be performed, by either physically checking the status codes in CARRENT (at the time of rent) or by checking the CARRENT "Hot," "Legal" and "Safety" hold list provided by the responsible Region/Pool/Car Control Manager. Listings must be updated and issued by Car Control Management, (at a minimum) weekly.

c. For Non-automated locations, a manual "user created" equivalent OLQ report or manually created report using active theft file data (for non CARRENT Countries of Brazil and New Zealand) must be distributed by the responsible management to ensure these locations are not renting vehicles reported stolen.

d. CARRENT Countries - Utilize the CARRENT "Daily Police Report" (North America - report ID FSCC0011, Europe - report ID FSCC0045, and Australia - report ID FSCC0070) to identify vehicles in hot status which are now being re-rented. Refer to W7-03 RAC, Recovery of Converted or Stolen Vehicles, for further details.

13. <u>Internal Audit Reporting</u> - If the theft/conversion/disappearance involves loss of rental vehicles as the result of a theft ring, conspiracy or other concerted criminal activity, a copy of the completed Theft Vehicle Report must be forwarded to the Senior Vice President, Audit and Chief Risk Officer who must further distribute to the following officers of The Hertz Corporation:

- Chairman and Chief Executive Officer
- Group President responsible for the affected Division
- Senior Executive Vice President and Chief Financial Officer
- Executive Vice President, General Counsel and Secretary
- Senior Vice President and Chief Accounting Officer

14. <u>Write-Off of Stolen Vehicles</u> - When a vehicle remains "converted" or "stolen" for a period of one (1) year (six (6) months in Brazil) from the "date converted/stolen" (as noted on the monthly VISION RAC Aging of Conversion Report, available from RDS, or similar report (i.e., Report ID VCAP0027 in North America)) it must be written-off.

| Country | Responsible for Performing Write-Off |
|---|---|
| North America (includes US, Canada, Puerto Rico and St. Thomas) and Brazil | Vehicle Control Department, OKC |
| EMEA and Asia Pacific | International Fleet Accounting, OKC |

15. <u>Confirming Theft Details in VISION</u> - If the initial Theft or Conversion is not processed in VISION by OKC Fleet Accounting (North America), International Fleet Accounting (Europe and Australia) or Head Office (Brazil) this will appear as a

Case ID: 200501362

reconciling item on the Suspend Hold list. Refer to Procedure W6-18 Fleet Suspensions/Deletions for requirements.

16. <u>Vehicle Title Documents</u> - Vehicle titles must be handled in accordance with Procedure W1-18 RAC, Control of Vehicle Titles, and for all other countries their minimum legal requirement.

17. <u>Corporate/Country Security Manager Investigations</u> - Every theft/conversion/disappearance must be promptly investigated by the Corporate/Country Security Manager responsible for the location from which the related Theft Vehicle Report is filed. All employees are required to cooperate fully with such an investigation.

18. <u>Follow-Up Correspondence</u> - All follow up correspondence pertaining to Theft Vehicle Reports must be sent to the responsible Corporate/Country Security Manager, who will distribute copies to other appropriate individuals, with a copy retained in the Vehicle Theft/Conversion file.

19. <u>Retention</u> - The following report/files included in this procedure must be retained as required by Procedure W1-06, Record Retention & Management Program:

- VISION RAC Aging of Conversion Report

- Theft Vehicle Reports and all related documentation

- Owning City/Country Theft/Conversion File - Each Owning City/Country Car Control Manager (or designee) must maintain a "Vehicle Theft/Conversion" file, containing all documents pertaining to each reported vehicle theft or conversion, including vehicles that are on active alarm or have been reported as recovered.

**B.** <u>Distribution of Initial Theft/Conversion Report</u>

1. The Theft/Conversion Report must be prepared and then reported to the police by the responsible management stated below:

| Type of Theft | Responsible for Preparing the Theft/Conversion Report | Responsible for Reporting to Police |
|---|---|---|
| Theft – Conversion | <u>North America</u><br>OKC Vehicle Control Department - prepares theft package and forwards to Renting City. | Renting City |
| Theft – Fraud | <u>Brazil</u><br>Car Control Department | Renting City |
| Theft from Renter (1) | <u>Europe, Australia and New Zealand</u><br>Location/Branch Manager - prepares theft package and forwards to Renting City. | Customer or Renting City |
| Theft from Hertz Premises (2) | | Last Known Hertz Location |
| (1) Requires the Customer to complete the Vehicle Theft from Customer Report (Form 702005P). Refer to Section C.<br>(2) The theft package must be forwarded to the last known Hertz location to have possession of the vehicle. | | |

Case ID: 200501362

2.    The Theft/Conversion Report must be completed as follows:

- Check "Initial Report" and then identify the type of theft (as stated in table above);

- The report must be typed and all the required information (unit, description, serial, license numbers, etc.) recorded in the "Vehicle Description" section. All information must be accurate to ensure reporting police agency records and alarms the correct vehicle. Whenever possible, record vehicle information from a copy of vehicle's registration and attach a copy to the 702003P being presented to the police.

- Note:    Odometer reading - is the Vehicle's last recorded mileage before the theft occurred, if stolen from lot. If on rental, the actual "out" mileage recorded on the RA.

- Enter the information required in the "Rental Information" area. If the vehicle was not on rental when stolen, leave this section blank and indicate in "Summary of What Happened" section that the vehicle was not rented and the exact circumstances of theft (last known date, mileage, etc.).

- Enter all available information about the renter (if applicable).

- Enter all alarm information (police authority reported to, date reported, location of vehicle at time of theft, etc.). In the case of Conversions, enter the due date as the "Date & Time Stolen." If the vehicle was stolen from a renter, the "Date & Time Stolen" is generally the date the vehicle was discovered missing. If the vehicle was stolen from Hertz' premises, the "Date & Time Stolen" is the date of the last movement, unless the theft was actually witnessed. This date appears on the Depreciation Run, the VISION RAC Aging of Conversion Report and is used by OKC Fleet Accounting to determine the write-off date if the vehicle is not recovered.

- Where a conversion has occurred and the Counter Representative remembers the description of the customer, or if the theft was witnessed, enter it in "Description of Renter or Suspect" section (where applicable).

- Use summary section to document any additional facts obtained pertinent to the Theft/Conversion being reported.

- Signature of the responsible Hertz management employee completing the report, including the date.

C.    Vehicle Thefts from Customers

1.    Whenever a customer calls or is present at the rental counter and reports that the vehicle has been stolen from them, advise the customer that to the extent possible, they are responsible for reporting the theft to the police.

a.    Whenever a customer indicates they reported the theft to the police, obtain all required information (date reported, agency reported to, police complaint number, etc.) and contact the police to confirm the theft details.

Case ID: 200501362

b.   If not reported, advise the customer to immediately report the incident to the police and call Hertz back with the required facts.

c.   If the customer is unable or refuses to report the theft to the Police, the Theft Vehicle Report (702005P, available in iForms) is prepared by the individuals outlined in Section B. and forwarded to the a location in the area/jurisdiction where the customer claims the theft occurred.

Note: In U.S Cities which have access to Department of Motor Vehicle (DMV) files, management can confirm alarm status by entering the full serial number into the DMV system.

2.   Regardless of whether reported by the customer or subsequently by Hertz, document all details of the occurrence (date, time, location of vehicle at time of theft, etc.) on a Vehicle Theft from Customer Report (an equivalent local language translation can be used where required) and in all cases, every attempt must be made to have the customer sign the form. Whenever possible, have a Manager speak with the customer to record this information.

3.   If the customer was overdue from their original rental due date and is now reporting the vehicle has been stolen from them, contact the OKC Vehicle Control Department (North America), Car Control Department (Europe and Brazil), Fleet Accounting Manager (Australia), Insurance Manager (New Zealand). It is possible that "Locators" or "Retrieval" services were utilized to repossess the vehicle from the customer and therefore, it must not be reported stolen.

4.   Have the customer turn in or send in the keys and rental documentation to the vehicle. If it is determined that the customer left the keys in the vehicle prior to being stolen or any of the details surrounding the theft are unusual, refer to Procedure W7-42, Do Not Rent and immediately contact the responsible Corporate/Country Security Manager.

5.   The completed Vehicle Theft from Customer Report must be forwarded immediately to the Responsible Manager (i.e., Area Manager of the Renting City (North America and Brazil), Country Security Managers Delegate (Europe), National Fleet Accounting (Australia)) who must then ensure it is forwarded to those identified in Section B. in order for the Theft/Conversion Report to be prepared. Additionally:

•   The OKC Vehicle Control Department (North America)/Car Control Department (Brazil) must immediately verify information with the police, upon receipt.

•   Australia Locations must verify with the police before sending to National Fleet Accounting, once received a scanned copy must be forwarded to International Fleet Accounting, OKC to enter into VISION.

•   All vehicle thefts from customers and incidents of vandalism must be reported to the First Notice of Loss (FNOL) Office (North America) or the responsible HCM/Country Claims Department (all other Countries) daily.

Case ID: 200501362

**D.**    <u>Closing Associated Rental Agreements</u>

1.    The OKC Vehicle Control Department (North America), Car Control Department (Brazil), Location/Branch Manager (Europe, Australia and New Zealand) must close the RA after verifying the Theft Vehicle Report with police. Therefore, North America and Brazil rental locations <u>must not</u> close the RA or perform an exchange on the RA.

2.    Once confirmed that the theft/conversion has been reported to the police, the responsible management (as listed above) must Close RAs in the ASAP/TAS/CARS+/HTZRENT Post Return or BCHCLOSE applications by:

- Entering an approximate 'mileage in', estimating 70 miles/100 kilometers per day.

- Recording the date the vehicle was reported stolen in the 'return date and time' field.

- Ensuring the Rent and Return locations are the same.

- Applying the 'best' or lowest rate available.

- Providing background information (e.g., theft from renter, date reported, etc.), in the 'remarks' section.

Note:    If determined that a charge card was used fraudulently and the true card holder did not rent, close out the RA and only bill for the amount authorized by the card company at time of rental. On cash rentals later confirmed to be fraudulent rentals (e.g., stolen passport, stolen company ID, other) the bill must be no greater than the amount of actual deposit taken, so the final net due equals zero.

**E.**    <u>Reconciling Open Theft/Conversion Files to CARRENT and VISION</u>

1.    It is critical that every open Theft/Conversion Vehicle Report at each reporting City/Country be properly recorded as such, both in CARRENT (except for Brazil and New Zealand where CARRENT is not currently utilized) and in VISION.

2.    To verify this, each Owning City/Country Car Control Manager, Fleet Manager (North America, Brazil and Europe)/Fleet Accounting Manager (Australia) or designated employee must perform a monthly reconciliation of all active Theft/Conversion files.

a.    Compare all open Theft Vehicle Reports to the monthly VISION RAC Aging of Conversion Report. All open thefts/conversions must appear on this report with a Depreciation status code of "C" (Active Conversions).

b.    All open Theft/Conversion Vehicle Reports must also appear in CARRENT with a status code of "H" (Hot). Responsible Management must either compare all files to the CARRENT Theft and Conversion By Unit Report or to a user created OLQ report that lists all "H" status vehicles.

c.    Investigate any active Theft/Conversion files that are not appearing as such on the VISION RAC Aging of Conversion Report (or equivalent country report) or in CARRENT. Document notations of variances, related research and resolutions on reports. Contact OKC, Vehicle Control (North America) /OKC Fleet Accounting (other Countries) directly for items not appearing on the

Case ID: 200501362

VISION RAC Aging of Conversion Report. Add any active Theft/Conversion files not appearing in CARRENT immediately.

Note: Whenever functional, RDS Reports must be reviewed on line, annotated as required above in Document Direct and retained in RDS.

**F.** <u>Distribution of Completed Theft/Conversion Report</u>

On completion of the Theft Vehicle Report, and after confirming theft details with the police, distribute immediately as follows:

| Copy | North America | Brazil | Europe | Australia | New Zealand |
|------|---------------|--------|--------|-----------|-------------|
| 1 | OKC Vehicle Control Department (1) | OKC Fleet Accounting (1) | OKC Fleet Accounting (1) | OKC Fleet Accounting (1) | OKC Fleet Accounting (1) |
| 2 | HCM – First Notice of Loss (FNOL) Department, Dallas | Country Insurance Department | Country HCM Department | Country Insurance Department | Country Insurance Manager |
| 3 | Owning Area Car Control Manager | Owning Country Car Control Manager | Owning Country Car Control Manager | Owning Country Car Control & State Distribution Manager | Island Car Control & Operations Manager |
| 4 | Responsible Corporate Security Manager | Responsible Corporate Security Manager | Responsible Country Security Manager | Responsible Corporate Security Manager | Responsible Corporate Security Manager |

(1) Faxed/scanned copy of Initial Theft Report only - OKC Fleet Accounting must update vehicle depreciation status in VISION.

**G.** <u>Retail Car Sales Repossession</u>

1. When a financial institution rejects funding of a Retail Deal, and the customer has taken possession of vehicle, store management should immediately begin search for alternative funding
   a. Alternative funding found- resign deal
   b. Unable to find alternative funding- notify GM by phone to discuss. GM notifies Director of situation

2. Store Management should attempt phone contact with customer to return vehicle
   a. Car returned proceed to step VII
   b. Vehicle not returned contact GM, Director and Corporate team and update situation
   c. If a Trade is involved contact OKC, Retail Processing

3. Corporate team forwards store Default Letter and strategy for handling going forward

4. Store mails Default letter to customer following individual state guidelines. Letter should be sent both regular and certified mail.

5. If the car is returned proceed to step VII. If not, conduct follow-up per state guidelines

6. If car still remains out contact GM, Director and Corporate Team for decision on repossession
   a. If Corporate Team decides on repossession they should email Sr. Director Corporate Security to initiate repossession procession
   b. Corporate security will assign local region security manager to handle. If no region security mgr in area security will then provide Corporate Car Sales team with a Repossession vendor to handle

Case ID: 200501362

    c.   Corporate Team emails Vehicle Control to create 723 and monitor vehicle

7.    If car is returned,  inspect for damage.  Decide whether or not to repair and sell vehicle

8.    OKC Retail Processing  will send Notice of Sale and re-Title vehicle per state guidelines

**Executive Summary**

- This Worldwide procedure applies to the Rent-A-Car (RAC) Division of The Hertz Corporation and includes requirements for reporting vehicle thefts and conversions.

