**<u>Exhibit 4</u>**

**First R&R**



**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| IN THE MATTER OF | : | MISCELLANEOUS |
| | : | |
| FRANCIS MALOFIY | : | No. 14-mc-139 |
| | : | |
| | : | FILED UNDER SEAL |

FILED
MAY 20 2015
MICHAEL E. KUNZ, Clerk
By_____ Dep. Clerk

Padova, Davis, and Sánchez, JJ.                                      May 20, 2015

## REPORT AND RECOMMENDATION

The Office of Disciplinary Counsel of the Disciplinary Board of the Supreme Court of Pennsylvania (ODC) asks this Court to find that Respondent Francis Malofiy violated Pennsylvania Rules of Professional Conduct 4.1(a), 4.3, 8.4(c), and 8.4(d) in his dealings with William Guice, an unrepresented defendant in *Marino v. Usher, et al.*, No. 11-6811 (E.D. Pa. filed Oct. 28, 2011), a copyright infringement action before the Honorable Paul S. Diamond in which Mr. Malofiy represents the plaintiff. In May 2014, Judge Diamond sanctioned Mr. Malofiy pursuant to 28 U.S.C. § 1927 and the Court's inherent authority for violating Rule 4.3. ODC urges this Court to give preclusive effect to Judge Diamond's sanctions ruling in this disciplinary proceeding based on the doctrine of offensive collateral estoppel and to reprimand Mr. Malofiy for his ethical violations. Mr. Malofiy objects to the application of offensive collateral estoppel, denies violating the Rules of Professional Conduct, and, in the event the Court finds a violation, argues the appropriate sanction would be private discipline, such as an admonition, reprimand, or dismissal with a letter of education.

Because the applicability of offensive collateral estoppel in attorney disciplinary proceedings is an open question in the Third Circuit, and in light of the fairness considerations raised by Mr. Malofiy, who did not testify at the sanctions hearing before Judge Diamond, we

reserved ruling on the collateral estoppel issue and held a de novo evidentiary hearing on February 24, 2015, at which Mr. Malofiy testified and presented both character and fact witnesses. Based on the record developed at that hearing, we conclude Mr. Malofiy violated Rule 4.3 by obtaining an inculpatory affidavit from Mr. Guice without adequately explaining that Mr. Malofiy's client's interests were adverse to those of Mr. Guice, misleading Mr. Guice about his status in the *Marino* action, and causing Mr. Guice's default to be entered without ever correcting Mr. Guice's misunderstanding about where he stood in the case. We also conclude Mr. Malofiy violated Rules 4.1(a), 8.4(c), and 8.4(d) by misrepresenting to Mr. Guice that he would not take any action against Mr. Guice in the case.

After considering all of the aggravating and mitigating circumstances, we are not persuaded a reprimand is a sufficient sanction for the serious ethical violations in this case. As explained below, we recommend that Mr. Malofiy be suspended from practice before this Court for three months and one day.

## I.     PROCEDURAL HISTORY

### A.     The Sanctions Proceeding Before Judge Diamond

In October 2011, Mr. Malofiy filed a copyright infringement action in this Court on behalf of Daniel V. Marino against recording artist Usher Terry Raymond IV (known professionally as Usher) and a host of other individual and corporate defendants, including Mr. Marino's former producing partner Dante Barton and Mr. Guice, a lyricist. Mr. Marino alleged that he, Mr. Barton, and Mr. Guice co-authored a song called "Club Girl," which was recorded by Usher as the song "Bad Girl" and included in Usher's hugely successful 2004 album *Confessions*. Although Mr. Barton and Mr. Guice were both credited as writers of "Bad Girl," Mr. Marino did not receive either songwriting or producing credit for the song. Seeking to

enforce his rights to the song, Mr. Marino brought copyright infringement and related claims against Mr. Barton, Mr. Guice, Usher, and numerous other individuals and entities involved in exploiting "Club Girl"/"Bad Girl."[1]   Neither Mr. Barton nor Mr. Guice was represented by counsel at any point during the litigation.

In October 2013, following the completion of discovery, a group of defendants in the *Marino* action filed a motion for sanctions against Mr. Malofiy for engaging in abusive, unprofessional, and unethical conduct during discovery.   Invoking Federal Rules of Civil Procedure 30(d)(2) and 37(b), 28 U.S.C. § 1927, and the Court's inherent authority, the motion alleged Mr. Malofiy had (1) violated Pennsylvania Rule of Professional Conduct 4.3 by obtaining an affidavit and deposition testimony from Mr. Guice without first advising him to secure counsel or correcting his obvious misunderstanding that he was only a witness in the case, (2) obstructed depositions by repeatedly violating the Court's admonition against making speaking objections and by making inappropriate and abusive comments about defense counsel, witnesses, and the Court, and (3) otherwise been disrespectful to opposing counsel and the Court.

Mr. Malofiy responded to the motion, and after further briefing, Judge Diamond issued an order to show cause denying the defendants' request for sanctions based on Mr. Malofiy's pattern of discourteous and abusive behavior,[2] but directing the parties to appear at a hearing to

---

[1] As to Mr. Barton and Mr. Guice, Mr. Marino brought claims for direct, contributory, and vicarious copyright infringement, a constructive trust, an accounting, and breach of songwriting and publishing agreements, and sought damages and other relief, including disgorgement of any profits derived from the exploitation of the song.  Mr. Marino brought additional claims against Mr. Barton for breach of production, recording studio, and record label agreements, breach of fiduciary duty, misrepresentation, and fraud.

[2] Although Judge Diamond observed that Mr. Malofiy's repeated inappropriate comments to defense counsel at depositions and in correspondence appeared to violate Federal Rule of Civil Procedure 30 and/or Pennsylvania Rule of Professional Conduct 3.5(d), he declined to impose

（）

determine whether Mr. Malofiy should be sanctioned for his alleged violations of Rule 4.3. *See* Hr'g Ex. 26. The order authorized the moving defendants to subpoena Mr. Guice for the hearing and to provide him with transportation from his home in Colorado to Philadelphia and lodging, if necessary. *See id.* at 6. The order also strongly advised Mr. Malofiy to retain counsel, noting it appeared his testimony would be necessary at the hearing and he would not be permitted to testify in narrative form. *See id.* at 7.

The hearing on the sanctions motion took place over the course of two days in January 2014. Mr. Malofiy was represented at the hearing by Samuel C. Stretton, Esq., who also represents him in this disciplinary proceeding. The moving defendants called only one witness—Mr. Guice—who was subject to cross-examination by Mr. Malofiy's counsel. Mr. Malofiy presented testimony from his client, Mr. Marino, but did not personally testify at the hearing.

On May 21, 2014, Judge Diamond issued a Memorandum and Order granting the moving defendants' sanctions motion and imposing sanctions on Mr. Malofiy pursuant to 28 U.S.C. § 1927 and the Court's inherent authority for intentionally violating Rule 4.3 in his dealings with Mr. Guice. Pursuant to § 1927, Judge Diamond awarded the defendants the reasonable attorneys' fees, costs, and expenses they incurred in connection with the second day of Mr. Guice's deposition.[3] Finding a monetary sanction was insufficient to fully correct the harm caused by Mr. Malofiy's conduct, Judge Diamond also opened the default entered against Mr.

---

sanctions for this behavior, noting the Third Circuit has questioned whether a court may sanction overly aggressive attorneys because of discourteous and offensive behavior during depositions.

[3] We take judicial notice that Judge Diamond ultimately awarded the defendants a total of approximately $28,000 in fees and costs. *See Marino v. Usher, et al.*, No. 11-6811, Order 1-2, 9-10 (E.D. Pa. Aug. 28, 2014), ECF No. 188.

4

Guice and struck Mr. Guice's affidavit and related deposition testimony pursuant to the Court's inherent authority. Finally, Judge Diamond referred the matter to Chief Judge Petrese B. Tucker for further proceedings, if necessary, pursuant to Rule V of the Rules of Disciplinary Enforcement set forth in Local Rule of Civil Procedure 83.6.[4]

### B. Disciplinary Proceedings

On June 17, 2014, Chief Judge Tucker appointed ODC pursuant to Rules V(C) and X of Local Rule 83.6[5] to investigate whether there was probable cause to believe Mr. Malofiy violated the Pennsylvania Rules of Professional Conduct in the *Marino* action and, if so, to file a petition for a rule to show cause why discipline should not be imposed. After reviewing the relevant portions of the record in the *Marino* action, ODC determined there was probable cause to believe Mr. Malofiy had violated Rules 4.1(a), 4.3, 8.4(c), and 8.4(d) in the course of his dealings with Mr. Guice. On October 2, 2014, ODC filed a petition for a rule to show cause why discipline should not be imposed against Mr. Malofiy for his conduct in the *Marino* litigation. Chief Judge Tucker thereafter issued an order directing Mr. Malofiy to show cause within 30 days why he

---

[4] Under Rule V(A),

> When the misconduct or other basis for action against an attorney . . . or allegations of the same which, if substantiated, would warrant discipline or other action against an attorney admitted to practice before this court shall come to the attention of a Judge of this court, whether by complaint or otherwise, and the applicable procedure is not otherwise mandated by these Rules, the judge shall refer the matter to the Chief Judge who shall issue an order to show cause.

Local R. Civ. P. 83.6, Rule V(A).

[5] Rule V(C) authorizes the Court to appoint counsel "at any stage . . . to investigate and/or prosecute" a proceeding under Rule V. Local R. Civ. P. 83.6, Rule V(C). Rule X provides that "[w]henever counsel is to be appointed pursuant to these Rules to investigate allegations of misconduct or prosecute disciplinary proceedings . . . this court shall appoint as counsel the disciplinary agency of the Supreme Court of Pennsylvania, or other disciplinary agency having jurisdiction." *Id.*, Rule X.

5

should not be disciplined for his violations of the foregoing Rules. By separate order, Chief Judge Tucker referred this matter to the undersigned Panel to make a recommendation to the Court as to whether discipline should be imposed on Mr. Malofiy for his conduct in the *Marino* litigation.

In his response to the rule to show cause, Mr. Malofiy argued that this disciplinary proceeding is premature as he intends to appeal Judge Diamond's sanctions ruling but cannot do so until final judgment is entered in the *Marino* action.[6] He also denied violating Rules 4.1(a), 4.3, 8.4(c), and 8.4(d), and requested a hearing at which he could present evidence of his compliance with his ethical obligations and diligence as a practicing attorney. The parties thereafter made additional submissions as to the nature and scope of the instant disciplinary proceeding. ODC objected to Mr. Malofiy's request for a de novo disciplinary hearing, arguing the sanctions hearing before Judge Diamond had served as the disciplinary hearing in this matter and Mr. Malofiy was bound by Judge Diamond's findings in the sanctions proceeding, which established his violation not only of Rule 4.3, but also of Rules 4.1(a), 8.4(c), and 8.4(d), leaving unresolved only the issue of the type of discipline to be imposed. Mr. Malofiy argued that treating the sanctions hearing as a disciplinary hearing would violate his due process rights and would otherwise be unfair in light of the significant differences in the procedures applicable in, considerations relevant to, and interests at stake in each proceeding. For example, Mr. Malofiy explained that his decision not to testify at the sanctions hearing was influenced by his desire not to be exposed to cross-examination by his opposing counsel in the ongoing copyright matter, a

---

[6] Mr. Malofiy attempted unsuccessfully to appeal the sanctions ruling prior to the entry of final judgment in the *Marino* action. In this disciplinary proceeding, he acknowledges he cannot obtain appellate review of the sanctions order until final judgment is entered in the *Marino* case. Final judgment was entered in that case on May 1, 2015, and Mr. Malofiy filed a notice of appeal from the sanctions order, among other rulings, on May 19, 2015.

consideration that would not be present in a disciplinary proceeding, in which he would "definitely" exercise his right to testify about the events in question. *See* Resp't's Answer to ODC's Answer ¶ 7.

