## <u>EXHIBIT I</u>

**Supplemental Redacted Version of Reply**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:

Rental Car Intermediate Holdings, LLC,[1]

Reorganized Debtor.

Chapter 11

Case No. 20-11247 (MFW)

(Jointly Administered)

**Ref. D.I. 190 & 214**

**Status Conf. Date: January 4, 2022, at 2:00 p.m. ET
Hearing Date: To Be Determined**

## CLAIMANTS' REPLY IN SUPPORT OF MOTION TO DEEM CLAIMS TIMELY OR FOR EXTENSION OF GENERAL BAR DATE UNDER RULES 3003(c) AND 9006

On December 6, 2021, certain "Group 3" False Police Report Claimants, by and through

their applicable undersigned counsel,[2] filed a motion [D.I. 190] (the "Motion") for entry of an

order deeming their proofs of claim timely filed, and, accordingly, overruling the Reorganized

Debtors' 21st Omnibus Objection [Case No. 20-11218, D.I. 5898] as to those proofs of claim. The

Reorganized Debtors (collectively, "Hertz" or the "Debtors") objected to the Motion on December

---

[1]  The last four digits of the tax identification number of Reorganized Debtor Rental Car Intermediate Holdings, LLC ("RCIH") are 2459. The location of the Reorganized Debtors' service address is 8501 Williams Road, Estero, FL 33928. On September 28, 2021, the Court entered a final decree closing each of the chapter 11 cases for The Hertz Corporation and its affiliated reorganized debtors (collectively, the "Reorganized Debtors") other than RCIH's chapter 11 case. Commencing on September 28, 2021, all motions, notices, and other pleadings relating to any of the Reorganized Debtors shall be filed in RCIH's chapter 11 case, Case No. 20-11247 (MFW).

[2]  The Law Firm Francis Alexander represents all of the False Police Report Claimants. Susman Godfrey LLP jointly represents the Claimants listed in Exhibit A2 attached to the Motion as well as Janette Brown and Tyresha Caudle. Faegre Drinker Biddle & Reath LLP are Bankruptcy Counsel representing all False Police Report Claimants. Ciardi Ciardi & Astin are Bankruptcy Counsel representing all False Police Report Claimants. Farnan LLP is local Delaware counsel in the Delaware Superior Court action.

20, 2021 [D.I. 214] (the "Objection"). In further support of the Motion and in response to the Objection, the Claimants[3] respectfully file this reply (the "Reply") and represent as follows:

## PRELIMINARY STATEMENT

1.      The Motion and Group 4 Motion [D.I. 193] alone recounted the stories of almost fifty victims who have submitted sworn declarations explaining how Hertz grievously harmed them. Indeed, numerous victims have been arrested even after Hertz filed for bankruptcy relief in May 2020. These victims—as well as those in Groups 1 and 2—had their reputations destroyed and defamed. They were frequently arrested *at gunpoint* by officers who thought they were dealing with dangerous criminals. Many were thrown in jail. Many were prosecuted for serious crimes. Careers were destroyed. Families were torn apart—indeed, the mother of a two-month-old child was kept in prison for 40 days. Yet the theme of Hertz's Objection is that it doesn't care because the problem is "*de minimis*." Obj. ¶ 3. Its public statements dismiss the victims as "very rare."[4] But as one news broadcast commented, "very rare is still a large number of people," and "I want to know Hertz's definition of 'isolated incidents.'"[5]

2.      Hertz now admits that it reports *thousands* of its own customers for auto theft each year. And all of those theft reports—implicating customers in serious, life-destroying criminal proceedings—are generated with the same bogus system plagued by the same systemic problems. Hertz does not adequately investigate the rental. It does not communicate with local offices that know the renters and process extensions. It presents false information about the renter's rental

---

[3]     Except where otherwise indicated, all capitalized terms used in this Reply shall have the meanings ascribed to them in the Motion.

[4]     *See* https://www.cbsnews.com/video/customers-allege-rental-car-giant-hertz-had-them-falsely-arrested-some-jailed-for-stealing-cars/#x.

[5]     *See* https://www.cbsnews.com/video/claims-are-mounting-against-hertz-from-customers-who-say-they-were-wrongfully-arrested-for-rental-car-theft/.

2

history so that it looks like this is the renter's only rental ever. It does not tell the police about critical contacts with the renter. It omits rental extensions and backdates the vehicle due date. It tells the police the renter never paid for the rental, *all while typically receiving payment in full the day it reports the theft.* And to top things off, Hertz openly admits to a corporate policy of refusing to correct or withdraw false and misleading theft reports after filing them.[6] Hertz's only response to the many sworn declarations from victims and reams of evidence submitted with the Motion is that "[i]t is axiomatic that unproven and disputed allegations, like those asserted by Movants, are not evidence." Obj. ¶ 58. The Objection does not even attempt to engage with the evidence submitted with the Motion, nor does it specifically deny that the thousands of theft reports Hertz files each year suffer from the systemic problems the Claimants have extensively detailed.

3.    Instead, Hertz trains all of its focus on a single aspect of the Claimants' evidentiary presentation—related prepetition claims against Hertz. Hertz offers no evidentiary support for its asserted "ratio," but even taking it at face value it supports the Claimants. Hertz's own statistics reveal a "ratio" *five times higher* than in *New Century*, *two times higher* than in the Seventh Circuit's *Fogel* decision (which found known creditors), and almost certainly *hundreds if not thousands of times higher* than in the Second Circuit's *Motors Liquidation* decision (which found known creditors). What is more, the ratio cannot be taken at face value––even if supported with evidence Hertz currently declines to offer—because it is significantly misleading. Hertz suppresses the numerator by omitting an untold number of claims involving settlements or claims resolved through alternative dispute resolution. Further still, it ignores demand letters and other statements

---

[6]    Sam Wood, "Bankrupt Hertz is Still Wrongly Accusing Customers of Stealing Cars," Page A1,      Philadelphia      Inquirer      (Aug.      3,      2020),      available      at https://www.inquirer.com/business/retail/hertz-stolen-car-grand-theft-auto-malofiy-bankruptcy-lawsuit-20200803.html.

3

of intent to sue Hertz for claims well within statutes of limitations. Hertz likewise essentially doubles the relevant denominator in calculating its "ratio" by adding in types of theft reports separate from those affecting the Claimants. With these issues corrected, the "ratio" will grow significantly.

4.     In any event, the prepetition lawsuits are just one brick in the Claimants' significant evidentiary presentation. Hertz obviously is aware of its own conduct, and the Claimants have presented significant (and presently unrebutted) evidence that *thousands* of theft reports Hertz files against persons like the Claimants are false and misleading as a matter of practice and design. Hertz cannot elude the grievous injuries that it caused to the Claimants—and countless others— by asserting that too few victims caught on quickly enough to sue. Indeed, the Motion already documents many third parties (including law enforcement) telling Hertz about these problems— all without the Claimants having the benefit of any discovery.

5.     Yet Hertz continues to do nothing and instead dismisses the victims. All the while, still more lives are continuing to be destroyed on an ongoing basis. How many more of those theft reports are latent traps for people like Paula Murray—who was given an extension by the local branch in error, returned the car immediately when the local branch called her, and confirmed with a Hertz investigator that the car had been returned and that she was in the clear, only to be arrested out of the blue years later (in 2021) because Hertz had apparently reported her for theft anyhow? How many more victims are out there like Manuel Garcia—who was reported for theft *after the November 4 hearing in this Court*? How many people are *currently* facing arrest warrants, sitting

ACTIVE.135112366.08

in jail, or being prosecuted based on Hertz's bogus theft reports? This has to stop, and it has to stop as soon as possible.

6.    This Reply responds to the Objection and further details why the Motion should be granted. Part I argues that the Claimants received insufficient notice of the General Bar Date. Section I.A explains why the victims of Hertz's systemic false-police-report practices were known creditors. Hertz does not meaningfully rebut any of the Claimants' cited case law. It does not specifically contest any of the systemic problems underlying *thousands* of theft reports it admits to filing each year. Nor does Hertz deny the evidence that it has an internal list of those affected by theft reports, that it works with its insurer to manage and track claims based on false theft reports, or even that it has a special fund to compensate victims of these systemic problems. On these facts—not to mention further facts that will be unveiled with discovery over disputed factual issues—the victims are known creditors. Section I.B further explains that Hertz's books and records will reveal even further evidence that particular Claimants are known creditors, and it explains how most Claimants informed Hertz of the substance of their claims.

7.    Section I.C shows that Hertz's publication notice was ineffective even if the Claimants were unknown creditors. To start, the notices failed to comply with the clear requirements of the Bankruptcy Code and Rules, and those failures render publication notice ineffective based on the text of the Code as well as precedent and common sense. *See* Section I.C.i. That issue does not turn on any question of fact and can be resolved expeditiously. Further, Section I.C.ii shows that the published notices, even beyond the legal defects above, failed to satisfy due process requirements because they were not calculated to actually provide notice to persons affected by the proceedings, as required by *Mullane*. Part II explains why Hertz's efforts to rebut the Claimants' excusable neglect arguments are inconsistent with relevant legal standards

5

ACTIVE.135112366.08

and should be rejected. Finally, Part III argues that certain claims do arise postpetition, that the Claimants are not required to seek administrative expense priority for such claims, and that these arguments have not been "forfeited" in this contested matter.[7]

8.    At a minimum, Hertz's response reveals the need for an expeditious hearing and full discovery to determine the full scope of Hertz's knowledge along with the injuries that have occurred. Hertz's response also reveals that *on this record alone*, this Court can find these Group 3 claims timely. *Cf. In re Chicago Newspaper Liquidation Corp.*, 490 B.R. 487, 495 (Bankr. D. Del. 2013) (finding that in the absence of evidence establishing that notice was proper, "due process requires that the Court not time bar the [claimant]'s claims"). The Claimants respectfully request that the Court grant the Motion or, if it concludes that additional factual development is necessary, order accelerated discovery (much of which has already been served) and schedule a prompt hearing.

## ARGUMENT

### I.    Hertz Failed to Provide Claimants with Adequate Notice of the General Bar Date.

9.    Hertz does not contest that the Claimants' claims must be deemed timely if Hertz failed to provide adequate notice of the General Bar Date. Nor does it assert that it provided any notice to the Claimants beyond publishing notice once deep within the midweek editions of several newspapers—notice that lacked essential information required by the Code and Bankruptcy Rules. The Court should deem all the Claimants' claims timely because Hertz failed to provide sufficient notice of the General Bar Date.

---

[7]    The Claimants address this argument last (although it comes first in the Objection) because it applies only to a subset of the Claimants. This Reply leads with the arguments that are sufficient to render all claims timely.

6

## A.     The Claimants Are Known Creditors Because Hertz's False Theft Reports are a Known, Systemic Issue.

10.     The Claimants are known creditors because Hertz knew that the theft reports underlying their claims were systemically flawed. Hertz argues that the "position—that the Debtors should have known of alleged systemic theft reporting issues generally and, therefore, should have provided Movants with actual notice of the General Bar Date—is false." Obj. ¶ 54; *see also* Obj. at 25 ("Hertz Did Not have a 'Systemic' Problem with False Police Reports"). But Hertz is wrong on the law and the facts.

11.     As for the law, Hertz cannot distinguish the Claimants' cited precedent. It attempts to distinguish *Fogel* by arguing that the case "discussed the pipe in question as if no party disputed that it was, in fact, defective," Obj. ¶ 57 (citing *Fogel* v. *Zell*, 221 F.3d 955, 960–62 (7th Cir. 2000)).[8] But Hertz offers no response to the actual import of the case—that awareness of the defective pipe made purchasers known claimants. And *at best* this would tee up the factual question of whether the theft reports—like the pipes—were defective. Hertz makes no attempt whatsoever to distinguish *In re Motors Liquidation Co.* beyond two sentences recounting a handful facts of the case. 829 F.3d 135, 159-161 (2d Cir. 2016); *compare* Obj. ¶57 (two sentences of facts) *with* Mot. ¶¶70–71 (explaining extensively why the case before this Court tracks facts leading to the Second Circuit's decision). And it suggests that *In re Thomson McKinnon Securities Inc.* applied a rejected legal standard because it said, "If the debtor knows, or should know, of its potential

---

[8]     In a footnote, Hertz attempts to distinguish *Fogel* for "discuss[ing] the claim in question as arising when the harm occurred … rather than when the claimant was exposed to the debtor's conduct." Obj. at 28 n.23. It makes no effort to explain how that would be relevant to the known creditor issue; indeed, if claims arise *later* in time that would only make persons *less likely* to be known creditors. In all events, *Fogel* simply discussed various views on the same sorts of difficult conceptual questions decided in *Grossman's* but explicitly held, with respect to these timing questions, that "[t]his we need not decide." 221 F.3d at 962. Because the Court did not need to (and in fact did not) resolve that question, it is not a valid basis to distinguish the case.

ACTIVE.135112366.08

liability to a specific creditor, that creditor is a known creditor." 130 B.R. 717, 720 (S.D.N.Y. 1991). That argument seemingly targets the "*or should know*" language. To the extent Hertz suggests that a "should know" standard has been rejected by the Third Circuit, it is wrong. *See In re Trans World Airlines, Inc.*, 96 F.3d 687, 690 (3d Cir. 1996) ("[A] diligent search of TWA's records by its bankruptcy counsel would, *or at least should*, have revealed the Berger claims." (emphasis added)); *see also In re Motors Liquidation*, 829 F.3d, at 159–161 (explaining that "reckless disregard of the facts [is] sufficient to satisfy the requirement of knowledge"). And Hertz cannot distinguish *In re Geo Specialty Chemicals Ltd.*, which held that victims of a price-fixing conspiracy were known creditors, reasoning that "[b]ecause [the debtor] knew about the conspiracy, it follows that [it] knew or could have easily ascertained the identity of all of the upstream and downstream purchasers . . . affected by its alleged conspiracy . . . ." 577 B.R. 142, 192 (Bankr. D.N.J. 2017); *see also id.* at 191 (debtor "knew about the conspiracy it originated and knew *or should have known* about any contingent antitrust claims" (emphasis added)).[9]

12.    The debtor in *Fogel* sold defective pipes. The debtor in *Motors Liquidation* sold vehicles with defective ignition switches. The debtor in *Thomson McKinnon* failed to deliver securities to a purchaser. The debtors in *Geo Specialty* fixed prices. And Hertz filed false and misleading theft reports. The victims of those false and misleading theft reports, as with the victims in *Fogel, Motors Litigation, Thompson McKinnon,* and *Geo Specialty,* are known creditors.

_____

[9]    Hertz's only mention of *Geo Specialty* is in its response to the Claimants' unknown creditor arguments, where it argues that "*Tillman,* like *Motors Liquidation* and *Geo Specialty,* stands for the proposition that debtors cannot use publication notice to shed liability for acts or omissions that they have hidden from the world." Obj. ¶ 78. It's true that publication notice cannot be used to shed liability for misconduct hidden from the world—like, for example, Hertz's hidden and continuing false theft reports that it continues to suggest are true and unproblematic—but the effort to pass over *Geo Specialty* with an argument about publication notice to *unknown* creditors does not respond in any way to the holding of the case that victims of systemic misconduct are *known* creditors.

8

13.     As for the facts, the Objection directly tees up disputed questions of fact, including whether Hertz knew or reasonably should have known about the systemic issues underlying its theft reports (and the extent of those issues). The Claimants look forward to obtaining discovery, presenting even more evidence to support their arguments, and ultimately proving these facts to the Court at a future evidentiary hearing. Regardless, Hertz's treatment of fact issues is utterly inconsistent throughout its briefing. On one hand, it offers general denials along with unsupported (and misleading) summary statistics, which it argues provide a basis upon which "the Court should determine, *as a matter of law*, that Movants and the other individuals identified in the Late Claims were unknown creditors." Obj. ¶ 69 (emphasis added). (Indeed, Hertz did not submit a single declaration or piece of evidence supporting its Objection.) But on the other hand, as to the Motion—which is backed by reams of cited exhibits and dozens of sworn declarations from victims in Group 3 and other groups—Hertz argues that "[i]t is axiomatic that unproven and disputed allegations, like those asserted by Movants, are not evidence." Obj. ¶ 58.

14.     Critically, the Objection does not directly address or deny the existence of crucial pieces of evidence demonstrating that the Claimants are known creditors. For instance, Hertz does not deny that "**Hertz had an internal list of customers who were reported for theft.**" Attachment N (Murray Decl.) ¶ 13 (emphasis added).[10] (In fact, the specific data asserted in the Objection makes it quite obvious that Hertz has such a list.) Nor does it deny that the problems were "**so pervasive that Hertz had established a special fund to compensate the victims**" of false police reports, [Case No. 20-11218, D.I. 1081, Ex. A., Declaration of Earl Holland ¶ 9

---

[10]     Unless otherwise noted, citations to attachments refer to attachments to the Declaration of Francis Malofiy, which was filed as Exhibit D to the Motion, or the Supplemental Declaration of Francis Malofiy, which is attached as Exhibit A hereto. The attachments to the Declaration and Supplemental Declaration are tabulated consecutively for ease of use; the Supplemental Declaration starts with Attachment AO.

9

(emphasis added)].[11] It does not deny that **it uses third-party claims administrators, in connection with its insurer, to track legal claims associated with false theft reports.** [*see* Case No. 20-11218, D.I. 1071, Ex. A, Declaration of Frederick Jekel ¶ 4].[12] And it does not deny that certain law enforcement agencies had recognized the problem and stopped accepting theft reports from Hertz. *Compare* Mot. ¶ 64.f, *with* Obj. ¶ 58 (declining to address law enforcement comments and any of the Claimant declarations). These unrebutted facts, each supported by sworn declarations or other evidence, completely undermine Hertz's *ipse dixit* that there was no systemic problem underlying its theft reporting.

15.     Further, the *thousands* of theft reports Hertz admits to filing against customers each year are plagued by systemic problems. The Objection does not address any of these systemic problems (or specifically deny that they exist). And it is worth explaining again exactly what some of those problems are. When Hertz reports a theft, it generates and delivers to the police a "theft package." The processes and policies that produce these theft packages are severely flawed, and result in false, misleading, incomplete, and unverified police reports. The systemic problems include:

---

[11]  Hertz further doesn't deny that an employee told Earl Holland that the false theft reports were "a known problem with the company." [Case No. 20-11218, D.I. 1081, Ex. A., Declaration of Earl Holland].

[12]  The Claimants cited *In re J.A. Jones, Inc.* for a case where preparations respecting claims with an insurer weighted substantially in favor of a known creditor finding. 492 F.3d 242, 250-52 (4th Cir. 2007). Hertz responds simply that known creditor determinations are "a totality-of-the-circumstances, case-specific inquiry . . . [a]nd the facts of that case are unlike any facts here." Obj. ¶67. But the core point in the Fourth Circuit's reasoning was that preparations for liability with an insurer made it far more likely that the debtors knew of a liability and should have provided notices to holders of claims creating that liability. The (undenied) evidence that Hertz was working with third-party insurers and their affiliates to track this category of known liabilities substantially supports a known creditor finding, just as it did in *J.A. Jones*.

10

16.   **Failure to Investigate**: Hertz's internal policies purportedly require two levels of investigation before a theft report goes to the police: one at the national level and one at the local level by a Corporate Security Manager. [*See* Case No. 20-11218, D.I. 5032-2 ("Hertz Policy W7-02"), § (a)(17))]. The first level of the investigation is extremely incomplete. It consists only of reach-outs to the renter from Hertz's Vehicle Control, but usually does not assess whether the renter extended with or called Hertz's extension, billing, or roadside departments (for example, if the renter asked Hertz to tow a vehicle); does not look at payment; fails to obtain information from the local office, including notes about extensions and conversations; and fails to investigate (and document) when a customer has rented through insurers or rideshare companies. All of this information is critical because insurance rentals, rideshare rentals, paying customers, and renters who contact the company are unlikely to be thieves. Therefore, the second level of investigation at a local level by a Corporate Security Manager, which can look into these specific issues *and actually look for the vehicle itself*, is critically important. Hertz has admitted that the local investigation is a critical safeguard against false police reports. *See* Attachment AR, Wilkerson Testimony, at 34:16–37:17. But Hertz has cut personnel in corporate security to save costs and told the remaining Corporate Security Managers to skip the local investigation and not investigate or verify the contents of the theft package. The following testimony was elicited at the *Grady* trial from Richard Livingston, Corporate Security Manager for the mid-Atlantic region:

> COUNSEL:   Is it your testimony that you don't go to the location and question any of the Hertz employees when you receive a theft package?
>
> MR. LIVINGSTON:   That's my testimony, yes.
>
> COUNSEL:   Why?
>
> MR. LIVINGSTON: Because I mean the package has been completed, all the reports have been reviewed, I guess, by OKC. **And my marching orders are to report the car stolen** when I get

11

> the -- again, I do look at it for everything being accurate, as far as I can tell, within the report itself.
>
> COUNSEL: **Yeah. But you don't do any independent investigation?**
>
> MR. LIVINGSTON: **I do not.**
>
> COUNSEL: **You don't do any check?**
>
> MR. LIVINGSTON: **I do not.**

Attachment AS, Livingston Testimony, at 195:17–196:8 & 115:05–117:11. (emphasis added). Mr. Livingston's Assistant Corporate Security Manager confirmed the same: "I didn't personally provide that information [in the theft package]. It was sent to me [by Vehicle Control], and I just reported it stolen as per Hertz policies." Attachment AT, Graeber Testimony, at 19:6–14. And Hertz's Vehicle Control training manual requires immediately reporting the theft package received from the national team rather than investigating its allegations:

---

d.  Renting Location Responsibilities

> 1)  Immediately report the theft to local law enforcement upon receipt of the theft package

---

Attachment AH, at 4 (excerpting DASH Vehicle Control Representative Desktop Procedure, at 12). The consequence of these policies is that in all cases the police are given a wholly incomplete theft report that does not reflect the actual course of the rental. The reports are unverified and uninvestigated—notably lacking information in possession of the local rental office and several key corporate departments.

17.     **False Rental History Information**. The theft packages given to police present false and misleading information to the police, which can be seen clearly through the case of Group 1 Claimant Hanna "John" Ayoub, for whom counsel have obtained significant records to date. (The Claimants bringing the instant Motion have not obtained any discovery to date.) The

12

theft packages—every single one viewed to date—report that the accused has zero prior rentals and is not part of any rewards program even if that is not true. For instance, John Ayoub's theft package said:

**# Prior Rntls**       **Gold**

0            N

[*see* Case No. 20-11218, D.I. 5032-11, Ex. 10, p.2 ("Ayoub Theft Package")]. In reality, Mr. Ayoub was a returning renter and part and a "Gold" rewards member with Hertz (No. 986201102). *See* Attachment AH. These false statements to police are important pieces of information in considering a theft accusation—a true thief is very unlikely to have returned earlier rentals and be part of the premier rewards program offered by the rental company.[13]

18. **False Due Date Information/Deleted Extensions**. The theft packages also falsify and misleadingly present the rental's due date, while deleting rental extensions and failing to tell law enforcement of a customer's attempts to extend the rental. Return to John Ayoub's case. The theft package Hertz filed against Mr. Ayoub says that his vehicle was due on April 16, 2019:

**Due Date/Time**
**2019/04/16 18:26**

Ayoub Theft Package, at 2. In actuality, Mr. Ayoub called and extended his rental weekly on April 15, April 22, April 29, May 6, May 13, May 20, and May 28. [*See* Case No. 20-11218, D.I. 3604, Exhibit A, p.22, ¶ 3 ("Ayoub Declaration").] That is provable because Mr. Ayoub recorded his phone calls extending the rental. In reporting Mr. Ayoub for theft, however, Hertz *deleted these*

---

[13] Information available to date suggests that theft reports relating to insurance rentals—where an insurance company arranges a rental for the renter—also systemically (and falsely) say that the rental was not an insurance rental. Further discovery and investigation should shed light on that related issue.

*rental extensions,* backdated the due date of the vehicle, and did not report to the police that John repeatedly called to extend (and did extend) the rental.[14] These rental extension deletions and omissions from the theft reports are done automatically by Hertz's system and are not visible to local branches or even Hertz's national employees. Those systems apply to all overdue-vehicle theft reports. Critically, because Hertz's systems automatically delete rental extensions, even Hertz employees do not know whether or not an extension was erased. That means that Hertz's theft packages systemically cannot tell police whether or not a renter called to extend the rental.

19.     **False and Misleading Payment Information.** Whether an accused "thief" has paid for and provided valid payment means for the rental is obviously an essential part of evaluating a potential theft. Hertz, however, has a practice of issuing false and misleading payment information when it accuses customers of theft. Return to Mr. Ayoub's case. Hertz reported to the police that he had a "Net Due" on his rental of $2,309.44, suggesting that he had absconded with the rental and refused to pay for it (and further reported that charges to his card were "denied"):



Ayoub Theft Package, at 2, 14. But the truth is that Mr. Ayoub gave Hertz a valid card and was charged (and he paid in full) the $2,309.44 on the very day the "theft package" was generated. Ayoub Declaration ¶ 7. This was not an accident or a one-off—this practice of reporting to police

---

[14]   Customers extend rentals in person or by phone, and during that interaction the customer will be told the extension goes through. After that occurs, Hertz then pings the customer's bank card with an "authorization hold" to verify the card is active. The "ping" on the renter's account further suggests to the customer that he or she has a valid extension. But if that hold is denied for any reason, Hertz's system erases the extension and backdates the due date of the rental. No trace of the customer contact and extension attempt or deletion remain in Hertz's system.

14

that victims have not paid for the rental only to charge their cards and receive payment immediately after filing the theft report is written in Hertz's Policy W7-02(D). It applies to all the overdue-vehicle theft reports filed by Hertz:

**D.** **Closing Associated Rental Agreements**

1. The OKC Vehicle Control Department (North America), Car Control Department (Brazil), Location/Branch Manager (Europe, Australia and New Zealand) must close the RA after verifying the Theft Vehicle Report with police. Therefore, North America and Brazil rental locations must not close the RA or perform an exchange on the RA.

2. Once confirmed that the theft/conversion has been reported to the police, the responsible management (as listed above) must Close RAs in the ASAP/TAS/CARS+/HTZRENT Post Return or BCHCLOSE applications by:

   - Entering an approximate 'mileage in', estimating 70 miles/100 kilometers per day.
   - Recording the date the vehicle was reported stolen in the 'return date and time' field.
   - Ensuring the Rent and Return locations are the same.
   - Applying the 'best' or lowest rate available.

Hertz Policy W7-02 § (D). In other words, Hertz's practice for *every overdue-vehicle theft report* is to give the police a theft package claiming massive unpaid bills and denied cards (which is overwhelmingly material to evaluating theft) while Hertz knows that it has the ability to charge the customer and in fact immediately does so and receives payment.[15]

20. **Omitted Renter Contacts**. The theft reports routinely omit important contacts with the renter, including not only extension requests, but also critical conversations with and statements made to local offices, Hertz Roadside towing services, investigators, and other employees and agents of Hertz. Mr. Ayoub's theft package, for example, omits full responses to the investigator, his seven rental extensions, and his repeated other contacts with the local office and corporate departments. Communications from the renter are obviously critical in assessing

---

[15] Hertz just recently reiterated this practice to a customer. [*See* Meado Decl. ¶37, D.I. 194-1, Group 4 Motion Attachment L ("We have reported [the car] as stolen to the authorities. Our process once a contract is severely overdue is to close the contract and charge the customer while we continue to work on recovering our property.")].

whether the renter is a likely thief, but Hertz routinely fails to give the police this exonerating information.

21. **Deletion of Records.** Hertz's policies (obtained to date) require maintaining rental records for seven years when a theft report is filed. But, based on investigation and prior judicial orders, Hertz deletes critical records relating to theft reports almost immediately after filing the report. These records, of course, would contradict the incomplete, false, and misleading theft reports. And the lack of records can make it much more difficult (if not impossible) for a victim to exonerate herself. In the *Grady* trial, Hertz was severely sanctioned for this conduct, including in a Court order that held:

- "The Hertz Corporation admits 'purging' and destroying Plaintiff's contract and payment information; had such information . . . not been destroyed the information it contained would have . . . shown that Grady did not steal the car and that she had done nothing criminal."
- "Hertz is precluded from introducing any evidence, testimony, or argument concerning the lack of electronic or physical contract renewal records."
- "Hertz is precluded from offering any evidence, testimony, or argument contesting that Ms. Grady was charged in full for the car rental."
- "Hertz is precluded from offering any evidence, testimony, or argument to dispute that Grady made 12 phone calls to Hertz numbers between" certain dates.

Attachment AN (*Grady* Sanctions Order), at 1–2. These proven record-deletion practices affect every renter reported for theft. This is far more important than civil sanctions suggest: Hertz deliberately violates its document management policies to deprive victims of evidence that could exonerate them, knowing all the while that the information given to police was false and materially incomplete.

22. **Refusal to Correct or Withdraw Theft Reports.** Not only are the theft reports systemically false and misleading, but Hertz has a corporate policy of refusing to withdraw or correct theft reports after they have been filed. That means when Hertz files a false and misleading

16

theft report in the first instance, and then realizes that it has exonerating information (such as finding that the vehicle had been returned or paid for), it deliberately withholds this information from law enforcement and leaves the victim to fight it out in the criminal justice system based on the original false report. Hertz has admitted this practice to the news: "Hertz has no mechanism to withdraw a criminal referral because, the company spokesperson said, it has to maintain a relationship of 'integrity and responsibility' with law enforcement. 'In the rare instances this happens, if you report a crime, and you later say it didn't happen, then law enforcement tends not to believe you if you retract it or say you were mistaken.' the spokesperson said. 'Hertz's continued good relationship with law enforcement is important.'"[16]

23.    And on December 6, 2021—the day the Motion was filed—Hertz again confirmed this ongoing practice to a Group 4 Claimant. Hertz told the victim: "We are not empowered to withdraw the theft report; *therefore, you must address this matter through the legal system.*" [Meado Decl., at 37 (email from customer service), D.I. 194-1, Group 4 Motion, Attachment L (emphasis added)]. Hertz consequently has a uniform and ongoing policy of permitting false, outdated, and misleading information to form the basis for criminal charges and prosecutions even if it realizes the report was false, baseless, and mistaken.

24.    Put together, the police receive a report asserting theft based on (1) unverified allegations; (2) false rental history information; (3) false and deleted due date information; (4) false and misleading payment information; and (5) omitted facts and contacts with the renter. This false information paints a totally untrue picture for the police, casting a premeditated theft rather than (at *worst*) a civil payment dispute. And then Hertz deletes relevant, exonerating information and refuses to withdraw or correct false and outdated reports. Instead, the victims are forced to survive

---

[16]   *See supra*, note 6.

17

within a criminal justice system primed to give credence to allegations made by a major and well-known company. Many lives have been destroyed because of Hertz's conduct.

25. In fact, counsel just obtained a December 15, 2021 *nolle prosequi* order dismissing criminal charges from a postpetition theft report illustrating some of these systemic problems. *See* Attachment AU. The motion filed by the State of Georgia describes how Bianca DeLoach[17] rented a vehicle from Hertz on October 3, 2020, and that Hertz reported the vehicle stolen on March 25, 2021. *Id.* at 1. Ms. DeLoach was arrested the next day on March 26. She told deputies upon arrest, "I just paid them $3900" but was jailed because she "did not have proof of payment" and was not released on bond until April 4, 2021. *Id.* Prosecutors did not dismiss the felony charges (with court approval) *until December*. By that time, a "thorough and exhaustive review" revealed "a copy of the ... invoice ... showing full payment as of February 25, 2021." *Id.* Further, the "State communicated with a Hertz representative from New Jersey who was unable to explain how the defendant paid in full in February for the vehicle, yet the vehicle was reported stolen." *Id.* What is more, "the State reached out to the Hertz representative on file [seven times between March and November] and was unable to speak with him." *Id.* Putting it all together, the State concluded:

> Based on the defendant's time in custody, the lack of cooperation from any representative of Hertz Rental Car Company, the proof of payment, ... the national claims against Hertz Rental Car Company, the alleged stolen vehicle being in the custody of Hertz Rental Car Company, and the interest of justice, the State respectfully requests that the above felony charge be NOLLE PROSSED.

*Id.* at 2. The court granted the motion. *Id.* The false payment information in the theft report filed against Ms. DeLoach combined with the "lack of cooperation" (and investigation) by Hertz

---

[17] Ms. DeLoach is just one of many individuals whose case counsel is actively investigating and preparing for filing. Counsel anticipates filing a motion similar to the Group 4 Motion on behalf of more victims, including Ms. DeLoach, in the near future.

18

thankfully led to the dismissal of the unwarranted felony charges—but only after Ms. DeLoach was arrested, imprisoned, and ultimately prosecuted for most of 2021. This is happening every day around the country based on the systemic problems identified above.

26.     It is obvious that Hertz is and was fully aware of its own flawed practices. After all, it created and implemented the broken systems described above. And further, Hertz does not deny any of the extensive contacts from law enforcement, media, counsel, and countless victims telling it that the theft reports were false and misleading and explaining those problems in substantially greater detail than what is included above. Mot. ¶¶ 64–65. The Claimants, in other words, have shown that Hertz had notice in spades.

27.     Instead of denying or countering the underlying substance of the systemic issues, the substance of the Claimants' or other victims' cases, or the overwhelming evidence presented that Hertz knew about these issues and took active steps to prepare for such liabilities with insurers and special funds, Hertz hangs its hat on a single asserted statistic. It picks a time frame and asserts that it files about 7,982 (████ ████ ████ 3,365) theft reports each year for four years but that only 56 persons filed lawsuits against it during that time. From that, it calculates a "ratio of only 0.00175"—i.e., .175%—that somehow proves no problem exists with its theft reports.[18] Despite treating this as its primary argument, Hertz offers no evidence whatsoever in support of its assertions.

28.     This argument fails for many reasons. Even taken on its face, the ratio affirmatively supports the Claimants. Hertz's asserted "ratio" is already more than five times higher than the

---

[18]    Notice that every time Hertz describes this case it uses a "ratio," whereas numbers in other cases are described using "percent." This apples-to-oranges comparison increases the perceived difference between the numbers in this case and the other cases by two orders of magnitude by including two extra zeros after the decimal in numbers in this case. (A "ratio" of .00175 is equivalent to .175 "percent.")

19

equivalent number in *New Century*, Hertz's lead citation.[19] It is more than double the "ratio" of prepetition lawsuits in *Fogel v. Zell*, where the Seventh Circuit relied heavily on prepetition lawsuits in finding that pipe purchasers were known creditors when, of "some 10,000 purchasers," "[b]y the time [the debtor] declared bankruptcy, eight purchasers . . . had sued." 221 F.3d, at 958. It is infinitely higher than the "ratio" in *Geo Specialty*, where antitrust victims were known creditors even though it appears *no one* had yet sued. 577 B.R. at 147–49. And it is almost certainly hundreds if not thousands of times higher than the "ratio" in *Motors Liquidation*, where victims of an ignition switch defect were known creditors where "the number of affected vehicles in the United States alone surpass[ed] 25 million," 829 F.3d at 148, but "all or nearly all of those with Ignition Switch Defects" had not yet "sued or manifested a possible intention to sue" when notice was provided. *In re Motors Liquidation Co.*, 529 B.R. 510, 556 (Bankr. S.D.N.Y. 2015) (underlying bankruptcy court opinion).

29.     Hertz's ratio already significantly exceeds that in the cited cases, but a more accurate ratio will be much higher. Hertz significantly suppresses its ratio by skewing both numerator and denominator. The denominator includes types of reports that seemingly have no relevance to the allegations at issue.[20] ▮▮▮▮ cases ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮–▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[19]   Hertz also cites *In re Spiegel, Inc.*, 354 B.R. 51, 56–57 (Bankr. S.D.N.Y. 2006), which is a case involving a single prepetition lawsuit by a third party and (it appears) no other relevant bases for asserting known creditor status. To be clear, the Claimants seek discovery which will allow them to assess the true number of claims Hertz had dealt with prepetition, as well as give concrete numbers to other aspects of the magnitude of the Hertz's systemic problems.

[20]   Hertz hardly defines the various types of theft reports at issue, and the Claimants have not obtained discovery. These arguments are made based on the best understanding of the slim and unsupported statements in Hertz's briefing, but discovery will reveal substantially more about these numbers.

20

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████  Hertz undoubtedly

has records when renters or other persons are arrested in those circumstances (and those victims
are obviously known claimants). Hertz's manipulations of the denominator essentially *double* the
scope of theft reports at issue for the Claimants. Most Claimants fall within the last category, which
Hertz now states for the first time is 3,365 per year. These claims are the police reports that list
"conversion" or "theft by conversion" as the type of theft and that involve a renter who *lawfully
rented from Hertz* in the first instance and for which Hertz has payment information on file.

30.    Turn next to the numerator. Hertz looks only to "filed" lawsuits. In other words, it
seems to immediately exclude all alternative dispute resolutions, all formal and informal out-of-
court settlements, and all other unresolved formal claims or demand letters.[21] This all despite the
fact that Hertz seemingly tracks that information through its insurer and insurer's affiliates. *See
supra*, ¶ 14. Indeed, Hertz already produced in prior litigation a database of claims of false police
reports (in about a week after it was ordered to do so by the court). [*See* Case No. 20-11218, D.I.

---

[21]    To give just one example of the last group, consider Group 4 Claimant Kellan McClellan.
Mr. McClellan was arrested at gunpoint on October 12, 2019. He sent Hertz notices of loss on
January 2 and 8, 2020, as well as a formal demand letter on February 3, 2020, extensively laying
out his claims, his intent to seek compensation, and an offer to settle the case. Group 4 Motion,
Attachment K ¶¶ 14–19 (McClellan Decl.). Mr. McClellan further corresponded with Hertz, Hertz
attorneys, and a claims agent for Hertz at Chubb/ESIS. *Id.* His clearly-asserted claims would
appear to be excluded from Hertz's "ratio." Notably, even after the formal demand letter, Hertz
did not give Mr. McClellan notice of the General Bar Date. *Id.* ¶¶ 20–23.

21

1071. Ex. A, Declaration of Frederick Jekel, at 4.] But it has refused to produce any actual evidence in this Court.[22]

31.     Moreover, the whole premise of Hertz's endeavor is flawed. As a threshold matter, many cases are like those of Paula Murray, who had a police report filed against her in 2016 unbeknownst to her and did not find out about it until she was arrested in 2021. Attachment N (Murray Decl.), ¶ 20. Hertz can give no assurance of how many more Paula Murrays exist from its chosen time period—with a false police report that the renter is unaware of ready to trigger his or her arrest at any time.

32.     Regardless, the proportion of faulty theft reports that Hertz knew to be false or misleading must be viewed along with the severity of the underlying problem. That is an obvious and essential component of the reasonableness inquiry underlying the known creditor analysis. Whatever the true proportion of bogus theft reports ends up being, the problematic theft reports lead to incredibly dire consequences. People have suffered heart attacks and miscarriages. They have lost jobs. They have been arrested at gunpoint. They have been thrown in jail. They have been rendered homeless. Whatever would be the threshold for what Hertz says is "*de minimis*" problems for minor harms, the number of severe harms necessary to demonstrate a systemic problem in this context is much lower.

33.     Equally as fundamentally, existing civil claims are just one of many ways that Hertz knew that its theft reports were systemically false. The Claimants have explained that Hertz designed systems that produce systemically false reports, and Hertz has offered no answer.

---

[22]     It is clear that Hertz's ratio is not an accurate reflection of the scope of the problem or Hertz's notice of the problem. It is, however, an accurate reflection of the scope of information Hertz possesses and its ability to gather detailed information quickly despite its continuing refusal to provide any discovery to the False Police Report Claimants under its now-debunked claim of undue burden.

22

Moreover, how many victims directly told it that the report it had filed was false? How many prosecutions were dismissed because the prosecutor or court saw the theft reports were baseless? How many officers told Hertz that its reports were flawed—and how many counties' law enforcement informed Hertz that they would *no longer act upon its vehicle theft reports in light of these flaws*? How many times did Hertz rent to customers cars that they had previously reported stolen, leading to an indefensible arrest? How often did Hertz realize that it had the car in its possession but decline to withdraw a previously filed theft report? The Claimants stand ready to prove that Hertz overwhelmingly knew (or should have known) that its theft reports were systemically false and misleading.

34.     Finally, even wrongly assuming all else is true about Hertz's self-serving mathematical "analysis," the data show that Hertz could easily give notice. Even Hertz concedes that it "knew" of 56 claims. It hardly disputes—and indeed, cannot dispute—that at a minimum it had knowledge that others believed a systemic problem existed. And in a matter of weeks, it pulled exact numbers of a little over three thousand reports per year. Hertz's own numbers show that the number of persons it would have given notice to is a manageable and easily-accessible data set.

## B.     The Claimants are also Known Creditors Based on Individualized Evidence, Including Contacts with Hertz.

35.     Hertz further attempts to discount or ignore every contact and document the Claimants have presented with a series of shifting standards for when a creditor becomes "known" based on its books and records, including contacts with the creditor. But the more remarkable thing is that Hertz has apparently done nothing to search its own books and records. Hertz proposed this whole "motion" process with specific representations to the Court. At the November 4 hearing, Hertz's counsel offered a promise that, with a new motion and individualized declarations:

> [W]e'll be able to search our records with regard to the specific names and find out whether those names are in our system. If they

23

> are, we might be able to address it. If they're not, we might be able
> to address it.
>
> But our evidentiary presentation is going to be driven in the first
> instance by the filings of the specific motions, with respect to the
> specific claimants who want leave to file a late claim, and then we
> can go through and provide, you know, tailor our evidentiary
> presentation.
>
> . . .
>
> Maybe we can resolve the claims. Maybe we can resolve the late-
> claim issue.

Hr'g Tr. Nov. 4, 2021 at 45:4–13, 46:4–5.[23]

36.     In response, Claimants' counsel reached out to the victims they represent and spent the better part of the last two months gathering documents, preparing new declarations more clearly laying out the facts underlying each claim, detailing Claimants' communications with Hertz, and filing amended, individual proofs of claim (also on behalf of many others). Yet the two-way street where each party would gather evidence so that things could potentially be worked out efficiently didn't materialize. Counsel for Hertz promised that the Debtors would "be able to search our records with regard to the specific names and find out whether those names are in our system." Hr'g Tr. Nov. 4, 2021 at 45:4-8. And he represented that Hertz could do so by mid-November (at the latest). It does not appear that Hertz or its counsel did that. While Hertz cites the number of cases brought against it, it does not say how many of the Claimants it located in its files as part of its investigation. In other words, Hertz researched various numbers and statistics (and then represented them as misleading ratios) but did not reveal the results of the investigation it represented it would undertake regarding the Claimants. Did Hertz have rental records for the Claimants? Did it have the theft packages it filed? Did it have records of any investigation? Did it

---

[23]     A true and accurate copy of the November 4, 2021, hearing transcript is attached as Exhibit B hereto.

24

have records of the contacts described in the declarations? Did it know who was arrested and charged? Did it know the cases that were dismissed? Had Hertz recovered the "stolen" vehicles? Did the Claimants appear on internal lists of theft reports, insurance claims, or other investigation lists? All Hertz offers, now three months after the 21st Omnibus Objection, is that "certain Movants *might* have appeared as customers in the Debtors' books and records." Obj. ¶52 (emphasis added). Which is to say, it offers absolutely nothing.

37.     The Claimants stand ready to obtain those documents and records through discovery. Those records are directly relevant to advancing certain arguments why the claims at issue were reasonably ascertainable. And, as described more fully in the Class Objection Reply, also filed today, the Claimants have already served discovery on Hertz that would address these points. [*See* Motion to Quash, D.I. 61, Objection to Motion to Quash, D.I. 86 (September 2021 discovery requests); Case No. 20-11218, D.I. 1038, Exs. A and B (July 2020 discovery requests)]. The Claimants look forward to analyzing Hertz's books and records relating to their claims upon discovery, which should proceed promptly.

38.     Instead of engaging in a constructive process to help narrow the range of disputed questions, Hertz simply attempts to attack each Claimant's contacts with a series of shifting and incompatible legal standards. In this way, Hertz attempts to discount *every single contact* from a Claimant without bringing any of its own evidence to the table. Again, those contacts are only one component of a larger set of books and records, and facts, in Hertz's possession that will further show that each Claimant is a known creditor. These Claimant-specific questions of fact can only be resolved with discovery because Hertz has declined to provide any books and records in its Objection or in response to pending discovery to date. But even at this juncture, Hertz's arguments can be rejected.

25

39.     To start, Hertz makes a medley of arguments to the effect that it would be just impossible or unreasonable to "sift through myriad (indeed, millions of) customer interactions to try to detect potential . . . claims." Obj. ¶ 68. This is a straw man. Nobody is arguing that Hertz needed to sift through every customer interaction—rather, the argument is Hertz, like the debtors in *Fogel*, *Motors Liquidation*, and *Thompson McKinnon*, knew (or *at a minimum*, should have known) of an issue affecting a subset of its customers whose identities were readily ascertainable from its records. And the Objection's pointed non-denial all but reveals that Hertz maintained an internal list of those against whom it filed police reports. Obj. ¶ 64 ("Movants argue, 'on information and belief', that the Debtors 'had an internal list of customers who were reported for theft.' . . . **Even if true** . . ." (emphasis added)). Indeed, Hertz had no trouble producing an exact list of the number of theft reports it generates per year—a number in the thousands. It was plainly unreasonable under the circumstances for Hertz not to review its books and records one bit with respect to a defined group of customers it had exposed to life-altering criminal consequences, especially when a list of those persons was already available.[24] And this is doubly true in light of the extensive problems and notice of those problems described above and in the Motion.

40.     Relatedly, Hertz attempts to discount actual, documented contacts with specific Claimants on the theory that "even where a potential claimant makes itself known to a prepetition debtor, the circumstances of such contact or the passage of time may render that person an unknown creditor. . . . This is particularly true for a large organization like the Debtors." Obj. ¶ 60. This argument fails on the law, facts, and common sense. There is no "too big to care" exception

---

[24]     Relatedly, Hertz offers several generic descriptions of the "reasonably foreseeable" standard that the Third Circuit rejected in *Chemetron I*. Obj. ¶¶ 65–66. As explained in the Motion and this Reply, the Claimants embrace the standard put forward by *Chemetron* and its progeny; they don't seek to apply a rejected legal standard.

26

to due process that gives a debtor a free pass to ignore actual contacts with creditors, and the cases relied upon by Hertz for this proposition are readily distinguishable.

41.     In *Trump Taj Mahal*, the creditor had a slip and fall on the debtor's premises and filed an incident report prepetition, to which the debtor's claim adjuster responded with a letter offering to reimburse medical bills and provide compensation for distress, and requesting copies of medical bills and a doctor's evaluation of her injury. Civ. A. No. 93-3571 (JEI), 1993 WL 534494, at *1 (D.N.J., Dec. 13, 1993). The creditor never responded to the letter, and this non-response (rather than the size of the debtor's operation or the number of other incident reports it received) was the material fact for the district court in affirming the bankruptcy court's determination that the creditor's claims were "speculative and conjectural" so as to render the creditor "unknown" to the debtor. *See id.* (affirming conclusion that the creditor's claims were "speculative and conjectural, where [the creditor] had filed a prepetition incident report but failed to respond to a letter from debtor's claim adjuster mailed ten months before the bar date").[25] In *US Airways*, the only prepetition contact from the creditor indicating she might have a claim was her filing of a proof of claim in the debtor's prior chapter 11 case, which claim had been both disallowed by order of the court and discharged under the confirmed plan in that prior case. No. 04-13819-SSM, 2005 WL 3676186, *5 (Bankr. E.D. Va. Nov. 21, 2005). The court found that, absent "some affirmative conduct by the creditor subsequent to the discharge evidencing [her] belief that the claim is still alive" (which the court found lacking), the debtor would have had "no

---

[25]     Other courts considering *Trump Taj Mahal* in the known/unknown creditor context have recognized this as the material fact and distinguished it on this basis. *See In re HNRC Dissolution Co.*, 3 F.4th 912, 926 (6th Cir. 2021) (noting creditor had filed an incident report but refrained from further communication and "ignored the debtor's letter seeking to resolve the matter"); *Monster Content, LLC v. HOMES.COM, Inc.*, 331 B.R. 438, 443 (N.D. Cal. 2005) (describing *Trump Taj Mahal* as a case where "the debtor reasonably considered the creditor's potential claims to be abandoned").

27

reasonable ground to believe the claim needed to be scheduled in [its] subsequent case." *Id.* The size of the debtor's business and number of other interactions with potential claimants had literally nothing to do with the result.

42.     Hertz also misrepresents the state of the law as to the information that must be considered in determining whether a creditor is "reasonably ascertainable" by a debtor, which, depending on the circumstances, is not necessarily limited to the debtor's books and records. *Compare* Obj. ¶ 68 *with Chemetron*, 72 F.3d at 347 n.2 ("Although some courts have held, regardless of the circumstances, that the 'reasonably ascertainable' standard requires *only* an examination of the debtor's books and records, without an analysis of the specific facts of each case, . . . we do not construe it so narrowly." (emphasis in original, citations omitted)); *Geo Specialty Chems.*, 577 B.R. at 192 (rejecting argument that the standard for ascertaining known claimants is limited to the debtor's books and records as an "attempt . . . to place a narrow and inflexible standard on the due process requirement that has been expressly rejected by the Third Circuit in *Chemetron*"). And building on this incorrect, books-and-records-only and context-oblivious criterion, Hertz suggests that the degree of contact necessary for a creditor to become "known" is an overt threat to bring a lawsuit. But the primary case relied upon for this proposition (which his non-binding in any event) does not even go so far. The creditors in that case, Lantry and CTB, were co-defendants in a lawsuit brought by Warren, an employee of the debtors, in connection with injuries he sustained on Lantry's farm when he fell from a feed bin that had been manufactured by CTB. *In re Agway, Inc.*, 313 B.R. 31, 36 (Bankr. N.D.N.Y. 2004). The debtors had paid Warren's worker's compensation insurance benefits, including medical expenses, but at the time the debtors served the bar date notice in their bankruptcy proceedings, they had not been named as defendants in Warren's suit, brought in as third-party defendants by Lantry or CTB, or

28

notified that they might be brought into the suit at some point in the future. *Id.* at 39. Under these circumstances, the court concluded that Lantry's and CTB's contingent indemnity/contribution claims against the debtors were "uncertain and speculative" so as to render them "unknown" creditors. *Id.* If anything, *Agway* fits perfectly within the legal framework advanced by the Claimants, because the claims at issue there were not of a kind that would have been reflected in the debtors' books and records, and there were no particular circumstances suggesting it was necessary for the debtors to look beyond their books and records—indeed, unasserted contingent third-party indemnity/contribution claims in connection with a lawsuit to which a debtor is not a party are perhaps the *quintessential* example of claims that are speculative and conjectural. But they are nothing like the Claimants' claims here.

43.     All this being said, Hertz refuses to apply even its own proffered legal standard— i.e., that Hertz can be "too big to care" unless someone actually threatens to sue it—to the Claimants. For example, some Claimants *did* directly threaten legal action, and still Hertz did nothing and now again dismisses their claims. These instances show just how far Hertz is willing to contort legal standards to avoid giving notice to Claimants, to wit:

> A. Britne McClinton told a Hertz representative on October 12, 2018, that "she was going to sue Hertz if the company did not immediately stop claiming she stole a car." Attachment M, ¶ 16. Hertz dismisses this threat because Ms. McClinton did not "identify the Hertz employee," but the threat was conveyed to the *person investigating her case* which would be contained in Hertz's books and records. Moreover, it is absurd to put the burden on Claimants to identify the names of Hertz's employees. Hertz further attempts to dismiss her clear threat of legal action because it "could be reasonably construed as a threat of legal action if calls did not

cease, rather than an assertion of a false police report claim." Obj. Ex. A. But if Hertz reported Ms. McClinton for theft (a fact that Hertz knows but still refuses to reveal), then the intent to bring legal action would be unmistakable.[26]

B. Zanders Pace extensively notified Hertz of the falsity of its theft report against him. Recall that Zanders was in an accident and the vehicle he rented was towed to a repair shop. Zanders told Hertz in mid-July that the car was in a particular repair shop. Attachment P, ¶ 6. On July 24, 2019, after Hertz contacted him to say the car had to be returned, he again told Hertz that the vehicle had been towed to a shop and that Hertz should retrieve it. *Id.* ¶ 9. On July 31, the body shop called Hertz to notify it that the car was in the shop. *Id.* ¶ 13. On August 15, BNY Mellon emailed Hertz to notify it that the repair shop had contacted the bank and that Hertz had improperly abandoned the car at the repair shop. *Id.* ¶ 16. On September 16, 2019—after the filing of the theft report—BNY Mellon forwarded emails from the body shop to Hertz's legal team stating that the report filed against Zanders was "false." *Id.* ¶ 25. Zanders also repeatedly contacted and spoke with Hertz, explaining that the theft report was false and that the vehicle was at the repair shop. He also "threatened to file a civil suit" relating to the false police report and "said that he was going to file a civil suit against Hertz if this was not resolved." *Id.* ¶¶ 27-35. In response to these clear *litigation threats*, Hertz says "Mr. Pace does not identify the Hertz roadside representative to whom he purportedly communicated a legal

---

[26]   Ms. McClinton also gave Hertz ample reason to know that, if it filed a theft report against her, that report was false because she filled out an affidavit saying she had returned the car.

threat"—again, information in Hertz's possession.[27] Hertz further blames Mr. Pace for "his subsequent years of inaction," which it claims "undercut any assertion that he was pursuing a legal claim of which the Debtors should have been aware." But the legal threats were made in September 2019, just months before the May 2020 bankruptcy petition. Hertz cannot discount legal threats because it feels that Mr. Pace should have filed his litigation on its timeline. Indeed, Mr. Pace was *still under criminal prosecution* when he threatened litigation and remained under prosecution until the charges were dismissed on November 4, 2021.[28]

44. It is clear from those examples that Hertz did not (and still does not, apparently) take even bona fide litigation threats seriously. Regardless, Hertz's "threat to sue" standard is not the law. Indeed, Hertz elsewhere concedes that "[a] creditor might be known if a debtor has specific information regarding the creditor's actual injury" (short of a formal litigation threat). Obj. ¶ 65 (citing *In re Placid Oil Co.*, 753 F.3d 151 (5th Cir. 2014)); *accord In re Maya Constr. Co.*, 78 F.3d 1395, 1398 (9th Cir. 1996) (finding creditor was "known" where, despite conflicting statements from the creditor and the creditor's lawyer regarding whether he intended to sue the debtor, the creditor's "state of mind and intention did not obviate [debtor]'s knowledge that it had placed

---

[27]   Mr. Pace communicated legal threats in multiple conversations. As for the 9:03am call on September 17, 2019, audio of the call makes it sound like the Hertz employee identified herself as "Vermika." *See* Attachment P, ¶¶ 28–30 (describing call). As for the 2:58pm call that same day, audio suggests that the customer service representative identified herself as "Tanaya." *Id.* ¶¶ 33–35. Mr. Pace is fortunate to have preserved audio of these conversations, but that should not alter the broader legal point that it is absurd for Hertz to put the burden on creditors to recall the names of Hertz employees they contacted rather than for Hertz to record that information in its own books and records.

[28]   It bears further mention that Group 4 Claimant Kellan McClellan *sent a formal demand letter* to Hertz, and even he was not given notice of the General Bar Date. *See supra*, note 21. It appears that Hertz declined to give any False Police Report claimants notice unless they had filed prepetition litigation—a standard it does not defend in its briefing, presumably because it finds no support in the relevant precedent.

contaminated soil on [creditor]'s land and that, whether he planned to sue [debtor] or not, he had a potential claim"); *Solow Bldg. Co. v. ATC Assocs.*, 175 F. Supp. 2d 465, 472-73 (E.D.N.Y. 2001) (collecting cases, noting "courts dispense with the requirement of actual notice only in cases where a [debtor] does not have in its possession any information sufficient to alert [it] to the existence of a problem underlying a claim in issue"). Short of formal litigation threats, the point is that tort victims can become known creditors by asserting to a debtor that the debtor has engaged in injurious misconduct.[29] And those communications must be viewed in context with other information in the debtor's books and records. Many of the Claimants' communications with Hertz more than satisfy that standard. To give a few examples:

> A. Siobhan Abrams told Hertz Customer Billing and Customer Relations that the company took "[t]he following adverse actions ... against me," including "falsely report[ing] stolen [my rental] to the local police." Attachment A ¶ 14 & p.77; *id.* p.71 (text messages with Hertz investigator saying "Do you have the information on the person who sent the paperwork to the police? Because this was not legal"); *id.* ¶ 11–13 (describing Hertz personnel admitting that Hertz made an error, that it had the car, and suggesting that the "case will be closed"; but the theft report had

---

[29]  Common sense undergirds the Claimants' argument. Consider an individual debtor who punches someone the day before filing for bankruptcy protection. If the victim said, "you just assaulted me," or "you had no reason to hit me," or "you just broke my nose," Hertz's argument would mean that the victim would not need to be given notice of the bankruptcy unless she also said the magic words, "and I'm going to sue you for it." That is absurd. The victim's tort claim is reasonably ascertainable based on her statements (not to mention the debtor's own knowledge of the incident), whether or not she has also threatened to sue. She may at the end of the day decide not to press a claim—it is, after all, her right to decide whether to do so—but the debtor cannot force that choice upon her by declining to give her notice of the bankruptcy proceedings.

already been filed).[30] It is abundantly clear from these interactions that Ms. Abrams had been injured—Hertz filed a police report that she stole a car that she told Hertz was "false" and "not legal."

B. Sean Hurt filed an affidavit with Hertz saying that the car was stolen from him (and consequently that he did not steal the car), contested charges related to the "ongoing" rental with Hertz and through his bank, and told Hertz Vehicle Control "I don't have [the car]. I've been reporting the vehicle stolen since 1/19/2020 and you've done nothing except continue to charge me for the vehicle." Attachment AQ ¶¶ 5, 8, 10, 12. Hertz knew that it nonetheless continued to charge Mr. Hurt and *reported him for theft*. Those are clearly injuries after repeated assertions that the whole basis for the charges and theft report was false. All Hertz says in response is "Mr. Hurt does not state that he asserted a claim or threatened litigation regarding the theft report in these communications," Obj. Ex. A, but this applies the wrong legal standard.

C. Raelena Lewis called Hertz approximately "50 times in March and April 2020 and left messages demanding an explanation" for her unjustified arrest and notifying Hertz "about the false accusation [it made] against her." Attachment J ¶¶ 16–17. Here again, Ms. Lewis told Hertz—just a month or two before the bankruptcy petition—that she had been arrested and that the arrest was based on a "false accusation" Hertz had made against her. Hertz responds only that "Ms. Lewis does not identify any Hertz employees for whom she purportedly left messages, and does

---

[30] Ms. Abrams also threatened litigation in connection with related billing disputes, which Hertz dismisses as "broadly worded mention of legal action," which apparently is not good enough for Hertz to list creditors. Obj. Ex. A.

33

ACTIVE.135112366.08

not state that she asserted a claim or threatened litigation regarding the theft report in these communications." Obj. Ex. A. The first response will be likely be answered by Hertz's books and records and is irrelevant; the second once again ignores Hertz's conceded "injury" standard.

D. Jessica Malone and Jason Cook were arrested in the same incident. Ms. Malone "called Hertz local and corporate repeatedly in April and May 2017, demanding to know what happened and why she and Jason had been falsely accused of car theft. She explained that they both had been arrested and that the accusations were false and should be corrected." Attachment K ¶ 14. In other words, she told Hertz that it caused injury to her and to Mr. Cook—they both had been arrested because Hertz had "falsely accused" them. All Hertz can offer in response is the same faulty responses it gave regarding Ms. Lewis.[31]

45.     As these examples show, Hertz's attempts to pick apart the Claimants' declarations to justify giving no notice to false-police-report claimants except those with prepetition litigation are inconsistent and ineffective. In each of these instances, the Claimant had given Hertz ample information to make clear that he or she asserted that Hertz had falsely reported him or her for theft—that is an injury. Full stop. *Cf.* Obj. at 33 n.27 (arguing that the "*Placid Oil* court accordingly

---

[31]    The listed examples suffice to illustrate Hertz's refusal to apply conceded legal standards to the Claimants. For avoidance of doubt, the Claimants identified in the Motion, including Holly Harris, Lateshia Jenkins, Heather Kasdan, and Marissa White, also gave Hertz clear notice of their injuries for the reasons described in the Motion and their declarations (Attachments F, H, I, & S, respectively). Indeed, cases like Ms. Kasdan's are particularly straightforward. Hertz reported her for theft after she was in an accident and Hertz had promised to retrieve (and tow) the car; Ms. Kasdan never saw the vehicle again. Hertz had all this information in its own records and *still* reported Ms. Kasdan for theft. It didn't need Ms. Kasdan to tell it that the report was false when its own records would make that abundantly clear. Regardless, Ms. Kasdan did repeatedly inform Hertz that she had not stolen the car and did not have the car, and that Hertz had promised to tow it. Further, she actively disputed overcharges based on the "ongoing" rental. *See* Attachment I.

34

'shed additional light on the space between mere foreseeability and books-and-records knowledge by requiring that the debtor possess information regarding a creditor's actual injury, in order for that creditor to be known'"). And Hertz's books and records will likely reveal not only these contacts, but significant other reasons to know of the Claimants' claims from internal records (*e.g.*, recovering the vehicle, requests to tow the vehicle, lack of investigation, deleted extensions, etc.) and contacts from other sources. To give just one example, Kimberli Costabile's declaration describes extensive correspondence from the local branch to corporate explaining that "Kim is indeed renting in good faith" and had arranged to return the vehicle. Attachment E ¶ 10. As another example, Paula Murray details communications where an investigator confirmed that she had returned the car, which would give Hertz every reason to know she had a legal claim based on theft report Hertz filed but never told Ms. Murray about.

46.     In sum, many of the Claimants specifically informed Hertz of the substance of their claims and the core of their injury—that the theft report Hertz had filed or the basis for the theft report Hertz knew it filed was utterly false. Hertz's efforts to ignore those contacts fall flat. But the full scope of Hertz's knowledge of the facts underlying the particular claims of the Claimants will only be revealed upon discovery. The Claimants are prepared to offer further evidence and argument once Hertz (finally) reveals its own books and records relating to the Claimants.

## C.      Hertz's "Publication Notice" Fails Due Process.

47.     There is no dispute that the only notice Hertz provided was newspaper publication. The Objection argues that such notice was sufficient under the Due Process Clause. That is not correct. Hertz all but concedes that its published notice failed to comply with the relevant legal rules. Therefore, the Court can already grant the motion as a matter of law. Moreover, the publication notice was inadequate as a matter of fact, as described in the Motion and below and as

35

will be further shown with discovery and evidentiary presentation at a future hearing, to the extent necessary.

### i. Hertz's Published Notice Was Legally Ineffective Because it Failed To Comply with the Bankruptcy Code and Rules.

48.     Hertz all but concedes that its published notices did not comply with the Bankruptcy Code and Rules. It does not contest that Bankruptcy Rules 1002 and 2002(n) and Section 342(c) of the Bankruptcy Code required that the published notices contain certain pieces of information, including the names of the Debtors and the names under which they did business. There is no real dispute that Hertz failed to include that information in the notices.[32] And the Code, case law, and common sense all direct that the Court can (and should) grant the Motion because the published notices were inadequate as a matter of law.

49.     Hertz nonetheless dismisses the issue as simply a "technicality." It is far from a technicality. It is a requirement. The Bankruptcy Code and Rules provide threshold requirements for such notice specifically to protect the due-process rights of creditors who (like the Claimants) are not part of the bankruptcy proceedings but may have their rights stripped away by those proceedings. In fact, the Code and Rules do not address many aspects of the contents of published notice. Instead, they specify certain core pieces of information—like the name of the debtors and the names under which they do business—deeming those pieces of information not to be "technicalities," but instead necessary elements of every notice. That is an eminently sensible choice—the names of debtors and the names under which they do business are arguably the most

---

[32]     Hertz suggests, without citation to any legal authority, that a web address in the *print* notice could have led persons to find some of the required information from sources other than the notice. But the Code and Rules provide that the notices themselves "shall include" and "shall contain" the required information, not that they can omit that information and instead reference other documents or sources that readers could search out to find that information. 11 U.S.C. § 342(c)(1); Fed. R. Bankr. P. 1005, 2002(n).

important pieces of information on a notice of a deadline for filing claims against the debtors in their bankruptcy proceedings. And Congress has specifically directed Courts not to treat that information as a "technicality." Instead, the Bankruptcy Code says that noncompliant notice "shall not be effective notice." 11 U.S.C. § 342(g)(1). Hertz does not even reference § 342(g)(1) in the Objection or attempt in any way to respond to it. That alone is a sufficient basis for granting the Motion. In fact, statutory history further confirms that the required information cannot be dismissed as a "technicality": an earlier version of § 342(c) provided that "the failure of such notice to contain [the name, address, and taxpayer identification number of the debtor] shall not invalidate the legal effect of such notice." 11 U.S.C. § 342(c) (1996). But Congress specifically amended the Code in 2005 to remove that language. *See H. Rep. Report No.* 109-31, Pt. 1, 109th Cong., 1st Sess., 77 (noting that section 342(c) was amended "to delete the provision specifying that the failure of a notice to include certain information required to be given by a debtor to a creditor does not invalidate the notice's legal effect"). That congressional choice must be enforced and respected.

50. Regardless, calling something a "technicality" does not provide *carte blanche* to avoid the statute. In some sense, all law is a "technicality"—especially so here, when Hertz is relying on the fiction of constructive notice to deprive the Claimants of their rights. If Hertz is trying to strip the Claimants of their rights, it must comply with the statute—"technicalities" and all. Moreover, a substantive point underlies this statutory provision. Because constructive notice rests on the fiction of full disclosure to all interested parties, the disclosure must in fact be complete and in compliance. Otherwise, creditors are barred when notice was statutorily insufficient. Indeed, it is completely missing for most Debtors. Moreover, the Plan purports to bar creditors even from suing *non-debtor* affiliates, such as Hertz Vehicles LLC (the listed "owner" of the vehicle on some

37

theft reports), without even attempting to have provided notice that rights relating to those entities would be affected.[33] Hertz simply cannot invoke the fiction of publication notice without following even the threshold requirements for doing so.

51.    Further, Hertz offers no legal basis for disregarding the requirements of the Code and Rules. In fact, Hertz does not cite *a single case* providing that publication notice inconsistent with the Code and Rules somehow still trumps a creditor's due-process rights. And its efforts to distinguish *Ellett v. Stanislaus*, which held that omitting or misstating required information from a notice renders the notice ineffective even for served notice, fail. 506 F.3d 774, 781 (9th Cir. 2007); *see* Obj. 38 n.29. That *Ellett* involved an "individual" bankruptcy case makes no difference. 506 F.3d at 781 (citing Fed. R. Bankr. P. 1005). And the *Ellett* court did not hinge its decision on the creditor's methods of using the misstated information, as Hertz suggests. It either distinguished or declined to follow cases where the creditor would have been able to protect its rights notwithstanding the defect in notice, instead aligning with cases holding that creditors should not be required to conduct their own search for required information that is missing from bankruptcy notices. *See id.* at 779–81. The court explained precisely why it enforced the Bankruptcy Rules as written:

> Mr. Ellett was in the best position to list the correct SSN on his petition and comply with the additional requirements of Rule 1005 of the Federal Rules of Bankruptcy Procedure. Requiring a creditor to ferret out a debtor's correct identity when incorrect identifying information is provided would be overly burdensome and inappropriate. As stated in *Maya*[ *Constr. Co.*, 78 F.3d 1395 (9th Cir. 1996)], "[the debtor] seeks to free itself of an obligation by means of a federal court judgment." *Maya*, 78 F.3d at 1399. Thus, it is not unreasonable to place the burden on the debtors to ensure that their creditors received proper notice of their bankruptcy filing.

---

[33]    These particular Claimants objected to and opted out of the Plan's third-party release provisions, but the fact that the bar on creditor claims was effectively extended to cover non-debtors underscores the importance of giving proper notice under the statute.

> Here, due to Mr. Ellett's negligence in listing an erroneous SSN on
> his bankruptcy petition and § 341(a) notice, proper notice was not
> provided to the FTB.

*Id.*, at 781. That holding did not turn on how the creditor would have used the SSN had it been

correctly provided. The Code and Rules, as the Ninth Circuit held, place the burden on debtors to

provide legally compliant notice. And, if anything, that burden should be enforced with extra vigor

when protecting claimants who did not receive *any* notice and are instead having their rights

extinguished by a legal fiction. Hertz failed to meet its burden of providing notice that complied

with the rules. And, in addition to the unrebutted statutory command of § 342(g)(1),[34] precedent

and common sense dictate that Hertz's failure renders publication notice ineffective to satisfy the

Due Process Clause.

52.     Hertz's remaining counterargument does not hold water. It argues that the Joint

Administration Order [Case No. 20-11218, D.I. 182] or Bar Date Order somehow excuse its failure

to comply with the Code and Rules. They do not, and Hertz cannot pin its own failure to provide

the required statutory notice on the Court.[35] It is silly to suggest that the Court's entry of an

---

[34] Notably, the *Ellett* decision involved a 1994 bankruptcy case, which would have been
governed by the pre-2005 version of § 342(c). So even if the court's reasoning was as Hertz
suggests (which it was not), that reasoning would have been superseded by statute and would not
help Hertz.

[35] There are many flaws to Hertz's argument, which fails most obviously for the reasons
described in the body of this filing. To point out just a few others, the Joint Administration Order,
on its face, applied to "each pleading filed and notice *mailed* by the Debtors" but not to publication
notice, it says nothing of Rule 1005, and Hertz offers no argument how these orders could trump
the plain language of the Code and Rules. Moreover, whatever measures of convenience are
sensible for the caption on documents filed in the jointly administered docket, it would make no
sense for such an administrative order to strip essential information—information which is
required to be included for substantive reasons—from published notice that is necessary to (even
arguably) satisfy the requirements of the Due Process Clause. All this is unlikely to surprise Hertz,
which began the *mailed* Bar Date Notice with a list showing the legal name of every Debtor despite
the Joint Administration Order, but chose not to include that same information in the published
notice.

39

(uncontested) order drafted by the Debtors at the outset of the bankruptcy resolves important due-process concerns for all of time. More importantly, these orders obviously are not determinative of the Claimants' arguments, as the Claimants were not served with the motions giving rise to these orders and thus had no notice or opportunity to respond to them at the time. Perhaps recognizing this problem, Hertz instead attempts to argue that certain counsel for the Claimants (not including Faegre Drinker or Susman Godfrey) represented other persons involved in the bankruptcy at that time. Obj. ¶ 76. But other clients already represented by counsel in the bankruptcy case had no reason to litigate over the contours of publication notice. Anyhow, there is no legal or logical basis for concluding that the Claimants are bound by those orders because they subsequently hired counsel who had represented other persons in those earlier proceedings. (And Hertz offers none in its briefing.)

53.     The Court should grant the Motion because Hertz relies only on publication notice that failed to comply with relevant legal rules in attempting to bar the Claimants' claims as untimely.[36]

### ii. Hertz's Published Notice Further Failed To Satisfy *Mullane*.

54.     As to the Claimants' fact-based arguments why publication notice was inadequate, the Objection only further undermines Hertz's position. Hertz concedes that "[t]he proper inquiry in evaluating notice is whether a party acted reasonably in selecting means likely to inform persons

---

[36] This defect would necessarily apply to all FPR Claimants and potential claimants. The Court may correspondingly decide to order legally (and factually) sufficient notice be given to those affected by Hertz's theft reporting and establish a new bar date for filing such claims. *See* 11 U.S.C. § 105(a) (court's general authority to issue orders necessary to carry out the provisions of the Bankruptcy Code and ensure orderly and efficient administration of the case). The parties could negotiate the specifics of that notice and bar date and propose something to the Court. This would not only render the Claimants' claims timely, but also take a substantial step forward towards resolving some of the larger issues involved in this litigation.

40

affected." Obj. ¶ 35 (internal quotation marks omitted). And "[d]etermining the adequacy of publication notice is a fact-intensive analysis that 'depends on the circumstances of a particular case.'" *In re Weiand Auto. Indus.*, 612 B.R. 824, 851 (Bankr. D. Del. 2020) (quoting *Wright v. Corning*, 679 F.3d 101, 108 (3d Cir. 2012)). The circumstances of this case show that the publication notice was plainly inadequate for the reasons outlined in the Motion.[37]

55.    Start with Hertz's argument that it provided "robust publication notice." It is silly to suggest that the publication notice provided was—to quote the legal standard Hertz advances— "means likely to inform persons affected." *See also Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950) ("The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it."). Hertz touts that it published

---

[37]   Hertz concedes this is a question of fact, but seems to try to convert it into a question of law by citing two decisions from decades ago finding newspaper publication sufficient on the facts of those cases. *See* Obj. ¶ 70 (citing *Chemetron I* and *Brown v. Seaman Furniture Co.*, 171 B.R. 26, 27 (E.D. Pa. 1994)). On the facts, those cases are very different. *Chemetron* involved "a group of former residents and occasional visitors to a neighborhood containing a toxic site," and the Court explained that there was no reasonable method of even learning their identities. 72 F.3d at 344, 347–48. Further, the only alternative method of publication notice advanced in that case, publication in another newspaper, would not have even reached any plaintiff (all of whom resided elsewhere). *Id.* at 348–49. Here, by contrast, the Claimants were Hertz customers and their identities (and contact information) were in Hertz's possession. (Indeed, there is almost certainly an internal list specifically of victims of the alleged torts.) And the alternative options available for providing notice are not (equally ineffective) publication in one more newspaper, but instead much more effective and targeted means available to Hertz because of the unique facts of this case and advances in technology since Chemetron Corp. published notice in the late 1980s (*i.e.*, the Internet). *Seaman Furniture*, a short district court opinion with little analysis, is non-binding and even further afield, as it involved a furniture owner's claim arising from furniture that broke after she purchased it (without any apparent assertions of a systemic problem) and did not discuss *any* alternative means of providing notice to unknown creditors in the early 1990s.

Hertz also cites *In re Washington Mutual, Inc.*, C.A. No. 15-995-GMS, 2018 WL 3736515, *4 (D. Del. Aug. 6, 2018), which rejected a *pro se* litigant's argument simply by pointing out that the publication notice complied with the bar date order in that case. *Id.* ("Debtors complied with the Bar Date Order's notice requirements. Specifically, the court correctly construed the plain language of its order."). But *Washington Mutual* did not cite, discuss, or analyze the constitutional questions of fact disputed here.

notice in certain newspapers with "a combined circulation of approximately 2.2 million." Obj. ¶ 14.[38] But there are more than 120.7 million households in the United States and about 8 million "employer establishments." *See* https://www.census.gov/quickfacts/fact/table/US/HSD410219. Based on households alone, the "robust" notice immediately omits 118.5 million households (120.7-2.2) or more than 98% of them. (Indeed, Hertz is including distribution of *The Globe and Mail* in Canada in its numbers, which would make the numbers even starker.) Means ignoring 98% of households are not means "likely to inform persons affected"; they are in fact all but guaranteed not to inform persons in 49 of every 50 households. These numbers are especially problematic for a large, national company that enters "more than *25 million* rental transaction in the United States per year." Obj. ¶ 54. Indeed, even these numbers generously assume that each household reaches fine-print partway through business sections in midweek editions of these newspapers. But Hertz chose to publish notice in these publications only once on page B3 of a Thursday edition of *USA Today*, page B3 of a Thursday edition of *The Wall Street Journal*, page B3 of a Thursday edition of *The New York Times*, and page B6 of a Thursday, Canadian edition of *The Globe and Mail*. Any newspaper reader knows that the reader count for fine print on those pages is far lower than general distribution numbers would suggest.

56.     Even more revealing than what Hertz did is what it did not do. The Motion offered many alternatives (or supplements) to publishing deep in midweek print newspapers. Hertz, for example, could have issued press releases, emailed existing listservs, purchased targeted online

---

[38] Hertz also offers an uncited "readership" number of "approximately 20 million." It's unclear where that number comes from, but it's unusual, to say the least, to suggest that the business-section notices in every midweek print copy are read on average ten times. The Claimants are happy to test that submission if it is accompanied by some evidentiary support. In all events, this number (including Americans and Canadians) would pale relative to more than 330 million Americans alone. Hertz likewise offers no data for the handful of local newspapers in which it published notice, but these would not significantly change the numeric analysis.

advertising, sent text messages, etc. *See* Mot. ¶¶ 84–85. Instead of circulating a notice to something like 2% of households in a manner with no asserted correlation to likely creditors, each of these alternatives could have been targeted to persons known to have connections with the company. And instead of burying information in fine print deep within a publication, these alternatives could be presented as standalone notices far more likely to actually convey information to the recipient. Take just the persons Hertz reported for theft. It has their contact information. It plainly has a database listing all of them. And (at a bare minimum) it admits that dozens of similarly situated persons have brought serious claims. But it did not even send a mass email to those affected. Hertz offers no responses whatsoever to these arguments, does not suggest that alternatives were even considered, and provides no reasons why these methods of notice are not superior alternatives far more "likely to inform persons affected."[39]

57.    In fact, the Motion identified other, recent bankruptcies involving much more robust publication notice in light of likely holders of mass tort claims. *See* Mot. ¶¶ 81–82, 86; *see also* 10 Collier on Bankruptcy § 9008.01 (16th ed. 2021) ("For example, in . . . mass tort cases . . . a publication campaign will inevitably involve print and electronic media."). Hertz's response is that, in those cases, "the . . . claims were major drivers . . . of the debtors' chapter 11 filings." Obj. ¶72. In other words, Hertz argues that it did not need to make any real efforts to provide notice to potential false-police-report claimants because they were not the precipitating cause of Hertz's

---

[39]    To be clear, each of these options is still available. And there are almost certainly thousands of persons that Hertz for theft that have no idea these proceedings are occurring. One path forward would be to order new, effective notice and establish a new bar date for false-police-report claims.

bankruptcy. The Due Process Clause and legion precedent described above and in the Motion say otherwise.[40]

58.     Indeed, Hertz's own submissions make clear just how easy it would have been (and still would be) to provide better notice to potential false-police-report claimants. Hertz's highly specific numbers of theft reports filed against its customers make it obvious that lists of theft reports filed against customers are readily available. And contact information is (or should be) readily available, as it is included in the theft packages, provided by customers when renting the vehicle, and likely part of the same lists compiling these individuals. Discovery will help illuminate those facts. (In fact, Hertz almost certainly also maintains this contact information in what counsel understands is a "Do Not Rent" list that includes those reported for theft.) Even assuming *arguendo* that particular false-police-report victims were not known creditors, Hertz

---

[40]     The content of the published notices was also lacking. Indeed, the omissions of content required by the Code and Rules described extensively above in Section I.C.i—including the names of all but one Debtor and the names under which that Debtor did business—plainly demonstrate that the notices were not means to inform persons of the relevant information. Those deficiencies are more than sufficient on their own to grant relief under *Mullane.*

The Motion also made two further arguments that the Claimants continue to press. First, it argued that the content of the notice (beyond the clear failure to include information on the Debtors) was insufficient because it was not written at a level ordinary renters would understand. Mot. ¶ 88–89; *see Jones v. Chemetron Corp.,* 212 F.3d 199, 205 n.6 (3d Cir. 2000) ("The [claimant's] degree of sophistication is an issue that is relevant to the adequacy of the notice of bankruptcy proceedings they received."). This issue is particularly salient in light of the timely class proofs of claim, which are discussed more fully in Class Objection Reply filed concurrently herewith. Hertz did not respond to this argument.

The Motion also argued that the publication notice should have discussed the potential claims by false-police-report victims—an issue the Third Circuit has explicitly held open and discussed. *Sweeney v. Alcon Lab'ys,* 856 F. App'x 371, 375 (3d Cir. 2021) ("[I]f a debtor's records revealed the existence—but not the identities—of persons with claims against the debtor, due process would require that the nature of those claims be announced in the relevant notices."). Hertz responds with a non-binding Eighth Circuit case resolving this issue against requiring specification of certain claims. *See* Obj. ¶ 74 (citing *Dahlin v. Lyondell Chemical Co.,* 881 F.3d 599, 605 (8th Cir. 2018)). The Court can and should reach the opposite conclusion here.

44

undoubtedly had ample notice that there were problems affecting many of those persons reported for theft. And with a list of such persons on hand, it is plainly unreasonable under the circumstances of these claims to rely solely on print newspapers circulated to something like 2% of American households.[41]

## II.   The Claimants Have Demonstrated Excusable Neglect.

59.     Hertz argues that the Claimants have failed to demonstrate excusable neglect. Its counterarguments largely rehash its points on publication notice, which is not at issue for excusable neglect, or allege that the Claimants somehow have strategically delayed these proceedings, which could not be further from the truth. Regardless of any other argument, the Court should grant the Motion because the Claimants have proven excusable neglect.

60.     Hertz identifies the "reason for delay" factor as the "focus" of the inquiry and the "critical" factor. Obj. ¶ 81. The Motion explains that each of the relevant Claimants' "reason for delay" was that he or she was not aware of the General Bar Date and did see the publication notice. Hertz offers no adequate response to this argument. It simply attempts to relitigate whether its publication notice was constitutionally sufficient. Obj. ¶¶ 90–94. While that argument is wrong for the reasons above, it's not a response to the excusable-neglect argument at all. Indeed, the Claimants identified binding Third Circuit precedent applying the *Pioneer* factors exactly as the Claimants suggest: In *In re Orthopedic Bone Screw Products Liability Litigation*, the Third Circuit

---

[41]     Hertz attempts to distinguish *Tillman* because it "was a case in which the debtor had, for years pre-petition, concealed facts that potentially established claims against it." Obj. ¶ 78. That's actually not unlike the instant cases, where frequently Hertz would not disclose that it filed theft reports and would not withdraw/update outdated theft reports such that persons would be arrested without warning and without cause. Still to this day, Hertz flatly denies and attempts to hide patterns of misconduct. And the further actions identified in the Motion, ¶¶ 90–93, plainly weigh in favor of finding publication notice inadequate. The Claimants anticipate that additional plus factors will be identified with discovery.

45

applied the reason-for-delay *Pioneer* factor. It found that a "seven[-]month delay" traced to "the minimal constructive notice provided" and that it would have, "absent actual notice mailed to [the movant's] address," been "incongruous . . . to find [the movant] culpable for his failure to note a small advertisement run once on page 50 of a newspaper he does not receive." 246 F.3d 315, 326 (3d Cir. 2001). On that reasoning, the Third Circuit found that the reason for delay favored the movant and supported that determination by examining precedent in the Third Circuit and other Circuits. *Id.* at 327–328; *see also In re O'Brien Env't Energy, Inc.*, 188 F.3d 116, 128–29 (3d Cir. 1999).

61.     Hertz buries its attempt to distinguish this controlling precedent in a footnote, saying, "The Third Circuit in that case, however, expressly 'd[id] not at this time opine as to the constitutional sufficiency of the notice provided under [Fed. R. Civ. P.] 23 and [*Mullane*] . . . .'" Obj. n.36. But that's not a reason to distinguish *Orthopedic Bone Screw*, that's a reason to *apply it to this case*. The Third Circuit didn't have to address whether the publication notice was constitutionally sufficient because it could find excusable neglect even if the publication notice had been sufficient. So too here, the Claimants can similarly demonstrate excusable neglect even

46

if the newspaper notices they did not receive somehow provided constitutionally sufficient constructive notice.[42]

62.    Hertz also argues that each of the Claimants knew (or should have known) about the substance of their claims prior to the date of the petition. Obj. ¶ 83.[43] In that sense, Hertz responds to an argument the Claimants did not make. To be clear, the Claimants don't argue that their "reason for delay" was the lack of awareness of the content of their claims (what Hertz seems to call "ignorance" of their claims). Instead, the Claimants argue that their "reason for delay" was

---

[42]   Hertz seems to suggest that unknown creditors are categorically foreclosed from arguing that they were unaware of the general bar date as a reason for delay by citing an unpublished district court case from 2006. Obj. ¶ 91 (citing *PacifiCorp & Van Cott Bagley Cornwall & McCarthy v. W.R. Grace*, No. CIV.A.05-764, 2006 WL 2375371, at *14 (D. Del. Aug. 16, 2006)). To the extent Hertz makes the nonsensical argument that a legal fiction renders delay categorically inexcusable, it is plainly foreclosed by *Orthopedic Bone Screw*, *O'Brien*, and the cases discussed therein. Nor does Third Circuit precedent "turn the constructive notice standard on its head." Obj. ¶ 92. Debtors are free to rely on constructive notice (at least legally and factually adequate constructive notice) to discharge claims held by those without actual notice. Those persons losing property rights based on a legal fiction simply have the opportunity to show that late claims still should be allowed for excusable neglect—a real burden. That is a profoundly sensible system, and more importantly it is the one established by *Pioneer*, Third Circuit precedent, and the Bankruptcy Rules.

[43]   For at least three of the Claimants—Paula Murray, Sean Hurt, and Heather Kasdan—that is not true. Those three did not know that Hertz had reported them for theft until after the petition date (and, for that matter, after the General Bar Date). These Claimants have a uniquely strong excusable neglect argument since part of the delay is directly attributable to Hertz's failure to inform them that it had reported them for theft even after dialogue with each of them where the Claimants explained exactly what happened to the vehicle. (Ms. Murray had already returned it; Mr. Hurt had reported it stolen from him; and Ms. Kasdan had been in an accident after which Hertz promised to tow it.)

Relatedly, Hertz observes that a police report attached to Ms. Kasdan's declaration suggests that law enforcement closed the incident report when the vehicle was recovered in November 2019. Obj. n.32. The police generally keep a theft report open until the vehicle is recovered, and when recovered the police report is cleared or closed. This does not necessarily reflect whether charges will be filed and an arrest warrant issued, as those decisions are generally left to the District or State Attorney's office rather than police.

a lack of knowledge of the General Bar Date, and that reason is firmly supported by precedent for the reasons described above.[44]

63.     Hertz next contests the length of delay factor. Obj. ¶ 82. This factor focuses on "the length of the delay and its impact on the judicial proceedings." *In re O'Brien Env't Energy, Inc.*, 188 F.3d 116, 129 (3d Cir. 1999). Hertz highlights several district and bankruptcy court cases finding that shorter delays weighed against an excusable neglect finding; but the Motion highlighted Circuit decisions finding excusable neglect on similar time frames. Mot. ¶ 103. While the length of delay is relevant, an important consideration under this factor is also the delay's impact on the judicial proceedings. In *Energy Future*, the Third Circuit held that this factor "cu[t] in favor of granting . . . Rule 3003(c)(3) motions" where "bankruptcy proceedings . . . concluded with [a] Confirmation Order" despite a "substantial delay" that could be many years long for certain latent asbestos claims. *In re Energy Future Holdings Corp.*, 949 F.3d 806, 824 (3d Cir. 2020). Here, the confirmed and effective Plan similarly allows this factor to cut in favor of the Claimants, and the length of delay is much shorter than the years involved in *Energy Future*. In fact, we know that the seven-month delay had no impact on these proceedings whatsoever because there were similar claims filed before the General Bar Date—namely, those of the "Group 1" and "Group 2" False Police Report Claimants—and Hertz waited until well after the instant "Group 3"

---

[44]  In this portion of its briefing, Hertz suggests (but does not affirmatively argue) that several Claimants bring claims that "likely" have statute of limitations issues. For example, Hertz argues that Paula Murray's claims "are likely time-barred." Hertz looks to when (it argues) claims accrue for bankruptcy purposes, but the relevant date for statute of limitations questions is when claims arise outside of bankruptcy. On that standard, Paula's claims, based on a January 2021 arrest and March 2021 dismissal of criminal proceedings, are clearly timely. Regardless, the excusable neglect question at this juncture is whether the claims were timely within the bankruptcy, not whether they were timely outside of it.

claims were filed to issue a first round of objections.[45] In these circumstances, the length of delay and its impact on the proceedings strongly favors a finding of excusable neglect.

64. Hertz also accuses the Claimants (and their counsel) of various forms of "strategic delay," seemingly under the bad faith *Pioneer* factor. But there has not been any strategic delay or bad faith. The most outlandish suggestion by Hertz is that the Claimants or counsel somehow attempted to "re-date" or alter certain declarations to hide when declarations from the Claimants were available. Obj. at 88 (discussing Claimant Sean Hurt); *id.* nn. 33, 34 (expressing "concerns . . . regarding Mr. Hurt's declarations"). But there was no effort to hide or redate declarations. Mr. Hurt executed a May 19, 2021, declaration, and that declaration was publicly filed in the bankruptcy record as an attachment to the 22nd Omnibus response.[46] After the Court requested

---

[45] Of course, Hertz's decision to litigate timeliness and force the filing of a motion to tee up that issue will cause some delay. But the Third Circuit has made clear that litigation about the late claim itself is not to be considered. "Such a rule would be unfair, for the delay caused by the adjudication of the late claim, and not the lateness of the claim itself, would often give sufficient reason to reject the claim regardless of the effect of the movant's actual delay." *Orthopedic Bone Screw*, 246 F.3d at 325.

[46] Hertz, because of its apparent "concerns," "reserve[s] all rights to seek appropriate discovery relating to whether any of the other Movants similarly executed declarations" prior to filing proofs of claim. Obj. n.33. The Claimants note that they have already publicly filed on the docket May 2021 declarations from Claimants Breanna Oneal, Heather Kasdan, Lateshia Jenkins, and Siobhan Abrams as well as a June 2021 declaration from Claimants Charles Bort and Kwai Chan. *See* 22nd Omnibus Objection, Malofiy Decl., Attachment AM. Like Mr. Hurt, these Claimants executed new declarations for the Motion and their amended proofs of claim to comply with the Court's guidance at the November 4 hearing.    *[continued next page]*

On a similar note, Hertz identifies a couple misstatements in the unopposed extension motion for filing declarations from three Claimants (Janette Brown, Tyresha Caudle, and Wanda Nelson). In particular, that filing wrote that "the Movants filed the group Claims at issue more than one year ago, on June 10, 2021," [D.I. 191 at ¶ 20]. Of course, June 2021 is actually less than a year ago, and Hertz is correct to "presume that Movants' counsel miscalculated . . . the relevant timeline and simply erred in making the statements in the" motion. Obj. n.34. By way of update, the parties have agreed that Hertz will not object to the timing of any declarations from those individuals that are filed by January 19, 2022, and Hertz may amend its objection to address any new declarations after that time. Declarations from Ms. Caudle and Ms. Brown are attached to this Reply, but counsel have not been able to contact Ms. Nelson to date. *See* Attachments AO, AP.

amended proofs of claim along with declarations containing particular information, Mr. Hurt simply executed a new declaration conforming to the Court's request.[47] This sequence does not show bad faith or strategic delay.

65.      The Objection otherwise attempts to spin the declarations and other litigation as efforts to delay proceedings. But the Claimants have no desire or incentive to delay proceedings— quite the opposite, they have tried to advance their claims (in this Court or elsewhere) as quickly as possible at every turn. To be sure, as with all the earlier proofs of claim filed by Groups 1, 2, or 3, the June proof of claim did not include Mr. Hurt's May declaration (or others like it). But that was not an effort to delay proceedings. The claims were filed in a good faith attempt to present orderly proofs of claim on behalf of many claimants. And while the Claimants have now amended their proofs of claim to include declarations at the Court's request, there is no general rule that every (or indeed, *any*) proof of claim must include a declaration. So too with the Claimants' belief that any due-process/notice arguments were properly litigated as a defense to the 21st Omnibus Objection rather than a separate motion.[48] And when the Court requested a separate motion, the Claimants filed a thorough one promptly. In sum, the Claimants have consistently tried to advance and accelerate resolution of their claims, not slow them down or engage in strategic delay for tactical reasons.

---

[47]    The December declaration accidentally transposed his date of arrest from November 2020 to February 2021. Mr. Hurt's corrected declaration is attached to this Reply and will be submitted along with an amended proof of claim. *See* Attachment AQ.

[48]    Hertz's assertion that the Claimants' decision to file their June proofs of claim and pursue relief from the Plan injunction constituted a "collateral attack" on the Bar Date Order and Confirmation Order (*see* Obj. ¶ 87) is overblown. Under § 501(a) of the Bankruptcy Code, proofs of claim are allowed until objected to, and the Claimants were within their statutory rights to get their claims on file and then deal with any timeliness arguments if and when an objection was filed under § 502(b)(9). This is exactly what they did.

50

66.     Nor should the Court credit the Objection's three prejudice arguments. First, Hertz argues that the "plan sponsors reasonably relied upon the universe of claims against them as defined by the General Bar Date in connection with formulating and confirming the Plan." Obj. ¶ 96; *see also id.* ¶ 95 (outlining Plan terms). But the "universe of claims" entered prior to the General Bar Date encompassed the Claimants' claims: there were timely filed class claims that cover the Claimants.[49] Therefore, the plan sponsors had full awareness that these claims were part of the bankruptcy process. (Not to mention that Rule 9006 is also part of the bankruptcy process that plan sponsors can anticipate.[50]) There is consequently no prejudice in negotiating the Plan, just as this Court remarked in an analogous situation in *In re Kaiser Grp. Int'l, Inc.*, 278 B.R. 58, 64 (Bankr. D. Del. 2002) (Walrath, J.) ("The Debtors are not prejudiced by [class members' having claims], since the Debtors had notice of the existence of the class claim before the bar date.").[51]

---

[49]   This is not to say that the Claimants properly amended class claims. They did not make that argument in the 21st Omnibus Response or in the Motion. *Contra* Obj. ¶46. The class claims are instead relevant to the prejudice inquiry for the reasons noted in the text. Further, as explained in the Class Motion and Class Objection Reply, the disposition of the class claims could affect the rights of putative class members, which would include the Claimants. For instance, the Class Motion argued that if the Court declines to apply Rule 7023 to the class proofs of claim, it should establish a new deadline by which putative class members may file proofs of claim. Class Motion ¶¶31–32; *see, e.g., Gentry v. Siegel*, 668 F.3d 83, 91 (4th Cir. 2012) ("Of course, if the bankruptcy court denies the motion [to apply Rule 7023], it should then establish a reasonable time within which the individual putative class members are allowed to file individual proofs of claim."). Hertz did not object to that request, nor did any other party to the bankruptcy proceedings. And many courts have taken that course. Doing so here would likely moot the instant Motion, as the Claimants would have filed (or could file) claims well before any such deadline.

[50]   The plan sponsors, who are sophisticated asset managers with approximately $471 billion in collective assets under management, also could have anticipated that "the actual amount of Allowed Claims may vary from the Debtors' projections and feasibility analysis, and the variation may be material," which the Debtors expressly stated in the "Allowed Claims Could Exceed Estimates" risk factor in their Court-approved Disclosure Statement. [Case No. 20-11218, D.I. 4130 at 185].

[51]   Hertz protests that "the facts are different" in *Kaiser* and that *Kaiser* is irrelevant because it discussed prejudice as part of class certification rather than as part of excusable neglect. Obj. ¶ 84. But a decision explaining that timely class claims do not create prejudice when Claimants who did not file by the bar date are permitted to bring claims in bankruptcy via the class claim is

ACTIVE.135112366.08

And there is certainly no prejudice to other claimants, all of whom will be paid in full no matter the outcome of this motion.

67.     Second, Hertz argues that "[p]ayment from the Reorganized Debtors' general funds, rather than from a specific cash reserve, has a far greater prejudicial impact on the Reorganized Debtors." Obj. ¶ 97. Their argument, drawn from their one quoted case, is that "profits [might] be thereby so depleted as to preclude the Debtor from remaining in operation and the plan from being carried out, [so] all of the unsecured creditors which timely filed claims in this bankruptcy case would be directly and significantly adversely affected." *In re Penn. Truck Lines, Inc.*, 189 B.R. 331, 336 (Bankr. E.D. Pa. 1995). Suffice it to say that putting the Reorganized Debtors back into bankruptcy is a totally phantom concern. In fact, Hertz is currently buying back $2 billion of its own stock notwithstanding the pendency, and uncertainty of outcome, of these proceedings. *See* Hertz Global Holdings, Inc., *Hertz Announces $2.0 Billion Share Repurchase Program* (Nov. 29, 2021).[52] If management were concerned that allowance of the False Police Report Claims posed an existential threat to the company they presumably would not (or at least, *should* not) approve the divestiture of $2 billion of its cash as part of a stock buy-back program.

68.     Third, Hertz argues that granting the Motion "would open the floodgates to . . . further purported false police report claims." Obj. ¶ 99. It is hard to take this argument seriously based on the Objection's theme that the number of problematic theft reports is "*de minimis*" and that the systemic-issue allegations are "false." Obj. ¶¶ 3, 54. But if there are no systemic issues and the number of problematic theft reports is *de minimis*, as Hertz repeatedly asserts in an effort

---

on all fours with rejecting Hertz's prejudice argument here.

[52]     Available at https://ir.hertz.com/news-releases/news-release-details/hertz-announces-20-billion-share-repurchase-program.

to defeat the notice arguments, then there will be no "floodgates" prejudice. The truth, however, is that these are systemic issues and there are potentially thousands of false and misleading police reports already tearing real people's lives apart or just waiting to do so. But the Court should not credit that as a material component of prejudice. It is on Hertz—not the Claimants—that the problem is *more widespread* than Hertz has acknowledged until now.

69.     The Court should grant the Motion on the basis of excusable neglect.

## III.    Thirteen Claimants Bring Timely Postpetition Claims.

70.     In the Motion, a selection of Claimants argued that certain claims arose postpetition and are therefore timely because the General Bar Date does not apply to postpetition claims. Two Claimants—Breanna Oneal and Israel Sundseth—presented claims that all agree arose postpetition based on postpetition rentals. Hertz does not object to those claims, and they should be deemed timely. *See* Obj. at 12 n.13.

71.     Hertz does object to arguments made by eleven of the nineteen remaining Claimants that certain of their claims arose postpetition. In particular, three claimants—Sean Hurt, Heather Kasdan, and Paula Murray—argued that their claims predominately arose postpetition under the *Grossman's* test because they were not exposed to Hertz's conduct until after the petition (when, for example, Paula Murray was arrested out of the blue while applying for a job with law enforcement). Eight others—Siobhan Abrams, Charles Bort, Tyresha Caudle,[53] Kimberli Costabile, Lateshia Jenkins, Britne McClinton, Zanders Pace, and Marissa White—bring

---

[53]    Ms. Caudle's declaration was obtained after the Objection was filed. *See* Attachment AO. Ms. Caudle is described herein because her prosecution continued postpetition and she is similarly situated to Claimants with similar fact patterns. On agreement of the parties, Hertz will not object to Ms. Caudle's declaration but retains the right to amend its Objection to address Ms. Caudle's claim. Ms. Brown similarly signed her declaration after the Objection, but she does not bring postpetition claims. *See* Attachment AP. Ms. Nelson, from whom a declaration has not yet been obtained, will join this argument as applicable based on the facts in her declaration (if obtained).

predominately prepetition claims, but argued that they also had timely postpetition claims in connection with postpetition criminal proceedings and conduct. Hertz's arguments as to these postpetition claims—that they are prepetition claims under *Grossman's*, that they fail *Reading*, and that they are forfeited—are incorrect.

72.     ***Claimants correctly identify postpetition claims under* Grossman's.** To start, Hertz contorts the *Grossman's* standard for when a claim arises for bankruptcy purposes (as contrasted with when it accrues outside of bankruptcy). *See In re Grossman's Inc.*, 607 F.3d 114 (3d Cir. 2010). *Grossman's* addressed asbestos claims, which could arise at one of three times: (1) when the tortious conduct that caused the injury occurred; (2) when the victim was exposed to the asbestos; or (3) when the injury manifested itself sometime later. The *en banc* Third Circuit rejected the first position (based on the date of conduct) and overturned precedent applying the third position (the *Frenville* test) in favor of the second position: "exposure." Hertz, by contrast, pushes the rejected first position—arguing that "[h]ere, the 'conduct giving rise to an injury' is the filing with law enforcement of an allegedly inaccurate theft report," Obj. ¶ 39, and faults the Claimants for "proffer[ing] . . . [a] standard . . . focus[ing] . . . on Movants' subjective . . . awareness of the claim, *rather than the Debtors' alleged conduct giving rise to the claim*," *id.* ¶ 40 (emphasis altered); *see also id.* ¶ 2 ("Under *Grossman's*, [filing the false police report] is the only conduct of the Debtors that could possibly give rise to a claim."). Hertz's incorrect standard based on the "conduct giving rise to the claim" must be rejected under *Grossman's*.

73.     By contrast, the Claimants argue that claims arise when a Claimant is exposed to Hertz's tortious conduct—just like in *Grossman's*. Hertz mischaracterizes the Claimants' position as based on "awareness"—but there is a better word for it: "exposure." And exposure is precisely the standard in the Third Circuit and the standard that must be applied here. Take Sean Hurt's and

Paula Murray's claims as examples. Both rented vehicles prepetition, but to their shock were arrested postpetition many months (for Mr. Hurt) or years (for Ms. Murray) later. The filing of the theft report was tortious conduct that Claimants believe occurred prepetition (much like the installation of asbestos-laden materials), but they weren't actually exposed to that conduct until they were arrested postpetition (much like when a victim came in contact with asbestos)—and that is the critical point in time under *Grossman's*. Indeed, the due process thread undergirding *Grossman's* supports this reading. Asbestos claims do not arise until a victim at least has *some* basis for understanding a contingent claim because they were exposed to the asbestos. But Hertz's standard would subject Mr. Hurt and Ms. Murray to the General Bar Date where they had no contact whatsoever suggesting even a contingent claim based on a bogus theft report.[54]

74. ***The postpetition claims should proceed as general, unsecured claims rather than administrative claims subject to* Reading.** The Claimants' preferred path forward for their postpetition claims, as described in the Motion and the amended proofs of claim, is not to seek administrative priority and instead to advance their claims as unsecured, postpetition claims under § 502. *See* Motion ¶¶ 49–50; *see also, e.g.*, Claim #15,643 (Heather Kasdan), Addendum to Proof of Claim ¶ 3 ("*To the extent that certain causes of action brought by the Claimant are deemed to have arisen postpetition and the Court determines that they must be filed as requests for payment*

---

[54] Hertz elsewhere suggests that Mr. Hurt "discovered" his claim when he was overcharged in March 2020 "and when he was reported for theft." Obj. ¶ 83.d. But his declaration makes clear, he did not know he had been reported for theft in March 2020 until his postpetition arrest. *See* Attachment AQ. And an overcharge on his credit card did not expose him to a criminal theft report. Similarly, Hertz argues that Ms. Murray may have discovered her claim "as early as November 2016 when she allegedly received a communication from Hertz that the company would be working with law enforcement to issue a warrant for her arrest." Obj. ¶ 83.b. What Hertz omits is that in that conversation "Paula … made it clear that the car was already returned. The investigator said that it would have to be confirmed the car was returned. … [A few days later] the investigator responded that Hertz had confirmed the car was returned and that Paula was in the clear." Attachment N ¶¶ 5–6.

55

*of administrative claims rather than as general unsecured claims*, the Claimant hereby requests that the Court consider the Proof of Claim form, this Addendum, and the Declaration, in pertinent part(s), as a request for payment of an administrative expense under 11 U.S.C. § 503(b)." (emphasis added)). This comports fully with the Plan. Class 7 of the Plan leaves "all General Unsecured Claims against a Debtor" unimpaired. Plan, Art. III.B.7.a. And the Claimants' postpetition claims are "General Unsecured Claims against a Debtor" under the terms of the Plan. *See id.* Art. I.A.83, 181, 370 (defining "Claim," "General Unsecured Claim," and "Unsecured").

75.    Hertz makes no argument that postpetition claims *must* be advanced as administrative expenses under § 503 rather than as unsecured, general claims under § 502. And it would make no sense to force the Claimants down that route: the Claimants don't want (or need, given the full-pay Plan) administrative priority treatment under § 503 and Hertz seems geared to extensively litigate over the contours of the *Reading* exception. Proceeding as general, unsecured claims will spare pointless litigation over *Reading* and provide efficiencies for the Court and parties by keeping all pre- and postpetition claims on the same track. That's the best path forward.

76.    Indeed, looking at Hertz's lengthy arguments that the relevant claims do not qualify for administrative priority under the *Reading* exception show the wisdom of the Claimants' preferred path. All agree that *Reading* is only relevant if claims arise postpetition under *Grossman's*. Hertz's *Reading* argument boils down to this: postpetition claims under *Grossman's* are not eligible administrative expenses under *Reading* unless "there [is] some new action by the debtor post-petition." Obj. ¶ 45. In other words, Hertz's argument carves out a category of claims that (1) arise postpetition under *Grossman's* because exposure occurred postpetition and (2) are discharged by the plan but (3) do not qualify as administrative expenses because they involve prepetition conduct under *Reading*. (That category would include, for example, all claims in an

asbestos case where exposure occurred postpetition but the tortious conduct occurred prepetition. It would also include most claims here that were filed by persons with hidden prepetition theft reports that led to postpetition arrests, like Sean Hurt and Paula Murray.)

77.   Hertz's argument suggests that postpetition claims based on prepetition conduct would be discharged yet categorically ineligible as administrative expenses under § 503. Unless those claims can otherwise obtain payment in bankruptcy, there would be a massive due-process problem because all such claims would be discharged with no means for recovery. The best (and correct) answer to this dilemma is that postpetition claims do not need to seek administrative expense priority—in other words they can be filed and allowed under § 502 just like prepetition claims. The alternatives are to hold that the Code creates a widespread due process problem and consequently relieve such claims from discharge, or to expand the *Reading* exception and treat such claims as administrative expenses to avoid due-process problems.[55] Although the Claimants will advance their claims under any of these frameworks, the Claimants' preferred route of proceeding under § 502 (described above) is by far the best option.

78.   In all events, Hertz vastly overplays its *Reading* arguments. While certain claims brought by Sean Hurt, Paula Murray, and Heather Kasdan do trace to prepetition conduct (most notably filing theft reports), all applicable Claimants also bring claims based on postpetition conduct—at a minimum, the postpetition failure to withdraw false police reports and otherwise attempt to correct the record underlying ongoing criminal proceedings. Hertz concedes that the Claimants "argue that a Debtor continuously breached a legal duty to withdraw theft reports." Obj.

---

[55]   If the Court accepts Hertz's arguments and determines that such claims cannot be allowed as administrative expenses under § 503 *and* cannot be allowed as ordinary claims under § 502, then it should release the Claimants' postpetition claims from discharge based on the obvious due-process problem of discharging claims that have no means for recovery in bankruptcy.

57

¶ 46. Its only response to *that argument* is that it has no legal duty to withdraw theft reports. *Id.* But whether such a legal duty exists goes to the merits of such claims, not whether the claims would be timely asserted within the bankruptcy.[56]

79.    Hertz, nonetheless, is wrong. The Claimants offered a declaration from a former Deputy Attorney General of Delaware Steven P. Wood reaching the opposite conclusion. Attachment T ¶ 24 (Wood Decl.). That duty obviously comports with common sense. A company cannot initiate a prosecution, obtain information that the prosecution is baseless or false, and then simply ignore that persons are being prosecuted and imprisoned based on *false and misleading* information that the company gave to the police.[57] That is what is happening over and over again. And Hertz admits as much: "Hertz has no mechanism to withdraw a criminal referral because, the company spokesperson said, it has to maintain a relationship of 'integrity and responsibility' with law enforcement. 'In the rare instances this happens, if you report a crime, and you later say it didn't happen, then law enforcement tends not to believe you if you retract it or say you were mistaken.' the spokesperson said. 'Hertz's continued good relationship with law enforcement is

---

[56]   Hertz goes on to cite a number of cases where the courts found that a debtor in possession did not have a continuing legal duty to abate a prepetition violation of the law—three in the environmental contamination context, one in the employment discrimination context (*see* Obj. ¶¶ 44-45)—which, of course, begs the question presented. If there is a continuing legal duty to remedy false police reports, breach of which constitutes a continuous tort, then Hertz as debtor in possession would be required to abide by that duty. *See* 28 U.S.C. § 959(b) ("[A] debtor in possession[] shall manage and operate the property in its possession . . . according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof."); *In re Quanta Res. Corp.*, 739 F.2d 912, 919 (3d Cir. 1984) ("Implicit in Section 959(b) is the notion that the goals of the federal bankruptcy laws, including rehabilitation of the debtor, do not authorize transgression of state laws setting requirements for the operation of the business . . . .").

[57]   For that reason, Hertz's discussion of conduct committed by third parties and *In re SuperMedia Inc.*, Case No. 13–10546 (KG), 2014 WL 7403448 (Bankr. D. Del. Dec. 29, 2014) is beside the point. The Claimants seek to hold Hertz liable for its own postpetition conduct—namely, any actions taken to further prosecute the criminal cases and the independent failure to withdraw or correct false and misleading theft reports postpetition—not for the acts of third parties.

58

important."[58] Hertz lastly attempts to push back on the idea of any duty by suggesting that "malicious prosecution claims are not 'continuing torts' because each arises from a discrete act at a specific moment in time." Obj. ¶ 46. But Hertz is wrong even as to that tort. As the Supreme Court of California concluded in 2004: "[S]o far as our research reveals, the rule in every other state that has addressed the question is, and in many states has long been, that the tort of malicious prosecution *does* include continuing to prosecute a lawsuit discovered to lack probable cause." *Zamos v. Stroud*, 87 P.3d 802, 807 (Cal. 2004) (surveying states and secondary sources). This rationale by itself is sufficient to hold that the eleven cases identified in ¶ 71, *supra*, bring postpetition claims based on prosecutions occurring after May 2020.

80.     ***Postpetition claim arguments were not forfeited***. Hertz's forfeiture argument based on the 21st Omnibus Response has no merit. Hertz's primary citation does not suggest that an earlier filing in a different contested matter somehow forfeits arguments raised in a new motion. *See McGoveran v. Amazon Web Servs., Inc.*, Civ. No. 20-1399-LPS, 2021 WL 4502089, at *3 n.2 (D. Del. Sept. 30, 2021). *McGoveran* addresses a classic forfeiture, where a party did not make an argument in its briefing on *the motion before the court*, but instead filed a notice of subsequent authority "[j]ust before the hearing" with a new argument it pressed "more forcefully" at oral argument. *Id.*; *see also* Obj. ¶ 36 (citing one other case "rejecting argument raised for first time at oral argument"). By contrast, the Claimants advanced the instant arguments in the Motion itself. Hertz offers no support for pushing a forfeiture in this context.

81.     More centrally, the entire premise of Hertz's forfeiture argument is flawed because Hertz affirmatively advocated that these issues would be addressed in new contested matters, not as part of the 21st Omnibus Objection papers. The Claimants stood ready to proceed on the 21st

---

[58] *See supra*, note 6.

Omnibus Objection and Response at the November 4 hearing, but it was Hertz that insisted repeatedly that the timeliness of these claims be presented in a new and separate motion. *See* Hr'g Tr. Nov. 4, 2021 at 18:18–19 (Mr. Shore: "I think everyone else files a Rule 9006 motion by some deadline"), 42:2–4 (Mr. Shore: "We need a deadline for when they're going to file a Rule 9006 motion and that will set forth a separate issue with respect to those late claims."), 43:1–2 (counsel describing "declarants who were coming forward with their Rule 9006 motions"), *id.* 45:9–11 (Mr. Shore: "But our evidentiary presentation is going to be driven in the first instance by the filings of the specific motions."). Counsel for Hertz explicitly outlined that he "was envisioning . . . that they get a motion on file . . . . *Those [motions] become separate, contested matters which we can address.*" *Id.* at 42:20–25 (emphasis added). After the Court adopted Hertz's proposal, the Claimants did exactly what Hertz requested: they initiated "separate, contested matters" offering their best arguments as to why their claims are timely. Hertz cannot now cry foul that it got what it asked for—new contested matters and a new motion—by arguing that months of legal work and delay were all really for naught because the earlier filings in a different matter govern the issues before the Court.

82.     Hertz's backup forfeiture arguments fare no better. For instance, Hertz points to the *Motion of False Police Report Claimants No. 3 for Relief from any Stay and Plan Injunction.* [Case No. 20-11218, D.I. 5656.] It argues that the relevant Group 3 Claimants somehow forfeited their arguments in the instant Motion because "nowhere in that [stay-relief] motion did Movants assert that the automatic stay did not apply to their claims because those claims arose post-petition." Obj. ¶ 33. But there was no reason to make that argument because, as the motion described, "[t]he automatic stay . . . terminated upon the June 30, 2021 effective date of the plan and the only stay that remains is the stay established pursuant to the plan." Case No. 20-11218, D.I. 5656, at 1 n.2;

*see* 11 U.S.C. §362(c)(2)(C) (termination of automatic stay). In fact, the stay relief motion directly undercuts Hertz's forfeiture point: it explained, "Prior to the Debtors' bankruptcy filings, *and in some cases subsequent to the bankruptcy filing,* the False Police Report Claimants No. 3 suffered injuries based on Hertz's actions." *Id.* at 6 (emphasis added).

83.     Hertz also faults the Claimants for not more actively seeking administrative priority in their initial proofs of claim and for arguments in the 22nd Omnibus Response (on behalf of all 165 False Police Report Claimants at that time) under the legal framework established by Section 502 and Bankruptcy Rule 3001. Obj. ¶¶ 30–32, 34–35. But Hertz concedes that the Group 3 claims did label a great many claims as "Post" or "Pre and Post."[59] And as explained in the Motion, these filings met all the stated requirements for administrative claims (at a minimum under the informal proof of claim doctrine). Motion ¶ 52 & n.14. The 22nd Omnibus Response responded to an objection arguing that claims from all 165 Claimants "should be disallowed under section 502(b)(1)." 22nd Omnibus Obj. ¶ 38. It was therefore fully appropriate (and far from a forfeiture) to respond on behalf of all 165 Claimants under the legal framework that applies under § 502.

---

[59]     There is no reason to construct a forfeiture in these contested matters because the initial proofs of claim did not check "other" for Question 12 and cite § 507(a)(2) as the basis for priority. While Hertz is correct that § 507(a)(2) affords priority to § 503 administrative expenses, they appear to overlook that the instructions on the proof of claim form expressly state that the form is not to be used to assert § 503 administrative expenses. Certain of the Claimants' amended individual proofs of claim do check the "other" box and cite § 507(a)(2), but this is coupled with a request, at page 20, note 13 of the Motion, for leave to assert administrative expenses on the same form for the sake of efficiency—a request that Hertz does not oppose (*see* Obj. at 13 n.14). And this request is in the alternative, i.e., *if* the Court concludes that the Claimants must proceed under § 503(b)—which the Claimants do not need to do for the reasons discussed herein, including that there would be no practical purpose for doing so where administrative and general unsecured claims both receive payment in full under the Plan. (Incidentally, this fact distinguishes cases where priority asserted for the first time in an amendment was not permitted—in those less-than-full-pay cases, a newly-asserted priority would be tantamount to a "new" claim for distribution purposes. Here, by contrast, the priority of the Claimants' claims is functionally irrelevant to their treatment under the Plan—so it would grossly elevate form over substance to hold that the June proofs of claim, as amended, cannot be considered timely administrative expense requests.)

61

Granular, claimant-by-claimant and claim-by-claim analysis trying to bring certain claims outside of the § 502 framework *in response to a § 502 objection* would have been completely out of place. Indeed, eight of the relevant Claimants currently at issue bring predominately prepetition claims and the other three bring at least a prepetition defamation claim, all of which everyone agrees would be subject to § 502 and Bankruptcy Rule 3001(f). In all events, the Claimants' lead argument is that their postpetition claims, too, should move forward under § 502. And there is certainly no disconnect between that argument and the arguments in the 22nd Omnibus Response.

## RESERVATION OF RIGHTS

84. The False Police Report Claimants reserve the right to amend, supplement, or otherwise modify this Reply and to file and present evidence further supporting it upon discovery and/or responsive to further argument from the Reorganized Debtors.

*[Remainder of page intentionally left blank.]*

## **CONCLUSION**

WHEREFORE, for the reasons set forth above and in the Motion, the Claimants respectfully request that the Court overrule the Objection, grant the Motion, and grant any such other and further relief as the Court deems just and proper.

Dated: December 29, 2021

**FRANCIS ALEXANDER, LLC**
Francis Malofiy
280 N. Providence Road, Suite 1
Media, PA 19063
Telephone: (215) 500-1000
Facsimile: (215) 500-1005
Email: francis@francisalexander.com

**SUSMAN GODFREY LLP**
Justin A. Nelson (*pro hac vice*)
John P. Lahad (*pro hac vice*)
Taylor C. Hoogendoorn (*pro hac vice*)
1000 Louisiana, Suite 5100
Houston, TX 77002-5096
Telephone: (713) 651-9366
Facsimile: (713)654-6666
Emails: jnelson@susmangodfrey.com
        jlahad@susmangodfrey.com
        thoogendoorn@susmangodfrey.com

**FARNAN LLP**
Brian E. Farnan
919 N Market Street
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
Email: bfarnan@farnanlaw.com

**FAEGRE DRINKER
BIDDLE & REATH LLP**

*/s/ Patrick A. Jackson*
Patrick A. Jackson (Bar No. 4976)
Ian J. Bambrick (Bar No. 5455)
Jaclyn C. Marasco (Bar No. 6477)
222 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telephone: (302) 467-4200
Facsimile: (302) 467-4201
Emails: patrick.jackson@faegredrinker.com
        ian.bambrick@faegredrinker.com
        jaclyn.marasco@faegredrinker.com

**CIARDI CIARDI & ASTIN**
Albert A. Ciardi, III, Esquire
Walter W. Gouldsbury III, Esquire
1905 Spruce Street
Philadelphia, PA 19103
Telephone: (215) 557-3550
Facsimile: (215) 557-3551
Emails: aciardi@ciardilaw.com
        wgouldsbury@ciardilaw.com

*Co-Counsel for the False Police Report Claimants*[60]

---

[60] *See supra*, note 2.

ACTIVE.135112366.08

## EXHIBIT A

**Supplemental Declaration of Francis Malofiy**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | :    Chapter 11 |
| | : |
| Rental Car Intermediate Holdings, LLC,[1] | :    Case No. 20-11247 (MFW) |
|            Reorganized Debtors. | : |
| | :    (Jointly Administered) |
| | : |
| | :    **Ref. Case No. 20-11218, D.I. 5875, 5899.** |
| | : |
| | :    **Status Conference Date: January 4, 2022 @ 2:00 p.m. E.T.** |
| | :    **Hearing Date: To Be Determined.** |

## SUPPLEMENT TO DECLARATION OF FRANCIS MALOFIY IN SUPPORT OF CLAIMANTS' MOTION TO DEEM CLAIMS TIMELY OR FOR EXTENSION OF GENERAL BAR DATE UNDER RULES 3003(c) AND 9006

I, Francis Malofiy, declare as follows[2]:

1.　　　I am a Partner of the law firm of Francis Alexander, LLC, counsel to the False Police Report Plaintiffs. I previously submitted a Declaration in support of *Claimants' Motion to Deem Claims Timely or for Extension of General Bar Date Under Rules 3003(c) and 9006* [D.I. 190; D.I. 190-6 to 190-8].

2.　　　I submit this Supplement to my earlier Declaration in support of *Claimants' Reply in Support of Motion to Deem Claims Timely or for Extension of General Bar Date Under Rules*

---

[1] The last four digits of the tax identification number of reorganized debtor Rental Car Intermediate Holdings, LLC ("RCIH") are 2459. The location of the reorganized debtor's service address is 8501 Williams Road, Estero, FL 33928. On September 28, 2021, the Court entered a final decree closing each of the chapter 11 cases for The Hertz Corporation and its reorganized debtors (referred to herein as the "Reorganized Debtors," the "Debtors," or "Hertz") other than RCIH's chapter 11 case. Commencing on September 28, 2021, all motions, notices and other pleadings relating to any of the Reorganized Debtors shall be filed in RCIH's chapter 11 case, Case No. 20-11247 (MFW).
[2] All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

1

*3003(c) and 9006.* The attachments referenced below are labelled consecutively with those submitted with my earlier declaration.

3.      I have personal knowledge of the facts stated in this supplement, and I can testify competently to them if called upon to do so.

4.      Attached hereto as **Attachment AO** is a signed declaration from Claimant Tyresha Caudle, which is a true and correct copy of the declaration she delivered to me.

5.      Attached hereto as **Attachment AP** is a signed declaration from Claimant Janette Brown, which is a true and correct copy of the declaration she delivered to me.

6.      Attached hereto as **Attachment AQ** is an amended, signed declaration from Claimant Sean Hurt, which is a true and correct copy of the declaration he delivered to me. This declaration replaces Mr. Hurt's earlier declaration (Attachment G). The amended declaration corrects an error by clarifying that Mr. Hurt was arrested in November 2020 in Lewisville, Texas. It also attaches additional documentation showing Hertz's charges to Mr. Hurt and the dismissal of criminal charges against him.

7.      Attached hereto as **Attachment AR** is a transcript of the sworn trial testimony of Julie Wilkerson provided on September 14, 2017 before The Philadelphia Court of Common Pleas in Civil Action 151103380, *Kelly A. Grady vs. The Hertz Corporation*, which is a true and correct copy of the testimony found in the court records.

8.      Attached hereto as **Attachment AS** is a partial transcript of the sworn deposition testimony of Richard Livingston provided on October 4, 2016 as part of the Civil Action 151103380, *Kelly A. Grady vs. The Hertz Corporation*, before The Philadelphia Court of Common Pleas, which is a true and correct copy of the testimony recorded by the court reporter.

9.      Attached hereto as **Attachment AT** is a partial transcript of the sworn deposition testimony of Ken Graeber provided on October 16, 2016 as part of the Civil Action 151103380, *Kelly A. Grady vs. The Hertz Corporation*, before The Philadelphia Court of Common Pleas, which is a true and correct copy of the testimony recorded by the court reporter.

10.     Attached hereto as **Attachment AU** is the State of Georgia's December 15, 2021 Motion to Nolle Prosequi and accompanying order of the court in the criminal proceedings against Bianca DeLoach in the Superior Court of Clayton County, Georgia in Case Number 2021CR01670-09, *State of Georgia vs. Bianca Deloach*, which is a true and correct copy of the motion and signed order found in the court records.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed on December 23 2021

Francis Malofiy, Esquire

# ATTACHMENT AO

## DECLARATION OF TYRESHA CAUDLE

1.     My name is Tyresha Caudle.  I have personal knowledge of the facts stated in this declaration, and I can testify competently to them if called upon to do so.

2.     In summation: Tyresha rented a car from Hertz's location at the Dallas Fort Worth Airport in February 2018, and thereafter extended. She had also given Hertz a valid bank card. During the rental, she was going back and forth with Hertz over a billing dispute. However, Hertz charged her card $3,342.43 during the rental and she thought everything was fine. A detective then contacted her on March 15, 2018, and told her she had 24 hours to return the vehicle, seemingly unware of her payment. While she was on her way to return the vehicle on March 15, she was arrested and the car towed. Hertz had already reported the car stolen. Then, over 1 year later in January 2020, she was arrested and jailed for 7 days because Hertz alleged she had not paid for the rental. Hertz even submitted a restitution request to the court for $3,342.43—the exact amount the company had already charged her. Terrified of facing more time in jail, Tyresha took a plea deal.

3.     Tyresha rented a car from the Hertz location the Dallas Fort Worth Airport on February 2, 2018. It was initially for 1 day, but she thereafter extended. The rental record number was 196679755.

4.     In mid-February Tyresha was told by Hertz to give them a call about her credit card. She tried to call, but the number was busy and no one would pick it up.

5.     Then on or around February 26, 2018, an investigator contacted her about the car. The investigator told her that Hertz would pick up the vehicle if the matter could not be worked out. The car was equipped with a GPS tracker.

6.      She then responded to the investigator that she was in the process of making the payment. The investigator told her to let him know when the payment was made, or to drop the car off.

7.      On March 2, 2018, a Friday, the investigator then threatened to report her for car theft, which was bizarre to her in light of the prior conversation about making payment and his prior statement that Hertz would pick up the car if there was an issue.

8.      However, Tyresha thought the situation was resolved on March 6 when Hertz charged her card $3,342.43, which was approved by the bank on March 8, 2018.

9.      Tyresha, at this point, thought that everything with the rental was fine since Hertz had been fully paid.

10.     Yet, on March 15, 2018, Tyresha got another call from a detective who told her that she had 24 hours to return the car. She was thoroughly confused because Hertz had in fact been paid, but started on her way to return the car to the airport location.

11.     What Tyresha did not know was that Hertz had already reported the car stolen and had used GPS to alert the police to the vehicle's location. At no point prior to reporting the car stolen did Hertz use GPS to locate the vehicle and pick it up prior to involving the police.

12.     During a brief stop while on her way to the airport on March 15, 2018, Tyresha was detained by police and the car was towed. Caudle explained to the officer that she had extended the rental and had been fully billed, but was actually returning the car that day because of a call from a detective telling her to return the car.

13.     None of this mattered; Tyresha was arrested and spent the day in jail.

14.     Bizarrely, Hertz had falsely told the police that Tyresha had not paid anything toward the vehicle.

15.     However, she was not formally charged at that time because a warrant had not issued for her yet. The warrant only issued on March 20, 2018, after Hertz told police that Caudle had paid nothing for the rental—which was an absolute falsehood.

16.     On January 28, 2020, in Rockwall, TX, Tyresha was pulled over for a traffic violation and was shocked when she was arrested. She spent 7 days in the Rockwall County jail.

17.     She was then prosecuted in Tarrant County Criminal District Court Two for Theft of Services under Cause No. 1629072 for the next 1.5 years.

18.     Terrified of going to jail for years, Tyresha took a plea on October 7, 2021 given the enormous pressure on her.

19.     Hertz's failures in her case that led to the false theft report were egregious.

20.     For instance, Hertz told the police that Tyresha had not paid any money for the rental and had given them a bad card. In fact, she was charged $3,342.43 in early March 2018 and had clearly not stolen any car.

21.     Hertz never told the police about this payment, and even attempted to collect restitution from Tyresha while hiding that she had paid.

22.     Hertz had also told Tyresha that it would pick up the car before reporting it stolen; the car was equipped with GPS and easy to locate.

23.     Instead of locating the car with GPS and picking it up *before* filing a theft report, Hertz first reported Tyresha to the police and then told the police the GPS location so that the police would pay for the tow and recovery. This is backwards and outrageous.

24.     Furthermore, the theft report submitted to police by Hertz not only omits extension requests she made, but it also deliberately omits contact she had with the company in late February 2018 which would have made it clear she was a not a car thief.

25.     Given that Hertz repeatedly asked that Tyresha be arrested, and gave false payment information to the police, Hertz is fully aware of the false report if filed against her. She also believes Hertz was contacted by the prosecution during her case and knew that she was trying to fight their accusations.

26.     Tyresha did not know about any bar date. She does not regularly *read USA Today, The Wall Street Journal, The New York Times, The Globe and Mail, The Philadelphia Inquirer, San Francisco Chronicle, Arizona Republic, Chicago Tribune, Los Angeles Times, The San Diego Union Tribune, Naples Daily News, El Diario De El Paso, or Journal De Montreal.*

27.     As a direct and proximate result of Hertz's conduct, Tyresha was arrested twice, thrown in jail for 8 days, was falsely prosecuted for three years, had her reputation harmed, and has been severely mentally and emotionally harmed.

28.     There was no probable cause for Hertz to report Tyresha for any crime at any point in time.


I declare under the penalty of perjury of the United States of America that the foregoing is true and correct.

Dated:  December____, 2021           /s/ _Tyresha Cardle_____
                        23                        Declarant

| | |
|---|---|
| NAME  TYRESHA CAUDLE | OFFENSE  THEFT OF SERV >=$2,500<$30K |
| RACE  Black  SEX  Female  AGE  29  DOB  8/24/1990 | OFFENSE DATE  2/3/2018 |
| CASE NO.  1629072 | I.P.  CIEARA WILLIAMS |
| CID NO.  0808556 | AGENCY  DFW AIRPORT PD |
| | CRIMINAL DISTRICT COURT NO. 2 |

## THE STATE OF TEXAS VS. TYRESHA CAUDLE

## COMPLAINT NO: 1629072

**IN THE NAME AND BY THE AUTHORITY OF THE STATE OF TEXAS:**

Before me, the undersigned Assistant Criminal District Attorney of Tarrant County, Texas, this day personally appeared affiant, who upon his oath says that he has good reason to believe and does believe

THAT TYRESHA CAUDLE, HEREINAFTER CALLED DEFENDANT, ON OR ABOUT THE 3RD DAY OF FEBRUARY 2018, IN THE COUNTY OF TARRANT, STATE OF TEXAS, DID  INTENTIONALLY OR KNOWINGLY, WITH INTENT TO AVOID PAYMENT FOR SERVICE THAT HE KNOWS IS PROVIDED ONLY FOR COMPENSATION, CONTROL OR HOLD PERSONAL PROPERTY, NAMELY, A MOTOR VEHICLE, UNDER A WRITTEN RENTAL AGREEMENT BEYOND THE EXPIRATION OF THE RENTAL PERIOD WITHOUT THE EFFECTIVE CONSENT OF THE OWNER, CIEARA WILLIAMS, AND DEPRIVING THE SAID OWNER OF THE PROPERTY OF ITS USE IN FURTHER RENTALS, THE VALUE OF SAID FURTHER RENTALS IS $2,500 OR MORE BUT LESS THAN $30,000,

AGAINST THE PEACE AND DIGNITY OF THE STATE.

Sworn to and subscribed before me on this the         day of                    , 20     .

_____          _____
Affiant                                                              Assistant Criminal District Attorney of Tarrant County, Texas

COMPLAINT

# TEXAS
# INCIDENT REPORT
UNAPPROVED

**INCIDENT**

| PAGE # | ORI NUMBER |
|---|---|
| 1 | TX1990000 |

**INCIDENT NUMBER**
2020-00121

**DATE(S) OF INCIDENT**   R
01/28/2020

**AGENCY NAME**
ROCKWALL COUNTY SHERIFF'S OFFICE

**TIME(S) OF INCIDENT**
01:46 - 02:35

**DAY(S) OF INCIDENT**
Tuesday

**INTERNAL INCIDENT STATUS:**
- ☐ (A) Active
- ☑ (CA) Closed by Arrest
- ☐ (CE) Closed by Exception
- ☐ (CO) Closed by Other Means
- ☐ (I) Inactive
- ☐ (U) Unfounded

**EXCEPTIONAL CLEARANCE STATUS:**
- ☐ (A) Death of the Offender
- ☐ (B) Prosecution Declined
- ☐ (C) Extradition Denied
- ☐ (D) Victim Ref. to Cooperate
- ☐ (E) Juvenile, No Custody
- ☑ (N) Not Applicable

**DISPATCHER**
rsotew - Wilson, Teresa

**TIME RECEIVED** 1:46

**TIME ARRIVED** 1:46

**REPORTING AREA**

**EXCEPT. CLEAR. DATE**

**OFFENSE**

| OFFENSE # | UCR CODE | OFFENSE STATUS: | OFFENDER USED: ☑ (N) Not Applicable | Burglary (220) Location 14&19: | FORCED ENTRY? |
|---|---|---|---|---|---|
| 1 | 90Z | ☐ (A) Attempted ☑ (C) Completed | ☐ (A) Alcohol ☐ (C) Cptr. Equip. ☐ (D) Drugs | # PREMISES ENTERED? | ☐ Yes ☐ No |

**OFFENSE DESCRIPTION**
WARRANT - THEFT OF SERVICE $2500 < $30000

**STATUTE**
WARRANT

**ADDRESS OF OFFENSE**
SSR/OLIVE GARDEN, ROCKWALL, TX 75087

**LOCATION CODE** (Enter 1)
- ☐ (01) Air/Bus/Train Terminal
- ☐ (02) Bank/Savings & Loan
- ☐ (03) Bar/Night Club
- ☐ (04) Church/Synagogue/Temple/Mosque
- ☐ (05) Commercial/Office Building
- ☐ (06) Construction Site
- ☐ (07) Convenience Store
- ☐ (08) Department/Discount Store
- ☐ (09) Drug Store/Doctor's Office/Hospital
- ☐ (10) Field/Woods
- ☐ (11) Government/Public Building
- ☐ (12) Grocery/Supermarket
- ☑ (13) Highway/Road/Alley/Street/Sidewalk
- ☐ (14) Hotel/Motel/Etc.
- ☐ (15) Jail/Prison/Penitentiary/Corrections Facility
- ☐ (16) Lake/Waterway/Beach
- ☐ (17) Liquor Store
- ☐ (18) Parking Lot/Drop Lot/Garage
- ☐ (19) Rental/Storage Facility
- ☐ (20) Residence/Home
- ☐ (21) Restaurant
- ☐ (23) Service/Gas Station
- ☐ (24) Specialty Store
- ☐ (25) Other/Unknown
- ☐ (37) Abandoned/Condemned Structure
- ☐ (38) Amusement Park
- ☐ (39) Arena/Stadium/Fairgrounds/Coliseum
- ☐ (40) ATM Separate From Bank
- ☐ (41) Auto Dealership New/Used
- ☐ (42) Camp/Campground
- ☐ (44) Daycare Facility
- ☐ (45) Dock/Wharf/Freight/Modal Terminal
- ☐ (46) Farm Facility
- ☐ (47) Gambling Facility/Casino/Race Track
- ☐ (48) Industrial Site
- ☐ (49) Military Installation
- ☐ (50) Park/Playground
- ☐ (51) Rest Area
- ☐ (52) School - College/University
- ☐ (53) School - Elementary/Secondary
- ☐ (54) Shelter - Mission/Homeless
- ☐ (55) Shopping Mall
- ☐ (56) Tribal Lands
- ☐ (57) Community Center

**WEAPON FORCE:** (Max. 3)
(For 11-15, place "A" in space next to box if weapon was an Automatic.)
- ____ ☐ (11) Firearm (Type not stated)
- ____ ☐ (12) Handgun
- ____ ☐ (13) Rifle
- ____ ☐ (14) Shotgun
- ____ ☐ (15) Other Firearm
- ☐ (20) Knife/Cutting Instru. (Ax, etc.)
- ☐ (30) Blunt Object (Club, etc.)
- ☐ (35) Motor Vehicle (As weapon)
- ☐ (40) Personal Weapons (Hands, etc.)
- ☐ (50) Poison
- ☐ (60) Explosives
- ☐ (65) Fire/Incendiary Device
- ☐ (70) Narcotics/Drugs/ Sleeping Pills
- ☐ (85) Asphyxiation
- ☐ (90) Other
- ☐ (95) Unknown
- ☐ (99) None

**TYPE CRIMINAL ACTIVITY:** (Max. 3)
- ☐ (B) Buying
- ☐ (C) Cultivate/Manufacture/Publish
- ☐ (D) Distributing/Selling
- ☐ (E) Exploiting Children
- ☐ (O) Operating/Promoting/Assisting
- ☐ (P) Possessing/Concealing
- ☐ (T) Transport/Transmit/Import
- ☐ (U) Using/Consuming

**TYPE GANG ACTIVITY:** (Max. 3)
- ☐ (G) Other Gang
- ☐ (J) Juvenile Gang
- ☐ (N) None/Unknown

**BIAS MOTIVATED CRIME:**
None (No Bias)

**VICTIM**

| VICTIM # | NAME: Last, First, Middle | DRIVER'S LICENSE | DR. LI. STATE | SOC. SEC. NO. | DATE OF BIRTH |
|---|---|---|---|---|---|
| 1 | STATE OF TEXAS, ROCKWALL COUNTY | | | | |

**RESIDENT ADDRESS:** Street   City   State   ZIP
950 T L TOWNSEND, ROCKWALL, TX   75087

**OCCUPATION**

**RESIDENT PHONE**
(972) 204-7001

**EMPLOYMENT PHONE**

**SEX:**
☐ (M) Male   ☐ (F) Female   ☐ (U) Unknown

**ETHNIC:**
☐ (H) Hispanic   ☐ (N) Nonhispanic   ☐ (U) Unknown

**AGE:**
Exact Age ____
Range ____ / ____
- ☐ (NN) Under 24 Hrs. Old
- ☐ (NB) 1-6 Days Old
- ☐ (BB) 7-364 Days Old
- ☐ (99) Over 98 Yrs. Old
- ☐ (00) Unknown

**RACE:**
☐ (W) White   ☐ (I) American Indian   ☐ (U) Unknown
☐ (B) Black   ☐ (A) Asian/Pacific Islander

**RES. STATUS:**
☐ (R) Resident   ☐ (N) Nonresident   ☐ (U) Unknown

**VICTIM TYPE:** ☐ (I) Individual ☐ (B) Business ☐ (F) Financial Institution ☐ (U) Unknown
☐ (G) Government ☐ (R) Religious ☑ (S) Society/Public ☐ (O) Other

**VICTIM INJURY:** (Max. 5)
- ☐ (N) None
- ☐ (A) Apparent Broken Bones
- ☐ (I) Possible Internal Injury
- ☐ (L) Severe Laceration
- ☐ (M) Apparent Minor Injury
- ☐ (O) Other Major Injury
- ☐ (T) Loss of Teeth
- ☐ (U) Unconsciousness

**THIS VICTIM RELATED TO WHICH OFFENSES?**
☐ #1 ☐ #4 ☐ #7 ☐ #10
☐ #2 ☐ #5 ☐ #8 others:
☐ #3 ☐ #6 ☐ #9

**RELATIONSHIP OF THIS VICTIM TO OFFENDERS**
(check relationship under appropriate offender number):

| | #1 | #2 | #3 | #4 | #5 | #6 | #7 | #8 | #9 | #10 | VICTIM WAS: |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | (SE) Spouse |
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | (CS) Common-Law Spouse |
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | (PA) Parent |
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | (SB) Sibling |
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | (CH) Child |
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | (GP) Grandparent |
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | (GC) Grandchild |
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | (IL) In-Law |
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | (SP) Stepparent |
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | (SC) Stepchild |
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | (SS) Stepsibling |
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | (OF) Other Family Member |
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | (AQ) Acquaintance |
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | (FR) Friend |
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | (NE) Neighbor |
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | (BE) Babysittee (baby) |
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | (BG) Boyfriend/Girlfriend |
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | (CF) Child of Boyfriend/Girlfriend |
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | (HR) Homosexual Relationship |
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | (XS) Ex-Spouse |
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | (EE) Employee |
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | (ER) Employer |
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | (OK) Otherwise Known |
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | (RU) Relationship Unknown |
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | (ST) Stranger |
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | (VO) Victim was Offender |

**AGGRAVATED ASSAULT/HOMICIDE CIRCUMSTANCES**

**Aggravated Assault/Murder:** (max. 3)
- ☐ (01) Argument
- ☐ (02) Assault On Law Enf. Officer
- ☐ (03) Drug Dealing
- ☐ (04) Gangland
- ☐ (05) Juvenile Gang
- ☐ (06) Lover's Quarrel
- ☐ (07) Mercy Killing
- ☐ (08) Other Felony Involved
- ☐ (09) Other Circumstances
- ☐ (10) Unknown Circumstances

**Negligent Manslaughter:** (enter 1)
- ☐ (30) Child Playing With Weapon
- ☐ (31) Gun-Cleaning Accident
- ☐ (32) Hunting Accident
- ☐ (33) Other Negligent Weapon Handling
- ☐ (34) Other Negligent Killings

**Justifiable Homicide:** (enter 1)
- ☐ (20) Criminal Killed by Private Citizen
- ☐ (21) Criminal Killed by Police Officer

**ADDITIONAL JUSTIFIABLE HOMICIDE CIRC.:**
(enter 1)
- ☐ (A) Criminal Attacked Police Officer
- ☐ (B) Criminal Attacked Fellow Police Officer
- ☐ (C) Criminal Attacked Civilian
- ☐ (D) Criminal Attempted Flight from a Crime
- ☐ (E) Criminal Killed in Commission of a Crime
- ☐ (F) Criminal Resisted Arrest
- ☐ (G) Unable to Determine/Not Enough Information

**ADM**

| REPORT DATE | DAY | TIME (Military) | REPORTING OFFICER | CODE # | APPROVING SUPERVISOR | CODE # | DATE APPROVED |
|---|---|---|---|---|---|---|---|
| 01/28/2020 | Tue | 1:46 | DEPUTY CHRISTOPHER E. S | 539CES | | | |

# INCIDENT REPORT

| PAGE # 2 | DATE 01/28/2020 | INCIDENT NUMBER 2020-00121 | OR# ("B") TX1990000 | REPORTING OFFICER DEPUTY CHRISTOPHER E. STRATT | CODE # 539CES | VICTIM NAME STATE OF TEXAS, ROCKWALL COUNTY |
|---|---|---|---|---|---|---|

**OFFENDER / ARRESTEE**

| ARRESTEE # | NAME Last, CAUDLE, TYRESHA SHARDINA | First, | Middle, | AKA |
|---|---|---|---|---|

| OFFENDER # 1 | RESIDENT ADDRESS Street 1001 FRINGEWOOD DR, FT WORTH, TX | City | State | Zip 76120 | DATE OF BIRTH 08/24/1990 |
|---|---|---|---|---|---|

| RESIDENT PHONE (682) 251-5577 | EMPLOYMENT/SCHOOL PHONE | DRIVER'S LICENSE 33702674 | DR. LI. STATE TX | SSN 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 |
|---|---|---|---|---|

| ARREST LOCATION | OCCUPATION HOUSE KEEPING | PLACE OF EMPLOYMENT MOTEL 6 | ARREST TYPE: ☐ (O) On View Arrest ☐ (S) Summons/Cited ☐ (T) Taken Into Cust. |
|---|---|---|---|

| SEX: ☐ (M) Male ■ (F) Female ☐ (U) Unk. | AGE: EXACT AGE 29 AGE RANGE: ___ to ___ ☐ (99) Over 98 Yrs. Old ☐ (00) Unknown | MULT. ARREST INDIC.: ☐ (C) Count Arrestee ☐ (M) Multiple ☐ (N) N/A | WEAPONS AT ARREST: (Max. 2) (Place "A" in blank if automatic) |
|---|---|---|---|
| ETHNIC: ☐ (H) Hispanic ■ (N) Nonhisp. ☐ (U) Unk. | | | ☐ (01) Unarmed ☐ (16) Illegal Cutting Instr. |
| RACE ☐ (W) White ■ (B) Black ☐ (I) American Indian ☐ (A) Asian/Pacific Islander ☐ (U) Unknown | | DISPOSITION OF JUVENILE: ☐ (H) Handled within Department. ☐ (R) Referred outside Department | ☐ (11) Firearm ☐ (12) Handgun ☐ (13) Rifle ☐ (14) Shotgun ☐ (15) Other Firearm ☐ (17) Club / Blackjack / Brass Kn. |

| RES. STATUS: ☐ (R) Resident ☐ (N) Nonres. ☐ (U) Unknown | UCR ARR. CODE | OFFENSE NAME | ARREST DATE | ARREST TRANSACT. # |
|---|---|---|---|---|

| HEIGHT 5'01" | WEIGHT 115 | BUILD LGT - Light | HAIR COLOR BLK - Black | HAIR STYLE CRL - Curly | HAIR LENGTH MED - Medium | EYE COLOR BRO - Brown | SKIN TONE LBR - Light Brown |
|---|---|---|---|---|---|---|---|

**OFFENDER / ARRESTEE**

| ARRESTEE # 1 | NAME Last, CAUDLE, TYRESHA SHARDINA | First, | Middle, | AKA |
|---|---|---|---|---|

| OFFENDER # | RESIDENT ADDRESS Street 1001 FRINGEWOOD DR, FT WORTH, TX | City | State | Zip 76120 | DATE OF BIRTH 08/24/1990 |
|---|---|---|---|---|---|

| RESIDENT PHONE (682) 251-5577 | EMPLOYMENT/SCHOOL PHONE | DRIVER'S LICENSE 33702674 | DR. LI. STATE TX | SSN 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 |
|---|---|---|---|---|

| ARREST LOCATION | OCCUPATION HOUSE KEEPING | PLACE OF EMPLOYMENT MOTEL 6 | ARREST TYPE: ☐ (O) On View Arrest ☐ (S) Summons/Cited ☐ (T) Taken Into Cust. |
|---|---|---|---|

| SEX: ☐ (M) Male ■ (F) Female ☐ (U) Unk. | AGE: EXACT AGE 29 AGE RANGE: ___ to ___ ☐ (99) Over 98 Yrs. Old ☐ (00) Unknown | MULT. ARREST INDIC.: ☐ (C) Count Arrestee ☐ (M) Multiple ■ (N) N/A | WEAPONS AT ARREST: (Max. 2) (Place "A" in blank if automatic) |
|---|---|---|---|
| ETHNIC: ☐ (H) Hispanic ■ (N) Nonhisp. ☐ (U) Unk. | | | ☐ (01) Unarmed ☐ (16) Illegal Cutting Instr. |
| RACE ☐ (W) White ■ (B) Black ☐ (I) American Indian ☐ (A) Asian/Pacific Islander ☐ (U) Unknown | | DISPOSITION OF JUVENILE: ☐ (H) Handled within Department. ☐ (R) Referred outside Department | ☐ (11) Firearm ☐ (12) Handgun ☐ (13) Rifle ☐ (14) Shotgun ☐ (15) Other Firearm ☐ (17) Club / Blackjack / Brass Kn. |

| RES. STATUS: ☐ (R) Resident ■ (N) Nonres. ☐ (U) Unknown | UCR ARR. CODE 90Z | OFFENSE NAME WARRANT - THEFT OF SERVICE $2 | ARREST DATE 1/28/2020 | ARREST TRANSACT. # 2020-00121 |
|---|---|---|---|---|

| HEIGHT 5'01" | WEIGHT 115 | BUILD LGT - Light | HAIR COLOR BLK - Black | HAIR STYLE CRL - Curly | HAIR LENGTH MED - Medium | EYE COLOR BRO - Brown | SKIN TONE LBR - Light Brown |
|---|---|---|---|---|---|---|---|

**SUBJECT DESCRIPTORS**

OFFENDER #1: Last, First, Middle
CAUDLE, TYRESHA SHARDINA

| FEATURE Tattoo | LOCATION: RIGH | BODY PART: FARM | FEATURE DESCRIPTION: |
|---|---|---|---|
| Tattoo | RIGH | FARM | |

ARRESTEE #1: Last, First, Middle
CAUDLE, TYRESHA SHARDINA

| FEATURE Tattoo | LOCATION: | BODY PART: | FEATURE DESCRIPTION: |
|---|---|---|---|

# INCIDENT REPORT

| VEHICLE / HEAD | | | | | | | |
|---|---|---|---|---|---|---|---|
| PAGE #: 3 | DATE: 01/28/2020 | INCIDENT #: 2020-00121 | REPORTING OFFICER: DEPUTY CHRISTOPHER E. STRATTON | | CODE #: 539CES | VICTIM NAME: STATE OF TEXAS, ROCKWALL COUN | |

| YEAR | MAKE | MODEL | STYLE | VIN | | LICENSE NUMBER | STATE |
|---|---|---|---|---|---|---|---|
| 2008 | CHRYSLER | SEBRING | 4DR | 1C3LC46KX8N157753 | | 54486A9 | TX |

| OWNER'S NAME | ADDRESS |
|---|---|
| CAUDLE, TYRESHA SHARDINA | 1001 FRINGEWOOD DR, FT WORTH, TX 76120 |

| TOP/SOLID COLOR | SECOND COLOR | DISPOSITION OF RECOVERY: |
|---|---|---|
| TAN | | ☐ (I) Impounded   ☐ (R) Released To Owner |

| YEAR | MAKE | MODEL | STYLE | VIN | LICENSE NUMBER | STATE |
|---|---|---|---|---|---|---|
| | | | | | | |

| OWNER'S NAME | ADDRESS |
|---|---|
| | |

| TOP/SOLID COLOR | SECOND COLOR | DISPOSITION OF RECOVERY: |
|---|---|---|
| | | ☐ (I) Impounded   ☐ (R) Released To Owner |

## PROPERTY

| OF. CODE | P. LOSS | P. DES. | QTY. | DESCRIPTION (Include serial number, make, model, primary color) | OWNER | ITEM VALUE | RECOV. DATE |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

| TOTAL NUMBER VEHICLES STOLEN: | TOTAL NUMBER VEHICLES RECOVERED: | TOTAL VALUE STOLEN: | TOTAL VALUE RECOVERED: |
|---|---|---|---|
| | | | |

## PROPERTY CODES

PROPERTY LOSS:   (1) None   (2) Burned   (3) Counterfeited/Forged   (4) Damaged/Destroyed/Vandalized   (5) Recovered   (6) Seized   (7) Stolen, etc.   (8) Unk.

PROPERTY DESCRIPTION:
- (01) Aircraft
- (02) Alcohol
- (03) Automobiles
- (04) Bicycles
- (05) Buses
- (06) Cloths/Furs
- (07) Computer Hardware/Software
- (08) Consumable Goods
- (09) Credit/Debit Cards
- (10) Drugs/Narcotics
- (11) Drug/Narcotic Equipment
- (12) Farm Equipment
- (13) Firearms
- (14) Gambling Equipment
- (15) Heavy Construction/Industrial Equipment
- (16) Household Goods
- (17) Jewelry/Precious Metals/Gems
- (18) Livestock
- (19) Merchandise
- (20) Money
- (21) Negotiable Instruments
- (22) Nonnegotiable Instruments
- (23) Office-Type Equipment
- (24) Other Motor Vehicles
- (25) Purses/Handbags/Wallets
- (26) Radios/TVs/VCRs/DVD Players
- (27) Recordings-Audio/Visual
- (28) Recreational Vehicles
- (29) Structures-Single Occupancy
- (30) Structures-Other Dwellings
- (31) Structures-Commercial/Business
- (32) Structures-Industrial/Manufacturing
- (33) Structures-Public/Community
- (34) Structures-Storage
- (35) Structures-Other
- (36) Tools
- (37) Trucks
- (38) Vehicle Parts/Accessories
- (39) Watercraft
- (41) Aircraft Parts/Accessories
- (42) Artistic Supplies/Accessories
- (43) Building Materials
- (44) Camping/Hunting/Fishing Equipment/Supplies
- (45) Chemicals
- (48) Collections/Collectibles
- (47) Crops
- (48) Documents/Personal or Business
- (49) Explosives
- (59) Firearm Accessories
- (64) Fuel
- (65) Identity Documents
- (66) Identity - Intangible
- (67) Law Enforcement Equipment
- (68) Lawn/Yard/Garden Equipment
- (69) Logging Equipment
- (70) Medical/Medical Lab Equipment
- (71) Metals, Non-Precious
- (72) Musical Instruments
- (73) Pets
- (74) Photographic/Optical Equipment
- (75) Portable Electronic Communications
- (76) Recreational/Sports Equipment
- (77) Other
- (78) Trailers
- (79) Watercraft Equipment/Parts/Accessories
- (80) Weapons - Other
- (88) Pending Inventory (of Property)

## DRUG INFO.

| DRUG TYPE | WHOLE DRUG QUANTITY | FRACTIONAL DRUG QUANTITY | DRUG MEASUREMENT | TYPE DRUG MEASUREMENT: |
|---|---|---|---|---|
| | | | | WEIGHT          CAPACITY |

TYPE DRUG MEASUREMENT:

WEIGHT
- (GM) Gram
- (KG) Kilogram
- (OZ) Ounce
- (LB) Pound

CAPACITY
- (ML) Milliliter
- (LT) Liter
- (FO) Fluid Ounce
- (GL) Gallon

UNITS
- (DU) Dosage Unit (Pills, etc.)
- (NP) Number of Plants

DRUG TYPE:
- (A) "Crack" Cocaine
- (B) Cocaine
- (C) Hashish
- (D) Heroin
- (E) Marijuana
- (F) Morphine
- (G) Opium
- (H) Other Narcotics
- (I) LSD
- (J) PSP
- (K) Other Hallucinogens
- (L) Amphetamines/Methamphetamines
- (M) Other Stimulants
- (N) Barbiturates
- (O) Other Depressants
- (P) Other Drugs
- (U) Unknown Type Drug
- (X) Over 3 Drug Types

## COMPLNT.

| NAME: Last, | First, | Middle | SEX: | AGE: | RACE: |
|---|---|---|---|---|---|
| | | | ☐ (M) Male ☐ (F) Female ☐ (U) Unk. | ☐ (00) Unknown | ☐ (W) White ☐ (B) Black ☐ (I) American Indian ☐ (A) Asian/Pacific Islander ☐ (U) Unknown |

| RESIDENT ADDRESS: Street | City | State | Zip | RESIDENT PHONE | EMPLOY'T. PHONE |
|---|---|---|---|---|---|
| | | | | | |

## CONFIDENTIAL SUPPLEMENT

| PAGE # | DATE | INCIDENT NUMBER | REPORTING OFFICER | CODE # | VICTIM NAME |
|---|---|---|---|---|---|
| 4 | 01/28/2020 | 2020-00121 | DEPUTY CHRISTOPHER E. STRATT | 539CES | STATE OF TEXAS, ROCKWALL COUNTY |

**WITNESSES**

| NAME: | Last, | First, | Middle | SEX: ☐ (U) Unk. ☐ (M) Male ☐ (F) Female | AGE: ☐ (00) Unknown | RACE: ☐ (U) Unk. ☐ (W) White ☐ (B) Black ☐ (I) American Indian ☐ (A) Asian/Pacific Islander |
|---|---|---|---|---|---|---|
| RESIDENT ADDRESS: | Street | City | State | Zip | RESIDENT PHONE | EMPL. PHONE |
| NAME: | Last, | First, | Middle | SEX: ☐ (U) Unk. ☐ (M) Male ☐ (F) Female | AGE: ☐ (00) Unknown | RACE: ☐ (U) Unk. ☐ (W) White ☐ (B) Black ☐ (I) American Indian ☐ (A) Asian/Pacific Islander |
| RESIDENT ADDRESS: | Street | City | State | Zip | RESIDENT PHONE | EMPL. PHONE |

**NARRATIVE:**

On 01/28/2020 at approximately 1:46am, I, Deputy Stratton #539 was traveling eastbound on Interstate Highway 30 near State Highway 205. I observed a white Chrysler Sebring ahead of me with an unsecured temporary paper license plate that was blowing up in the wind. I activated my overhead emergency lights, and conducted a traffic stop on the south service road of Interstate 30 near the Olive Garden restaurant. As I approached the vehicle, I observed that the registration displayed on the vehicle expired 01/06/2020.

I made contact with the driver of the vehicle and identified her by her TX DL#33702674 as Caudle, Tyresha B/F DOB 08/24/1990. I identified the passenger of the vehicle by his LA DL#10770088 as Bonner, Jermon B/M DOB 04/13/1992. Dispatch advised that Caudle had 2 active TCIC warrants for her arrest out of DFW Airport PD and North Richland Hills PD. I advised dispatch to confirm on both warrants. I placed Caudle in a set of double locked handcuffs and into the back seat of my patrol vehicle. The vehicle was released to Bonner. I transported Caudle to RCDC where she was booked in on her warrants and released to jail staff without incident.

# CONTINUATION PAGE

| PAGE #<br>5 | DATE<br>01/28/2020 | INCIDENT #<br>2020-00121 | REPORTING OFFICER<br>DEPUTY CHRISTOPHER E. STRATTON | CODE #<br>539CES | VICTIM NAME<br>STATE OF TEXAS, ROCKWALL COUNT |
|---|---|---|---|---|---|

## Offense(s)

| OFFENSE #<br>2 | UCR CODE<br>90Z | OFFENSE STATUS:<br>☐ (A) Attempted ☑ (C) Completed | OFFENDER USED:<br>☐ (A) Alcohol ☐ (C) Cptr. Equip. ☐ (D) Drugs | ☑ (N) Not Applicable | Burglary (220) Location 14&19:<br># PREMISES ENTERED? | FORCED ENTRY?<br>☐ Yes ☐ No |
|---|---|---|---|---|---|---|

| OFFENSE DESCRIPTION<br>WARRANT - THEFT OF SERVICE $100 < $750 | STATUTE<br>WARRANT | ADDRESS OF OFFENSE<br>SSR/OLIVE GARDEN, ROCKWALL, TX 75087 |
|---|---|---|

| LOCATION CODE     (Enter 1) | | WEAPON FORCE:     (Max. 3)<br>(For 11-15, place "A" in space next to box<br>if weapon was an Automatic.) |
|---|---|---|
| ☐ (01) Air/Bus/Train Terminal | ☐ (17) Liquor Store | |
| ☐ (02) Bank/Savings & Loan | ☐ (18) Parking Lot/Drop Lot/Garage | ☐ (46) Farm Facility |
| ☐ (03) Bar/Night Club | ☐ (19) Rental/Storage Facility | ☐ (47) Gambling Facility/Casino/Race |
| ☐ (04) Church/Synagogue/Temple/Mosque | ☐ (20) Residence/Home | Track |
| ☐ (05) Commercial/Office Building | ☐ (21) Restaurant | ☐ (48) Industrial Site |
| ☐ (06) Construction Site | ☐ (23) Service/Gas Station | ☐ (49) Military Installation |
| ☐ (07) Convenience Store | ☐ (24) Specialty Store | ☐ (50) Park/Playground |
| ☐ (08) Department/Discount Store | ☐ (25) Other/Unknown | ☐ (51) Rest Area |
| ☐ (09) Drug Store/Doctor's Office/Hospital | ☐ (37) Abandoned/Condemned | ☐ (52) School - College/University |
| ☐ (10) Field/Woods | Structure | ☐ (53) School - Elementary/Secondary |
| ☐ (11) Government/Public Building | ☐ (38) Amusement Park | ☐ (54) Shelter - Mission/Homeless |
| ☐ (12) Grocery/Supermarket | ☐ (39) Arena/Stadium/Fairgrounds/ | ☐ (55) Shopping Mall |
| ☑ (13) Highway/Road/Alley/Street/Sidewalk | Coliseum | ☐ (56) Tribal Lands |
| ☐ (14) Hotel/Motel/Etc. | ☐ (40) ATM Separate From Bank | ☐ (57) Community Center |
| ☐ (15) Jail/Prison/Penitentiary/Corrections | ☐ (41) Auto Dealership New/Used | |
| Facility | ☐ (42) Camp/Campground | |
| ☐ (16) Lake/Waterway/Beach | ☐ (44) Daycare Facility | |
| | ☐ (45) Dock/Wharf/Freight/Modal Terminal | |

WEAPON FORCE column entries:
- ☐ (11) Firearm (Type not stated)     ☐ (90) Other
- ☐ (12) Handgun     ☐ (95) Unknown
- ☐ (13) Rifle     ☐ (99) None
- ☐ (14) Shotgun
- ☐ (15) Other Firearm
- ☐ (20) Knife/Cutting Instru. (Ax, etc.)
- ☐ (30) Blunt Object (Club, etc.)
- ☐ (35) Motor Vehicle (As weapon)
- ☐ (40) Personal Weapons (Hands, etc.)
- ☐ (50) Poison
- ☐ (60) Explosives
- ☐ (65) Fire/Incendiary Device
- ☐ (70) Narcotics/Drugs/ Sleeping Pills
- ☐ (85) Asphyxiation

| TYPE CRIMINAL ACTIVITY:     (Max. 3) | | TYPE GANG ACTIVITY:     (Max. 3) |
|---|---|---|
| ☐ (B) Buying | ☐ (O) Operating/Promoting/Assisting | ☐ (G) Other Gang |
| ☐ (C) Cultivate/Manufacture/Publish | ☐ (P) Possessing/Concealing | ☐ (J) Juvenile Gang |
| ☐ (D) Distributing/Selling | ☐ (T) Transport/Transmit/Import | ☐ (N) None/Unknown |
| ☐ (E) Exploiting Children | ☐ (U) Using/Consuming | |

| BIAS MOTIVATED CRIME:<br>None (No Bias) |
|---|

## Arrest Offense(s)

**Arrestee #1: CAUDLE, TYRESHA SHARDINA**

| SEQ. | OFFENSE CODE | OFFENSE DESCRIPTION |
|---|---|---|
| 2 | 90Z | WARRANT - THEFT OF SERVICE $100 < $750 |

## Others Involved

### OTHER

| NAME:     Last,          First,          Middle<br>          BONNER, JERMON | SEX:<br>☑ (M) Male<br>☐ (F) Female<br>☐ (U) Unk. | AGE:  27<br>☐ (00) Unknown | RACE:<br>☐ (W) White<br>☑ (B) Black<br>☐ (I) American Indian<br>☐ (A) Asian/Pacific Islander<br>☐ (U) Unknown |
|---|---|---|---|
| RESIDENT ADDRESS:     Street          City          State          Zip<br>916 VAN AVE, Bastrop, TX          71220 | RESIDENT PHONE | EMPLOY'T. PHONE | |

TYRESHA S CAUDLE                    [REDACTED]                    Page 2 of 3

## Important Information

Listed below are the phone numbers we have on file for you:
Home Phone 000-000-0000    Business Phone 682-204-7568
Cell Phone 000-000-0000    Other Phone 469-957-8594
E-mail [REDACTED]@GMAIL.COM

Please use the following options available to update your records:
Call: 1- 800-987-5521
Website: www.mypremiercreditcard.com
Remit Coupon: Update your information with your payment

**Indemnification: You agree to indemnify us for all damages, costs and expenses, including reasonable attorney fees, we incur when we attempt to contact you at any third party's telephone number for which you fail to notify us is no longer associated with you as the subscriber.**

YOUR ACCOUNT IS PAST DUE $30.00. PLEASE REMIT
PAYMENT TODAY OR CALL 1-800-987-5521 FOR
ASSISTANCE.

## Your Transactions

| Tran Date | Post Date | Reference | Transaction Description | | Amount |
|---|---|---|---|---|---|
| 02/18 | 02/18 | 7541823E11FKJWY4F | CREDITREPORT | 800-7569684 UT | $14.99 |
| 03/03 | 03/03 | 5543286EE5SB56ZXN | PLAYSTATION NETWORK | 800-345-7669 CA | $64.94 |
| 03/03 | 03/03 | 5543286EE5SG8SE8Z | PLAYSTATION NETWORK | 800-345-7669 CA | $19.99 |
| 03/05 | 03/05 | 5543286EG5SP4M2YL | PLAYSTATION NETWORK | 800-345-7669 CA | $19.99 |
| 03/05 | 03/05 | 5543286EG5SR72MZH | PLAYSTATION NETWORK | 800-345-7669 CA | $19.99 |
| 03/05 | 03/05 | 1527021EG000L557G | PLAYSTATIONNETWORK SAN MATEO  CA | | $19.99 |
| 03/08 | 03/08 | 5517842EKHV2MXJJ6 | HERTZ RENT-A-CAR DALLAS  TX | | $3,342.43 |

|  | | | Fees | | |
|---|---|---|---|---|---|
| 03/13 | 03/13 | | PREMIER CREDIT PROTECTION    AT  $.890 | | $31.97 |
| 03/09 | 03/09 | | LATE FEE | | $30.00 |
| | | | **TOTAL FEES FOR THIS PERIOD** | | **$61.97** |

|  | | | Interest Charged | | |
|---|---|---|---|---|---|
| 03/13 | 03/13 | | Interest Charge on Purchases | | $21.65 |
| 03/13 | 03/13 | | Interest Charge on Cash Advances | | $0.00 |
| | | | **TOTAL INTEREST FOR THIS PERIOD** | | **$21.65** |

| 2018 Totals Year to Date | |
|---|---|
| Total  Fees Charged in 2018 | $64.24 |
| Total Interest Charged in 2018 | $21.65 |

## INTEREST CHARGE CALCULATION

Your **Annual Percentage Rate (APR)** is the annual interest rate on your account.

| Type of Balance | Annual Percentage Rate (APR) | Balance Subject to Interest Rate | Interest Charge |
|---|---|---|---|
| Purchases | 36.00% | $721.73 | $21.65 |
| Cash Advances | 36.00% | $0.00 | $0.00 |

# ATTACHMENT AP

## DECLARATION OF JANETTE BROWN

1.      My name is Janette Brown.  I have personal knowledge of the facts stated in this declaration, and I can testify competently to them if called upon to do so.

2.      In summation: Janette was in a wreck in 2018 and was renting from Hertz through insurance. However, her rental was stolen from her Memorial Day weekend 2018 in Detroit, MI. She was given a replacement from the Hertz Ferndale location, also through insurance. She extended and was supposed to have the car until the insurance situation was resolved. Hertz, however, with almost no reach out to Janette, reported the car as stolen and unpaid for. Hertz then charged her bank card but never told police about the payment. She was shocked when she was rushed by officers and arrested at gun point in Detroit in July 2018. A friend in the car was also arrested. She was jailed for 3 days, and when released had to go to the hospital because the jail had denied her medication prescribed after the car accident. She was then arrested and jailed again in February 2019 and held overnight. When she finally got in front of a judge, her attorney pointed out how absurd it was for Hertz to report an insurance customer for theft, and that a Hertz employee had lied to the Court in the hearing about investigating the alleged theft when in fact no investigation was performed. The court ruled that there was no probable cause and dismissed all charges. Although Janette was vindicated it does not change the fact that she was arrested twice, jailed for 5 days, hospitalized, and prosecuted for 8 months.

3.      Janette was in a bad wreck in or around May 2018 and was rented a car by State Farm insurance from the Grand Rapids Hertz location. She was on medication as a result of the wreck.

4.      However, that rental car was stolen the weekend of Memorial Day 2018 in Detroit, MI. She reported this incident to the police, Hertz, and State Farm.

5.  As a replacement for the stolen rental, she was then rented a car from Hertz's Ferndale location on May 30, 2018, by State Farm. The rental record number was H41162284.

6.  Between the wreck and the car being stolen, this was quite a taxing ordeal. Little did she know Hertz was about to make it much worse.

7.  She was supposed to have the rental car until her car could be replaced in coordination with State Farm, and she was also in touch with Hertz regarding the rental and extending it. Hertz had her bank card and knew to charge it if for some reason State Farm was not covering any charges.

8.  Hertz, however, improperly registered the car as overdue in it systems and began to make preparations to report the car stolen and tell the police that Janette was a thief.

9.  Egregiously, Hertz made almost no attempt to reach out to Janette regarding the rental and did not reach out to State Farm despite the fact that Hertz knew this was an insurance rental and that Janette was supposed to have the rental until he insurance situation was worked out.

10.  Furthermore, at one point during the rental she was charged several thousand dollars, even though insurance was supposed to be covering it.

11.  Unknown to her, Hertz reported the car stolen July 18, 2018, and told the police that it had not been paid for and was due back June 6, 2018.

12.  Janette was arrested July 20, 2018. She had no idea the car had been reported stolen and was walking back to the car on Greenfield St. in Detroit from an errand; her friend was in the car.

13.  As she approached the car she was swarmed by police and her and her friend were arrested. She was held for 3 days and was denied her medication.

14.  After being released she had to go the hospital due to the pain she was suffering.

15.     On July 30, 2018, the police contacted Sam Milanovich of Hertz Corporate Security. The report filed by the police indicates that Hertz still wanted to pursue charges against Janette even though the vehicle was recovered.

16.     Then, on or around February 21, 2019, Janette was arrested again regarding the Hertz case and held overnight in jail. She pled not guilty on February 22, 2019, in Case No. 18-36568 in the 43rd Judicial District of Michigan, Ferndale Division.

17.     On March 14, 2019, a preliminary hearing was held.

18.     At the hearing, Sam Milanovich, the Hertz Corporate Security employee who demanded that Janette be prosecuted after the vehicle was recovered, testified on behalf of Hertz that he had performed an investigation into Janette's rental. This testimony was knowingly false.

19.     Under cross examination, Milanovich was forced to admit that he had never performed any investigation and that his only knowledge about Janette's rental was that he had read the cover page of a theft package prepared by Hertz corporate in Oklahoma City.

20.     In fact, although Hertz policy requires that corporate security managers investigate thefts at the branch level, Hertz has instructed its corporate security employees not to perform any investigation to save on costs. The theft packages submitted to police are incomplete, unverified and uninvestigated, and prepared remotely in Oklahoma.

21.     Milanovich also falsely testified that the theft package contains all records relevant to the rental, despite knowing that it omits a great deal of information about the rental and renter.

22.     It was also established that Hertz had sent an overdue notice letter to a wrong address, despite the fact that State Farm had Janette's correct address on file.

23.     Once it became apparent that Janette had an insurance rental, and that Milanovich had lied about performing an investigation, all charges were dropped at the March 14, 2019 hearing.

24.     Based on Hertz employees being present at the dismissal of charges against Janette, Hertz was well aware the charges were dismissed and that it had filed a false police report.

25.     Janette did not know about any bar date.  She does not regularly *read USA Today, The Wall Street Journal, The New York Times, The Globe and Mail, The Philadelphia Inquirer, San Francisco Chronicle, Arizona Republic, Chicago Tribune, Los Angeles Times, The San Diego Union Tribune, Naples Daily News, El Diario De El Paso, or Journal De Montreal.*

26.     As a direct and proximate result of Hertz's conduct, Janette was arrested twice, thrown in jail for 5 days, was falsely prosecuted for 8 months, had her reputation harmed, was hospitalized, and has been severely mentally and emotionally harmed.

27.     There was no probable cause for Hertz to report Janette for any crime at any point in time.


I declare under the penalty of perjury of the United States of America that the foregoing is true and correct.

Dated:  December __22__, 2021              /s/    *Janette Brown*
                                                   Declarant

| STATE OF MICHIGAN<br>43RD JUDICIAL DISTRICT<br>ORI630065J<br>PIN: 180009920 | **REGISTER OF ACTIONS** | CASE NO:  18-36568   D01 FY<br>X-REFERENCE #:  18-57061<br>STATUS: CLSD    01/22/20 |
|---|---|---|

```
                                    JUDGE OF RECORD: LONGO,JOSEPH,        P-29712
                                         JUDGE: LONGO,JOSEPH,        P-29712
   STATE OF MICHIGAN v

        BROWN/JANETTE/                              CTN: 631805706101
        20027 STEEL                                 TCN: C319052005X
        DETROIT        MI 48235                      SID: 1578678L
                                            ENTRY DATE: 09/10/18
                                          OFFENSE DATE: 06/27/18
                                            ARREST DATE:
   DEF PHONE: (313) 854-6324      VEHICLE TYPE:        VPN:
   DOB: #########  SEX: F RACE: B  DLN: ###############  CDL:
   VEH YR:      VEH MAKE:       VIN:               PAPER PLATE:
```

| DEFENSE ATTORNEY ADDRESS<br>LYNCH,STEVEN PATRICK,<br>261 E MAPLE RD<br>BIRMINGHAM        MI 48009 | BAR NO.<br>P-47008        APPOINTED<br>Telephone No.<br>(248) 594-8844 |
|---|---|
| OFFICER: PROULX/ANTHONY/DET | DEPT: FERNDALE POLICE DEPARTMEN |
| PROSECUTOR: COOPER,JESSICA R.,<br>VICTIM/DESC: HERTZ CAR RENTAL | P-23242 |

```
CNT: 01 C/M/F: F  750362A3A              PACC#750.362A
FAILURE TO RETURN RENTED PROPERTY $1000 L/THAN $20,000 (1/99)
     AMENDED FROM
CNT: 01 C/M/F: F  750362A2A              PACC#750.362A
FAILURE TO RETURN RENTED PROPERTY $20,000 + (EFF. 1/1/99)
ARRAIGNMENT DATE: 02/22/19    PLEA:    PLEA N-GLTY   PLEA DATE: 02/22/19
FINDINGS:  DISMISSED    DISPOSITION DATE: 03/14/19
SENTENCING DATE:
```

|   | FINE | COST | ST.COST | CON | MISC. | REST | TOT FINE | TOT DUE |
|---|---|---|---|---|---|---|---|---|
|   | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

```
     JAIL SENTENCE:               PROBATION:
 VEH IMMOB START DATE:         NUMBER OF DAYS:        VEH FORFEITURE:

BOND HISTORY:
     15,000.00    PERSONAL   BOND SET
```

| DATE | ACTIONS, JUDGMENTS, CASE NOTES | INITIALS |
|---|---|---|
| 06/27/18 | | |
| 1 ORIGINAL CHARGE        FAILURE TO R | | DRJ |
| 08/31/18 | | |
| 1 AUTHORIZATION OF COMPLAINT DATE | | DRJ |
| PROS COOPER,JESSICA R.,        P-23242 | | DRJ |
| 09/05/18 | | |
| 1 COMPLAINT ISSUANCE DATE | | DRJ |
| 09/10/18 | | |
| FILING DATE        090518 | | DRJ |
| 09/11/18 | | |
| WARRANT ENTRY REQUESTED  91118 1009A | | SKD |
| SYSIDNO (20:) GENERATED BY LEIN | | |
| 47008023 | | SKD |
| WARRANT ENTERED INTO LEIN | | SKD |

NAME: BROWN/JANETTE/          CASE NO: 18-36568     PAGE   2

| DATE | ACTIONS, JUDGMENTS, CASE NOTES | INITIALS |
|---|---|---|

11/07/18
    PREV. 3081 CREEK DR. SE APT 1B                                    DRJ
    ADDR: KENTWOOD       MI 49512                                     DRJ
    MISCELLANEOUS ACTION       ALL COUNTS                             DRJ
    *UPDATED PER US DEPT OF JUSTICE;FBI NOTICE*                       DRJ
02/21/19
    MISCELLANEOUS ACTION       ALL COUNTS                             JCC
    WARRANT RETURNED                                                  JCC
    WARRANT MISDEMEANOR STOP                                          JCC
    WARRANT NOTICE STOPPED                                            JCC
02/22/19
    TCN ADDED                                                         JCC
    ARRAIGNMENT HELD           ALL COUNTS                             JCC
    MAG  BRENNAN,JAMES PATRI                              P-37508     JCC
    ATT  COURT APPT'D,IN-HOU                              #     1     JCC
    PLEAD NOT GUILTY                                                  JCC
    SCHEDULED FOR PROBABLE CAUSE CONFERENCE
                        030419  100P  LONGO,JOSEPH,       P-29712     JCC
        NOTICE TO APPEAR FOR DEFENDANT REQUESTED
                        ALL COUNTS                                    JCC
        SCHEDULED FOR EXAMINATION 031119  200P  LONGO,JOSEPH,  P-29712 JCC
        NOTICE TO APPEAR FOR DEFENDANT REQUESTED
                        ALL COUNTS                                    JCC
    PERSONAL                                                          JCC
    BOND SET                                  $   15000.00            JCC
    PTS SUPERVISION                                                   JCC
    NOTICE TO APPEAR GENERATED                                        JCC
    NOTICE TO APPEAR GENERATED                                        JCC
03/04/19
    MISCELLANEOUS ACTION       ALL COUNTS                             DRJ
    ATT  LYNCH,SHAREEN M.,                                P-49876     DRJ
    REMOVED FROM DOCKET      031119  200P  LONGO,JOSEPH,  P-29712     DRJ
    SCHEDULED FOR EXAMINATION 031419  200P  LONGO,JOSEPH, P-29712     DRJ
    NOTICE TO APPEAR FOR DEFENDANT AND ATTORNEY REQUESTED
                        ALL COUNTS                                    DRJ
    NOTICE TO APPEAR GENERATED
                        ALL COUNTS                                    DRJ
    NOTICE TO APPEAR GENERATED                                        DRJ
03/05/19
    MISCELLANEOUS ACTION       ALL COUNTS                             DRJ
    ATT  LYNCH,STEVEN PATRIC                              P-47008     DRJ
    NOTICE TO APPEAR GENERATED
                        ALL COUNTS                                    DRJ
    NOTICE TO APPEAR FOR DEFENDANT AND ATTORNEY REQUESTED
                        FAILURE TO R                                  DRJ
  1 NOTICE TO APPEAR GENERATED
                        FAILURE TO R                                  DRJ
03/14/19
  1 MISCELLANEOUS ACTION       FAILURE TO R                          DRJ
    JDG  LONGO,JOSEPH,                                    P-29712     DRJ
    AMENDED CHARGE             FAILURE TO                            DRJ
    SUPPLEMENTAL SENTENCING                                           DRJ
    *AMENDED AFTER EXAM*                                              DRJ

NAME: BROWN/JANETTE/                    CASE NO: 18-36568    PAGE    3

| DATE | ACTIONS, JUDGMENTS, CASE NOTES | INITIALS |
|------|-------------------------------|----------|
| | PROCEEDING HELD         ALL COUNTS | DRJ |
| | DISMISSED | DRJ |
| | DISMISSED WITHOUT PREJUDICE | DRJ |
| 1 | ORDER OF ACQUITTAL/DISMISSAL GENERATED | |
| | FAILURE TO | DRJ |
| 03/21/19 | | |
| | CC JUDGE: S KUMAR P-56595 | JIS |
| | CC APPT ATTY: S LYNCH P-47008 | JIS |
| 01/22/20 | | |
| | MISCELLANEOUS ACTION     ALL COUNTS | DRJ |
| | CASE CLOSED | DRJ |
| 01/26/21 | | |
| | MISCELLANEOUS ACTION     ALL COUNTS | DRJ |
| | *REC'D TRANSCRIPT REQUEST FROM DEFENDANT* | DRJ |
| 01/27/21 | | |
| | MISCELLANEOUS ACTION     ALL COUNTS | DRJ |
| | *TRANSCRIPT REQUEST SENT OUT VIA USPS* | DRJ |
| | PREV. 12870 W OUTER DRIVE #302 | DRJ |
| | ADDR: DETROIT          MI 48223 | DRJ |

***** END OF REGISTER OF ACTIONS ***** 12/08/21 11:57

9/4/2018 CJF/CE

Page 1 of 1

**STATE OF MICHIGAN**

THE DISTRICT COURT-JUDICIAL DISTRICT NO.    **43F**

County of OAKLAND

**PROS. ORDER NO.    18-57061**

**COMPLAINT/GENERAL INFORMATION**

**THE PEOPLE OF THE STATE OF MICHIGAN**
VS.

JANETTE BROWN /63-18-057061-01
3081 Creek Dr. Se Apt 1b    *12870 W. OVRR DRIVE*
Kentwood, MI 49512    *APT 302*
*(616) 437.8018*    *DET. 48223*

| | |
|---|---|
| **Date of Offense:** | JUNE 27, 2018 |
| **Location:** | CITY OF FERNDALE |
| **Complainant:** | HERTZ CAR RENTAL |
| **Complaining Witness:** | DET. PROULX |

**Defendant(s)**

**WITNESSES**
DET. A. PROULX, c/o FERNDALE POLICE DEPT.
OFC. I. KAKISH
OFC. J. CORSI
SANITA HARRISON

*PROL          OVI*
*3·10          16·10*
*5·10          8-17·*

STATE OF MICHIGAN, COUNTY OF OAKLAND

The COMPLAINING WITNESS says that on the date and at the location described, the defendant, contrary to law,

being a person to whom a 2017 Nissan Altima had been delivered on a rental or lease basis under a written agreement providing for its return on June 6, 2018 to Hertz Car Rental, located at 23600 Woodward, Ferndale, Oakland County, MI 48220, did with intent to defraud the lessor refuse or wilfully neglect to return the property after expiration of the time stated in the written notice mailed by registered or certified mail to the defendant's last known address, the property having a value of $20,000.00 or more; Contrary to the statute in such case made and provided and against the peace and dignity of the People of the State of Michigan. MCL 750.362a(2)(a); MSA 28.594(1)(2)(a). [750.362A2A].

FELONY:      10 Years and/or $15,000.00, or 3 times the value of the vehicle, trailer, or property rented, whichever is greater. To impose a fine of 3 times the value, the defendant must admit the amount, or it must be determined by the trier of fact at trial. See Southern Union Co. v United States 567 U.S.   ; No. 11-94 (2012).

FAILURE TO RETURN RENTED PROPERTY - $20,000.00 OR MORE
NOTICE: This incident resulted in property damage.

**WARRANT AUTHORIZED BY**
**THE OAKLAND COUNTY PROSECUTING ATTORNEY**

*91· 8+8 BLNG          JURY
96· ACC APST          14.
   LARC < 100          DISORDERLY
03· RT
03· RF 3ᵈ*

*(signature)*

**Assistant Prosecuting Attorney**

The complaining witness asks that defendant be apprehended and dealt with according to law.

Subscribed and Sworn to on this day by

Dated: _____

No: _____

*750.362A (3)(a)
> 1000 < 20.000*

**Complaining Witness**

**Before the above-named District Judge/Deputy Clerk/Magistrate**

1

CR No: 180009920

## FERNDALE PD

310 E. NINE MILE RD.
FERNDALE MI 48220
248 541-3650



*POLICE DEPT.*

### Case Report

| Administrative Details: | |
|---|---|
| CR No<br>**180009920** | Subject<br>**2404 - Vehicle Theft UDAA (reported by your jurisdiction) [24001]** |
| Report Date/Time<br>**07/18/2018 12:33** | Occurrence Date/Time<br>**From: 05/30/2018 13:10     To: 06/06/2018 16:00** |
| | Call Source<br>**PHONE** |
| Dispatched Offense<br>**2404 Vehicle Theft UDAA (reported by your jurisdiction)** | Verified Offense<br>**2404 Vehicle Theft UDAA (reported by your jurisdiction)** |
| OIC<br>**Proulx, Antonnio (FEPROULXA-37948)** | OIC Contact Number |
| County<br>**63 - Oakland** | City/Twp/Village<br>**81 - Ferndale** |
| Division<br>**Patrol** | Victim<br>**Hertz Car Rental (30249614)** |

| Action Requested: | |
|---|---|
| [ ] Arrest warrant | [ ] Review only |
| [ ] Search warrant | [ ] Forfeiture |
| [ ] Juvenile petition | [ ] Other |

2

Created On 07/30/2018 12:29 PM

CR No: 180009920

| Offenses: | | |
|---|---|---|
| **2404 - Vehicle Theft UDAA (reported by your jurisdiction)  [FEHEATHJ (17345)]** | | |
| IBR Code / IBR Group | Offense File Class | |
| 240 - Motor Vehicle Theft / A | 24001 - MOTOR VEHICLE THEFT | |
| Crime Against | Location Type | Offense Completed |
| PR | 05 - Commercial/Office Building | Completed |
| Domestic Violence | Hate/Bias | |
| No | 00 - None (No Bias) | |
| Using | | Cargo Theft |
| A-Alcohol: No   C-Computer Equipment: No   D-Drugs/Narcotics: No | | No |

| People: | | | | | |
|---|---|---|---|---|---|
| **BROWN, JANETTE   (S-SUSPECT)   [FEHEATHJ (17345)]** | | | | | |
| Last Name | First Name | Middle Name | | Suffix | Mr/Mrs/Ms |
| Brown | Janette | | | | |
| Aliases | | Driver License# | | DL State | DL Country | Personal ID# |
| | | B650368005128 | | MI | USA | |
| DOB (Age) | Sex | Race | Ethnicity | Birth City & State | Birth Country | Country of Citizenship |
| 02/18/1977 (41) | F | BLACK | | | | |
| Street Address | | Apt # | County | Country | Home Phone | Work Phone |
| 3081 Creek Dr SE | | 1B | | | UNKNOWN | |
| City | | State | Zip | Cell Phone | Email | |
| Kentwood | | MI | 49512 | 313-420-9145 | | |
| ▮ | MDOC/PRN# | | | | | |

| (V-VICTIM)   [FEHEATHJ (17345)] | | | | |
|---|---|---|---|---|
| Victim Type | Victim of | | | |
| B - Business | 2404 - Vehicle Theft UDAA (reported by your jurisdiction) | | | |
| PE: | W.Typ e: | Name | | Suffix | Mr/Mrs/Ms |
| | | Hertz Car Rental | | | |

| Phone/Email | |
|---|---|
| Type | Description |
| BU-Business Phone #1 | ▮ |
| Victim Injury | |

| **HARRISON, SANITA   (W-WITNESS)   [FEHEATHJ (17345)]** | | | | | |
|---|---|---|---|---|---|
| PE: | W.Type: | Last Name | First Name | Middle Name | Suffix | Mr/Mrs/Ms |
| | EY | Harrison | Sanita | | | |

| Phone/Email | |
|---|---|
| Type | Description |

CR No: 180009920

BU-Business Phone #1 | 248-584-3327

## MILANOVICH, SAM  (O-OTHER) (X-MISCELLANEOUS)   [FEPROULXA (37948)]

| PE: | W.Type: | Last Name | First Name | Middle Name | Suffix | Mr/Mrs/Ms |
|---|---|---|---|---|---|---|
| | | Milanovich | Sam | | | |

Notes
From the Cooperate Security Department of Hertz.

## PROULX, ANTONNIO  (O-OTHER) (L-POLICE OFFICER)   [FEPROULXA (37948)]

| PE: | W.Type: | Last Name | First Name | Middle Name | Suffix | Mr/Mrs/Ms |
|---|---|---|---|---|---|---|
| | | Proulx | Antonnio | | | Detective |

| DOB (Age) | Sex | Ethnicity | Birth City & State | Birth Country | Country of Citizenship |
|---|---|---|---|---|---|
| | | | | | |

| Street Address | Apt # | County | Country | Home Phone | Work Phone |
|---|---|---|---|---|---|
| 310 E. Nine Mile Rd. | | OAKLAND | USA | | |

| City | State | Zip | Cell Phone | Email |
|---|---|---|---|---|
| Ferndale | MI | 48220 | | |

### Phone/Email

| Type | Description |
|---|---|
| BU-Business Phone #1 | 248 541-3650 |

Notes
OIC

## HEATH, JOHN  (O-OTHER) (L-POLICE OFFICER)   [FEHEATHJ (17345)]

| PE: | W.Type: | Last Name | First Name | Middle Name | Suffix | Mr/Mrs/Ms |
|---|---|---|---|---|---|---|
| | | Heath | John | | | |

| DOB (Age) | Sex | Ethnicity | Birth City & State | Birth Country | Country of Citizenship |
|---|---|---|---|---|---|
| | | | | | |

| Street Address | Apt # | County | Country | Home Phone | Work Phone |
|---|---|---|---|---|---|
| 310 E. Nine Mile Rd. | | OAKLAND | USA | | |

| City | State | Zip | Cell Phone | Email |
|---|---|---|---|---|
| Ferndale | MI | 48220 | | |

### Phone/Email

| Type | Description |
|---|---|
| BU-Business Phone #1 | 248 541-3650 |

### Property:

## 3500 - Automobile/Car/Vehicle (Locally Stolen) 5403   [FEHEATHJ (17345)]

| Property Class | IBR Type | UCR Type | | |
|---|---|---|---|---|
| 03 | 03 - Automobiles | D - Locally Stolen Motor Vehicle | | |

| Status | | Count | Value |
|---|---|---|---|
| SR - Both Stolen And Recovered (Also Used To Update Prev. Stolen) | | 1 | 24470 |

| Manufacturer | Model | | | Color |
|---|---|---|---|---|
| Nissan | Altima | | | GRY - Gray |

| Vehicle Year | Body Style | State | License Year |
|---|---|---|---|
| 2017 | | FL | 2018 |

| Description | Disposition | Evidence Tag |
|---|---|---|
| | | |

4

CR No: 180009920

| 2017 Nissan Altima | | |
|---|---|---|
| Recovered Date/Time | Location | Owner |
| 07/23/2018 20:30 | | |

## Narrative:

**CR No: 180009920-001    Written By: FEHEATHJ (17345)    Date: 07/18/2018 06:07 PM**

Report writer Officer Heath #36.

**Summary:**

Reporting party Harrison states, that suspect Janette Brown has failed to return, the listed 2017 Nissan Altima, which she rented from her at Hertz ▉▉▉▉▉▉▉▉▉▉ Vehicle was rented on 5/30/18 and was scheduled to be returned on 6/6/18.

Hertz sent a letter to her listed address. No answer. All attempts to contact the suspect by phone have been unsuccessful.

Vehicle has a value of $24,470. Brown owed $1253.93 as of 6/27/18.

Vehicle entered ▉▉▉▉ Reference Number 42450007.

**CR No: 180009920-002    Written By: FEMCDONALDR (00115)    ATTACHMENT ONLY REPORT - No**


**CR No: 180009920-003    Written By: FEKRUMMS (143)    Date: 07/24/2018 10:35 AM**

on 07/23/18, listed vehicle was recovered in Detroit. Hertz was contacted with recovery information, vehicle was cancelled ▉▉▉▉.

**CR No: 180009920-004    Written By: FEPROULXA (37948)    Date: 07/30/2018 10:44 AM**

Report written by Detective Antonnio Proulx #201.

On 07/20/2018, I attempted to locate the suspect Janette BROWN and the Hertz vehicle (2017 Nissan Altima, Florida License Plate: ▉▉▉▉) at ▉▉▉▉▉▉▉▉. This was before the vehicle was recovered by the Detroit Police Department (DPD). This was the only local address I could find for BROWN. That address is a vacant house that had the windows and door boarded up.

CR No: 180009920

On 07/30/2018, I contacted Sam MILANOVICH from Hertz Cooperate Security. MILANOVICH stated the vehicle had a cracked windshield when it was recovered in Detroit, MI. MILANOVICH stated he still wanted to pursue charges against BROWN even though the vehicle was recovered. MILANOVICH provided me with the Hertz recovery report and I attached it to this report.

DPD arrested BROWN when they recovered the Hertz vehicle on 07/20/2018. I attached the DPD case report to this report (1807200340).

22,500    24,470

# FERNDALE POLICE DEPARTMENT
## WITNESS STATEMENT

Of →

| Please print all information clearly And sign at the bottom of the form. | Incident Number: |
|---|---|
| | Classification: Fail to Return |
| Full Name: SANITA HARRISON | Date: 7-18-18    Time: |

1 Rented to Janelle Brown on 5/30/18 for
2 insurance replacement purposes.
3 As of 7/16/18 the customer has
4 funds held for the vehicle in the
5 amount of $698 with an
6 outstanding balance of $1253.93.
7 Contact has been attempted
8 multiple times.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**I understand that this statement is being written as part of a criminal investigation. The statements I am writing are true and accurate:**

Signature: X _Sanita Harrison_    Officer accepting Statement: HEATH #56

7

Report Type: C            *IMMEDIATE ATTENTION REQUIRED*            ***Confidential***

HERTZ

Initial Report of Vehicle

**REPORT THIS VEHICLE STOLEN TO YOUR LOCAL POLICE DEPARTMENT WITHIN 4 DAYS AND RETURN THIS SHEET TO OKC VEHICLE CONTROL WITH REQUIRED THEFT INFORMATION HIGHLIGHTED ON THIS SHEET**

| | | | | | | **Confidential** |
|---|---|---|---|---|---|---|
| VCWX0390 | | | | | | |
| Report Type: C | | | HERTZ | | | |
| TR=Theft Renter | | | OKC Vehicle Control | | | |
| TF=TheftFraud | | | Initial Report of Vehicle | | | |
| C=Conversion | | | | | Theft ID: | |

| Unit No | Year | Make | Model | | Type | Color | Serial No. |
|---|---|---|---|---|---|---|---|
| 0008744593 | 2017 | NISSAN | ALTIMA | | 4DR | GRA | |
| Lic Plate YR | Lic ST | Lic NO. | Odometer Out | Odometer In | Owning Area | | Rental No. |
| 2018 | FL | | 38716 | | 01398 | | H41162284 |

| Date & Time Rented | Rented From | Due Date | Location Due | Home Phone | Business Phone | Local Phone |
|---|---|---|---|---|---|---|
| 05/30/2018 13.10.00 | 05424-10 | 06/06/2018 12.16.00 | 05424-10 | | | STACEY |

| Renter's Name | Residence Address (City, State, & Zip Code) |
|---|---|
| JANETTE BROWN | 3081 CREEK DR SE APT 1B KENTWOOD      MI49512 |
| Employer's Name | Secondary Address (City, State, & Zip Code) |
| | 3081 CREEK DR SE APT 1B, KENTWOOD, MI 49512 |

| Identification Used | Driver's License No. | ST. | DT of Birth | Person Renting Veh Provided False Info.(Yes/No) |
|---|---|---|---|---|
| XXXXXXXXXXXX0401 | B650368005128 | MI | 02/18/1977 | No |

| Dept. Reported to | Reported to | Reported By | Reported On | Alarm Number |
|---|---|---|---|---|
| | | | | |

| Keys Returned? | Veh Locked? | LDW | Book Value | Date & Time Stolen | Location of Vehicle at Time of Theft |
|---|---|---|---|---|---|
| No | No | N | 11698.12 | 06/06/2018 12:16 | In Renters Possession |
| | | | | See Attached Pages for the overdue notes for the Worksheet ID: | 18060800371 |

THE VEHICLE APPEARED ON THE OVERDUE REPORT, THE PHONE NUMBER ON THE RENTAL WAS CALLED. ALL AVAILABLE SYSTEMS HAVE BEEN CHECKED. NO ADDITIONAL INFORMATION HAS BEEN FOUND.

| | | | |
|---|---|---|---|
| Date certified Demand Letter Was Sent: | 06/27/2018 | Return Mail: | |
| Force Return Hired: | 06/27/2018 | Repossession Service Hired: | 07/06/2018 |
| Rental Rep: | 0667 | DNR Submitted: | 14C |

Prepared By:    S. HENDRICKS            Prepared Date:  7/11/2018

VC Supervisor Signature  T. Sayers            Printed Date:  7/11/2018 10:16:46 AM

8

(Page 1 of 5)



PG 1 OF 5 # 0  RT  RR H41162284

**BROWN, JANETTE**

MRFER10   0542410
*VEHICLE* 01398/6744593  17 NISSAN         TK CAP    18
LIC FL                    MILES OUT   38716    FUEL OUT  4/8
RENTED: 05/30/2018 13:10 @  FERNDALE HLE
RETURN: 06/06/2018 13:10 @  FERNDALE HLE
Return Date is an estimate only. State Farm provides Hertz additional
days to apply as necessary based upon the length of your vehicle's repa
You agree to pay charges at the rates and in the amounts that appear
on the left of the table below. Taxable charges are denoted by a T, and
additional details about some charges appear beneath the table. Hertz's
estimates of Your total charges appear on the right of the table below.
Hertz's estimates assume (1) You will rent and return the vehicle at the
times and places indicated, (2) if a mileage charge applies, You will drive
no more than the distance indicated and (3) You will not incur any charges
that are either listed below opposite **** or cannot be calculated until return
If any of these assumptions is incorrect, additional charges or charges at
higher rates may apply.

| CHARGE RATE / AMOUNT | CHARGE ESTIMATE |
|---|---|
| TIME / MILEAGE CHGS: RATE PLAN - HLE ST | [C]  CLASS  F |
| 8  @ $  19.24 / DAY    WITH ALL MILES FREE | $        153.92 |

WITH ALL MILES FREE

| | |
|---|---|
| ADJUSTMENT | |
| SUBTOTAL | T $        153.92 |
| ADDITIONAL CHARGES | |

OPTIONAL SERVICES

| | |
|---|---|
| FUEL & SERVICE $   0.37/MI $  9.990/GL  18  /TK CAP  $ | **** |
| TAX / FEES | |
| SURCHARGE | $          9.36 |
| TAX     6.00  % ON EST. TAXABLE TTL $ 163.28 | $          9.80 |
| ADJUSTMENTS | |
| ESTIMATED COMPANY CHARGE | |
| ESTIMATED CUSTOMER CHARGE | $        173.08 |
| TOTAL ESTIMATED CHARGE | $        173.08 |
| H41162284 | |

9

(Page 2 of 5)

 PG 2 OF 5 # 0  RT  RR H41162284

Further information relating to Your rental charges, and other terms to
which You agree, appear below.
**EXTRA CHARGES IF APPLICABLE:**

**FUEL & SERVICE CHARGES:** PURSUANT TO PARAGRAPH 8 OF THE
RENTAL AGREEMENT, FUEL & SERVICE CHARGES APPLY
AT $ 9.990  PER GALLON OR, IF YOU DO NOT BUY
FUEL DURING THE RENTAL AT $    0.37  PER MILE.
BOTH RATES PRODUCE APPROXIMATELY THE SAME RESULT.

**YOU AGREE TO OPTIONAL SERVICES OF:**
LDW   DECLINED
PDW   DECLINED
LIS   DECLINED

PAI   DECLINED
**OTHER FEES AND ASSESSMENTS:**
SALES TAX            6    %

SURCHARGE      $9.36

TAX RATE -     6.00 % APPLIES TO ALL CHARGES MARKED T
* PROPERTY TAX, TITLE AND LICENSE FEE REIMBURSEMENT
- YOU REPRESENT THAT YOU ARE SPECIFICALLY AUTHORIZED
TO RECEIVE BENEFITS EXTENDED TO EMPLOYEES/ MEMBERS OF
CDP  1800681          #0 STATE FARM RES ONLY
CLM# 223986W71

PASSENGER CAPACITY: THE PASSENGER CAPACITY OF THIS
VEHICLE IS DETERMINED BY THE NUMBER OF SEATBELTS
AND, BY LAW, MUST NOT BE EXCEEDED. WHILE IN THE
VEHICLE, PLEASE FASTEN YOUR SEATBELT. IT SAVES LIVES AND
IT'S THE LAW.  SHOULD YOU REQUIRE A LARGER VEHICLE,
PLEASE CHECK AT THE COUNTER FOR AVAILABILITY.

YOU WILL BE CHARGED AN ADMINISTRATIVE FEE     ALONG WITH
TOWING/IMPOUND EXPENSES IF THE CAR MUST BE    TOWED AS A
RESULT OF YOUR NEGLIGENCE.
We prohibit smoking in all Vehicles. A cleaning fee will apply for violations.
Excessive mileage on a repeat basis may result in suspension of future rent
RES: OKRCU95621  PLAN:       HLE ST    CLASS:     F
PREPARED BY:   0667/MIFER10  PRINTED:  20180530131658 SANI

H41162284

10

(Page 3 of 5)



PG 3 OF 5  #  0  RT RR H41162284

**IMPORTANT INFORMATION REGARDING TOLLS/TRAFFIC CITATIONS**
You are responsible to pay all tolls. For your convenience, we
offer PlatePass, an electronic toll payment system operated by
by PlatePass LLC, for use on toll roads in the areas specified below.

************

In the following areas all our vehicles (even without a windshield
toll transponder) may use any cashless electronic toll lane:
The entire States of FLORIDA, GEORGIA, COLORADO, NORTH
CAROLINA AND TEXAS, and in Seattle, the TACOMA NARROWS
BRIDGE and the SR 520 BRIDGE.
TO USE PLATEPASS IN THESE AREAS: pass through the cashless
toll lane. You will be billed automatically as outlined below.
IF YOU DO NOT WISH TO USE PLATEPASS IN THESE AREAS,
use only traditional cash toll lanes (if available) and
make payment directly to the toll authority.
If your rental vehicle includes a transponder, make sure it
remains fully closed within the shield box. In both video and
audio transponder toll areas, pay all tolls with cash or your own
toll transponder (where permitted) compatible to the toll road.
**Some toll roads no longer accept cash payments.**
If you incur a toll on these roads, without using your own
compatible transponder, you will be enrolled in PlatePass.

************

IN DELAWARE, ILLINOIS, INDIANA, MAINE, MARYLAND,
MASSACHUSETTS, NEW HAMPSHIRE, NEW JERSEY, NEW YORK,
OHIO, PENNSYLVANIA, VIRGINIA and WEST VIRGINIA, only
vehicles equipped with a windshield toll transponder may
access cashless toll lanes (The toll authority may allow for an
alternate payment method, such as payment by mail).
CALIFORNIA CUSTOMERS: PlatePass coverage is available on the
Golden Gate Bridge, San Francisco-Oakland Bay Bridge, Richmond-
San Rafael Bridge, Carquinez Bridge, Benicia-Martinez Bridge,
Antioch Bridge, San Mateo Bridge, Dumbarton Bridge, SR 73,
SR 133, SR 241 and SR 261 ONLY. Coverage is NOT available on I-10,
I-110, SR 91, I-15 Express Lanes and SR 125. In Southern California,
for toll roads that accept PlatePass, the toll authority allows for
payment by phone/online within five (5) days of accessing the
toll road. If you travel in the excluded HOV lanes in Southern
California or if you travel on toll roads in Southern California that
do not accept PlatePass, you will also be charged an administrative
fee of $30.00.
TO USE PLATEPASS IN THESE STATES, slide the transponder out of
the shield box and pass through the cashless toll lane. You will
be billed automatically as outlined below.
IF YOU DO NOT WISH TO USE PLATEPASS IN THESE STATES, keep
the transponder fully within the shield box and use only cash
lanes (if available) to make payment directly to the toll authority.

************

NOTE: Certain toll roads do not accept cash. If you travel on such
a toll road without a personal transponder that can be used on the
toll road, you will be reqired to use PlatePass and be billed
automatically as outlined below, or incur toll charges or violations
for which you will be responsible.
Where permitted by Toll Authorities, you may opt to user your
personal transponder. Follow the instructions above for NOT

If PlatePass is used, PlatePass LLC will charge you a service fee of
$4.95 for each day of your rental including prior or subsequent days
on which the PlatePass service is not used (capped at $24.75 per
rental) plus incurred tolls at the Toll Authority's cash toll rate or
highest undiscounted toll rate.
PlatePass LLC will separately charge your credit or debit card the
applicable charges after the close of your rental. Charges typically
take 1-3 weeks after the rental closes to appear on your statement,
but a longer delay may occur. Cash customers will be invoiced.
PARKING AND MOVING CITATIONS. You are responsible for the
payment of all vehicle parking and moving citations assessed
against You or the Car during the rental period, including all such
citations captured by camera and any related fines, fees, or
penalties. If a citation-issuing authority notifies us that we may
be liable for any such citation at any related fines, fees, or
penalties, You will be charged a $30.00 administrative fee for each
such notification. You authorize us to release your billing/rental
information to PlatePass LLC and American Traffic Solutions
Consolidated, LLC to process and bill for all tolls and moving
citations and administrative charges and service fees.
H41162284

(Page 4 of 5)

PG 4 OF 5



# 0  RT  RR H41162284



**ARBITRATION PROVISION: THIS AGREEMENT REQUIRES ARBITRATION OR A SMALL CLAIMS COURT CASE ON AN INDIVIDUAL BASIS, RATHER THAN JURY TRIALS OR CLASS ACTIONS. BY ENTERING INTO THIS AGREEMENT, YOU AGREE TO THE ARBITRATION PROVISION.**

Except for claims for property damage, personal injury or death, ANY DISPUTES BETWEEN You and us ("us" and "we" for the purposes of this Arbitration Provision mean The Hertz Corporation, ("Hertz") its parent and affiliate corporations, and their respective officers, directors and employees and any vendor or third party providing services for this rental transaction) MUST BE RESOLVED ONLY BY ARBITRATION OR IN A SMALL CLAIMS COURT ON AN INDIVIDUAL BASIS; CLASS ARBITRATIONS AND CLASS ACTIONS ARE NOT ALLOWED. YOU AND WE EACH WAIVE THE RIGHT TO A TRIAL BY JURY OR TO PARTICIPATE IN A CLASS ACTION, EITHER AS A CLASS REPRESENTATIVE OR CLASS MEMBER. You and we remain free to bring any issues to the attention of government agencies.

This Arbitration Provision's scope is broad and includes, without limitation, any claims arising from or relating to this Agreement or any aspect of the relationship or communications between us, whether based in contract, tort, statute, fraud, misrepresentation, equity, or any other legal theory. It is governed by the Federal Arbitration Act, 9 U.S.C. ???? 1 et seq.

In any arbitration under this Arbitration Provision, all issues are for the arbitrator to decide, including his or her own jurisdiction, and any objections with respect to the existence, scope or validity of this Arbitration Provision. The arbitration will take place in the county of Your billing address unless agreed otherwise.

The American Arbitration Association ("AAA") will administer any arbitration pursuant to its Consumer Arbitration Rules (the "Rules"). You can obtain the Rules at www.adr.org.

You or we may commence an arbitration by providing a written demand for arbitration to the other (to us: The Hertz Corporation, 8501 Williams Road, Estero, FL 33928 Attn: Arbitration) and two copies of the demand to the AAA. If You seek $10,000 or less through arbitration, we will reimburse You for any AAA required filing fee.

The arbitrator may award injunctive relief as well as money, but only in favor of and as warranted by the claim of the individual party seeking relief. Judgement on the arbitral award may be entered in any court having jurisdiction. An arbitration award and any judgement confirming it apply only to the specific parties in that case and cannot be used in any other case except to enforce the reward itself. The arbitrator may not consolidate more than one person's claims, and may not otherwise preside over any form of representative or class action.

IF YOU DO NOT WISH TO AGREE TO THIS ARBITRATION PROVISION, YOU MUST NOTIFY HERTZ IN WRITING WITHIN 30 DAYS OF YOUR RECEIPT OF THIS AGREEMENT BY EMAIL AT no.arbitration@hertz.com OR BY MAIL TO The Hertz Corporation, 8501 Williams Road, Estero, FL 33928 Attn: Arbitration. Include Your name, address, the number at the top of this Rental Record and a clear statement that You do not agree to this Arbitration Provision. If you have previously notified Hertz of Your decision to opt out of this Arbitration

H41162284                    PRINTED:    20180530131658

(Page 5 of 5)



PG 5 OF 5    # 0 RT  RR H41162284

TO BE CHARGED TO:  VI  XXXXXXXXXXXX0401
<   AUTH $ 374.00  /  601813   AT FERNDALE HLE
PH    2485843327    Rental Ext #                    MIFER10
THIS VEHICLE MAY NOT BE DRIVEN INTO MEXICO.
Under Michigan law, Hertz is liable for an injury
caused by the negligent operation of the Car only
up to the maximum amount of $20,000 because of
bodily injury or death of one person in any one
accident and $40,000 because of bodily injury or
death of two or more persons in any one accident, and
only if the injury occured while the Car was being
operated by You or another Authorized Operator, or
Your spouse, parent, sibling, child or other
immediate family member.  You may be liable to Hertz
up to the maximim amounts specified in the preceding
sentence and to an injured person for amounts awarded
in excess of those maximum amounts.
If You decline Loss Damage Waiver (LDW) and Partial
Damage Waiver (PDW), which are optional, You may be
responsible for any loss or damage to the Car,
regardless of fault--see Par.4 of the Rental
Agreement Terms And Conditions, which appear on the
folder (PGN1900005) delivered to You with this Rental
Record (the Rental Terms).  Coverage for all or part of
Your responsibility may be provided by Your own auto
insurance or under Your credit card agreement.
If You direct charges to be billed to any person,
corporation, or other entity, You represent that
You are authorized to do so.  If such person,
corporation, or entity fails to pay such charges,
You will be responsible for full payment of these
charges.
If You elect LIS, LIS provides protection from liability for
third party automobile claims for the difference between
the liability limits in Paragraph 10 of the Rental
Agreement and the maximum combined single limit of
$1,000,000 for bodily injury, including death and property
damage. LIS also includes uninsured/underinsured
motorist coverage (while occupying the Car) for bodily
injury, if applicable, for the difference between the
statutory minimum underlying limits and $1,000,000. No
claim for UM/UIM may be made due to the negligence of
the driver of the Car.
By signing below, You acknowledge that You have read,
understand, accept and agree to to the above and
the Rental Terms; and You accept or decline the
Optional Services as shown on this Rental Record.
This transaction is classified as a "Replacement"
rental.

X
Renting Company - The Hertz Corporation
The Hertz Privacy Policy governs the use of data about you. A copy
of the policy is available at the rental counter and online at hertz.com.

13



```
FSCR6260                 CURRENT - UNIT HISTORY DETAIL               FSCR8260
A/U # : 01398     6744593  OLD A/U #:              CC ADD    : 2016/12/19
SER # :                    OP STAT  : 2018/04/11 RT  DELIVERY : 2016/12/14
LIC   :           ST: FL   CC REQ   : O            IN SERV   : 2016/12/19
MODEL : NALT     YR: 17    RECALL   :              SALE/TRAN :
COLOR : GRA      VC: F     CAP DATE :              VIS KEY   :
TNBK OVERRIDE:             P/M MLG  :   37363 SPI 7NORO  TIER    CLS F TYPE O
ELIG TNBK:   NO RT/TB:     MAX MLG  :     915               DEPR A  COA
****************************************************************************
RENT/OUT  OUT/OLD      OUT  DUE/IN  DUE/IN      IN   DOCUMENT    DOC  OP M C M
EFF DTE   AREA/LOC   MILES  DATE  AREA/LOC   MILES   NUMBER   TYP/ST ST M I U
180628   REQUEST FOR HOLD CHANGED FROM B      TO O
180530   0542410     38716 180606 0542410            H41162284  R  O  RT    N
180523   0542410     37363 180530 0542410     38716 584190110  R  C  RT
180523   REQUEST FOR HOLD CHANGED FROM FB     TO B
180522   REQUEST FOR HOLD CHANGED FROM B      TO FB
180507   0542410     36631 180518 0542410     37363 H39999956  R  C  RT
180504   0542410     35913 180507 0542410     36631 549898145  R  C  RT
180503   0221828     35376 180504 0542410     35913 549050283  R  C  RT
180501   0221828     34959 180502 0221828     35376 547147650  R  C  RT
SEL:        AU: 01398 /        LIC/ST:            /  SER/CC:          / US
PA1 - MASTER MENU             PF5 - WWD/AREA NBR        PF7 - PAGE BACK
PA2 - INQUIRY/UPDATE MENU     ENTER - ACCEPT FIELDS     PF8 - PAGE FORWARD
DISPLAY COMPLETE.
```

  Firefly

The Hertz Corporation
Vehicle Control

June 27, 2018

JANETTE BROWN
3081 CREEK DR SE APT 1B
KENTWOOD, MI  49512

Dear JANETTE BROWN,

The vehicle that you recently rented from a Hertz Company (Hertz, Dollar, Thrifty, or Firefly Car Rental) was scheduled to be returned to:                              on the date indicated:

Rented at
Rental #                    H41162284
Date due                   06/06/2018
Vehicle Detail ID
License Plate
License State              FL
Color                      GRA

This vehicle is now seriously overdue.
Please do not ignore this letter.

Pursuant to the Terms and Conditions of the Rental Agreement, we hereby demand that our vehicle be immediately returned to the scheduled return location listed above, or to the nearest Hertz Company.  (Note: Additional charges will apply if you return to a location other than the scheduled return location.)

Failure to return our vehicle as instructed may result in the vehicle being reported stolen. Please note that pursuant to laws in some states, you may already be in violation of state law by failing to return our vehicle. You are also advised that we may attempt to repossess this vehicle without additional notice to you. In addition to any overdue fees and/or additional rental charges you have already incurred, you will be responsible for all repossession expenses we incur. We will not be responsible for any personal property left in a vehicle we repossess.

Your immediate attention is necessary to prevent the potential revocation of future rental privileges and/or legal action to recover our vehicle.

If you have already returned this vehicle and believe this letter has been sent to you in error, we apologize for any inconvenience. Please contact us with your return details so we may investigate and resolve this matter as quickly as possible.

The Hertz Corporation
Vehicle Control

Form: VCWX0710      ID: 18060800371DEL18178501708

Hertz Corporation
Vehicle Control
P.O.Box 24130

Oklahoma City, OK 73124-
0130



USPS CERTIFIED MAIL™

9214 8901 3628 0200 5351 81

RR H41162284
JANETTE BROWN
3081 CREEK DR SE APT 1B
KENTWOOD            MI     49512

17

805281

Mail Lien Satisfaction to: Dept of Highway Safety and Motor Vehicles, Neil Kirkman Building, Tallahassee, FL 32399-0500

| Identification Number | Year | Make | Body | WT-L-BHP | Vessel Regis. No. | Title Number |
|---|---|---|---|---|---|---|
| | 2017 | NISS | 4D | 3117 | | 125711610 |

Date of Issue 12/21/2016

Registered Owner:

HERTZ VEHICLES LLC

Mail To:
12/16/2016
BNY MELLON TRUST CO N.A.

## LIEN SATISFACTION

Lien Release
Interest in the described vehicle is hereby released.

By _____
Title _____
Date _____

**IMPORTANT INFORMATION**
1. When ownership of the vehicle described herein is transferred, the seller MUST complete in full the Transfer of Title by Seller section at the bottom of the certificate of title.
2. Upon sale of this vehicle, the seller must complete the notice of sale on the reverse side of this form.
3. Remove your license plate from the vehicle.
4. See the web address below for more information and the appropriate forms required for the purchaser to title and register the vehicle, mobile home or vessel. http://www.flhsmv.gov/fmvtitlinf.html

## STATE OF FLORIDA

## CERTIFICATE OF TITLE

| Identification Number | Year | Make | Body | WT-L-BHP | Vessel Regis. No. | Title Number |
|---|---|---|---|---|---|---|
| | 2017 | NISS | 4D | 3117 | | 125711610 |

Lien Release
Interest in the described vehicle is hereby released

| Prev State | Color | Primary Brand | Secondary Brand | No of Brands | Use | Prev Issue Date |
|---|---|---|---|---|---|---|
| | GRY | | | | LEASE | |

By _____

| Odometer Status or Vessel Manufacturer or Off Use | Haz Material | Prop | Date of Issue |
|---|---|---|---|
| 15 MILES  12/16/2016 ACTUAL | | | 12/21/2016 |

Title _____
Date _____

Registered Owner
HERTZ VEHICLES LLC
5400 BUTLER NATIONAL DR
ORLANDO   FL 32812

1st Lienholder
12/16/2016
BNY MELLON TRUST CO N.A.

DIVISION OF MOTORIST SERVICES    TALLAHASSEE    FLORIDA    DEPARTMENT OF HIGHWAY SAFETY AND MOTOR VEHICLES

*Robert R. Kynoch*
Robert R. Kynoch
Director

Control Number  6744593  **128412740**

*Terry L. Rhodes*
Terry L. Rhodes
Executive Director

TRANSFER OF TITLE BY SELLER (This section must be completed at the time of sale.)
Federal and/or state law require that the seller state the mileage, purchaser's name, selling price and date sold in connection with the transfer of ownership.
Failure to complete or providing a false statement may result in fine, and/or imprisonment.
This title is warranted to be free from any liens except as noted on the face of the certificate and the motor vehicle or vessel described is hereby transferred to:

Seller Must Enter Purchaser's Name: _____    Address: _____

Seller Must Enter Selling Price: _____    Seller Must Enter Date Sold: _____

I/We state that this [ ] 5 or [ ] 6 digit odometer now reads _[_]_[_]_[_]_[_]_[_]_[_].[_] X (no tenths) miles, date read _____, and I hereby certify that to the best of my knowledge the odometer reading:
[ ] 1. reflects ACTUAL MILEAGE.   [ ] 2. is IN EXCESS OF ITS MECHANICAL LIMITS.   [ ] 3. is NOT THE ACTUAL MILEAGE.

UNDER PENALTIES OF PERJURY, I DECLARE THAT I HAVE READ THE FOREGOING DOCUMENT AND THAT THE FACTS STATED IN IT ARE TRUE.

SELLER Must Sign Here: _____    CO-SELLER Must Sign Here: _____

Print Here: _____    Print Here: _____

Selling Dealer's License Number: _____    Tax No.: _____    Tax (if Used): _____

Auxiliar Name _____    License Number: _____

PURCHASER Must Sign Here: _____    CO-PURCHASER Must Sign Here: _____

Print Here: _____    Print Here: _____

NOTICE: PENALTY IS REQUIRED BY LAW IF NOT SUBMITTED FOR TRANSFER WITHIN 30 DAYS AFTER DATE OF PURCHASE

HSMV 82250 (REV. 3/15)

## STATE OF FLORIDA

18

**STATE OF FLORIDA**
**DEPARTMENT OF HIGHWAY SAFETY AND MOTOR VEHICLES**
**DIVISION OF MOTOR VEHICLES**
2900 Apalachee Parkway  •  Neil Kirkman Building - Tallahassee, FL 32399-0620
**Notice of Sale of Motor Vehicle, Mobile Home or Vessel**

Section 319.22(2), Florida Statutes, requires that the seller file a Notice of Sale with the department within 30 days after the sale or transfer of the motor vehicle, vessel or mobile home. Filing this form removes any civil liability for the operation of the sold motor vehicle, vessel or mobile home. In addition to filing this form, we suggest you keep a copy of your bill of sale (we suggest it be notarized), certificate of title or other type of transaction document showing the vehicle was sold. **Complete the information below, tear the top portion of this document at the perforation and mail to the address above or submit it to your local tax collector's office or license plate agency.**

I have this _____ day of _____, _____, transferred by assignment of and delivered Florida Certificate of Title to:

Name: Purchaser(s) _____ Purchaser's DL/ID _____
First        MI        Last

Address _____ Selling Price $ _____

UNDER PENALTIES OF PERJURY, I DECLARE THAT I HAVE READ THE FOREGOING DOCUMENT AND THAT THE FACTS STATED IN IT ARE TRUE.

Seller's Signature _____ Co-Seller's Signature _____

**NOTE: THE SUBMISSION OF THIS FORM, ACCURATELY COMPLETED, TO A TAX COLLECTOR'S OFFICE, LICENSE PLATE AGENCY OR TO THE ADDRESS ABOVE WILL ALLOW THE TITLE CLERK TO UPDATE THE DMV DATABASE TO REFLECT THE TITLE RECORD AS "SOLD". HOWEVER, THE OWNERSHIP STATUS WILL NOT CHANGE UNTIL THE PURCHASER APPLIES FOR AND IS ISSUED A CERTIFICATE OF TITLE.**

---

ODOMETER CERTIFICATION - Federal and state laws require that you state the mileage in connection with transfer of ownership. Failure to complete or providing a false statement may result in fines and/or imprisonment.

**FIRST REASSIGNMENT BY LICENSED DEALER**

Selling Dealer's License No.: _____ Selling Dealer's Name: _____ Tax No.: _____ Tax Collected: _____

Selling Dealer's Address: _____ Date Sold: _____

Purchaser's Name(s): _____ Address: _____

I/WE STATE THAT THIS ☐ 5 OR ☐ 6 DIGIT ODOMETER NOW READS [ ] XX (NO TENTHS) MILES, DATE READ ___/___/___, AND I HEREBY CERTIFY THAT TO THE BEST OF MY KNOWLEDGE THIS ODOMETER READING:

CAUTION: READ CAREFULLY BEFORE YOU CHECK A BOX
☐ 1. REFLECTS ACTUAL MILEAGE
☐ 2. IS IN EXCESS OF ITS MECHANICAL LIMITS (EXCESS OF ITS MECHANICAL LIMITS APPLIES TO 5 DIGIT ODOMETERS)
☐ 3. IS NOT THE ACTUAL MILEAGE. WARNING - ODOMETER DISCREPANCY

Purchaser Must Sign Here: _____ Co-Purchaser Must Sign Here: _____

Print Here: _____ Print Here: _____

Seller/Agent Must Sign Here: _____ Auction Name (When Applicable): _____

Print Here: _____ Auction License Number: _____

**SECOND REASSIGNMENT BY LICENSED DEALER**

Selling Dealer's License No.: _____ Selling Dealer's Name: _____ Tax No.: _____ Tax Collected: _____

Selling Dealer's Address: _____ Date Sold: _____

Purchaser's Name(s): _____ Address: _____

I/WE STATE THAT THIS ☐ 5 OR ☐ 6 DIGIT ODOMETER NOW READS [ ] XX (NO TENTHS) MILES, DATE READ ___/___/___, AND I HEREBY CERTIFY THAT TO THE BEST OF MY KNOWLEDGE THIS ODOMETER READING:

CAUTION: READ CAREFULLY BEFORE YOU CHECK A BOX
☐ 1. REFLECTS ACTUAL MILEAGE
☐ 2. IS IN EXCESS OF ITS MECHANICAL LIMITS (EXCESS OF ITS MECHANICAL LIMITS APPLIES TO 5 DIGIT ODOMETERS)
☐ 3. IS NOT THE ACTUAL MILEAGE. WARNING - ODOMETER DISCREPANCY

Purchaser Must Sign Here: _____ Co-Purchaser Must Sign Here: _____

Print Here: _____ Print Here: _____

Seller/Agent Must Sign Here: _____ Auction Name (When Applicable): _____

Print Here: _____ Auction License Number: _____

**THIRD REASSIGNMENT BY LICENSED DEALER**

Selling Dealer's License No.: _____ Selling Dealer's Name: _____ Tax No.: _____ Tax Collected: _____

Selling Dealer's Address: _____ Date Sold: _____

Purchaser's Name(s): _____ Address: _____

I/WE STATE THAT THIS ☐ 5 OR ☐ 6 DIGIT ODOMETER NOW READS [ ] XX (NO TENTHS) MILES, DATE READ ___/___/___, AND I HEREBY CERTIFY THAT TO THE BEST OF MY KNOWLEDGE THIS ODOMETER READING:

CAUTION: READ CAREFULLY BEFORE YOU CHECK A BOX
☐ 1. REFLECTS ACTUAL MILEAGE
☐ 2. IS IN EXCESS OF ITS MECHANICAL LIMITS (EXCESS OF ITS MECHANICAL LIMITS APPLIES TO 5 DIGIT ODOMETERS)
☐ 3. IS NOT THE ACTUAL MILEAGE. WARNING - ODOMETER DISCREPANCY

Purchaser Must Sign Here: _____ Co-Purchaser Must Sign Here: _____

Print Here: _____ Print Here: _____

Seller/Agent Must Sign Here: _____ Auction Name (When Applicable): _____

Print Here: _____ Auction License Number: _____

## FERNDALE POLICE DEPARTMENT STOLEN AUTO RECOVERY REPORT

DPD Auto Recov
RECOVERING DEPT

7/20/18 @1950
DATE & TIME RECIVED

18-9920
OUR COMP.#

1807200340
THEIR COMP. #

PO KaKish #854
OFC TAKING CALL

YEAR / MAKE / MODEL OF VEHICLE    2017 Nissan

VR 201806

LOCATION OF RECOVERY  Green field/West field

VEHICLE STORED AT  Michigan Auto Recovery

PHONE #

VEHICLE CONDITION  Plate/Vin Intact/No damages

ARRESTS (NAME & DOB)  Janette Brown B/F  2/18/77
    Sterling Turner B/M  6/12/1992

PLATE RECOVERED? YES  NO (CIRCLE ONE)  Re-enter LEIN if not.

PLEASE ENTER LEIN REFNO:  4245 0007

OWNER CONTACTED: YES  NO  By Whom  Jones #131
DATE & TIME NOTIFIED  7/24 @ 1605
If the owner is unable to be notified at the time the vehicle is reported recovered, please hold and
pass this information to the next shift for processing.

MORE ATTEMPTS TO CONTACT OWNER OF RECOVERED VEHICLE
DATE _____ TIME _____ OFFICER _____
DATE _____ TIME _____ OFFICER _____

CANCELLED BY  Jones #131  DATE: 7/23/18  TIME: 2029

After canceling this stolen car, send paperwork to Detective Bureau. After DB processing, send
to clerks office for filling.

Checked by Detective : _____

20

Report Type: C                    *IMMEDIATE ATTENTION REQUIRED*                ***Confidential***

HERTZ

Initial Report of Vehicle

REPORT THIS VEHICLE STOLEN TO YOUR LOCAL POLICE DEPARTMENT WITHIN 4 DAYS AND RETURN THIS
SHEET TO OKC VEHICLE CONTROL WITH REQUIRED THEFT INFORMATION HIGHLIGHTED ON THIS SHEET

Okctheftandrecovery@hertz.com or 405-775-3078

---

VCWX0380                                                                        **Confidential**

Report Type: C                              HERTZ
TR=Theft Renter                        OKC Vehicle Control
TF=Theft Fraud                       Initial Report of Vehicle
C=Conversion                                                              Theft ID:

| Unit No. | Year | Make | Model | Type | Color | Serial No. |
|---|---|---|---|---|---|---|
| 0006744593 | 2017 | NISSAN | ALTIMA | 4DR | GRA | |

| Lic Plate YR | Lic ST | Lic NO. | Odometer Out | | Owning Area | Rental No. |
|---|---|---|---|---|---|---|
| 2018 | FL | HLEX22 | 38716 | | 01398 | H41162284 |

| Date & Time Rented | Rented From | Due Date | | Home Phone | Business Phone | Local Phone |
|---|---|---|---|---|---|---|
| 05/30/2018 13.10.00 | 05424-10 | 06/06/2018 12.16.00 | 05424-10 | 3134209145 | *3134209145 | STACEY |

Renter's Name                              Residence Address (City, State, & Zip Code)
JANETTE BROWN                              3081 CREEK DR SE APT 1B KENTWOOD    MI49512

Employer's Name                            Secondary Address (City, State, & Zip Code)
                                           3081 CREEK DR SE APT 1B, KENTWOOD, MI 49512

| Identification Used | Driver's License No. | ST. | DY of Birth | Person Renting Veh Provided False Info (Yes/No) |
|---|---|---|---|---|
| XXXXXXXXXXX0401 | B850368005128 | MI | 02/18/1977 | No |

| Dept. Reported to: | Reported to: | Reported By: | Reported On | Alarm Number |
|---|---|---|---|---|
| Ferndale PD | Officer Heath | 061885 | 7/18/18 | 18-9920 |

| Keys Returned? | Veh Locked? | LDW | Book Value | Date & Time Stolen | Location of Vehicle at Time of Theft |
|---|---|---|---|---|---|
| No | No | N. | 11698.12 | 06/06/2018 12:16 | In Renters Possession |

See Attached Pages for the overdue notes for the Worksheet ID:    18060080371

---

THE VEHICLE APPEARED ON THE OVERDUE REPORT. THE PHONE NUMBER ON THE RENTAL WAS CALLED.
ALL AVAILABLE SYSTEMS HAVE BEEN CHECKED. NO ADDITIONAL INFORMATION HAS BEEN FOUND.

Date certified Demand Letter Was Sent:  06/27/2018          Return Mail:

Force Return Hired:  06/27/2018              Repossession Service Hired:  07/06/2018

Rental Rep:  0667                            DNR Submitted:  14C

Prepared By:  S. HENDRICKS                   Prepared Date:  7/11/2018

VC Supervisor Signature  T. Sayers          Printed Date:  7/11/2018 10:16:46 AM

**Remit To:**

GERBER NATIONAL CLAIM SERVICES


Invoice Number: 167898238
Invoice Date: 7/25/2018
Claim Entered: 7/23/2018 3:28 PM

# GERBER NATIONAL CLAIM SERVICES INVOICE

**Bill To:**
HERTZ RENTAL (SECONDARY TOW)

Phone:
Fax:

**Billing Information:**
Terms: NET 15
Authorized By: HERTZ

**Customer Information:**
Name: DETROIT AUTO RECOVERY

48228
Home Phone:
Work Phone:
Mobile:

**Job Information:**
Work Authorized: TOW AND IMPOUND
Damage Description:
PO: 200855813
Unit Number: 6744593
Loss-Desc: STOLEN UNIT
Loss-Date: 07/23/18
Loss-Location: MI
Tow miles: 15
Impound Days: 5

**Vehicle:**
Year: 2017
Make: NISSAN
Model: ALTIMA
Style:
VIN:
Lice
Mileage:

Rental agreement number: H41162284
Reported / Received Date: 07/23/18
Complaint/problem with car: stolen unit
Cause: Tow and Impound
ERS Case #: n/a
Damages: FEES OWED 07/24/18  2/5 00 STORAGE PER DAY  15 00 P
Accident/Damage: Unknown
Customer Responsible: Yes - Recovered Stolen Vehicle
Additional Notes: recovered stolen unit

| Qty | Part / Description | List Price | Rate | Material | Labor | Item Total |
|-----|-------------------|-----------|------|----------|-------|-----------|
| 1 | SURCHARGE FEE | 16.56 | -100% | 0.00 | 16.56 | 16.56 |
| 1 | HOOK UP FEE | 85.00 | -100% | 0.00 | 85.00 | 85.00 |
| 1 | OTHER | 65.00 | -100% | 0.00 | 65.00 | 65.00 |
| 1 | IMPOUND FEES | 290.00 | -100% | 0.00 | 290.00 | 290.00 |
| 1 | DISPATCH FEE | 30.00 | -100% | 0.00 | 30.00 | 30.00 |

**Notes:**

OTHER: WAIT TIME SKATES NO START
Tow from: 14201 Joy Rd Detroit MI 48228
Tow to: 289 Lucas Dr B Detroit MI 48242
Thank you for your business!

| Material | Labor | Sales Tax | Total | Deductible | Payments | Balance |
|----------|-------|-----------|-------|-----------|----------|---------|
| 0.00 | 486.56 | 0.00 | 486.56 | 0.00 | 0.00 | 486.56 |

22

## Work Order Detail

**153013-2018-18165**
**3AP3HN321706**
**2017 GRA NISSAN ALTIMA**

### 153013 - DETROIT

| | | | | |
|---|---|---|---|---|
| Owning Area: | P01598 - POOL 01598 | | Department: | FLEET |
| Equipment: | 3AP3HN321706 - 2017 ALTIMA | | VIN: | 1N4AL3AP3HN321706 |
| Owning Area/Unit#: | 013986744593 | License/ST: | HLEX22 / FL | |
| Job Type: | REPAIR | Repair Reason: | J - OTHER | Warranty: | YES |
| Opened: | 07/25/2018 14:59 | By  79211 - DAVID BULLOCK | Mileage 1 Reading: | 45598 |
| Finished: | 07/25/2018 17:44 | By  79211 - DAVID BULLOCK | Mileage 2 Reading: | 0 |
| Closed: | 07/27/2018 15:52 | By  28626 - BRIAN WOODWARD | Shop Downtime: | 2.75 |
| VDA Ref: | | Multi-Unit Project: | | User Downtime: | 34.16 |

**Performed Repairs:**

| | |
|---|---|
| Complaint: | KEYLESS REMOTE INOP |
| Fail/Cause: | OT--CHECKED VEH FOUND REMOTE INOP VEH NOSTART |
| Correction: | REPLACED REMOTE BATTERY CHECKED WORKING DONE |

Task 007-000-BODY ELECTRICAL STRAIGHT TIME     Repair Reason:   J - OTHER

| Internal Labor | | | | |
|---|---|---|---|---|
| Employee | Hours | Cost | Clock Off | Clock On |
| 79211 | 0.75 | $38.06 | 07/25/2018 15:46 | 07/25/2018 15:01 |

Task 007-435-REPLACE KEYFOB BATTERY     Repair Reason:   J - OTHER

| Internal Labor | | | | |
|---|---|---|---|---|
| Employee | Hours | Cost | Clock Off | Clock On |
| 79211 | 0.02 | $1.02 | 07/25/2018 15:47 | 07/25/2018 15:46 |

Task 026-001-STOLEN RECOVERY INSPECTION     Repair Reason:   J - OTHER

| Internal Labor | | | | |
|---|---|---|---|---|
| Employee | Hours | Cost | Clock Off | Clock On |
| 79211 | 0.40 | $20.30 | 07/25/2018 17:43 | 07/25/2018 17:19 |

| | |
|---|---|
| Complaint: | CUSTOMER SATISFACTION INSP |
| Fail/Cause: | CUST SAT-PERFORM INSPECTION |
| Correction: | CK TIRE PRESSURE & TREAD DEPTH, SPARE OR INFLATOR KIT, CK KEY RING CONFIG & FUNCTION OF KEY/REM OTE, POWER PORTS, WIPERS/WASHER, HEATER-A/C, ENTERTAIMNT SYS, SEATS, SEAT BELTS, DOOR LOCKS & W IN CONTROLS, EXT LIGHTS, MIRRORS, CK HORN, RST PM COUNTER |

Task 019-CUST INS-CUSTOMER SATISFACTION     Repair Reason:   J - OTHER

| Internal Labor | | | | |
|---|---|---|---|---|
| Employee | Hours | Cost | Clock Off | Clock On |
| 79211 | 0.10 | $5.08 | 07/25/2018 15:53 | 07/25/2018 15:47 |

| | |
|---|---|
| Complaint: | TREAD THICKNESS |
| Fail/Cause: | OT--CHECKED VEH FOUND BOTH FRONT TIRES AT OR BELOW SPEC |
| Correction: | REPLACED FRONT TIRES DONE |

Task 022-000-CHECK ALL TIRES CONDITION AND     Repair Reason:   J - OTHER

| Internal Labor | | | | |
|---|---|---|---|---|
| Employee | Hours | Cost | Clock Off | Clock On |
| 79211 | 0.22 | $11.17 | 07/25/2018 16:43 | 07/25/2018 16:30 |

Task 022-050-RF TIRE REPLACE INCLUDES BALANCE     Repair Reason:   J - OTHER

| Internal Labor | | | | |
|---|---|---|---|---|
| Employee | Hours | Cost | Clock Off | Clock On |
| 79211 | 0.45 | $22.84 | 07/25/2018 17:10 | 07/25/2018 16:43 |

| Internal Parts | | | Qty | Unit Issue | Total Cost |
|---|---|---|---|---|---|
| Part Number | Description | | | $46.87 | $93.74 |
| 2156016 95H CAPITOL SP | TIRE; CAPITOL SPORT | | 2 | | |

Task 022-060-LF TIRE REPLACE INCLUDES BALANCE     Repair Reason:   J - OTHER

| Internal Labor | | | | |
|---|---|---|---|---|
| Employee | Hours | Cost | Clock Off | Clock On |
| 79211 | 0.15 | $7.61 | 07/25/2018 17:19 | 07/25/2018 17:10 |

23

| | |
|---|---|
| Internal Parts Cost: | $93.74 |
| Internal Labor Cost: | $106.08 |
| Commercial Parts Cost: | $0.00 |
| Commercial Labor Cost: | $0.00 |
| Commercial Misc Cost: | $0.00 |
| Work Order Total: | $199.82 |

## Work Order Detail

**153013-2018-18183**
**3AP3HN321706**
**2017 GRA NISSAN ALTIMA**

### 153013 - DETROIT

| | | | |
|---|---|---|---|
| Owning Area: | P01598 - POOL 01598 | Department: | FLEET |
| Equipment: | 3AP3HN321706 - 2017 ALTIMA | VIN: | 1N4AL3AP3HN321706 |
| Owning Area/Unit#: | 013988744593 | License/ST: | HLEX22 / FL | |
| Job Type: | REPAIR | Repair Reason:  J - OTHER | Warranty: | YES |
| Opened: | 07/25/2018 17:52 | By  79211 - DAVID BULLOCK | Mileage 1 Reading: | 45598 |
| Finished: | 07/27/2018 21:16 | By  79211 - DAVID BULLOCK | Mileage 2 Reading: | 0 |
| Closed: | 07/29/2018 12:04 | By  26525 - BRIAN WOODWARD | Shop Downtime: | 51.40 |
| VDA Ref: | | Multi-Unit Project: | User Downtime: | 44.20 |

**Performed Repairs:**

| | |
|---|---|
| Complaint: | WINDSHIELD CRACKED |
| Fail/Cause: | OT-FOUND FRONT WINSHIELD CRACKED |
| Correction: | VEND FOR REPLACEMENT REPLACED WINDSHIELD |

Task 002-000-BODY EXTERIOR STRAIGHT TIME D      Repair Reason:   J - OTHER

**Internal Labor**

| Employee | Hours | Cost | Clock Off | Clock On |
|---|---|---|---|---|
| 79211 | 0.10 | $5.08 | 07/25/2018 18:00 | 07/25/2018 17:54 |

Task 002-300-WINDSHIELD REPLACEMENT      Repair Reason:   J - OTHER

**WO Delays**

| Delay Code | Start | Stop | Hours |
|---|---|---|---|
| MV | 7/25/2018 8:39:00 PM | 7/27/2018 4:49:00 PM | 44.17 |

25

| | |
|---|---|
| Internal Parts Cost: | $0.00 |
| Internal Labor Cost: | $5.08 |
| Commercial Parts Cost: | $0.00 |
| Commercial Labor Cost: | $0.00 |
| Commercial Misc Cost: | $0.00 |
| **Work Order Total:** | **$5.08** |

# INCIDENT/INVESTIGATION REPORT

| | | |
|---|---|---|
| **Agency Name** *Detroit Police Department* | | **Case#** *180720-0340* |
| **ORI** *MI 8234900* | | **Date / Time Reported** *07/20/2018  16:25  Fri* |
| | | **Last Known Secure** *07/20/2018  16:25  Fri* |
| **Location of Incident** ▮▮▮▮ | **Premise Type** *Highway/road/alley* | **Zone/Tract** 608 | **At Found** *07/20/2018  16:25  Fri* |

**INCIDENT DATA**

| | | | | | |
|---|---|---|---|---|---|
| **#1** | **Crime Incident(s)** (Com) *Motor Vehicle As Stolen Property (recovered Only) - 24002* | **Weapon / Tools** | | **Security** | **Activity** *P* |
| | | Entry | Exit | | |
| **#2** | **Crime Incident** ( ) | **Weapon / Tools** | | **Security** | **Activity** |
| | | Entry | Exit | | |
| **#3** | **Crime Incident** ( ) | **Weapon / Tools** | | **Security** | **Activity** |
| | | Entry | Exit | | |

**MO**

**VICTIM**

| # of Victims 1 | Type: BUSINESS | | Injury: | | Domestic: NO |
|---|---|---|---|---|---|

| | Victim/Business Name (Last, First, Middle) | Victim of Crime # | DOB | Race | Sex | Relationship To Offender | Resident Status | Military Branch/Status |
|---|---|---|---|---|---|---|---|---|
| **V1** | *HERTZ* | *1,* | Age | | | | | |

| Home Address ▮▮▮▮ | | Home Phone *407-859-8400* |
|---|---|---|
| Employer Name/Address | Business Phone — — | Mobile Phone |

| VYR | Make | Model | Style | Color | Lic/Lis | VIN |
|---|---|---|---|---|---|---|

**OTHERS INVOLVED**

CODES: V- Victim (Denote V2, V3)   O = Owner (if other than victim)   R = Reporting Person (if other than victim)

| | Type: | | Injury: | | | | | |
|---|---|---|---|---|---|---|---|---|
| Code | Name (Last, First, Middle) | Victim of Crime # | DOB Age | Race | Sex | Relationship To Offender | Resident Status | Military Branch/Status |

| Home Address | | Home Phone |
|---|---|---|
| Employer Name/Address | Business Phone | Mobile Phone |

| | Type: | | Injury: | | | | | |
|---|---|---|---|---|---|---|---|---|
| Code | Name (Last, First, Middle) | Victim of Crime # | DOB Age | Race | Sex | Relationship To Offender | Resident Status | Military Branch/Status |

| Home Address | | Home Phone |
|---|---|---|
| Employer Name/Address | Business Phone | Mobile Phone |

**PROPERTY**

1 = None  2 = Burned  3 = Counterfeit / Forged  4 = Damaged / Vandalized  5 = Recovered  6 = Seized  7 = Stolen  8 = Unknown
("OJ" = Recovered for Other Jurisdiction)

| VI # | Code | Status Frm/To | Value | OJ | QTY | Property Description | Make/Model | Serial Number |
|---|---|---|---|---|---|---|---|---|
| | 03 | 5 | $1.00 | | 1 | 2017 GRY ▮▮▮▮ | NISS Altima | ▮▮▮▮ |

Tot Rec Val: $1.00

| Officer/ID# *Kakish, Ibrahim   (WES, 6TH) (240455)* | | Supervisor *Robinson, Kevin C   (WES, 6TH)* |
|---|---|---|
| Invest ID# *Leonard, Kenneth G   (DET, CATS) (230243)* | | Page 1 |
| **Status** Complainant Signature | Case Status *Cleared By Arrest* *07/28/2018* | Case Disposition: |

R_CS1.TBR          Printed By: GREEND065,                    Sys#: 240283              07/30/2018 11:04

27

## INCIDENT/INVESTIGATION REPORT

*Detroit Police Department*

Case # 180720-0340

| Status Codes | 1 = None   2 = Burned   3 = Counterfeit / Forged   4 = Damaged / Vandalized   5 = Recovered   6 = Seized   7 = Stolen   8 = Unknown |
|---|---|

| | IBR | Status | Quantity | Type Measure | Suspected Type | |
|---|---|---|---|---|---|---|
| D R U G S | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

Assisting Officers
*PARRINELLO, J.J. (240583),  LEE, S.E. (233911),  TATUM, W.D. (236409),  MATHIS, R.W. (240629),  KING, D.L. (240284), GARCIA, D.J. (236683),  PEAKE, T.J. (240811),  DENLAR, D.M. (240560),  CORSI, J.A. (240201),  DAVILA, M.F. (241123),*

Suspect Hate / Bias Motivated:    *NONE*

## INCIDENT/INVESTIGATION REPORT
*Detroit Police Department*

Narr. (cont.) OCA: 180720-0340

N A R R A T I V E

## REPORTING OFFICER NARRATIVE

| | | OCA<br>180720-0340 |
|---|---|---|
| *Detroit Police Department* | | Date / Time Reported<br>*Fri 07/20/2018 16:25* |
| Victim<br>*HERTZ* | Offense<br>*MOTOR VEHICLE AS STOLEN PROPERTY* | |

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

NO FORCE USED

PO I. KAKISH 854
PO J. CORSI 5063

SCT 6-7 IN VEHICLE 173014 FULLY MARKED WITH WORKING VIDEO AND AUDIO.

SCT 6-7 TRAVELING S/B ON GREENFIELD PASSING WESTFIELD WHEN SCT RECEIVED AN LPR HIT FOR A STOLEN MOTOR VEHICLE TRAVELING N/B OCCUPIED 2 TIMES. SCT TURNED AROUND AFTER CHECKING TALON TO INSURE THE VEHICLE WAS STOLEN. SCT OBSERVED OFFENDER 1 OUT OF THE VEHICLE BUT REACHING INTO VEHICLE AT THE CORNER OF GREENFIELD/WESTFIELD IN THE CAPTAIN JAY`S RESTURANT PARKING LOT. SCT STOOD BY AND WAITED FOR MORAL SUPPORT AT GREENFIELD NEAR JOY RD  WAITING FOR OFFENDER 1 TO EXIT THE ESTABLISHMENT. OFFENDER 2 STILL IN THE STOLEN VEHICLE, SCT`S SURROUNDED THE STOLEN VEHICLE WHEN OFFENDER 1 CAME OUT OF THE LOCATION AND OPENED THE DRIVER DOOR TO REACH IN THE VEHICLE WITH VEHICLE KEYS IN HAND. SCT 6-7 APPROACHED THE VEHICLE FROM THE REAR WITH THE EMERGENCY LIGHTS ACTIVATED. AND DETAINED THE 2 OFFENDERS.

██████████          IS:FL  LIY:(JUL)-2018 ██████████
VYR:2017 VMA:NISS VMO:ALT  VST:4D  VCO:GREY
DOT:07/18/2018  OPT:OUT  OCA:18-9920
OFFENDER 1- JANETTE BROWN B/F DOB-02/18/1977
OFFENDER 2- STERLING MARCUS TURNER JR B/M DOB-06/12/1992

SCT 6-1 STOOD BY FOR THE TOW. I PO I. KAKISH DETAINED OFFENDER 1 WHILE SCT 651 DETAINED OFFENDER 2. BOTH OFFENDER 1 AND OFFENDER 2 WERE TRANSPORTED TO THE DDC WITHOUT INCIDENT OR FORCE. NO FURTHER INFORMATION AT THIS TIME.

[07/20/2018 18:45 KAKISHI455]

# Incident Report Suspect List

*Detroit Police Department*

OCA: *180720-0340*

---

**1**

| Name (Last, First, Middle) | Also Known As | Home Address |
|---|---|---|
| BROWN, JANETTE | | 3081 CREEK DR - 1B KENTWOOD, MI 49512 616-589-3742 |

Business Address

| DOB | Age | Race | Sex | Eth | Hgt | Wgt | Hair | Eye | Skin | Driver's License / State. |
|---|---|---|---|---|---|---|---|---|---|---|
| 02/18/1977 | 41 | B | F | | 506 | 175 | BRO | BRO | MED | B650368005128 |

Scars, Marks, Tattoos, or other distinguishing features

| Reported Suspect Detail | Suspect Age | Race | Sex | Eth | Height | Weight | | SSN |
|---|---|---|---|---|---|---|---|---|
| Weapon, Type | Feature | Make | Model | | Color | Caliber | Dir of Travel | |
| | | | | | | | Mode of Travel | |
| VehYr/Make/Model | | Drs | Style | Color | Lic/St | | VIN | |

Notes                                         Physical Char

---

**2**

| Name (Last, First, Middle) | Also Known As | Home Address |
|---|---|---|
| TURNER, STERLING MARCUS | | ▓▓▓▓▓ |

Business Address

▓▓▓▓▓                                         Driver's License / State.

Scars, Marks, Tattoos, or other distinguishing features

| Reported Suspect Detail | Suspect Age | Race | Sex | Eth | Height | Weight | | SSN |
|---|---|---|---|---|---|---|---|---|
| Weapon, Type | Feature | Make | Model | | Color | Caliber | Dir of Travel | |
| | | | | | | | Mode of Travel | |
| VehYr/Make/Model | | Drs | Style | Color | Lic/St | | VIN | |

Notes                                         Physical Char

---

## Incident Report Related Vehicle List

*Detroit Police Department*

OCA: *180720-0340*

| | VehYr/Make/Model *2017 NISS, Altima* | Style | Color *GRY* | Lic/Lis *HLEX22 FL* | | |
|---|---|---|---|---|---|---|
| 1 | IBR Status *Recovered* | Date *07/20/2018* | | | | |
| | Condition | Value *$1.00* | Offense Code *2402* | Jurisdiction *Locally* | State # | NIC # |
| | Name (Last, First, Middle) *No name* | | Also Known As | | Home Address | |
| | Business Address | | | | | |

| DOB | Age | Race | Sex | Hgt | Wgt | Scars, Marks, Tattoos, or other distinguishing features |
|---|---|---|---|---|---|---|
| | | | | | | |

Notes

# CASE SUPPLEMENTAL REPORT

Printed: 07/30/2018 11:05

OCA: **1807200340**

*Detroit Police Department*

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

Case Status: *CLEARED BY ARREST*　　Case Mng Status: *CLEARED BY ARREST*　　Occurred: *07/20/2018*

Offense: *MOTOR VEHICLE AS STOLEN PROPERTY (RECOVERED ONLY)*

Investigator: *CORSI, JAMES A    (240201)*　　Date / Time: *07/20/2018 18:57:38, Friday*

Supervisor: *ROBINSON, KEVIN C    (200613)*　　Supervisor Review Date / Time: *07/20/2018 22:14:17, Friday*

Contact:　　Reference: *Assisting Officer's Report*

[07/20/2018 18:58 CORSIJ201]

PO J. CORSI 5063
PO I. KAKISH 854

SCT WAS TRAVELING SOUTHBOUND ON GREENFIELD  WHEN THE LICENSE PLATE READER GOT A HIT ON A STOLEN VEHICLE. MY PARTNER CHECKED THE COMPUTER TO SEE WHICH LICENSE PLATE THE PROGRAM HIT ON. MY PARTNER READ THE LICENSE PLATE OFF AND STATED IT IS A FLORIDA PLATE. I TURNED THE SCT CAR AROUND TO GO BACK NORTHBOUND ON GREENFIELD TO SEE IF SCT CAN FIND THE STOLEN VEHICLE. SCT HAD NEGATIVE RESULTS WHEN SEARCHING FOR THE VEHICLE NORTHBOUND ON GREENFIELD. I TURNED THE SCT CAR BACK AROUND TO GO BACK SOUTHBOUND ON GREENFIELD AND THAT IS WHEN WE OBSERVED THE VEHICLE BY WESTFIELD AND GREENFIELD IN THE CAPTAIN JAYS PARKING LOT. I CONTINUED TO DRIVE THE SCT CAR SOUTHBOUND ON GREENFIELD AND TURNED IT AROUND TO GET ON THE OPPOSITE SIDE OF GREENFIELD TO FACE NORTHBOUND TO KEEP AN EYE ON THE VEHICLE. I OBSERVED OFFENDER 1 OPENING THE DRIVER DOOR REACHING FOR SOMETHING AND THAT IS WHEN I DROVE THE SCT CAR UP TO THE VEHICLE WITH THE POLICE LIGHTS ACTIVATED. MY PARTNER DETAINED OFFENDER 1 AND SCT 6-51 DETAINED OFFENDER 2 FOR FURTHER INVESTIGATION. BOTH OFFENDERS WHERE ARRESTED AND CONVEYED TO THE DDC WITHOUT INCIDENT.

Investigator Signature　　　　　　Supervisor Signature

## CASE SUPPLEMENTAL REPORT

Printed: 07/30/2018  11:05

*Detroit Police Department*

OCA: **1807200340**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** *CLEARED BY ARREST*     **Case Mng Status:** *CLEARED BY ARREST*     **Occurred:** *07/20/2018*

**Offense:** *MOTOR VEHICLE AS STOLEN PROPERTY (RECOVERED ONLY)*

**Investigator:** *CSUTAK, HUNOR T    (240602)*         **Date / Time:** *07/20/2018 19:28:33, Friday*

**Supervisor:** *ROBINSON, KEVIN C    (200613)*     **Supervisor Review Date / Time:** *07/20/2018 19:45:26, Friday*

**Contact:**         **Reference:** *Assisting Officer's Report*

---

[07/20/2018 19:28, CSUTAKH602]

PO H.CSUTAK BADGE 438
PO M.DAVILA BADGE 2100
SCOUT 6-8

SCOUT 6-7 CALLED OUT ON RADIO A CONFIRMED STOLEN VEHICLE. SCOUT MADE LOCATION TO ASSIST SCOUT 6-7. SCOUT STOOD BY GREENFIELD AND ELLIS.ST TILL SCOUT 6-7 GIVE THE ORDER TO GO. PER SCOUT 6-7 DRIVER WAS IN CAPTAIN JAY'S RESTAURANT ONLY PASSENGER WAS IN THE VEHICLE.

UPON SCOUT 6-7 GIVE THE ORDER SCOUT DROVE IN THE PARKING LOT BEHIND THE VEHICLE AND STOOD BY TILL SCOUT 6-7 MADE THE ARREST. FEMALE DRIVER(JANETTE BROWN) WAS PLACED IN THE REAR OF OUR SCOUT CAR. SCOUT STOOD BY TILL SCOUT 6-7 FINISHED THE SEARCH OF THE VEHICLE.

SCOUT CONVEYED FEMALE DRIVER(JANETTE BROWN) TO DDC WITHOUT INCIDENT.

Investigator Signature                    Supervisor Signature

## CASE SUPPLEMENTAL REPORT

Printed: 07/30/2018  11:05

*Detroit Police Department*

OCA: *1807200340*

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** *CLEARED BY ARREST*   **Case Mng Status:** *CLEARED BY ARREST*   Occurred: *07/20/2018*

**Offense:** *MOTOR VEHICLE AS STOLEN PROPERTY (RECOVERED ONLY)*

**Investigator:** *DAVILA, MARIO F    (241123)*   **Date / Time:** *07/20/2018 19:58:24, Friday*

**Supervisor:** *ROBINSON, KEVIN C    (200613)*   **Supervisor Review Date / Time:** *07/20/2018 22:12:39, Friday*

**Contact:**   **Reference:** *Assisting Officer's Report*

[07/20/2018 19:58, DAVILAM123, 4701]

SCOUT 6-8

PO. M DAVILA 2100
PO. H CSUTAK 436

CREW RECEIVED INFO BY SCOUT 6-7 ON A STOLEN VEHICLE THAT WAS PARKED OUT SIDE CAPTAIN JAYS ON GREENFILED. SCOUT STOOD BY AT GREENFIELD/ELLIS ST UNTIL SCOUT 6-7 GAVE THE GREEN LIGHT. ONCE SCOUT 6-7 GAVE THE GREEN LIGHT SCOUT MADE LOCATION PARKING VEHICLE BEHIND THE STOLEN VEHICLE AND STOOD BY WHILE SCOUT 6-7 MADE ARREST. SCOUT THEN CONVEYED ON B/F TO THE DDC FOR SCOUT 6-7.

Investigator Signature                    Supervisor Signature

## CASE SUPPLEMENTAL REPORT

Printed: 07/30/2018  11:05

Detroit Police Department

OCA: **1807200340**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

Case Status: *CLEARED BY ARREST*    Case Mng Status: *CLEARED BY ARREST*    Occurred: *07/20/2018*

Offense: *MOTOR VEHICLE AS STOLEN PROPERTY (RECOVERED ONLY)*

Investigator: *GRANT, ROBERT E  (222440)*    Date / Time: *07/23/2018 15:10:27, Monday*

Supervisor: *LITTLEJOHN, WHITNEY  ...*    Supervisor Review Date / Time: *07/23/2018 16:32:21, Monday*

Contact:    Reference: *Additional Information  Discovered*

7/23/2018  ABOUT 1455 HRS  RECEIVED TX CALL FROM RYAN PENDLETON OF HERTZ CAR RENTAL ▓▓▓▓▓▓▓▓ CONCERNING A RECOVERED VEHICLE.
A CHECK OF LEIN SHOWED THAT THE VEHICLE IS STILL LISTED AS A STOLEN VEHICLE THAT HAS BEEN ENTERED BY FERNDALE MI PD ▓▓▓▓▓▓

CHECKED DETROIT AUTHORIZED CONTRACT IMPOUNDS AND LEARNED FROM SABRINA THAT THE VEHICLE IS AT DETROIT AUTO RECOVERY TOW.

REQUESTED A FAX OF THE IMPOUND CARD FROM SABRINA AND NOTIFIED MR. PENDLETON THAT THE VEHICLE IS AT DETROIT AUTO RECOVERY (▓▓▓▓▓▓
-GRANT/TCRU

Investigator Signature    Supervisor Signature

## CASE SUPPLEMENTAL REPORT

Printed: 07/30/2018  11:05

OCA: **1807200340**

*Detroit Police Department*

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

Case Status: *CLEARED BY ARREST*    Case Mng Status: *CLEARED BY ARREST*    Occurred: *07/20/2018*

Offense: *MOTOR VEHICLE AS STOLEN PROPERTY (RECOVERED ONLY)*

Investigator: *WILLIAMS, SHERICA    (296560)*    Date / Time: *07/23/2018 16:39:28, Monday*

Supervisor: *LITTLEJOHN, WHITNEY    ...*    Supervisor Review Date / Time: *07/23/2018 16:57:58, Monday*

Contact:    Reference: *Recovered Vehicle*

FORM RECOVERY W/ARREST

PO IBRAHIM KAKISH BADGE 854 SCOUT 6-7 RECOVERED A VEHICLE FROM GREENFIELD AND WESTFIELD ON 07/20/2018 AT 6:50PM. VIN INTACT. IGNITION AND STEERING COLUMN INTACT. PLATE WITH VEHICLE. OWNER HAS NOT BEEN NOTIFIED.

DAMAGE: NONE

MISSING: NONE

TOWED TO: MICHIGAN AUTO RECOVERY ▮▮▮▮▮
CONTROL# 201820103026

VIN# ▮▮▮▮▮
SILVER 2017 NISSAN ALTIMA
PLATE▮▮▮▮ (EXPIRES) 07/2018 FL

REFERENCE# 42450007

FERNDALE OCA: 18-9920
V810455552

ARRESTED: (DRIVER)- JANETTE BROWN B/F 02/18/1977
          (PASSENGER)- STERLING TURNER B/M 06/12/1992

Investigator Signature    Supervisor Signature

## CASE SUPPLEMENTAL REPORT

Printed: 07/30/2018  11:05

*Detroit Police Department*

OCA: **1807200340**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

Case Status: *CLEARED BY ARREST*    Case Mng Status: *CLEARED BY ARREST*    Occurred: *07/20/2018*

Offense: *MOTOR VEHICLE AS STOLEN PROPERTY (RECOVERED ONLY)*

Investigator: *BARTLEY, DAISALETA    (295610)*    Date / Time: *07/24/2018 11:14:33, Tuesday*

Supervisor: *CHILDRESS, LATASHA T    ...*    Supervisor Review Date / Time: *07/24/2018 11:27:06, Tuesday*

Contact:    Reference: *Additional Information  Discovered*

hit request sent 7/24/2018 1045 mri 8643287 ferndale pd
hit response received 7/24/2018 11:09am
however veh was cancel by ferndale on 7/23/2018 2029
dbartley 7/24/2018 11:16

Investigator Signature                    Supervisor Signature

# ATTACHMENT AQ

## DECLARATION OF SEAN HURT

1.      My name is Sean Hurt. I have personal knowledge of the facts stated in this declaration, and I can testify competently to them if called upon to do so.

2.      In summation: Sean rented a truck from Dollar at the Dallas Fort Worth airport location in January 2020. It was a 1-week rental and he paid in advance. During the rental, the truck was stolen from him and he immediately reported the theft to Hertz and the police. Months later, without warning, Hertz outrageously charged him $2,600, and then had him arrested and prosecuted for car theft in November 2020. The charges were dismissed in May 2021.

3.      Sean rented a car from Dollar at the Dallas Fort Worth airport location on January 12, 2020. The truck rental was only for 1 week, and he paid in advance. The rental number was 73367326.

4.      While helping someone move, the truck was stolen from him. Sean immediately reported the theft to Hertz and the police on or around January 19, 2020.

5.      Hertz had him fill out an affidavit at the location detailing what happened. It should be noted that Hertz had a GPS locator on the vehicle and could have immediately recovered the vehicle had it wanted.

6.      Hertz told Sean he did not need to do anything further. Hertz stated that if they needed Sean further, they would call him. Sean heard nothing further about the car being stolen from him from Hertz.

7.      However, Hertz improperly continued to charge his bank account in late January 2020 as if the rental was continuing—even though Hertz knew he did not have the vehicle.

8.      Sean called Hertz repeatedly and demanded that they stop billing him—and pointed out they could use the GPS to get the vehicle—but they refused to do so, and also refused to close

1

his rental.

9.    Then, on or around February 3, 2020, Sean received a letter of demand from Hertz claiming the car was overdue and had to be returned.

10.    Frustrated and angry, Sean sent an email to Vehicle Control's vehcntl@hertz.com email address on February 3, 2020:

> **From:** seanzhurt@aol.com,
> **To:** vehcntl@hertz.com,
> **Subject:** Rental #373367326
> **Date:** Mon, Feb 3, 2020 11:35 pm
>
> Good Evening,
>   I received the letter of demand only problem is I don't have it. I've been reporting the vehicle stolen since 1/19/2020 and you've done nothing except continue to charge me for the vehicle. I've asked repeatedly for someone to activate the GPS and I'd go collect it but no one would. Now 3 weeks later you're sending me a letter of demand. Well I still don't have it and I still don't know where it is. But you guys are still happily charging me for the rental. Cops wouldn't do anything y'all haven't done anything, this whole thing would have been over if you'd have just activated the gps. But since no one else is doing anything I have. I closed down my account you were charging me on so you aren't bleeding me dry while you sit around doing nothing but ignoring my requests to do something about this.  Now I'm doing nothing too.
> Sincerely
> Sean Hurt
>
> Sent from my iPhone

11.    In March 2020, he was then charged $2,600 by Hertz out of the blue, as if he had been renting the vehicle the entire time. He was furious as the charge drained his account and he missed a car insurance payment. While his insurance had lapsed he got into an accident which totaled his car, causing $14,000 of damage that he is now personally responsible for.

12.    Sean tried to challenge the charge with Chase, but Hertz continued to dispute his challenge until Chase eventually charged the money. Sean was exasperated, and financially devastated, but thought that the ordeal was over. He was wrong.

13.    On or around November 4, 2020, he had stopped to help a friend who had run out of gas in Lewisville, TX. The police came to see what was going on and routinely ran his license. They informed Sean, to his shock, that he had a warrant out for his arrest.

14.     He was arrested and jailed overnight until he could pay bail of $750. He then had to pay $300 to get his car out of the police impound lot.

15.     He was then forced to appear in court 5 times, until all charges were dropped in May 2021.

16.     Sean did not know about any bar date and did not see it in any publication. Sean does not regularly read *USA Today, The Wall Street Journal, The New York Times, The Globe and Mail, The Philadelphia Inquirer, San Francisco Chronicle, Arizona Republic, Chicago Tribune, Los Angeles Times, The San Diego Union Tribune, Naples Daily News, El Diario De El Paso*, or *Journal De Montreal.*

17.     Based on Sean's repeated phone communications to Hertz, the affidavit of theft/loss he filled out for Hertz, and his email to Hertz Vehicle Control expressly notifying the company that it was falsely accusing him of having the overdue car, Hertz should have records of all of this.

18.     As a direct and proximate result of Hertz's conduct, Sean was falsely arrested, jailed for 2 days, prosecuted, overcharged for $2,600, had $14,000 worth of damages due to a car accident, missed work, had to pay bail of $750, had to pay $300 to get his car out of an impound lot, suffered severe mental and emotional harm, and otherwise had his life destroyed.

19.     There was no probable cause for Hertz to report Sean for any crime at any point in time.

I declare under the penalty of perjury of the United States of America that the foregoing is true and correct.

Dated:  December ____27____, 2021        /s/  _SZ Hurt_
                                                              Declarant

3

**From:** seanzhurt@aol.com,
**To:** vehcntl@hertz.com,
**Subject:** Rental #373367326
**Date:** Mon, Feb 3, 2020 11:35 pm

Good Evening,

    I received the letter of demand only problem is I don't have it. I've been reporting the vehicle stolen since 1/19/2020 and you've done nothing except continue to charge me for the vehicle. I've asked repeatedly for someone to activate the GPS and I'd go collect it but no one would. Now 3 weeks later you're sending me a letter of demand. Well I still don't have it and I still don't know where it is. But you guys are still happily charging me for the rental. Cops wouldn't do anything y'all haven't done anything, this whole thing would have been over if you'd have just activated the gps. But since no one else is doing anything I have. I closed down my account you were charging me on so you aren't bleeding me dry while you sit around doing nothing but ignoring my requests to do something about this.  Now I'm doing nothing too.

Sincerely

Sean Hurt

Sent from my iPhone

**DOLLAR RENT A CAR**
Phone:      800-800-5252
Web:        www.dollar.com

# dollar.™
## CAR RENTAL

CHARGE DETAIL

| Rental Agreement No: | 373367326 |
|---|---|
| Date: | 03/02/2020 |
| Document: | 950002612913 |

Direct All Inquiries To:
   DOLLAR RENT A CAR
   PO BOX 35250
   TULSA, OK 74153-1167

   TAX Id:      73-1389882

Renter:        SEAN HURT
Account No.:   ************4529 MC

SEAN HURT
2801 DENTON TAP RD
LEWISVILLE, TX 75067

## RENTAL REFERENCE
Rental Agreement No: 373367326
Reservation ID:      J2734311662

## RENTAL DETAILS
Rate Plan:        IN: SPW    OUT: RCUW5
Rented On:      01/12/2020 12:10  LOC# 054023
                DALLAS - DFW AP, TX
Returned On:    03/02/2020 09:00  LOC# 054023
                DALLAS - DFW AP, TX
Car Description:    SIRRAM1504CCSBN  LHR4411
Veh. No.:          9273509

| CAR CLASS | Charged: | Q6 | MILEAGE | In: | 36,233 |
|---|---|---|---|---|---|
| | Rented: | S | | Out: | 32,733 |
| | Reserved: | Q6 | | Driven: | 3,500 |

## MISCELLANEOUS INFORMATION
CC AUTH: 015749  DATE: 2020/01/12  AMT:  200.00
CC AUTH: CALL    DATE: 2020/03/02  AMT:  419.00

## RENTAL CHARGES
| WEEKS | 7 @ | 242.70 | 1698.90 |
|---|---|---|---|
| EXTRA DAYS | 1 @ | 33.99 | 33.99 |
| SUBTOTAL | | | 1732.89 |
| | | | |
| CONCESSION FEE RECOVERY | | | 201.41 |
| VEHICLE LICENSE FEE | | | 97.00 |
| CUSTOMER FACILITY CHARGE | | | 325.00 |
| LATE RETURN FEE | | | 80.00 |
| TAX | | 6.25% | 152.27 |

TOTAL CHARGES                    2588.57 USD

## E-RETURN RECEIPT

THANK YOU FOR RENTING FROM DOLLAR

---

ALL CHARGES HAVE BEEN BILLED TO YOUR ACCOUNT.

| Rental Agreement No: | 373367326 |
|---|---|
| Date: | 03/02/2020 |
| Document: | 950002612913 |

Direct All Inquiries To:
   DOLLAR RENT A CAR
   PO BOX 35250
   TULSA, OK 74153-1167
   UNITED STATES

Renter:        SEAN HURT
Account No.:   ************4529 MC

Phone:      800-800-5252
Web:        www.dollar.com

QDOL03P        0095 GC

| TOTAL CHARGES | 2588.57 USD |
|---|---|

No. 1666502

| THE STATE OF TEXAS | 371st DISTRICT COURT |
|---|---|
| vs. | OF |
| SEAN ZIMMERLE HURT | TARRANT COUNTY, TEXAS |

### STATE'S MOTION TO DISMISS

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES, the State of Texas, by and through her Criminal District Attorney, and respectfully requests the Court to dismiss the above entitled and numbered cause for the following reason:

\_\_\_\_\_ DM02   The defendant was convicted in Cause No._____ on \_\_\_\_day of_____, 20\_\_\_.

\_\_\_\_\_ DM03   The complaining witness has requested dismissal.

\_\_\_\_\_ DM04   The case has been re-filed or re-indicted as Cause No. _____.

\_\_\_\_\_ DM05   The defendant has never been apprehended.

\_\_\_\_\_ DM06   The defendant is deceased.

\_\_\_\_\_ DM08   Other_____.

\_\_\_\_\_ DM10   The defendant has successfully completed the deferred prosecution program.

_x_\_\_ DM14   Prosecutorial discretion.

\_\_\_\_\_ DM15   The defendant has successfully completed the First Offender Drug Program.

\_\_\_\_\_ DM16   The defendant has successfully completed the Mental Health Diversion Program.

\_\_\_\_\_ DM17   The defendant has successfully completed the Veterans Diversion Program.

WHEREFORE, it is prayed that the above entitled and numbered cause be dismissed.

Respectfully submitted,

**FILED**
**THOMAS A WILDER, DIST. CLERK**
**TARRANT COUNTY, TEXAS**

MAY 0 3 2021

TIME 11:27 AM

BY_____ DEPUTY

Sharen Wilson
Criminal District Attorney
Tarrant County, Texas

/s/ KELLY MEADOR
E-mail: KSMeador@tarrantcountytx.gov
Assistant Criminal District Attorney
State Bar No. 24053499
Phone:

### ORDER OF DISMISSAL

The foregoing Motion having been considered, it is therefore ORDERED, ADJUDGED and DECREED that the above entitled and numbered cause be and the same is hereby DISMISSED.

Signed this _3rd_ day of _MAY_ 20_21_.

Judge Presiding

# ATTACHMENT AR

1

```
 1                IN THE COURT OF COMMON PLEAS
          FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
 2                    CIVIL TRIAL DIVISION
                          -  -  -
 3
    KELLY GRADY,              : NOVEMBER TERM, 2015
 4               Plaintiff    :
          vs.                 :
 5                            :
    THE HERTZ CORPORATION;    :
 6  HERTZ RENT-A-CAR PHILADELPHIA :
    INTL AIRPORT,             :
 7               Defendants   : NO. 3380

 8                          -  -  -

 9            Thursday, September 14, 2017
                   Afternoon Session
10
                          -  -  -
11
                  Courtroom 475
12                  City Hall
             Philadelphia, Pennsylvania
13
                          -  -  -
14
    BEFORE:  THE HONORABLE PAULA A. PATRICK, J., and a
15           Jury

16                          -  -  -

17

18

19

20

21

22

23

24

25
```

*Danielle O'Connor, RPR, CRR 215-683-8023*

Case ID: 151103380

**2**

1  APPEARANCES:

2  FRANCIS ALEXANDER, LLC
   BY:  FRANCIS MALOFIY, ESQUIRE
3      ALFRED JOSEPH FLUEHR, ESQUIRE
   280 N. Providence Road
4  Media, PA  19063
   Counsel for Plaintiff
5
   EDELSTEIN LAW, LLP
6  BY:  JAY L. EDELSTEIN, ESQUIRE
       CHRISTOPHER LEEDS, ESQUIRE
7  230 S. Broad Street, Suite 900
   Philadelphia, PA  19102
8  Counsel for the Defendants

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

*Danielle O'Connor, RPR, CRR 215-683-8023*

**3**

1              **INDEX**

2  **WITNESS**        **DR   CR   RDR   RCR**

3  Julie Wilkerson    --    4    55    56

4  John Cocklin       57   64    --    --
5  (Voir Dire)

6  John Cocklin       68   97    --    --

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

*Danielle O'Connor, RPR, CRR 215-683-8023*

**4**

1                  - - -
2           (The following occurred in open court
3  outside the presence of the jury:)
4                  - - -
5           THE COURT:  Is there anything we need
6  to discuss before the jury comes in?
7           MR. MALOFIY:  No, Your Honor.
8           THE COURT:  Are you sure?
9           MR. MALOFIY:  Yes, Your Honor.
10                 - - -
11          (Whereupon, the jury entered the
12  courtroom at 1:22 p.m.)
13                 - - -
14          THE COURT:  Welcome back, ladies and
15  gentlemen.  We'll proceed now with the
16  cross-examination of the Hertz representative.
17          MR. MALOFIY:  Thank you.
18          May I proceed, Your Honor?
19          THE COURT:  Yes, go ahead.
20          MR. MALOFIY:  Thank you.
21                 - - -
22          CROSS-EXAMINATION
23                 - - -
24  BY MR. MALOFIY:
25  Q.    A few questions.  And thank you for being

*Danielle O'Connor, RPR, CRR 215-683-8023*

**5**

1  here.  I know you were here the whole time.
2           My understanding is you flew in from
3  Florida.  Are you from Oklahoma or Florida?  I'm
4  confused.
5  A.    **I'm from Oklahoma.  I do work down in Florida.**
6  Q.    Okay.  I see.  A few things.
7           You would agree as the corporate
8  designee here on behalf of the Hertz Corporation
9  that prior to a report to the police -- and if a
10  report is made, you would agree with me that it must
11  be true?
12  A.    **Correct, yes.**
13  Q.    And you'd agree with me that it must be
14  accurate?
15  A.    **Yes.**
16  Q.    And you'd agree with me that it also must be
17  correct?
18  A.    **Yes.**
19  Q.    And would you also agree with me that if
20  there's omissions in the facts, that there's a duty
21  that Hertz corrects those omissions?
22  A.    **Yes.**
23  Q.    Did Hertz do that in this case?
24          MR. EDELSTEIN:  Objection, Your Honor.
25          THE COURT:  Overruled.  She can

*Danielle O'Connor, RPR, CRR 215-683-8023*

6

1    answer.
2         THE WITNESS:  I'm not sure what
3    omissions you're talking about.
4    BY MR. MALOFIY:
5    Q.    Do you believe there were any omissions in the
6    information provided to the police, yes or no?
7    A.    At what time?
8    Q.    At any time.
9    A.    We gave them what we had at -- what
10   information we had.  We handed the theft report off
11   to the police, the information that we had, and then
12   that was given to the police.  And what they did
13   from there is up to them.
14   Q.    Do you believe if there's -- I think you
15   testified if there's omitted facts, they should be
16   corrected, correct?
17   A.    Yes.
18   Q.    Eventually did Hertz become aware of
19   additional facts in regards to Ms. Grady's rental
20   that should have been provided to the police?
21   A.    Which facts?
22   Q.    Well, the payment of 2400.
23   A.    That was actually in the theft package.  The
24   police had that information.
25   Q.    The police had that information?

*Danielle O'Connor, RPR, CRR 215-683-8023*

7

1    A.    Yes, it's in the billing page of the theft
2    package.
3    Q.    What page is that, ma'am?
4    A.    We went over it this morning.
5         MR. MALOFIY:  Court's indulgence.
6         (Pause.)
7         MR. MALOFIY:  I need the date on this.
8    BY MR. MALOFIY:
9    Q.    Ma'am, do you know when this was completed,
10   this document that you had reviewed with counsel?
11   A.    It's on there.
12   Q.    Okay.
13   A.    July the 12th, 2013.  It says, "process date."
14        MR. EDELSTEIN:  You're writing on my
15   document.
16        MR. MALOFIY:  I don't mean to do that.
17   That's why...
18        MR. EDELSTEIN:  Okay.
19   BY MR. MALOFIY:
20   Q.    I want to go to something, ma'am.
21        This was July the 12th you said it was
22   created?
23   A.    July the 12th, 2013, I believe is when it said
24   the rental was closed.  We had to close the rental
25   out --

*Danielle O'Connor, RPR, CRR 215-683-8023*

8

1    Q.    Yes.
2    A.    -- in order to report it stolen.
3    Q.    I understand.  If I could make sure?  Let me
4    confirm that, ma'am.
5         MR. MALOFIY:  Can I approach the
6    witness?
7         THE COURT:  Ginelle, can you give that
8    to the witness?
9         THE WITNESS:  So it says "date, time
10   posted, July 12th, 2013, at 12:34 p.m."
11   BY MR. MALOFIY:
12   Q.    Okay.
13   A.    We closed it back to May 31st, because that's
14   all the authorization we got at time of rent.  And
15   it says right there, "bill to auth plus 15 percent
16   Vehicle Control, Alicia Brown."
17   Q.    I see.
18        MR. MALOFIY:  Can I have that document
19   back?
20   BY MR. MALOFIY:
21   Q.    Can we put up P-6?  That document was created
22   on 7/12, correct?
23   A.    What?
24   Q.    7/12, that was your testimony, correct?
25   A.    When the rental was closed, correct.

*Danielle O'Connor, RPR, CRR 215-683-8023*

9

1    Q.    And when the payment went down, I'd like to
2    blow this up for the benefit of the jury and also
3    for Ms. Wilkerson -- Mrs. Wilkerson or Ms.?
4    A.    Mrs. Wilkerson.
5    Q.    Mrs. Wilkerson, my apologies.
6         The payment was put through and Hertz
7    was paid 2445 on 7/15, correct?
8    A.    Right.  So we closed it and it went through
9    the process to force charge through the bank.
10   Q.    Isn't it a fact that the car was paid?
11   A.    No.
12   Q.    It wasn't?
13   A.    It wasn't paid in full.
14   Q.    Well, I'm sorry --
15        MR. MALOFIY:  Objection.
16        MR. EDELSTEIN:  Objection to what?
17        THE COURT:  Okay.  But you asked the
18   question, so now she answered it.
19   BY MR. MALOFIY:
20   Q.    The car -- let's be clear.  Hertz received
21   1805, correct?
22   A.    At time of rent we received 1805
23   authorization.
24   Q.    Did Hertz receive and put in their bank
25   account $1805, yes or no?

*Danielle O'Connor, RPR, CRR 215-683-8023*

10

1  A.    Yes.  But then we force charged 2,444.94
2  cents, but the car wasn't actually picked up
3  until -- we didn't recover our car until September
4  11th, 2013.
5  Q.    That's a different issue, when you recovered
6  your car.  We can move to that and I will.  But
7  let's go to the payment.
8            You don't dispute that you received --
9  Hertz put in their bank account $1805, correct?
10  A.    Correct.
11  Q.    And you don't dispute that Hertz put in Hertz'
12  bank account $2,444.94, correct?
13  A.    Correct.
14  Q.    And you don't dispute that when you produce
15  this theft package and the report to the police that
16  was completed on 7/12, correct?
17  A.    Correct, but --
18  Q.    Hold on.
19  A.    But it wasn't paid in full.
20  Q.    And this payment was 7/15/2013, days later,
21  correct?
22  A.    It has to go through the process.
23  Q.    Is that correct, ma'am?
24  A.    Yes.
25  Q.    Yes, it is correct.

11

1  A.    But it still wasn't paid in full.
2  Q.    I think what we're going at is because you
3  didn't receive it until September --
4            THE COURT:  Counsel, do you want to go
5  into that?  Because I made a ruling on that
6  earlier.
7            MR. MALOFIY:  Fair enough, Your Honor.
8            THE COURT:  It's up to you if you want
9  to go into it.
10  BY MR. MALOFIY:
11  Q.    Let's be clear.  OnStar, correct, was called?
12  A.    They were called, but not by Hertz.
13  Q.    When OnStar was called, did Hertz know where
14  their vehicle was?
15  A.    Not at that time.
16  Q.    Oh, Hertz --
17  A.    The police had to notify us.
18  Q.    Well, Hertz actually spoke to the police on
19  7/22, correct?
20  A.    Correct.
21  Q.    You don't dispute that Hertz representatives
22  spoke to the police in regards to Ms. Grady's
23  rental, correct?
24  A.    And told her she wasn't authorized to keep the
25  car.

12

1  Q.    Hold on a second.  They also told her she did
2  not steal the car, correct?
3  A.    That's what they said.
4  Q.    Are you disputing what they said, Trooper
5  Kemmerling?
6  A.    No, no.
7  Q.    So you accept the representation from Trooper
8  Kemmerling and the state police report that said
9  Hertz had said the car was not stolen, correct?
10  A.    Correct.  But he let -- he did not let her
11  take our car and our asset.  And Trooper Kemmerling
12  also told her she could be -- Philadelphia PD might
13  go after her.
14  Q.    Well, he said "might," and there's dispute as
15  to that and that's for the jury to decide.
16  A.    Okay.
17  Q.    Let me move to something else.
18            You admit and you accept the
19  representation that Hertz said the car was not
20  stolen, correct, on that day?  On 7/22, when a Hertz
21  representative was contacted, Hertz said the car was
22  not stolen?
23  A.    Someone at Hertz said that, yes.
24  Q.    Who was that?
25  A.    I have no idea.

13

1  Q.    Well, if there was a call and there was a
2  situation and someone called the number, they would
3  have called up and it would have got directed right
4  to you, right?
5  A.    That's correct, but they weren't directed
6  right to me.
7  Q.    And was it you who said the car was not stolen
8  or was it someone else?
9  A.    It was not me.
10  Q.    Well, where are the notes to indicate who said
11  that, ma'am?
12  A.    There are no notes because we don't know who
13  said that.
14  Q.    I'm sorry?
15  A.    I don't know who said that.
16  Q.    Did you ask?
17  A.    Ask who?
18  Q.    Well, ask anyone at Hertz who said that.
19  A.    No.
20  Q.    Did you do that?
21  A.    No.
22  Q.    You could have done that, right?
23  A.    I could have.
24  Q.    You could have got an e-mail, put a global
25  message out to everyone in the corporate global --

14

1  Hertz corporate global and said, I need to know who
2  said that, that is a serious matter, I have to
3  testify in court under oath; you could have done
4  that, right?
5  **A.    Well, we didn't actually have our car back at**
6  **that time.**
7  **Q.    No, no.  I'm asking before you took the stand**
8  today, before you testified to this jury, you could
9  have sent an e-mail to everyone at Hertz saying, I
10 need this information, who spoke to the police
11 officers on this date and said Ms. Grady was
12 authorized, correct?
13 **A.    Someone at Hertz could have said that, yes.**
14 **Q.    But you didn't do that as you took the stand**
15 here today, correct?
16 **A.    No.**
17 **Q.    And you don't have any notes in your system to**
18 indicate -- you don't have any notes in your system
19 that records that phone call where the Hertz
20 representative said it, right?
21 **A.    Well, first of all, they don't document what**
22 **Hertz representative they spoke to in the notes at**
23 **the police, nor do they say what phone call they**
24 **called.  So it's a little difficult for me to**
25 **understand who Officer Kemmerling called and who he**

Danielle O'Connor, RPR, CRR 215-683-8023

15

1  **exactly spoke to.  Usually, we would get that**
2  **information if they spoke to us.**
3  **Q.    But Trooper Kemmerling testified he spoke to**
4  Hertz, he called the number, was routed to the 800,
5  gave the information on the contract and that would
6  have gone, you said, to I believe it was Oklahoma
7  City Vehicle Control, correct?
8  **A.    Correct.**
9  **Q.    That's where it should have gone, correct?**
10 **A.    Where it should have gone.**
11 **Q.    And if it should have gone in the right place**
12 and things happened the right way, they should have
13 filed procedure and that phone call should have been
14 documented in the notes, correct?
15 **A.    Correct.**
16 **Q.    And it wasn't, correct?**
17 **A.    But Officer Kemmerling didn't say what phone**
18 **number he called.**
19 **Q.    And it wasn't documented in the notes,**
20 correct?
21 **A.    Correct.**
22 **Q.    Thank you.  Now, let me get to another point.**
23 Ms. Grady brought her phone record in this case,
24 TD -- excuse me -- Bank record, correct?
25 **A.    Yes.**

Danielle O'Connor, RPR, CRR 215-683-8023

16

1  **Q.    Are you familiar with bank statements?**
2  **A.    Yes.**
3  **Q.    You are.  Do you work with them?**
4  **A.    No, I don't work with them.**
5  **Q.    You're familiar with them?**
6  **A.    Yes.**
7  **Q.    Have you seen them before?**
8  **A.    Yes.**
9  **Q.    Now, does Hertz have a bank account?**
10 **A.    Yes.**
11 **Q.    It does.  Who does it bank with?**
12 **A.    I can't give you the exact name.**
13 **Q.    Well, you could have done an investigation and**
14 looked at Hertz' bank statements to determine and
15 confirm the 1805 and the $2445, correct?
16 **A.    It's actually on the document we already**
17 **presented to you this morning.**
18 **Q.    The one before the charges went through,**
19 correct?
20 **A.    The 1805, when she rented, and then when we**
21 **closed out the contract on July 12th, the force**
22 **charge is the two charges.**
23 **Q.    I understand.  We'll get to the force charge**
24 in a minute.  You could have brought your bank
25 records here today.  You're here as a fact witness

Danielle O'Connor, RPR, CRR 215-683-8023

17

1  for Hertz.  You're here as a corporate designee to
2  bind the corporation; do you understand that?
3  **A.    Yes.**
4  **Q.    And you're here and what you say binds the**
5  corporation to Hertz.
6         Did Hertz bring any corporate bank
7  statements here today to go over and look at the
8  bank's statement to determine what was paid or what
9  was not?
10 **A.    Well --**
11 **Q.    Yes, it did or no, it didn't, ma'am, and then**
12 you can explain.
13 **A.    It's in the theft package what was billed.**
14 **The 1805 and the 2444 are actually on the closed --**
15 **Q.    I'm sorry.  Maybe I'm not clear.  My question**
16 was a little different.
17        Did you bring the bank records to this
18 court here today, yes or no?
19 **A.    No, we have securities.  I can't just pop up a**
20 **bank record.**
21 **Q.    We asked for it in discovery I'll represent as**
22 an officer of the court.
23        MR. EDELSTEIN:  Objection, Your Honor.
24        THE COURT:  You object to that?
25        MR. EDELSTEIN:  I object to that

Danielle O'Connor, RPR, CRR 215-683-8023

18

1  editorialization, yes.
2           THE COURT:  All right.  It's
3  sustained.
4           MR. EDELSTEIN:  The jury has heard it,
5  so it doesn't matter.
6  BY MR. MALOFIY:
7  Q.   Let me go to Exhibit 13.
8           MR. MALOFIY:  Do you have that, Mr.
9  Segal?
10 BY MR. MALOFIY:
11 Q.   Now, do you know who Kenneth Graeber is?
12 A.   **The assistant corporate security at the time.**
13 Q.   Of where?
14 A.   **Hertz, Philadelphia.**
15 Q.   Did you ever speak to him?
16 A.   **Yes.**
17 Q.   You know who he is, right?
18 A.   **Yes.**
19 Q.   Do you know he gave an interview in this case?
20 A.   **Yes.**
21 Q.   Did you review that interview?
22 A.   **Yes.**
23 Q.   It says here, the interview was taken, if I'm
24 not mistaken, on 7/23/2013.  Do you see that?
25 A.   **Yes.**

*Danielle O'Connor, RPR, CRR 215-683-8023*

20

1  BY MR. MALOFIY:
2  Q.   Do you see that?
3  A.   **What was the question?**
4  Q.   It says here in the interview that was
5  conducted by and between Officer Ianoconne and
6  Kenneth Graeber, who's the assistant corporate
7  security manager of the Philadelphia branch at the
8  time, correct?
9  A.   **Yes.**
10 Q.   And the question was asked of him in his
11 interview on 7/23/2013:  "How much of a payment was
12 received from the renter, Question.
13           "ANSWER:  We received 1805 for the
14           contracted rental and a deposit."
15           Do you see that?
16 A.   **Yes.**
17 Q.   Why wasn't any additional information provided
18 to Officer Ianoconne?
19 A.   **It was.  The whole theft package was given to**
20 **him.**
21 Q.   The theft package you showed does not have the
22 payment of 2445, ma'am; isn't that correct?
23 A.   **No, it does.**
24 Q.   It was made on 7/12, ma'am; isn't that true?
25 A.   **Yes, but the interview was 7/23.**

*Danielle O'Connor, RPR, CRR 215-683-8023*

19

1  Q.   Now, if you go down here, it says --
2           MR. MALOFIY:  And if you go to the
3           second page, Mr. Segal, blow this portion up
4           for the benefit of the jury.  Bring that up.
5  BY MR. MALOFIY:
6  Q.   When he was questioned by the police officer,
7  Officer Ianoconne took the stand here, the question
8  was asked of Kenneth Graeber:  "How much of a
9  payment was received from the renter?
10           "ANSWER:  We received 1805 for the
11           contracted rental and a deposit."
12           MR. EDELSTEIN:  Judge --
13 BY MR. MALOFIY:
14 Q.   Do you see --
15           MR. EDELSTEIN:  Just for the record,
16           although I have no problem with the actual
17           question, the questions are being asked of --
18           as to what the actual statement says, not as to
19           what the officer said when he was in the
20           courtroom --
21           THE COURT:  Okay.
22           MR. EDELSTEIN:  -- as I understand it.
23           MR. MALOFIY:  That's correct.
24           MR. EDELSTEIN:  Okay.
25           THE COURT:  All right.

*Danielle O'Connor, RPR, CRR 215-683-8023*

21

1  Q.   Right, but you don't have the payment --
2  there's no -- there's no indication that the
3  additional 2445 was paid by Ms. Grady before a
4  police interview was taken, correct?
5  A.   **It was in the theft package that Mr. Graeber**
6  **handed to the detective questioning him.**
7  Q.   What you showed me is as identifying 2445 was
8  the rate that Ms. Grady was supposed to get; isn't
9  that correct?
10 A.   **No.**
11 Q.   It's not?
12 A.   **20 --**
13 Q.   Isn't it true that the payment was on 7/15, we
14 just looked at that on TD Bank records, you didn't
15 dispute that, ma'am, right?
16 A.   **Right.  It was closed out on 7/12 and it went**
17 **through the cycle as a force charge on 7/15.**
18 Q.   Right.  So why didn't -- Officer Ianoconne,
19 why wasn't he provided with that information in the
20 interview?
21 A.   **He was provided the theft package.**
22 Q.   The theft package did not identify a payment,
23 ma'am.
24 A.   **In the theft package, there does have the 1805**
25 **in the payment.  If he had looked at the theft**

*Danielle O'Connor, RPR, CRR 215-683-8023*

Control No.: 17093136

22

1  **package, it was right there.**
2  Q.    Let me go to another -- I understand your
3  testimony.  But let's go to something else so we can
4  make this clear.  Exhibit 3 --
5          MR. EDELSTEIN:  Your Honor, let me
6      just object to the editorialization again.
7      It's clear.  She testified that the theft
8      package showed it.  So whether it's clear to
9      Mr. Malofiy --
10         THE COURT:  Objection is sustained.
11     Her testimony is what it is.
12         MR. EDELSTEIN:  We're supposed to do
13     this without editorializing.
14         THE COURT:  We're supposed to,
15     correct.
16         MR. MALOFIY:  Mr. Edelstein has done
17     it quite a bit.
18         THE COURT:  You didn't object.
19         MR. MALOFIY:  I know I didn't.  I was
20     giving him some leeway.  I thought he would do
21     the same.
22         MR. EDELSTEIN:  I appreciate it, and
23     I'll give you some leeway.
24  BY MR. MALOFIY:
25  Q.    If we could go to Exhibit 3, paragraph 20.

Danielle O'Connor, RPR, CRR 215-683-8023

23

1  Let me see it real quick.
2          Did you review interrogatories that
3  were signed under oath in this case, verified
4  answers to interrogatories?
5  A.    **No.**
6  Q.    You didn't.  Let me go to Exhibit 3.  These
7  were the interrogatories that were propounded upon
8  Hertz.  Could we pull that up for the jury?
9          Can you see that, ma'am?
10  A.    **Yes.**
11  Q.    Now, to be clear, these were the
12  interrogatories in this case, these are the answers
13  from Hertz.
14          You didn't have a chance to review
15  these?
16  A.    **I did see that.  I'm sorry.**
17  Q.    And it said here on 20: "Describe in detail
18  all payments, including date, time, amount, and
19  payment method Kelly Grady made for the rental of
20  the Chevy Yukon."  Do you see that?
21  A.    **Yes.**
22  Q.    And the answer was:  "One payment on April
23  17th, 2013, at 1:57 p.m. for 1805 to a Visa card
24  ending in 0583."  Do you see that?
25  A.    **Yes.**

Danielle O'Connor, RPR, CRR 215-683-8023

24

1  Q.    Isn't it true that Hertz also received a
2  payment of 2445 --
3          MR. EDELSTEIN:  Objection, Your Honor.
4      There's testimony it was a force charge, not a
5      payment made by Ms. Grady.
6          MR. MALOFIY:  I would appreciate if
7      the witness testified.
8          THE COURT:  He objected based upon a
9      characterization of the question.  You just
10     have to rephrase the question.
11  BY MR. MALOFIY:
12  Q.    Ma'am, isn't it true that this Answer 20 did
13  not identify all the payments that Hertz had
14  received in regards to Ms. Grady's rental?
15         MR. EDELSTEIN:  Just note my
16     objection.  That wasn't the question that was
17     asked, Your Honor.
18         THE COURT:  Overruled.  Go ahead.
19         THE WITNESS:  So we received one
20     payment that she authorized of 1805, the other
21     payment of $2400 and some change was a force
22     charge.
23  BY MR. MALOFIY:
24  Q.    Let me ask you something about force charge.
25  You received the payment, did you not?

Danielle O'Connor, RPR, CRR 215-683-8023

25

1  A.    **We didn't receive any authorization from TD**
2  **Bank, so she has up to six months to dispute the**
3  **charge.**
4  Q.    You received the payment, ma'am, correct?
5  A.    **Yes.**
6  Q.    You received the payment and did Ms. Grady
7  ever deny that charge?
8  A.    **No.**
9  Q.    And did Ms. Grady ever send you a letter to
10  corporate saying I deny this charge?
11  A.    **No.**
12  Q.    And did you have any evidence whatsoever that
13  she called up and she said no, this charge can't go
14  through?
15  A.    **She would dispute the charge with her bank,**
16  **not with Hertz.**
17  Q.    I'm asking if she called Hertz and you have
18  any evidence whatsoever in this world to say she
19  ever disputed that charge?
20  A.    **She didn't dispute with Hertz.  She would have**
21  **to dispute with her credit card company.**
22  Q.    And you have nothing in Hertz' file to
23  indicate she disputed this in any way, shape, or
24  form, correct?
25  A.    **That's correct.**

Danielle O'Connor, RPR, CRR 215-683-8023

26

1    Q.    So, to be clear, you would agree -- you would
2    agree with me that Hertz received 1805 on 4/27/2013,
3    correct?
4    A.    **As an authorization, correct.**
5    Q.    And she provided you her credit card when she
6    initially rented the car, correct?
7    A.    **At time of rent.**
8    Q.    She did that?
9    A.    **Yes.**
10   Q.    Did she ever withdraw her authorization to
11   you, yes or no?
12   A.    **No.**
13   Q.    Have you ever had billing issues or
14   communications issues as Hertz has had with its bank
15   or with someone else's bank?
16   A.    **Yes, we have billing issues.**
17   Q.    Sometimes there's problems with banks talking
18   to other people's banks and there's issues, correct?
19   A.    **Correct.**
20   Q.    You don't dispute that, that's not unusual,
21   that there might be a problem with a wire or
22   communications between the two banking institutions,
23   correct?
24   A.    **No, not at all.**
25   Q.    Did you do any investigation to determine --

27

1    I'll withdraw the question.
2                Let me move forward to this:  My
3    understanding, if I understand your testimony
4    correctly, is that if someone calls in and the card
5    isn't -- you call it Block status?
6    A.    **Yes, it's blocked in Pick Up status.**
7    Q.    And it would go right to you or someone in
8    your office, correct?
9    A.    **In the Vehicle Control area.**
10   Q.    How many people are in that office?
11   A.    **Seventy.**
12   Q.    Seventy people?
13   A.    **Yes.**
14   Q.    That's a lot of people handling this.  How
15   many cars does Hertz have?
16   A.    **Currently or in 2013?**
17   Q.    Let's go with 2013.
18   A.    **At the time we had approximately 700,000 cars.**
19   Q.    700,000?
20   A.    **Uh-huh, in North America.**
21   Q.    And, you know, my understanding, and correct
22   me if I'm wrong, is that you've worked for Vehicle
23   Control for over ten years; is that correct?
24   A.    **Yes.**
25   Q.    And my understanding also is that you're the

28

1    supervisor?
2    A.    **Yes.**
3    Q.    And my understanding also, it's actually part
4    of your job to make sure those overdue vehicle
5    investigations are done properly, correct?
6    A.    **Yes.**
7    Q.    And it's your job to manage a fleet of
8    $700,000 cars?
9    A.    **Yes.**
10   Q.    And, basically, you regulate all the stealing
11   off of Hertz' lot?
12   A.    **Well, we handle four different types of**
13   **thefts.**
14   Q.    Well, that's one type -- any type of theft,
15   you represent the stealing off of Hertz' property?
16   A.    **Yes.**
17   Q.    I'm a little confused as to what factual
18   knowledge you have about this case.  I know you're
19   testifying here as a corporate designee, but I have
20   a few questions for you.
21   A.    **Okay.**
22   Q.    Do you recall ever speaking to Ms. Grady?
23   A.    **No.**
24   Q.    Would you remember speaking to Ms. Grady if
25   you did?

29

1    A.    **It would be in the notes.**
2    Q.    Ma'am, you didn't bring any notes here today,
3    did you?
4    A.    **I did.**
5    Q.    Do you have the notes of the police officer?
6    A.    **I have the theft package --**
7    Q.    I'm asking --
8    A.    **-- with the notes.**
9    Q.    -- when the police officer called on 7/22 and
10   let this young lady go, do you have notes of that
11   conversation in your records?
12   A.    **No.**
13   Q.    No, you don't.  Sometimes notes aren't taken,
14   correct?
15   A.    **Correct.**
16   Q.    In this case you've heard the testimony of
17   Joseph Jaussi, it was read in, correct?
18   A.    **Yes.**
19   Q.    He said the records were purged in regards to
20   Ms. Grady.  Do you remember that?
21   A.    **Yes.**
22   Q.    Do you dispute his testimony which was under
23   oath and bound the Hertz Corporation?
24   A.    **Well, it's the definition --**
25   Q.    I would ask for a yes --

Case 20-11247-03380
Control No.: 17093136

30

1   A.   -- definition of purged.
2        MR. EDELSTEIN:  Objection, Your Honor.
3        He asked the question.
4   BY MR. MALOFIY:
5   Q.   Do you dispute it, ma'am, yes or no, and then
6   you can explain?
7        MR. EDELSTEIN:  Your Honor, he asked
8        the open-ended question.
9        THE COURT:  He did.  So that's
10       sustained.  Rephrase the question.  What you
11       just asked is fine.
12  BY MR. MALOFIY:
13  Q.   Ma'am, do you dispute Joseph Jaussi's
14  testimony that the records were purged, yes or no?
15  A.   No.  Can I give the definition of purged,
16  though?
17  Q.   I think it's subjective to a degree, but maybe
18  your counsel can follow up with you.
19  A.   Sure.
20  Q.   You see hundreds of packages every day,
21  correct, hundreds of theft packages?
22  A.   Yes.
23  Q.   And I think you were testifying that in the
24  months of -- in the months of July and the summer
25  months, it gets real busy?

Danielle O'Connor, RPR, CRR 215-683-8023

31

1   A.   Yes.
2   Q.   Real busy?
3   A.   During the summer months.
4   Q.   And I imagine when someone calls on the phone
5   and they're trying to get ahold of a representative,
6   then they get routed to another department, that
7   would happen, right?
8   A.   Right.
9   Q.   And then they would sit on the phone for a
10  long time and they get routed to another department
11  because you're very busy, right?
12  A.   We're busy, but when we have a theft that
13  comes through, it's routed to us.  We have someone
14  available to take those calls.
15  Q.   You're supposed to have someone available,
16  correct?
17  A.   We do have someone available.
18  Q.   Okay.
19  A.   It's a theft package.  It's our asset, we want
20  it back.
21  Q.   So your goal in this instance was to get your
22  asset back, correct?
23  A.   Correct.
24  Q.   On 7/22, you knew that your asset was no
25  longer with Ms. Grady, correct?

Danielle O'Connor, RPR, CRR 215-683-8023

32

1   A.   We didn't have it back.
2   Q.   I'm asking you, did you know, yes or no, that
3   your asset was no longer with Ms. Grady on 7/22?
4   A.   Somebody at Hertz did.
5   Q.   Right.  Now, who at Hertz knew?
6   A.   I'm not sure, because the police officer
7   didn't tell me what phone number or who he spoke to.
8   Q.   Well, you mean the police officer -- you mean
9   there's no notes here today that indicate that,
10  correct?
11  A.   Correct.
12  Q.   You do what, about a hundred theft packages
13  per day; is that about right?
14  A.   Some days.
15  Q.   So in the course of you've been sitting here,
16  maybe 400, 500 theft packages went out, correct?
17  A.   Yes.
18  Q.   Basically, this is a mechanical process, you
19  pretty much just approve them?
20  A.   No.
21  Q.   No?
22  A.   No.
23  Q.   Isn't it sort of automated, or you actually do
24  a hundred theft packages a day that are this big?  I
25  mean --

Danielle O'Connor, RPR, CRR 215-683-8023

33

1   A.   So every night that I left here, I went back
2   to my hotel and reviewed theft packages, page by
3   page by page.
4   Q.   You did?
5   A.   I did.
6   Q.   How many did you review since you've been
7   here?
8   A.   About 380.
9   Q.   I see.  Now, let's be clear, you're here to
10  testify as to the policies and procedures of Hertz
11  Rental Car Corporation, correct?
12  A.   Yes.
13  Q.   And you're here also to discuss this policy
14  W7-02, correct?
15  A.   Yes.
16  Q.   Are you familiar with that policy?
17  A.   Yes.
18  Q.   And you're familiar with that policy because
19  that's a policy that you work with, correct?
20  A.   Yes.
21  Q.   And that's a policy which basically regulates
22  all the stealing off of Hertz' lot, correct?
23  A.   Yes.
24  Q.   Did you help draft that?
25  A.   No.

Danielle O'Connor, RPR, CRR 215-683-8023

34

1  Q.  You didn't.  Who helped draft that document?
2  A.  **Corporate counsel.**
3  Q.  Lawyers?
4  A.  **Yes.**
5  Q.  I see.  Are you technically an officer of the
Hertz Corporation?
7  A.  **No.**
8  Q.  Are you just strictly an employee?
9  A.  **I am an employee.**
10  Q.  So no officers of the Hertz Corporation came
11  to this court today, correct, or at any point during
12  this trial, correct?
13  A.  **No.**
14  Q.  Any board members came?
15  A.  **No.**
16          MR. MALOFIY:  And can we pull up
17  W7-02?  Mr. Segal, do you know that number?  Is
18  it P-9?  Thank you.
19  BY MR. MALOFIY:
20  Q.  You're familiar with this document, correct?
21  A.  **Yes.**
22          MR. MALOFIY:  I want to go up here and
23  I want to blow up -- right here, let's blow
24  this up, Mr. Segal.
25  BY MR. MALOFIY:

*Danielle O'Connor, RPR, CRR 215-683-8023*

35

1  Q.  Mrs. Wilkerson, can you see that?
2  A.  **Yes.**
3          MR. MALOFIY:  Thank you, Mr. Segal.
4  Can we elevate that?
5  BY MR. MALOFIY:
6  Q.  "Executive summary, this worldwide procedure
7  applies to the rent-a-car division of the Hertz
8  Corporation and includes requirements for reporting
9  vehicle thefts and conversions."  Did I read that
10  correctly?
11  A.  **Yes.**
12  Q.  It says:  "All vehicle theft and conversions
13  must be documented on a theft recovery vehicle
14  report."  Did I read that correctly?
15  A.  **Yes.**
16  Q.  Then it says:  "All vehicle thefts from
17  customers must also be documented on the vehicle
18  theft from customer report."  Did I read that
19  correctly?
20  A.  **Yes.**
21  Q.  And here's what I'm getting at and where I'm
22  going with this, it says near the last line:
23  "Location, maintenance, area, country, head office,
24  and OKC management must ensure compliance with this
25  procedure."  Do you see that?

*Danielle O'Connor, RPR, CRR 215-683-8023*

36

1  A.  **Yes.**
2  Q.  Is it your job to ensure compliance with this
3  procedure?
4  A.  **Yes.**
5  Q.  And you're the person in charge of 700,000
6  cars to make sure as the regulator that these cars
7  and these -- excuse me -- procedures are followed,
8  correct?
9  A.  **Correct.**
10  Q.  Now, when it says "location," that means in
11  this instance the Philadelphia location, correct?
12  A.  **Correct.**
13  Q.  Just to make this clear, this here says:
14  "W7-02 RAC, reporting vehicle thefts and
15  conversions, August 21st, 2009."  Did I read that
16  correctly?
17  A.  **Yes.**
18  Q.  That's the policy in effect at the time Ms.
19  Grady was arrested and policy in effect at the time
20  of 2013-2014, correct?
21  A.  **Yes.**
22  Q.  The purpose of this standard operating
23  procedure, correct, was to provide requirements for
24  reporting thefts, conversions, or the disappearance
25  of Hertz vehicles, correct?

*Danielle O'Connor, RPR, CRR 215-683-8023*

37

1  A.  **Correct.**
2          MR. MALOFIY:  Pull that back, Mr.
3  Segal.  Can we go to the next page?  Page 3 --
4  page 4.  Excuse me.  With the court's
5  indulgence?  Try page 5.  There also.
6  BY MR. MALOFIY:
7  Q.  All right.  You're intimately familiar with
8  this whole theft package correct -- excuse me, this
9  whole theft procedure, correct?
10  A.  **Yes.**
11  Q.  You use it on a daily basis?
12  A.  **Yes.**
13  Q.  In fact, this is a procedure that you follow
14  to make sure that innocent people aren't wrongfully
15  arrested for accidental reporting to the police,
16  correct?
17  A.  **Correct.**
18  Q.  And it's important these policies and
19  procedures are followed by Hertz Corporation,
20  correct?
21  A.  **Correct.**
22  Q.  And if Hertz doesn't follow this problem --
23  this procedure, that would be a failure on the part
24  of Hertz, correct?
25  A.  **Correct.**

*Danielle O'Connor, RPR, CRR 215-683-8023*

38

1         MR. MALOFIY:  Now, I'd like to blow up
2     17 for the benefit of the jury.
3  BY MR. MALOFIY:
4  Q.    "Corporate/country security manager
5  investigations, every theft conversion disappearance
6  must be promptly investigated by the
7  corporate/country security manager responsible for
8  the location" --
9         MR. MALOFIY:  Can you highlight
10    "location," Mr. Segal?
11 BY MR. MALOFIY:
12 Q.    -- "from which the related theft vehicle
13 report is filed."  In this instance, the location
14 would be Philadelphia, correct?
15 A.    Correct.
16 Q.    Now, it goes on to say -- and I want to
17 highlight this, too, Mr. Segal -- "all employees are
18 required to cooperate fully with such an
19 investigation."  Did I read that correctly?
20 A.    Yes.
21 Q.    Now, it also says there must be promptly
22 investigated.  Do you see that?
23 A.    Yes.
24 Q.    Now, in this instance --
25         MR. EDELSTEIN:  You sound like Darth

*Danielle O'Connor, RPR, CRR 215-683-8023*

39

1     Vader.
2         MR. MALOFIY:  I do, really?  Do I need
3     new batteries?  I'm sorry.
4         Is it okay?
5  BY MR. MALOFIY:
6  Q.    In this instance, you've heard the testimony
7  of Richard Livingston, correct?
8  A.    Yes.
9  Q.    And Richard Livingston is, I believe,
10 currently, the corporate security manager, not the
11 assistant security manager of Philadelphia, but the
12 corporate security manager of Philadelphia, correct?
13 A.    Yes.
14 Q.    You've worked with him many times, correct?
15 A.    Yes.
16 Q.    Now, Mr. Livingston testified under oath that
17 he does no investigation whatsoever at the local
18 level.  Did you hear that?
19 A.    I heard that, but he does check, check to make
20 sure that the VIN is correct, check to make sure
21 that there's no movement, or check to make sure that
22 the car hasn't been returned.
23 Q.    I'm sorry.  Do a typo check on the VIN.  What
24 else?
25 A.    Make sure that there's no further movement on

*Danielle O'Connor, RPR, CRR 215-683-8023*

40

1     the vehicle.
2  Q.    Uh-huh.
3  A.    And then make sure that the car has not been
4  returned.  He has to make sure the car has hot been
5  returned.
6  Q.    Returned?
7  A.    Returned.  By the renter.
8  Q.    How would he do that?
9  A.    He goes into the system and check.
10 Q.    What system, ma'am?
11 A.    His vehicle movement system.
12 Q.    Oh, I see.  Well, if he didn't do that, that
13 would be a failure, correct?
14 A.    Yes.
15 Q.    And he would not be following Hertz' policies
16 and procedures, correct?
17 A.    Correct.
18 Q.    Now, let me go to Mr. Livingston's deposition
19 testimony which was read into the record.  And I'm
20 going to go to page P8-54, top right-hand quadrant,
21 which is page 215.
22         MR. MALOFIY:  Mr. Segal, I got some
23    psychedelic thing going on on my computer.
24    Okay.  Thank you.
25         Now, if we could, for the benefit of

*Danielle O'Connor, RPR, CRR 215-683-8023*

41

1     Mrs. Wilkerson, could we blow up 10 to 16,
2     lines 10 through 16 on page 215?
3  BY MR. MALOFIY:
4  Q.    Question was asked:  "As a corporate security
5  manager for Hertz for this area or anyone working
6  with you or for you, would they have done any
7  independent investigation and what payments are made
8  with the car before filing a police report?
9         His answer:  "No, not on my side of
10    the fence."
11        Should he have checked to see if any
12 additional payments were made on that car?
13 A.    Mr. Livingston didn't report this car stolen.
14 Q.    I'm just asking you, he said specifically,
15 ma'am, he's the manager of Philadelphia, right,
16 security manager?
17 A.    Correct.
18 Q.    And he still is the security manager, correct?
19 A.    Right, but he also --
20 Q.    Hold on.  He was the very big guy.
21        MR. EDELSTEIN:  She's answering the
22    question, Your Honor.
23        THE COURT:  She was.
24        THE WITNESS:  It's okay.
25 BY MR. MALOFIY:

*Danielle O'Connor, RPR, CRR 215-683-8023*

Case 2:15-583-03380

Control No : 17093136

09/14/2017 08:38:32 PM

**42**

1  Q.   I'm sorry.  I stepped on your words.  Go
2  ahead.
3  A.   Go ahead.  What's the question?
4  Q.   Mr. Livingston is the awfully big guy, he's
5  like 7 feet tall, right?
6  A.   Yes.
7  Q.   He's the corporate security manager for Hertz
8  Rental Car Corporation here in Philadelphia,
9  correct?
10  A.   Correct.
11  Q.   Now, it says here that the question was asked
12  of him or anyone working for him or working with
13  him, if they did any check and his response was no,
14  not on his side of the fence.  Do you see that?
15  A.   I do see that.
16  Q.   Now, you just testified that he would have
17  checked the computer system of some sort, right?
18  A.   He should have checked the computer system.
19  Q.   If he failed to check the computer system, he
20  would have failed to follow the policies and
21  procedures of Hertz which must be followed, correct,
22  ma'am?
23  A.   Correct.  But he also in the thing that you
24  read, testimony that you read, it said he didn't
25  file police reports.

**43**

1  Q.   Ma'am, Mr. Livingston is the head of a two-man
2  department, correct?
3  A.   Correct.
4  Q.   Let's be clear.  It's him and one other
5  person, right?
6  A.   Yes.
7  Q.   And that one other person was Mr. Graeber,
8  correct?
9  A.   At the time, yes.
10  Q.   And then Mr. Graeber was let go.  Do you
11  remember why?
12  A.   Yes.
13  Q.   He was let go why?
14  A.   I'm not sure.
15  Q.   He was let go, according to Mr. Livingston's
16  testimony, because Hertz wanted to cut costs.  Do
17  you remember that?
18  A.   No.
19       MR. MALOFIY:  Well, let's pull it up.
20       MR. EDELSTEIN:  We'll stipulate that
21  was the testimony, Judge.
22  BY MR. MALOFIY:
23  Q.   Hertz --
24       THE COURT:  It's been stipulated to.
25  All right.

**44**

1  BY MR. MALOFIY:
2  Q.   Hertz Corporation wanted to cut the costs so
3  they let Mr. Graeber go, correct?
4  A.   If you say so, yes.
5  Q.   And by doing so, they're basically cutting
6  costs at the local investigation at the local level
7  to prevent innocent people from being wrongfully
8  accused of car theft, correct?
9       MR. EDELSTEIN:  Objection, Your Honor.
10       THE COURT:  Sustained.
11  BY MR. MALOFIY:
12  Q.   Ma'am, does Hertz global -- excuse me, Hertz
13  Corporation, are they able to do a local
14  investigation on every case?
15  A.   Well, that's the reason why we have Oklahoma
16  City specialized in doing the investigation.  We
17  have specialized people that work for us and also
18  that's why we hire the private investigator to go
19  out and assist us and also get the repossession
20  company involved, to show what investigation we need
21  to do.  We work hand-in-hand with both of those
22  companies.  We try to do our due diligence before we
23  report a car stolen.
24  Q.   How many theft reports have come out of
25  Philadelphia?

**45**

1       MR. EDELSTEIN:  When?
2  BY MR. MALOFIY:
3  Q.   After daily basis in 2013-2014, ma'am.
4  A.   A lot.
5  Q.   A lot?
6  A.   Yes.
7  Q.   And what would you say?
8  A.   Maybe 2000.
9  Q.   Do you know -- excuse me.  Mr. Livingston
10  testified that he's gone into court and handled
11  about 400 of these and he's never done a local
12  investigation to determine the truth and veracity of
13  those theft packages?
14  A.   No, I didn't know that.
15  Q.   And that would be falling well below the
16  standard of care even by Hertz' own policies and
17  procedures?
18       MR. EDELSTEIN:  Objection to the
19  leading conclusion.
20       THE COURT:  Sustained.  You have to
21  rephrase.
22       MR. MALOFIY:  I'll rephrase it.  Thank
23  you.
24  BY MR. MALOFIY:
25  Q.   That would fall well below the policies and

03380
Case No : 17003136
Control No : 17003136

46

1  procedures of even Hertz Corporate policies,
2  correct?
3  **A.    Yes.**
4  **Q.**    Do you think it's acceptable for 400 cases to
5  go to court and no local investigation to be done
6  whatsoever?
7          MR. EDELSTEIN:  Objection, Your Honor.
8      The testimony was that Mr. Livingston didn't
9      actually do it, not no investigation was done.
10         THE COURT:  Overruled.  I'll let her
11     answer.
12         THE WITNESS:  Yeah.  We have
13     investigated it.  We investigate each overdue
14     renter.  Each theft is investigated.
15         MR. MALOFIY:  Ma'am, read back my
16     question for the witness, please.  Sorry.
17             - - -
18         (Whereupon, the court reporter read
19     the record as requested.)
20             - - -
21         THE WITNESS:  By Mr. Livingston?
22  BY MR. MALOFIY:
23  **Q.**    By the two people in that office who handle
24  the 400 cases that went to court and no local
25  investigation was done, that's what I'm referring

47

1  to, ma'am.
2  **A.    There is some investigation being done.**
3  **Q.**    Check for typos and the VIN number, correct?
4  **A.    And movement.**
5  **Q.**    On the system, right, on the computer system?
6  **A.    Yes.**
7  **Q.**    Let's go to that computer system right now.
8  Let's talk about that.
9          Now, you indicated that it was Mr.
10  Graeber who made the police report on behalf of
11  Hertz to Detective -- to Officer Ianoconne, he was
12  the one who gave the interview, correct?
13  **A.    Correct.**
14  **Q.**    And it wasn't Mr. Livingston?
15  **A.    Correct.**
16  **Q.**    Both those two people work in one office,
17  correct?
18  **A.    Yes.**
19  **Q.**    And Mr. Graeber answers to Mr. Livingston,
20  correct?
21  **A.    Correct.**
22  **Q.**    Now, let's go to combination 8 of P-3, which
23  is the interrogatory, the question to defendant and
24  the answer of defendant's.  Can we pull that combo
25  up for the benefit of the jury and also for Ms.

48

1  Wilkerson -- Mrs. Wilkerson, excuse me, ma'am.
2          It says here, 8, this was a question
3  posed to Hertz Corporation:  "Identify the computer
4  systems that the Hertz employees identified in the
5  immediately preceding interrogatory consulted while
6  on the phone with the police on July 22nd, 2013, and
7  what information was on that system regarding Ms.
8  Grady."
9          The answer:  "Objection.  This
10  interrogatory assumes a computer system was
11  consulted with during Mr. Graeber's conversation
12  with Officer Brighter.  Mr. Graeber" -- I'd like to
13  highlight this, Mr. Segal -- "Mr. Graeber did not
14  utilize any computer system while speaking with
15  Officer Brighter on July 22nd, 2013."  Do you see
16  that, ma'am?
17  **A.    Yes, I see it.**
18  **Q.**    And these sworn interrogatories, where we
19  asked whether or not a computer system was used, the
20  sworn answers verified answers from Hertz
21  Corporation by Mr. Livingston was that no computer
22  system was used?
23         MR. EDELSTEIN:  Objection, Your Honor.
24  BY MR. MALOFIY:
25  **Q.**    Do you understand that?

49

1          MR. EDELSTEIN:  The question in the
2      interrogatory was what was used while on the
3      phone with the police.  That's the question.
4          MR. MALOFIY:  I'm asking a follow-up
5      question, not this specific question, but a
6      follow-up question.
7          THE WITNESS:  So basically --
8          THE COURT:  No, I have to rule on the
9      objection.
10         The objection at this time is
11     sustained only because you can't change what
12     the interrogatories are saying.  If it's a
13     separate question, that's fine.
14         MR. MALOFIY:  I'm asking a follow-up
15     question, a different question.  I already
16     asked that question.  Maybe the confusion is on
17     the screen.  So we can block that out now.
18     Thank you.
19  BY MR. MALOFIY:
20  **Q.**    Isn't it true that Mr. Graeber utilized no
21  computer system whatsoever in regards to before he
22  reported this to the police?
23  **A.    No.  It actually says "while speaking."  So**
24  **while he was speaking to the detective, he wasn't on**
25  **the computer system.  That's the verbiage in what**

Control No.: 17093136

50

1   you just read me.
2           MR. MALOFIY:  Let me be more specific
3       with the court's indulgence.
4           Let me move to 21, combo 21.  Do you
5       have that, Mr. Segal?
6   BY MR. MALOFIY:
7   Q.   You looked at the questions which we
8   propounded upon Hertz, which we served on Hertz and
9   the answers, correct?
10  A.   Yes.
11  Q.   And you saw that Mr. Livingston had signed
12  these under oath, correct?
13  A.   Yes.
14  Q.   We had asked of Hertz Corporation:  "Describe
15  in detail all actions/steps taken and communications
16  the Hertz manager identified in the complaint as
17  filing the August 2013 police report regarding Kelly
18  Grady."  That's Ken Graeber, correct?
19  A.   Yes.
20  Q.   So let's read this again:  "Describe in detail
21  all actions/steps taken and communications the Hertz
22  manager" -- I'll insert Ken Graeber -- "took before
23  reporting the Chevy Yukon stolen on around July
24  22nd, 2013, including identifying all employees he
25  communicated with and the contents of the

*Danielle O'Connor, RPR, CRR 215-683-8023*

51

1   communication, identifying all employees he
2   communicated with and the contents of the
3   communication."  I think that was twice.  I
4   apologize if I read that twice.  I think it was
5   written twice.  "Identifying all computer systems he
6   consulted and the program names and reasons for
7   doing so."
8           MR. MALOFIY:  Highlight this bottom
9       line, "identifying all computer systems he
10      consulted and the program names and reasons for
11      doing so."
12  BY MR. MALOFIY:
13  Q.   The answer, there was an objection lodged.
14  And then it said:  "The police report was not filed
15  by a Hertz manager in August 2013.  Mr. Graeber
16  reviewed the rental contract, investigation
17  performed, and had communications with individuals
18  in Hertz' Vehicle Control Department in Oklahoma
19  City, Oklahoma.  A theft package was put together
20  and reported to the airport police."  Do you see
21  that?
22  A.   Yes.
23  Q.   Now, it doesn't identify all computer systems
24  he consulted and the program names and reason for
25  doing so, does it?

*Danielle O'Connor, RPR, CRR 215-683-8023*

52

1   A.   No, but he was on the phone with Hertz Vehicle
2   Control.
3   Q.   I'm just asking you, verified answer said that
4   that was produced in discovery.
5   A.   Okay.
6   Q.   Right, ma'am?
7   A.   Yes.
8   Q.   And even if he was on the phone, he didn't
9   consult any computer systems, right?
10  A.   Well, we're speaking about it over the phone.
11  Q.   But he personally did not consult any computer
12  systems, correct?
13  A.   No, he didn't put his fingers on the keyboard.
14  Q.   And then a day after this, he went to the
15  police and told them the only payment was 1805,
16  correct?
17  A.   In a deposit, yes.
18  Q.   Ma'am, I'm going to put this back up to you,
19  this document.  Do you see that document?
20  A.   Yes.
21  Q.   Now, you say, oh, the 2445 was identified on a
22  document, right?
23  A.   Yes.
24  Q.   And you'd agree that that document was created
25  7/12/13, correct?

*Danielle O'Connor, RPR, CRR 215-683-8023*

53

1   A.   Yes.
2   Q.   And you agree the payment went through on
3   7/15, three days later, correct?
4   A.   Yes, correct.
5   Q.   And you'd agree with me that wasn't actually
6   the payment identified, it was what was owed,
7   correct?
8   A.   No.
9   Q.   Doesn't it indicate what was owed and not what
10  was paid on 7/12, ma'am?
11  A.   No.
12  Q.   What does it say?
13  A.   It says that we had to close the vehicle out
14  to 5/31/2013 because we didn't have anymore
15  authorization.  It's on this form right here.
16  Q.   I'm sorry.  Maybe my question wasn't clear.  I
17  asked you a different question.
18          Isn't it true that it doesn't show
19  that the payment of 2445 was made on that document?
20  A.   Yeah, it shows it was --
21  Q.   It was owed?
22  A.   It was owed at the time.
23  Q.   And it was not paid, correct?
24  A.   Not on 7/12.
25  Q.   Right.  And three days later it was paid,

*Danielle O'Connor, RPR, CRR 215-683-8023*

Control No : 17093136

54

1  correct, ma'am?

2  **A.    Not in full.**

3  **Q.**    Ma'am, I'm asking you was 2445 paid, yes or

4  no?

5  **A.    Yes.**

6  **Q.**    And that information was never updated to the

7  police, correct?

8  **A.    No.**

9  **Q.**    It was not corrected, correct?  It was not

10  updated to the police, correct?

11  **A.    They had the information.**

12  **Q.**    I'm asking you if the information that it was

13  paid was updated to the police, yes or no?

14  **A.    The police actually have the theft package and**

15  **this was in the theft package.**

16  **Q.**    Ma'am, you just identified that that is not a

17  payment for 2445, it's what is owed.  Do you

18  understand the difference between --

19  **A.    Yes.**

20  **Q.**    -- money in your bank account --

21  **A.    Yes.**

22  **Q.**    -- and what is owed to you?  It's the

23  difference between an asset and a liability, right?

24  **A.    Yes.**

25  **Q.**    Okay.  Understand the difference?

*Danielle O'Connor, RPR, CRR 215-683-8023*

55

1  **A.    Yes.**

2  **Q.**    You deal with this every day?

3  **A.    Yes.**

4  **Q.**    So let's be clear.  The police didn't know

5  2445 was paid before they signed an affidavit of

6  probable cause allowing Ms. Grady to be arrested,

7  correct?  Correct, ma'am?

8  **A.    Correct.**

9        MR. MALOFIY:  No further questions.

10        THE COURT:  Any redirect?

11        MR. EDELSTEIN:  Just two.  I promise.

12        - - -

13        REDIRECT EXAMINATION

14        - - -

15  BY MR. EDELSTEIN:

16  **Q.**    Mr. Graeber, the assistant corporate manager

17  who worked for Mr. Livingston --

18  **A.    Yes.**

19  **Q.**    -- he did the investigation?

20  **A.    Yes.**

21  **Q.**    And he would have -- in an effort to find car

22  movement, how would he have determined that, meaning

23  was the car back in Hertz' possession?

24  **A.    Yes, so he would have gone into a specialized**

25  **system that shows all cars that have been checked in**

*Danielle O'Connor, RPR, CRR 215-683-8023*

56

1  or have an idle sighting at the location to prove

2  that the car was back in Hertz' possession.

3  **Q.**    And, again, when did the car come back to your

4  possession?

5  **A.    September 11th, 2013.**

6        MR. EDELSTEIN:  Thank you.  That's all

7  I have.

8        THE COURT:  Anything else, Counsel?

9        MR. MALOFIY:  No.  One second, Your

10  Honor.  Court's indulgence.

11        (Pause.)

12        - - -

13        RECROSS-EXAMINATION

14        - - -

15  BY MR. MALOFIY:

16  **Q.**    Help my confusion.  Did you actually fly in

17  from Florida?

18  **A.    I -- yes.**

19  **Q.**    You flew in from Florida to here?

20  **A.    I took a special route, yes.**

21        MR. MALOFIY:  No further questions.

22        THE COURT:  Anything else?

23        MR. EDELSTEIN:  No, Your Honor.

24        THE COURT:  Thank you, ma'am.  Watch

25  your step.

*Danielle O'Connor, RPR, CRR 215-683-8023*

57

1        - - -

2        (Witness excused.)

3        - - -

4        THE COURT:  Who's your next witness?

5        MR. EDELSTEIN:  Mr. Cocklin.

6        THE COURT:  That's the expert.

7        Step up.

8        THE COURT CRIER:  State your full

9  name.

10        THE WITNESS:  John Cocklin,

11  C-O-C-K-L-I-N.

12        - - -

13        ...JOHN COCKLIN, having been duly

14  sworn/affirmed, was examined and testified as

15  follows:

16        - - -

17        THE COURT:  Your witness.

18        - - -

19        DIRECT EXAMINATION ON VOIR DIRE

20        - - -

21  BY MR. EDELSTEIN:

22  **Q.**    Good afternoon, Mr. Cocklin.

23  **A.    Good afternoon.**

24  **Q.**    How are you today?

25  **A.    Okay.**

*Danielle O'Connor, RPR, CRR 215-683-8023*

# ATTACHMENT AS

RICHARD LIVINGSTON

Page 1

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA

- - -

KELLY A. GRADY,                    :   CIVIL ACTION
                                   :
                Plaintiff,         :   NOVEMBER TERM, 2015
                                   :
        vs.                        :
                                   :   NO. 151103380
                                   :
THE HERTZ CORPORATION; HERTZ       :
RENT-A-CAR PHILADELPHIA INTL.      :
AIRPORT; JOHN DOE(s),              :
                                   :
                Defendant.         :

- - -

Oral sworn testimony of RICHARD

LIVINGSTON, held at ZANARAS REPORTING & VIDEO, 1845

Walnut Street, Suite 938, Philadelphia, Pennsylvania,

taken on Tuesday, October 4, 2016, commencing at 10:08

a.m., before Lynda DiGrazio-Smith, a NJ Certified

Court Reporter (Lic. #30XI002212), Certified Livenote

Reporter, Licensed CaseViewNet Realtime Provider and

Notary Public for the State of New Jersey.


ZANARAS REPORTING & VIDEO

Registered Professional Reporters

1845 Walnut Street, Suite 9382112 Bay Avenue

Philadelphia, PA 19103        Ocean City, NJ 08226

215.790.7857                  877.GO.DEPOS

RICHARD LIVINGSTON

Page 53

1            THE WITNESS:  Yeah.  I can't tell

2     you.  I just don't know.

3     BY MR. MALOFIY:

4            Q.   So you recall you being the person

5     required to go to court from May 2010, until a

6     certain point.  Then it was Mr. Graeber; right?

7            A.   Yes.  Right.

8            Q.   And then it was a Mr. Lomis?

9            A.   Yes.

10           Q.   Or was there someone else?

11           A.   No.  Mr. Lomis.

12           Q.   Okay.  What's Mr. Lomis's title?

13           A.   Assistant corporate security manager.

14           Q.   How long has he been at Hertz?

15           A.   Since February of 2016.

16           Q.   Okay.  Mr. Graeber is still with Hertz?

17           A.   No.

18           Q.   Or no?

19           A.   He's not.

20           Q.   When did he stop -- did he no longer --

21     was he no longer employed at Hertz after

22     February 2016?

23           A.   No.  He was not.  He left somewhere in

24     the summer.  I am going to say July of 2015.  Again,

RICHARD LIVINGSTON

Page 54

1    that's an approximate.

2           Q.    I understand.  Why did he leave?

3           A.    He got laid off.

4           Q.    Okay.  Do you understand the

5    circumstances regarding his being laid off?

6           A.    My understanding was, it was just a

7    corporate decision to lay off a large group of

8    people at that time for cost savings.

9           Q.    Okay.  What was his role?

10          A.    Assistant corporate security manager.

11          Q.    So they laid him off and they hired on

12   another corporate security manager roughly six

13   months later?

14          A.    Yes.

15          Q.    What was the reason for that?

16          A.    They found out that they made a mistake

17   in laying him off.

18          Q.    Did they ask for him to come back?

19          A.    They did.

20          Q.    And what was his response?

21          A.    He's already obtained other employment.

22          Q.    Do you know where he's now employed?

23          A.    With the federal government, but I don't

24   know exactly what the job is.

RICHARD LIVINGSTON

Page 108

1        A.    I'd be at the airport.

2        Q.    So which police officers would you give

3    it to?

4        A.    Whoever arrived to take the report.

5        Q.    How would they know to pick up a report?

6        A.    I'd call them on the phone.

7        Q.    So first, you would receive this theft

8    package from Oklahoma City?

9        A.    Right.

10        Q.    You wouldn't review the theft package.

11    Correct?

12        A.    I'd look at it to make sure that

13    everything is in order.

14        Q.    What does that mean?  All the pieces of

15    the sandwich are there?

16        A.    The dates are right and everything

17    was -- there's numerous copies of the same

18    information.  Make sure everything is correct on it.

19        Q.    How would you determine if it's correct,

20    if you didn't have the factual knowledge relating to

21    it?

22        A.    Well, I can look at all the pages on

23    that and make sure that they have it throughout the

24    report is the same.

RICHARD LIVINGSTON

Page 109

1          Q.    You would look through the report for
2     basic typos.  Is that right?
3          A.    In most cases, yes.
4          Q.    Would you do any other determination,
5     other than looking for typos within the theft
6     package itself?
7          A.    No.
8          Q.    Would you check any Hertz systems?
9          A.    No.
10          Q.    Okay.  So your investigation or your
11     review of the theft package was solely strictly the
12     pages contained within the theft package itself?
13          A.    That's correct.
14          Q.    So then once you received it, how would
15     you receive it?  E-mail?  Fax?
16          A.    At one time it was faxed, now it's
17     e-mailed.
18          Q.    Okay.  How many of these things do you
19     receive a day?
20                    MR. WOLF:  At what point?
21     BY MR. MALOFIY:
22          Q.    At any point.  Does it change?
23          A.    I don't receive any anymore.
24          Q.    Why not?

RICHARD LIVINGSTON

Page 115

1    was the car stolen, yes.

2          Q.    Okay.  Would they ask you questions or

3    do the interview at that point?

4          A.    No.  They would not interview me.

5          Q.    What's the form?  7548?

6          A.    I'm sorry?

7          Q.    Are you familiar with the 75 --

8          A.    I'm not -- yeah, the 48 is what

9    Philadelphia uses.

10         Q.    Yes.

11         A.    Yes.

12         Q.    You're familiar with that form?

13         A.    Yes.

14         Q.    Do you recall being interviewed by the

15   police, when you turned in the theft package?

16         A.    No.

17         Q.    No.  When you put in the theft package,

18   what were the checks done to confirm the information

19   was correct?  When I say, What were the checks done,

20   I mean what, as the corporate security manager, did

21   you do to confirm that the information was true,

22   accurate and correct, if anything?

23         A.    I went through the form to make sure

24   that everything was in order.

RICHARD LIVINGSTON

Page 116

1         Q.   When you say, Everything was --

2         A.   Well, for example, for the State, you

3    need like a certified mailing, make sure that the

4    mailing was included in the theft report.

5         Q.   Besides, I mean, from my testimony, it

6    sounds like you didn't do anything as far as checks

7    and balances, to confirm the information was

8    correct, other than making sure the pieces in the

9    theft package were there?

10        A.   Right.

11        Q.   And then, also, checking for typos.  Is

12   that accurate?

13             MR. WOLF:  Well, I'll just object to

14   his testimony speaks for itself.  And it's not

15   counsel's characterization of the testimony.

16             MR. MALOFIY:  Well, there's no

17   characterization there.  It was crystal clear.

18             MR. WOLF:  The record will speak for

19   itself.

20             MR. MALOFIY:  Right.  And I can ask a

21   question and build it with foundation with prior

22   facts for prior things he's testified to.

23   BY MR. MALOFIY:

24        Q.   Now, my understanding, sir, is that when

RICHARD LIVINGSTON

Page 117

1   you received this theft package, your testimony is

2   that you didn't do any independent investigation,

3   other than looking at the package itself and then

4   you would check to see if there were typos --

5       A.   Right.  My company would --

6       Q.   -- and make sure -- hold on a second.

7       A.   I'm sorry.

8       Q.   And make sure that the different parts

9   that were supposed to comprise the theft package

10  were there.  Correct?

11      A.   Yes.

12      Q.   Okay.  What parts are supposed to

13  comprise the theft package?

14      A.   Well, what the police actually require,

15  which is a certified mailing.

16      Q.   Okay.  What else?

17      A.   Car information.

18      Q.   What else?

19      A.   That's probably just about it.

20      Q.   Okay.

21      A.   They might require more in court, but...

22      Q.   Now, it says here, Submitted DNR 14 A,

23  do you know what that means, on this Exhibit 32,

24  page 3?

RICHARD LIVINGSTON

Page 137

1          Q.   You'd agree with me that -- oh, you

2     don't even know if 1805 was charged on Ms. Grady's

3     card.  Correct?

4          A.   I'm sorry?

5          Q.   I am going back to page 4 of 16 of

6     Exhibit 32.  You don't even know if 1805 was charged

7     on the card, correct, on Ms. Grady's card?

8          A.   No.  I do not.

9          Q.   But it says it here.  Correct?

10         A.   Okay.

11         Q.   I'm reading that correctly; right?

12    Credit card authorization would be 1805?

13         A.   That's the estimated charge, yes.

14         Q.   Okay.

15         A.   I don't know if that was charged to the

16    card or not.

17         Q.   Now, you did no investigation to

18    determine whether or not it was charged to the card?

19         A.   Absolutely not.

20         Q.   Okay.  Let's go to page 7 of 16.

21              Before I do that -- strike that.

22              Am I correct that page 4, 5 and 6 are

23    part of the Hertz contract?

24         A.   Yes.

RICHARD LIVINGSTON

Page 195

1          A.    No.  No.  You have mechanics.  You have

2     mechanic bays.  You have probably ten mechanic bays

3     in the back of the building.  Maintenance, but I

4     don't deal with them.  Most of the people there are

5     on a regional basis.

6          Q.    Okay.  Besides you in, you know,

7     corporate security and besides Mr. Lomis,

8     Mr. Graeber, Mr. -- who you already identified

9     yourself, is there anyone else that's involved in

10    corporate security or vehicle location tracking?

11         A.    For the Philadelphia area?

12         Q.    Yeah.

13         A.    No.

14         Q.    And that would be at all relevant times

15    that we're talking about.  Correct?

16         A.    Yes.

17         Q.    Is it your testimony that you don't go

18    to the location and question any of the Hertz

19    employees when you receive a theft package?

20         A.    That's my testimony, yes.

21         Q.    Why?

22         A.    Because I mean the package has been

23    completed, all the reports have been reviewed, I

24    guess, by OKC.  And my marching orders are to report

RICHARD LIVINGSTON

Page 196

1    the car stolen when I get the -- again, I do look at

2    it for everything being accurate, as far as I can

3    tell, within the report itself.

4         Q.    Yeah.  But you don't do any independent

5    investigation?

6         A.    I do not.

7         Q.    You don't do any check?

8         A.    I do not.

9         Q.    How far away is your office from the

10   Philadelphia Hertz office?

11        A.    From the airport?

12        Q.    Yeah.  Philadelphia Airport Hertz

13   office?

14        A.    Half a mile, three-quarters of a mile.

15        Q.    So how long would it take you to get

16   there by car?

17        A.    Five minutes.

18        Q.    Okay.  Is it your testimony that when

19   you receive a theft package that deals with the

20   Philadelphia Hertz Airport location, you wouldn't go

21   and speak to individuals there regarding the theft

22   package?

23             MR. WOLF:  Asked and answered, but

24   you can answer.

RICHARD LIVINGSTON

Page 197

1              THE WITNESS:  In reference to?

2    BY MR. MALOFIY:

3         Q.   Receiving a theft package and doing any

4    kind of inquiry, you wouldn't do that normally?

5              MR. WOLF:  Asked and answered, but

6    you can answer.

7              THE WITNESS:  A conversion has

8    nothing to do with the people that wrote the

9    contract or anything like that.  No, I would not.

10   BY MR. MALOFIY:

11        Q.   Would you have to speak to the rental

12   representative who was?

13        A.   I don't know who -- what are you talking

14   about as far as a rental representative.

15        Q.   The person who rented the car to the

16   renter.

17        A.   All right.

18        Q.   Did you ever speak to them in regards to

19   a theft or a conversion or a stolen vehicle?

20        A.   Possibly if there was fraudulent

21   paperwork submitted to them, I might.

22        Q.   But it wouldn't be your practice to do

23   that.  Correct?  To enter --

24        A.   Not in the normal course of business

RICHARD LIVINGSTON

Page 205

1          A.    I have never been deposed for Hertz.

2          Q.    Okay.  Are you aware of any lawsuits

3     against Hertz for improperly reporting a car stolen

4     when it was not?

5          A.    I am not.

6          Q.    Okay.  Have you ever complained that the

7     Hertz computer systems are not -- strike that.

8               Do you have access to phone logs to

9     determine when a renter called in?

10         A.    I do not.

11         Q.    Do you have access to any kind of logs

12    that determine the contacts the renter had with

13    Hertz?

14         A.    Do not.

15              MR. MALOFIY:  I want to take a half

16    hour break for lunch and finish up?

17              MR. WOLF:  Do you need a break?

18              THE WITNESS:  I need to go.

19              MR. WOLF:  Let's finish.

20              MR. MALOFIY:  We're going to be a few

21    hours.

22              MR. WOLF:  A few more hours?

23              MR. MALOFIY:  Absolutely.  Yeah.  I

24    got a lot of documents to go through.  If you want a

RICHARD LIVINGSTON

Page 215

1    changes between the contract and that sheet.  What

2    exactly transpired to make that happen, I don't

3    know.

4         Q.   Okay.  At any point would -- as a

5    corporate security manager or anyone in your

6    division of one other person, I mean -- I don't mean

7    to make that --

8         A.   It is all right.

9         Q.   -- let me strike that.

10            As a corporate security manager for

11   Hertz for this area or anyone working with you or

12   for you, would they have done any independent

13   investigation in to what payments are made with the

14   car before filing a police report?

15        A.   Not on my side of the fence.  On OKC's

16   side possibly.

17        Q.   Okay.

18        A.   We're still the same company.  I just

19   don't know what they do, possibly do to investigate

20   that further.

21        Q.   That's one of the questions I had.  Who

22   does this investigation if you don't, the corporate

23   security manager?

24        A.   As far as I know, vehicle control does

RICHARD LIVINGSTON

Page 216

1      all that paperwork.

2              Q.    Well, you said paperwork --

3              A.    Well --

4              Q.    -- what do you mean by that?

5              A.    Whatever they do to glean the

6      information that they put down in the theft package.

7              Q.    Do you know how that process is done?

8              A.    I do not.

9              Q.    If you don't know, who would know?

10             A.    Vehicle control would know.

11             Q.    Do you know if someone is testifying

12     from vehicle control?

13             A.    I do not know.

14             Q.    Did anyone from vehicle control talk to

15     you in regards to this case?

16             A.    No.

17             Q.    Did anyone from Hertz internally talk to

18     you in regards to this case?

19             A.    No.

20             Q.    Do you know anyone in vehicle control or

21     investigation that does the investigations for

22     vehicle control?

23             A.    All vehicle control does different tasks

24     within it but I don't know who does what.

RICHARD LIVINGSTON

Page 374

1    recovered the vehicle?

2         A.   They know it.  They had to take it out

3    of the system.

4         Q.   Did you ever tell police that Ms. Grady

5    was -- were you aware that Ms. Grady was released?

6         A.   I didn't even know she was arrested.

7         Q.   So you didn't know she was detained?

8         A.   Correct.

9         Q.   What procedure was in place to notify

10   the police that Ms. Grady had made a payment of

11   $2,000?

12        A.   It has no bearing on the case

13   whatsoever.

14        Q.   I didn't ask --

15        A.   There's no procedure.

16        Q.   I didn't ask you --

17        A.   There's no procedure --

18        Q.   -- whether or not it's your judgment --

19             MR. WOLF:  He's answering the

20   question.

21             THE WITNESS:  -- in place.

22   BY MR. MALOFIY:

23        Q.   Let me ask it again so we have a clean

24   answer.  What procedure was in place at Hertz to

RICHARD LIVINGSTON

Page 375

1    inform the police that Hertz had made a charge that

2    went through on her bank for $2,500 days before the

3    report of the car stolen, which was not included in

4    the theft package or any information previously

5    provide to the police?

6        A.    There is no procedure in place because

7    it's not relevant.

8        Q.    So it's Hertz's position that payment

9    for a vehicle, pursuant to an agreement with Hertz,

10   is not relevant to prosecuting a young lady for a

11   theft of a vehicle?

12       A.    Hertz is only trying to recover even a

13   fraction of their loss from them not having the car

14   back when it was contracted to be back.

15       Q.    Isn't it true that she had an agreement

16   to the end of July and she paid the $2,500 pursuant

17   to that agreement?

18       A.    As far as the paperwork I see, no.

19       Q.    Why was the $2,500 paid to Hertz by Ms.

20   Grady on the same credit card and on the same rental

21   contract?

22            MR. WOLF:  Same objection.  That's

23   been noted throughout the course of today.  He's

24   already testified he has nothing to do with billing.

RICHARD LIVINGSTON

Page 376

1     He doesn't know it.  Joe Jaussi is the proper

2     individual to be answering that question.

3              It's outside this witness' area of

4     expertise.

5     BY MR. MALOFIY:

6        Q.   I'm asking the context of corporate

7     security and also notifying the correct law

8     enforcement of changes to the facts and the scenario

9     relating to a criminal complaint filed on behalf of

10    Hertz against a renter.  That's the context the

11    question is being asked.

12       A.   Money paid prior to the car being stolen

13    is strictly a contractual thing prior to.  After

14    it's reported stolen, it becomes restitution.

15       Q.   Where in any of the documents do you see

16    the updated information that Hertz had received a

17    payment of $2,500?

18       A.    I haven't seen it in any of the

19    documents there.  That's because it is not revelent.

20              MR. WOLF:  Relevant.

21              MR. MALOFIY:  I understand.

22              THE WITNESS:  Thank you.

23    BY MR. MALOFIY:

24       Q.   Where in the documentation do you see

RICHARD LIVINGSTON

Page 377

1    anywhere where Ms. Grady kept in constant contact

2    with Hertz?

3            A.    I don't.

4            Q.    Okay.  And what investigation did you

5    do, if any, to determine whether or not she was in

6    constant contact with Hertz during the course of the

7    rental?

8            A.    I personally didn't.  I imagine the OKC

9    did, but I can't...

10           Q.    You don't know that information.

11   Correct, sir?

12           A.    That's correct.

13           Q.    All right.  And you don't know what OKC

14   did; right?

15           A.    I don't know what exact steps they took,

16   no.

17           Q.    Right.  And as you came here today and

18   also the discovery you produced, you didn't produce

19   the actual procedure to follow in regards to the

20   theft.  Correct?

21           A.    That was my mistake, I apologize.

22                 MR. WOLF:  We have already been over

23   this.

24                 MR. MALOFIY:  And you will supplement

# ATTACHMENT AT

KEN GRAEBER

## Page 1

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

FIRST JUDICIAL DISTRICT OF PENNSYLVANIA

- - -

KELLY A. GRADY,

            : CIVIL ACTION

            : NOVEMBER TERM,

2015

       Plaintiff,    :

            : NO. 151103380

     vs.        :

            :

THE HERTZ CORPORATION; HERTZ :

RENT-A-CAR PHILADELPHIA INTL.:

AIRPORT; JOHN DOE(s),    :

       Defendants.   :

- - -

October 16, 2016

- - -

Oral deposition of KEN GRAEBER taken pursuant to notice, held at 1845 Walnut Street, Suite 938, Philadelphia, Pennsylvania, commencing at 10:38 a.m., on the above date, before Jennifer P. Miller, RPR, CCR, CRR, and Notary Public for the Commonwealth of Pennsylvania, State of Delaware and the State of New Jersey.

## Page 2

```
 1     APPEARANCES:
 2
 3         FRANCIS ALEXANDER, LLC
 4         BY: FRANCIS MALOFIY, ESQUIRE
 5         280 North Providence Road
 6         Suite 105
 7         Media, Pennsylvania 19063
 8         215.583.1099
 9         COUNSEL FOR PLAINTIFF
10
11         EDELSTEIN LAW, LLP
12         BY: STUART J. WOLF, ESQUIRE
13         230 South Broad Street.
14         Suite 900
15         Philadelphia, Pennsylvania 19102
16         215.893.9311
17         COUNSEL FOR DEFENDANT
18
19
20
21
22
23
24
25
```

## Page 3

```
 1              INDEX
 2     WITNESS:
 3     KEN GRAEBER
 4        E X A M I N A T I O N
 5         DIRECT CROSS REDIRECT RECROSS
 6     BY MR. MALOFIY  8
 7
 8              - - -
 9        E X H I B I T S
10     NUMBER      DESCRIPTION        PAGE
11     Plaintiff 45   Complaint        11
12
13
14        Direction to Witness not to Answer
15           Page Line    Page Line
16           14  24
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1              - - -
 2        P R O C E E D I N G S
 3              - - -
 4         (It is hereby stipulated
 5     and agreed by and between counsel that
 6     reading, signing, sealing, filing and
 7     certification are not waived; and that
 8     all objections, except as to the form
 9     of the questions, be reserved until the
10     time of trial.)
11
12           KEN GRAEBER,
13     after having been first duly sworn, was
14     examined and testified as follows:
15              - - -
10:38:34  16     MR. MALOFIY:  We're here for the
10:38:36  17  deposition of Mr. Joseph Jaussi, who is an
10:38:40  18  employee of Hertz, as well as a deposition
10:38:43  19  of Ken Graeber who's a potential named
10:38:47  20  defendant in this case.  Listed as a John
10:38:50  21  Doe at this time.  Opposing counsel, Mr.
10:38:56  22  Stuart Wolf, has indicated he's demanding
10:38:59  23  that both are present at the same time.
10:39:01  24  The rules absolutely unequivocally do not
10:39:04  25  allow for fact witnesses to be present at
```

1 (Pages 1 to 4)

KEN GRAEBER

Page 17

| | |
|---|---|
| 10:57:39 | 1 | was told he faces and may face personal |
| 10:57:43 | 2 | liability for the plaintiff's complaint. |
| 10:57:48 | 3 | Please also let the record reflect that |
| 10:57:51 | 4 | this man has never seen the complaint. |
| 10:57:54 | 5 | Also let the record reflect this man has |
| 10:57:56 | 6 | never read the complaint or the |
| 10:57:57 | 7 | allegations contained therein. |
| 10:57:59 | 8 | BY MR. MALOFIY: |
| 10:58:00 | 9 | Q. Sir, do you understand there's a |
| 10:58:01 | 10 | conflict, as you sit here today, in an attorney |
| 10:58:04 | 11 | representing Hertz and also representing your |
| 10:58:06 | 12 | personal interest? |
| 10:58:07 | 13 | MR. WOLF: Objection. You're |
| 10:58:08 | 14 | asking for a legal conclusion or a legal |
| 10:58:10 | 15 | opinion and -- |
| 10:58:11 | 16 | THE WITNESS: I'm not a lawyer. |
| 10:58:14 | 17 | I don't know. |
| 10:58:15 | 18 | BY MR. MALOFIY: |
| 10:58:15 | 19 | Q. You don't know? |
| 10:58:16 | 20 | A. I was told to come here -- |
| 10:58:19 | 21 | Q. Did you ever -- sorry. |
| 10:58:20 | 22 | A. I was told to come here for a |
| 10:58:22 | 23 | deposition. |
| 10:58:22 | 24 | Q. What was your understanding of your |
| 10:58:24 | 25 | role here today? |

Page 18

| | |
|---|---|
| 10:58:25 | 1 | MR. WOLF: Anything that we |
| 10:58:25 | 2 | spoke about, do not discuss. |
| 10:58:28 | 3 | MR. MALOFIY: This witness might |
| 10:58:29 | 4 | have the -- I brought up in front of Judge |
| 10:58:33 | 5 | New because clearly he doesn't understand |
| 10:58:36 | 6 | his role or why he's here today. No one |
| 10:58:40 | 7 | has told him that. He faces potentially |
| 10:58:43 | 8 | millions of dollars in damages, because |
| 10:58:45 | 9 | that's what this case is worth. Let me |
| 10:58:47 | 10 | finish. |
| 10:58:47 | 11 | BY MR. MALOFIY: |
| 10:58:48 | 12 | Q. Are you aware that there were |
| 10:58:49 | 13 | individuals at Hertz or that were employed by |
| 10:58:52 | 14 | Hertz that were listed as John Does in the |
| 10:58:55 | 15 | complaint? |
| 10:58:57 | 16 | A. No, I wasn't aware of that. |
| 10:58:59 | 17 | Q. Were you aware of -- that in the |
| 10:59:03 | 18 | complaint, there were police reports which |
| 10:59:05 | 19 | plaintiff had alleged -- were improperly given |
| 10:59:08 | 20 | to police? |
| 10:59:11 | 21 | A. Say that again. |
| 10:59:11 | 22 | Q. Let me strike that. |
| 10:59:13 | 23 | Were you aware that in the |
| 10:59:14 | 24 | complaint, there were allegations that there |
| 10:59:16 | 25 | was false police information -- strike that. |

Page 19

| | |
|---|---|
| 10:59:22 | 1 | Were you aware that in the |
| 10:59:23 | 2 | complaint, there's allegations that an |
| 10:59:26 | 3 | individual at Hertz had provided misleading or |
| 10:59:29 | 4 | wrong information to the police? |
| 10:59:31 | 5 | A. No, I wasn't aware of that. |
| 10:59:32 | 6 | Q. Were you ever told that you were the |
| 10:59:34 | 7 | individual who through discovery it appears, is |
| 10:59:39 | 8 | the person who filed the report with the police |
| 10:59:42 | 9 | that plaintiff has alleged is improper? |
| 10:59:44 | 10 | A. Well, me as an employee of Hertz, I |
| 10:59:46 | 11 | was custodian of records and I didn't |
| 10:59:48 | 12 | personally provide that information. It was |
| 10:59:50 | 13 | sent to me, and I just reported it stolen as |
| 10:59:54 | 14 | per Hertz policies. |
| 10:59:56 | 15 | Q. Do you remember an interview that |
| 10:59:57 | 16 | occurred with the police and you? |
| 10:59:58 | 17 | A. I don't remember it, no. |
| 10:59:59 | 18 | Q. Did you ever look at any discovery in |
| 11:00:01 | 19 | this case? |
| 11:00:01 | 20 | A. Yes, I did, yeah. |
| 11:00:02 | 21 | Q. Did you look at the police report |
| 11:00:04 | 22 | that you gave? |
| 11:00:04 | 23 | A. The police report? |
| 11:00:06 | 24 | Q. There was a police interview where |
| 11:00:08 | 25 | questions were asked of you and you testified |

Page 20

| | |
|---|---|
| 11:00:09 | 1 | to that police officer? |
| 11:00:12 | 2 | A. Yes, I did read that. |
| 11:00:13 | 3 | Q. You did read that? |
| 11:00:14 | 4 | A. Yeah. |
| 11:00:14 | 5 | Q. Were you ever told that there was an |
| 11:00:16 | 6 | allegation that someone at Hertz provided false |
| 11:00:18 | 7 | information to the police, which make up the |
| 11:00:22 | 8 | allegations in this complaint? |
| 11:00:24 | 9 | MR. WOLF: Objection. Anything |
| 11:00:25 | 10 | that you spoke to me or my office about, |
| 11:00:28 | 11 | do not answer. If you have other |
| 11:00:30 | 12 | information, it's fine for you to answer, |
| 11:00:32 | 13 | but if it came from me or my office, do |
| 11:00:34 | 14 | not answer. |
| 11:00:35 | 15 | MR. MALOFIY: He still has to |
| 11:00:36 | 16 | say I can't -- you still have to make the |
| 11:00:39 | 17 | objection -- this is -- hold on. |
| 11:00:41 | 18 | You have to make the attorney-client |
| 11:00:42 | 19 | privilege. You can't say don't talk about |
| 11:00:45 | 20 | anything so there's no indication of what |
| 11:00:48 | 21 | came from your client and what didn't. |
| 11:00:49 | 22 | This is a very serious issue here. |
| 11:00:52 | 23 | MR. WOLF: I just told him, if |
| 11:00:53 | 24 | it's anything outside of my office you can |
| 11:00:55 | 25 | testify. |

5 (Pages 17 to 20)

# ATTACHMENT AU

EFILED
CLAYTON COUNTY, GA
12/15/2021 11:12am
Jacquline D. Wills
CLERK SUPERIOR COURT

# IN THE SUPERIOR COURT OF CLAYTON COUNTY
## STATE OF GEORGIA

STATE OF GEORGIA         *    CASE#: 2021CR01670-09

                           *

vs.                           *    CHARGE:

                           *    Theft by Conversion

Bianca Deloach           *

## MOTION TO NOLLE PROSEQUI

Defendant having been charged with the offense indicated above, upon filing and docketing of the **WARRANT**, the offense being a **FELONY**, and a **THOROUGH and EXHAUSTIVE REVIEW** of the facts and circumstances of this case revealing that:

On March 25, 2021, Hertz Rental Car reported a Ford Explorer stolen to Atlanta Police Department. That vehicle was rented by the defendant on October 3, 2020, and to be returned on December 22, 2020. On March 26, 2021, Clayton County Sheriff's Deputies observed the vehicle being driven on Godby Road, when the vehicle tag came back stolen as of the day before. Deputies followed the vehicle into a chevron gas station, located on Godby Road, where they witnessed the defendant getting out of the vehicle and pumping gas. Deputies approached the defendant and placed her under arrest. As she was being placed under arrest she uttered "I just paid them $3900.00". At the time of arrest the defendant did not have proof of payment. The defendant was arrested on March 26, 2021, and was released on bond April 4, 2021.

On November 8, 2021, the State received a copy of the Dollar Car Rental invoice provided to the defendant from the company. The invoice is in the amount of $3,974.57 and is showing full payment as of February 25, 2021. The State also received correspondence from the defendant's attorney regarding national claims against Hertz Rental Car Company, which also owns and acquired Dollar Car Rental, for false claims of theft of rented vehicles. In performing due diligence, the State reached out to the Hertz representative on file and was unable to speak with him. It should be noted the State has reached out seven times to this representative, only making contact twice, between March 31, 2021, and the end of November. The State communicated with a Hertz representative from New Jersey who was unable to explain how the defendant paid in full in February for the vehicle, yet the vehicle was reported stolen. The New Jersey representative was also unable to identify any number of attempts made by Hertz to contact the defendant and request the vehicle returned. As of to date, the State has yet to hear from the Georgia Hertz representative. The State did confirm the reported stolen vehicle is now back in the custody of Hertz Rental Car Company.

Based on the defendant's time in custody, the lack of cooperation from any representative of Hertz Rental Car Company, the proof of payment in the amount of $3,974.57, the national claims against Hertz Rental Car Company, the alleged stolen vehicle being in the custody of Hertz Rental Car Company, and in the interest of justice, the State respectfully requests that the above felony charge be NOLLE PROSSED.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Comes now, Brianna N. Woods, Assistant District Attorney, Clayton Judicial Circuit, and for good cause shown moves this Court to:

Nolle Prosse:   [ X ]

Brianna N. Woods
#: 600616
Assistant District Attorney

## ORDER

The within and foregoing Motion having been READ AND CONSIDERED, said Motion is HEREBY GRANTED, SO ORDERED this 15th day of Dec., 2021.

EFILED
CLAYTON COUNTY, GA
12/15/2021 11:12am
Jacquline D. Wills
CLERK SUPERIOR COURT

Honorable Geronda Carter
Superior Court Clayton Judicial Circuit

## EXHIBIT B

**Transcript of November 4, 2021, Hearing**

ACTIVE.135112366.08

1

```
 1                   UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE
 2

 3                                  .   Chapter 11
      IN RE:                         .
 4                                   .   Case No. 20-11247 (MFW)
      RENTAL CAR INTERMEDIATE        .
 5    HOLDINGS, LLC,                 .
                                     .
 6                                   .   Courtroom No. 3
                                     .   824 Market Street
 7                                   .   Wilmington, Delaware 19801
                                     .
 8          Reorganized Debtor.      .   November 4, 2021
      . . . . . . . . . . . . . . . .    10:30 A.M.
 9

10                      TRANSCRIPT OF HEARING
             BEFORE THE HONORABLE MARY F. WALRATH
11               UNITED STATES BANKRUPTCY JUDGE

12    APPEARANCES:

13    For the Reorganized      Christopher De Lillo, Esquire
      Debtors:                 RICHARDS, LAYTON & FINGER, P.A.
14                             One Rodney Square
                               920 N. King Street
15                             Wilmington, DE 19801

16                             - and -

17                             Chris Shore, Esquire
                               WHITE & CASE LLP
18                             1221 Avenue of the Americas
                               New York, New York 10020
19

20    Audio Operator:          Donna Capell, ECRO

21
      Transcription Company:   Reliable
22                             1007 N. Orange Street
                               Wilmington, Delaware 19801
23                             (302)654-8080
                               Email:  gmatthews@reliable-co.com
24

25    Proceedings recorded by electronic sound recording,
      transcript produced by transcription service.
```

```
 1   APPEARANCES (Cont'd):

 2   For the False Police      Patrick Jackson, Esquire
     Report Claimants:         FAEGRE DRINKER BIDDLE & REATH LLP
 3                             222 Delaware Avenue, Suite 1410
                               Wilmington, Delaware 19801
 4
                               - and -
 5
                               Justin Nelson, Esquire
 6                             John Lahad, Esquire
                               SUSMAN GODFREY, LLP
 7                             1000 Louisiana, Suite 5100
                               Houston, Texas 77002
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1  MATTERS GOING FORWARD:

2  1. Reorganized Debtors' Twenty-First Omnibus (Non-Substantive) Objection to False Police Report Claimants' (i)
3  Amended and Superseded Claims, (ii) Duplicative Claims, and (iii) Late Claims [Docket No. 58983 - filed September 20,
4  2021]

5  2. Reorganized Debtors' Twenty-Second Omnibus (Substantive)
6  Objection to False Police Report Claimants' Non-Compliant, Unsubstantiated, and Class Claims, and Request for a Limited
7  Waiver of Local Rule 3007-1(f)(iii), to the Extent Such Rule May Apply [Docket No. 5899 - filed September 20, 2021]

8  3. Reorganized Debtor's Motion (i) to Quash the False Police
9  Report Claimants' Notice of Rule 30(b)(6) Deposition and (ii) for Entry of a Protective Order Limiting Written Discovery
10 [Case No. 20-11247 (MFW) - Docket No. 61 - filed October 21, 2021]

11

12          **Court's Ruling:  Matters Taken Under Advisement**

13

14

15

16

17

18

19

20

21

22

23

24

25

              (Proceedings commenced at 10:32 a.m.)

1          THE COURT:  …the Hertz case on some procedural

2   argument on procedural matters related to the twenty-first

3   and twenty-second omnibus objections to claims.

4          I do want to tell the parties that I have read

5   their pleadings, so I hope this can be streamlined to hit the

6   significant issues.  So I will turn it over to, I guess, the

7   objecting party in the first instance, the reorganized

8   debtor.

9          MR. DE LILLO:  Good morning, Your Honor.  Chris De

10  Lillo of Richards, Layton & Finger on behalf of the

11  reorganized debtor.

12         Before we get started we thought it would be more

13  efficient to argue the objections together rather then going

14  back and forth on one and then back and forth on the other.

15  Would that be acceptable to Your Honor?

16         THE COURT:  That's fine.  I think it would be

17  preferable to deal with the -- you're right, there is some

18  overlap, so let's deal with the issues; do it issue specific,

19  I guess is the best.

20         MR. DE LILLO:  Okay.  Understood.  With that, Your

21  Honor, I will cede the floor to Mr. Shore.

22         THE COURT:  Mr. Shore.

23         MR. SHORE:  Good morning, Your Honor.  Chris Shore

24  from White & Case on behalf of the reorganized debtors.

25         Let me start with a couple of preliminary points

1  before I go to what I think is what we can get done today and

2  what we can't get done today.

3         First, this is a synopsis of the claims.  We

4  addressed that in the scheduling conference last week, but I

5  wanted to make clear that we are not dealing with the

6  allegations and nobody is expecting a point by point rebuttal

7  of the allegations.

8         As I noted at that conference, there seems to be

9  an inconsistency between plaintiff's insistence that this

10 court has no jurisdiction to hear anything about the

11 substance of their claims and they're taking every

12 opportunity, even when it's not necessary, to fill the record

13 with the substance of their claims or fill the press pages

14 with the substance of their claims.  I am not going to be

15 addressing those.

16        For now Hertz reserves all rights with respect to

17 the substantive arguments made in this court and in the press

18 including the reorganized debtor's rights under the discharge

19 injunction with respect to how they are going about

20 proceeding to collect on their prepetition claims.

21        THE COURT:  Okay.

22        MR. SHORE:  The issue today is solely what of the

23 165 claims at issue comply with the bar date order entered by

24 this court and the law.

25        Second, it bears noting that this group is the one

1   exception to an incredibly successful claims resolution

2   process for representative actions.  As the court may recall,

3   after the bar date came and went the debtors were faced with

4   dozens of group claims; claims filed by purported class

5   claimants, private attorney generals, and other ways in which

6   parties sought to adjudicate (indiscernible) it through one

7   or a cluster of groups of claims, the claims of hundreds or

8   thousands of individuals.

9           Those claims were all filed as contingent and

10  unliquidated.  And as we discussed, Your Honor, when that

11  process was playing out, that posed a problem for plan

12  negotiation and distribution processes including the

13  possibility of having to reserve significant portions of plan

14  consideration to address these claims.

15          In response working with the debtors, and the UCC,

16  and the claimants themselves the court put in place a dual

17  process where parties with group claims --

18          THE COURT:  Alright, I understand your point that

19  they are the only ones who didn't --

20          MR. SHORE:  Well, I think its --

21          THE COURT:  -- but let's move forward.

22          MR. SHORE:  I think it's going to come -- and let

23  me get to the point here because it's going to come up when

24  we get to the class claim.  There was a process put in place

25  in this case for claimants to file 9014 motions, and they

1  were filed in October, November and December of last year to

2  have Rule 7023 apply to their specific claims, and there was

3  a mediation.  That is the process that paved the way for the

4  plan that came out.

5       I am not -- I have got nothing to say about why

6  the claimants did not choose to participate.  My only point

7  is they can't take the position that they should get the

8  benefits of a debtor who made an equity distribution and then

9  claim that the processes that led to that should not apply to

10 them.

11      That brings me to my third point.  They are

12 seeking to come forward and take the position that because

13 the Hertz case was so successful they should be relieved of

14 this first step in the process which is whether or not they

15 can have allowed claims.  The only thing that gets paid under

16 this plan are allowed claims.  Unless the court allows the

17 claims they get no distribution.

18      So unless the court thinks otherwise I am not

19 going to address it today, the argument that a solvent debtor

20 cannot avail itself of a bar date order.  There is no support

21 for that in the law and as noted it was the bar date order

22 and the subsequent claims resolution process that made the

23 equity distribution possible in the first place.  So we're

24 here in the first step of what we could deal with on the law

25 today, potentially filed by an evidentiary issue on the

1  preliminary allowance process.

2         Let me start by taking one set of claims off the

3  table.  There are 30 individual claims which were either

4  scheduled by the debtors because they were the subject of a

5  prepetition demand or were the subject of prepetition

6  lawsuits.  Those are not the subject of today; again, but

7  subject to all of the reorganized debtors substantive

8  objections to those claims.  That leaves 135.  In our view

9  none of them, on their face and as a matter of law, are

10  compliant with the bar date order or the (indiscernible).

11         Let's start with the 16 class claims filed at the

12  bar date.  The bar date order and the rules specifically

13  require that claims be filed by an authorized representative.

14  For today's purposes we don't need to get into teh debate

15  about whether authorization for a class claim must be in hand

16  before finding of the proof of claim or can be authorized

17  afterwards as this court did in <u>Kaiser</u>.

18         I think the trend in the cases now is that we want

19  to push that process, that authorization process earlier into

20  the case because of the issues with respect to allowing class

21  claims particularly in the context of a post-effective date

22  claims resolution process.

23         The only question today is why we don't have a

24  motion on file.  The -- we have these class claims, there was

25  a known dispute with respect to the propriety of the class

1  claims, as specific reservation in the bar date order with

2  respect to the treatment of class claims and a specific order

3  by this court which established the processes for filing Rule

4  9014 motions to have 7023 apply which everybody else in the

5  case complied with.  These claimants did not.

6        The only question then is should the disallowance

7  of the claim be with prejudice or without prejudice in

8  granting leave to file a class claim motion at some point.

9  We can't wait around forever for it.  As I said at the status

10  conference I believe with respect to this issue, given what

11  was done in the representative claim adjudication process.

12        THE COURT:  So your position on the class -- on

13  the purported class claims is that there is an order that

14  required the filing of a motion by what date?

15        MR. SHORE:  It was -- well it was -- well the

16  order said if you want to participate in the mediation

17  process you got to get your class claim on file.  So they

18  were not under a pre-existing order to have to file a class

19  claim motion.  All I am saying is we are now months after the

20  effective date of the plan.  We still don't have a class

21  claim motion on file and the only question is, is Your Honor

22  going to even entertain that now given the facts of the case.

23        I think it is important to note that --

24        THE COURT:  Well they had no obligation to

25  participate in the mediation and they chose not to.

1        MR. SHORE:  Correct.

2        THE COURT:  So are they necessarily bound by that

3   order that required the filing of the 9014 motion?

4        MR. SHORE:  I don't think they're -- to be clear,

5   I don't think they're bound by the order, but it does provide

6   context as to whether or not this court is going to exercise

7   its discretion to allow a class claim not only after the

8   effective date, but after a process was put in place to

9   handle class proofs of claim and mediation which they did not

10  participate in.

11       So this is not a case in which they are unaware of

12  the issue of the need to file a class proof of claim motion.

13  They have just, for whatever strategic purpose, taken

14  themselves out of that and are purporting to reserve the

15  right now at some future date to file a class claim motion.

16       So as I said, the claims themselves are not

17  compliant with the bar date order or the bankruptcy rules.

18  So, as I said, the only issues --

19       THE COURT:  What in the bankruptcy rules requires

20  that there be a class certification before you file a class

21  proof of claim?

22       MR. SHORE:  Its not -- it doesn't require it.

23  What it says is it needs to be filed by an authorized

24  representative.  Your Honor said in Kaiser, a very early case

25  here, that the question of authorization can come after the

1   proof of claim is on file and there are many other cases. As

2   I said the weight of the current case law is authorization

3   should be sought before the bar date order or as soon

4   thereafter as practicable so that parties can order their

5   affairs going forward.

6              So, as I said, it is not (indiscernible) because

7   they still don't have a motion on file.  So the only issue is

8   whether it should be with prejudice or with a tight

9   restriction on when they are going to be filing their class

10  proof of claim motion with the debtors reserving all rights

11  as to both the legality of filing a class proof of claim

12  after the bar date has passed, or authorization after the bar

13  date has passed, or the substantive defenses as to why the

14  court should not exercise its jurisdiction or its discretion

15  either to apply 7023 in the first instance or to allow a

16  class process.

17             I just think given where we --

18             THE COURT:  Well I am not aware of any case, even

19  the cases you cite on this point, that say that there is an

20  absolute deadline by which a certification has to be filed.

21  The courts, instead, consider it as a factor in, as you say,

22  exercising their discretion to determine whether they should

23  be allowed to proceed as a class.

24             So isn't that the better rule here?

25             MR. SHORE:  Whether or not it's a -- I think there

1  are some cases outside the district which have come down very

2  hard on even filing a motion after the bar date order.  We

3  don't need to deal with that.  As I said, we don't

4  necessarily need to get into disputes.

5          We have an objection to the class claim motion.

6  It is being heard today.  There is still not on file a class

7  certification motion.

8          THE COURT:  I know.

9          MR. SHORE:  Now why they have chosen to do that

10 and why they reserve the right to do that at some later date

11 I think, in fairness, we have an objection up today.  On its

12 face the proof of claim is not signed by an authorized

13 representative of the group.

14          What you did in Kaiser was say, well, okay, now we

15 have the motion and we will deal with that in due course

16 (indiscernible).  What they're proposing is not only are they

17 not going to file it by the date the objection is being

18 heard, they're reserving to file this motion which is being

19 heard today on this subject.  We don't have even a motion on

20 file which would purport to give them (indiscernible) to sign

21 the proof of claim.

22          That is where we are right now.  So I think, in

23 fairness to the debtors, it should just be done with

24 prejudice at this point, but if the court is inclined to not

25 only allow them to skirt the responsibilities under the rules

1  to obtain authorization through the filing of a motion, but

2  not even do so before the motion is being heard.  I just

3  think that is the proper way to address this claim at this

4  point.

5           All I was saying is if Your Honor is inclined to

6  let them out of those strategic decisions there has to be a

7  short fuse on when they are going to be filing this motion.

8  We just can't have this hanging out there for more months or

9  years or whenever they get around to filing their class

10 claim, then we will respond in due course.

11          THE COURT:  Well let me address this. I don't need

12 to hear from the claimants.

13          I think that there are no -- as you acknowledged

14 there are no rules or cases that set any specific deadline

15 for the filing of a certification of a class, but rather it

16 is a factor -- the timing of the filing of the motion is a

17 factor that the court does take into consideration in

18 determining in its discretion whether to allow a class proof

19 of claim.

20          So I am going to overrule your request that I

21 disallow those claims with prejudice.  And I will set a

22 deadline, but I think that I want to hear from the parties on

23 that deadline after we resolve some of these other issues

24 because the timing of how we proceed after today has a lot of

25 moving parts in it.  But I appreciate it is something that

1  all the courts consider and I will hear that at the time,

2  presumably, that I hear a motion for class certification.  I

3  will not prejudge any of those issues.

4        I think that that might involve some additional

5  argument and facts regarding where we found ourselves in this

6  case with respect to these claimants particularly.

7        MR. SHORE:  Your Honor, I hear you.  Let me just

8  state for the record I am not aware of any case in which a

9  class certification was permitted after the objection was

10  heard on whether or not they were represented or authorized

11  representatives. I just -- I haven't seen that procedural

12  setting. I would have thought that they would have to have

13  their motion on file by today, at least, to do that, but I

14  hear Your Honor. I am not going to argue that point.

15        Alright, let's get to the individual claims then

16  or outside the 30 that were scheduled or litigated.  In our

17  view all are deficient pursuant to the express terms of the

18  bar date order.  I think were largely in agreement with the

19  claimants as to the disallowance of the amended and

20  superseded claims on schedule one and the duplicate claims on

21  schedule two of both of the non-substantive objections.  If I

22  am wrong about that I will address that issue. I think the

23  only issue is with respect to whether the court expunges the

24  claims versus disallowed.

25        THE COURT:  Well I will just make a comment on

1  that because I don't -- when I can catch it I don't normally

2  expunge claims because my understanding of expunge is as if

3  it never happened.  Well that is not what is going on here. I

4  am disallowing the claims not expunging them.  So if the form

5  of order excises the expunged language I'm fine with that.

6          MR. SHORE:  So let's go to the big substantive

7  issue here which is the group claims.  Look, there are two

8  ways of saying the same thing; one is a proof of claim that

9  is filed on behalf of a bunch of people and another is a

10 group of claims -- proofs of claim that are filed alleging a

11 group of causes of action.

12         I think what we have here is the same, right.  We

13 have two group claims that were filed that provide almost no

14 detail with respect to the individualized claims of the

15 members of the filing group.  Paragraph 11(e) of the bar date

16 order is explicit with respect to the need to provide

17 supporting documentation with respect to the claims.  Those

18 group proofs of claim fail.

19         The groups then kind of fall apart.  The first

20 thing is a large number, all but 33 of those group claimants,

21 have sought to effectively seek leave to amend the claims by

22 either filing declarations now or pointing to declarations

23 that were filed at various places around the dockets of the

24 case.

25         Now, to be clear, 33, by our count, and if I'm

1  wrong because we didn't pick one up that was filed somewhere

2  in the case, 33 of the claimants do not even seek to provide

3  declarations to set forth what the substance of their claim

4  is.  Essentially, they have not sought leave by providing the

5  court a proffer of what they would do if they were given the

6  opportunity to amend.  That information is, obviously,

7  important.  It's not just a make weight requirement in the

8  bar date order.

9          First, we need to identify who was a Hertz

10  customer and who wasn't.  And, in fact, looking at some of

11  the declarations it's clear that people who are asserting

12  claims were not the original renter of the vehicle.

13          Two, to identify what the nature of the claim is,

14  which is going to be important when the court has to address

15  the issue of its jurisdiction to deal with the substance of

16  the claims.  We do need an articulation as to the specific

17  type of claim that is being asserted and some of the

18  declarations do, do that.

19          Then, for us, it's important to be able to bring

20  defenses to the floor.  For example, the statute of

21  limitations on some of the claims that are alleged and some

22  of the declarations are as short as one year from the injury.

23  So that is important information.

24          THE COURT:  Well I agree with you and I will

25  shortcut you without -- and I think that the claimants

1 themselves concede that additional detail is required.  I

2 think they took issue with the fact that you sought to

3 disallow them without giving them leave to amend.

4        MR. SHORE:  Well I am going to break-off a group

5 of that, right.  First of all, I think of the 33 who didn't

6 file -- who haven't even proffered what their claims are now

7 I think those are substantively different then the parties

8 who have either filed declarations in connection with this

9 motion or have noted declarations that were filed elsewhere.

10 I will come to kind of how I propose moving forward with

11 respect to that.

12        Also, 29 of the claims are late.  They were filed

13 --

14        THE COURT:  That is a different --

15        MR. SHORE:  -- at about the confirmation hearing.

16        THE COURT:  That is a different issue.  Let's

17 leave it to the sufficiency of the facts alleged and the

18 right to amend to cure that.

19        MR. SHORE:  Right.  I am going to come back to how

20 we deal with the amendment in a second.  I think that the 29

21 are -- should be with prejudice at this point.  They have had

22 an opportunity to seek leave under Rule 9006 and at least do

23 with respect to the late nature of their claims.  Again, we

24 are on the objection deadline and we don't have a -- or the

25 objection hearing, and we don't have any motions for leave to

1    file a late claim.

2            THE COURT:  Again, let's not deal with the late

3    claims now.  Let's deal with the issue on claim detail of

4    those that don't fit into the late category.

5            MR. SHORE:  Okay.  I will cut to the -- this is

6    what I think we can get done today and where we should go,

7    then I want to go back and address the issue that they are

8    known claimants and so the bar date requirements don't apply

9    to them at all.  So let me just talk about how we can go

10   through them.

11           I think -- leave aside the 30 scheduled or

12   litigation claims. I think the 33 parties who have not

13   provided declarations or if we missed one or two, they should

14   be dismissed with prejudice at this point.  They have been

15   given their opportunity.  This is the claim objection hearing

16   and that was -- at the very least they had to proffer what

17   they want to put in their amended claim.

18           I think everyone else files a Rule 9006 motion by

19   some deadline, and we can talk about that.  They attach a

20   revised individualized proof of claim, they attach the

21   declaration or whatever additional detail they want to

22   provide with respect to their claim that identifies the

23   salient facts around their purported claim and to address

24   this issue of a known claimant provided individualized

25   description of how the debtors were put on notice of their

1  claim.  I will, as I said, come back to that because that is

2  how I think we're going to have to deal with the known

3  creditor issue at this point.

4        Then I think the 29 who haven't filed their late

5  claims can do that, but I think they got an additional hurdle

6  to cross at that point with respect to why they didn't seek -

7  - why they didn't file before the bar date or they haven't

8  sought leave to file since they --

9        THE COURT:  Late is different.

10       MR. SHORE:  So let's just address the known

11  creditor claim and how I got to where I got in the suggestion

12  as to how we go forward.  The issue from my perspective is an

13  issue of law and the disagreement between the parties is the

14  distinction between what constitutes a known creditor and

15  what constitutes an angry customer or -- I mean -- you know,

16  a protesting customer. I think that those two concepts are

17  different.

18       Judge Carey -- we cited the New Century bankruptcy

19  case where Judge Carey cites back to his decision in White v.

20  New Century which was a case where an individual couple

21  brought an adversary proceeding against the debtors, the

22  debtors move to dismiss certain claims as being asserted in

23  violation of the bar date order.  Judge Carey goes into the

24  distinction between customers and known creditors.  And even

25  in a case in which a debtor knows that certain of its

1 customers are, in fact, litigation prep.

2         Ultimately, he ruled at the pleading stage on,

3 essentially, where we are today which is the mere fact that

4 you are a customer does not mean that you are a known

5 creditor.  You must put the debtor on notice of your

6 litigation claim.  So in that case there were 500, I think,

7 prepetition lawsuits that had been brought.  And in this case

8 we scheduled those claimants who provided us with notice of

9 potential litigation claims to be asserted against the

10 debtor.

11         Having gone through the declarations myself and

12 having the team comb them even more closely almost no

13 instances in which -- there are, obviously, many instances in

14 which a customer called up and complained about the

15 treatment, but very few, if any, instances in which the

16 creditor -- the customer put Hertz on notice of its

17 litigation claims.  That is they asserted that there would be

18 an action brought against Hertz.

19         That is why I say when we get to these claims, the

20 group claims which have to be both individualized and

21 substantiated there needs to be a description of the notice

22 that they gave the debtors of any potential future

23 litigation.  That will, I think, especially with respect to

24 the 29 late claims, allow the court to make a final

25 determination with respect to whether or not they were known

1  creditors. It is not enough to say that you knew you had a

2  lot of customers who were suing and, therefore, Hertz had to

3  send out notices to all of its customers.

4         I think, you know, that rule which we are required

5  not just sending out individualized notice, but scheduling

6  anybody who might have a potential claim.  There needs to be

7  a notice element coming towards the debtors which allows for

8  the assertion of known creditors.

9         THE COURT:  Let me -- I'm sorry to interrupt.  Are

10  you done on the known creditor that your solution to this is

11  to require that they give evidence as part of the declaration

12  they file in support of their proof of claim --

13         MR. SHORE:  Correct.

14         THE COURT:  -- is what evidence that they were

15  known to the debtor.

16         MR. SHORE:  Correct.

17         THE COURT:  Okay. I understand.

18         MR. SHORE:  Then we have a record -- look, from

19  our perspective the bar date order required that we be where

20  we are at the end of the process as of the bar date.  We're

21  not there, but once we get that that is going to allow the

22  court to address the jurisdictional issue, the known creditor

23  issue, issues with respect to excusable neglect, but it's

24  going to be not based upon what the claimants want here which

25  is, Your Honor, look at this declaration that was filed over

1  here, filed over here, filed over here, filed over here, that

2  is brought in a group claim.

3      Among other things, if Your Honor were to disallow

4  one claim within the group claim then we can't even fit the

5  claims register with respect to that.  So I think what we

6  need to get to is outside the 30 we need a process for

7  dealing with the class proof of claim, class proofs of claim

8  and we need a process by which we're going to get to

9  individualized proofs of claim laying out what I said and

10 then we can start the process, the next step in the process

11 which is a determination from Your Honor as to what of the

12 substance you can and cannot address in light of the nature

13 of the claims that are being asserted.

14      THE COURT:  Well, one issue I want to press back

15 on you with is you cited to Judge Carey's decision in New

16 Century and you say it was at a preliminary stage, but he, in

17 fact, had testimony from New Century, itself, regarding the

18 total number of loans, for example; the total number of

19 complaints of which they were aware.  And I think that the

20 claimants here are seeking to assert an analogy to that,

21 that, in fact, that the debtor is aware of a substantial

22 number of complaints on a specific issue, should it not have

23 known there were others who had that same issue.

24      What is your response to that?

25      MR. SHORE:  That's right.  There are two New

1  <u>Century</u> decisions.  One is the one you're referring to, which

2  is the evidentiary hearing.  The other, which he cites back

3  to, was the original decision bought on Rule 7012, dismissing

4  at the pleadings stage, the claim that the couple, the

5  Whites, the were known creditors, subject only to a showing

6  that the constructive notice that was provided was not

7  sufficient.

8          So, Judge Carey, in that decision, the earlier

9  one, which is, I think, captioned <u>White v New Century</u>, what

10  was done at the pleading stage, because otherwise, what ends

11  up happening is anybody who claims known creditor status gets

12  to, you know, comb through all of the debtors' books to see

13  whether -- because, quite frankly, it would always be, you

14  know, one piece of paper that exists somewhere which says

15  someone's name and the debtor would have to tear apart all of

16  the records in a -- I guess it wouldn't be a 2004; it would

17  still be a (audio interference) exam -- go through, you know,

18  books and records to prove a negative.

19          I think that the issue that gets addressed by

20  Judge Carey, ultimately, is one of notice going back to the

21  debtors.  And then the claimants are there the best position,

22  quite frankly, and the cheapest position to come forward with

23  their evidence that they put the debtors on notice versus --

24          THE COURT:  I understand.  If they actually did.

25  They're asserting that even if they did not, the debtor

1  should have known that there were lots of other problems out

2  there.

3          And on your distinction between the two opinions,

4  one was, yes, at the pleading stage because it was an

5  adversary and a motion to dismiss was filed.  There's not

6  really, is there, a similar process at this stage?

7          I guess nonsubstantive objection is the closest we

8  get to that.

9          MR. SHORE:  Look, as I said, we're at the

10 objection (indiscernible), right.  The evidence should have

11 been here from the other side that they put the debtors on

12 notice, not that the debtors might have in their file, an

13 indication that this one particular customer, who has not

14 asserted a legal claim, might assert a legal claim in the

15 future and, therefore, we need to not just provide them

16 individualized notice, but schedule it.

17          I think that rule, which they're espousing is the

18 one that's unworkable in the context of a claims objection

19 process, because every time a debtor sought to enforce a bar

20 date order, they would have to go through the process of

21 proving the negative to not a known creditor, and I think,

22 you know, that's where we are now.  This is the time to be

23 dealing with that.

24          And as I said, I think the entry into that world

25 is the actual notice being provided to the debtor, not the

1  assertion by somebody that maybe the debtor could have pieced

2  it together, because I just don't think that's where the case

3  law is, that what the debtor should be doing is putting

4  together, you know, pieces of a jigsaw puzzle and then making

5  its schedules accordingly, among other things.

6          THE COURT:  Right.  I understand.

7          MR. SHORE:  The scheduling requirement comes so

8  early in the case that the idea that a debtor would have to,

9  even a debtor in this situation, who has claims, certain

10  claims -- this is not New Century, where there were 500

11  lawsuits; we're talking about a couple of pre-petition

12  lawsuits that what the debtors should have done as part of

13  their scheduling process is pulled together all of these

14  pieces and put it out.

15          If someone gave us notice, we scheduled them.  If

16  they didn't, we didn't.

17          THE COURT:  Okay.  I understand your argument.

18          All right.  So, those are the three bases.  Let's

19  see, the class certification, group claims, insufficient

20  evidence we dealt with, and late; i.e., the known- versus

21  unknown-creditor issue.

22          Did I get them all?

23          MR. SHORE:  Yes, you did, Your Honor.

24          THE COURT:  All right.

25          MR. SHORE:  And then, obviously, the issue with

1   respect to Schedule 1, you have to do a nonsubstantive writ.

2   I think, since Your Honor isn't going to expunge, I don't

3   think we have any disagreement, but I may hear differently.

4        THE COURT:  I'll hear from the claimants, then, in

5   response.

6        MR. JACKSON:  Thank you, Your Honor.  Patrick

7   Jackson, from Faegre Drinker Biddle & Reath, on behalf of the

8   False Police Report Claimants.

9        We've got a lot of folks with us today:  Justin

10  Nelson, John Lahad, Taylor Hoogendoorn from the Susman

11  Godfrey firm; they've all been admitted *pro hac vice*.  We

12  also have Albert Ciardi on the line.

13       And we had, you know, kind of not knowing the

14  direction this may be headed, there's a lot of issues, we

15  have kind of whacked up the issues between us.  So, if you'll

16  indulge us in handing off to one another --

17       THE COURT:  That's fine.

18       MR. JACKSON:  -- we'd appreciate that.

19       So, with that, I'll turn it over to Mr. Nelson of

20  the -- to, I shall say a sort of reshuffled opening in light

21  of a lot of the new information that we just heard from

22  Mr. Shore.

23       THE COURT:  Before you hand the ball off to your

24  colleagues, do you want to go in the order that I just

25  articulated:  the class certification issue, the group claim

1  issue, and then the -- oh, I guess, insufficient facts issue,

2  and then the late issue?

3          MR. NELSON:  Your Honor, this is Justin Nelson.

4          Go ahead, Mr. Jackson, please.

5          MR. JACKSON:  Yeah, I was going to say, I think

6  that's right, but Mr. Nelson is sort of our master of

7  ceremonies as far as the task list, so I would kick it to him

8  for that.

9          THE COURT:  All right.  Thank you.

10         MR. NELSON:  Your Honor, we would agree, though,

11 with one addition, which is we believe for all of the

12 objections on the 22nd there, is a threshold issue regarding

13 Rule 3007(d)(6), which we raised in our responses and they

14 did not even mention in their reply and we think that is a

15 separate legal basis for denying, in full, every single

16 objection that they raised in the 22nd.

17         THE COURT:  Remind me what your argument is on

18 that point.

19         MR. NELSON:  Yes, Your Honor.

20         May I share my screen?  Actually, it might be

21 easier to show the text of the rule and what it is.

22         THE COURT:  Yes, so I don't have to pull up my

23 Code.

24         MR. NELSON:  Thank you, Your Honor.

25         THE COURT:  I do that in here.

1          (Pause)

2          MR. NELSON:  So, I'm going to skip, Your Honor.

3     We tried to break this up in terms of the issues, but let me

4     skip exactly, directly to the 3007 issue that we have here.

5     And so, the ordinary rule to object, Your Honor, is for a

6     proof of claim is on 3007(1)(b)(6), Local Rule, which states,

7     and we've highlighted it and bolded it that any objection

8     under this subsection must be supported by an affidavit or a

9     declaration that states that affiant or declarant has

10    reviewed the claim and all supporting information and

11    documentation provided therewith, made reasonable efforts to

12    research the claim on the debtors' books and records, and

13    believes such documentation does 23409 provide *prima facie*

14    evidence of the validity and amount of claim.

15          They did not do this here.  They, instead, moved

16    on Rule 3007(d)(6).  This is from their brief, which is the

17    relevant text of the rule, at least in part, which says that

18    one of the grounds for an objection is that the claims were,

19    quote, presented in a form that does not comply with the

20    applicable rules and the objector is unable to determine the

21    validity of the claim, because of the noncompliance.

22          There is actually an important part missing from

23    the ellipse, which I'll get to in a second.

24          But the point here is that it's not enough, simply

25    under Rule 3007(d)(6) to say that they were presented in a

1  form that does not comply with the applicable rules.  The

2  debtor has to then affirmatively state that it is unable to

3  determine the validity of the claim because of the

4  noncompliance.

5          Here, what they say, and this is the next

6  sentence, which is really the only part of this argument,

7  this paragraph, which is they filed improper group claims

8  that have failed to state any facts or attach any

9  documentation and that, therefore, the False Police Report

10  Claimants failed to give the debtors proper notice of the

11  claims against them.

12          That is, at heart, an issue of fact, which is one

13  of the reasons why we raised the issues of fact we did in our

14  briefs.  It then goes on in that same paragraph to say that

15  this is their main point, which is the claimants cannot meet

16  their burden of demonstrating they have complied with the

17  Bankruptcy Code, the Rules, the bar date order, et cetera.

18          But that is not sufficient under the plain text of

19  the rule; that is just everything before the "and."  So, if

20  we go back to what Rule 3007(d)(6) actually requires, it's

21  they were presented in the form that does not comply with the

22  applicable rules.

23          To be clear, and as Mr. Jackson and Mr. Ciardi

24  will address later, should Your Honor want to hear it, we

25  agree, we believe that it did actually comply with the

1  applicable rules, but regardless, there's still the "and"

2  that the --

3          THE COURT:  All right.  I'm going to overrule you

4  on this.  I think that a form does have to have a certain

5  amount of information to support its claim and that there are

6  some claims that do not comply or provide any evidence.

7          MR. NELSON:  Right.

8          THE COURT:  But to talk about the sufficiency of

9  the claims anyway --

10         MR. NELSON:  Yes, Your Honor?

11         THE COURT:  -- do you object to providing the

12  information that counsel for the debtors suggested they

13  attach by declaration and, specifically, file individual

14  proofs of claim and detail, with respect to the claims,

15  giving the salient facts and the details as to why where a

16  known claim, including date of arrest, et cetera, in order to

17  permit or apprise the debtor of the facts relevant to that

18  claim, to which they may have a valid objection.

19         MR. NELSON:  Thank you, Your Honor.

20         And Mr. Jackson and Mr. Lahad will be speaking in

21  part on both of those, but the short answer, Your Honor, is,

22  we embrace an efficient process.  We believe, in fact, that

23  the debtor already has notice of these.  The only thing

24  that -- so, we're happy to give more information.

25         But, specifically, on the known-claimants issue,

1 we do have a dispute about that.  That they were effectively,

2 as Mr. Lahad will address, seeking to shift the burden on

3 this.

4         And from our understanding, regardless, I think

5 that only applies to the so-called Group 3 Claimants.  For

6 the first time today, we heard that evidently, there's about

7 a hundred that they're really not objecting to, to go

8 forward, so that leaves the so-called Group 3 Claimants and

9 the ones without the declaration.

10        But for the issue on the sufficiency of the proof

11 of claim, if it's okay with Your Honor, I'll turn that back

12 over to Mr. Jackson.

13        THE COURT:  All right.  Thank you.

14        MR. JACKSON:  Thank you, Your Honor.

15        And I had broader remarks, but I will truncate

16 them in light of --

17        THE COURT:  Good.

18        MR. JACKSON:  -- Your Honor's preliminary ruling.

19        Again, just for the record, we don't agree that

20 any of the proofs of claim are lacking and, you know, 3001(a)

21 of the Bankruptcy Rules is the pleading standard, such as it

22 is for proofs of claim.  They are, you know, notwithstanding

23 any analogies that one might draw to a proof of claim and a

24 complaint, notwithstanding Twombly and Iqbal and the like, it

25 just doesn't apply.

1          THE COURT:  I --

2          MR. JACKSON:  Rule 8 does not apply to proofs of

3   claim.  So, 3001 requires substantial (audio interference) --

4          THE COURT:  I agree with you on all of that and I

5   agree that the filing of the proof of claim before an

6   objection is *prima facie* valid, but we have an objection and

7   from the perspective of where we are at this point, cognizant

8   of the fact that there may be other substantive objections to

9   these claims based on facts that are within the, perhaps,

10  sole custody of the creditors -- I won't prejudge whether or

11  not those creditors gave notice to the debtor of them -- but

12  on the assumption that many of these have, and readily have

13  the facts available, as demonstrated by your almost thousand

14  pages of evidence so far, I don't know why we can't work out

15  an efficient process with respect to each claim.

16         MR. JACKSON:  Well, I agree, I think we can, and I

17  mean, we are where we are, as Judge Shannon would say.

18         The most efficient way to -- it sounds like what

19  the debtors want is complaints, pretrial motion practice, the

20  like.  I mean, I think this was before my time.  I think we

21  tried that and the debtors said, no, we don't want to go to

22  another court; we want to go here and deal with it through

23  the claims reconciliation process.

24         So, I understand, and we said, we certainly can

25  provide more information with respect to, and I suppose if

1  it's important, although Mr. Ciardi would be prepared to

2  address the group, first, and then an individual issue if

3  it's important, to have multiple versions of the claim that

4  attaches similar addendum as opposed to a Group 1 that has

5  been supplemented with more information.  We can work with

6  that.

7          THE COURT:  Well --

8          MR. JACKSON:  But I guess my question is --

9          THE COURT:  -- I will deal with him about that or

10  maybe you're the one to address about this.

11          I am not contemplating that each individual proof

12  of claim will attach all these other evidence, but only a

13  declaration by the claimant, explaining the details of what

14  happened to that individual, you know:  I rented the car on X

15  date; I was arrested on Y date; or I extended the contract, I

16  was arrested, et cetera, specific to that individual

17  creditor.

18          MR. JACKSON:  Right.

19          THE COURT:  We're not at the trial stage where all

20  this other evidence regarding the -- many of the other --

21  much of the other evidence is included in the declarations

22  and documents already filed.  But I think it would be

23  helpful, and I agree from the perspective of allowance of

24  claims.

25          While there is no prohibition of a group claim, I

1  agree that it would be most efficient to have individual

2  claims so that each individual claim can be addressed

3  individually.

4          MR. JACKSON:  Yeah.  I guess we hear you and I

5  think the concern we have is there is certainly more

6  information.  I think, first, let's take the folks who didn't

7  file declarations.  I believe that there's more information

8  that can be provided to those claims.

9          I suppose two questions and concerns that we have

10 is, one, we can only put in that declaration what we know.

11 There hasn't been discovery.  There were efforts to obtain

12 discovery well before I was involved; they've been shut down.

13 There were efforts to obtain discovery in connection with

14 these objections, which were functionally shut down by the

15 pendency of the motion to quash.

16         THE COURT:  Well, I agree with you and I will deal

17 with discovery at the end of this, but I think with respect

18 to the facts that I'm suggesting should be in the declaration

19 attached to -- I'm not suggesting that you're attaching all

20 the evidence, but you may have to support your claim.  But

21 the bare-bone facts of that claim could assist the Court,

22 certainly, but it may assist the debtor in determining

23 whether or not they can see that that is a valid claim.

24         MR. NELSON:  And, Your Honor, may --

25         THE COURT:  Mr. Nelson, go ahead.

1        MR. NELSON:  May I intervene here?

2        Most of that, for the declarations, the debtor has

3   that for most of them.  We embrace, again, for those where

4   they don't have enough information, we will provide that

5   information.  We can talk about when that is, but in some

6   defined set of frame, relatively quickly, we will do that,

7   Your Honor.

8        THE COURT:  Yeah, I'll be setting a deadline by

9   which that should be done for each of the creditors.

10        So, I think that we don't really have any

11   remaining dispute on the insufficient facts if the parties

12   are in agreement.

13        MR. NELSON:  Your Honor, just one other point of

14   clarification, and I am trying to kind of read the tea leaves

15   of Mr. Shore's opening.  It seems like he was suggesting that

16   after this supplementation round, if you will, then putting

17   aside the, for the motion to leave issue, but just on the

18   folks who were filed by the bar date and that you ruled

19   should provide some more information, it seems like he was

20   suggesting that there could be another hearing like this,

21   another sort of preliminary round where they say, okay, now

22   we've got more information, now we're going to see another

23   preliminary procedural objection along the lines of, you

24   know, a failure to state a claim, kind of a Rule 12(b)(6)

25   sort of thing.

1          Just to be clear, if that's what -- we want to

2   know if that's what folks have in mind, because that's not

3   the law.  That's not the standard that applies to proofs of

4   claim and, again, not to argue against your ruling, but just

5   to clarify where we're coming from on this, the Code

6   contemplates if you file a proof of claim, it's deemed

7   allowed until there's an objection.  When there's an

8   objection, 502(b) says the Court determines it.

9          So, that's intentional.  There is no Rule 12,

10  Rule 8; they don't apply in contested matters.  That's

11  purposeful, because the normal process on claim objections

12  is, you file the claim, there's an objection, you have

13  discovery, you have a merits hearing.

14         So, as long as -- I mean, that's the understanding

15  that we supplement with what we have.  We, of course, would

16  need discovery on what we don't, and that does, and Mr. Lahad

17  can address this or I can address this, that does also entail

18  some notice issues that we don't have in our possession.  We

19  might be able to produce what we told Hertz or when we

20  contacted Hertz, but there are also some other issues that we

21  think are seriously in play on notice that have to do with,

22  does Hertz maintain a database, for example.

23         So, there needs to be bilateral discovery --

24         THE COURT:  We're not on that.  We're only on

25  sufficiency of the claim.

1          On that point, I agree with you that objections to

2    claims are not adversary proceedings, but I think they may be

3    converted to adversaries; am I not correct?

4          MR. JACKSON:  I don't think -- they can only be

5    converted if the debtor filed -- I think what you're thinking

6    of, Your Honor, is if the debtor seeks relief, again, in sort

7    of a counterclaim in response to a proof of claim, I think

8    then it gets converted to an adversary proceeding.

9          THE COURT:  All right.

10          MR. JACKSON:  But the filing of the claim, itself,

11    I don't think there's any mechanism to convert it.

12          There would be, you know, under Rule 9014, of

13    course, as we talk about in a class claim context, there's an

14    ability of the Court to rule that certain adversary rules

15    would apply to a given contested matter, but I think that

16    would be the only mechanism to sort of arrive at any kind of,

17    you know, the second preliminary stage, and we don't think

18    that should happen.  I mean, that would just drag things out

19    further.

20          We think once we come with what we have, we've

21    more than satisfied what --

22          THE COURT:  I understand.

23          MR. JACKSON:  -- the proof of claim

24    (indiscernible) requires.

25          THE COURT:  But just so it's clear, are you

1  suggesting that once that is done, that this be transferred

2  to the District Court to handle, because the District Court

3  is not going to do that simply because they're not PI claims.

4  They're going to leave it with me to do, quote, all

5  preliminary matters.

6          MR. JACKSON:  Yeah.

7          THE COURT:  Where do you think --

8          MR. JACKSON:  Well, I think that becomes --

9          THE COURT:  Where do you think we go from here?

10          MR. JACKSON:  Well, I -- let me put it this way.

11  If there's a -- and I'm just spitballing here -- but let's

12  say more information comes out and the debtor, in good faith,

13  believes that on a given claim, they actually have an

14  absolute defense based upon a statute of limitation.  So,

15  there is a literally purely legal defense.

16          I think an objection based on that would be the

17  sort of thing that wouldn't constitute a determination of the

18  merits that would run afoul of Your Honor's jurisdictional

19  limitation, I would envision.  Again, if there is such a

20  defense -- now, I think the question is, are there going to

21  be any such defenses?

22          We don't think there are.  Really, all of the --

23  everything that's come out so far we think is so completely

24  bound up in the facts -- let me think of another example,

25  though.  Perhaps notice, perhaps known versus unknown

1  creditors, if that's relevant to the final determination of

2  the given claim, that's not a determination of the merits of

3  the claim.  Maybe that's something, you know -- and we were

4  never saying that Your Honor can't touch any evidence and

5  Your Honor can't rule on anything.  I think that was a

6  mischaracterization by Mr. Shore as far as like trying to get

7  us talking out of both sides of our mouth.

8          We were just simply saying because the Code says

9  that there's a point, there's a determination of a personal

10  injury claim.  Whatever that means in the statute, that's

11  what you can't do.

12          And we don't want to end up in a situation where

13  we are so far down the road having to parse through, like,

14  what constitutes a determination of a personal injury claim

15  versus what constitutes not.  We're all about efficiency; we

16  want to do this the right way.

17          But, you know, as Your Honor knows, this is very

18  theoretical.  This doesn't often happen.  So, you know, the

19  possibility of coordinating with the District Court and kind

20  of being the magistrate for the District Court up until the

21  moment of trial, I mean, that's something that, in theory, is

22  there, but I, personally, have never seen it happen.  So, we

23  are kind of wandering a dark (indiscernible) lane here, to

24  some extent and we hear you --

25          THE COURT:  But, unfortunately, I --

1          MR. JACKSON:  We're not trying to --

2          THE COURT:  Unfortunately, I (indiscernible) on

3   claims --

4          MR. NELSON:  And, Judge Walrath, if I may just add

5   to that to emphasize, again, we embrace an efficient process.

6   We agree with Your Honor that to handle these preliminary

7   matters, it is with Your Honor.  We think that there are

8   jurisdictional issues, including -- and I know it's preserved

9   and Your Honor might have a leaning of where they go

10  afterwards -- but for now, we embrace the efficiency of being

11  in this court to go to the next step and we can address that

12  after we get through all the hearings.  I just want to

13  emphasize that, Your Honor.

14         THE COURT:  All right.  Well, I think we've got

15  agreement that the creditors will file amend claims, and I

16  will allow them to file an individual amended claim for each

17  individual on the list that was attached to the group claims,

18  and that they should submit a declaration that gives the

19  specifics of that claim, and I think articulated that I'll

20  leave it to a creditor to, you know, specify additional

21  detail they think may be necessary.

22         MR. NELSON:  Your Honor, if I may?

23         I'm sorry to interrupt, but just so we're on the

24  same page here so that we know what we are supposed to

25  provide, again, we think that for many of them they're

1 already in the declarations, but what I heard Your Honor say

2 was the date of the arrest, the circumstances surrounding the

3 arrest, the details along those lines.  And I just want to

4 make sure that we are covering the waterfront for what Your

5 Honor is looking for in any amendment.

6          If I'm missing anything, please let me know

7 because I want to make sure that we have that information in

8 our possession and that we're providing it.  And, again,

9 we're wanting to work with the debtors if we have more

10 information here to let them know.  We think some of it,

11 again, is in the debtors' possession, as well.

12          THE COURT:  Well, I think, obviously, a statement

13 of the damages.  I think many of the declarations that you've

14 already filed contain the facts sufficient, you know,

15 supportive of your claims.  So, I think you -- just break

16 them out, per proof of claim.

17          MR. NELSON:  Thank you, Your Honor.

18          THE COURT:  Now, the Group 1 claims that, you

19 know, refer to the complaints, the complaint has the facts,

20 so that's the type of attachment that would support your

21 claim and you're fully aware of what you need to do on that.

22          MR. SHORE:  Your Honor, I just don't want to let

23 this slip through the cracks.  Some of these group claims,

24 the last group, were late claims and I think those have to be

25 dealt with separately --

1          THE COURT:  Separately.

2          MR. SHORE:  We need a deadline for when they're

3    going to file a Rule 9006 motion and that will set forth a

4    separate issue with respect to those late claims.

5          THE COURT:  Yeah, but the late claims, but I was

6    trying to focus on the insufficient-fact claims that we can

7    all agree on, and I think we have a framework for how they

8    can all be dealt with.

9          I think on the late claims, there are two issues.

10   One is the known versus unknown.  But the other is excusable

11   neglect, and that was raised.  And I agree that a motion on

12   the excusable neglect would be a process to deal with that.

13         But I have some concern about the known versus

14   unknown, whether I can rule today on what is before me today,

15   because I think it would require evidence on, really, the

16   Chemetron standard of what was known or reasonably could have

17   been known to the debtor.  And I know that the claimants have

18   raised that latter point particularly.

19         MR. SHORE:  Yeah, Your Honor, if I may be heard?

20         I think that goes just to the 29 claims.  What I

21   was envisioning is they get a motion on file and it's going

22   to frame the issue of excusable neglect or whether the bar

23   date even applies to them because they were known creditors.

24   Those become separate, contested matters which we can

25   address.

1        My only point was that the declarants who were

2   coming forward with their Rule 9006 motions, put forth

3   whatever facts they have with respect to whether they put the

4   debtors on notice, because that, again, from my perspective,

5   that's the relevant fact and I just don't want to be in a

6   situation where I have to go start taking depositions of

7   these individual claimants, which doesn't do anybody any good

8   if they've got evidence that they put the debtors on notice.

9        THE COURT:  Well, maybe they can be bifurcated,

10  then, to the group of those who did, in fact, give some kind

11  of notice the debtor.  But I think we're still going to have

12  the category of claimants who did not put the debtor on

13  notice of it but want to argue that the debtor was on notice

14  because of others.

15       And I think that the New Century, you know, the

16  Westlaw-cited one, the Court did take evidence on that point.

17  And I think that that is a question that I think might

18  require some discovery.

19       Mr. Jackson, do you want to chime in on where we

20  go on that category.

21       MR. JACKSON:  Well, I just wanted to point out on

22  the New Century point, just for what it's worth, around the

23  same time as the New Century case was going on in front of

24  Judge Carey, there was also another mortgage case, American

25  Home Mortgage, that was going on in front of Judge Sontchi.

1          And I just wanted to note that consistent with

2   your observation about New Century, the issue of -- this

3   almost identical issue came up in this case and it was raised

4   at the confirmation hearing, actually, and it was the

5   argument for the borrowers who -- borrower-claimants was

6   that, you know, they -- the whole process was, you know,

7   problematic, because there had been a failure of notice of

8   the commencement of the case and of the bar date and the

9   like.

10          So, really, all the same issues came up in AHM,

11   and there was extensive discovery on it and it was ultimately

12   considered, with evidence, at the confirmation hearing and

13   Judge Sontchi ended up ruling.  It was a transcript ruling,

14   but I just would point out that, yes, that also came up then

15   and it also was properly disposed of on an evidentiary

16   hearing.  So, we, you know, wholeheartedly agree with you,

17   with your assessment of New Century.

18          MR. NELSON:  And, Your Honor --

19          MR. SHORE:  Your Honor?

20          MR. NELSON:  I'm sorry.  Go ahead, Mr. Shore.

21          MR. SHORE:  What I am envisioning, once we get

22   those 29, then the debtors can do an analysis.  One, did they

23   provide notice and we're just not finding it?

24          They have that in their possession.  And if

25   someone comes forward and says, here's my letter saying, I'm

1  going to sue you, right, then we can resolve whether or not

2  that objection is late or the claim is late or not, right.

3  We may consent to allow that one in.

4          By the same token, we'll be able to search our

5  records with regard to the specific names and find out

6  whether those names are in our system.  If they are, we might

7  be able to address it.  If they're not, we might be able to

8  address it.

9          But our evidentiary presentation is going to be

10  driven in the first instance by the filings of the specific

11  motions, with respect to the specific claimants who want

12  leave to file a late claim, and then we can go through and

13  provide, you know, tailor our evidentiary presentation

14  without turning a -- recognize the issue here in respect of a

15  late claimant who is bringing a ten-thousand-dollar claim, a

16  fifty-thousand-dollar claim.  The notion that the debtors are

17  going to spend $300,000 searching their records and turning

18  over things to try and find a notice of that person may not

19  be appropriate under the circumstances.

20          So, when we talk about an efficient process, part

21  of the efficiency of a process is the definition of what the

22  process is.  And I think for those claimants, those are the

23  only claims who have a known-creditor issue.  The other

24  claimants are all, as long as they're filing their

25  amendments, we're going forward.  So, we just need to put

1  some definition on this and then, when they get that, they

2  can serve us with discovery requests and we can talk about

3  what we can do that is not going to break the bank with

4  respect to this.  Maybe we can resolve the claims.  Maybe we

5  can resolve the late-claim issue.  But there needs to be

6  something better than the thousand-page declaration that

7  comes in and says it's all in there.  That's not particularly

8  helpful to us or the Court.

9        THE COURT:  Yeah, I think it's not.

10        Mr. Nelson, do you agree that we can bifurcate the

11  late claims into the two categories, those that did in fact

12  give notice to the debtor that they had a complaint -- and

13  I'll use that with a lower case, not that suit was filed, but

14  that they had a complaint and that there was a problem

15  because of what the false report -- the alleged false police

16  report did to them, et cetera.  And then we can call those

17  out of the category of the creditors who want to proceed on

18  the issue of whether or not the debtor should have known that

19  they in that category had a claim.

20        MR. NELSON:  Your Honor, we do not think that's

21  appropriate for a couple of reasons.  First, when we get into

22  the next steps, what discovery is going to come up, the

23  reasonably-should-have-known comes up as part of what we

24  expect to get back from the discovery we're going to get on

25  the remaining hundred-and-some-odd claims.

1           The reality of it is, the vast majority of the 29

2    -- and, again, it's a small group of what we're talking about

3    now -- did not provide specific notice of litigation, but our

4    argument is intrinsically bound up with the merits of it.

5    We're happy to have the issue be preserved, but it should go

6    on -- again, our guiding light here is efficiency and we

7    should take discovery on that, we should see what it is.

8           And to be clear, our argument, as we presented it

9    in our brief, is that they do know this information, that

10   there's a --

11          THE COURT:  Right.

12          MR. NELSON:  -- for example, a spreadsheet.

13          So we think that's completely tied up into what it

14   is and certainly it's no further burden for Hertz to say --

15   after they get these declarations, if they don't already have

16   them, to say here are our claimants, here's what happened to

17   them, please provide us this information.  We think that

18   should proceed forthwith.

19          THE COURT:  Well, you don't object, though, do

20   you, of including within your declarations providing

21   sufficient facts with respect to all of your claims,

22   identifying if that creditor in fact gave notice of those

23   claims to the debtor.

24          MR. NELSON:  No, Your Honor, we do not object to

25   that for those -- certainly for those -- as I understand it

1  for those 29, we are -- again, we'd embrace doing that,

2  that's not a problem at all.

3       THE COURT:  Right, I'm going to get to the other

4  issue later, but, I mean, at least from that we can get a

5  declaration that at least splits out the two categories.

6       MR. SHORE:  Right.  But they also -- but it's not

7  -- I think what Mr. Nelson is saying, he doesn't even want to

8  file a Rule 9006 motion.  The late claims have to be subject

9  -- again, my view is, if you're coming to a claims objection

10  on the basis that your claim is late, you should probably

11  show up with your motion in hand saying, I want to file late;

12  for whatever reason, they haven't done that.  For whatever

13  reason, Your Honor is amenable to letting them file that at

14  some later date, but they have to get a motion on file to

15  allow the late claim; otherwise, the debtors' objection -- if

16  they're not offering to do that, the debtors' objection with

17  respect to those 29 claims should be granted today.

18       THE COURT:  Mr. Nelson, do you object to filing

19  such a motion?

20       MR. NELSON:  No, we do not object to filing -- and

21  I'll Mr. Lahad talk on the merits of it -- we think that it's

22  -- obviously, there are allowed oral motions on this, but if

23  I can turn it over to Mr. Lahad as well.

24       THE COURT:  Mr. Lahad.

25       MR. LAHAD:  Good morning, Your Honor.  I think the

1  proposal that Mr. Shore has articulated overlooks basically

2  what Hertz knew and Hertz's knowledge was, right?  It's not a

3  one-way street.  We are entitled to know what Hertz knew

4  about these claimants, and Hertz can't shift the burden to

5  these claimants and have some kind of gated discovery

6  sequence --

7          THE COURT:  We're not at the gated discovery;

8  we're not at the discovery.  The only question is,

9  procedurally, are we going to have you file a 9006 motion to

10  file a late claim on the basis of either excusable neglect or

11  you were known creditors and didn't get actual notice.

12          MR. LAHAD:  I don't think that we're opposed to

13  filing that motion.  It would be a much more fulsome motion

14  if we got the discovery that we're seeking from Hertz, so

15  that we can, again, as Mr. Nelson said, make this more

16  efficient.  You know, I think we can show that these

17  claimants were known.  You know, we have case law, the Fogel

18  and the Thompson cases that we cite in our brief, that these

19  claimants surely must have been known to Hertz.  And their

20  argument --

21          THE COURT:  Well, we're going to get into

22  discovery because I think that's a different issue.

23          MR. LAHAD:  And as far as excusable neglect, Your

24  Honor, I think, you know, we can show excusable neglect on

25  this record.  You know, the Pioneer factors all favor

1  excusable neglect --

2          THE COURT:  I'm not going to prejudge your motion.

3  I think we have to tee it up.

4          MR. LAHAD:  And, if that's the approach that Your

5  Honor wishes to do, we can do that.  My bottom line is, it is

6  going to require discovery from Hertz.

7          THE COURT:  With respect to the known versus

8  unknown --

9          MR. LAHAD:  Yes, Your Honor.

10          THE COURT:  -- issue.  Well, do we want to

11  bifurcate those two motions then, Mr. Shore?  And I think you

12  were asking that they be put into the two categories, so two

13  separate motions.

14          MR. SHORE:  Actually, I was -- I don't think

15  that's necessary.  All I was saying is they need to get --

16  the 29 need to get their motions on file by a specific date,

17  if Your Honor is going to grant them leave to file a motion

18  for leave to file a late claim, even though the objection is

19  up today.

20          All I was saying is, if they put in there that

21  they put the debtor on notice and provide details, we can

22  track that down.  If it turns out that they did put the

23  debtor on notice and we just missed it, then we can probably

24  resolve the late claim motion.  For those who -- right?  So

25  maybe it's one, maybe it's two, maybe it's ten, I don't know.

1   Put it in the motion and then we can assess whether or not

2   that actually put us on notice.  And then, if we have

3   remaining issues that are resolved, we're going to work out

4   the discovery with them.

5          We certainly know what their requests are going to

6   be based upon what they've been saying about what they want

7   from us to prove their case that they were known creditors.

8   I don't think that's what was done in Century, but that's a

9   dispute as to a later date when we start talking about what's

10  proportional here.  I don't think that in the context of a

11  late claim motion and asking the debtors to turn over every

12  leaf for this kind of stuff and provide them evidence of

13  other claimants or whatnot, which aren't even subject, it

14  would just --

15         THE COURT:  I understand.

16         MR. SHORE:  -- (indiscernible) I think -- right?

17         THE COURT:  So you know --

18         MR. SHORE:  We'll deal with that -- we'll deal

19  with that now.  I think, for today, what I ask for is at

20  least some understanding of when they're going to get those

21  on file, when we're going to get the amendments to the claims

22  with respect to the other ones, and when we're going to get a

23  class claim motion, and that's going to just pick out a

24  number of discussions that have to be had with claimants with

25  respect to the scheduling of that.

1          And they'd probably have to run on separate tracks

2    because the class claim motion, if we're getting into -- if

3    we're not going to bifurcate it into whether or not you're

4    going to apply 7023 and then, if you are, that's going to

5    require a lot of discovery and the like.  The late claim

6    motions will probably run pretty quickly, and then we have to

7    deal with the jurisdictional issue.

8          I do think we should know -- these claimants,

9    through their counsel, have the right to waive their

10   objection with respect to the Court adjudicating

11   (indiscernible) the claims on the merits and we should

12   probably have an understanding as to when they're going to do

13   that, rather than put Your Honor in the position of not

14   knowing how to proceed.  But, as I said, I think once we get

15   Your Honor's views as to the track you want those things to

16   be proceeding, then we just have to have a lot of

17   discussions, which we can certainly do, to talk about

18   scheduling and discovery and the like.

19          THE COURT:  Mr. Nelson, do you have an opinion on

20   the timing of amended claims, the class certification motion,

21   and the 9006 motions?

22          MR. NELSON:  Yes, Your Honor.  We would -- I mean,

23   we're going to put together some, you know, 2,000-odd claims

24   here, it's going to take -- just from a logistical matter,

25   it's going to take 60 to 90 days, I would say, to do that,

1 and we would propose at the same time, if we do file the

2 class motion, we would do that at the same time and that that

3 would -- that there would be the same date for that.

4        With respect to this known/unknown claimants

5 issue, we have no problem filing a motion, but, to be clear,

6 what is going to be relevant to the decision on that is the

7 discovery that will happen at the same time.  And so we do

8 believe that those should be coordinated and done forthwith.

9        And the last thing I will just say, which is -- I

10 think I said this before, but just to emphasize -- and I

11 think Your Honor understood this, but we -- again, we embrace

12 the efficiency part of it for this Court to keep jurisdiction

13 during the preliminary phase and to wait until much later in

14 the process to decide the jurisdictional issue, which we do

15 believe is live, but we also think at this point it's

16 premature, embracing the efficiency process that we have

17 right now.

18        THE COURT:  Well, on the waiver of objection to

19 the jurisdiction issue, I think that it might be helpful to

20 the Court and the parties if with respect to -- if we all

21 agree that this is a preliminary matter and the Court can

22 enter an order that we all get written consent that you

23 consent to a final order on that point, but that's just a

24 suggestion for going forward.

25        With respect to the 9006, I would like to see you

1    get that motion on file, so that we know who fit -- which of

2    the creditors fit in each category.  And then the discovery,

3    I agree that some discovery of the debtor is relevant to the

4    known-versus-unknown-creditor issue.  So let's talk about

5    that.

6            Mr. Shore, do you have -- I'm not going to allow

7    -- I'll just say right now, though, I'm not going to allow,

8    you know -- or require the debtor to go through extensive

9    discovery on that point if what we're talking about is 29 or

10   less creditors.  But an overview -- to the extent the debtor

11   has a tracking system, to the extent the debtor does have

12   some documents regarding the same numbers that Judge Carey

13   considered, i.e. total number of false police reports filed

14   by the debtor, total number -- excuse me, total number of

15   police reports filed by the debtor and the total number of

16   that category that turned out to be false police reports,

17   because that will allow the Court to, at least in a

18   preliminary stage, determine whether or not additional

19   discovery on that is warranted or whether that in and of

20   itself shows it's a known or an unknown creditor.

21           What do the parties think about that?

22           MR. NELSON:  Thank you, Your Honor.  That works

23   from our perspective.  The one addition, which, again, I

24   think fits within that same category, is that we believe that

25   there may be a list of when the law enforcement agencies then

1  tell Hertz that the person has been arrested.  And so to the

2  extent that that exists as well we think clearly falls within

3  that same category as well.

4         MR. SHORE:  I think, Your Honor, that -- let's

5  just get them to get their 9006 motions on file that lay out

6  what they want to lay out, we'll assess it and we'll look and

7  we'll -- right?  I can't -- until I see how many claims we're

8  talking about, the size of the claims we're talking about,

9  and anything else like that, it's kind of hard to make these

10 determinations.  I would just -- as I said, I don't know

11 whether they want 60, 90 days, whatever, all claims must be

12 filed by February 1.  Class proof of claim motions, all

13 motions to allow late claims of false police report

14 plaintiffs by February 1 is fine with me, and then we're just

15 going to have to talk about a schedule.  And, as I said, I

16 think that the schedules may have to diverge on some of these

17 issues, at least, you know, class claim versus late claim are

18 probably going to be --

19         THE COURT:  Right.

20         MR. SHORE:  -- put on separate tracks.

21         THE COURT:  Well, let's do this.  I think the

22 discovery requested to date that's the subject of the motion

23 to quash does include some of this, so I don't think a

24 separate discovery motion is necessary.  Should I -- well, I

25 would like to order the debtor at this -- well, maybe -- when

1  would the 9006 motion be filed, by February 1 as well?

2         MR. SHORE:  We would potentially -- if it's simply

3  that, we can do that within 30 days, Your Honor, but knowing

4  that there will be discovery with it.  To be clear, though,

5  our position is, from an efficiency standpoint, the discovery

6  can begin in the mean time.  We certainly know the issues, we

7  have pending discovery requests, both that we just issued and

8  also discovery that was issued at the beginning of the case

9  that is still live.

10         So there are issues with respect to both of those

11  that we believe should in the meantime go forward.

12         THE COURT:  Well, I'm going to do this.  I think

13  the 9006 motion should be filed so we know who's in which

14  category.

15         MR. SHORE:  Yeah.  And just to remind you --

16         THE COURT:  And if it's filed in 30 days, then we

17  can address what discovery should proceed.

18         Mr. Shore, I'm sorry, I keep interrupting you.

19         MR. SHORE:  No, no, I'm sorry.  I was speaking

20  while you were speaking.  That's what the scheduling order

21  contemplated, right?  That we resolve what we could get

22  resolved today, then the parties are going to sit down and

23  converse.

24         And I agree, I think let's just get -- get the

25  identified universe of people who are coming forward

1  asserting late claims by 30 days, that's fine, I don't --

2  December 4th, that's fine with me, but then we have our known

3  universe and we can address it.  You know, part of any

4  debtor's claims resolution process is dealing with the

5  individual claims and see if we can't come to an

6  accommodation with respect to them.  We don't need to turn

7  this into a giant fight over something which it may not be, I

8  don't know.

9           So, once we get that and if we can get the class

10  proof of claim motion on file by December 4th, great.

11           THE COURT:  Well, I would like to address the 9006

12  motion promptly, so I think December 4 on that.  And then I

13  would like to have a status conference, written -- a

14  continued hearing on the discovery requests to see if those

15  or any discovery should proceed on the known-versus-unknown-

16  creditor issue that is raised by that motion.

17           MR. NELSON:  Thank you, Your Honor.  And I did see

18  that Mr. Jackson had his hand up, but I did have one

19  clarifying question.  That is obviously for a subset of the

20  overall group.  Certainly, for ones where there is a

21  declaration, we would suggest that the debtors do provide the

22  information they have in their possession regarding the

23  information they have, the call records, what they have, and

24  so we can at least get that process started as well.  There

25  really isn't a reason to wait for all hundred-and-some-odd

 1  claims for the resolution and discovery of the known/unknown

 2  issue.

 3           THE COURT:  Well, but you're asking for -- well --

 4           MR. SHORE:  May I be heard, Your Honor?

 5           THE COURT:  Yes.

 6           MR. SHORE:  I think the issue is that where we are

 7  today is it seems like Your Honor is saying the current

 8  claims are deficient, they need to be amended.  They should

 9  get their amendments on file, it sounded like they wanted 60

10  to 90 days to do that.  I don't -- whenever they get the

11  amendments to us, then we can have a discussion on an

12  individualized basis with respect to claims and addressing,

13  you know, discovery with respect to them and everything else.

14  But I think the starting point of the claims allowance

15  process is getting a proper proof of claim on file.

16           MR. NELSON:  I see Mr. Jackson has his hand up, so

17  --

18           THE COURT:  Mr. Jackson, go ahead.  Sorry.

19           MR. JACKSON:  Thank you, Your Honor.  I was --

20  what I had been kind of raising and lowering my hand about

21  was similar to Mr. Nelson's suggestion.  I think -- what I

22  was going to ask for clarification on is -- so I understand

23  there's a 9006 motion that's going to be forthcoming, our

24  cards are on the table as far as what the motion is going to

25  say.  So what I was going to suggest is I think it would

1   really -- it elevates form over substance to say, well, file

2   the motion and then, if there's an objection, then we've got

3   a contested matter and then we've got discovery.

4           Regardless of whether any individual claimant

5   provides facts in their declaration that says here's when I

6   notified Hertz, all of the claimants are going to have as a

7   secondary -- well, some of them as a primary argument if they

8   didn't notify Hertz, but all of them are going to have as a

9   sort of fallback argument that there was a systemic issue of

10  which Hertz was aware.  So this is an issue, everybody knows

11  it's going to be an issue, and I think -- I mean, Mr. Shore

12  would be hard pressed to say that he's going to -- that we're

13  going to say something in this motion that's going to make

14  him agree and that they're not going to contest this issue.

15          So what I was going to suggest is, for purposes of

16  either pending discovery requests that already cover this

17  issue about sort of known or should have known, which is

18  going to be front and center in the 9006 motion, or, frankly,

19  for maybe some more-targeted requests that we could issue

20  shortly, can we treat the forthcoming 9006 motion as a

21  contested matter and just get rolling on discovery?

22          And if we overreach and they say, no, they're

23  asking for stuff that's beyond the scope of what's going to

24  be in the 9006, we can deal with it, but I think -- as I

25  understand what Mr. Shore is suggesting, you know, we filed a

1   motion, they filed an objection, we come back at that point

2   and figure out what discovery is necessary, that's a three,

3   four month delay, when there's clearly some facts that are

4   already at issue, we've already shown our hand as far as what

5   those are and, obviously, it's going to be contested.  So I

6   was just going to suggest, to really streamline it, that we

7   consider that.

8              MR. SHORE:  May I be heard on that?

9              THE COURT:  Yes.

10             MR. SHORE:  And maybe I can ask for this.  I've

11  resolved every of their claim and the team has resolved every

12  other contested claim in this case, and that's because people

13  put their claims on file, they get their motions on file,

14  we're able to review them, we're able to assess the

15  assertions that are being made.  If they put forward

16  individualized claims and make an individualized showing with

17  respect to leave to file a late claim, we are in fact

18  representing the interests of all the other creditors who

19  have an interest in not seeing late claims just come in for

20  no reason, and we'll make an assessment.

21             I don't think it's fair to say that this is going

22  to be turned into a conflagration and I'm a little worried

23  that they want to turn something like that into a

24  conflagration.  People have requirements, they need to get

25  their motions on file, we'll assess them and, if it turns out

1   that we can allow the late claim, we'll allow the late claim.

2   If it turns out that there's something raised in there that

3   causes us to want to contest it, knowing full well that the

4   cost of litigation may exceed the value of the claim being

5   asserted, we'll take all that into consideration, but to say

6   that what they should do is get discovery now and take away

7   from the debtor the opportunity to just resolve the issue,

8   that's not particularly fair.

9           THE COURT:  Well, although we're not -- I'm going

10  to suggest this as a procedure.  Although each will file an

11  individual proof of claim, I think there should be an orderly

12  process that encompasses everybody, or at least groups of

13  claims.  We're talking about 135 claims in that category.

14  You know, if the creditors can start filing them in 30 days,

15  get 50 on file, et cetera, then I'll have a status conference

16  to discuss where we go from that.  I'll have a meet-and-

17  confer, if you will, so we can talk about discovery and

18  timetables for those.  I don't think we have to wait for all

19  of them to be filed.

20          And I think that, you know, creditors -- I was

21  surprised they asked for 60 to 90 days, I think for many of

22  them they already have the information and could it file it

23  tomorrow, but it will take time to do in the proper order.

24          I don't think we need -- well, the 9006 motion, I

25  would like one motion to be filed with a delineation of what

1  creditor fits in which category, those that actually provided

2  information to the debtors and those that did not.  There are

3  going to be two different discovery -- two different types of

4  discovery with respect to each.  For those who provided

5  information, the debtor may want discovery with respect to

6  what information was actually provided, but I think that

7  probably with respect to them a meet-and-confer between the

8  parties, where the parties give the debtor all the

9  information they have and the debtor goes back and checks its

10  records, that might resolve those, at least resolve the late

11  objection, the basis on lateness.  With respect to the

12  others, that's going to be a completely different category.

13         And it was with respect to the others that I

14  wanted to have a further conference to talk about exactly how

15  extensive that is.  But I think until we know who -- how many

16  fit in that category, I don't think that I can direct any

17  discovery on that point.

18         MR. NELSON:  Thank you, Your Honor.  Our

19  expectation is that the vast majority of the group -- so

20  called group three will not have provided the specific notice

21  that Hertz is looking for and so will fall within this

22  reasonably should have known and what Hertz knew category.

23         THE COURT:  Well, then file the motion and I'll

24  have a hearing.  Obviously, the debtor is going to object on

25  the legal basis that they're not known creditors.  So I'd

 1  like a status hearing sooner rather than later on the issue

 2  of the production of discovery relative to that issue.

 3          I'm going to look at my calendar.  December 1 --

 4  or December 4 is not a weekday.

 5      (Pause)

 6          THE COURT:  So file your motions by -- or motion

 7  by December 6th.  Two weeks to respond will take us to

 8  December 20.  We're going to have a hearing in early January,

 9  it looks like, on that.

10          MR. JACKSON:  And to be clear, Your Honor --

11  Patrick Jackson for the claimants -- this hearing you're

12  envisioning wouldn't be -- so we'll do the -- notice a motion

13  out with a 14-day objection deadline, set it for hearing on

14  the January date that we'll work out, but that's going to be

15  a sort of conference, it will be kind of a scheduling

16  conference hearing, not a hearing on the motion per se?

17          THE COURT:  And also it's -- I'll say it's a

18  continuance of the motion to quash because I think the

19  discovery -- much of the discovery or some of the discovery

20  that the creditors sought were related to that very issue.

21  Am I wrong on that?

22          MR. JACKSON:  No, that was my point I think

23  earlier is that we have -- we have a contested matter now,

24  we're here today on it, and there was discovery that's

25  relevant to defenses that we've raised in the contested

1    matter, that discovery is still pending.  So that was my

2    point about not kind of kicking out discovery of these facts

3    which are relevant today, you know, to some further date.

4           But understood, if you'd like to have the papers,

5    have a full set of the papers, have a conference in January,

6    obviously, you know, everybody has to agree that the process

7    is working efficiently and, you know, Your Honor's opinion is

8    the most (indiscernible) of that, so --

9           THE COURT:  Well, I'd like to -- I will address

10   the discovery and what will proceed at that January

11   conference once we have seen what the motions say and what

12   creditors fall in that category, what number of creditors

13   fall in that category.

14          MR. NELSON:  Thank you, Your Honor.  On the non-

15   group three claimants, on groups one and group two, a couple

16   of issues here.  One is, once we put these on file, what is

17   the next step?  May we get information from the debtors on

18   those once it is on file?

19          THE COURT:  Well, I think that what you're going

20   to do is have a meet-and-confer and talk about discovery with

21   respect to those --

22          MR. NELSON:  Okay.

23          THE COURT:  -- both sides.  If there's a dispute

24   of that, then it can be raised at the January hearing or I'll

25   hear it separately -- I don't want to have a whole lot of

1  discovery litigation -- and we can set one quickly if there's

2  a dispute.  But I think you need to meet and confer on these

3  groups of claims as they get filed with the amended and

4  additional information.

5          MR. NELSON:  Okay.  Thank you, Your Honor.

6          There's one other logistical question.  One of the

7  issues about why there might be so many is that -- and we can

8  meet and confer on this with Mr. Shore, but we have raised

9  the issue of we've, frankly, sued probably -- or put in the

10 proofs of claim probably more than ultimately will end up

11 being defendants, in large part because the debtor has in its

12 information who was responsible and which entity and we

13 didn't -- we asked the debtor for information about that so

14 we could streamline on that measure.  And obviously, if we're

15 filing one claim -- in other words, are we going to have to

16 file 15 for each claimant or would it be sufficient for that

17 same group one per individual?  And that would streamline

18 things for ours and, obviously, I think we'd be able to move

19 that up a little bit.

20         THE COURT:  One discovery request, is that what

21 you're suggesting --

22         MR. NELSON:  No, no, Your Honor --

23         THE COURT:  -- or what --

24         MR. NELSON:  -- I'm sorry.  Just in terms of a

25 proof of claim itself, the amendment, so that --

1          THE COURT:  I don't think you can.  I think you

2    have to do a separate proof of claim form per individual.

3          MR. NELSON:  Agreed, Your Honor, and --

4          MR. JACKSON:  And per debtor --

5          THE COURT:  Oh, I see --

6          MR. JACKSON:  -- per debtor --

7          THE COURT:  -- I see, you said per debtor --

8          MR. JACKSON:  -- per debtor, I think, is his

9    question.

10         THE COURT:  No, no, one proof of claim per

11   individual, and you can check the box all the debtors that

12   you think apply.

13         MR. NELSON:  Thank you, Your Honor.

14         THE COURT:  I misunderstood the question, sorry.

15         Okay.  Any other questions then on how we're going

16   to proceed?

17         MR. SHORE:  A date for filing a class claim

18   motion.

19         THE COURT:  Mr. Nelson, when will you file that?

20         MR. NELSON:  Well, we'd like 60 days for that.  We

21   think that will take a longer process, Your Honor, to decide

22   whether to file it.  We actually -- we think it actually

23   might be -- just to be clear, our position would be it may

24   make sense to wait on that until even later in the process,

25   given some of the efficiencies here.  And so we actually

 1  would suggest waiting until after some of the discovery given

 2  some of the issues, but failing that, then at least 60 days

 3  to get into some of those issues as well and to decide

 4  whether to file it.

 5          THE COURT:  Well, I can see how whether or not

 6  there is going to be a certification of a class could be

 7  relevant to the debtor before doing any discovery on these

 8  claims.  So I would like to see it filed sooner rather than

 9  later and even to the point of the December 4 -- what did I

10  say -- December 6th deadline, which is that Monday.

11          MR. NELSON:  Thank you, Your Honor.

12          THE COURT:  Okay.  Anything else then for today?

13          MR. SHORE:  I don't think so.  We need to, I

14  think, submit an order with respect to the duplicate and

15  amended and superseded claims, and then we can get back to

16  you.  And we're just going to have to have a discussion with

17  the other side with respect to putting the rest of this in an

18  order that we can submit to Your Honor.

19          THE COURT:  A scheduling order, if you will, yes.

20          MR. SHORE:  Yes.

21          THE COURT:  All right.  I'll let the parties talk

22  then on that.  And thank you for -- both sides for trying to

23  make this more efficient.

24          MR. SHORE:  Thank you, Your Honor.

25          MR. NELSON:  Thank you.

1          THE COURT:  We'll stand adjourned.

2          MR. JACKSON:  Thank you, Your Honor.

3      (Proceedings concluded at 12:13 p.m.)

4

5

6                          CERTIFICATE

7

8      We certify that the foregoing is a correct transcript

9  from the electronic sound recording of the proceedings in the

10 above-entitled matter.

11
   /s/Mary Zajaczkowski            November 4, 2021
12 Mary Zajaczkowski, CET**D-531

13
   /s/William J. Garling           November 4, 2021
14 William J. Garling, CE/T 543

15
   /s/ Tracey J. Williams          November 4, 2021
16 Tracey J. Williams, CET-914

17

18

19

20

21

22

23

24

25