**<u>EXHIBIT I</u>**

**Unredacted Motion**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Rental Car Intermediate Holdings, LLC,[1] | Case No. 20-11247 (MFW) |
| Reorganized Debtor. | **Ref. Case No. 20-11218, D.I. 5261** |
| | Preliminary Hearing Date (Issues in Feb. 14 Briefing): March 2, 2022 at 10:30 a.m. ET |
| | Hearing Date (Other Issues): To Be Determined |
| | Objection Deadline: February 21, 2021 at 4:00 p.m. ET |

**NOTICE OF GROUP 4b FALSE POLICE REPORT CLAIMANTS' MOTION FOR
RELIEF FROM THE CONFIRMATION ORDER TO PURSUE CLAIMS
OUTSIDE OF BANKRUPTCY OR, IN THE ALTERNATIVE, TO DEEM CLAIMS
TIMELY OR FOR EXTENSION OF GENERAL AND ADMINISTRATIVE BAR
DATES UNDER RULES 3003(c) AND 9006(b) AND RELATED RELIEF**

TO:    (A) COUNSEL TO THE REORGANIZED DEBTORS; AND (B) THE OFFICE OF THE
UNITED STATES TRUSTEE FOR THE DISTRICT OF DELAWARE

**PLEASE TAKE NOTICE** that Group 4b False Police Report Claimants (the
"Claimants") have filed the attached *Group 4b False Police Report Claimants' Motion for Relief
from the Confirmation Order to Pursue Claims Outside of Bankruptcy or, in the Alternative, to
Deem Claims Timely or for Extension of General and Administrative Bar Dates Under Rules
3003(c) and 9006(b) and Related Relief* (the "Motion").[2]

---

[1]    The last four digits of the tax identification number of Reorganized Debtor Rental Car
Intermediate Holdings, LLC ("RCIH") are 2459. The location of the Reorganized Debtors' service
address is 8501 Williams Road, Estero, FL 33928. On September 28, 2021, the Court entered a
final decree closing each of the chapter 11 cases for The Hertz Corporation and its affiliated
reorganized debtors (collectively, the "Reorganized Debtors") other than RCIH's chapter 11 case.
Commencing on September 28, 2021, all motions, notices, and other pleadings relating to any of
the Reorganized Debtors shall be filed in RCIH's chapter 11 case, Case No. 20-11247 (MFW).

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed
to them in the Motion.

ACTIVE.135463620.02

PLEASE TAKE FURTHER NOTICE that any responses or objections to the relief requested in the Motion must be filed and served so as to be received on or before **4:00 p.m. (ET) on February 21, 2022**, (the "Objection Deadline") with the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 3rd Floor, Wilmington, Delaware 19801 (the "Court"), with a copy to the undersigned counsel.

PLEASE TAKE FURTHER NOTICE that a preliminary hearing with respect to certain issues raised by the Motion (the "Preliminary Hearing") will be held on **March 2, 2022, at 10:30 a.m. (ET)** before the Honorable Mary F. Walrath, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Delaware, 824 N. Market Street, 5th Floor, Courtroom No. 4, Wilmington, Delaware 19801.[3] The Preliminary Hearing may be held via Zoom and the information for appearing via Zoom will be provided in an agenda to be filed in advance of the Hearing.

A hearing on the remaining issues raised by the Motion will go forward at a date and time to be determined by the Court.

**PLEASE TAKE FURTHER NOTICE THAT IF YOU FAIL TO RESPOND TO THE MOTION IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER NOTICE OR A HEARING.**

[Remainder of page intentionally left blank.]

---

[3]    At the January 4, 2022, status conference in the above-captioned case the Court directed that the parties file a supplemental brief by February 14, 2022, on the issue of whether Claimants were "known creditors" based on their contacts with the Debtors, which issue will be taken up by the Court at the March 2, 2022, hearing.

ACTIVE.135463620.02

Dated: February 7, 2021

**FRANCIS ALEXANDER, LLC**
Francis Malofiy
280 N. Providence Road, Suite 1
Media, PA 19063
Telephone: (215) 500-1000
Facsimile: (215) 500-1005
Email: francis@francisalexander.com

**SUSMAN GODFREY LLP**
Justin A. Nelson (*pro hac vice*)
John P. Lahad (*pro hac vice*)
Taylor C. Hoogendoorn (*pro hac vice*)
1000 Louisiana, Suite 5100
Houston, TX 77002-5096
Telephone: (713) 651-9366
Facsimile: (713)654-6666
Emails: jnelson@susmangodfrey.com
        jlahad@susmangodfrey.com
     thoogendoorn@susmangodfrey.com

**FAEGRE DRINKER
BIDDLE & REATH LLP**

*/s/ Patrick A. Jackson*
Patrick A. Jackson (Bar No. 4976)
Ian J. Bambrick (Bar No. 5455)
Jaclyn C. Marasco (Bar No. 6477)
222 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telephone: (302) 467-4200
Facsimile: (302) 467-4201
Emails: patrick.jackson@faegredrinker.com
        ian.bambrick@faegredrinker.com
        jaclyn.marasco@faegredrinker.com

*Co-Counsel for the Group 4 False Police Report Claimants*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>Rental Car Intermediate Holdings, LLC,[1]<br><br>Reorganized Debtor. | Chapter 11<br><br>Case No. 20-11247 (MFW)<br><br>**Ref. Case No. 20-11218, D.I. 5261**<br><br>Preliminary Hearing Date (Issues in Feb. 14 Briefing):<br>March 2, 2022 at 10:30 a.m. ET<br>Hearing Date (Other Issues): To Be Determined<br>Objection Deadline: February 21, 2021 at 4:00 p.m. ET |

### GROUP 4b FALSE POLICE REPORT CLAIMANTS' MOTION FOR RELIEF FROM THE CONFIRMATION ORDER TO PURSUE CLAIMS OUTSIDE OF BANKRUPTCY OR, IN THE ALTERNATIVE, TO DEEM CLAIMS TIMELY OR FOR EXTENSION OF GENERAL AND ADMINISTRATIVE BAR DATES UNDER RULES 3003(c) AND 9006(b) AND RELATED RELIEF

Seventy-seven individuals harmed by the Debtors' systemically flawed theft-reporting practices (collectively, the "Group 4b False Police Report Claimants," or "Movants"),[2] by and through their undersigned counsel, hereby file this motion (the "Motion") for entry of an order

---

[1]   The last four digits of the tax identification number of Reorganized Debtor Rental Car Intermediate Holdings, LLC ("RCIH") are 2459. The location of the Reorganized Debtors' service address is 8501 Williams Road, Estero, FL 33928. On September 28, 2021, the Court entered a final decree closing each of the chapter 11 cases for The Hertz Corporation and its affiliated reorganized debtors (collectively, "Hertz" or the "Reorganized Debtors" or and prior to the Effective Date (as defined below), the "Debtors") other than RCIH's chapter 11 case. Commencing on September 28, 2021, all motions, notices, and other pleadings relating to any of the Reorganized Debtors shall be filed in RCIH's chapter 11 case, Case No. 20-11247 (MFW).

[2]   The Group 4b False Police Report Claimants are represented by certain of the same counsel as the "Group 1, "Group 2," "Group 3," and "Group 4a" False Police Report Claimants, some of whose claims are the subject of the Reorganized Debtors' 21st and 22nd Omnibus Objections to Claims [Case No. 20-11218, D.I. 5898 & 5899]. As the Court will recall: (i) the "Group 1" claimants had pending litigation against one or more Debtors prepetition and filed proofs of claim by the October 21, 2020, general claims bar date; (ii) the "Group 2" claimants generally had no prior pending litigation and filed proofs of claim by the bar date; (iii) the "Group 3" claimants had no prior pending litigation and filed proofs of claim on June 10, 2021; and (iv) twenty-six "Group 4" claimants (referred to herein as "Group 4a") filed a motion seeking similar relief to that sought herein on December 6, 2021.

(i) granting relief from the Confirmation Order,[3] insofar as it implements the discharge, release, and injunctive provisions of the Plan,[4] so as to permit the Movants to pursue and collect on their claims against the Reorganized Debtors and others outside of bankruptcy, or (ii) in the alternative, (A) deeming their filed proofs of claim timely notwithstanding the General Bar Date and Administrative Bar Date (as defined below) so as to permit the Movants to assert claims against the Reorganized Debtors under the applicable processes set forth in the Plan, and (B) deeming the Movants to have timely "opted out" of the Plan's third-party release provisions. In support of this Motion, the Movants respectfully represent as follows:

## PRELIMINARY STATEMENT[5]

1.     The Movants' proofs of claims and supporting declarations—in conjunction with the declarations and proofs of claim already in front of the Court from claimants in Groups 1, 2, 3, and 4a—speak for themselves. Hertz has caused, and continues to cause, grievous injury to its own customers by filing false police reports and refusing to correct false reports once filed. These harms have been ongoing throughout these bankruptcy proceedings. From Group 4b alone:

A. At least 17 Movants rented after the bankruptcy petition.

B. At least 28 Movants were arrested[6] and 7 more detained as part of an arrest[7] after the Debtors filed for bankruptcy on May 22, 2020. Many arrests were at gunpoint and many of those arrested spent time in jail postpetition.

---

[3]     The *Order (I) Confirming Second Modified Third Amended Joint Chapter 11 Plan of Reorganization of The Hertz Corporation and its Debtor Affiliates, and (II) Granting Related Relief* [Case No. 20-11218, D.I. 5261] (the "Confirmation Order").

[4]     The *Second Modified Third Amended Joint Chapter 11 Plan of Reorganization of The Hertz Corporation and its Debtor Affiliates* [Case No. 20-11218, D.I. 5178] (the "Plan").

[5]     Capitalized terms used but not otherwise defined in this Preliminary Statement shall have the meanings ascribed to them in the body of this Motion.

C. At least 30 Movants faced criminal proceedings after the bankruptcy petition.[8]

D. At least 13 Movants are still facing criminal proceedings.[9]

E. At least 6 Movants were arrested after the Effective Date of the Plan.[10] Movant Brandy Porter, for example, used to work for the Debtors through a "temp" agency. She was arrested and jailed on January 4, 2022 (the day of the last hearing) based on a September 2019 rental. She had always extended that rental with a local employee named Evan (whom she knew from her earlier employment), returned the rental on November 21, 2019, with manager "AB," and paid about $2,300 for the rental. She had no idea there was a problem with a rental she had returned years earlier until her shocking arrest just last month. Criminal charges are now pending.

2.      Hertz knows its troubled reporting often leads to arrest, jail time, and ruined reputations of innocent victims but refuses to change its practices. But despite Hertz's knowledge of its systemic practices of filing false police reports and the corresponding civil liability to the

---

[6]    Patrick Andrews, Adriane Beamon, Marc Bednarczyk, Cody Breedlove, Abraham Carmichael, Jason Campbell, Angela Delafontaine, Bianca DeLoach, Lakesia Dowlen, Howard English, Daniel Morales Hernandez, Raynard Hill Jr., Jason Kearny, Casey Kurpjuweit, Saleema Lovelace, Charles Malone, Brandy Porter, Sierra Ryan, Samantha Simpson, Amber Rather, Latricia Taylor, Evan Tanner, Jamol Toney, Elbert Turpen, Jr., Jeric Wilson, Tiffiany West, Anson Westerfield, Duni Zenaye.

[7]    Benita Bridges, K.F., Jose Monteiro, G.M., A.P., C.P., M.P.

[8]    Patrick Andrews, Adriane Beamon, Marc Bednarcsyk, Cody Breedlove, Abraham Carmichael, Tawana Cole, Angela Delafontaine, Bianca DeLoach, Lakeshia Dowlen, Zantavia Franklin, Antwanette Hill, Raynard Hill, Jr., Jason Kearny, Casey Kurpjuweit, Saleema Lovelace, Anne Maha, Charles Malone, Brandy Porter, Franklin Richards, Sierra Ryan, Samantha Simpson, Ameerah Singleton, Latricia Taylor, Evan Tanner, Jamol Toney, Elbert Turpen, Jr., Jeric Wilson, Tiffiany West, Anson Westerfield, Duni Zenaye.

[9]    Patrick Andrews, Cody Breedlove, Abraham Carmichael, Tawana Cole, Zantavia Franklin, Saleema Lovelace, Charles Malone, Brandy Porter, Franklin Richards, Ameerah Singleton, Jamol Toney, Elbert Turpen, Jr., Tiffiany West.

[10]   Cody Breedlove, Abraham Carmichael, Raynard Hill, Jr., Charles Malone, Brandy Porter, Elbert Turpen, Jr.

