D. **Prepetition Law Enforcement Complaints:** Law enforcement agencies have recognized these systemic issues and informed Hertz of the problems. In June 2015, for example, Captain Josh Grimes of the Louisville Airport Department of Public safety wrote to his superior: "Until Hertz corporate takes some action with their Louisville lot and personnel, I recommend that we suspend taking stolen auto reports for Hertz for 'missing inventory' unless they physically see someone steal an auto, have evidentiary proof of such or obviously non returns that warrants have been taken." [Case No. 20-11218, D.I. 5032-6]. Officers from the Louisville Airport Police later contacted Hertz's Corporate Security office. *Id.* In November 2016, the Indianapolis Airport Police similarly imposed restrictions on Hertz theft reports due to false reports leadings to the wrongful arrests of customers. *See* Attachment K (Van Pay Affidavit) (detailing conversation with Indianapolis Airport Police Department). What these officers did not know is that Hertz's failures are not limited to Louisville and Indianapolis—they permeate the company nationwide.

41.    Furthermore, certain counsel for the Movants had extensive contacts prior to the bankruptcy process detailing the systemic nature of Hertz's problems with a focus on his clients at the time. These contacts include:

A. On September 6, 2017, counsel filed a motion for punitive damages in the *Grady* case that extensively outlined evidence of Hertz's systemic problems. *See* Attachment L.

B. In October 2018, counsel sent another letter on behalf of a client seeking redress for wrongful arrest and prosecution. Counsel explained that the customer offered a valid card and had paid for the rental at all times, but that Hertz nonetheless had him arrested for car theft. *See* Attachment M. Counsel described to Hertz's General Counsel how the customer rented a car in February 2018 and had his credit charged for over $3,000.00 and was still reported as stealing the car. *Id.*

C. In December 2019, Movants' counsel sent Hertz's counsel an email advising of forthcoming lawsuits regarding several Hertz customers for the same pattern of malfeasance involved in prior cases. Movants' counsel told Hertz counsel, consistent with the later-filed claims, that Hertz "fails to follow their own standard operating procedures, refuses to fix broken computer systems, cuts out corporate security managers because they cost too much, and routinely throws good paying customers in jail." Movants' counsel also noted Hertz's "reckless indifference to the rights of others." [Case No. 20-11218, D.I. 5032-12, at p.7–9].

D. On February 13, 2020, Movants' counsel wrote another letter to Hertz counsel as well as Hertz's CEO. Movants' counsel began by reminding Hertz about his years-long efforts at seeking redress for falsely arrested customers. Counsel also attached brief summaries of 23 of his clients' ordeals, and again identified the basis for the claims: "Hertz's computer systems are—*obviously*—broken and outdated. The company can't keep track of inventory, doesn't know when rentals are extended or returned, can't account for

57

payments, and isn't doing the local investigations mandated in its theft reporting standard operating procedure W7-02(A)(17). Compounding matters, the locations, [a corporate office], and corporate security have no idea what each other are doing. In some cases, Hertz bizarrely rents cars to customers that Hertz reported stolen before the rental began." Attachment N, at 1. Counsel reminded Hertz that "six months ago I submitted to your company a list of clients detailing how they had been wrongfully detained, jailed, and prosecuted. These customers had paid, extended, and event returned their rentals." *Id.*; [Case No. 20-11218, D.I. 5032-12, at 8 (describing an "avalanche" of persons with claims based on these systemic issues)].

E. On April 28, 2020, Movants' counsel served several briefs on Hertz counsel Winston and Strawn regarding Hertz's systemic failures and summarizing the harm to some of his clients. *See* Attachments O, P, Q, R:

   i. The first memo describes how Hertz improperly destroys its rental records. Attachment O. It details how Hertz "has admitted that various files, voice recordings, contract notes, and phone records of customers are purged from its system without regard for the fact that a case may go to suit and has been reported to the police as a crime." *Id.* at p.2.

   ii. A second memo describes Hertz's practice of deleting rental extensions and backdating the vehicles' due dates. Attachment P. The focus of the memo was Hanna Ayoub's case, and how Hertz's systems deleted all record of Mr. Ayoub calling Hertz and extending his rental. As the memo states, "The implications of this failure are wide-reaching. Hertz has been

denying that the renters at issue have extended their rentals-claiming that the theft packages are complete-but in reality Hertz is systematically deleting any record of the extensions which confirm that the renters have been advised by Hertz of the continued authorization to use the vehicles. This evidence undercuts every theft report that Hertz has ever submitted for an overdue rental." *Id.* at p.2.

iii. The third memo focuses on Hertz's policy of charging a customer's card after submitting a police report. Attachment Q. Hertz recognizes that law enforcement agencies are less likely to act on a theft report if the rental has been paid. Accordingly, Hertz's stated policy is to file the police report without telling the police that it is about to charge the card. In some instances, Hertz tells the police that the customer's card has been denied, which is clearly a misrepresentation. Of course, the prosecutors and police reasonably view payment as a key piece of information.

iv. The fourth memo highlights Hertz's failure to investigate the potential thefts before filing the report. Attachment R. The memo explains how "Hertz policy W7-02(a)(17) mandates that all theft reports be independently investigated and verified by Hertz location corporate security managers. However, in 100% of the cases, Hertz does not perform this required investigation. Multiple Hertz corporate designees testified in the Grady case that Hertz corporate has given them marching orders, that theft packages compiled by Vehicle Control in OKC are to be immediately delivered by location personnel to the police **with no independent**

> *verification* and no inquiry into whether payment has been made, the
> vehicle returned, the rental period extended, the inventory lost, or any
> other facts that might be critical to the decision to accuse a customer of
> having stolen a Hertz vehicle." *Id.* at 1-2.

F. On May 4, 2020, Movants' counsel served several briefs on Hertz counsel
   Winston and Strawn regarding Hertz's systemic failures and summarizing the
   harm to some of his clients. *See, e.g.*, Attachments S, T.

42.     The above discussions present the facts available to the Movants without the
benefit of discovery into any systemic issues. Nonetheless, these facts alone required Hertz,
under any standard of reasonableness, to identify and notify of relevant bankruptcy proceedings
persons harmed by its systematic misconduct (or, in Hertz's view, extensive allegations thereof).
This is particularly true in light of internal records documenting theft reports, arrests, and legal
claims based on allegations of false theft reports.

43.     *Third*—to the extent that having records of persons affected by widespread,
systemic issues having consistent and crushing effects on a small, defined, and known subset of
individuals is not already enough to qualify those persons as known Movants—the Debtors, upon
information and belief, had specific information in their records underlying each claim. The full
scope of these records will become clearer with discovery. As a general matter, however, the
Debtors would have in their books and records rental contracts, information relating to the rented
vehicle's prior and post-report history, records of the customer's address and contact
information, records of contacts with the customer and third parties relating to the rental and
theft report, records of payments from the customer, records of any investigation (or lack
thereof) done into the rental, records of the theft report that was filed; and records of any

communications from or with police or prosecutors relating to subsequent arrests, charges, and prosecutions; and records of internal communications regarding each claimant's claim. These records—especially when combined with the Debtors' systemic practices of deleting rental extensions, failing to investigate missing vehicles before filing theft reports, failing to indicate payments in theft reports, and failure to retrieve vehicles, among other systemic problems—would reveal upon any reasonable investigation that the Movants had claims against the debtors.[31]

44.    Further, former Delaware Deputy Attorney General Steven P. Wood examined the facts of these cases and reached certain conclusions regarding Hertz's knowledge of the underlying cases. *See* Attachment U, Wood Decl. ¶¶27–28. After reviewing the materials in connection with the Delaware Complaint, Wood attested:

> [I]t is common practice for law enforcement and prosecutors to alert complaining parties when persons are arrested in connection with theft reports they have filed, and as the criminal case proceeds through the criminal justice system. This would include initial notification as well as close communication after a charging decision was made, after charges were filed, and concerning any court dates involving the matter. In many states, communication between the police, prosecutors, and "victims" of a crime is mandated by statute. In Delaware, the Victims Bill of Rights (11 Del. C. § 9401 *et. seq.*) establishes the obligation of the police and prosecutors to provide crime victims with notice as the case progresses through the system. Consequently, it is virtually certain that Hertz received multiple notices about each of the cases described in the Complaint and similar cases alerting it to the fact that a prosecution had commenced and was progressing. In Delaware, and in many states, the pre-trial custody status of the arrestee would be routinely provided to the victim. And, of course, notice that an arrest had occurred would be a natural part of returning the vehicle to Hertz.

---

[31] The reasonableness of any investigation should be measured against the significant and devastating injuries suffered by those harmed by Hertz's false theft reporting practices. This is not a dispute about dollars and cents, but about real peoples' lives and wellbeing.

*Id.* ¶ 27. For that reason, Wood concluded that "The fact that Hertz would have received the notice as described [above], when coupled with the information in its possession pertaining to its credit card billings and full lease payments in each of the cases described in the Complaint means that Hertz had actual knowledge, or at least should have known, that each of the defendants in each prosecution described in the Complaint were being wrongfully prosecuted for theft. The same would be true for others with similar fact patterns." *Id.* ¶ 28. The fact patterns of the Movants track those alleged in the Delaware Complaint.

### iii. Precedent Confirms that the Movants were Known Creditors.

45.     Precedent amply supports a finding that the Movants were known creditors based on the above factual circumstances, let alone on whatever else additional discovery may uncover. The facts here track the Seventh Circuit's decision in *Fogel v. Zell*, 221 F.3d 955, 963 (7th Cir. 2000). There, a pipe manufacturer had sold potentially defective pipe to a reasonably large number of customers. Some of those pipes had already burst, leading to "multimillion dollar claims" filed by some other purchasers of the pipe. The court held that another purchaser of the pipe—who had not yet suffered a pipe failure by the bar date—was a "known" claimant and had to be given actual notice. The debtor's books and records contained information that the claimant had purchased "a large quantity of the defective pipe." *Id.* at 963. And the claims failed against the debtor by similarly situated third parties demonstrated that other pipe purchasers might have claims to bring, and thus notice was required for holders of these potential "mass tort claims." *Id.* at 961. To be sure, some of those purchasers may never have actually suffered a pipe failure. But the fact that this group of purchasers were likely to have such claims was sufficient to require notice to the purchasers. In this case, like in *Fogel*, the debtors had knowledge of systemic issues leading to "mass tort claims," and had records detailing those affected by the systemic problems.

But they made no apparent efforts to notify those individuals of the bar date or investigate whether those individuals have claims.

46.     Consider next the Second Circuit's decision in *Motors Liquidation*, 829 F.3d, at 159–161; *id.* at 159 (relying on the Third Circuit's *Chemetron* decision to provide the legal standard for known creditors). There, the Second Circuit concluded that purchasers of certain cars were known Movants because "Old GM know of defects in its cars" and would also have known "the identity of a significant number of affected" persons. *Id.*, at 159. The facts "paint[ed] a picture that Old GM did nothing, even as it knew that the ignition switch defect impacted consumers." *Id.* That knowledge, the Court found, could be inferred from (1) "various complaints"; (2) "[n]ews outlet report[s]"; (3) approaches from regulators, including "a police report"; and (4) internal discussions of the issue. *Id.* at 160. Like Old GM, Hertz plainly had actual knowledge of the systemic issues undergirding its theft reporting practices, based on complaints, ¶¶ 64.A–C, 65.G, news reports, ¶ 64.D, and notice from law enforcement, ¶ 64.F. Indeed, Hertz's notice is even stronger, given the extensive details of notice described above even before discovery, ¶¶ 62, 64.E, 65.A–F. Coupled with books and records containing the identities of persons affected by these issues, Hertz was obligated to treat the Movants as known Movants.

47.     The Second Circuit also offered an alternative rationale that applies here with equal force. Even if Old GM didn't have actual knowledge of the systemic defects in the ignition switches, the Second Circuit continued, "Old GM—if reasonably diligent—surely *should have known* about the defect" because its employees and agents "should have followed up when they learned their ignition switch did not initially pass certain technical specifications," "should have followed up when they heard disturbing reports" of issues, and "should have followed up when"

it internally identified an issue; put simply, "[i]f any of these leads had been diligently pursued in the seven years between 2002 and 2009, Old GM likely would have learned that the ignition switch defect posed a hazard for vehicle owners." 829 F.3d, at 160. The company's "reckless disregard of the facts [was] sufficient to satisfy the requirement of knowledge," especially where the company "knew about [problems] and should have revealed those facts in bankruptcy." *Id.* (internal quotation marks omitted); *see also In re Geo Specialty Chemicals Ltd.*, 577 B.R. 142, 190–192 (Bankr. D. N.J. 2017) (victims of a price-fixing conspiracy were known creditors because debtor knew of the conspiracy and "knew or should have known about" the victims, even though they were "'not identifiable through the debtor's books and records.'" (quoting *Chemetron*, 72 F.3d, at 347 n.2)). Here, too, the extensive complaints and instances of false police reporting, at the very least, put Hertz in a position where it should have known and should have investigated in ways that would have led to the discovery of the Movants' claims.

48.    *In re Thomson McKinnon Securities Inc.*, 130 B.R. 717 (S.D.N.Y. 1991), is also instructive. In that case, the debtor securities firm had sold securities to an individual (Robinson) prepetition but never delivered them. *Id.* After the bankruptcy court established a bar date, the debtor published notice of the bar date and sent mailed notice of the bar date to those of its former customers "who had made inquiries about customer property"—but not to Robinson, who had not yet inquired about his securities at the time the bar date notice was mailed. *Id.* at 718. On Robinson's motion for leave to file a late proof of claim, the bankruptcy court concluded that Robinson was not bound by the bar date because he was a known creditor who was entitled to actual notice from the debtor, finding:

> There is no question that the debtor knew that Robinson was a former customer who had purchased from the debtor the securities for which he paid $10,009.94. Additionally, the debtor had a record of Robinson's address. . . . The debtor took his money and

> then did not give him actual notice of the deadline for filing claims
> because Robinson did not ask what happened to his money or the
> securities he purchased.

*Id.* at 719-20.

49.     Similarly, in *In re Geo Specialty Chemicals Ltd.*, the Court held that that victims of a price-fixing conspiracy were known creditors. Although none of the victims had seemingly brought claims prepetition, the Court reasoned that "[b]ecause [the debtor] knew about the conspiracy, it follows that [it] knew or could have easily ascertained the identity of all of the upstream and downstream purchasers . . . affected by its alleged conspiracy . . . ." 577 B.R. 142, 192 (Bankr. D.N.J. 2017); see also id., at 191 (debtor "knew about the conspiracy it originated and knew or should have known about any contingent antitrust claims" even though they were "'not identifiable through the debtor's books and records.'" (quoting *Chemetron*, 72 F.3d, at 347 n.2) (emphasis added)). The claims of those creditors consequently were not discharged by an earlier bankruptcy plan.

