## EXHIBIT 1

**Objection**

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| Rental Car Intermediate Holdings, LLC,[1] | Case No. 20-11247 (MFW) |
| Reorganized Debtor. | **Re: Main D.I. 5898 & D.I. 190[2]** |

### REORGANIZED DEBTOR'S OBJECTION TO
### CLAIMANTS' MOTION TO DEEM CLAIMS TIMELY OR FOR
### EXTENSION OF GENERAL BAR DATE UNDER RULES 3003(C) AND 9006

The above-captioned debtor (the "**Reorganized Debtor**") hereby files this objection

(this "**Objection**") to the *Claimants' Motion to Deem Claims Timely or for Extension of General*

*Bar Date Under Rules 3003(c) and 9006* [D.I. 190] (the "**Motion for Leave**") filed on behalf of

21 persons in the group "False Police Report Claimants No. 3" (the "**Movants**"), and respectfully

states as follows:[3]

---

[1] The last four digits of the tax identification number of Reorganized Debtor Rental Car Intermediate Holdings, LLC ("**RCIH**") are 2459. The location of RCIH's service address is 8501 Williams Road, Estero, FL 33928. On September 28, 2021, the Court entered a final decree closing each of the chapter 11 cases for The Hertz Corporation and its reorganized debtor affiliates (the "**Reorganized Debtors**," and prior to the Effective Date (as defined below), the "**Debtors**") other than RCIH's chapter 11 case. Commencing on September 28, 2021, all motions, notices, and other pleadings relating to any of the Reorganized Debtors shall be filed in RCIH's chapter 11 case, Case No. 20-11247 (MFW).

[2] As used herein, "Main D.I." references are to the docket in Case No. 20-11218, and "D.I." references are to the docket in Case No. 20-11247.

[3] The Reorganized Debtor will demonstrate the facts stated herein at any evidentiary hearing regarding the Motion for Leave, this Objection, or the Non-Substantive Objection (as defined later herein). Additionally, given that three Movants (Janette Brown, Tyresha Caudle, and Wanda Nelson) have not yet filed declarations, and by agreement with the Movants, the Reorganized Debtor will supplement this objection after January 19, 2022. The Reorganized Debtor reserves the right to object to and defend against the Late Claims on any ground.

## PRELIMINARY STATEMENT[4]

1.      Movants filed the Late Claims as one group claim on the day the Debtors' Plan was confirmed, almost eight months after the General Bar Date.  After the Court ordered Movants to file individualized proofs of claim, they abandoned claims asserted by eight of the 29 claimants (about 30%) and moved for leave to file late proofs of claim on behalf of the remaining Movants. Movants have not met their burden, and the Court should deny the Motion for Leave.

2.      *First*, Movants' new argument that the General Bar Date did not apply to their claims because they arose post-petition fails.  Movants never made this argument before, and it contradicts their prior positions before this Court.  Indeed, Movants failed to raise this argument in their response filed just two months ago [D.I. 50] to the Non-Substantive Objection, which put at issue the preclusive effect of the General Bar Date.  To the contrary, Movants repeatedly argued that their claims should be allowed because they lacked notice of the General Bar Date, conceding that the General Bar Date applies to their pre-petition claims.  Moreover, Movants failed to assert administrative priority for any of their Late Claims, including on the proof of claim forms. Movants have therefore forfeited this argument.   Additionally, this argument lacks merit. Movants' claims all arise from the Debtors' alleged false police report, which Movants do not dispute occurred pre-petition.  Under *Grossman's*, that is the only conduct of the Debtors that could possibly give rise to a claim.  Movants cite the *Reading* exception for assertion of post-petition torts as administrative claims, but cases applying *Reading* require a post-petition act by the debtor.  Almost all of the Movants allege none.

3.      *Second*, Movants argue that they did not receive adequate notice of the General Bar Date because (i) they were known creditors entitled to actual notice and (ii) the Debtors'

---

[4] Capitalized terms used but not otherwise defined in this Preliminary Statement are defined later herein.

constructive notice was inadequate.  Both arguments fail.  Movants rely on their own allegations

(which include hearsay within hearsay) to argue that supposed "systemic" issues with the Debtors'

theft reporting practices put the Debtors on notice that **all** subjects of theft reports were known

creditors.  But the number of litigation claims against the Debtors regarding false police reports

compared with the total number of police reports the Debtors issued—which the Court requested

and the Debtors hereby produce—is approximately 0.00175.  That statistic, of course, ignores that

the Reorganized Debtors dispute the allegations in those lawsuits.  Indeed, courts have found that

Hertz issued police reports containing inaccurate information in only two cases.  These numbers

are *de minimis*:  even an order of magnitude increase would not signify the "systemic" issues

Movants claim exist.[5]  Additionally, Movants' analogy to asbestos, sexual abuse, product defect,

and other mass tort cases is misplaced, because there is no admitted, inherent tort here.

> 4.    The sweeping discovery that Movants seek of all customers who either received a

police report or contacted the Debtors regarding a police report is unduly burdensome and

impractical.  Hertz receives between two to three million customer calls per year, almost all of

which never result in a claim.  Moreover, the law is clear that knowledge of a merely potential

claim does not necessarily create a "known" creditor, and the contacts with the Debtors that certain

(but not all) of the Movants allege fail to transcend that threshold.  Movants have failed to

demonstrate how the expansive discovery they seek—which is plainly aimed at identifying

additional possible late claimants—is relevant to *Movants'* claims, and that discovery is prejudicial

to the Reorganized Debtor.[6]

---

[5]  Indeed, even if all approximately 185 of the False Police Report Claimants had meritorious claims—which they plainly do not, given that certain Movants have abandoned their claims—the ratio of false police reports to total police reports issued would still be significantly less than 1%.

[6]  On December 20, 2021 at 4:20 p.m. ET, the False Police Report Claimants served on the Debtors an additional 44 Requests for Production and 23 Interrogatories.  That is on top of the 32 Requests for

5.     Because Movants were not known creditors, they were entitled only to constructive notice—and the Debtors' constructive notice more than satisfied due process.  The Debtors published notice of the General Bar Date in 13 newspapers around North America.  Movants seem to argue that publishing notice of a bar date only in newspapers is *per se* deficient, but that is not the law.  Additionally, the form of publication notice was approved by the Court and counsel did not object to that relief.

6.     ***Third***, Movants fail to satisfy their burden of showing excusable neglect for filing their claims after the General Bar Date.  Movants first filed their claims on the date of confirmation of the Debtors' Plan, almost eight months after the General Bar Date.  Their only excuse is to reincorporate their argument that they lacked notice of the General Bar Date, but, as shown above, that argument fails.  Moreover, deeming the claims timely filed would prejudice the Reorganized Debtor because the Debtors and their stakeholders reasonably relied on the universe of timely claims against the Debtors during the Plan negotiation, formulation, and confirmation process.  Movants seek to increase the size of the estimated Allowed general unsecured claims pool on which the Debtors and their stakeholders relied by at least 10%, and potentially much more, to the detriment of all other stakeholders.  Additionally, granting the Motion for Leave would open the door for other claimants otherwise barred by the General Bar Date to come forward now.

7.     The Reorganized Debtor has been and continues to be willing to address and resolve, to the extent appropriate, the timely filed claims of the False Police Report Claimants Nos. 1 and 2.  But Movants have failed to justify the mass-tort noticing requirements they belatedly

---

Production, 33 Interrogatories, four Requests for Admission and 13 deposition topics that Claimants previously served and apparently continue to press.  The Debtors are continuing to review the new discovery requests and reserve all rights and objections.

RLF1 26535408v.1

demand, the burdensome discovery they seek and their failure timely to file their claims.  The Motion for Leave should be denied.

## BACKGROUND

### A.   General background

8.   On May 22, 2020 (the "**Petition Date**"), each of the Debtors commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code (collectively, the "**Chapter 11 Cases**"), which were jointly administered for procedural purposes.

9.   On August 26, 2020, the Debtors filed a motion [Main D.I. 1140] (the "**Bar Date Motion**") seeking entry of an order (i) establishing deadlines by which creditors must file proofs of claim in the Chapter 11 Cases and (ii) approving the form and manner of noticing such deadlines.  The Debtors extended the Bar Date Motion's objection deadline for certain parties. Main D.I. 1230.  Ultimately, the Debtors received, and resolved, one formal reservation of rights [Main D.I. 1189] from the "Ad Hoc Group of Litigation Creditors" as well as informal comments from ten additional parties, including the Official Committee of Unsecured Creditors and other creditor constituencies.  *See* Main D.I. 1230.

10.   On September 9, 2020, the Court entered the *Order Establishing Bar Dates and Related Procedures for Filing Proofs of Claim, Including Claims Arising Under Section 503(b)(9) of the Bankruptcy Code, and Approving the Form and Manner of Notice Thereof* [Main D.I. 1240] (the "**Bar Date Order**").  That same day, the Debtors filed the *Notice of Deadlines for Filing Proofs of Claim, Including Claims Arising Under Section 503(b)(9) of the Bankruptcy Code Against Debtors* [Main D.I. 1243] (the "**Bar Date Notice**").

11.   The Bar Date Order and Bar Date Notice established, among other things, October 21, 2020 at 5:00 p.m. (prevailing Eastern Time) as the deadline to file proofs of claim in

the Chapter 11 Cases for persons or entities (except governmental units (as that term is defined in section 101(27) of the Bankruptcy Code)) (the "**General Bar Date**").

12.    The Bar Date Order also expressly "approved in all respects" the form of notice (the "**Publication Notice**") that was attached to the Bar Date Order as Exhibit 3.   Bar Date Order ¶¶ 2, 22.   The Bar Date Order directed that the Publication Notice be published in *USA Today*, *The Wall Street Journal*, *The New York Times*, and *The Globe and Mail*, as well as "local newspapers, trade journals or similar publications, if any, as the Debtors deem appropriate." *Id.* ¶ 22.   The Bar Date Order further provided that the Publication Notice "shall be deemed good, adequate, and sufficient notice of the General Bar Date . . . by publication."   *Id.*

13.    Throughout this process, counsel for the False Police Report Claimants, who otherwise were active in the Debtors' bankruptcy cases, remained silent.   Indeed, counsel did not object, formally or informally, to any aspect of the Bar Date Order or the Publication Notice.

14.    In accordance with the Bar Date Order, on September 16, 2020, Prime Clerk mailed the Bar Date Notice and proof of claim forms to, among others, all known holders of potential claims and their counsel (if known), including counsel to the False Police Report Claimants No. 1. *See* Main D.I. 1376 (affidavit of service).   The Debtors caused the Publication Notice to be published (a) on September 17, 2020 in *USA Today* (national distribution), *The Wall Street Journal* (national distribution), *The New York Times* (national distribution), and *The Globe and Mail* (Canadian distribution) (*see* Main D.I. 1396), (b) on September 30, 2020 in *The Philadelphia Inquirer*, *San Francisco Chronicle*, *Arizona Republic*, *Chicago Tribune*, *Los Angeles Times*, *The San Diego Union Tribune* (*see* Main D.I. 1572), and (c) on October 2, 2020 in *Naples Daily News*, *El Diario de El Paso* (translated into Spanish), and *Journal De Montreal* (translated into French) (*see* Main D.I. 1572) (the foregoing thirteen publications, collectively, the "**Newspapers**").   *The*

*Globe and Mail* and the national editions of *USA Today*, *The Wall Street Journal*, and *The New York Times* have a combined circulation of approximately 2.2 million and a readership of approximately 20 million.

15.     Prime Clerk also caused the Bar Date Notice to be featured prominently on its website for the Chapter 11 Cases, https://restructuring.primeclerk.com/hertz/ (the "**Case Management Website**").  The Bar Date Notice was available starting on September 9, 2020 under multiple links on the Case Management Website, including on the main page and a dedicated "Bar Date Notice" link under the "Quick Links" menu.  The General Bar Date was also highlighted under the "Submit a Claim" link on the Case Management Website.  Since going live on or about the Petition Date, the Case Management Website has at all times been free for public access.

16.     On June 10, 2021 (the "**Confirmation Date**"), the Court entered the *Order (i) Confirming Second Modified Third Amended Joint Chapter 11 Plan of Reorganization of The Hertz Corporation and its Debtor Affiliates and (ii) Granting Related Relief* [Main D.I. 5261] (such underlying chapter 11 plan, together with the Plan Supplements (as defined therein), all schedules, and exhibits thereto, the "**Plan**").  On June 30, 2021 (the "**Effective Date**"), the Plan became effective in accordance with its terms and the Debtors became the Reorganized Debtors. *See* Main D.I. 5477.

B.     **The False Police Report Claimants**

17.     The "**False Police Report Claimants**" consist of approximately 185 individuals[7] that are identified in various proofs of claim filed against the Debtors, including a subset of

---

[7] As of the filing of the Reorganized Debtors' Claims Objections (defined below), the False Police Report Claimants numbered approximately 165.  At that point, the False Police Report Claimants had filed pooled claims on behalf of three groups: a form asserting a claim on behalf of "False Police Report Claimants No. 1" (a group of 26 individuals); another asserting a claim on behalf of "False Police Report Claimants No. 2" (a group of 110 individuals); and a third asserting a claim on behalf of "False Police Report Claimants No. 3" (a group of 29 individuals).  On December 6, 2021, the False Police Report

individuals identified as the "False Police Report Claimants No. 3".  Movants, in turn, are a subset of the False Police Report Claimants No. 3.

18.    On October 20 and 21, 2020, the False Police Report Claimants filed a total of 91 proofs of claim against the Debtors.[8]  The False Police Report Claimants filed those proofs of claim on behalf of three groups:  (i) the False Police Report Claimants No. 1; (ii) a group of 115 additional claimants called the "False Police Report Claimants No. 2";[9] and (iii) a purported unknown class of False Police Report Claimants.

19.    On the Confirmation Date, the False Police Report Claimants filed 28 additional proofs of claim against the Debtors, all of which were styled as amendments to purported class proofs of claim.  Among other things, some of the proofs of claim filed that day (the "**Late Claims**")[10] professed to change the purported class proofs of claims to be on behalf of a group of 29 individual claimants called the "False Police Report Claimants No. 3."  These 29 claimants

---

filed a motion for relief from the Plan injunction on behalf of 26 additional claimants identified as the Group 4 False Police Report Claimants.  *See* D.I. 193.

Additionally, four individuals from the False Police Report Claimants No. 3 group—Edward Guy, Lamont Liner, Kate McCarthy, and John [Hertz Rape Victim]—are withdrawing their claims.  Motion for Leave at p. 9 n. 7; Malofiy Decl. ¶ 39.  It is not entirely clear from the filings, but it appears that counsel to the False Police Report Claimants do not intend to proceed with the claims of four additional claimants—Asiah Draine, Lilliam Lesueur, Vincent Byrd and Kimberly Killen—upon counsel's inability to contact such claimants (and counsel's determination, after having filed proofs of claim on their behalf, that Draine's and Lesueur's "grievances with Hertz do not relate to false theft reporting or allegations").  Motion for Leave at p. 9 n. 7; Malofiy Decl. ¶¶ 40–41.

