# <u>EXHIBIT I</u>

**Unsealed Supplemental Brief**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:

Rental Car Intermediate Holdings, LLC,[1]

Reorganized Debtor.

Chapter 11

Case No. 20-11247 (MFW)

Ref. D.I. 190, 193, & 332

## GROUP 3 AND GROUP 4 FALSE POLICE REPORT CLAIMANTS' SUPPLEMENTAL BRIEF REGARDING "KNOWN CREDITOR" STATUS (INDIVIDUAL CONTACTS)

As directed by the Court at the January 4, 2022, status conference, 123 of the Group 3, Group 4a, and Group 4b False Police Report Claimants (collectively, the "Claimants"),[2] by and through their undersigned counsel, hereby submit this supplemental brief in support of the

---

[1]    The last four digits of the tax identification number of Reorganized Debtor Rental Car Intermediate Holdings, LLC ("RCIH") are 2459. The location of the Reorganized Debtors' service address is 8501 Williams Road, Estero, FL 33928. On September 28, 2021, the Court entered a final decree closing each of the chapter 11 cases for The Hertz Corporation and its affiliated reorganized debtors (collectively, the "Reorganized Debtors") other than RCIH's chapter 11 case. Commencing on September 28, 2021, all motions, notices, and other pleadings relating to any of the Reorganized Debtors shall be filed in RCIH's chapter 11 case, Case No. 20-11247 (MFW).

[2]    As the Court will recall: (i) the "Group 1" Claimants had pending litigation against one or more Debtors prepetition and filed proofs of claim by the October 21, 2020, general claims bar date; (ii) the "Group 2" Claimants had no prior pending litigation and filed proofs of claim by the bar date; (iii) the "Group 3" Claimants had no prior pending litigation and filed proofs of claim on June 10, 2021; (iv) the "Group 4a" Claimants had not filed proofs of claim and, in light of the relief requested in the Group 4 Motions, had not intended to do so; and (v) the "Group 4b" Claimants had not filed proofs of claim or any motion prior to January 4 but filed by January 31, 2022 (some claims were filed by Prime Clerk after that date, per agreement with the Reorganized Debtor). However, as directed at the January 4, 2022, status conference, the Group 4a and Group 4b Claimants filed conditional proofs of claim without prejudice to any relief that might permit proceedings in other courts. Further, as also expressed in their proofs of claim, all Claimants expressly reserve and advance all rights to proceed in other forums, as requested and/or required by any source of law, and to present their claims in a jury trial.

following motions (collectively, the "Motions"),[3] specifically as to the issue of the applicable

Claimants' status as "known creditors" based on their individual contacts with the Debtors:

- the *Claimants' Motion to Deem Claims Timely or for Extension of General Bar Date under Rules 3003(c) and 9006* filed December 6, 2021 [D.I. 190] (the "Group 3 Motion");

- the *Group 4 False Police Report Claimants' Motion for Relief from the Confirmation Order to Pursue Claims Outside of Bankruptcy or, in the Alternative, for Extension of General and Administrative Bar Dates under Rules 3003(c) and 9006(b) and Related Relief* filed December 6, 2021 [D.I. 193] (the "Group 4a Motion"); and

- the *Group 4b False Police Report Claimants' Motion for Relief from the Confirmation Order to Pursue Claims Outside of Bankruptcy or, in the Alternative, for Extension of General and Administrative Bar Dates under Rules 3003(c) and 9006(b) and Related Relief* filed February 7, 2022 [D.I. 332] (the "Group 4b Motion" and, together with the Group 4a Motion, the "Group 4 Motions").[4]

In further support of the Motions, the Claimants respectfully represent as follows:

## PRELIMINARY STATEMENT

1.      A fundamental issue raised by the Motions is whether the Claimants were "known"

or "unknown" creditors. If the Group 3 Claimants were known creditors, then Hertz cannot invoke

the Bar Date Order to disallow their claims because they did not receive direct notice of the same

as required by due process. And if the Group 4a and 4b Claimants were known creditors, then the

Plan and Confirmation Order cannot prevent them from pursuing their claims against the

---

[3]      Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Motions.

[4]      The Group 4b Claimants had not yet appeared in the case as of the January 4 status conference, but, consistent with the Court's instruction at that hearing, filed proofs of claim by January 31. To join issue on the matters raised in the Group 4a Motion and to be considered at the March 2 hearing, the Group 4b Claimants filed a stand-alone motion in lieu of a joinder in the Group 4a Motion. But the issues and arguments are substantially identical in the Group 4b Motion.

ACTIVE.135550357.04

Reorganized Debtors because they did not receive direct notice of the same as required by due process. This is black-letter law.

2. If the Claimants were known creditors, then the Court also need not reach the numerous other arguments raised in the Motions, which include:

- whether the Debtors' publication notices lacked content required by the Bankruptcy Code, Bankruptcy Rules, and Due Process Clause, including the Debtors' failure to comply with Section 342(g) of the Bankruptcy Code, *see, e.g.*, Group 4b Motion ¶¶ 57–61;

- including those content failures, whether the publication notice in these chapter 11 cases was inadequate under *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306 (1950), *see, e.g.*, Group 4b Motion ¶¶ 62–76;

- whether Claimants' claims are all timely in light of the timely-filed class proofs of claim and whether each Hertz customer against whom the company filed a false police report is entitled to notice, *see, e.g.*, Group 4b Motion ¶¶ 78–80;

- whether post-petition claims asserted in the Group 3 proofs of claim can be considered timely-filed administrative expense requests, *see, e.g.*, Group 3 Motion ¶¶ 49–56; Group 3 Reply ¶¶ 70–83;

- whether post-petition claims by any Claimants may be asserted as general unsecured claims in any event, given that there was never a deadline established for filing post-petition, non-administrative claims in the chapter 11 cases or under the Plan, *see, e.g.*, Group 4b Motion ¶¶ 88–92;

- whether Claimants' claims should be accepted as timely under Bankruptcy Rule 3003(c)(3), Bankruptcy Rule 9006, and/or 11 U.S.C. § 503(a) for excusable neglect and/or cause, *see, e.g.*, Group 4b Motion ¶¶ 81–87; and

- whether relief from the Confirmation Order should be granted to certain Claimants under Fed. R. Civ. P. 60(b)(1), (4) & (6), as applicable by Bankruptcy Rule 9024, *see, e.g.*, Group 4b Motion ¶¶ 93–99.

3. Moreover, with respect to the known/unknown creditor issue, multiple independent bases exist upon which the Court can find that the Claimants were known creditors—as detailed extensively in the Motions. *First*, applicable to all Claimants, is Hertz's awareness that its theft-reporting practices were systemically inaccurate and led to false reports against many customers, whose identities were reasonably ascertainable to Hertz (the "Systemic Misconduct Issue").

*Second*, applicable to certain Claimants, is Hertz's knowledge of specific cases based on individual contacts with Hertz from the Claimant or third parties putting Hertz on notice of the Claimants individually that Hertz filed a false police report against them (the "Individual Contacts Issue").[5]

4.    At the January 4 status conference, the Court determined it would move forward with a hearing on March 2 solely on the Individual Contacts Issue, expressly reserving consideration of the Systematic Misconduct Issue for later, to the extent necessary. To this end, the Court (i) directed the Group 4a Claimants to file proofs of claim with declarations detailing their contacts with the Debtors, (ii) directed the Debtors to produce records with respect to those Claimants who filed individual claims on a rolling basis, and (iii) directed the parties to file supplemental briefs by February 14 regarding how the information in the proofs of claim and declarations impacted the Individual Contacts Issue.

5.    The Claimants have complied with the Court's directions; the Debtors have not. Specifically, they have not produced all of their records with respect to the individual Claimants— or even, in the Claimants' view, made a serious attempt to locate such records. As set forth more fully in the Claimants' *Objection to the Reorganized Debtor's Supplemental Motion for a Protective Order and Cross-Motion to Compel*, also filed today, there are critically relevant documents that remain outstanding and have not been searched for or produced. In fact, counsel below describe concrete evidence of a list including many Claimants that the Reorganized Debtor has not only failed to produce, but affirmatively represented does not exist.

---

[5]    As explained in more detail below, the Systemic Misconduct Issue manifests itself in many individual cases, and, once the Court reaches the Systemic Misconduct Issue, the Claimants reserve the right to argue that systemic issues in their particular cases warranted individualized notice separate and apart from any widespread notice required because of any Systemic Misconduct Issue.

ACTIVE.135550357.04

6.     Having insisted upon the current procedure, with which the Claimants have assiduously complied, the Debtors should not now be heard to complain about it. As discussed below, certain of the Claimants have provided more than enough evidence, in the form of detailed, sworn declarations and the limited discovery obtained to date, to establish that they were known creditors under the applicable legal standards and precedent, based upon Hertz's knowledge that their specific police report was false. For those Claimants, the Court should grant the Group 3, 4a, or 4b Motion, as applicable. For the remaining Claimants, the Court should defer ruling on the Individual Contacts Issue until the Debtors have complied with the Court's instruction to produce their full records with respect to those Claimants. The Court should also establish a schedule to move forward with these cases efficiently and expeditiously, including the Groups 1 and 2 claims who now have valid proofs of claim and the Systemic Misconduct Issues, which is part of the relevant discovery for Groups 1 and 2 in any event.

7.     Indeed, the importance of forward progress cannot be overstated. The appendices describe in devastating detail how the Claimants had their lives upended by doing nothing more than renting a car from Hertz. While each person has his own unique story, the combined portrait demonstrates how a company callously disregarded basic legal and moral principles by having its own innocent customers arrested, jailed, and prosecuted. Over and over again, the Claimants told Hertz that they had been wrongly accused of a serious crime and grievously harmed by that accusation. Over and over again, Hertz ignored them. Over and over again, Hertz chose to do nothing about the problem. Indeed, it even refused to intervene in these prosecutions because, in Hertz's own words, "if you report a crime, and you later say it didn't happen, then law enforcement

ACTIVE.135550357.04

tends not to believe you if you retract it or say you are mistaken."[6] In other words, Hertz prioritized **continuing to falsely report people to the police and its own reputation** over the freedom, livelihood, and reputation of its innocent customers.

8.     And perhaps worst of all, as the appendices demonstrate, Hertz continued these practices well after it knew the harm it was causing. Arrests **still** continue to happen.[7]  It has now been nearly two years since Hertz's bankruptcy. In that span, while Claimants have waited, more and more Hertz customers have been falsely arrested and jailed. Indeed, many of the Claimants here were arrested post-petition. Hertz has taken advantage of this bankruptcy by refusing to address a known problem. Instead of trying to fix the issues, its strategy of delay has caused even more of its customers to suffer grievous harm even as it now admits that some of its police reports contain inaccuracies (a vast understatement). Feb. 9, 2022, Hr'g Tr. at 9:14-15 (testimony of Michael A. Severance) ("there have been some inaccuracies in some of the [theft] reporting").

9.     The Debtors' false theft-reporting practices continue to ensnare innocent renters in the criminal justice system to this day. Just in the past few days, for example, a Hertz Gold customer named Charles Doucette informed Claimants' Counsel that he was just arrested in

---

[6]     This quote was given by a Hertz spokesperson to the Philadelphia Inquirer. A scan of the original publication of this article is attached as Exhibit 1 to the declaration of Alfred Fluehr filed in support of this supplemental brief, which is attached hereto as **Exhibit C** (the "Fluehr Declaration"), with the relevant quotation highlighted. Counsel have cited this quote in earlier briefing. Counsel recently discovered that the current online version of the article published by the Philadelphia Inquirer notes that it now "includes updated statements from Hertz." In particular, Hertz "updated" the relevant quote to remove the following statement: " 'In the rare instances this happens, if you report a crime, and you later say it didn't happen, then law enforcement tends not to believe you if you retract it or say you were mistaken.' 'Hertz's continued good relationship with law enforcement is important.' " Elsewhere, that article explains, "[The spokesperson] said that if overdue customers are involved in an accident, Hertz could be liable for damages. 'To cut the liability off, we report the car stolen.' "

[7]     As described elsewhere, in the interests of caution and to reserve all rights, Claimants have included in this proceeding anyone who had any contacts with Hertz prior to emergence. For actions occurring after July 1, 2021, the reorganized company is responsible.

Florida based on a false police report filed by Hertz.[8] Just among the most recent filers in Group 4b, more than two dozen persons were arrested post-petition up through 2022 and more than a dozen still face serious criminal charges. Claimants' counsel expect that more claims will emerge. Of the 3,365 Hertz customers each year who lawfully rented from Hertz but Hertz nevertheless reported to the police—a number that exceeds 20,000 in the six-year period between 2016 and 2021—there is no telling how many people are currently facing arrest, prosecution, or jail based on the same conduct underlying the claims of the 230 Claimants. Indeed, many people may not even know that Hertz has filed a police report or that a warrant for their arrest is pending.

10.     This Brief, however, does not focus on the systemic issues. Instead, it demonstrates failures of notice based on the Individual Contacts issue for 113 of the 123 Claimants in Groups 3, 4a, and 4b—based only on information obtained to date. These Claimants fall within six categories, described below:

(1) 9 Claimants threatened to bring legal claims against Hertz based on its misconduct;

---

[8]     Mr. Doucette retained counsel after the January 4 hearing. Because Mr. Doucette is currently in jail, Claimants' Counsel has been unable to obtain a Declaration. His pattern, however, is similar to so many other Claimants. He rented a car from Hertz in late 2020—post-petition. He did not like his car so exchanged it for another one in the Hertz lot. He extended his rental and never heard any issues from Hertz. Hertz had his credit card on file and billed him around $3,900 in March 2021. On approximately March 18, 2021, he was pulled over in Arizona and was told that Hertz reported the car as stolen to the Salt Lake City police on March 8. He called Hertz shortly thereafter and told Hertz the car was falsely reported stolen. Hertz told him his balance was zero and the contract was closed. Months later, he received a summons from an Arizona state court to answer for the charge of felony theft. Hertz of course did not show up. The judge said he had no bail, and permitted him to leave the State. He later found out that a grand jury had indicted him based on this false charge on August 19, 2021. He then hired a lawyer for his criminal charges. After he deboarded from a cruise in Florida just days ago, he was arrested. He is currently in jail awaiting extradition to Arizona. Counsel have reached out to the Reorganized Debtor requesting immediate intervention so that Mr. Doucette can be released from jail—the Reorganized Debtor has offered to discuss Mr. Doucette tomorrow.

ACTIVE.135550357.04

(2) 43 Claimants directly told Hertz that it had falsely accused them of theft or caused their false arrest;

(3) 21 Claimants directly told Hertz that what the company put (or would put) in the theft report was false (but the Claimant was not yet aware of the report or it had not yet been filed);

(4) 14 Claimants present claims for which third-party communications informed Hertz of the falsity of the underlying theft report or arrest;

(5) 10 Claimants not otherwise represented above communicated with Hertz to extend their rentals but were nonetheless reported for theft; and

(6) 21 Claimants bring cases directly tied to those of a known creditor listed above who was not given notice.[9]

11.     In total, 113 of the 123 Group 3, Group 4a, and Group 4b Claimants can show, based on limited information obtained to date, that they received inadequate notice of key bankruptcy events based on the Individual Contacts Issue. This Court should allow those claims to proceed by granting relief to those Claimants on March 2.

## RELEVANT PROCEDURAL BACKGROUND

12.     Based on various interactions with the Debtors' counsel since the January 4 status conference, it appears the parties' understanding of the nature and purpose of the March 2 hearing and supplemental briefing requested by the Court differs substantially. For this reason, the Claimants believe it appropriate to set forth their understanding of the procedural history and current posture before proceeding to the supplemental arguments on the Individual Contacts Issue.

---

[9]     As explained below and in the Appendices, 5 of these 21 Claimants also bring direct known-creditor arguments in one of the earlier groups.

ACTIVE.135550357.04

A.      **The 21st Omnibus Objection and September 28, 2021, Discovery**

13.     In their 21st Omnibus Objection filed September 9, 2020 [Case No. 20-11218, D.I. 5898], the Reorganized Debtors sought disallowance of the Group 3 Claimants' claims as untimely filed. In their October 20, 2021, response to the 21st Omnibus Objection [D.I. 50], the Group 3 Claimants argued, *inter alia*, that notice of the claims bar date was deficient as to them because they were known creditors but did not receive direct notice as required by due process. *Id.* ¶¶ 32-46. As noted in this response, Hertz disclosed in discovery in another case that it maintains an internal spreadsheet detailing claims against the company for false arrest/theft reports (the "Internal Claims Spreadsheet"), *id.* ¶ 34 (citing [Case No. 20-11218, D.I. 1071, Ex. A, Declaration of Frederick Jekel at 4]). Hertz moved to seal that information, and therefore it is not in the public record.

14.     The Group 1, 2, and 3 False Police Report Claimants propounded discovery in furtherance of their responses to the Debtors' omnibus objections to their claims[10] on September 28, 2021 (the "September 28 Discovery"), which included specifically requests for production of the Internal Claims Spreadsheet and any updated version of it, any other documents relating to similar claims. The Reorganized Debtors filed a motion for a protective order on October 21, 2021 [D.I. 61], seeking to limit discovery to facts they considered relevant to the Group 3 Claimants, which they conceded would include "what, if any, records the Debtors had of those individuals and their claims." *Id.* ¶ 5. Despite agreeing that at least some discovery was appropriate and seeking only a partial protective order (which, to date, has not been entered and remains *sub*

---

[10]   The Reorganized Debtors' 22nd Omnibus Objection [D.I. 5899] sought disallowance of the Group 1, 2, and 3 Claimants' claims on various "substantive" grounds.

9

*judice*), the Reorganized Debtors never formally responded or objected to the September 28 Discovery.[11]

### B.    The October 28, 2021, Status Conference

15.    The Debtors' omnibus claim objections were scheduled for a hearing on November 4, 2021. On October 28, 2021, the Court held a status conference to discuss the manner of proceeding at that hearing, and clarified for the parties that it would not be an evidentiary hearing with testimony, but rather a hearing to determine whether there were any material issues of fact in dispute for which an evidentiary hearing would be necessary:

> I'll hear argument . . . to determine whether the proof of claim that is submitted did make a *prima facie* case and/or that the debtors' objection contains sufficient evidence that would overrule the *prima facie* claim. But I am not going to address conflicting evidence on the claims . . . .
>
> And to the extent we agree that has to be heard in an evidentiary hearing, we will decide whether I'm the one that's going to hear that or whether it has to go to the district court.

Hr'g Tr. Oct. 28, 2021, at 12:5-15. The Claimants' counsel noted that the Debtors had submitted a declaration in support of each claim objection, and sought clarification whether there would be cross-examination on those declarations at the hearing. *Id.* at 13:9-20. The Court responded:

> I'm not going to hear any evidence on it. If they've submitted a declaration and additional evidence you want to submit in response to it, and I've determined that the declaration has in fact presented legal issues in dispute, I can deal with that . . . .
>
> I need to consider what has been submitted and I'll do it on a procedural ground, but I'm not going to hear testimony on the various details of each and every claim.

---

[11]    The September 28 Discovery had a return date of October 19, 2021, which the Reorganized Debtors indicated they would not abide by, given that it was less than the thirty days provided by the Federal Rules of Bankruptcy Procedure. However, October 28, 2021, came and went with no responses, objections, or document production. Such self-help is improper under the Rules.

ACTIVE.135550357.04

*Id.* at 14:1-10. The Court then heard from the Debtors' counsel, who stated:

> I think I understand what Your Honor is envisioning for this. We don't need to move the declaration into evidence, which would give them the right to claim hearsay unless they can cross-examine. The point of the declaration . . . is to provide the Court with the information to determine that these are group claims or that these are duplicate claims, or that the claims have been amended and superseded. . . . [T]hat declaration shifts the burden to the claimants to come forward with their evidence that they're not . . . group claims that are not in compliance with the bar date order, or they haven't been amended or superseded, or they—right?
>
> And so I understand what Your Honor wants. We don't need to turn [the hearing] into a debate over evidence or not.

*Id.* at 15-19.

### C.    The November 4, 2021, Hearing

16.    At the November 4, 2021, hearing, counsel for the Debtors requested that the Group

3 Claimants be required to file a motion for leave to file late claims by a date certain:

> They attach a revised individualized proof of claim, they attach the declaration or whatever additional detail they want to provide with respect to their claims that identifies the salient facts around their purported claim and to address this issue of a known claimant provided individualized description of how the debtors were put on notice of their claims.

Hr'g Tr. Nov. 4, 2021, at 18:18-19:1. Counsel asserted that this would "allow the court to make a

final determination with respect to whether or not th[e Group 3 Claimants] were known creditors."

*Id.* at 20:24-21:1. The Court sought clarification on this point:

> THE COURT: Let me—I'm sorry to interrupt. Are you done on the known creditor that your solution to this is to require that they give evidence as part of the declaration they file in support of their proof of claim—
>
> MR. SHORE: Correct.
>
> THE COURT: —is what evidence that they were known to the debtor.

> MR. SHORE: Correct.
>
> THE COURT: Okay. I understand.

*Id.* at 21:9-17.

17.     The Court agreed with this approach, and in colloquy with the Claimants' counsel

clarified:

> I am not contemplating that each individual proof of claim will
> attach all th[is] other evidence, but only a declaration by the
> claimant, explaining the details of what happened to the claimant,
> you know: I rented the car on X date; I was arrested on Y date; or I
> extended the contract, I was arrested, et cetera, specific to that
> individual creditor.

*Id.* at 33:11-17; *see also id.* at 34:19-20 ("I'm not suggesting that you're attaching all the evidence

[that][12] you may have to support your claim . . . ."). Counsel for the Debtors concurred, stating:

> My only point was that the declarants who were coming forward
> with their Rule 9006 motions, put forth whatever facts they have
> with respect to whether they put the debtors on notice, because that,
> again, from my perspective, that's the relevant fact and I just don't
> want to be in a situation where I have to go start taking depositions
> of these individual claimants, which doesn't do any good if they've
> got evidence that they put the debtors on notice.

*Id.* at 43:1-8. He went on to state:

> What I am envisioning, once we get those [individualized Group 3
> proofs of claim and declarations], then the debtors can do an
> analysis. One, did they provide notice and we're just not finding it?
>
> They have that in their possession. And if someone comes forward
> and says, here's my letter saying, ["]I'm going to sue you,["] right,
> then we can resolve whether or not that objection is late or the claim
> is late or not, right. We may consent to allow that one in.
>
> By the same token, we'll be able to search our records with regard
> to the specific names and find out whether those names are in our

---

[12]     The transcript says "but," but this appears to be a scrivener's error, given the context and
counsel's recollection of the colloquy.

> system. If they are, we might be able to address it. If they're not, we
> might be able to address it.

*Id.* at 44:21-45:8. Despite this representation, Debtors have not searched (or at least have not produced) all their "records with regard to the specific names and find out whether those names are in [their] system."

### C.    The Group 3 and 4a Motions, and December 20, 2021, Discovery

18.    As directed by the Court, twenty Group 3 Claimants filed the Group 3 Motion on December 6, 2021, and thereafter filed individualized proofs of claim supported by declarations detailing the bases for their claims and, if applicable, their individual contacts with the Debtors.[13] Also on December 6, 2021, the twenty-six Group 4a Claimants filed the Group 4a Motion. In light of the nature of the relief requested in the Group 4a Motion (i.e., leave to pursue their claims in another forum), the Group 4a Claimants did not file proofs of claim in the bankruptcy case.[14] However, consistent with the Court's direction to the Group 3 Claimants at the November 4 hearing, the Group 4a Claimants each filed declarations detailing the factual bases for their claims and, if applicable, their individual contacts with the Debtors.

19.    The Debtors objected to the Group 3 Motion on December 20, 2021 [D.I. 214 (sealed); D.I. 220 (public/redacted)] (the "Group 3 Objection").[15] It was apparent from the cursory discussion therein of the Group 3 Claimants' individual contacts with the Debtors—consisting

---

[13]    A twenty-first Claimant, Wanda Nelson, was part of the December 6 motion. Counsel filed an individualized proof of claim on her behalf but have been unable to reach her to procure a declaration. Because she has not filed a claim supported by a declaration, Ms. Nelson is not included in this briefing or relevant totals.

[14]    As discussed below, the Group 4a Claimants have since filed proofs of claim at the request of the Court, which was without prejudice to any arguments raised in the Group 4a Motion.

[15]    At the Debtors' request, the Group 4a Claimants agreed to several extensions of the Debtors' objection deadline to the Group 4a Motion, ultimately through January 24, 2022.

entirely of summaries and characterizations of the allegations in the Claimants' declarations—that the Debtors had not actually undertaken any efforts to "search [their] records with regard to the specific names and find out whether those names are in [their] system" as promised by the Debtors' counsel at the November 4 hearing.

20.     The Group 3 and Group 4a Claimants propounded discovery in furtherance of the Group 3 and 4a Motions on December 20, 2021 (the "December 20 Discovery"), which included specifically a request for production of the Internal Claims Spreadsheet and any updated version of it (which had already been requested by the Group 3 Claimants in the September 28 Discovery), a request for production of internal lists of customers reported for theft, all documents compiling, listing, or otherwise showing those reported for theft, as well as a request for production of documents and communications relating to the Claimants (which would encompass anything the Debtors might find in a search of their records as promised at the November 4 hearing), including specific requests for communications with third parties related to any Claimant.

21.     The Group 3 Claimants filed their reply in support of the Group 3 Motion on December 29, 2021 [D.I. 228 (sealed); D.I. 234 (public/redacted); D.I. 339 (revised public/redacted)] (the "Group 3 Reply"), in which they noted the Debtors had apparently done nothing to search their own records as promised at the November 4 hearing, and, rather than meaningfully analyzing the individual contacts set forth in the Claimants' declarations, the Debtors had simply ignored them. *Id.* at ¶¶ 35-46.

22.     Throughout November and December 2021, the Debtors did not produce any of the documents with respect to the Group 3 Claimants that they had conceded would be relevant and properly responsive to the September 28 Discovery (which production was, by the end of

December, over two months overdue[16]). Nor did the Debtors produce the results of any searches of their records with respect to the Group 3 or Group 4a Claimants.

### D.      The January 4, 2022, Status Conference

23.      At the January 4 status conference, counsel for the Debtors complained about the filing of the Group 4a Motion, which he derided (falsely) as "a lawyer's motion, devoid of declarations or proof of claim forms," in which the Group 4a Claimants "didn't swear to anything." Hr'g Tr. Jan. 4, 2022, at 11:6-7. The motion was in fact supported by detailed, signed declarations from each of the movants setting forth the factual bases for their claims and, if applicable, their individual contacts with the Debtors. Counsel for the Claimants noted that the Group 4a Motion, which was filed on behalf of people who had not previously asserted claims, raised many of the same issues presented in the Group 3 Motion, and advised that the number of Group 4 Claimants was expected "to grow significantly" from the twenty-six movants in the Group 4a Motion. *Id.* at 13:22-14:2. Regarding the absence of proofs of claim, counsel for the Claimants explained that filing a proof of claim would be inconsistent with the relief requested in the motion (i.e., to pursue claims in another forum), but that if the Court would prefer proofs of claim filed along with the declarations that were already attached to the motion while the Claimants reserved their rights, the Group 4a Claimants would oblige. *Id.* at 26:23-27:25. With respect to Group 4 (as may be expanded), the Court concluded:

> [I]f you just want my gut of where we should be heading and what to do, first, I agree, we need to get proofs of claim with declarations filed with respect to every creditor that you intend to proceed on. And again, with respect to each, if they're filed late, I'll have to decide whether, in fact, those creditors meet the excusable neglect standard for filing late and/or whether or not they were known or

---

[16]   The Reorganized Debtor has offered no reason why the pendency of a motion for a protective order seeking to limit the scope of discovery would serve to toll the movant's deadline to produce documents it concedes are within the proper scope of discovery.

