**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Rental Car Intermediate Holdings, LLC,[1] | Case No. 20-11247 (MFW) |
| Reorganized Debtors. | **Re: D.I. 1401** |

**ACI'S PRE-HEARING BRIEF**

900 Atlantic Collision, Inc. ("900 ACI"), 950 Atlantic Collision, Inc. ("950 ACI"), 1050 Atlantic Collision, Inc. ("1050 ACI"), 1100 Atlantic Collision, Inc. ("1100 ACI"), and Virginia Collision Corp. ("VCC," and collectively with 900 ACI, 950 ACI, 1050 ACI, and 1100 ACI, "ACI"), pursuant to the Amended Scheduling Order entered in this action [D.I. 1571], submit this Pre-Hearing Brief in advance of the claim objection hearing scheduled to begin on October 29, 2024. In support, ACI respectfully states:

**INTRODUCTION AND RELEVANT BACKGROUND**

This dispute arises out of Hertz's numerous breaches of exclusivity provisions in its contracts with ACI. Starting in 2009, Hertz undertook the contractual obligation to send all or a majority percentage of vehicles needing body repair work from six Hertz locations to ACI — four airports (Miami, West Palm Beach, Fort Lauderdale, and Orlando) and two Hertz service locations (Port Newark, New Jersey and Sterling, Virginia) (the "ACI-Hertz Locations").[2] On November

---

[1] The last four digits of the tax identification number of Reorganized Debtor Rental Car Intermediate Holdings, LLC ("Hertz") are 2459. The location of Hertz's service address is 8501 Williams Road, Estero, FL 33928. On September 28, 2021, the Court entered a final decree closing each of the chapter 11 cases for The Hertz Corporation and its affiliated reorganized debtors other than Hertz's chapter 11 case. "D.I." references are to the docket in Case No. 20-11247.

[2] The evidence will show that these service locations serviced Hertz vehicles from several of Hertz's airport and non-airport locations.

15, 2017, ACI sued Hertz in the Supreme Court of the State of New York, Kings County — *900 Atlantic Collision, Inc. et al v. The Hertz Corporation,* Index No. 522226/2017 ("State Court Litigation"). ACI's proofs of claim in this bankruptcy proceeding are premised on ACI's claims in the State Court Litigation.

Hertz's contractual promise of high vehicle volume caused ACI to expend great resources to build out, staff, and prepare for significant repair volume. ACI was always ready, willing, and able to meet whatever volume of vehicles Hertz sent to it. Despite ACI performing well under its contracts with Hertz (collectively, the "ACI-Hertz Contracts"), leading Hertz to expand its business with ACI to five different locations, Hertz breached those contracts by sending significant volumes of vehicles to other vendors. Hertz did not tell ACI it was doing so or maintain reliable metrics justifying sending vehicles to other vendors.

Hertz rarely, and in some cases, never told its own employees "on the ground" at the ACI-Hertz Locations that it was contractually bound to vend body-damaged vehicles to ACI.  Hertz also never put in place controls to ensure that it followed the ACI-Hertz Contracts, which is the most likely reason Hertz repeatedly breached the ACI-Hertz Contracts. In this litigation, Hertz has raised continuously shifting excuses for not sending required cars to ACI and relies on second-hand, anecdotal hearsay testimony. Accounting and operational systems which, for most sophisticated companies, would provide reliable data supporting these defenses if they were genuine (and which would enable ACI to address them) do not exist at Hertz. As this Court is aware from ACI's Motion to Bar Use of Documents Not Produced in Discovery and to Strike Hertz's "Rebuttal" Expert Report Relying on Them ("ACI's Motion to Strike") [D.I. 1520] and related briefing, Hertz's purported "actual" data as to body-damaged vehicles is seriously deficient, riddled with errors, and, given Hertz's discovery violations, now inadmissible.

As such, throughout this case, ACI has been forced to rely on pre-contract representations and operational data Hertz created in the normal course of business to support its claims.[3] ACI's damages expert William Metzdorff will use this information to offer opinions as to what ACI should have earned absent Hertz's repeated breaches, which Hertz provided to ACI and others not to litigate a position but to help ACI and other body damage vendors prepare to handle Hertz's body repair volume.

### A.    Factual Background

Marc Capus is the owner of the ACI entities. Capus will testify that he started in the automobile body repair business at age 16 working on cars in his father's driveway and grandmother's garage. In 1988, he opened the original ACI location, not at issue in this dispute, in Bedford-Stuyvesant, Brooklyn, New York. Since its inception, ACI has focused on commercial fleet automobile body repair and started repairing vehicles for Hertz shortly after opening in 1988.

