**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| Rental Car Intermediate Holdings, LLC,[1] | Case No. 20-11247 (MFW) |
| Reorganized Debtor. | **Hearing Date: October 29-31, 2024** |

## REORGANIZED DEBTOR'S PRE-HEARING SUBMISSION

**WHITE & CASE LLP**

J. Christopher Shore (admitted *pro hac vice*)
David M. Turetsky (admitted *pro hac vice*)
Samuel P. Hershey (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8200

**WINSTON & STRAWN LLP**

William C. O'Neil (admitted pro hac vice)
Gretchen V. Scavo (admitted pro hac vice)
Tyler Richards (admitted pro hac vice)
35 W. Wacker Drive
Chicago, IL 60604
Telephone: (312) 558-5600

October 15, 2024

**RICHARDS, LAYTON & FINGER, P.A.**

Mark D. Collins (No. 2981)
Robert J. Stearn, Jr. (No. 2915)
John H. Knight (No. 3848)
Cory D. Kandestin (No. 5025)
Emily R. Mathews (No. 6866)
One Rodney Square
920 N. King Street
Wilmington, DE 19801
Telephone:  (302) 651-7700

*Co-Counsel to the Reorganized Debtor*

---

[1] The last four digits of the tax identification number of Reorganized Debtor Rental Car Intermediate Holdings, LLC ("**RCIH**") are 2459. The location of RCIH's service address is 8501 Williams Road, Estero, FL 33928. On September 28, 2021, the Court entered a final decree closing each of the chapter 11 cases for The Hertz Corporation ("**Hertz**") and its affiliated reorganized debtors (collectively, the "**Reorganized Debtors**" and, prior to the Effective Date (as defined herein), the "**Debtors**") other than RCIH's chapter 11 case. Commencing on September 28, 2021, all motions, notices, and other pleadings relating to any of the Reorganized Debtors shall be filed in RCIH's chapter 11 case, Case No. 20-11247 (MFW). "D.I." references are to the docket in Case No. 20-11247, and "Main D.I." references are to the docket in Case No. 20-11218.

## TABLE OF CONTENTS

Page

INTRODUCTION ....................................................................................................................... 1

JURISDICTION ......................................................................................................................... 5

BACKGROUND ......................................................................................................................... 5

I. Procedural Bankruptcy History.................................................................................... 5

II. The Proofs of Claim at Issue........................................................................................ 6

ARGUMENT .............................................................................................................................. 9

I. Hertz Did Not Breach Any of the Contracts. ................................................................ 10

    A. The Contracts expressly permitted Hertz to refer repairs to other body shops if—as was the case here—ACI was unable to perform the required work in a timely manner. ...................................................................... 10

    B. The Complaint fails to allege any facts—and the evidence will fail to show—that Hertz failed to properly and timely pay for work performed under the Contracts. ...................................................................................... 14

    C. The Contracts were not improperly terminated without proper notice................. 15

II. ACI Continued to Perform Under the Contracts for Years with Knowledge of Hertz's Alleged Breach but Without Providing Hertz Notice Thereof, Thereby Waiving Its Right to Pursue Any of the Breaches Currently Alleged. ......................................................... 16

III. ACI Is Not Entitled to Any Recovery, Either in the Form of Lost Profits, Start-Up Costs, or Prejudgment Interest.................................................................................................... 21

    A. ACI cannot prove entitlement to lost profits........................................................... 21

    B. ACI cannot prove entitlement to start-up costs...................................................... 25

    C. ACI cannot prove entitlement to prejudgment interest.......................................... 25

IV. Should the Court Allow the Proof(s) of Claim, the Court Should Nevertheless Decrease the Amount of ACI's Recovery. ..................................................................................... 26

RELIEF REQUESTED............................................................................................................... 27

CONCLUSION........................................................................................................................... 27

RLF1 31702227v.1

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Arcade Pub., Inc.*,
    455 B.R. 373 (Bankr. S.D.N.Y. 2011).................................................................................25

*Ashland Mgt. v Janien*,
    82 N.Y.2d 395 (N.Y. 1993) .................................................................................................21

*Awards.com v. Kinko's Inc.*,
    42 A.D.3d 178 (N.Y. App. Div. 1st Dep. 2007) .............................................................22, 23

*Blumenfeld Dev. Grp., Ltd. v. Roux Assocs.*,
    2004 NY Slip Op 51383(U), 5 Misc. 3d 1015(A), 798 N.Y.S.2d 707 (N.Y.
    Sup. Ct. 2004) .....................................................................................................................23

*C.f. Fin. Med. Sys., Inc. v. Nassau Health Care Corp.*,
    2013 N.Y. Misc. LEXIS 7067 (N.Y. Sup. Ct. October 9, 2013) ...........................................24

*Crystal Clear Dev., LLC v. Devon Architects of N.Y., P.C.*,
    97 A.D.3d 716 (N.Y. App. Div. 2d Dep't 2012) ..................................................................21

*Digital Broadcast Corp. v. Ladenburg Thalmann Co., Inc.*,
    2008 N.Y. Misc. LEXIS 10179 (N.Y. Sup. Ct. Dec. 11, 2008)............................................22

*Great Earth Int'l Franchising Corp. v. Milks Dev.*,
    311 F. Supp. 2d 419 (S.D.N.Y. 2004)..................................................................................21

*Harris v. Seward Park Housing Corp.*,
    79 A.D.3d 425 (N.Y. App. Div. 1st Dep't 2010)....................................................................9

*In re Hertz Corp.*,
    637 B.R. 781 (Bankr. D. Del. 2021) ......................................................................................4

*Inferno Rest. & Pizzeria, Inc. v. SW Michaels Pizzeria, Inc.*,
    2019 N.Y. Misc. LEXIS 3197 (N.Y. Sup. Ct. June 13, 2019)..............................................16

*Interfilm, Inc. v. Advanced Exhibition Corp.*,
    672 N.Y.S. 2d 309 (N.Y. App. Div. 1st Dep't 1998) ...........................................................24

*Jambetta Music, Inc. v. Nuget*,
    2008 N.Y. Misc. LEXIS 8543 (N.Y. Sup. Ct. Feb. 1, 2008)................................................23

RLF1 31702227v.1

*Kamco Supply Corp. v. On the Right Track, LLC*,
  149 A.D.3d 275 (N.Y. App. Div. 2d Dep't 2017) ........................................................16

*Kenford Co. v County of Erie*,
  67 N.Y.2d 257 (N.Y. 1986) ..................................................................................21, 22, 24

*Lexington 360 Assocs. v. First Union Nat'l Bank*,
  234 A.D.2d 187, 651 N.Y.S.2d 490 (N.Y. App. Div. 1st Dep't 1996)........................2, 17, 22

*Looks Great Servs., Inc., v. Nat'l Grid El. Servs., LLC*,
  2015 N.Y. Misc. LEXIS 5128 (N.Y. Sup. Ct. April 22, 2015) ..................................24

*Medinol Ltd. v. Boston Sci. Corp.*,
  346 F. Supp. 2d 575 (S.D.N.Y. 2004).......................................................................16

*Nat'l Westminster Bank v. Ross*,
  130 B.R. 656 (S.D.N.Y. 1991)............................................................................16, 17

*Prime Victor Int'l Ltd. v. Simulacra Corp.*,
  682 F. Supp. 3d 428 (D. Del. 2023)..........................................................................15

*RBFC One, LLC v. Zeeks, Inc.*,
  367 F. Supp. 2d 604 (S.D.N.Y. 2005).......................................................................17

*Revelations Perfume & Cosmetics v. Nelson*,
  2011 N.Y. Misc. LEXIS 6473 (N.Y. Sup. Ct. August 3, 2011) ................................21

**Statutes**

11 U.S.C. § 502.............................................................................................................5

11 U.S.C. § 726.............................................................................................................4

11 U.S.C. §§ 1101-1195 ............................................................................................5, 6

11 U.S.C. § 1107(a) ......................................................................................................5