- All Hertz vehicle thefts and conversions must be documented on the Theft/Recovery Vehicle Report.

- All vehicle thefts from customers must also be documented on the Vehicle Theft from Customer Report.

- Location, Maintenance, Area, Country Head Office and OKC Management must ensure compliance to this procedure.

**Key Revisions**

This procedure has been reissued to advise that the specific actions required to be taken prior to reporting a vehicle missing from inventory and reporting thefts to the police, are included in Procedure W9-18, Controlling Vehicle Physical Inventories (Section A.4). In addition, a Missing Vehicle Checklist has been developed and must be completed by the specific individuals conducting research of missing vehicles, prior to reporting thefts to the police (refer to Procedure W9-18).

# Procedure



| No. | | | | Subject | Date |
|---|---|---|---|---|---|
| **W** | **7** | **- 0** | **2** | **REPORTING VEHICLE THEFTS AND** | **August 21, 2009** |
| **R** | **A** | **C** | **:** | **CONVERSIONS** | |

**Scope:** This Worldwide Procedure applies to the Rent-A-Car (RAC) Division of The Hertz Corporation.

**Purpose:** To provide requirements for reporting thefts, conversions or the disappearance of Hertz vehicles.

**Index:** A. General

      B.   Distribution of Initial Theft/Conversion Report

      C.   Vehicle Thefts From Customers

      D.   Closing Associated Rental Agreements

      E.   Reconciling Open Theft/Conversion Files to CARRENT and VISION

      F.   Distribution of Completed Theft/Conversion Report

**Procedure:**

**To open a specific Section, click on the arrow. To open all Sections, click either Shift+ or**

Case ID: 200501362

**View/Expand All Sections on the Menu Bar**

A. General

1. All thefts, conversions and disappearances of Hertz vehicles must be reported to the police as soon as discovered and management must assist the police with both their investigation and the recovery of the vehicle.

    a. Conversions - Report conversions to police no later than 60 days from the original or extended due date (considered the date and time stolen) or earlier if research indicates that the vehicle is not likely to be returned (phone numbers given are no good, mail is returned "Addressee Unknown," etc.).

    b. Fraudulent ID, Stolen ID, Theft from Premises - Report rentals involving fraudulent or stolen credit cards or ID and vehicles reported missing from Hertz premises, to police upon detection.

2. The Theft/Recovery Vehicle Report (Form 702003P - available in i-Forms) must be utilized to report each incident.

    a. Vandalism - The theft, conversion or disappearance of parts from a rental vehicle while the vehicle is out on rent or in control by a person not employed by Hertz is considered vandalism and reported in accordance with Procedure W7-01, Reporting Vehicle Accidents.

    b. Unauthorized Access - Unauthorized access to Hertz property when Hertz vehicles are stolen must be reported on a Worldwide Breach of Security Report, in accordance with Procedure W1-41, Breaches of Security.

3.——There are four (4) vehicle theft categories:

    • Theft by Conversion - refer to Procedure W1-12, Controlling Overdue Rentals

    • Theft by Fraud - refer to Procedure W1-12, Controlling Overdue Rentals

    • Theft from Hertz Premises - refer to Procedure W9-18, Controlling Vehicle Physical Inventories

    • Theft from Customer - refer to Section C of this Procedure

4. Prior to Reporting Thefts to Police - Ensure requirements outlined in Procedures W1-12 and W9-18 were followed, prior to reporting a vehicle missing from inventory and reporting thefts to police. In addition, a Missing Vehicle Checklist has been developed and must be completed by the specific individuals conducting research of missing vehicles, prior to reporting thefts to the police (refer to Procedure W9-18).

5. Complaints or Warrants - In jurisdictions that require a complaint or warrant be lodged against the renter prior to alarming the car, the responsible Corporate/Country Security Manager (North America/Brazil) or an appointed designee has a maximum of ten (10) additional days from receipt of the file to complete research before reporting the

conversion (refer to Procedure W1-12).

6.   Authorizing Arrests or Prosecution - No level of management will authorize an arrest or prosecution on behalf of Hertz, nor will any employee sign any criminal complaint against an individual on behalf of Hertz, without the express approval of 1) the responsible Corporate/Country Security Manager or a lawyer in the Law or Human Resources Department, Park Ridge/ Legal and Corporate Affairs Department, HEL and 2) in the case of the arrest, prosecution or filing of a criminal complaint against a current or recently terminated employee, the express approval of the Vice President, Global Labor Relations and HR Practices, Park Ridge.

    Note: The only allowable exception is for the reporting of personally witnessed vehicle thefts, where the employee who witnessed the vehicle theft may cooperate with the law enforcement authorities, if requested, but must immediately advise the responsible Area/Location Manager.

7.   Police Removal of Hertz Property - If in connection with a theft/conversion/disappearance, the police remove any property from Hertz premises, custody or control, it is the responsibility of the Area/Location Manager (or delegate) to obtain a receipt from the police, if one is customarily given.

8.   Timely Notification of Theft Information - Individuals that are advised of a theft must notify the Hertz personnel responsible for preparing the Theft Vehicle Report (refer to B.1) of alarm/report details (date reported, reported to, alarm number, etc.) within one (1) work day of receipt of information from the reporting police agency so the Theft Vehicle Report can be completed and distributed timely (refer to Section F).

9.   Police Refusal to File Report - If for any reason the police are unwilling to file a report of theft/conversion/disappearance, indicate this fact on the Theft Vehicle Report, in the police file or alarm/report number section. Immediately contact the Corporate/Country Security Manager responsible for the location where the vehicle was rented or missing, who will work with the Corporate Legal Department to resolve issues.

10.  Thefts from Customers - All thefts and disappearances of vehicles from a customer while on rent must be reported to the police authorities by the customer (refer to Section C).

11.  Updating Systems for Vehicle Hot Status - Once alarm/complaint information on reported thefts, conversions or disappearances has been received, the OKC Vehicle Control Department (North America), Owning Country Car Control Manager (Europe), National Fleet Accounting Manager (Australia) will enter all initial alarm information and change the vehicle status to "H" (Hot) in the CARRENT Theft and Conversion system (Brazil and New Zealand must be updated in VISION) and also their applicable counter system (i.e., ASAP/"G" (Theft), "H" (Stolen) or "W" (True Conversion) in CARS+, etc.).

    Note:   In Canada, refer to System Information & Training Bulletin #5835, Car Control Hold Codes in CARS+.

12.  Preventing Rentals of Hot/Stolen Vehicles - Every attempt must be made to prevent Hot/Stolen vehicles from being rented or incurring non-revenue moves.

a. Once the vehicle "Hot" status is entered in the applicable rental counter system (ASAP, HLES, TAS, CARS+, HTZRENT), this will assist in systematically preventing the rental of a stolen vehicle until alarm cancellations are processed.

b. When counter systems are inoperable or do not automatically prevent the rental of vehicles in a Hot Status a manual status check must be performed, by either physically checking the status codes in CARRENT (at the time of rent) or by checking the CARRENT "Hot," "Legal" and "Safety" hold list provided by the responsible Region/Pool/Car Control Manager. Listings must be updated and issued by Car Control Management, (at a minimum) weekly.

c. For Non-automated locations, a manual "user created" equivalent OLQ report or manually created report using active theft file data (for non CARRENT Countries of Brazil and New Zealand) must be distributed by the responsible management to ensure these locations are not renting vehicles reported stolen.

d. CARRENT Countries - Utilize the CARRENT "Daily Police Report" (North America - report ID FSCC0011, Europe - report ID FSCC0045, and Australia - report ID FSCC0070) to identify vehicles in hot status which are now being re-rented. Refer to W7-03 RAC, Recovery of Converted or Stolen Vehicles, for further details.

13. Internal Audit Reporting - If the theft/conversion/disappearance involves loss of rental vehicles as the result of a theft ring, conspiracy or other concerted criminal activity, a copy of the completed Theft Vehicle Report must be forwarded to the Staff Vice President, Internal Audit who must further distribute to the following officers of The Hertz Corporation:

- Chairman and Chief Executive Officer
- Executive Vice President responsible for the affected Division
- Executive Vice President and Chief Financial Officer
- Senior Vice President, General Counsel and Secretary
- Senior Vice President, Finance and Corporate Controller

14. Write-Off of Stolen Vehicles - When a vehicle remains "converted" or "stolen" for a period of one (1) year (North America)/six (6) months (Brazil, Europe & Australia) from the "date converted/stolen" (as noted on the monthly VISION RAC Aging of Conversion Report or similar report, available from RDS (ie., North America use Report ID VCAP0027)) it must be written-off.

| Country | Responsible for Performing Write-Off |
|---|---|
| • North America (includes US, Canada, Puerto Rico and St. Thomas) | • Vehicle Control Department, OKC |
| • Brazil, Europe and Australia | • International Fleet Accounting, OKC |

15. Confirming Theft Details in VISION - If the initial Theft or Conversion is not processed in VISION by OKC Fleet Accounting (North America), International Fleet Accounting (Europe and Australia) or Head Office (Brazil) this will appear as a reconciling item on the Suspend Hold list. Refer to Procedure W6-18 Fleet Suspensions/Deletions for requirements.

16. Vehicle Title Documents - Must be handled in accordance with Procedure W1-18, Control of Vehicle Titles, and for all other countries their minimum legal requirement.

17. Corporate/Country Security Manager Investigations - Every theft/conversion/disappearance must be promptly investigated by the Corporate/Country Security Manager responsible for the location from which the related Theft Vehicle Report is filed. All employees are required to cooperate fully with such an investigation.

18. Follow-Up Correspondence - All follow up correspondence pertaining to Theft Vehicle Reports must be sent to the responsible Corporate/Country Security Manager, who will distribute copies to other appropriate individuals, with a copy retained in the Vehicle Theft/Conversion file.

19. Retention - The following report/files included in this procedure must be retained as required by Procedure W1-06, Record Retention & Management Program:

   • VISION RAC Aging of Conversion Report

   • Theft Vehicle Reports and all related documentation

   • Owning City/Country Theft/Conversion File - Each Owning City/Country Car Control Manager (or designee) must maintain a "Vehicle Theft/Conversion" file, containing all documents pertaining to each reported vehicle theft or conversion, including vehicles which are on active alarm or have been reported as recovered.

B. Distribution of Initial Theft/Conversion Report

   1. The Theft/Conversion Report must be prepared and then reported to the police by the responsible management stated below:

| Type of Theft | Responsible for Preparing the Theft/Conversion Report | Responsible for Reporting to Police |
|---|---|---|
| Theft - Conversion | North America<br>• OKC Vehicle Control Department - prepares theft package and forwards to Renting City.<br><br>Brazil<br>• Car Control Department<br><br>Europe, Australia and New Zealand<br>• Location/Branch Manager - prepares | Renting City |
| Theft - Fraud | | Renting City |
| Theft - from Renter (1) | | Customer or Renting City |

| Theft - from Hertz Premises (2) | North America<br>• OKC Vehicle Control Department - prepares theft package and forwards to Renting City.<br><br>Brazil<br><br>    • Car Control Department<br>Europe, Australia and New Zealand<br><br>• Location/Branch Manager - prepares theft package and forwards to Renting City. | Last known Hertz location |
|---|---|---|

(1) Requires the Customer to complete the Vehicle Theft from Customer Report (Form 702005P) (Refer to Section C )
(2) The theft package must be forwarded to the last known Hertz location to have possession of the vehicle

2.  The Theft/Conversion Report must be completed as follows:

- Check "Initial Report" and then identify the type of theft (as stated in table above);

- The report must be typed and all the required information (unit, description, serial, license numbers, etc.) recorded in the "Vehicle Description" section. All information must be accurate to ensure reporting police agency records and alarms the correct vehicle. Whenever possible, record vehicle information from a copy of vehicle's registration and attach a copy to the 702003P being presented to the police.

  Note:  Odometer reading - is the Vehicle's last recorded mileage before the theft occurred, if stolen from lot. If on rental, the actual "out" mileage recorded on the RA.

- Enter the information required in the "Rental Information" area. If the vehicle was not on rental when stolen, leave this section blank and indicate in "Summary of What Happened" section that the vehicle was not rented and the exact circumstances of theft (last known date, mileage, etc.).

- Enter all available information about the renter (if applicable).

- Enter all alarm information (police authority reported to, date reported, location of vehicle at time of theft, etc.). In the case of Conversions, enter the due date as the "Date & Time Stolen." If the vehicle was stolen from a renter, the "Date & Time Stolen" is generally the date the vehicle was discovered missing. If the vehicle was stolen from Hertz' premises, the "Date & Time Stolen" is the date of the last movement, unless the theft was actually witnessed. This date appears on the Depreciation Run, the VISION RAC Aging of Conversion Report and is used by OKC Fleet Accounting to determine the write-off date if the vehicle is not recovered.

- Where a conversion has occurred and the Counter Representative remembers the description of the customer or if the theft was witnessed enter it in "Description of Renter or Suspect" section (where applicable).

- Use summary section to document any additional facts obtained pertinent to the Theft/Conversion being reported.

Case ID: 200501362

- Signature of the responsible Hertz management employee completing the report, including the date.

C. Vehicle Thefts from Customers

1. Whenever a customer calls or is present at the rental counter and reports that the vehicle has been stolen from them, advise the customer that to the extent possible, they are responsible for reporting the theft to the police.

   a. Whenever a customer indicates they reported the theft to the police, obtain all required information (date reported, agency reported to, police complaint number, etc) and contact the police to confirm the theft details.

   b. If not reported, advise the customer to immediately report the incident to the police and call Hertz back with the required facts.

   c. If the customer is unable or refuses to report the theft to the Police, the Theft Vehicle Report (702005P, available in iForms) is prepared by the individuals outlined in Section B. and forwarded to the a location in the area/jurisdiction where the customer claims the theft occurred.

   Note:   In U.S Cities which have access to Department of Motor Vehicle (DMV) files, management can confirm alarm status by entering the full serial number into the DMV system.

2. Regardless of whether reported by the customer or subsequently by Hertz, document all details of the occurrence (date, time, location of vehicle at time of theft, etc.) on a Vehicle Theft from Customer Report (an equivalent local language translation can be used where required) and in all cases, every attempt must be made to have the customer sign the form. Whenever possible, have a Manager speak with the customer to record this information.