We held a case management conference on December 4, 2014, to address these procedural issues. Without deciding whether it would be appropriate to apply the doctrine of collateral estoppel offensively to preclude Mr. Malofiy from relitigating the misconduct underlying Judge Diamond's sanctions ruling, an issue the parties had not adequately briefed, we scheduled a full de novo hearing in this matter at which ODC would have the burden to prove the charged disciplinary violations. *See* Status Conf. Tr. 17-18, 21-22, Dec. 4, 2014. In response to ODC's concerns about the burden to Mr. Guice if he were required to testify yet again concerning his interactions with Mr. Malofiy, we noted there was nothing to prevent the parties from relying on Mr. Guice's prior deposition and hearing testimony, but we left it to the parties to decide how best to present Mr. Guice's testimony and what, if any, additional evidence they wished to present. We rejected Mr. Malofiy's argument that this disciplinary proceeding is premature, at least insofar as we decide this case based on a record developed before us at a de novo hearing.

We held a full de novo hearing on February 24, 2015, at which the parties jointly offered numerous exhibits generated during the *Marino* action, including the transcripts of Mr. Guice's May 2, 2013, and June 4, 2013, deposition testimony, as well as his January 6, 2014, testimony at the sanctions hearing, which both parties agreed the Court could consider. *See* Disciplinary Hr'g Tr. 17, Feb. 24, 2014 (noting the parties' agreement that that the Court could "tak[e] [Mr. Guice's] testimony from the transcripts"); Resp't's Pre-trial Mem. 9 (noting Respondent "does not object to the introduction of the testimony of Mr. Guice during the sanctions hearing and

7

during the two depositions"). At our request, the videotapes of both days of Mr. Guice's deposition were also made part of the record. Apart from the joint exhibits, ODC offered only Judge Diamond's May 21, 2014, memorandum opinion imposing sanctions on Mr. Malofiy, which ODC argued the Court should accord preclusive effect under the doctrine of collateral estoppel.[7] ODC did not call any witnesses, but rested on the existing record.

Mr. Malofiy testified in his own defense at the hearing and presented two additional fact witnesses: Anthony Caroto, who interviewed Mr. Guice, Mr. Marino, and Mr. Barton about the making of the song "Club Girl"/"Bad Girl" in 2004, and James Beasley, Jr., Esq., the current head of The Beasley Firm, whom Mr. Malofiy consulted about his interactions with Mr. Guice. Mr. Malofiy also presented sixteen character witnesses, including Mr. Beasley.

Over ODC's objection, Mr. Malofiy also presented several additional exhibits at the hearing, including a newly discovered audio recording and transcript of the second of two phone calls between himself and Mr. Guice on February 23, 2012. Mr. Malofiy had previously produced a partial recording and transcript of the same call on the morning of the January 6, 2014, sanctions hearing before Judge Diamond, notwithstanding that defense counsel in the *Marino* action had requested production of the tape upon learning of its existence seven months earlier, during Mr. Guice's June 4, 2013, deposition. *See* Guice Dep. 40, June 4, 2013

---

[7] ODC briefed the issue of collateral estoppel in its pre-trial memorandum, citing *Office of Disciplinary Counsel v. Kiesewetter*, in which the Pennsylvania Supreme Court held the doctrine could be applied offensively in a disciplinary action based on a civil fraud verdict where ODC satisfied its burden to show the requirements for collateral estoppel were met and where "fairness dictate[d] such application." 889 A.2d 47, 52-54 (Pa. 2005).

[hereinafter, "Guice June Dep."]. Mr. Malofiy did not disclose during the sanctions hearing that the recording and transcript were incomplete.[8]

The week before the disciplinary hearing, however, Mr. Malofiy disclosed to his counsel and ODC that there was another, longer recording of the same February 23, 2012, phone call, which he claimed to have just discovered while consolidating files on his computer system. *See* Disciplinary Hr'g Tr. 126-28. The transcript of this second recording, which was also prepared by Mr. Malofiy, is more than twice as long as the original transcript. *Compare* Hr'g Ex. 5 (original four-page transcript), *with* Hr'g Ex. 5A (new nine-page transcript). According to Mr. Malofiy, the recording he discovered on the eve of the sanctions hearing was a recording he had made with a handheld digital recorder, while the longer recording he discovered on the eve of the disciplinary hearing was a backup recording made by his paralegal using an iPhone. *See* Disciplinary Hr'g Tr. 126-27, 133-34. Although the paralegal made the backup recording at Mr. Malofiy's behest, Mr. Malofiy claims he never asked the paralegal about the recording, either on the date it was made or at any time thereafter. *See id.* at 137-38, 141-42, 151.

Mr. Malofiy's communications with Mr. Guice were the basis for the sanctions motion in the *Marino* action and are the basis for the disciplinary charges in this proceeding. The

---

[8] At the sanctions hearing, Mr. Malofiy's counsel represented that his client had just discovered the recording the night before the hearing and immediately transcribed it. *See* Sanctions Hr'g Tr. 4-5, Jan. 6, 2014 [hereinafter, "Sanctions Hr'g I Tr."]. After listening to the recording and reviewing Mr. Malofiy's transcription, defense counsel at the hearing agreed the transcript accurately reflected what was recorded on the tape, but objected that it was not clear whether "what was recorded and transcribed . . . [wa]s the beginning of the conversation and whether or not the end [wa]s actually the end of the conversation." *Id.* at 83-84. When questioned by the Court as to whether the tape accurately depicted his entire conversation with Mr. Malofiy, Mr. Guice said that it did, *id.* at 85, and the tape was admitted into evidence as constituting the entire phone conversation. *See* Disciplinary Hr'g Tr. 129-30 (acknowledgement by Mr. Malofiy that the transcript admitted at the sanctions hearing was submitted as constituting the entire phone conversation that had taken place). Mr. Malofiy did not correct Mr. Guice's statement at the sanctions hearing that the recording depicted the entire conversation between the two.

significance of the recordings as evidence of the content of those communications is obvious. Mr. Malofiy's handling of this evidence is extremely troubling and reflects adversely on his candor and credibility. While Mr. Malofiy maintains he was unaware that his paralegal's backup recording was on his computer system until he discovered the recording while consolidating some files the week before the disciplinary hearing, he gave no indication he ever made any effort to locate the recording, even though he knew it had been made. We are also troubled by Mr. Malofiy's failure to correct Mr. Guice's representation that the partial transcript Mr. Malofiy submitted at the sanctions hearing depicted their entire conversation, when Mr. Malofiy was, at a minimum, aware he had further conversation with Mr. Guice to "ask him for his email and other things of that nature." *See* Disciplinary Hr'g Tr. 139.

At the conclusion of the disciplinary hearing, counsel presented argument on the issue of whether Mr. Malofiy violated Rules of Professional Conduct 4.1(a), 4.3, 8.4(c), and 8.4(d) in his dealings with Mr. Guice. While Mr. Malofiy's counsel also presented argument on the issue of disposition, in the event a violation were found, ODC reserved argument and requested the opportunity to address the issue by way of a written submission, which we allowed. ODC thereafter submitted a memorandum in support of discipline, and Mr. Malofiy submitted a post-hearing brief.

## II.    BURDEN OF PROOF AND COLLATERAL ESTOPPEL

### A.    Burden of Proof

A district court has the inherent power "to control admission to its bar and to discipline attorneys who appear before it." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991); *see also In re Surrick*, 338 F.3d 224, 229 (3d Cir. 2003). The Rules of Disciplinary Enforcement promulgated by this Court authorize the Court to conduct original disciplinary proceedings and

10

to impose discipline on attorneys admitted to practice in this District who violate the Pennsylvania Rules of Professional Conduct, which we have adopted. *See* Local R. Civ. P. 83.6, Rules IV, V. Under Rule IV, acts or admissions that violate the Rules of Professional Conduct constitute misconduct for which, "for good cause shown, and after notice and opportunity to be heard, an[] attorney admitted to practice before this court may be disbarred, suspended from practice before this court, reprimanded or subjected to such other disciplinary action as the circumstances may warrant." *Id.*, Rule IV.

Our Rules do not specify the burden of proof applicable in original disciplinary proceedings in this Court. Although we have found no reported case in which the Court of Appeals for the Third Circuit has addressed this issue, other Circuits have held that in attorney disciplinary proceedings in federal court, disciplinary violations must be established by clear and convincing evidence. *See In re Sealed Appellant*, 194 F.3d 666, 670 (5th Cir. 1999) ("A federal court may disbar an attorney only upon presentation of clear and convincing evidence sufficient to support the finding of one or more violations warranting this sanction."); *In re Fisher*, 179 F.2d 361, 369 (7th Cir. 1950) (holding the charges in a disbarment proceeding "must be sustained by clear and convincing proof"). The Court of Appeals for the District of Columbia Circuit recently observed that the American Bar Association's Model Rules for Lawyer Disciplinary Enforcement and "most state and federal jurisdictions that have addressed the question require complainants (or disciplinary counsel) to establish misconduct by clear and convincing evidence, although a sizable minority require only a preponderance of the evidence." *In re Charges of Judicial Misconduct*, 769 F.3d 762, 767 (D.C. Cir. 2014); *see also In re Barach*, 540 F.3d 82, 85 (1st Cir. 2008) (noting "most jurisdictions require clear and convincing evidence in [attorney disciplinary] proceedings"). The clear and convincing standard is advocated by Mr.

11

Malofiy. *See* Resp't's Br. 20. We agree that this standard is appropriate in original disciplinary proceedings conducted pursuant to Rule V of our Rules of Disciplinary Enforcement. We therefore hold that in proceedings on an original petition for discipline pursuant to Rule V in this Court, the misconduct constituting grounds for discipline must be proved by clear and convincing evidence.[9]

### B.   Collateral Estoppel

As noted, ODC urges this Court to apply the doctrine of collateral estoppel offensively to preclude Mr. Malofiy from relitigating the misconduct underlying Judge Diamond's sanctions ruling. Because the sanctions order was issued by a federal court, the preclusive effect of the order is a question of federal law. *See Paramount Aviation Corp. v. Agusta*, 178 F.3d 132, 135 (3d Cir. 1999). Under federal law, the doctrine of collateral estoppel may be used offensively, in appropriate circumstances, to prevent a defendant from litigating an issue he has previously litigated unsuccessfully in an action with another party. *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331 (1979). Because offensive use of collateral estoppel raises the potential for unfairness, district courts have broad discretion to determine whether the doctrine should be applied in a particular case, even when the requirements for its application are otherwise met. *See id.* at 331-32 (holding a trial judge should not allow use of offensive collateral estoppel where application of the doctrine would be unfair to the defendant); *Raytech Corp. v. White*, 54 F.3d 187, 195 (3d Cir. 1995) ("A finding of fairness to the defendant is . . . a necessary premise to the application of offensive collateral estoppel.").