Movants, and despite Movants' identities being known or reasonably ascertainable to Hertz, Hertz nonetheless failed to provide the Movants with direct notice of (i) the General Bar Date, (ii) the Plan, Confirmation Hearing, or deadline to file objections to the Plan, or (iii) the Administrative Bar Date as required by due process. And even assuming *arguendo* that the Movants were "unknown" to Hertz, the publication notice of the foregoing fell well short of the requirements of due process under the particular circumstances of this case, as discussed below. Accordingly, and for the further reasons described below, the Movants' claims must be permitted to proceed against the Debtors in this Court or elsewhere.

## JURISDICTION & VENUE

3.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 1334 and 157 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012. This Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(1) and the Court may enter a final order consistent with Article III of the United States Constitution.[11] Venue is proper before this Court pursuant to 28 U.S.C. § 1409. The statutory and procedural predicates for the relief requested herein are Sections 105(a) and 503(a) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), and Rules 3002, 3003, 9006, and 9024 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

---

[11]   If it is determined that the Court, absent consent of the parties, cannot enter a final order on this Motion consistent with Article III of the United States Constitution, the Movants consent to the Court's entry of such an order. For the avoidance of doubt, the Movants reserve all other rights with respect to their claims, including the right to contest the Court's authority to determine any other issue relating to such claims and to demand a trial by jury.

## **RELEVANT BACKGROUND**

I.    **Hertz Was Aware of an Extensive Pattern of Tortious Conduct Underlying the Movants' Claims.**

4.    As described in other motions in this litigation and detailed below, Hertz has engaged in a course of conduct of systemically filing false and misleading police reports without probable cause and has openly admitted to a corporate policy of refusing to correct or withdraw such reports,[12] causing countless of its own customers to be thrown in jail and prosecuted for crimes they did not commit.

5.    Hertz had significant knowledge and understanding of the substance and pattern underlying these claims before filing for bankruptcy. It admits that it reports *thousands* of its own customers for auto theft each year. [(Sealed) D.I. 214.] It has heard from countless customers explaining that they had been falsely reported by Hertz for serious crimes. It has faced dozens of lawsuits, multiple adverse verdicts, and complaints from law enforcement, and has presumably seen media reports outlining the systemically flawed conduct. Moreover, counsel for Claimants had offered extensive evidence of Hertz's systemic problems prepetition, including a series of prepetition letters, memos, and briefs providing detailed explanations of why Hertz's practices repeatedly lead to well-meaning customers' being arrested at gunpoint and imprisoned.

6.    Although the Debtors have made every effort to minimize or otherwise ignore the substance of these claims, there is evidence that the Debtors have taken internal steps to prepare for these claims. There is record evidence that a Hertz customer-service employee told Earl Holland (a Group 2 Claimant) that false-police-reporting problems were "a known problem with

---

[12]    Sam Wood, "Bankruptcy Hertz is Still Wrongly Accusing Customers of Stealing Cars," Page    A1,    Philadelphia    Inquirer    (Aug.    3,    2020),    *available    at* https://www.inquirer.com/business/retail/hertz-stolen-car-grand-theft-auto-malofiy-bankruptcy-lawsuit-20200803.html.

the company," and were "so pervasive that Hertz had established a special fund to compensate the victims" of false police reports, [Case No. 20-11218, D.I. 1081, Ex. A., Declaration of Earl Holland]. There is record evidence that Hertz uses third-party claims administrators "ESIS, Lambda, and Lambda GCL" to track legal claims based on Debtors' false arrest/theft reports, including maintaining internal spreadsheets that catalogue such claims, [*see* Case No. 20-11218, D.I. 1071, Ex. A, Declaration of Frederick Jekel, at 4]. Significantly, ESIS is a subsidiary of Chubb, the Debtors' insurer, which strongly suggests that the Debtors were working with their insurance providers to account for false-police-report claims. And a corporate security manager for Hertz named Richard Livingston told a claimant that "Hertz had an internal list of customers who were reported for theft." Claim 15,652, at 14 (¶ 13). Despite this, the Debtors did nothing to give those it had falsely reported for theft notice of these proceedings beyond publishing legally deficient notice once deep in a handful of newspapers. Apparently, Hertz believes that the number of life-altering claims—230 individualized claims have now been filed and the universe of claims may be much larger given the systemic issue of false police reports—neither justified the cost of appropriate notice, nor the cost of remedying Hertz's wrongful police-reporting practices, because of the number of vehicles it rents each year and number of customers it reports for theft.

7.      Every day that goes by, more innocent persons are being grievously, horrifically, and baselessly harmed by the Debtors' conduct. Despite active litigation on false-police-report claims, Hertz customers continue to be arrested and that "tiny fraction" continues to grow.

**II.  The Movants**

8.      Pursuant to the Court's request at the January 4, 2022, hearing with respect to similarly situated Group 4a Claimants, each of the Movants has filed a proof of claim without

6

prejudice to any of the relief sought in this Motion. *See* Jan. 4, 2022 Hr'g Tr. 27:18–23 (MR. JACKSON: "If we were ordered to file [a proof of claim], we would want it to be with a full reservation and without prejudice of arguments that we've made in the motion. I just want to make that clear." THE COURT: "Yeah, it will be. But it would be easier for the Court if the actual proof of claim were filed . . . ."). A short summary of certain facts underlying each Movant's proof of claim are recounted below:

A. **Patrick Andrews**: Mr. Andrews filed Claim No. 15,837 on January 28, 2022. He rented from Hertz in Southaven, Mississippi in October 2020 through his company, Pilot Travel Center, which took over extensions and the contract after two days. Mr. Andrews heard nothing further from the local rental location. On or around February 2, 2021, a member of Hertz vehicle control contacted Mr. Andrews, telling him he owed $3,900[13] for the vehicle and that it had been reported stolen. Hertz plainly never got in touch with Pilot, which was paying for the rental and willing to continue doing so. Ultimately, Hertz told Mr. Andrews it would come pick up the vehicle, but it never did despite being asked to do so several times. Around May 11, 2021, Mr. Andrews was arrested by a SWAT team and taken to jail for two days. Mr. Andrews contacted Hertz, which told him it had the vehicle and wasn't looking to press charges. But Hertz never appeared at any court date and charges are still pending.

B. **Adriane Beamon**: Ms. Beamon filed Claim No. 15,871 on January 31, 2022. She rented from Thrifty in Katy, Texas around October 2017. She rented for three months, extending each week using the corporate 1-800 number. Around late January 2018, Ms. Beamon told the local office that she would return the vehicle to a nearby

---

[13] A large number of the "charges" paid by the Movants total right around $3,900.

location in Houston, Texas—which she did and left the keys in the designated drop box. The Debtors (including a vehicle recovery unit) then reached out several times to ask where she had returned the vehicle, and Ms. Beamon told them repeatedly exactly where she had already returned the vehicle. She was charged about $3,000 for the rental and thought everything was good to go. Unknown to Ms. Beamon, however, Hertz filed a report in 2018 claiming she had absconded with the vehicle on October 27, 2017—deleting all her extensions. Hertz had since recovered the vehicle. Ms. Beamon learned that there was a warrant for her arrest when she applied for a job in December 2020. She voluntarily turned herself into authorities, was arrested, and spent a day in jail. She contested the charges and informed Hertz that the report was false, but Hertz never appeared in Court and charges were dismissed on July 2, 2021.

C. **Marc Bednarczyk**: Mr. Bednarczyk filed Claim No. 15,921 on January, 31, 2022. Mr. Bednarczyk rented a minivan on November 5 or 6, 2020 from Hertz in Seminole, Florida through State Farm. He regularly extended his rentals by phone and email and would see Hertz fees on his credit card. After about three weeks, he exchanged the minivan for a Nissan Altima at the Tampa International Airport location. On February 1, 2021, Mr. Bednarczyk informed Hertz that he was out of the state to care for a relative and that Hertz could charge his card as needed to extend the rental. On February 24, 2021, he was charged $2,420.79. Based on that payment, he was surprised when the car was towed back to Hertz on March 9; he figured then the rental was over. But on April 21, 2021 he was arrested and was taken to jail and charged. All charges were dropped on May 18, 2021 because "the facts and circumstances revealed do not warrant prosecution."

8

D. **Cody Breedlove**: Mr. Breedlove filed Claim No. 15,888 on January 31, 2022. He was a Gold Rewards business member who rented from Dollar in Dallas, Texas on September 20, 2020 as part of a move to Salem, Oregon. He exchanged for a new vehicle after about one week, and thereafter extended the rental at all times. He worked with Hertz to have various services done to the car through December, January, and early February 2021, and extended for another month at the end of January. When Mr. Breedlove saw a $3,984.54 on his card, he called the 1-800 number again and Hertz confirmed his extension. He then spoke with a third party investigator acting for Hertz to whom he explained the extensions and payments. When the investigator insisted that he return the car, Mr. Breedlove and the investigator agreed that we would return the vehicle on March 11, 2021 after he purchased a new vehicle for himself on March 10. But on March 10, Mr. Breedlove was arrested at gunpoint by nine police cars in Carrolton, Texas. That began a streak of 5-7 arrests and 39 days in jail through September 2021 because the "interstate" nature of his rental (Texas and Oregon) led to lingering warrants in both states. He is currently facing prosecution—the indictment claims his car was due September 26, 2020, completely ignoring all of his many extensions. He emailed Hertz customer relations asserting that Hertz had filed "false theft charges" prior to the Administrative Claims Bar Date, but was not given any notice of that deadline.

E. **Benita Bridges and minor child K.F.**: Ms. Bridges and K.F. filed Claims No. 15885 and 15904 on January 31, 2022. K.F.'s father and Ms. Bridges son-in-law, Group 2 Claimant Kenny Fearence, rented from Thrifty around May 10 or 11, 2020 in California. He regularly called to extend the rental. Mr. Fearence spoke with Thrifty

Roadside on July 21, 2020, saying that he wanted to return the vehicle but had tested positive for COVID-19; Thrifty told him it would pick up the vehicle and comp him for the time he was sick. Thrifty never towed the car. In early August, Mr. Fearence called to ask why the vehicle was not towed, and he was told someone would get back to him. Instead of responding to Mr. Fearence or towing the vehicle as requested, Hertz/Thrifty reported it stolen on August 12, 2020. Ms. Bridges, Mr. Fearence, Group 2 Claimant Dajanae Bridges, and K.F. were all pulled over and held at gunpoint on August 14, 2020. Mr. Fearence was taken to jail and charged, but all charges were dismissed by December 2020.

F.  **Jason Don Campbell**: Mr. Campbell filed Claim No. 15,934 on February 2, 2022.[14] Mr. Campbell rented from Hertz in Fort Worth, Texas, on May 15, 2020—the return date on his receipt was June 1. On May 27, 2020, he was arrested at gunpoint. The police ascertained during the arrest that Hertz had rented Mr. Campbell a car it had previously reported stolen and let him go.

G.  **Abraham Carmichael**: Mr. Carmichael filed Claim No. 15,809 on January 25, 2022 and amended Claim No. 15,940 on February 7, 2020. Mr. Carmichael is a Hertz Gold member and longtime renter. He rented a vehicle from Hertz in July 2020 from a location in Highland, Indiana. It was a one-month rental to start, but he regularly extended the rental and spoke with Hertz to do so. In September, he returned to Hertz for an oil change and spoke to the manager, who confirmed that he could keep the

---

[14] Each Movant electronically served a claim on Prime Clerk and counsel for the Reorganized Debtors on or before January 31, 2022. Per an agreement with counsel for the Reorganized Debtors, the parties will treat the e-served claims as filed on or before January 31. For the Court's convenience, the claims are listed as filed on the date entered by Prime Clerk on the official claims register.

vehicle. In January 2021, he was surprised to find the vehicle missing from his driveway, but learned that Hertz had towed it. Also in January, he paid over $3,900 for the rental. After the tow, Mr. Carmichael received a letter in February 2021 noting a warrant for his arrest. He was shocked and called Hertz to contest the theft report. He thought the charge and tow would have resolved any issues, but was arrested on November 15, 2021, jailed for two days, and is currently facing prosecution.

H. **Daydan Carter**: Mr. Carter filed Claim No. 15,935 on February 2, 2022. Mr. Carter rented a truck from Hertz around November 1, 2019 in Stockton, California. He called to extend the rental each week or two for about three months, during which time he could see weekly charges on his bank statements. He also extended twice in person at the location. In late January 2020, Hertz left a message asking Mr. Carter to return the vehicle—he called the location, which told him it was fine to return it a few days later in early February. Mr. Carter was arrested at gunpoint on February 2, 2020—he was taken to jail for a day and, when he got home, discovered a charge for $2,750 on his bank account.

I. **Tawana Cole**: Ms. Cole filed Claim No. 15,910 on January 31, 2022. Ms. Cole rented from Hertz in Appleton Wisconsin on May 30, 2019. It was a four-day rental at first, but she contacted the location to extend it to seven days. Shen then extended the rental twice more for 7 days each time, for a total of 21 days. She returned the vehicle in June 2019. But on June 18 and unknown to Ms. Cole, she was reported for stealing the rental, with Hertz claiming the car was due on June 5—omitting her extensions beyond that date. Two years later, in June 2021, she received a letter informing her that there was a warrant for her arrest. She contacted Hertz's 1-800

number to inquire about the warrant, but Hertz told her it didn't have any information and she needed to go to court. She is currently being prosecuted.