50.     The debtor in *Fogel* sold defective pipes. The debtor in *Motors Liquidation* sold vehicles with defective ignition switches. The debtors in *Thomson McKinnon* failed to deliver securities to a purchaser. The debtors in *Geo Specialty* fixed prices. And Hertz filed false and misleading theft reports. The victims of those false and misleading theft reports, as with the victims in *Fogel*, *Motors Litigation*, *Thompson McKinnon*, and *Geo Specialty*, are known creditors.

51.     Hertz has elsewhere isolated one aspect of other False Police Report Claimants' presentations—namely, prepetition litigation—in an effort to rebut similar known creditor arguments. In so doing, Hertz presented a "ratio" of filed claims to theft reports. The unsupported ratio was misleading, but even taken at face value the Movants note that it supports a known creditor finding. Hertz's asserted "ratio" is already more than five times higher than the

equivalent number in *New Century*, Hertz's lead citation. It is more than double the "ratio" of prepetition lawsuits in *Fogel v. Zell*, where the Seventh Circuit relied heavily on prepetition lawsuits in finding that pipe purchasers were known creditors when, of "some 10,000 purchasers," "[b]y the time [the debtor] declared bankruptcy, eight purchasers . . . had sued." 221 F.3d, at 958. It is infinitely higher than the "ratio" in *Geo Specialty*, where antitrust victims were known creditors even though it appears no one had yet sued. 577 B.R., at 147–149. And it is almost certainly hundreds if not thousands of times higher than the "ratio" in *Motors Liquidation*, where victims of an ignition switch defect were known creditors when "the number of affected vehicles in the United States alone surpass[ed] 25 million," 829 F.3d, at 148, but "all or nearly all of those with Ignition Switch Defects" had not yet "sued or manifested a possible intention to sue" when notice was provided. *In re Motors Liquidation Co.*, 529 B.R. 510, 556 (Bankr. S.D.N.Y. 2015) (underlying district court opinion).

52.    Each of the Movants reserves the right to supplement and modify these factual arguments in any way based on subsequent discovery.[32] But given the facts presented above, it is already clear that the Movants were known creditors.

---

[32] As the *en banc* Third Circuit made clear in *In re Grossman's Inc.*, that "[w]hether a particular claim has been discharged by a plan of reorganization depends on factors applicable to the particular case," including "the circumstances of the initial exposure to [the tortious conduct], whether and/or when the claimants were aware of their vulnerability to [such conduct], whether the notice of the claims bar date came to their attention, whether the claimants were known or unknown creditors, whether the claimants had a colorable claim at the time of the bar date, and other circumstances specific to the parties . . . ." 607 F.3d 114, 127 (3d Cir. 2010). Thus, to the extent the Movants' legal arguments regarding the categorical inapplicability of the discharge to false-police-reporting claims do not prevail, each of the Movants must be afforded an opportunity to establish the inapplicability of the discharge based on the particular circumstances relevant to his or her claims. *See id.* (remanding to the lower courts for consideration whether discharge of the appellants' claims was consistent with due process based on the particular circumstances). This is particularly relevant for those Movants who were arrested or charged postpetition (or even after the Effective Date) based on rentals that occurred much earlier—often to their shock because they were unaware they were susceptible to being arrested for stealing a

### C. Hertz Received Specific Notice that Certain Movants Were Known Creditors.

53.    A claimant can be a known creditor based on statements to the debtor that would

reveal the claim to the debtor. *See, e.g., Arch Wireless*, 534 F.3d, at 81–82 (customer was known

creditor based on correspondence indicating disputes relating to product sales). The most

obvious form of such notice is a litigation threat or related assertion (e.g., preservation letter,

demand letter, etc.). But, as the cases above demonstrate, awareness of the factual circumstances

underlying a claim qualify too. Indeed, Hertz elsewhere has conceded that "[a] creditor might be

known if a debtor has specific information regarding the creditor's actual injury" (short of a

formal litigation threat). Group 3 Obj. ¶65 (citing *In re Placid Oil Co.*, 753 F.3d 151 (5th Cir.

2014)); *see also In re Maya Constr. Co.*, 78 F.3d 1395, 1398 (9th Cir. 1996) (finding creditor

was "known" where, despite conflicting statements from the creditor and the creditor's lawyer

regarding whether he intended to sue the debtor, the creditor's "state of mind and intention did

not obviate [debtor]'s knowledge that it had placed contaminated soil on [creditor]'s land and

that, whether he planned to sue [debtor] or not, he had a potential claim"); *Solow Bldg. Co. v.*

*ATC Assocs.*, 175 F. Supp. 2d 465, 472 73 (E.D.N.Y. 2001) (collecting cases, noting "courts

dispense with the requirement of actual notice only in cases where a [debtor] does not have in its

possession any information sufficient to alert [it] to the existence of a problem underlying a

claim in issue"). And the "systemic" cases described above all established known creditors with

information short of formal litigation threats by that creditor. *See, supra*, ¶¶ 45–52 (discussing

cases). Short of formal litigation threats, tort victims can become known creditors by explaining

---

car they returned long ago. Movant Brandy Porter, for example, was arrested in 2022 based on a
rental she returned in 2019—to the extent her claims are deemed pre-petition claims, it would be
deeply violative of Due Process to penalize her for not having filed a claim prior to the General
Bar Date in 2020, long before she was arrested. Due process concerns are also uniquely relevant
for Movant Larry Wilcoxson, whose 2014 conviction (after which he spent 6 months in jail) was
vacated and all charges were dismissed in early 2022.

that a debtor has engaged in injurious conduct.[33] Jan. 4, 2022, Hr'g Tr. at 31:22–32:1 (THE COURT: "[I]f you're correct and these people told the debtor, you know, I was arrest -- had numerous contacts with the debtors to prove that they, you know, extended their lease . . . ."). And those communications must be viewed in context with other information in the debtor's books and records.

54.     Common sense undergirds that standard. Consider an individual debtor who physically strikes someone the day before filing for bankruptcy protection. If the victim said to the debtor, "you just assaulted me," or "you had no reason to hit me," or "you just broke my nose," the debtor plainly would owe actual notice to the victim even if she did not also say "magic words" like "and I'm going to sue you for it." The victim's tort claim is reasonably ascertainable based on her statements (not to mention the debtor's own knowledge of the incident), whether or not she has also threatened to sue. She may at the end of the day decide not to press a claim—it is, after all, her right to decide whether to do so—but the debtor cannot force that choice upon her by declining to give her notice of the bankruptcy proceedings.

55.     Based on information currently available—although no discovery has yet been obtained by the Movants, who recently filed claims—the Debtors had notice of the injury or grievance underlying the following Claimants' claims.

A. **Patrick Andrews**: Mr. Andrews—who rented and was arrested post-petition— contacted Hertz after his May 11, 2021 arrest, and Hertz told him it "wasn't

---

[33] This could be described as an "injury" standard—namely, that a debtor must provide notice to those for whom it is aware that it has injured. *See* Group 3 Obj. Obj. 33 n.27 (arguing that the "*Placid Oil* court accordingly 'shed additional light on the space between mere foreseeability and books-and-records knowledge by requiring that the debtor possess information regarding a creditor's actual injury, in order for that creditor to be known'"). As the Movants' proofs of claim amply demonstrate, the filing of a false police report is itself an injury, and is frequently further followed a huge range of additional injuries, including arrest, reputation loss, imprisonment, inability to find work or a place to live, and prosecution.

looking to press charges." Claim No. 15,837, at 16 (¶ 16). He had a corporate rental that his employer was paying for, and Hertz had repeatedly promised to pick up the vehicle but never did so even after discussing with Hertz investigators. *Id.* at 15–16 (¶¶ 7–11). In short, "Hertz was aware that they had filed a false police report." *Id.* at 17 (¶ 23).

B. **Adriane Beamon**: Ms. Beamon was arrested post-petition on a rental she had returned in 2018. After returning the rental (and before Hertz reported her for theft), "Hertz repeatedly called her and asked where the car was and she repeatedly told them exactly where it was"—namely, at the location where she returned the vehicle and left the keys in a dropbox. Claim No. 15,871, at 15 (¶¶ 6–7). She thought everything was good once she told Hertz where she returned the vehicle and paid in full for the rental, but Ms. Beamon later discovered post-petition that there was a warrant for her arrest. She was then arrested, jailed, and prosecuted (after voluntarily turning herself into authorities). During that time, "Hertz was repeatedly notified that [Ms. Beamon] was falsely accused and documents were demanded from them. Hertz refused to produce anything and did not appear for Court" until charges were dismissed. *Id.* at 16 (¶ 17).

C. **Marc Bednarczyk**: Mr. Bednarczyk regularly extended and fully paid for his rental, which was towed on March 9, 2021. But he was arrested on April 21, taken to jail, and prosecuted until May 18, 2021. It is likely that investigation will reveal that interactions with prosecutors showed Hertz the theft report was baseless.

D. **Cody Breedlove**: All postpetition, Mr. Breedlove rented a vehicle, was reported for theft, was arrested multiple times, and is being prosecuted. "Hertz has repeatedly been called and emailed by Cody asking them why a false theft [report] was filed, and a Beaverton, OR police officer spent an hour on the phone with Hertz demanding to know if the theft report was false." Claim No. 15,888, at 21 (¶49). Among those contacts are two July 2, 2021 emails (before the Administrative Claims Bar Date) to "customerrelations@hertz.com," with the latter saying: "You have filed false theft charges causing the loos [sic] of my career for a returned vehicle and here is proof. You also had caused jail time. Bank statement as well." *Id.* at 32. The email attached an e-return invoice and bank statement showing his payment for the vehicle. An automated reply confirmed receipt of the email and provided a case reference number, but Hertz otherwise appears to have ignored Mr. Breedlove, *id.* at 33.

E. **Benita Bridges and minor child K.F.**: Hertz/Thrifty failed to tow a vehicle it had agreed to tow, instead reporting it stolen. Ms. Bridges and K.F. were held at gunpoint while K.F.'s father was arrested. K.F.'s father, Kenny Fearence, was then prosecuted but all charges were quickly dismissed. It is likely that Hertz/Thrifty discovered its erroneous theft accusation during that prosecution of Mr. Fearence.

F. **Daydan Carter**: Mr. Carter had extended his rental and reached an agreement to return the vehicle to the local branch in early February, but was arrested at gunpoint on February 2, 2020. Investigation into his case is ongoing, but it is

likely that Mr. Carter was reported for theft after agreeing with the rental location to return the car at a later date.

G. **Jason Don Campbell**: Mr. Campbell was arrested at gunpoint on May 27, 2020 during his initial rental contract because Hertz rented him a vehicle it had reported stolen. When Mr. Campbell returned the vehicle on June 1 (the due date), "he confronted the branch manager, Kelsia Sanders. He told her about the false arrest and that he could have been killed. She apologized for his false arrest. The manager said that this was not the first time she had seen switched plates and said that she was going to contact corporate because she was aware of serious ongoing problems with Hertz's inventory control and tracking." Claim No. 15,934, at 15 (¶ 14).

H. **Abraham Carmichael**: Mr. Carmichael rented and was reported for theft post-petition and was arrested and prosecuted after the Effective Date of the Plan. Shortly after learning in February 2021 that he had been reported for theft, Mr. Carmichael reached out and "called the local Hertz in Highland to complain about the false report and the criminal case against him. He had rental agreements and proof the money was paid. He was furious." Claim No. 15,940, at 16 (¶ 13). Further, he "notified Hertz that it had filed a false police report, and that the company had not properly updated his contact information, had not emailed him, and had in fact charged him for the rental." *Id.* at 18 (¶ 25).

I. **Tawana Cole**: Ms. Cole was unaware that Hertz had reported her for theft around June 18, 2019—a time past which she had extended her rental. When she saw a large charge for the rental, she contested the high charge with the local and

corporate office, but no one told her she had been accused of stealing the vehicle

with the overcharge. When she learned of an arrest warrant in June of 2021, she

subsequently "called Hertz's 1-800 corporate number, [but] she was told that they

don't have any answer for her, and she needed to go to court." Claim No. 15,910,

at 16 (¶17).[34]

J.   **Faristina Collins**: Ms. Collins was arrested in 2017 based on Hertz's accusation

that she stole a vehicle in 2014—in truth, she had returned the vehicle. Hertz

refused to appear in Court while she faced active prosecution for 6 months up to

2018, but ultimately her defense counsel learned that Hertz had recovered the car

in the possession of third parties all the way back in 2015. Because Hertz had

recovered the vehicle *years* before it received notice that Ms. Collins was arrested

and actively prosecuted—when Hertz then refused to appear in court for

months—Hertz plainly had notice that Ms. Collins had a claim against the

Debtors for her arrest, days in jail, and baseless prosecution.

K.   **Adam Cuevas**: Mr. Cuevas rented a car that Hertz had previously reported stolen

and was arrested at gunpoint during his rental. During his January 2020 arrest,

"The police . . . contacted Hertz to figure out if [Mr. Cuevas] was telling the truth.

Hertz eventually informed the officers that [Mr. Cuevas] had validly rented the

car but that the company had rented [Mr. Cuevas] a . . . car previously reported as

stolen before [Mr. Cuevas's] rental started." Claim No. 15,931, at 15 (¶ 9). The

day after the arrest, Mr. Cuevas "contacted Hertz demanding an explanation for

their outrageous treatment of him"—explaining that he "had been falsely arrested

---

[34]   The exact timing of this call is unclear from the proof of claim and should be revealed
upon further investigation and discovery.

and rented a car that Hertz had already reported to the police as stolen"—"but Hertz acted like they had no knowledge of [Mr. Cuevas's] false arrest nor having any knowledge of renting him a car that was listed as stolen." *Id.* (¶¶ 11, 14).

L. **Angela Delafontaine, Jose Monteiro, Minor Child G.M.:** Ms. Delafontaine was reported for theft prepetition without her knowledge. When she discovered a pending warrant postpetition, on or around February 2, 2021, she contacted Hertz's Asset Loss Prevention Department and was told "that the vehicle she previously rented was not reported missing . . . and that it must be a mistake as there w[ere] no issues with her prior rental, name, or account." Claim No. 15,823, at 16 (¶¶8–10). But what Hertz told her was false: Hertz *had* filed a theft report and Ms. Delafontaine was subsequently arrested and detained along with her family, and prosecuted for 171 days. *Id.*, at 17–18 (¶¶11–20).