[8]  On April 29, 2021 the Court entered an order approving a stipulation between the Debtors and the False Police Report Claimants to withdraw certain of the False Police Report Claimants' claims against the Debtors.  *See* Main D.I. 4322.

[9]  The addenda to the proofs of claim filed on behalf of "False Police Report Claimants No. 2" in June 2021, which were filed as amendments to some but not all of the earlier proofs of claim, identify only 110 individuals.

[10]  Specifically, Claim Nos. 15282, 15257, 15245, 15261, 15277, 15268, 15256, 15278 & 15276.

were not identified anywhere in the purported class proofs of claim or any other proof of claim

filed by the General Bar Date.

### C.    The Debtors' Preliminary Objections and the Motion for Leave

20.    On August 4, 2021, the False Police Report Claimants No. 3 filed the *Motion of*

*False Police Report Claimants No. 3 for Relief from Any Stay and Plan Injunction*

[Main D.I. 5656] (the "**Plan Injunction Motion**"), in which other members of the False Police

Report Claimants group joined [Main D.I. 5687], seeking relief from any stay or injunction under

the Plan so as to: (a) pursue and liquidate their asserted claims in the forum of their choice outside

of this Court; (b) recover against applicable insurance policies; (c) pursue alleged non-Debtor

co-defendants; and (d) seek other equitable relief.  Plan Injunction Motion, ¶ 38.  The Reorganized

Debtors objected [Main D.I. 5703], and the Court denied the Plan Injunction Motion.  *See* Main

D.I. 5875 (the "**Initial Scheduling Order**").  Among other things, the Initial Scheduling Order

also established deadlines related to the Reorganized Debtors' preliminary objections to the False

Police Report Claimants' proofs of claim.  *Id.* ¶ 2.

21.    On September 20, 2021, in accordance with the Initial Scheduling Order, the

Reorganized Debtors filed two preliminary omnibus objections to the proofs of claim filed by the

False Police Report Claimants: (i) the *Reorganized Debtors' Twenty-First Omnibus (Non-*

*Substantive) Objection to False Police Report Claimants' (I) Amended and Superseded Claims,*

*(II) Duplicative Claims, and (III) Late Claims* [Main D.I. 5898] (the "**Non-Substantive**

**Objection**") and (ii) the *Reorganized Debtors' Twenty-Second Omnibus (Substantive) Objection*

*to False Police Report Claimants' Non-Compliant, Unsubstantiated, and Class Claims, and*

*Request for a Limited Waiver of Local Rule 3007-1(f)(iii), to the Extent Such Rule May Apply*

[Main D.I. 5899] (the "**Substantive Objection**" and together, the "**Claim Objections**").  The

Claim Objections set forth objections to certain of the False Police Report Claimants' proofs of

claim on various grounds, including, among others, that the Late Claims filed on behalf of False Police Report Claimants No. 3 were filed after the General Bar Date and do not relate to earlier filed claims.

22.     On November 4, 2021, the Court held a hearing (the "**November 4 Hearing**") to consider, among other things, the Claim Objections.  At the hearing, the Court ordered further proceedings and deadlines regarding the claims filed, or to be filed, by the False Police Report Claimants, including directing that the False Police Report Claimants (i) file by December 6, 2021 a motion pursuant to Bankruptcy Rule 9006 seeking authorization to file claims after the General Bar Date on behalf of False Police Report Claimants No. 3 and (ii) amend the proofs of claim to include separate declarations by each claimant regarding the facts underlying their claim. *See* Nov. 4, 2021 Tr. at 61:24-62:2, 63:6-9.  The parties conferred and agreed on a scheduling order for the further deadlines and proceedings.  *See* D.I. 184.

23.     On December 6, 2021, the Court entered the *Scheduling Order Regarding Certain False Police Report Proofs of Claim* [D.I. 187] (the "**Second Scheduling Order**"), which, among other things, ordered that Movants file amended proofs of claim "as well as a declaration by the claimant stating facts supporting the claim that are known to the declarant."  Second Scheduling Order ¶ 2.

24.     On December 6, 2021, Movants filed the Motion for Leave, seeking a determination by the Court that the proofs of claim filed on behalf of those individuals in June 2021 (the "**Contested Claims**")[11] were timely because, Movants argue, (a) the General Bar Date did not apply to some of the Contested Claims because those claims arose after the Petition Date,

---

[11] The Contested Claims include the proofs of claim filed on behalf of False Police Report Claimants No. 3 on June 10, 2021, and any amendments to those proofs of claim filed on behalf of an individual claimant-Movant.

(b) Movants were known creditors and the Debtors failed to provide them actual notice of the General Bar Date, (c) to the extent Movants were unknown creditors, the Debtors' constructive notice by publication was not constitutionally adequate, and (d) to the extent any Contested Claim was untimely, the delay was due to excusable neglect.  *See* Motion for Leave ¶¶ 43, 80.  The Motion for Leave also seeks to have the Court overrule the Non-Substantive Objection as to the Contested Claims.  *See id.* ¶ 43.

25.    After the Court required Movants to file individualized proofs of claim, eight of the 29 False Police Report Claimants No. 3—or nearly one-third—abandoned their purported claims. Specifically, certain claimants (Edward Guy, Lamont Liner, Kate McCarthy and John [Hertz Rape Victim]) have decided not to pursue their claims and will withdraw them.  *Id.* ¶ 18 n.7.  Moreover, Movants' counsel determined that certain other claimants (Asiah Draine and Lilliam Lesueur) "do not have claims related to false police reporting" and "has been unable to obtain signed declarations or evaluate the claims of Vincent Byrd or Kimberly Killen."  *Id.*  Additionally, as of the filing of this Objection, three Movants have not filed signed declarations supporting their claims as the Court ordered.[12]

---

[12] On December 6, 2021, the *Certain Group 3 False Police Report Claimants' Motion for an Order Extending the Deadline to File Declarations in Support of Proofs of Claim Under 11 U.S.C. § 105(a) and Bankruptcy Rule 9006* [D.I. 191] (the "**Scheduling Order Extension Motion**") was filed in which claimants Janette Brown, Tyresha Caudle, and Wanda Nelson request an extension through January 19, 2022 of the Court's December 6, 2021 deadline to submit declarations in support of their amended proofs of claim.  These claimants filed amended proofs of claim on December 6, 2021 but did not include executed declarations with such filings.  By agreement with Movants, the Reorganized Debtor does not oppose the Scheduling Order Extension Motion's requested extension to January 19, 2022, but otherwise reserves all rights.

## ARGUMENT[13]

26.     There is no dispute that every one of the Late Claims was filed on the Confirmation Date, almost eight months after the General Bar Date, and Movants did not seek permission for such late filing until directed to do so at the November 4 Hearing.  The Motion for Leave should be denied because each of the Movants was an unknown creditor as of the entry of the Bar Date Order who received sufficient notice by publication, and none of the Movants has shown excusable neglect that would justify the late filing of a claim.

## I.     The Contested Claims Allege Pre-Petition Injury from the Debtors' Pre-Petition Conduct, Not Post-Petition Torts

27.     In the Motion for Leave, Movants argue, for the first time, that they are not subject to the General Bar Date because their claims arose post-petition.  This argument is not only new but contradicts Movants' prior positions before this Court.  It is therefore forfeit.  Additionally, the argument lacks merit, as the fact that alleged injuries may continue to accrue post-petition does not transform that pre-petition conduct into a post-petition claim.  That is especially true where, as here, none of the alleged post-petition injuries were committed by the Debtors.

### A.     Movants Have Repeatedly Represented to This Court That Their Claims Arose Pre-Petition and Have Thus Forfeited the Argument That Their Claims Arose Post-Petition

28.     Movants forfeited the argument that their claims arose post-petition by their affirmative actions and statements before this Court, and their silence in the face of direct challenges to their claims.

---

[13] As used in this Argument section, "**Movants**" means 19 of the 21 individuals identified in Exhibit A1 to the Motion for Leave, excluding Breanna Oneal and Israel Sundseth, and "**Contested Claims**" similarly means the claims of the same 19 individuals.  The declarations of Oneal and Sundseth submitted on December 6, 2021 allege that all events related to those individuals' asserted claims (including the vehicle rental) occurred after the Petition Date.  Therefore, the Reorganized Debtor does not object to those two individuals' claims under section 502(b)(9) but reserves its right to object on all other grounds.

29.     **First**, Movants did not allege that their claims arose post-petition in response to the Non-Substantive Objection, which objected to the Late Claims pursuant to section 502(b)(9) because they were filed after the General Bar Date. *See* Non-Substantive Objection ¶¶ 24–33. In other words, the objection sought to enforce the bar date's preclusive effect, and in response, Movants did not argue (as they do now) that the General Bar Date did not apply to their claims. Instead, they argued the opposite: that "[t]he Group 3 Claimants are known claimants who required actual notice of the Debtors' bankruptcy cases *(and the General Bar Date)*, but received none." D.I. 50 (emphasis added). This argument makes no sense if Movants hold post-petition claims, as the General Bar Date applies only to claims that arose pre-petition. *See* Main D.I. 1240 ¶ 3. Movants' affirmative statements in response to the Non-Substantive Objection foreclose their new and contradictory argument that the General Bar Date does not apply to their claims. *See McGoveran v. Amazon Web Servs., Inc.*, Civ. No. 20-1399-LPS, 2021 WL 4502089, at *3 n.2 (D. Del. Sept. 30, 2021) ("[T]here is no reason why Plaintiffs could not have made this statutory argument in their briefing. Consequently, the Court considers this argument forfeited.").

30.     **Second**, Movants' Late Claims failed to assert administrative priority for all or any portion of the claims.[14] In June 2021, the proofs of claim were filed on behalf of the group called "False Police Report Claimants No. 3" (*i.e.*, the Late Claims). Those proofs of claims were filed using the modified version of Official Form 410 approved by the Bar Date Order. Part 2, Question 12 of the form asks, "Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?" and has "yes/no" check boxes enabling the claimant to assert priority. Section 507(a)(2) gives priority to "administrative expenses allowed under section 503(b)." 11 U.S.C. § 507(a)(2). Question 12

---

[14] To be clear, the Reorganized Debtor does not object to a claimant's use of the proof of claim form to assert an administrative expense claim, subject to the other points raised herein. *Contra* Motion for Leave ¶ 50 n.13; *id.* ¶ 52 & n.14.

includes a list of commonly cited bases for priority but also has an "Other" item that allows the claimant to identify another subsection of section 507 that applies, such as section 507(a)(2). Each of Movants' proofs of claim checked the "no" box to Part 2, Question 12, affirmatively asserting no priority for all or any portion of their claims. Additionally, the addendum attached to each proof of claim did not allege administrative expense priority. The most those proofs of claim provided was a chart identifying each individual and a column labeled "Pre or Post," without providing any facts or context as to what that column referred (*i.e.*, date of rental, date of police report, date of arrest, etc.).[15]

31.    Regardless of the form used, it is the claimant's burden to assert and demonstrate administrative expense status. *See In re Philadelphia Newspapers, LLC*, 690 F.3d 161, 173 (3d Cir. 2012) ("The party asserting an administrative expense claim bears the burden of demonstrating that it deserves administrative expense status."). This priority should be asserted when the initial proof of claim is filed. Indeed, an amendment to a claim that attempts to assert a higher priority "changes the nature of the proof of claim," and if made after the bar date should be disallowed. *In re Walls & All, Inc.*, 127 B.R. 115, 118–19 (W.D. Pa. 1991) ("If the claim deserved priority, it deserved it at the time [it] filed its first proof of claim." (citation omitted)); *see also Ellis v. Westinghouse Electric Co., LLC*, 11 F.4th 221, 231 (3d Cir. 2021) ("A claim is either an administrative expense claim or it is not; it cannot be a chameleon.").

32.    Here, contrary to the Motion for Leave's assertions (*see* Motion for Leave ¶ 52), this Court already found that the earlier proofs of claim failed to state sufficient facts. *See* Nov. 4,

---

[15] The proofs of claim submitted by Movants around December 6, 2021 *all* assert administrative priority—including the proofs of claim on behalf of the Group 1 Claimants, all of whom filed pre-petition litigation. Also, the Motion for Leave only presses the argument for administrative priority on behalf of 12 of the 21 Movants. *See* Motion for Leave ¶ 56. Even ignoring their prior contradictory actions, the Motion for Leave's omission of almost half of the Movants forfeits the argument as to the other nine claimants.

2021 Transcript at 30:3–6 ("I'm going to overrule you on this.  I think that a form does have to have a certain amount of information to support its claim and that there are some claims that do not comply or provide any evidence.").   Therefore, this is not a situation where a claimant inadvertently failed to check the priority box but otherwise provided, before the applicable bar date, documentation and evidence supporting the asserted administrative claim.  *See In re Bluestem Brands, Inc.*, Case No. 20-10566 (MFW), 2021 WL 3174911, at *3 (Bankr. D. Del. July 27, 2021) (agreeing with courts that "recharacterize timely filed proofs of claim as administrative claims ***if they contain sufficient facts to put the debtor on notice that they are administrative claims***" (emphasis added)).   Here, Movants' June 2021 proofs of claim asserted no priority, provided no facts regarding the events that allegedly occurred post-petition (if any), and offered no basis for whether any of the asserted causes of action arose post-petition.[16]

33.    ***Third***, on August 4, 2021, Movants (and the eight other, former "Group 3" individuals) filed a motion for relief from the automatic stay and the Plan's injunction.  *See* Main D.I. 5656.  It is axiomatic that the automatic stay under section 362(a) prohibits the prosecution of, or efforts to collect on, only pre-petition claims, not post-petition claims.  *See* 11 U.S.C. § 362(a)(1), (6).  But nowhere in that motion did Movants assert that the automatic stay did not apply to their claims because those claims arose post-petition.  *See generally* Main D.I. 5656 at 17 ("The False Police Report Claimants No. 3 are entitled to relief from any stay and plan injunction and ***the automatic stay under section 362(d)(1)*** of the Bankruptcy Code").

---

[16]  In stark contrast, the *Bluestem* claimants' proofs of claim attached purchase orders, invoices, bills of lading, and packing lists that showed shipping and receiving dates after the petition date, and the parties did not dispute that the debtor received the goods after the petition date.  *See In re Bluestem Brands, Inc.*, 2021 WL 3174911, at *5; Proofs of claim nos. 247, 259, 1085, *In re Bluestem Brands, Inc.*, Case No. 20-10566 (MFW) (Bankr. D. Del.) (available at https://cases.primeclerk.com/bluestem/Home-ClaimInfo).  Even now, neither the Motion for Leave nor Movants' amended proofs of claim identify which causes of action each particular Movant asserts and whether a particular cause of action purportedly arose pre- or post-petition.