> unknown creditors who are not bound by the bar date. But until I
> know the universe of them and what their specific circumstances
> are, I can't address that.

*Id.* at 18:15-24. The Court directed the Group 4a Claimants to file proofs of claim and declarations

by January 31, which would be without prejudice to their various legal arguments that would allow

them to proceed outside of bankruptcy. *See id.* at 27:18-28:3.

24.     Regarding Group 3, counsel for the Claimants pointed out that the Debtors had not

yet produced any documents, despite having had the Group 3 Motion and individualized proofs of

claim with declarations since December 6. *See* Hr'g Tr. Jan. 4, 2022, at 24:12-21; 37:18-22;

38:16-24.[17] Counsel also observed that the Debtors "have a database of these claims that is, without

getting into details, easily findable within the time frame of the response in this case," *id.*

24:18-21—i.e., the Internal Claims Spreadsheet, which had been requested in both the September

28 Discovery and the December 20 Discovery. Counsel for the Debtors represented that they were

"ready to go" with respect to discovery relevant to the Group 3 Claimants, *id.* at 16:6, and would

"start rolling it out the door," *id.* at 38:6.

25.     Regarding next steps, the Court said it would be helpful "if the parties would put at

least their preliminary arguments" on this issue in supplemental briefs to be filed February 14,

2022, "to the extent that they think the evidence presented by the proofs of claim will cause me to

consider the request or the analysis." Hr'g Tr. Jan. 4, 2022, at 28:15-22. Counsel for the Claimants

sought clarification that this supplemental briefing would be limited to the Individual Contacts

Issue, with the Systemic Misconduct Issue reserved for a later date, if necessary. *See id.* at

29:4-31:19. The Court agreed:

---

[17]    The official hearing transcript identifies Mr. Shore as the speaker for this excerpt, but it
was Mr. Nelson.

> I'm only trying to winnow down—if you're correct and these people told the debtor, you know, I was arrest[ed]—had numerous contacts with the debtors to prove that they, you know, extended their lease, and nonetheless, they were then . . . .
>
> . . . .
>
> If everybody in your group is a known creditor, why do I even have to talk about anything else?

*Id.* at 31:22-32:4.

### E.    Developments Following the January 4 Status Conference

26.    Following the Court's instructions, the twenty-six Group 4a Claimants and seventy-seven new Group 4b Claimants filed conditional proofs of claim without prejudice to requested relief on a rolling basis on or before January 31.

27.    Between January 10 and February 4, the Debtors propounded interrogatories on 123 Group 3 and 4 Claimants, posing the same six requests to each (i.e., 738 interrogatories in total):

> (1) Identify the date and manner by which You learned that any of the Debtors had filed for bankruptcy.
>
> (2) Identify the date and manner by which You first learned about (i) the General Bar Date; (ii) the Administrative Claims Bar Date, and (iii) the Plan.
>
> (3) Identify (i) who rented the rental vehicle that is relevant to Your proof of claim, (ii) the date of the rental and (iii) if someone other than yourself rented the vehicle, whether you were listed on the rental agreement as an authorized driver of the vehicle.
>
> (4) Identify the date, manner, participants and subjects of Your first Communication with any of the Firms regarding any of the Debtors and/or your claim against any of the Debtors.
>
> (5) Identify the date, manner, participants and substance of all Communications You have had with any of the Debtors' employees concerning return of the rental vehicle that is relevant to Your proof of claim, including, without limitation, any Communications regarding Your failure timely to return the vehicle.

17

(6) Identify the date, manner, participants and substance of all Communications You have had with any of the Debtors' employees by which you claim to have provided notice of Your intent to assert against any of the Debtors a litigation claim arising from an allegedly inaccurate police report.

The first group of interrogatories (directed to forty-two Claimants) demanded that responses and objections be served by January 17 (seven days later), and that attendant answers be substantially completed by January 31 (twenty-one days later). Following a meet-and-confer where the Debtors' counsel offered no legal basis for modifying the 30-day response deadline clearly set forth in Fed. R. Civ. P. 33(b)(2), as applicable by Fed. R. Bankr. P. 7033, but suggested that failure to abide by the Debtors' proposed deadlines would result in a request to move the March 2 hearing, the Claimants filed a motion for a limited protective order on January 14, 2022 [D.I. 278] (the "Claimants' Motion for Protective Order").

28.     The Debtors did not provide responses or objections to the December 20 Discovery when the same were due on January 19. Following several meet-and-confers with counsel for the Claimants, the Debtors filed a supplemental motion for entry of a protective order on January 31 [D.I. 305]. This motion did not address any of the requests for production or interrogatories specifically, but simply replied *en masse*. At one of these meet-and-confers, counsel for the Debtors disclosed that the Debtors have internal lists, compilations, or spreadsheets that identify certain of the Claimants, but stated that they were withholding the document on privilege grounds (though, as noted above, no privilege log has been produced to date and it is unclear what privilege they could assert over the **\*fact\*** that Hertz knew about individuals who were asserting false police report claims and the number of individuals). Between January 16 and February 3, the Debtors made document productions that the Claimants believe are incomplete for the reasons set forth in the *False Police Report Claimants' (I) Objection to Reorganized Debtor's Supplemental Motion*

ACTIVE.135550357.04

*for Entry of a Protective Order Limiting Written Discovery and (II) Cross-Motion to Compel Interrogatory Responses and Production of Documents* filed contemporaneously herewith.

29.     On January 24, 2022, after failing to procure the Claimants' agreement that the Debtors' objections to the Group 4a Motion could be rolled into the Debtors' supplemental brief on the Individual Contacts Issue, the Debtors filed a perfunctory so-called "preliminary" objection to the Group 4a Motion [D.I. 296], which advanced a number of arguments unrelated to the Individual Contacts Issue that will be addressed in due course.

30.     On January 28, 2022, the Debtors filed a "reservation of rights" with respect to the Claimants' Motion for Protective Order [D.I. 301] (the "Debtors' ROR") in which they asserted that the proposed response deadlines were driven by the "tight litigation schedule" and that "when and how the [Claimants] learned of the Debtors' bankruptcy filing, the General Bar Date, the Administrative Claims Bar Date and the Plan" was "information highly relevant to whether Claimants were 'known' creditors[18] and whether their failure to file a timely proof of claim resulted from excusable neglect[19]," *id.* ¶4. Accordingly, the Debtors "reserve[d] the right to seek an extension of the briefing deadline (currently set for February 14) and continuance of the hearing (currently set for March 2) depending on the timing and substance of Claimants' responses to the interrogatories." *Id.* ¶ 5. The Claimants' Motion for Protective Order was granted on February 3, 2022 [D.I. 317].

---

[18]   It is of course absurd to suggest that whether a Claimant was known *to the Debtors* would turn upon what *the Claimant* knew about the Debtors' bankruptcy case.

[19]   If a Claimant was "known" creditor by reason of his or her individual contacts with the Debtors, then the Court need not reach the issue of excusable neglect.

ACTIVE.135550357.04

31.     On February 7, 2022, the Group 4b Claimants filed the Group 4b Motion, which raised substantially identical legal issues as in the Group 4a Motion, with some additional development in light of certain issues raised in the Debtors' preliminary objection thereto.

32.     On February 9, 2022, the forty-two Claimants who had been served with interrogatories on January 10, and four Claimants who had been served with interrogatories on January 25, served their preliminary responses and objections to the interrogatories. These interrogatories confirmed in relevant part that no Claimant knew about the bar date or had retained the firms to bring claims against Hertz before that date, and they offered extensive responses detailing the best available information about relevant rentals, the date of first communication between a Claimant and any law firm, and extensively highlighting contacts between the Claimant and the Debtors as described in the declarations and related documents supporting the proofs of claim. To date, the Debtors have not responded (or even rejected) to a single interrogatory posed by the Claimants in September and December 2021.

### E.     Developments on the Day this Brief Is Filed.

33.     At 3:43 pm on February 14, the day this brief was due and as the Claimants were preparing to file it, Hertz emailed Claimants' Counsel to say that "none of the claimants who we are objecting to as 'unknown' creditors are on any lists we are aware of." **Exhibit B** (the "Marasco Declaration") at Ex. 3 (the "Hertz 2/14 Email"). This email is in contradiction to Hertz's prior representation that some of the Claimants **did** appear on such lists but that Hertz was nevertheless refusing to produce them on privilege grounds. Marasco Declaration, Ex. 1 ("[T]he only lists of which we are presently aware that reflect the names of Group 3 and Group 4 Claimants are privileged, as they were prepared by or at the direction of counsel."). To the extent that Hertz no longer is objecting to some of the Group 3 or Group 4 Plaintiffs, it has not informed the Claimants.

And to the extent Hertz is maintaining their objection to all Group 3 and Group 4 Claimants, it is impossible to square their email of February 14 with its prior representation. If Hertz is now withdrawing its objections to certain Group 3 or Group 4 Claimants in an attempt to avoid production of these spreadsheets and lists, such an action is entirely improper and is gamesmanship at its worst. A party cannot refuse to produce a relevant document, then attempt to stipulate away its relevancy on a narrow issue in an attempt to avoid the disclosure of the document that is plainly relevant to the case. The document was relevant when its production was required. Hertz should produce it. Hertz also notably has not even revealed which "lists" exist, except to say that the Claimants they are objecting to are not "on any lists we are aware of." Discovery will reveal the accuracy of this blanket assertion. Regardless, Hertz's handling of this issue demonstrates the need to move quickly and expeditiously with substantive discovery to Hertz so that the parties and the Court can understand the scope of Hertz's knowledge—both to these individual claimants and to its false police reporting generally.

34.     Indeed, based on information available to the Claimants, Hertz's assertions appear misleading at best. For instance, Hertz maintains a Do-Not-Rent List, which according to Hertz's policies is "a **list** of individuals to whom Hertz has decided it no longer wishes to rent vehicles." Hertz Policy RAC-51.1, *Do Not Rent* § (A)(1) (emphasis added) (attached to the Fluehr Declaration at Ex. 2). Hertz's internal policies specifically call for adding a customer to the Do-Not-Rent List when they meet the following criteria: "[w]here the customer has failed to respond to a vehicle overdue notice(s), or has been unable to provide an excusable reason for not returning a Hertz vehicle after such notice is communicated (verbally or written), resulting in OKC Vehicle Control . . . *filing a conversion or theft report with the police.*" *Id.* § (C)(14)(a) (emphasis added). "The DNR status for this criteria is *permanent.*" *Id.* (emphasis added). It is virtually impossible to

ACTIVE.135550357.04

believe that the Do-Not-Rent List does not include the Claimants, almost all of whom meet that criterion.

35.    In fact, in the hours since Hertz's eleventh-hour email, counsel have identified **14** Claimants in Group 3 and 4a where Hertz's internal records specifically note that they were added to the Do-Not-Rent List. While the total number upon careful review will certainly be much, much higher, those **14** listed Claimants are:

| Document Bates Number | Claimant | Annotation |
|---|---|---|
| HERTZ_FPRP_0000057 | Charles Bort | "DNR Submitted: 14C" |
| HERTZ_FPRP_0000081 | Janette Brown | "DNR Submitted: 7" |
| HERTZ_FPRP_0000089 | Tyresha Caudle | "DNR Submitted: 14C" |
| HERTZ_FPRP_0000165 | Sean Hurt | "DNR Submitted: 14C" |
| HERTZ_FPRP_0000190 | Heather Kasdan | "DNR Submitted: 14C" |
| HERTZ_FPRP_0000261 | Paula Murray | "DNR Submitted: 14C" |
| HERTZ_FPRP_0000391 | Marissa White | "DNR Submitted: 14C" |
| HERTZ_FPRP_0002013 | Carmen Bosko | "DNR Submitted: 14C" |
| HERTZ_FPRP_0002127 | Rejeana Meado | "DNR Submitted: 14C" |
| HERTZ_FPRP_0002182 | Jenelle Reece-Williams | "DNR Submitted: 14C" |
| HERTZ_FPRP_0002232 | Andrew Seaser | "DNR Submitted: 13" |
| HERTZ_FPRP_0002335 | Melinda Smith | "DNR Submitted: 14C" |
| HERTZ_FPRP_0002540 | Tedheri Usude | "Renter will be Added to DNR" |
| HERTZ_FPRP_0002664 | Reginald Brown | "DNR Submitted: 14C" |

The majority of those persons are specifically noted as "14C" additions to the Do-Not-Rent List, which corresponds to policy (C)(14) quoted above. And that information comes directly from the *front page of the theft reports* at issue, as shown by example below:

22

Report Type: C                     *IMMEDIATE ATTENTION REQUIRED*                     ***Confidential***

HERTZ

Initial Report of Vehicle

**REPORT THIS VEHICLE STOLEN TO YOUR LOCAL POLICE DEPARTMENT WITHIN 4 DAYS AND RETURN THIS SHEET TO OKC VEHICLE CONTROL WITH REQUIRED THEFT INFORMATION HIGHLIGHTED ON THIS SHEET TO:**

Okctheftandrecovery@hertz.com or 405-775-3078

| VCWX0390 | | | | | | | | | | **\*\*Confidential\*\*** |
|---|---|---|---|---|---|---|---|---|---|---|
| Report Type: C | | | | HERTZ | | | | | | |
| TR=Theft Renter | | | | OKC Vehicle Control | | | | | | |
| TF=TheftFraud | | | | Initial Report of Vehicle | | | | | | |
| C=Conversion | | | | | | | | | | |
| | | | | | | | | | Theft ID:    92412 | |
| Unit No | Year | Make | Model | | | Type | Color | | Serial No. | |
| 0007107188 | 2015 | NISSAN | ALTIMA | | | 4DR | SIL | | 1N4AL3AP0FN375462 | |
| Lic Plate YR | Lic ST | Lic NO. | Odometer Out | | Odometer In | | Owning Area | | Rental No. | |
| 2017 | NY | GSD4776 | 39992 | | | | 01998 | | 195855656 | |
| Date & Time Rented | | Rented From | Due Date | | Location Due | | Home Phone | | Business Phone | Local Phone |
| 09/30/2016 10.00.00 | | 05864-12 | 11/04/2016 09.55.00 | | 05864-12 | | 8437095364 | | | |
| Renter's Name | | | | | Residence Address (City, State, & Zip Code) | | | | | |
| PAULA MURRAY | | | | | 42 HOBSON STREET PORTSMOUTH       VA23704 | | | | | |
| Employer's Name | | | | | Secondary Address (City, State, & Zip Code) | | | | | |
| | | | | | 42 HOBSON STREET, PORTSMOUTH, VA 23704 | | | | | |
| Identification Used | | Driver's License No. | | ST. | DT of Birth | | | Person Renting Veh Provided False Info.(Yes/No) | | |
| XXXXXXXXXXXX0870 | | 004248120 | | SC | 1973 | | | No | | |
| Dept. Reported to | | | Reported to | | Reported By | | Reported On | | Alarm Number | |
| | | | | | | | | | | |
| Keys Returned? | Veh Locked? | LDW | Book Value | | Date & Time Stolen | | | Location of Vehicle at Time of Theft | | |
| No | No | N | 10789.77 | | 11/04/2016 09:55 | | | IN RENTERS POSSESSION, VA | | |
| | | | | See Attached Pages for the overdue notes for the Worksheet ID:      16100902308 | | | | | | |

THE VEHICLE APPEARED ON THE OVERDUE REPORT. THE PHONE NUMBER ON THE RENTAL WAS CALLED. ALL AVAILABLE SYSTEMS HAVE BEEN CHECKED. NO ADDITIONAL INFORMATION HAS BEEN FOUND.

Date certified Demand Letter Was Sent:   11/01/2016          Return Mail:

Force Return Hired:    11/01/2016          Repossession Service Hired:

Rental Rep:   1484                     DNR Submitted:   14C

Prepared By:    H. Bates                    Prepared Date:  11/15/2016 10:29

VC Supervisor Signature _____          Printed Date:      11/15/2016 10:31:21 AM

Marasco Declaration, Ex. 4, HERTZ_FPRP_0000261. The record directly contracts the assertion

"that none of the claimants who we are objecting to as 'unknown' creditors are on any lists we are

aware of." Hertz 2/14 Email.

    36.    Even more remarkably, the Do-Not-Rent List policy admits on its face that Hertz

files some false police reports. As discussed above, Policy "(C)(14)" or "14C" requires those

customers Hertz reports for theft by conversion to be added <u>permanently</u> to the Do-Not-Rent List. Policy (C)(14), however, provides one notable exception: "[i]f it is later determined that the vehicle was previously returned, or a valid rental extension had been granted, the individual must be promptly removed from DNR." Hertz Policy RAC-51.1, *Do Not Rent* § (C)(14)(a). In other words, Hertz's own policies specifically note that customers are sometimes falsely reported for theft and require specific steps to be taken to manage their names on a particular list. And while Hertz might remove them from the Do-Not-Rent List, it apparently does not withdraw its false police reports. Regardless, removing a person from the Do-Not-Rent list is at minimum an acknowledgement that Hertz understands it has falsely reported renters to the police.

### <u>SUMMARY OF ARGUMENT</u>

I. The overwhelming majority of Claimants in Group 3, Group 4a, and Group 4b were known creditors entitled to actual notice of key steps in these bankruptcy proceedings based on individualized communications with the Debtors. Per the Reorganized Debtor's request and the Court's direction, each of these Claimants has filed individualized proofs of claim supported by a sworn declaration. And a minority of these Claimants have received *some* limited discovery from Hertz. Based on those aspects of the record alone, the Court has ample basis for holding that most Claimants were deprived of due-process rights based on Hertz's failure to provide actual notice to known creditors under the *Allegheny* and Rule 56 decisional frameworks.

II. Known creditors are those that are known or reasonably ascertainable to the debtor based on its books and records or otherwise. As relevant here, specific communications can put a debtor on notice that a creditor has a claim against the debtor, whether by directly threatening to sue, directly alleging that the debtor has injured the creditor, or giving the debtor sufficient information

ACTIVE.135550357.04

to know that an injurious action it has taken or will take is false or unjustified. Relevant communications can come from the creditor himself or from third parties.

III. 113 Claimants present due-process arguments based on based on the Individual Contacts Issue: (a) 9 Claimants threated to bring legal claims against Hertz for its conduct; (b) 43 Claimants directly confronted Hertz and accused the company of filing a false police report or having them falsely arrested; (c) 21 Claimants directly contested the underlying substance of the theft report before being aware that they had been reported for theft (or, in some cases, before they were reported for theft)[20]; (d) 14 Claimants offer communications from Third Parties that notified Hertz that a Claimant was falsely arrested or reported for theft; (e) 10 Claimants not already included above communicated with Hertz to extend their rental but were nonetheless reported for theft; and (f) 21 Claimants bring claims interconnected with those of a known creditor (e.g., a child detained at gunpoint while a known-creditor parent was arrested) and were deprived of due process based on Hertz's failure to provide actual notice to the related creditor.

IV. Although Hertz has not, to date, provided individualized arguments to the overwhelming majority of the Claimants, it has provided some general arguments that the Court should reject. In particular, the Court should not accept the Reorganized Debtor's attempt to justify its blanket failure to provide notice to false-police-report Claimants based on *post-hoc* attempts to (a) dismiss any communication with a Claimant—including where a Claimant directly accuses Hertz of falsely reporting her for auto theft—if that Claimant did not directly state an intent to bring litigation, a position of the Reorganized Debtor that is inconsistent with law and common sense alike; (b) create artificial time constraints on relevant contacts that are utterly inconsistent with pertinent legal standards and Hertz's own document retention policies; (c) dismiss contacts

---

[20]   Five of these 21 Claimants also assert they were known creditors in other appendices.

ACTIVE.135550357.04

where Claimants cannot *name a particular* Hertz employee involved in a communication; and (d) attempt to shirk responsibility for giving notice to holders of significant legal claims based on a defined set of customers reported for theft because Hertz engages in a large number of rental transactions and communications each year.

V. The Court should grant relief to the 113 Claimants (or as many as possible) for whom the record is already sufficient to find that actual notice was required based on the Individual Contacts Issue. To the extent the Court believes that the record is insufficient to grant relief to any particular Claimant, the Court should reserve judgment until the Reorganized Debtor has engaged in real discovery on these issues—indeed, the Reorganized Debtor has produced no documents for a majority of Claimants and woefully inadequate documents for the remainder. Going forward, the Court should establish a discovery schedule that will permit it to resolve the Group 3, Group 4a, and Group 4b motions in their entirety at a hearing to be held this summer, and that will allow the Court to decide the appropriate path to resolving all false-police-report claims properly asserted against Hertz.

## **ARGUMENT**

### I.     **The Court Can Grant Relief to Certain Claimants on the Current Record.**

37.     As envisioned at the prior hearings, this Court has sufficient information based on the individual proofs of claim and the limited discovery provided by Hertz to rule at the March 2 hearing that 97 of the 123 Claimants were "known" creditors that required actual notice under the Due Process Clause and that an additional 15 Claimants were deprived of due process because their claims are interrelated to known creditors who were not provided notice. Following the Court's instructions, Claimants here have now submitted individual proofs of claim detailing their contacts with Hertz that are sufficient to establish that they were known creditors, as well as some

limited discovery obtained to date that underscores their claims. Accordingly, they file this brief in advance of the March 2 hearing "to the extent that they think the evidence presented by the proofs of claim will cause me to consider the request or the analysis." Hr'g Tr. Jan. 4, 2022, at 28:15-22.

38.     Claimants remain concerned that Hertz is not producing relevant information and is trying to force Claimants to jump through various hoops that do not exist in any other bankruptcy—let alone civil litigation—context.  In the various meet-and-confers between the parties, and in their "reservation of rights" with respect to the Claimants' Motion for Protective Order, the Debtors have taken the position that the Court will need a "full record" at the March 2 hearing, *see* Debtors' ROR ¶ 5. They assert that this record must include discovery not only from the Debtors, but also from the Claimants. As support for this proposition, they rely on the following statement of their counsel at the January 4 status conference: "'We'll get discovery out to Mr. Nelson, *he's going to have to get us some discovery back*.'" Debtors' ROR ¶ 2 (emphasis added) (citing Hr'g Tr. Jan. 4, 2022, at 36:17-20). Of course, a lawyer saying something at a hearing does not make it so. And the Court never assented to this, or even mentioned it at any point during its ruling, which was as follows:

> All right. Well, you all [i.e., the Debtors] respond with respect to the claims that we all acknowledge, the proofs of claim are now on file with the appropriate declarations, and you'll start rolling those out [i.e., document productions from the Debtors' records].
>
> And with respect to the remaining declarations we're waiting for, the claimants will be filing those by January 31st.
>
> And the parties will be filing, on February 14th, brief supplemental briefing on how *that information* impacts on the issue of known creditor with respect to those claimants. And I will reserve the whole systemic issue until I've addressed those and can address whether I need to go any further.

ACTIVE.135550357.04

Hr'g Tr. Jan. 4, 2022, at 39:10-22 (emphasis added). By "that information," the Court was referring to the information in the Claimants' declarations detailing their individual contacts with the Debtors. Consistent with the Court's direction, the Claimants discuss below how the information in the proofs of claim and declarations, supplemented in some cases by documents that have been produced thus far by the Debtors, impact the Individual Contacts Issue with respect to particular Claimants. The Debtors should do the same in their simultaneous supplemental brief, which would put the Court in a position to substantially narrow the issues in dispute at or after the March 2 hearing. Indeed, as demonstrated below, the record is already sufficient for the Court to grant relief to the majority of Claimants—those Claimants' cases should not be delayed by the Debtors obstinate discovery tactics.

39.    Deciding the issue on the basis of the proofs of claim is exactly the type of process that the Reorganized Debtor envisioned when they teed up their "preliminary" objections to the False Police Report Claims in their 21st and 22nd Omnibus Objections. Recall the Court's direction to the parties on October 28, 2021, regarding the manner of proceeding at the November 4, 2021, hearing:

> I'll hear argument . . . to determine whether the proof of claim that is submitted did make a *prima facie* case and/or that the debtors' objection contains sufficient evidence that would overrule the *prima facie* claim. But I am not going to address conflicting evidence on the claims . . . .

Hr'g Tr. Oct. 28, 2021, at 12:5-15. And recall further the Debtors' counsel's understanding of the role the declarations the Debtors had submitted in support of their omnibus claim objections would play at that hearing:

> I think I understand what Your Honor is envisioning for this. We don't need to move the declaration into evidence, which would give them the right to claim hearsay unless they can cross-examine. The point of the declaration . . . is to provide the Court with the information to determine that these are group claims or that these

are duplicate claims, or that the claims have been amended and superseded. . . . *[T]hat declaration shifts the burden to the claimants to come forward with their evidence* that they're not . . . group claims that are not in compliance with the bar date order, or they haven't been amended or superseded, or they—right?

And so I understand what Your Honor wants. We don't need to turn [the hearing] into a debate over evidence or not.

*Id.* at 15-19 (emphasis added).

40.     With respect to the Group 3 Claimants, the March 2 hearing is effectively a continuation of the November 4 hearing, because the Group 3 Motion is an outgrowth of the Group 3 Claimants' response to the Debtors' 21st Omnibus Claim Objection. And with respect to the Group 4 Claimants, their filing of proofs of claim puts them in a similar procedural posture as the Group 3 Claimants because of the burden-shifting framework applicable to proof-of-claim litigation under *In re Allegheny International, Inc.*, 954 F.2d 167, 173 (3d Cir. 1992) ("[A] claim that alleges facts sufficient to support a legal liability to the claimant satisfies the claimant's initial obligation to go forward."). *Allegheny* aside, the Court could also consider the Individual Contacts Issue for both the Group 3 and Group 4 Claimants under a Fed. R. Civ. P. 56 framework, which is applicable to contested matters pursuant to Fed. R. Bankr. P. 9014(c) and 7056.

41.     Under either the *Allegheny* framework or the Rule 56 framework, the upshot is this: many Claimants have already *come forward* with evidence sufficient to make a *prima facie* showing that they were "known" to the Debtors by virtue of their specific contacts with the Debtors (as discussed further below). And Debtors have not produced any evidence contradicting the Claimants' evidence of notice. If such evidence exists in Debtors' possession, they would have (and should have) produced it by now. Accordingly, the Court should hold that those Claimants were known creditors not provided notice of relevant bankruptcy events (as described in the underlying motions) and grant the relief requested in those motions.

ACTIVE.135550357.04

42.     Debtors may argue in the simultaneous briefing that they cannot rebut certain Claimants' *prima facie* known-creditor presentations by reason of their lack of discovery and request deferment of the Court's ruling on the Individual Contacts Issue for the applicable Claimant(s). But to support such deferment, the Debtors must establish that the discovery sought is "essential to justify its opposition" on the Individual Contacts Issue and "cannot" be obtained otherwise "for specified reasons." *See* Fed. R. Civ. P. 56(d). The Debtors cannot meet such a standard with respect to their interrogatories to the Claimants.

43.     Interrogatories #1, #2, and #4 seek information relating to *the Claimants' knowledge* of the bankruptcy proceedings and association with counsel, which is obviously irrelevant to the question of whether *the Debtors knew* about the Claimants. Moreover, the Claimants specifically answered whether they were aware of relevant bankruptcy proceedings (i.e., bar dates and/or the Plan) and provided the date of first Communication with any of the firms, as requested. And interrogatories #3, #5, and #6 simply ask for details regarding the Claimants' claims and individual contacts with the Debtors, which details are already included (per the Court's direction) in the Claimants' filed proofs of claim. The Claimants answered these interrogatories based on the information in their proofs of claims and accompanying declarations, as well as that in limited discovery produced to date that has been reviewed by certain counsel for Claimants (but not the Claimants themselves or other their primary contact counsel given the Reorganized Debtor's confidentially designations). Moreover, on the Individual Contacts Issue specifically, the applicable Claimants have already come forward with the facts that were known to them at the time and upon which they were relying to establish that they were known creditors based on individual contacts with the Debtors.