In 2009, one of Hertz's Fleet Managers approached Capus to build out and manage an on-site body shop at Hertz's fleet service location near Newark Liberty International Airport in Port Newark, New Jersey ("Port Newark Facility"). 900 ACI was to be Hertz's exclusive provider of automobile body repair services at this important repair facility. So that he could determine the necessary investment in employees and equipment to meet Hertz's automobile body repair needs at its Port Newark location, Capus asked for and received information from Hertz stating that it

---

[3] ACI's reliance on pre-contract negotiations and operational data Hertz created in the normal course of business is due, in part, to Hertz producing incomplete repair data in discovery [Trial Ex. A-57], as well as this Court striking Hertz's "Corrected Second Spreadsheets" and "Raw Data Exports" that were untimely produced. [D.I. 1565.] These evidentiary issues are set out more fully in The Reorganized Debtor's Motion to Exclude the Expert Testimony of ACI's Damages Expert, William B. Metzdorff, Pursuant to Federal Rules of Evidence 702 and 703 [D.I. 1568] and ACI's: (1) Objection To Motion to Exclude the Expert Testimony of ACI's Damages Expert, William B. Metzdorff, Pursuant to Federal Rules of Evidence 702 and 703 and Cross-Motion for Further Relief in Connection With Order Granting ACI's Motion to Bar Use of Documents Not Produced in Discovery and to Strike Hertz's "Rebuttal" Expert Report Relying On Them [D.I. 1579].

had paid $4 million in 2008 to vendors for automobile body repair for vehicles maintained by Hertz at the Port Newark service location.[4]

On November 16, 2009, ACI and Hertz entered a 5-year contract for ACI to lease space and build out a repair shop at the Port Newark facility (the "Port Newark Contract"). Under the Port Newark Contract, Hertz agreed to "refer to [ACI] **all body work repairs for vehicles prepared by [Hertz] at Port Newark facility**" and to "**refer all of its vehicle body work for the Port Newark service area**" to ACI. [Trial Ex. JX-1, §§ 4, 25 (emp. added).] Additionally, "[i]f ACI is unable to perform the work in a timely manner, including but not limited to lacking the proper equipment or excessive volume of repairs, [Hertz] reserves the right to refer the repair to other body shops." [*Id.*]  So, Hertz was only allowed to send repair work elsewhere if ACI was unable to perform the repair work in a timely manner.

With ACI performing well under the Port Newark Contract, Hertz recruited Capus and ACI to open a new location near Dulles International Airport in Northern Virginia to service cars from Hertz's Sterling, Virginia fleet service facility ("Sterling Facility"), representing to Capus that he should expect approximately $2.5 million in labor revenue each year for Sterling alone. The Sterling contract again specifically provided that Hertz would refer to ACI all "**body work repairs for vehicles prepared by [Hertz] at [its Sterling, Virginia location]**," with a "**right of first refusal to [ACI] of vehicles requiring automotive body repair work from [Hertz's] facility at Baltimore Washington Airport**." [Trial Ex. JX-3, § 4 (the "Sterling Contract").] Hertz could only send work elsewhere if ACI was unable to complete it in a timely manner. Hertz also could terminate the contract at any time, but it had to provide 6-months' notice to do so. [*Id.* at § 2(c).]

---

[4] The amount paid by Hertz to body repair vendors in 2008 was given to Capus before Hertz's acquisition of Dollar Thrifty Automotive Group ("DTAG") and the addition of DTAG vehicles to the ACI-Hertz Contracts.

4

The Sterling Contract subsequently was amended by the parties to: (1) increase leased space to ACI; (2) extend the term of contract another five years to May 31, 2017; (3) add all vehicles Hertz acquired as part of its acquisition of Dollar Thrifty Automotive Group ("DTAG").

Pleased with ACI's performance at the Port Newark Facility and the Sterling Facility, Capus will testify that Hertz recruited ACI in 2011 to open additional locations near airports in Florida, its busiest locations in the nation. After Hertz represented to Capus that its Miami location paid $4.2 million to automobile body repair vendors in 2010, the parties entered contracts and amendments for ACI to perform body repair work for Hertz at its Miami, Ft. Lauderdale, West Palm Beach, and Orlando airport locations.

Specifically, 950 ACI signed an Agreement to provide 50% of all body repair work originating at Hertz's Miami airport location (the "Florida Contract"). After performing well at Miami, Hertz asked ACI to open another shop near its Ft. Lauderdale and West Palm Beach airport locations and agreed to send at least 60% of all its body damage repair work from Miami, Ft. Lauderdale, and West Palm Beach to ACI. Thereafter, Hertz asked Capus to open another repair shop in Orlando. The parties amended their contract again, and Hertz agreed to send 70% of its body repair work from its Orlando airport location to ACI.

As set forth above, the Newark Contract, Sterling Contract, and Florida Contract (and amendments) (collectively, as above defined, the "ACI-Hertz Contracts") each contained an exclusivity provision, giving ACI the exclusive or semi-exclusive right to service Hertz vehicles requiring body repair at the various locations described above. [Trial Exs. JX-1, JX-3, JX-4, JX-7, JX-10, JX-11.][5] Further, after Hertz acquired DTAG, which included Hertz adding an additional

_____

[5] The semi-exclusivity provisions for Florida were as follows: (1) Miami – 50% of all body repair work (later increased to 60%); (2) 60% of all body repair work once Ft. Lauderdale/West Palm Beach operations were set up; and (3) 70% of all body repair work relating to Hertz's Orlando location.

approximately 130,900 rental vehicles to its fleet of 359,100 (a 1.36x increase), each contract was amended to include DTAG vehicles within the contracts' exclusivity provisions.