11 U.S.C. § 1108...........................................................................................................5

28 U.S.C. § 157.............................................................................................................5

28 U.S.C. § 157(b).........................................................................................................5

28 U.S.C. § 1334...........................................................................................................5

28 U.S.C. § 1408...........................................................................................................5

28 U.S.C. § 1409...........................................................................................................5

iv

**Other Authorities**

Fed. R. Bankr. P. § 3007 ...............................................................................................5

L. R. Bankr. 3007-1 ......................................................................................................5

N.Y. C.P.L.R. § 213(2) ...............................................................................................25

N.Y. C.P.L.R. § 5001(a) .............................................................................................25

Williston on Contracts (4th Ed. 2013) § 39:15 ..........................................................16

RLF1 31702227v.1

**INTRODUCTION**

On November 15, 2017, Atlantic Collision, Inc. ("**900 ACI**"), Virginia Collision Corp. ("**VCC**"), 950 Atlantic Collision, Inc. ("**950 ACI**"), 1050 Atlantic Collision, Inc. ("**1050 ACI**"), and 1100 Atlantic Collision, Inc. ("**1100 ACI**") (collectively, "**ACI**," and together with Hertz, the "**Parties**") filed a complaint against Hertz in the New York Supreme Court, Kings County ("**Complaint**"), alleging that Hertz breached three commercial lease and service contracts with ACI (the "**Contracts**") related to ACI's locations in Port Newark, New Jersey; Sterling, Virginia; Orlando, Miami, West Palm Beach/Ft. Lauderdale, Florida (collectively, the "**Contract Locations**"). *See* Ex. 1.

ACI alleges in its Complaint that Hertz breached the Contracts (1) by impermissibly diverting repair work to third parties and thereby failing to provide ACI the volume of auto-body work agreed upon under the Contracts; (2) by failing to properly and timely pay for work performed under the Contracts; and (3) by terminating the Contracts without proper notice. As a result of the alleged breaches, ACI seeks to recover lost profits, start-up expenses, and pre-judgment interest. *See generally* Ex. 1. As of the filing of the Complaint, ACI estimated such damages to be at least $3.7 million. Ex. 1 at ¶¶ 58, 67, 76.

After Hertz filed for bankruptcy on May 22, 2020, ACI filed its Proofs of Claim (as defined herein), referencing and attaching the Complaint as their sole basis.[2] The amount sought from Hertz in the Proofs of Claim, however, was vastly different than the amount sought in the Complaint. Indeed, far more than the $3.7 million sought by the Complaint, the Proofs of Claim total more than $28 million—a *657%* increase from the Complaint's pre-bankruptcy allegations.

---

[2] *See* Proofs of Claim at ¶ 8 (stating that the "basis of the claim[s] "are "[b]reach of exclusive auto body services contract as reflected in attached complaint, with damages calculated in attached report of retained expert.").

1

ACI's damages expert has since opined that ACI suffered at least $21 million in damages, consisting of $13,652,883 in purported lost profits and $7,691,440 in prejudgment interest through May 21, 2020. *See generally* Ex. 2.

The Proofs of Claim should be disallowed because ACI will not be able to meet its burden to prove that Hertz breached any of the Contracts or that ACI incurred damages as a result.

***First***, ACI will not meet its burden to prove that Hertz breached any of the Contracts.  This is because, under the Contracts, Hertz did not have a contractual obligation to vend repairs to ACI if ACI was unable to timely complete those repairs.  In other words, if ACI did not have the capacity to timely handle more repairs or lacked the ability to perform them in the first place because, for example, it did not have the proper equipment, or if ACI did not want to perform the repairs, then Hertz was free to send the repairs to other vendors. These key provisions in the Contracts were critical to Hertz's business; they ensured that Hertz's cars could be timely repaired and rented out to customers. It is ACI's burden to prove that it had the capacity—at all relevant times throughout the Contract periods and at all Contract Locations—to handle the repair volume to which it claims it was entitled.  ACI has admitted, through its corporate representative, that it does not know its repair capacity for any of the Contract Locations, and ACI failed to disclose any expert testimony that would assist the Court in determining whether ACI had capacity during the relevant period to handle additional repairs.  Given this dearth of evidence, ACI will fail to meet its burden.

ACI will likewise fail to prove that Hertz breached the Contracts by providing insufficient notice of termination.  The evidence will show that one of the Contracts was terminated by mutual agreement (and with Hertz voluntarily paying ACI $15,000 to cover moving expenses) and another Contract was terminated by Hertz after it discovered that ACI had been stealing and reselling

RLF1 31702227v.1

Hertz's parts.  As the evidence will demonstrate, the third Contract simply expired without being renewed.

ACI's final theory of breach—to the extent it is even still part of its claims—that Hertz did not properly and timely pay ACI for work performed under the Contracts will likewise fail for lack of proof.  Indeed, ACI has retracted this portion of its claim via interrogatory response.

*Second*, even if ACI could prove that Hertz breached any of the Contracts (it cannot), the evidence will show that ACI continued to perform under the Contracts *with knowledge* of Hertz's alleged breach and without providing Hertz any notice thereof, thereby forever waiving its right to pursue any of the breaches it now alleges.  In fact, ACI *never once* asserted that Hertz had breached any of the Contracts over the course of the Parties' eight-year relationship during which Hertz referred auto-body repair work to ACI, and during which ACI continued to collect payment for work done.  This amounts to legal waiver which bars ACI from recovering for these so-called breaches.

*Third*, even if ACI could prove that Hertz committed any breach that ACI did not otherwise waive (it cannot), ACI would still not be entitled to any recovery on its Proofs of Claim. The Complaint alleges lost profits that were neither fairly within the contemplation of the Parties at the time they executed the Contracts, nor are the alleged lost profits capable of proof with reasonable certainty, as New York law requires.  ACI cannot recover start-up costs either, given that the plain language of the Contracts lays full responsibility on ACI for such costs.  Allowing the recovery of such costs on top of the profits that ACI has already realized would run counter to the plain language of the Contracts and would lead to an inequitable windfall.  Any claim for prejudgment

interest likewise fails. Without a verdict, judgment, or decision from the New York state court, prejudgment interest cannot form a basis of the Proofs of Claim.[3]

For any of these three reasons, the Court should disallow the Proofs of Claim in their entirety.[4] If the Court nevertheless finds liability and allows the Proofs of Claim, it should award ACI nowhere near what the Proofs of Claim currently seek. For one, New York's six-year statute of limitations for breach of contract claims prevents any recovery of damages relating to conduct pre-dating November 15, 2011. That alone significantly decreases the claimed amount.

Statute of limitations issues aside, the remainder of ACI's calculation remains vastly overinflated. The report of ACI's expert William Metzdorff ("**Metzdorff**") is premised on faulty assumptions and unreliable methodology, the correction of which expose any theoretical damages at issue to be only a small fraction of those currently claimed. Most notably:

- Metzdorff bases his damages opinions on unreliable estimates and "data" from outside the loss periods, along with Capus's subjective say-so;

- Metzdorff bases his damages opinions on his speculative assumptions about ACI's capacity that are not only unsupported but also contradicted by the factual record, including ACI's own testimony; and

- Metzdorff relies on the same Hertz data he criticizes as "unreliable and incomplete."

Hertz respectfully submits that these flaws rise above typical fodder for cross examination and into the realm of unreliability, as further explained in its motion to exclude Metzdorff's

---

[3]Moreover, to the extent ACI is entitled to any prejudgment interest, such interest is significantly capped at interest accrued since the Petition Date at the federal judgment rate. *See* 11 U.S.C. § 726 (providing that "property of the estate shall be distributed . . . in payment of interest at the legal rate from the date of the filing of the petition"); *In re Hertz Corp.*, 637 B.R. 781, 801 (Bankr. D. Del. 2021) (Walrath, J.) (holding that Hertz's creditors are entitled to "payment of their allowed claim plus post-petition interest at the federal judgment rate in accordance with section 726(a)(5)"). Since the Petition Date, the federal judgment rate has ranged from .06% to 5.76%.