3. If the customer was overdue from their original rental due date and is now reporting the vehicle has been stolen from them, contact the OKC Vehicle Control Department (North America), Car Control Department (Europe and Brazil), Fleet Accounting Manager (Australia), Insurance Manager (New Zealand). It is possible that "Locators" or "Retrieval" services were utilized to repossess the vehicle from the customer and therefore, it must not be reported stolen.

4. Have the customer turn in or send in the keys and rental documentation to the vehicle. If it is determined that the customer left the keys in the vehicle prior to being stolen or any of the details surrounding the theft are unusual, refer to Procedure W7-42, Do Not Rent and immediately contact the responsible Corporate/Country Security Manager.

5. The completed Vehicle Theft from Customer Report must be forwarded immediately to the Responsible Manager (ie., Area Manager of the Renting City (North America and Brazil), Country Security Managers Delegate (Europe), National Fleet Accounting (Australia)) who must then ensure it is forwarded to those identified in Section B. in order for the Theft/Conversion Report to be prepared. Additionally;

- The OKC Vehicle Control Department (North America)/Car Control Department (Brazil) must immediately verify information with the police, upon receipt.

- Australia Locations must verify with the police before sending to National Fleet Accounting, once received a scanned copy must be forwarded to International Fleet Accounting, OKC to enter into VISION.

- All vehicle thefts from customers and incidents of vandalism must be reported to the First Notice of Loss (FNOL) Office (North America) or the responsible HCM/Country Claims Department (all other Countries) daily.

D. Closing Associated Rental Agreements

1.  The OKC Vehicle Control Department (North America), Car Control Department (Brazil), Location/Branch Manager (Europe, Australia and New Zealand) must close the RA after verifying the Theft Vehicle Report with police. Therefore, North America and Brazil rental locations must not close the RA or perform an exchange on the RA.

2.  Once confirmed the theft/conversion has been reported to the police, the responsible management (as listed above) must Close RAs in the ASAP/TAS/CARS+/HTZRENT Post Return or BCHCLOSE applications by:

    - Entering an approximate 'mileage in', estimating 70 miles/100 kilometers per day.

    - Recording the date the vehicle was reported stolen in the 'return date and time' field.

    - Ensuring the Rent and Return locations are the same.

    - Applying the 'best' or lowest rate available.

    - Providing background information (e.g, theft from renter, date reported, etc), in the 'remarks' section.

    Note:   If determined that a charge card was used fraudulently and the true card holder did not rent, close out the RA and only bill for the amount authorized by the card company at time of rental. On cash rentals later confirmed to be fraudulent rentals (e.g., stolen passport, stolen company ID, other) the bill must be no greater than the amount of actual deposit taken, so the final net due equals zero.

E. Reconciling Open Theft/Conversion Files to CARRENT and VISION

1.  It is critical that every open Theft/Conversion Vehicle Report at each reporting City/Country be properly recorded as such, both in CARRENT (except for Brazil and New Zealand where CARRENT is not currently utilized) and in VISION.

2.  To verify this, each Owning City/Country Car Control Manager, Fleet Manager (North America, Brazil and Europe)/Fleet Accounting Manager (Australia) or designated employee must perform a monthly reconciliation of all active Theft/Conversion files.

    a.  Compare all open Theft Vehicle Reports to the monthly VISION RAC Aging of Conversion Report. All open thefts/conversions must appear on this report with a

Depreciation status code of "C" (Active Conversions).

b.  All open Theft/Conversion Vehicle Reports must also appear in CARRENT with a status code of "H" (Hot). Responsible Management must either compare all files to the CARRENT Theft and Conversion By Unit Report or to a user created OLQ report that lists all "H" status vehicles.

c.  Investigate any active Theft/Conversion files that are not appearing as such on the VISION RAC Aging of Conversion Report (or equivalent country report) or in CARRENT. Document notations of variances, related research and resolutions on reports. Contact OKC, Vehicle Control (North America) /OKC Fleet Accounting (other Countries) directly for items not appearing on the VISION RAC Aging of Conversion Report. Add any active Theft/Conversion files not appearing in CARRENT immediately.

Note:   Whenever functional, RDS Reports must be reviewed on line, annotated as required above in Document Direct and retained in RDS.

F. Distribution of Completed Theft/Conversion Report
   On completion of the Theft Vehicle Report, and after confirming theft details with the police, distribute immediately as follows:

| Copy | North America | Brazil | Europe | Australia | New Zealand |
|---|---|---|---|---|---|
| 1 | OKC Vehicle Control Department (1) | OKC Fleet Accounting (1) | OKC Fleet Accounting (1) | OKC Fleet Accounting (1) | OKC Fleet Accounting (1) |
| 2 | HCM - First Notice of Loss (FNOL) Department, Dallas | Country Insurance Department | Country HCM Department | Country Insurance Department | Country Insurance Manager |
| 3 | Owning Area Car Control Manager | Owning Country Car Control Manager | Owning Country Car Control Manager | Owning Country Car Control & State Distribution Manager | Island Car Control & Operations Manager |
| 4 | Responsible Corporate Security Manager | Responsible Corporate Security Manager | Responsible Country Security Manager | Responsible Corporate Security Manager | Responsible Corporate Security Manager |

(1) Faxed/scanned copy of Initial Theft Report only - OKC Fleet Accounting must update vehicle depreciation status in VISION.

Case ID: 200501362

# EXHIBIT 2

Case ID: 200501362

RICHARD LIVINGSTON

Page 1

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA

- - -

| | | |
|---|---|---|
| KELLY A. GRADY, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | NOVEMBER TERM, 2015 |
| | : | |
| vs. | : | |
| | : | NO. 151103380 |
| | : | |
| THE HERTZ CORPORATION; HERTZ | : | |
| RENT-A-CAR PHILADELPHIA INTL. | : | |
| AIRPORT; JOHN DOE(s), | : | |
| | : | |
| Defendant. | | |

- - -

Oral sworn testimony of RICHARD
LIVINGSTON, held at ZANARAS REPORTING & VIDEO, 1845
Walnut Street, Suite 938, Philadelphia, Pennsylvania,
taken on Tuesday, October 4, 2016, commencing at 10:08
a.m., before Lynda DiGrazio-Smith, a NJ Certified
Court Reporter (Lic. #30XI002212), Certified Livenote
Reporter, Licensed CaseViewNet Realtime Provider and
Notary Public for the State of New Jersey.


ZANARAS REPORTING & VIDEO

Registered Professional Reporters

1845 Walnut Street, Suite 9382112 Bay Avenue

Philadelphia, PA 19103        Ocean City, NJ 08226

215.790.7857                  877.GO.DEPOS

Case ID: 200501362

RICHARD LIVINGSTON

Page 53

1            THE WITNESS:  Yeah.  I can't tell

2   you.  I just don't know.

3   BY MR. MALOFIY:

4        Q.   So you recall you being the person

5   required to go to court from May 2010, until a

6   certain point.  Then it was Mr. Graeber; right?

7        A.   Yes.  Right.

8        Q.   And then it was a Mr. Lomis?

9        A.   Yes.

10        Q.   Or was there someone else?

11        A.   No.  Mr. Lomis.

12        Q.   Okay.  What's Mr. Lomis's title?

13        A.   Assistant corporate security manager.

14        Q.   How long has he been at Hertz?

15        A.   Since February of 2016.

16        Q.   Okay.  Mr. Graeber is still with Hertz?

17        A.   No.

18        Q.   Or no?

19        A.   He's not.

20        Q.   When did he stop -- did he no longer --

21   was he no longer employed at Hertz after

22   February 2016?

23        A.   No.  He was not.  He left somewhere in

24   the summer.  I am going to say July of 2015.  Again,

Case ID: 200501362

RICHARD LIVINGSTON

Page 54

1    that's an approximate.

2         Q.   I understand.  Why did he leave?

3         A.   He got laid off.

4         Q.   Okay.  Do you understand the

5    circumstances regarding his being laid off?

6         A.   My understanding was, it was just a

7    corporate decision to lay off a large group of

8    people at that time for cost savings.

9         Q.   Okay.  What was his role?

10        A.   Assistant corporate security manager.

11        Q.   So they laid him off and they hired on

12   another corporate security manager roughly six

13   months later?

14        A.   Yes.

15        Q.   What was the reason for that?

16        A.   They found out that they made a mistake

17   in laying him off.

18        Q.   Did they ask for him to come back?

19        A.   They did.

20        Q.   And what was his response?

21        A.   He's already obtained other employment.

22        Q.   Do you know where he's now employed?

23        A.   With the federal government, but I don't

24   know exactly what the job is.

Case ID: 200501362

RICHARD LIVINGSTON

Page 108

1          A.   I'd be at the airport.

2          Q.   So which police officers would you give

3     it to?

4          A.   Whoever arrived to take the report.

5          Q.   How would they know to pick up a report?

6          A.   I'd call them on the phone.

7          Q.   So first, you would receive this theft

8     package from Oklahoma City?

9          A.   Right.

10         Q.   You wouldn't review the theft package.

11    Correct?

12         A.   I'd look at it to make sure that

13    everything is in order.

14         Q.   What does that mean?  All the pieces of

15    the sandwich are there?

16         A.   The dates are right and everything

17    was -- there's numerous copies of the same

18    information.  Make sure everything is correct on it.

19         Q.   How would you determine if it's correct,

20    if you didn't have the factual knowledge relating to

21    it?

22         A.   Well, I can look at all the pages on

23    that and make sure that they have it throughout the

24    report is the same.

Case ID: 200501362

RICHARD LIVINGSTON

Page 109

1          Q.   You would look through the report for
2     basic typos.  Is that right?
3          A.   In most cases, yes.
4          Q.   Would you do any other determination,
5     other than looking for typos within the theft
6     package itself?
7          A.   No.
8          Q.   Would you check any Hertz systems?
9          A.   No.
10          Q.   Okay.  So your investigation or your
11     review of the theft package was solely strictly the
12     pages contained within the theft package itself?
13          A.   That's correct.
14          Q.   So then once you received it, how would
15     you receive it?  E-mail?  Fax?
16          A.   At one time it was faxed, now it's
17     e-mailed.
18          Q.   Okay.  How many of these things do you
19     receive a day?
20               MR. WOLF:  At what point?
21     BY MR. MALOFIY:
22          Q.   At any point.  Does it change?
23          A.   I don't receive any anymore.
24          Q.   Why not?

Case ID: 200501362

RICHARD LIVINGSTON

Page 115

1  was the car stolen, yes.

2       Q.   Okay.  Would they ask you questions or

3  do the interview at that point?

4       A.   No.  They would not interview me.

5       Q.   What's the form?  7548?

6       A.   I'm sorry?

7       Q.   Are you familiar with the 75 --

8       A.   I'm not -- yeah, the 48 is what

9  Philadelphia uses.

10      Q.   Yes.

11      A.   Yes.

12      Q.   You're familiar with that form?

13      A.   Yes.

14      Q.   Do you recall being interviewed by the

15  police, when you turned in the theft package?

16      A.   No.

17      Q.   No.  When you put in the theft package,

18  what were the checks done to confirm the information

19  was correct?  When I say, What were the checks done,

20  I mean what, as the corporate security manager, did

21  you do to confirm that the information was true,

22  accurate and correct, if anything?

23      A.    I went through the form to make sure

24  that everything was in order.

Case ID: 200501362

RICHARD LIVINGSTON

Page 116

1          Q.   When you say, Everything was --

2          A.   Well, for example, for the State, you

3     need like a certified mailing, make sure that the

4     mailing was included in the theft report.

5          Q.   Besides, I mean, from my testimony, it

6     sounds like you didn't do anything as far as checks

7     and balances, to confirm the information was

8     correct, other than making sure the pieces in the

9     theft package were there?

10          A.   Right.

11          Q.   And then, also, checking for typos.  Is

12     that accurate?

13                MR. WOLF:  Well, I'll just object to

14     his testimony speaks for itself.  And it's not

15     counsel's characterization of the testimony.

16                MR. MALOFIY:  Well, there's no

17     characterization there.  It was crystal clear.

18                MR. WOLF:  The record will speak for

19     itself.

20                MR. MALOFIY:  Right.  And I can ask a

21     question and build it with foundation with prior

22     facts for prior things he's testified to.

23     BY MR. MALOFIY:

24          Q.   Now, my understanding, sir, is that when

Case ID: 200501362

RICHARD LIVINGSTON

Page 117

1    you received this theft package, your testimony is

2    that you didn't do any independent investigation,

3    other than looking at the package itself and then

4    you would check to see if there were typos --

5        A.    Right.  My company would --

6        Q.    -- and make sure -- hold on a second.

7        A.    I'm sorry.

8        Q.    And make sure that the different parts

9    that were supposed to comprise the theft package

10   were there.  Correct?

11       A.    Yes.

12       Q.    Okay.  What parts are supposed to

13   comprise the theft package?

14       A.    Well, what the police actually require,

15   which is a certified mailing.

16       Q.    Okay.  What else?

17       A.    Car information.

18       Q.    What else?

19       A.    That's probably just about it.

20       Q.    Okay.

21       A.    They might require more in court, but...

22       Q.    Now, it says here, Submitted DNR 14 A,

23   do you know what that means, on this Exhibit 32,

24   page 3?

Case ID: 200501362

RICHARD LIVINGSTON

Page 137

1          Q.    You'd agree with me that -- oh, you

2    don't even know if 1805 was charged on Ms. Grady's

3    card.  Correct?

4          A.    I'm sorry?

5          Q.    I am going back to page 4 of 16 of

6    Exhibit 32.  You don't even know if 1805 was charged

7    on the card, correct, on Ms. Grady's card?

8          A.    No.  I do not.

9          Q.    But it says it here.  Correct?

10         A.    Okay.

11         Q.    I'm reading that correctly; right?

12   Credit card authorization would be 1805?

13         A.    That's the estimated charge, yes.

14         Q.    Okay.

15         A.    I don't know if that was charged to the

16   card or not.

17         Q.    Now, you did no investigation to

18   determine whether or not it was charged to the card?

19         A.    Absolutely not.

20         Q.    Okay.  Let's go to page 7 of 16.

21               Before I do that -- strike that.

22               Am I correct that page 4, 5 and 6 are

23   part of the Hertz contract?