---

[9] We note that ODC takes the position that the clear and convincing evidence standard is "essentially the same" as the standard applied in disciplinary proceedings before the Pennsylvania Supreme Court, in which ODC "has the burden of proving, by a preponderance of the evidence, that an attorney's action constitutes professional misconduct," and must establish this burden by "clear and satisfactory evidence." ODC's Pre-trial Mem. 12.

Whether findings of misconduct by an attorney in a civil action may be accorded preclusive effect in a subsequent federal disciplinary proceeding against the attorney is an open question in the Third Circuit. Neither we nor the parties have found any case in which this Court or the Court of Appeals has addressed the issue.[10] While some federal courts have approved of the offensive use of collateral estoppel against attorneys in disciplinary proceedings,[11] federal case law on this issue is sparse. State courts are divided on the question. *Compare, e.g.*, *Kiesewetter*, 889 A.2d at 52 (holding "there is no prohibition against applying collateral estoppel offensively in a disciplinary matter when fairness dictates such application"), *with, e.g.*, *In re Owens*, 532 N.E.2d 248, 252 (Ill. 1988) (declining to give "offensive collateral estoppel effect in a disciplinary proceeding to factual findings in a civil fraud action," as "[t]he risk of unfairly imposed discipline is too great, and the economy to be gained too minimal, to warrant such an abridgement of the disciplinary process"). *See also In re Wilde*, 68 A.3d 749, 761 (D.C. 2013) (noting a "majority of other jurisdictions apply offensive collateral estoppel, generally, in bar discipline cases").

---

[10] Nor do our Rules of Disciplinary Enforcement resolve this question. In contrast to Rules I and II, which specify the preclusive effect to be accorded certain criminal convictions and public discipline imposed by state courts or other federal courts, Rule V does not address whether findings of attorney misconduct made by a judge of this Court in a civil matter may be given preclusive effect in a subsequent disciplinary proceeding.

[11] See *In re Caranchini*, 160 F.3d 420, 424 (8th Cir. 1998) (rejecting an attorney's due process challenge to state disciplinary proceedings in which the attorney was precluded from relitigating misconduct for which she had been sanctioned in four federal cases, and imposing reciprocal discipline based on the state proceedings); *In re Cook*, 49 F.3d 263, 266 (7th Cir. 1995) (suspending an attorney based on findings in a federal contempt proceeding involving the attorney).

13

We find it unnecessary to resolve this issue here, as we have held a full de novo evidentiary hearing in this matter, at which Mr. Malofiy testified, and we may therefore resolve this case based on the record developed at that hearing.

## III.    FACTUAL FINDINGS

1.      Mr. Malofiy is 37 years old and is a graduate of Temple Law School. He was admitted to the Pennsylvania bar in October 2008 and was admitted to the bar of this Court in April 2009. He has litigated a number of cases in this Court in addition to the *Marino* action.

2.      Since the start of his legal career, Mr. Malofiy has been a trial lawyer with his own general practice, taking on what he described as "high risk, high reward" cases for people who would not otherwise be able to find legal representation. *See* Disciplinary Hr'g Tr. 103. He has won several significant verdicts on behalf of his clients. From March 2011 to January 2014, Mr. Malofiy had an "of counsel" relationship with The Beasley Firm, an arrangement whereby he continued to maintain his own law practice but occupied office space in the Beasley Building and partnered with the firm on certain cases. Mr. Malofiy now practices in Media, Pennsylvania.

3.      Mr. Malofiy has no prior disciplinary history.

4.      Mr. Malofiy filed the original complaint in the *Marino* action on October 28, 2011, and filed an amended complaint on November 17, 2011. The amended complaint is 77 pages long and includes 28 pages of exhibits. *See* Hr'g Ex. 2. Mr. Malofiy's name and contact information, including his cell phone number,[12] appear in upper left-hand corner of the cover page of the amended complaint, above the designation "Law Firm/Attorney for Plaintiff." Hr'g

---

[12] Mr. Malofiy uses his cell phone for business purposes, and his cell number is the phone number listed on all pleadings and notices. *See* Disciplinary Hr'g Tr. 150.

14

Ex. 2, at 1. Mr. Guice is identified as one of nineteen defendants in the caption of the amended complaint. He is also identified as a defendant in the body of the amended complaint.

5.      Mr. Guice was served with the amended complaint in Aurora, Colorado, on February 14, 2012.[13] *See* Hr'g Ex. 3; Disciplinary Hr'g Tr. 113-14; Sanctions Hr'g I Tr. 16-17; Guice Dep. 169, May 2, 2013 [hereinafter, "Guice May Dep."]. A high school graduate, Mr. Guice is not a lawyer or a professional businessperson and has "no experience in law or contracts or the ins and outs of them," a fact Mr. Malofiy established at some length during Mr. Guice's deposition. *See* Guice May Dep. 58-61, 143; Guice June Dep. 21. Although Mr. Guice had some interaction with the legal system as a juvenile and was arrested once as an adult for driving under the influence, *see* Sanctions Hr'g I Tr. 93-94, he has no experience in civil litigation. At the time he was served with the amended complaint, he had never been a defendant in a civil action. *See id.* at 18.[14]

---

[13] According to the proof of service, Mr. Guice was also served with a summons for the amended complaint, advising that a lawsuit had been filed against him, that he was required to serve an answer or motion pursuant to Federal Rule of Civil Procedure 12 on the plaintiff or his attorney within 21 days of service of the summons, and that failure to respond to the complaint would result in entry of a judgment by default for the relief demanded in the complaint. *See* Hr'g Ex. 3. Guice, however, did not recall receiving the summons. *See* Sanctions Hr'g I Tr. 60-61.

[14] At the disciplinary hearing, Mr. Malofiy testified that he believed Mr. Guice was "street smart" with respect to business and legal matters, having been involved in contracts with "some of the biggest stars, like [Boyz II Men]," and having "made a considerable amount in publishing, and also as an artist." Disciplinary Hr'g Tr. 219; *see also* Resp't's Br. 4-5 (characterizing Mr. Guice as "very sophisticated in the music business and contracts since he made his living that way over a number of years"). We do not find this testimony credible. While Mr. Guice has been involved in the music business for a number of years, he characterized himself as "[b]arely" making a living as an artist, *see* Sanctions Hr'g I Tr. 64-65, and we have been presented with no evidence to the contrary. At his deposition, Mr. Guice indicated, in response to Mr. Malofiy's questioning regarding his lack of sophistication in business matters, that he was "still actually learning how to decipher certain things as far as music goes in contracts." Guice May Dep. 61. Even if Mr. Malofiy assumed, based on Mr. Guice's prior work with Boyz II Men, that Guice had some familiarity with music contracts, he offered no basis for his belief that Mr. Guice had

15

6. After receiving the amended complaint, Mr. Guice skimmed through it. *See* Guice May Dep. 170; Sanctions Hr'g I Tr. 18. The document was unfamiliar to him as he had never been sued before. *See* Sanctions Hr'g I Tr. 18. Based on his review, he had some understanding that there was an issue about Mr. Marino not receiving compensation for the song "Bad Girl." *See* Guice May Dep. 168-70. He also saw he was listed as a defendant in the case, but did not know why. *See id.* at 171; Sanctions Hr'g I Tr. 18, 59. On February 23, 2012, Mr. Guice called Mr. Malofiy at the phone number listed on the cover page of the amended complaint to find out what it was about. *See* Guice May Dep. 170; Sanctions Hr'g I Tr. 18, 58.

7. Mr. Malofiy received Mr. Guice's call on his cell phone shortly after 11:00 a.m. Eastern Standard Time, while in the lobby of the Beasley Building, where his offices were then located. *See* Disciplinary Hr'g Tr. 116; Hr'g Ex. 4, at 10. Upon answering, he was surprised to learn the caller was Mr. Guice, as he had never previously been contacted by a defendant in a case. *See* Disciplinary Hr'g Tr. 116, 118, 120, 144. After Mr. Guice introduced himself, he and Mr. Malofiy had some preliminary conversation about the subject of the lawsuit. *See* Sanctions Hr'g I Tr. 57-58. Mr. Malofiy identified himself as the attorney for Mr. Marino and confirmed Mr. Guice's status as a defendant in the case, *see* Disciplinary Hr'g Tr. 116, but did not otherwise explain the adversarial relationship between his client and Mr. Guice.[15] During this preliminary conversation, Mr. Malofiy also ascertained that Mr. Guice was not represented by

---

any sophistication with respect to civil litigation, the salient issue for purposes of this proceeding.

[15] For example, although by Mr. Malofiy's account, Mr. Guice stated he wanted to "set the record straight" about the song "Club Girl"/"Bad Girl," *see* Disciplinary Hr'g Tr. 116, 120, Mr. Malofiy did not explain that Mr. Marino was suing Mr. Guice for money Mr. Guice received from the song, *see* Guice May Dep. 172, nor did Mr. Malofiy confirm that Mr. Guice understood Mr. Marino was suing him for copyright infringement and the various other claims asserted against him in the amended complaint, *see id.* at 173-84.

counsel. *See* Disciplinary Hr'g Tr. 116. Although he told Mr. Guice that Mr. Guice was not

obligated to speak to him, *see* Sanctions Hr'g I Tr. 21, he did not advise Mr. Guice to seek

counsel to represent him in the case, *see* Guice May Dep. 177-79, 181, 184; Sanctions Hr'g I Tr.

21, 35, 80.[16]

---

[16] The contents of this initial phone conversation between Mr. Guice and Mr. Malofiy, the first of two conversations they had on February 23, 2012, are disputed. At the disciplinary hearing, Mr. Malofiy testified that, upon hearing from Mr. Guice, he immediately told Mr. Guice he represented the plaintiff, confirmed that Mr. Guice understood he was a defendant, explained he was suing Mr. Guice, asked Mr. Guice if he had counsel, and advised him of his right to seek counsel. *See* Disciplinary Hr'g Tr. 116-17, 120, 125, 143. Mr. Guice recalled that Mr. Malofiy identified himself as Mr. Marino's lawyer and said Mr. Guice was under no obligation to speak to him, but denied that Mr. Malofiy told him he was a defendant, asked whether he had counsel, or advised him to secure counsel. *See* Sanctions Hr'g I Tr. 20-21, 24, 35.