J.  **Faristina Collins**: Ms. Collins filed Claim No. 15,801 on January 25, 2022. Ms. Collins rented a vehicle from Hertz in Detroit, Michigan in April 2014—she was a Gold Member and returning renter. It was initially a one-month rental, but Ms. Collins called the location to extend the rental each week for three more weeks. The branch told Ms. Collins to return the vehicle to a different location in Troy, Michigan because it was closing permanently. Ms. Collins returned the vehicle and, as instructed, left the keys under the drivers' side mat after hours. Three years later, in Spring 2017, Ms. Collins was applying for jobs and was shocked to discover an open warrant for her arrest based on the 2014 rental. She turned herself in, was in jail for two days, and was prosecuted until around January 2018. Hertz did not appear to 5 court dates over six months, but all charges were dismissed after it was discovered that Hertz had recovered the vehicle back in 2015.

K.  **Adam Cuevas**: Ms. Cuevas filed Claim No. 15,931 on February 2, 2022. Mr. Cuevas is a Lyft rideshare driver who regularly rents vehicles from Hertz for his job. He regularly rented vehicles from a location in Seattle, Washington, which auto renew each week through a partnership between Hertz and Lyft. On January 15, 2020, Mr. Cuevas was arrested at gunpoint by many officers and told he was in possession of a stolen vehicle. The officers called Hertz and Hertz informed the officer that the company had rented Mr. Cuevas a vehicle Hertz had reported stolen before the rental began.

L. **Angela Delafontaine, Jose Monteiro, and Minor Child G.M.**: Ms. Delafontaine, Mr. Monteiro, and their child G.M. filed claim nos. 15,823, 15,826 and 15,830. Ms. Delafontaine rented a vehicle from Hertz in Massachusetts on August 25, 2017 via an insurance claim. On September 30, Ms. Delafontaine called and was approved to return the vehicle to another Hertz location closer to her home. She returned the car as instructed. But unknown to Ms. Delafontaine, on March 16, 2018, Hertz filed a theft report against her for failing to return the car. Years later, on February 2, 2021, she was denied housing because of a warrant for her arrest. She reached out to Hertz Asset Loss Prevention Department and was told that the vehicle she rented was not reported missing and that it was a mistake. But on April 9, 2021, Ms. Delafontaine, Mr. Monteiro, and G.M. were pulled over and detained. Angela was arrested for theft, booked, and prosecuted until September 27, 2021, when the case was dismissed, but not until she lost her job because of the pending charges.

M. **Bianca DeLoach and minor children A.P. and C.P.**: Ms. DeLoach and her children filed Claim Nos. 15,764, 15,765, and 15,766 on January 15, 2022. As detailed in the proofs of claim, Ms. DeLoach rented a car from Dollar in October 2020 and extended the vehicle repeatedly with both the local branch and the corporate 1-800 number. Ms. DeLoach paid $3,974.24 for the rental in late February or early March and thought the rental was good based on the payment. Hertz, however, reported Ms. DeLoach for theft on March 25, 2020—the theft report did not indicate her payment for the vehicle and reported an "offense end date" of October 10, 2020—the original return date for the vehicle and omitting her repeated extensions of the rental. Proof of Claim 15,764, at 24. Ms. DeLoach was arrested at gunpoint on March 26 along with

her two children. Ms. DeLoach spent nine days in jail and was prosecuted for about 9 months. As the State recounted in its *nolle prosequi* motion, when confronted by the State, Hertz "was unable to explain how the defendant paid in full in February for the vehicle, yet the vehicle was reported stolen." Proof of Claim, at 19. All charges were dismissed on December 15, 2021 "[b]ased on the defendant's time in custody, the lack of cooperation from any representative of Hertz Rental Car Company, the proof of payment in the amount of $3,974.57, the national claims against Hertz Rental Car Company, the alleged stolen vehicle being the custody of Hertz Rental Car Company, and in the interest of Justice." *Id.*

N. **Lakeshia Dowlen**: Ms. Dowlen filed Claim No. 15,933 on February 2, 2022. Ms. Dowlen rented a Hertz vehicle from Clarksville, Tennessee on March 3, 2020. She extended the rental each week directly with the manager, Connie Hooks and returned the vehicle on May 15, 2020 the Clarksville location. On June 24, 2020, a Hertz investigator called and told Ms. Dowlen that she would be reported for theft if she did not return the car; Ms. Dowlen was confused because she had returned the car. She heard nothing further and figured all was resolved. But on May 15, 2021, she was arrested for a felony in connection with the rental while at work. After two days in jail, she was released. She called Hertz corporate, which claimed that it could not locate her rental agreement or case. All charges were dismissed on November 16, 2021.

O. **Iasia Eaves**: Ms. Eaves filed Claim No. 15,802 on January 25, 2022. She rented a car from a New York Hertz location on April 5, 2017. She called each week to extend the vehicle, and saw a charge for $3,921.55 on May 17 of that year, which caused her to

14

believe the rental remained on track. Unknown to her, Hertz reported her for theft and a warrant issued on May 19, 2017. Ms. Eaves was arrested on September 13, 2017 based on that warrant and spent two days in jail. She confronted Hertz about the false theft report and Hertz "apologized and told her directly that there was a mistake between the local and corporate offices," also telling the same thing to police. Proof of Claim, at 16 (¶¶ 15, 17). But Hertz never showed up to Court and Ms. Eaves continued to be prosecuted until charges were dismissed on October 15, 2018—by which point she had lost her job based on the lengthy and baseless prosecution.

P.  **Howard English**: Mr. English filed Claim No. 15,937 on February 2, 2022, and amended Claim No. 15,941 on February 7, 2022. Mr. English and his brother are contractors who regularly rent trucks from Hertz for work. They rented two trucks from Hertz in Miami, Florida in September 2019 under his brother Michael P. English's name—Mr. Howard English was an authorized driver. The long-term rental was extended for 2–6 months at a time working with an employee named Victor. The English brothers always extended their rentals and stayed in contact with Hertz and Victor. On May 25, 2021, Mr. English was arrested at gunpoint in Doral, Florida— police told him the vehicle had been reported stolen, but Hertz was unable to find his contract and the police said he was free to leave.

Q.  **Melanie Evans and minor children N.E. and N.E.**: Ms. Evans filed Claim Nos. 15,926, 15,929, and 15.930 on February 2, 2022. She rented from Hertz in Phoenix, Arizona in December 2013. She extended the rental every two weeks for about six weeks, but Ms. Evans was arrested at gunpoint while in her vehicle around January 15, 2014. Her children were in the car. Police took the car and let Ms. Evans walk

free after seeing the rental contract. She immediately confronted the local branch and 1-800 number but was not given any explanation for why Hertz had filed a false report. In 2016, Ms. Evans was arrested again based on the same theft report, at which point she was jailed for two days and prosecuted into 2018, when she agreed to probation to move on with her life. Hertz never appeared in court.

R.  **Zantavia Franklin**: Ms. Franklin filed Claim No. 15,928 on February 2, 2022. Ms. Franklin rented from Hertz in Mobile, Alabama on or around October 15, 2020. Ms. Franklin extended her rental with the local store and could see charges hitting her card on file. Around February 18, 2021, officers informed Ms. Franklin that Hertz wanted the rental back and towed the car, but also told her that there was no warrant for her arrest. Ms. Franklin discovered on January 4, 2022, however, that a warrant for her arrest had subsequently issued on July 1, 2021, five months after Hertz received the rental back in its possession. The charges against Ms. Franklin are pending.

S.  **Tanya Funderburk**: Ms. Funderburk filed Claim No. 15,804 on January 25, 2022. Ms. Funderburk rented a Hertz vehicle through insurance in the summer of 2014 from a Las Vegas, Nevada location. She notified her attorneys each month so that insurance could extend the rental. On February 13, 2015 Hertz filed a police report claiming she had stolen the insurance rental—she had no notice of any problem. On April 1, 2015, Ms. Funderburk, to her shock, was arrested, jailed for 3 days, and prosecuted for theft for many months. After Hertz failed to appear in court over an eight-month span, she pleaded no contest to minor charges in exchange for probation.

T. **Daniel Morales Hernandez**: Mr. Hernandez filed Claim No. 15,889 on January 31, 2022. Mr. Hernandez rented from Hertz in Panorama City, California on September 1, 2020. It was initially a one-week rental, but Mr. Hernandez extended into late September. On September 20, 2020, he was arrested at gunpoint by several squad cars. After Mr. Hernandez showed police his rental contract, the police contacted Hertz and identified that Hertz had rented Mr. Hernandez a vehicle Hertz had previously reported stolen. Mr. Hernandez was then released from custody.

U. **Antwanette Hill**: Ms. Hill filed Claim No. 15,923 on February 1, 2022. Ms. Hill was a Hertz platinum member who reserved a prepaid rental for pickup in Atlanta, Georgia on October 8, 2018. Rewards members with prepaid reservations are allowed to drive the vehicle off the lot without interacting with staff. While driving out, an employee accused her of trying to steal the vehicle and called the police. She was arrested at taken to the police station. While there, police called Hertz and validated the rental, so she was released. She thought everything was resolved, but was instead arrested three more times from 2019 to 2021 for failure to appear at court dates of which she was unaware, spending a total of about 20 days in jail and suffering a miscarriage in jail. Charges remain pending.

V. **Raynard Hill, Jr.**: Mr. Hill filed Claim No. 15,922 on February 1, 2022. Mr. Hill rented on February 26, 2021 from a Dollar location at an airport in Charlotte, North Carolina. He extended each week with the 1-800 corporate number. On June 1, he was charged $3,757.81, and the company confirmed receipt of payment on June 6, so he thought the rental was good to continue. Unknown to Mr. Hill, Hertz/Dollar reported the vehicle stolen on June 15, 2021. On July 1, 2021, Mr. Hill was arrested

at gunpoint and jailed for five days. The State dismissed the charges against him on November 3, 2021 after reviewing the rental agreement and after Hertz did not appear in court.

W. **Jason Kearny**: Mr. Kearny filed Claim No. 15,894 on January 31, 2022. Mr. Kearny rented a Hertz vehicle on July 3, 2020 from Scotts Valley, California. It was initially an insurance rental, and Mr. Kearny added his debit card to cover the rental when insurance coverage ended. The manager of the location told Mr. Kearny that he would be charged $25 a day if he wanted to keep the rental after coverage ended. On July 8, 2020, Mr. Kearny was arrested at gunpoint because police thought he was driving a stolen car, but Hertz confirmed he had a valid rental to the police and he was released. On September 8, he was contacted by an investigator named Kelly Timmerman claiming the vehicle was overdue; Mr. Kearney said he'd contact the location. He in fact called the location and spoke with the manager, Ken, who "informed him that 'Local and corporate Hertz do not communicate well' and that there was no issue with  [Mr. Kearny's] rental agreement and he was extended and authorized to have the car." Claim No. 15,894, at 15–16 (¶ 12). But on September 25, 2020, Mr. Kearny was again arrested and this time charged with Theft of a Motor Vehicle—he believes the charges are still pending.

X. **Casey Kurpjuweit**: Mr. Kurpjuweit filed Claim No. 15,914 on January 31, 2022. Mr. Kurpjuweit was a Lyft driver who regularly rented through Hertz. He rented a Hertz vehicle in early February 2019 from a location in Downy, California. He was in an accident with the rental on March 3, 2019. The car was towed to a Hertz distribution center. But on June 15, 2019, Hertz called to ask Mr. Kurpjuweit where the vehicle

was—he responded that the car was towed after the accident and returned to Hertz. In January, 2020, Mr. Kurpjuweit received a letter that he was being charged for theft. After numerous delays, he was arrested and arraigned on August 13, 2021 when he went to the courthouse. The case wasn't dismissed until August 24, 2021.

Y.  **Saleema Lovelace**: Ms. Lovelace filed Claim No. 15,873 on January 31, 2022. Ms. Lovelace rented a Hertz vehicle in July 2020 from a Philadelphia, Pennsylvania airport location. She extended the rental for a month at a time by contacting the local location. In January 2021, Hertz asked Ms. Lovelace to bring the vehicle to the location for an inspection—she instead asked to return the vehicle on January 15, 2021 and Hertz confirmed that she could return the vehicle at that time. Despite that, on January 13, 2021, Saleema was arrested at gunpoint for theft and then held at the police station. Saleema's prosecution remains pending based on a theft report that omitted her payments, her extensions, and her agreement to return the vehicle on two days *after* she was arrested.