M. **Bianca DeLoach (and minor children):** Ms. DeLoach's rental occurred postpetition. As described in the State's *nolle prosequi* motion, starting March 31, 2021, "[t]he State communicated with a Hertz representative from New Jersey who was unable to explain how the defendant paid in full in February for the vehicle, yet the vehicle was reported stolen. The New Jersey representative was also unable to identify any number of attempts made by Hertz to contact the defendant and request the vehicle returned." Claim No. 15,764, at 27.

N. **Lakeshia Dowlen:** Ms. Dowlen rented a car in March 2020 and returned it on May 15. On June 24, 2020, a Hertz investigator[35] called and told Ms. Dowlen that she would be reported for theft if she did not return the car; Ms. Dowlen was

---

[35]   Ms. Dowlen recalls a name for the investigator of Jessy Coleman (spelling unknown).

confused because she had returned the car. But on May 15, 2021, she was arrested for a felony in connection with the rental. After two days in jail, she was released. "After being released from jail, she contacted Hertz's corporate office furious with the company and explained that they had filed a false report for a car she had returned. They informed Lakeshia that they could not locate her case or her rental agreement. Lakeshia asked them 'how can they press charges against her if they don't have documentation to prove she had the vehicle?'" Claim No. 15,933, at 15 (¶ 12). That was almost certainly false, as Hertz had rented her the car, reported her for theft, and called her to seek return of the vehicle. Hertz never appeared in Court and all charges were dismissed.

O. **Iasia Eaves**: In late 2017, Ms. Eaves "contacted and confronted Hertz to find out why Hertz had gone to the police, filed a false police report against her, and had the courts issue a warrant for her arrest. Hertz apologized and told her directly that there was a mistake between the local and corporate offices." Claim No. 15,802, at 16 (¶ 17). Hertz also confirmed to the police at the time of her arrest that Ms. Eaves had a legal rental agreement, *id.* (¶¶ 13–15), but avoided attending any proceedings until charges were dismissed in October 2018.

P. **Howard English**: Mr. English was arrested at gunpoint on May 25, 2021 (postpetition) during a long-term rental. During his arrest, "police . . . informed [Mr. English] that Hertz had no record of his contract and that he was free to leave." Claim No. 15,941, at 15 (¶ 14). "After his arrest, [Mr. English] reached out to Hertz to inquire why there had been a false theft report. Hertz refused to offer any explanation." *Id.* at 16 (¶ 15).

Q. **Melanie Evans (for herself and minor children N.E. and N.E.)**: After Ms. Evans was arrested in late 2014 while driving a vehicle for which she had extended the rental, she "immediately called Hertz and demanded to know why there was a false and baseless warrant issued for her arrest. She contacted both the local Hertz and the 1-800 corporate number, but did not receive a satisfactory resolution as why they issued a theft report when her bank statements clearly show that [Ms. Evans] paid for the rental." Claim No. 15,926, at 15 (¶ 10).

R. **Zantavia Franklin**: Ms. Franklin recently discovered that a warrant for her arrest had issued on July 1, 2021 (one day after the Effective Date of the Plan). The vehicle in question was towed by police on or around February 18, 2021, which suggests that Hertz may have reported Ms. Franklin or prosecuted the case months after obtaining possession the vehicle. The charges against Ms. Franklin are pending and investigation is ongoing.

S. **Daniel Morales Hernandez**: Postpetition, Hertz rented Mr. Hernandez a vehicle it had previously reported stolen. Mr. Hernandez was arrested at gunpoint. During the September 20, 2020 arrest "police contacted Hertz and discovered that Hertz had rented Daniel a vehicle that they had previously reported stolen." Claim No. 15,889, at 15 (¶ 19). Mr. Hernandez "then called Hertz to ask why they had rented him a vehicle they had previously reported as stolen but he was not provided with any answers." *Id.*, at 16 (¶ 22).

T. **Antwanette Hill**: Ms. Hill has been arrested four times in connection with a prepaid rental reservation that Hertz accused her of trying to steal from the lot. She has spent 20 days in jail and suffered a miscarriage while in jail. Charges

remain pending. After her initial arrest on October 8, 2018, Ms. Hill "called Hertz corporate . . . and demanded an explanation for the false report. They said they would call back but never did." Claim No. 15,923, at 16 (¶ 22). Further, at the station "Hertz was called and actually validated the rental." *Id.* at 14 (¶ 7).

U.  **Raynard Hill, Jr.**: Mr. Hill was arrested after the Effective Date of the Plan on a theft report likely filed shortly before that time. He had paid almost $4,000 for the rental before the theft was report and regularly extended. Investigation is ongoing, but it is likely that Hertz's own records will review that the theft report was false.

V.  **Jason Kearny:** Mr. Kearny was arrested twice post-petition on a postpetition rental. The first time he was arrested during the original rental duration because police thought the car was stolen. He "told the company about the false arrest due to the severely expired registration," Claim No. 15,894, at 18 (¶26): first on July 8–9 when he complained about the incident and had to go to the rental location to get new tags, and second in a text message to a Hertz investigator (likely named Lisa) at 954-445-6998, saying "My 3rd or 4th day i got pulled over by the police which doesnt happen to me because i have a clean criminal record. After i had the cop pull his gun on me because he thought it was a stolen car." *Id.* at 16 (¶ 15).[36]

W.  **Casey Kurpjuweit**: Mr. Kurpjuweit rental vehicle was towed to a Hertz distribution center after an accident on March 3, 2019. Mrs. Kurpjuweit (Mr.

---

[36] Notice of his injuries from the first arrest is enough for Mr. Kearny to be a known creditor. Nonetheless, the Debtors also had notice of the substance of his claims for the second arrest, as Mr. Kearny spoke shortly before the arrest with the branch manager, Ken, who told him "'Local and corporate Hertz do not communicate well' and that there was no issue with Jason's rental agreement and he was extended and authorized to have the car." *Id.* at 15–16 (¶12). Prior to his arrest, Mr. Kearny also explained to the same Hertz investigator his agreement with the location to pay $25 a day to keep the rental and contested the Hertz "force charge" connected to the second arrest. Hertz reimbursed him for that charge. *Id.* at 16–17 (¶¶ 15, 21).

Kurpjuweit's mother) "contacted Hertz to update them on her son's accident" on March 4, 2019, informing Hertz that "she believed the [rental] was returned to Hertz." Claim No. 15914, at 15 (¶ 8). When Hertz called on June 15, 2019, to ask Mr. Kurpjuweit to return the vehicle—he responded that the car was towed after the accident and returned to Hertz. On January 23, 2020, Mr. Kurpjuweit received a letter that he was being charged for theft. Mr. Kurpjuweit and his mother then "called both the [local branch] and Hertz's legal department to demand an explanation for the false theft charge. They informed Hertz that the car was towed to a Hertz facility and that the theft report was baseless. Hertz did nothing to help them." *Id.* (¶13). After numerous delays, he was arrested and arraigned on August 13, 2021 when he went to the courthouse. Charges were not dismissed until August 24, 2021.

X. **Saleema Lovelace:** Ms. Lovelace was arrested post-petition for car theft two days after the date upon which she agreed with Hertz to return the vehicle. Further, the theft report Hertz filed omitted her agreement to return the vehicle in the future, her payments, and her rental extensions. For these reasons, Hertz was plainly aware it had filed a false report against her.

Y. **Anne Maha (for herself and two minor children) & Adult Daughter Aniyah Johnson**: After being arrested and jailed for 19 days around April 2019, Ms. Maha "immediately contacted both the local Hertz office and the 1-800 corporate number demanding answers as to why Hertz filed a false police report against her and had her arrested for a crime which she did not commit. However, neither the

local office nor the 1-800 Hertz corporate office provided her any real answers."
Claim No. 15,814, at 17 (¶ 19).

Z.  **Charles Malone**: Mr. Malone returned the relevant rental on January 8, 2021, and
Hertz provided him confirmation of the return multiple times. Proof of Claim No.
15,798, at 15 (¶¶6–7). Despite that, Hertz reported Charles for theft on May 15,
2021—months after it confirmed that he returned the "stolen" vehicle. *Id.*, at 16
(¶¶14, 17). Because Hertz had confirmed return of the rental, Hertz's own records
demonstrate that Mr. Malone was falsely accused of theft.

AA.     **The McCoy Family**: The McCoy Family members were arrested as part
of a corporate rental using a corporate credit card and corporate HR company.
Although discovery has not been obtained to date, it is highly likely that Hertz's
records show that the report was patently frivolous

BB.     **Sophia Ortiz**: Shortly after her June 2016 arrest, Ms. Ortiz "called Hertz's
1-800 corporate number to ask why they had falsely requested a warrant for her
arrest when she had proof that she had paid for the rental." Claim No. 15,875, at
15 (¶ 15). The theft report had deleted her rental extensions and her payments.
Hertz never appeared to court during Ms. Ortiz's prosecution until she pleaded
guilty to a minor charge nearly a year and a half later.

CC.     **Jason Reeder**: Mr. Reeder was arrested shortly after speaking with the
local branch and being told he was good to keep the car. The police called Hertz
corporate at the time of the arrest around June 30, 2015—the corporate office said
that Mr. Reeder had paid and that is was not aware why there was a warrant for
his arrest. Mr. Reeder and the police also spoke with the local office, which said

that corporate had listed the vehicle stolen, which led to Mr. Reeder's arrest and prosecution. After his arrest, Mr. Reeder called and spoke with Gunnar, the manager of the local branch, who was unable to explain why a theft report had issued. All charges have since been dismissed.

DD.    **Franklin Richards & Celita James**: Mr. Richards rented a vehicle in California and extended the rental. He was arrested when the vehicle was reported stolen out of Texas and arrested at gunpoint in late July or early August 2016. (Ms. James was in the car when it was approached at gunpoint.) The circumstances of this case—an arrest report in Texas leading to the arrest of a valid renter from California—self-evidently provide a claim. Moreover, while Mr. Richards spent 7 days in jail, Ms. James "called Hertz at the 1800 number and demanded an explanation for the false report. No one would tell her anything." Claim No. 15,919, at 15 (¶ 8). While Mr. Richards was told that all charges were resolved soon thereafter, he learned in 2020 that there remained (and, it seems, still remains) a warrant for his arrest.

EE.    **Kevin Richardson & Kevin Richardson, Jr.**: Mr. Richardson and Mr. Richardson, Jr., were rented a stolen vehicle by Hertz and arrested or held at gunpoint two days into the rental. The police report details: "It was apparent that Hertz had reported the vehicle stolen in error, given that they had rented it out after reporting it stolen to Little Rock Police. . . . I spoke with dispatchers with LRPD, who in turn contacted the Hertz employee that filed the commercial burglary and stolen vehicle reports. It was determined that the vehicle rented to Mr. Richardson was entered stolen by mistake." Claim No. 15,913, at 22–23.

Later the morning of the arrest, Mr. Richardson "called the local branch and spoke with the manager. [Mr. Richardson] informed Hertz what happened with the police, and asked why Hertz rented them a stolen vehicle. The manager simply claimed that 'Hertz made a mistake.'" *Id.* at 16 (¶ 18).

FF. **Sierra Ryan**: Ms. Ryan has never rented from Hertz. On September 9, 2020, Ms. Ryan was arrested and jailed for two days for allegedly renting a vehicle from Hertz in Springfield, Illinois that was reported stolen around July 2018—when she would have been 23 (too young typically to even rent a vehicle). Ms. Ryan understands that the prosecution repeatedly reached out to Hertz pre-petition, post-petition, and through dismissal in September 2021 to try and obtain any evidence supporting the false and uninvestigated theft report. Claim No. 15,836, at 16 (¶ 13).

GG. **Darlene Sacca**: Ms. Sacca had a Hertz rental stolen from her in early November 2018. She repeatedly informed Hertz that the rental was stolen from her, but received communications and letters threatening to report her for theft for months after. Even after she learned that Hertz had recovered the vehicle, she was charged more than $3,000 for a rental that was stolen after a few days. Based on this fact pattern, it is likely that Ms. Sacca was reported for theft. If so, Hertz plainly knew of her claim because she had repeatedly informed the company of the stolen vehicle report and the vehicle was in fact recovered by police long before the charge.

HH. **Dan Shurtz**: Mr. Shurtz was arrested at gunpoint after Hertz rented him a vehicle it had reported stolen. The arresting officer at the time of arrest and Hertz

admitted that Hertz had reported the vehicle's tags stolen before renting that vehicle to Mr. Shurtz. The local office the next day (on March 29, 2018) "confirmed to [Mr. Shurtz] he was rented a stolen vehicle and said 'we are sorry about you getting arrested.'" Claim No. 15,902, at 15 (¶15).

II. **Samantha Simpson & Amber Rather**: Ms. Simpson and Ms. Rather were arrested in connection with a postpetition rental that Ms. Simpson was working to purchase from Hertz after leasing it in September 2020. On March 18, 2021, Ms. Simpson and her fiancée Ms. Rather were arrested; Ms. Simpson was then jailed for two days. Upon release, Ms. Simpson "immediately reached out to Hertz and spoke to the representatives from the 1-800 corporate number. She told them she had been falsely arrested. Hertz apologized for the misunderstanding, told [her] they had the correct paperwork to prove that [Ms. Simpson] legally owned the vehicle and would send paperwork to the police to have the charges dropped." Claim No. 15,839, at 17 (¶¶ 20–21). (Hertz never followed through and sent police/prosecution that exonerating paperwork.)

JJ. **Ameerah Singleton**: Ms. Singleton's insurance rental was towed by Hertz in July or August of 2017. She called the local branch because she didn't think the car should have been towed. Nonetheless, about a month later and long after Hertz obtained the car without law enforcement involvement, Ms. Singleton was arrested and is *still* being prosecuted. *See* Claim No. 15,794, at 15–17 (¶¶ 2, 5–16).

KK.     **Evan Tanner**: Mr. Tanner was an Uber driver renting through Hertz. He called to discuss a rate increase in December 2020 and poke with six different

departments. When he saw a charge of around $2,700 in late February 2021—the type of charge associated with the filing of a theft report—he "called Hertz many, many times. . . . The employees appeared to be unwilling to help him or tell him what was going on, but he did not know why." Claim No. 15,936, at 14 (¶ 10). Despite contesting the charge that Hertz knows is connected with a theft report, Mr. Tanner was not told he was reported for theft. Instead, on March 16, 2020 he was arrested because Hertz had claimed a rental was due October 26—he spent three weeks in jail. (It is possible that Hertz reported stolen a vehicle he had returned to Hertz in exchange for a new vehicle back in November 2020, but investigation is ongoing). In all events, whatever vehicle Hertz reported stolen was baseless and Mr. Tanner was in regular contact with Hertz contesting charges or extending rentals long after the alleged "theft."