34.    *Fourth*, Movants' responded to the Substantive Objection and argued that their unsupported proofs of claim were entitled to *prima facie* validity under section 502(a) of the Bankruptcy Code and Bankruptcy Rule 3001(f) and, therefore, that the burden to refute an essential element of their claims had shifted to the Reorganized Debtors. *See* D.I. 51 ¶¶ 71–75, 106–108; Nov. 4, 2021 Transcript at 31:20–21 ("you know, 3001(a) of the Bankruptcy Rules is the pleading standard, such as it is for proofs of claim").[17] That standard does not apply to administrative claims because the administrative claimant always bears the burden to demonstrate entitlement to priority status, which courts strictly enforce. *See* 11 U.S.C. § 503(b)(1)(A); *In re Philadelphia Newspapers, LLC*, 690 F.3d at 173; *In re RS Legacy Corp.*, Case No. 15-10197 (BLS), 2016 WL 1084400, at *3 (Bankr. Del. Mar. 17, 2016).

35.    Movants also argued that the Court could not consider the Debtors' preliminary objection because the evidentiary burdens for proofs of claim under section 502 are a "substantive . . . framework for analyzing the merits of a claim," which, in turn, would have required the Court to decide the merits of their alleged personal injury tort claims in contravention of the Court's constitutional authority. D.I. 51 ¶ 69. Now, Movants urge this Court to conclude that it does not matter whether they asserted pre-petition or post-petition claims—and consequently which party bears the burden of proof—because the Plan pays allowed general unsecured claims in full. *See* Motion for Leave ¶ 50 ("In the particular circumstances of these cases—in which general unsecured claims are unimpaired and to be paid in full under the Plan—there is no need for the Claimants to seek administrative expense priority for their unsecured, post-petition claims."). But

---

[17] Indeed, Movants also cite the *prima facie* standard for claims filed under section 502 in their motion to extend the December 6 deadline for three Movants, notwithstanding that they now assert administrative claims. *See* D.I. 191 ¶ 18 ("counsel submit that the amended Claims will be *prima facie* valid under 11 U.S.C. § 502(a) and Federal Rule of Bankruptcy Procedure 3001(f)").

section 503(b) does not distinguish between solvent and insolvent chapter 11 cases. *See* 11 U.S.C. § 503(b)(1); *see also* 11 U.S.C. § 1129(a)(9). Movants previously used the *prima facie* validity afforded a pre-petition proof of claim as a shield and now abandon that argument to avoid the preclusive effect of the General Bar Date.

36.     In sum, throughout these proceedings, Movants have treated their claims as pre-petition general unsecured claims. Only now, after several rounds of litigation, including prior briefing regarding the General Bar Date's undisputed application to their claims, do Movants assert post-petition priority. The Court's direction at the November 4 Hearing to Movants to amend their claims to state particularized facts supportive of each claimant's specific claims was not an invitation for Movants to assert higher claim priority and sidestep the General Bar Date. Movants should have raised this argument when they were required to do so—in their original proofs of claim and their response to the Non-Substantive Objection. Accordingly, Movants have forfeited that argument by their prior actions. *See, e.g.*, *McGoveran*, 2021 WL 4502089, at *3 n.2 (finding party forfeited argument raised in notice of subsequent authority prior to hearing); *Almirall, LLC v. Torrent Pharm., Ltd.*, Civ. No. 20-1373-LPS, 2021 WL 3021947, at *6 (D. Del. July 13, 2021) (rejecting argument raised for first time at oral argument, "Almirall's brief does not contain any reference to this theory. . . . it did have a chance to raise this argument, as it could have included it in its answering brief.").

### B.     Movants' Claims Arose Pre-Petition Under *Grossman's* and Do Not Qualify as Administrative Expense Claims Under *Reading*

37.     Movants assert two arguments for why certain claims allegedly arose post-petition: (i) some of the Movants were not "exposed" to the Debtors' conduct until they were arrested by police after the Petition Date; and (ii) the Debtors' failure to withdraw allegedly inaccurate theft

reports constitutes continuing post-petition torts against Movants.  These arguments misapply the *Grossman's* standard and also fail to meet the *Reading* exception.

        i.      <u>Movants' Claims Arose Pre-Petition</u>

38.     The Bankruptcy Code broadly defines "claim" to include a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent . . . ." 11 U.S.C. § 101(5).  In overruling the prior "accrual" test, the *Grossman's* court, consistent with other circuits, weighed the concern that some claimants may not be aware of their injuries at a given time against the Bankruptcy Code's broad definition of "claim."  *See In re Grossman's Inc.*, 607 F.3d 114, 122–25 (3d Cir. 2010) (reviewing cases).  *Grossman's*, like its sister-circuit cases, arose primarily in the context of asbestos or other products liability situations where "exposure" to the harmful product was necessary to give rise to the applicable tort claim but a claimant may not be aware of any injury until much later.  *See id.*  The Third Circuit held, "a 'claim' arises when an individual is exposed pre-petition to a product or other conduct giving rise to an injury, which underlies a 'right to payment' under the Bankruptcy Code."  *Id.* at 125.  "In other words, a lawsuit based on conduct (or exposure) that occurred before the bankruptcy filing yields a pre-petition claim even though the cause of action did not accrue until the injury manifested sometime after the bankruptcy filing."  *In re Ruitenberg*, 745 F.3d 647, 651 (3d Cir. 2014).  Even where prepetition asbestos exposure continues post-petition, courts have held that the claim arose before the petition date.  *See In re Johns-Manville Corp.*, 623 B.R. 242, 250 (S.D.N.Y. 2020) ("Appellant has a pre-petition claim, despite the fact that the exposure continued post-petition.").

39.     Here, the "conduct giving rise to an injury" is the filing with law enforcement of an allegedly inaccurate theft report.  That is the one common allegation across all of Movants' claims. Indeed, several of the Movants have not been arrested and do not know if an arrest warrant has been issued, meaning that the only offending action allegedly giving rise to the claim is the filing

18

of the police report.  *See* Motion for Leave ¶ 56.C, F, G.  Yet at the same time, Movants argue that, for some Movants,[18] "exposure" occurred not at the time of the filing of the report, but when those Movants were arrested.  Motion for Leave ¶ 54.  Movants do not uniformly apply *Grossman's* exposure standard even among themselves.

40.    Movants' objective is clear: manufacture a flexible standard under which all of their claims, including claims of individuals not arrested, arose post-petition and therefore are not late. Their proffered, and incorrect, standard focuses on Movants' subjective (and potentially unknowable) ***awareness*** of the claim, rather than the Debtors' alleged conduct giving rise to the claim.  That is not the law.  *See, e.g.*, *In re Grossman's, Inc.*, 607 F.3d at 125 (rejecting requirement for injury from debtor's conduct to be evident before claim arises); *In re Hayes Lemmerz Int'l, Inc.*, 340 B.R. 461, 480 (Bankr. D. Del. 2006) (rejecting administrative claim for conversion of equipment parts that occurred pre-petition, even though equipment lessor was not aware of the conversion until it repossessed equipment post-petition).

41.    Movants' exposure argument also ignores the nature of their asserted causes of action, all of which arise from the same alleged conduct of a Debtor—submission of the theft report.  Simply put, that is the only conduct the Debtors are accused of.  Any other, subsequent, or future conduct was committed by third parties, such as police officers (*i.e.*, arresting the individual) or prosecutors (*i.e.*, pursuing the criminal case).  At most, those actions were the supposed post-petition ***effects*** of a Debtor's alleged pre-petition conduct, but post-petition effects of pre-petition conduct do not transform a pre-petition claim into a post-petition claim  *See In re SuperMedia,*

---

[18] Two Movants (Sean Hurt and Paula Murray) state in their declarations that they were arrested after the Petition Date.  However, they also state that their rentals and the other events occurred prior to the Petition Date.  All other Movants' declarations state that any arrest was prior to the Petition Date and the Motion for Leave only references "continuing tortious conduct" either "based on ongoing criminal proceedings" or "to the extent there are any criminal proceedings."

*Inc.*, Case No. 13–10546 (KG), 2014 WL 7403448, at *20 (Bankr. D. Del. Dec. 29, 2014) (rejecting request for administrative claim based on the "post-petition *effects* of prepetition conduct" (emphasis in original)).[19]

> ii.     Movants' Allegations Regarding the Debtors Do Not Qualify as Post-Petition Torts Entitled to Administrative Priority

42.     Movants argue that the Debtors' post-petition failure to withdraw or remedy the allegedly inaccurate theft reports endows them with post-petition claims because they faced continuing prosecutions or outstanding warrants.  Motion for Leave ¶ 55.  Although Movants generally refer to the *Reading* exception as authority for their purported administrative expenses (*see id.* ¶ 50), they ignore this District's precedent, which holds that the post-petition effects of a debtor's pre-petition conduct, or the post-petition acts of a non-debtor third party, fail to satisfy *Reading*.

43.     For a claim to be allowed as an administrative expense claim under section 503(b), other than certain exceptions not applicable here, it must arise from a transaction with the debtor that was beneficial to the debtor-in-possession in the operation of its business.  *In re SuperMedia, Inc.*, 2014 WL 7403448, at *19.  The Supreme Court articulated a narrow exception to that rule in *Reading Co. v. Brown*, 391 U.S. 471 (1968).  Under that exception, "certain tort claims may be entitled to administrative expense priority if, and only if, they arise from acts committed by the debtor-in-possession '*after the bankruptcy filing*.'"  *In re SuperMedia, Inc.*, 2014 WL 7403448, at *19 (quoting *In re Refco Inc.*, 331 F. App'x 12, 13 (2d Cir. 2009)) (emphasis in original); *see also*

---

[19] Even if viewed in the light most favorable to Movants, a contingent claim would arise (at the latest) upon institution of criminal proceedings against the claimants, which generally precedes the issuance of an arrest warrant.  *See Noviho v. Lancaster Cnty. of Penn.*, 683 F. App'x 160, 166 (3d Cir. 2017) (noting arrests made pursuant to a warrant "generally occur after the institution of legal process").  Indeed, the existence of a criminal proceeding is one of the elements of, and the principal harm alleged by, a malicious prosecution claim.  *See id.*; Restatement (Second) Torts § 653 (1977).

*In re Philadelphia Newspapers, LLC*, 690 F.3d at 173 (noting exception allows for administrative status "if those claims arise from actions related to the preservation of a debtor's estate"); *In re Cont'l Airlines, Inc.*, 148 B.R. 207, 214 (D. Del. 1992). "There are no cases applying *Reading* to allow administrative expense status to tort claims which arose prepetition." *In re SuperMedia, Inc.*, 2014 WL 7403448, at *19 (citation omitted). Movants' claims fall outside this narrow exception.

44.    **First**, Movants' argument centers on the post-petition effects of a Debtor's alleged pre-petition conduct. Courts disallow administrative expense claims under *Reading* where the claim is based on (a) continuing post-petition effects resulting from pre-petition conduct or (b) unabated pre-petition conduct. *See In re Exide Techs.*, 601 B.R. 271, 289 (Bankr. D. Del. 2019) (disallowing administrative claim for post-petition penalties based on "prepetition conduct that continued unabated postpetition"); *see also In re N.P. Min. Co., Inc.*, 963 F.2d 1449, 1459 (11th Cir. 1992) (same, claim for failure to "abate a prepetition violation of the statute"); *In re Cont'l Airlines, Inc.*, 148 B.R. at 214 (affirming denial of administrative expense claim for damages based on debtor's post-petition "failure to reinstate" employee in alleged violation of employment law).

45.    In other words, for there to be an administrative expense claim under *Reading* and its progeny, there must be some new action by the debtor post-petition. *See In re Lazar*, 207 B.R. 668, 675, 680 (Bankr. C.D. Cal. 1997) (rejecting administrative claim for environmental contamination because "[t]he requirement that an administrative expense be postpetition cannot be met absent such new [postpetition] contamination" and "continued postpetition deterioration or postpetition failure to remediate prior contamination does not satisfy this requirement"). *Continental Airlines* is particularly instructive. There, the District Court rejected an argument that the debtor's failure to take action to cure a violation constituted a post-petition tort, finding "no

new harm was done to Kapernekas *from a post-petition act by Continental*, rather the damage caused by the pre-petition harm continued to accrue." *In re Cont'l Airlines, Inc.*, 148 B.R. at 216 (emphasis added); *see also In re Exide Techs.*, 601 B.R. at 289 (denying administrative expense priority for unabated air pollution that was released pre-petition).

46.     Here, the only conduct of which the Debtors are accused is the filing of an allegedly inaccurate theft report, which in each instance occurred pre-petition; no Debtor took any further action post-petition.   False arrest and malicious prosecution claims are not "continuing torts" because each arises from a discrete act at a specific moment in time.  *See Williams v. Dalbec*, Civ. No. 18-cv-11850, 2019 WL 1474020, at *3 (E.D. Mich. Feb. 28, 2019) (rejecting argument that false imprisonment and malicious prosecution were continuing violations because "continuous effects from an original act do not constitute a continuous violation").   Movants appear to argue that a Debtor continuously breached a legal duty to withdraw theft reports but cite no authority for that proposition.   Instead they rely on hearsay and a declaration that offers legal opinion on the existence of a duty.   *See* Motion for Leave ¶ 55.   But charges in criminal cases are initiated, pursued, and controlled by prosecutors, not by private parties such as the Debtors.  *See Albright v. Oliver*, 510 U.S. 266, 279 n.5 (1994) ("The principal player in carrying out a prosecution—in 'the formal commencement of a criminal proceeding' . . .—is not police officer but prosecutor." (citation omitted)) (Ginsburg, J. concurring).   Thus, Movants' entire premise upon which they base their post-petition administrative expense claim argument is flawed.

47.     *Second*, Movants' argument also fails because post-petition acts by non-debtor third parties following from a debtor's pre-petition act do not meet the *Reading* standard.   *See In re SuperMedia, Inc.*, 2014 WL 7403448, at *20.   In *SuperMedia*, a claimant alleged the debtor infringed its copyrights by exceeding the scope of a license, including by distributing copyrighted

images to third parties and allowing unauthorized users to utilize the images. *Id.* at *18. The court agreed there was infringement pre-petition, but the claimant also (a) asserted an administrative claim because "the consequences of that infringement were still being felt during the Administrative claims Period" and (b) sought to hold the debtor "accountable for the alleged post-petition tortious act of third parties." *Id.* at *20. The court rejected those arguments, noting that the claimant had failed to identify any post-petition action by a debtor. *Id.* ("Neither argument passes muster.").

48.    Here, Movants allege only that some of them were arrested post-petition and that certain criminal proceedings continued post-petition. But the Debtors were not prosecutors or other officers of the law that acted on an existing, pre-petition arrest warrant or controlled the post-petition prosecution of charges against any Movant. *See Albright*, 510 U.S. at 279 n.5. Therefore, Movants fail to allege any post-petition action by a Debtor, which in turn fails the requirements articulated under *Reading* and its progeny for an administrative expense.