44.     In sum, the Court should consider the evidence collected and presented to date on the Individual Contacts Issue as to the applicable Claimants and grant relief where the current record is sufficient to find that the Claimants were "known" creditors.

## II.     The Court Should Grant Relief to Certain Claimants Based on Specific Notice.

45.     This Court now has more than sufficient record evidence to hold that many Claimants were known creditors based on their specific contacts with the Debtors before the General Bar Date or Administrative Claims Bar Date (as applicable). This section explains why most Claimants have already presented enough to show that they are known creditors. For the Court's convenience, individual arguments are set forth in appendices that group similar types of individual arguments based on evidence included in the Claimants' proofs of claim (including their declarations and other evidence submitted as part of their proofs of claim) and documents produced by the Reorganized Debtors to date. Most Claimants' arguments center on specific communications between the Claimant (or a representative) and the Debtors. In some cases, arguments will also include communications made by third parties—for example, police or prosecutors.[21]

---

[21]     In addition to the claims of specific, individualized contacts described in this brief, the theft reports underlying the Claimants' cases are based on flawed policies and procedures that produce false, misleading, and unverified criminal accusations. Examples include Hertz's policy of telling the police that the renter has not paid when in fact it charges the renter immediately after the police report; Hertz's reporting of renters to the police even where mail to the renter is returned as undeliverable; Hertz's policy of refusing to correct or update information in the police report; Hertz's failure to investigate and follow its own policies prior to filing a police report; and Hertz's refusal with withdraw filed police reports even when it knows no crime occurred. Based on the Court's instructions, however, the Claimants have not included arguments based on manifestations of systemic issues in individual cases because those issues cut across multiple police reports and therefore are more "systemic." Claimants believe, however, that the record already is sufficient for this Court to rule, for example, that Hertz's policy of charging the renter after submission of the police report and not informing the police of that payment is sufficient to have required individualized notice for any reports reflecting that issue.

46.     The Claimants note that both parties have extensively briefed the legal standards underlying known creditor status. In particular, the Claimants expressly incorporate legal arguments made in earlier briefing and refer the Court specifically to the following for further legal argument, if desired. *See* Group 3 Motion ¶¶ 57–59, 69–73, 75; Group 4a Motion ¶¶ 57–59, 69–73, 75; Group 3 Reply ¶¶ 11–12, 39–46; Group 4b Motion ¶¶ 23–24, 53–55.[22] The Claimants restate certain key legal principles here.

47.     For notice purposes, bankruptcy law divides claimants into two types, 'known' and 'unknown.'" *Chemetron Corp. v. Jones*, 72 F.3d 341, 346 (3d Cir. 1995) (citing *Charter Crude Oil Co. v. Petroleos Mexicanos* (*In re Charter Co.*), 125 B.R. 650, 654 (M.D. Fla. 1991)). A "known" creditor is one whose identity is either known or "reasonably ascertainable by the debtor." *Tulsa Pro. Collection Serv., Inc. v. Pope,* 485 U.S. 478, 490 (1988). A claim is reasonably ascertainable where a debtor has "some specific information that reasonably suggests both the claim for which the debtor may be liable and the entity to whom he would be liable." *In re Arch Wireless, Inc.*, 534 F.3d 76, 81 (1st Cir. 2008) (quoting *In re Crystal Oil Co.*, 158 F.3d 291, 297 (5th Cir. 1998)); *J.A. Jones*, 492 F.3d, at 250 ("[A] creditor is 'reasonably ascertainable' if the debtor can uncover the identity of that creditor through 'reasonably diligent efforts.'") (quoting *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 798 n. 4 (1983)).

48.     Moreover, "[s]ituations may arise when creditors are 'reasonably ascertainable,' although not identifiable through the debtor's books and records." *Chemetron*, 72 F.3d, at 347 n.2. And "[i]f the debtor knows, *or should know*, of its potential liability to a specific creditor, that

---

[22]   The Group 3 Motion, Group 4a Motion, and Group 4b motion each contain additional background and summary of the Claimants' experiences as summarized in each respective proof of claim.

creditor is a known creditor entitled to actual notice." *Thomson McKinnon Secs.*, 130 B.R. at 720

(emphasis added) (citing *Atlantic Richfield Co. v. Sharon Steel Corp.* (*In re Sharon Steel Corp.*),

110 B.R. 205, 206 (Bankr. W.D. Pa. 1990)); *see also Trans World Airlines*, 96 F.3d at 690 ("a

diligent search of TWA's records by its bankruptcy counsel would, *or at least should*, have

revealed the Berger claims." (emphasis added)); *In re Geo Specialty Chemicals Ltd.*, 577 B.R. 142,

192 (Bankr. D. N.J. 2017) (debtor "knew about the conspiracy it originated and knew *or should*

*have known* about any contingent antitrust claims" (emphasis added)). Indeed, as the Second

Circuit has made clear in this context, a debtor's "reckless disregard of the facts [is] sufficient to

satisfy the requirement of knowledge" for known creditor purposes. *In re Motors Liquidation*, 829

F.3d 135, 159–61 (2d Cir. 2016).

49.     A creditor can be a known creditor based on communications with the debtor. *See*,

*e.g.*, *Arch Wireless*, 534 F.3d at 81–82 (customer was known creditor based on correspondence

indicating disputes relating to product sales). The most obvious form of such notice is a litigation

threat or related assertion (e.g., preservation letter, demand letter, etc.). But, as the cases above

demonstrate, a debtor's knowledge of the factual circumstances underlying a claim qualify too.

Indeed, Hertz elsewhere has conceded that "[a] creditor might be known if a debtor has specific

information regarding the creditor's actual injury" (short of a formal litigation threat). Group 3

Obj. ¶65 (citing *In re Placid Oil Co.*, 753 F.3d 151 (5th Cir. 2014)). That was the standard applied

by the Ninth Circuit in *In re Maya Construction Co.*, where a creditor was "known," despite

conflicting statements from the creditor and the creditor's lawyer regarding whether he intended

to sue the debtor, because the creditor's "state of mind and intention did not obviate [debtor]'s

knowledge that it had placed contaminated soil on [creditor]'s land and that, whether he planned

to sue [debtor] or not, he had a potential claim." 78 F.3d 1395, 1398 (9th Cir. 1996). In other

ACTIVE.135550357.04

words, "courts dispense with the requirement of actual notice only in cases where a [debtor] does not have in its possession any information sufficient to alert [it] to the existence of a problem underlying a claim in issue." *Solow Bldg. Co. v. ATC Assocs.*, 175 F. Supp. 2d 465, 472–73 (E.D.N.Y. 2001).

## III.  Categories of Claimants Establishing Known Creditor Status Based on the Individual Contacts Issue.

50.     This Section presents evidence that 97 of the 123 Claimants who filed individualized claims after the General Bar Date were known creditors and a further 16 Claimants bring cases intimately linked to those of known creditors not provided notice.[23] The 123 Claimants are grouped into seven categories, each accompanied by an appendix that presents by Claimant the relevant record evidence from the proofs of claim and Hertz's productions to date. Except for five Claimants with cases tied to those of other known creditors, each Claimant is included only in one appendix even if he or she satisfied the criteria for multiple appendices. In short: (A) 9 Claimants threated to bring legal claims against Hertz for its conduct; (B) 43 Claimants directly confronted Hertz and accused the company of filing a false police report or having them falsely arrested; (C) 21 Claimants directly contested the underlying substance of the theft report before being aware that they had been reported for theft (or, in some cases, before they were reported for theft); (D) 14 Claimants offer communications from Third Parties that notified Hertz that a Claimant was falsely arrested or reported for theft; (E) 10 Claimants not already included above communicated with Hertz to extend their rental but were nonetheless reported for theft; (F) 21 Claimants bring claims interconnected with those of a known creditor (e.g., a child detained at gunpoint while a known-

---

[23]     As explained below, 21 Claimants bring Claims interrelated to those of a known creditor (typically, a parent or spouse who rented the vehicle); five of those Claimants also present direct known-creditor arguments included in another appendix.

ACTIVE.135550357.04

creditor parent was arrested); and (G) 10 Claimants do not present individualized-contacts arguments based on information obtained to date. For ease of reference, each appendix lists Claimants by their name, their group (i.e., Group 3, Group 4a, or Group 4b), their Claim Number, and the Master Claimant Number listed in **Exhibit A**. *See* **Exhibit A** (listing the 230 Claimants who have filed individualized claims with supporting declarations or complaints).[24]

### A. Claimants Who Indicated an Intent to Bring Legal Claims.

51.    Appendix A lists 9 Claimants who in fact threatened to bring legal claims against Hertz.[25] Many of these persons had documented legal threats leading up to the bankruptcy filing or were involved in settlement negotiations with the Debtors or their third-party claims managers. Claimant Kellan McClellan, for example, sent numerous formal demand letters and notice of losses, as well as spoke with in-house and third-party claims examiners while offering to settle his claims connected to a false arrest. Similarly, Claimants James Tolen and Krystal Carter retained non-bankruptcy counsel (Husein Hadi) to bring post-petition claims stemming from a December 23, 2020, arrest of Mr. Tolen at gunpoint in a vehicle that Hertz reported stolen despite renting it to Ms. Carter. Non-bankruptcy counsel extensively discussed those claims with Hertz and Hertz's claims adjuster, including a January 4, 2021, notice of representation from counsel "advis[ing] that [his] law firm has been retained by [Mr. Tolen and Ms. Carter] to represent them for personal injuries and other related damages sustained due to [Hertz's] negligence." Marasco Declaration, Ex. 4, HERTZ_FPRP_0002396. Unaware of the bankruptcy, non-bankruptcy counsel filed a lawsuit against Hertz on July 30, 2021 (prior still to the Administrative Claims Bar Date). Hertz

---

[24]    This list is being provided solely for the Court's convenience and is not a waiver or indication of any intent not to pursue any other outstanding claims, including any "group" claim on behalf of a Claimant who has not filed an individualized claim supported by a declaration.

[25]    For clarity, "Hertz" as used herein refers collectively to the Debtors and Reorganized Debtors.

ACTIVE.135550357.04

responded on August 24, 2021, with a letter threatening "to hold [non-bankruptcy counsel] in contempt of court and seek sanctions and attorney's fees" if the lawsuit was not withdrawn, arguing for post-petition claims that Mr. "Tolen's failure to file a proof of claim against the Reorganized Debtors in the Bankruptcy Cases bars any recovery on his alleged claims against the Reorganized Debtors." Claim No. 15,761, at 73–77 (letter from White & Case to non-bankruptcy counsel). Two days after a non-suit was filed in light of the letter the Reorganized Debtor's counsel, non-bankruptcy counsel for Mr. Tolen—who had been arrested at gunpoint after Hertz rented Ms. Carter a vehicle it had reported stolen—received an email from Hertz's Assistant General Counsel that said: "Didn't hertz so much after all I guess." *Id.* at 32.

## B. Claimants Who Told Hertz It Falsely Reported Them for Theft.

52.     Appendix B lists 43 Claimants who confronted Hertz over the theft report it filed or the related criminal proceedings against them (e.g., arrest warrant, arrest, prosecution, *etc.*). Typically, these individuals directly told Hertz that the theft report was false, and therefore directly informed Hertz that it had harmed them by falsely accusing them of a serious crime. For example, as reflected in Hertz's internal records, Claimant Raelena Wright Lewis called on March 6, 2020— just two months before Hertz filed its Petition—and "said we [i.e., Hertz] had her false[l]y arrested." Marasco Declaration, Ex. 4, HERTZ_FPRP_0002589[26]; *see also* Claim No. 15,663, at 13–14 (¶¶ 16–17) (Ms. Lewis's declaration describing many similar calls). Similarly, Claimant

---

[26]   The Claimants redact descriptions and quotations of the discovery produced by Hertz because all of that discovery has been deemed highly confidential. But much if not all of the discovery to date should not be confidential. Hertz has deemed "highly confidential" copies of the Claimants' own declarations submitted earlier in bankruptcy. And there is no reason, for example, that a theft package that Hertz often gives to police and can sometimes be obtain via public record searches should be deemed confidential. The consequences of these markings, among other things, has been to prohibit the Claimants from personally seeing and responding to information about themselves.

Cody Breedlove emailed customer relations about a post-petition claim on July 2, 2021, saying "You have filed false theft charges causing the loos [sic] of my career for a returned vehicle and here is proof. You also had caused jail time. Bank statement as well." Claim No. 15,888, at 32 (copy of email). The email attached a return invoice and bank statement showing his payment for the vehicle, and Hertz assigned a claim number but otherwise did not appear to respond. *Id.* at 33 (automated Hertz reply and July 26 email that Mr. Breedlove "[hadn't] received a response!"). The Claimants in Appendix B directly accused Hertz of initiating false and life-altering criminal proceedings against them. They were known creditors.

### C. Claimants Who Told Hertz the Underlying Substance of the Report Was False.

53.     Appendix C lists 21 Claimants whose communications with Hertz directly contradict the underlying basis for Hertz's theft report, but typically did so before the report was filed or before they were aware of the report (and therefore didn't or couldn't say "I was falsely reported for theft"). These Claimants, too, directly communicated to Hertz that the information Hertz knew was in the theft report (or that it would soon after put in the theft report) was not true. Claimant Heather Kasdan, for instance, arranged for Hertz to tow her rental after an accident. After Hertz reached out to her about returning the rental, she emailed customer relations and vehicle control extensively explaining that she was in an accident, that she arranged a tow with Hertz Roadside Assistance, and asking "[w]hy are you contacting me in regard to where it is?" Claim No. 15,945, at 20–21 (email); Marasco Declaration, Ex. 4, HERTZ_FPRP_0002588 (internal record of the email). She also contested charges for "rental" time after the accident. Hertz nonetheless reported Ms. Kasdan for stealing the vehicle on October 7. Claim No. 15,945, at 24 (excerpt of police report). Hertz did not tell the police about her August 30 email. In this way, Ms. Kasdan's own contacts directly informed Hertz that the report it was about to file claiming she

stole the car was false because Hertz had arranged to tow the car. Indeed, a produced tow receipt shows that the vehicle was in fact impounded by the tow company for 92 days until October 10, 2019—putting the tow date right near the July 7, 2019 accident. (And putting Hertz's "recovery" of the vehicle three days after Hertz reported the "theft.") Marasco Declaration, Ex. 4, HERTZ_FPRP_0000211–212. In other words, Hertz lost track of the car in the towing process, and Ms. Kasdan told Hertz exactly what happened, but Hertz reported her for theft anyway. Given that Ms. Kasdan directly and repeatedly told Hertz that she did not steal the car because the company had agreed to tow the vehicle after her accident (and the two receipt confirming that was true), she plainly put Hertz on notice that she would have a claim when the company nonetheless accused her of stealing the vehicle.

54.    As another example, Hertz's records confirm that when it inquired about a missing vehicle, Claimant Reginald Brown—who returned the vehicle long before he was reported for theft—sent Hertz a picture of the returned vehicle at the Hertz location and requested that Hertz send him an affidavit to swear to the return. Marasco Declaration, Ex. 4, HERTZ_FPRP_0002670 ("Renter shared pictures of where he dropped of[f] the unit at location … He is requesting a[n] affidavit be sent to him via email."); *see* Claim No. 15,739, at 15 (¶¶ 8–9) (time-stamped picture of returned vehicle). Instead of sending Mr. Brown the affidavit, Hertz reported *him* to the police for theft because it was dissatisfied with how he returned the vehicle. Marasco Declaration, Ex. 4, HERTZ_FPRP_0002671 ("cannot send renter an affidavit because the keys were left in the vehicle and not properly returned."). Mr. Brown was ultimately arrested, spent a night in jail, and was prosecuted for almost two years before all charges were dismissed. It is plainly reasonably ascertainable that a customer would have a legal claim when reported for stealing a vehicle after he had already told Hertz he had returned the "stolen" vehicle, sent Hertz a time-stamped

38

photograph of the returned vehicle on its property, and requested an affidavit to swear to the return.[27]

### D. Claimants for Whom Third-Party Communications Informed Hertz the Report Was False or Had No Basis.

55.     Appendix D lists 14 Claimants for whom communications from third parties put Hertz on notice of their claims. Hertz had thus far refused to search for or generally produce communications from third parties. But many Claimants have still been able to identify such communications in their declarations or via indirect references in other records. For example, in Claimant Jessica Andolino's case, Hertz produced records detailing a call with law enforcement explaining that Ms. Andolino was arrested during an initial rental contract (because Hertz rented her a "stolen" vehicle). Marasco Declaration, Ex. 4, HERTZ_FPRP_0002004 (March 24, 2021, record linked to Ms. Andolino's file: "Driver of vehicle arrested[.] Officer wanted to make sure vehicle was not reported stolen. Confirmed contract is current and he gave me the renter name. Confirmed that as well"). Similarly, Claimant Bianca DeLoach submitted a *nolle prosequi* motion filed by the State of Georgia saying, "[t]he State communicated with a Hertz representative from New Jersey who was unable to explain how the defendant paid in full in February for the vehicle, yet the vehicle was reported stolen. The New Jersey representative was also unable to identify any number of attempts made by Hertz to contact the defendant and request the vehicle returned." Claim No. 15,764, at 27. Other Claimants describe communications with ride-share companies like Uber or Lyft that would directly undermine any notion that the vehicle had been stolen.

---

[27]    Appendix C contains further details supporting Ms. Kasdan and Mr. Brown's notice cases.

**E. Claimants Who Communicated with Hertz to Extend Their Rentals.**

56.     Appendix E lists 10 Claimants who were reported for theft (and often arrested) despite communicating with Hertz to extend their rentals. Although this narrative is true of many Claimants, this appendix includes only those Claimants who do not present an argument in one of the earlier appendices. The Court previewed at the January 4 Hearing that rental extensions were relevant to the known-creditor inquiry in these circumstances, *see* Hr'g Tr. Jan. 4, 2022, at 31:22–32:4. (describing Claimants who had "numerous contacts with the debtors to prove that they, you know, extended their lease"). And indeed they are. There is no basis for reporting a renter who is actively communicating with the company to extend the rental for theft (even if the company deletes or ignores those extensions because of a payment dispute or inadequate funds in the customer's account).

57.     For example, Claimant Brandy Porter rented a vehicle from Dollar/Thrifty in September 2019 from an airport location in Raleigh, North Carolina. Claim No. 15,887, at 13 (¶ 3). She had previously worked for Dollar/Thrifty through a "temp" agency, so was familiar with the employees and managers there. *Id.* Each week, Ms. Porter called the location and spoke with Evan, an employee she knew from her previous time working with Dollar/Thrifty, to extend the rental. *Id.* at 13–14 (¶¶ 2, 4). After about 30 days, a check-engine light came on and she exchanged the car for a new vehicle, which she again extended each week with Evan. *Id.* at 14 (¶¶ 4–6). She returned the vehicle on November 21, 2019 (her birthday), personally working with manager "AB" (who she also knew); she saw a large charge on her card when she returned home. *Id.* at 14 (¶¶ 7–9). More than two years later, on January 4, 2022, Ms. Porter and her daughter were detained and she was arrested, jailed, and prosecuted. *Id.* at 14–15 (¶¶ 10–13). Criminal charges remain pending based on the rental that Ms. Porter extended, paid for, and returned years earlier. *Id.* at 15 (¶ 16).

ACTIVE.135550357.04

**F.  Claimants Whose Claims Are Linked to Those of a Known Creditor.**

58.      Appendix F lists 21 Claimants who were detained, arrested, or otherwise injured in connection with another Claimants' rental. These individuals, typically children[28] and spouses, bring claims interrelated to those of another Claimant who is a known creditor listed in Appendices A–E. Where the Debtors failed to provide notice to a known creditor, ordinary due-process principles compel that notice to related creditors also was insufficient.[29] A debtor's failure to notify known creditors necessarily falls short of "[a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality," namely, "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950). Where the circumstances include the failure to provide notice to related, known creditors, the "circumstances" plainly demonstrate that the notice was not "reasonably calculated … to apprise interested parties," and they were not *"such as one desirous of actually informing the absentee might reasonably adopt to accomplish it." Id.[30]*

59.      Indeed, a contrary ruling would create a perverse incentive for debtors *not* to notify known creditors that might, in turn, notify other creditors about the opportunity to bring claims.

---

[28]   Minor children (or those who were minors at relevant bankruptcy dates) also argue that their claims can be deemed timely under Federal Rule of Bankruptcy Procedure 3002(c)(2), which permits the Court to extend bar dates for children. *See* Group 4b Motion note 45.

[29]   As reflected in the underlying Appendices, Claimants Kwai Yee Chan, Saurabh Rathi, Zachary Tedder, Kevin Richardson, Jr., and Celita James also present individual known-creditor arguments listed in other Appendices.

[30]   The same result follows even under the "unknown creditor" paradigm, where Hertz has conceded that "[t]he proper inquiry in evaluating notice is whether a party acted reasonably in selecting means likely to inform persons affected." Group 3 Obj. ¶ 35 (internal quotation marks omitted). It is emphatically unreasonable to select means including the failure to provide constitutionally required notice to a Claimant's parent or significant other, who in turn could provide *that* creditor with notice that his rights could be affected by the bankruptcy.

41

At worst, the known creditor might attempt to bring a claim in the future based on a due-process argument, but the debtor seemingly would still have discharged all claims of those the creditor might have told about the opportunity to bring bankruptcy claims. And that concern is particularly acute where, as here, a debtor emerges from bankruptcy unimpaired and therefore its owners get to keep any excess "unclaimed" capital. It would be antithetical to due process and fundamental fairness for debtors to reap a reward from the failure to provide notice to known creditors.

### G. Claimants Without Particularized Contacts Identified to Date.

60.    Finally, Appendix G lists 10 Claimants who, based on information collected so far, do not present a claimant-specific notice argument of the type presented by other Claimants in this brief. This is not to say that these Claimants have weaker claims. Claimant Elbert Turpen, Jr., for example, was a returning renter who rented a vehicle from Hertz on September 22, 2020, and returned it on September 28. Claim No. 15,900, at 14 (¶¶ 3–5). In October 2021, Mr. Turpen was recovering at home from a stroke when he was arrested out of the blue for "stealing" the rental he had returned more than a year earlier. *Id.* at 15 (¶¶ 10–12). Mr. Turpen, who lives in Arkansas, spent 5 days in jail but was not extradited to Mississippi based on health concerns—there remains a warrant for his arrest in Mississippi. *Id.* at 15–16 (¶¶ 13–17, 23). Mr. Turpen has not obtained any discovery to date and, given his arrest after the Effective Date of the Plan for a vehicle he returned one week after renting it, has not identified specific contacts with Hertz at this time. Mr. Turpen and all 122 other Claimants expressly reserve the right to present new or further argument on the Individual Contacts Issue upon further investigation and fulsome discovery— noting that the majority of Claimants have not yet obtained any discovery and discovery for Group 3 and Group 4a has been severely inadequate. Further, like all Claimants, the Claimants in

ACTIVE.135550357.04

Appendix G reserve the right to make individual arguments based on systemic issues as reflected in their particular cases once the Court considers the systemic issues.

### III.    Hertz's *Post-Hoc* Counterarguments Should be Rejected.

61.    Hertz has not offered any argument against the overwhelming majority of Claimants addressed in this briefing. Indeed, it filed its objection to the Group 4a motion seven weeks after that motion was first filed and still refused to even address the arguments made by any particular claimant. And given Hertz's proposed simultaneous briefing schedule, the Group 4a and Group 4b Claimants offer this brief without ever having seen Hertz's response to their claims. With that said, Hertz raised several boilerplate arguments in its Group 3 objection—the Claimants therefore respond collectively to the types of arguments offered in earlier briefing and likely to be repeated in the simultaneous briefing. These arguments fail to undermine the prima facie known-creditor cases established by the Claimants.

62.    *First*, Hertz attempted to discount any contact short of a direct threat of litigation or assertion of a right to payment. That is not the law. Hertz conceded as much elsewhere in its briefing—admitting that "[a] creditor might be known if a debtor has specific information regarding the creditor's actual injury." Group 3 Obj. ¶65 (citing *In re Placid Oil Co.*, 753 F.3d 151 (5th Cir. 2014)). And it is contrary to what the Court described at the January 4 hearing, where informing Hertz about the underlying substance of a claim without threatening to sue plainly would qualify. *See* Jan. 4, 2022, Hr'g Tr. at 31:22–32:1 (THE COURT: "[I]f you're correct and these people told the debtor, you know, I was arrest -- had numerous contacts with the debtors to prove that they, you know, extended their lease . . . ."). Under the correct legal standards, creditors are not required to make a specific threat of litigation to receive notice in bankruptcy court. *See*, *e.g.*, *In re Motors Liquidation Co.*, 829 F.3d 135, 159–61 (2d Cir. 2016); *In re Arch Wireless, Inc.*, 534

43

F.3d 76, 81 (1st Cir. 2008); *In re J.A. Jones, Inc.*, 492 F.3d 242, 251–53 (4th Cir. 2007); *Fogel v. Zell*, 221 F.3d 955 (7th Cir. 2000); *In re Maya Construction Co.*, 78 F.3d 1395, 1398 (9th Cir. 1996); *Chemetron* Corp*. v. Jones*, 72 F.3d 341, 347 n.2 (3d Cir. 1995); *In re Geo Specialty Chemicals Ltd.*, 577 B.R. 142, 192 (Bankr. D.N.J. 2017); *Solow Bldg. Co. v. ATC Assocs.*, 175 F. Supp. 2d 465, 472–73 (E.D.N.Y. 2001); *In re Thomson McKinnon Secs., Inc.*, 130 B.R. 717, 720 (Bankr. S.D.N.Y. 1991).

63.    Common sense undergirds that standard. Consider an individual debtor who physically strikes someone the day before filing for bankruptcy protection. If the victim said to the debtor, "you just assaulted me," or "you had no reason to hit me," or "you just broke my nose," the debtor plainly would owe actual notice to the victim even if she did not also say "magic words" like "and I'm going to sue you for it." The victim's tort claim is reasonably ascertainable based on her statements (not to mention the debtor's own knowledge of the incident), whether or not she has also threatened to sue. *Maya Constr.*, 78 F.3d at 1398 (the creditor's "state of mind and intention did not obviate [debtor]'s knowledge that it had placed contaminated soil on [creditor]'s land and that, whether he planned to sue [debtor] or not, he had a potential claim"). And the "threat-to-sue" standard advanced by Hertz would be uniquely perverse in these circumstances, where Claimants' first priority is understandably to resolve ongoing criminal proceedings, which can often take years in light of Hertz's widespread failure to appear in court.

64.    *Second*, Hertz repeatedly argued that the passage of time since a given communication made that communication irrelevant. For example, it argued that Claimant Zanders Pace—who threatened litigation in phone calls on September 17, 2019 and emailed vehcntl@hertz.com that an employee "made a false statement to police to have charges brought against Zanders Pace" that same day—was not a known creditor because "his subsequent years of

inaction undercut any assertion that he was pursuing a legal claim." Group 3 Objection, Exhibit A, at 5. But Hertz omitted that his legal threat was *less than a year* before it filed for bankruptcy and that Mr. Pace was facing prosecution when he communicated the legal threat. Indeed, Mr. Pace's prosecution continued until charges were dismissed on November 4, 2021—long after Hertz should have provided him notice (and, in fact, after he filed a claim). Outside of bankruptcy, malicious prosecution claims are not even ripe until criminal proceedings are resolved. *E.g.*, 1 Florida Torts § 22.08 ("An action for malicious prosecution cannot be filed until the original action is concluded. Accordingly, the statute of limitations for a malicious prosecution action does not commence to run until appeal of the underlying action has been decided, or the time for taking such an appeal has expired."). Hertz's timing arguments, in other words, should not be credited.