To perform its obligations and handle the large volume of vehicles Hertz promised, and relying on Hertz's promises of exclusivity in the ACI-Hertz Contracts, Capus will testify that ACI invested a significant amount of money to build out repair facilities, hire employees, and begin operations at new state-of-the-art shops at or near these Hertz locations. ACI's exclusive right to repair Hertz cars, which should have generated tens of millions of dollars of revenue, justified ACI incurring these costs and offering Hertz discount labor rates. Importantly, ACI will prove at trial that Capus negotiated for the exclusive right to repair Hertz's cars so that ACI could use the revenues it achieved from Hertz to continue to invest substantially more in its new locations and grow its relationship with Hertz throughout the country. Unfortunately, Hertz never allowed ACI to achieve this goal.

While Capus had no reason to believe Hertz was not honoring its exclusivity obligations, it eventually became apparent that Hertz was not sending the volume of vehicles it had originally promised. Without the promised volume, ACI could not recoup its investment in building out each location, including the purchase of expensive equipment and growing its workforce. When Capus complained about the lack of volume, Hertz personnel would tell him numerous reasons about why volume was down, each of which — if true — could have been legitimate business reasons that would not have constituted breaches of the ACI-Hertz Contracts. Capus will testify that whenever there was an issue where ACI was not getting enough repair work at a given location, he complained. He would thereafter get more work and things would get better, but then trail off again. Capus will testify that he never got any straight answers but only excuses. Capus was

6

ultimately left with a "Hobson's Choice" – continue to do the best he could with Hertz or lose his substantial investment in the new ACI facilities.

The real reasons for Hertz's non-compliance with the ACI contracts came out in deposition discovery in this action and will be the subject of cross examination at trial. ACI will show that Hertz was so internally disorganized during the relevant time period that its witnesses: (1) couldn't confirm that the terms of the ACI contracts were even adequately disclosed to local repair personnel; (2) admitted that Hertz had no system in place to track its compliance (or lack thereof) with ACI-Hertz Contracts; and (3) frequent internal turf wars between Hertz personnel interfered with the intent of the ACI-Hertz Contracts.

In the end, Hertz's claimed reasons for less-than-promised volume of repairs were not true. In January 2015, claiming it wanted to use the property it leased to ACI to prep cars for sale, Hertz required ACI to move out of its Port Newark location but stated it would continue to honor its exclusivity obligation. In violation of their agreement, Hertz failed to honor that contractual obligation soon after it moved. This forced ACI to sell its Newark equipment at fire sale prices and denied ACI its negotiated the six-month time period to find alternative revenue in the case of termination.

As Capus will testify, Hertz orchestrated similar scenarios as to the Florida Contract and Sterling Contract, terminating the Florida Contract on April 23, 2015 (despite agreeing on September 5, 2013 to extend the contract through 2018, and without the required six months' notice) and the Sterling Contract in May 2017 (without the required six months' notice).

### B.    Procedural History And The Results Of Discovery

In the State Court Litigation, Hertz mounted an aggressive procedural defense, briefing and arguing an exhaustive motion to dismiss for failure to state a claim. In its motion to dismiss, Hertz presented four arguments in support of its contention that ACI could not state a claim for

damages as a matter of law: (1) ACI could not recover lost profits under the ACI-Hertz Contracts; (2) ACI could not rely on Hertz's representations of future volume to calculate damages; (3) ACI's lost profits claims were speculative; and (4) ACI was not entitled to start-up costs. [D.I. 1416-3 at 7–13.] After Hertz's motion was fully briefed and the parties presented oral argument, the court in the State Court Litigation rejected each of Hertz's arguments. [D.I. 1416-4.]

In discovery, Hertz's inability and/or refusal to produce basic repair expenditure information revealed, at best, its failure to maintain proper records on its body repair expenditures and forced ACI to engage in extensive meet and confer correspondence in order to obtain necessary documents — *i.e.,* Hertz's records of the vehicles it sent to shops other than ACI in breach of the ACI-Hertz Contracts — for ACI to calculate damages.

Notwithstanding Hertz's poor recordkeeping and ACI's access to discovery being cut off by Hertz's bankruptcy, ACI's damages expert, Metzdorff, was able to calculate ACI's damages by combining: (1) Hertz's pre-contract representations as to its expenditures on body repairs at the relevant locations; (2) certain documentation that Hertz produced in discovery; (3) information from Hertz's public securities filings; and (4) certain industry data. He will use this data at trial to offer opinions as to what ACI should have earned but for Hertz's breaches of the ACI-Hertz Contracts. ACI will also ask for an award of prejudgment interest through the date of hearing.

## **ARGUMENT**

### A.     **Hertz's Legal Argument That ACI Is Not Entitled To Lost Profits, Already Rejected By The Court In The State Court Litigation, Should Also Be Rejected Here.**

Hertz raises two contentions in support of its position that ACI may not obtain lost profits under the ACI-Hertz Contracts: (1) lost profits were not "within the contemplation of the parties"; and (2) lost profits are not capable of proof with reasonable certainty. [D.I. 1401 ¶ 57.] Hertz raised both of these arguments in its Motion to Dismiss in the State Court Litigation. [D.I. 1416-3, at 7–

13.] This Court, like the court in the State Court Litigation [D.I. 1416-4], should reject these arguments.