[4]Under certain of the Contracts, Hertz is entitled to its attorney's fees and expenses if it prevails in a dispute regarding the Contracts. *See* Ex. 3, Lease § 20(e); Ex. 4, Lease § 20(e). If Hertz prevails, Hertz reserves the right to file a motion seeking an order requiring ACI to pay those fees and expenses.

4

testimony in its entirety. *See* D.I. 1567 and 1568. Metzdorff's speculative and unreliable damages opinions cannot provide a basis for the Court to assess ACI's purported lost profits with "reasonable certainty," as required by New York law.  As such, ACI will not be able to prove damages.  The Proofs of Claim should be disallowed in their entirety.

## JURISDICTION

This Court has jurisdiction to consider Hertz's Claim Objection under 28 U.S.C. §§ 157 and 1334 along with the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012 (Sleet, C.J.).  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these Chapter 11 Cases (as defined below) and this Objection is proper in this District under 28 U.S.C. §§ 1408 and 1409.The predicates for the relief requested by Hertz's Objection are section 502 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 3007-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**").

## BACKGROUND

### I.    Procedural Bankruptcy History

On May 22, 2020 (the "**Petition Date**"), each of the Debtors commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code (collectively, the "**Chapter 11 Cases**"), which were jointly administered for procedural purposes. The Debtors operated their businesses and managed their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

On August 11, 2020, the Debtors filed their schedules of assets and liabilities and statements of financial affairs [Main D.I. 964-1023], which were subsequently amended on November 21, 2020 [D.I. 1824, 1826-1880, 1882, 1884-1886, 1889] and on April 14, 2021 [Main

5

D.I. 3892-3896] (collectively, the "**Schedules**"). In addition, in the ordinary course of business, the Debtors maintained books and records (the "**Books and Records**") that reflect, among other things, the nature and amount of the liabilities the Debtors owed to their creditors.

On June 10, 2021, the Court entered the Order (i) Confirming Second Modified Third Amended Joint Chapter 11 Plan of Reorganization of The Hertz Corporation and its Debtor Affiliates and (ii) Granting Related Relief [Main D.I. 5261] (such underlying chapter 11 plan, together with the Plan Supplements (as defined therein), all schedules, and exhibits thereto, the "**Plan**").

On June 30, 2021 (the "**Effective Date**"), the Plan became effective in accordance with its terms, and the Debtors became the Reorganized Debtors. On June 30, 2021, the Reorganized Debtors filed their *Notice of Effective Date and Entry of Order Confirming the Second Modified Third Amended Joint Chapter 11 Plan of Reorganization of The Hertz Corporation and Its Debtor Affiliates* [Main D.I. 5477].

On September 28, 2021, the Court entered the Final Decree closing each of the Chapter 11 Cases other than RCIH's chapter 11 case, Case No. 20-11247 (MFW) [Main D.I. 5940].

II.    **The Proofs of Claim at Issue**

As previewed above, the Contracts at issue pertained to auto-body repair work to be performed by specific ACI entities within specific geographic regions. The first contract, executed in 2009, covered auto-body work to be performed by 900 ACI on Hertz rental cars written at Hertz's facility in Port Newark, New Jersey (the "**New Jersey Contract**").[5] The second contract, executed in 2010, covered work to be performed by VCC on Hertz rental cars written at Hertz's

---

[5]*See* Ex. 3.

Sterling, Virginia, facility near Dulles Airport (the "**Virginia Contract**").[6]   The third and final

contract, executed in 2011, initially covered work to be performed by 950 ACI in the Miami,

Florida, area before expanding to include auto-body repair work in Fort Lauderdale (to be

performed by 1050 ACI) and Orlando (to be performed by 1100 ACI) (the "**Florida Contract**").[7]

Each of the Contracts contained a commitment by Hertz to send a certain volume of auto-

body repair work to ACI.  *See* Ex. 3 at § 4 ("[Hertz] agrees to refer to [900 ACI] all body work

repairs for vehicles prepared by [Hertz] at Port Newark facility."); Ex. 4 at § 4 ("[Hertz] agrees to

refer to [VCC] all body work repairs for vehicles prepared by [Hertz] at [Hertz's Sterling facility].

[Hertz] will also give right of first refusal to [VCC] of vehicles requiring automotive body repair

work from [Hertz's] facility at Baltimore Washington Airport."); Ex. 5 at Addendum ("Hertz

agrees to refer fifty (50%) of its vehicle body work from its Miami Florida locations[] to Atlantic

Collision Corp."); Ex. 6 at § 2 ("Hertz hereby . . . agrees . . . [t]o assign 60% of the total work of

Hertz automobiles vended from its Miami, Ft Lauderdale, and West Palm Beach locations to 950

Atlantic Collision Corp."); Ex. 7 at § 1 ("The [Florida Contract] shall be spread to include at least

70% of all body shop vended work for the Orlando, Florida location.").

Critically, however, the Contracts also contained an important and express qualifier to

Hertz's above-referenced commitment: if ACI was unable to perform the repair work in a timely

manner, including but not limited to lacking the proper equipment or not having the capacity to

repair the number of vehicles written by Hertz, Hertz reserved the right to refer the repair work to

other body shops. *See* Ex. 3 at § 4 ("If [900 ACI] is unable to perform the work in a timely manner,

including but not limited to lacking the proper equipment or excessive volume of repairs, [Hertz]

---

[6]*See* Ex. 4.

[7]*See* Ex. 5.

7

reserves the right to refer the repair to other body shops."); Ex. 4 at § 4 ("If [VCC] is unable to perform the work in a timely manner, whether due to the lack of proper equipment or excessive volume of repairs or otherwise, [Hertz] reserves the right to refer the repair to other automotive body repair shops."); Ex. 5 (ACI guaranteed that "upon quarterly review, it w[ould] provide Hertz with repair turn around times either equal to or better than the average of the Southeast Region" and that "[950 ACI] w[ould] outperform the current average of 8 days per repair").[8]

The Contracts each ultimately terminated or expired in due course.  The New Jersey Contract, for instance, was terminated in January 2015 when ACI agreed to move off site and accepted $15,000 from Hertz to compensate it for moving expenses, a move that allowed ACI to perform non-Hertz repair work moving forward—something ACI had been unable to do while under contract and on site at Hertz's Port Newark facility.  The Florida Contract was terminated in April 2015 on the basis that 1050 ACI had been selling Hertz's parts for its own profit. The Virginia Contract, on the other hand, simply expired on May 31, 2017, without being renewed.

On November 15, 2017, ACI filed its Complaint against Hertz in New York state court, alleging breach of contract.  On May 21, 2018, Hertz filed its answer and affirmative defenses. The Parties thereafter exchanged written discovery, and Hertz produced a significant volume of electronic documents (close to 400,000 pages), including emails and billing/invoice data.  By early February 2020, the Parties had stipulated to a case scheduling order providing for depositions and expert disclosures.  On March 10, 2020, Hertz took the deposition of Marc Capus.  ACI indicated that it planned to depose at least 12 Hertz witnesses.

---

[8]Relatedly, the Contracts also required ACI to meet certain quality standards. *See, e.g.*, Ex. 3 at § 25 ("[900 ACI] shall guaranty all work on vehicles and shall reimburse [Hertz] for any expenses incurred as a result of [900 ACI] breaching this covenant."); Ex. 4 at § 25 (same for VCC); Ex. 5 ("[950 ACI] will guarantee all repairs.  Hertz will give [950 ACI] the option to correct any unacceptable work.  If a car is rejected at Auction due to poor repair, [950 ACI] agrees to pay the difference in the sales price to make Hertz whole.").