24         A.    Yes.

Case ID: 200501362

RICHARD LIVINGSTON

Page 195

1          A.   No.  No.  You have mechanics.  You have

2     mechanic bays.  You have probably ten mechanic bays

3     in the back of the building.  Maintenance, but I

4     don't deal with them.  Most of the people there are

5     on a regional basis.

6          Q.   Okay.  Besides you in, you know,

7     corporate security and besides Mr. Lomis,

8     Mr. Graeber, Mr. -- who you already identified

9     yourself, is there anyone else that's involved in

10     corporate security or vehicle location tracking?

11          A.   For the Philadelphia area?

12          Q.   Yeah.

13          A.   No.

14          Q.   And that would be at all relevant times

15     that we're talking about.  Correct?

16          A.   Yes.

17          Q.   Is it your testimony that you don't go

18     to the location and question any of the Hertz

19     employees when you receive a theft package?

20          A.   That's my testimony, yes.

21          Q.   Why?

22          A.   Because I mean the package has been

23     completed, all the reports have been reviewed, I

24     guess, by OKC.  And my marching orders are to report

Case ID: 200501362

RICHARD LIVINGSTON

Page 196

1    the car stolen when I get the -- again, I do look at

2    it for everything being accurate, as far as I can

3    tell, within the report itself.

4         Q.   Yeah.  But you don't do any independent

5    investigation?

6         A.   I do not.

7         Q.   You don't do any check?

8         A.   I do not.

9         Q.   How far away is your office from the

10   Philadelphia Hertz office?

11        A.   From the airport?

12        Q.   Yeah.  Philadelphia Airport Hertz

13   office?

14        A.   Half a mile, three-quarters of a mile.

15        Q.   So how long would it take you to get

16   there by car?

17        A.   Five minutes.

18        Q.   Okay.  Is it your testimony that when

19   you receive a theft package that deals with the

20   Philadelphia Hertz Airport location, you wouldn't go

21   and speak to individuals there regarding the theft

22   package?

23             MR. WOLF:  Asked and answered, but

24   you can answer.

Case ID: 200501362

RICHARD LIVINGSTON

Page 197

1          THE WITNESS:  In reference to?

2   BY MR. MALOFIY:

3          Q.   Receiving a theft package and doing any

4   kind of inquiry, you wouldn't do that normally?

5              MR. WOLF:  Asked and answered, but

6   you can answer.

7              THE WITNESS:  A conversion has

8   nothing to do with the people that wrote the

9   contract or anything like that.  No, I would not.

10  BY MR. MALOFIY:

11         Q.   Would you have to speak to the rental

12  representative who was?

13         A.   I don't know who -- what are you talking

14  about as far as a rental representative.

15         Q.   The person who rented the car to the

16  renter.

17         A.   All right.

18         Q.   Did you ever speak to them in regards to

19  a theft or a conversion or a stolen vehicle?

20         A.   Possibly if there was fraudulent

21  paperwork submitted to them, I might.

22         Q.   But it wouldn't be your practice to do

23  that.  Correct?  To enter --

24         A.   Not in the normal course of business

Case ID: 200501362

RICHARD LIVINGSTON

Page 205

1          A.    I have never been deposed for Hertz.

2          Q.    Okay.  Are you aware of any lawsuits

3    against Hertz for improperly reporting a car stolen

4    when it was not?

5          A.    I am not.

6          Q.    Okay.  Have you ever complained that the

7    Hertz computer systems are not -- strike that.

8                Do you have access to phone logs to

9    determine when a renter called in?

10         A.    I do not.

11         Q.    Do you have access to any kind of logs

12   that determine the contacts the renter had with

13   Hertz?

14         A.    Do not.

15               MR. MALOFIY:  I want to take a half

16   hour break for lunch and finish up?

17               MR. WOLF:  Do you need a break?

18               THE WITNESS:  I need to go.

19               MR. WOLF:  Let's finish.

20               MR. MALOFIY:  We're going to be a few

21   hours.

22               MR. WOLF:  A few more hours?

23               MR. MALOFIY:  Absolutely.  Yeah.  I

24   got a lot of documents to go through.  If you want a

Case ID: 200501362

RICHARD LIVINGSTON

Page 215

1    changes between the contract and that sheet.  What

2    exactly transpired to make that happen, I don't

3    know.

4         Q.   Okay.  At any point would -- as a

5    corporate security manager or anyone in your

6    division of one other person, I mean -- I don't mean

7    to make that --

8         A.   It is all right.

9         Q.   -- let me strike that.

10             As a corporate security manager for

11   Hertz for this area or anyone working with you or

12   for you, would they have done any independent

13   investigation in to what payments are made with the

14   car before filing a police report?

15        A.   Not on my side of the fence.  On OKC's

16   side possibly.

17        Q.   Okay.

18        A.   We're still the same company.  I just

19   don't know what they do, possibly do to investigate

20   that further.

21        Q.   That's one of the questions I had.  Who

22   does this investigation if you don't, the corporate

23   security manager?

24        A.   As far as I know, vehicle control does

Case ID: 200501362

RICHARD LIVINGSTON

Page 216

1    all that paperwork.

2           Q.   Well, you said paperwork --

3           A.   Well --

4           Q.   -- what do you mean by that?

5           A.   Whatever they do to glean the

6    information that they put down in the theft package.

7           Q.   Do you know how that process is done?

8           A.   I do not.

9           Q.   If you don't know, who would know?

10          A.   Vehicle control would know.

11          Q.   Do you know if someone is testifying

12   from vehicle control?

13          A.   I do not know.

14          Q.   Did anyone from vehicle control talk to

15   you in regards to this case?

16          A.   No.

17          Q.   Did anyone from Hertz internally talk to

18   you in regards to this case?

19          A.   No.

20          Q.   Do you know anyone in vehicle control or

21   investigation that does the investigations for

22   vehicle control?

23          A.   All vehicle control does different tasks

24   within it but I don't know who does what.

Case ID: 200501362

RICHARD LIVINGSTON

Page 374

1    recovered the vehicle?

2          A.   They know it.  They had to take it out

3    of the system.

4          Q.   Did you ever tell police that Ms. Grady

5    was -- were you aware that Ms. Grady was released?

6          A.   I didn't even know she was arrested.

7          Q.   So you didn't know she was detained?

8          A.   Correct.

9          Q.   What procedure was in place to notify

10   the police that Ms. Grady had made a payment of

11   $2,000?

12         A.   It has no bearing on the case

13   whatsoever.

14         Q.   I didn't ask --

15         A.   There's no procedure.

16         Q.   I didn't ask you --

17         A.   There's no procedure --

18         Q.   -- whether or not it's your judgment --

19              MR. WOLF:  He's answering the

20   question.

21              THE WITNESS:  -- in place.

22   BY MR. MALOFIY:

23         Q.   Let me ask it again so we have a clean

24   answer.  What procedure was in place at Hertz to

Case ID: 200501362

RICHARD LIVINGSTON

Page 375

1    inform the police that Hertz had made a charge that

2    went through on her bank for $2,500 days before the

3    report of the car stolen, which was not included in

4    the theft package or any information previously

5    provide to the police?

6         A.   There is no procedure in place because

7    it's not relevant.

8         Q.   So it's Hertz's position that payment

9    for a vehicle, pursuant to an agreement with Hertz,

10   is not relevant to prosecuting a young lady for a

11   theft of a vehicle?

12        A.   Hertz is only trying to recover even a

13   fraction of their loss from them not having the car

14   back when it was contracted to be back.

15        Q.   Isn't it true that she had an agreement

16   to the end of July and she paid the $2,500 pursuant

17   to that agreement?

18        A.   As far as the paperwork I see, no.

19        Q.   Why was the $2,500 paid to Hertz by Ms.

20   Grady on the same credit card and on the same rental

21   contract?

22             MR. WOLF:  Same objection.  That's

23   been noted throughout the course of today.  He's

24   already testified he has nothing to do with billing.

Case ID: 200501362

RICHARD LIVINGSTON

Page 376

1    He doesn't know it.  Joe Jaussi is the proper

2    individual to be answering that question.

3                    It's outside this witness' area of

4    expertise.

5    BY MR. MALOFIY:

6         Q.   I'm asking the context of corporate

7    security and also notifying the correct law

8    enforcement of changes to the facts and the scenario

9    relating to a criminal complaint filed on behalf of

10   Hertz against a renter.  That's the context the

11   question is being asked.

12        A.   Money paid prior to the car being stolen

13   is strictly a contractual thing prior to.  After

14   it's reported stolen, it becomes restitution.

15        Q.   Where in any of the documents do you see

16   the updated information that Hertz had received a

17   payment of $2,500?

18        A.   I haven't seen it in any of the

19   documents there.  That's because it is not revelent.

20                MR. WOLF:  Relevant.

21                MR. MALOFIY:  I understand.

22                THE WITNESS:  Thank you.

23   BY MR. MALOFIY:

24        Q.   Where in the documentation do you see

Case ID: 200501362

RICHARD LIVINGSTON

Page 377

1   anywhere where Ms. Grady kept in constant contact

2   with Hertz?

3           A.   I don't.

4           Q.   Okay.  And what investigation did you

5   do, if any, to determine whether or not she was in

6   constant contact with Hertz during the course of the

7   rental?

8           A.   I personally didn't.  I imagine the OKC

9   did, but I can't...

10          Q.   You don't know that information.

11  Correct, sir?

12          A.   That's correct.

13          Q.   All right.  And you don't know what OKC

14  did; right?

15          A.   I don't know what exact steps they took,

16  no.

17          Q.   Right.  And as you came here today and

18  also the discovery you produced, you didn't produce

19  the actual procedure to follow in regards to the

20  theft.  Correct?

21          A.   That was my mistake, I apologize.

22              MR. WOLF:  We have already been over

23  this.

24              MR. MALOFIY:  And you will supplement

Case ID: 200501362

# EXHIBIT 3

Case ID: 200501362

JOSEPH MICHAEL JAUSSI

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

FIRST JUDICIAL DISTRICT OF PENNSYLVANIA

- - -

```
KELLY A. GRADY,              :
                             : CIVIL ACTION
                             : NOVEMBER TERM,
2015                         
         Plaintiff,          :
                             : NO. 151103380
     vs.                     :
                             :
THE HERTZ CORPORATION; HERTZ :
RENT-A-CAR PHILADELPHIA INTL.:
AIRPORT; JOHN DOE(s),        :
                             :
         Defendants.         :
```

- - -

October 16, 2016

- - -

Oral deposition of JOSEPH MICHAEL JAUSSI, taken pursuant to notice, held at 1845 Walnut Street, Suite 938, Philadelphia, Pennsylvania, commencing at 11:56 a.m., on the above date, before Jennifer P. Miller, RPR, CCR, CRR, and Notary Public for the Commonwealth of Pennsylvania, State of Delaware and the State of New Jersey.

Case ID: 200501362

JOSEPH MICHAEL JAUSSI

Page 69

1   theft package and all the overdue notes

2   associated with the transaction.

3       Q.   Do you know the name of the

4   individuals who were involved with putting

5   together the theft package regarding Ms. Kelly

6   Grady?

7       A.   Say -- state the question again.

8       Q.   Name the individuals who are involved

9   in putting together the theft package relating

10  to Ms. Kelly Grady?

11      A.   It's my understanding that Rich

12  Livingston was on vacation at the time.  Ken

13  Graeber put the package together after he

14  received all the pertaining information within

15  the package for Oklahoma City.

16      Q.   We deposed Mr. Rich Livingston

17  Tuesday.  He indicated that he doesn't put the

18  package together.  He just gets it from

19  Oklahoma City and then basically just couriers

20  it to the police.

21              Is it your understanding that

22  the corporate security manager or assistant

23  corporate security manager actually puts the

24  theft package together?  Or is it your

Case ID: 200501362

JOSEPH MICHAEL JAUSSI

Page 70

1    understanding that the theft package is put

2    together in Oklahoma City and then sent to the

3    corporate security manager at the location

4    where the car was allegedly taken from?

5                    MR. WOLF:  I'm going to object

6          to the characterization.  His testimony

7          will speak for itself.

8                    You can answer.

9                    THE WITNESS:  So it's my

10         understanding that Oklahoma City generates

11         the packet and all the pertaining

12         documents within it, feeds Ken Graeber or

13         Rich Livingston, right, and Ken Graeber or

14         Rich Livingston essentially print, file,

15         and go seek a police report claim or case

16         number.

17   BY MR. MALIFOY:

18        Q.   Okay.  So the theft package is

19   already completed in Oklahoma City before it's

20   sent to the corporate security manager at the

21   Hertz location where the car was allegedly

22   taken from, correct?

23        A.   That's my understanding, correct.

24        Q.   So who specifically by name do you

Case ID: 200501362

# EXHIBIT 4

Case ID: 200501362

1

1              IN THE COURT OF COMMON PLEAS
         FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
2                  CIVIL TRIAL DIVISION
                       - - -
3
   KELLY GRADY,                 : NOVEMBER TERM, 2015
4           Plaintiff          :
        vs.                     :
5                               :
   THE HERTZ CORPORATION;       :
6  HERTZ RENT-A-CAR PHILADELPHIA :
   INTL AIRPORT,                :
7           Defendants         : NO. 3380

8                      - - -

9              Thursday, September 14, 2017
                **Afternoon Session**
10
                       - - -
11
                 Courtroom 475
12                  City Hall
              Philadelphia, Pennsylvania
13
                       - - -
14
   BEFORE:  THE HONORABLE PAULA A. PATRICK, J., and a
15         Jury

16                     - - -

17

18

19

20

21

22

23

24

25

*Danielle O'Connor, RPR, CRR 215-683-8023*

**Page 2**

1  APPEARANCES:

2  FRANCIS ALEXANDER, LLC
   BY:  FRANCIS MALOFIY, ESQUIRE
3      ALFRED JOSEPH FLUEHR, ESQUIRE
   280 N. Providence Road
4  Media, PA  19063
   Counsel for Plaintiff

5

   EDELSTEIN LAW, LLP
6  BY:  JAY L. EDELSTEIN, ESQUIRE
       CHRISTOPHER LEEDS, ESQUIRE
7  230 S. Broad Street, Suite 900
   Philadelphia, PA  19102
8  Counsel for the Defendants

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

*Danielle O'Connor, RPR, CRR 215-683-8023*

**Page 3**

1  **INDEX**

2

   **WITNESS**          **DR**  **CR**  **RDR**  **RCR**

3  Julie Wilkerson      --   4   55   56

4  John Cocklin         57  64   --   --
   (Voir Dire)

5

6  John Cocklin         68  97   --   --

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

*Danielle O'Connor, RPR, CRR 215-683-8023*

**Page 4**

1      - - -

2      (The following occurred in open court

3  outside the presence of the jury:)

4      - - -

5      THE COURT:  Is there anything we need

6  to discuss before the jury comes in?