   We credit Mr. Malofiy's testimony that, during his conversation with Mr. Guice, he explained that he was Mr. Marino's lawyer and that Mr. Guice was a defendant in the case, which is partially corroborated by Mr. Guice and which is consistent with the affidavit Mr. Malofiy later prepared for Mr. Guice's signature. *See* Hr'g Ex. 8, at 2 ("I understand that I am a party to this lawsuit and that I am a named defendant. I understand that you, Francis Malofiy, represent plaintiff Dan Marino ('Dan')."). We also credit Mr. Malofiy's testimony that he asked if Mr. Guice had counsel and learned he did not, which is consistent with Mr. Beasley's testimony that Mr. Malofiy came to him for advice about obtaining an affidavit from Mr. Guice, who was not represented. We do not, however, credit Mr. Malofiy's testimony that he told Mr. Guice that Mr. Guice had the right to seek counsel. Rather, we credit Mr. Guice's testimony that Mr. Malofiy did not advise him to secure counsel in their initial conversation.

   The initial phone conversation between Mr. Malofiy and Mr. Guice was not recorded, and although Mr. Malofiy took notes of the conversation, he did not retain them. As a result, there is no contemporaneous written record of the conversation. The affidavit Mr. Malofiy prepared does not reflect that Mr. Guice was advised of his right to retain counsel, *see id.*, and although Mr. Malofiy noted in a follow-up email to Mr. Guice that if he "want[ed] to review [the affidavit] with a lawyer, that's fine too," the email does not reference any prior advice to that effect, *see* Hr'g Ex. 7, at 1. At Mr. Guice's original deposition in May 2013, before his communications with Mr. Malofiy's had become an issue in the litigation, Mr. Guice repeatedly denied that Mr. Malofiy had advised him to get a lawyer or told him he had the opportunity to get a lawyer to defend him in the case. *See* Guice May Dep. 177-79, 181, 184. At the continuation of his deposition in June 2013, Mr. Guice acknowledged, in response to questioning from Mr. Malofiy, that Mr. Malofiy had told him he could speak to counsel before signing the affidavit, *see* Guice June Dep. 150, 153-54, but Mr. Guice later clarified at the sanctions hearing that "initially, [Mr. Malofiy] didn't tell [him] to speak to counsel," Sanctions Hr'g I Tr. 80.

   In evaluating credibility, we note that Mr. Guice testified about his conversations with Mr. Malofiy on three separate occasions, while Mr. Malofiy testified only once, after hearing all of Mr. Guice's testimony and after ample opportunity to study the record in preparation for this

8.     Mr. Malofiy wanted to obtain an affidavit from Mr. Guice but was unsure how to

go about doing so because of Mr. Guice's status as an unrepresented defendant. *See* Disciplinary

Hr'g Tr. 117-18. Rather than end the call so he could consult the Rules of Professional Conduct

or seek advice from one of the available bar ethics hotlines[17] and then call Mr. Guice back, Mr.

Malofiy put the call on hold and went to see Mr. Beasley, whose office was next to his and

whom he would go to with questions from time to time.[18] *See* Disciplinary Hr'g Tr. 61-62, 117-

18. Mr. Malofiy explained that Mr. Guice, a defendant, had called him and did not have an

attorney and sought Mr. Beasley's advice about what he should do. *See id.* at 44. Mr. Beasley

advised Mr. Malofiy that if he wanted to speak with Mr. Guice, he had to tell Mr. Guice to get a

lawyer. *See id.* at 44, 50. With respect to getting an affidavit from Mr. Guice, Mr. Beasley

advised that if Mr. Malofiy was going to seek an affidavit, (1) he should advise Mr. Guice to get

an attorney; (2) if Mr. Guice was not going to get an attorney, he should ensure that Mr. Guice

---

disciplinary proceeding, in which his interest is obvious. We have reviewed the transcripts of all
of Mr. Guice's prior testimony in the *Marino* action and portions of his videotaped depositions,
and we find Mr. Guice to be a credible witness. Although Mr. Malofiy urges us to discredit Mr.
Guice based on inconsistencies in Mr. Guice's testimony about his understanding of whether he
was a defendant in the case, we find credible Mr. Guice's explanation that it was not until he was
questioned by defense counsel about what it meant to be a defendant that he understood his
status in the case.

[17] For example, the Pennsylvania Bar Association maintains an ethics hotline through which
members may obtain advisory opinions regarding prospective conduct from members of the
Association's Committee on Legal Ethics and Professional Responsibility. *See*
http://www.pabar.org/public/Membership/ethics.asp (last visited May 20, 2015). Similarly, the
Philadelphia Bar Association's Professional Guidance Committee provides advisory ethics
opinions to lawyers facing or anticipating facing ethical dilemmas. *See*
http://www.philadelphiabar.org/page/EthicsOpinions (last visited May 20, 2015).

[18] While Mr. Beasley served as a mentor to Mr. Malofiy, *see* Disciplinary Hr'g Tr. 43, he did not
supervise Mr. Malofiy, who was not an employee of The Beasley Firm. Mr. Beasley was aware
of the *Marino* action and knew that it was a copyright action, but he was not working on the case
with Mr. Malofiy. *See id.* at 55, 61.

understood where he was in the case, i.e., that the relationship between Mr. Malofiy's client and Mr. Guice was adverse; and (3) he should tell Mr. Guice he could change the affidavit. *See id.* at 44-45, 50-51.

9.        After speaking with Mr. Beasley, and without consulting the ethics rules or performing any independent research, Mr. Malofiy went into a conference room and resumed his conversation with Mr. Guice. *See id.* at 121-22. Notwithstanding Mr. Beasley's advice, Mr. Malofiy did not advise Mr. Guice to secure counsel, nor did he clarify the adversarial relationship between his client and Mr. Guice in any way.[19] At Mr. Malofiy's request, Mr. Guice described his knowledge of the song "Club Girl"/"Bad Girl," including how the song was created and Mr. Marino's participation in it, with Mr. Malofiy asking follow up questions. *See* Guice June Dep. 41; Sanctions Hr'g I Tr. 26-28. Mr. Malofiy viewed Mr. Guice's account as confirming what Mr. Marino and others had told Mr. Malofiy about his client's role in writing the song, corroborating the allegations of the amended complaint, and benefitting his client's position. *See* Disciplinary Hr'g Tr. 122, 247-48.

10.        During the conversation, Mr. Guice felt that he was helping Mr. Marino. *See* Sanctions Hr'g I Tr. 24. He did not feel that he was defending himself against anything. *See id.* at 25.[20] After hearing Mr. Guice's account, Mr. Malofiy told Mr. Guice he would like to put

---

[19] For the reasons explained above, *see supra* note 16, we do not credit Mr. Malofiy's testimony to the contrary. *See* Disciplinary Hr'g Tr. 217.

[20] At the sanctions hearing, Mr. Guice testified that Mr. Malofiy assured him, during their initial conversation, that Mr. Marino was "not coming after [Mr. Guice]" but was going after "everyone else" and that he and Mr. Marino were "cool . . . and that was the reason that [Mr. Marino] was not coming after [Mr. Guice]." Sanctions Hr'g I Tr. 23. This statement closely tracks assurances Mr. Malofiy made to Mr. Guice during a follow-up conversation later the same day, which was recorded and transcribed. *See* Hr'g Ex. 5A, at 5 (noting Mr. Marino "d[id]n't want to really point the finger at [Mr. Guice] because, really, . . . it was [Mr. Barton] that really screwed him

19

together an affidavit for Mr. Guice to sign and would call Mr. Guice back to review the affidavit with him. *See* Disciplinary Hr'g Tr. 123. Mr. Malofiy explained that the affidavit would be Mr. Guice's testimony and that he wanted the affidavit to have Mr. Guice's side of the story with respect to the song "Club Girl"/"Bad Girl." *See* Sanctions Hr'g I Tr. 30-31. He did not advise Mr. Guice to seek legal advice with respect to signing the affidavit. This initial phone conversation lasted approximately nineteen minutes, including the three to five minutes that Mr. Guice was on hold while Mr. Malofiy conferred with Mr. Beasley. *See* Hr'g Ex. 4, at 10.

11.  Immediately after speaking with Mr. Guice, Mr. Malofiy called Mr. Marino to report that Mr. Guice had called and said he had no idea Mr. Marino had not been credited or paid and he was not involved in those decisions in any way. *See* Disciplinary Hr'g I Tr. 157-58; Hr'g Ex. 34, at 1. Mr. Malofiy spoke with Mr. Marino by phone later the same day, and the two agreed that if it was true that Mr. Guice really had no involvement in Mr. Marino's not being credited or paid, then perhaps he did not belong in the lawsuit. *See* Sanctions Hr'g I Tr. 158-59. Mr. Malofiy recognized, however, that Mr. Guice was still an adverse party in the case. *See* Disciplinary Hr'g Tr. 164.

12.  Mr. Malofiy drafted an affidavit for Mr. Guice's signature based on his notes of their earlier phone conversation. *See id.* at 123. At 3:30 p.m. the same day, he called Mr. Guice back to review the affidavit with him before sending it to him. *See* Hr'g Ex. 4, at 10. Mr. Malofiy wanted to record the conversation to capture the affidavit on tape and planned to do so using a handheld recorder. *See* Disciplinary Hr'g Tr. 127, 133, 140. Mr. Malofiy also asked his paralegal to record the conversation on an iPhone so as to have a backup recording in the event

---

over"), *id.* at 8 (noting Mr. Marino said Mr. Guice was "pretty cool" and "probably didn't know what was going on either").

his handheld device failed. *See id.* at 127, 134, 136-37. Notwithstanding Mr. Beasley's admonition that before obtaining an affidavit from Mr. Guice, Mr. Malofiy should ensure that Mr. Guice understood "where he [wa]s in th[e] case," *see id.* at 45, when Mr. Guice answered the call, Mr. Malofiy greeted him in a distinctly non-adversarial manner, saying, "Yo Wil, how you doing bud?" Hr'g Ex. 5A, at 1. Mr. Malofiy explained that he had put together an affidavit based on his notes of their earlier conversation and wanted to review the affidavit with Mr. Guice to ensure he was comfortable with it. *See id.* Mr. Malofiy also obtained Mr. Guice's consent to record the call. *See id.*

13.    Mr. Malofiy then proceeded to read to Mr. Guice the affidavit he had drafted. The affidavit included the statements that Mr. Guice understood that he was a named defendant in the "*Marino v. Usher*" lawsuit and that Mr. Malofiy represented Mr. Marino in the suit. *Id.* The affidavit also included Mr. Guice's admission to facts underlying Mr. Marino's claims against him, including that Mr. Marino, Mr. Guice, and Mr. Barton had written the song "Club Girl" together, Mr. Marino first created the song, and Mr. Guice understood that he, Mr. Marino, and Mr. Barton were supposed to receive equal credit as songwriters and that Mr. Marino and Mr. Barton had "split the production of the Song 50/50." *Id.* at 2-3. After Mr. Malofiy read the affidavit, Mr. Guice requested that he replace certain curse words with regular words, but otherwise indicated, in response to Mr. Malofiy's questions, that he was comfortable with the affidavit and the statements in it were true. *Id.* at 3-4.