Z.  **Anne Maha (for herself and two minor children) & Adult Daughter Aniyah Johnson**: Ms. Maha and her children filed Claims No. 15,814, 15,824–25, and 15,828 on January 27, 2022. Ms. Maha rented a Hertz vehicle in 2019 through State Farm insurance in San Antonio, Texas. The initial rental was for 45 days, extended weekly through State Farm; after that point, Ms. Maha then called and worked with the local branch to keep the rental while charging her card on file. Soon, Ms. Maha saw a $1,900 charge on her card and assumed the rental was good to go, but on April 29, 2019, she was arrested at gunpoint along with her three children—her children were taken to child protective services. Ms. Maha then spent 19 days in jail initially.

Finally, when Hertz did not show up to prosecute the case, she felt forced to accept a favorable plea and ultimately spent 152 days in jail and 768 days under prosecution.

AA.   **Charles Malone**: Mr. Malone filed Claim No. 15,798 on January 25, 2022. A Lyft driver, Mr. Malone regularly rented from Hertz and rented a vehicle around January 15, 2020 from a Hertz location in Marietta, Georgia. He regularly extended the rental and received payment confirmation statements from Lyft. Mr. Malone returned the vehicle on January 8, 2021 and received confirmation of the return. But on November 6, 2021, Mr. Malone was pulled over in Marietta, Georgia. He was arrested and jailed for two days because Hertz claimed he stole the rental—it appears that he was reported for theft on May 15, 2021, nearly four months *after* he returned the rental. Criminal charges against Mr. Malone are still pending.

BB.   **The McCoy Family**: Travis and Kimberly McCoy, as well as children Savanah, Emmah, and S.M. filed claim nos. 15,800, 15,805–07, and 15,810 on January 25, 2022. Father Travis McCoy worked for General Electric, which rented him a vehicle from Hertz in Birmingham, Alabama on or around March 21, 2016. The rental was secured with a corporate credit card and an HR company was listed as a contact. On April 21, 2016, however, Mr. McCoy and his family were stopped at gunpoint while heading to lunch. Mr. McCoy was arrested based on a Hertz theft report for his corporate rental, jailed for two days, and prosecuted until charges were dismissed around April 2017.

CC.   **Aujaneik "Nicki" Moss**: Ms. Moss filed claim no. 15,796 on January 25, 2022. She rented a vehicle from Thrifty on November 16, 2017 for two weeks, and called the location every two weeks to extend. On December 27, 2017, she was charged

$1,632.30. On January 22, 2018, she was arrested at gun point by six police cars. She spent five days in jail, as was subsequently prosecuted. After Hertz did not appear in court, Ms. Moss pled no contest to ensure her ability to care for her newborn son and foster children, and charges were dismissed on August 7, 2018.

DD.    **Sophia Ortiz**: Ms. Ortiz filed Claim No. 15,875 on January 31, 2022. Ms. Ortiz rented from Hertz in San Bruno, California around April 2016. Her insurance covered the first two weeks of the rental, after which point Ms. Ortiz provided a card and called the 1-800 corporate number to extend the rental each week. On June 28, 2016, two police officers arrested Ms. Ortiz (who was then pregnant) at gunpoint and took her to jail for two days. Ms. Ortiz called Hertz when she arrived home to ask "why they had falsely requested a warrant for her arrest when she had proof that she had paid for the rental." Claim No. 15,875, at 15 (¶ 15). Hertz never appeared to court during her prosecution, so Ms. Ortiz accepted a year of probation to get past this saga in September 2017.

EE.    **Brandy Porter (and minor child M.P.)**: Ms. Porter and her child filed Claim Nos. 15,887 and 15,925 on January 31, 2022. Mr. Porter rented from Dollar or Thrifty in the Raleigh, North Carolina airport location in September 2019. She had previously worked for Dollar/Thrifty through a temp agency and was familiar with the employees at the location. She extended the rental each week through an employee named Evan over the phone. She returned that rental for a new vehicle based on a check-engine light in October 2019, and extended the new rental through Evan. She returned that vehicle on November 21, 2019 with a manager "AB" who she knew from working there. She saw a $2,300 charge when she returned home. But years

later, on January 4, 2022, Ms. Porter was pulled over, and arrested with her daughter in the vehicle, and taken to the Sheriff's office. Charges are now pending.

FF. **Sierra Ryan**: Ms. Ryan filed Claim No. 15,836 on January 28, 2022. Ms. Ryan has never rented from Hertz. On September 9, 2020, Ms. Ryan was arrested and jailed for two days for allegedly renting a vehicle from Hertz in Springfield, Illinois that was reported stolen around July 2018—when she would have been 23 (too young typically to even rent a vehicle). Based on a lack of evidence that she had rented a vehicle—she hadn't—all charges were dismissed September 15, 2021.

GG.   **Samantha Simpson & Amber Rather**: Ms. Simpson filed Claim No. 15,839 on January 28, 2022. Ms. Rather filed Claim No. 15,835 on January 28, 2022. Ms. Simpson leased a vehicle from Thrifty in September 2020 in Tulsa, Oklahoma. In January 2021, she began working with the marketing department to purchase the vehicle and paid over $6,000 during that time—no one in marketing told her there was an issue. On March 18, 2021, Ms. Simpson and her fiancée Ms. Rather were arrested; Ms. Simpson was then jailed for two days. Upon release, Ms. Simpson "immediately reached out to Hertz and spoke to the representatives from the 1-800 corporate number. She told them she had been falsely arrested. Hertz apologized for the misunderstanding, told [her] they had the correct paperwork to prove that [Ms. Simpson] legally owned the vehicle and would send paperwork to the police to have the charges dropped." Claim No. 15,839, at 17 (¶¶ 20–21). Hertz never followed through and sent police/prosecution that exonerating paperwork—and after months more facing prosecution for 5–25 years in prison, Ms. Simpson accepted a year in probation in exchange for dropping the charges.

HH.   **Jason Reeder**: Mr. Reeder filed Claim No. 15,882 on January 31, 2022. Mr. Reeder rented from Hertz in Myrtle Beach, South Carolina in April 2015. He called the local branch to extend each week, and in mid-June called to make sure Hertz was aware that his funds were low but he would provide new payment soon—the local manager thanked him and told him not to worry. But on June 30, 2015, police arrived at his home. He showed them the rental agreement. The police called Hertz corporate, which said that a payment had been made and it was not sure why a warrant had issued. But the local branch then told police that the car was listed as stolen by corporate and that Mr. Reeder should thus be arrested. He was arrested and prosecuted until at least January 15, 2016.

II.   **Franklin Richards & Celita James**: Mr. Richards filed Claim No. 15,919 on February 1, 2022. Ms. James filed Claim No. 15,918 on February 1, 2022. Mr. Richards was a returning Hertz renter who rented from LAX airport on or around June 4, 2016. It was a one-month rental and he extended for another month at the location. In late July or early August, Mr. Richards saw a large charge hit his card. Soon thereafter, Mr. Richards and his wife Ms. James were driving when they were stopped at gunpoint by 8 police vehicles and a police helicopter. Police told Mr. Richards the car had been reported stolen in Texas—he had not rented the car from Texas but recalls that it had Texas plates. Mr. Richards was arrested and jailed for 7 days before being let go. He was not aware of formal charges until 2020, when he applied for a government job and a background report revealed a warrant for his arrest for stealing a vehicle. Mr. Richards believes that the charges remain pending.

JJ. **Kevin Richardson & Kevin Richardson, Jr.**: Mr. Richardson and Mr. Richardson, Jr., filed Claim Nos. 15,913 and 15,908 on February 1, 2022. Mr. Richardson rented from Hertz in Little Rock, Arkansas on May 13, 2017 to attend a wedding. Just two days later, Mr. Richardson was arrested at gunpoint for possessing a "stolen" vehicle, and his son (then 15) was held at gunpoint during the arrest. The police confirmed Mr. Richardson's rental agreement and determined that the car had been reported stolen on May 9, before the rental. In the police report, the officer details: "It was apparent that Hertz had reported the vehicle stolen in error, given that they had rented it out after reporting it stolen to Little Rock Police. . . . I spoke with dispatchers with LRPD, who in turn contacted the Hertz employee that filed the commercial burglary and stolen vehicle reports. It was determined that the vehicle rented to Mr. Richardson was entered stolen by mistake." Claim No. 15,913, at 22–23.

KK. **Darlene Sacca**: Ms. Sacca filed Claim No. 15,901 on January 31, 2022. Ms. Sacca rented from Hertz around November 1, 2018 in Las Vegas, Nevada. On November 6, the rental was stolen from her. Ms. Sacca reported the vehicle stolen to the police and informed Hertz of the theft and report number. She returned home but received a letter on or around November 28, 2018. It said she would be charged with theft if she didn't return the rental. She immediately called Hertz corporate and again gave all the information about the police report, rental, and customer care number. Hertz said the situation was resolved. But she later received a text on December 22, 2018 again threatening to report her for theft. In January 2019, she learned that police recovered the vehicle from the real thieves and returned it to Hertz. But she was later charged $3,490 in March 2020. Based on this fact pattern in comparison to other

24

Claimants, it is likely that Hertz reported Ms. Sacca for theft and that she could be arrested or prosecuted at any time.

LL. **Dan Shurtz**: Mr. Shurtz filed Claim No. 15,902 on January 31, 2022. Mr. Shurtz rented a Hertz vehicle in Wichita, Kansas on or around March 12, 2018. He was arrested at gunpoint on March 28, 2018. After being shown the recent rental contract, the trooper contacted Hertz, which admitted that Hertz had reported the vehicle's tags stolen before renting that vehicle to Mr. Shurtz. The local office the next day "confirmed to [Mr. Shurtz] he was rented a stolen vehicle and said 'we are sorry about you getting arrested.'" Claim No. 15,902, at 15 (¶15).

MM. **Ramie Singer & Zachary Tedder**: Ms. Singer filed Claim No. 15,872 on January 31, 2022. Mr. Tedder filed Claim No. 15,876 on January 31, 2022. Ms. Singer rented a Hertz vehicle in Miami, Florida in October 2019. She called the 1-800 number each week to extend the rental. One week, her credit card reached its limit so she missed a payment and instead went and made her weekly payment at the local branch—she was not told of any issues. At one point, she saw a charge for over $1,200. On January 13, 2020, Ms. Singer and Mr. Tedder were arrested at gunpoint for "possession of a stolen vehicle." They informed the police that it was a Hertz rental, and the police said "they had dealt with potential stolen vehicles from Hertz before, and were aware that there might be some miscommunication involved." Claim No. 15,872, at 15 (¶7). Ms. Singer spent two days in jail; Mr. Tedder spent one day in jail. Both were prosecuted. Mr. Tedder's case was dismissed on February 12, 2020. On February 28, 2020, Ms. Singer agreed to deferred prosecution because she was facing serious charges and Hertz refused to show up to court.

NN.  **Ameerah Singleton**: Ms. Singleton filed Claim No. 15,794 on January 25, 2022. She rented a vehicle through State Farm from Hertz in Baton Rouge, Louisiana in May 2017, and State Farm was handling extensions and payments on the rental. In July or August, 2017, the vehicle was towed back to Hertz—Ms. Singleton was surprised at the tow and spoke to the local office, which could not explain why the vehicle was towed. But on or around September 15, 2017, Ms. Singleton was arrested and jailed for 4 days for "stealing" the insurance rental that had been towed long prior. Charges against Ms. Singleton remain pending to this day.

OO.  **Evan Tanner**: Mr. Tanner filed Claim No. 15,936 on February 2, 2022. A Maryland resident, Mr. Tanner rented through the Uber/Hertz program from a location in Fairfax, Virginia, about 75 minutes from his home. He rented a vehicle in late September 2020; Hertz sold that vehicle during the rental and he returned it when asked. In mid-November, he rented another vehicle and would return to the location each week to extend the vehicle. In mid-December 2020, the rental transitioned to a personal rental and the rates increased. He disputed the higher rate, but could see charges on his account each week. In February 2021, he was charged $2,700. He called many times to contest the charge, but didn't get anywhere. Unknown to him, Hertz had reported him for theft around that time, claiming that he a vehicle was due back in early October 2020. (This likely was the vehicle that was sold and that he returned long before the arrest.)  Mr. Tanner was arrested and spent three weeks in jail. All charges were dismissed in in mid-2021, with the Judge commenting that Mr. Tanner "wasn't the first Uber driver he had seen reported by Hertz." Claim No. 15,936, at 15 (¶ 19).

PP. **Latricia Taylor**: Ms. Taylor filed Claim No. 15,874 on January 31, 2022. She rented a Hertz vehicle on November 15, 2019 in Capital Region International Airport in Lansing, Michigan. The rental initial extended until December 12, and it was secured with a valid credit card. Before the return date, Ms. Taylor extended the rental with the local Hertz office for two additional weeks. She then extended again for another two weeks in person at the Airport location and visited the branch on or around January 4. On January 28 or 29, she spoke with the local branch and agreed to return the vehicle on January 30, but that day the police told her the vehicle had been reported stolen. With an outstanding warrant for her arrest, Ms. Taylor turned herself into police I nearly October 2020, at which point she was arrested and jailed for two days. All charges were dismissed on October 20, 2020.