LL. **Latricia Taylor:** When Ms. Taylor learned pre-petition that Hertz had reported her for theft around January 30, 2020 based on a rental she had extended and paid for, she "called the local Hertz number to discuss the false theft report and was directed to contact the 1-800 corporate number. During these phone calls to Hertz local and corporate she told them Hertz had falsely reported the car stolen." Claim No. 15,874, at 15 (¶¶ 13–14). Ms. Taylor subsequently learned there was a warrant for her arrest, voluntarily turned herself in, was jailed for two days, and was prosecuted until charges were dismissed in October 2020.

MM.    **Zachary Tedder & Ramie Singer &:** Ms. Singer and Mr. Tedder believe that Hertz records and interactions with prosecutors show that the report leading to both of their arrest and prosecution was baseless.

NN.    **Amir Thomas & Lisa Brower**: Both were arrested, jailed for 5 and 27 days respectively, and ultimately accepted plea deals based on a false theft report from 2015. In early 2016, Ms. Brower (who rented the vehicle) "called the local Hertz at the Clevelan Airport and demanded to know why Hertz had filed a stolen police report when they were regularly charging her debit card." Claim No. 15,917, at 16 (¶ 18).

OO.    **Jamol Toney**: Mr. Toney—who rented and was arrested postpetition— emailed "customerrelations@hertz.com" on March 30, 2021 and explained: "I recently had an experience were as I was put in Jail for the Operation of a Rental Vehicle and is now facing Felony Charges . . . due to the . . . location filing charges on me. . . . [T]his ordeal was a total shock to my system. To have an officer come to my home and put handcuffs on me and carry me off to jail. . . . Before the ordeal I kept open correspondence with hertz via phone conversation and even went to the [local] Location Hertz to turn the keys when after a conversation with the local representative, was informed that I had till April 1st [the day after Mr. Toney sent this email] to return the vehicle. . . . I never attempted to steal the vehicle and have always made my payments . . . . During all this I called your customer service team and I've talked with your Hertz representatives. . . . I was told I have till April 1st to return by a Local Representative at the [local] Location in Harvey, La . . . . Please reach back to me so I see what will be the next steps from this point." Claim No. 15891, at 21.

PP. **Connie Totman**: Ms. Totman arranged to rent a Hertz vehicle and leave it at a trailhead so that she could hike the Appalachian Trail—she specifically called

Hertz to give the car's coordinates before leaving for the hike. Instead of picking up the car, Hertz reported it stolen while Ms. Totman was hiking for a month. Ms. Totman was subsequently arrested three times based on that false theft report until South Carolina charges were dismissed in June 2019. Ms. Totman "repeatedly called Hertz to explain to them that they had filed a false report or improperly charged her, as did her bank." Claim No. 15893, at 18 (¶ 21); *see id.* at 15 (¶ 9) (contesting overcharge, explaining to Hertz that accusing her of theft would be ridiculous); *id.* at 16 (¶ 14) (calling Hertz after first arrest "furious . . . because of the false report. Hertz . . . tried to assure her that the situation had been resolved."). Indeed, Hertz *reimbursed* Ms. Totman the overcharge tied to the theft accusation after her bank confirmed that the theft overcharge was a mistake and told prosecutors that it was "unable to locate information on [the] vehicle" during her prosecution. *Id.* at 17–18 (¶ 18).

QQ.     **Elbert James "Jimmy" Turpen, Jr.**: Mr. Turpen rented a car and returned it after six days in September 2020 in Mississippi. On or around July 12, 2021—unknown to Mr. Turpen—Hertz reported him for stealing the Mississippi rental he had returned nearly a year earlier after six days. He was arrested in Arkansas and spent 5 days in jail. Charges remain pending in Mississippi. Because Mr. Turpen returned the vehicle to Hertz just a few days after he rented it and long before the theft report was filed, Hertz plainly had notice of his claim.

RR.     **Nkem Uwagboi**: Hertz rented Ms. Uwagboi a vehicle it had reported stolen. On October 19, 2019, just three days after renting the vehicle, she was arrested and taken to jail. Police finally contacted a Hertz location at O'Hare

Airport, which confirmed that Ms. Uwagboi had a valid rental contract. Because

Hertz confirmed that Ms. Uwagboi was arrested three days into a valid rental, it

had notice that she had claims against the company.

SS. **Jennifer Weems**: Ms. Weems had warrants for her arrest in Oregon and Texas

for a single Hertz theft report based on a 2015 rental, and was ultimately charged

in Texas. In September 2016, Hertz "told the Deschutes County District Attorney

in Oregon that they had filed a false police report." Proof of Claim No. 15,808, at

17 (¶ 17). Once that happened, all charges were then dismissed in Texas. Because

Hertz admitted to a prosecutor to filing a false report and was informed of court

dates, it plainly had notice of her claims.

TT.     **William West:** Mr. West agreed with Hertz that we would bring in his

rental—which he had extended and for which he provided valid payment—on

November 21, 2016. But he was arrested on November 18, jailed for three days,

and prosecuted for almost three years before charges were dismissed. Based on

his agreement to later return the vehicle and Hertz's failure to appear or provide

any evidence during years of prosecution, it is plain that Hertz was aware it filed a

false police report against Mr. West. *See* Claim No. 15,847, at 15–16 (¶¶ 3–7, 11–

16).

UU.     **Tiffany West:** Ms. West rented a vehicle in April 2020 and agreed to

purchase that vehicle from Hertz in August 2020. She was arrested, however, on

November 14, 2020 for alleged theft of the vehicle she rented and purchased.

Before her arrest, Ms. West contacted Hertz to discuss a charge based on the

purchase (or potentially based on a Hertz billing error for failing to register the car

as transitioning to purchase) and was told that there were no issues with the purchase contract. After the arrest, she "confronted Hertz over the false report" and attempted to recover her belongings that were seized from the vehicle—clearly "notif[ying] Hertz that it had filed a false police report." Claim No. 15,905, at 16–17 (¶¶ 18, 25).

VV.     **Anson Westerfield**: Mr. Westerfield was a regular renter and Gold Club (rewards) member that was known by name to the local office. Nonetheless, he was arrested in February 2021 shortly after a late January 2021 rental. At that time, "Anson plead[ed] that he was a Hertz Gold Customer and not a car thief, [but] Hertz confirmed that the vehicle was reported stolen. Hertz told Anson that there was nothing that [it] could do . . . [and] instructed the police to follow through with the arrest." Claim No. 15,795, at 16 (¶ 8). Anson also "notified Hertz that it had filed a false police report." *Id.* (¶ 13). Hertz subsequently was informed of five court dates for Anson but failed to appear to any of them until charges were dismissed.

WW.     **Monique Wheeler**: Ms. Wheeler was arrested, jailed, and prosecuted twice based on a Hertz theft report. After the first arrest on November 11, 2015, she "contacted the 1-800 Hertz corporate office to demand to know why they falsely issued a warrant for her arrest. The representative took her information, but she never received a call back from Hertz." Claim No. 15,898, at 16 (¶ 18). After her second arrest around September 15, 2017, Ms. Wheeler "contacted [Hertz] about the false theft report and gave them her old Hertz rental contract number. They informed her that the rental was paid for in 'full' and were not sure

whey she was arrested. However, Hertz refused to send her copies of her rental agreement when she requested that they do so." *Id.* at 16–17 (¶ 26). During the second prosecution, Ms. Wheeler also believes the following employees were involved and would have been made aware that she claimed the report was false: Caroline Fry, Scott Green, Gregory Donatello, and Jason McCoin. Hertz never showed up to the proceedings, and both prosecutions have ended.

XX.     **Jeric Wilson**: Mr. Wilson was an Uber driver who stayed in touch with Uber and Hertz to extend his rental. When he was arrested and taken to the police station around January 20, 2021, the police called Hertz, which said that the car was not on its internal "stolen" list, so he was released. Hertz never showed up during his prosecution and all charges were dismissed around July 15, 2021. Because Hertz was alerted that Mr. Wilson had been arrested but could not find him on their "stolen" list, it knew that he would have a claim.

YY.     **Duni Zenaye**: Ms. Zenaye rented a vehicle, was arrested, and was prosecuted post-petition. *See* Claim No. 15,799. She had agreed upon a return date of Saturday, January 16, 2021, with the local manager, but was arrested on January 14, two days before the agreed-upon return date. "During her arrest, [Ms. Zenaye] was allowed to contact Hertz and made them aware that they had falsely filed a police report and that she was being wrongfully arrested." *Id.* at 17 (¶ 22). After 2 days in jail and 121 days facing charges, all charges were dismissed when Ms. Zenaye presented her evidence and Hertz declined to show up to court.

**D. The Debtors' "Publication Notice" Fails Due Process.**

56.    Regardless of whether the Movants were "known creditors," their due-process rights were violated because the Debtors' publication notice fell short of the requirements of the Due Process Clause, the Bankruptcy Code, and the Bankruptcy Rules.

### i. The Debtors' "Publication Notice" Lacked Content Required by the Bankruptcy Code, Bankruptcy Rules, and Due Process Clause.

57.    The Debtors' published notices of the General Bar Date, the Plan, and the Administrative Claims Bar Date were inadequate. The Debtors published an identical written notice of the General Bar Date in 13 newspapers, or the Confirmation Hearing in 12 newspapers, and of the Administrative Claims Bar Date in 2 newspapers. The published notices can be viewed in the various affidavits for publication. *See, e.g.*, Case No. 20-11218, D.I. 1396, at 4 (lower left-hand corner of page B6 of the 9/17/2020 edition of *The Globe and Mail*). The published notices were inadequate under the Bankruptcy Code, the Bankruptcy Rules, and the Due Process Clause. Bankruptcy Rule 2002 governs notice. Subpart (n) applies to publication notice, which is a "notice given under this rule" by virtue of subpart (*l*). Bankruptcy Rule 2002(n) provides, "The caption of every notice given under this rule shall comply with Rule 1005. The caption of every notice required to be given by the debtor to a creditor shall include the information required to be in the notice by §342(c) of the Code." The debtors' published notices lacked the information required by this rule and consequently lack legal effect under the Code, the Rules, and the Due Process Clause. *See Chemetron*, 72 F.3d at 346 ("Due process requires notice that is reasonably calculated to reach all interested parties, reasonably conveys *all the required information*, and permits a reasonable time for a response." (emphasis added)); *see also Arch Wireless*, 534 F.3d at 84–85 ("The statutory notice requirement shapes the contours of that constitutional due process analysis because it informs the reasonable expectations of creditors."); *City of New York*, 344 U.S. at 297 ("[An analogous] statutory command for notice

embodies a basic principle of justice—that a reasonable opportunity to be heard must precede judicial denial of a party's claimed rights.").

58.    To start, the published notices did not "include the information required to be in the notice by section 342(c) of the Bankruptcy Code." Fed. R. Bankr. P. 2002(n). Section 342(c)(1) provides, "notice shall contain the name, address, and last 4 digits of the taxpayer identification number of the debtor." 11 U.S.C. § 342(c)(1). As to every Debtor but The Hertz Corporation, the notices did not include the debtor's name or the last 4 digits of the Debtor's taxpayer identification number. [37, 38] Quite the opposite, the notices openly admit that "a complete list of debtors and the last four digits of their federal tax identification numbers is not provided herein." [*See e.g.*, Case No. 20-11218, D.I. 1396, at 4]. The notice therefore does not comply with Bankruptcy Rule 2002(n). And under the plain terms of section 342(g)(1), the notice "shall not be effective notice." Statutory history further confirms as much: an earlier version of section 342(c) provided that "the failure of such notice to contain [the name, address, and taxpayer identification number of the debtor] shall not invalidate the legal effect of such notice." 11 U.S.C. § 342(c) (1996). But Congress specifically amended the Bankruptcy Code in 2005 to remove that language. *See* H. Rep. Report No. 109-31, Pt. 1, 109th Cong., 1st Sess., 77 (noting that section 342(c) was amended "to delete the provision specifying that the failure of a notice to include certain information required to be given by a debtor to a creditor does not invalidate the notice's legal effect"). That congressional choice must be enforced and respected.

---

[37]   For the notice of the Plan and Confirmation Hearing, where unpacking the definition of "Released Parties" would have required a reader to know who the "Debtors" were, this was particularly problematic.

[38]   The Confirmation Hearing Notice indirectly mentions "Rental Car Intermediate Holdings, LLC" as an applicable entity when describing voting rights. Case No. 20-11218, D.I. 4111-5, at 4. That fails to comply with Bankruptcy Rule 2002(n) because the information was not included in "the caption" of the notice. And it is only one of many Debtors that were not listed in each notice.

59.    Moreover, the notices at issue did not "comply with Rule 1005." Fed. R. Bankr. P. 2002(n). Bankruptcy Rule 1005 provides, "The caption of a petition commencing a case under the Code shall contain the name of the court, the title of the case, and the docket number. The title of the case shall include the following information about the debtor: name, employer identification number, last four digits of the social-security number or individual debtor's taxpayer-identification number, any other federal taxpayer-identification number, *and all other names used within eight years before filing the petition*" (emphasis added). For every debtor but The Hertz Corporation, the published notice did not comply with Rule 1005 because it did not list the requisite "information about the debtor." And even for The Hertz Corporation, the notice (let alone the caption) fails to contain "all other names used within eight years before filing the petition." Those names—listed as required on The Hertz Corporation's "petition commencing a case" (the origin of the Rule 1005 requirement incorporated by Rule 2002(n))—are "Firefly, Hertz Car Sales, Hertz Rent-A-Car, Thrifty, Dollar Rent A Car, Thrifty Car Rental." [*See* Case No. 20-11218, D.I. 1 (petition listing, per Rule 1005, "[a]ll other names debtor used in the last 8 years")]. The published notices, therefore, failed to comply with the Bankruptcy Rules with respect to each Debtor.

60.    The Bankruptcy Code and Rules require that notices contain this information for good reason. Unquestionably, the single most important piece of information to provide in a notice of the general bar date is the *name of the debtors* at issue. Case in point: the first and most prominent piece of information on the *mailed* notice of the General Bar Date is a list of each Debtor in the bankruptcy. [*See* Case No. 20-11218, D.I. 1240-1 (Bar Date Notice)]. But the Debtors failed to include this critical information in the *published* bar date notice. Indeed, many Movants rented the applicable vehicles from debtors that were not even listed in the published

notices—including, for example, Bianca DeLoach and Cody Breedlove, who rented from Dollar and Jamol Toney, Aujaneik Moss, and Adriane Beamon who rented from Thrifty. Likewise, there are very good reasons why published notice should include other "names used within eight years before filing the petition," as those names can be essential in alerting potential creditors of their claims and the need to file in order to preserve them. In fact, via the Plan, the Debtors seek to bar the Movants from suing even non-debtor affiliates based on the Plan's third-party release provisions. And the notices didn't even purport to give notice that claims against those entities would be lost.