## II.    Movants Were, at All Relevant Times, Unknown Creditors Who Received Constitutionally Adequate Notice of the General Bar Date Through the Debtors' Publication Notice

49.    Due process requires notice that is "'reasonably calculated to reach all interested parties, reasonably conveys all the required information, and permits a reasonable time for a response.'" *Chemetron Corp. v. Jones*, 72 F.3d 341, 346 (3d Cir. 1995) ("***Chemetron I***") (quoting *In re Eagle Bus Mfg. Inc.*, 62 F.3d 730, 735 (5th Cir. 1995)). A debtor's obligation to provide actual or constructive notice of a claims bar date depends on whether the creditor is "known" or "unknown," respectively. *Chemetron I*, 72 F.3d at 345–46. While a debtor must give known

creditors actual notice of a debtor's bankruptcy filing and claims bar date, the due process rights

of unknown creditors—like Movants—are satisfied by constructive notice.  *Id.* at 345–46, 348.[20]

### A.    Movants Were Not Known Creditors

50.    Known creditors include only claimants actually known to the debtor and those that

are "reasonably ascertainable."  *See Chemetron I*, 72 F.3d at 346; *see also In re W.R. Grace & Co.*,

316 F. App'x 134, 137 (3d Cir. 2009).  For a creditor to be "reasonably ascertainable" means the

creditor "can be identified through 'reasonably diligent efforts.'"  *Chemetron I*, 72 F.3d at 346

(quoting *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 798 n.4 (1983)).

51.    The central question—what is "reasonable"—is a totality-of-the-circumstances

inquiry.  "What is reasonable must be determined by considering the totality of the circumstances

in each case in light of certain factors, including (1) whether the identity of the creditors or their

claims are conjectural or can be reasonably ascertained, (2) whether the cost of giving actual notice

would consume a disproportionate share of the debtor's resources, and (3) the obligation of the

court to existing creditors and the debtor's stockholders in light of the potential delay and the

balance of the debtor's resources."  *In re New Century TRS Holdings, Inc.*, 465 B.R. 38, 47 n.10

(Bankr. D. Del. 2012) (citing *Gentry v. Circuit City Stores, Inc. (In re Circuit City Stores, Inc.)*,

439 B.R. 652, 660 (E.D. Va. 2010)).

52.    There is no dispute that none of the Movants made themselves known creditors by

filing prepetition litigation against the Debtors, even though several of them had purported claims

---

[20] Movants' known creditor argument is made on behalf of most Movants *except* Breanna Oneal and Israel Sundseth.  Motion for Leave ¶ 61 n.21. Heather Kasdan, Sean Hurt, and Paula Murray join that argument only with respect to defamation or other claims that may be determined to have arisen pre-petition.  *Id*. Notwithstanding the foregoing, Ms. Kasdan's, Mr. Hurt's, and Ms. Murray's alleged claims are prepetition claims for the reasons argued above and, accordingly, they were unknown claimants at all relevant times entitled only to constructive notice of the General Bar Date.  This Objection will continue to refer to Movants as a group for ease of reading, unless specifically referencing a single Movant by name.

going back many years.  Had Movants done so, the Debtors would have served them with the Bar Date Notice, as they served litigation claimants.  *See* Bar Date Motion ¶ 23(f).  And while certain Movants might have appeared as customers in the Debtors' books and records, that does not make them known creditors.  *See, e.g.*, *In re Crystal Oil Co.*, 158 F.3d 291, 297 (5th Cir. 1998) (discussing cases, including *Chemetron I*, and concluding that "in order for a claim to be reasonably ascertainable, the debtor must have in [its] possession, at the very least, some specific information that reasonably suggests both the claim for which the debtor may be liable and the entity to whom [it] would be liable."); *In re New Century TRS Holdings, Inc.*, 450 B.R. 504, 512-13 (Bankr. D. Del. 2011) ("The availability of the [claimants'] names and address in the Debtors' loan files may have reflected that the [claimants] were known *customers,* but without more, it did not make them 'known *creditors.*'" (emphasis in original)).

53.    Movants state three bases for being "known creditors."  First, Movants argue based on their own allegations that the Debtors knew they had a systemic problem with false arrests, and, therefore, assert that all individuals against whom the Debtors had filed a police report were known creditors.  Motion for Leave ¶¶ 64–66.  Second, the Motion for Leave asserts that certain Movants' contacts with the Debtors made them known creditors.  *Id.* ¶ 75.  Third, Movants assert that the Debtors generally kept records of the rental, theft reports, records of payments, etc., and that they therefore were known creditors.  *See id.* ¶¶ 67.  Each of these arguments fails.

i.    Hertz Did Not Have a "Systemic" Problem with False Police Reports

54.    Movants' position—that the Debtors should have known of alleged systemic theft reporting issues generally and, therefore, should have provided Movants with actual notice of the

General Bar Date—is false.  From 2016 through the Petition Date,[21] the Debtors had, on average, more than *25 million* rental transactions in the United States per year.  During the same period, the Debtors filed approximately ███████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████ 3,365 theft reports per year in connection with rental vehicles that were kept long past the contracted return date, after exhausting all efforts to retrieve the vehicle and contact the customer who had not returned it.  That last category of theft reports occurs in the context of an average of over 1,000,000 rentals per year that are returned at least three days after the contractual return date.

55.    Additionally, from 2016 through the Petition Date, only 32 lawsuits, on behalf of 56 plaintiffs, were filed on account of the Debtors' theft reports.[22]  Thus, a ratio of only 0.00175 of all theft reports from 2016 through the Petition Date, and less than 0.000002 of rentals overall, have resulted in a lawsuit on account of the Debtors' alleged inaccurate police reporting.  Even if these numbers were many multiples larger, they still would not signal a systemic issue.  Moreover, these data points ignore that Hertz contests the facts alleged in many of these lawsuits and assumes, solely for the sake of argument, that all 56 plaintiffs' claims were well-founded or otherwise likely to succeed on the merits.

56.    As the *New Century* cases illustrate, knowledge of a potential issue affecting a tiny percentage of a group does not render all persons in that group known creditors.  In the *New*

---

[21]  The Reorganized Debtor uses this date range because (i) COVID-19 altered these numbers, which were generally consistent pre-petition and (ii) claims arising prior to 2016, if any, are likely time-barred.

[22]  Over one-third of these plaintiffs are represented by Mr. Malofiy and filed suit the day before the Petition Date.

*Century* cases, the debtors listed 320 pending lawsuits on their schedules—far more than the number of inaccurate police report-related lawsuits filed against the Debtors. *In re New Century TRS Holdings, Inc.*, 2014 WL 842637 at *5 (Bankr. D. Del. March 4, 2014) ("168 complaints alleging fraud and violations of TILA or RESPA; 94 complaints to quiet title to real property; and 58 complaints alleging breach of contract or breach of fiduciary duty claims"). However, "[t]he [d]ebtors originated more than *one million* loans between 2003 and its bankruptcy filing in 2007." *Id.* (emphasis original). Thus, the *New Century* debtors knew of lawsuits stemming from a mere 0.032% of loans, which was insufficient to render borrowers as a whole known creditors. *Id.* ("Lawsuits by approximately only 320 borrowers did not provide the Debtors with notice that *all* borrowers held claims." (emphasis original)). As noted above, between 2016 and the Petition Date, a ratio of only 0.00175 of the Debtors' theft reports, and *less than 0.000002* of all rentals, resulted in a lawsuit against the Debtors alleging an inaccurate police report. Like *New Century*, this is insufficient to render renters against whom a theft report was filed, or customers as a whole, known creditors. *See id.*; *see also In re Spiegel, Inc.*, 354 B.R. 51, 56–57 (Bankr. S.D.N.Y. 2006) (claimants, who did not assert their litigation claims until after the debtor's plan was approved, were not known creditors simply because a different party with similar claims had commenced litigation earlier).

57.    The cases cited by Movants, which are factually distinguishable and, in some instances, employ a standard expressly rejected by the Third Circuit, do not change this result. In *Fogel v. Zell*, the debtor's predecessor put defective pipes into the stream of commerce with large purchasers readily ascertainable from the debtor's records. *See* 221 F.3d 955, 960–62 (7th Cir. 2000). The *Fogel* court discussed the pipe in question as if no party disputed that it was, in fact,

defective.  *Id.* at 958–59.[23]  *In re Motors Liquidation Co.* centered on faulty ignition switches that the debtors had failed to remedy or widely report.  829 F.3d 135, 159-161 (2d Cir. 2016).  These faulty switches had been "approved for production, despite never having passed [internal] testing," *id.* at 149, and had been injected into the stream of commerce where issues—and related claims— could not be readily detected by would-be claimants until the time of failure, *id.* at 159-161.  And *In re Thomson McKinnon Securities Inc.*, a pre-*Chemetron I* case from New York cited by Movants, applied the foreseeability test that *Chemetron I* expressly rejected.  *See* 130 B.R. 717, 720 (S.D.N.Y. 1991) ("If the debtor knows, or should know, of its potential liability to a specific creditor, that creditor is a known creditor entitled to actual notice.").[24]

58.    Movants' purported support for their argument that the Debtors "had overwhelming knowledge of the systemic issues underlying their theft reporting" are (i) Movants' allegations, (ii) media reports of Movants' allegations and (iii) "many" lawsuits.  Mot. ¶ 46.  It is axiomatic that unproven and disputed allegations, like those asserted by Movants, are not evidence.  Nor do these allegations become evidence because the media reports them (potentially at the prompting of Movants' counsel, who has appeared in numerous media reports since the Effective Date).  And despite claiming "many" lawsuits, Movants cite a total of two lawsuits other than their own— which are also the ***only two lawsuits*** in which a verdict was entered finding that Hertz had issued a police report containing inaccurate information.  *See* Motion ¶ 64.

---

[23] The *Fogel* court also discussed the claims in question as arising when the harm occurred (*i.e.* when the pipes had burst), rather than when the claimant was exposed to the debtor's conduct.  *Id.* at 960.  This view runs contrary to *Grossman's*, *see supra* ¶ 35, further demonstrating *Fogel*'s inapplicability to this case.

[24] It is also distinguishable because it turned on "former customers from whom [the debtor had] received payment for purchased securities, but failed to deliver the securities."  *Id.* at 718.  The debtor was clearly obligated to either deliver the securities or pay a refund.  *Id.* at 720.  "The liability was fixed, noncontingent and not disputed."  *Id.*  *Thomson* is therefore inapplicable to this case, where Movants' claims have not been liquidated, are disputed, and were not asserted or known to the Debtors prior to the General Bar Date.

59.     At the November 4 Hearing, this Court directed the Reorganized Debtor to provide statistics, as it was able, on the number of police reports filed by the Debtors, and the number of such reports proven to be false.  Nov. 4, 2021 Tr. at 54:3-20.  As noted, there have been only two lawsuits that have resulted in Hertz being found to have issued a police report containing inaccurate information.  But even using the number of pre-petition lawsuits from 2016 through the Petition Date in which Hertz is merely alleged to have issued an inaccurate police report (32 lawsuits on behalf of 56 plaintiffs), and ignoring that Hertz disputes those allegations, the resulting ratio of alleged inaccurate police reports to total police reports issued is approximately .00175.  *See supra* ¶ 48.  These figures plainly do not rise to the "systemic" level necessary to transform individual, unknown litigation claimants into potential known creditors.

        ii.        <u>Movants' Stated Contacts with the Debtors Prior to the General Bar Date Were Insufficient to Render Them Known Creditors</u>

60.     Even where a potential claimant makes itself known to a prepetition debtor, the circumstances of such contact or the passage of time may render that person an unknown creditor. *See In re Trump Taj Mahal Assocs.*, 1993 WL 534494 at *4 (D.N.J. Dec. 13, 1993) (finding no abuse of discretion in bankruptcy court's determination that claimant who filed an incident report with the debtor prepetition, when slip-and-fall occurred, but then did not follow up or respond to debtor's claims adjuster for two years—during which time the debtor entered chapter 11 and the bar date passed—was not a known creditor).  This is particularly true for a large organization like the Debtors, which handles millions of customer interactions each year.  *See In re Trump Taj Mahal Assocs.*, 156 B.R. 928, 940 (Bankr. D.N.J. 1993) (finding claimant who had filed prepetition incident report was an unknown creditor based, in part, on evidence that the debtor hotel had received thousands of hotel complaint and casino incident reports in the past year, and "although many people in [the claimant's] position threaten to file suit against the Taj, only a nominal

number, if any, actually bring suit"); *see also In re US Airways, Inc.*, 2005 WL 3676186, at *5 (Bankr. E.D. Va. Nov. 21, 2005) (rejecting argument that parties were "known" creditors either on account of their filed-but-disallowed proof of claim from debtors' previous bankruptcy or on account of party's status as a furloughed employee, noting, "a debtor is not constitutionally required to broadly speculate as to the identity and theory of recovery of each conceivable or possible creditor").

61.   Movants' declarations, generally, contain allegations of minimal contact with the Debtors, indirect contact through third parties, or communications that are vague and dated. Details from certain Movants' declarations are often unclear, referring to broad date ranges and sometimes not specifying the identity or methods of contact with the Debtors.  And still other Movants' declarations, while providing some documentation and specificity regarding their communications with the Debtors, do not clearly establish that the Movant was asserting a legal claim or right to payment against the Debtors.  *See In re Crystal Oil Co.*, 158 F.3d at 297 ("in order for a claim to be reasonably ascertainable, the debtor must have in [its] possession, at the very least, some specific information that reasonably suggests both the claim for which the debtor may be liable and the entity to whom [it] would be liable"); *In re Trump Taj Mahal Assocs.*, 1993 WL 534494 at *4 ("There was nothing in the appellants' conduct that distinguished their case from the many thousands of claims received each year by the Taj that do not progress beyond the filing of an incident report.").

62.   Assuming, without conceding, that the facts alleged in Movants' declarations are true, they do not evidence contacts that would give rise to the Debtors' knowledge of Movants as known creditors prior to the General Bar Date:

a. Three Movants (Janette Brown, Tyresha Caudle, and Wanda Nelson) have failed to submit declarations in connection with the Motion for Leave or their proofs of claim, and therefore make no allegations that they contacted the Debtors.

b. One Movant (Marissa White) alleges no direct contact with the Debtors.

c. Four Movants (Lateshia Jenkins, Jessica Malone, Britne McClinton, Moneck Wallace) allege they had some minimal or long-ago contact.

d. One Movant (Molly Harris) alleges indirect contact on an unspecified date.

e. Two Movants (Charles Lee Bort and Paula Murray) allege potentially relevant contact with Hertz only after the General Bar Date had already passed.

f. Two Movants (Kwai Yee Chan and Jason Cook) allege indirect contact with the Debtors only through other Movants (Charles Lee Bort and Jessica Malone, respectively) or such other Movants' counsel.

g. Five Movants (Siobhan Adams, Kimberli Costabile, Heather Kasdan, Raelena Lewis, Zanders Pace) allege they contacted Hertz the year before the Petition Date, but none state facts sufficient to have put Hertz on notice of their potential litigation claims.[25]

63. The Debtors' North American customer communication centers handled approximately 2.5 million customer calls in each of 2016 and 2017, and more than 3 million calls in each of 2018 and 2019. In 2020, during the COVID-19 pandemic and related travel restrictions, the Debtors still handled 1.5 million customer calls in North America. Given the number of customers that contact Hertz in the ordinary course of its business, a customer call to the customer

---

[25] The potentially relevant contacts alleged in Movants' declarations are summarized on **Exhibit A** hereto. The Debtors continue to review the amended proofs of claims filed on December 6, 2021 and reserve the right to object or respond to those claims more fully, as appropriate.

service line or roadside assistance, or inquiry to the billing department, without much more, does not make that customer a known potential creditor.

   iii.  <u>The Debtors' Customers Are Not, Generally, Known Creditors</u>

  64.  Movants argue, "on information and belief", that the Debtors "had an internal list of customers who were reported for theft."  Motion for Leave ¶ 62; *see also id.* ¶ 46 ("of course a company should keep track of those it accuses of serious crimes").  Even if true, the fact that the Debtors tracked individuals who they believed stole cars from them does not provide any reason for the Debtors to treat these individuals as known creditors.  These are individuals against whom the Debtors had claims, not the reverse.