65.    More fundamentally, it is a creditor's prerogative when to bring a legal claim. The Due Process Clause does not permit a debtor to discharge legal rights provided by state law (i.e., tort claims) by asserting that a creditor's decision not to immediately sue meant that its right to bring a known claim could be discharged without notice. *Maya Constr.*, 78 F.3d at 1398 (the creditor's "state of mind and intention did not obviate [debtor]'s knowledge that it had placed contaminated soil on [creditor]'s land and that, whether he planned to sue [debtor] or not, he had a potential claim"). In all events, Hertz's temporal assertions do not track reality. Hertz is headquartered in a state with a four-year statute of limitations for many tort claims, including malicious prosecution. *See* Florida Stat. 95.11(3). And malicious prosecution claims do not even arise outside of bankruptcy until termination of the criminal proceedings, which often occurs years after an arrest, which in turn can be years after the theft report was filed.[31] *See* 1 Florida Torts

---

[31]    There are many examples of "lingering" theft reports that lead to arrests many years later, including Paula Murray, who was reported for theft in 2016 and arrested in 2020, and Brandy Porter, who was reported in 2019 and arrested in 2022.

§ 22.08, *supra*. In fact, Hertz's own record retention policies reflect a much longer relevant timeline for theft reports—"Hertz retains theft packages for seven years." 2/6/22 Email from S. Hershey, Marasco Declaration, Ex. 2. In the context of claims related to false theft reports, Hertz's arbitrary and short time horizons must be rejected.

66.      Hertz's artificial attempts to draw temporal lines should also be rejected for another reason. This is not a situation where a debtor took appropriate measures to track serious harms on third parties, carefully reviewed its records after filing for bankruptcy, and drew principled distinctions in providing notice to creditors. Instead, Hertz declined to notify Claimants of relevant bankruptcy proceedings no matter how recently they communicated with Hertz. Claimants Kellan McClellan, Krystal Carter, James, Tolen, and Christian Magnano threatened litigation in 2020 or 2021 (as applicable for pre-petition and post-petition claims). Claimant Raelena Wright Lewis called on March 6, 2020, and "said we [i.e., Hertz] had her false[l]y arrested." Marasco Declaration, Ex. 4, HERTZ_FPRP_0002589; *see also* Claim No. 15,663, at 13–14 (¶¶ 16–17) (describing many such calls). Claimant Cody Breedlove emailed customer relations about a post-petition claim on July 2, 2021, saying "You have filed false theft charges causing the loos [sic] of my career for a returned vehicle and here is proof. You also had caused jail time. Bank statement as well." *Id.* at 32 (copy of email). Appendices A, B, C, and D contain many more examples of recent notice. No matter how recent, Hertz ignored creditors when deciding whom to provide with notice (and typically ignored them altogether). Hertz's temporal arguments are simply *post-hoc* legal efforts to justify blanket decisions not to provide notice to known false-police-report creditors. They should not be credited.

67.      *Third*, this Court should reject Hertz's repeated argument that a Claimant failed to identify a particular Hertz employee to whom a statement was made. Appendices A–E present

documented and clear notice to a wide variety of persons at Hertz, and yet Hertz ignored those contacts no matter who heard them. Efforts to require Claimants to identify by name, for example, a customer service representative *employed by Hertz* are legal maneuvers of no practical consequence. And it is grossly inequitable to put the burden on Claimants to offer such minute details. Instead, a company like Hertz should have in place procedures to address complaints as serious as a customer suggesting that he was falsely reported to the police for a major crime. Finally, these arguments are disingenuous. Hertz has refused to produce a huge number of relevant documents. But even with what has been produced we know that Hertz will make this argument in an attempt to defeat a Claimants' claims *even when its own records reveal with whom the Claimant spoke*. Compare Group 3 Obj., Exhibit A, at 3 ("Ms. Lewis does not identify any Hertz employees for whom she purportedly left messages" in March and April 2020), *with* Marasco Declaration, Ex. 4, HERTZ_FPRP_002589 (employee Kianna Mccarthy recording phone call on March 6, 2020, in which Ms. Lewis "said we had her falsely arrested"). The standard is whether Hertz as a company had notice, which of course includes the employees of that company. The Claimants in this Motion have, where applicable, sworn to their contacts with Hertz that put Hertz on notice. But Hertz's argument is legally and factually unreasonable.

68.    *Fourth*, and finally, Hertz argued that it is a large company that cannot be required to track claims in light of its large number of rental transactions each year. This argument was addressed at some length in the Group 3 Reply from paragraphs 39 to 42, which includes discussion of some cases Hertz may cite once again. Claimants note that Hertz has repeatedly argued that the number of customers reported for theft (an alarmingly large number in absolute terms) is a small fraction of Hertz's total yearly rentals. It cannot use that number as a sword to attack systemic arguments but a shield to defend against clear notice that it harmed the Claimants.

69.     Regardless, Hertz misapprehends Claimants' arguments. The Claimants' arguments focus on the several thousand rental customers each year that Hertz accuses of serious crimes. As the Claimants' declarations illustrate, accusations that a person has stolen a motor vehicle inflict life-altering consequences, even for those ultimately vindicated with a dismissal. Many of the False Police Report Claimants were arrested at gunpoint, imprisoned, prosecuted, separated from children, rendered jobless, made homeless, and/or put in positions leading to crippling health consequences. A Claimant who tells Hertz that she was falsely accused of theft or arrested is not presenting a minor grievance. She is telling the company that it has wrongly exposed her to total devastation. And Hertz itself tracks such claims in at least some form, even if Hertz has not yet produced that information.  It is fully appropriate in those circumstances to require Hertz to treat such comments seriously and, as relevant here, provide notice to those persons.

70.     In fact, Hertz's own policies *require* that "[a]ll follow up correspondence pertaining to Theft Vehicle Reports must be sent to the responsible Corporate/Country Security Manager, who will distribute copies to other appropriate individuals, with a copy retained in the Vehicle Theft/Conversion file." Case No. 20-11218, D.I. 5032-2, at 6 (Hertz Policy W7-02, *Reporting Vehicle Thefts and Conversions* § (A)(18)); *id.* § (A)(19) (requiring record retention of "Theft Vehicle Reports and all related documentation"). Hertz has not produced those Vehicle Theft/Conversion files or the communications that are required to be stored therein. Nonetheless, Hertz cannot plead ignorance to communications involving serious claims that its own policies require it to catalogue, store, and maintain.

\*          \*          \*

71.     For these reasons, the Court should grant the Group 3, Group 4a, and Group 4b motions with respect to the Claimants listed in Appendices A–F (or as many of them as possible).

For any Claimant for whom the Court is not yet prepared to grant the motion, it should reserve ruling until Hertz has produced fulsome discovery as described in the Claimants' *Objection to the Reorganized Debtor's Supplemental Motion for a Protective Order and Cross-Motion to Compel*, filed today, as well as any discovery on the Systemic Misconduct issues. Further discovery—or in the case of the 77 Claimants in Group 4b, the start of discovery—will only reveal additional relevant communications and records further supporting individualized known-creditor arguments like those described above. But for Claimants who have already demonstrated that they were known creditors, those Claimants' claims should not be delayed or prejudiced by Hertz's refusal to meaningfully engage in discovery. The proofs of claim and the limited discovery to date provide more than sufficient information for the Court to rule that these Claimants were "known" based on the Individual Contacts Issue.

## PROPOSED NEXT STEPS

72.    In the past eighteenth months, 230 individuals have come forward alleging that Hertz filed false and misleading police reports wrongly accusing them of car theft. The 107 Group 1 and Group 2 Claimants have filed individual proofs of claim per the Court's instructions and already are "in" the bankruptcy regardless of any notice issues. And we now know that Hertz reports approximately 3,365 of its own customers who lawfully rented a car to the police. Claimants wish to move with expeditious speed. The Group 1 and Group 2 Claims have been pending since May and October 2020, respectively.

73.    There is no reason to delay substantive discovery into the facts and circumstances behind Hertz's theft reporting policies and practices. This discovery is relevant at least to the merits of the Group 1 and Group 2 claims in addition to the Systemic Misconduct notice issues. But for

ACTIVE.135550357.04

Hertz's bankruptcy, discovery would have commenced in Claimants' cases and might be complete or nearing completion.[32]

74.    Regardless of the ultimate venue for these claims, this Court should allow Claimants to commence discovery into the Systemic Misconduct issues central both to the Group 1 and Group 2 Claims (along with any other Claims the Court allows to proceed at the March 2 hearing) and to the Notice issues that remain after this hearing. Claimants suggest that Hertz provide comprehensive responses and productions to all outstanding requests by March 16, 2022; provide that Hertz will answer any new discovery propounded by Claimants by March 16, 2002 within 21 days thereafter; allow 30(b)(6) depositions on document storage and retention issues by March 31, 2022; allow Claimants to take up to 90 hours of depositions related to the Systemic Misconduct issues by May 20, 2022;[33] and set a hearing for mid-to-late June or early July where the Court can address (a) the Group 3 and Group 4 Motions, including the related Notice issues; (b) any notice required to the victims of Hertz's false police reports; and (c) the proper venue and next steps for the case. The parties can file simultaneous opening and reply briefs addressing the new discovery by June 3 for the Opening Brief and June 17 for the Reply brief.

75.    In opposition to comprehensive discovery, Debtors' primary—really, only—argument is that it would be too burdensome and costly. Thus, Debtors have adopted the position

---

[32]    Furthermore, there is a cohort of claimants whose claims did not accrue until after the bankruptcy. Issues of notice do not apply to them. Indeed, there is a question of whether their issues should be heard in this forum, and those Claimants, who have joined these motions given legal and factual uncertainty and out of an abundance of caution, reserve all rights to challenge this Court's jurisdiction and/or proceed in other courts for non-bankruptcy claims.

[33]    For sake of clarity, the 90 hours requested would relate to the 'systemic' issues affecting multiple Claimants, the facts and circumstances related to Hertz's knowledge of its police reporting practices, and any systemic notice issues stemming from the same. It is possible that this time will not be sufficient given the number of systemic issues here (and Claimants reserve the right to seek more time), but Claimants are hopeful that they can be efficient and this amount of time will be sufficient to present the scope of the systemic issues.

that the known/unknown creditor issue may "resolve" enough claims that discovery is unnecessary into highly relevant matters. This position is simply wrong. *First*, there does not need to be some "critical mass" of claimants to proceed with discovery into Hertz's practices. Even a single claimant would be entitled to this information, and its undisputed relevance greatly outweighs the minimal burden imposed on Hertz. Thus, when the Group 1 and 2 Claimants are taken together, any complaints about burden must fall away. *Second*, even if the case law demanded some kind of threshold number of claimants before discovery is justified—which is not the law under the discovery rules—that threshold is easily satisfied here, given the dozens and dozens of Group 1 and Group 2 claims that will proceed.

76.    Further, discovery into Hertz's practices can proceed in parallel with Hertz's claimant-specific discovery. Indeed, they involved related issues, as Hertz' tracking of false police report claims is relevant not only to the names on that list but to Hertz's knowledge of systemic inaccuracies in its police reports. Such discovery is efficient because it can be used for the Group 1 and Group 2 Claimants that will go forward as well as for other claimants, e.g., Groups 3 and 4, whose claims may go forward in this Court or elsewhere.

77.    Given the number of victims at issue, discovery—both as to notice and more broadly—should proceed without delay. Hertz has now admitted that it reports at least 3,365 of its own legitimate customers for vehicle theft each year. Since 2016 (Hertz's asserted time horizon), simple arithmetic puts the number of renters reported for auto theft at around 20,000 persons.

78.    Based on investigation to date for the subset of Claimants described in this brief, it is likely that a significant percentage of those persons were also known creditors who did not receive notice despite specific communications with Hertz describing a false police report. There may well be thousands of known, false-police-report creditors with serious claims to which Hertz

did not give notice. And many of those 20,000 persons may currently be facing prosecution, in jail, or even subject to arrest warrants of which they are completely unaware. These notice failures undermine the bankruptcy process and due process.

79.     It is also imperative that the Claimants' broader arguments move forward quickly. While many of the Claimants' have already met the known-creditor standard based on the arguments in this brief and relief should thus be granted, that will not be true of all Claimants. And it certainly will not be true of the about 20,000 other persons that Hertz accused of theft since 2016. Those persons had no notice of bankruptcy, and these proceedings could have an enormously consequential impact on their lives. The Court should strongly consider pathways to providing actual notice to those Hertz accused of theft and more broadly allowing them to bring claims in bankruptcy or elsewhere. Most recently, the Group 4b motion again presented arguments that would apply to all Claimants (and some or all of the about 20,000 others reported for theft) with significantly less burdensome factual development.

- The Claimants have argued that the publication notice was inadequate for many reasons, but one of those reasons is that it failed to comply with plain legal requirements in Rules 1005 and 2002 of the Federal Rules of Bankruptcy Procedure and Section 342 of the Bankruptcy Code. The failure to comply with these provisions in undeniable and does not turn on questions of facts. Moreover, section 342(g) directly provides that noncompliant notice "shall not be effective notice," and common sense and precedent further compel the same conclusion beyond the statutory command. *See* Group 4b Motion ¶¶ 57–61.

- The Claimants have argued that all the proofs of claim filed to date are timely because they are members of a putative class represented by timely filed class proofs of claim, or at a minimum that all proofs of claim should be held to be timely (and a new bar date

ACTIVE.135550357.04

established) if the class proofs of claim are denied. No party objected to the latter request. *See* Group 4b Motion ¶¶ 78–80.

- In addressing the Individual Contacts Issue, even constrained by limited discovery on a minority of Claimants and no discovery on a majority of Claimants, the Claimants have shown a huge number of known creditors that were not provided notice. The Debtors altogether failed to review their books and records and provide notice to the false police report creditors. Moreover, the number and scope of Claimants with Individual Contacts putting Hertz on notice was sufficient to provide Hertz with knowledge of systemic problems plaguing its police reporting that was leading to Hertz filing false police reports on many of its customers.

80.    The Court also should address the proper venue for these cases. This case presents an extremely unusual factual situation—litigation in bankruptcy court of tort claims when the plan treats all valid claims as unimpaired. *See, e.g.*, Hr'g Tr. April 22, 2021, at 18:24-19:1 (Mr. Shore: "I mean it is a little odd that they would all vote no to a plan that hopefully will pay them in full."); *see also* Hr'g Tr. June 10, 2021, at 39:7-11 (Ms. Byowitz on behalf of unsecured creditors committee: "And, finally, we added some language to the plan in Article 3(C) that provided that the discharge provisions in the plan would not alter creditors' rights to receive unimpairment on their claims. It helps address concerns like those of Mr. Ciardi's clients."). This posture raises a host of statutory and constitutional issues, especially where only a plan injunction prohibits Claimants from litigating their cases outside of bankruptcy and where Claimants could not vote on the Plan and opted out to the fullest extent allowed. In many ways, this situation is akin to the "Texas Two-Step," where a solvent company is attempting to cabin its liability by taking

advantage of bankruptcy rules—especially where, as here, Hertz knew about these problems and "inaccuracies" prior to and during the bankruptcy.

81.     Based on the foregoing, Claimants propose the schedule above so that the Court can have a full record on Hertz's knowledge of its systemic misconduct that has harmed up to thousands. A hearing in June or early July on (a) the Group 3, Group 4a, and Group 4b Motions; (b) the Notice issue overall; and (c) the next steps and proper venue, preceded by discovery into Hertz's misconduct that is relevant not only to these issues but also overlaps with the merits discovery for any claims already in bankruptcy, is the most efficient path forward that protects all parties and acknowledges the need to move quickly given the ongoing harm that is continuing to occur.

## **RESERVATION OF RIGHTS**

82.     The Claimants reserve the right to file and present evidence further supporting the Motions upon discovery and/or responsive to further arguments from the Reorganized Debtor.

ACTIVE.135550357.04

## CONCLUSION

WHEREFORE, for the reasons set forth in the Motions and this Supplemental Brief, the

Claimants respectfully request that the Court, grant the relief requested in the Motions and grant

any such other and further relief as the Court deems just and proper.

Dated: February 14, 2022

**FRANCIS ALEXANDER, LLC**
Francis Malofiy
280 N. Providence Road, Suite 1
Media, PA 19063
Telephone: (215) 500-1000
Facsimile: (215) 500-1005
Email: francis@francisalexander.com

**SUSMAN GODFREY LLP**
Justin A. Nelson (*pro hac vice*)
John P. Lahad (*pro hac vice*)
Taylor C. Hoogendoorn (*pro hac vice*)
1000 Louisiana, Suite 5100
Houston, TX 77002-5096
Telephone: (713) 651-9366
Facsimile: (713)654-6666
Emails: jnelson@susmangodfrey.com
        jlahad@susmangodfrey.com
        thoogendoorn@susmangodfrey.com

**FAEGRE DRINKER**
**BIDDLE & REATH LLP**

*/s/ Ian J. Bambrick*
Patrick A. Jackson (Bar No. 4976)
Ian J. Bambrick (Bar No. 5455)
Jaclyn C. Marasco (Bar No. 6477)
222 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telephone: (302) 467-4200
Facsimile: (302) 467-4201
Emails: patrick.jackson@faegredrinker.com
        ian.bambrick@faegredrinker.com
        jaclyn.marasco@faegredrinker.com

*Co-Counsel for the False Police Report Claimants*[34]

---

[34]    Of the 230 Claimants listed in **Exhibit A**, Susman Godfrey, LLP, does not represent Claimants Tia Lee and Sharifa Wright. All counsel listed above represent Claimant Larryelle Magee subject to approval of a motion to employ in Claimant Magee's chapter 13 bankruptcy proceeding, *In re Larryelle P. Magee*, Case No. 21-32885 (JPN) (Bankr. S.D. Tex.).

ACTIVE.135550357.04

## Appendix A: Claimants who Discussed Legal Claims
### (9 Claimants)

| Master Number (Group) | Name (Claim No.) | Argument |
|---|---|---|
| 109 (3) | Siobhan Abrams (15,950) | Hertz has reported Ms. Abrams for theft multiple times, including in 2017 and 2019. Claim No. 15,950, at 14 (¶9), 16 (¶21). On July 25, 2017, Ms. Abrams emailed customerbilling@hertz.com and customerrelations@hertz.com and requested "an arbitration hearing against Hertz Global Holdings, Inc," alleging claims for "willful misconduct" and "gross negligence" and raising, among other complaints, that "the multi-month rental I was contracted to have until October, as closed out and falsely reported stolen to the police.*Id.*at 84 (email); *id.* at 82 (text message with Hertz investigator: "Do you have the information on the person who sent the paperwork to the police? Because this was not legal"). *Id.* Hertz never withdrew that theft report, and Ms. Abrams was prosecuted for the 2017 "theft" starting July 21, 2019 until charges were dismissed on January 21, 2020. *Id.* at 16. This incident and litigation threat are sufficient to make Ms. Abrams a known creditor. However, Hertz also reported her for stealing a vehicle she purchased from Hertz in 2017. Hertz reported this alleged theft in 2019; Ms. Abrams was arrested on July 20, 2019, spent five days in jail, and prosecuted until charges were again dismissed on August 12, 2020. *Id.* at 18 (¶¶ 30-34), 19 (¶¶ 38). After release from jail, "[o]n July 25, 2019, [Ms. Abrams] contacted Hertz by email and demanded an explanation for being falsely arrested." *Id.* at 18 (¶ 35). "She received a generic email response from Hertz, and then a non-substantive email response from Hertz employee John Carillo who asked when she was available to talk. [Ms. Abrams] then asked Carillo to meet on Monday, July 29, 2019 … but neither Carillo nor Hertz ever responded." *Id.* |
| 116 (3) | Britne McClinton (15,642) | Ms. McClinton rented a car on September 1, 2018 and returned it after one day. Claim No. 15,642, at 12 (¶ 2). She received calls repeatedly through mid-October 2018 saying that she had not returned the car and would be reported for theft. *Id.* at 12 (¶¶ 8–9).These calls continued even after Hertz persuaded her to fill out a "theft from renter" affidavit even though she had returned the vehicle. *Id.* at ¶¶ 13–14 Ms. McClinton specifically told a Hertz representative on October 12, 2018—after that representative claimed the vehicle "was stolen"—that "she was going to sue Hertz if the company did not immediately stop claiming she stole a car." *Id.* at 13 (¶ 16). Hertz has not produced any documents relating Ms. McClinton's theft investigation and, likely, its reporting of her for theft. It did, however, produce a "theft recovery checklist" for the vehicle she appears to have rented stating a "Date of theft" of October 10, 2018 and a "Date of Recovery" in Charlotte, North Carolina, of December 13, 2018. HERTZ_FPRP_0000254.[1] On these facts, it appears that Hertz has failed to produce or has destroyed the theft materials relating to Ms. |

---

[1]    References to Bates Numbers refer to the Hertz productions refer to documents included in Exhibit 4 attached to the Declaration of Jaclyn Marasco (Exhibit B).

| | | |
|---|---|---|
| | | McClinton's case. With that said, Ms. McClinton offered a clear intent to sue if such a report was filed (as it appears it was). |
| 119 (3) | Zanders Pace (15,662) | Mr. Pace was in an accident and the vehicle he rented was towed to a repair shop. He told Hertz in mid-July 2019 that the car was in a particular repair shop. Claim No. 15,662, at 12 (¶ 6). On July 24, 2019, after Hertz contacted him to say the car had to be returned, he again told Hertz that the vehicle had been towed to a shop and that Hertz should retrieve it. *Id.* at 13 (¶ 9). On July 31, the body shop called Hertz to notify it that the car was in the shop. *Id.* at 13 (¶ 13). Hertz nonetheless reported Mr. Pace for theft on August 8, 2019. On September 16, 2019—after the filing of the theft report—BNY Mellon forwarded emails from the body shop to Hertz's legal team stating that the report filed against Mr. Pace was "false." *Id.* at 20–21 (copy of emails).  Mr. Pace also repeatedly contacted and spoke with Hertz, explaining that the theft report was false and that the vehicle was at the repair shop. *See Id.* at 16 (¶ 31) (email to "vehcntl@hertz.com" describing "a female by the name of Simone [the Hertz employee who reported Mr. Pace] who has made a false statement to the police to have charges brought against Zanders Pace"). He also "threatened to file a civil suit" relating to the false police report and "said that he was going to file a civil suit against Hertz if this was not resolved" in two phone calls on September 17. *Id.* at 16–17 (¶¶ 27-35). In response to these clear *litigation threats*, Hertz argued "Mr. Pace does not identify the Hertz roadside representative to whom he purportedly communicated a legal threat"—again, information in Hertz's possession. Hertz subsequently produced an internal report from September 17 where an employee named Taniya Chaney entered the following:



HERTZ_FPRP_0002592. Hertz further blamed Mr. Pace for "his subsequent years of inaction," which it claims "undercut any assertion that he was pursuing a legal claim of which the Debtors should have been aware." But the legal threats were made in September 2019, just months before the May 2020 bankruptcy petition. Hertz cannot discount legal threats because it feels that Mr. Pace should have filed his litigation on its timeline. Indeed, Mr. Pace was *still under criminal prosecution* when he threatened litigation and remained under prosecution until the charges were dismissed on November 4, 2021. |

| 133 (4a) | Jenelle Reece-Williams (15,746) | Ms. Reece-Williams was arrested, jailed for two days, and prosecuted for months because Hertz accused her of stealing a rental she extended each week.[2] Claim No. 15,746 at 13 (¶ 2). Ms. Reece-Williams "called Hertz likely over 100 times from November 2018 to mid-January 2019 demanding to know what happened. *Id.* at 15 (¶ 22). She threatened litigation, told them what happened was wrong, and told them they had to fix this. *Id.* She never got any satisfactory answers*" Id.* at 15 (¶¶ 22–23). But all charges against her were suddenly dropped in January 2019 and *Hertz refunded the charges of around $2,000 connected to the rental and associated theft report. Id.* at 15 (¶ 23). |
|---|---|---|
| 140 (4a) | Christian Mangano (15,949) | Mr. Mangano was arrested at gunpoint on April 26, 2020 in connection with a vehicle rented in conjunction with his employer, NASA's Jet Propulsion Laboratory. Police at that time called Hertz and confirmed that Mr. Mangano had a valid reservation until July 24, 2020, but that Hertz had reported the vehicle stolen on April 24. The officer involved apologized, saying "this wasn't the first time that he or his department was called because of a false report by Hertz." Claim No. 15,949, at 15 (¶ 16). Hertz offered to settle the case for $500, but on April 29, 2020, Mr. Mangano rejected that offer in an email with Hertz employee Krystle Kordsmeier because "the $500 check that has been offered doesn't even come close to being sufficient compensation for the trauma I was caused … being stopped by multiple police vehicles, ordered to step out of my vehicle at gunpoint with hands up and shirt pulled up, ordered to my knees while the officers forced me to my stomach to place handcuffs tightly around my wrists and ushered to the back of the police cruiser for over an hour while the matter was investigated." *Id.* at 26 (emails). He then demanded $30,000 to settle the matter. *Id.*[3] Prepetition, Hertz responded to that email on April 29 and reached out again on May 15 in a further attempt to settle. *Id.* at 24–25 (responses). |
| 144 (4a) | John Prawat (15,792) | Mr. Prawat was accused of stealing a rental back in 2014. At that time, he spoke to the branch manager about the situation. He "expressly and explicitly told [Branch Manager Jacob Matheny] and Hertz that if the company pursued a criminal case against him he would sue Hertz." Claim No. 15,792, at 14 (¶ 3). Matheny emailed the regional corporate security manager and explained that Mr. Prawat "has been our customer of ours for years now, and due to some circumstances he was not able to return the rental on time … due to personal illness and being out of town. He is obviously very concerned about the charges pending against him. When I last spoke to him before the vehicle was reported stolen, he had every intention of returning the rental as soon as he could." *Id.* at 14 (¶ 4). Despite this clear communication, Mr. Prawat was subsequently arrested, jailed, and prosecuted until all charges were dismissed on July 13, 2015 when he presented his evidence to the prosecutor, who said "Hertz does |

---

[2]   One issue with this theft report was that Hertz repeatedly contacted the wrong person in asking for the vehicle to be returned. *See* HERTZ_FPRP_2184 ("rec text … You have wrong number. We have not rented any cars in the last 10 years."). Perhaps this error is what caused Hertz to refund the charge for the rental and, seemingly, work with the prosecutor to have the case dismissed.