Hertz's argument in its Claim Objection that ACI's damages claims allegedly are not valid because the ACI-Hertz Contracts do not use the words "lost profits" [D.I. 1401 ¶ 58] adds a purported requirement in New York law that does not exist. "Although the lost profits sought by plaintiff are not specifically identified in the agreement, it cannot be said that defendant did not agree to pay them under the contract, as these profits flow directly from the pricing formula." *Biotronik v. Conor Medsystems,* 22 N.Y.3d 799, 808–09 (Ct. App. 2014); *see also, e.g., Coniber v. Center Point Transfer Station, Inc.,* 137 A.D.3d 1604, 1605–06 (N.Y. App. Div. 4th Dep't 2016) (affirming award of lost profits because "plaintiff seeks only to recover money that the breaching party agreed to pay under the contract[.]") (quotations omitted); *Orester v. Dayton Rubber Mfg. Co.,* 228 N.Y. 134, 138–39 (Ct. App. 1920) (in case where tires were to be resold from defendant at a profit, holding that lost profits were general damages for breach of an exclusive distribution agreement); *Am. List Corp. v. U.S. News & World Report, Inc.,* 75 N.Y.2d 38, 43 (Ct. App. 1989) (award of lost profits affirmed where "it is clear that plaintiff has sought only to recover moneys which defendant undertook to pay under the contract, thereby assuming a definite obligation"). Here, because the lost profits sought are "money that the breaching party agreed to pay under the contract," they naturally flow from the contracts and are recoverable. *See Biotronik,* 22 N.Y.3d at 812.

Moreover, it would be illogical to assume that ACI entered the ACI-Hertz Contracts if it did not intend to make revenue and profit on the vehicles Hertz promised to provide. Capus will testify that he entered the ACI-Hertz Contracts because if ACI committed to Hertz and Hertz committed to ACI, the agreement was to make a profit based on volume. There can be no doubt

that Hertz, a sophisticated business, understood that ACI was pricing a profit margin into the amounts it charged to repair each vehicle. It is not credible for Hertz to claim that it did not know that ACI would lose its contracted for revenue (and profit) if Hertz sent vehicles to other vendors in breach of the ACI-Hertz Contracts.

Further, contrary to Hertz's arguments, ACI can reasonably estimate lost profits. The authority upon which Hertz intends to rely as stated in its Claim Objection [D.I. 1401 at ¶ 60] is inapposite. The cases involved start-up businesses or situations where there was no prior record of success for various ventures. *See Jambetta Music, Inc. v. Nugent,* 2008 NY Slip Op 30363(U), at *14–15 (Sup. Ct.) (finding music publisher could not recover for lost profits for an album that was not made and the band was unknown and unsuccessful at the time the contract was executed); *Dig. Broad. Corp. v. Ladenburg, Thalmann & Co., Inc.,* 2008 NY Slip Op 33451(U), at *12–13 (Sup. Ct.) (finding plaintiff could not establish lost profits related to "a new business in an entertainment-related industry, and without any record of performance[.]"); *Cf. Contemporary Mission, Inc. v Famous Music Corp.*, 557 F.2d 918, 927–28 (2d Cir 1977) (holding it was an error to exclude evidence regarding a musical record's ***prior performance on the market*** as relevant to its likelihood to continue to succeed) (emp. added); *TAKTL, LLC v. IWR, North America, LLC*, No. 2:18cv1546, 2024 U.S. Dist. LEXIS 181564, at *18 (W.D. Pa. Oct. 4, 2024) (expert's damages calculation was reliable because he had the necessary knowledge and experience, and his opinions were based on facts in the case and a clear explanation of his methods).

ACI was a well-established business with a long history of success, including working with Hertz, which is evidenced by the fact that Hertz asked ACI to start several embedded, exclusive and/or semi-exclusive shops for Hertz and expanded and renewed each ACI-Hertz Contract, even

adding additional DTAG vehicles for repair under the ACI-Hertz Contracts after its acquisition of DTAG. This is not a case about a business that never got off the ground.

Moreover, Hertz has acknowledged that it sent vehicles from the relevant locations to body shops other than ACI. ACI's damages expert, Metzdorff, used available information produced by Hertz to provide a stable foundation for his damages calculation. As such, ACI's "lost profits may be estimated with reasonable certainty and other methods of evaluation." *Ashland Mgmt. v. Janien,* 82 N.Y.2d 395, 406 (Ct. App. 1993) (upholding a lost profits damages award based on a company's projections that had "extensive[]" back-testing over a number of years of operation); *Family Operating Corp. v. Young Cab Corp.*, 12 N.Y.S.3d 213, 215 (App. Div. 2015) (affirming lost profits award based upon calculations of the misdirected revenue generated within the relevant time period); *Flexitized, Inc. v. Nat'l Flexitized Corp.*, 335 F.2d 774, 779 (2d Cir. 1964) (approving use of evidence of sales before and after breach of exclusive distributorship contract to calculate lost profits); *One Barberry Real Est. Holding, LLC v. Maturo*, No. 3:17-CV-985 (SVN), 2024 U.S. Dist. LEXIS 76352 (D. Conn. Apr. 26, 2024) (lost profit damages calculated by measuring the difference between projected cash flow and actual cash flow).  That Hertz now feigns it did not know ACI sought to make revenue and profit from the ACI-Hertz Contracts — a remarkable contention — does not change the fact that the ACI-Hertz Contracts provide for such sums and that they can be reasonably calculated.