On May 22, 2020, Hertz filed for bankruptcy in this Court. Accordingly, on June 10, 2020, the New York state court stayed the litigation. During the bankruptcy proceedings, ACI submitted Proofs of Claim valuing the claims it had asserted in the New York state court litigation at over $28 million, despite previously averring them at $3.7 million in the Complaint.

Pursuant to court-ordered procedures in the bankruptcy action, the Parties attempted in good faith to settle this dispute before resorting to third-party mediation or arbitration. Those settlement discussions began in earnest in the spring of 2022, but after several meet and confer sessions and an exchange of written position documents, the Parties were unable to bridge the gap in their damages calculations in a meaningful way. ADR Procedures (as defined in the Plan) were likewise unsuccessful. Despite a December 2022 mediation with the Honorable Diane M. Welsh (ret.), the Parties' dispute remains unresolved.

## ARGUMENT

ACI will be unable to carry the requisite burden to recover on its Proofs of Claim. Forming the basis of the Proofs of Claim are breach of contract claims under New York law, which requires plaintiffs to prove: (1) the existence of a valid and enforceable agreement, (2) performance by the plaintiffs, (3) failure of performance by the defendant, and (4) damage resulting from the breach. *See, e.g.*, *Harris v. Seward Park Housing Corp.*, 79 A.D.3d 425, 426 (N.Y. App. Div. 1st Dep't 2010). ACI will be unable to prove that Hertz committed any breach, much less any breach that ACI did not waive and that entitles ACI to recovery on the Proofs of Claim. And even assuming ACI *can* prove such a breach (it cannot) *and* that ACI did not waive its claims, the Court should at the very least reduce the Proofs of Claim by the amount of alleged damages incurred outside of the statute of limitations period and by the amount in which they are overinflated due to Metzdorff's faulty assumptions and unreliable methodology.

9

## I.  Hertz Did Not Breach Any of the Contracts.

The Complaint alleges that Hertz breached the Contracts (i) by impermissibly diverting repair work to third parties, thereby failing to provide ACI the volume of auto-body repair work agreed upon under the Contracts; (ii) by failing to properly and timely pay for work performed under the Contracts; and (iii) by terminating the Contracts without proper notice. ACI will fail to prove liability under any of these theories.

### A.  The Contracts Expressly Permitted Hertz to Refer Repairs to Other Body Shops if—as was the Case Here—ACI was Unable to Perform the Required Work in a Timely Manner.

The Complaint's central theory is that Hertz impermissibly diverted repair work to third parties and thereby failed to provide ACI the agreed-upon volume of auto-body repair, thereby causing ACI to lose out on profits it hoped to earn. But this theory ignores the plain language of the Contracts, which allowed Hertz to refer repairs to non-ACI body shops if "[ACI] [was] unable to perform the work in a timely manner, including but not limited to lacking the proper equipment or excessive volume of repairs" (*see* Ex. 3 at § 4; *see also* Ex. 4 at § 4) and required ACI to adhere to certain repair turnaround times. Ex. 5 (ACI guaranteed that "upon quarterly review, it will provide Hertz with repair turnaround times either equal to or better than the average of the Southeast Region.  [ACI] will outperform the current average of 8 days per repair").

To be sure, Hertz was financially incentivized to send ACI all of the repairs it could handle. As Hertz's VP of Finance Zachary Mitchell testified, it was in Hertz's "inherent interest to keep [repair work] at an in-house body shop [like ACI] whenever possible," such that any time Hertz sent repair work elsewhere, it was "because [ACI] weren't getting the cars back timely." Ex. 8, Mitchell Dep. Tr. at 161:15-19. Echoing the same, Hertz's former VP of New York Operations Louis Scarpelli similarly testified that "if we could repair the car at Port Newark that was our best option to turn the car as quickly as possible . . . ." Ex. 9, Scarpelli Dep. Tr. at 209:23-210:3.

Consistent with its financial incentives, Hertz sent ACI as many repairs as possible. Hertz's former Director of Field Operations Christopher Meza testified that Hertz "sent [ACI] as many cars as they could until they could not keep up anymore, they could not produce the quality of the turn time to keep up." Ex. 10, Meza Dep. Tr. at 214:23-215:2. A former Hertz Regional Maintenance Manager, John Dolobach, also testified to the same effect. Ex. 11, Dolobach Dep. Tr. at 141:14-142:1 (agreeing that Hertz sent "as many cars to ACI as possible"). Indeed, ACI's own former Virginia shop manager John Dilanian similarly testified that VCC was "busy" with the volume of repairs it received from Hertz (Ex. 12, Dilanian Dep. Tr. at 153:7-11), and could not have handled more repair work. *Id*. at 155:6-19.

ACI's damages expert nevertheless assumes—despite not having conducted a capacity analysis (nor being qualified to conduct such an analysis)—that ACI could have timely repaired the full volume of repairs that ACI contends it was entitled to repair under the Contracts (i.e., all of the repairs Hertz vended from Port Newark and VCC, and 50-70% of repairs vended from the Florida Locations), as reflected in his damages calculations. Ex. 13, Metzdorff Dep. Tr. at 80:15-21, 82:14-19, 84:4-9. Even ignoring that Metzdorff concocted his "expected repairs" from unreliable sources (*see* D.I. 1568 at 15-25), Metzdorff's predicate assumptions as to ACI's capacity are not only unsupported, but also *contradicted*, by the factual record, including by the only ACI employee who has testified in this matter other than ACI's owner, Capus. Dilanian, who managed ACI's VCC Location throughout the entirety of the contract period, testified as follows:

- VCC could handle somewhere between 150 to 250 cars per month. Ex. 12, Dilanian Dep. Tr. at 155:6-19. This is significantly less than half the 500+ cars that Metzdorff's VCC lost profits calculation assumes, which Dilanian said would be "nearly impossible to do." *Id*. at 151:14-152:6.

- VCC was "busy" with the volume of repairs it received from Hertz (Ex. 12, Dilanian Dep. Tr. at 153:7-11), and Dilanian did not "think [they] could have handled more." *Id*. at 155:6-19.

11

- VCC stopped picking up cars from Baltimore after only 6 months because it did not make financial sense for VCC to pay its employees to drive to and from BWI airport to pick up cars. Ex. 12, Dilanian Dep. Tr. at 112:23-113:22, 158:20-162:9; *see also* Ex. 14, Pitz Dep. Tr. at 58:15-59:13 ("it ma[de] no financial sense to us or [ACI] to go all the way to Baltimore to get a car").

- Regarding ACI's Miami location (950 ACI), there was "[n]o way they could have handled not even 30 percent of what [VCC was] doing." Ex. 12, Dilanian Dep. Tr. at 166:11-167:1. He stated that the Miami shop was "capable of doing maybe 100, 125" cars per month. *Id*. Metzdorff's calculations nevertheless assume 950 ACI had the capacity to handle as much as 285 cars per month.

- He did not believe the Orlando shop (1100 ACI) could handle repairs for 400 cars per month.  Ex. 12, Dilanian Dep. Tr. at 167:8-21. Metzdorff nevertheless assumes 1100 ACI had the capacity to handle approximately 415 cars per month.

- The Fort Lauderdale location (1050 ACI) could not have repaired more than 250 cars per month.  Ex. 12, Dilanian Dep. Tr. at 169:16-171:15. Remarkably, Metzdorff makes no effort to distill how many cars 1050 ACI might have expected per month in order to even assume 1050 ACI had the capacity to handle as much.

- There was "no way" the Port Newark shop (900 ACI) could have repaired 1,000 cars per month, which he testified would be "nearly impossible."  Ex. 12, Dilanian Dep. Tr. at 178:15-179:17; *see also* Ex. 9, Scarpelli Dep. Tr. at 224:11-23 ("In my experience knowing the constraints of the facility and the body shop area, no, it would not be possible to repair [987] cars."). Metzdorff nevertheless assumes 900 ACI had the capacity to handle 987 cars per month.