7      MR. MALOFIY:  No, Your Honor.

8      THE COURT:  Are you sure?

9      MR. MALOFIY:  Yes, Your Honor.

10      - - -

11      (Whereupon, the jury entered the

12  courtroom at 1:22 p.m.)

13      - - -

14      THE COURT:  Welcome back, ladies and

15  gentlemen.  We'll proceed now with the

16  cross-examination of the Hertz representative.

17      MR. MALOFIY:  Thank you.

18      May I proceed, Your Honor?

19      THE COURT:  Yes, go ahead.

20      MR. MALOFIY:  Thank you.

21      - - -

22      CROSS-EXAMINATION

23      - - -

24  BY MR. MALOFIY:

25  Q.    A few questions.  And thank you for being

*Danielle O'Connor, RPR, CRR 215-683-8023*

**Page 5**

1  here.  I know you were here the whole time.

2      My understanding is you flew in from

3  Florida.  Are you from Oklahoma or Florida?  I'm

4  confused.

5  A.    **I'm from Oklahoma.  I do work down in Florida.**

6  Q.    Okay.  I see.  A few things.

7      You would agree as the corporate

8  designee here on behalf of the Hertz Corporation

9  that prior to a report to the police -- and if a

10  report is made, you would agree with me that it must

11  be true?

12  A.    **Correct, yes.**

13  Q.    And you'd agree with me that it must be

14  accurate?

15  A.    **Yes.**

16  Q.    And you'd agree with me that it also must be

17  correct?

18  A.    **Yes.**

19  Q.    And would you also agree with me that if

20  there's omissions in the facts, that there's a duty

21  that Hertz corrects those omissions?

22  A.    **Yes.**

23  Q.    Did Hertz do that in this case?

24      MR. EDELSTEIN:  Objection, Your Honor.

25      THE COURT:  Overruled.  She can

*Danielle O'Connor, RPR, CRR 215-683-8023*

Created by eScribers
Control No.: 17093136

**6**

1  answer.
2  THE WITNESS: I'm not sure what
3  omissions you're talking about.
4  BY MR. MALOFIY:
5  Q.  Do you believe there were any omissions in the
6  information provided to the police, yes or no?
7  A.  **At what time?**
8  Q.  At any time.
9  A.  **We gave them what we had at -- what**
10  **information we had. We handed the theft report off**
11  **to the police, the information that we had, and then**
12  **that was given to the police. And what they did**
13  **from there is up to them.**
14  Q.  Do you believe if there's -- I think you
15  testified if there's omitted facts, they should be
16  corrected, correct?
17  A.  **Yes.**
18  Q.  Eventually did Hertz become aware of
19  additional facts in regards to Ms. Grady's rental
20  that should have been provided to the police?
21  A.  **Which facts?**
22  A.  **Well, the payment of 2400.**
23  A.  **That was actually in the theft package. The**
24  **police had that information.**
25  Q.  The police had that information?

*Danielle O'Connor, RPR, CRR 215-683-8023*

**7**

1  A.  **Yes, it's in the billing page of the theft**
2  **package.**
3  Q.  What page is that, ma'am?
4  A.  **We went over it this morning.**
5  MR. MALOFIY: Court's indulgence.
6  (Pause.)
7  MR. MALOFIY: I need the date on this.
8  BY MR. MALOFIY:
9  Q.  Ma'am, do you know when this was completed,
10  this document that you had reviewed with counsel?
11  A.  **It's on there.**
12  Q.  Okay.
13  A.  **July the 12th, 2013. It says, "process date."**
14  MR. EDELSTEIN: You're writing on my
15  document.
16  MR. MALOFIY: I don't mean to do that.
17  That's why...
18  MR. EDELSTEIN: Okay.
19  BY MR. MALOFIY:
20  Q.  I want to go to something, ma'am.
21  This was July the 12th you said it was
22  created?
23  A.  **July the 12th, 2013, I believe is when it said**
24  **the rental was closed. We had to close the rental**
25  **out --**

*Danielle O'Connor, RPR, CRR 215-683-8023*

**8**

1  Q.  Yes.
2  A.  **-- in order to report it stolen.**
3  Q.  I understand. If I could make sure? Let me
4  confirm that, ma'am.
5  MR. MALOFIY: Can I approach the
6  witness?
7  THE COURT: Ginelle, can you give that
8  to the witness?
9  THE WITNESS: So it says "date, time
10  posted, July 12th, 2013, at 12:34 p.m."
11  BY MR. MALOFIY:
12  Q.  Okay.
13  A.  **We closed it back to May 31st, because that's**
14  **all the authorization we got at time of rent. And**
15  **it says right there, "bill to auth plus 15 percent**
16  **Vehicle Control, Alicia Brown."**
17  Q.  I see.
18  MR. MALOFIY: Can I have that document
19  back?
20  BY MR. MALOFIY:
21  Q.  Can we put up P-6? That document was created
22  on 7/12, correct?
23  A.  **What?**
24  Q.  7/12, that was your testimony, correct?
25  A.  **When the rental was closed, correct.**

*Danielle O'Connor, RPR, CRR 215-683-8023*

**9**

1  Q.  And when the payment went down, I'd like to
2  blow this up for the benefit of the jury and also
3  for Ms. Wilkerson -- Mrs. Wilkerson or Ms.?
4  A.  **Mrs. Wilkerson.**
5  Q.  Mrs. Wilkerson, my apologies.
6  The payment was put through and Hertz
7  was paid 2445 on 7/15, correct?
8  A.  **Right. So we closed it and it went through**
9  **the process to force charge through the bank.**
10  Q.  Isn't it a fact that the car was paid?
11  A.  **No.**
12  Q.  It wasn't?
13  A.  **It wasn't paid in full.**
14  Q.  Well, I'm sorry --
15  MR. MALOFIY: Objection.
16  MR. EDELSTEIN: Objection to what?
17  THE COURT: Okay. But you asked the
18  question, so now she answered it.
19  BY MR. MALOFIY:
20  Q.  The car -- let's be clear. Hertz received
21  1805, correct?
22  A.  **At time of rent we received 1805**
23  **authorization.**
24  Q.  Did Hertz receive and put in their bank
25  account $1805, yes or no?

*Danielle O'Connor, RPR, CRR 215-683-8023*

09/14/2017 08:38:32 PM

Control No.: 17093136

10

1  A.   Yes.  But then we force charged 2,444.94
2  cents, but the car wasn't actually picked up
3  until -- we didn't recover our car until September
4  11th, 2013.
5  Q.   That's a different issue, when you recovered
6  your car.  We can move to that and I will.  But
7  let's go to the payment.
8        You don't dispute that you received --
9  Hertz put in their bank account $1805, correct?
10 A.   Correct.
11 Q.   And you don't dispute that Hertz put in Hertz'
12 bank account $2,444.94, correct?
13 A.   Correct.
14 Q.   And you don't dispute that when you produce
15 this theft package and the report to the police that
16 was completed on 7/12, correct?
17 A.   Correct, but --
18 Q.   Hold on.
19 A.   But it wasn't paid in full.
20 Q.   And this payment was 7/15/2013, days later,
21 correct?
22 A.   It has to go through the process.
23 Q.   Is that correct, ma'am?
24 A.   Yes.
25 Q.   Yes, it is correct.

*Danielle O'Connor, RPR, CRR 215-683-8023*

11

1  A.   But it still wasn't paid in full.
2  Q.   I think what we're going at is because you
3  didn't receive it until September --
4        THE COURT:  Counsel, do you want to go
5        into that?  Because I made a ruling on that
6        earlier.
7        MR. MALOFIY:  Fair enough, Your Honor.
8        THE COURT:  It's up to you if you want
9        to go into it.
10 BY MR. MALOFIY:
11 Q.   Let's be clear.  OnStar, correct, was called?
12 A.   They were called, but not by Hertz.
13 Q.   When OnStar was called, did Hertz know where
14 their vehicle was?
15 A.   Not at that time.
16 Q.   Oh, Hertz --
17 A.   The police had to notify us.
18 Q.   Well, Hertz actually spoke to the police on
19 7/22, correct?
20 A.   Correct.
21 Q.   You don't dispute that Hertz representatives
22 spoke to the police in regards to Ms. Grady's
23 rental, correct?
24 A.   And told her she wasn't authorized to keep the
25 car.

*Danielle O'Connor, RPR, CRR 215-683-8023*

12

1  Q.   Hold on a second.  They also told her she did
2  not steal the car, correct?
3  A.   That's what they said.
4  Q.   Are you disputing what they said, Trooper
5  Kemmerling?
6  A.   No, no.
7  Q.   So you accept the representation from Trooper
8  Kemmerling and the state police report that said
9  Hertz had said the car was not stolen, correct?
10 A.   Correct.  But he let -- he did not let her
11 take our car and our asset.  And Trooper Kemmerling
12 also told her she could be -- Philadelphia PD might
13 go after her.
14 Q.   Well, he said "might," and there's dispute as
15 to that and that's for the jury to decide.
16 A.   Okay.
17 Q.   Let me move to something else.
18        You admit and you accept the
19 representation that Hertz said the car was not
20 stolen, correct, on that day?  On 7/22, when a Hertz
21 representative was contacted, Hertz said the car was
22 not stolen?
23 A.   Someone at Hertz said that, yes.
24 Q.   Who was that?
25 A.   I have no idea.

*Danielle O'Connor, RPR, CRR 215-683-8023*

13

1  Q.   Well, if there was a call and there was a
2  situation and someone called the number, they would
3  have called up and it would have got directed right
4  to you, right?
5  A.   That's correct, but they weren't directed
6  right to me.
7  Q.   And was it you who said the car was not stolen
8  or was it someone else?
9  A.   It was not me.
10 Q.   Well, where are the notes to indicate who said
11 that, ma'am?
12 A.   There are no notes because we don't know who
13 said that.
14 Q.   I'm sorry?
15 A.   I don't know who said that.
16 Q.   Did you ask?
17 A.   Ask who?
18 Q.   Well, ask anyone at Hertz who said that.
19 A.   No.
20 Q.   Did you do that?
21 A.   No.
22 Q.   You could have done that, right?
23 A.   I could have.
24 Q.   You could have got an e-mail, put a global
25 message out to everyone in the corporate global --

*Danielle O'Connor, RPR, CRR 215-683-8023*

Control No.: 17093136

14

1  Hertz corporate global and said, I need to know who
2  said that, that is a serious matter, I have to
3  testify in court under oath; you could have done
4  that, right?
5  **A.    Well, we didn't actually have our car back at**
6  **that time.**
7  Q.    No, no.  I'm asking before you took the stand
8  today, before you testified to this jury, you could
9  have sent an e-mail to everyone at Hertz saying, I
10  need this information, who spoke to the police
11  officers on this date and said Ms. Grady was
12  authorized, correct?
13  **A.    Someone at Hertz could have said that, yes.**
14  Q.    But you didn't do that as you took the stand
15  here today, correct?
16  **A.    No.**
17  Q.    And you don't have any notes in your system to
18  indicate -- you don't have any notes in your system
19  that records that phone call where the Hertz
20  representative said it, right?
21  **A.    Well, first of all, they don't document what**
22  **Hertz representative they spoke to in the notes at**
23  **the police, nor do they say what phone call they**
24  **called.  So it's a little difficult for me to**
25  **understand who Officer Kemmerling called and who he**

15

1  **exactly spoke to.  Usually, we would get that**
2  **information if they spoke to us.**
3  Q.    But Trooper Kemmerling testified he spoke to
4  Hertz, he called the number, was routed to the 800,
5  gave the information on the contract and that would
6  have gone, you said, to I believe it was Oklahoma
7  City Vehicle Control, correct?
8  **A.    Correct.**
9  Q.    That's where it should have gone, correct?
10  **A.    Where it should have gone.**
11  Q.    And if it should have gone in the right place
12  and things happened the right way, they should have
13  filed procedure and that phone call should have been
14  documented in the notes, correct?
15  **A.    Correct.**
16  Q.    And it wasn't, correct?
17  **A.    But Officer Kemmerling didn't say what phone**
18  **number he called.**
19  Q.    And it wasn't documented in the notes,
20  correct?
21  **A.    Correct.**
22  Q.    Thank you.  Now, let me get to another point.
23  Ms. Grady brought her phone record in this case,
24  TD -- excuse me -- Bank record, correct?
25  **A.    Yes.**

16

1  Q.    Are you familiar with bank statements?
2  **A.    Yes.**
3  Q.    You are.  Do you work with them?
4  **A.    No, I don't work with them.**
5  Q.    You're familiar with them?
6  **A.    Yes.**
7  Q.    Have you seen them before?
8  **A.    Yes.**
9  Q.    Now, does Hertz have a bank account?
10  **A.    Yes.**
11  Q.    It does.  Who does it bank with?
12  **A.    I can't give you the exact name.**
13  Q.    Well, you could have done an investigation and
14  looked at Hertz' bank statements to determine and
15  confirm the 1805 and the $2445, correct?
16  **A.    It's actually on the document we already**
17  **presented to you this morning.**
18  Q.    The one before the charges went through,
19  correct?
20  **A.    The 1805, when she rented, and then when we**
21  **closed out the contract on July 12th, the force**
22  **charge is the two charges.**
23  Q.    I understand.  We'll get to the force charge
24  in a minute.  You could have brought your bank
25  records here today.  You're here as a fact witness

17

1  for Hertz.  You're here as a corporate designee to
2  bind the corporation; do you understand that?
3  **A.    Yes.**
4  Q.    And you're here and what you say binds the
5  corporation to Hertz.
6        Did Hertz bring any corporate bank
7  statements here today to go over and look at the
8  bank's statement to determine what was paid or what
9  was not?
10  **A.    Well --**
11  Q.    Yes, it did or no, it didn't, ma'am, and then
12  you can explain.
13  **A.    It's in the theft package what was billed.**
14  **The 1805 and the 2444 are actually on the closed --**
15  Q.    I'm sorry.  Maybe I'm not clear.  My question
16  was a little different.
17        Did you bring the bank records to this
18  court here today, yes or no?
19  **A.    No, we have securities.  I can't just pop up a**
20  **bank record.**
21  Q.    We asked for it in discovery I'll represent as
22  an officer of the court.
23        MR. EDELSTEIN:  Objection, Your Honor.
24        THE COURT:  You object to that?
25        MR. EDELSTEIN:  I object to that