14.    Once Mr. Guice agreed he was comfortable with the affidavit, Mr. Malofiy turned off his handheld recorder, having captured "what [he] wanted to capture," i.e., Mr. Guice's assent to the affidavit. *See* Disciplinary Hr'g I Tr. 140. Mr. Malofiy continued to speak with Mr. Guice about the affidavit and the lawsuit, however, explaining that Mr. Marino had been

strung along by Mr. Barton, who kept promising him "the money's coming," but never paid him. *See* Hr'g Ex. 5A, at 4. In the course of getting Mr. Guice's email address and making arrangements for him to sign the affidavit and return it, Mr. Malofiy assured Mr. Guice, at four different points in the conversation, that he was going to "hold tight" or "sit tight" with Mr. Guice and was "not going to do anything with [him]" in the case. *See id.* at 5-6, 9. Mr. Malofiy also told Mr. Guice he would talk to Mr. Marino, representing that Mr. Marino "d[id]n't really want to point the finger at [Mr. Guice] because, really, he says, it was [Mr. Barton] that really screwed him over," *id.* at 5, and that Mr. Marino believed Mr. Guice was "pretty cool" and "probably didn't know what was going on either," *id.* at 8. Broaching the subject of how much Mr. Guice had been paid for the song, Mr. Malofiy suggested Mr. Guice "should have picked up about six hundred—four to six hundred grand" on "mechanicals," an amount that Mr. Guice implied was far greater than what he had actually received. *Id.* at 6-7. When Mr. Guice indicated he had not been paid money owed to him by Tommy van Dell, another defendant in the case, Mr. Malofiy promised to "look into it," advising Mr. Guice, "you might be in a situation where there's a lot, there's, you know, money left on the table and these guys did you dirty too." *Id.* at 6-9. The conversation concluded with the following exchange:

> MALOFIY: I'm, I'm gonna, I'm gonna get all those records and stuff. This is what I'm gonna do. Keep the lines of communication open, I'm not gonna do anything. I'm just gonna sit tight and I'm going to speak to [Mr. Marino] and see, see what he wants to do. But, I think, I think, um, he'll be a little more, uh, understanding knowing that you, you know, didn't flake out on him.
>
> GUICE: Yep. Yep.
>
> MALOFIY: Alright, man?
>
> GUICE: Cool.
>
> MALOFIY: Alright, man, you're, you're a good guy Guice.

22

| GUICE: | Ya, yup. Appreciate you man. |
|---|---|
| MALOFIY: | Alright, take care, my friend. |
| GUICE: | Tell, tell Dan I say what's up. |
| MALOIFY: | I will tell him, I will tell him. Take care. |
| GUICE: | Alright, cool. |
| MALOFIY: | Bye. |

*Id.* at 9. At no time during this thirteen-minute conversation did Mr. Malofiy advise Mr. Guice to seek counsel before signing the affidavit. *See id.*; Hr'g Ex. 4, at 10.

15.     Based on the tone and content of the conversation—including Mr. Malofiy's assurances that he was "not going to do anything" with Mr. Guice, Mr. Marino did not want to "point the finger" at Mr. Guice, and it was Mr. Barton who "really screwed [Mr. Marino] over"—Mr. Mr. Guice reasonably believed he was a witness in the case and did not need to respond to the amended complaint.[21] Although the affidavit Mr. Malofiy read to Mr. Guice at the beginning of the conversation characterized Mr. Guice as a named defendant in the *Marino v. Usher* lawsuit in which Mr. Malofiy represented the plaintiff, Mr. Malofiy's representations to Mr. Guice after he agreed to the affidavit communicated that Mr. Malofiy and Mr. Marino were,

---

[21] At the disciplinary hearing, Mr. Malofiy acknowledged his representations that he was going to "hold tight" with Mr. Guice and was "not going to do anything" with him were promises he made to Mr. Guice, but argued his position was that he was going to hold tight with Mr. Guice until he had obtained the records in the case and determined whether Mr. Guice was telling the truth. *See* Disciplinary Hr'g Tr. 179-81, 184-85, 218-19. We disagree that this is what Mr. Malofiy communicated to Mr. Guice. Although Mr. Malofiy mentioned records twice during the conversation, he did not suggest his client's position toward Mr. Guice depended on what the records showed. Indeed, Mr. Malofiy's statement that he was "gonna get all those records and stuff" immediately followed his suggestion that Mr. Guice might be in a situation where "these guys did you dirty too." *See* Hr'g Ex. 5A, at 8-9.

as Mr. Guice put it, "not coming after [him]" in the litigation, but were going after "everyone else." *See* Sanctions Hr'g I Tr. 23.[22]

16.     Later the same day, Mr. Malofiy emailed the affidavit to Mr. Guice. The subject line of email, like the affidavit, referenced the *Marino v. Usher* case, without mentioning any other defendants. *See* Hr'g Ex. 6. In the body of the email, Mr. Malofiy thanked Mr. Guice for "reaching out ... and setting the record straight from [Mr. Guice's] position"; noted he had changed the curse words in the affidavit, as Mr. Guice had requested; and asked Mr. Guice to sign and date the affidavit and send it back to him. *Id.* Mr. Malofiy also stated he would talk to Mr. Marino that night and get back in touch with Mr. Guice early the following week. *Id.* The email did not advise Mr. Guice to consult with an attorney before signing the affidavit.

17.     At some point on February 23 or 24, 2012, Mr. Malofiy showed the affidavit to Mr. Beasley, who told him the affidavit should memorialize that Mr. Guice had been advised to obtain counsel but had elected not to do so. *See* Disciplinary Hr'g Tr. 57-58, 60, 64-65.[23]

---

[22] In his both of his depositions and at the sanctions hearing, Mr. Guice testified that Mr. Malofiy told him he was a witness. *See* Guice May Dep. 187-88; Guice June Dep. 144, 149, 165; Sanctions Hr'g I Tr. 26. Mr. Malofiy denies ever calling Mr. Guice a witness. *See* Disciplinary Hr'g Tr. 152, 212. The word "witness" was not used during Mr. Malofiy's second phone call with Mr. Guice on February 23, 2012. Because the first call was not recorded, we do not know for certain whether the word was used during that conversation. Regardless of whether Mr. Malofiy used the word "witness," however, it is clear from the transcript of the second call that Mr. Malofiy led Mr. Guice to believe he was a witness in the case. Mr. Malofiy's inadvertent reference to Mr. Guice as a "third-party witness" during his original deposition underscores the point. *See* Guice May Dep. 151 ("He's a third-party witness—I mean, he's a ... he's a defendant and he's not represented by counsel. It's fair to provide him cautionary instructions.").

[23] It is not clear whether Mr. Beasley reviewed the affidavit before or after Mr. Malofiy sent it to Mr. Guice. Mr. Malofiy maintains he asked Mr. Beasley to give the affidavit a "quick scan" before sending it to Mr. Guice, and, after looking at the affidavit briefly, Mr. Beasley told him it looked "OK." *See* Disciplinary Hr'g Tr. 171. According to Mr. Malofiy, Mr. Beasley then came to him the following day, said he had read the affidavit again on his own, and instructed Mr. Malofiy to follow up with Mr. Guice to let him know he could change, edit, or modify the

Shortly before 4:30 p.m. on February 24, 2012, Mr. Malofiy sent Mr. Guice a follow-up email, noting he had not yet received the signed affidavit back from Mr. Guice and stating Mr. Guice should feel free to change or modify the language in the affidavit. Hr'g Ex. 7. The email also advised that if Mr. Guice wanted "to review [the affidavit] with a lawyer, that's fine too." *Id.*

18.     Mr. Guice signed and dated the affidavit on February 28, 2012, and sent it back to Mr. Malofiy via email without consulting an attorney. *See* Guice June Dep. 43; Sanctions Hr'g I Tr. 43; Hr'g Ex. 8. Mr. Guice did not feel any need to have an attorney look at the affidavit before signing it as he believed he was only a witness in case. *See* Sanctions Hr'g I Tr. 39. Moreover, he could not afford to pay an attorney. *See id.* at 51, 63; Guice May Dep. 186.

19.     Mr. Guice did not understand that he was required to file, and did not file, an answer to the amended complaint. When asked about the obligation to file an answer at his deposition, Mr. Guice was unfamiliar with the term "answer," and stated he believed the affidavit was his response to the complaint—"[a]s a witness, my testimony, my account of [Mr. Marino's] participation in the song." *See* Guice May Dep. 188.

20.     In March 2012, a group of defendants in the *Marino* action filed a motion to dismiss the amended complaint and attached as an exhibit to the motion a written agreement Mr. Barton and Mr. Guice had entered into with an entity called Fast Pace, Inc., to produce a master recording of a performance of the song "Bad Girl" by Usher. *See* Hr'g Ex. 9, at 41-50. The agreement identified Mr. Guice as a co-producer and listed Mr. Barton and Mr. Guice, but not Mr. Marino, as writers of the song. *See id.* After reading the contract, Mr. Malofiy believed Mr.

---

affidavit and could seek counsel. *See id.* at 171-72. Mr. Malofiy's account of Mr. Beasley's role with respect to the affidavit strains credulity and was not corroborated by Mr. Beasley, who recalled only that Mr. Malofiy showed him the affidavit and asked what he thought of it and that he told Mr. Malofiy the affidavit needed to say that Mr. Guice had been advised to obtain counsel and was choosing not to do so. *See id.* at 57-58, 60, 65.

Guice had lied to him about not knowing that Mr. Marino was not credited or paid for his contribution to the song.[24] *See* Disciplinary Hr'g Tr. 191-93. According to Mr. Malofiy, at that point, his and his client's position toward Mr. Guice changed. *See id.* at 193.

21.     Despite his previous assurances that he was going to "hold tight" and was "not going to do anything" with Mr. Guice, on June 14, 2012, Mr. Malofiy filed a request for entry of Mr. Guice's default for his failure "to file a responsive pleading or otherwise defend the suit." *See* Hr'g Ex. 11. The Clerk of Court entered the default the same day. Hr'g Ex. 32, at 22 (docket entries for June 14, 2012). Mr. Malofiy did not alert Mr. Guice in advance that his position toward Mr. Guice had changed or that he would be seeking entry of Mr. Guice's default. *See* Guice May Dep. 191; Disciplinary Hr'g Tr. 193. Although Mr. Guice received a copy of the request for entry of default, he did not understand what it meant and took no action in response to it. *See* Sanctions Hr'g I Tr. 44-45, 86-87.