QQ. **Jamol Toney**: Mr. Toney filed Claim No. 15,891 on January 31, 2022. Mr. Toney was an Uber driver who had rented from a Thrifty location in Louisiana since 2017. He paid more than $1,000 a month for his rentals. On February 23, 2021, Hertz emailed Mr. Toney to ask him to return the vehicle to a Hertz location elsewhere in Louisiana. Mr. Toney visited the new location within a few days and they agreed on an April 1, 2021 return date so he could keep driving for Uber. But on March 25, 2021—before the agreed-upon return date—Mr. Toney was arrested for alleged "theft" of the rental, jailed for one day, and then prosecuted for theft. He is currently facing charges.

RR. **Connie Totman (a/k/a Gypsylynn Ware)**: Ms. Totman filed Claim No. 15,893 on February 1, 2022. Ms. Totman rented from an airport branch in Columbia, South Carolina on April 29, 2016. She was hiking the Appalachian Trail and had a deal with

Hertz to leave the car at the trailhead in Suches, Georgia. After parking, she called Hertz and gave them the coordinates of the vehicle so that it could be picked up. Ms. Totman was then on the trail for one month without phone service. When she arrived back, she saw a receipt confirming the conclusion of her rental and payment. When she attempted to book a hotel room, however, she realized that her account was overdrawn. She saw that Hertz had charged her $3,936.52. She immediately called Hertz for an explanation of the overcharge—eventually the bank contacted Hertz, confirmed that the overcharge was an error, and Hertz reimbursed Ms. Totman. But around September 2016, Ms. Totman was arrested in Cleveland, Georgia based on a South Carolina Hertz warrant. She called Hertz, furious about the false report—Hertz assured her that the situation had been resolved. In February 2017, she was again arrested in Georgia, but not extradited to South Carolina. Finally, on October 1, 2017, Ms. Totman turned herself into detectives in South Carolina, was arrested a third time, and briefly jailed. All charges were dismissed on June 3, 2019 because "victim [was] unable to locate information on vehicle." Claim No. 15,893, at 16–17 (¶ 18) (quoting dismissal).

SS. **Elbert James "Jimmy" Turpen, Jr.**: Mr. Turpen filed Claim No. 15,900 on January 31, 2022. Mr. Turpen was a returning renter who rented from Hertz in Southaven, Mississippi on September 22, 2020. He provided his debit card and returned the vehicle on September 28. After Mr. Turpen moved to Arkansas, he was charged $3,952.88 on January 26, 2021, but he did not see the charge at the time. On or around July 12, 2021—unknown to Mr. Turpen—Hertz reported him for stealing the Mississippi rental he had returned nearly a year earlier after six days. Around October

21, 2021, Mr. Turpen was arrested and jailed for five days in Arkansas. He was not extradited because he had recently suffered a stroke, but Mr. Turpen understands that there are active charges and an arrest warrant in Mississippi based on the earlier rental.

TT. **Nkem Uwagboi**: Ms. Uwagboi filed Claim No. 15,899 on January 31, 2022. Ms. Uwagboi rented from Hertz in Berwyn, Illinois around October 16, 2019 through a program for Uber drivers. On October 19, she was arrested while two passengers were in her vehicle and then taken to jail. Police finally contacted a Hertz location at O'Hare Airport, which confirmed that Ms. Uwagboi had a valid rental contract— Hertz had rented Ms. Uwagboi a stolen vehicle.

UU. **Jennifer Weems**: Ms. Weems filed Claim No. 15,808 on January 25, 2022. Ms. Weems rented a vehicle from Hertz in Redmond, Oregon on August 19, 2015—it was a three-month rental that she returned on November 14, 2015. On February 17, 2016, Ms. Weems was arrested in Texas for theft of a vehicle in Oregon and spent two days in jail. Oregon declined to extradite her because it was a "phony" theft charge. But Texas then charged her—and Ms. Weems fought the charges until they were dismissed on September 29, 2016 because Hertz had admitted to the Oregon District Attorney that it had filed a false theft report. During that time she lost her job based on the pending charges.

VV. **Tiffany West**: Ms. West filed Claim No. 15,905 on January 31, 2022. Ms. West rented a Hertz vehicle in Conroe, Texas on April 4, 2020. She called the corporate 1-800 number to extend the rental each week. In August, the marketing department offered to sell Ms. West the vehicle and she agreed to purchase it on August 15, 2020.

A first payment was withdrawn from her account on November 5, 2020. But on November 14, 2020 police kicked down the door to her hotel room and arrested her for theft of the Hertz vehicle. She was jailed for three days at that time and is still being prosecuted. Investigation is ongoing, but it is likely that Hertz reported Ms. West for theft when it could not find the vehicle after the rental was marked concluded, but did not realize that it had *sold the vehicle* to Ms. West.

WW. **William West**: Mr. West filed Claim No. 15,847 on January 28, 2022. Mr. West rented from Hertz in Philadelphia, Pennsylvania around late July 2016. He extended the rental each week and used to credit card as payment. On Friday, November 18, 2016, Hertz asked Mr. West to return the vehicle for a routine checkup—he replied that he was away on business they agreed he would bring in the vehicle on Monday the 21st. That night, Mr. West was arrested in Philadelphia and jailed for three days. Hertz never appeared during *years* of prosecution until charges were dismissed around January 2019.

XX. **Anson Westerfield**: Mr. Westerfield filed Claim No. 15,795 on January 25, 2022. He was a regular renter and Gold Club member and he would regularly extend rentals using the 1-800 number or by going to the local office (which knew him by name). Mr. Westerfield began a rental in late January 2021, but in February of 2021, he was pulled over and arrested shortly after renting the vehicle. He explained to the police and to Hertz that he was Gold Customer, not a car thief, and that the theft report was false. But Hertz told him he would have to deal with the criminal justice system. He was imprisoned for three days and prosecuted for grand theft auto for eight months before charges were dismissed.

YY.  **Monique Wheeler**: Ms. Wheeler filed Claim No. 15,898 on January 31, 2022.

Ms. Wheeler rented a vehicle from Hertz on May 6, 2015 in Redlands, California.

The rental was due back in November 2015 and was supposed to extend beyond that

through the multi-month program. On June 8, 2015, Ms. Wheeler authorized Hertz to

charge a new card for her rental and Abir Muhaimin in the multi-month rental

department confirmed it. On June 10, 2015, Ms. Wheeler traded her rental for a

different vehicle at the Hertz location at the Harry Reid International Airport, and the

multi-month rental department again confirmed her card and information. But

unknown to Ms. Wheeler, Hertz field a theft report against her on October 12, 2015

claiming the vehicle was due back September 3, which was not true. On November

11, 2015, Ms. Wheeler was arrested and jailed for two days in Texas. Upon release,

she called the 1-800 Hertz corporate office "to demand to know why they falsely

issued a warrant for her arrest." Hertz took her information but never followed up

with her. The case in Texas was dismissed on May 18, 2016. But on September 15,

2017, Ms. Wheeler was again arrested and jailed for 3 days based on the same bogus

charges. That prosecuted ended on October 23, 2017.

ZZ. **Larry Wilcoxson**: Mr. Wilcoxson filed Claim No. 15,927 on February 2, 2022. Mr.

Wilcoxson was a repeat renter who rented a car from the Naples airport location in

Florida in Fall 2013. He extended the rental each week. He was arrested around

February 15, 2014. The police called the local office, which said it was unaware of

any issue with Mr. Wilcoxson's rental but to arrest him if a report had been filed. Mr.

Wilcoxson was convicted and ultimately spent 181 days in jail in connection with the

conviction and his relevant probation. In January 2022, with support of the prosecution, the Court vacated his conviction and all charges were dropped.[15]

AAA. **Jeric Wilson**: Mr. Wilson filed Claim No. 15,903 on January 31, 2022. Mr. Wilson rented a Hertz vehicle through Uber in Nashville, Tennessee in September 2020. He stayed in touch with Uber and Hertz to extend his rental, which continued week to week through his job. In mid-January 2021, he saw a $3,900 charge on his card—around January 20, 2021 he was arrested at gunpoint and taken to the police station. The police called Hertz, which said that the car was not on its internal

---

[15]   Counsel is continuing to review statute of limitations issues in connection with the claims of certain Movants listed below. But these Movants, at a minimum, present contingent claims based on the possibility of overturning their convictions similar to Mr. Wilcoxson.

Movant Shayla Colbert filed Claim No. 15,916 on February 1, 2022. Ms. Colbert rented a vehicle in December 2005 from Hagerstown International Airport in Maryland. She extended the rental by calling the location on or around January 1, 2006. But police later towed the vehicle as it had been reported stolen. When called, the local branch admitted that the vehicle was reported stolen by mistake and offered to let her retrieve the car. She declined and left the vehicle with Hertz. But on May 9, 2006 she was again arrested for stealing the Hertz vehicle. She spent 13 days in jail was prosecuted for about five months—during which time Hertz never showed up to prosecute the case—at which point she accepted a plea deal for probation to move on with her life and be with her children.

Movants Amir Thomas (son) and Lisa Brower (mother) filed Claim Nos. 15,917 and 15,909 on February 1, 2022. Ms. Brower rented from Dollar around March 2015 in Cleveland, Ohio. She extended online and by calling the location. Around October 25, 2015, Mr. Thomas was sitting in the rental when police surrounded him at gunpoint—he was arrested and spent 5 days in jail. Ms. Brower was arrested on November 17 and spent 27 days in jail. Facing lengthy sentences, both accepted minor plea deals around January 2016.

Movant Blagoja Bakrevski filed Claim No. 15,797 on January 25, 2022. Mr. Bakrevski rented a vehicle from Hertz in 2012 in Los Angeles and extended monthly. During the rental, Mr. Bakrevski's credit card was renewed and he called Hertz, giving the company the new card number to charge for the rental. But about one week after providing the new card, Mr. Bakrevski was arrested because Hertz reported him for "stealing" the rental, jailed for 2 days, and prosecuted for almost 100 days. As an immigrant facing deportation for a felony, Mr. Bakrevski pled to a misdemeanor and spent 10 more days in jail.

"stolen" list, so he was released. Hertz never showed up during his prosecution and all charges were dismissed around July 15, 2021.

BBB. **Duni Zenaye**: Ms. Zenaye filed Claim No. 15,799 on January 25, 2022. In September 2020, Ms. Zenaye—a frequent renter—rented a vehicle from a Hertz location in Woodbridge, Virginia. Ms. Zenaye regularly extended her rental by directly contacting the local manager, and could see money being taken out of her account each week. On January 13, 2021, Ms. Zenaye spoke to the location manager to extend the rental. The manager asked her to return the vehicle that day, but Ms. Zenaye needed the car so they agreed upon a return on Saturday, January 16—by this point Ms. Zenaye had paid more than $3,900 for the rental. But on January 14, two days before the agreed-upon return date, police showed up and arrested her. She was jailed for two days and prosecuted for 121 days until charges were dismissed when she presented evidence and Hertz did not show up to court.

III. **Notice**

9. According to the affidavits of service [Case No. 20-11218, D.I. 1354, 1376, 1447, 4573 & 5274], the Bar Date Order[16] and Bar Date Notice[17] were not served on the Movants.[18] On

---

[16] *Order Establishing Bar Dates and Related Procedures for Filing Proofs of Claim, Including Claims Arising Under Section 503(b)(9) of the Bankruptcy Code, and Approving the Form and Manner of Notice Thereof* dated September 9, 2020 [Case No. 20-11218, D.I. 1240] (the "Bar Date Order").

[17] *Notice of Deadlines for Filing Proofs of Claim, Including Claims Arising Under Section 503(b)(9) of the Bankruptcy Code, Against Debtors* dated September 9, 2020 [Case No. 20-11218, D.I. 1376 Ex. C] (the "Bar Date Notice").

[18] In reviewing the various affidavits of service, counsel identified several names similar to those of a Movant listed as "address on file." Counsel do not believe these listings reflect service to the Movants, but list them here in interest of full disclosure. Where individuals appear in multiple service lists, only the most recent master service list is identified. *See* Case No. 20-11218, D.I. 5550. "Andrews, Patrick Duane," D.I. 5550-3, at 272, tracks the name of Movant

September 17, 2020, the Debtors' claims and noticing agent published the Publication Notice (as defined in the Bar Date Order) in various news publications. [Case No. 20-11218, D.I. 1396 (affidavit of publication).]