61.    In sum, the relevant rules are plain and plainly stated; the Debtors designed the publication notice and now must bear the consequences of failing to comply with the Bankruptcy Code and Bankruptcy Rules in so doing. Section 342(g)(1) offers a clear command that noncompliant notice "shall not be effective notice." The requirements of Bankruptcy Rule 1005, too, are strictly construed even for mailed notice. *See Ellett v. Stanislaus*, 506 F.3d 774, 781 (9th Cir. 2007) (individual debtor's mailed notice without legal effect because, contrary to Rule 1005, he erroneously replaced a "3" with a "6" in the last four digits of his SSN).[39] The rules should be

---

[39]    The *Ellett* court explained precisely why it enforced the Bankruptcy Rules as written:

> Mr. Ellett was in the best position to list the correct SSN on his petition and comply with the additional requirements of Rule 1005 of the Federal Rules of Bankruptcy Procedure. Requiring a creditor to ferret out a debtor's correct identity when incorrect identifying information is provided would be overly burdensome and inappropriate. As stated in Maya, "[the debtor] seeks to free itself of an obligation by means of a federal court judgment." *Maya*, 78 F.3d at 1399. Thus, it is not unreasonable to place the burden on the debtors to ensure that their creditors received proper notice of their bankruptcy filing. Here, due to Mr. Ellett's negligence in listing an erroneous SSN on his bankruptcy petition and § 341(a) notice, proper notice was not provided to the FTB.

*Id.*, at 781.

applied with equal force, as the Reorganized Debtors cannot rely on a legal fiction to extinguish other individuals' interests without even satisfying the basic prerequisites for using that legal fiction. And these plain failures to comply with relevant rules by providing essential information within the notices further cements the due process violations here. *See, supra,* ¶ 57 (discussing *Chemetron, In re Arch Wireless*, and *City of New York*). For these reasons, the failure to include these legally and logically required pieces of information fails under the Rules, the Code, and due process.

### ii. The Debtors' "Publication Notice" Was Inadequate Under *Mullane*.

62.    Beyond those self-evident content deficiencies, the Debtors' publication notices fell well short of constitutional standards for other reasons. "Determining the adequacy of publication notice is a fact-intensive analysis that 'depends on the circumstances of a particular case.'" *In re Weiand Auto. Indus.*, 612 B.R. 824, 851 (Bankr. D. Del. 2020) (quoting *Wright v. Corning*, 679 F.3d 101, 108 (3d Cir. 2012)). True,

> publication in national newspapers is [generally] sufficient to satisfy the requirements of due process, particularly if it is supplemented by notice in local newspapers. But whether adequate notice has been provided depends on the circumstances of a particular case. . . . Due process requires notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action . . . . As the Supreme Court has repeatedly emphasized, the very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation.

*Wright v. Owens Corning*, 679 F.3d 101, 107–08 (3d Cir. 2012) (internal quotation marks, citations omitted).[40]

---

[40]    The publication of the Administrative Claims Bar Date in only two national newspapers fell short of even that general standard.

63.    The Supreme Court has made clear that, even in the bankruptcy context, "[n]otice by publication is a poor and sometimes a hopeless substitute for actual service of notice. Its justification is difficult at best." *City of New York*, 344 U.S. at 296. Notice by publication should only be resorted to as a matter of "plain necessity." *Id.* Indeed, *Mullane* itself explains that "[i]t would be idle to pretend that publication alone . . . is a reliable means of acquainting interested parties of the fact that their rights are before the courts." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 315 (1950). The adequacy of any notice publication must be "weigh[ed] against] equivalence with actual notice." *Id.* And that is because "outside the area of the newspaper's normal circulation the odds that the information will never reach [a claimant] are large indeed." *Id.* (In 2020, the same can be said of the area *inside* a print newspaper's normal circulation, especially for lay Movants.)

64.    Returning to due process basics, "[a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane*, 339 U.S. at 314. "The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it." *Id.* Regardless whether the Movants are classified as known or unknown creditors, it is plain that Hertz's publication falls far short of the efforts that would be undertaken by one "desirous of actually informing" those who may be interested in these proceedings of the bar date.

65.    The publication notices in this case fell short of those due-process standards with respect to the false-police-report Movants (assuming *arguendo* they are not known creditors) for

at least three reasons: (1) the manner of publication; (2) the content of publication (beyond the plain defects identified above); and (3) the Debtors' conduct surrounding the publication notice.

66.    *First*, the Debtors adopted insufficient means to provide publication notice in the circumstances of this case. Hertz has elsewhere conceded (as it must) that "[t]he proper inquiry in evaluating notice is whether a party acted reasonably in selecting means likely to inform persons affected." Group 3 Obj. ¶ 35 (internal quotation marks omitted); *see Mullane*, 339 U.S., at 314 ("The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it."). Hertz fell plainly and significantly short of that standard here.

67.    No reasonable person "actually desirous" of informing unknown creditors of these proceedings would have published notices a single time deep in midweek, print newspapers while declining to take any other step to inform unknown creditors. Hertz has touted that it published notice in certain newspapers with "a combined circulation of approximately 2.2 million." Group 3 Obj. ¶ 14. But there are more than 120.7 million households in the United States and about 8 million "employer establishments."[41] Based on households alone, the "robust" notice immediately omits 118.5 million households (120.7-2.2) or more than 98% of them. (Indeed, Hertz is including distribution of The Globe and Mail in Canada in its numbers, which would make the numbers even starker.) Any means ignoring 98% of households is not a means "likely to inform persons affected"; it is in fact all but guaranteed not to inform persons in 49 of every 50 households. These numbers are especially problematic for a large, national company that enters "more than 25 million rental transaction in the United States per year." Group 3 Obj. ¶ 54. Indeed, even these numbers generously assume that each household reaches fine-print

---

[41]    See https://www.census.gov/quickfacts/fact/table/US/HSD410219.

partway through business sections in midweek editions of these newspapers. But Hertz chose to publish notice only once on page B3 of a Thursday edition of *USA Today*, page B3 of a Thursday edition of *The Wall Street Journal*, page B3 of a Thursday edition of *The New York Times*, and page B6 of a Thursday, Canadian edition of *The Globe and Mail*.[42] Any newspaper reader knows that the reader count for fine print on those pages is far lower than general distribution numbers would suggest.[43] And the numbers for publication notice of the Plan and Administrative Claims Bar Date are far lower still because those items were published in fewer locations.

68.     To be sure, due process does not require the impossible or the infeasible. But that is far from the case here, where resources were abundant and there were ample alternatives. Hertz had many different, and inexpensive, means of informing those implicated in police reports (and other unknown creditors) of the bankruptcy aside from mailed notice. *See generally* Alan N. Resnick, *Bankruptcy As a Vehicle for Resolving Enterprise-Threatening Mass Tort Liability*, 148 U. Pa. L. Rev. 2045, 2079 (2000) (suggesting "press releases," "notices" given to "targeted groups of product users" and "other media advertisements"). Some obvious examples include targeted emails, letters, texts, recorded phone calls, or press releases. (Indeed, emails could easily be sent to all Hertz customers using ordinary listservs *at essentially no cost*.) Hertz does these things countless times every day in an attempt to further its own business interests—

---

[42]   Hertz also similarly published in a handful of local newspapers, but it did not offer any readership count for those publications. Even if those publications boost the "distribution" list, the end result would still be that the overwhelming majority of households would not be exposed to the notice.

[43]   This is not to say that print publications can never be part of a genuine effort to notify unknown creditors—just that the print publication practices here, standing alone, were not sufficient. *See In re Energy Future Holdings Corp.*, 949 F.3d 806, 822–23 (3d Cir. 2020) (debtor "employed a noticing expert, 'follow[ed] the principles in the Federal Judicial Center's . . . illustrative model forms of plain language notices' . . . and published notice in seven consumer magazines, 226 local newspapers, three national newspapers, forty-three Spanish-language newspapers, eleven union publications, and five Internet outlets.").

but it did none of those things to protect creditor interests. Further, electronic media could have been utilized as a cheaper and more effective alternative (or supplement) to print advertisements. Each of these means could have been designed to target those likely affected by the proceedings (instead of print newspapers that are sent to a random group that, if the Movants are an example, rarely includes the claimants). And all these means would have been trivially easy given that Hertz tracks those implicated in police reports—and its customers more generally—and has their contact information.

69.    These sorts of efforts are par for the course in the mass-tort context. A leading bankruptcy treatise states this as an obvious: "For example, in cases, including mass tort cases, in which there are a large number of unknown creditors, it may be necessary to publish notice of a bar date so as to reach the widest audience possible. **Such a publication campaign will inevitably involve print and electronic media**." 10 COLLIER ON BANKRUPTCY ¶ 9008.01 (16th ed. 2021) (emphasis added).   These efforts also fall far short of those employed in other bankruptcies in this district with respect to tort claims. In *In re Boy Scouts of America*, for example, the Debtors were required, under the guidance of a noticing expert, to publish (1) emails of English and Spanish notice to all relevant persons who had provided email addresses since 1999; (2) 6-7 weeks of television broadcast advertisements on national networks; (3) 4 weeks of advertising on streaming services; (4) 4-5 weeks of radio advertisements in English and Spanish; (4) publication in 8 magazines and 10 Spanish-language newspapers; (5) 89 million gross impressions worth of internet advertising; (6) social media distribution; (7) military advertising; (8) distribution of a targeted press release to 5,400 media outlets and 4,000 websites; and (9) a community outreach campaign. Case No. 20-10343 (LSS), D.I. 695 (bar date order); 556 (describing supplemental notice plan).   In *In re Catholic Diocese of Wilmington, Inc.*, an

older case, the bar date order required publication notice (i) once in English in the national edition of *USA Today*, (ii) twice each in English and Spanish in several local and regional newspapers in Delaware, Maryland, Virginia, and Pennsylvania. (iii) twice in both English and Spanish in the Diocese of Wilmington's newspaper *The Dialog*, (iv) bi-weekly, in English, in the bulletins promulgated by the various parishes within the Diocese of Wilmington, and (v) bi-weekly, in Spanish, in the bulletins promulgated by those parishes having a large number of Spanish-speaking parishioners.    Case No. 09-13560 (CSS), D.I. 308 at ¶ 13. The Debtors' minimal, perfunctory efforts in this case fall far short of those cases.

70.    *Second*, the contents of the notice were insufficient. As described above, the Debtors had extensive notice, and even acknowledge, that some of its customers were impacted by their systemically flawed theft-reporting practices. But they made no tailored efforts to inform those persons of the applicable bar dates or the Plan. The Third Circuit has specifically reserved the possibility that "if a debtor's records revealed the existence—but not the identities—of persons with claims against the debtor, due process would require that the nature of those claims be announced in the relevant notices." *Sweeney v. Alcon Lab'ys*, 856 F. App'x 371, 375 (3d Cir. 2021). To the extent the Movants were unknown creditors, this would be such a case: the debtors' known, systemic issues caused a mass tort on behalf of lay persons who did not receive mailed notice of the bar date.

71.    Further, "[t]he [claimant's] degree of sophistication is an issue that is relevant to the adequacy of the notice of bankruptcy proceedings they received." *Jones v. Chemetron Corp.*, 212 F.3d 199, 205 n.6 (3d Cir. 2000). Here, the wording of the notice was littered with complex bankruptcy terms and concepts—for example, "a claim . . . against the Debtors that arose, or is deemed to have arisen, prior to the Petition Date, no matter how remote or contingent such right

to payment or equitable remedy may be," Case No. 20-11218, D.I. 1240-3, at 2—and even practitioners can reach difficulties interpreting the *Grossman's* standard for when claims "arose." Therefore, "[e]ven if we assume that they read the bar date notice, the movants would have been hard pressed to determine what action, if any, should be taken with regard to the notice. The bar date notice . . . couched with legalese, is a complex legal document, and clearly is not easily comprehensible by a lay-person." *In re Grand Union Co.*, 204 B.R. 864, 873 (Bankr. D. Del. 1997) (cited with approval in *Jones*, 212 F.3d, at 205 n.6). And here, the Movants were lay persons with no legal training or background.

72.     *Third,* the Debtors' conduct with respect to notice and Movants provides additional reason to find publication notice inadequate. Indeed, "[t]he facts of this case demonstrate the prudence of not having the rule regarding publication always satisfy due process requirements." *Tillman ex rel. Est. of Tillman v. Camelot Music, Inc.*, 408 F.3d 1300, 1308 (10th Cir. 2005). In *Tillman*, the debtors had taken precautions to prevent potential Movants from filing claims. The Tenth Circuit thus explained that "[w]hen a party conceals the necessary facts upon which a claim is about to be made, that party cannot benefit from publication by notice. Due process does not allow a debtor who has actively concealed facts necessary to the presentation of certain claims to notify by publication those persons adversely affected by the active concealment." *Id.*

73.     A similar unclean hands argument applies to Hertz. The Movants have evidence that Hertz has engaged in similar conduct here to prevent creditors from filing claims. For example:

A. On February 2, 2021, Hertz told Movant Angela Delafontaine that it had not filed a theft report against her based on a 2017 rental. That was false, and Ms.

Delafontaine was arrested two months later along with her spouse and child. She was prosecuted for months until charges were dismissed. Claim 15,823, at 16–18.

B.   Group 4a Claimant Krystal Carter rented in October 2020 and extended that vehicle through December 30, 2020. *See* Claim No. 15,761. James Tolen was listed as an authorized driver. On December 23, 2020, police pulled Mr. Tolen with guns drawn and arrested him—saying that he was driving a vehicle Hertz had reported stolen. Police contacted Hertz at that time, and Ms. Carter contacted Hertz the next day to explain what happened. *Id.* at 18 (Dec. 27 email); *id.* at 20 (voicemail from Hertz transcription) On January 8, 2021, counsel for Carter was contacted by a Hertz assistant general counsel, and on January 14, 2021 counsel was contacted by ESIS, Hertz's claim administrator. Hertz put its claim administrator in touch with Mr. Tolen and Ms. Carter, and the Claim administrator said, "Please provide us with all the information so that we may establish a claim for you[r] clients from the 12/23/20 loss where you are seeking damages." *Id.* at 35. At no point during these interactions did counsel for Hertz or ESIS inform counsel, Carter, or Tolen of the pending bankruptcy proceedings or their ability to file a proof of claim. *Id.* Quite the opposite, before suit was filed and without acknowledging the bankruptcy, Hertz tried to get Carter and Tolen to release all claims in exchange for a refund of the rental fee by signing a "confidential settlement agreement." *Id.* at 23–25 (settlement offer). After a lawsuit was filed on July 30, 2021, Hertz sent a letter threatening sanctions if it was not immediately withdrawn. *See id.* at 73–77. After local counsel filed a nonsuit, the Hertz assistant general counsel emailed counsel for Ms. Carter and

Mr. Tolen—who had been arrested at gunpoint because Hertz rented him a stolen vehicle—gloating that Mr. Tolen's injuries "Didn't hertz so much after all I guess." Tolen & Carter Decl., ex. 5, at 4.