  65.  Movants' argument seems to be that it is at least foreseeable that customers as to whom Hertz files a police report may dispute the report and bring claims.  But the inference that a customer accused of theft may turn around and file a separate civil suit against the Debtors is not reasonable.  *Cf. Berger v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.)*, 96 F.3d 687, 689 (3d Cir. 1996) (claimants were unknown creditors until they actually asserted counterclaim in litigation with debtors).[26]  And reasonable efforts to identify creditors do not extend to claims that are merely foreseeable, conjectural, or future, as the Third Circuit has expressly rejected the 'reasonably foreseeable' analysis in identifying known creditors. *Chemetron I*, 72 F. 3d at 347.  *See also In re Placid Oil Co.*, 753 F.3d 151, 156–57 (5th Cir. 2014). A creditor might be known if a debtor has specific information regarding the creditor's actual

---

[26] Here, a customer accused of theft would have to initiate the lawsuit by initiating a separate civil suit, rather than assert a counterclaim as noted by the Third Circuit in *Trans World Airlines*.  Therefore, it is even more unreasonable to assume that every customer that is the subject of a theft report is a known creditor.

injury, but "[i]nformation, however specific, that makes a claim only reasonably foreseeable or conjectural is insufficient." *Id.*[27]

66.     Movants instead fit the definition of "unknown" creditors because their "interests are conjectural or future." *See Chemetron I*, 72 F.3d at 346 (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 317 (1950)). Indeed, in light of the data points noted above, *see supra* ¶¶ 47-48, the Debtors had no reason to assume that any of the individuals as to whom they filed police reports was a potential litigation claimant.

67.     Movants cite *In re J.A. Jones, Inc.* for the proposition that internal recordkeeping and litigation preparation activities can render persons known creditors. 492 F.3d 242, 250-52 (2007). But, as the *J.A. Jones* court noted, determining whether a creditor was known or unknown is a totality-of-the-circumstances, case-specific inquiry. *Id.* at 250. And the facts of that case are unlike any facts here. There, the court found a known creditor relationship stemming from one large, highly publicized auto accident that had resulted in two deaths, among other injuries, and which the debtor had reported as "an 'occurrence' or an offense which may result in a claim" to its liability insurer. *Id.* at 251. In response to that incident, the debtor had prepared and maintained a file hundreds of pages long. *Id.* at 251–52. Here, Movants point to no comparable, singular event, but merely assert that the Debtors should have cobbled together awareness of each Movant from knowledge of unrelated lawsuits and each Movants' passing interactions with diverse, far-flung representatives of the Debtors.

---

[27] The *Placid Oil* court noted that the Third Circuit in *Chemetron* had not had the opportunity to address when a creditor could become "known" without its claim appearing explicitly in a debtor's books and records. *Id.* at 157 n.5. The *Placid Oil* court accordingly "shed additional light on the space between mere foreseeability and books-and-records knowledge by requiring that the debtor possess information regarding a creditor's actual injury, in order for that creditor to be known." *Id.*

68.     In attempting to identify creditors, the Debtors were not obligated to sift through myriad (indeed, millions of) customer interactions to try to detect potential, conjectural, future claims. *See In re Agway, Inc.*, 313 B.R. 31, 39 (N.D.N.Y. 2004) ("[A] debtor is not charged with the knowledge of the existence of a contingent claim absent a claimant's express statement of its intent to lodge a future claim against the debtor.").  "Reasonable diligence does not require impracticable and extended searches.  The requisite search for a known creditor, instead, usually requires only a careful examination of a debtor's books and records." *W.R. Grace & Co.*, 316 F. App'x at 137 (citations omitted); *see also New Century*, 450 B.R. at 513  ("A debtor need not be omnipotent or clairvoyant, but need only do what is reasonable under the circumstances to provide notice to ascertainable creditors." (citation omitted)).  "The general rule in the Third Circuit is that a debtor is not required to look beyond its own books and records." *West Salem Storage, LLC v. Exide Techs. (In re Exide Techs.)*, 600 B.R. 753, 764 (Bankr. D. Del. 2019).  Reasonable diligence does not require a debtor to "search out each conceivable or possible creditor and urge that person or entity to make a claim against it." *Chemetron I*, 72 F.3d at 346 (citation omitted); *see also Tulsa Prof'l Collection Servs., Inc. v. Pope*, 485 U.S. 478, 490 (U.S. 1988) ("[n]or is everyone who may conceivably have a claim properly considered a creditor entitled to actual notice . . . [as] [i]t is reasonable to dispense with actual notice to those with mere 'conjectural' claims").

69.     Movants have not shown that they were known creditors by virtue of any alleged systemic issues or particular contacts, and the Debtors did not need to plumb millions of customer records to speculate on potential, conjectural claims or creditors.  Accordingly, the Court should determine, as a matter of law, that Movants and the other individuals identified in the Late Claims were unknown creditors.

B.      **The Debtors' Publication Notice Satisfied Due Process**

70.     Because Movants were unknown creditors, they were entitled to notice only by publication. *Chemetron I*, 72 F.3d at 345–46. Publishing in national newspapers is the benchmark for publication notice in countless bankruptcy cases. *See, e.g., id.* at 348–349 ("We have little difficulty holding that the notice which Chemetron published in the *New York Times* and the *Wall Street Journal* was sufficient"). Indeed, publication in national newspapers alone may suffice. *See id.* (the fact that supplemental local newspaper publication bolsters the adequacy of national publication "does not indicate that without this supplemental notice, publication in national newspaper is constitutionally inadequate" (citations omitted)); *see also Brown v. Seaman Furniture Co.*, 171 B.R. 26, 27 (E.D. Pa. 1994) (finding publication in national edition of *The New York Times* adequate). "The proper inquiry in evaluating notice is whether a party acted reasonably in selecting means likely to inform persons affected, not whether each person actually received notice." *New Century*, 465 B.R. at 48–49 (quoting *In re Charter Co.,* 113 B.R. 725, 728 (M.D. Fla.1990)).

71.     The Debtors provided robust publication notice sufficient to satisfy due process. The Bar Date Order required that the Debtors publish notice in "*USA Today, The Wall Street Journal, The New York Times*, and *The Globe and Mail* and (ii) local newspapers, trade journals or similar publications, if any, as the Debtors deem appropriate." Bar Date Order ¶ 22. The Debtors went beyond the minimum requirements of the Bar Date Order and caused the Publication Notice to be published in the national editions of *USA Today*, *The Wall Street Journal*, *The New York Times*, and *The Globe and Mail*, as well as regional publications across North America and providing publication notice where appropriate in French and Spanish. *See* Main D.I. 1396, 1572. This "above and beyond" publication notice satisfies constitutional due process requirements. *See Chemetron I*, 72 F.3d at 345, 348–349 (noting that the debtors had "voluntarily

35

published notice in seven other newspapers in areas where they were doing business at the time of the [bankruptcy] filing," and rejecting argument that the debtor should have *also* published notice in a Cleveland-area newspaper, despite the potential for claims arising from activities related to the debtor at Cleveland sites); *In re Wash. Mut., Inc.*, 2018 WL 3736515, at \*4 (D. Del. Aug. 6, 2018) (affirming bankruptcy court's determination that the debtors provided claimant notice by complying with bar date order and publishing notice in four newspapers).

72.     Movants cite certain mass tort bankruptcies, with unique and extensive noticing plans, as supposed points of comparison to suggest that the Debtors could have, or should have, done more.  *See* Motion for Leave ¶¶ 81–82, 86.  But the Debtors' cases are unlike the unique cases that Movants cite.  In each of those cases, the asbestos exposure or sexual abuse claims were major drivers—if not the primary driver—of the debtors' chapter 11 filings.  *See In re Energy Future Holdings Corp.*, 949 F.3d 806, 813–15 (3d Cir. 2020) ("***EFH***") (describing liabilities arising from prepetition exposure of debtor's predecessor's employees to "slow-acting but life-threatening carcinogens", and describing how paying these asbestos claims became a goal of the chapter 11 process); *In re Boy Scouts of America and Delaware BSA, LLC*, Case No. 20-10343 (LSS), *Declaration of Brian Whittman in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings*, D.I. 16, ¶¶ 8, 10 (Bankr. D. Del. Feb. 18, 2020) ("The number of abuse claims asserted against the BSA has sharply increased in recent years, an increase which I understand to coincide with a trend of states' enacting legislation to allow victims of sexual abuse to assert claims that would previously have been barred by applicable statutes of limitations.  The recent increase in the number of abuse claims filed against the BSA has placed tremendous financial pressure on the organization. . . . The Debtors' dual objectives in these chapter 11 cases are (a) timely and equitably compensating victims of abuse in Scouting and (b) ensuring that the Debtors emerge

from bankruptcy with the capability to continue carrying out its charitable mission."); *In re Catholic Diocese of Wilmington, Inc.*, Case No. 09-13560 (CSS), *Declaration of the Reverend Monsignor J. Thomas Cini in Support of Chapter 11 Petition and First-Day Relief*, D.I. 9, ¶¶ 64–89 (Bankr. D. Del. Oct. 19, 2009) (describing sexual abuse claims litigation leading up to bankruptcy filing, and noting obligation to "compensate all victims of clergy sexual abuse fairly" among the purposes and goals of the bankruptcy filing).

73.    The impetus for the Debtors' chapter 11 filing, on the other hand, arose primarily due to the COVID-19 pandemic. *See, e.g.*, Main D.I. 28, *Declaration of Jamere Jackson in Support of Debtors' Petitions and Requests for First Day Relief*, ¶ 5 ("The overall impact of the COVID-19 crisis devastated our revenue. In April 2020—the first full month after the COVID-19 crisis took hold in the U.S.—the Company's global revenue was down 73% from what it was in April of 2019.") (adopted and incorporated by reference in the *Declaration of Kenny Cheung in Further Support of Debtors' Chapter 11 Cases*, Main D.I. 1516); *id.* ¶¶ 76-85 (describing impacts of dramatically reduced travel rates and used vehicle values), 95-96 (describing business restructuring goals of chapter 11 filing).  The extensive noticing programs used in the *EFH*, *Boy Scouts*, or *Catholic Diocese* cases, where the existence and number of tort claimants was a driving consideration behind the chapter 11 cases, are not useful comparison points for the Debtors' cases, which were the result of an unexpected global pandemic's effect on the Debtors' business.

74.    Next, Movants argue that, even if the False Police Report Claimants were not known creditors, the content of the Publication Notice itself was somehow fundamentally insufficient to satisfy due process. *See* Motion for Leave ¶ 80, 87.[28]  The Debtors were not required

---

[28] Movants cite to the Third Circuit's decision in *Sweeney v. Alcon Labs*. *See* Motion for Leave ¶ 87.  Aside from the fact that this decision is non-precedential and non-binding, the Third Circuit specifically declined

to identify, describe, or announce each and every potential claim, or categories of claims, that each and every claimant might potentially hold. *See Dahlin v. Lyondell Chemical Co.*, 881 F.3d 599, 605 (8th Cir. 2018) ("The notice did not need to mention benzene claims or [a specific] facility in order to satisfy due process." (citation omitted)).

75.     Movants also argue that the Publication Notice needed to strictly comply with each provision of Bankruptcy Code section 342(c) or Bankruptcy Rule 1005 to be effective. *See* Motion for Leave ¶¶ 95–99. But this Court expressly approved the form of Publication Notice in the Bar Date Order and also the case caption that was used in the Publication Notice *via* its joint administration order. Main D.I. 182 ¶¶ 2-4 ("The foregoing caption and footnote satisfy the requirements set forth in section 342(c)(1) of the Bankruptcy Code."); Bar Date Order ¶ 22 ("The Publication Notice is hereby approved in all respects and shall be deemed good, adequate, and sufficient notice of the General Bar Date and the Governmental Bar Date by publication."). Moreover, the Publication Notice directed parties to the Debtors' Case Management Website for the full listing of each Debtor and their respective tax identification numbers. *See* Publication Notice at n.1 ("Due to the large number of debtors in these chapter 11 cases [. . .] a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at https://restructuring.primeclerk.com/hertz."). Movants' argument based on these technicalities should be rejected.[29]

---

to render any decision as to whether a debtor might need to announce the nature of unknown claimants' claims. *See Sweeney v. Alcon Labs.*, 856 F. App'x 371, 375 (3d Cir. 2021).

[29]  Movants cite *Ellett v. Stanislaus*, 506 F.3d 774, 781 (9th Cir. 2007). But *Ellett* was an individual's bankruptcy case where the technical non-compliance made a material difference to creditors. The debtor, Mr. Ellett, provided an incorrect social security number on his bankruptcy petition and § 341(a) notice of case commencement. *Id.* at 775. The resource-constrained California Franchise Tax Board ("**FTB**") relied on social security numbers to match bankruptcy notices to taxpayer accounts, and so when it received Mr. Ellett's § 341(a) notice, it apparently failed to accurately link Mr. Ellett with the bankruptcy filing. *Id.* at

76.     Movants' arguments against the adequacy of the Publication Notice are belied by their counsel's own conduct.  Certain of the law firms representing the False Police Report Claimants have been actively involved in the Debtors' bankruptcy since the early days of the Chapter 11 Cases, filing a stay relief motion on behalf of False Police Report Plaintiffs Group No. 1 barely one month after the Petition Date.  Main D.I. 589.  Despite stating in that stay relief motion that there may be "hundreds if not thousands" of additional false arrest claimants, *id.* ¶ 5, and filing a purported class proof of claim on behalf of an alleged "unknown class," the False Police Report Claimants did not object to the Bar Date Motion when it was filed, or contact the Debtors to suggest changes to the content of the Publication Notice.  *See* Main D.I. 1230 (listing responses to the Bar Date Motion).