[3]   Mr. Mangano's informal settlement offer does not in any way limit the damages sought now that he has filed a proof of claim and Hertz has vigorously contested his ability to recover.

| | | this all the time with us. They use the criminal justice system to handle what are essentially civil matters." *Id.* at 22 (¶ 31). |
|---|---|---|
| 147 (4a) | Kellan McClellan (15,915) | Mr. McClellan was arrested at gunpoint about 5 days into a valid rental, and then he was jailed and later prosecuted for about a month. Claim No. 15,915, at 13 (¶ 2). He sent a notice of loss to Hertz on January 2, 2020, which was assigned case number 18330228, and thereafter spoke with customer service, corporate security, and a senior examiner named Alex Wood. *Id.* at 14–15 (¶¶ 14–15). He sent another notice of loss on January 9, as well as a formal demand letter on February 3, 2020, extensively laying out his claims, his intent to seek compensation, and offering to settle the case for about $1.4 million. *Id.* at 29–35 (letters and notices). Mr. McClellan subsequently corresponded with Hertz, Hertz attorneys, and a claims agent for Hertz at Chubb/ESIS. On July 2, he received a letter from counsel telling him that Hertz had declared bankruptcy and promising to inform him of the general claims process, but Mr. McClellan never received any subsequent notice from Hertz. *Id.* at 27–28 (letter from Tucker, Robin & Merker) ("Hertz's claims agent, who will be managing the claims process, will be mailing full information about submitting a proof of claim and the applicable deadlines"). |
| 148 (4a) | James Tolen (15,761) | Krystal Carter rented in October 2020 and extended that vehicle through December 30, 2020. *See* Claim No. 15,761, at 12 (¶ 2). James Tolen was listed as an authorized driver. *Id.* On December 23, 2020, police pulled Mr. Tolen with guns drawn and arrested him—saying that he was driving a vehicle Hertz had reported stolen. *Id.* at 12 (¶¶ 4–7). Police contacted Hertz at that time, and Ms. Carter contacted Hertz the next day to explain what happened. *Id.* at 18 (Dec. 27 email); *id.* at 20 (voicemail from Hertz transcription). Hertz produced a January 4, 2021 notice of representation to its claims adjuster where a (prior) attorney for Mr. Tolen and Ms. Carter (Husein Hadi) "advised that [his] law firm has been retained by [Mr. Tolen and Ms. Carter] to represent them for personal injuries and other related damages sustained due to your insured's negligence." HERTZ_FPRP_0002396. On January 8, 2021, counsel for Mr. Tolen and Ms. Carter was contacted by a Hertz assistant general counsel, and on January 14, 2021 counsel was contacted by ESIS, Hertz's claim administrator. Claim No. 15,761, at 15 (¶¶ 13, 15) and at 35. The Claim administrator said, "Please provide us with all the information so that we may establish a claim for you[r] clients from the 12/23/20 loss *where you are seeking damages.*" *Id.* at 35 (emphasis added). At no point during these interactions did counsel for Hertz or ESIS inform counsel, Ms. Carter, or Mr. Tolen of the pending bankruptcy proceedings or their ability to file a proof of claim. *Id.* Quite the opposite, before suit was filed and without acknowledging the bankruptcy, Hertz tried to get the Claimants to release all claims in exchange for a refund of the rental fee by signing a "confidential settlement agreement." *Id.* at 23–25 (settlement offer). (They refused to settle.) Unaware of the bankruptcy, non-bankruptcy (Mr. Hadi) counsel filed a lawsuit against Hertz on July 30, 2021 (prior still to the Administrative Claims Bar Date). Hertz responded on August 24, 2021 with a letter threatening "to hold [non-bankruptcy counsel] in contempt of court and seek sanctions and attorney's fees" if the lawsuit was not withdrawn, arguing for post-petition claims that Mr. "Tolen's failure to file a proof of claim against the Reorganized Debtors in |

| | | the Bankruptcy Cases bars any recovery on his alleged claims against the Reorganized Debtors." *Id.* at 73–77 (letter from White & Case to non-bankruptcy counsel). Two days after a non-suit was filed in light of the letter the Reorganized Debtor's counsel, non-bankruptcy counsel for Mr. Tolen— who had been arrested at gunpoint after Hertz rented Ms. Carter a vehicle it had reported stolen—received an email from Hertz's Assistant General Counsel that said: "Didn't hertz so much after all I guess." *Id.* at 32. |
|---|---|---|
| 149 (4a) | Krystal Carter (15,759) | *See* above argument re James Tolen |

**Appendix B: Customers Who Accused Hertz of Falsely Reporting a Theft**
**(43 Claimants)**

| Master Number | Name (Claim No.) | Argument |
|---|---|---|
| 112 (3) | Lateshia Jenkins (15,658) | Ms. Jenkins has had a warrant for her arrest and charges pending in Washington State for more than a decade related to a 2005 rental. Claim No. 15,658, at 12 (¶ 2). She returned the car after three weeks (and having extended the rental). *Id.* She contacted Hertz in 2008 and 2012 to explain what happened to her and notify the company of the false police report it had filed. *Id.* at 13 (¶¶ 9–10). Charges remain pending against Ms. Jenkins. *Id.* at 13 (¶¶ 11–13). |
| 113 (3) | Raelena Wright Lewis (15,663) | Ms. Lewis called Hertz approximately "50 times in March and April 2020 and left messages demanding an explanation" for her unjustified arrest and notifying Hertz "about the false accusation [it made] against her." Claim No. 15,663, at 13–14 (¶¶ 16–17). Hertz argued in its Group 3 objection that "Ms. Lewis d[id] not identify any Hertz employees for whom she purportedly left messages." Obj. Ex. A. Discovery revealed in Hertz's own records that one employee recorded that Ms. Lewis in fact "said we had her falsely arrested" and created a related entry on March 6, 2020. <br><br><br><br>HERTZ_FPRP_0002589. The employee registering the accusation that Hertz had caused her false arrest was named Kianna McCarthy. *Id.* |
| 124 (3) | Jessica Malone (15,649) | Ms. Malone and Claimant Jason Cook, listed below, were arrested as part of the same rental. They both spent time in jail and endured lengthy prosecutions before all charges against each were dismissed. *See* Claim No. 15,649, at 12 (¶ 2). Shortly after their arrests, Ms. Malone "called Hertz local and corporate repeatedly in April and May 2017, demanding to know what happened and why she and Jason had been falsely accused of car theft. *Id.* at 13 (¶ 11). She explained that they both had been arrested and that the accusations were false |

and should be corrected." *Id.* at 14 (¶ 14). Hertz never showed up to either of their cases until charges were dismissed in early 2018. *Id.* at 14 (¶ 18). In addition to Ms. Malone's repeatedly informing Hertz that she and Mr. Cook had been falsely arrested—and Hertz's undoubted eventual notice that all charges were dismissed—the theft package itself details a situation where criminal charges were plainly inappropriate. It records the following notes:

- 2/23: Notes call from Mr. Cook that they will return the vehicle.

- 2/24: Notes call from renter that they "had a flat" – and won't be able to return vehicle as planned

| User ID | Time |
| --- | --- |
| DTC0280 | 2017/02/23 10:16 |

Note

Recv'd call from Jason Cook (fiance) stated rntr will rtn veh 2/24 by noon. Adv Jason if not returned repo will be hired.

| User ID | Time |
| --- | --- |
| DTC0280 | 2017/02/23 15:31 |

Note

CALL FROM RENTER - HAD A FLAT - HAVE DONUT ON CAR NOW. MAY NOT BE ABLE TO GET THERE BY NOON DUE TO TRAVELING 50 MILES. ADVISED HER TO CALL ERS AND FILE A REPORT

- 2/27: Notes next to Mr. Cook's number recording a conversation that "no tow sent – customer to return to [f]ort smith regional airport location"

| User ID | Time |
| --- | --- |
| DTC0280 | 2017/02/27 08:23 |

Note

ERS: 17C042695 TIFLT 2/23/17 - 479-652-1837 - NO TOW SENT - CUSTOMER TO RETURN TO FORT SMITH REGIONAL AIRPORT

- 2/28 – "called location, he advised me he reported the vehicle stolen as an overdue"

| User ID | Time |
| --- | --- |
| 9518 | 2017/02/28 08:39 |

Note

CALLED LOCATION 7640-01 S/W J. FELDER, HE ADVISED ME HE REPORTED THE VEHICLE STOLEN AS AN OVERDUE.

- Later on 2/28 – "I received a call from the renter … stating that the vehicle will be returned today"

| User ID | Time |
| --- | --- |
| DTC3483 | 2017/02/28 11:18 |

Note

2-28 CC/***FORCE UPDATE*** I received a call from the renter from 479-652-1837 stating that the vehicle will be returned today.

- 3/1 (morning) – "Voicemail from renter … pulled over since vehicle was reported as stolen – state trooper has them stopped"

| User ID | Time |
| --- | --- |
| DTC0280 | 2017/03/01 08:40 |

Note

VOICEMAIL FROM RENTER/JASON COOKE - PULLED OVER SINCE VEHICLE WAS REPORTED AS STOLEN - STATE TROOPER HAS THEM STOP 479-652-1837

HERTZ_FPRP_0000245–246. In other words, Hertz was in active conversations with Ms. Malone & Mr. Cook on February 27 about returning the vehicle to the Fort Smith Regional Airport Location. As the declaration explains, they brought the car to that location, but were told to return it elsewhere. Claim No. 15,649, at 13 (¶¶ 6–7). And on the very day the location reported them for stealing the car, Mr. Cook & Ms. Malone were in touch with

| | | |
|---|---|---|
| | | Hertz about returning it—only to have a voicemail first thing the next morning documenting a felony arrest. |
| 125 (3) | Jason Cook (15,657) | *See* above argument re Jessica Malone. |
| 127 (3) | Moneck Wallace (15,651) | Ms. Wallace rented a vehicle in 2011, which she returned after two weeks. Claim No. 15,651, at 12 (¶¶ 4–5). Over the next year, Ms. Wallace repeatedly explained to Hertz that she had returned the vehicle—at one point, an "investigator" for Hertz confirmed that the company had in fact rented the vehicle to other customers since she had returned it. *Id.* at 12–13 (¶¶ 6–8). But years later, after Ms. Wallace learned that there were pending charges against her for theft of the vehicle, she went to every court hearing until all charges were dismissed in or around 2015. *Id.* at 13–14 (¶¶ 10–19). While she was being prosecuted, Ms. Wallace "repeatedly called Hertz corporate and asked them why they had filed a false police report when they knew she had returned the car. She received no response." *Id.* at 14 (¶ 18). |
| 128 (4a) | Mary Lindsay Flannery (15,736) | In October 2020 Ms. Flannery was pulled over and told her rental had been reported stolen—she "called Hertz about every two weeks afterwards trying to get an explanation. She never heard back from Hertz." Claim No. 15,736, at 14 (¶ 8). She was then arrested based on the long-returned and paid-for rental on December 31, 2020. *Id.* at 14 (¶ 9). Shortly afterwards, Ms. Flannery, her mother, and Hertz spoke on a 3-way call in early January 2021 where Ms. Flannery and her mother told Hertz "that it was a false police report, they wanted the charges dropped, and they wanted a copy of the bill." *Id.* at 15 (¶ 20). Hertz's internal records reflect a January 6, 2021 conversation documenting that Ms. Flannery was in jail while "money was already taken from" the Visa card for the rental.<br><br><br><br>HERTZ_FPRP_0002597. Further, because the payment was not in the theft report, prosecutors contacted Hertz before dismissing the case in January 2021. Claim No. 15,736, at 15 (¶ 20). |

| 130 (4a) | Darnay Taper (15,749) | Mr. Taper was arrested at gunpoint, jailed for two days, and prosecuted for Grand Theft Auto for about 8 months starting on March 13, 2021 while driving a vehicle Claimant Tonia Rich had rented, extended with a location employee named Mia, paid for, and arranged to return on March 15, 2021. Claim No. 15,749 at 13 (¶¶ 2, 4). After the arrest, in May and June 2021, Ms. Rich called Hertz's corporate number "to complain … about the false theft report" that had been filed with respect to a vehicle she rented. *Id.* at 15 (¶ 19). Hertz partially noted at least one of these conversations on May 19, 2021. |
|---|---|---|

|  |  |
|---|---|
| Impacted Brand | Hertz |
| Impacted Brand Logo | Hertz |
| Contact Name | TONIA RICH |
| Subject | |
| Description | CCI STATING THAT THE RENTAL VEH WAS REPORTED STOLEN AND HER BOYFRIEND IS LOCKED UP FOR GRAND THEFT |

HERTZ_FPRP_0002606. One June 12, 2021, a Hertz employee named Joshua Boles called and said he would reach out to Hertz's legal department about the report, but he never got back to her. Claim No. 15,749, at 15 (¶¶ 20–21). On July 1, 2021, Ms. Rich emailed Hertz Customer Relations, saying: "My name is Tonia Rich I rented a vehicle from Hertz my rental agreement number is 591619000. **My boyfriend was pulled over in the vehicle in March and he is being charged with Grand Theft Auto for a vehicle I rented and paid for. I am unsure of what the employee at the location were doing but I was told everything was fine.** I spoke with Joshua Boles on June 12 the concerning the matter. He told me he was going to reach out to the legal department and I have yet to hear back. I would like for someone to please call me back it is very urgent I have left him numerous messages. My phone number is (901) 364-8300. Thank you." *Id.* at 15 (¶ 22) (emphasis added). She received no response, and Mr. Taper's prosecution continued for months afterwards until it was dismissed after Hertz never appeared in court. *Id.* at 15 (¶ 22) (email), & *Id.* at 15 (¶ 23) (lack of response). Also on July 1, Hertz recorded a contact with Ms. Rich describing how Ms. Rich said "she was paying agent at the loc[ation] to keep the veh[icle] … [yet] boy friend going to [j]ail."

| | | |
|---|---|---|
| | | **Impacted Brand**     Hertz<br><br>**Impacted Brand Logo**     *Hertz.*<br><br>**Contact Name**     TONIA RICH<br><br>**Subject**<br><br>**Description**     swc aboutv stolen veh cust state that she was<br>paying agent at the loc to<br>keep the veh however the contract was not<br>extend however it was not ext<br>end and boy friend going to hail adv cust of<br>what is in out our system<br>base the return time and to email<br>customerrelations@hertz.com<br><br>HERTZ_FPRP_0002607. In sum, Ms. Rich repeatedly and clearly informed Hertz that it reported stolen a vehicle she had extended and paid for, but that Mr. Taper was in jail and being prosecuted for stealing the vehicle.[4] |
| 131 (4a) | Tonia Rich (15,742) | *See* above argument re Darnay Taper. |
| 135 (4a) | Jeffrey Smith (15,741) | Mr. Smith rented a car on March 8, 2019 and extended the rental at all times. Claim No. 15,741, at 13 (¶ 2). On or around April 25, he saw a large charge from Hertz. *Id.* at 13 (¶ 6). "He called Hertz that same day to speak with them about extending the rental. He had an agreement to extend the rental and return the car on Monday, April 29, 2019. During that phone call, Hertz never informed [Mr. Smith] that the rental needed to be returned." *Id.* at 13 (¶¶ 7–8). He was arrested later that day for possession of a stolen Hertz vehicle. *Id.* at 14 (¶ 9). After spending 68 days in jail because he could not afford bail, in July 2019, Mr. Smith "reached out to Hertz and asked them what had happened. He called the 1800 number and asked them why they had filed a false police report. Specifically, he wanted to know how Hertz could have told police he did not pay. Every[one] refused to comment or help him." *Id.* at 14 (¶ 14).[5] Facing serious charges and with Hertz's refusal to help, Mr. Smith accepted a plea. *Id.* |
| 136 (4a) | Saurabh Rathi (15,740) | Hertz rented a vehicle to Claimant Nirbhay Agarwal that it reported stolen for reasons unrelated to Mr. Agarwal's valid rental.[6] Claim No. 15,740, at 13 (¶ 2). Mr. Agarwal and Mr. Rathi (his passenger) were arrested at gunpoint, handcuffed, interrogated, and even encircled by a police helicopter just hours into the rental. *Id.* at 14 (¶¶ 7–9). During the arrests, police called Hertz to inquire about what happened. *Id.* at 14 (¶ 12). Hertz knew what happened and |

---

[4]    To the extent that Hertz argues that it knew only that Ms. Rich's "boyfriend" was in jail, not Mr. Taper, it is all but certain that Mr. Taper's name would have come up in conversations with Hertz's legal staff. Moreover, Hertz has refused to produce any communications with law enforcement or prosecution personnel. Plainly, Hertz was aware (or, at minimum, should have been aware) of the identity of the person being prosecuted for stealing its vehicle.

[5]    After spending 68 days in jail, Mr. Smith accepted a plea in exchange for probation.

[6]    It appears that Hertz towed the car away from a different customer on February 12, the day it rented the vehicle to Mr. Agarwal, but that the vehicle was also reported stolen that day. HERTZ_FPRP_0001977, 1984–1985.

did not charge Mr. Agarwal for the rental. *Id.* at 15 (¶ 18). Hertz's internal records associated with Mr. Agarwal's rental show that Mr. Agarwal called in around 3:30am on the day of his arrest: "[Mr. Agarwal] called in 2021-02-13@0330 after having been pulled over in a car that was reported stolen by Hertz. Cust[omer] commenced the rental at 2021-02-12@2200 PST… Cust[omer] was not happy with California Highway Patrol pulling him over at gunpoint. … [Customer called in] reported he and his passenger [*i.e.*, Mr. Rathi] were pulled over [b]y local police due to veh[icle] being reported stolen earlier in the day. Veh[icle] also shows returned to loc[ation] and re-rented. Customer was understandably upset about this." HERTZ_FPRP_0002595.

From: Jackson, Michael A
Sent: Saturday, February 13, 2021 3:58 AM
To: Duncan, Nicquelsia <nicquelsia.duncan@hertz.com>
Cc: Chance, Jeffrey L. <JChance@hertz.com>
Subject: 210021618

Hi folks,
This gentleman called in 2021-02-13@0330 after having been pulled over in a car that was reported stolen by Hertz. Cust commenced the rental at 2021-02-12@2200 PST.
Cust was not happy with the California Highway Patrol pulling him over at gunpoint and taking an hour for the situation to be resolved. I thanked him for his restraint while speaking with me. The following is what I sent to the location manager –

CCI REPORTED HE AND HIS PASSENGER WERE PULLED OVER MY LOCAL POLICE DUE TO VEH BEING REPORTED STOLEN EARLIER IN THE DAY. VEH ALSO SHOWS RETURNED TO LOC AND RE-RENTED. CUST WAS UNDERSTANDABLY UPSET ABOUT THIS. CUST PULLED OVER BY CHP- OFFICER SOLANO, LOC CODE 365, 2021-02-13@0029 HELD UNTIL 2021-02-13@0131.
CCI REPORTED HE AND HIS PASSENGER WERE PULLED OVER MY LOCAL POLICE DUE TO VEH BEING REPORTED STOLEN EARLIER IN THE DAY. VEH ALSO SHOWS RETURNED TO LOC AND RE-RENTED. CUST WAS UNDERSTANDABLY UPSET ABOUT THIS.
CUST PULLED OVER BY CHP- OFFICER SOLANO, LOC CODE 365, 2021-02-13@0029 HELD UNTIL 2021-02-13@0131.
ADV CUST TO KEEP ALL DOCUMENTATION FOR THE RENTAL HANDY.
ALSO ADV CUST TO EXCHANGE VEH IN THE AM.
I did suggest loc mgr reach out to custjomer.
Thanks,
MJ

And on February 14, 2021, Mr. Rathi (the passenger) "contacted the Hertz customer care line to complai[n] about being falsely arrested. A supervisor was supposed to call him back. Hertz never followed up with any phone call." Claim No. 15,740, at 15 (¶ 17).

| 137 (4a) | Nirbhay Agarwal (15,763) | *See* above argument for Saurabh Rathi. |
|---|---|---|
| 141 (4a) | Edward Sturkie, Jr. (15,946) | Mr. Sturkie was prosecuted from October 2016 for allegedly stealing an insurance rental obtained through State Farm, which also happened to be Mr. Sturkie's employer. Claim No. 15,946, at 13 (¶¶ 3–5). He was actively prosecuted from October 25, 2016 until April 21, 2017 (when he accepted deferred prosecution until charges were dismissed on September 13, 2021). *Id.* at 14 (¶¶ 11–12). During that time, he "called Hertz … and spoke with an attorney. He told Hertz that he did not steal the car and it was an insurance rental. A lawyer from Hertz told him that it sounded like a big misunderstanding, but did not provide any help." *Id.* at 14 (¶ 15). In fact, Hertz's records reflect that "the vehicle was returned by the last renter, Sturkie/Edward to the above location prior to the theft." HERTZ_FPRP_0002383. If so, it is unclear why Mr. Sturkie would then have been reported or arrested for theft at all. |

| 142 (4a) | Steven Robinson Valdes (15,760) | Mr. Valdes was arrested on June 25, 2021 and is currently being prosecuted despite having never rented a vehicle from Hertz. Claim No. 15,760 at 13 (¶¶ 2, 4) & 14 (¶ 13). "Upon being released [from jail] the morning of June 27, 2021, he started calling Hertz corporate demanding answers and the withdrawal of the false theft report." *Id.* at 13–14 (¶¶ 7, 13). He also called the location, which could not find records of the rental. *Id.* at 13 (¶ 8). Additionally, Hertz insufficiently investigated the likely identity fraud incident before reporting Mr. Valdes for theft—in fact, the identity thief also rented from competitor Avis-Budget, which <u>did not</u> report Mr. Valdes for theft because Avis-Budget contacted him and he explained that he was a victim of identity theft. *Id.* at 13 (¶ 3). Hertz, by contrast, did not contact Mr. Valdes and reported him for theft even though the "demand letter" it sent was returned to sender. HERTZ_FPRP_0002581. |
|---|---|---|
| 157 (4b) | Iasia Eaves (15,802) | In late 2017, Ms. Eaves "contacted and confronted Hertz to find out why Hertz had gone to the police, filed a false police report against her, and had the courts issue a warrant for her arrest. Hertz apologized and told her directly that there was a mistake between the local and corporate offices." Claim No. 15,802, at 16 (¶ 17). Hertz also confirmed to the police at the time of her arrest that Ms. Eaves had a legal rental agreement, *id.* at 16 (¶¶ 13–15), but avoided attending any proceedings until charges were dismissed in October 2018. *Id.* at 16 (¶ 19). Hertz later admitted Ms. Eaves had a legal rental agreement for the car but the theft report was due to an internal issue within Hertz. *Id.* at 17 (¶ 21). |
| 159 (4b) | Jamol Toney (15,891) | Mr. Toney—who rented and was arrested postpetition—emailed "customerrelations@hertz.com" on March 30, 2021 and explained: "I recently had an experience were as I was put in Jail for the Operation of a Rental Vehicle and is now facing Felony Charges . . . due to the . . . location filing charges on me. . . . [T]his ordeal was a total shock to my system. To have an officer come to my home and put handcuffs on me and carry me off to jail. . . . Before the ordeal I kept open conversation with hertz via phone conversation and even went to the [local] Location Hertz to turn the keys when after a conversation with the local representative, was informed that I had till April 1st [the day after Mr. Toney sent this email] to return the vehicle. . . . I never attempted to steal the vehicle and have always made my payments . . . . During all this I called your customer service team and I've talked with your Hertz representatives. . . . I was told I have till April 1st to return by a Local Representative at the [local] Location in Harvey, La . . . . Please reach back to me so I see what will be the next steps from this point." Claim No. 15891, at 21 (email).

In other words, Mr. Toney informed Hertz that the location told him he had until April 1 to return the vehicle, but that he was arrested and jailed for stealing the vehicle before that return date. |
| 168 (4b) | Angela Delafontaine (15,823) | Ms. Delafontaine was reported for theft prepetition without her knowledge. Claim No. 15,823, at 16 (¶ 6). When she discovered a pending warrant postpetition, on or around February 2, 2021, she contacted Hertz's Asset Loss Prevention Department and was told "that the vehicle she previously rented was not reported missing . . . and that it must be a mistake as there w[ere] no issues with her prior rental, name, or account." *Id.* at (¶¶ 8–10). But what Hertz |

| | | told her was false: Hertz *had* filed a theft report and Ms. Delafontaine was subsequently arrested and detained along with her family, and prosecuted for 171 days. *Id.* at 17–18 (¶¶ 11–20). |
|---|---|---|
| 171 (4b) | Anson Westerfield (15,795) | Mr. Westerfield was a regular renter and Gold Club (rewards) member that was known by name to the local office. Claim No. 15,795, at 15 (¶ 4). Nonetheless, he was arrested in February 2021 shortly after a late January 2021 rental. *Id.* at 16 (¶ 7). At that time, "Anson plead[ed] that he was a Hertz Gold Customer and not a car thief, [but] Hertz confirmed that the vehicle was reported stolen. Hertz told Anson that there was nothing that [it] could do . . . [and] instructed the police to follow through with the arrest." *Id.* at 16 (¶ 8). Anson also "notified Hertz that it had filed a false police report." *Id.* at 16–17 (¶ 13). Hertz subsequently was informed of five court dates for Anson but failed to appear to any of them until charges were dismissed. *Id.* at 16 (¶ 11). |
| 172 (4b) | Duni Zenaye (15,799) | Ms. Zenaye rented a vehicle, was arrested, and was prosecuted post-petition. *See* Claim No. 15,799. She had agreed upon a return date of Saturday, January 16, 2021, with the local manager, but was arrested on January 14, two days before the agreed-upon return date. *Id.* at 16 (¶ 2). "During her arrest, [Ms. Zenaye] was allowed to contact Hertz and made them aware that they had falsely filed a police report and that she was being wrongfully arrested." *Id.* at 17 (¶ 22). After 2 days in jail and 121 days facing charges, all charges were dismissed when Ms. Zenaye presented her evidence and Hertz declined to show up to court. *Id.* at 17 (¶¶ 20–21). |
| 173 (4b) | Abraham Carmichael (15,940) | Mr. Carmichael rented and was reported for theft post-petition and was arrested and prosecuted after the Effective Date of the Plan. Shortly after learning in February 2021 that he had been reported for theft, Mr. Carmichael reached out and "called the local Hertz in Highland to complain about the false report and the criminal case against him. He had rental agreements and proof the money was paid. He was furious." Claim No. 15,940, at 16 (¶ 13). Further, he "notified Hertz that it had filed a false police report, and that the company had not properly updated his contact information, had not emailed him, and had in fact charged him for the rental." *Id.* at 18 (¶ 25). |
| 177 (4b) | Anne Maha (15,867) | After being arrested and jailed for 19 days around April 2019, Ms. Maha "immediately contacted both the local Hertz office and the 1-800 corporate number demanding answers as to why Hertz filed a false police report against her and had her arrested for a crime which she did not commit. However, neither the local office nor the 1-800 Hertz corporate office provided her any real answers." Claim No. 15,867, at 17 (¶ 19). Facing serious charges, Ms. Maha ultimately accepted a plea. *Id.* at 18 (¶¶ 25–28). |
| 181 (4b) | Cody Breedlove (15,888) | All postpetition, Mr. Breedlove rented a vehicle, was reported for theft, was arrested multiple times, and is being prosecuted. Claim No. 15,888, at 15 (¶ 2). "Hertz has repeatedly been called and emailed by Cody asking them why a false theft [report] was filed, and a Beaverton, OR police officer spent an hour on the phone with Hertz demanding to know if the theft report was false." *Id.* at 21 (¶ 49). Among those contacts are two July 2, 2021 emails (before the Administrative Claims Bar Date) to "customerrelations@hertz.com," with the |

| | | latter saying: "You have filed false theft charges causing the loos [sic] of my career for a returned vehicle and here is proof. You also had caused jail time. Bank statement as well." *Id.* at 32. The email attached an e-return invoice and bank statement showing his payment for the vehicle. An automated reply confirmed receipt of the email and provided a case reference number, but Hertz otherwise appears to have ignored Mr. Breedlove. *Id.* at 33. |
|---|---|---|
| 183 (4b) | Samantha Simpson (15,839) | Ms. Simpson was arrested in connection with a postpetition rental that Ms. Simpson was working to purchase from Hertz after leasing it in September 2020. Claim No. 15,839, at 15 (¶ 2). On March 18, 2021, Ms. Simpson and her fiancée Ms. Rather were arrested; Ms. Simpson was then jailed for two days. *Id.* Upon release, Ms. Simpson "immediately reached out to Hertz and spoke to the representatives from the 1-800 corporate number. She told them she had been falsely arrested. Hertz apologized for the misunderstanding, told [her] they had the correct paperwork to prove that [Ms. Simpson] legally owned the vehicle and would send paperwork to the police to have the charges dropped." *Id.* at 17 (¶¶ 20–21). (Hertz never sent police/prosecution that exonerating paperwork.) Ms. Simpson eventually accepted a plea. *Id.* at 18 (¶ 29). |
| 187 (4b) | Latricia Taylor (15,874) | When Ms. Taylor learned pre-petition that Hertz had reported her for theft around January 30, 2020 based on a rental she had extended and paid for, she "called the local Hertz number to discuss the false theft report and was directed to contact the 1-800 corporate number. During these phone calls to Hertz local and corporate she told them Hertz had falsely reported the car stolen." Claim No. 15,874, at 15 (¶¶ 13–14). Ms. Taylor subsequently learned there was a warrant for her arrest, voluntarily turned herself in, was jailed for two days, and was prosecuted until charges were dismissed in October 2020. *Id.* at 14 (¶ 2). |
| 188 (4b) | Melanie Evans (15,926) | After Ms. Evans was arrested in late 2014 while driving a vehicle for which she had extended the rental, she "immediately called Hertz and demanded to know why there was a false and baseless warrant issued for her arrest. She contacted both the local Hertz and the 1-800 corporate number, but did not receive a satisfactory resolution as why they issued a theft report when her bank statements clearly show that [Ms. Evans] paid for the rental." Claim No. 15,926, at 15 (¶ 10). Mrs. Evans entered a plea to avoid being separated from her children. |
| 193 (4b) | Daniel Morales Hernandez (15,889) | Postpetition, Hertz rented Mr. Hernandez a vehicle it had previously reported stolen. Claim No. 15,889, at 15 (¶ 19). Mr. Hernandez was arrested at gunpoint. *Id.* at (¶¶ 10–15). During the September 20, 2020 arrest "police contacted Hertz and discovered that Hertz had rented Daniel a vehicle that they had previously reported stolen." *Id.* at (¶ 19). Mr. Hernandez "then called Hertz to ask why they had rented him a vehicle they had previously reported as stolen but he was not provided with any answers." *Id.* at 16 (¶ 22). |
| 194 (4b) | Sophia Ortiz (15,875) | Shortly after her June 2016 arrest, Ms. Ortiz "called Hertz's 1-800 corporate number to ask why they had falsely requested a warrant for her arrest when she had proof that she had paid for the rental." Claim No. 15,875, at 15 (¶ 15). The theft report had deleted her rental extensions and her payments. Hertz never |