For these reasons, this Court should reject Hertz's contention that ACI cannot recover lost profits as a matter of law for Hertz's breaches of the ACI-Hertz Contracts.

11

**B.      Hertz's Fact-Based Contention That ACI Did Not Properly Perform Under The ACI-Hertz Contracts Fails When Considering The Totality Of The Evidence, Rather Than Hertz's Incomplete and Out-Of-Context Justifications For Not Complying With the Unambiguous Terms of the ACI-Hertz Contracts.**

Hertz will claim at trial that ACI's alleged failure to timely repair vehicles and quality issues entitled it to ignore the exclusivity provisions of the ACI-Hertz Contracts, send thousands of vehicles to vendors other than ACI, and terminate the ACI-Hertz Contracts without their required six months' notice. [D.I. 1401 (Claim Objection) ¶¶ 34–43, 45.]

In support, Hertz will seek to rely on incomplete, conclusory, and inadmissible evidence consisting of the testimony of some of its witnesses and a handful of emails to purportedly justify Hertz diverting tens of thousands of vehicles, and millions of dollars of revenue, elsewhere. [*Id.* ¶¶ 35, 39–40.] However, the weight of evidence supports that Hertz's high employee turnover, operational disarray, and failures to implement corporate controls led Hertz to breach the ACI-Hertz Contracts, not any decision grounded in actual data showing that ACI was not timely turning around vehicle repairs.

In fact, Hertz's Rule 30(b)(6) corporate representative, John Dolobach, testified[6] as to Hertz's management and/or monitoring of ACI's performance under the ACI-Hertz Contracts, including but not limited to, ACI's timely repair of vehicles. [**Exhibit 1** (Dolobach Dep. Tr.) at 11:11–24; 12:1–8.] Dolobach acted as a Regional Maintenance Manager and oversaw the Port Newark Facility and Sterling Facility while ACI was operating in those locations and later oversaw Hertz's Florida locations where ACI also operated. Dolobach affirmed that no critical issues were ever raised about the timeliness and/or quality of ACI's repairs at all six locations. [Ex. 1 at 70:9–

---

[6] Hertz has elected not to present the testimony of Mr. Dolobach, its corporate representative designated to testify regarding the sufficiency of ACI's performance of the ACI-Hertz Contracts, live at trial, and the parties are designating portions of his deposition transcript.

16 (Q: "During the time that you worked and oversaw the Port Newark facility, do you recall whether or not there was any issues raised with you about the timeliness of 900 Atlantic's repair activities?  A: No, sir."; 95:2–14 (Q: "In your experience when you were working in Virginia, and I take that's true in 2013, do you recall any negative issues concerning the timeliness of VCC's work?" A: Any timely issues.  I'm going to say no more than any other body shop."; 114:3–18 Q: "Do you recall with respect to its work that it did in Miami, do you recall at any point in time issues being brought to your attention about 950 ACI and any out of the ordinary issues with the timing of its repairs? A: No sir.  No more than anyone else."; 115:17–24 (same answer regarding Ft. Lauderdale/West Palm Beach); 116:1–12 (same answer regarding Orlando).]

In the end, Hertz's allegations that ACI could not repair vehicles at the necessary volume will be contradicted by the entirety of the evidence in this case. Importantly, Hertz will not be able to credibly argue at the close of evidence that ACI failed to add additional repair capacity through additional shifts, equipment, or employees to accommodate Hertz's required volume. Rather, ACI was, at all times, ready, willing, and able to repair the volume of vehicles Hertz had promised as to each site within contractually required time periods. Capus will testify that ACI was always prepared to hire a second shift and a third shift and work weekends.

Ultimately, the evidence will show that Hertz misses a critical point. The purpose of ACI-Hertz Contracts was to obligate Hertz to send repairs to the various ACI entities so that the ACI entities could use that volume to grow and handle more and more Hertz work. Hertz completely violated not only the express terms of the ACI-Hertz Contracts but also the fundamental spirit of the agreements.

As to purported complaints that ACI did not or could not initially perform at the level of Hertz's promised volume while it ramped up at each location once an ACI-Hertz Contract was

signed, Hertz does not argue that ACI *actually* failed to perform but rather argues ACI had a *theoretical, untested* inability to perform at such volume. Capus will testify otherwise — that had Hertz sent its promised volume, ACI was ready, willing, and able to handle it. Capus never gave his okay to send cars elsewhere and would have done what was necessary to repair the full volume of vehicles Hertz had promised had it performed under the ACI-Hertz Contracts.