Nor could ACI handle all *types* of repairs written at the relevant Hertz locations. In Sterling, for example, John Dilanian testified that VCC was equipped to handle only "minor repairs," such as "side swipes, scratches, bumpers, fenders, stuff like that," and was "designed to do small work." Ex. 12, Dilanian Dep. Tr. at 147:8–12. He said that Capus "did not want [VCC] to do anything big because it slowed…production," and that VCC was not to handle larger repairs for Hertz. *Id*. at 147:16–148:2.

There were even repairs that ACI simply rejected.  Capus testified that Hertz sent work to three or four overflow shops at Port Newark "at [his] discretion," and that "if I did not want a job, I gave [Hertz] the option to send it elsewhere. That's why [Hertz] kept overflow shops. I also did not want to put myself in a position where if [Hertz] had six Cadillac Escalades that were going to

12

wait three months for parts, that they were going to sit in my shop, so I would turn those away because that would impact my flow."  Ex. 15, ACI 30(b)(6) Dep. Tr. at 82:8-83:7.

Moreover, Hertz will show at the hearing that it complained that ACI was not timely repairing the volume of cars that it *did* receive.  Turnaround time was a persistent and intractable issue with ACI. *See, e.g.*, Ex. 16 (email from Hertz to Capus attaching long list of late cars and stating, "GUYS YOU WANTED THE WORK NOW YOU HAVE IT."); Ex. 17 (email from Hertz to Capus stating "In my career with Hertz I have never had so much trouble with ONE body shop . . . Bottom line is I need you to get that 2nd paint station up and running within a week and start a 3rd shift pronto."); Ex. 18 (email from Hertz maintenance manager regarding "[l]ate and due cars"); Ex. 19 (email from Hertz to Capus regarding "overdue cars" asking, "Why are the cars not returning on time?"); Ex. 20 (email from Hertz to Capus regarding "overdue[]" repairs stating "Need some urgency around these overdues and reworks"); Ex. 21 (email from Hertz notifying Capus of "[s]erious issues with the local Atlantic shop. We have cars sitting at the shop for a week that have not been touched. Large number of overdue units . . . It appears the staffing may not be in place to handle the volume[.]"); Ex. 10, Meza Dep. Tr. 227:17-21 (it was a "consistent issue for a while there until we ended the relationship with them that all of the [Florida ACI] locations seemed to have some sort of process issues").

ACI also struggled to consistently meet Hertz's quality standards, despite guaranteeing the quality of its work in the Contracts. *See* Ex. 3 at § 25 (900 ACI guaranteeing quality of work); Ex. 4 at § 25 (same for VCC); Ex. 5 (same for 950 ACI); Ex. 22 (email from Hertz to Capus regarding poor prior repairs, asking "What's your excuse this time?"); Ex. 23 (email from Hertz to Capus regarding "disappointing" repair work by Plaintiffs, including "[p]oor body work and paint runs" and cars that were "never cleaned properly"); Ex. 24 (email from Hertz to Capus regarding poor

13

prior repairs on "2nd car this week"); Ex. 25 (email from Hertz to Capus noting "looks like we got good for a while, than back to bad" and that "[q]uality of repair, especially in the paint quality, needs to be addressed"); Ex. 21 (email from Hertz to Capus noting that "the rejects are starting to climb up again, 4 rejects on Monday alone."). To this point, during his deposition, Christopher Meza recalled ACI's "significant issues with rework…and quality of work" being a frequent topic of discussion during Hertz's daily body damage calls. Ex. 10, Meza Dep. Tr. at 227:11–21.

To prove liability and recover damages at the upcoming hearing, ACI bears the burden of proof to demonstrate that it had the capacity to timely handle the repair work Hertz allegedly sent to non-ACI vendors. Capus, however, has already testified that ACI does not know what its capacity limits were at any of the Contract Locations. ACI's damages expert, on the other hand, simply assumes—with no factual basis—that ACI had the ability to timely repair each and every vehicle that ACI contends Hertz was obligated to send to it under the Contracts. As explained above, however, the factual record does not support ACI on this issue. To the contrary, the factual record concretely contradicts what ACI is trying to claim. ACI will be unable to prove that it had the capacity and ability to timely repair the vehicles that Hertz allegedly sent to non-ACI vendors and, as a result, ACI's claim fails to the extent it is based on the theory that Hertz impermissibly sent repair work to third-party vendors.

**B.    The Complaint Fails to Allege any Facts—and the Evidence Will Fail to Show—that Hertz Failed to Properly and Timely Pay for Work Performed under the Contracts.**

The Complaint alleges, in conclusory fashion only, that Hertz breached the Contracts by failing to properly and timely pay ACI for work performed pursuant to the Contracts. *See* Ex. 1 at ¶¶ 53, 63, 72.  Notably, however, ACI has since admitted that as of February 26, 2024, "Hertz ha[d] paid [ACI] the amounts owed." Ex. 26, ACI's Responses to Hertz's Supplemental Interrogatories at Interrogatory No. 2.  Because ACI has abandoned this portion of its claim, the

14

Court should disallow the Proofs of Claim to the extent they seek to recover any amounts due to Hertz's alleged failure to properly and timely pay ACI under the Contracts.

### C.   The Contracts Were not Improperly Terminated Without Proper Notice.

The record does not support ACI's allegations that Hertz breached the Contracts by terminating them without proper notice.  Ex. 1 at ¶¶ 54, 62, 71.  That is because not a single Contract was improperly terminated.

The New Jersey Contract, for instance, was *mutually* terminated in January 2015 when ACI *agreed* to move off site, thereby allowing ACI to perform non-Hertz repairs moving forward—something ACI had been unable to do while under contract and on site at Hertz's Port Newark facility.  *See* Ex. 15, ACI 30(b)(6) Dep. Tr. at 48:22–49:11 (ACI corporate representative agreeing that "ACI agreed to move its body shop off of the Port Newark property," which "enabled ACI to do work for customers other than Hertz," and that "Hertz voluntarily paid . . . some of ACI's moving expenses for that relocation" in the amount of $15,000); *see also* Ex. 27 (email thread noting Hertz's agreement to pay ACI's moving expenses in exchange for "Marc [Capus] . . . agreeing to relocate his business off the Port Newark Hertz lot").

The Florida Contract was likewise terminated but on the basis that 1050 ACI had been improperly selling Hertz's parts for its own profit.  *See* Ex. 11, Dolobach Dep. Tr. at 116:17–118:18, 124:9-13 (former Hertz Regional Maintenance Manager explaining that Hertz terminated the Florida Contract because of an instance involving stolen parts); *see also* Ex. 28 (photos of stolen parts).  Although the Florida Contract does not provide an express "for cause" termination provision, interpreting the Contract to prevent Hertz from terminating the Contract immediately after its discovery that ACI had been stealing parts from Hertz and selling them for profit would be an absurd result.  *See, e.g., Prime Victor Int'l Ltd. v. Simulacra Corp.*, 682 F. Supp. 3d 428, 445 (D. Del. 2023) (citing rule that courts "should interpret contracts in a way that avoids absurdities").

15

The Virginia Contract, for its part, was not terminated at all.  Rather, the Virginia Contract simply expired without being renewed.  *See* Ex. 29, Capus Dep. Tr. at 206:5-12 (Capus clarifying that Hertz did not terminate the Virginia Contract but rather the Parties simply failed to renew it); *see also* Ex. 8, Mitchell Dep. Tr. at 251:7-19 (Mitchell testifying that, as for the Virginia Contract, "[t]here was a discussion on lease renewals that didn't go anywhere").

As such, not a single Contract was improperly terminated, and the Court should disallow the Proofs of Claim to the extent they seek to recover any amounts on that basis.