B434-02103380
Control No.: 17093136

18

1  editorialization, yes.
2        THE COURT:  All right.  It's
3  sustained.
4        MR. EDELSTEIN:  The jury has heard it,
5  so it doesn't matter.
6  BY MR. MALOFIY:
7  Q.    Let me go to Exhibit 13.
8        MR. MALOFIY:  Do you have that, Mr.
9  Segal?
10 BY MR. MALOFIY:
11 Q.    Now, do you know who Kenneth Graeber is?
12 A.    **The assistant corporate security at the time.**
13 Q.    Of where?
14 A.    **Hertz, Philadelphia.**
15 Q.    Did you ever speak to him?
16 A.    **Yes.**
17 Q.    You know who he is, right?
18 A.    **Yes.**
19 Q.    Do you know he gave an interview in this case?
20 A.    **Yes.**
21 Q.    Did you review that interview?
22 A.    **Yes.**
23 Q.    It says here, the interview was taken, if I'm
24 not mistaken, on 7/23/2013.  Do you see that?
25 A.    **Yes.**

*Danielle O'Connor, RPR, CRR 215-683-8023*

19

1  Q.    Now, if you go down here, it says --
2        MR. MALOFIY:  And if you go to the
3        second page, Mr. Segal, blow this portion up
4        for the benefit of the jury.  Bring that up.
5  BY MR. MALOFIY:
6  Q.    When he was questioned by the police officer,
7  Officer Ianoconne took the stand here, the question
8  was asked of Kenneth Graeber:  "How much of a
9  payment was received from the renter."
10       "ANSWER:  We received 1805 for the
11       contracted rental and a deposit."
12       MR. EDELSTEIN:  Judge --
13 BY MR. MALOFIY:
14 Q.    Do you see --
15       MR. EDELSTEIN:  Just for the record,
16       although I have no problem with the actual
17       question, the questions are being asked of --
18       as to what the actual statement says, not as to
19       what the officer said when he was in the
20       courtroom --
21       THE COURT:  Okay.
22       MR. EDELSTEIN:  -- as I understand it.
23       MR. MALOFIY:  That's correct.
24       MR. EDELSTEIN:  Okay.
25       THE COURT:  All right.

*Danielle O'Connor, RPR, CRR 215-683-8023*

20

1  BY MR. MALOFIY:
2  Q.    Do you see that?
3  A.    **What was the question?**
4  Q.    It says here in the interview that was
5  conducted by and between Officer Ianoconne and
6  Kenneth Graeber, who's the assistant corporate
7  security manager of the Philadelphia branch at the
8  time, correct?
9  A.    **Yes.**
10 Q.    And the question was asked of him in his
11 interview on 7/23/2013:  "How much of a payment was
12 received from the renter, Question.
13       "ANSWER:  We received 1805 for the
14       contracted rental and a deposit."
15       Do you see that?
16 A.    **Yes.**
17 Q.    Why wasn't any additional information provided
18 to Officer Ianoconne?
19 A.    **It was.  The whole theft package was given to**
20 **him.**
21 Q.    The theft package you showed does not have the
22 payment of 2445, ma'am; isn't that correct?
23 A.    **No, it does.**
24 Q.    It was made on 7/12, ma'am; isn't that true?
25 A.    **Yes, but the interview was 7/23.**

*Danielle O'Connor, RPR, CRR 215-683-8023*

21

1  Q.    Right, but you don't have the payment --
2  there's no -- there's no indication that the
3  additional 2445 was paid by Ms. Grady before a
4  police interview was taken, correct?
5  A.    **It was in the theft package that Mr. Graeber**
6  **handed to the detective questioning him.**
7  Q.    What you showed me is as identifying 2445 was
8  the rate that Ms. Grady was supposed to get; isn't
9  that correct?
10 A.    **No.**
11 Q.    It's not?
12 A.    **20 --**
13 Q.    Isn't it true that the payment was on 7/15, we
14 just looked at that on TD Bank records, you didn't
15 dispute that, ma'am, right?
16 A.    **Right.  It was closed out on 7/12 and it went**
17 **through the cycle as a force charge on 7/15.**
18 Q.    Right.  So why didn't -- Officer Ianoconne,
19 why wasn't he provided with that information in the
20 interview?
21 A.    **He was provided the theft package.**
22 Q.    The theft package did not identify a payment,
23 ma'am.
24 A.    **In the theft package, there does have the 1805**
25 **in the payment.  If he had looked at the theft**

*Danielle O'Connor, RPR, CRR 215-683-8023*

Control No.: 17093136

22

1    **package, it was right there.**
2    **Q.**    Let me go to another -- I understand your
3    testimony.  But let's go to something else so we can
4    make this clear.  Exhibit 3 --
5             MR. EDELSTEIN:  Your Honor, let me
6        just object to that editorialization again.
7        It's clear.  She testified that the theft
8        package showed it.  So whether it's clear to
9        Mr. Malofiy --
10            THE COURT:  Objection is sustained.
11       Her testimony is what it is.
12            MR. EDELSTEIN:  We're supposed to do
13       this without editorializing.
14            THE COURT:  We're supposed to,
15       correct.
16            MR. MALOFIY:  Mr. Edelstein has done
17       it quite a bit.
18            THE COURT:  You didn't object.
19            MR. MALOFIY:  I know I didn't.  I was
20       giving him some leeway.  I thought he would do
21       the same.
22            MR. EDELSTEIN:  I appreciate it, and
23       I'll give you some leeway.
24   BY MR. MALOFIY:
25   **Q.**    If we could go to Exhibit 3, paragraph 20.

*Danielle O'Connor, RPR, CRR 215-683-8023*

23

1    Let me see it real quick.
2             Did you review interrogatories that
3    were signed under oath in this case, verified
4    answers to interrogatories?
5    **A.**    No.
6    **Q.**    You didn't.  Let me go to Exhibit 3.  These
7    were the interrogatories that were propounded upon
8    Hertz.  Could we pull that up for the jury?
9             Can you see that, ma'am?
10   **A.**    Yes.
11   **Q.**    Now, to be clear, these were the
12   interrogatories in this case, these are the answers
13   from Hertz.
14            You didn't have a chance to review
15   these?
16   **A.**    I did see that.  I'm sorry.
17   **Q.**    And it said here on 20:  "Describe in detail
18   all payments, including date, time, amount, and
19   payment method Kelly Grady made for the rental of
20   the Chevy Yukon."  Do you see that?
21   **A.**    Yes.
22   **Q.**    And the answer was:  "One payment on April
23   17th, 2013, at 1:57 p.m. for 1805 to a Visa card
24   ending in 0583."  Do you see that?
25   **A.**    Yes.

*Danielle O'Connor, RPR, CRR 215-683-8023*

24

1    **Q.**    Isn't it true that Hertz also received a
2    payment of 2445 --
3             MR. EDELSTEIN:  Objection, Your Honor.
4        There's testimony it was a force charge, not a
5        payment made by Ms. Grady.
6             MR. MALOFIY:  I would appreciate if
7        the witness testified.
8             THE COURT:  He objected based upon a
9        characterization of the question.  You just
10       have to rephrase the question.
11   BY MR. MALOFIY:
12   **Q.**    Ma'am, isn't it true that this Answer 20 did
13   not identify all the payments that Hertz had
14   received in regards to Ms. Grady's rental?
15            MR. EDELSTEIN:  Just note my
16       objection.  That wasn't the question that was
17       asked, Your Honor.
18            THE COURT:  Overruled.  Go ahead.
19            THE WITNESS:  So we received one
20       payment that she authorized of 1805, the other
21       payment of $2400 and some change was a force
22       charge.
23   BY MR. MALOFIY:
24   **Q.**    Let me ask you something about force charge.
25   You received the payment, did you not?

*Danielle O'Connor, RPR, CRR 215-683-8023*

25

1    **A.**    We didn't receive any authorization from TD
2    **Bank, so she has up to six months to dispute the**
3    **charge.**
4    **Q.**    You received the payment, ma'am, correct?
5    **A.**    Yes.
6    **Q.**    You received the payment and did Ms. Grady
7    ever deny that charge?
8    **A.**    No.
9    **Q.**    And did Ms. Grady ever send you a letter to
10   corporate saying I deny this charge?
11   **A.**    No.
12   **Q.**    And did you have any evidence whatsoever that
13   she called up and she said no, this charge can't go
14   through?
15   **A.**    She would dispute the charge with her bank,
16   **not with Hertz.**
17   **Q.**    I'm asking if she called Hertz and you have
18   any evidence whatsoever in this world to say she
19   ever disputed that charge?
20   **A.**    She didn't dispute with Hertz.  She would have
21   **to dispute with her credit card company.**
22   **Q.**    And you have nothing in Hertz' file to
23   indicate she disputed this in any way, shape, or
24   form, correct?
25   **A.**    That's correct.

*Danielle O'Connor, RPR, CRR 215-683-8023*

Control No.: 17093136

**26**

1  Q.   So, to be clear, you would agree -- you would
2  agree with me that Hertz received 1805 on 4/27/2013,
3  correct?
4  A.   **As an authorization, correct.**
5  Q.   And she provided you her credit card when she
6  initially rented the car, correct?
7  A.   **At time of rent.**
8  Q.   She did that?
9  A.   **Yes.**
10 Q.   Did she ever withdraw her authorization to
11 you, yes or no?
12 A.   **No.**
13 Q.   Have you ever had billing issues or
14 communications issues as Hertz has had with its bank
15 or with someone else's bank?
16 A.   **Yes, we have billing issues.**
17 Q.   Sometimes there's problems with banks talking
18 to other people's banks and there's issues, correct?
19 A.   **Correct.**
20 Q.   You don't dispute that, that's not unusual,
21 that there might be a problem with a wire or
22 communications between the two banking institutions,
23 correct?
24 A.   **No, not at all.**
25 Q.   Did you do any investigation to determine --

*Danielle O'Connor, RPR, CRR 215-683-8023*

**27**

1  I'll withdraw the question.
2         Let me move forward to this:  My
3  understanding, if I understand your testimony
4  correctly, is that if someone calls in and the card
5  isn't -- you call it Block status?
6  A.   **Yes, it's blocked in Pick Up status.**
7  Q.   And it would go right to you or someone in
8  your office, correct?
9  A.   **In the Vehicle Control area.**
10 Q.   How many people are in that office?
11 A.   **Seventy.**
12 Q.   Seventy people?
13 A.   **Yes.**
14 Q.   That's a lot of people handling this.  How
15 many cars does Hertz have?
16 A.   **Currently or in 2013?**
17 Q.   Let's go with 2013.
18 A.   **At the time we had approximately 700,000 cars.**
19 Q.   700,000?
20 A.   **Uh-huh, in North America.**
21 Q.   And, you know, my understanding, and correct
22 me if I'm wrong, is that you've worked for Vehicle
23 Control for over ten years; is that correct?
24 A.   **Yes.**
25 Q.   And my understanding also is that you're the

*Danielle O'Connor, RPR, CRR 215-683-8023*

**28**

1  supervisor?
2  A.   **Yes.**
3  Q.   And my understanding also, it's actually part
4  of your job to make sure those overdue vehicle
5  investigations are done properly, correct?
6  A.   **Yes.**
7  Q.   And it's your job to manage a fleet of
8  $700,000 cars?
9  A.   **Yes.**
10 Q.   And, basically, you regulate all the stealing
11 off of Hertz' lot?
12 A.   **Well, we handle four different types of**
13 **thefts.**
14 Q.   Well, that's one type -- any type of theft,
15 you represent the stealing off of Hertz' property?
16 A.   **Yes.**
17 Q.   I'm a little confused as to what factual
18 knowledge you have about this case.  I know you're
19 testifying here as a corporate designee, but I have
20 a few questions for you.
21 A.   **Okay.**
22 Q.   Do you recall ever speaking to Ms. Grady?
23 A.   **No.**
24 Q.   Would you remember speaking to Ms. Grady if
25 you did?

*Danielle O'Connor, RPR, CRR 215-683-8023*

**29**

1  A.   **It would be in the notes.**
2  Q.   Ma'am, you didn't bring any notes here today,
3  did you?
4  A.   **I did.**
5  Q.   Do you have the notes of the police officer?
6  A.   **I have the theft package --**
7  Q.   I'm asking --
8  A.   **-- with the notes.**
9  Q.   -- when the police officer called on 7/22 and
10 let this young lady go, do you have notes of that
11 conversation in your records?
12 A.   **No.**
13 Q.   No, you don't.  Sometimes notes aren't taken,
14 correct?
15 A.   **Correct.**
16 Q.   In this case you've heard the testimony of
17 Joseph Jaussi, it was read in, correct?
18 A.   **Yes.**
19 Q.   He said the records were purged in regards to
20 Ms. Grady.  Do you remember that?
21 A.   **Yes.**
22 Q.   Do you dispute his testimony which was under
23 oath and bound the Hertz Corporation?
24 A.   **Well, it's the definition --**
25 Q.   I would ask for a --

*Danielle O'Connor, RPR, CRR 215-683-8023*

Control No.: 17093136

30

1   **A.**    -- definition of purged.
2              MR. EDELSTEIN:  Objection, Your Honor.
3         He asked the question.
4   BY MR. MALOFIY:
5   **Q.**    Do you dispute it, ma'am, yes or no, and then
6   you can explain?
7              MR. EDELSTEIN:  Your Honor, he asked
8         the open-ended question.
9              THE COURT:  He did.  So that's
10        sustained.  Rephrase the question.  What you
11        just asked is fine.
12  BY MR. MALOFIY:
13  **Q.**    Ma'am, do you dispute Joseph Jaussi's
14  testimony that the records were purged, yes or no?
15  **A.**    **No.  Can I give the definition of purged,**
16  **though?**
17  **Q.**    I think it's subjective to a degree, but maybe
18  your counsel can follow up with you.
19  **A.**    **Sure.**
20  **Q.**    You see hundreds of packages every day,
21  correct, hundreds of theft packages?
22  **A.**    **Yes.**
23  **Q.**    And I think you were testifying that in the
24  months of -- in the months of July and the summer
25  months, it gets real busy?