22.     Mr. Malofiy had no further contact with Mr. Guice until the spring of 2013, when he called Mr. Guice to discuss scheduling his deposition. *See* Sanctions Hr'g I Tr. 43-44; Disciplinary Hr'g Tr. 200. Mr. Malofiy and Mr. Guice had two phone conversations about the logistics of the deposition, which was ultimately held in Philadelphia on May 2, 2013. *See* Guice

---

[24] When he took Mr. Guice's deposition a year later, however, Mr. Malofiy asked Mr. Guice to reaffirm under oath that the affidavit—in which Mr. Guice claimed he was shocked to learn that Mr. Marino was neither credited nor paid for his role in writing and producing the song—was true, accurate, and correct, *see* Guice May Dep. 26-35, 41, and then argued to opposing counsel that Mr. Guice's deposition testimony was the truth, *see* Hr'g Ex. 22, at 122 ("Mr. Guice isn't going to lie because he's real. Call him back for a deposition, he's going to tell you the same thing. The truth is the truth." (emphasis omitted)). Indeed, by Mr. Malofiy's account, the impetus for taking Mr. Guice's deposition was defense counsel's refusal to allow Mr. Malofiy to use the statements in the affidavit because the affidavit was not notarized and sworn under penalty of perjury. *See* Disciplinary Hr'g Tr. 201.

May Dep. 158.[25]  Mr. Malofiy did not discuss the case with Mr. Guice during these calls, beyond advising Mr. Guice that he was going to ask Mr. Guice about his affidavit at the deposition. *See* Sanctions Hr'g I Tr. 46-47; Disciplinary Hr'g Tr. 202.  He did not advise Mr. Guice to obtain counsel in connection with the deposition, nor did he notify Mr. Guice that a default had been entered. *See* Sanctions Hr'g I Tr. 44; Disciplinary Hr'g Tr. 202.

23.     At the start of the May 2, 2013, deposition, Mr. Malofiy identified himself as the attorney for Mr. Marino and confirmed that Mr. Guice understood he was a defendant in the *Marino* action. *See* Guice May Dep. 9.  After giving Mr. Guice some preliminary instructions about the deposition, Mr. Malofiy also confirmed that Mr. Guice was not represented by counsel. *See id.* at 15.  He did not advise Mr. Guice of his right to have counsel present at the deposition or suggest that Mr. Guice had been advised to retain counsel.

24.     Following Mr. Malofiy's examination, defense counsel questioned Mr. Guice about his contacts with Mr. Malofiy and his understanding of the litigation and his position in the case.  Although Mr. Guice again confirmed that he understood he was named as a defendant in the case, *see id.* at 171, when questioned further about his understanding, it became clear that Mr. Guice did not fully understand his status.  For example, when asked whether he understood that Mr. Marino was seeking money or money damages from him, Mr. Guice responded that he did not, explaining he "didn't know [Mr. Marino] was seeking it from him personally," as opposed to Mr. Barton or Usher. *See id.* at 171-74.  Likewise, when asked about the individual counts in the amended complaint, Mr. Guice indicated he did not understand he was being sued for the various causes of action alleged, but instead thought he was a witness in the case. *See id.*

---

[25] Mr. Malofiy made Mr. Guice's travel arrangements for the deposition and paid for his travel, hotel, and expenses. *See* Sanctions Hr'g I Tr. 46; Disciplinary Hr'g Tr. 202.

at 175-88. Mr. Guice also indicated he did not know his default had been entered. *See id.* at 190-91.

25.     Upon learning his default had been entered, Mr. Guice felt surprise, anger, and confusion, as his understanding of where he was in the case had been "turned on its head." *See* Sanctions Hr'g I Tr. 48. He also felt "played" by Mr. Malofiy. *See* Guice June Dep. 145. As Mr. Guice later explained, although he had previously acknowledged his status as a defendant in the case, it was not until he was questioned by defense counsel that he really understood what it meant to be a defendant. *See* Sanctions Hr'g I Tr. 76-79. Following the disclosure that he had been defaulted, Mr. Guice asked to take a break so he could "wrap [his] head around what was happening." *Id.* at 48. When the deposition resumed, defense counsel asked if, in light of his new understanding of his status in the litigation, Mr. Guice wanted to consult with an attorney before continuing. *See* Guice May Dep. 195. Mr. Guice agreed it would be in his best interest to seek counsel, and the deposition was thereafter adjourned to permit him to do so. *See id.* at 197-98, 205-06.

26.     Mr. Guice's deposition was completed on June 4, 2013, in Denver, Colorado. Unable to find pro bono counsel or to pay an attorney on his own, Mr. Guice was still unrepresented during the continuation of his deposition. *See* Sanctions Hr'g I Tr. 63; Hr'g Ex. 17, at 9, 11 (emails from Mr. Guice to parties noting difficulty in obtaining pro bono counsel). At the start of the deposition, Mr. Malofiy represented that based on "things that came out in [Mr. Guice's] testimony that clearly, clearly indicate[d] that he wasn't as involved as [the other] defendants," the plaintiff would be filing a further amended complaint to withdraw "certain facts and certain causes of action" that "properly do not belong on Mr. Guice." Guice June Dep. 13-14. Mr. Malofiy again referenced the contemplated amendment at the end of the deposition,

28

asking where he should send the amended complaint to Mr. Guice. *See id.* at 170, 172.[26] Notwithstanding these representations, Mr. Malofiy did not thereafter file a further amended complaint.

27.     Following his deposition, Mr. Guice, who continued to be unrepresented, did not take any action in the *Marino* case. Judge Diamond ultimately opened Mr. Guice's default and struck his associated deposition testimony in May 2014 as a sanction for Mr. Malofiy's bad faith conduct toward Mr. Guice.

28.     Although not the basis for the disciplinary charges in this case, Mr. Malofiy's conduct during discovery in the *Marino* action, which counsel conceded may appropriately be considered as to disposition in this matter, was reprehensible. In the sliver of the record we have reviewed, Mr. Malofiy repeatedly made abusive, degrading, and derogatory remarks to opposing counsel during depositions. *See, e.g.*, Guice June Dep. 8 ("I want to set a record because a lot happened and a lot of crap trap and hogwash from you."); *id.* at 50 ("I'm tired of your clap trap and hogwash."); *id.* at 91 ("You're like a little kid with your little mouth."); *id.* at 146 ("This is bullshit."); *id.* at 172 ("I'll call the judge. He doesn't like you at all."); Marino Dep. 156, May 3, 2013[27] ("Here you go with your claptrap again."); *id.* at 148 ("You don't like the truth, it disturbs you. You've never seen the truth in a deposition before."); *id.* at 169 ("[Y]ou can't handle the truth."); *id.* at 207 ("You coached him to hell, and the judge came and slammed you. Slammed you."); *id.* at 260 ("This is nauseating—wait. This is nauseating."); *id.* at 362 ("I never seen any lawyer do this so bad ever.").

---

[26] Mr. Malofiy also asked Mr. Guice to whom he should speak about settlement negotiations, stating, "[p]art of it is trying to limit your involvement, I think, because it's clear who was really pulling the strings in this case," and advising Mr. Guice that "joint and several liability means the deep pockets pay for the whole thing." *Id.* at 172-73.

[27] Mr. Marino's Deposition appears in Hearing Exhibit 22 at pages 139 to 330.

29.　　Indeed, Mr. Malofiy's overly aggressive conduct during Mr. Guice's June 2013 deposition prompted both opposing counsel and Tommy van Dell, a pro se defendant, to comment that they felt menaced by Mr. Malofiy. *See* Guice June Dep. 30 ("Mr. Malofiy, you're menacing us. You are leaning over the table and you are acting threatening."); *id.* at 146 ("And for the record, I would like to say . . . that I feel menaced and threatened by Mr. Malofiy and his continual outbursts and seemingly anger-driven conduct today and also during the Los Angeles deposition . . . ."). Mr. Malofiy responded to Mr. van Dell's statement by accusing him of being a "cheat":

> What I am concerned about is, you rooked a man who wrote a song. You stole $200 million, you and the defendants, and he got nothing. And you're a cheat, and you cheated this man. You rooked him out of a song. And everyone made money, including you, and you put it in your pocket.

*Id.*

30.　　In addition to making abusive comments, Mr. Malofiy repeatedly made lengthy speaking objections during depositions, even though he personally sought and obtained a ruling from Judge Diamond limiting counsel to "stat[ing] the objection and nothing more." Hr'g Ex. 22, at 136; *see, e.g.*, Marino Dep. 52-53 ("Objection, company. You have to be very specific here. You are playing games. If it's a company, it's a company. If it's an LLC, it's an LLC. If it's an Inc., it's an Inc. Don't play games and call it something it's not."); *id.* at 168-69 ("Objection. I think he answered this question before the break. Now, after the break you can ask it again as many times as you want. Do it 100 times. What you want is you want a little piece of information, but what you are getting is you are getting the truth, and you can't handle the truth."). Judge Diamond indicated Mr. Malofiy made 65 improper speaking objections in his client's deposition alone. Hr'g Ex. 33, at 2.

31.    When asked about his deposition misconduct at the disciplinary hearing, Mr. Malofiy acknowledged his conduct was unprofessional, lacked civility, and violated the discovery rules and the spirit of discovery. Disciplinary Hr'g Tr. 225.

32.    At the disciplinary hearing, Mr. Malofiy presented sixteen character witnesses, including attorneys and other professionals who have worked with him, family members, friends, and former clients. Several witnesses testified to Mr. Malofiy's diligence as an attorney. Mr. Beasley described the long hours Mr. Malofiy put in while working in the Beasley Building, explaining that Mr. Malofiy had requested a key to the building so that he could stay at work later than 10:00 p.m., when the Building closed. *See* Disciplinary Hr'g Tr. 48. Drew Salman, an attorney hired by Mr. Malofiy to enforce a judgment, whom Mr. Malofiy consults from time to time about his case investigations, stated he was impressed by Mr. Malofiy's thoroughness and preparation. *See id.* at 35-36. Brian Bricklin, a friend and former client, testified that Mr. Malofiy's pro bono representation allowed Bricklin to keep his home when his income dropped while battling cancer. *See id.* at 83-85. All of Mr. Malofiy's character witnesses testified Mr. Malofiy's reputation as a truthful and honest person is very good among people in the community who know him. These witnesses also testified that they personally believe Mr. Malofiy has a very good reputation as a truthful and honest person.[28]

---

[28] Five of Mr. Malofiy's character witnesses were questioned individually by counsel. The remaining character witnesses testified via stipulation, after identifying themselves and their relationship to Mr. Malofiy. *See* Disciplinary Hr'g Tr. 91-98.

III. **DISCUSSION**

A. **Violations of the Rules of Professional Conduct**

ODC asks this Court to find that Mr. Malofiy violated Pennsylvania Rules of Professional

Conduct 4.1(a), 4.3, 8.4(c), and 8.4(d) in his dealings with Mr. Guice in the *Marino* action. We

begin with Rule 4.3, which provides as follows:

> (a) In dealing on behalf of a client with a person who is not represented by counsel, a lawyer shall not state or imply that the lawyer is disinterested.
>
> (b) During the course of a lawyer's representation of a client, a lawyer shall not give advice to a person who is not represented by a lawyer, other than the advice to secure counsel, if the lawyer knows or reasonably should know the interests of such person are or have a reasonable possibility of being in conflict with the interests of the lawyer's client.
>
> (c) When the lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in the matter, the lawyer should make reasonable efforts to correct the misunderstanding.