      10.    Based on the affidavits of service [Case No. 20-11218, D.I. 4314, 4520, 4529, 4861, 4953, 5147, 5222, 5877], it appears that notice[19] of the Plan and hearing to consider confirmation thereof (the "Confirmation Hearing") was not served on any of the Movants (who were not represented by the below-signed counsel until after the Confirmation Hearing). On April 30, 2021 and May 4, 2021, a version of the Confirmation Hearing Notice was published in 12 newspapers. [Case No. 20-11218, D.I. 4619 (affidavit of publication).]

---

Patrick Andrews, but this individual was served notice of the General Bar Date on September 16, 2020. Movant Patrick Andrews rented the relevant vehicle in October 2020, and did not have any theft-related interactions with Hertz until 2021, and did not recall receiving any notice. Therefore, counsel do not believe that listing reflects the Movant. "Daniel Hernandez," *id.* at 1183, is a common name and unlikely to reflect Movant Daniel Morales Hernandez, who counsel understands listed "Daniel Morales" on his rental contract. Counsel further have no reason to believe that "Morales, Daniel Christopher," D.I. 5550-4, at 679, or "Morales, Daniel," *id.*, refer to Movant Daniel Morales Hernandez, as they are not familiar with the added name Christopher and both were served notice of the General Bar Date on September 16, 2020, while Movant Daniel Morales Hernandez was not arrested until September 20, 2020. Counsel does not believe that "Jose Eduardo Monteiro Correa," D.I. 5550-3, at 2379, is Movant Jose Monteiro, as counsel are not familiar with the additional names and that individual in service list was also served notice of the general bar date, while Movant Joes Monteiro's relevant arrest/detention occurred in April 2021. "Charles Randolph Malone," D.I. 5550-4, at 340, is not likely Movant Charles Malone, whose middle initial, counsel understands, is "D." "Kevin Richardson," *id.* at 14, "Richardson, Kevin," *id.* at 1321, and "Richardson, Kevin A." *id.*, are unlikely to be Movants Kevin L. Richardson (Sr. or Jr.), as the middle initial is inconsistent with two of the entries and "Kevin Richardson" is a common name. "West, Tiffany M.," *id.* at 2317, is unlikely Movant Tiffany West given the spelling of the first name and because the Movant's middle initial, counsel understands, is "G." Lastly, counsel have no reason to believe that "West, Willie," *id.*, refers to Movant William West.

[19]   *Notice of (I) Approval of Disclosure Statement, (II) Establishment of Voting Record Date, (III) Hearing on Confirmation of the Plan, (IV) Procedures for Objecting to the Confirmation of the Plan, and (V) Procedures and Deadline for Voting on the Plan* [Case No. 20-11218, D.I. 4138] (the "Confirmation Hearing Notice").

11.     According to the affidavits of service [Case No. 20-11218, Docket Nos. 5512,

5550, 5576, 5872, and 5887 and Case No. 20-11247, Docket Nos. 15, 37, 95, and 170], notice[20]

of the Administrative Claims Bar Date was not served on any of the Movants (who were not

represented by the below-signed counsel until after the Administrative Claims Bar Date).

According to a Certificate of Publication, notice of the Administrative Claims Bar Date was

published in two newspapers on July 7, 2021. [Case No. 20-11218, D.I. 5524.]

12.     Because the Debtors did not serve the Bar Date Order, the Bar Date Notice, the

Confirmation Hearing Notice, or the Administrative Bar Date Notice on the Movants, the

Movants did not know to (and thus, did not) file proofs of claim on account of any prepetition

claims, opt out of the Plan's third-party release provisions or otherwise object to the Plan, or file

requests for payment of an administrative expense or file proofs of claim on account of any post-

petition claims.

## IV.    The Plan and Confirmation Order

13.     The Plan was confirmed on June 10, 2021, and went effective on June 30, 2021

(the "Effective Date"). [Case No. 20-11218, D.I. 5477.] Regarding discharge, the Plan provides,

in pertinent part, that on the Effective Date,

> the distributions, rights, and treatment that are provided in the Plan
> shall be in complete satisfaction, discharge, and release, effective
> as of the Effective Date, of Claims . . . of any nature whatsoever
> . . . whether known or unknown, against . . . the Debtors or any of
> their assets . . . that arose before the Effective Date . . . whether or
> not (i) a Proof of Claim based upon such debt . . . is Filed pursuant
> to section 501 of the Bankruptcy Code; (ii) a Claim . . . based upon
> such debt is Allowed pursuant to section 502 of the Bankruptcy
> Code; or (iii) the Holder of such Claim . . . has voted to accept the
> Plan.

---

[20] *Notice of Effective Date and Entry of Order Confirming the Second Modified Third
Amended Joint Chapter 11 Plan of Reorganization on the Hertz Corporation and Its Debtor
Affiliates* [Case No. 20-11218, D.I. 5477] (the "Administrative Bar Date Notice").

(Plan Art. VIII.B.)  The Plan provides further that "[t]he Confirmation Order shall be a judicial determination of the discharge of all Claims . . . ."  (*Id.*)

14.     Regarding third-party releases, the Plan provides, in pertinent part, that each "Releasing Party" (defined in Art. I.A.321 to include "Holders of Unimpaired Claims . . . who do not File a timely objection to the third party releases provided for in Article VIII.D")

> shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived and discharged each Debtor, Reorganized Debtor, and other Released Party from any and all Claims . . . , whether known or unknown, foreseen or unforeseen, existing or hereinafter [*sic*] arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, the Debtors . . . or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing.

(Plan Art. VIII.D.) The term "Released Party" is defined to include, among others, all of the Debtors' current and former directors, officers, and affiliates, as well as the affiliates' current and former directors and officers. (Plan Art. I.A.320.)

15.     The Plan's injunctive provision provides, in pertinent part, as follows:

> ALL ENTITIES THAT HAVE HELD, HOLD, OR MAY HOLD CLAIMS . . . THAT HAVE (1) BEEN RELEASED PURSUANT TO . . . <u>ARTICLE VIII.D</u>, [OR] (2) SHALL BE DISCHARGED PURSUANT TO ARTICLE VIII.B OF THE PLAN . . . ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE DEBTORS, THE REORGANIZED DEBTORS, [OR] THE RELEASED       PARTIES . . . :     (I) COMMENCING      OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR RESPECT TO ANY SUCH CLAIMS . . . ; AND (V) COMMENCING OR CONTINUING IN ANY MANNER

> ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON
> ACCOUNT OF OR IN CONNECTION WITH OR RESPECT TO
> ANY SUCH CLAIMS ... RELEASED OR SETTLED
> PURSUANT TO THE PLAN.

(Plan Art. VIII.F.)

16.     Paragraph 15 of the Confirmation Order provides that each of the foregoing provisions of the Plan is "hereby approved and will be effective immediately on the Effective Date without further order or action by the Court . . . ." Thus, absent relief from the Confirmation Order, the Movants understand they would be prohibited from commencing suit against the Reorganized Debtors or any of the enumerated "Released Parties,"[21] prosecuting such a suit, or collecting any judgment that may result. Accordingly, while the Movants do not believe these provisions of the Confirmation Order and Plan are properly enforceable against them for want of proper notice, they seek relief from the Confirmation Order from this Court in an abundance of caution, while proceeding on a parallel track with the motions filed by claimants in "Group 3" [D.I. 190] (the "Group 3 Motion") and "Group 4a" [D.I. 193] (the "Group 4a Motion"), which raise many of the same factual and legal issues presented by this Motion.[22]

## RELIEF REQUESTED

17.     By this Motion, the Movants seek entry of an order permitting their claims against the Debtors to move forward to the merits in this court or otherwise. A proposed order granting relief from the Confirmation Order, insofar as it implements the discharge, release, and injunctive provisions of the Plan, is attached as Exhibit A hereto (the "Proposed Order").

---

[21]     Article VIII.D on its face does not release "Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence." The Movants reserve to right to bring any actions permitted by that exception to Article VIII.D, including outside of Bankruptcy Court.

[22]     The Movants join in the arguments advanced in the Group 3 and Group 4a Motion, as well as the Group 3 Claimants' response to the Reorganized Debtors' 21st Omnibus Objection [D.I. 50], to the extent applicable and consistent with this Motion.

Alternately, should that relief be denied for any reason, the Movants request entry of an order (i) extending the General Bar Date and Administrative Bar Date or otherwise deeming the Movants' proofs of claim timely so as to permit the Movants to assert claims against the Reorganized Debtors under the applicable processes set forth in the Plan, and (ii) deeming the Movants to have timely "opted out" of the Plan's third-party release provisions.[23]

18.     Counsel will address certain aspects of the Movants' arguments in the Court-ordered supplemental briefing due on February 14. The remainder of the Motion will be calendared for a later hearing date based on subsequent guidance from the Court.

## SUMMARY OF ARGUMENT

19.     The Movants seek to bring pre-petition and post-petition claims against the Debtors, among other reasons, because they were not given constitutionally and statutorily required notice of the General Bar Date, Confirmation Hearing, and Administrative Claims Bar Date.

20.     First, the Movants are known creditors for purposes of the relevant bar dates. Even without discovery, the Movants have identified Hertz's substantial, internal efforts to track police reports and claims related to police reports in connection with third-party insurers. This follows from common sense: of course a company should keep track of those it accuses of serious crimes. *See, e.g.*, *In re J.A. Jones, Inc.*, 492 F.3d 242, 251–53 (4th Cir. 2007) (accident victims were known creditors based, in part, on debtor's reporting potential claims to an insurer, investigating the possibility of similar claims, and retaining counsel in connection with those possible claims). Moreover, the Debtors had overwhelming knowledge of the systemic issues underlying their theft reporting, including from law enforcement, news media, many individuals,

---

[23]    The Movants have not included a proposed form of order on this alternative relief, but will do so if and when the circumstances require.

many lawsuits, and extensive prepetition contact with some of the below-signed counsel—not to mention likely ample records relating to each individual (which will be revealed with discovery). These facts put the Movants comfortably within the known creditor group. *See, e.g.*, *In re Motors Liquidation Co.*, 829 F.3d 135, 159–61 (2d Cir. 2016); *Fogel v. Zell*, 221 F.3d 955 (7th Cir. 2000). In fact, most of the Movants specifically put the Debtors on notice that false police report had been filed, sent demand letters, or threatened litigation, but even these Movants were not given notice of the relevant bankruptcy deadlines.

21.     Even if the Movants were not known creditors, the Debtors' publication notice in this case fell far short of the standards put forward by the Supreme Court in *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 317 (1950). The Third Circuit has made clear that publication notice to unknown creditors is a fact-intensive inquiry not subject to blanket rules. *Wright v. Owens Corning*, 679 F.3d 101, 107–08 (3d Cir. 2012). Here, notice was published only once buried deep in a handful of newspapers. There were many other means of reaching unknown creditors, means that are inexpensive and easily available, but the Debtors took none of those approaches and made no apparent efforts to investigate the best means of informing unknown creditors. In fact, the published notices were missing critical pieces of information—such as *the name of each debtor*—that are required by the Bankruptcy Code and the Bankruptcy Rules. The Debtors' paltry efforts fell well short of those required by the Fifth Amendment and illustrated by other cases in this Circuit.

22.     In addition to their due-process arguments, the Movants' claims may also be deemed timely on other grounds. First, the pending class proofs of claim tolled the bar date for putative class members. And to the extent that this court denies the class claim, an extension of the relevant bar dates for putative class members has been requested, has not been objected to,

and is common practice in bankruptcy courts. Moreover, the *Pioneer* excusable neglect factors call for such relief, especially in light of the full-pay plan,[24] the fact that these claims were encompassed by timely filed class claims, the lack of actual awareness of the bar dates on the Movants part, the lack of impact on the larger bankruptcy proceedings now that a plan has been confirmed, and the good-faith nature of these claims. *See Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993). Finally, there is no bar date prohibiting assertion of certain post-petition claims as general, unsecured claims under the terms of the Plan.

## BASIS FOR RELIEF REQUESTED

### I.   Debtors Failed to Provide Notice to the Movants.

#### A. Legal Background.

23.    "For notice purposes, bankruptcy law divides claimants into two types, 'known' and 'unknown.'" *Chemetron*, 72 F.3d at 346 (citing *In re Charter Co.*, 125 B.R. 650, 654 (M.D. Fla. 1991)). "Known creditors must be provided with actual written notice of a debtor's bankruptcy filing and bar claims date." *Id.* (citations omitted). As characterized by the Supreme Court, a "known" creditor is one whose identity is either known or "reasonably ascertainable by the debtor." *Tulsa Pro. Collection Serv., Inc. v. Pope*, 485 U.S. 478, 490 (1988); *see In re Arch Wireless, Inc.*, 534 F.3d 76, 81 (1st Cir. 2008) ("[I]n order for a claim to be reasonably ascertainable, the debtor must have in his possession . . . some specific information that reasonably suggests both the claim for which the debtor may be liable and the entity to whom he would be liable.") (quoting *In re Crystal Oil Co.*, 158 F.3d 291, 297 (5th Cir. 1998)); *J.A. Jones*, 492 F.3d, at 250 ("[A] creditor is 'reasonably ascertainable' if the debtor can uncover the identity

---

[24]    Additionally, as argued in the Group 3 Claimants' response to the Reorganized Debtors' 21st Omnibus Objection, and incorporated herein by reference, sections 502(b)(9) and 726(a)(3) mandate allowance of "late" claims given the distribution posture of the Plan.  [D.I. 50 at ¶¶ 56-58.]

of that creditor through 'reasonably diligent efforts.'") (quoting *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 798 n. 4 (1983)). An "unknown" creditor, on the other hand, is one whose "interests are either conjectural or future or, although they could be discovered upon investigation, do not in due course of business come to knowledge [of the debtor]." *Mullane*, 339 U.S., at 317.