C.   Group 4a Claimant Kellan McClellan—who was arrested at gunpoint during the original duration of his one-week rental—sent Hertz notices of loss on January 2 and 9, 2020, as well as a formal demand letter on February 3, 2020, extensively laying out his claims, his intent to seek compensation, and offering to settle the case for about $1.4 million. Claim No. 15,915, at 29–35 (letters and notices). Mr. McClellan subsequently corresponded with Hertz, Hertz attorneys, and a claims agent for Hertz at Chubb/ESIS. On July 2, he received a letter telling him that Hertz had declared bankruptcy and promising to inform him of the general claims process, but Mr. McClellan never received any subsequent notice from Hertz. Claim No. 15,915, at 27–28 (letter from Tucker, Robin & Merker) ("Hertz's claims agent, who will be managing the claims process, will be mailing full information about submitting a proof of claim and the applicable deadlines").

74.    Additional "plus factors" are also present here. For example, the Debtors conspicuously failed to give notice to *dozens* of False Police Report Claimants who informed the debtor that the theft report or information in the theft report was false. *See, supra*, ¶ 55; Group 4a Motion ¶¶ 75–76 (describing claimant accounts). There was simply a lack of desire to take steps to inform victims of false police reports. Further, Hertz has faced spoliation sanctions relating to records involved in its theft reporting practices. *See, e.g.*, Attachment C (*Grady* spoliation orders). It has brazenly admitted to refusing to withdraw criminal theft reports—even when the lives of innocent persons are being destroyed by false charges—or provide any assistance to

those wrongfully charged. *See* Attachment V, Garcia Decl. ¶ 24 (December 1, 2021 Hertz email saying "we are not empowered to dismiss the police report that was filed with the authorities. Therefore, you must address this matter through the court system."); Wood, "Bankrupt Hertz is Still Wrongly Accusing Customers of Stealing Cars," *supra*, note 12 ("Hertz has no mechanism to withdraw a criminal referral because, the company spokesperson said, it has to maintain a relationship of 'integrity and responsibility' with law enforcement. 'In the rare instances this happens, if you report a crime, and you later say it didn't happen, then law enforcement tends not to believe you if you retract it or say you were mistaken,' the spokesperson said. 'Hertz's continued good relationship with law enforcement is important.'"). This is flatly contrary to its "legal and moral" duty to update police reports with incomplete or false information. Attachment U, Wood Decl. ¶ 24. And it is extraordinary that Hertz admits to "instances" where false police reports occur, but it does nothing about them as a matter of policy. Worse still, the Reorganized Debtors continue these ruinous practices post-petition and post-confirmation, as demonstrated by many of the Movants' experiences and those of Manuel Garcia.

75.    Moreover, former Delaware Deputy Attorney General Steven P. Wood determined that the "question of whether Hertz's conduct amounts to criminal conduct is worthy of a criminal investigation to determine whether Hertz should be prosecuted for its misconduct" based on the facts alleged in the Delaware prepetition complaint. Attachment U, Wood Decl. ¶ 29. In particular, he determined that, assuming the allegations in the Delaware complaint to be true, "there is more probable cause to conclude that Hertz committed a crime than there is probable cause to conclude that any Claimant committed a crime." *Id.* ¶ 30. In these circumstances, the Due Process Clause calls for more than "burying the lead" deep in a few newspapers such that equity holders emerge from bankruptcy with value, but persons grievously

harmed by the Debtors lose their ability to seek justice because they too infrequently read the New York Times.

76.     The bottom line is that did not employ means consonant with an actual desire to provide notice to those whose rights would be affected by these proceedings, and certainly not means likely to notify those persons. These efforts, in light of the facts of these claims and the Debtors' surrounding conduct, fell far short of what due process requires; Hertz's notice by publication in this case was not "more than a feint" in that direction with respect to those implicated by its false and misleading theft reporting practices. *Mullane*, 339 U.S. at 315. And the Movants' Due Process Clause rights therefore prohibit disallowing their claims as untimely based on the General Bar Date about which they received no notice.

## II.     <u>Other Bases to Deem Claims Timely or Extend Relevant Bar Dates.</u>

77.     In addition to the due-process arguments described above, the Movants offer alternative bases for deeming their claims timely or otherwise extending the pertinent bar dates. In particular, the Movants move under Bankruptcy Rules 9006 and 3003(c)(3), sections 105 and 503(a) of the Bankruptcy Code,[44] and the Due Process Clause principles described above, as

---

[44]     As well as sections 502(b)(9) and 726(a)(3), *see supra*, note 26.

applicable, for the acceptance of claims filed after the General Bar Date and Administrative Bar Date.[45]

### A. The Movants Timely Filed Claims in Light of the Pending Class Proofs of Claim.

78.     Class proofs of claim were timely filed on behalf of putative classes of False Police Report Claimants on or before the General Bar Date (and, necessarily, the Administrative Claims Bar Date). Those proofs of claim remain pending. Those proofs of claim tolled the relevant bar dates for individual claimants and therefore the Movants' claims as putative class members are timely filed.

79.     It is well settled that "the commencement of the original class suit tolls running of the statute for all purported members of the class who make timely motions to intervene after the court has found the suit inappropriate for class action status." *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 553 (1974). The same rule applies to class proofs of claim and bankruptcy bar dates. Consequently, the Movants' claims are timely. As Judge Bernstein has explained:

---

[45]    Certain Movants are minors or were minors at the time of the General Bar Date and Plan Confirmation Hearing, including A.P. (minor child of Movant Bianca DeLoach), C.P. (minor child of Movant Bianca DeLoach), S.M. (minor child of Movant Kimberly McCoy), Savannah McCoy (currently an adult but turned 18 after General Bar Date), Emmah McCoy (ditto), G.M. (minor child of  Movant Angela Delafontaine), A.J. (minor child of Movant Anne Maha), A.J. (second minor child of Movant Anne Maha), N.E. (minor child of Movant Melanie Evans), N.E. (second minor child of Movant Melanie Evans), M.P. (minor child of Movant Brandy Porter), K.F. (minor child of Group 2 Claimants Dajanae Bridges and Kenny Fearence). These Movants generally were children who were detained/arrested (often at gunpoint) along with their parents in connection with a theft report filed by Hertz. The Movants listed above move under Bankruptcy Rules 3003(c)(3) and by incorporation 3002(c)(2), which provides: "In the interest of justice and if it will not unduly delay the administration of the case, the court may extend the time for filing a proof of claim by an infant or incompetent person or the representative of either." Here, the "interest of justice" plainly supports permitting these minors (or their representative) who suffered significant harm to pursue claims against Hertz, and the case will not be unduly delayed as many similar claims will already be moving forward on the merits no matter how this Court rules on other issues in this Motion. Further, there are ample funds available to pay any claims, so uncertainty surrounding these claims will not delay administration of the Plan as to other creditors.

The bar date, however, has already been extended. "[T]he commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974) (footnote omitted); *accord Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 353–54, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983); *Official Committee of Asbestos Claimants of G–I Holding, Inc. v. Heyman*, 277 B.R. 20, 30 (S.D.N.Y.2002) ("As a general rule, statute of limitations periods are suspended against putative class members from the time a class action is filed until class certification is denied, or, if state law applies and permits, upon decertification."). The tolling rule satisfies the policies of ensuring essential fairness to the defendants and barring stale claims because the class action "notifies the defendants not only of the substantive claims being brought against them, but also of the number and generic identities of the potential plaintiffs who may participate in the judgment." *American Pipe*, 414 U.S. at 554, 94 S.Ct. 756; *Crown, Cork*, 462 U.S. at 352, 103 S.Ct. 2392. The rule also eliminates the need for individual members of a class to file their own actions or intervene in the pending action to preserve their rights before the decision on certification is made—"precisely the multiplicity of activity which Rule 23 was designed to avoid." *American Pipe*, 414 U.S. at 551, 94 S.Ct. 756.

If a class action was filed prior to the running of the statute of limitations and class certification is denied, the tolling of the statute of limitations will give the class members additional time to assert their individual rights. *See Crown, Cork*, 462 U.S. at 354, 103 S.Ct. 2392; *G–I Holding, Inc.*, 277 B.R. at 32. Furthermore, the class members do not have to demonstrate that they refrained from taking individual action prior to the expiration of the statute of limitations in reliance on the pendency of the class action. *American Pipe*, 414 U.S. at 552, 94 S.Ct. 756 ("[E]ven as to asserted class members who were unaware of the proceedings brought in their interest or who demonstrably did not rely on the institution of those proceedings, the later running of the applicable statute of limitations does not bar participation in the class action and in its ultimate judgment.").

The same tolling rule applies in bankruptcy. If the representative files a timely adversary proceeding or class proof of claim, and the Court denies a motion to certify the class, it should set a reasonable bar date to allow the members of the putative class to file individual claims.

*In re Connaught Grp., Ltd.*, 491 B.R. 88, 97 (Bankr. S.D.N.Y. 2013); *see also Gentry v. Siegel*, 668 F.3d 83, 91 (4th Cir. 2012) (Applying tolling reasoning to class proof of claim such that "if the bankruptcy court denies the motion [to apply Bankruptcy Rule 7023], it should then establish a reasonable time within which the individual putative class members are allowed to file individual proofs of claim."); *Matter of Am. Rsrv. Corp.*, 840 F.2d 487, 493 (7th Cir. 1988) ("Not every effort to represent a class will succeed . . . Putative agents keep the case alive pending the decision on certification. . . . If the bankruptcy judge denies the request to certify a class, then each creditor must file an individual proof of claim."); other cases cited in note 50, *infra*. Individual proofs of claim filed while the class proof of claim remains pending—like those filed by the Movants—are timely.[46]

80.     As a practical matter, moreover, resolution of the class proofs of claim may resolve all timing issues. "If the class claim is certified, then the claims of all the members of the class are incorporated in the proof of claim that was timely filed." *In re Kaiser Grp. Int'l, Inc.*, 278 B.R. 58, 63 (Bankr. D. Del. 2002). And if the Court declines to apply Bankruptcy Rule 7023 (or ultimately certify a class), the Class Motion specifically requested an extension of the General Bar Date and Administrative Claims Bar Date such that putative class members may file claim. *See False Police Report Claimants' Motion Pursuant to Bankruptcy Rule 9014 to Apply Bankruptcy Rule 7023*, D.I. 192, at Part II, ¶¶31–32; *Claimants' Reply in Support of Motion Pursuant to Bankruptcy Rule 9014*, D.I. 230, ¶¶35–38. No party objected to that relief. *See*

---

[46]     Nothing in the Bar Date Order says otherwise. Quite the opposite, that order describes how proofs of claim must be filed "whether or not such person or entity is or may be included in, or represented by a purported class action, class suit, or similar representative action filed, or that may be filed, against the Debtors." [Case No. 20-11218, D.I. 1240, ¶7] The Bar Date Order specifically does **not** include class proofs of claim in that list, which would be an extraordinary omission if it applied (or was meant to apply) to class proofs of claim. The entire order, after all, is about proofs of claim, which are not "actions" in a traditional sense and not described as such throughout the Bar Date Order.

*generally* D.I. 215 (Reorganized Debtor's Sealed Objection to Class Motion). That path has been frequently employed and prescribed by bankruptcy courts in the context of class proofs of claim.[47] And such an order would result in the Movants' claims being timely. Either way, therefore, the Movants' claims would be allowed to move forward to the merits (without further and extensive litigation on notice and other issues raised in this motion).

### B. The Court Should Permit the Late-Filed Claims for Excusable Neglect.

81.    "[T]he Bankruptcy Court must accept late-filed proofs of claim under Federal Rule of Bankruptcy 3003(c)(3) for 'cause shown.' Fed. R. Bankr. P. 3003(c)(3). That 'flexible' standard is met when the 'danger of prejudice to the debtor' is low; the claimant shows good 'reason for the delay'; and the 'length of the delay' does not have outsize 'impact on [the] judicial proceedings.' *Energy Future Holdings*, 949 F.3d at 823 (quoting *Pioneer Inv. Servs.* 507 U.S. at 395). Under that standard, late claims may also be rejected for bad faith. *Id.* at 824, n.11;

---

[47] *See, e.g., Gentry v. Siegel*, 668 F.3d 83, 91 (4th Cir. 2012) ("Of course, if the bankruptcy court denies the motion [to apply Rule 7023], it should then establish a reasonable time within which the individual putative class members are allowed to file individual proofs of claim."); *In re TWL Corp.*, 712 F.3d 886, 899 (5th Cir. 2013) (noting that putative class members' rights would be protected by application of the *Gentry* reasoning if proceeding as a class is denied; citing *In re Am. Rsrv. Corp.*, 840 F.2d 487, 493 (7th Cir. 1988) for the same point); *In re Wildwood Vills., LLC*, No. 3:20-bk2569-RCT, 2021 WL 1784408, at *8 (Bankr. M.D. Fla. May 4, 2021) (refusing to apply Bankruptcy Rule 7023 but ordering a new deadline by every putative class member to file a proof of claim); *In re PG&E Corp.*, No. 19-30088-DM, 2020 WL 5626038, at *2 (Bankr. N.D. Cal. Feb. 24, 2020) ("If the representative files a timely adversary proceeding or class proof of claim, and the Court denies a motion to certify the class, it should set a reasonable bar date to allow the members of the putative class to file individual claims." (quotation marks omitted)); *Morgan v. Affiliated Foods Sw., Inc.*, No. 4:15CV00296, 2016 WL 1676898, at *7 (E.D. Ark. Apr. 26, 2016) (same); *In re MF Glob.*, 512 B.R. at 765 ("And even if the Court were to deny class certification, the Court would extend the bar date to allow each of the MFGI Class Claimants to file individual claims, which would result in a greater delay in administration of the case."); *In re Connaught Grp., Ltd.*, 491 B.R. 88, 99 (Bankr. S.D.N.Y 2013) ("If the representative files a timely adversary proceeding or class proof of claim, and the Court denies a motion to certify the class, it should set a reasonable bar date to allow the members of the putative class to file individual claims. ... Thus, even if I deny the class certification motion, I would fix a new bar date for individual ... claims").

*see also Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993) (excusable neglect factors include "the danger of prejudice to the debtor, the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith.").