77.     Unlike other parties, the False Police Report Claimants did not even file a reservation of rights regarding the Bar Date Motion.[30]  Despite appearing at the hearing on the Bar Date Motion, the False Police Report Claimants' counsel did not address any issues or concerns regarding the Debtors' bar date process or Publication Notice, instead they pressed objections to unrelated motions.  *See* Sept. 9, 2020 Tr. at 31:5–18; 46:5–47:1.  Analyzing and responding to the Debtors' Publication Notice was plainly within the capacity of the False Police Report Claimants' counsel at the time the Bar Date Motion was under consideration by this Court.  If counsel to the

---

775-76.  The FTB did not file a timely claim against Mr. Ellett or participate in the bankruptcy proceedings. *Id.*  Considering Mr. Ellett's subsequent adversary proceeding to determine the dischargeability of his FTB debt, the *Ellett* court found that Mr. Ellett had not provided proper notice to the FTB and therefore the taxes he owed the FTB were not dischargeable.  *Id.* at 781.

[30]  By comparison, the Ad Hoc Group of Litigation Creditors filed a reservation of rights, noting their concerns that certain members of their class(es) might not receive notice or recognize the opportunity to file individual proofs of claim, and stating that, among other things, certain lead plaintiffs would file class proofs of claim by the applicable bar date(s).  Main D.I. 1189.

False Police Report Claimants believed that the content of the Publication Notice was technically deficient, the proper time to raise such a concern was in connection with the Bar Date Motion.

78.     Movants also assert that the Debtors' failure to affirmatively announce the Chapter 11 Cases to certain individuals who interacted with disparate business units of the Debtors provides a basis to find publication notice inadequate, as if the Debtors were somehow actively concealing the fact of the Chapter 11 Cases to prevent creditors from filing claims.  Motion for Leave ¶ 90.  Movants cite *Tillman ex rel. Estate of Tillman v. Camelot Music, Inc.*, 408 F.3d 1300, 1308 (10th Cir. 2005).  But *Tillman* was a case in which the debtor had, for years pre-petition, concealed facts that potentially established claims against it, by not telling its employees that it had purchased life insurance policies on them.  *See id.* at 1302.  *Tillman*, like *Motors Liquidation* and *Geo Specialty*, stands for the proposition that debtors cannot use publication notice to shed liability for acts or omissions that they have hidden from the world.  *Id.* at 1308 ("When a party conceals the necessary facts upon which a claim is to be made, that party cannot benefit from publication by notice.").  Here, Movants cite to two sets of interactions that occurred after the General Bar Date, in which representatives of the Debtors allegedly failed to mention their then-pending Chapter 11 Cases.  *See* Motion for Leave ¶¶ 90–91.  But such conduct did not serve to conceal any facts underpinning alleged claims against the Debtors.  And in any event, as noted below, each Movant (other than Ms. Oneal and Mr. Sundseth) knew or should have known of their alleged claims before the Petition Date.  *See infra.* ¶ 83.  Accordingly, the alleged failure of any of Debtors' representatives to advise any Movant (or, for that matter, every other customer, vendor, contract counterparty, *etc.* that contacted a Debtor in the ordinary course) of the Chapter 11 Cases' existence, after the General Bar Date had already passed, has no bearing on the constitutional sufficiency of the Debtors' notice provided to unknown creditors by publication.

40

### III.    Movants Have Failed to Show Excusable Neglect

79.    As set forth above, Movants were unknown creditors at all relevant times, and the

Debtors' publication notice of the General Bar Date was constitutionally sufficient.  Therefore,

Movants "must show that their failure to file in a timely manner was due to 'excusable neglect;'

otherwise, their claims arising pre-petition will be barred." *Chemetron I*, 72 F.3d at 349.  The four

factors to be considered for "excusable neglect" are:  (1) the danger of prejudice to the debtor,

(2) the length of the delay and its potential impact on judicial proceedings, (3) the reason for the

delay, including whether it was within the reasonable control of the movant, and (4) whether the

movant acted in good faith.  *See Pioneer Inv. Servs. v. Brunswick Assocs. Ltd. P'ship*,

507 U.S. 380, 395 (1993).

80.    "[T]he burden of proof is on the late claimant to demonstrate excusable neglect by

a preponderance of the evidence." *In re Hayes Lemmerz Int'l, Inc. v. Emmons (In re Hayes

Lemmerz Int'l, Inc.)*, 2012 WL 1203731, *3 (D. Del. Apr. 9, 2012) (citing *Jones v. Chemetron

Corp.*, 212 F.3d 199, 205 (3d Cir. 2000) ("***Chemetron II***")).  "[C]ourts take a 'hard line' when

applying the *Pioneer* test." *In re Nortel Networks, Inc.*, 573 B.R. 522, 527 (Bankr. D. Del. 2017).

This is because a bar date is akin to a statute of limitations and must be strictly construed.  *See

Trans World Airlines*, 96 F.3d at 690 (noting that bar date means "a 'drop-dead date' that bars all

prepetition claimants who received the required notice").

### A. Movants Have Not Stated a Valid Basis for Waiting Until the Confirmation Date—Eight Months after the General Bar Date—to File Their Claims

81.    In applying the *Pioneer* factors, courts in the Third Circuit have focused on the third

factor—the reason for delay—in analyzing whether excusable neglect exists.  *See Hefta v. Official

Comm. of Unsecured Creditors (In re Am. Classic Voyages Co.)*, 405 F.3d 127, 133–34 (3d Cir.

2005) (relying "primarily on the third Pioneer factor . . . [because] the delay in this case was

entirely avoidable and within [the movant's] control"); *In re Woskob*, 96 F. App'x 794 (3d Cir.

2004) (affirming orders of district court and bankruptcy court that there was no excusable neglect

where movant satisfied all *Pioneer* factors except for the reason for the delay with respect to

motion for extension of time to file appeal); *Dep't of Treasury IRS v. Seivers (In re Seivers)*, 378

B.R. 473, 481 (Bankr. W.D. Pa. 2007) ("Not all factors are weighted equally.  A crucial factor is

the reason for the delay, including whether it was within the reasonable control of the Movant."

(citations omitted)).

82.     Here, Movants have failed to demonstrate excusable neglect.  Movants filed the

Late Claims almost eight months after the General Bar Date.  Courts have held that delays much

shorter than this weigh against finding excusable neglect.  *See, e.g., In re Smidth & Co.*, 413 B.R.

161, 164, 167 (Bankr. D. Del. 2009) (among other reasons, filing of late claim five weeks post-

discovery and six weeks after the bar date is too lengthy of a delay to justify relief); *In re Majestic*

*Holdco, LLC*, 2013 WL 653091, *3 (Bankr. D. Del. Feb. 21, 2013) ("Adding insult to injury,

Entergy did not file the Motions to Enlarge until five months had passed from discovering the

meter malfunction.  What is especially egregious is that Entergy took more time from discovery

to filing[,] five months[,] [than the] 45 and 60 day[] . . . bar dates the Court set for pre-petition and

administrative claims, respectively."); *In re Nortel Networks, Inc.*, 531 B.R. 53, 66 (Bankr. D. Del.

2015) ("Further, by their own admission, the Canadian Employees waited approximately six

months to file the Motion after 'discovering' their potential claims against the U.S. Debtors.  The

six month delay in and of itself constitutes inexcusable neglect."); *In re Goody's Family Clothing,*

*Inc.*, 443 B.R. 5, 16 (Bankr. D. Del. 2010) ("Thus, the true length of the delay was roughly 5

months. Courts have held that comparable delays weigh against the movant.").  The length of

Movants' delay "must be examined in 'absolute terms' or in an 'absolute sense,' meaning that the

extent of the delay should be considered in isolation." *See In re Energy Future Holdings Corp.*, 619 B.R. 99, 108 (Bankr. D. Del. 2020) (quoting *Ragguette v. Premier Wines & Spirits*, 691 F.3d 315, 322 (3d Cir. 2012)).

83.     As an initial matter, unlike in other cases where a claimant may be uncertain as to the identity of the corporate entity against which he or she has a claim, there can be no dispute that each of Movants knew that, to the extent he or she had a claim, that claim was against Hertz, Dollar, Firefly, or Thrifty.   Moreover, assuming, *arguendo*, the facts alleged in Movants' declarations are true, all of the Movants—other than Ms. Oneal and Mr. Sundseth, *see supra* p. 12 n. 13—knew or should have known of their alleged claims prior to the May 22, 2020 Petition Date and, in some cases, many years before then.

a.   **Moneck Wallace.**   According to her declaration, Ms. Wallace discovered her potential claim as early as March 2011 when she allegedly received communications from Hertz that she had failed to return the vehicle, and as late as 2015 when she allegedly received written notice that a warrant was issued for her arrest.   Additionally, since Ms. Wallace's claims accrued in 2011, they are likely time-barred.

b.   **Paula Murray.**   According to her declaration, Ms. Murray discovered her potential claim as early as November 2016 when she allegedly received a communication from Hertz that the company would be working with law enforcement to issue a warrant for her arrest, and as late as January 2021 when she allegedly was arrested. Additionally, since Ms. Murray's claims arose more than three years before the Petition Date, they are likely time-barred.

c.   **Raelena Lewis.**   According to her declaration, Ms. Murray discovered her potential claim as early as February 2020 when she allegedly was overcharged for her rental, and as late as March 2020 when she allegedly was arrested.

d.   **Sean Hurt.**   According to his declaration, Mr. Hurt discovered his potential claim as early as March 2020 when he allegedly was overcharged for his rental and when a warrant allegedly was issued for his arrest, and as late as November 2020 when he was allegedly arrested.[31]

---

[31]   As noted in footnote 33 below, a different declaration from Mr. Hurt states that he was arrested in February 2021.

e. **Zanders Pace.**  According to his declaration, Mr. Pace discovered his potential claim as early as July 2019 when he allegedly was overcharged for his rental, and as late as September 2019 when (a) the vehicle allegedly was reported stolen and a warrant was issued for his arrest, and (b) he allegedly accused Hertz of making false statements to police.

f. **Britne McClinton.**  According to her declaration, Ms. McClinton discovered her potential claim in September 2018 when she allegedly received communications from Hertz that she had failed to return the vehicle, allegedly was accused of vehicle theft, and allegedly had $100 credit holds placed on her account.

g. **Charles Lee Bort and Kwai Yee Chan.**  According to their joint declaration, Mr. Bort and Ms. Chan discovered their potential claims as early as March 2020 when they allegedly were overcharged, April 2020 when they allegedly were informed the vehicle's registration expired, and as late as April 18, 2020 when they allegedly were arrested.

h. **Heather Kasdan.**  According to her declaration, Ms. Kasdan discovered her potential claim as early as July 2019 when she allegedly was overcharged, August 2019 when she allegedly was accused of vehicle theft, September 2019 when she allegedly was overcharged again, October 7, 2019 when Hertz allegedly submitted a police report, and as late as November 2020 when she allegedly discovered the existence of the police report.[32]

i. **Holly Harris.**  According to her declaration, Ms. Harris discovered her potential claim as early as January 2019 when Hertz allegedly submitted a police report for vehicle theft, February 2019 when criminal charges allegedly were filed, May 2019 when she allegedly was arrested, and as late as August 2019 when she allegedly accepted a plea bargain.

j. **Jason Cook.**  According to his declaration, Mr. Cook discovered his potential claim in April 2017 when he allegedly was arrested.  Additionally, since Mr. Cook's claims arose more than three years before the Petition Date, they are likely time-barred.

k. **Jessica Malone.**  According to her declaration, Ms. Malone discovered her potential claim in April 2017 when she allegedly was arrested.  Additionally, since Ms. Malone's claims arose more than three years before the Petition Date, they are likely time-barred.

l. **Kimberli Costabile.**  According to her declaration, Ms. Costabile discovered her potential claim as early as February 2020 when she allegedly received communications accusing her of vehicle theft, and as late as March 2020 when she

---

[32] Supplement #1 to the October 7, 2019 police report attached to Ms. Kasdan's declaration contains an additional entry, dated November 29, 2019, suggesting that the relevant law enforcement agency closed the incident report in 2019 upon learning the vehicle had been recovered.

allegedly received communications from Hertz that the vehicle would be reported stolen to law enforcement.

m. **Lateshia Jenkins.**  According to her declaration, Ms. Jenkins discovered her potential claim as early as 2006 when she was allegedly informed that a warrant was issued for her arrest.  Additionally, since Ms. Jenkins' claims accrued in 2006, they are likely time-barred.

n. **Marissa White.**  According to her declaration, Ms. White discovered her potential claim as early as March 27, 2019 when she was arrested.

o. **Siobhan Abrams.**  According to her declaration, Ms. Abrams discovered her potential claim as early as June 2017 when she allegedly encountered billing errors with her rental, July 2017 when Hertz allegedly reported one or more vehicles as stolen, March 2019 when Hertz allegedly submitted a police report for theft of a different vehicle, and as late as July 2019 when she was allegedly arrested.

84.    Movants assert that the Debtors were on notice of their claims because class proofs of claim were filed by the General Bar Date on behalf of an unknown class of False Police Report Claimants, which Movants would necessarily be a part of.  *See* Motion for Leave ¶ 101.  In support of this argument, Movants cite to this Court's decision in *In re Kaiser Grp. Int'l, Inc*., 278 B.R. 58 (Bankr. D. Del. 2002).   In that decision, this Court considered whether to certify a class of shareholders, and the debtors argued that the Court should not "give class members an opportunity to participate in the class if they did not file proofs of claim before the bar date" because it would "give[] class members an extension of the time within which to file a claim." *Id.* at 63 (internal citation omitted).  The Court held that "[t]he Debtors are not prejudiced by this, since the Debtors had notice of the existence of the class claim before the bar date" and added that, "[i]f the class is certified, then the claims of all the members of the class are incorporated in the proof of claim that was timely filed." *Id.* at 63-64.

85.    But those facts are not present in these cases, and the legal principles and standards considered when certifying a class in a bankruptcy case are different from the legal principles and standards applicable to the Motion for Leave.  Movants are trying to have it both ways:  they filed

purported class proofs of claim on behalf of unknown claimants by the General Bar Date to insulate themselves against a later inexcusable neglect argument from the Debtors, and then they amended those class proofs of claim to identify actual claimants to protect against the risk that the Court might not certify a class.  Indeed, paragraph 3 of the addendum attached to each of the "Group 3" claimants' June 10, 2021 group proofs of claim notes that "[i]n addition, they filed claims for the Class Claimants, to allow other similarly situated claimants who did not receive notice of the bankruptcy to bring claims against the Debtors.  The False Police Report Claimants No. 3 received no notice of the bankruptcy from Debtors and now bring their claims as part of the Class as the group Claimants No. 3."

86.    Moreover, the Late Claims do not relate back to the purported class proofs of claim because the Late Claims identified new claimants not originally included in the purported class proofs of claim.  *See Nortel Networks*, 573 B.R. at 528 (denying motion to amend claim to add additional claimant and stating "Rule 15 does not apply to adding a party" (citing *Gardner v. State Farm Fire & Cas. Co.*, 544 F.3d 553, 562 (3d Cir. 2008))); *Exide Techs*., 601 B.R. at 293 ("A creditor may not use the claims amendment process to circumvent the claims bar date.").