| | | appeared to court during Ms. Ortiz's prosecution until she pleaded guilty to a minor charge nearly a year and a half later. *Id.* at 16 ¶¶ 19–24. |
|---|---|---|
| 196 (4b) | Adam Cuevas (15,931) | Mr. Cuevas rented a car that Hertz had previously reported stolen and was arrested at gunpoint during his rental. During his January 2020 arrest, "The police . . . contacted Hertz to figure out if [Mr. Cuevas] was telling the truth. Hertz eventually informed the officers that [Mr. Cuevas] had validly rented the car but that the company had rented [Mr. Cuevas] a . . . car previously reported as stolen before [Mr. Cuevas's] rental started." Claim No. 15,931, at 15 (¶ 9). The day after the arrest, Mr. Cuevas "contacted Hertz demanding an explanation for their outrageous treatment of him"—explaining that he "had been falsely arrested and rented a car that Hertz had already reported to the police as stolen"—"but Hertz acted like they had no knowledge of [Mr. Cuevas's] false arrest nor having any knowledge of renting him a car that was listed as stolen." *Id.* at 15 (¶¶ 11, 14). |
| 199 (4b) | Howard English (15,941) | Mr. English was arrested at gunpoint on May 25, 2021 (postpetition) during a long-term rental. Claim No. 15,941, at 15 (¶ 10). During his arrest, "police . . . informed [Mr. English] that Hertz had no record of his contract and that he was free to leave." *Id.* at (¶ 14). "After his arrest, [Mr. English] reached out to Hertz to inquire why there had been a false theft report. Hertz refused to offer any explanation." *Id.* at 16 (¶ 15). |
| 200 (4b) | Jason Don Campbell (15,934) | Mr. Campbell was arrested at gunpoint on May 27, 2020 during his initial rental contract because Hertz rented him a vehicle it had reported stolen. Claim No. 15,934, at 15 (¶¶ 7–12). When Mr. Campbell returned the vehicle on June 1 (the due date), "he confronted the branch manager, Kelsia Sanders. He told her about the false arrest and that he could have been killed. She apologized for his false arrest. The manager said that this was not the first time she had seen switched plates and said that she was going to contact corporate because she was aware of serious ongoing problems with Hertz's inventory control and tracking." *Id.* at 15 (¶ 14). |
| 201 (4b) | Lakeshia Dowlen (15,933) | Ms. Dowlen rented a car in March 2020 and returned it on May 15. Claim No. 15,933, at 14 (¶¶ 3–5). On June 24, 2020, a Hertz investigator[7] called and told Ms. Dowlen that she would be reported for theft if she did not return the car; Ms. Dowlen was confused because she had returned the car. *Id.* at 14–15 (¶¶ 6–7). But on May 15, 2021, she was arrested for a felony in connection with the rental. *Id.* at 15 (¶ 9). After two days in jail, she was released. *Id.* at 15 (¶ 10). "After being released from jail, she contacted Hertz's corporate office furious with the company and explained that they had filed a false report for a car she had returned. They informed Lakeshia that they could not locate her case or her rental agreement. Lakeshia asked them 'how can they press charges against her if they don't have documentation to prove she had the vehicle?'" *Id.* at 15 (¶ 12). That was almost certainly false, as Hertz had rented her the car, reported her for theft, and called her to seek return of the vehicle. Hertz never appeared in Court and all charges were dismissed. *Id.* at 15 (¶ 14). |

---

[7]    Ms. Dowlen recalls a name for the investigator of Jessy Coleman (spelling unknown).

| 205 (4b) | Casey Kurpjuweit (15,914) | Mr. Kurpjuweit's rental vehicle was towed to a Hertz distribution center after an accident on March 3, 2019. Claim No. 15,914, at 14–15 (¶¶ 6–7). Mrs. Kurpjuweit (Mr. Kurpjuweit's mother) "contacted Hertz to update them on her son's accident" on March 4, 2019, informing Hertz that "she believed the [rental] was returned to Hertz." *Id.* at 15 (¶ 8). When Hertz called on June 15, 2019, to ask Mr. Kurpjuweit to return the vehicle—he responded that the car was towed after the accident and returned to Hertz. *Id.* at 15 (¶ 11). On January 23, 2020, Mr. Kurpjuweit received a letter that he was being charged for theft. *Id.* at 15 (¶ 12). Mr. Kurpjuweit and his mother then "called both the [local branch] and Hertz's legal department to demand an explanation for the false theft charge. *Id.* at 15 (¶ 13). They informed Hertz that the car was towed to a Hertz facility and that the theft report was baseless. *Id.* Hertz did nothing to help them." *Id.* After numerous delays, he was arrested and arraigned on August 13, 2021 when he went to the courthouse. *Id.* at 16 (¶ 15). Charges were not dismissed until August 24, 2021. *Id.* at 16 (¶ 16). |
|---|---|---|
| 206 (4b) | Jason Kearny (15,894) | Mr. Kearny was arrested twice post-petition on a postpetition rental. Claim No. 15,894, at 14 (¶ 2). The first time he was arrested at gunpoint during the original rental duration because police thought the car was stolen. *Id.* at 15 (¶¶ 6–7). He "told the company about the false arrest due to the severely expired registration," *Id.* at 18 (¶ 26): first on July 8–9, 2020, when he "contacted Hertz' about the incident and had to go to the rental location to get new tags, *id.* at 15 (¶ 8), and second in a text message to a Hertz investigator (likely named Lisa) at 954-445-6998, saying "My 3rd or 4th day i got pulled over by the police which doesnt happen to me because i have a clean criminal record. After i had the cop pull his gun on me because he thought it was a stolen car." *Id.* at 16 (¶ 15).[8] |
| 207 (4b) | Jason Reeder (15,882) | Mr. Reeder was arrested shortly after speaking with the local branch and being told he was good to keep the car. Claim No. 15,882, at 14–15 (¶¶ 5–7). The police called Hertz corporate at the time of the arrest around June 30, 2015—the corporate office said that Mr. Reeder had paid and that it was not aware why there was a warrant for his arrest. *Id.* at 15 (¶ 10). Mr. Reeder and the police also spoke with the local office, which said that corporate had listed the vehicle stolen, which led to Mr. Reeder's arrest and prosecution. *Id.* at 15 (¶ 11). After his arrest, Mr. Reeder called and spoke with Gunnar, the manager of the local branch, who was unable to explain why a theft report had issued. *Id.* at 16 (¶ 18). All charges have since been dismissed. *Id.* at 16 (¶ 22). |
| 211 (4b) | Dan Shurtz (15,902) | Mr. Shurtz was arrested at gunpoint after Hertz rented him a vehicle it had reported stolen. Claim No. 15,902, at 14 (¶ 2). During his arrest, the arresting |

---

[8]    Notice of his injuries from the first arrest is enough for Mr. Kearny to be a known creditor. Nonetheless, the Debtors also had notice of the substance of his claims for the second arrest, as Mr. Kearny spoke shortly before the arrest with the branch manager, Ken, who told him "'Local and corporate Hertz do not communicate well' and that there was no issue with Jason's rental agreement and he was extended and authorized to have the car." *Id.* at 15–16 (¶12). Prior to his arrest, Mr. Kearny also explained to the same Hertz investigator his agreement with the location to pay $25 a day to keep the rental and contested the Hertz "force charge" connected to the second arrest. Hertz reimbursed him for that charge. *Id.* at 16–17 (¶¶ 15, 21).

| | | |
|---|---|---|
| | | officer and Hertz admitted that Hertz had reported the vehicle's tags stolen before renting that vehicle to Mr. Shurtz. *Id.* at 14–15 (¶¶ 2, 11–13). The local office the next day (on March 29, 2018) "confirmed to [Mr. Shurtz] he was rented a stolen vehicle and said 'we are sorry about you getting arrested. *Id.* at 15 (¶15). |
| 214 (4b) | Monique Wheeler (15,898) | Ms. Wheeler was arrested, jailed, and prosecuted twice based on a Hertz theft report. Claim No. 15,898, at 14 (¶ 2). After the first arrest on November 11, 2015, she "contacted the 1-800 Hertz corporate office to demand to know why they falsely issued a warrant for her arrest. The representative took her information, but she never received a call back from Hertz." *Id.* at 16 (¶ 18). After her second arrest around September 15, 2017, Ms. Wheeler "contacted [Hertz] about the false theft report and gave them her old Hertz rental contract number. They informed her that the rental was paid for in 'full' and were not sure why she was arrested. However, Hertz refused to send her copies of her rental agreement when she requested that they do so." *Id.* at 16–17 (¶ 26). During the second prosecution, Ms. Wheeler also believes the following employees were involved and would have been made aware that she claimed the report was false: Caroline Fry, Scott Green, Gregory Donatello, and Jason McCoin. *Id.* at 17 (¶¶ 28, 29). |
| 217 (4b) | Tiffany West (15,905) | Ms. West rented a vehicle in April 2020 and agreed to purchase that vehicle from Hertz in August 2020. Claim No. 15,905, at 14 (¶ 2). She was arrested, however, on November 14, 2020 for alleged theft of the vehicle she rented and purchased. *Id.* at 15 (¶ 12). Before her arrest, Ms. West contacted Hertz to discuss a charge based on the purchase (or potentially based on a Hertz billing error for failing to register the car as transitioning to purchase) and was told that there were no issues with the purchase contract. *Id.* at 15 (¶ 11). After the arrest, she "confronted Hertz over the false report" and attempted to recover her belongings that were seized from the vehicle— "notif[ying] Hertz that it had filed a false police report." *Id.* at 16–17 (¶¶ 18, 25). |
| 221 (4b) | Kevin Richardson (15,913) | Mr. Richardson was rented a stolen vehicle by Hertz and arrested at gunpoint two days into the rental. Claim No. 15,913, at 14 (¶ 2). The police report details: "It was apparent that Hertz had reported the vehicle stolen in error, given that they had rented it out after reporting it stolen to Little Rock Police. . . . I spoke with dispatchers with LRPD, who in turn contacted the Hertz employee that filed the commercial burglary and stolen vehicle reports. It was determined that the vehicle rented to Mr. Richardson was entered stolen by mistake." *Id.* at 22–23. Later the morning of the arrest, Mr. Richardson "called the local branch and spoke with the manager. [Mr. Richardson] informed Hertz what happened with the police, and asked why Hertz rented them a stolen vehicle.  The manager simply claimed that 'Hertz made a mistake.'" *Id.* at 16 (¶ 18). |
| 222 (4b) | Kevin Richardson, Jr. (15,908) | *See* above argument re Kevin Richardson. Further the police incident report, which Hertz likely would have received as the reporting party, specifically describes that Mr. Richardson's "fifteen year old son" was a passenger during the arrest at gunpoint. Claim No. 15,908, at 22. |

| 223 (4b) | Antwanette Hill (15,923) | Ms. Hill has been arrested four times in connection with a prepaid rental reservation that Hertz accused her of trying to steal from the lot. Claim No. 15,923, at 14 (¶ 2). She has spent 20 days in jail and suffered a miscarriage while in jail. *Id.* Charges remain pending. *Id.* at 15 (¶ 18). After her initial arrest on October 8, 2018, Ms. Hill "called Hertz corporate . . . and demanded an explanation for the false report. They said they would call back but never did. *Id.* at 16 (¶ 22). Further, at the station "Hertz was called and actually validated the rental." *Id.* at 14 (¶ 7). |
|---|---|---|
| 225 (4b) | Celita James (15,918) | Franklin Richards rented a vehicle in California and extended the rental. Claim No. 15,918, at 14 (¶ 4). The vehicle he rented was reported stolen out of Texas and he was arrested at gunpoint in late July or early August 2016. (Ms. James was in the car when it was approached at gunpoint.) *Id.* at 14 (¶¶ 5–6). The circumstances of this case—an arrest report in Texas leading to the arrest of a valid renter from California—self-evidently provide a claim. Moreover, while Mr. Richards spent 7 days in jail, Ms. James "called Hertz at the 1800 number and demanded an explanation for the false report. No one would tell her anything." *Id.* at 15 (¶ 8). While Mr. Richards was told that all charges were resolved soon thereafter, he learned in 2020 that there remained (and, it seems, still remains) a warrant for his arrest. *Id.* at 15 (¶¶ 12–13). |
| 226 (4b) | Franklin Richards (15,919) | *See* above argument re Celita James. |
| 228 (4b) | Connie Totman (a/k/a Gypsylynn Ware) (15,893) | Ms. Totman arranged to rent a Hertz vehicle and leave it at a trailhead so that she could hike the Appalachian Trail—she specifically called Hertz to give the car's coordinates before leaving for the hike. Claim No. 15,893, at 14 (¶ 2). Instead of picking up the car, Hertz reported it stolen while Ms. Totman was hiking for a month. *Id.* at 15 (¶ 11). Ms. Totman was subsequently arrested three times based on that false theft report until South Carolina charges were dismissed in June 2019. *Id.* at 15–16 (¶¶ 11, 15, 17–18). Ms. Totman "repeatedly called Hertz to explain to them that they had filed a false report or improperly charged her, as did her bank." *Id.* at 18 (¶ 21); *see id.* at 15 (¶ 9) (contesting overcharge, explaining to Hertz that accusing her of theft would be ridiculous); *id.* at 16 (¶ 14) (calling Hertz after first arrest "furious . . . because of the false report. Hertz . . . tried to assure her that the situation had been resolved."). Indeed, Hertz *reimbursed* Ms. Totman the overcharge tied to the theft accusation after her bank confirmed that the theft overcharge was a mistake and told prosecutors that it was "unable to locate information on [the] vehicle" during her prosecution. *Id.* at 17–18 (¶ 18). |
| 230 (4b) | Lisa Brower (15,909) | Mr. Thomas and Ms. Brower were arrested, jailed for 5 and 27 days, and ultimately accepted plea deals based on a false theft report from 2015. Claim No. 15,909, at 14 (¶ 2). In early 2016, Ms. Brower (who rented the vehicle) "called the local Hertz at the Cleveland Airport and demanded to know why Hertz had filed a stolen police report when they were regularly charging her debit card." *Id.* at 16 (¶ 18). Facing serious jail time alongside her son, Ms. Brower ultimately accepted a plea. *Id.* at (¶ 21). |

**Appendix C: Claimants Who Told Hertz Information Underlying Report Was False (21 Claimants)**

| Master Number | Name (Claim No.) | Argument |
|---|---|---|
| 108 (3) | Heather Kasdan (15,945) | Ms. Kasdan was in a car accident one day after renting her vehicle. *See* Claim No. 15,945. She reported the accident to Hertz, which agreed to tow the vehicle. *Id.* at 12 (¶ 4). She never saw the vehicle again. *Id.* at 12 (¶ 6). Nonetheless, Hertz contacted her more than a month later claiming that she had not returned the vehicle and would report her for car theft. *Id.* at 12 (¶ 7). She repeatedly contacted Hertz to say she didn't have the vehicle. Among those contacts, she emailed "vehcntl@hertz.com" and "customerrelations@hertz.com" on August 30, 2019 explaining the accident, that Hertz Emergency Roadside had towed the vehicle, that she submitted a vehicle incident report to Hertz, and that she nonetheless was being harassed and accused of "felony theft." *Id.* at 20–21 (email). Hertz created an incident report based on this email, but proceeded to print a "theft package" and instruct the location to report Ms. Kasdan for theft on September 10, 2019. *See* HERTZ_FPRP_0000190. The theft package did not contain Ms. Kasdan's extensive contacts with the company, including the content of her August 30 email. *See* HERTZ_FPRP_000192–195. <br><br>  <br><br> Ms. Kasdan was reported for stealing the vehicle on October 7, 2019. <br><br> On 10/07/2019 I P/O L.Gawlak was dispatched Hertz car rental return to meet with the manager regarding a stolen vehicle. The vehicle (NY HTU6766) was rented by a Kasdan,Heather on 07/07/2019 at 0846 hours and was due to be returned on 07/07/2019 at 0849 hours. Vehicle was rented from Hertz at the Buffalo Niagara International airport. A certified demand letter was sent on 08/23/2019 and a repossession service was hired on 08/29/2019. Vehicle information will be sent to OCC to be input into eJustice as a stolen vehicle. A copy of the report will be sent to the detective division. <br><br> *Id.* at 24 (excerpt of police report). A produced tow receipt shows that the vehicle was impounded by the tow company for 92 days until October 10, 2019—putting the tow date right around the July 7, 2019 accident. HERTZ_FPRP_0000211–212. Further, Ms. Kasdan was charged almost $4,000 prior to the filing of the theft report (which was omitted from the report to the police) and she extensively contested that charge through her bank and with |

| | | |
|---|---|---|
| | | Hertz.[9] Claim No. 15,945, at 13–17 (¶¶ 15–28). Ms. Kasdan did not know during this time that Hertz had reported her for car theft, but her dispute of the charges and repeated assertions that Hertz had towed the vehicle clearly showed that the report Hertz knew it had filed was false. |
| 110 (3) | Israel Sundseth (15,646) | Mr. Sundseth rented a vehicle post-petition on October 20, 2020 and returned it on October 26, 2020. Hertz continued charging him for the rental each day after the return. Claim No. 15,646, at 12 (¶¶ 4–5). On October 30, he sent Hertz a direct message via Twitter explaining that he returned the car and was being wrongly charged. *Id.* at 13–15 (¶ 11). Hertz promised to close the contract, but kept charging him daily. *Id.* at 13 (¶ 10). On November 2, Mr. Sundseth went to the location and saw the vehicle still parked where he returned it. *Id.* at 15–16 (¶ 13). A few days later, he received a call from Hertz corporate explaining that it would report him for theft; he again explained that he returned the car. *Id.* at 16 (¶ 17). On November 10, he received a letter from Hertz dated November 3 saying it would report him for theft. *Id.* at 16 (¶ 19). And on November 11, 2020 he received a call from a police officer saying that Hertz had accused him of stealing the vehicle. *Id.* at 16–17 (¶ 20). The officer said he would follow up with Hertz—Mr. Sundseth now fears being arrested.[10] *Id.* at 16–17 (¶¶ 20–21). Because Mr. Sundseth repeatedly and clearly told Hertz he returned the car, but Hertz reported him for theft anyways, Hertz plainly had notice of the substance of his claims. |
| 118 (3) | Sean Hurt (15,706) | Mr. Hurt rented from Dollar on January 12, 2020. Claim No. 15,706, at 12 (¶ 3). On January 19, the vehicle was stolen from him. *Id.* at 12 (¶ 4). He reported the theft to the police and to Hertz, and he filled out an affidavit at the location detailing that the car was stolen *from* him; *Id.* at 12 (¶¶ 4–6). After Hertz continued to demand that he return the vehicle, Mr. Hurt sent an email to Hertz on February 3, 2020, detailing that "I received the letter of demand only problem is I don't have it. I've been reporting the vehicle stolen since 1/19/2020 and you've done nothing except continue to charge me for the vehicle. … Well I still don't have it and I still don't know where it is." *Id.* at 15 (copy of email). Despite having clearly told Hertz via the affidavit and email[11] that the car was stolen *from* him, Hertz reported Mr. Hurt for stealing the car—with the "theft package" sent to the location on February 25, 2020 claiming the vehicle was stolen on January 19 in Mr. Hurt's possession. *See* HERTZ_FPRP_0000165. (Hertz has another type of reporting system for when vehicles are stolen *from* a renter, but chose not to use that reporting system for Mr. Hurt). Mr. Hurt contested charges for time after the vehicle was stolen from him. Claim No. 15,706, at 13 (¶ 12). Mr. Hurt was subsequently arrested, jailed overnight, and prosecuted until all charges were dismissed in May 2021. *Id.* at 14 (¶¶ 14–15). In sum, Mr. Hurt had |

---

[9] American Express resolved the dispute against Ms. Kasdan when Hertz produced an invoice falsely claiming she had the car for 20 days—she had the car only one day.

[10] Hertz has either failed to produce or has deleted many documents related to Mr. Sundseth's recent case, including the November 3 letter it sent him and the materials underlying reporting him to the police (which it obviously did given that the police called Mr. Sundseth).

[11] Hertz's productions did not include either of these documents.

| | | clearly and repeatedly informed Hertz that the car was stolen from him, but Hertz reported that he stole the car. |
|---|---|---|
| 117 (3) | Kimberli Costabile (15,660) | Ms. Costabile rented a vehicle through State Farm from Hertz on February 4, 2020, and she regularly extended that vehicle for a return on March 24. Claim No. 15,660, at 12 (¶ 2–5). In late February, Ms. Costabile started receiving texts suggesting she stole the rental. *Id.* at 12 (¶ 6). She returned to the location and spoke with its employees and branch manager, who "assured her the rental was fine" and "told [her] to ignore the messages from Hertz corporate and that corporate had bad systems." *Id.* at 12 (¶ 7). On March 10, she received another threatening email—she responded that the location knew her return date was March 24 and that she would extend further, copying the location employee. *Id.* at 12 (¶ 9) & 21 (email). Hertz's produced records confirming that it got Ms. Costabile's email: <br><br>  <br><br> HERTZ_FPRP_0000118–120. The Hertz employee at the location also emailed the corporate employee to clarify "the return date of 3/24" and that "[Ms. Costabile] is renting in good faith and has been very cooperative since the beginning of her rental." Claim No. 15,660, at 20 (copy of email). Despite all that, the "investigator" emailed her again on March 11 again claiming the car was overdue. *Id.* at 13 (¶ 12). Ms. Costabile ultimately returned the vehicle in coordination with the local branch, but to the extent she was reported for theft Hertz was plainly on notice of her claim given these extensive communications.[12] |
| 126 (3) | Paula Murray (15,652) | Ms. Murray rented a vehicle on or around September 30, 2016. Claim No. 15,652, at 12 (¶ 3); HERTZ_FPRP_0000259. She extended regularly with the location. *Id.* On November 1, Hertz sent Ms. Murray a letter threatening to report her for theft. HERTZ_FPRP_0000257. She told Hertz she believed the rental had been extended. Hertz called the location and confirmed the extension to November 4. HERTZ_FPRP_0000257. The theft package does not record further contact with Ms. Murray—who had been responsive and had already confirmed extensions with the location that corporate didn't know about when pursuing the theft report—or with the local branch, which had extended the vehicle—before she was reported for theft on November 16. *See* HERTZ_FPRP_0000261. The November 1 theft report attached the November 1 Demand letter, which had already been confirmed to have come before a valid extension. HERTZ_FPRP_0000270. As described in the Proof of Claim, Ms. Murray tried to make another extension, but was told by the local branch that it had given her |

---

[12]  Hertz's productions confirm that the vehicle was in fact properly extended on March 13. HERTZ_FPRP_0000120. Investigation is ongoing into whether Hertz reported Ms. Costabile for theft or simply wrongly accused her of doing so without a formal report.

| | | |
|---|---|---|
| | | an additional extension in error and that she needed to return the car. Claim No. 15,652, at 12 (¶ 4). She did so, and Hertz corporate confirmed the return on November 21, 2016. HERTZ_FPRP_0000258.[13] But Hertz never withdrew the theft report—which had no basis given her confirmed and attempted extensions—and instead Ms. Murray was arrested four years later for stealing the vehicle she had returned when asked to do so. Claim No. 15,652, at 12 (¶ 2). |
| 129 (4a) | ReJeana Meado (15,754) | Ms. Meado rented a vehicle from Thrifty from May 13 to May 16, 2021, at which point she returned the vehicle by leaving where she was instructed to leave it after hours. Claim No. 15,754, at 13 (¶¶ 3–4). Over the following months, she was repeatedly told that Hertz would report her for theft—including in letters, calls, and emails. *Id.* at 13–18 (¶¶ 5–19). Each time, she told Hertz/Thrifty where she had returned the vehicle and that she had not stolen it, including by many calls (*id.* at 13–15 (¶¶ 5, 7–8, 10, 12, 15)) and emails (*id.* at 15–17 (¶¶ 14, 18)) clearly laying out what had happened. Despite her repeated and unmistakable efforts to explain to Hertz that she had returned the car, Hertz corporate instructed the local office to report her for car theft on September 1, 2021. Hertz_FPRP_0002127; *see also* Hertz_FPRP_0002130 ("she is probably trying to get some extra days … go ahead and report the vehicle stolen"). To be clear, this theft report was not a theft *from* renter, but directly asserted that Ms. Meado stole the on May 16, 2021. Hertz_FPRP_0002127. She was charged more than $5,000 on September 2—the day after Hertz instructed the local branch to report her for theft "within four days." HERTZ_FPRP_0002127; HERTZ_FPRP_0002601. Hertz customer service told Ms. Meado that no theft report was filed on December 3. Claim No. 15,754, at 21 (¶ 30) ("Please be advised Hertz/Thrifty did not file a theft report").[14] But then, when pressed further, Hertz/Thrifty admitted on December 4 that "I appreciate the opportunity to revisit this matter … According to our records … we have reported [the vehicle] as stolen to the authorities." *Id.* at 22 (¶ 33). After Ms. Meado filed a motion seeking relief in this Court, Hertz reached out again, saying "I am truly sorry for the inconvenience this matter has caused you…I want to reassure you; I have confirmed The Hertz Corporation did not file a police report … . The information you received on 12/04/21 was incorrect. We are reviewing this matter internally and will provide the necessary corrective actions." HERTZ_FPRP_2603. Given that Hertz specifically instructed the local branch to report Ms. Meado for theft and told her that it in fact reported her for theft, but has deleted the remainder of the theft package, it is likely that Hertz did in fact report her for theft. If so, Ms. Meado amply informed Hertz that the theft report was false. |
| 132 (4a) | Carmen Bosko | Ms. Bosko, a returning renter and Gold member, rented from Hertz in Florida on January 20, 2021 and returned it on or around April 12, 2021 to a location in |

---

[13]    The theft package suggests that on November 17 Ms. Murray was in touch with a Hertz investigator and said she would immediately return the vehicle. HERTZ_FPRP_0000257. Ms. Murray recalled in her declaration that she had already returned the vehicle at that time four years ago. Claim No. 15,652, at 12 (¶4). Regardless, all agree that she did return the car and that receipt was confirmed no later than November 21.