Finally, Hertz's own actions will refute its contentions at trial. *After* ACI's performance that Hertz, post-hoc, now calls deficient, Hertz actually *expanded* the ACI-Hertz Contracts from Port Newark to Dulles, to Baltimore-Washington Airport, to Miami, to Fort Lauderdale, to West Palm Beach, and to Orlando, renewed and extended each of the ACI-Hertz Contracts, and added DTAG vehicles to each of the ACI-Hertz Contracts for ACI to repair. Hertz would not have done so had ACI been failing to perform. Hertz's witnesses agreed, and will agree at hearing, that Hertz would not expand its business with an entity that was performing poorly.

ACI will prove at trial that Hertz's arguments are simply after-the-fact attempts to justify its failure to honor the ACI-Hertz Contracts. ACI could have fully performed its contractual duties, but Hertz never allowed it to do so. Its own employees' ignorance of the requirements of the ACI-Hertz Contracts is underscored by Hertz's repeated disregard of the ACI-Hertz Contracts' six month notice of intent to terminate provisions. [Ex. 1 (Dolobach Dep. Tr.) at 106:19–107:3; 108:4–13 (Q: 'Do you know at least as of the time that you arrived in 2013, what, if any, systems that Hertz had in place to ensure it was meeting its requirements [sending 50% of body work at Miami to ACI] under the contract? A: No, sir."; Q "Based on your work at Hertz throughout your career, do you have an understanding of how that – the contractual requirements [sending 50% of body work at Miami to ACI] would have been adhered to by Hertz? A: No, sir."; 111:2–12 (Same regarding Ft. Lauderdale/West Palm Beach); 113:2–17 (same regarding Orlando).]

**C.      Hertz's Fact Based Contention That ACI Waived Enforcement of the Exclusivity Provisions Will Be Directly Contradicted By Capus' Testimony.**

Hertz intends to argue that ACI waived its breach of contract claims. Because Hertz raises waiver as an affirmative defense to ACI's claims, Hertz bears the burden of proof with respect to the defense. *See, e.g., 2 Bowery Holding LLC v. Ng (In re 26 Bowery LLC),* No. 22-10412 (MG) and 22-10413 (MG), Adv. Pro. No. 23-01163 (MG), 2023 Bankr. LEXIS 2962, at *15–16 (Bankr. S.D.N.Y. Dec. 18, 2023) ("Generally, a defendant asserting an affirmative defense bears the burden of proof with respect to that defense."); *Jakimas v. Hoffmann-LaRoche, Inc.,* 485 F.3d 770, 782 (3d Cir. 2007) (defendant bore burden to establish affirmative defense of release).

In New York, to prevail on a waiver affirmative defense to a breach of contract claim, a defendant bears the burden to establish that: (1) the plaintiff had "actual knowledge" of defendant's breach of contract; and (2) the plaintiff continued to perform under the contract, intending to ***voluntarily*** waive such breaches. *Gallegos v. Top Rx, Inc.,* No. 04-CV-773A(F), 2008 U.S. Dist. LEXIS 119433, at *37 (W.D.N.Y. Mar. 12, 2008). A party will only be found to have waived a contractual right when the evidence proves such waiver was "voluntary and intentional," and "the intent to waive must be unmistakably manifested, and is not to be inferred from a doubtful or equivocal act." *Id.* (citations omitted).

Further, "under New York law, the question of waiver as to an alleged breach of contract is a matter of intent and as such presents a question of fact requiring unambiguous proof." *Id.* at *42–43. Waiver of contract rights based on "conduct, or language of a party, is <u>rarely</u> established as a matter of law" and requires a close factual analysis. *Id.* (quoting *Alsens American Portland Cement Works v. Degnon Contracting Company,* 222 N.Y. 34, 37 (Ct. App. N.Y. 1917)) (emp. in orig.). Moreover, a "party's reluctance to terminate a contract upon a breach and its attempts to encourage the breaching party to adhere to its obligations under the contract to [*sic*] not necessarily

15

constitute a waiver of the innocent party's rights in the future." *Am. Int'l Tel., Inc. v. Mony Travel Servs.,* No. 99 Civ. 11581 (CM)(LMS), 2001 U.S. Dist. LEXIS 2143, at *18 (S.D.N.Y. Feb. 23, 2001).

Capus will testify that he did not know that Hertz had been breaching the ACI-Hertz Contracts. When ACI did not receive the volume of vehicles that Hertz had promised, he would complain. In response, Hertz personnel would give him several excuses, all of which could have been legitimate business reasons if true and not have breached the ACI-Hertz Contracts.

Further, it was reasonable for Capus to rely on Hertz's statements as to the lack of volume. As Hertz acknowledges, the ACI-Hertz Contracts did not set forth a specific number of vehicles that Hertz was required to send ACI as to any location, which would have been impractical given the nature of the business. [D.I. 1401 ¶ 61.] Rather, the ACI-Hertz Contracts obligated Hertz to send all or a specific percentage of vehicles needing repair in certain areas to ACI, *supra at* 3–7, which Hertz's own documents that will be used at trial will prove it did not do.