**II.    ACI Continued to Perform Under the Contracts for Years with Knowledge of Hertz's Alleged Breach but Without Providing Hertz Notice Thereof, Thereby Waiving Its Right to Pursue Any of the Breaches Currently Alleged.**

Even if Hertz breached the Contracts (it did not), ACI waived any claim it otherwise had by continuing to perform under the Contracts *for years* without ever notifying Hertz that it was allegedly in breach.  It would be inequitable to retroactively enforce strict compliance with the exclusivity provisions of the contracts *years after they expired* and in the absence of any notice to Hertz at the time that ACI believed Hertz was in breach.

Under New York law, continued performance can serve to alter the terms of a contract or operate as a waiver of a party's contractual rights.  *Kamco Supply Corp. v. On the Right Track, LLC*, 149 A.D.3d 275, 281 (N.Y. App. Div. 2d Dep't 2017).  "[T]he roots of waiver lie firmly in equity and are 'designed to prevent the waiving party from lulling the other party into a belief that strict compliance with a contractual duty will not be required and then either suing for noncompliance or demanding compliance for the purpose of avoiding the transaction."  *Id.* (quoting Williston on Contracts (4th Ed. 2013) § 39:15).  For example, in *Kamco*, a claimant waived their breach of contract claim to both past and prospective damages when they continued to accept a "persistent and repeated failure to [perform]" without any reservation of rights or notice

16

of breach until just before the expiration of the contract, "by which time it was, of course, too late to insist upon strict compliance with the terms of the agreements." *Id*. at 285.

When one party materially breaches a contract, the non-breaching party must choose between two remedies: it can either terminate the contract or continue the contract and sue for damages. *Inferno Rest. & Pizzeria, Inc. v. SW Michaels Pizzeria, Inc.*, 2019 N.Y. Misc. LEXIS 3197, at *9-10 (N.Y. Sup. Ct. June 13, 2019). But if a party chooses to continue the contract, it must give timely and formal notice of the breach to the other party, or it forever waives its right to sue for the breach. *Id*. at 4; *Medinol Ltd. v. Boston Sci. Corp.*, 346 F. Supp. 2d 575, 620 (S.D.N.Y. 2004) ("If a party chooses to continue performance, it must give notice of breach to the other side, or it waives its right to sue the breaching party."); *see also Nat'l Westminster Bank v. Ross*, 130 B.R. 656, 675 (S.D.N.Y. 1991) ("It is well-established that where a party to an agreement has actual knowledge of another party's breach and continues to perform under and accepts the benefits of the contract, such continuing performance constitutes a waiver of the breach.").

To prevail on the defense of waiver through continued performance, Hertz must establish that: (i) ACI had actual knowledge of Hertz's breach, yet (ii) ACI elected to continue the Contracts by performing and accepting benefits pursuant to the Contracts. *Ross*, 130 B.R. at 675. ACI, for its part, bears the burden to prove that it gave appropriate notice of breach. *See RBFC One, LLC v. Zeeks, Inc.*, 367 F. Supp. 2d 604, 613 (S.D.N.Y. 2005) ("Plaintiff must show that it gave [the party plaintiff alleges breached the contract] 'written notice' concerning any alleged breach."). Hertz prevails on each of these elements; ACI prevails on none.

*First*, ACI had actual knowledge of Hertz's alleged breaches. For this element, because ACI claims to have had capacity to handle all repair work (or the contractually required portion thereof) written at each of the relevant Hertz locations, Hertz need only show that ACI had actual

17

knowledge that Hertz was sending repair work elsewhere.  The record overwhelmingly shows that ACI had such knowledge.  Indeed, the Court need look no further than ACI's own Complaint to conclude that ACI had actual knowledge of Hertz's alleged breaches.  According to ACI's allegations, prior to executing the Contracts, Hertz provided ACI with repair volumes it could expect at each of the relevant Hertz locations, yet—according to ACI's own allegation—Hertz sent ACI much less than ACI claims it was told to expect.  Below are the relevant allegations in the Complaint:

New Jersey Contract

- "Hertz sent to 900 ACI less than half of the volume of work agreed to under the 900 Atlantic Agreement and its Amendments." Ex. 1 at ¶ 37.

- "[W]hile Hertz represented to 900 ACI that the volume of work for its Newark location would [sic] almost $2.5 million a year in labor, Hertz never sent 900 Atlantic Collision anywhere near that volume of work in any year of the 900 Atlantic Agreement." Ex. 1 at ¶ 38.

Virginia Contract

- "VCC commenced operations and received auto body repair work from Hertz from both Virginia and Baltimore, but never in the amounts represented by Hertz as existed between the two locations. On information and belief, this was so because Hertz was sending many of its damaged cars to other repair facilities in violation of the VCC Agreement." Ex. 1 at ¶ 46.

Florida Contract

- "Where Hertz had represented that its Florida operations generated in excess of $1.7 million a year in auto body repairs, 950 ACI, 1050 ACI, and 1100 ACI routinely failed to see half that amount." Ex. 1 at ¶ 42.

In other words, ACI contends it knew volume of repair work it could expect from Hertz at each facility *before* it entered into the Contracts.  ACI also knew how much repair work it received from Hertz.  As such, the alleged substantial shortfall between the amount ACI expected and the amount it received should have been a red flag for breach.  ACI therefore would have had

18

knowledge of Hertz's alleged breaches from the *very beginning* of the Contracts, at least under its own theory of the case.

When asked at his deposition at what point he reached the conclusion that Hertz was not fulfilling the exclusivity provisions of the Contracts, Capus identified the year 2015, but he tellingly was unable to identify any new facts he learned in 2015 that led him to that conclusion. *See* Ex. 29, Capus Dep. Tr. at 66:11-17.  This is because ACI knew long before 2015 that Hertz was "openly" sending repair work to non-ACI shops.  Indeed, ACI's Complaint concedes as much: "Hertz *openly utilized* an auto body repair vendor alongside VCC at Hertz's Virginia location that diminished the volume of work to be submitted to VCC." Ex. 1 at ¶ 48 (emphasis added).  In fact, Hertz explicitly told ACI as early as 2012 that Hertz would begin vending cars to other locations: "Until these cars are back your shop will not receive any new cars. By tomorrow I will be vending cars to our older locations that we haven't used in over a year." Ex. 30.  The record is teeming with additional evidence showing that ACI had actual knowledge of Hertz's alleged breaches for years. For example:

- Ex. 31, March 2011 email from ACI to Hertz: "If there were no cars at any other shops, I could understand, but I doubt that's the case."

- Ex. 32, June 2014 email from ACI to Hertz: "We are supposed to be getting 70% of the work and we are not even getting enough to cover payroll."

- Ex. 33, July 2014 email from ACI to Hertz: "Marc [Capus] asked me to send you an e mail regarding some information he received today.  Apparently Ed [Hertz] has been vending cars early in the a.m. to other shops before Marsh [ACI] gets in."

- Ex. 34, September 2014 email from ACI to Hertz: "[I]t is frustrating to us when we see other shops picking up cars when we can get them done and back the next morning."

- Ex. 35, September 2014 email from ACI to Hertz: "It doesn't seem like we are getting Baltimore cars and as a result, the entire year has been off. . . . I really need that Baltimore work to make it through."

19

- Ex. 36, November 2014 email from ACI to Hertz: "It is very frustrating to be starving for cars while other shops are picking up work that we desperately need."

- Ex. 37, November 2014 email from ACI to Hertz: "At the moment there are vendors outside taking bd [body damage] cars."

- Ex. 38, November 2014 email from ACI to Hertz: "According to Omar, who was there delivering, there is decent work.  We just aren't getting it."'

Capus begrudgingly admitted the same while testifying as ACI's 30(b)(6) corporate representative:

Q.    And so Atlantic Collision was aware in September of 2014 that Hertz was sending cars to other shops at Newark, correct?
A.    If you're using the hearsay of Atlantic Collision, then yes.  I am not saying I saw it.

Ex. 15, ACI 30(b)(6) Dep. Tr. at 145:23-146:2.