*Danielle O'Connor, RPR, CRR 215-683-8023*

31

1   **A.**    **Yes.**
2   **Q.**    Real busy?
3   **A.**    **During the summer months.**
4   **Q.**    And I imagine when someone calls on the phone
5   and they're trying to get ahold of a representative,
6   then they get routed to another department, that
7   would happen, right?
8   **A.**    **Right.**
9   **Q.**    And then they would sit on the phone for a
10  long time and they get routed to another department
11  because you're very busy, right?
12  **A.**    **We're busy, but when we have a theft that**
13  **comes through, it's routed to us.  We have someone**
14  **available to take those calls.**
15  **Q.**    You're supposed to have someone available,
16  correct?
17  **A.**    **We do have someone available.**
18  **Q.**    Okay.
19  **A.**    **It's a theft package.  It's our asset, we want**
20  **it back.**
21  **Q.**    So your goal in this instance was to get your
22  asset back, correct?
23  **A.**    **Correct.**
24  **Q.**    On 7/22, you knew that your asset was no
25  longer with Ms. Grady, correct?

*Danielle O'Connor, RPR, CRR 215-683-8023*

32

1   **A.**    **We didn't have it back.**
2   **Q.**    I'm asking you, did you know, yes or no, that
3   your asset was no longer with Ms. Grady on 7/22?
4   **A.**    **Somebody at Hertz did.**
5   **Q.**    Right.  Now, who at Hertz knew?
6   **A.**    **I'm not sure, because the police officer**
7   **didn't tell me what phone number or who he spoke to.**
8   **Q.**    Well, you mean the police officer -- you mean
9   there's no notes here today that indicate that,
10  correct?
11  **A.**    **Correct.**
12  **Q.**    You do what, about a hundred theft packages
13  per day; is that about right?
14  **A.**    **Some days.**
15  **Q.**    So in the course of you've been sitting here,
16  maybe 400, 500 theft packages went out, correct?
17  **A.**    **Yes.**
18  **Q.**    Basically, this is a mechanical process, you
19  pretty much just approve them?
20  **A.**    **No.**
21  **Q.**    No?
22  **A.**    **No.**
23  **Q.**    Isn't it sort of automated, or you actually do
24  a hundred theft packages a day that are this big?  I
25  mean --

*Danielle O'Connor, RPR, CRR 215-683-8023*

33

1   **A.**    **So every night that I left here, I went back**
2   **to my hotel and reviewed theft packages, page by**
3   **page by page.**
4   **Q.**    You did?
5   **A.**    **I did.**
6   **Q.**    How many did you review since you've been
7   here?
8   **A.**    **About 380.**
9   **Q.**    I see.  Now, let's be clear, you're here to
10  testify as to the policies and procedures of Hertz
11  Rental Car Corporation, correct?
12  **A.**    **Yes.**
13  **Q.**    And you're here also to discuss this policy
14  W7-02, correct?
15  **A.**    **Yes.**
16  **Q.**    Are you familiar with that policy?
17  **A.**    **Yes.**
18  **Q.**    And you're familiar with that policy because
19  that's a policy that you work with, correct?
20  **A.**    **Yes.**
21  **Q.**    And that's a policy which basically regulates
22  all the stealing off of Hertz' lot, correct?
23  **A.**    **Yes.**
24  **Q.**    Did you help draft that?
25  **A.**    **No.**

*Danielle O'Connor, RPR, CRR 215-683-8023*

Control No.: 17093136

34

1  Q.   You didn't.  Who helped draft that document?
2  A.   **Corporate counsel.**
3  Q.   Lawyers?
4  A.   **Yes.**
5  Q.   I see.  Are you technically an officer of the
6  Hertz Corporation?
7  A.   **No.**
8  Q.   Are you just strictly an employee?
9  A.   **I am an employee.**
10 Q.   So no officers of the Hertz Corporation came
11 to this court today, correct, or at any point during
12 this trial, correct?
13 A.   **No.**
14 Q.   Any board members came?
15 A.   **No.**
16           MR. MALOFIY:  And can we pull up
17 W7-02?  Mr. Segal, do you know that number?  Is
18 it P-9?  Thank you.
19 BY MR. MALOFIY:
20 Q.   You're familiar with this document, correct?
21 A.   **Yes.**
22           MR. MALOFIY:  I want to go up here and
23 I want to blow up -- right here, let's blow
24 this up, Mr. Segal.
25 BY MR. MALOFIY:

*Danielle O'Connor, RPR, CRR 215-683-8023*

35

1  Q.   Mrs. Wilkerson, can you see that?
2  A.   **Yes.**
3           MR. MALOFIY:  Thank you, Mr. Segal.
4  Can we elevate that?
5  BY MR. MALOFIY:
6  Q.   "Executive summary, this worldwide procedure
7  applies to the rent-a-car division of the Hertz
8  Corporation and includes requirements for reporting
9  vehicle thefts and conversions."  Did I read that
10 correctly?
11 A.   **Yes.**
12 Q.   It says:  "All vehicle theft and conversions
13 must be documented on a theft recovery vehicle
14 report."  Did I read that correctly?
15 A.   **Yes.**
16 Q.   Then it says:  "All vehicle thefts from
17 customers must also be documented on the vehicle
18 theft from customer report."  Did I read that
19 correctly?
20 A.   **Yes.**
21 Q.   And here's what I'm getting at and where I'm
22 going with this, it says near the last line:
23 "Location, maintenance, area, country, head office,
24 and OKC management must ensure compliance with this
25 procedure."  Do you see that?

*Danielle O'Connor, RPR, CRR 215-683-8023*

36

1  A.   **Yes.**
2  Q.   Is it your job to ensure compliance with this
3  procedure?
4  A.   **Yes.**
5  Q.   And you're the person in charge of 700,000
6  cars to make sure as the regulator that these cars
7  and these -- excuse me -- procedures are followed,
8  correct?
9  A.   **Correct.**
10 Q.   Now, when it says "location," that means in
11 this instance the Philadelphia location, correct?
12 A.   **Correct.**
13 Q.   Just to make this clear, this here says:
14 "W7-02 RAC, reporting vehicle thefts and
15 conversions, August 21st, 2009."  Did I read that
16 correctly?
17 A.   **Yes.**
18 Q.   That's the policy in effect at the time Ms.
19 Grady was arrested and policy in effect at the time
20 of 2013-2014, correct?
21 A.   **Yes.**
22 Q.   The purpose of this standard operating
23 procedure, correct, was to provide requirements for
24 reporting thefts, conversions, or the disappearance
25 of Hertz vehicles, correct?

*Danielle O'Connor, RPR, CRR 215-683-8023*

37

1  A.   **Correct.**
2           MR. MALOFIY:  Pull that back, Mr.
3  Segal.  Can we go to the next page?  Page 3 --
4  page 4.  Excuse me.  With the court's
5  indulgence?  Try page 5.  There also.
6  BY MR. MALOFIY:
7  Q.   All right.  You're intimately familiar with
8  this whole theft package correct -- excuse me, this
9  whole procedure, correct?
10 A.   **Yes.**
11 Q.   You use it on a daily basis?
12 A.   **Yes.**
13 Q.   In fact, this is a procedure that you follow
14 to make sure that innocent people aren't wrongfully
15 arrested for accidental reporting to the police,
16 correct?
17 A.   **Correct.**
18 Q.   And it's important these policies and
19 procedures are followed by Hertz Corporation,
20 correct?
21 A.   **Correct.**
22 Q.   And if Hertz doesn't follow this problem --
23 this procedure, that would be a failure on the part
24 of Hertz, correct?
25 A.   **Correct.**

*Danielle O'Connor, RPR, CRR 215-683-8023*

Case ID: 160503080
Control No.: 17093136

38

1    MR. MALOFIY:  Now, I'd like to blow up
2    17 for the benefit of the jury.
3  BY MR. MALOFIY:
4  Q.    "Corporate/country security manager
5  investigations, every theft conversion disappearance
6  must be promptly investigated by the
7  corporate/country security manager responsible for
8  the location" --
9    MR. MALOFIY:  Can you highlight
10    "location," Mr. Segal?
11  BY MR. MALOFIY:
12  Q.    -- "from which the related theft vehicle
13  report is filed."  In this instance, the location
14  would be Philadelphia, correct?
15  A.    **Correct.**
16  Q.    Now, it goes on to say -- and I want to
17  highlight this, too, Mr. Segal -- "all employees are
18  required to cooperate fully with such an
19  investigation."  Did I read that correctly?
20  A.    **Yes.**
21  Q.    Now, it also says there must be promptly
22  investigated.  Do you see that?
23  A.    **Yes.**
24  Q.    Now, in this instance --
25    MR. EDELSTEIN:  You sound like Darth

39

1    Vader.
2    MR. MALOFIY:  I do, really?  Do I need
3    new batteries?  I'm sorry.
4    Is it okay?
5  BY MR. MALOFIY:
6  Q.    In this instance, you've heard the testimony
7  of Richard Livingston, correct?
8  A.    **Yes.**
9  Q.    And Richard Livingston is, I believe,
10  currently, the corporate security manager, not the
11  assistant security manager of Philadelphia, but the
12  corporate security manager of Philadelphia, correct?
13  A.    **Yes.**
14  Q.    You've worked with him many times, correct?
15  A.    **Yes.**
16  Q.    Now, Mr. Livingston testified under oath that
17  he does no investigation whatsoever at the local
18  level.  Did you hear that?
19  A.    **I heard that, but he does check, check to make**
20  **sure that the VIN is correct, check to make sure**
21  **that there's no movement, or check to make sure that**
22  **the car hasn't been returned.**
23  Q.    I'm sorry.  Do a typo check on the VIN.  What
24  else?
25  A.    **Make sure that there's no further movement on**

40

1  the vehicle.
2  Q.    Uh-huh.
3  A.    **And then make sure that the car has not been**
4  **returned.  He has to make sure the car has hot been**
5  **returned.**
6  Q.    Returned?
7  A.    **Returned.  By the renter.**
8  Q.    How would he do that?
9  A.    **He goes into the system and check.**
10  Q.    What system, ma'am?
11  A.    **His vehicle movement system.**
12  Q.    Oh, I see.  Well, if he didn't do that, that
13  would be a failure, correct?
14  A.    **Yes.**
15  Q.    And he would not be following Hertz' policies
16  and procedures, correct?
17  A.    **Correct.**
18  Q.    Now, let me go to Mr. Livingston's deposition
19  testimony which was read into the record.  And I'm
20  going to go to page P8-54, top right-hand quadrant,
21  which is page 215.
22    MR. MALOFIY:  Mr. Segal, I got some
23    psychedelic thing going on on my computer.
24    Okay.  Thank you.
25    Now, if we could, for the benefit of

41

1    Mrs. Wilkerson, could we blow up 10 to 16,
2    lines 10 through 16 on page 215?
3  BY MR. MALOFIY:
4  Q.    Question was asked:  "As a corporate security
5  manager for Hertz for this area or anyone working
6  with you or for you, would they have done any
7  independent investigation and what payments are made
8  with the car before filing a police report?
9    His answer:  "No, not on my side of
10    the fence."
11    Should he have checked to see if any
12  additional payments were made on that car?
13  A.    **Mr. Livingston didn't report this car stolen.**
14  Q.    I'm just asking you, he said specifically,
15  ma'am, he's the manager of Philadelphia, right,
16  security manager?
17  A.    **Correct.**
18  Q.    And he still is the security manager, correct?
19  A.    **Right, but he also --**
20  Q.    Hold on.  He was the very big guy.
21    MR. EDELSTEIN:  She's answering the
22    question, Your Honor.
23    THE COURT:  She was.
24    THE WITNESS:  It's okay.
25  BY MR. MALOFIY:

Control No.: 17093136

42

1   Q.   I'm sorry.  I stepped on your words.  Go
2   ahead.
3   A.   Go ahead.  What's the question?
4   Q.   Mr. Livingston is the awfully big guy, he's
5   like 7 feet tall, right?
6   A.   Yes.
7   Q.   He's the corporate security manager for Hertz
8   Rental Car Corporation here in Philadelphia,
9   correct?
10  A.   Correct.
11  Q.   Now, it says here that the question was asked
12  of him or anyone working for him or working with
13  him, if they did any check and his response was no,
14  not on his side of the fence.  Do you see that?
15  A.   I do see that.
16  Q.   Now, you just testified that he would have
17  checked the computer system of some sort, right?
18  A.   He should have checked the computer system.
19  Q.   If he failed to check the computer system, he
20  would have failed to follow the policies and
21  procedures of Hertz which must be followed, correct,
22  ma'am?
23  A.   Correct.  But he also in the thing that you
24  read, testimony that you read, it said he didn't
25  file police reports.

*Danielle O'Connor, RPR, CRR 215-683-8023*

43

1   Q.   Ma'am, Mr. Livingston is the head of a two-man
2   department, correct?
3   A.   Correct.
4   Q.   Let's be clear.  It's him and one other
5   person, right?
6   A.   Yes.
7   Q.   And that one other person was Mr. Graeber,
8   correct?
9   A.   At the time, yes.
10  Q.   And then Mr. Graeber was let go.  Do you
11  remember why?
12  A.   Yes.
13  Q.   He was let go why?
14  A.   I'm not sure.
15  Q.   He was let go, according to Mr. Livingston's
16  testimony, because Hertz wanted to cut costs.  Do
17  you remember that?
18  A.   No.
19       MR. MALOFIY:  Well, let's pull it up.
20       MR. EDELSTEIN:  We'll stipulate that
21       was the testimony, Judge.
22  BY MR. MALOFIY:
23  Q.   Hertz --
24       THE COURT:  It's been stipulated to.
25  All right.