Pennsylvania Rule 4.3 is substantially similar to Model Rule of Professional Conduct 4.3, the

purpose of which is to ensure unrepresented persons "are not misled when dealing with a lawyer

acting for a client." Ellen J. Bennett et al., *Annotated Model Rules of Professional Conduct* 422

(7th ed. 2011). The Model Rule also seeks to protect against attorney overreaching by "severely

limit[ing] the ability of counsel to take advantage of [the] situation[]" in which a person is not

represented by counsel. 2 Geoffrey C. Hazard, Jr. & W. William Hodes, *The Law of Lawyering*

§ 39.2 (3d ed. Supp. 2011-1); *see also People v. Mascarenas*, 103 P.3d 339, 345 (Colo. O.P.D.J.

2003) (noting Rule 4.3 "is intended to preclude an attorney from compromising an unrepresented

party's interests").

Recognizing that unrepresented persons, especially persons lacking experience in legal

matters, might assume a lawyer is disinterested, even when the lawyer is representing a client,

the comment to Rule 4.3 specifies that "[i]n order to avoid a misunderstanding, a lawyer will

32

typically need to identify the lawyer's client and, where necessary, explain that the client has interests opposed to those of the unrepresented person." Pa. R. Prof'l Conduct 4.3 cmt. 1. A lawyer's obligations under the Rule do not end, however, with the making of such disclosures. Although the Rule "does not prohibit a lawyer from negotiating the terms of a transaction or settling a dispute with an unrepresented person" after adequate disclosure, *see id.* cmt. 2, the Rule imposes a continuing obligation on lawyers to exercise caution throughout the course of their dealings with unrepresented persons. A lawyer may not, for example, "ignore circumstances indicating that [an unrepresented party] misunderstands the partisan, adversarial role of [the opposing party's counsel] in the proceedings at issue." D.C. Bar, Ethics Op. 321 (July 2003). When the lawyer has reason to believe that an unrepresented person misunderstands the lawyer's role, the lawyer should "make reasonable efforts to correct the misunderstanding." Pa. R. Prof'l Conduct 4.3(c); *see also* N.Y. City Bar Ass'n, Formal Op. 2009-2 (Feb. 2009) (recognizing that a lawyer may need to clarify his or her role in the case more than once if the lawyer knows or has reason to know a self-represented person misapprehends the lawyer's role). When the lawyer knows or should know that the unrepresented person's interests are or have a reasonable possibility of being adverse to the interests of the lawyer's client, the lawyer must refrain from giving any advice to the person, other than the advice to secure counsel. Pa. R. Prof'l Conduct 4.3(b).

Mr. Malofiy argues he fulfilled his obligations under Rule 4.3 because he told Mr. Guice, at the outset of their first conversation, that he represented Mr. Marino and because he advised Mr. Guice to obtain counsel. We disagree. As an initial matter, as explained above, we do not credit Mr. Malofiy's testimony that he advised Mr. Guice to seek counsel. Moreover, we find that Mr. Malofiy's disclosures regarding his and Mr. Guice's roles in the case failed to

33

adequately convey the adversity of interests between Mr. Malofiy's client and Mr. Guice. Upon hearing from Mr. Guice, Mr. Malofiy identified himself as Mr. Marino's counsel, but his disclosure that his client's interests were adverse to Mr. Guice's interests was limited to his statement that Mr. Guice was a defendant in the case. As we have noted, Mr. Malofiy had no basis to believe Mr. Guice was sophisticated with respect to legal matters, and in fact he was not, never having previously been sued. In these circumstances, Mr. Malofiy's use of the word defendant, unaccompanied by any further information about the lawsuit, such as the nature of the claims asserted or relief sought, fell short of the clear and effective explanation of adversity of interests the Rule requires. *See Brown v. St. Joseph Cnty.*, 148 F.R.D. 246, 254 (N.D. Ind. 1993) (holding Rule 4.3 requires a lawyer making ex parte contact with unrepresented former or current employees of an opposing corporate party to "make clear to the unrepresented employee the lawyer's role in the case, including the nature of the case, the identity of the lawyer's client, and the fact that the person's former or current employer is an adverse party"); *In re Guilbeau*, 35 So. 3d 207, 214 (La. 2010) (holding a lawyer violated Rule 4.3 by drafting an assignment of rights in favor of his client, which his client presented to an unrepresented person with adverse interests, without "clearly stat[ing] his position").

Beyond the inadequacy of Mr. Malofiy's initial disclosures, the record is clear that in their ensuing interactions, Mr. Malofiy affirmatively misled Mr. Guice about his role in the case. During the initial phone conversation on February 23, 2012, Mr. Guice provided his account of the song "Club Girl"/"Bad Girl" with Mr. Malofiy asking follow-up questions. Mr. Malofiy believed Mr. Guice's account was beneficial to his client, and nothing in his approach toward Mr. Guice gave Mr. Guice cause to believe he was defending himself. Indeed, when Mr.

Malofiy called Mr. Guice back a few hours later, he greeted Mr. Guice not as an adversary but as a friend, saying, "Yo Wil, how you doing bud?" Hr'g Ex. 5A, at 1.

During the second conversation, Mr. Malofiy read the affidavit he had drafted to Mr. Guice, repeating his earlier statements that Mr. Guice was a named defendant in the *Marino* action and that Mr. Malofiy represented Mr. Marino, the plaintiff in the suit. After Mr. Guice indicated he was comfortable with the affidavit, however, Mr. Malofiy repeatedly assured Mr. Guice that Mr. Guice was not the target of the suit, stating he was going to "hold tight" with Mr. Guice and was "not going to do anything with him" in the case and that Mr. Marino did not want to "point the finger" at Mr. Guice, as it was Mr. Barton, not Mr. Guice, who "really screwed [Mr. Marino] over." *See id.* at 5-6, 9. Mr. Malofiy also volunteered that Mr. Guice should have been paid $400,000 to $600,000 on "mechanicals" for the song, and when Mr. Guice indicated he had not been paid money owed to him by Tommy van Dell, Mr. Malofiy offered to look into it, suggesting that Mr. Guice, like Mr. Marino, might have been a victim of wrongdoing by the other defendants, and implying that his efforts might inure to Mr. Guice's benefit. In making these assurances, Mr. Malofiy negated any prior suggestion that his client's interests were adverse to Mr. Guice's without ever advising Mr. Guice to seek counsel to defend him in the case. Indeed, Mr. Malofiy did not broach the subject of counsel until the next day when he emailed Mr. Guice to follow up about the affidavit, which he had not yet received back from Mr. Guice. Mr. Malofiy's belated suggestion that if Mr. Guice wanted to "review [the affidavit] with a lawyer, that's fine too," Hr'g Ex. 7, falls short of advice to secure counsel in the case.

The record before us establishes by clear and convincing evidence that Mr. Malofiy violated all three subsections of Rule 4.3. As to Rule 4.3(a), Mr. Malofiy went further than implying he was disinterested; he suggested his client's interests and Mr. Guice's interests were

35

aligned. *See In re Pautler*, 47 P.3d 1175, 1182 (Colo. 2002) (en banc) (holding a prosecutor who misrepresented to an unrepresented murder suspect that the prosecutor was a public defender violated Rule 4.3 by going "further than implying he was disinterested" and "purport[ing] to represent [the suspect]"). Mr. Malofiy also violated Rule 4.3(b)'s prohibition against giving advice to an unrepresented person with interests adverse to those of the lawyer's client. Mr. Guice was a named defendant in the *Marino* action, and, as Mr. Malofiy conceded at the disciplinary hearing, the relationship between his client and Mr. Guice was at all times adverse. *See* Disciplinary Hr'g Tr. 161, 164. Yet, after obtaining Mr. Guice's verbal assent to the affidavit, Mr. Malofiy proceeded to give him advice, offering his opinion about what Mr. Guice should have earned from the song and suggesting that Mr. Guice might have claims against the other defendants in the case, without advising Mr. Guice to obtain independent counsel. Having created the perception that his client was not going after Mr. Guice in the copyright action and that he might be able to help Mr. Guice, Mr. Malofiy should have known that Mr. Guice did not understand his role in the case. Rule 4.3(c) suggests that Mr. Malofiy should have made reasonable efforts to correct this misunderstanding. *See Jones v. Allstate Ins. Co.*, 45 P.3d 1068, 1077-78 (Wash. 2002) (en banc) (holding an insurance claims adjuster acting as an attorney violated Rule 4.3 by leading unrepresented third-party claimants to believe she had their best interests in mind and by not correcting the claimants' perception that she was helping them); *see also X-It Prod., L.L.C. v. Walter Kidde Portable Equip., Inc.*, 227 F. Supp. 2d 494, 548 (E.D. Va. 2002) (finding a lawyer violated Rule 4.3 by failing to correct an unrepresented party's misunderstanding about the lawyer's adversarial role in the case). Instead, he sought entry of Mr. Guice's default without ever notifying Mr. Guice his position about "holding tight" with Mr. Guice had changed.

36

The remaining disciplinary charges concern Mr. Malofiy's affirmative misrepresentations to Mr. Guice about his status in the *Marino* action, by which ODC contends Mr. Malofiy violated Rules 4.1(a), 8.4(c), and 8.4(d). Rule 4.1(a) prohibits a lawyer from knowingly making a false statement of material fact or law to a third person in the course of representing a client. Misrepresentations under Rule 4.1(a) may include "partially true but misleading statements or omissions that are the equivalent of affirmative false statements." Pa. R. Prof'l Conduct 4.1(a) cmt. 1. Rule 8.4(c) provides that it is professional misconduct for a lawyer to "engage in conduct involving dishonesty, fraud, deceit or misrepresentation." Rule 8.4(d) provides that it is professional misconduct for a lawyer to "engage in conduct that is prejudicial to the administration of justice."

It is undisputed that during his second phone conversation with Mr. Guice on February 23, 2012, Mr. Malofiy repeatedly assured Mr. Guice, "I'm gonna hold tight with ya, I'm not going to do anything," or words to that effect, *see* Hr'g Ex. 5A, at 5-6, 9, assurances Mr. Malofiy conceded were promises he made to Mr. Guice. It is also beyond dispute that these statements ultimately proved to be false. On June 14, 2012, several months after his last communication with Mr. Guice, Mr. Malofiy caused Mr. Guice's default to be entered.