24.     In bankruptcy, "a debtor must make reasonably diligent efforts to uncover the identities of those who have claims against it . . . ." *In re Thomson McKinnon Secs., Inc.*, 130 B.R. 717, 720 (Bankr. S.D.N.Y. 1991) (citing *Charter Crude Oil Co. v. Petroleos Mexicanos (In re Charter Co.)*, 125 B.R. 650, 655 (M.D. Fla. 1991)); *accord Trans World Airlines*, 96 F.3d at 690 ("[T]he debtor must undertake a careful examination and diligent search of its own books and records." (citing *Chemetron*, 72 F.3d at 346-47)). Moreover, "[s]ituations may arise when creditors are 'reasonably ascertainable,' although not identifiable through the debtor's books and records." *Chemetron*, 72 F.3d, at 347 n.2. And "[i]f the debtor knows, or should know, of its *potential liability* to a specific creditor, that creditor is a known creditor entitled to actual notice." *Thomson McKinnon Secs.*, 130 B.R. at 720 (emphasis added) (citing *Atlantic Richfield Co. v. Sharon Steel Corp. (In re Sharon Steel Corp.)*, 110 B.R. 205, 206 (Bankr. W.D. Pa. 1990)); *see also Trans World Airlines*, 96 F.3d, at 690 ("a diligent search of TWA's records by its bankruptcy counsel would, *or at least should*, have revealed the Berger claims." (emphasis added)).

25.     "Determining the adequacy of publication notice is a fact-intensive analysis that 'depends on the circumstances of a particular case.'" *In re Weiand Auto. Indus.*, 612 B.R. 824, 851 (Bankr. D. Del. 2020) (quoting *Wright v. Corning*, 679 F.3d 101, 108 (3d Cir. 2012)). The Supreme Court has made clear that, even in the bankruptcy context, "[n]otice by publication is a

poor and sometimes a hopeless substitute for actual service of notice. Its justification is difficult at best." *City of New York v. New York, N. H. & H. R. Co.*, 344 U.S. 293, 296 (1953). Accordingly, "[a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane*, 339 U.S., at 314. "The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it." *Id.*

### B. The Movants Are Known Creditors Who Did Not Receive Actual, Written Notice.

26.     The Movants are known creditors who required actual notice of the General Bar Date, the Plan and Confirmation Hearing, and the Administrative Bar Date, as applicable, but who received none. The Debtors acknowledge that they maintain books and records in the ordinary course, and upon information and belief, they have in their possession specific records showing that Movants were implicated by police reports filed by Hertz. Moreover, the Debtors had extensive awareness of the issues underlying these claims, including, in some instances, systematic destruction of rental extensions and other records that would substantiate the claim. To be clear: the Movants have not received any discovery relating to these matters, and they believe that discovery—including but not limited to the pending discovery—is fully appropriate on these factual inquiries. But even without discovery, the Movants have shown that the Debtors had extensive knowledge of systemic issues that caused tremendous injury to a known, and limited, group of individuals who had been accused or arrested based on the Debtors' theft reporting. Yet the Debtors took no steps whatsoever to inform those individuals that their rights in the bankruptcy proceedings would be affected by the General Bar Date or the Plan. That falls well short of what due process requires. *See Harbor Tank Storage*, 385 F.2d at 115 ("Although

notice by publication may be deemed to satisfy the requirements of the [Bankruptcy] Act in some situations, certainly such notice is insufficient where, as here, the trustee knows both the existence and address of a creditor.").

### i.    The Debtors Designed and Used Flawed Theft Reporting Processes

27.    The Debtors filed police reports accusing customers of serious crimes instead of simply using civil recourse methods of obtaining their vehicles—i.e., towing the vehicle and suing/arbitrating for breach of contract. Those theft reports, moreover, were generated based on flawed systems and practices that resulted in false, misleading, and incomplete reports. Employees at the local rental locations would then report completely misleading stories to the police, who believed they were dealing with bona fide grand theft auto cases, not valid rental agreements that, at worst, were overdue. The Debtors designed and maintained these systems and plainly were aware of their deficiencies, including the problems described below:

28.    **Failure to Investigate**: Hertz's internal policies purportedly require two levels of investigation before a theft report goes to the police: one at the national level and one at the local level by a Corporate Security Manager. [*See* Case No. 20-11218, D.I. 5032-2 ("Hertz Policy W7-02"), § (a)(17))]. The first level of the investigation is extremely incomplete. It consists only of reach-outs to the renter from Hertz's Vehicle Control, but usually does not assess whether the renter extended with or called Hertz's extension, billing, or roadside departments (for example, if the renter asked Hertz to tow a vehicle); does not look at payment; fails to obtain information from the local office, including notes about extensions and conversations; and fails to investigate (and document) when a customer has rented through insurers or rideshare companies. All of this information is critical because insurance rentals, rideshare rentals, paying customers, and renters who contact the company are unlikely to be thieves. Therefore, the second level of investigation at a local level by a Corporate Security Manager, which can look into these specific issues *and*

*actually look for the vehicle itself*, is critically important. Hertz has admitted that the local investigation is a critical safeguard against false police reports. *See* Attachment A, Wilkerson Testimony, at 34:16–37:17.[25] But Hertz has cut personnel in corporate security to save costs and told the remaining Corporate Security Managers to skip the local investigation and not investigate or verify the contents of the theft package. The following testimony was elicited at the *Grady* trial from Richard Livingston, Corporate Security Manager for the mid-Atlantic region:

> COUNSEL:    Is it your testimony that you don't go to the location and question any of the Hertz employees when you receive a theft package?
>
> MR. LIVINGSTON:  That's my testimony, yes.
>
> COUNSEL:    Why?
>
> MR. LIVINGSTON:  Because I mean the package has been completed, all the reports have been reviewed, I guess, by OKC. **And my marching orders are to report the car stolen** when I get the -- again, I do look at it for everything being accurate, as far as I can tell, within the report itself.
>
> COUNSEL:    **Yeah. But you don't do any independent investigation?**
>
> MR. LIVINGSTON:  **I do not.**
>
> COUNSEL:    **You don't do any check?**
>
> MR. LIVINGSTON:  **I do not.**

Attachment B, Livingston Testimony, at 195:17–196:8 & 115:05–117:11. (emphasis added). Mr. Livingston's Assistant Corporate Security Manager confirmed the same: "I didn't personally provide that information [in the theft package]. It was sent to me [by Vehicle Control], and I just reported it stolen as per Hertz policies." Attachment C, Graeber Testimony, at 19:6–14. And Hertz's Vehicle Control training manual requires immediately reporting the theft package

---

[25]  Unless otherwise noted, all citations to "Attachment [*X*]" refer to attachments to the Declaration of Francis Malofiy attached as <u>Exhibit B</u> hereto.

received from the national team rather than investigating its allegations:

> d.  **Renting Location Responsibilities**
>
> > 1)  Immediately report the theft to local law enforcement upon receipt of the theft package.

Attachment R, at 4 (excerpting DASH Vehicle Control Representative Desktop Procedure). The consequence of these policies is that in all cases the police are given a wholly incomplete theft report that does not reflect the actual course of the rental. The reports are unverified and uninvestigated—notably lacking information in possession of the local rental office and several key corporate departments.

29.    **False Rental History Information**. The theft packages often given to police present false and misleading information, which can be seen clearly through the case of Group 1 Claimant Hanna "John" Ayoub, for whom counsel have obtained significant records to date. (The Movants have not obtained any discovery to date.) The theft packages generally report that the accused has zero prior rentals and is not part of any rewards program even if that is not true. For instance, John Ayoub's theft package said:

| # Prior Rntls | Gold |
|---|---|
| 0 | N |

[*see* Case No. 20-11218, D.I. 5032-11, Ex. 10, p.2 ("Ayoub Theft Package")]. In reality, Mr. Ayoub was a returning renter and part and a "Gold" rewards member with Hertz (No. 986201102). *See* Ayoub Theft Package. These false statements to police are important pieces of

information in considering a theft accusation—a true thief is very unlikely to have returned earlier rentals and be part of the premier rewards program offered by the rental company.[26]

30.    **False Due Date Information/Deleted Extensions**. The theft packages also falsify and misleadingly present the rental's due date, while deleting rental extensions and failing to tell law enforcement of a customer's attempts to extend the rental. Return to John Ayoub's case. The theft package Hertz filed against Mr. Ayoub says that his vehicle was due on April 16, 2019:

```
Due Date/Time
2019/04/16 18:26
```

Ayoub Theft Package, at 2. In actuality, Mr. Ayoub called and extended his rental weekly on April 15, April 22, April 29, May 6, May 13, May 20, and May 28. *See* Claim No. 15,674, at 13 (¶3)]. That is provable because Mr. Ayoub recorded his phone calls extending the rental. In reporting Mr. Ayoub for theft, however, Hertz *deleted these rental extensions*, backdated the due date of the vehicle, and did not report to the police that John repeatedly called to extend (and did extend) the rental.[27] These rental extension deletions and omissions from the theft reports are done automatically by Hertz's system and are not visible to local branches or even Hertz's national employees. Those systems apply to all overdue-vehicle theft reports. Critically, because Hertz's systems automatically delete rental extensions, even Hertz employees do not know

---

[26]    Information available to date suggests that theft reports relating to insurance rentals— where an insurance company arranges a rental for the renter—also systemically (and falsely) say that the rental was not an insurance rental. Further discovery and investigation should shed light on that related issue.

[27]    Customers extend rentals in person or by phone, and during that interaction the customer will be told the extension goes through. After that occurs, Hertz then pings the customer's bank card with an "authorization hold" to verify the card is active. The "ping" on the renter's account further suggests to the customer that he or she has a valid extension. But if that hold is denied for any reason, Hertz's system erases the extension and backdates the due date of the rental. No trace of the customer contact and extension attempt or deletion remain in Hertz's system.

whether or not an extension was erased. That means that Hertz's theft packages systemically cannot tell police whether or not a renter called to extend the rental.

31.    **False and Misleading Payment Information**. Whether an accused "thief" has paid for and provided valid payment means for the rental is obviously an essential part of evaluating a potential theft. Hertz, however, has a practice of issuing false and misleading payment information when it accuses customers of theft. Return to Mr. Ayoub's case. Hertz reported to the police that he had a "Net Due" on his rental of $2,309.44, suggesting that he had absconded with the rental and refused to pay for it (and further reported that charges to his card were "denied"):



Ayoub Theft Package, at 2, 14. But the truth is that Mr. Ayoub gave Hertz a valid card and was charged (and he paid in full) the $2,309.44 on the very day the "theft package" was generated. Ayoub Declaration ¶7. This was not an accident or a one-off—this practice of reporting to police that victims have not paid for the rental only to charge their cards and receive payment immediately after filing the theft report is written in Hertz's Policy W7-02(D). It applies to all the overdue-vehicle theft reports filed by Hertz:

**D.    Closing Associated Rental Agreements**

1.    The OKC Vehicle Control Department (North America), Car Control Department (Brazil), Location/Branch Manager (Europe, Australia and New Zealand) must close the RA after verifying the Theft Vehicle Report with police. Therefore, North America and Brazil rental locations must not close the RA or perform an exchange on the RA.

2.    Once confirmed that the theft/conversion has been reported to the police, the responsible management (as listed above) must Close RAs in the ASAP/TAS/CARS+/HTZRENT Post Return or BCHCLOSE applications by:

- Entering an approximate 'mileage in', estimating 70 miles/100 kilometers per day.
- Recording the date the vehicle was reported stolen in the 'return date and time' field.
- Ensuring the Rent and Return locations are the same.
- Applying the 'best' or lowest rate available.