82.     Similarly, section 503(a) of the Bankruptcy Code provides that an entity "may tardily file [a] request [for payment of an administrative expense claim] if permitted by the court for cause." At a minimum, this provision permits tardy filings upon a showing of excusable neglect. *Cf. Ellis v. Westinghouse Elec. Co., LLC*, 11 F.4th 221, 233 n.6 (3d Cir. 2021) (referencing that "courts have often relied on the 'excusable neglect' standard to determine whether to allow a tardily filed request for payment of an administrative claim" (internal quotation marks omitted)); *In re Promise Healthcare Grp., LLC*, No. 18-12491 (CTG), 2021 WL 4528461, at *9 (Bankr. D. Del. Oct. 4, 2021) ("[T]he disallowance of Figueroa's claim on the ground that she missed the administrative claims bar date would provide a windfall to the estate. Figueroa alleges that she suffered personal injuries as a result of the debtors' negligence during the bankruptcy case. . . . Leaving Figueroa with no means to pursue such a claim would clearly be prejudicial to her interests and would permit the estate to avoid an obligation that it would otherwise be required to bear under applicable legal principles.").[48]

83.     These factors support permitting the Movants' claims that were filed after the General Bar Date or Administrative Claims Bar Date, as applicable, as well as permitting a late opt-out from the Plan's third-party release provisions. To start, there is no prejudice to the

---

[48]    On the plain language of the Bankruptcy Code, there is nothing limiting the "for cause" language in section 503(a) only to excusable neglect. Even if the Court concludes that the *Pioneer* factors are not met, it may find cause based on similar considerations, including the plain interests of justice for the Movants and the relative equitable positions of the parties with respect to the alleged conduct.

Debtor by accepting these proofs filed after any bar date. This is true for several reasons. For instance, there were class proofs of claim filed on behalf of a class of all false police report Movants, which would include the Movants making this motion. Therefore, the Plan was negotiated and confirmed with full awareness that false-police-report claims would be part of the bankruptcy, and accepting the claims when filed could "not alter the expectations the parties had at the time they agreed to the" plan. *Energy Future Holdings*, 949 F.3d at 823; *see also In re Kaiser Grp. Int'l, Inc.*, 278 B.R. 58, 64 (Bankr. D. Del. 2002) (Walrath, J.) ("The Debtors are not prejudiced by [class members' having claims], since the Debtors had notice of the existence of the class claim before the bar date."). Also, these claims will have no impact on the proceedings of this bankruptcy. The Plan provides for unimpaired treatment of unsecured claims like those of the Movants, and there are plenty of resources available to pay these claims (which, though substantial for the Movants, are a very small portion of the total value of this bankruptcy).[49]

84.     Second, the reason for the delay traces back to a lack of actual notice. Even if the Court concludes that that publication notice was adequate—which it should not do—each of the Movants was not aware of the General and Administrative Bar Dates, or the need to file claims in these cases, until the bar dates had elapsed. In *In re Orthopedic Bone Screw Products Liability Litigation*, the Third Circuit applied exactly this argument to the reason-for-delay *Pioneer* factor. It found that a "seven[-]month delay" traced to "the minimal constructive notice provided" and that it would have, "absent actual notice mailed to [the movant's] address," been "incongruous . . . to find [the movant] culpable for his failure to note a small advertisement run once on page 50 of a newspaper he does not receive." 246 F.3d 315, 326 (3d Cir. 2001). On that reasoning, the

---

[49] The Movants specifically reserve the right to respond to any factual evidence of prejudice that the Reorganized Debtors wish to offer. *See In re O'Brien Env't Energy, Inc.*, 188 F.3d 116, 127 (3d Cir. 1999) (holding "prejudice is not an imagined or hypothetical harm; a finding of prejudice should be a conclusion based on facts in evidence").

Third Circuit found that the reason for delay favored the movant and supported that determination by examining precedent in the Third Circuit and other Circuits. *Id.* at 327–328; *see also O'Brien*, 188 F.3d at 128–29. The same is true of the publication notice provided here: newspaper advertisements run once in middling pages of newspapers that none of the Movants receive (let alone reach the fine print in the back pages each day).[50]

85.    Next, consider "the length of the delay and its impact on the judicial proceedings." *O'Brien*, 188 F.3d at 129. It is now about 15 months since the General Bar Date and 6 months since the Administrative Claims Bar Date. Precedent confirms that similar timelines may favor finding excusable neglect.[51] In *Energy Futures*, for example, the Third Circuit held that this factor "cu[t] in favor of granting ... Rule 3003(c)(3) motions" where "bankruptcy proceedings ... concluded with [a] Confirmation Order" despite a "substantial delay" that could be many years long for certain latent asbestos claims. 949 F.3d, at 824. In this case, the confirmed and effective Plan similarly makes this factor cut in favor of the Movants. Moreover, the plan leaves general, unsecured claims unimpaired and pays administrative claims in full (and there are ample funds to pay additional claims), so there is no reason why the timing of the claims would impact the judicial proceedings or why additional claims would throw the Plan off course.

---

[50]    Some Claimants were not arrested and did not know about the relevant theft reports until after an applicable bar date had passed because Hertz did not alert them of that fact. Movant Larry Wilcoxson had his conviction overturned long after the (arguably) applicable bar date. These circumstances likely give rise to specific arguments, Movant by Movant, on excusable neglect. Given the length of this Motion, however, the Movants reserve Claimant-specific excusable neglect arguments for a later time should they become relevant.

[51]    This point is particularly salient for the 6-month delay since the Administrative Claims Bar Date. *Orthopedic Bone Screw Prod. Liab. Litig.*, 246 F.3d at 319 (7 months satisfied excusable neglect standard); *Chemetron*, 72 F.3d, at 350 (remanding to determine excusable neglect where motion to file late claim occurred 2 years after plan was confirmed); *In re Eagle Bus Mfg. Inc.*, 62 F.3d 730, 740 (5th Cir. 1995) (finding excusable neglect where delay was 6–8 months).

86.    Finally, the Movants have proceeded in good faith. As described in their declarations and proofs of claim, they were not aware of the relevant bankruptcy deadlines and there was no plausible benefit to any delay in filing. Instead, the Movants and counsel have expended tremendous resources to file claims and individualized declarations on behalf of each Movant since the January 4 hearing.

87.    For these reasons, and solely in the event the Court does not enter the Proposed Order providing more general relief from the Confirmation Order, the Movants request that the Court deem the extend the relevant bar dates such that their filed proofs of claim are deemed timely and deem them to have opted out of the Plan's third-party release provisions.

**C. Certain Movants Bring Post-Petition Claims.**

88.    Many of the Movants' claims arose in whole or in part post-petition, and therefore some may be treated as general, unsecured post-petition claims or administrative claims.[52] To the extent any claim is deemed to have arisen post-petition (and other relief sought herein is denied), the Movants request that the Court treat those claims as post-petition, general, unsecured claims under the terms of the Plan. To the Movants' knowledge, there was—and still is—no legal barrier to filing general unsecured claims that arose post-petition in these bankruptcy proceedings. (The General Bar Date does not apply to post-petition claims, and the Administrative Claims Bar Date applies only to post-petition claims seeking administrative expense priority.) And such claims may be paid as part of Class 7 of the Plan, which leaves "all

---

[52]    If the Court is inclined to require post-petition claims to be asserted as administrative expenses, then the Movants respectfully request that the Court, in the interest of efficiency and judicial economy, permit administrative expense claims to be asserted on Form 410 along with pre-petition claims. *See* 11 U.S.C. § 105(a) (Court's general equitable and case-management powers). The Debtors have previously consented to this approach for similarly situated claimants, and the Movants have filed their proofs of claim on that understanding. *See Reorganized Debtor's Objection to Claimants' Motion to Deem Claims Timely or For Extension of General Bar Date Under Rules 3003(C) and 9006*, D.I. 220-1 (Public Version), at 13 n.14.

General Unsecured Claims against a Debtor" unimpaired. Plan, Art. III.B.7.a. And the Movants'
post-petition claims are "General Unsecured Claims against a Debtor" under the terms of the
Plan. *See id.* Art. I.A.83, 181, 370 (defining "Claim," "General Unsecured Claim," and
"Unsecured"); *see also* Group 3 Motion ¶¶ 49-50; Group 3 Reply ¶ 74.[53]

89.    The Third Circuit addressed the date on which a claim accrues in its *en banc*
decision in *Grossman's*, which overruled *In re M. Frenville Co.*, 744 F.2d 332 (3d Cir. 1984).
*See JELD_WEN, Inc. v. Van Brunt (In re Grossman's Inc.)*, 607 F.3d 114, 117 (3d Cir. 2010).
The *Frenville* court had adopted an "accrual" test for determining when a "claim" arises for
bankruptcy purposes, finding that an accounting firm's third-party claims for common-law
indemnity and contribution against the debtor in connection with a lawsuit filed against the firm
did not arise until the lawsuit was filed post-petition because the firm had no "right to payment"
under applicable state law until that time. 744 F.2d at 336-37. In *Grossman's*, which considered
whether an asbestos personal injury tort claim arose prepetition so as to be subject to a chapter
11 discharge injunction, the court aligned with the overwhelming weight of authority rejecting
the *Frenville* accrual test, and held that "a 'claim' arises when an individual is exposed pre-
petition to a product or other conduct giving rise to an injury, which underlies a 'right to
payment' under the Bankruptcy Code." *Grossman's*, 607 F.3d at 125. This test focuses not on
the conduct underlying the claim, but rather on the individual's exposure to that conduct. *Id.* at
121–25. So, for example, an asbestos-exposure claim arises when the victim is exposed to the

---

[53]    To the extent the Court determines that such claims must be brought as administrative
claims—which it should not do and a position for which the Debtors have provided no legal
basis—a Debtor's post-petition torts may be treated as administrative expenses in the bankruptcy
process. *See Reading Co. v. Brown*, 391 U.S. 471 (1968) (tort claims count as administrative
claims under the Bankruptcy Act); *Ellis v. Westinghouse Elec. Co., LLC*, 11 F.4th 221, 230 (3d
Cir. 2021) (applying *Reading* to the Bankruptcy Code). To the extent any Movants claims are
ordered to proceed in this manner, those Movants will brief administrative expense issues at a
later date.

asbestos, not earlier when the asbestos is manufactured/installed or later when the injury caused by the exposure manifests itself.

90.    Under *Grossman's*, the Movants' claims arise for bankruptcy purposes when he or she is "exposed" to the Debtors' tortious conduct. Generally, exposure occurs when there is some connection between the false theft report and the Claimant.[54] In many cases, the exposure to the Debtors' conduct first occurs upon arrest, although in some cases Movants were impacted by the theft report prior to being arrested.

91.    Further, many of the Movants also bring claims relating to the Debtors' conduct in failing to withdraw or remedy the false theft reports while prosecutions or warrants were pending. For many Movants whose prosecutions extended after the May 22, 2020, petition date, these ongoing failures include post-petition conduct and necessarily post-petition claims. Specifically, the former Deputy Attorney General of Delaware has asserted that the Debtors had (and the reorganized entities, for that matter, continue to have) a "legal and moral" duty to update theft reports containing incomplete or false information when there are charges pending against an individual reported for theft. Attachment U, Wood Decl. ¶ 24. The Debtors however, openly admit that "Hertz has no mechanism to withdraw a criminal referral because, the company spokesperson said, it has to maintain a relationship of 'integrity and responsibility' with law enforcement. 'In the rare instances this happens, if you report a crime, and you later say it didn't happen, then law enforcement tends not to believe you if you retract it or say you were mistaken,' the spokesperson said. 'Hertz's continued good relationship with law enforcement is important.'" Wood, "Bankrupt Hertz is Still Wrongly Accusing Customers of Stealing Cars,"

---

[54]    The defamation claim most naturally arises when to the statement is made to a third party—in many cases, the date of the false arrest report—at which point the reputational injury has occurred.

*supra*, note 12; *see also* Garcia Decl. ¶ 24. The continued breach of that ongoing duty, as well as the continued, malicious prosecution of cases after the petition date and until the Effective Date are administrative claims, while the continued breach of that duty after the Effective Date of the plan is not a claim in bankruptcy at all.

92.    On this understanding of the law, the following Movants anticipate bringing claims that may arise post-petition and before the Effective Date[55]:

| Claimant | Postpetition Rental | Postpetition Arrest or Detention | Postpetition Prosecution |
|---|---|---|---|
| Patrick Andrews | X | X | X |
| Adriane Beamon | | X | X |
| Marc Bednarczyk | X | X | X |
| Cody Breedlove | X | X | X |
| Benita Bridges (and K.F.) | | X | |
| Abraham Carmichael[56] | X | X | X |
| Jason Don Campbell | | X | |
| Tawana Cole | | | X |
| Angela Delafontaine, Jose Monteiro, G.M. | | X | X |
| Bianca DeLoach (and two minor children) | X | X | X |
| Lakeshia Dowlen | | X | X |
| Howard English | | X | |
| Zantavia Franklin | X | | X |
| Daniel Morales Hernandez | X | X | |

[55]    These postpetition claims are based on information available to date. Investigation of these claims remains ongoing, and discovery has not yet been obtained. Movants reserve the right to identify additional postpetition claims as relevant. All Movants also reserve the right, where appropriate, to bring in other courts claims arising after the effective date of the Plan.

[56]    Mr. Carmichael was arrested after the Effective Date of the Plan based on a theft report filed post-petition but before the Plan became effective. Mr. Carmichael joins this Motion to the extent his claims are deemed to have arisen prior to the Effective Date of the Plan.

| Claimant | Postpetition Rental | Postpetition Arrest or Detention | Postpetition Prosecution |
|---|---|---|---|
| Antwanette Hill[57] | | X | X |
| Raynard Hill, Jr.[58] | X | X | X |
| Jason Kearny | X | X | X |
| Casey Kurpjuweit | | X | X |
| Saleema Lovelace | X | X | X |
| Anne Maha | | | X |
| Charles Malone[59] | | X | X |
| Brandy Porter (and minor child M.P.)[60] | | X | X |
| Franklin Richards | | | X |
| Sierra Ryan[61] | | X | X |
| Samantha Simpson & Amber Rather | X | X | X |
| Ameerah Singleton | | | X |
| Latricia Taylor | | X | X |
| Evan Tanner | X | X | X |
| Jamol Toney | X | X | X |
| Elbert Turpen, Jr.[62] | X | X | X |

---

[57]  Ms. Hill was initially arrested prior to May 22, 2020, but was arrested additional times in connection with the charges after that date.

[58]  Mr. Hill was arrested and prosecuted after the Effective Date of the Plan based on a theft report of which he was unaware. He joins this motion to the extent his claims are deemed to have arisen prior to the Effective Date of the Plan.