87.    Movants' counsel knew that Bankruptcy Rule 9006(b) relief was required in order to deem their claims timely filed.  First, Article VII.G of the Plan required Movants to obtain an order from the Court extending the General Bar Date, and Movants' counsel appeared at the Confirmation Hearing, *see* Motion for Leave ¶ 101, knowing that the claims would be filed that same day.  Additionally, the Reorganized Debtors repeatedly have pointed out that Movants needed to utilize the procedures under Bankruptcy Rules 9006(b) and 3003(c)(3) to have their claims deemed timely.  *See* Aug. 18, 2021 Tr. at 20:4–14; 23:14–23 (Reorganized Debtors' counsel describing definition of "Allowed" under the Plan and timeliness issues related to Movants'

claims); Non-Substantive Objection ¶ 32.  Rather than promptly seeking relief from the General Bar Date, Movants instead elected to collaterally attack the Bar Date Order and Confirmation Order by filing the Plan Injunction Motion.

88.    As another example of Movants' strategic delay, the declaration attached to Mr. Hurt's proof of claim #15653 is dated May 19, 2021, but the version of Mr. Hurt's declaration that is attached to the Motion for Leave is dated December 1, 2021.  Accordingly, it appears as if Movants' counsel obtained an executed declaration from Mr. Hurt on or about May 19, 2021—twenty-two days before the date Movants filed the Late Claims—but it was re-dated for December 1, 2021 after the Court directed Movants to submit declarations to their amended claims.[33]  Movants did not submit declarations until this Court directed them to do so because many of their claims "d[id] not comply or provide any evidence."  Nov. 4, 2021 Tr. at 30:6.  Yet it appears that at least Mr. Hurt was able to submit his declaration as early as May 19, 2021.[34]

---

[33] The group proofs of claim that were filed on June 10, 2021 did not include Mr. Hurt's, nor any other Movant's, declaration.  The Reorganized Debtors reserve all rights to seek appropriate discovery relating to whether any of the other Movants similarly executed declarations prior to the filing of the June 10, 2021 group proofs of claim but chose not to file them for strategic reasons.  The Hurt declarations also differ in material respects.  For example, the declaration attached to proof of claim #15653 states that, in November 2020, Mr. Hurt was arrested in connection with an alleged theft report issued in March 2020, but the declaration attached to the Motion for Leave states that Mr. Hurt was arrested in February 2021.  Similarly, the Motion for Leave states that Mr. Hurt was arrested in November 2020. *See* Motion for Leave ¶ 22.

[34] The Reorganized Debtors note that, in the Scheduling Order Extension Motion, in which certain group 3 claimants (Janette Brown, Tyresha Caudle, and Wanda Nelson) seek an extension of their deadline to submit declarations in support of their amended claims, the movants state that these three claimants "who likely have adequate justification for their inability to be reached *more than a year after the filing of their original group Claims*—will be prejudiced by denial of the Motion if the Court later finds the supporting declarations are necessary for the claims to survive the Objections."  Scheduling Order Extension Motion ¶ 3 (emphasis added).  Then, at paragraph 20 of that same motion, they state the following:  "the Movants filed the group Claims at issue more than one year ago, on June 10, 2021.  It is not surprising that three (of twenty-nine total) "Group 3" False Police Report Claimants cannot be immediately reached nearly a year later, during the one-month period following the November 4 Hearing, notwithstanding counsel's outreach efforts."  *Id*. ¶ 20.  As noted herein, they also state in the Motion for Leave that the Reorganized Debtors should have been on notice of Movants' Late Claims because of purported class proofs of claims that were filed by the bar date. *See* Motion for Leave ¶ 101.  Accordingly, it is not clear whether Movants' counsel knew of Janette Brown's, Tyresha Caudle's, and Wanda Nelson's claims, or were retained by them, at the time the purported class proofs of claim were filed.  The Reorganized Debtors presume that Movants'

47

89.     To the extent that this delay was a tactical decision by Movants' counsel, it must be imputed to Movants. *Pioneer*, 507 U.S. at 397 ("[I]n determining whether respondents' failure to file their proofs of claim prior to the bar date was excusable, the proper focus is upon whether the neglect of respondents *and their counsel* was excusable." (emphasis in original)); *Am. Classic Voyages*, 405 F.3d at 134 (under *Pioneer*, imputing the actions of counsel to a late filing creditor and concluding "that the delay in this case was entirely avoidable and within [the creditor's] control"). A "conscious, deliberate decision" not to file a proof of claim bars a finding of excusable neglect. *See Nortel Networks*, 573 B.R. at 528 ("SNMP made a conscious, deliberate decision that they would not name SNMPR as a claimant. The decision 'was within the reasonable control of the movant.' Then, waiting seven years to seek to add SNMPR by amendment is very much inexcusable." (citing *Pioneer*, 507 U.S. at 395)).[35]

90.     Movants' only statements in the declarations supporting excusable neglect is that each claimant "did not know about" or "had no notice of any bar date or bankruptcy plan," and that each claimant "does not regularly read *USA Today*, *The Wall Street Journal*, *The New York Times*, *The Globe and Mail*, *The Philadelphia Inquirer*, *San Francisco Chronicle*, *Arizona Republic*, *Chicago Tribune*, *Los Angeles Times*, *The San Diego Union Tribune*, *Naples Daily News*, *El Diario De El Paso*, or *Journal De Montreal*." Nevertheless, Movants were at all relevant times unknown claimants entitled only to constructive—not actual—notice of the General Bar Date. *See*

counsel miscalculated or misapprehended the relevant timeline and simply erred in making the statements in the Scheduling Order Extension Motion. That said, the Reorganized Debtors reserve all rights with respect thereto, particularly because of the concerns the Reorganized Debtors have regarding Mr. Hurt's declarations.

[35] The statement in counsel's declaration that "[a]ll of the Claimants in False Police Report Claimants No. 3, including those bringing this motion, retained my firm after the General Bar Date," Malofiy Decl. ¶ 37, is irrelevant to whether the claimants themselves discovered their alleged claims against the Debtors. Nor does this statement identify when each Movant retained counsel.

*supra* ¶¶ 50-69.  That they might not regularly read the periodicals in which the Debtors published notice of the General Bar Date does not mean that constructive notice was inadequate or insufficient.

91.     Indeed, "[t]he proper inquiry in evaluating notice is whether a party acted reasonably in selecting means likely to inform persons affected, not whether each person actually received notice." *Energy Future Holdings Corp.*, 619 B.R. at 108 (internal citations omitted). Moreover, "unknown creditors entitled to only publication notice cannot blame their ignorance on the fact that they did not receive actual notice . . . ." *PacifiCorp v. W.R. Grace (In re W.R. Grace & Co.)*, 2006 WL 2375371, at *14 (D. Del. 2006) ("[B]ecause Appellants did 'not read the legal section of the newspaper and did not read the legal section of the newspaper that published the bar date order in this case is not controlling.'" (quoting *In re Trump Taj Mahal Assocs.*, 156 B.R. at 940)); *see also Chemetron II*, 212 F.3d at 204 ("[I]gnorance of one's own claim does not constitute excusable neglect." (quoting *In re Best Prods. Co., Inc.*, 140 B.R. at 353, 359 (Bankr. S.D.N.Y.)). As set forth above, constructive notice of the General Bar Date was constitutionally sufficient with respect to Movants.  *See supra* ¶¶ 70-71.

92.     Movants contend that "[e]ven if the Court concludes that publication notice was adequate . . . each of the Claimants was not aware of the General Bar Date or the need to file a claim until the bar date had elapsed." *See* Motion for Leave ¶ 102.  Taken to its logical conclusion, Movants' position would turn the constructive notice standard on its head:  indeed, every debtor would need to publish notice of bar dates in virtually every print and online periodical each day until the expiration of the bar date to ensure readership—in effect, provide actual notice to unknown creditors.  And even then, this absurd notice standard still would not be satisfied unless the creditor *actually reads* the published notice.

93.    This is not the law.  The Third Circuit has held that publication in national newspapers provides sufficient notice to unknown creditors "especially where supplemented . . . with notice in papers of general circulation in locations where the debtor is conducting business." *Chemetron I*, 72 F.3d at 349.  Consistent with this principle, the Debtors published notice of the General Bar Date in four national and nine regional newspapers.  *See supra* ¶¶ 14, 71.  This notice was sufficient and satisfied due process.  As the Third Circuit has noted, "the equities will rarely if ever favor a party who 'fails to follow the clear dictates of a court rule' and . . . where the rule is entirely clear . . . a party claiming excusable neglect will, in the ordinary course, lose under the *Pioneer* test."  *Gruber v. Kaplan (In re Kaplan)*, 482 F. App'x 704, 707 (3d Cir. 2012) (applying *Pioneer* factors to motion to extend time to appeal) (quoting *Silivanch v. Celebrity Cruises, Inc.*, 333 F.3d 355, 366-67 (2d Cir. 2003) (internal quotations omitted).  Therefore, publication notice of the General Bar Date was constitutionally adequate with respect to Movants.

94.    Next, Movants attack the propriety of publication notice generally and cite to the Supreme Court's decision in *City of New York v. New York, N.H. & H.R. Co.*, 344 U.S. 293 (1953) for the proposition that publication is rarely if ever useful.[36]  In that decision, however, the Supreme Court acknowledged that "when the names, interests and addresses of persons are unknown, plain necessity may cause a resort to publication." *Id.* at 296.  Furthermore, that decision turned on whether the City of New York was a known or unknown creditor.  *See id.*  Indeed, the Supreme Court concluded that the City of New York was a "'creditor' in the statutory sense" under

---

[36] Movants also cite to *In re Orthopedic Bone Screw Products Liability Litigation* for this proposition.  The Third Circuit in that case, however, expressly "d[id] not at this time opine as to the constitutional sufficiency of the notice provided under [Fed. R. Civ. P.] 23 and [*Mullane*] . . . ." *In re Orthopedic Bone Screw Prods. Liability Litig.*, 246 F.3d 315, 326–27 (3d Cir. 2001).

section 77(b) of the Bankruptcy Act.  *Id.* at 295–96.  And because section 77(c)(4) of the Bankruptcy Act was "designed to enable the court to serve personal notices on creditors," the Supreme Court held that there was "reason to mail notice to the non-appearing *known* creditor New York City" due in part to the priority of the city's liens.  *Id*. at 296 (emphasis added).

### B.   Allowing the Late Claims Will Prejudice the Reorganized Debtors

95.    Finally, to deem the Late Claim timely filed under these circumstances would be extremely prejudicial to the Reorganized Debtors.  As the Court is aware, the Debtors' formulation and negotiation of the Plan was the culmination of a competitive process between two plan sponsor groups that began in November 2020 after the General Bar Date passed.  Between March 1, 2021 (when the Debtors filed their initial plan and disclosure statement) and June 10, 2021 (when the Court confirmed the Plan), 11 versions of the plan were filed [Main D.I. 2912, 3500, 3598, 3782, 3897, 3954, 4077, 4129, 4667, 4754, 5178], two disclosure statement hearings were held (April 16, 2021 and April 21, 2021), bidding and auction procedures were approved related to the submission of alternative plan sponsor proposals [Main D.I. 4310], and a 32-hour, non-stop plan sponsor auction process was conducted.  Initially, recoveries to holders of allowed general unsecured claims were estimated to be approximately 70% and paid from a finite cash reserve. *See* Main D.I. 2913 at 9.  Following the plan sponsor auction process, the Court ultimately confirmed the Plan, which leaves all holders of Allowed (as defined in the Plan) claims unimpaired and provided a significant recovery to holders of Allowed Existing Hertz Parent Interests (as defined in the Plan).

96.    The Debtors and plan sponsors reasonably relied upon the universe of claims against them as defined by the General Bar Date in connection with formulating and confirming the Plan.  *See In re Energy Future Holdings Corp.*, 522 B.R. 520, 527 (Bankr. D. Del. 2015) (noting that "the setting of a bar date" assists in "achieving" "[t]he objectives of finality and fixing

51

the universe of claims") (quotation omitted); *see also Am. Classic Voyages*, 405 F.3d at 133 ("A policy that would allow proofs of claim . . . two days *after* Debtors filed their [plan] . . . would have disrupted Debtors' reorganization." (emphasis in original)).  Movants seem to assume that, because the Plan contemplates a 100% distribution on account of Allowed claims, the Reorganized Debtors hold a limitless amount of cash such that "there are plenty of resources available to pay these claims."  Motion for Leave ¶ 101.

97.     To the contrary, distributions on account of Allowed general unsecured claims are paid from the Reorganized Debtors' general funds, and not from the previously proposed finite general unsecured claim recovery pool.  Payment from the Reorganized Debtors' general funds, rather than from a specific cash reserve, has a far greater prejudicial impact on the Reorganized Debtors.  *See In re Penn. Truck Lines, Inc.*, 189 B.R. 331, 336 (Bankr. E.D. Pa. 1995) ("Should profits be thereby so depleted as to preclude the Debtor from remaining in operation and the Plan from being carried out, all of the unsecured creditors which timely filed claims in this bankruptcy case would be directly and significantly adversely affected.").

98.     Informed by the General Bar Date, the Debtors estimated Class 7 (General Unsecured Creditors) to contain Allowed claims in the approximate amount of $547 million.  *See* Main D.I. 4759 at 11.  Movants seek to increase the size of that pool by approximately $58 million—over 10%—and potentially much more, given that the group proof of claim filed on behalf of Movants asserts "punitive damages at a multiple of 2 to 9" (allegedly totaling over $1 billion for all False Police Report Claimants).  *See, e.g.*, Claim No. 15245; *see also* Main D.I. 5656-1.  This is not, as Movants suggest, "a very small portion of the total value of this bankruptcy."  *See* Motion for Leave ¶ 101.

99.     Therefore, deeming the Late Claims timely at this stage, after the Debtors and other stakeholders spent the better part of a year formulating a Plan that relied on the universe of claims established by the General Bar Date, would result in actual and substantial prejudice to the Reorganized Debtors.  Furthermore, granting the Motion for Leave would open the floodgates to other late-filed claims, including further purported false police report claims that counsel is actively recruiting through media and other means (including possibly discovery sought in this matter), thereby substantially interfering with the administration of the Debtors' estates, thereby substantially interfering with the administration of the Debtors' estates.  *See New Century*, 465 B.R. at 51 (recognizing the "allowance of late-filed claims in this case unquestionably will open a floodgate to similar claims" and using such consideration in determining prejudice under *Pioneer*).

100.     Indeed, a review of the recent filings on the docket of these chapter 11 cases shows that the floodgates are already opening.  On September 27, 2021, James Tolen filed a motion for allowance of an administrative expense claim after the August 6, 2021 Administrative Claims Bar Date.  *See* Main D.I. 5932.  Then, on December 6, 2021, the False Police Report Claimants filed a motion for relief from the Plan injunction on behalf of twenty-six other such claimants, now including Mr. Tolen.  *See* D.I. 193.

101.     Therefore, Movants have failed to meet their burden to establish excusable neglect.

## CONCLUSION

WHEREFORE the Reorganized Debtor respectfully requests that the Court deny the Motion for Leave and disallow the Late Claims, including the Contested Claims, and grant such other and further relief as it deems just and proper.