[14]    Counsel recognize that some of these communications occurred after the Administrative Claims Bar Date, but they are included for full context. Because Ms. Meado appears to have been reported for theft after the Effective Date of the Plan, counsel have consistently argued that her claims should not be in bankruptcy court.

| | | |
|---|---|---|
| | (15,744) | Morrow, Georgia. Claim No. 15,744, at 13, (¶¶ 2–5). Hertz reported the vehicle stolen on April 27, 2021. HERTZ_FPRP_0002013. She was arrested on August 9, 2021, and spent 40 days in jail while her child was about 2 months old. *See* Claim No. 15,744, at 14 (¶¶ 9–12). To the extent that Ms. Bosko's claims arise before the effective date, she specifically called Hertz's corporate 1-800 number and informed them that she was returning the vehicle to a Morrow, Georgia location after hours and was given permission to do so prior to being reported for theft. *Id.* at 13 (¶¶ 4–5). Hertz has produced records showing that the car was impounded as early as April 29, 2021 in Georgia, HERTZ_FPRP_0002038, and the location of recovery was listed as a Hertz location in Springdale, Georgia. HERTZ_FPRP_0002037. Although Hertz had indisputably "recovered" the vehicle no later than May 8, 2021 (and likely earlier), Ms. Bosko was arrested, jailed, and prosecuted starting in August of 2021. Only after Ms. Bosko filed a claim in this Court—on January 25, 2022—did Hertz send local police a letter "to confirm recovery" of the vehicle Ms. Bosko had rented and returned long before. HERTZ_FPRP_0002014.[15] |
| 138 (4a) | Dr. Tederhi Usude (15,752) | Dr. Usude rented a Hertz vehicle in June 2020 and routinely extended. Claim No. 15,752, at 13 (¶¶ 3, 6). He worked at a rural hospital that was struck near the beginning of the COVID-19 pandemic. *Id.* at 13–14 (¶¶ 5, 8). In December 2020, he received a threatening communication from Hertz employee (or agent) Harout Boghossian claiming that the car would be reported stolen if not returned. *Id.* at 13 (¶ 6–7). He replied on December 8 that "There's No need to Report the Car Stolen. 3 Nurses have Just Tested Positive for COVID at the Rural Hospital where I work. I Tested Negative and in Quarantine. I get Retested Tomorrow at 10am. And then take things from there. By 12/14 I'd know my Test Status and then I'd Decontaminate your Car and Look for the Nearest Hertz Rental to SAFELY Return your Car." *Id.* at 28. Hertz nonetheless reported Dr. Usude for stealing the vehicle on December 15 without any further recorded contacts with Dr. Usude to follow up on the COVID-19 quarantine and return status—and there is no evidence it told police of the COVID-19 quarantine situation. HERTZ_FPRP_0002533 (confirmation of December 15 theft report), 2536–2541 (no recorded contacts). On December 18, shortly after his quarantine ended, Dr. Usude drove seven hours across California from Laytonville (the rural hospital) to Santa Clarita to return the vehicle. Claim No. 15,752, at 14 |

---

[15] Ms. Bosko threatened to sue Hertz on September 19, 2021, which like her arrest was after the Administrative Claims Bar Date. *See* HERTZ_FPRP_0002596 ("cust[omer] mentioned that she will sue HERTZ due to the situation").

| Impacted Brand | Hertz |
|---|---|
| Impacted Brand Logo | *Hertz.* |
| Contact Name | CARMEN BOSKO |
| Subject | |
| Description | S/w cust about rental charges. Cust called asking for a SUP. Cust mentioned that she got arrested due our company reported a car as stolen under her name. cust mentioned that she will sue HERTZ due the situation. And per TL approval MP, I transferred the caller. LP |

| | | |
|---|---|---|
| | | (¶ 10). But he was arrested at gunpoint and jailed before he arrived. *Id.* at 14–15 (¶¶ 11–16). |
| 139 (4a) | Edward Solis (15,753) | Hertz had a payment dispute with Mr. Solis. Claim No. 15,753, at 13 (¶¶ 3–5, 8). Mr. Solis repeatedly spoke with Hertz and informed Hertz that Lyft was paying for his rental each week (funds were being taken from his account), and that any inquiries regarding payment disputes should be directed to Lyft. *Id.* at 13–15 (¶¶ 5, 8–9, 20). It should have been plain that Mr. Solis was not stealing the vehicle as he referred the Debtors to Lyft, which was paying for the rental each week. The Debtors have not produced any written communications with or records of payment from Lyft, but it is likely that communications with that company would further undermine any theft report.[16] |
| 145 (4a) | Reginald Brown (15,739) | Mr. Brown rented a Hertz vehicle through Lyft in mid-2019. Claim No. 15,739, at 13 (¶ 3). Lyft extended his rental throughout its duration. *Id.* at 13 (¶ 5). On July 25, 2019, Lyft reached out about a problem with the rental, which Mr. Brown quickly resolved. *Id.* at 13–14 (¶ 6). Lyft confirmed to him on July 27, 2019 that "you've got the green light to continue renting with Express Drive." *Id.* Mr. Brown returned the vehicle to Hertz on August 23, 2019 and took a date-stamped picture of the car returned to the lot; Lyft subsequently confirmed the return. *Id.* at 14–15 (¶¶ 7–9) (including picture of returned vehicle). Mr. Brown subsequently provided the details of his return to a Hertz investigator, which is confirmed by Hertz's records on August 28 reflecting that "Renter shared pictures of where he dropped of[f] the unit at location … He is requesting a[n] affidavit be sent to him via email," and he provided his email address. <br><br>  <br><br> HERTZ_FPRP_0002670. Hertz refused to send Mr. Brown an affidavit to swear he had returned the vehicle or attest (perhaps) that it had been subsequently stolen, and instead internally remarked: "cannot send renter an affidavit because the keys were left in the vehicle and not properly returned." HERTZ_FPRP_0002671. Instead, it reported Mr. Brown to the police for stealing the vehicle on September 6—remarkably suggesting a "Date & Time Stolen" of July 25, 2019, two days before Lyft confirmed that Mr. Brown could keep the rental. HERTZ_FPRP_0002664. Mr. Brown was subsequently arrested, jailed overnight, and prosecuted for about two years until all charges were dropped—Hertz never showed up to Court. Claim No. 15,739, at 16 (¶¶ 12–13, 18). |
| 152 (4a) | Andrew Seaser (15,953) | Mr. Seaser was the apparent victim of identity theft. Claim No. 15,953, at 15 (¶ 7). In his proof of claim, Mr. Seaser describes that he received a letter suggesting that he had rented a vehicle, told Hertz that he had never rented the |

---

[16] There are differences in the rental date and dates of certain events between Mr. Solis's declaration and the theft package Hertz has produced in connection with his case. Hertz has marked that information Highly Confidential and prohibited counsel from discussing that information with Mr. Solis. Investigation into this claim is continuing.

<table>
<tr><td></td><td></td><td>vehicle and had never been to Georgia. <em>Id.</em> at 15 (¶ 6). Hertz's records confirm that Mr. Seaser told the company he never rented the vehicle. HERTZ_FPRP_0002233 (October 12, 2020: "I made contact with the renter … He said he did not rent this vehicle."). On November 9, 2020, Hertz nonetheless reported to the police that Mr. Seaser had stolen the vehicle. HERTZ_FPRP_0002250. He was subsequently arrested almost a year later, Claim No. 15,953, at 15 (¶ 13), but charges were dismissed when he proved that he was in a different state at the time of the rental. <em>Id.</em> at 16–17 (¶¶ 22, 24). Hertz's productions reveal that it also reported Mr. Seaser to a different police department on December 23, 2020 for stealing another vehicle—counsel is unsure whether Mr. Seaser is aware of this <em>second</em> theft allegation, even though he may be at risk of another arrest. HERTZ_FPRP_0002251. Even though Hertz was able to contact Mr. Seaser on October 12 when he told them he didn't even rent the first vehicle, Hertz seemingly did not discuss this second "theft" with him or make any effort to contact him before reporting this "theft" to police. HERTZ_FPRP_0002253–2254.</td></tr>
</table>

| | | |
|---|---|---|
| | | vehicle and had never been to Georgia. *Id.* at 15 (¶ 6). Hertz's records confirm that Mr. Seaser told the company he never rented the vehicle. HERTZ_FPRP_0002233 (October 12, 2020: "I made contact with the renter … He said he did not rent this vehicle."). On November 9, 2020, Hertz nonetheless reported to the police that Mr. Seaser had stolen the vehicle. HERTZ_FPRP_0002250. He was subsequently arrested almost a year later, Claim No. 15,953, at 15 (¶ 13), but charges were dismissed when he proved that he was in a different state at the time of the rental. *Id.* at 16–17 (¶¶ 22, 24). Hertz's productions reveal that it also reported Mr. Seaser to a different police department on December 23, 2020 for stealing another vehicle—counsel is unsure whether Mr. Seaser is aware of this *second* theft allegation, even though he may be at risk of another arrest. HERTZ_FPRP_0002251. Even though Hertz was able to contact Mr. Seaser on October 12 when he told them he didn't even rent the first vehicle, Hertz seemingly did not discuss this second "theft" with him or make any effort to contact him before reporting this "theft" to police. HERTZ_FPRP_0002253–2254. |
| 153 (4a) | Larryelle Magee (15,737) | Ms. Magee was arrested shortly after returning to the local branch, which told her "to keep the car." Claim No. 15,737, at 13 (¶ 5). The local branch told her that well after the date on which Hertz claimed she stole the vehicle—namely November 20, 2017. HERTZ_FPRP_0002089 (listing "Date & Time Stolen"). Hertz knew that Ms. Magee contested the charges against her for years during the prosecution for the 2017 rental. Ultimately, it sent an employee to testify against her in a trial in November 2020, where Ms. Magee was *acquitted of all charges*. Claim No. 15,737, at 15 (¶ 19). |
| 158 (4b) | Ameerah Singleton (15,794) | Ms. Singleton's insurance rental was towed by Hertz in July or August of 2017. Claim No. 15,794, at 15 (¶¶ 4, 7). She called the local branch to complain that the car should not have been towed. *Id.* at 15–16 (¶¶ 8–10). Although Hertz apparently had reported her for stealing the insurance rental that she complained should not have been told, the local branch did not explain why the vehicle was towed or that there were any issues with the rental. *Id.* at 15–16 (¶ 9). Nonetheless, about a month later and long after Hertz obtained the car without law enforcement involvement, Ms. Singleton was arrested and is *still* being prosecuted. *Id.* at 15–17 (¶¶ 2, 5–16). |
| 184 (4b) | Patrick Andrews (15,837) | Mr. Andrews—who rented and was arrested post-petition—contacted Hertz repeatedly in connection with a corporate rental. Claim No. 15,837, at 15–16 (¶¶ 2, 10–11). Hertz agreed to retrieve the vehicle, which Mr. Andrews requested several times. *Id.* at 16 (¶¶ 10–11). Hertz failed to do so, and Mr. Andrews was arrested by a SWAT team in May. *Id.* at 16 (¶¶ 12–15). Mr. Andrews contacted Hertz after his May 11, 2021 arrest, and Hertz finally told him it "wasn't looking to press charges." *Id.* at 16 (¶ 16). He had a corporate rental that his employer was paying for, and Hertz had repeatedly promised to pick up the vehicle but never did so even after discussing with Hertz investigators. *Id.* at 15–16 (¶¶ 7–11). Charges against Mr. Andrews remain pending. *Id.* at 17 (¶ 20). |
| 186 (4b) | William West | Mr. West rented a vehicle from Hertz around late July 2016. Claim No. 15,847, at 15 (¶ 3). His extended the rental over a period of about four months. *Id.* at 15 |

| | | |
|---|---|---|
| | (15,847) | (¶¶ 4–5). On Friday, November 18, 2016, Hertz asked him to bring the vehicle back for a routine checkup—he agreed to bring the vehicle to the location on the following Monday, November 21. *Id.* at 15 (¶ 6). But he was arrested on November 18, jailed for three days, and prosecuted for almost three years before charges were dismissed. *Id.* at 15–16 (¶¶ 7–15). Based on his agreement to bring the vehicle back *after* the date on which he was arrested, and his subsequent years of contesting the charges, he gave Hertz notice that the substance of the theft report was false. |
| 191 (4b) | Saleema Lovelace (15,873) | Ms. Lovelace rented a vehicle in July 2020 and extended it monthly by calling the Philadelphia Airport location. Claim No. 15,873, at 14 (¶¶ 3–4). In early January, Hertz contacted Ms. Lovelace to bring the car back for a vehicle inspection, she agreed to return the vehicle on January 15, 2021. *Id.* at 14 (¶¶ 5–6). But on January 13, 2021—two days before the agreed-upon return date—she was arrested at gunpoint by a large number of police officers. *Id.* at 15 (¶¶ 7–15). Charges remain pending. *Id.* at 16 (¶ 22). |
| 192 (4b) | Adriane Beamon (15,871) | Ms. Beamon was arrested post-petition on a rental she had returned in 2018. Claim No. 15,871, at 14 (¶ 2). After returning the rental (and before Hertz reported her for theft), "Hertz repeatedly called her and asked where the car was and she repeatedly told them exactly where it was"—namely, at the location where she returned the vehicle and left the keys in a drop box. *Id.* at 15 (¶¶ 6–7). She thought everything was good once she told Hertz where she returned the vehicle and paid in full for the rental, but Ms. Beamon later discovered post-petition that there was a warrant for her arrest. *Id.* at 15–16 (¶¶ 8-10, 16). She was then arrested, jailed, and prosecuted (after voluntarily turning herself into authorities). *Id.* at 16 (¶ 15). During that time, "Hertz was repeatedly notified that [Ms. Beamon] was falsely accused and documents were demanded from them. Hertz refused to produce anything and did not appear for Court" until charges were dismissed. *Id.* at 16 (¶ 17). |
| 197 (4b) | Daydan Carter (15,935) | Mr. Carter rented a vehicle around November 1, 2019, and he extended that rental every week or two for about three months. Claim No. 15,935, at 14 (¶ 4). In January 2020, Mr. Carter received messages asking him to return the vehicle. *Id.* at 15 (¶ 6). He called the location and agreed to bring the vehicle back a few days later in early February. *Id.* at 15 (¶ 7). But was arrested at gunpoint on February 2, 2020. *Id.* at 15 (¶¶ 9–11). |
| 198 (4b) | Evan Tanner (15,936) | Mr. Tanner was an Uber driver renting through Hertz. Claim No. 15,936, at 13 (¶ 4). He called to discuss a rate increase in December 2020 and spoke with six different departments. *Id.* at 14 (¶ 8). When he saw a charge of around $2,700 in late February 2021—the type of charge associated with the filing of a theft report—he "called Hertz many, many times . . . . The employees appeared to be unwilling to help him or tell him what was going on, but he did not know why." *Id.* at 14 (¶ 10). Despite contesting the charge that Hertz knows is connected with a theft report, Mr. Tanner was not told he was reported for theft. *Id.* at 14 (¶ 11). Instead, on March 16, 2020 he was arrested because Hertz had claimed a rental was due October 26—he spent three weeks in jail. *Id.* at 14 (¶¶ 11–14) (It is very possible that Hertz actually reported stolen a vehicle he had returned to Hertz in exchange for a new vehicle back in November 2020, but investigation |

| | | |
|---|---|---|
| | | is ongoing). In all events, whatever vehicle Hertz reported stolen was baseless and Mr. Tanner was in regular contact with Hertz contesting charges or extending rentals long after the alleged "theft." |
| 212 (4b) | Darlene Sacca (15,901) | Ms. Sacca rented a Hertz vehicle on or around November 1, 2018, and that vehicle was stolen from her on November 6. Claim No. 15,901, at 15 (¶¶ 3–4). She reported the theft to the police and informed Hertz that the rental was stolen from her. *Id.* at 15 (¶¶ 5–6). After that, Ms. Sacca received additional letters and texts suggesting that she had stolen the car; she again informed Hertz that it was stolen from her and reported to the police. *Id.* at 15 (¶¶ 7–8). After the car was recovered, Hertz charged her thousands of dollars, and she fears that she was reported for theft. *Id.* at 16–17 (¶¶ 13–17). If Ms. Sacca was reported for theft, Hertz plainly would know that the basis for the report was false, as she repeatedly told the company that the car was stolen from her. |
| 216 (4b) | Tawana Cole (15,910) | Ms. Cole was unaware that Hertz had reported her for theft around June 18, 2019—a time past which she had extended her rental. Claim No. 15,910, at 15 (¶¶ 9–10). When she saw a large charge for the rental, she contested the high charge with the local and corporate office, but no one told her she had been accused of stealing the vehicle with the overcharge. *Id.* at 15 (¶ 13). When she learned of an arrest warrant in June of 2021, she subsequently "called Hertz's 1-800 corporate number, [but] she was told that they don't have any answer for her, and she needed to go to court." *Id.* at 16 (¶ 17).[17] |

---

[17]    The exact timing of this call is unclear from the proof of claim and should be revealed upon further investigation and discovery.

**Appendix D: Claimants With Third-Party Communications**
**(14 Claimants)**

| Master Number | Name (Claim No.) | Argument |
|---|---|---|
| 111 (3) | Holly Harris (15,665) | Ms. Harris rented a vehicle on October 16, 2018 and returned it to the rental location after hours on December 28 or 29, 2018. Claim No. 15,665, at 12 (¶¶ 3–5). Hertz reported her for theft in mid-January. *Id.* at 12 (¶ 6). Ms. Harris explained to the prosecutor that she returned the car and had paid for it, and she understands that the prosecutor reached out to Hertz to discuss the case and relay that information in 2019. *Id.* at 20 (¶ 20). Hertz has refused to produce these interactions with the prosecutor and, just as if not more importantly, has not produced records related to its recovery of the vehicle that Ms. Harris was accused of stealing. Facing serious charges, Ms. Harris accepted a plea on August 21, 2019, in return for probation. *Id.* at 14 (¶ 21). |
| 114 (3) | Marissa White (15,650) | Ms. White rented through Lyft on February 8, 2019. Claim No. 15,650, at 12 (¶ 3). Lyft told her the rental would auto renew each week starting February 14, and she could see weekly rental payments being taken out of her Lyft payments, including a payment around March 24, 2019. *Id.* at 18 (Feb. 14 email from Lyft that "your … rental is scheduled to auto-renew for seven days on February 15."), at 20 (March 18–24 receipt for "weekly rental rate" to Hertz). But Hertz reported Ms. White for theft on March 20, saying the vehicle was due on February 15. HERTZ_FPRP_0000391. And on March 27, Ms. White was arrested at gunpoint; she explained her payment to police and recalls that the police called Hertz to say that she was claiming the report was false but that Hertz denied she was a Lyft driver. Claim No. 15,650, at 12–13 (¶¶ 8–11). Moreover, Ms. White contacted Lyft to explain what Hertz had done, and it is likely that Lyft contacted Hertz about the situation. *Id.* at 14 (¶ 24), 22–23. |
| 115 (3) | Janette Brown (15,705) | Ms. Brown was arrested less than two months into a State Farm insurance rental; State Farm was supposed to extend and pay for the rental, and [Ms. Brown] had provided alternate payment. Claim No. 15,705, at 12–13 (¶¶ 2, 7). A Hertz employee named Sam Milanovich appeared to testify against Ms. Brown at a preliminary hearing. *Id.* at 14 (¶ 18). At that hearing, it became clear that Hertz's "demand letter" was sent to the wrong address, *id.* at 14 (¶ 22)—Hertz's productions show that it had the correct address on file.[18] Further, Hertz was |

---

[18] Hertz sent the demand letter to an address in Kentwood, Michigan.

JANETTE BROWN
3081 CREEK DR SE APT 1B
KENTWOOD, MI  49512

Claim No. 15,705, at 34.

Hertz filed a report with Ms. Brown's address in Grand Rapids when a car was stolen *from* her in May 2018, which was the address provided for her State Farm rental.

| Renter's Name | Residence Address (City, State, & Zip Code) |
|---|---|
| JANETTE BROWN | 1031 BEMIS ST SE, GRAND RAPIDS, MI 495062514 |
| Employer's Name | Secondary Address (City, State, & Zip Code) |
| | 1031 BEMIS ST SE, GRAND RAPIDS, MI 495062514 |

| | | present when the Judge dismissed all charges at the preliminary hearing for a lack of evidence. *Id.* at 15 (¶ 23). Because Hertz was present for the dismissal of charges, and because it heard that it sent the demand letter to the wrong address, it had notice of Ms. Brown's claim. |
|---|---|---|
| 120 (3) | Breanna Oneal (15,655) | Ms. Oneal explained at the time of her arrest that she had just paid $3,518 for the rental she was accused of stealing. Claim No. 15,655, at 13 (¶¶ 14–17). The police called Hertz to ask about the payment at that time, but Hertz told the police to arrest her anyhow despite the theft report saying she owed $3,518 for the vehicle. *Id.* at 24. |
| 122 (3) | Charles Lee Bort (15,948) | Mr. Bort rented from Hertz through Uber. Claim 15,948, at 12 (¶¶ 3–4). Hertz reported that he had stolen the car as of February 21, 2020. HERTZ_FPRP_0000057. But after that time, on March 5, the theft package reflects that he told corporate that "he went in [to the location] a few days ago and was advised he is ok." HERTZ_FPRP_0000059. On March 12, Mr. Bort took the rental in for servicing that was charged to Hertz's corporate fleet account. Claim No. 15,948, at 12 (¶ 5). Around March 15, he tried to return the car to the location but, at the dawn of COVID-19, no one was present at the location to accept the return. *Id.* at 12–13 (¶ 6). Not knowing what to do, Mr. Bort could see that "Hertz was charging his wife's card and so he continued working as he had since January 2020"—namely as an Uber driver paying weekly rent. *Id.* at 13 (¶ 8). He kept driving and stayed in touch with Uber. On April 8, for example, Uber notified him that his Hertz rental's registration had expired. *Id.* at 13 (¶ 9). And on April 18, Uber notified him that the car's registration had been extended to June 8, 2020—obviously by working with Hertz to extend the registration of Hertz's vehicle. *Id.* at 13 (¶ 11) & 29. But Hertz nonetheless reported Mr. Bort for theft on April 21, just three days later, without any further recorded contacts with Mr. Bort or Uber. HERTZ_FPRP_0000077. Mr. Bort and his wife Ms. Chan were arrested at gunpoint that day by 12 officers. Claim 15,948, at 13 (¶ 13). Throughout this saga, Mr. Bort informed Hertz that he had extended past the "stolen" date with the location, took its vehicle in for servicing, provided payment via a card and Uber, and worked with its corporate partner (Uber) to extend the registration of Hertz's vehicle. Hertz plainly had notice of these events. |
| 123 (3) | Kwai Yee Chan (15,666) | *See* argument re Charles Lee Bort. Ms. Chan's credit card was used for Mr. Bort's rentals, so Hertz should have had her information associated with the file as well. Claim No. 15,948, at 12-13 (¶¶3-4, 8), and Claim No. 15,666, at 12-13 (¶¶3-4, 8). |
| 151 (4a) | Jessica Andolino (15,755) | Hertz rented Ms. Andolino a stolen car on March 21, 2021. Claim No. 15,755, at 13 (¶ 3). Two days into her rental, on March 23, she was arrested, jailed overnight, and then forced to appear in Court until charges were dropped on September 14, 2021. *Id.* at 13 (¶¶ 3–9). Hertz's internal records related to Ms. Andolino's rental confirm that, on March 24, 2021, law enforcement called |

HERTZ_FPRP_0000081. In other words, Hertz knew it sent the letter demanding return of the vehicle to the wrong address, and that Ms. Brown was then arrested for failing to return the vehicle on the assumption that she had received a demand letter. And it knew that all charges were dismissed at a preliminary hearing.

Hertz and told the company that Ms. Andolino was arrested during a current rental contract. HERTZ_FPRP_0002004 ("Driver of vehicle arrested[.] Officer wanted to make sure vehicle was not reported stolen. Confirmed contract is current and he gave me the renter name. Confirmed that as well"). Excerpts of that entry are shown below:

| | |
|---|---|
| **Date** | 2021-03-24 |
| **Related Case #2** | |
| **Last Name** | ANDOLINO |
| **Drivers License #** | XXXXXXXXX9471 |
| **Company Name** | EXPEDIA MEMBER SERVICES |
| **Primary Phone** | |
| **Created By Agent** | 9452 |

OFFICER TAMATE
BADGE#:35410
LA PD
818-756-4800
*DRIVER OF VEHICLE ARRESTED OFFICER WANTED TO MAKE SURE VEHICLE WAS NOT REPORTED STOLEN, CONFIRMED CONTRACT IS CURRENT AND HE GAVE ME RENTER NAME. CONFIRMED THAT AS WELL

| | | |
|---|---|---|
| 154 (4b) | Bianca DeLoach (15,764) | Ms. DeLoach's rental occurred postpetition. Claim No. 15,764, at 13 (¶ 3). As described in the State of Georgia's *nolle prosequi* motion, starting March 31, 2021, "[t]he State communicated with a Hertz representative from New Jersey who was unable to explain how the defendant paid in full in February for the vehicle, yet the vehicle was reported stolen. The New Jersey representative was also unable to identify any number of attempts made by Hertz to contact the defendant and request the vehicle returned." *Id.* at 27. |
| 174 (4b) | Jennifer Weems (15,808) | Ms. Weems had warrants for her arrest in Oregon and Texas for a single Hertz theft report based on a 2015 rental and was ultimately charged in Texas. Claim No. 15,808, at 15–16 (¶¶ 2, 9–11). In September 2016, Hertz "told the Deschutes County District Attorney in Oregon that they had filed a false police report." *Id.* at 17 (¶ 17). Once that happened, all charges were then dismissed in Texas. *Id.* at 16 (¶ 12). Because Hertz admitted to a prosecutor to filing a false report, it plainly had notice of her claims. |
| 175 (4b) | Faristina Collins (15,801) | Ms. Collins was arrested in 2017 based on Hertz's accusation that she stole a vehicle in 2014. Claim No. 15,801, at 15 (¶ 2). In truth, she had returned the vehicle. *Id.* at 16 (¶ 8). Hertz refused to appear in Court while she faced active prosecution for 6 months up to 2018. *Id.* at 17 (¶¶ 16–17). Defense counsel subpoenaed Hertz for records. *Id.* at 17 (¶ 18). Hertz admitted to defense counsel that it recovered the vehicle Ms. Collins was being accused of stealing in 2015. *Id.* at 17 (¶ 19). The vehicle was recovered when police arrested 3 other people in possession of the car. *Id.* These communications gave Hertz specific notice of a claim, as Ms. Collins was being prosecuted in 2017 and 2018 because Hertz accused her of stealing a car that had been recovered in the possession of third parties in 2015. All charges were dismissed about one week later. *Id.* at 17 (¶20). |
| 185 (4b) | Sierra Ryan (15,836) | Ms. Ryan has never rented from Hertz. Claim No. 15,836, at 15 (¶ 4). On September 9, 2020, Ms. Ryan was arrested and jailed for two days for allegedly |

|  |  | renting a vehicle from Hertz in Springfield, Illinois that was reported stolen around July 2018—when she would have been 23 (too young typically to even rent a vehicle). *Id.* at 15 (¶ 2). Ms. Ryan understands that the prosecution repeatedly reached out to Hertz pre-petition, post-petition, and through dismissal in September 2021 to try and obtain any evidence supporting the false and uninvestigated theft report. *Id.* at 16 (¶ 13). |
|---|---|---|
| 215 (4b) | Nkem Uwagboi (15,899) | Hertz rented Ms. Uwagboi a vehicle it had reported stolen. Claim No. 15,899, at 15 (¶ 11). On October 19, 2019, just three days after renting the vehicle, she was arrested and taken to jail. *Id.* at 14 (¶¶ 3, 6). Police finally contacted a Hertz location at O'Hare Airport, which confirmed that Ms. Uwagboi had a valid rental contract. *Id.* at 15 (¶ 11). |
| 218 (4b) | Jeric Wilson (15,903) | Mr. Wilson was an Uber driver who stayed in touch with Uber and Hertz to extend his rental. Claim No. 15,903, at 14 (¶¶ 3–5). When he was arrested and taken to the police station around January 20, 2021, the police called Hertz, which said that the car was not on its internal "stolen" list, so he was released. *Id.* at 14–15 (¶¶ 9–10). Hertz never showed up during his prosecution and all charges were dismissed around July 15, 2021. *Id.* at 15 (¶ 11). Because Hertz was alerted by police that Mr. Wilson had been arrested based on its theft report but could not find him on its "stolen" list, it knew that he would have a claim. (It is further likely, but not necessary, that communications with Uber will also undermine any theft report.) |
| 224 (4b) | Raynard Hill, Jr. (15,922) | Mr. Hill rented from Dollar on February 26, 2021; he extended the rental each week using the corporate 1-800 number and provided his debit card. Claim No. 15,922, at 14 (¶¶ 3–6). On June 1, he was charged $3,757.81, which Hertz confirmed on or around June 6. *Id.* at 14–15 (¶¶ 7–8), & 18 (June 1 bank charge). But Hertz nonetheless reported Mr. Hill for theft on or around June 15, and he was arrested at gunpoint on July 1. *Id.* at 15 (¶¶ 10–12). During the arrest, he told the officers that he had paid for the rental; while he was in custody, "*both the Lieutenant and the She[r]iff called Hertz at the 1-800 corporate number to clear up the issues. They told Hertz he was claiming he paid*, but they were unable to resolve the matter." *Id.* at 15 (¶ 13) (emphasis added). Because Hertz did not clear up the issue, Mr. Hill spent five days in jail and was prosecuted until November 3, 2021, when the State filed a *nolle prosequi* after it had "reviewed rental agreement documentation." *Id.* at 15–16 (¶ 17) (excerpt of *nolle prosequi* motion). |