Given the foregoing, at the evidentiary hearing, Hertz will fail to establish the required "unambiguous proof" to show that ACI knew of and voluntarily waived Hertz's breaches of the ACI-Hertz Contracts. Hertz's objection premised on its affirmative defense of waiver will fail.

### D. The Mixed Legal and Factual Issues Regarding the Beginning and End Dates of the ACI-Hertz Contracts Favor ACI

Generally, the Parties dispute when the respective ACI-Hertz Contracts began and ended. The Parties do not dispute that it took ACI some time to "ramp up" due to the need for ACI to get permits, equipment, and staff in place to handle the expected volume of repairs. ACI will submit evidence at the hearing in this matter supporting the following start and end dates:

| Shop | Location | Start Date | End Date |
|---|---|---|---|
| 900 ACI | Newark, New Jersey | April 1, 2010 | June 30, 2015 |
| VCC | Sterling, Virginia | September 1, 2011 | November 30, 2017 |

| 950 ACI | Miami, Florida | October 1, 2011 | October 23, 2015 |
|---------|----------------|-----------------|------------------|
| 1050 ACI | Ft. Lauderdale and West Palm Beach, Florida | February 15, 2013 | October 23, 2015 |
| 1100 ACI | Orlando, Florida | June 1, 2014 | October 23, 2015 |

Discovery has made evident at least points of contention that will require this Court to consider mixed questions of law and fact: 1) when the Florida Contract began; and 2) when the Sterling Contract ended.

### 1.    *The Florida Contract Should Not Be Interpreted To Have Begun When The Lease Was Entered For The 1050 ACI Location.*

Hertz appears poised to argue that ACI was not entitled to receive work for Hertz in Florida until after December 7, 2012, when a lease was entered into for ACI's Ft. Lauderdale/West Palm Beach location (1050 ACI). In doing so, Hertz conflates the addition of a term of years for the amendment adding Ft. Lauderdale/West Palm Beach to the Florida Contract with Hertz's agreement to vend repair work to 950 ACI from its "Miami Florida locations" when it entered into the Florida Contract on May 3, 2011. The Parties do not dispute that the Florida Contract was entered into between Hertz and 950 ACI on May 3, 2011 or that the Florida Contract was amended on July 8, 2011, before 950 ACI was operational, to provide that Hertz would "refer fifty (50%) of it's [sic] vehicle body work from it's [sic] Miami Florida locations to Atlantic Collision Corp." There is an apparent disagreement about when 950 ACI became operational in Miami and relatedly when Hertz was obligated to vend 50% of its vehicle body work to 950 ACI from Hertz's Miami locations.

The Parties do not dispute that a lease for the Fort Lauderdale/West Palm Beach shop (1050 ACI) was entered into on December 7, 2012. There is some apparent confusion about the impact of that lease on the relationship between the parties. The Amendment to the Florida Contract adding Ft. Lauderdale and West Palm Beach ("1050 ACI Amendment"), entered on September

17

30, 2012, provides that the term of the amended Florida Contract was to begin "for five years from the date a lease is entered into in Ft. Lauderdale for operation of the second location referred to herein." [Trial Ex. JX-7, § 1.] Hertz agreed "[t]o assign 60% of the total work of Hertz automobiles vended from its Miami, Ft. Lauderdale, and West Palm Beach locations to 950 Atlantic Collision Corp." [*Id.* § 2.]

The evidence will show that 950 ACI had been operating near Miami, Florida for nearly a year before the 1050 ACI Amendment was signed, a fact that Hertz ignores. Indeed, on October 26, 2011, Capus received a document from Hertz labeled "Body Shop Vendor Review Form," which approved 950 ACI to be vended minor repairs. [Trial Ex. A-12.] The form identified "Miami" as the location of the shop, at an address of 4152 E. 11 Ave, Hialeah, FL 83013. [*Id.*] This is a different address than the Fort Lauderdale shop, located at 1201 North 21st Avenue, Hollywood, FL 33030. [Trial Ex. JX-36.] Capus will testify, and the evidence will show, that 950 ACI was repairing Hertz's vehicles at its Miami shop in October 2011. The Parties were thus already operating under the Florida Contract when the 1050 ACI Amendment was entered. It would defy reason and the intent of the parties for the Court to find that the 1050 ACI Amendment somehow stopped the clock on the Florida Contract as to Miami while the Fort Lauderdale shop was ramping up.

The general principles of contract interpretation are familiar. "When interpreting a contract, the court should arrive at a construction which will give fair meaning to all of the language employed by the parties to reach a practical interpretation of the expressions of the parties so that their reasonable expectations will be realized." *Hepburn v. Hepburn*, 78 A.D.3d 1001, 1002 (N.Y. App. Div. 2nd Dept.) (cleaned up). "It is a fundamental principle that the intention of the parties must be gleaned from all corners of the document . . . and every part of the contract should be

18

interpreted to give effect to its general purpose." *Tougher Heating & Plumbing Co. v. State*, 73 A.D.2d 732, 733–34 (N.Y. App. Div. 3rd Dept. 1979). A court may "interpret a contract to carry out its intention, and words may be transposed, rejected, or supplied, to make its meaning more clear." *Id.* (quoting *Castellano v State of New York*, 43 N.Y.2d 909, 911 (Ct. App. 1978)) (internal quotation omitted).