Q.    You doubted that Hertz was sending all their repair work to VCC in March of 2011, right?
A.    I was throwing out a theory.  It just made no sense to me that with the (inaudible) they had, that there could be no work anywhere, so what's going on?
Q.    What made you doubt that Hertz was sending all their repair work to VCC?
A.    Common sense.

*Id.* at 163:11-19.

*Second*, ACI continued to perform under the Contracts for many years with full knowledge of Hertz's alleged continuous breaches.  According to Metzdorff's calculation, Hertz began breaching the Contracts ***on the first day that each was commenced***.  If so, ACI continued to perform and accept benefits under the Contracts for a total of eight years (through 2017) despite knowledge of Hertz's alleged breaches.  During that time, ACI performed thousands of repairs, accepted millions of dollars in revenues from Hertz, and earned substantial profits.  And despite knowing of Hertz's alleged breaches, ACI reaffirmed its relationship with Hertz multiple times during the period that Hertz was supposedly in repeated breach of the contracts. Indeed, the polar opposite of notifying Hertz that ACI believed Hertz to be in breach of the Contracts, ACI instead agreed to expand from the single Port Newark, New Jersey facility to multiple new locations in Virginia and Florida along with extending the Contracts for additional five-year terms.

20

*Third*, ACI admitted during discovery that it never provided notice of breach as to any of the Contracts before filing its Complaint in November 2017.  *See* Ex. 26, ACI's Responses to Hertz's Supplemental Interrogatories at Interrogatory No. 5 ("Subject to and without waiving any objections, ACI is not aware of any instances in which it notified Hertz it believed Hertz to be in breach of any of the Contracts at issue, other than the filing of the New York state court lawsuit."). Taken together with the two elements above, ACI forever waived its right to pursue any of the breaches currently alleged.

**III.    ACI Is Not Entitled to Any Recovery, Either in the Form of Lost Profits, Start-Up Costs, or Prejudgment Interest.**

Even if ACI could prove liability and avoid waiver (it cannot), ACI would still not be entitled to any recovery on its Proofs of Claim.  This is because even in the event of a non-waived breach, neither lost profits, start-up costs, nor prejudgment interest would be recoverable.

**A.    ACI Cannot Prove Entitlement to Lost Profits.**

Under New York law, a plaintiff seeking damages for a breach of contract must establish that: (1) such damages were actually caused by the breach; (2) the "particular damages were fairly within the contemplation of the parties to the contract at the time it was made"; and (3) the alleged loss is "capable of proof with reasonable certainty."  *Kenford Co. v Cnty. of Erie*, 67 N.Y.2d 257, 261 (N.Y. 1986); *Ashland Mgmt. v Janien*, 82 N.Y.2d 395, 404 (N.Y. 1993).  The lost profit damages claimed here, however, were neither fairly within the contemplation of the parties nor are they capable of proof with reasonable certainty.

To the contrary, it is clear from the express language of the Contracts that Hertz and ACI did *not* contemplate that a party would be entitled to lost profits in the event of a breach.  Indeed, the words "lost profits" appear nowhere in any of the Contracts.  New York courts routinely reject claims for economic loss where the underlying contract is silent on a party's entitlement to such

21

damages in the event of a breach.  *See Crystal Clear Dev., LLC v. Devon Architects of N.Y., P.C.*, 97 A.D.3d 716, 718-19 (N.Y. App. Div. 2d Dep't 2012) (granting summary judgment in favor of the defendants because "damages were not contemplated by the parties in entering into the subject contract. A review of the terms of the subject contract demonstrates that there was no intent by the parties to allow for economic loss as a potential basis for damages in the event of a breach.").  New York courts have been particularly consistent in dismissing claims for lost profits where, as here, the underlying contract is silent on the availability of such special damages.  *See Great Earth Int'l Franchising Corp. v. Milks Dev.*, 311 F. Supp. 2d 419, 432 (S.D.N.Y. 2004) ("Most of the leading cases which have decided on claims of future lost profits have ruled they are not recoverable."); *Revelations Perfume & Cosmetics v. Nelson*, 2011 N.Y. Misc. LEXIS 6473, *10-11 (N.Y. Sup. Ct. August 3, 2011) (granting summary judgment in favor of defendants because, *inter alia*, "the agreement itself is silent on the subject of lost profits. . . .").

ACI and Hertz are sophisticated parties such that if they had intended for lost profits to be a measure of damages in the event of a breach, they could have written the Contracts to provide for them.  *See Awards.com v. Kinko's Inc.*, 42 A.D.3d 178, 184-85 (N.Y. App. Div. 1st Dep. 2007) ("If the parties had intended to agree to pay lost profits in the event of a breach, they could have so specified just as they had set forth the payment terms due [to the defendants].  Thus, plaintiffs are attempting to obtain through litigation what they failed to secure at the bargaining table.").  Indeed, the Contracts are quite detailed in other respects—such as the terms of the lease, the terms of vehicle repairs to be performed by ACI, ACI's responsibilities concerning start-up costs, insurance and environmental matters, and other miscellaneous provisions—but notably silent on the issue of lost profits.  Simply put, there is nothing in the express language of the Contracts to

22

suggest that Hertz "would have entered into an agreement to undertake responsibility for lost profits, a liability with unlimited potential." *Awards.com*, 42 A.D.3d at 184.

Not only is there no evidence that Hertz agreed to pay ACI lost profits in the event of a breach, but such damages would also be speculative at best and thus impermissible under New York law:

> To receive lost profits damages: . . . First, it must be demonstrated with certainty that such damages have been caused by the breach and, second, the alleged loss must be capable of proof with reasonable certainty. In other words, the damages may not be merely speculative, possible or imaginary, but must be reasonably certain and directly traceable to the breach, not remote or the result of other intervening causes.

*Digital Broadcast Corp. v. Ladenburg Thalmann Co., Inc.*, 2008 N.Y. Misc. LEXIS 10179 (N.Y. Sup. Ct. Dec. 11, 2008) (citing *Kenford*, 67 N.Y.2d at 261); *see also Lexington 360 Assocs. v. First Union Nat'l Bank*, 234 A.D.2d 187, 190, 651 N.Y.S.2d 490, 492 (N.Y. App. Div. 1st Dep't 1996) (holding that dismissal is warranted when a party fails to "come forward with evidence sufficient to demonstrate damages flowing from the breach alleged and relies, instead, on wholly speculative theories of damages, dismissal of the breach of contract claim is in order."); *Blumenfeld Dev. Grp., Ltd. v. Roux Assocs.,* 2004 NY slip op. 51383(U), ¶ 3, 5 Misc. 3d 1015(A), 1015A, 798 N.Y.S.2d 707, 707 (N.Y. Sup. Ct. 2004) (same).

Nothing in the language of the contracts obligates Hertz to send ACI a set or minimum amount of auto-body work per year, in either a unit measure (number of cars) or dollars. Absent such thresholds, it is impossible to determine the lost profits ACI was allegedly entitled to receive under the Contracts, particularly given that ACI is unable to identify a single repair sent to a non-ACI vendor that ACI had both the capacity and ability to handle in a timely manner, if at all. *See Awards.com*, 42 A.D.3d at 185 (affirming summary judgment and dismissing plaintiff's complaint entirely because "[e]ven if plaintiffs could show that the parties had, in fact, at the time of

23

contracting contemplated liability for lost profits damages, their claim for such damages would still have been properly dismissed because of its purely speculative nature").

Moreover, there is no way for the Court to otherwise determine what ACI's profits would have been absent the alleged breach. The Complaint alleges that ACI had not previously entered into any exclusive dealing contracts with Hertz. *See generally* Ex. 1 at ¶¶ 12, 19, 27, 29. New York courts have consistently rejected claims for lost profits involving new business ventures with no track record of success and no reasonable basis to calculate such damages. *Jambetta Music, Inc. v. Nuget*, 2008 N.Y. Misc. LEXIS 8543, *20-21 (N.Y. Sup. Ct. Feb. 1, 2008) (holding that lost profits was an inappropriate measure of damages when there is no "reasonable basis of experience upon which to estimate lost profits with the required degree of certainty") (citation omitted); *Awards.com*, 42 A.D.3d at 184 (holding that it would be "highly speculative and unreasonable to infer an intent to assume the risk of lost profits," and that viewing a new business relationship as "one having value and potential is not to say that the parties contemplated being liable for each other's losses").