*Danielle O'Connor, RPR, CRR 215-683-8023*

44

1   BY MR. MALOFIY:
2   Q.   Hertz Corporation wanted to cut the costs so
3   they let Mr. Graeber go, correct?
4   A.   If you say so, yes.
5   Q.   And by doing so, they're basically cutting
6   costs at the local investigation at the local level
7   to prevent innocent people from being wrongfully
8   accused of car theft, correct?
9       MR. EDELSTEIN:  Objection, Your Honor.
10      THE COURT:  Sustained.
11  BY MR. MALOFIY:
12  Q.   Ma'am, does Hertz global -- excuse me, Hertz
13  Corporation, are they able to do a local
14  investigation on every case?
15  A.   Well, that's the reason why we have Oklahoma
16  City specialized in doing the investigation.  We
17  have specialized people that work for us and also
18  that's why we hire the private investigator to go
19  out and assist us and also get the repossession
20  company involved, to show what investigation we need
21  to do.  We work hand-in-hand with both of those
22  companies.  We try to do our due diligence before we
23  report a car stolen.
24  Q.   How many theft reports have come out of
25  Philadelphia?

*Danielle O'Connor, RPR, CRR 215-683-8023*

45

1       MR. EDELSTEIN:  When?
2   BY MR. MALOFIY:
3   Q.   After daily basis in 2013-2014, ma'am.
4   A.   A lot.
5   Q.   A lot?
6   A.   Yes.
7   Q.   And what would you say?
8   A.   Maybe 2000.
9   Q.   Do you know -- excuse me.  Mr. Livingston
10  testified that he's gone into court and handled
11  about 400 of these and he's never done a local
12  investigation to determine the truth and veracity of
13  those theft packages?
14  A.   No, I didn't know that.
15  Q.   And that would be falling well below the
16  standard of care even by Hertz' own policies and
17  procedures?
18       MR. EDELSTEIN:  Objection to the
19       leading conclusion.
20       THE COURT:  Sustained.  You have to
21       rephrase.
22       MR. MALOFIY:  I'll rephrase it.  Thank
23       you.
24  BY MR. MALOFIY:
25  Q.   That would fall well below the policies and

*Danielle O'Connor, RPR, CRR 215-683-8023*

Control No.: 17093136

46

1 procedures of even Hertz Corporate policies,
2 correct?
3 **A.    Yes.**
4 **Q.**    Do you think it's acceptable for 400 cases to
5 go to court and no local investigation to be done
6 whatsoever?
7 MR. EDELSTEIN:  Objection, Your Honor.
8 The testimony was that Mr. Livingston didn't
9 actually do it, not no investigation was done.
10 THE COURT:  Overruled.  I'll let her
11 answer.
12 THE WITNESS:  Yeah.  We have
13 investigated it.  We investigate each overdue
14 renter.  Each theft is investigated.
15 MR. MALOFIY:  Ma'am, read back my
16 question for the witness, please.  Sorry.
17 - - -
18 (Whereupon, the court reporter read
19 the record as requested.)
20 - - -
21 THE WITNESS:  By Mr. Livingston?
22 BY MR. MALOFIY:
23 **Q.**    By the two people in that office who handle
24 the 400 cases that went to court and no local
25 investigation was done, that's what I'm referring

*Danielle O'Connor, RPR, CRR 215-683-8023*

47

1 to, ma'am.
2 **A.    There is some investigation being done.**
3 **Q.**    Check for typos and the VIN number, correct?
4 **A.    And movement.**
5 **Q.**    On the system, right, on the computer system?
6 **A.    Yes.**
7 **Q.**    Let's go to that computer system right now.
8 Let's talk about that.
9 Now, you indicated that it was Mr.
10 Graeber who made the police report on behalf of
11 Hertz to Detective -- to Officer Ianoconne, he was
12 the one who gave the interview, correct?
13 **A.    Correct.**
14 **Q.**    And it wasn't Mr. Livingston?
15 **A.    Correct.**
16 **Q.**    Both those two people work in one office,
17 correct?
18 **A.    Yes.**
19 **Q.**    And Mr. Graeber answers to Mr. Livingston,
20 correct?
21 **A.    Correct.**
22 **Q.**    Now, let's go to combination 8 of P-3, which
23 is the interrogatory, the question to defendant and
24 the answer of defendant's.  Can we pull that combo
25 up for the benefit of the jury and also for Ms.

*Danielle O'Connor, RPR, CRR 215-683-8023*

48

1 Wilkerson -- Mrs. Wilkerson, excuse me, ma'am.
2 It says here, 8, this was a question
3 posed to Hertz Corporation:  "Identify the computer
4 systems that the Hertz employees identified in the
5 immediately preceding interrogatory consulted while
6 on the phone with the police on July 22nd, 2013, and
7 what information was on that system regarding Ms.
8 Grady."
9 The answer:  "Objection.  This
10 interrogatory assumes a computer system was
11 consulted with during Mr. Graeber's conversation
12 with Officer Brighter.  Mr. Graeber" -- I'd like to
13 highlight this, Mr. Segal -- "Mr. Graeber did not
14 utilize any computer system while speaking with
15 Officer Brighter on July 22nd, 2013."  Do you see
16 that, ma'am?
17 **A.    Yes, I see it.**
18 **Q.**    And these sworn interrogatories, where we
19 asked whether or not a computer system was used, the
20 sworn answers verified answers from Hertz
21 Corporation by Mr. Livingston was that no computer
22 system was used?
23 MR. EDELSTEIN:  Objection, Your Honor.
24 BY MR. MALOFIY:
25 **Q.**    Do you understand that?

*Danielle O'Connor, RPR, CRR 215-683-8023*

49

1 MR. EDELSTEIN:  The question in the
2 interrogatory was what was used while on the
3 phone with the police.  That's the question.
4 MR. MALOFIY:  I'm asking a follow-up
5 question, not this specific question, but a
6 follow-up question.
7 THE WITNESS:  So basically --
8 THE COURT:  No, I have to rule on the
9 objection.
10 The objection at this time is
11 sustained only because you can't change what
12 the interrogatories are saying.  If it's a
13 separate question, that's fine.
14 MR. MALOFIY:  I'm asking a follow-up
15 question, a different question.  I already
16 asked that question.  Maybe the confusion is on
17 the screen.  So we can block that out now.
18 Thank you.
19 BY MR. MALOFIY:
20 **Q.**    Isn't it true that Mr. Graeber utilized no
21 computer system whatsoever in regards to before he
22 reported this to the police?
23 **A.    No.  It actually says "while speaking."  So**
24 **while he was speaking to the detective, he wasn't on**
25 **the computer system.  That's the verbiage in what**

*Danielle O'Connor, RPR, CRR 215-683-8023*

Control No.: 17093136

50

1  you just read me.
2           MR. MALOFIY:  Let me be more specific
3  with the court's indulgence.
4           Let me move to 21, combo 21.  Do you
5  have that, Mr. Segal?
6  BY MR. MALOFIY:
7  Q.    You looked at the questions which we
8  propounded upon Hertz, which we served on Hertz and
9  the answers, correct?
10  A.    Yes.
11  Q.    And you saw that Mr. Livingston had signed
12  these under oath, correct?
13  A.    Yes.
14  Q.    We had asked of Hertz Corporation:  "Describe
15  in detail all actions/steps taken and communications
16  the Hertz manager identified in the complaint as
17  filing the August 2013 police report regarding Kelly
18  Grady."  That's Ken Graeber, correct?
19  A.    Yes.
20  Q.    So let's read this again:  "Describe in detail
21  all actions/steps taken and communications the Hertz
22  manager" -- I'll insert Ken Graeber -- "took before
23  reporting the Chevy Yukon stolen on around July
24  22nd, 2013, including identifying all employees he
25  communicated with and the contents of the

Danielle O'Connor, RPR, CRR 215-683-8023

51

1  communication, identifying all employees he
2  communicated with and the contents of the
3  communication."  I think that was twice.  I
4  apologize if I read that twice.  I think it was
5  written twice.  "Identifying all computer systems he
6  consulted and the program names and reasons for
7  doing so."
8           MR. MALOFIY:  Highlight this bottom
9        line, "identifying all computer systems he
10        consulted and the program names and reasons for
11        doing so."
12  BY MR. MALOFIY:
13  Q.    The answer, there was an objection lodged.
14  And then it said:  "The police report was not filed
15  by a Hertz manager in August 2013.  Mr. Graeber
16  reviewed the rental contract, investigation
17  performed, and had communications with individuals
18  in Hertz' Vehicle Control Department in Oklahoma
19  City, Oklahoma.  A theft package was put together
20  and reported to the airport police."  Do you see
21  that?
22  A.    Yes.
23  Q.    Now, it doesn't identify all computer systems
24  he consulted and the program names and reason for
25  doing so, does it?

Danielle O'Connor, RPR, CRR 215-683-8023

52

1  A.    No, but he was on the phone with Hertz Vehicle
2  Control.
3  Q.    I'm just asking you, verified answer said that
4  that was produced in discovery.
5  A.    Okay.
6  Q.    Right, ma'am?
7  A.    Yes.
8  Q.    And even if he was on the phone, he didn't
9  consult any computer systems, right?
10  A.    Well, we're speaking about it over the phone.
11  Q.    But he personally did not consult any computer
12  systems, correct?
13  A.    No, he didn't put his fingers on the keyboard.
14  Q.    And then a day after this, he went to the
15  police and told them the only payment was 1805,
16  correct?
17  A.    In a deposit, yes.
18  Q.    Ma'am, I'm going to put this back up to you,
19  this document.  Do you see that document?
20  A.    Yes.
21  Q.    Now, you say, oh, the 2445 was identified on a
22  document, right?
23  A.    Yes.
24  Q.    And you'd agree that that document was created
25  7/12/13, correct?

Danielle O'Connor, RPR, CRR 215-683-8023

53

1  A.    Yes.
2  Q.    And you agree the payment went through on
3  7/15, three days later, correct?
4  A.    Yes, correct.
5  Q.    And you'd agree with me that wasn't actually
6  the payment identified, it was what was owed,
7  correct?
8  A.    No.
9  Q.    Doesn't it indicate what was owed and not what
10  was paid on 7/12, ma'am?
11  A.    No.
12  Q.    What does it say?
13  A.    It says that we had to close the vehicle out
14  to 5/31/2013 because we didn't have anymore
15  authorization.  It's on this form right here.
16  Q.    I'm sorry.  Maybe my question wasn't clear.  I
17  asked you a different question.
18           Isn't it true that it doesn't show
19  that the payment of 2445 was made on that document?
20  A.    Yeah, it shows it was --
21  A.    It was owed?
22  A.    It was owed at the time.
23  Q.    And it was not paid, correct?
24  A.    Not on 7/12.
25  Q.    Right.  And three days later it was paid,

Danielle O'Connor, RPR, CRR 215-683-8023

Control No.: 17093136

54

1  correct, ma'am?
2  **A.    Not in full.**
3  Q.    Ma'am, I'm asking you was 2445 paid, yes or
4  no?
5  **A.    Yes.**
6  Q.    And that information was never updated to the
7  police, correct?
8  **A.    No.**
9  Q.    It was not corrected, correct?  It was not
10 updated to the police, correct?
11 **A.    They had the information.**
12 Q.    I'm asking you if the information that it was
13 paid was updated to the police, yes or no?
14 **A.    The police actually have the theft package and**
15 **this was in the theft package.**
16 Q.    Ma'am, you just identified that that is not a
17 payment for 2445, it's what is owed.  Do you
18 understand the difference between --
19 **A.    Yes.**
20 Q.    -- money in your bank account --
21 **A.    Yes.**
22 Q.    -- and what is owed to you?  It's the
23 difference between an asset and a liability, right?
24 **A.    Yes.**
25 Q.    Okay.  Understand the difference?

*Danielle O'Connor, RPR, CRR 215-683-8023*

55

1  **A.    Yes.**
2  Q.    You deal with this every day?
3  **A.    Yes.**
4  Q.    So let's be clear.  The police didn't know
5  2445 was paid before they signed an affidavit of
6  probable cause allowing Ms. Grady to be arrested,
7  correct?  Correct, ma'am?
8  **A.    Correct.**
9         MR. MALOFIY:  No further questions.
10        THE COURT:  Any redirect?
11        MR. EDELSTEIN:  Just two.  I promise.
12        - - -
13     REDIRECT EXAMINATION
14        - - -
15 BY MR. EDELSTEIN:
16 Q.    Mr. Graeber, the assistant corporate manager
17 who worked for Mr. Livingston --
18 **A.    Yes.**
19 Q.    -- he did the investigation?
20 **A.    Yes.**
21 Q.    And he would have -- in an effort to find car
22 movement, how would he have determined that, meaning
23 was the car back in Hertz' possession?
24 **A.    Yes, so he would have gone into a specialized**
25 **system that shows all cars that have been checked in**

*Danielle O'Connor, RPR, CRR 215-683-8023*

56

1  **or have an idle sighting at the location to prove**
2  **that the car was back in Hertz' possession.**
3  Q.    And, again, when did the car come back to your
4  possession?
5  **A.    September 11th, 2013.**
6         MR. EDELSTEIN:  Thank you.  That's all
7  I have.
8         THE COURT:  Anything else, Counsel?
9         MR. MALOFIY:  No.  One second, Your
10 Honor.  Court's indulgence.
11        (Pause.)
12        - - -
13     RECROSS-EXAMINATION
14        - - -
15 BY MR. MALOFIY:
16 Q.    Help my confusion.  Did you actually fly in
17 from Florida?
18 **A.    I -- yes.**
19 Q.    You flew in from Florida to here?
20 **A.    I took a special route, yes.**
21        MR. MALOFIY:  No further questions.
22        THE COURT:  Anything else?
23        MR. EDELSTEIN:  No, Your Honor.
24        THE COURT:  Thank you, ma'am.  Watch
25 your step.

*Danielle O'Connor, RPR, CRR 215-683-8023*

57

1         - - -
2         (Witness excused.)
3         - - -
4         THE COURT:  Who's your next witness?
5         MR. EDELSTEIN:  Mr. Cocklin.
6         THE COURT:  That's the expert.
7  Step up.
8         THE COURT CRIER:  State your full
9  name.
10        THE WITNESS:  John Cocklin,
11 C-O-C-K-L-I-N.
12        - - -
13     ...JOHN COCKLIN, having been duly
14 sworn/affirmed, was examined and testified as
15 follows:
16        - - -
17        THE COURT:  Your witness.
18        - - -
19     DIRECT EXAMINATION ON VOIR DIRE
20        - - -
21 BY MR. EDELSTEIN:
22 Q.    Good afternoon, Mr. Cocklin.
23 **A.    Good afternoon.**
24 Q.    How are you today?
25 **A.    Okay.**

*Danielle O'Connor, RPR, CRR 215-683-8023*

Control No.: 17093136