To constitute a violation of Rule 4.1(a), Mr. Malofiy's misrepresentations must have been made knowingly. *See* Pa. R. Prof'l Conduct 4.1. To constitute a violation of Rule 8.4(c), the misrepresentations must have been made either knowingly or "with reckless ignorance of the truth or falsity thereof." *Office of Disciplinary Counsel v. Anonymous Att'y A*, 714 A.2d 402, 407 (Pa. 1998). We are persuaded the misrepresentations in this case satisfy both standards. In his testimony before us, Mr. Malofiy took the position his promises to Mr. Guice were conditional, explaining that he was going to wait and see what the records disclosed before

37

deciding how to proceed with respect to Mr. Guice. *See* Disciplinary Hr'g Tr. 181-82, 184-85, 219. Because Mr. Malofiy knew his promises to "hold tight" with Mr. Guice were contingent upon what the records showed, but failed to disclose this contingency to Mr. Guice, we conclude Mr. Malofiy's misrepresentations were not only recklessly but knowingly made.[29]

Finally, we conclude Mr. Malofiy's false statements were statements of "material fact," as required to establish a violation of Rule 4.1(a), and were "prejudicial to the administration of justice," as required to establish a violation of Rule 8.4(d). Mr. Malofiy's statements that he was "not going to do anything" with Mr. Guice were certainly material to Mr. Guice as they contributed to his understanding that he was witness in the case and that there no need for him to respond to the amended complaint because he had provided his testimony by giving an affidavit. The statements also had a material impact on the course of the copyright action, as Mr. Guice's failure to answer the amended complaint enabled Mr. Malofiy to obtain entry of Mr. Guice's default. *See Office of Disciplinary Counsel v. DiAngelus*, 907 A.2d 452, 456 (Pa. 2006) (holding the materiality requirement of Rule 4.1(a) and the "prejudicial to the administration of justice" requirement of Rule 8.4(d) are satisfied if the violation affected the outcome of the proceedings).

The record establishes, by clear and convincing evidence, that by repeatedly assuring Mr. Guice that he was going to "hold tight" and was "not going to do anything" with him, Mr. Malofiy knowingly made false statements of material fact and engaged in conduct that involved dishonesty, fraud, deceit or misrepresentation and was prejudicial to the administration of justice. Accordingly, we also find Mr. Malofiy violated Rules 4.1(a), 8.4(c), and 8.4(d).

---

[29] As noted, beyond misrepresentation, Rule 8.4(c) encompasses conduct involving dishonesty and deceit. Mr. Malofiy's conduct toward Mr. Guice constitutes misconduct under these standards as well.

38

**B.  Disposition**

ODC argues the appropriate sanction for Mr. Malofiy's misconduct is a reprimand, citing *Attorney Q v. Mississippi State Bar*, 587 So. 2d 228 (Miss. 1991), and *Office of Disciplinary Counsel v. Rich*, 633 N.E.2d 1114 (Ohio 1994), two disciplinary cases in which attorneys received public or private reprimands for violating Rule 4.3 or its predecessor in the Code of Professional Responsibility.  Mr. Malofiy argues his conduct at most warrants private discipline, such as an admonition, a reprimand, or a dismissal with a letter of education, in light of the mitigating factors present in this case.

We recognize there are a number of mitigating factors here.  Mr. Malofiy has no prior disciplinary record.  He was still a relatively new lawyer at the time of the events in question, having been a member of the bar for less than four years when Mr. Guice first contacted him in February 2012.  Upon hearing from Mr. Guice, Mr. Malofiy sought guidance from a more experienced attorney on how to proceed in that unfamiliar situation.  At the disciplinary hearing, several witnesses testified to Mr. Malofiy's strong work ethic as an attorney, tenacious advocacy on behalf of his clients, and reputation as a truthful and honest person.

We do not agree, however, that a reprimand—or private discipline—is a sufficient sanction in light of the serious misconduct in this case.  Mr. Malofiy violated duties owed to the public and the legal system.  His conduct, moreover, was knowing.  Mr. Malofiy recognized the need for caution in his dealings with Mr. Guice because of Mr. Guice's status as an unrepresented defendant, and he was specifically advised by Mr. Beasley of the need to be clear with Mr. Guice that the relationship between Mr. Marino and Mr. Guice was adverse.  Yet, in his conversations with Mr. Guice, Mr. Malofiy led Mr. Guice to believe Mr. Marino was not pursuing claims against him and that he was only a witness in the case.  Mr. Malofiy's

39

misconduct also created a risk of serious potential injury to Mr. Guice. Based on Mr. Malofiy's representations, Mr. Guice believed he did not need to respond to the amended complaint and did not, in fact, file an answer, enabling Mr. Malofiy to obtain entry of default. But for Judge Diamond's intervention, Mr. Guice was at risk of having of a default judgment entered against him.

As ODC notes, some courts have reprimanded attorneys for violating their obligations under Rule 4.3. *See Guilbeau*, 35 So. 3d at 215 (holding the applicable baseline sanction for a negligent violation of Rules 4.3 and 8.4(c) that caused "little or no" actual harm to the unrepresented person was a public reprimand); *Rich*, 633 N.E.2d at 1117 (publicly reprimanding an attorney for giving advice to a woman claiming to be the mother of his client's child in connection with paternity proceedings involving his client); *Attorney Q*, 587 So. 2d at 233 (imposing a private reprimand on an attorney who violated Rule 4.3 by advising an unrepresented defendant "[d]on't worry about it" and "[d]on't do anything" when the defendant asked what she should do in response to the summons in a suit the attorney had filed against her).

Other courts, however, have imposed stronger sanctions, particularly where the Rule 4.3 violation was accompanied by other disciplinary violations or aggravating circumstances. *See Mascarenas*, 103 P.3d at 345, 349-50 (imposing a three-month suspension followed by twelve months of probation on an attorney who violated Rule 4.3 by advising his client's mother that it was "legal" and "ok" for her to sign a promissory note, which the lawyer sought to ensure payment of his own fee, and for engaging in other misconduct in his billing practices); *Pautler*, 47 P.3d at 1183-84 (imposing a three-month suspension, stayed during a twelve-month probationary period, on a prosecutor who violated Rules 4.3 and 8.4(c) by misrepresenting that he was a public defender as part of an attempt to secure an unrepresented murder suspect's

surrender without taking any steps to correct the misunderstanding, even after the suspect had been arrested); *In re Michelman*, 616 N.Y.S.2d 409, 412 (N.Y. App. Div. 1994) (imposing a three-year suspension on an attorney who gave advice to two birth mothers in connection with private placement adoptions in which he represented the adoptive parents where the attorney had a history of similar misconduct). We note that the American Bar Association's *Standards for Imposing Lawyer Sanctions* regarding improper communications with individuals in the legal system provide that "suspension is generally appropriate when a lawyer engages in communication with an individual in the legal system when the lawyer knows that such communication is improper, and causes injury or potential injury to a party or causes interference or potential interference with the outcome of the legal proceeding." ABA, *Standards for Imposing Lawyer Sanctions* § 6.32 (1986, amended 1992).

In our view, there are a number of aggravating factors that make a reprimand an inadequate sanction in this case. Although we recognize that Mr. Malofiy made some effort to seek guidance regarding his ethical obligations, his approach of putting Mr. Guice on hold and briefly conferring with Mr. Beasley underscores that his focus was on obtaining an affidavit rather than complying with the ethics rules. Moreover, Mr. Malofiy failed to heed Mr. Beasley's advice, obscuring rather than clarifying the adverse relationship between his client and Mr. Guice.

While Mr. Malofiy has no prior disciplinary record, his litigation conduct in this District gives us cause for concern about his professionalism. As he readily admitted, his discovery misconduct in the *Marino* action "was unprofessional, lacked civility, violated the discovery rules, [and] violated the spirit of discovery." Disciplinary Hr'g Tr. 225. We expect civility and professionalism from all counsel. The Rules of Professional Conduct prohibit lawyers from

41

engaging in conduct intended to disrupt any proceeding of a tribunal, including a deposition, *see* Pa. R. Prof'l Conduct 3.5(d) & cmt. 5, and the type of abusive conduct that occurred in the *Marino* action will not be tolerated and may very well lead to serious discipline in future cases.

Mr. Malofiy's testimony at the disciplinary hearing, including his refusal to acknowledge that his conduct toward Mr. Guice was in any way inappropriate, gives us pause about his fitness to practice in this Court. As we have noted, we are troubled by Mr. Malofiy's belated disclosure of a newly discovered recording and transcript of his second phone conversation with Mr. Guice on the eve of the disciplinary hearing, more than a year after he produced a partial recording and transcript of the same call on the morning of the sanctions hearing. More troubling is the fact that Mr. Malofiy at no time made any effort to locate this more comprehensive "backup" recording, even though he knew the recording had been made. We are most troubled, however, by Mr. Malofiy's reaction to the expanded transcript at the disciplinary hearing. Whereas the partial transcript Mr. Malofiy produced at the sanctions hearing memorialized only Mr. Guice's assent to the affidavit Mr. Malofiy had prepared for him, the extended transcript captures the tone and flow of a conversation in which Mr. Malofiy erased any prior suggestion of adversity and persuaded Mr. Guice that he and Mr. Marino were on the same side. The extended transcript corroborates Mr. Guice's account that Mr. Malofiy told him that he and Mr. Marino were "cool" and that Mr. Marino was not "coming after [Mr. Guice], it's everyone else." *See* Sanctions Hr'g I Tr. 23. Nevertheless, at the disciplinary hearing, Mr. Malofiy appeared to believe the new transcript pages were exculpatory:

> And so I never knew that that [backup recording] actually made it onto our system or we had that. If I did, I would have—I don't think I would be here today and that would have been the end of it. And so when I found that I was very excited to share that with you and also hand deliver it to [ODC].

42

Disciplinary Hr'g Tr. 127.  Mr. Malofiy's insistence that he did nothing wrong in his dealings with Guice, even when confronted with a transcript that shows otherwise, is a significant aggravating factor in this case.

Upon consideration of all of the foregoing factors, and mindful that the purpose of attorney discipline is "to protect the public from unfit attorneys and to maintain the integrity of the legal profession and the judicial process," *Office of Disciplinary Counsel v. Price*, 732 A.2d 599, 606 (Pa. 1999),[30] we are not persuaded a reprimand is a sufficient sanction here.  Rather, we recommend that Mr. Malofiy be suspended from practice before this Court for three months and one day.[31]

IV.  **CONCLUSION**

For the reasons set forth above, we conclude the record establishes by clear and convincing evidence that Mr. Malofiy violated Pennsylvania Rules of Professional Conduct 4.1(a), 4.3, 8.4(c), and 8.4(d) in his dealings with Mr. Guice in the *Marino* action.  Upon consideration of the entire record, we believe the appropriate sanction for Mr. Malofiy's misconduct is a suspension from practice before this Court for three months and one day.

Accordingly, we make the following recommendation.

---

[30] *Accord In re Mitchell*, 901 F.2d 1179, 1183 (3d Cir. 1990) (recognizing the purpose of attorney discipline is "to protect the public and the administration of justice from lawyers who have not discharged, will not discharge, or are unlikely to discharge their professional duties to clients, the public, the legal system, and the legal profession." (quoting ABA, *Standards for Imposing Lawyer Sanctions*, Standard 1.1 (1986))).

[31] *See* Local R. Civ. P. 83.6, Rule VII(A) ("An attorney suspended for more than three months . . . may not resume practice until reinstated by order of this court.").

43

## RECOMMENDATION

Having found that Francis Malofiy violated Pennsylvania Rules of Professional Conduct 4.1(a), 4.3, 8.4(c), and 8.4(d), we recommend that he be suspended from practice before this Court for three months and one day.

_____
John R. Padova, J.

_____
Legrome D. Davis, J.

_____
Juan R. Sánchez, J.

44