Attachment Q, at 2 (excerpting Hertz Policy W7-02 §(D)). In other words, Hertz's practice for *every overdue-vehicle theft report* is to give the police a theft package claiming massive unpaid bills and denied cards (which is overwhelmingly material to evaluating theft) while Hertz knows that it has the ability to charge the customer and in fact generally does so and receives payment immediately after filing a theft report.[28]

32.    **Omitted Renter Contacts**. The theft reports routinely omit important contacts with the renter, including not only extension requests, but also critical conversations with and statements made to local offices, Hertz Roadside towing services, investigators, and other employees and agents of Hertz. Mr. Ayoub's theft package, for example, omits his full responses to the investigator, his seven rental extensions, and his repeated other contacts with the local office and various corporate departments. Communications from the renter are obviously critical in assessing whether the renter is a likely thief, but Hertz routinely fails to give the police this exonerating information.

---

[28]   Hertz just recently reiterated this practice to a customer. *See* Claim No. 15,754, at 22 (¶33) ("We have reported [the car] as stolen to the authorities. Our process once a contract is severely overdue is to close the contract and charge the customer while we continue to work on recovering our property.").

33.    **Deletion of Records**. Hertz's policies (obtained to date) require maintaining rental records for seven years when a theft report is filed. But, based on investigation and prior judicial orders, Hertz deletes critical records relating to theft reports almost immediately after filing the report. These records, of course, would contradict the incomplete, false, and misleading theft reports. And the lack of records can make it much more difficult (if not impossible) for a victim to exonerate herself. In the *Grady* trial, Hertz was severely sanctioned for this conduct, including in a Court order that held:

- "The Hertz Corporation admits 'purging' and destroying Plaintiff's contract and payment information; had such information . . . not been destroyed the information it contained would have . . . shown that Grady did not steal the car and that she had done nothing criminal."

- "Hertz is precluded from introducing any evidence, testimony, or argument concerning the lack of electronic or physical contract renewal records."

- "Hertz is precluded from offering any evidence, testimony, or argument contesting that Ms. Grady was charged in full for the car rental."

- "Hertz is precluded from offering any evidence, testimony, or argument to dispute that Grady made 12 phone calls to Hertz numbers between" certain dates.

Attachment C (*Grady* Sanctions Order), at 1–2. These proven record-deletion practices affect every renter reported for theft. This is far more important than civil sanctions suggest: Hertz deliberately violates its document management policies to deprive victims of evidence that could exonerate them, knowing all the while that the information given to police was false and materially incomplete.

34.    **Refusal to Correct or Withdraw Theft Reports**. Not only are the theft reports systemically false and misleading, but Hertz has a corporate policy of refusing to withdraw or correct theft reports after they have been filed. That means when Hertz files a false and misleading theft report in the first instance, and then realizes that it has exonerating information (such as finding that the vehicle had been returned or paid for), it deliberately withholds this

information from law enforcement and leaves the victim to fight it out in the criminal justice system based on the original false report. Hertz has admitted this practice to the news: "Hertz has no mechanism to withdraw a criminal referral because, the company spokesperson said, it has to maintain a relationship of 'integrity and responsibility' with law enforcement. 'In the rare instances this happens, if you report a crime, and you later say it didn't happen, then law enforcement tends not to believe you if you retract it or say you were mistaken,' the spokesperson said. 'Hertz's continued good relationship with law enforcement is important.'"[29] And on December 6, 2021, Hertz again confirmed this ongoing practice to a Group 4a Claimant. Hertz told the victim: "We are not empowered to withdraw the theft report; *therefore, you must address this matter through the legal system.*" *See* Claim No. 15,754, at 48 (emphasis added). Hertz consequently has a uniform and ongoing policy of permitting false, outdated, and misleading information to form the basis for criminal charges and prosecutions even if it realizes the report was false, baseless, and mistaken. Indeed, in almost every case Hertz never appears in court and the case lingers until the accused takes a plea or (more often) the case is dismissed.

35.    Put together, the police receive a report asserting theft based on (1) unverified allegations; (2) false rental history information; (3) false and deleted due date information; (4) false and misleading payment information; and (5) omitted facts and contacts with the renter. This false information paints a totally untrue picture for the police, casting a premeditated theft rather than (at *worst*) a civil payment dispute. And then Hertz deletes relevant, exonerating information and refuses to withdraw or correct false and outdated reports. Instead, the victims are forced to survive within a criminal justice system primed to give credence to allegations made by a major and well-known company. All the while Hertz never appears in Court to increase the

---

[29]    Wood, "Bankrupt Hertz is Still Wrongly Accusing Customers of Stealing Cars," *supra*, note 12.

pressure on Claimants to take a plea because the company doesn't provide exonerating information. Many lives have been destroyed because of Hertz's conduct.

36.    In fact, counsel recently obtained a December 15, 2021, *nolle prosequi* order dismissing criminal charges against a Movant based on a postpetition theft report illustrating some of these systemic problems. *See* Claim No. 15,764, at 27–28. The motion filed by the State of Georgia describes how Bianca DeLoach rented a vehicle from Hertz on October 3, 2020, and that Hertz reported the vehicle stolen on March 25, 2021. *Id.* at 27. Ms. DeLoach was arrested the next day on March 26. She told deputies upon arrest, "I just paid them $3900" but was jailed because she "did not have proof of payment" and was not released on bond until April 4, 2021. *Id.* Prosecutors did not dismiss the felony charges (with court approval) *until December*. By that time, a "thorough and exhaustive review" revealed "a copy of the . . . invoice . . . showing full payment as of February 25, 2021." *Id.* Further, the "State communicated with a Hertz representative from New Jersey who was unable to explain how the defendant paid in full in February for the vehicle, yet the vehicle was reported stolen." *Id.* What is more, "the State reached out to the Hertz representative on file [seven times between March and November] and was unable to speak with him." *Id.* Putting it all together, the State concluded:

> Based on the defendant's time in custody, the lack of cooperation from any representative of Hertz Rental Car Company, the proof of payment, . . . the national claims against Hertz Rental Car Company, the alleged stolen vehicle being in the custody of Hertz Rental Car Company, and the interest of justice, the State respectfully requests that the above felony charge be NOLLE PROSSED.

*Id.* at 28. The court granted the motion. *Id.* The false payment information in the theft report filed against Ms. DeLoach combined with the "lack of cooperation" (and investigation) by Hertz thankfully led to the dismissal of the unwarranted felony charges—but only after Ms. DeLoach

was arrested, imprisoned, and ultimately prosecuted for most of 2021. This is happening every day around the country based on the systemic problems identified above.

37.     Taken together, these systemic issues infect the relevant theft reports and result in grievous injuries to those reported for theft and those around them. The Debtors designed and perpetuated these systems and were plainly aware of their deficiencies. In these circumstances and for the further reasons described below, the victims of those systems are known creditors entitled to actual notice of relevant bankruptcy proceedings.

> **ii.  The Debtors Tracked Victims of False Police Reports and Had Overwhelming Notice of the Problems with those Reports.**

38.     *First*, on information and belief, the Debtors made internal efforts to track potential and actual false-police-report creditors. Even without the benefit of discovery and to date, the Movants have offered evidence that a corporate security manager for Hertz named Richard Livingston told a claimant that "Hertz had an internal list of customers who were reported for theft." Claim 15,652, at 14 (¶ 13). Moreover, they have submitted evidence that a Hertz customer-service employee told Earl Holland (a Group 2 claimant) that false-police-reporting problems were "a known problem with the company," and were "so pervasive that Hertz had established a special fund to compensate the victims" of false police reports, [Case No. 20-11218, D.I. 1081, Ex. A., Declaration of Earl Holland]. And they have submitted evidence that Hertz uses third-party claims administrators "ESIS, Lambda, and Lambda GCL" to track legal claims based on Debtors' false arrest/theft reports, including maintaining internal spreadsheets that catalogue such claims, [*see* Case No. 20-11218, D.I. 1071, Ex. A, Declaration of Frederick Jekel at 4]. Significantly, ESIS is a subsidiary of Chubb, Debtors' insurer, which strongly suggests that the Debtors were working with their insurance providers to account for false-police-report claims. Finally, the Reorganized Debtor has now admitted that, prior to giving

notice of the General Bar Date, the Debtors "assembled a task force" and "hired outside counsel" to investigate claims of false police reporting. [*Reorganized Debtor's Objection to Motion to Appear Pro Hac Vice of Francis Malofiy, Esq., and Alfred Jr. Fluehr, Esq.*, D.I. 329, at 17 n.10.] Despite all these efforts to track, address, and prepare for potential litigation on such claims, no notice was given to those reported for theft. And the Movants anticipate that discovery will only reveal further efforts to track and catalogue these practices and the victims of these practices.

39.    These practices of systematically maintaining internal lists of affected customers, creating "a special fund to compensate victims" based on a "known problem," and hiring third-party administrators to track liabilities based on that specific problem make the victims of that systemic issue, including the Movants, known creditors. In *In re J.A. Jones, Inc.*, for example, the Fourth Circuit determined that "the known creditor analysis must properly focus on the totality of the circumstances in each case," because "[w]hat is reasonable depends on the particular facts of each case." 492 F.3d 242, at 250–51 (internal quotation marks omitted). Applying that standard, the Court found that tort victims were known creditors based on the debtors' familiarity with the harms underlying a particular mass tort and contacts between the debtors and their insurer in connection with the potential torts, *id.* at 251–52—in other words, the very sorts of internal recordkeeping and litigation preparation activities Hertz engaged in above.

40.    *Second*, the Debtors had extensive notice that their theft reporting practices were systemically inaccurate and led to false reports against many customers. Hertz has had actual notice of the pattern of misconduct underlying each Movant's claims for many years. To highlight just a few examples:

A. **Prepetition Individual Complaints:** From just this subset of 77 Movants bringing this motion, paragraph 55, *infra*, details contacts in many individual

cases demonstrating that Hertz's own wrongly accused customers pointed out the pattern of false theft reports. Undoubtedly there are countless more contacts from other individuals relaying specific complaints and allegations relating to false police reporting, including those outlined in the Group 3 Motion (at ¶¶ 75.A–K) and Group 4a Motion (at ¶¶ 75–76).

B. **Prepetition Claims:** In January 2017, a federal jury in Galveston, Texas found that Hertz maliciously prosecuted Michael Gray. Mr. Gray had sued Hertz for the same conduct at issue in the present claims. Attachment D. In September 2017, a jury in Philadelphia, Pennsylvania reached a verdict in favor of Kelly Grady, finding Hertz culpable of intentional infliction of emotional distress, malicious prosecution, and false imprisonment. Ms. Grady had sued Hertz for the same conduct at issue in the present claims. Attachment E. Further, in November 2017, the trial court in Ms. Grady's case granted her motion to seek punitive damages and set a trial date on that issue. *See* Attachments F; *see also* Case No. 20–11218; D.I. 762, at ¶ 6; D.I. 893, at pp.3-4, ¶ 6. In that Motion, Ms. Grady alleged that what happened to her was the product of a systemic deficiencies affecting Hertz business nationwide. Hertz settled with Ms. Grady in December 2017 in order to avoid a looming trial on punitive damages. Beyond the case filed by the Movants, other cases alleging false theft reports were filed across the country. *See* Attachments G, H, I, J. In other briefing, Hertz has admitted that more than 50 persons have brought such claims in formal litigation—not even including alternative

dispute resolution, settlements, and those with prelitigation notice/demand letters/conduct.

C. **Prepetition Media**: There was extensive news coverage of Hertz's theft-reporting problems before it sent notices of the General Bar Date.[30] In May 2018, for example, ABC6 Action News reported how Hertz customers had been wrongly arrested. Investigative reporter Chad Pradelli identified six customers who had their rental cars reported stolen, including Ms. Grady and Ms. Van Pay. According to the news outlet, it reached out to Hertz "but the company declined to participate" in the story. Similarly, in March 2019, Matthew Mershon of ABC7 in Little Rock, Arkansas reported on the ordeal suffered by Hertz customer Jonathan Olivares, who was arrested and jailed improperly. The story states that the day after Olivares's release, he received a phone call from Hertz corporate offices, explaining they were aware of the incident, were looking into how it happened and that they would quickly get him his belongings that were confiscated with the car by the police. According to Olivares, "Same lady called back said we're going to take full responsibility for this." As part of the story, ABC7 reached out to Hertz for comment, "but both a phone call and email went unreturned."

---

[30] *See, e.g.*, Laura Layden, "Hertz Accused of Falsely Reporting that Customers Stole Rental Cars," Naples Daily News/USA Today (July 23, 2020); Chad Pradelli and Cheryl Mettendorf, "Action News Investigation: Customers sue Hertz for False Theft Claims," 6ABC Phila. (July 7, 2020); Sarah Buduson, "Hertz customers detained, arrested after rental vehicles mistakenly reported stolen," 5ABC Cleve. (May 21, 2019); Katie LaGrone, "Hertz has a pattern of mistakenly reporting cars stolen leaving customers arrested, attorney says," ABC Action News - WFTS Tampa Bay (May 9, 2019); Chad Pradelli and Cheryl Mettendorf, "Investigation: Hertz customers arrested after rental vehicles mistakenly reported stolen," 6ABC Phila. (May 18, 2018).