[59]  Mr. Malone was arrested after the Effective Date of the Plan based on a theft report he was not aware had been filed (and that was filed months after he returned the rental). Mr. Malone joins this motion out of an abundance of caution to the extent his claims are deemed to have arisen prior to the Effective Date of the Plan.

[60]  Ms. Porter was arrested (and M.P. detained) on January 4, 2022, long after the Effective Date of the Plan, based on a 2019 rental she had properly extended and returned. They join this motion out of an abundance of caution to the extent their claims are deemed to have arisen prior to the Effective Date of the Plan.

[61]  Ms. Ryan never rented from Hertz, but was arrested and prosecuted post-petition until all charges were dismissed for a lack of evidence.

[62]  Mr. Turpen was arrested, and possibly reported for theft, after the Effective Date of the Plan. He joins this motion out of an abundance of caution to the extent his claims are deemed to have arisen prior to the Effective Date of the Plan.

| Claimant | Postpetition Rental | Postpetition Arrest or Detention | Postpetition Prosecution |
|---|---|---|---|
| Jeric Wilson | X | X | X |
| Tiffany West | | X | X |
| Anson Westerfield | X | X | X |
| Duni Zenaye | X | X | X |

### III.    <u>The Movants' Claims Should be Permitted to Move Forward in Some Court Based on the Above Arguments.</u>

93.     The Motion above identifies multiple reasons why the Movants' claims must be allowed to move forward against the Debtors. The Movants recognize that their claims could move forward in bankruptcy or outside of bankruptcy. The notice-based arguments, the Movants submit, support relief from the Plan and consequently the right to pursue their claims in a forum of their choosing. In the alternative, a lack of notice also would support deeming their claims timely filed and payable under the Plan.

94.     Federal Rule of Civil Procedure 60(b), applicable to these proceedings by Bankruptcy Rule 9024, provides, in pertinent part, that

> [o]n motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:
>> (1) mistake, inadvertence, surprise, or excusable neglect;
>
> . . .
>> (4) the judgment is void; . . . [or]
>> (6) any other reason that justifies relief.

Fed. R. Civ. P. 60(b)(1), (4) & (6).

95.     Lack of notice to an interested party that constitutes a due-process violation is grounds for relief from an order under Rule 60(b), and the Court has broad discretion to fashion an appropriate remedy. *See, e.g., In re Polycel Liquidation, Inc.*, Case No. 00-62780, 2006

Bankr. LEXIS 4545, at *34 (Bankr. D.N.J. Apr. 18, 2006) (granting movant who lacked notice of section 363 sale motion relief from final sale order as to the asset in question, but leaving the sale order otherwise undisturbed), *aff'd*, Civ. Act. No. 06-2183, 2007 U.S. Dist. LEXIS 955 (D.N.J. Jan. 8, 2007). The Due Process Clause requires notice of any proceedings that affect property rights, including bankruptcy proceedings. "Absent such notice" of, for example, a claims bar date or plan confirmation hearing, a "suit may proceed" to recover on otherwise-dischargeable debts outside of bankruptcy. *Chemetron* Corp. *v. Jones*, 72 F.3d 341, 345 (3d Cir. 1995).

96.     Indeed, it is well settled that "[i]nadequate notice . . . 'precludes discharge of a claim in bankruptcy'" and necessarily other prohibitive aspects of a plan injunction. *Wright v. Owens Corning*, 679 F.3d 101, 107 (3d Cir. 2012) (quoting *Chemetron*, 72 F.3d, at 346); *see In re Harbor Tank Storage Co.*, 385 F.2d 111, 114 (3d Cir. 1967) (holding that, where creditor lacked notice of the plan and confirmation hearing, it had an "absolute right" to assert its claim against the debtor irrespective of the bar date and plan confirmation order); *see also Reliable Electric Co. v. Olson Constr. Co.*, 726 F.2d 620, 623 (10th Cir. 1984) ("A fundamental right guaranteed by the Constitution is the opportunity to be heard when a property interest is at stake. Specifically, the reorganization process depends upon all creditors and interested parties being properly notified of all vital steps in the proceeding so they may have the opportunity to protect their interests. *See In re Harbor Tank* [*Storage*, 385 F.2d, at 115]. We will not require Olson to subject its claim to a confirmed reorganization plan it had no opportunity to dispute."). None of the Movants received notice of the General Bar Date, the Confirmation Hearing, or the Administrative Claims Bar Date sufficient to comply with due process. Accordingly, the Due Process Clause permits them to proceed in other fora to collect on claims against the

Reorganized Debtors and the Released Parties. *See Wright*, 679 F.3d at 109 (holding, for a class action filed in Pennsylvania District Court with claims allegedly discharged by a bankruptcy plan in Delaware Bankruptcy Court: "[T]he Plaintiffs were not afforded due process [due to inadequate notice]. Accordingly their claims were not discharged by the Plan and Confirmation Order, and they retained their cause of action against Owens Corning."); *cf. In re CareMatrix Corp.*, 306 B.R. 478, 484 (Bankr. D. Del. 2004) (rejecting debtor's request for preliminary injunction and related contempt order against parties that received no notice but were nominally covered by plan injunction).

97. The Reorganized Debtor's *pro forma* preliminary objection to the Group 4a Motion argued that a creditor generally aware of bankruptcy proceedings is bound by the Plan and related bar dates even without notice of applicable bar dates or plan confirmation hearings. *See* D.I. 296, at 6–7.[63] That position is flatly inconsistent with binding Third Circuit precedent. The Third Circuit made as much clear all the way back in *In re Harbor Tank Storage*, finding "a denial of due process" where a claimant was aware of the bankruptcy but not given notice of relevant deadlines. 385 F.2d, at 115. And it has reaffirmed and applied that holding since. For example, in *In re Trans World Airlines, Inc.*, the Third Circuit held that "discharge as to [the claimants'] claims would violate the Fifth Amendment Due Process Clause" because "[i]t is well settled that a known creditor is entitled to formal notice of impending bankruptcy proceedings. . . . This is true even where . . . the creditor has actual knowledge of the pendency of the bankruptcy proceedings generally, but is not given formal notice of the confirmation hearing." 96 F.3d 687, 690 (3d Cir. 1996) (citing *Harbor Tank Storage*, 385 F.2d, at 114–15); *see City of New York v. New York, N. H. & H. R. Co.*, 344 U.S. 293, 297 (1953) ("Nor can the bar order

---

[63] This is not to say that any Movant or Movants were aware of the bankruptcy proceedings generally, just that the issue is not relevant to the due process issues discussed herein.

against New York be sustained because of the city's knowledge that reorganization of the railroad was taking place in the court. The argument is that such knowledge puts a duty on creditors to inquire for themselves about possible court orders limiting the time for filing claims. But even creditors who have knowledge of a reorganization have a right to assume that the statutory 'reasonable notice' will be given them before their claims are forever barred."); *Chemetron*, 72 F.3d, at 346 ("Inadequate notice is a defect which precludes discharge of a claim in bankruptcy. . . . Known creditors must be provided with actual written notice of a debtor's bankruptcy filing *and bar claims date*." (emphasis added)); *see also Arch Wireless*, 534 F.3d, at 81 (1st Cir. 2008) (collecting cases and holding that "the fact that the creditor may . . . be generally aware of the pending reorganization, does not of itself impose upon him an affirmative burden to intervene in that matter and present his claim. . . . [T]he creditor has a right to assume that proper and adequate notice will be provided before his claims are forever barred.").

98.     In support of their legally-foreclosed position, the Reorganized Debtors suggested that *Harbor Tank Storage* has "been distinguished by at least one court in this Circuit" because it involved the Bankruptcy Act of 1898. That reasoning is unpersuasive (among other reasons, because the Bankruptcy Code of 1978 did not, and could not, abrogate the Due Process Clause), but more importantly it ignores and relies on cases that precede *Trans World Airlines* and other cases applying *Harbor Tank Storage*'s legal rule to the modern Bankruptcy Code. The Reorganized Debtors also point to several non-binding cases, largely preceding the binding circuit precedent, discussing actual knowledge of a creditor meeting and certain deadlines fixed by rule 60-days after that those meetings occur or are scheduled. *See, e.g.*, 11 U.S.C. § 523(c); Fed. R. Bankr. P. 4007(c). Hertz calls that an "analogous" situation, but "analogous" non-binding cases are not relevant with binding precedent addressing the actual situation before the

Court. And the situations are not analogous in any event. As the First Circuit has explained, "unlike in Chapter 7 and 13 proceedings where the bar date may be roughly computed based on one's knowledge of the creditors meeting, there is simply no way to 'compute' a bar date in a Chapter 11 proceeding because the date is set at the discretion of the court." *In re Arch Wireless, Inc.*, 534 F.3d 76, 85 (1st Cir. 2008).

99.     Should the Court deny that relief, the failure to provide notice required under the Due Process Clause of the Fifth Amendment also gives rise to "an absolute right to file and prove [one's] claim in the proceeding, despite the fact that the bar date ha[s] passed and the plan was confirmed." *Harbor Tank Storage*, 385 F.2d at 114. The Movants recognize that there may be administrative advantages to pursuing all false-police-report claims in bankruptcy and that the Court may be inclined to otherwise extend the bar dates or permit these claims within bankruptcy if it finds a due-process violation. If the Court, for any reason, finds a due-process violation but determines that these claims should move forward in bankruptcy court, then the Movants also request that they be deemed opted out of the Plan's third-party release provisions based on a lack of notice. The Movants further note that similar relief would be called for if the Court accepts the Movants' arguments advanced in Part II, above, including that their claims were timely filed because of the pending class claims, that claims of minors should be accepted after the relevant bar dates, or that the relevant bar dates should be extended on the basis of excusable neglect.

## **RESERVATION OF RIGHTS**

100.     The Movants reserve the right to amend, supplement, or otherwise modify this Motion and to file and present evidence further supporting it upon discovery and/or responsive to further argument from the Reorganized Debtors.

## NOTICE

101.    Notice of this Motion has been provided to (a) the Reorganized Debtors; and

(b) the Office of the United States Trustee for the District of Delaware. In light of the nature of

the relief requested, the Movants submit that no additional notice need be given.

## CONCLUSION

WHEREFORE Movants respectfully request that the Court enter the Proposed Order and

grant any such other and further relief as the Court deems just and proper.

Dated: February 7, 2021

**FRANCIS ALEXANDER, LLC**
Francis Malofiy
280 N. Providence Road, Suite 1
Media, PA 19063
Telephone: (215) 500-1000
Facsimile: (215) 500-1005
Email: francis@francisalexander.com

**SUSMAN GODFREY LLP**
Justin A. Nelson (*pro hac vice*)
John P. Lahad (*pro hac vice*)
Taylor C. Hoogendoorn (*pro hac vice*)
1000 Louisiana, Suite 5100
Houston, TX 77002-5096
Telephone: (713) 651-9366
Facsimile: (713)654-6666
Emails: jnelson@susmangodfrey.com
        jlahad@susmangodfrey.com
   thoogendoorn@susmangodfrey.com

**FAEGRE DRINKER**
**BIDDLE & REATH LLP**

*/s/ Patrick A. Jackson*
Patrick A. Jackson (Bar No. 4976)
Ian J. Bambrick (Bar No. 5455)
Jaclyn C. Marasco (Bar No. 6477)
222 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telephone: (302) 467-4200
Facsimile: (302) 467-4201
Emails: patrick.jackson@faegredrinker.com
        ian.bambrick@faegredrinker.com
        jaclyn.marasco@faegredinker.com

*Co-Counsel for the Group 4b False Police Report Claimants*

## EXHIBIT A

Proposed Order

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>Rental Car Intermediate Holdings, LLC,[1]<br><br>Reorganized Debtor. | Chapter 11<br><br>Case No. 20-11247 (MFW)<br><br>(Jointly Administered)<br><br>**Ref. Dkt. No. __** |

## ORDER GRANTING RELIEF FROM THE CONFIRMATION
## ORDER TO PURSUE CLAIMS OUTSIDE OF BANKRUPTCY

Upon the motion (the "<u>Motion</u>")[2] of the Group 4b False Police Report Claimants for

entry of an order (i) granting relief from the Confirmation Order, insofar as it implements the

discharge, release, and injunctive provisions of the Plan, so as to permit the Movants to pursue

and collect claims against the Reorganized Debtors and others outside of bankruptcy, or (ii) in

the alternative, (A) extending the General Bar Date and Administrative Bar Date so as to permit

the Movants to assert claims against the Reorganized Debtors under the applicable processes set

forth in the Plan, and (B) deeming the Movants to have timely "opted out" of the Plan's third-

party release provisions, as described more fully in the Motion; and this Court having

jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 1334

and 157, and the *Amended Standing Order of Reference* dated as of February 29, 2012, from the

United States District Court for the District of Delaware; and it appearing that this is a core

---

[1]    The last four digits of the tax identification number of Reorganized Debtor Rental Car Intermediate Holdings, LLC ("<u>RCIH</u>") are 2459. The location of the Reorganized Debtors' service address is 8501 Williams Road, Estero, FL 33928. On September 28, 2021, the Court entered a final decree closing each of the chapter 11 cases for The Hertz Corporation and its affiliated reorganized debtors (the "<u>Reorganized Debtors</u>") other than RCIH's chapter 11 case. Commencing on September 28, 2021, all motions, notices, and other pleadings relating to any of the Reorganized Debtors shall be filed in RCIH's chapter 11 case, Case No. 20-11247 (MFW).

[2]    Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Motion.

proceeding within the meaning of 28 U.S.C. § 157(b), and that this Court may enter a final order on the Motion consistent with Article III of the United States Constitution; and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided; and such notice having been adequate and appropriate under the circumstances; and it appearing that no other or further notice need be provided; and the Court having reviewed the Motion and the exhibits thereto and referenced therein, and held a hearing to consider the relief requested in the Motion (the "Hearing") and any objections thereto; and upon the record of the Hearing, including the evidence adduced and the arguments of counsel; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, it is hereby

FOUND AND DETERMINED that Movants are not bound by the Plan or Confirmation Order because the applicable Movants were either (a) known creditors who were not provided direct notice of the General Bar Date, the Plan and Confirmation Hearing, or the Administrative Bar Date, or (b) unknown creditors for whom the publication notice of the General Bar Date, the Plan and Confirmation Hearing, and the Administrative Bar Date was insufficient as a matter of law; accordingly, it is hereby

ORDERED that the Motion is GRANTED; and it is further

ORDERED that the Movants are hereby granted relief from the Confirmation Order to the extent necessary to permit the Movants to pursue and collect claims against the Reorganized Debtors and others outside of bankruptcy notwithstanding the Plan's discharge, release, and injunction provisions.