*[Remainder of Page Left Intentionally Blank]*

Dated:  December 20, 2021

*/s/ Robert J. Stearn, Jr.*

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Robert J. Stearn, Jr. (No. 2915)
John H. Knight (No. 3848)
Brett M. Haywood (No. 6166)
Christopher M. De Lillo (No. 6355)
J. Zachary Noble (No. 6689)
One Rodney Square
920 N. King Street
Wilmington, DE 19801
Telephone:    (302) 651-7700
Facsimile:    (302) 651-7701
Collins@rlf.com
Stearn@rlf.com
Knight@rlf.com
Haywood@rlf.com
DeLillo@rlf.com
Noble@rlf.com

—and—

**WHITE & CASE LLP**
Thomas E Lauria (admitted *pro hac vice*)
Matthew C. Brown (admitted *pro hac vice*)
Cecilia Walker (admitted *pro hac vice*)
200 South Biscayne Boulevard, Suite 4900
Miami, FL 33131
Telephone:    (305) 371-2700
tlauria@whitecase.com
mbrown@whitecase.com
cecilia.walker@whitecase.com

J. Christopher Shore (admitted *pro hac vice*)
David M. Turetsky (admitted *pro hac vice*)
Samuel P. Hershey (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020
Telephone:    (212) 819-8200
cshore@whitecase.com
david.turetsky@whitecase.com
sam.hershey@whitecase.com

Jason N. Zakia (admitted *pro hac vice*)
Laura E. Baccash (admitted *pro hac vice*)
111 South Wacker Drive
Chicago, IL 60606
Telephone:    (312) 881-5400
jzakia@whitecase.com
laura.baccash@whitecase.com

Ronald K. Gorsich (admitted *pro hac vice*)
Aaron Colodny (admitted *pro hac vice*)
Doah Kim (admitted *pro hac vice*)
555 South Flower Street, Suite 2700
Los Angeles, CA 90071
Telephone:    (213) 620-7700
rgorsich@whitecase.com
aaron.colodny@whitecase.com
doah.kim@whitecase.com

*Co-Counsel to the Reorganized Debtor*

**EXHIBIT A**

| Movant / Claimant | Alleged Communications with Hertz Potentially Relevant to False Arrest Claims (according to each Movant's declaration)[1] |
|---|---|
| Siobhan Abrams | Ms. Abrams' potentially relevant contacts were:<br><br>(a) Ms. Abrams submitting an FTC complaint and a complaint lodged with "Hertz" specifically related to two named Hertz representatives in June 2017 regarding billing disputes;<br>(b) text message contact in July 2017 with an investigator named "Lee";<br>(c) unspecific communications with "Hertz employees" between July 20-25, 2017;<br>(d) a roadside pickup on July 24, 2017;<br>(e) a verified return with manager Mi Suk;<br>(f) the investigator confirming return via text on July 25, 2017;<br>(g) Ms. Abrams emailing Hertz's customer billing and customer relations on July 25, 2017 to "request an arbitration hearing against Hertz Global Holdings, Inc for willful misconduct, gross negligence, [breach] of contract, and violation of the Fair Credit Billing Act" in connection with Hertz reporting her for car theft in 2017;<br>(h) Ms. Abrams subsequently renting and purchasing a Hertz vehicle;<br>(i) Ms. Abrams "contacted Hertz by email" on July 25, 2019 for an explanation of her arrest; and<br>(j) emailed responses from Hertz generally and a response from a John Carillo regarding a potential meeting, with no further contact from Hertz.<br><br>Ms. Abrams' email exchange on June 21, 2017 with billing employees includes a broadly worded mention of legal action. Ms. Abrams' years of subsequent inaction undercut any assertion that she was pursuing a legal claim of which the Debtors should have been aware, and in any event the claim with respect to which she asserts she mentioned legal action was a billing dispute, not a theft report. |
| Charles Lee Bort | Mr. Bort's potentially relevant contacts were his defense attorney's limited emails with Hertz paralegal Jacqueline Resop in December 2020 (*i.e.*, after the General Bar Date and long after his April 21, 2020 arrest). |
| Kwai Yee Chan | Ms. Chan signed a declaration jointly with Mr. Bort and makes no allegation of separate contacts. |

---

[1] These are limited to specific communications the claimant alleges they made to the Debtors that could potentially be related to their assertion of a false theft report claim. Declarants' rental background, descriptions of arrests, and other details are omitted.

| Movant / Claimant | Alleged Communications with Hertz Potentially Relevant to False Arrest Claims (according to each Movant's declaration)[1] |
|---|---|
| Kimberli Costabile | Ms. Costabile's potentially relevant contacts were:<br>(a) she called Fairfax, VA Hertz location in late February – early March 2020, spoke with manager Austin and was told to ignore theft report messages from "Hertz corporate";<br>(b) a March 10, 2020, email from Nikisha Thompson claiming vehicle "seriously overdue";<br>(c) Ms. Abrams' same-day response noting the location knew of March 24 return date and planned extension, copying Ashlea Hood from location;<br>(d) Hood emailing Thompson same day that she "was an authorized renter and in good standing";<br>(e) Thompson emailing again on March 11 that rental was 19 days overdue;<br>(f) at some point, Ms. Abrams speaking to Thompson on phone (no date or other information given); and<br>(g) Ms. Abrams speaking with "corporate" at some point (no date or other information given).<br><br>Ms. Costabile does not state that she asserted a claim or threatened litigation regarding the theft report in these communications. |
| Holly Harris | Ms. Harris' potentially relevant contacts were that Hertz should have records of Ms. Harris returning the car and that, after her defense attorney asked the prosecutor to dismiss her case in 2019, the prosecutor in her criminal case contacted "Hertz" to inform it that Ms. Harris believed the police report was false.  Ms. Harris said she ultimately took a plea deal. |
| Sean Hurt | Mr. Hurt's potentially relevant contacts were:<br>(a) reporting his rental truck stolen on or around January 19, 2020, and filling out a related affidavit at the Dollar/Hertz location in Dallas-Forth Worth;<br>(b) calling Hertz "repeatedly" regarding improper continued charges on rental;<br>(c) emailing Hertz Vehicle Control on Feb. 3, 2020 in response to a letter of demand, stating he didn't have the vehicle; and<br>(d) Hertz disputing Mr. Hurt's challenge to charges on Chase [Bank] account.<br><br>Mr. Hurt does not state that he asserted a claim or threatened litigation regarding the theft report in these communications. |
| Lateshia Jenkins | Ms. Jenkins' potentially relevant contacts were:<br>(a) contacting unnamed Hertz employees in 2008 to ask about a 2005 theft report, which she learned of in 2006, and which she characterized to these unnamed employees as a false report; and<br>(b) calling Hertz again for information in 2012 (and being told Hertz had no information regarding the rental).<br><br>Ms. Jenkins does not identify any of the various Hertz employees with whom she purportedly spoke, and does not state that she asserted a claim or threatened litigation regarding the theft report in these communications. |

| Movant / Claimant | Alleged Communications with Hertz Potentially Relevant to False Arrest Claims (according to each Movant's declaration)[1] |
|---|---|
| Heather Kasdan | According to her declaration, Ms. Kasdan's potentially relevant contacts were:<br>(a) contacting Hertz Roadside on July 7, 2019 regarding rental car accident;<br>(b) Roadside saying Hertz would tow car from location, telling her to leave it there;<br>(c) a July 8, 2019 Hertz incident report;<br>(d) a text message from an investigator named Green and a letter from Hertz regarding car theft report, both on August 29, 2019;<br>(e) Ms. Kasdan "immediately call[ing] Hertz corporate" on August 29, 2020 [likely intended to state 2019];<br>(f) speaking with a "Josh", then "Sophia", then "Wanda in vehicle control";<br>(g) speaking with "Sheryl in Hertz's insurance replacement department", who transferred her call to "Casper" in the Notice of Loss Department;<br>(h) being transferred to Victoria Rogers and "Brittany" in claims department, who "admitted that Hertz was unable to find the car";<br>(i) emailing customer relations on August 30, 2019 explaining situation;<br>(j) Hertz Care Team responding same day acknowledging email and saying it would respond in 3-5 days (but no response came);<br>(k) after alleged September 12, 2019 overcharge on credit card, calling Hertz again and speaking with "Emily in Vehicle Control", who said Roadside had no call on file, she saw in system that car was supposed to be towed, but Hertz stopped the tow, and that Hertz would keep a file and stop contacting Ms. Harris regarding car theft;<br>(l) after credit card company resolved card charge in Hertz's favor, calling Hertz on November 19, 2019, and speaking with "Henry and Nicholas in billing, Wami in Roadside Service", transferring to "supervisor named Tevon" who said Ms. Kasdan would get a refund;<br>(m) calling Hertz on December 11, 2020 [likely intended to state 2019] regarding the refund, speaking with "female rep named Alex";<br>(n) sending a follow-up email on December 11, 2019, with no substantive response,<br>(o) calling February 25, 2020 and speaking with "Gerson in billing", who acknowledged that Hertz was supposed to tow the car on July 7, 2019;<br>(p) being transferred to "Hya in the claims department", who then transferred her back to billing.<br><br>Ms. Kasdan does not state that she asserted a claim (other than for a refund) or threatened litigation regarding the theft report in these communications |
| Raelena Lewis | Ms. Lewis' potentially relevant contacts consisted of calling Hertz "approximately 50 times in March and April 2020 and [leaving] messages demanding an explanation" with no callbacks.<br><br>Ms. Lewis does not identify any Hertz employees for whom she purportedly left messages, and does not state that she asserted a claim or threatened litigation regarding the theft report in these communications. |

3

| Movant / Claimant | Alleged Communications with Hertz Potentially Relevant to False Arrest Claims (according to each Movant's declaration)[1] |
|---|---|
| Jessica Malone | Ms. Malone's potentially relevant contacts consisted of calling "Hertz local and corporate repeatedly in April and May 2017" asking questions and stating that the theft report was false.<br><br>Ms. Malone does not identify any of the various Hertz employees with whom she purportedly spoke, and does not state that she asserted a claim or threatened litigation regarding the theft report in these communications. |
| Jason Cook | Mr. Cook's declaration refers to Ms. Malone's contacts with Hertz, and does not separately allege that Mr. Cook had relevant contacts. |
| Britne McClinton | Ms. McClinton's potentially relevant contacts were:<br>(a) being emailed and receiving calls from "Hertz" on or about September 10, 2018 regarding missing vehicle;<br>(b) submitting an "affidavit of theft" on September 25, 2018;<br>(c) being called by "Hertz" on September 27, 2018 accusing theft;<br>(d) being called by "Hertz" again on October 12, 2018, and Ms. McClinton threatening to sue Hertz if the company "did not immediately stop claiming she stole a car".<br><br>Ms. McClinton does not identify the various Hertz employees with whom she purports to have spoken, nor does she identify the Hertz employees to whom she purportedly communicated any legal threat.  Her threat could be reasonably construed as a threat of legal action if calls did not cease, rather than an assertion of a false police report claim. |
| Paula Murray | Ms. Murray's potentially relevant contacts were:<br>(a) contact with an investigator in late 2016 or early 2017, Ms. Murray stating that she had returned her rental, and confirming with investigator a few days later car was returned;<br>(b) calling "Hertz" for "1-week straight" after being arrested in 2021 (*i.e.*, after the General Bar Date) and receiving "apologies" from unnamed persons.<br><br>Ms. Murray does not state that she asserted a claim or threatened litigation regarding the theft report in these communications. |

4

| Movant / Claimant | Alleged Communications with Hertz Potentially Relevant to False Arrest Claims (according to each Movant's declaration)[1] |
|---|---|
| Zanders Pace | Mr. Pace's potentially relevant contacts were: <br> (a) contacting "Hertz 2 or 3 days after" a July 12, 2019 accident involving his rental and telling "Simone Straugher, a manager at the location" the name and location of the autoshop where the rental had been towed; <br> (b) receiving a text on July 19, 2019 to return the car; <br> (c) receiving another text on July 24, 2019 saying the car would be repossessed if not returned, to which Mr. Pace responded that day that the car was in the shop; <br> (d) "Hertz" texting on July 25, 2019 asking for clarification, to which Mr. Pace responded with details; <br> (e) the body shop calling Hertz Emergency Roadside on Mr. Pace's behalf on July 31, 2019 to notify that the car was in the shop; <br> (f) a Diane Moser of BNY Mellon emailing Hertz on August 15 to pick up the vehicle after Hertz did not do so; <br> (g) Moser forwarding an email to Hertz (including Bianca Giavazzi and Melissa Gates) on September 16, 2019, which indicated that the theft report for "Mr Peace" [sic] was false; <br> (h) Mr. Pace calling Hertz Roadside, Vehicle Control, and Customer Service "repeatedly" on Sept. 17, 2019 saying the theft report was false; <br> (i) the body shop also calling unnamed parties on Sept. 17, 2019; <br> (j) in a 9:03 a.m., Sept. 17, 2019 call with Mr. Pace, "Hertz roadside admit[ing]" that information regarding the accident and request "was in the system", Mr. Pace giving the operator the "roadside reference number," threatening a civil suit, and asking who to contact regarding a Hertz manager filing a fraudulent claim, and Hertz Roadside "claim[ing] ignorance" of who to contact; <br> (k) emailing "vehcntl@hertz.com" on Sept. 17, 2019 at 11:26 a.m. stating it regarded "a female by the name of Simone who has made a false statement to police to have charges brought against Zanders Pace"; <br> (l) Mr. Pace stating in a 2:58 p.m., Sept. 17, 2019 call with customer service that he was falsely accused of car theft, threatening a lawsuit, and asking Hertz to contact the DA; and <br> (m) the body shop owner calling Hertz again on Sept. 19, 2019, speaking with a "Sheryl" and explaining the situation. <br><br> Mr. Pace does not identify the Hertz roadside representative to whom he purportedly communicated a legal threat, and his subsequent years of inaction undercut any assertion that he was pursuing a legal claim of which the Debtors should have been aware. |

| Movant / Claimant | Alleged Communications with Hertz Potentially Relevant to False Arrest Claims (according to each Movant's declaration)[1] |
|---|---|
| Moneck Wallace | Ms. Wallace's potentially relevant contacts were:<br>(a) around August 2011, calling a Hertz location regarding her prior rental, and subsequently calling "a corporate 1800 number", without success in finding out "what was going on";<br>(b) receiving a call from "a man in NYC" "1 year after those calls" (so around 2012), who said he "did 'recovery'" but, after Ms. Wallace provided the license plate, saying he was unsure why he'd been told to call since the car had been rented after Ms. Wallace's rental, and<br>(c) "repeatedly call[ing] Hertz corporate and ask[ing] them why they had filed a false police report" sometime after 2014 or 2015.<br><br>Ms. Wallace does not identify any Hertz employees for whom she purportedly left messages, and does not state that she asserted a claim or threatened litigation regarding the theft report. |

6