**Appendix E: Claimants Who Extended Their Rentals**
**(10 Claimants)**

| Master Number | Name (Claim No.) | Argument |
|---|---|---|
| 121 (3) | Tyresha Caudle (15,707) | Ms. Caudle rented a vehicle from Hertz on February 2, 2018—it was initially a one-day rental but she thereafter extended the rental. Claim No. 15,707, at 12 (¶ 3). In mid-February, Hertz called about her credit card and an investigator reached out to that effect on or around February 26. *Id.* at 12 (¶¶ 4–5). The investigator said that the car would be picked up using GPS if the payment issue could not be worked out. *Id.* at 12–13 (¶¶ 5–6). Ms. Caudle explained that she was in the process of making payment. *Id.* On March 2, she received another contact threatening to report her for theft, which she thought was odd given the payment issue she had discussed just days earlier. *Id.* at 13 (¶ 7). Ms. Caudle thought everything was fine and the payment issue discussed earlier resolved, however, when she saw a charge on March 6 for $3,342.43, which was approved by the bank on March 8. *Id.* at 13 (¶ 8) & 22 (copy of bank statement). However, she was shortly thereafter arrested for theft and spent a day in jail; and she was later arrested again for the same offense, spent seven more days in jail, and prosecuted for 1.5 years before taking a plea. *Id.* at 13–14 (¶¶ 12–18). <br><br> Hertz's productions reveal that Hertz reported that the vehicle was "stolen" on February 3, 2018, just one day into a rental that Ms. Caudle *extended.* HERTZ_FPRP_0000089. Similarly, the production shows that Hertz instructed the local branch to report Ms. Caudle for theft "within 4 days" on March 8, telling police that Ms. Caudle had a "net due" of $3,342.43, HERTZ_FPRP_0000100, the exact amount that her bank records confirm she paid that day for the rental. |
| 150 (4a) | Melinda Smith (15,738) | Ms. Smith rented a vehicle from Hertz in mid-February 2021 in connection with Hurricane Delta; she was coordinating with FEMA to pay for the rental. Claim No. 15,738, at 13–14 (¶ 2–6).[19] Ms. Smith repeatedly and consistently contacted Hertz to extend the rental, first by three weeks up to a total of four weeks location told her she "was cleared and go[od] to go," and then "every 4 weeks" thereafter. *Id.* at 14 (¶¶ 7–9). Nonetheless, Hertz reported her for theft on June 7, 2021, HERTZ_FPRP_0002335. The theft report claimed that the vehicle had been stolen on March 4, *id.*, well before the extensions that had been made with and confirmed by the local branch. Claim No. 15,738, at 14 (¶¶ 7–9). The theft report—printed on June 1 but reported to police on June 7—also said that her credit card was "denied" and listed a net due of $3,245.48. HERTZ_FPRP_0002338–2351. Ms. Smith had been charged $3,245.48 on June 3. Claim No. 15,738, at 14 (¶ 15). Ms. Smith was arrested shortly after the theft report, jailed, and charges remain pending. *Id.* at 14–15 (¶¶ 16–24). <br><br> Further, Hertz filed a theft report attaching a certified demand letter *that had been returned to sender*—namely Hertz in Oklahoma City. *See* |

---

[19] Hertz's records show a rental start date of February 19, while Ms. Smith recalls picking up the vehicle on February 22, she may have picked up the vehicle shortly after the start of the contracted rental or simply have picked up the vehicle a couple days earlier than she recalled. Any difference in date is not material.

| | | |
|---|---|---|
| | | HERTZ_FPRP_2353–2355. Around that time and before the theft report, Hertz sent Ms. Smith several other letters that she received, including a red-light camera ticket. Claim No. 15,738, at 14 (¶¶ 12–14). |
| 160 (4b) | Aujaneik "Nikki" Moss (15,796) | Ms. Moss rented from Thrifty on November 16, 2017; she called the location every two weeks to extend the rental and could see charges hitting her card. Claim No. 15,796, at 15 (¶¶ 3–6). On December 27, 2017, she saw a charge for $1,632.30. *Id.* at 15 (¶ 7). (Claimants have received no discovery, but from what we see with other Claimants this is presumably when the theft report was filed claiming she had not paid.) On January 22, 2018, she was arrested at gunpoint, jailed for five days, and prosecution started. *Id.* at 15–16 (¶¶ 9–14). Hertz never appeared in Court, and Ms. Moss pleaded no contest to return to her newborn son—charges were dismissed on August 7, 2018. *Id.* at 16 (¶¶ 17–21). |
| 161 (4b) | Travis McCoy (15,810) | Mr. McCoy's employer, General Electric, rented a car for Mr. McCoy around March 21, 2016. Claim No. 15,810, at 15 (¶ 4). The rental used a corporate credit card and was extended both by GE's HR company and phone calls from Mr. McCoy to Hertz's national customer service number. *Id.* at 16 (¶¶ 5–6). On April 21, 2016, just a month into the corporate rental, Mr. McCoy, his wife, and his three children were held at gunpoint while Mr. McCoy was arrested for grand theft auto. *Id.* at 16 (¶¶ 7–12). Mr. McCoy spent two days in jail and was prosecuted until around April 2017 for "stealing" the corporate rental he and General Electric's HR company had extended. *Id.* at 17 (¶¶ 20, 23). |
| 176 (4b) | Tanya Funderburk (15,804) | Ms. Funderburk rented a replacement vehicle through insurance after an accident in 2014. Each month, she would work with her attorneys to extend the rental. Claim No. 15,804, at 15 (¶¶ 3–5). On February 13, 2015, Hertz reported Ms. Funderburk for stealing the insurance rental. *Id.* at 16 (¶ 6). She was arrested on April 1, 2015, jailed for three days, and prosecuted for eight months. *Id.* at 16 (¶¶ 11–15). When Hertz never appeared in Court, Ms. Funderburk ultimately pleaded no contest to move on with her life in November of 2015. *Id.* at 16 (¶ 15). |
| 189 (4b) | Ramie Singer (15,872) | Ms. Singer rented a vehicle in October 2019; she extended the rental each week by calling the corporate 1-800 number. Claim No. 15,872, at 14 (¶ 3). One week, Ms. Singer's credit card was maxed out, so she instead went and made a payment for that week at the local branch in Miami. *Id.* at 14 (¶ 4). On or around January 13, 2020, Ms. Singer and Claimant Zachary Tedder were arrested at gunpoint for possession of a "stolen" vehicle—both were taken to jail. *Id.* at 15 (¶¶ 6–10). Facing serious charges, Ms. Singer accepted deferred prosecution. *Id.* at 15–16 (¶ 13). |
| 190 (4b) | Zachary Tedder (15,876) | Mr. Tedder was arrested, jailed, and prosecuted in connection with Ms. Singer's rental. All charges against him were dismissed. Claim No. 15,876, at 15–16 (¶¶ 6, 10, 12). Hertz almost certainly was informed that Mr. Tedder was being prosecuted in connection with theft of its vehicle. |
| 195 (4b) | Zantavia Franklin (15,928) | Ms. Franklin rented a vehicle from Hertz in Mobile, Alabama around October 15, 2020; when she went to extend her rental after two weeks, the "Hertz representative informed [Ms. Franklin] she did not need to come in to extend |

| | | |
|---|---|---|
| | | the rental. Hertz said they would charge her card on file for any extensions during the length of her possession of the rental and call her if they needed anything. Claim No. 15,928, at 14 (¶¶ 3–4). During the rental, [Ms. Franklin] could see Hertz charging and putting holds on her card." *Id.* at 14 (¶ 4). Around February 18, 2021, Ms. Franklin's vehicle was towed by police—she was surprised because she had paid for the vehicle, Hertz had her card, and she hadn't heard anything from Hertz. *Id.* at 14 (¶ 5–6). In January 2022, Ms. Franklin discovered that there was a warrant for her arrest in Alabama that had issued on July 1, 2021; the warrant issued five months after the vehicle was towed and remains pending. *Id.* at 15 (¶¶ 8–10). |
| 208 (4b) | Marc Bednarczyk (15,921) | Mr. Bednarczyk rented a vehicle as an insurance rental on November 5 or 6, 2020; he used his Visa credit card and, when insurance coverage ended, regularly authorized Hertz, by phone call or email, to charge his card to extend the rental. Claim No. 15,921, at 14 (¶¶ 3–5). After about three weeks, he exchanged the vehicle for another car. *Id.* at 14 (¶ 6). On February 1, 2021, Mr. Bednarczyk informed Hertz that he was out of state to care for a family member and authorized Hertz to charge his card as needed, which it did on February 24 when Hertz charged him $2,420.79. *Id.* at 15 (¶ 8). Mr. Bednarczyk was surprised when the car was towed just a couple weeks after his large payment. *Id.* at 15 (¶¶ 9–10). But on April 21, Mr. Bednarczyk was arrested, jailed, and ultimately charged. *Id.* at 15–16 (¶¶ 11–15). All charges were dropped on May 18, 2021 after an investigation revealed that prosecution was not warranted. *Id.* at 16 (¶ 16). |
| 209 (4b) | Brandy Porter (15,887) | Ms. Porter rented a vehicle from Dollar/Thrifty in September 2019 from an airport location in Raleigh, North Carolina. Claim No. 15,887, at 13 (¶ 3). She had previously worked for Dollar/Thrifty through a "temp" agency, so was familiar with the employees and managers there. *Id.* Each week, Ms. Porter called the location and spoke with Evan, an employee she knew from her previous time working with Dollar/Thrifty, to extend the rental. *Id.* at 13–14 (¶ 4). After about 30 days, a check-engine light came on and she exchanged the car for a new vehicle, which she again extended each week with Evan. *Id.* at 14 (¶¶ 4–6). She returned the vehicle on November 21, 2019 (her birthday), personally working with manager "AB" (who she also knew); she saw a large charge on her card when she returned home. *Id.* at 14 (¶¶ 7–9). More than two years later, on January 4, 2022, Ms. Porter and her daughter were detained and she was arrested, jailed, and prosecuted. *Id.* at 14–15 (¶¶ 10–13). Charges remain pending based on the rental that Ms. Porter extended, paid for, and returned years earlier. *Id.* at 15 (¶ 16). |

**Appendix F: Claimants with Claims Connected to Known Creditors
(21 Claimants)**

| Master Number (Group) | Name (Claim No.) | Relevant Known Creditor |
|---|---|---|
| 123 (3) | Kwai Yee Chan[20] (15,666) | Charles Lee Bort (122; Group 3; *see* Appendix D) |
| 136 (4a) | Saurabh Rathi[21] (15,740) | Nirbhay Agarwal (137; Group 4a; *see* Appendix B) |
| 155 (4b) | A.P. (15,765) | Bianca DeLoach (154; Group 4b; *see* Appendix D) |
| 156 (4b) | C.P. (15,766) | Bianca DeLoach (154; Group 4b; *see* Appendix D) |
| 162 (4b) | Kimberly McCoy (15,805) | Travis McCoy (161; Group 4b; *see* Appendix E) |
| 163 (4b) | S.M. (15,807) | Travis McCoy (161; Group 4b; *see* Appendix E) |
| 164 (4b) | Savannah McCoy (15,806) | Travis McCoy (161; Group 4b; *see* Appendix E) |
| 165 (4b) | Emmah McCoy (15,800) | Travis McCoy (161; Group 4b; *see* Appendix E) |
| 169 (4b) | Jose Monteiro (15,863) | Angela Delafontaine (168; Group 4b; *see* Appendix B) |
| 170 (4b) | G.M. (15,830) | Angela Delafontaine (168; Group 4b; *see* Appendix B) |
| 178 (4b) | A.J. (15,825 | Anne Maha (177; Group 4b; *see* Appendix B) |
| 179 (4b) | A.J. (15,828) | Anne Maha (177; Group 4b; *see* Appendix B) |
| 180 (4b) | Aniyah Johnson (15,824) | Anne Maha (177; Group 4b; *see* Appendix B) |
| 182 (4b) | Amber Rather (15,835) | Samantha Simpson (183; Group 4b; *see* Appendix B) |
| 190 (4b) | Zachary Tedder[22] | Ramie Singer (189; Group 5b; *see* Appendix E) |

---

[20] Ms. Chan also presents his own known-creditor argument, but is included in this Appendix as well.

[21] Mr. Rathi also presents his own known-creditor argument, but is included in this Appendix as well.

[22] Mr. Tedder also presents his own known-creditor argument, but is included in this Appendix as well.

| | (15,876) | |
|---|---|---|
| 203 (4b) | N.E. (15,930) | Melanie Evans (188; Group 4b; *see* Appendix B) |
| 204 (4b) | N.E. (15,939) | Melanie Evans (188; Group 4b; *see* Appendix B) |
| 210 (4b) | M.P. (15,925) | Brandy Porter (209; Group 4b; *see* Appendix E) |
| 222 (4b) | Kevin Richardson, Jr.[23] (15,908) | Kevin Richardson (Sr.) (221; Group 4b; *see* Appendix B) |
| 225 (4b) | Celita James[24] (15,918) | Franklin Richards (226; Group 4b; *see* Appendix B) |
| 229 (4b) | Amir Thomas (15,917) | Lisa Brower (230; Group 4b; *see* Appendix B) |

---

[23]  Mr. Richardson also presents his own known-creditor argument, but is included in this Appendix as well.

[24]  Ms. James also presents his own known-creditor argument, but is included in this Appendix as well.

**Appendix G: No Communications-Based Argument From Information Obtained and Reviewed to Date (10 Claimants)**

| Master Number (Group) | Name (Claim No.) |
|---|---|
| 134 (4a) | Della Davis (15,751) |
| 143 (4a) | Cynthia Vaughn (15,748) |
| 146 (4a) | Dedrick Jackson (15,750) |
| 166 (4b) | Charles Malone (15,798) |
| 167 (4b) | Blagoja Bakrevski (15,797) |
| 202 (4b) | Larry Wilcoxson (15,927) |
| 213 (4b) | Elbert Turpen, Jr. (15,900) |
| 219 (4b) | Benita Bridges (15,885) |
| 220 (4b) | K.F. (15,904) |
| 227 (4b) | Shayla Colbert (15,916) |

**Exhibit A**

**Claimants Who Filed Individual Proofs of Claims With Declarations or Complaints**

| Master Claimant Number | Group | Claimant Name |
|---|---|---|
| 1 | 1 | Hannah Ayoub |
| 2 | 1 | Nicole Stevens |
| 3 | 1 | Shontrell Higgs |
| 4 | 1 | Julius Burnside |
| 5 | 1 | Magalie Sterlin |
| 6 | 1 | Arthur Stepanyan |
| 7 | 1 | Howard Junious |
| 8 | 1 | Laketa Collins |
| 9 | 1 | Michelle Johnson |
| 10 | 1 | Brian Steinberg |
| 11 | 1 | Antwone Person |
| 12 | 1 | Michael Koss |
| 13 | 1 | Amanda Koss |
| 14 | 1 | Cheryl Young |
| 15 | 1 | Stephanie Keene |
| 16 | 1 | James Keene |
| 17 | 1 | Barbara Fernandez |
| 18 | 1 | Thomas Channell |
| 19 | 1 | Michael Channell |
| 20 | 1 | Jessical Gurumendi |
| 21 | 1 | Roula Vangelis (for minor child A.G.) |
| 22 | 1 | Roula Vangelis (for minor child C.G) |
| 23 | 1 | Brent Williams Sr |
| 24 | 1 | Nancy Cullen Smits |
| 25 | 1 | Ryan Smits |
| 26 | 1 | Henry Essick III |
| 27 | 2 | Utseoritselaju Ogedengbe |
| 28 | 2 | Michelle Sides |
| 29 | 2 | Sharifa Wright |
| 30 | 2 | Jacqueline Suzanne Rayburn |
| 31 | 2 | Alan Hill |
| 32 | 2 | Brandon White |
| 33 | 2 | Jamsly Edouard |
| 34 | 2 | Tanysha Harris |
| 35 | 2 | John Willen |
| 36 | 2 | Crystal Henderson |
| 37 | 2 | Michael Tobin |
| 38 | 2 | Kenneth Reed |

| Master Claimant Number | Group | Claimant Name |
|---|---|---|
| 39 | 2 | William Cottles III |
| 40 | 2 | Gerald Albert |
| 41 | 2 | Tia Lee |
| 42 | 2 | Derrick Craft |
| 43 | 2 | Temika Thompson |
| 44 | 2 | Ronald Rojas, Jr. |
| 45 | 2 | Roberta McGregor |
| 46 | 2 | Fianchi Beamon-Pernell |
| 47 | 2 | Quitman Jones |
| 48 | 2 | Wendy Fenton |
| 49 | 2 | Edmund Wilson |
| 50 | 2 | Audrey Simmons (nee Mays) |
| 51 | 2 | Gabrielle Eichbaum (aka Libi Kavanah) |
| 52 | 2 | Desery Martin |
| 53 | 2 | Helen Mitchell |
| 54 | 2 | Daiyon Davis |
| 55 | 2 | Van Love Jr. (by Teyauna Hamell) |
| 56 | 2 | Mary Hunt |
| 57 | 2 | Latasha Dupriest |
| 58 | 2 | Courtney Miles |
| 59 | 2 | Relinda Mattson |
| 60 | 2 | Danny Dale |
| 61 | 2 | Jennifer Rogers |
| 62 | 2 | Earl Holland |
| 63 | 2 | Kimberly D. Levene |
| 64 | 2 | Morgan D. Elliott |
| 65 | 2 | Tommie Blanks |
| 66 | 2 | Wilbur Clark |
| 67 | 2 | Marshall Anthony Bourdier |
| 68 | 2 | Tamika Willis |
| 69 | 2 | Carrie Gibbs (nee Wong) |
| 70 | 2 | Akilah S Brackett |
| 71 | 2 | Dajanae Bridges |
| 72 | 2 | Kenny Fearence |
| 73 | 2 | Mark E Fountain, Jr. |
| 74 | 2 | Asia Jackson |
| 75 | 2 | Melanie Shiller (aka Melanie McDonald) |
| 76 | 2 | William Sullivan |
| 77 | 2 | Kathleen Scott |
| 78 | 2 | Estate of Donald Peterson |
| 79 | 2 | Jefferson Bourgeois |
| 80 | 2 | Dennis Dunphy |

| Master Claimant Number | Group | Claimant Name |
|---|---|---|
| 81 | 2 | Brett McDowell |
| 82 | 2 | Elijah Holmes |
| 83 | 2 | Alisa Pearlman |
| 84 | 2 | Christine Long |
| 85 | 2 | Perry Long |
| 86 | 2 | Mikayla Long |
| 87 | 2 | Paul Anthony Knight |
| 88 | 2 | Rebecca Couch |
| 89 | 2 | Cindi Musgraves |
| 90 | 2 | Myles W.D. Musgraves II |
| 91 | 2 | Renita Yates |
| 92 | 2 | Melissa Harris |
| 93 | 2 | Maribel Pereyra |
| 94 | 2 | Niesha Rush |
| 95 | 2 | Jessica Johnston |
| 96 | 2 | Drew Arvary |
| 97 | 2 | Guillermo R. Garza |
| 98 | 2 | Cristel Hibbs |
| 99 | 2 | Scott Sherlock |
| 100 | 2 | Michelle Lowe |
| 101 | 2 | Kimarsha Dunn |
| 102 | 2 | Michelle Jones |
| 103 | 2 | Mark W. Grant |
| 104 | 2 | Michael Williams (h/w) |
| 105 | 2 | Mindy Arney (h/w) |
| 106 | 2 | Mindy Arney (for minor child R.C.) |
| 107 | 2 | Amke Crotz |
| 108 | 3 | Heather Kasdan |
| 109 | 3 | Siobhan Abrams |
| 110 | 3 | Israel Sundseth |
| 111 | 3 | Holly Harris |
| 112 | 3 | Lateshia Jenkins |
| 113 | 3 | Raelena Lewis |
| 114 | 3 | Marissa White |
| 115 | 3 | Janette Brown |
| 116 | 3 | Britne McClinton |
| 117 | 3 | Kimberli Costabile |
| 118 | 3 | Sean Hurt |
| 119 | 3 | Zanders Pace |
| 120 | 3 | Breanna ONeal |
| 121 | 3 | Tyresha Caudle |

ACTIVE.135550357.04

| Master Claimant Number | Group | Claimant Name |
|---|---|---|
| 122 | 3 | Charles Lee Bort |
| 123 | 3 | Kwai Yee Chan |
| 124 | 3 | Jessica Malone |
| 125 | 3 | Jason Cook |
| 126 | 3 | Paula Murray |
| 127 | 3 | Moneck Wallace |
| 128 | 4a | Mary Lindsay Flannery |
| 129 | 4a | ReJeana Meado |
| 130 | 4a | Darnay Taper |
| 131 | 4a | Tonia Rich |
| 132 | 4a | Carmen Bosko |
| 133 | 4a | Jenelle Reece-Williams |
| 134 | 4a | Della Davis |
| 135 | 4a | Jeffrey Smith |
| 136 | 4a | Saurabh Rathi |
| 137 | 4a | Nirbhay Agarwal |
| 138 | 4a | Tedheri Teddy Usude |
| 139 | 4a | Edward Emiliano Solis |
| 140 | 4a | Christian Mangano |
| 141 | 4a | Edward Sturkie, Jr. |
| 142 | 4a | Steven Robinson Valdes |
| 143 | 4a | Cynthia Vaughn |
| 144 | 4a | John Prawat |
| 145 | 4a | Reginald Brown |
| 146 | 4a | Dedrick Jackson |
| 147 | 4a | Kellan McClellan |
| 148 | 4a | James Tolen |
| 149 | 4a | Krystal Carter |
| 150 | 4a | Melinda Smith |
| 151 | 4a | Jessica Andolino |
| 152 | 4a | Andrew Seaser |
| 153 | 4a | Larryelle Magee |
| 154 | 4b | Bianca Deloach |
| 155 | 4b | Bianca Deloach (for minor child A.P.) |
| 156 | 4b | Bianca Deloach (for minor child C.P.) |
| 157 | 4b | Iasia A Eaves |
| 158 | 4b | Ameerah Singleton |
| 159 | 4b | Jamol Toney |
| 160 | 4b | Aujaneik 'Nikki' Moss |
| 161 | 4b | Travis McCoy (h/w) |
| 162 | 4b | Kimberly McCoy (h/w) |
| 163 | 4b | Kimberly McCoy (for minor child S.M.) |

ACTIVE.135550357.04

| Master Claimant Number | Group | Claimant Name |
|---|---|---|
| 164 | 4b | Savannah McCoy (daughter) |
| 165 | 4b | Emmah McCoy (daughter) |
| 166 | 4b | Charles Malone |
| 167 | 4b | Blagoja Bakrevski |
| 168 | 4b | Angela Delafontaine (h/w) |
| 169 | 4b | Jose Monteiro (h/w) |
| 170 | 4b | Angela Delafontaine (for minor child G.M.) |
| 171 | 4b | Anson Westerfield |
| 172 | 4b | Duni Zenaye |
| 173 | 4b | Abraham Carmichael |
| 174 | 4b | Jennifer Weems |
| 175 | 4b | Faristina Collins |
| 176 | 4b | Tanya Funderburk |
| 177 | 4b | Anne Maha |
| 178 | 4b | Anne Maha (for minor daughter A.J.) |
| 179 | 4b | Anne Maha (for minor son A.J.) |
| 180 | 4b | Aniyah Johnson (daughter) |
| 181 | 4b | Cody Breedlove |
| 182 | 4b | Amber Rather |
| 183 | 4b | Samantha Simpson |
| 184 | 4b | Patrick Andrews |
| 185 | 4b | Sierra Ryan |
| 186 | 4b | William West |
| 187 | 4b | Latricia Taylor |
| 188 | 4b | Melanie Evans |
| 189 | 4b | Ramie Singer |
| 190 | 4b | Zachary Tedder |
| 191 | 4b | Saleema Lovelace |
| 192 | 4b | Adriane Beamon |
| 193 | 4b | Daniel Morales Hernandez |
| 194 | 4b | Sophia Ortiz |
| 195 | 4b | Zantavia Franklin |
| 196 | 4b | Adam Cuevas |
| 197 | 4b | Daydan Carter |
| 198 | 4b | Evan Tanner |
| 199 | 4b | Howard English |
| 200 | 4b | Jason Don Campbell |
| 201 | 4b | Lakeshia Dowlen |
| 202 | 4b | Larry Wilcoxson |
| 203 | 4b | Melanie Evans (for minor daughter N.E.) |
| 204 | 4b | Melanie Evans (for minor son N.E.) |
| 205 | 4b | Casey Kurpjuweit |

5

| Master Claimant Number | Group | Claimant Name |
|---|---|---|
| 206 | 4b | Jason Kearny |
| 207 | 4b | Jason Reeder |
| 208 | 4b | Marc Bednarczyk |
| 209 | 4b | Brandy Porter |
| 210 | 4b | Brandy Porter (for minor child M.P.) |
| 211 | 4b | Daniel Shurtz |
| 212 | 4b | Darlene Sacca |
| 213 | 4b | Elbert J. Turpen, Jr. |
| 214 | 4b | Monique Wheeler |
| 215 | 4b | Nkem Uwagboi |
| 216 | 4b | Tawana Cole |
| 217 | 4b | Tiffany West |
| 218 | 4b | Jeric Wilson |
| 219 | 4b | Benita Bridges |
| 220 | 4b | Dajanae Bridges (for minor son K.F.) |
| 221 | 4b | Kevin Richardson |
| 222 | 4b | Kevin Richardson, Jr. |
| 223 | 4b | Antwanette Hill |
| 224 | 4b | Raynard Hill, Jr. |
| 225 | 4b | Celita James |
| 226 | 4b | Franklin Richards |
| 227 | 4b | Shayla Colbert |
| 228 | 4b | Connie Totman (a/k/a Gypsylynn Ware) |
| 229 | 4b | Amir Thomas |
| 230 | 4b | Lisa Brower |

ACTIVE.135550357.04