Here, while the Fort Lauderdale/West Palm Beach amendment to the Florida Contract did not take effect until December 7, 2012, this fact does not negate that Hertz was obligated under the Florida Contract to vend 50% of its vehicle repairs to 950 ACI in Miami from the time 950 ACI was approved by Hertz to be vended vehicles in October 2011 until the five-year term of the Florida Contract began on December 7, 2012. After December 7, 2012, Hertz was required to vend 60% of its vehicle repairs to 950 ACI in Miami.

This Court should not interpret the Florida Contract as to 950 ACI to have begun on December 7, 2012, because such an interpretation would render the Florida Contract meaningless before that time. To the extent the Court finds the contract ambiguous and seeks to rely on extrinsic evidence, the evidence will show the 950 ACI shop was operational and repairing Hertz vehicles in October 2011. Accordingly, the clear intent of the parties as to 950 ACI in Miami when the 1050 ACI Amendment was entered was to increase the percentage of vehicles to be vended to ACI and add a term of years to the Florida Contract. Any other interpretation would not be true to the intent of the parties.

> ### 2. *Because Hertz Wrongfully Terminated the Sterling Contract, Hertz Deprived VCC of Its Contractual Entitlement To A Six-Month Notice Provision.*

The evidence at hearing will show that Sterling Contract end date should be November 30, 2017. On June 1, 2012, the Sterling contract was extended through May 31, 2017. [Trial Ex. JX-

6, § 2.] All other terms of the Sterling Contract remained unchanged. [*Id.* § 5.] The Sterling Contract provided that either party could terminate with 180 days prior written notice. [Trial Ex. JX-3, § 2(c). The Sterling Contract also provided that VCC could exercise its options to extend the agreement upon notice to Hertz six months before the expiration of the contract. [*Id.* at 2(b).]

The evidence at hearing will show that Capus had put Hertz on notice of his intent to renew the Sterling Contract more than 180 days before the contract expired. VCC continued to operate in Sterling after the contract expired on May 31, 2017. During this time, VCC treated the Sterling Contract as renewed. Accordingly, VCC was entitled to six-months advanced written notice of termination of the Sterling Contract. Damages for the Sterling Contract are therefore calculated from June 2017 to November 2017.

### E.      ACI's Damages Are Not Barred By The Statute Of Limitations.

Hertz will also argue that New York's six-year statute of limitations bars ACI's claims for Hertz's breaches of the ACI-Hertz Contracts before November 15, 2011— six years before it filed suit in the State Court Litigation on November 15, 2017. [D.I. 1401 (Claim Objection) ¶ 67.] Under New York law, however, this Court should find that Hertz is estopped from making such arguments.

"It is the rule that a defendant may be estopped to plead the Statute of Limitations where plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action." *Simcuski v. Saeli,* 44 N.Y.2d 442, 448–49 (Ct. App. 1978); *see also Niagara Mohawk Power Corp. v. Freed,* 265 A.D.2d 938, 940 (N.Y. App. Div. 4th Dep't) (misrepresentations and active concealment by defendant may estop defendant from raising statute of limitations defense).

Here, because Capus' trial testimony will demonstrate that Hertz repeatedly misled him about why ACI received less-than-promised volume, *supra* at 15–16, Hertz should be estopped from asserting a statute of limitations defense.

### CONCLUSION

**WHEREFORE**, ACI respectfully requests that the Court overrule the Claim Objection as it relates to the ACI Claims, enter a finding that Hertz breached its ACI-Hertz Contracts with ACI, award damages to ACI accordingly, and grant ACI such other and further relief as the Court deems appropriate under the circumstances.

Dated: October 15, 2024

**BLANK ROME LLP**

*/s/ Jordan L. Williams*
Jordan L. Williams (DE No. 7128)
1201 N. Market Street, Suite 800
Wilmington, Delaware 19801
Telephone: (302) 425-6400
E-mail: Jordan.williams@blankrome.com

- and –

John E. Lucian, Esq. (*pro hac vice*)
Rick Antonoff, Esq. (*pro hac vice*)
BLANK ROME LLP
One Logan Square
130 North 18th Street
Philadelphia, PA 19103
Telephone: (215) 569-5500
Facsimile: (215) 569-5555
john.lucian@blankrome.com
rick.antonoff@blankrome.com

-and-

Christopher E. Kentra, Esq. (*pro hac vice*)
Joshua J. Cauhorn, Esq. (*pro hac vice*)
BURKE, WARREN, MACKAY & SERRITELLA, P.C.
330 North Wabash Avenue, Suite 2100
Chicago, IL 60611-3607
(312) 840-7000
ckentra@burkelaw.com
jcauhorn@burkelaw.com

*Counsel to 900 Atlantic Collision, Inc., 950 Atlantic Collision, Inc., 1050 Atlantic Collision, Inc., 1100 Atlantic Collision, Inc., and Virginia Collision Corp*