Because of the inherent difficulties in calculating damages under service contracts, New York courts frequently limit damages in such cases to the work performed, but not yet paid, under the terms of the contract. *C.f. Fin. Med. Sys., Inc. v. Nassau Health Care Corp.*, 2013 N.Y. Misc. LEXIS 7067, **4, 21 (N.Y. Sup. Ct. October 9, 2013) (holding that the proper measure of damages consisted of the amount owed for services provided by plaintiff at the time of breach); *Looks Great Servs., Inc., v. Nat'l Grid El. Servs., LLC*, 2015 N.Y. Misc. LEXIS 5128, *20-21 (N.Y. Sup. Ct. April 22, 2015) (holding that damages for a breach of a services contract claim were limited to the services provided, not those that are speculative, punitive, or conjectural). However, the Complaint

24

fails to allege—other than in conclusory fashion—that ACI performed *any* work for which ACI has not yet been paid. In fact, ACI has explicitly admitted the opposite.  *See supra* Argument § I.B.

### B.    ACI Cannot Prove Entitlement to Start-Up Costs.

Nor can ACI recover its start-up costs.  The Contracts make clear that ACI alone bore responsibility for such costs.  Specifically, under the plain, unambiguous terms of the each of the Contracts, ACI was "solely responsible for the conversion of the Premises into a body shop, including the installation of all equipment necessary to operate a body shop." Ex. 3 at § 7; Ex. 4 at § 7.

Moreover, any claim for start-up costs is unavailing insofar as ACI incurred such expenses to perform auto-body work for which ACI has already been paid millions of dollars.  *See Kenford*, 489 N.Y.S.2d at 949 ("It is well settled . . . that a party may not recover both the expense of performing his side of the contract and the profit to be received under it. . . ."), *rev'd on other grounds* at 73 N.Y. 2d 312 (N.Y. App. Div. 1989); *see also Interfilm, Inc. v. Advanced Exhibition Corp.*, 672 N.Y.S. 2d 309, 310 (N.Y. App. Div. 1st Dep't 1998).  None of the Contracts were terminated until January 2015, meaning that Hertz paid ACI—and ACI therefore profited from its investment in start-up costs—for at least five years, and in some cases longer.  ACI should not be allowed to recover the start-up costs it was contractually required to incur to be able to perform its side of the Contracts and from which it handsomely profited for years.

### C.    ACI Cannot Prove Entitlement to Prejudgment Interest.

Any claim for prejudgment interest likewise fails.  New York law "requires that a verdict, judgment, or decision be rendered in favor of the plaintiff in a breach of contract action before plaintiff is entitled to statutory interest." *In re Arcade Pub., Inc.*, 455 B.R. 373, 379-80 (Bankr. S.D.N.Y. 2011) (citing N.Y. C.P.L.R. § 5001(a) ("Interest shall be recovered upon a sum awarded because of a breach of performance of a contract . . . .")).  ACI, however, never received an award

RLF1 31702227v.1

on their breach of contract claims in New York state court.  In fact, the Parties never even finished fact discovery prior to the New York state court staying the action because of Hertz's bankruptcy. As such, prejudgment interest cannot form a basis of the Proofs of Claim and the Court should disallow the recovery of prejudgment interest on that basis. *Id.* at 380 ("Without a verdict, judgment or decision in the State Court Action, [claimant's] right to prepetition prejudgment statutory interest did not form part of [his] 'claim' against [the debtor's] estate.").

IV.     **Should the Court Allow the Proof(s) of Claim, the Court Should Nevertheless Decrease the Amount of ACI's Recovery.**

In the event the Court allows all or part of the Proofs of Claim, the amount of ACI's recovery must be significantly decreased. The Proofs of Claim seek lost profits dating back to 2009. ACI filed its Complaint on November 15, 2017.  The statute of limitations for a breach of contract claim under New York law is six years. N.Y. C.P.L.R. § 213(2).  As such, ACI cannot recover any damages suffered before November 15, 2011.  Any recovery must exclude those amounts.

Statute of limitations issues aside, ACI's calculation remains vastly overinflated due to Metzdorff's reliance on faulty assumptions and unreliable methodology.  Most notably, without having conducted any capacity analysis, Metzdorff simply assumes, with no factual support and contrary to record evidence, that ACI would have been able to handle all repairs (or the contractually required portions thereof) written at all relevant locations, including repairs which ACI did not have the ability to perform due to lack of capacity.  *See supra* Argument § I.A.  Hertz details Metzdorff's reliance on this and other faulty assumptions and unreliable methodology in its pending *Daubert* motion. *See* D.I. 1567 and 1568.  If the Court allows Metzdorff to testify at all, Hertz will rebut his testimony with its own damages expert, Jack Schwager of FTI Consulting, Inc., to show that any damages at issue—even assuming ACI could prevail on breach (it cannot)— would amount only to a small fraction of those currently claimed.  Indeed, in correcting just some

of the many flaws in Metzdorff's expert report, Schwager will testify that ACI is entitled to far less than what Metzdorff opines, assuming ACI is entitled to recover anything at all.

Thus, if the Court is to award any amount on the Proofs of Claim, that amount should be commensurate with the opinion of Hertz's expert and reduced—at the very least—by the amount of alleged damages incurred outside of the statute of limitations period and by the amount in which they are overinflated due to Metzdorff's faulty assumptions and unreliable methodology.

## RELIEF REQUESTED

RCIH, on behalf of the Reorganized Debtors, respectfully seeks entry of an order, substantially in the form attached hereto as **Exhibit A** (the "**Proposed Order**"), disallowing the Proofs of Claim in their entirety.  If the Court allows one or more of the Proofs of Claim, RCIH requests that the Court reduce such Proof(s) of Claim by the amount of alleged damages incurred outside of the statute of limitations period and by the amount in which they are overinflated due to Metzdorff 's faulty assumptions and unreliable methodology.

To the extent the Court disallows the Proofs of Claim in their entirety based on a finding that Hertz has not breached any of the Contracts, RCIH, on behalf of the Reorganized Debtors, intends to seek entry of an additional order awarding Hertz all fees and costs incurred in defending the New York state court action along with objecting to the Proofs of Claim.

## CONCLUSION

Hertz looks forward to the upcoming hearing and respectfully requests that, at the conclusion of evidence, the Court find that the ACI failed to carry its burden and award the relief requested by Hertz.

[*Signature Page Follows*]

27

Dated: October 15, 2024

/s/ Emily R. Mathews

| **RICHARDS, LAYTON & FINGER, P.A.** | **WINSTON & STRAWN LLP** |
|---|---|
| Mark D. Collins (No. 2981) | William C. O'Neil (admitted *pro hac vice*) |
| Robert J. Stearn, Jr. (No. 2915) | Gretchen V. Scavo (admitted *pro hac vice*) |
| John H. Knight (No. 3848) | Tyler Richards (admitted *pro hac vice*) |
| Cory D. Kandestin (No. 5025) | 35 W. Wacker Drive |
| Emily R. Mathews (No. 6866) | Chicago, IL 60604 |
| One Rodney Square | Telephone: (312) 558-5600 |
| 920 N. King Street | woneil@winston.com |
| Wilmington, DE 19801 | gscavo@winston.com |
| Telephone: (302) 651-7700 | trichards@winston.com |
| Facsimile: (302) 651-7701 | |
| Collins@rlf.com | |
| Stearn@rlf.com | |
| Knight@rlf.com | |
| Kandestin@rlf.com | |
| Mathews@rlf.com | |

RLF1 31702227v.1