IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| RENTAL CAR INTERMEDIATE | ) | Case No. 20-11247 (MFW) |
| HOLDINGS, LLC, | ) | |
| | ) | |
| | ) | Re:  1401, 1416, 1583, 1585, |
| Reorganized Debtor. | ) | 1668, 1690, 1691, 1698, 1705, |
| | ) | 1706, 1707, 1770, 1771 |

OPINION[1]

Before the Court is the Reorganized Debtors' Objection to claims asserted by ACI.[2]  After a full evidentiary hearing and consideration of the parties' briefs, the Court will grant the Reorganized Debtors' Objection to all of ACI's claims.

I.    BACKGROUND

The Hertz Corporation and its affiliates (collectively, "Hertz") was a global rental car enterprise that filed voluntary chapter 11 petitions on May 22, 2020, because of the devastating effects that the COVID-19 pandemic had on their business.  The

---

[1]    This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.  References to the pleadings in this case are to "D.I. #."  The hearing transcripts, while docketed, are referred to by "[Date] Hr'g Tr. (Witness) at [page:line]."  References to the exhibits admitted into evidence are to "JX-#" for Joint Exhibits, "A-#" for ACI's exhibits, and "H-#" for Hertz's exhibits.

[2]    ACI consists of five entities: 900 Atlantic Collision, Inc. ("900 ACI"), 950 Atlantic Collision, Inc. ("950 ACI"), 1050 Atlantic Collision, Inc. ("1050 ACI"), 1100 Atlantic Collision, Inc. ("1100 ACI"), and Virginia Collision Corp. ("VCC") (collectively, "ACI").

Court confirmed the Debtors' Plan of Reorganization on June 10, 2021.  The Plan provides for payment in full, plus interest, of all claims against the estate and the continued existence of the Hertz enterprise as the Reorganized Debtors.[3]

Prior to the bar date, ACI filed five proofs of claim against the Debtors based upon alleged pre-petition breaches of contract (collectively, the "Claims").[4]  Post-confirmation, the Reorganized Debtors objected to the Claims.[5]

On October 15, 2024, the Reorganized Debtors and ACI submitted pre-hearing briefs[6] and a Joint Proposed Pretrial Order.[7]  An evidentiary hearing on ACI's Claims and the Reorganized Debtors' objection was held from October 29 to 31, 2024.  Afterward, the parties filed proposed Findings of Fact and Conclusions of Law[8] and corresponding Responses.[9]

---

[3]    D.I. 5261.  Prior to confirmation, the Debtors' cases had been jointly administered under case number 20-11218.  Post-confirmation, all of the Debtors' cases were closed except for that of Rental Car Intermediate Holdings, LLC, No. 20-11247.  After confirmation, all pleadings related to the Debtors or Reorganized Debtors have been filed in case number 20-11247.

[4]    See JX-86 (900 ACI Proof of Claim); JX-87 (950 ACI Proof of Claim); JX-88 (1050 ACI Proof of Claim); JX-89 (1100 ACI Proof of Claim); JX-90 (VCC Proof of Claim).

[5]    D.I. 1401.

[6]    D.I. 1581; D.I. 1585.

[7]    D.I. 1608.

[8]    D.I. 1690; D.I. 1691.

[9]    D.I. 1706; D.I. 1707.

II.  <u>JURISDICTION</u>

The Court has subject matter jurisdiction over this proceeding.  These breach of contract claims are core claims because they relate to the allowance or disallowance of claims against the estate.[10]  The parties have consented to entry of a final order or judgment by the Court.[11]

III.  <u>DISCUSSION</u>

A.  <u>Standard of Review</u>

ACI's claims are based on allegations that Hertz had breached three commercial lease and service contracts granting ACI an exclusive or semi-exclusive right to perform auto-body work for Hertz's fleets in New Jersey, Virginia, and Florida.[12] The Proofs of Claim filed by ACI constitute prima facie evidence of those breach of contract claims.[13]  By filing its omnibus

---

[10]  28 U.S.C. §157(b)(2)(B).  <u>See also</u> <u>Langenkamp v. Culp</u>, 498 U.S. 42, 44-45 (1990) (holding that a creditor who files a proof of claim subjects itself to the equitable jurisdiction of the bankruptcy court to adjudicate that claim).

[11]  D.I. 1608 at 2.  <u>See</u> <u>Wellness Int'l Network, Ltd. v. Sharif</u>, 575 U.S. 665, 683-84 (2015) (holding that a bankruptcy court may enter a final order without offending Article III if the parties consent).

[12]  On November 15, 2017, ACI had filed a complaint in New York state court against Hertz asserting these claims.  When Hertz filed bankruptcy, ACI filed proofs of claim based on the same allegations.  <u>See</u> JX-86; JX-87; JX-88; JX-89; JX-90.

[13]  <u>See</u> 11 U.S.C. § 502(a) ("A claim . . . proof of which is filed . . . is deemed allowed, unless a party in interest . . . objects."); Fed. R. Bankr. P. 3001(f) ("A proof of claim executed

3

objection to ACI's Claims, the Reorganized Debtors have shifted the burden of proof back to ACI to present evidence in support of its Claims.[14]

The parties agree that New York law applies to these claims.[15]  In a breach of contract claim, the plaintiff bears the burden of proving the contract's existence, the fulfillment of its obligations, the defendant's breach, and its entitlement to the damages sought.[16]  The parties do not dispute that the Agreements existed, but do dispute whether they were breached and the degree of damages, if any, ACI suffered.[17]

   B.  Analysis

ACI contends that while it fully performed under the Agreements, Hertz breached them by failing to exclusively or semi-exclusively send its repair work to ACI and by wrongfully

---

and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim.").

[14]   D.I. 1401.  11 U.S.C. § 502(b) ("[I]f [an] objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim . . . as of the date of the filing of the petition, and shall allow such claim in such amount.").  See also In re Heritage Highgate, Inc., 679 F.3d 132, 140 (3d Cir. 2012).

[15]   D.I. 1690 ¶ 44 n. 5; D.I. 1691 ¶ 197.

[16]   WMC Realty Corp. v. City of Yonkers, 148 N.Y.S.3d 161, 167 (N.Y. App. Div. 2021) ("The essential elements of a cause of action to recover damages for breach of contract are the existence of a contract, the plaintiff's performance pursuant to the contract, the defendant's breach of its contractual obligations, and damages resulting from the breach.").

[17]   D.I. 1608 ¶¶ 5-6.

terminating the Agreements.

The Reorganized Debtors contend that ACI's poor performance justified Hertz diverting work to non-ACI shops and terminating the Agreements.  It further asserts that ACI waived Hertz's alleged breaches by failing to give Hertz formal, written notice of default while continuing to perform under (and receive the benefits of) the Agreements.  Finally, the Reorganized Debtors argue that ACI failed to meet its burden of proving that Hertz's alleged breaches resulted in the damages asserted.

        1.   <u>The Agreements</u>

Beginning in 2010, Hertz and ACI executed several contracts which collectively provided that ACI would perform body service work exclusively or semi-exclusively on Hertz's vehicles in New Jersey, Virginia, and Florida.[18]  To do so, ACI leased on-site premises from Hertz at a discount in New Jersey and Virginia, and leased space near Hertz in Florida.[19]  At its own cost, ACI furnished the sites with the equipment it needed to perform that

---

[18]    JX-1 (900 ACI Agreement); JX-3 (VCC Agreement); JX-4 (950 ACI Agreement); JX-7 (950 ACI Agreement amendment); JX-11 (950 ACI Agreement amendment).

[19]    JX-1 at §§ 1, 3 (lease terms for Hertz's Port Newark, New Jersey, facility); JX-3 at §§ 1, 3 (lease terms for Hertz's Sterling, Virginia, facility); JX-4 ("Atlantic agrees to open an Auto Body repair shop as close as possible to Miami International Airport for the sole purpose of repairing damaged Hertz vehicles."); JX-7 (requiring ACI to "open a second location in Ft. Lauderdale suitable for performing work assigned by Hertz"); JX-11 at § 3 (requiring ACI to "provide a suitable offsite location to perform the body shop vended work for the Orlando, Florida location").

work.[20]

The 900 ACI Agreement commenced on April 1, 2010.[21]  It
required that Hertz send 900 ACI all of its body shop work in
Port Newark, New Jersey,[22] and prohibited ACI from performing
repair work on non-Hertz vehicles.[23]  If 900 ACI could not timely
perform, however, Hertz had the right to refer excess work to
non-ACI shops.[24]  The 900 ACI Agreement required six months'
written notice of termination,[25] but Hertz had the right to
terminate the contract without notice if 900 ACI vacated the Port

---

[20]     10/29/24 Hr'g Tr. (Capus) at 23:6-15, 30:6-14, 32:19-23,
33:5-9, 34:4-8, 74:12-13, 92:6-9, 179:3-8.

[21]     D.I. 1608 ¶¶ 14, 18; JX-2 (900 ACI Commencement Date
Agreement).

[22]     D.I. 1608 ¶ 14; JX-1 at § 4 ("[Hertz] agrees to refer to
[ACI] all body work repairs for vehicles prepared by [Hertz] at
[the] Pork Newark facility. . . .  [Hertz] agrees that during the
Term of this [900 ACI Agreement], as it may be extended, [ACI]
shall be the exclusive body shop located in the building of which
the Premises are a part.  There shall be no restriction upon the
hours in which [ACI] may operate its business, except [ACI] shall
give [Hertz] written notice of its hours of operation and any
changes to those hours.") (emphasis added).

[23]     D.I. 1608 ¶ 15; JX-1 ¶ 12; 10/29/24 Hr'g Tr. (Capus) at
34:9-12 (stating that at Port Newark, 900 ACI could only perform
repairs for Hertz).

[24]     JX-1 at § 4 ("If Tenant is unable to perform the work in a
timely manner, including but not limited to lacking the proper
equipment or excessive volume of repairs, Landlord reserves the
right to refer the repair to other body shops.") (emphasis
added).  D.I. 1608 ¶ 14.

[25]     D.I. 1608 ¶ 17; JX-1 at § 2(c).

Newark facility.[26]  In 2012 and 2014, the contract was amended to
account for Hertz's expanded fleet following its acquisition of
Dollar Thrifty Automotive Group ("DTAG") and to extend the term
to March 31, 2020.[27]  However, in early 2015, 900 ACI moved out
of the Port Newark facility at Hertz's request.[28]

    The VCC Agreement, executed in 2010, similarly required that
Hertz send all of its Sterling, Virginia, repair work to VCC.[29]
Hertz retained the right to refer work to other body shops if VCC
could not timely perform.[30]  Between 2010 and 2012, the VCC
Agreement was amended several times, to increase the space leased
to VCC, to temporarily reduce VCC's rent, to extend the term to
May 31, 2017, and to reflect Hertz's fleet expansion.[31]

    The 950 ACI Agreement, starting in 2011, required that Hertz
send varying percentages of its body shop work to 950 ACI across

---

[26]    JX-1 at §§ 19(f), 20(a)(i).

[27]    D.I. 1608 ¶¶ 19-20; JX-8 (reflecting the DTAG acquisition);
JX-12 (reflecting ACI's valid exercise of its option to extend
the 900 ACI agreement).

[28]    D.I. 1608 ¶ 21, Ex. 2(B)(i) (Scarpelli Dep. at 188:20-
189:23).

[29]    D.I. 1608 ¶¶ 23-24; JX-3 at § 4; JX-5 at § 1 (amending the
VCC agreement to reflect a commencement date of September 1,
2011).

[30]    D.I. 1608 ¶¶ 23-24; JX-3 at § 4 ("If [ACI] is unable to
perform the work in a timely manner, whether due to the lack of
the proper equipment or excessive volume of repairs or otherwise,
[Hertz] reserves the right to refer the repair to other
automotive body repair shops.").

[31]    D.I. 1608 ¶¶ 29-31; JX-5 at §§ 2-3; JX-6 at §§ 2-3; JX-9.

various Florida sites.[32]  Either party could cancel the 950 ACI

Agreement with six-months' written notice.[33]  The 950 ACI

Agreement differed from the other ACI contracts in three ways.

First, 950 ACI had to have turn-around times equal to or better

than an average of 8 days per repair.[34]  Second, no provision

permitted Hertz to refer work to non-ACI shops if ACI lacked

capacity.  Third, rather than lease facilities from Hertz, 950

ACI set up its own body shops nearby.[35]  In 2012 and 2013, the

950 ACI Agreement was amended to change the percentage of work

---

[32]    JX-4 (May 3, 2011, agreement requiring Hertz to refer 75% of its Miami-based work to 950 ACI; July 8, 2011, agreement requiring Hertz to refer 50% of its Miami-based work to ACI); JX-7 (September 30, 2012, agreement requiring Hertz to refer 60% of its Miami, Fort Lauderdale, and West Palm Beach repair work to ACI); JX-11 (September 5, 2013, agreement requiring Hertz to send ACI 70% of its work from Orlando); D.I. 1608 ¶¶ 32-33, 36, 40. The 950 Agreement amendments permitted 950 ACI to use other entities to perform the work in Fort Lauderdale, West Palm Beach, and Orlando.  JX-7 ¶ 2; JX-11 ¶ 4.  950 ACI created 1050 ACI and 1100 ACI to do that work.  D.I. 1608 ¶¶ 36, 41.  (The 950 ACI Agreement and its amendments are collectively, referred to herein as the "950 ACI Agreement.").

[33]    JX-4 Addendum.

[34]    D.I. 1608 ¶ 32; JX-4 ("Atlantic Collision will guarantee that upon quarterly review, it will provide Hertz with repair turn around times either equal to or better than the average of the Southeast Region[.]  950 Atlantic Collision Corp. will outperform the current average of 8 days per repair.  Any vehicle which is held up as a result of verifiable parts issues for more than 10 days will be backed out of the average.").

[35]    D.I. 1608 ¶ 34; JX-36 (December 7, 2012, lease agreement for 1050 ACI's premises in Hollywood, Florida); A-24 (12/11/13 Email from Capus to Hertz) (confirming that a lease for the Orlando ACI shop was signed on October 30, 2013); 10/29/24 Hr'g Tr. (Capus) at 82:23-25, 87:21-88:1; 92:21-24, 95:1-4, 96:6-10, 127:20-128:1, 128:19-129:8.

that Hertz was obligated to send to ACI, to include vehicles from
additional Hertz locations, to require 950 ACI to open a second
shop, to reflect Hertz's DTAG acquisition, and to extend the
contract's term.[36]

 2.  ACI's Performance

 At the evidentiary hearing, ACI's founder, Marc Capus,
testified that ACI was able to satisfactorily repair the vehicles
it received from Hertz.[37]  He stated that, given the volume of
work that ACI received, it had relatively few complaints from
Hertz about the capacity, timeliness, or quality of that work.[38]

---

[36]    JX-7; JX-10; JX-11; D.I. 1608 ¶¶ 33, 35, 40-42.

[37]    10/29/24 Hr'g Tr. (Capus) at 39:12-15, 40:6-8, 41:3-6,
63:15-18, 63:23-25, 95:13-15, 95:19-21, 100:14-17, 101:8-10 ("Q.
Was 900 ACI ever unable to handle the volume of repairs that
Hertz sent to it in a timely manner, as the contract suggests?
A.  No, we were not. . . .  Q.  Did ACI ever turn down vehicles
sent by Hertz to be repaired?  A.  Absolutely not, we took
everything they gave us. . . .  Q.  Was there ever any time when
900 [ACI] ever didn't have the capacity to address repairs that
Hertz was asking it to do?  A.  Never. . . .  Q.  Was VCC ever
unable to handle any volume of repairs that Hertz was sending to
it in a timely manner at the Sterling facility?  A.  No, we were
not. . . .  Q.  Did VCC ever turn down vehicles sent to it by
Hertz for repair at Sterling?  A.  No.  Not that I am aware of. .
. .  Q.  Was 1050 ACI ever unable to handle the volume of repairs
that Hertz sent to it in a timely manner?  A.  We were never
unable to handle the volume. . . .  Q.  Did 1050 ACI ever turn
down repair work offered to it by Hertz?  A.  No, we didn't. . .
.  Q.  Was 1100 ACI ever unable to handle the volume of repairs
that Hertz sent to it in a timely manner from Orlando?  A.  No,
we were not. . . .  Q.  Did 1100 ACI ever turn down work from
Hertz that was sent to it?  A.  No, we did not.").

[38]    See 10/29/24 Hr'g Tr. (Capus) at 40:9-15, 41:9-15, 64:19-
65:5, 86:17-25, 101:24-102:3 ("Q.  [D]id Hertz ever complain at
times about the quality of ACI's repair work?  A.  They [sic]
were a couple of issues, here and there, but they were small in

Capus also testified that ACI repeatedly requested additional work from Hertz, which he states ACI could have undertaken.[39] Capus asserted that any delays in ACI's turnaround were attributable to Hertz's delay in ordering parts, not ACI's own performance.[40]

---

comparison to the volume that we were doing, which is basically thousands, if not, tens of thousands [sic] vehicles; it was negligible. . . . Q. Okay. Did you receive [a] . . . complaint at any point in time from Hertz about the timeliness of ACI's repairs? A. Actually, it was the opposite. . . . [T]hey were very happy with our numbers. . . . Q. [T]urning to the quality and timeliness of the repairs by VCC at Sterling, did Hertz ever complain about quality? A. Very, very rare. Q. Did Hertz complain about timeliness? A. No, Compared to what they had before we were there they never complained about timeliness. . . . I believe the turnaround time was 18 days on average with the shops that they had and when they consolidated and gave it to us, we lowered it down to around four. . . . Q. Was 950 ACI ever unable to handle the volume of repairs that Hertz was sending to it in a timely manner? A. Never. Q. Okay. Did ACI ever turn down repair work from Hertz at the Miami facility? A. We did not. . . . Q. Do you recall any issues with respect to timeliness or quality of ACI's work at its Florida facilities? A. There were issues, but they were, again, few and far between for the volume we were turning."). See also JX-65 (9/15/14 Email from Capus to Hertz) ("Also keep in mind that with the volume we do, there will probably be something here and there that gets missed. . . . We have had very few turnback issues to date, and with the new manager things should get even better.").

[39]   10/29/24 Hr'g Tr. (Capus) at 20:7-21:21, 26:11-19, 38:13-18, 39:12-15, 40:1-41:15, 57:18-25, 58:4-7, 61:19-62:22, 63:15-65:14, 85:19-87:3, 95:1-96:5, 99:25-100:10, 100:14-23, 101:14-19, 102:24-103:20, 103:23-104:25, 151:5-9; 10/31/24 Hr'g Tr. (Capus) at 168:21-170:23, 171:5-172:6, 175:9-176:24, 179:18-181:3.

[40]   10/29/24 Hr'g Tr. (Capus) at 24:19-25:1 ("Q. Were there ever delays that you encountered while working at Port Newark with obtaining written estimates in order to start your work or obtaining parts? A. At times they were for both. Q. How frequently was that? A. It was fairly frequent. If they were short an appraiser or they hadn't paid a dealer and the dealer was not delivering parts, there would be hold-ups."). See also

ACI presented documents which corroborated Capus's
testimony.[41]  In addition, ACI cites the testimony of John
Dolobach, Hertz's designated corporate representative and former
Regional Maintenance Manager, who testified that the ACI shops
did not have more than usual timeliness or quality issues.[42]

---

10/29/24 Hr'g Tr. (Capus) at 24:4-18 (describing the process
Hertz used for vehicle repairs and noting that Hertz's body
damage appraisers were responsible for ordering the parts that
ACI needed for repairs).

[41]    JX-30 (3/3/11 Email from Capus to Dolobach) ("If we don't
get parts today, we will have [almost] nobody here tomorrow.  As
I said before, if I lose these guys, they are going to be very
difficult to replace.  We can't work like this.  Besides costing
money, we will never look good at this location and it will never
be known what we can [truly] produce. . . .  It has been going on
since the beginning."); JX-55 (4/11/14 Email from ACI to Hertz)
("Please refer to the status sheet to see what we are waiting for
parts on . . . .  [W]hen cars are not written our hands are tied
and productivity comes to a halt."); JX-56 (4/11/14 Email from
ACI to Hertz) (noting the lack of work received and attaching a
spreadsheet of cars that could not be repaired because necessary
parts had not been received); JX-60 (6/10/14 Email from Capus to
Hertz) ("I have had Mike begging Albert every day for work and
this is what we are getting for the last 2 weeks. . . .  We are
supposed to be getting 70% of the work and we are not even
getting enough to cover the payroll – especially since we are
using the whole shop to transport small jobs in such a small
window. . . .  I hate for you to get involved, but Mike is
getting nowhere and he shouldn't have to go beg for work every
day. . . .  We can't cover the overhead like this.  These shops
were designed around the figures we supplied."); JX-64 (9/15/14
Email from Capus to Hertz) (requesting more work at 900 ACI); JX-
75 (2/25/15 Email from Capus to Hertz) (requesting additional
work).

[42]    D.I. 1608, Ex. 2(C)(i) (Dolobach Dep. at 70:9-16, 71:7-22,
95:2-14, 114:8-18, 115:17-115:24, 116:10-12) ("Q.  During the
time that you worked and oversaw the Port Newark facility, do you
recall whether or not there was [sic] any issues raised with you
about the timeliness of 900 Atlantic's repair activities?  A.
No, sir. . . .  Q.  Do you recall at any point in time when you
were working at the Port Newark facility whether delays in

Further, Hertz's former Regional Vice President, Lou Scarpelli,
admitted that there were instances where Hertz employees caused
delays in ACI's turnaround time by not promptly ordering parts
needed for repair work or failing to assess cars quickly.[43]

Hertz's ordering parts or parts being delivered caused delays in
repairs?  A.  I will not say it was at . . . the fault of Hertz
or the body shops ordering the parts.  I would say it's at the
fault of the manufacturer securing the parts and getting them to
the dealerships so they could be delivered to the body shop.
That was our biggest holdup when parts were on back-order.  Q.
That typically was the biggest holdup at Hertz in terms of - and
that would impact a shop's ability to complete the repair
process, obviously, correct?  A.  Absolutely. . . .  Q.  In your
experience when you were working in Virginia . . . do you recall
any negative issues concerning the timeliness of VCC's work?  A.
Any timely issues.  I'm going to say no more than any other body
shop.  Q.  Okay.  And how about quality?  Do you remember
anything specifically negative about VCC as opposed to the other
body shops that Hertz did business with?  A.  No, sir.  Again,
they're all going to have their problems.  Nobody stood out more
than the other. . . .  Q.  Do you recall with respect to its work
that it did in Miami, do you recall at any point in time issues
being brought to your attention about 950 ACI and any out of the
ordinary issues with the timing of its repairs?  A.  No, sir.  No
more than anyone else.  Q.  Do you recall any issues out of the
ordinary, more than anything else, arising with respect to the
quality of 950 ACI's work?  A.  No, sir. . . .  Q.  So again with
respect to . . . the repair shop that ACI ran at Ft. Lauderdale
which serviced Ft. Lauderdale and West Palm Beach.  Any
particular issues with respect to turnaround time, quality,
anything of that nature that you recall standing out about ACI?
A.  No. . . .  Q.  Would you expect that if there was a
significant problem, that it would be brought to your attention?
A.  Yes.  Q.  Anything with respect to quality, turnaround time,
anything out of the ordinary [for ACI's work at Orlando]?  A.
No, sir.").

[43]     D.I. 1608 ¶ 11, Ex. 2(B)(i) (Scarpelli Dep. at
215:21-216:20, 217:12-19) ("Do you agree from your experience in
Port Newark and Orlando that parts for body shop cars were
holding up repairs?  A.  I would not agree that - with that as a
general issue.  No.  Q.  So you're saying that Mr. Sheldon is
wrong?  A.  I'm saying that there are - there were occasions that
parts take longer than expected so in those cases, yes, it could

Finally, Hertz's own fact witness, John Dilanian, who was ACI's manager of the VCC shop and later took over those operations through a non-ACI entity, testified that while ACI operated the VCC shop, it had to wait for Hertz to order the parts which caused delays in ACI's turnaround time.[44]   Dilanian also confirmed that while he worked at various locations for ACI, ACI routinely tracked turnaround time, expanded the types of repair work it undertook, extended its hours, and added shifts to

_____

hold up the repair of that vehicle.   Q.   Did you ever implement a predictive maintenance parts inventory to make sure sufficient parts were on hand?   A.   I do recall that there was an initiative to carry an inventory - to the point of this e-mail to carry an inventory of specific parts that we anticipated we would need more often than others. . . .   So, yes, in that respect it was an initiative that was - that we tried in the division.   Q.   That initiative was after ACI moved off of the Port Newark property, right?   A.   Based on the date of this e-mail, yes. . . .   Q. Were there issues with body damage appraisers being undertrained or not properly trained?   A.   Not chronic issues, no.   Q.   Were you aware of issues with body damage appraisers not writing vehicles quickly enough?   A.   There were issues from time to time for a variety of reasons where cars were not being written as quickly as possible.").

[44]     10/30/24 Hr'g Tr. (Dilanian) at 179:3-13, 215:2-215:16 ("Q. Did [Hertz] send [work] to [VCC] when asked?   A.   Yeah, it takes a day or two, but yes, eventually, they do send it.   But you lose two days, you just lost two days of work - well, not total work, but, you know, we could have done more, of course. . . .   Q. Hertz provided parts, right?   A.   Correct.   Q.   And Hertz handled the parts ordering process, right?   A.   Yes.   Q.   VCC had no control over parts, did it?   A.   Maybe at the end, but not for the longest time.   I don't remember during the last couple months if VCC had to order the parts, because now we have to order the parts.   Q.   But VCC did not?   A.   I don't think so. . . .   Q. VCC could not complete a repair until it had all the parts, right?   A.   It depends.   If the car does not need parts, then yeah, we could complete it.   If it needs the parts, then we have to wait for the parts."); 10/30/24 Hr'g Tr. (Dilanian) at 169:19-23, 169:24-170:16, 190:1-6, 191:25-192:5, 211:24-212:5.

service Hertz's vehicles.[45]  While Dilanian testified that VCC

sometimes rejected repair work that Hertz offered because it was

---

[45]    H-8 (8/8/11 Email from Dilanian to Hertz) (attaching a
spreadsheet of financial data and car turnaround times for July
2011).  See also 10/30/24 Hr'g Tr. (Dilanian) at 145:5-15,
151:8-10, 162:11-163:3, 174:12-17, 184:21-185:6, 195:16-196:3
("Q.  What was the purpose of the spreadsheets?  A.  It's nice to
know what we do on a day to day.  But when we receive the
estimates or we complete the car, those emails go back and forth
to main office.  So Atlantic Collision receives everything that
we get, and everything that we finished.  So at the end of the
month, Mr. [Capus] always asked, you know, how many cars did you
get this month or how many, you know - do you have the turnaround
time, because Hertz wanted to know the turnaround time.  So those
are the things that I started capturing [s]o that way I'll be on
top of my game. . . .  Q.  So you sent these spreadsheets to
ACI's main office in Brooklyn, New York, on a monthly basis?  A.
Correct. . . .  Q.  While you worked for VCC, Mr. Dilanian, what
was your understanding of the types of repairs that VCC was
equipped to handle for Hertz?  A.  Well, in the beginning, we
were told we were only going to do minor body damage cars, [s]o
we were doing basically small hits.  That's what we call them,
small damages.  As, you know, the time passed, of course, you
know, we . . . had gotten bigger and bigger. . . .  Q. When you
handled - when VCC handled bigger hits, did that affect the
capacity of the shop in terms of how quickly it could turn
repairs?  A.  Well, that's the key.  If the jobs are larger, it
takes longer time to repair it.  It's going to affect turnaround
time as much as amount of cars.  So I think in those exhibits, if
you look at the turnaround time on the time on the right side,
when you see it lower, the number, that mean the hits were
smaller.  That means we flipped them faster, that means we do
work faster. . . .  Q.  And do you remember, Mr. Dilanian, the
month that VCC achieved that - repaired that number of cars, were
you operating with multiple shifts?  A.  We were definitely
operating with longer hours, multiple shifts, I guess.  I don't
remember exactly which month it was or what year it was. . . .
Q.  And, Mr. Dilanian, as part of your training of the managers
in ACI border [sic] locations, did you train them how to prepare
the Excel spreadsheets like the ones we reviewed previously
today?  A.  Yes, we did.  [Capus] did end up buying equipment for
the other shops [s]o we can do exact same thing [sic], what we
did in VCC.  Q.  So for each Florida location, did you visit the
location and train the employees how to [sic] create those
spreadsheets?  A.  I had to, yes.").

too big a job,[46] he also testified that ACI did ask Hertz for more work and was willing to work additional hours to do that work.[47]

ACI's performance of the Agreements is further evidenced by Hertz's request that ACI expand its operations to other Hertz locations:[48] six months after ACI started working in Port Newark,

---

[46]    10/30/24 Hr'g Tr. (Dilanian) at 163:17-164:11 ("Q.   Did [VCC] ever reject vehicles?  A.  Absolutely.  Q.  How often?  A. It varies from month-to-month, but, you know, [s]ometimes there [sic] was once a week, [s]ometimes once every two weeks, [s]ometimes it was once a month.  So it really depends on the month that they wreck more cars.  If the damage is severe, then it could be ten cars, [s]ometimes, a month or it could be 15 cars a month.  I can't give you an exact number on that.  Q.  And just to clarify, Mr. Dilanian, these were repairs that Hertz offered [to] VCC to repair and then VCC rejected the offer.  Is that right?  A.  Yes, I mean, when the adjusters were at the office, which is next to my office, they used to call me out there and say, John, do you want to take this job, and of course [the] percentage is not too high and I used to say, no, I'll take all the rest.  So that way, we can do more vehicles instead of taking the big job, because if we take that one big job, I could be losing 15 small jobs, [s]o yes, they did ask me.  And I basically [said], send it out.").

[47]    10/30/24 Hr'g Tr. (Dilanian) at 179:8-13 ("Q.  Were there times when Mr. Capus asked Hertz for more work and you disagreed that you needed more work?  A.  Well, I'm a workaholic guy, so I work 20 hours, 15 hours a day.  If your boss tells you that you can handle more work, I'm never going to say no.  It doesn't mean we needed more work, but I never told them no.  I always said sure.").

[48]    A-1 (8/19/10 Email from Hertz copying Capus) ("We have been successful opening [an] on-site body shop at our Port Newark, NJ location and we are planning to expand this model to Dulles, VA and possibly Philadelphia.  The vendor we have teamed up with is Atlantic Collision who is very proficient in performing fleet work. . . .  He does have interest to help Hertz expand this model in Georgia and Florida."); 10/29/24 Hr'g Tr. (Capus) at 87:22-88:2 ("Q.  Did ACI open up another facility in Florida to service Hertz vehicles in – or to service Hertz vehicles from its

Hertz asked ACI to provide exclusive repair services at Hertz's
Sterling, Virginia, facility,[49] and between 2011 and 2013, Hertz
asked ACI to provide semi-exclusive body shop work for several of
its Florida locations.[50]

The Reorganized Debtors in rebuttal attempted to establish
that ACI had not performed its obligations under the Agreements,
thereby justifying Hertz's diversion of repair work to other
shops.  Although the Reorganized Debtors did present evidence
that there were occasional complaints about ACI's quality of work
or slow turnaround time,[51] the Court finds that ACI provided

---

Fort Lauderdale and West Palm Beach Airports?  A.  We did.  They
were very happy with us in Miami and asked us to expand to Ft.
Lauderdale.").

[49]   D.I. 1608 ¶ 22; JX-3.

[50]   10/29/24 Hr'g Tr. (Capus) at 75:6-16, 87:13-88:2, 97:2-11,
99:21-24; JX-4; JX-7; JX-10; JX-11; A-11.

[51]   See, e.g., D.I. 1608, Ex. 2(A)(i) (Pitz Dep. at 40:15-41:8,
69:9-20) (Hertz's former Regional Vice President stated that
ACI's work was of good quality, though there were issues with
timeliness that he was generally aware of visually from the
number of cars "sitting idle"), Ex. 2(B)(i) (Scarpelli Dep. at
166:11-167:13) ("Issues I recall were related to [900 ACI's]
ability to be able to handle the workload, and the ability to be
able to staff the location . . . adequately to be able to handle
more workload. . . .  I officed out of Port Newark so I was on-
site there very often . . .  I would observe firsthand the
staffing challenges with lack of personnel to be able to handle
the volume that we were trying to push through [900 ACI]."); H-44
(3/18/15 Email from Hertz to ACI) ("Serious issue with the local
Atlantic shop [in Orlando].  We have cars sitting at the shop for
a week that have not been touched.  Large number of overdue
units.  And the rejects are starting to climb again, 4 rejects on
Monday alone.  This needs to be fixed ASAP!!!!!  It appears the
staffing may not be in place to handle the volume, but whatever
the reason, we need our cars back on time and repaired

ample evidence that ACI made reasonable efforts to address those complaints, including adding personnel and instituting controls to assure quality repairs.[52]

As a result, the Court concludes that ACI materially performed its contractual obligations under the Agreements. The Court's finding that ACI was generally able to repair the vehicles which Hertz sent to it is not, however, a finding that ACI had the ability to repair all of the vehicles that Hertz needed repaired during the term of the Agreements.[53]

---

properly."); H-46 (3/23/15 Email from Hertz's Area Maintenance Manager to Capus) ("Still a high number of reworks from the ones sent back on Friday. . . . Most of these are pretty easy to spot up to including the obvious ones that should have never left your shop.").

[52]   See, e.g., JX-54 (4/3/14 Email from ACI to Hertz) ("Another idea that we can discuss is adding people in Brooklyn to lighten the load in New Jersey. Since we already pick up on the east side of Manhattan, perhaps we can help out with the west side as well. . . . That will free up the workload and allow them to catch up."); JX-65 (9/15/14 Email from Capus to Hertz) (stating that ACI was installing additional controls to maintain good work quality); JX-77 (3/20/15 Email from Capus to DTAG) ("[We] spoke at length about correcting the issues we discussed today. We are sending 5 employees from Miami tomorrow to help clean up as much work as they can for Monday delivery. We also spoke with Omar and made him aware of the concerns."); H-50 (5/20/16 Email from ACI to Hertz) ("The size of the building is what it is and the only way to increase volume is with more space. Have you given any thought to adding a small building or tent?"); H-51 (10/14/16 Email from ACI to Hertz) ("We have went [sic] through a complete restaffing through the company and I feel we now have the necessary staff to fulfill your need in a timely and quality matter [sic] to get your vehicles back on the road.").

[53]   See infra notes 155-183 and accompanying text.

3.   <u>Hertz's Breaches</u>

ACI contends that Hertz breached the Agreements by sending cars to non-ACI shops in violation of ACI's exclusivity rights and by wrongfully terminating the Agreements.

a.   <u>Failure to comply with exclusivity provisions</u>

ACI relies on Hertz's own records, and the testimony of Zachary Mitchell, Hertz's Vice President of Finance, to demonstrate that Hertz referred a substantial amount of repair work to non-ACI shops in violation of the Agreements.[54]

This occurred in part because Hertz did not implement any formal policies or controls to ensure that its employees complied with the Agreements.[55] Nor did Hertz fully inform its employees

---

[54]   <u>See, e.g.</u>, H-72; H-73; H-74; H-75; H-76; H-77; H-78; H-79; 10/31/24 Hr'g Tr. (Mitchell) at 65:17-21 ("Q.  You'd agree that those spreadsheets show that Hertz was, in fact, vending thousands, perhaps tens of thousands of vehicles to non-ACI shops at the ACI/Hertz locations, correct?  A.  Yes.").

[55]   D.I. 1608, Ex. 2(C)(i) (Dolobach Dep. at 61:10-18, 92:19 93:22, 108:4-13, 111:6-12) ("Q.  Did Hertz have some type of formal system in place to see that its obligations under this contract to send, you know, all the cars to 900 ACI was being followed and complied with?  A.  No, sir.  That was strictly a visual thing and conversations, I'm sure, between [Capus's] manager and the city maintenance manager. . . .  Q.  Okay.  Do you know what Hertz did to make sure that its employees at Sterling knew about the terms of this Agreement?  A.  Other than word of mouth, you know once that - once that shop opened, then they all understood that we had to keep going - putting all the cars we could in there from Dulles Airport, off-airport locations that were coming in there, and then of course Baltimore where they could pick up at least 25 cars.  Q.  I believe you testified as it relates to Port Newark that there was no formal process in place that Hertz had to ensure that the requirements of this contract were being met.  Was that also true with Virginia?  A. Yes, it was all visual.  It was all how many cars they had and

of the exclusivity provisions in those Agreements.[56]

---

how many were returned.  Q.  Is it also true that there were no
summaries or reports that were prepared on a regular basis in the
ordinary course of business to keep track of the total number of
cars that were being sent to different vendors?  A.  Correct.  Q.
Do you know whether or not employees were prohibited from sending
cars to other shops unless and until there was some form of
approval by management?  A.  Prohibited for - no, sir. . . .  Q.
Do you know at least as of the time that you arrived in 2013
what, if any, systems that Hertz had in place to ensure that it
was meeting its requirements under this contract?  A.  No, sir.
Q.  Based on your work at Hertz throughout your career, do you
have an understanding of how that - the contractual requirements
would have been or should have been adhered to by Hertz?  A.  No,
sir. . . .  Q.  Do you know whether or not Hertz had any system
in place to monitor its compliance with this contractual
requirement?  A.  No, sir.  Q.  Did it ever come to your
attention at any time when you were performing services for
Hertz?  A.  No, sir.");  D.I. 1608, Ex. 2(A)(i) (Pitz Dep. at
170:13-16) ("Q.  And we've discussed you're not aware of any
controls that were put in place to ensure that contract was being
followed, correct?  A.  Correct.");  10/30/24 Hr'g Tr. (Meza) at
125:1-23 (stating that Dolobach would know whether Hertz
implemented any processes to ensure compliance, but that he was
not aware of any Hertz policy requiring Hertz managers to monitor
employees to ensure compliance with the Agreements);  10/31/24
Hr'g Tr. (Mitchell) at 49:11-52:24 (confirming that although
controls are important to ensure that contracts are not breached,
he knew of no controls that were implemented for the Agreements,
and he had not verified that any such controls were actually
implemented by Hertz's regional maintenance managers).

[56]   10/31/24 Hr'g Tr. (Mitchell) at 49:18-52:24 (confirming that
he never verified that Hertz's on-the-ground employees or
regional maintenance managers were informed of the terms of the
Agreements);  D.I. 1608, Ex. 2(A)(i) (Pitz Dep. at 165:3-169:9)
(testifying that many relevant individuals, including Hertz's
corporate counsel, did not have access to or knowledge of the VCC
Agreement), Ex. 2(C)(i) (Dolobach Dep. at 55:3-8, 61:22-62:5,
62:24-63:4, 63:8-14, 93:23-94:2, 108:9-13, 110:24-111:5) ("Q.
Can you tell me if you've ever seen [the 900 ACI Agreement]
before?  A.  No, I have not.  Q.  Okay.  You have no recollection
of ever seeing this agreement at any time?  A.  That's true.
Absolutely. . . .  Q.  Secondarily, Mr. Dolobach, do you know if
anyone at Hertz actually informed the employees at the Port
Newark facility of the specifics of this agreement?  A.  I cannot
- I cannot say for a fact that they were notified, but obviously

While the Reorganized Debtors contend that Hertz's employees were informed of its obligations under the Agreements, it largely relies on employee testimony that Hertz's on-site workers generally understood Hertz's obligations "through word of mouth" or by "visualizing" the arrangement because ACI worked on-site.[57]

---

they were with just the volume of work going through that building. . . . Q.  Was there any prohibition of a local employee from sending a car to a different vendor than Atlantic Collision without getting some type of management approval?  A. Not that I'm aware of. . . .  Q.  Do you know within Hertz who received a final copy of this contract once it was finalized and signed?  A.  I do not know that, sir.  Q.  But you did not receive a copy of the contract?  A.  Correct. . . .  Q.  Do you know who within Hertz received a copy of [the VCC Agreement] when it was signed and executed?  A.  I do not. . . .  Q.  Based on your work at Hertz throughout your career, do you have an understanding of how that - the contractual requirements would have been or should have been adhered to by Hertz?  A.  No, sir. . . .  Q.  Have you ever seen this amendment [JX-7] before?  A. No, sir.  Q.  Did this contractual requirement ever come to your attention when you came to Florida in 2013?  A.  No, sir.").

Although Hertz argues that it presented evidence showing that there was a policy in place to inform employees of the terms of its contracts, that evidence spoke only of what the general policy was and was not convincing evidence that Hertz did so with respect to the Agreements at issue here.  See, e.g., D.I. 1608, Ex. 2(b)(i) (Scarpelli Dep. at 43:10-44:4) ("Q.  Was there any kind of policy that you were aware of that required the business terms of certain contracts to be communicated to the operations people and to the people on the ground to make sure the contracts were followed?  A.  Yes.  I would say that was general policy to ensure that the people who needed to know the terms of an agreement or contract were aware and knew about . . . that.").

[57]    D.I. 1608, Ex. 2(C)(i) (Dolobach Dep. at 57:14-58:18, 60:1-23, 61:22-62:5, 92:19-94:12, 110:18-111:12, 112:13-113:13, 124:14-17) (testifying that he was orally informed that Hertz was required to send all of its cars to 900 ACI until it was at maximum capacity, that he did not know if any other Hertz employees were informed of that obligation, that Hertz's employees at VCC were not required to follow any formal processes and were only orally informed of its obligations, that he had not seen the amendments to the 950 ACI Agreement, was unaware of

The Court concludes that the evidence clearly demonstrates
that Hertz failed to inform its employees of its contractual
obligations to ACI and lacked a policy to ensure compliance with
the ACI Agreements' exclusivity requirements.[58]  As a result,
Hertz's damage appraisers continued to send tens of thousands of
vehicles to non-ACI shops for repair in violation of the ACI
Agreements' exclusivity provisions.[59]

       i.    <u>Excused by ACI's Lack of Capacity?</u>

The Reorganized Debtors contend, however, that Hertz had a
right to send cars to other shops because ACI was unable to
handle all of its work.  It cites provisions of the 900 ACI and
VCC Agreements that expressly allow Hertz to refer work to other
shops if ACI was "unable to perform the work in a timely manner,
including but not limited to lacking the proper equipment or

---

Hertz implementing any controls to monitor compliance with the
950 ACI Agreement, and was unaware of any termination provision
within the 950 ACI Agreement).  <u>But see</u> JX-75 (2/25/15 Email sent
by Hertz internally which apparently was not sent to any manager
at the ACI sites or anyone who testified at trial) ("Make sure we
are compliant with vending 70% of our vended cars each day to
Atlantic Collision.").

[58]    <u>See</u> <u>supra</u> notes 54-56 and accompanying text.

[59]    H-72; H-73; H-74; H-75; H-76; H-77; H-78; H-79; 10/31/24
Hr'g Tr. (Mitchell) at 65:17-21 ("Q.  You'd agree that those
spreadsheets show that Hertz was, in fact, vending thousands,
perhaps tens of thousands of vehicles to non-ACI shops at the
ACI/Hertz locations, correct?  A.  Yes."); 10/31/24 Hr'g Tr.
(Mitchell) at 52:8-10 (testifying that Hertz body damage
appraisers determined which body shop received repair work).

excessive volume of repairs."[60]

ACI asserts that the evidence is to the contrary.[61]   In
addition, ACI argues that it had no way to know whether (or to
what extent) Hertz was failing to abide by the exclusivity
provisions within the Agreements.[62]   On those few occasions when
it learned of Hertz referring cars to other vendors, ACI asserts
that it complained to Hertz and requested that Hertz stop and
honor its Agreements.[63]

---

[60]   JX-1 at § 4; JX-3 at § 4.

[61]   See supra notes 37-50 and accompanying text.

[62]   See, e.g., 10/29/24 Hr'g Tr. (Capus) at 60:20-23 ("Q.   Why
was there no way for you to know [if Hertz was properly including
the DTAG cars in its vending obligation to ACI]?   A.   Because the
appraisers wrote the estimates and we had no access to their
appraisal system.   So, we didn't know where the vehicles came
from.").   See also id. at 102:12-103:20, 104:4-22.

[63]   JX-30 (3/2/11 Email from Capus to Hertz) (complaining of
lack of cars sent to VCC from Hertz and stating that "[i]f there
were no cars at any other shops, I could understand, but I doubt
that[']s the case.");   JX-60 (6/10/14 Email from Capus to Hertz)
("We are supposed to be getting 70% of the work and we are not
even getting enough to cover payroll.");   JX-61 (7/23/14 Email
from ACI to Hertz) ("Apparently [Hertz] has been vending cars
early in the a.m. to other shops before [ACI's manager] gets in.
The amount of vehicles we have been receiving are very low.");
JX-64 (9/15/24 Email from Capus to Hertz) ("It doesn't seem like
we are getting Baltimore cars and as a result, the entire year
has been off. . . .   I really need the Baltimore work to make it
through.");   JX-66 (9/29/14 Email from Capus to Hertz) ("Please
get us more work first thing tomorrow.");   H-28 (9/30/14 Email
from ACI to Hertz) ("That's why it is frustrating to us when we
see other shops picking up cars when we can get them done and
back the next morning.");   JX-71 (11/21/14 Email from 900 ACI to
Hertz) ("At the moment there are [other] vendors outside taking
[body damage] cars. [D]ue to insufficient work we are unable to
run our night shift and also will be closed for the weekend.");
JX-68 (11/3/14 Email from Capus to Hertz) (complaining about lack

The Reorganized Debtors assert that Capus's testimony that
ACI could handle all the work Hertz had is not credible and is
contradicted by the substantial evidence that ACI did not have
sufficient capacity to even do the work Hertz gave it.[64]   The
Reorganized Debtors contend that Capus's testimony is

---

of cars being sent to it and noting that apparently Hertz had
cars to be repaired "[w]e just aren't getting it."); JX-26
(11/19/10 Email from Capus to Hertz) ("Please keep in mind that
this number reflects my turn around time compared with the best 4
shops [Hertz is] still using currently for overflow."); JX-28
(1/21/17 Email from Capus to Hertz) (lauding VCC's shorter
turnaround time and stating that he believed Hertz had reduced
the number of overflow shops it was using from 17 to 3 or 4 in
New Jersey); JX-84 (6/20/17 Email from Capus to Hertz) ("I was
not sent the work which was agreed to per the contract . . . we
have received substantially less work than before as someone
decided to send the damage we were getting elsewhere."). <u>See
also</u> 10/29/24 Hr'g Tr. (Capus) at 44:17-21, 45:24-46:7, 68:3-22,
102:24-103:12, 104:9-10, 138:1-8 (stating that he repeatedly
requested additional work from Hertz at each of ACI's locations).

[64]   D.I. 1608, Ex. 2(B)(i) (Scarpelli Dep. at 166:11-18) ("Q.
What issues did you observe with ACI's performance when you
returned to Newark - Port Newark in 2013? A.   Issues I recall
were related to some quality concerns with the repairs, ability
to be able to handle the workload, and the ability to be able to
staff the location - the site adequately to be able to handle
more workload."), Ex. 2(C)(i) (Dolobach Dep. Tr. at 62:10-18,
91:19-21) (testifying that 900 ACI was always busy and that VCC
was similarly at maximum capacity); 10/30/24 Hr'g Tr. (Meza) at
100:10-101:5 (opining that Hertz's work was too much for any one
shop to handle); 10/30/24 Hr'g Tr. (Dilanian) at 169:24-171:1,
191:15-24 (acknowledging that while VCC was "busy most of the
time," he would still on occasion have to ask Hertz for work, and
admitting that while Orlando was similarly busy, it was not
necessarily from Hertz's vehicles); 10/31/24 Hr'g Tr. (Mitchell)
at 13:8-12, 24:9-10, 43:23-44:8 (stating that no single body shop
could handle all of Hertz's work, that VCC was given sufficient
work, and disputing Metzdorff's assumption that ACI could handle
all of Hertz's body damage work given ACI's capacity limits).
<u>See also</u> JX-29 (1/13-14/11 Emails between ACI and Hertz)
(discussing VCC's need to ramp-up and get paint booth and frame
machine in place in order to get more cars from Hertz).

23

particularly unconvincing because ACI failed to preserve its records which would have demonstrated ACI's true capacity.[65]

The Court agrees with the Reorganized Debtors that the record does not support ACI's argument that it could handle <u>all</u> of Hertz's repair work.[66] Capus testified only that ACI was satisfactorily repairing the work Hertz gave it,[67] and even that testimony was contradicted by Capus's admissions, and other testimony, that there were often times when ACI could not handle the work that Hertz sent to it.[68]

However, the Court cannot conclude from the evidence presented that Hertz referred work to other body shops <u>only</u> when ACI could not handle all of Hertz's work. On the contrary, there was substantial evidence that Hertz was referring work to other shops even when ACI had capacity to do it.[69] Hertz's own witnesses admitted that it put no policies in place to assure its

---

[65]    <u>See</u> D.I. 1668, 1698, 1705. <u>See also</u> 10/29/24 Hr'g Tr. (Capus) at 123:1-16, 144:20-145:15, 147:21-148:5, 148:9-18, 149:24-150:10 (acknowledging ACI's failure to preserve various business records).

[66]    10/30/24 Hr'g Tr. (Meza) at 100:10-101:5 (opining that Hertz's work was too much for any one shop to handle); 10/31/24 Hr'g Tr. (Mitchell) at 13:8-12, 24:9-10, 43:23-44:8 (stating that no single body shop could handle all of Hertz's work). <u>See</u> <u>supra</u> note 37 (Capus testifying only that ACI was able to handle the Hertz work that it was given). <u>See</u> infra notes 155-183 and accompanying text.

[67]    <u>See</u> <u>supra</u> note 37.

[68]    <u>See</u> <u>supra</u> notes 38, 46, 47, 51, 52.

[69]    <u>See</u> <u>supra</u> notes 39, 41, 58, 61-62.

24

employees complied with the exclusivity provisions of the ACI
Agreements or even knew about those Agreements.[70]

Consequently, the Court concludes that the record does not
support Hertz's argument that its failure to comply with the
exclusivity provisions was excused by ACI's lack of capacity to
do Hertz's repair work.

### ii.   Waiver of Breaches?

The Reorganized Debtors argue, however, that ACI waived
Hertz's breaches.  They assert that the evidence clearly shows
that, although ACI had knowledge of Hertz referring body work to
other shops, it nonetheless continued to perform under the
Agreements to reap the benefit of those contracts, without
providing Hertz any timely, formal notice that it considered
Hertz in breach.[71]  Therefore, Hertz argues that ACI's actions

---

[70]   See supra notes 54-56.

[71]   See, e.g., H-66 (ACI's Responses to Hertz's Supplemental
Interrogatories No. 5 ("ACI is not aware of any instances in
which it notified Hertz it believed Hertz to be in breach of any
of the Contracts at issue, other than the filing of the New York
state court lawsuit.").  See also 10/29/24 Hr'g Tr. (Capus) at
138:25-140:8, 140:18-141:1 ("Q.  Here, one of your shop managers
had told you that he saw other body shops picking up repair work
at Port Newark, correct?  A.  He said that, yes.  Q.  You
testified on direct examination — and I made a note of this.  I
think your words were, [y]ou couldn't possibly know that Hertz
was breaching the agreements.  That's what you said, right?  A.
I heard, as in this instance [in H-28], on a couple of occasions
that they had other shops picking up the cars.  I could not
confirm it.  I questioned them.  I was given the runaround.  I
was told a million different reasons, and I ran it up the ladder
until I finally got some answer.  Q.  But in this e-mail, Hertz
exhibit 28, one of your managers you trusted to run the day-to-
day operations was telling you that Hertz was sending cars to

were a knowing, voluntary and intentional waiver of Hertz's

breaches.[72]

---

other body shops, correct? A. Correct. He told me that. Q.
And you continued to perform work for Hertz after receiving this
information in September of 2014? A. I did not agree that it
was okay. I was on-site. I had life savings invested. I had
close to a hundred people working. It was families [sic] were
relying on me and I could not just walk away from them or be
confrontational with them. Q. Sir, 900 ACI continued to perform
repair work for Hertz after September 30, 2014. A. Yes, we did.
Q. Did 900 ACI continue to submit invoices to Hertz after
September 2014? A. Yes, we did. Q. Did Hertz continue to pay
those invoices and ACI continued to accept that payment after
September 2014? A. Yes, we did. . . . Q. Sir, you didn't file
a lawsuit against Hertz in 2014 when your manager told you they
were vending cars to other places, right? A. No. Q. In fact,
you didn't provide Hertz [any] notice at any time that you
believed Hertz had breached the agreements with you, right? A.
I couldn't confirm anything as far as them breaching the
agreements."). See also JX-26 (11/19/10 Email from Capus to
Hertz) (acknowledging that Hertz was using non-ACI shops in Port
Newark for overflow); JX-28 (1/21/17 Email from Capus to Hertz)
(acknowledging that Hertz was using "3 or 4 [non-ACI shops] for
overflow."); JX-61 (7/13/14 Email from ACI to Hertz) ("Marc asked
me to send you an email regarding some information he received
today. Apparently [Hertz] has been vending cars [at Port Newark]
early in the a.m. to other shops before Marsh gets in."); JX-71
(11/21/14 Email from 900 ACI to Hertz) ("At the moment there are
vendors outside taking [body damage] cars. [D]ue to insufficient
work we are unable to run our night shift and also will be closed
for the weekend."); H-28 (9/30/14 Email from Capus to Hertz) ("We
have the ability to handle a lot more than we are getting. We
are on site because management saw the benefit of not vending out
cars when they can be fixed over night. That's why it is
frustrating to us when we see other shops picking up cars when we
can get them done and back the next morning.").

[72]    See, e.g., Fundamental Portfolio Advisors, Inc. v.
Tocqueville Asset Mgmt., L.P., 850 N.E.2d 653, 658 (N.Y. 2006)
("Contractual rights may be waived if they are knowingly,
voluntarily and intentionally abandoned."); Cap. Med. Sys. v.
Fuji Med. Sys., U.S.A., Inc., 658 N.Y.S.2d 475, 478 (N.Y. App.
Div. 1997) ("A party to an agreement who believes it has been
breached may elect to continue to perform the agreement and give
[timely] notice [of the breach] to the other side rather than
terminate it."). See also Medinol Ltd. v. Boston Scientific

Based on the evidence presented, however, the Court finds
that ACI had no knowledge of the extent of Hertz's violation of
the exclusivity provisions of the Agreements and so could not
know whether those violations were sporadic or material.  This is
because ACI had no ability to track the extent of Hertz's
compliance with the Agreements.[73]

---

Corp., 346 F. Supp. 2d 575, 620 (S.D.N.Y. 2004) (if a party
chooses to continue to perform after learning of a breach of
contract rather than terminating the contract, the party must
give notice of the breach to the other side or waive its right to
sue); Nat'l Westminster Bank, U.S.A. v. Ross, 130 B.R. 656, 675
(S.D.N.Y. 2004) (stating that "it is well-established that where
a party to an agreement has actual knowledge of another party's
breach and continues to perform under and accepts the benefits of
the contract, such continuing performance constitutes a waiver of
the breach . . . .  It is equally well-settled that a party to an
agreement who believes it has been breached may elect to continue
to perform the agreement rather than terminate it, and later sue
for breach; this is true, however, only where notice of the
breach has been given to the other side.").

[73]    See, e.g., 10/29/24 Hr'g Tr. (Capus) at 60:16-23,
68:23-69:12, 102:12-23, 103:13-18 ("Q.  Was there any way for VCC
to know or track if it was receiving the DTAG cars that Hertz was
adding to this contract?  A.  There was no way for us to know.
Q.  Why was there no way for you to know?  A.  Because the
appraisers wrote the estimates and we had no access to their
appraisal system.  So, we didn't know where the vehicles came
from. . . .  Q.  Was it still your understanding, as of this
email, that VCC was entitled to receive the right of first
refusal for vehicles vended from Baltimore?  A.  Yes.  Q.  Okay.
But you had no ability to ensure that that happened?  A.  It was
impossible for me to know what they were doing.  Q.  At any point
during the life of this contract did you know that Hertz vehicles
were being sent to other vendors?  A.  No.  Q.  Why not?  A.
Again, it was impossible for me to know with their system what
they were doing with the vehicles when they came in.  We were on
one part of the lot and they were on another. . . .  Q.  So with
respect to . . . Hertz's compliance with these Florida contracts,
did ACI have any way of checking whether Hertz was fulfilling its
volume obligations in Florida at these different facilities?  A.
It was impossible for us to know.  Q.  Okay.  Why was that?  A.

27

Hertz did not advise ACI that it was sending work to non-ACI body shops, and often did so in a surreptitious way.[74]  As a result, Hertz never gave ACI the opportunity to formally protest the diversion of body work to other shops.  When ACI noticed that Hertz was not sending it enough work or was diverting work to non-ACI shops, Capus complained and advised Hertz that it had the

---

Because they had their own facility where they vended from and they would let us know when to pick up cars, so I had no idea if they had sent cars out prior to us arriving, nobody was watching them, and we had no way of seeing their internal system, what estimates they were writing or who it was going to, we couldn't see it. . . .  Q.  At any point in time - and with this influx and deflux of work being sent by Hertz, at any point in time did you know if Hertz was violating the volume requirements of the Florida contract?  A.  I couldn't possibly know, once again, what they were doing.").

[74]    See, e.g., JX-61 (7/23/14 Email from ACI to Hertz) ("Apparently [Hertz] has been vending cars early in the a.m. to other shops before [ACI's manager] gets in.").  See also, 10/29/24 Hr'g Tr. (Capus) at 40:1-5, 58:4-7, 65:6-14, 101:20-23 ("Q.  At any point in time during the life of [the 900 ACI Agreement], did Hertz ever inform you that it was going to vend repair work elsewhere, as allowed for in the contract, due to ACI's inability to timely repair vehicles?  A.  No, they never said that. . . .  Q.  At any time at the Sterling facility did Hertz ever notify VCC that it had defined [sic] to invoke this exception contained in Paragraph 4 to direct cars elsewhere?  A. They never said that. . . .  Q.  Were you ever advised at any time by any representative of Hertz that it was going to send cars to other shops because VCC was not adequately or timely repairing cars?  A.  No.  I was never advised of that.  Q.  Okay. Do you remember Hertz ever invoking exception in the Sterling contract that we just looked at a minute ago that it could be send [sic] cars to other vendors if VCC could not timely repair cars.  Did Hertz ever do that?  A.  They never did, no. . . .  Q. At any point of time during the life of [the VCC Agreement] did you know that Hertz vehicles were being sent to other vendors? A.  No. . . .  Q.  Did Hertz ever inform you that it was going to vend repair work elsewhere due to ACI's inability to meet the requirements of the Florida contract?  A.  No, they did not.").

28

capacity for more work.[75]

Therefore, the Court concludes that ACI's actions were an assertion of its contractual rights, not a knowing, voluntary, and intentional waiver of those rights.[76]

        b.   <u>Wrongful Termination</u>

ACI also contends that Hertz wrongfully terminated the Agreements by failing to provide the required advance written notice.[77]

---

[75]  <u>See, e.g.</u>, JX-60 (6/10/14 Email from Capus to Hertz) ("We are supposed to be getting 70% of the work and we are not even getting enough to cover payroll."); JX-64 (9/15/24 Email from Capus to Hertz) ("It doesn't seem like we are getting Baltimore cars and as a result, the entire year has been off."); JX-68 (11/3/14 Email from Capus to Hertz) ("According to [1050 ACI's manager], who was there delivering, there is decent work. We just aren't getting it."); JX-84 (6/20/17 Email from Capus to Hertz) ("I was not sent the work which was agreed to per the contract . . . we have received substantially less work than before as someone decided to send the damage we were getting elsewhere."); H-28 (9/30/14 Email from ACI to Hertz) ("That's why it is frustrating to us when we see other shops picking up cars when we can get them done and back the next morning."); 10/29/24 Hr'g Tr. (Capus) at 33:25-34:8, 44:17-21, 45:24-46:7, 68:3-22, 102:24-103:12, 104:9-10, 138:1-10, 139:18-24 (stating that he repeatedly requested additional work from Hertz at each of ACI's locations).

[76]  <u>Gallegos v. Top RX, Inc.</u>, No. 04-CV-773A, 2008 WL 4279526, at *13-14 (W.D.N.Y. Sept. 15, 2008) (requiring unambiguous proof of the plaintiff's voluntary intent to waive a breach of contract claim for a successful defense of waiver); <u>Seven-Up Bottling Co. (Bangkok), Ltd. v. PepsiCo, Inc.</u>, 686 F. Supp. 1015, 1023 (S.D.N.Y. 1988) (holding that "a party's reluctance to terminate a contract upon a breach and its attempts to encourage the breaching party to adhere to its obligations under the contract do not necessarily constitute a waiver of the innocent party's rights in the future.").

[77]  JX-1 at § 2(c) (requiring six months' written notice for termination of the 900 ACI Agreement); JX-3 at § 2(c) (requiring

i.   900 ACI Agreement

Despite extending the 900 ACI Agreement in August 2014 for
an additional 5 years, in early January 2015, Hertz asked 900 ACI
to vacate the premises at Port Newark, New Jersey, stating that
it wanted to repurpose the facility.[78]   900 ACI agreed to do so
and was paid $15,000 to cover a part of its moving expenses.[79]

---

180 days' written notice for termination of the VCC Agreement);
JX-7 at § 3 (requiring six months' written notice for termination
of the 950 ACI Agreement).

[78]   10/29/24 Hr'g Tr. (Capus) at 46:11-47:19 ("Q.  [D]id ACI and
Hertz extend [the 900 ACI Agreement] through March 31st, 2020?
A.  Yes, we did.  Q.  Did ACI continue to operate in Newark until
that time?  A.  We did not.  Q.  Why not?  A.  Before this
extension even took effect in February we were asked to leave the
premises.  Q.  Okay.  When were you asked to leave the premises?
A.  We were asked to leave the premises in early January.  Q.  Do
you recall who asked you to do that?  A.  I was asked by Lou
Scarpelli who had initially said that he was putting us on
probation, and then by Todd Harris who was vice president under
Lou Scarpelli.  Q.  Did any of those gentlemen, in discussing
with you leaving the premises, tell you that Hertz wanted ACI to
give up its exclusive right to repair cars at the facility?  A.
We were never told that.  We were told that the premises was
going to be repurposed.  So, they wanted us to move off site.  Q.
If you believe that was going to be true would you have agreed to
move off site?  A.  If we were going to continue to work
absolutely, we would have.  We did believe we were going to get
work.  Q.  Okay.  So, did you agree to move?  A.  I did.  Q.  Do
you recall specifically when ACI's contract in Port Newark was
terminated?  A.  It was never actually terminated.  We [were]
just asked to move off site.  Q.  Okay.  Did the work stop coming
to you shortly after that time?  A.  Yes, it did."), 70:5-17,
74:3-18, 106:11-14; 10/30/24 Hr'g Tr. (Meza) at 129:1-4); D.I.
1608 ¶ 20 (stipulating that the 900 ACI Agreement was extended to
March 31, 2020, on August 31, 2014); JX-12 ¶ 1.

[79]   H-41 (1/20/15 internal Email from Todd Harris, Hertz Vice
President) (stating that "[w]hile not required under our current
lease agreement, [Capus] is agreeing to relocate his business off
of the Port Newark Hertz lot so that we can increase our vehicle
capacity on this lot" and asking for the issuance of a check in

Capus testified that ACI was not told that Hertz wished to
terminate their exclusive relationship[80] and no written notice of
termination was ever sent or received as required by the 900
Agreement.[81]  After vacating the premises, 900 ACI stopped
receiving any Hertz cars for repair.[82]

The Reorganized Debtors argue that they did not wrongfully
terminate the 900 ACI Agreement, because the express terms of the
Agreement provide that it will terminate without need for formal
notice if 900 ACI vacates the premises.[83]  They contend that 900
ACI triggered that provision when it vacated the premises in
January 2015.[84]  The Reorganized Debtors further contend that ACI
benefitted from vacating the premises because it received $15,000

---

the amount of $15,000 to Capus for that agreement).

[80]    10/29/24 Hr'g Tr. (Capus) at 47:1-6 ("Q.  Did any of those
gentlemen, in discussing with you leaving the premises, tell you
that Hertz wanted ACI to give up its exclusive right to repair
cars at the facility?  A.  We were never told that.  We were told
that the premises was going to be repurposed.  So, they wanted us
to move off site.").

[81]    JX-1 at § 2(c).

[82]    10/29/24 Hr'g Tr. (Capus) at 47:14-49:15 (testifying that
Hertz stopped referring work to ACI shortly after it moved
offsite because of an over-billing dispute).

[83]    JX-1 at §§ 19(f), 20(i) (providing that an event of default
occurs if ACI vacates the premises, upon which Hertz may
terminate the agreement and take possession of the premises
"without any notice or demand whatsoever.").

[84]    10/29/24 Hr'g Tr. (Capus) at 46:14-20, 47:1-12, 129:18-21
(acknowledging that 900 ACI agreed to vacate the Port Newark
facility upon Hertz's request).

in move-out expenses from Hertz and was able to do body work for other customers.[85]

The Court agrees with the Reorganized Debtors that the express terms of the 900 ACI Agreement provide that it was terminated when ACI vacated the premises, without any need for written notice or demand.[86]  ACI agreed to leave the premises and accepted $15,000 from Hertz to do so.[87]  Although Capus testified that he was led to believe that he would continue to be the exclusive body shop for the Port Newark location,[88] the Court does not find that testimony to be credible.  Capus knew that Hertz was dissatisfied with ACI's performance in Port Newark and was considering putting ACI on probation at the time ACI was asked to vacate the premises.[89]  Although Hertz told ACI that it

---

[85]   Id. at 34:9-12, 46:14-20, 47:1-12, 129:18-21, 130:11-24; D.I. 1608, Ex. 2(B)(i) (Scarpelli Dep. at 208:17-23); H-41.

[86]   JX-1 at §§ 19(f), 20(i).

[87]   10/29/24 Hr'g Tr. (Capus) at 46:14-20, 47:1-12, 129:18-21; H-41.

[88]   10/29/24 Hr'g Tr. (Capus) at 47:1-6.

[89]   See, e.g., id. at 46:11-47:19 ("Q.  Do you recall who asked you to [move out of Newark]?  A.  I was asked by Lou Scarpelli who had initially said that he was putting us on probation, and then by Todd Harris who was vice president under Lou Scarpelli.");  D.I. 1608, Ex. 2(B)(i) (Scarpelli Dep at 189:16-23, 190:2-4) ("Q.  What specifically did you say to Marc about ACI vacating the Port Newark location?  A.  I recall having conversations with Marc about his ability or to be able to form [sic] as required at Port Newark and trying to work out an option that would allow us to continue to do business with him but not at Port Newark - not while he's on-site at Port Newark. . . .  Q. Did you require him to leave the Port Newark location?  A.  I

would try to find a way to continue to send work to it, Hertz had no obligation to do so[90] and by February 26, 2015, ACI was told unequivocally that Hertz would not be sending it any more work.[91]

Consequently, the Court concludes that Hertz did not wrongfully terminate the 900 ACI Agreement.  The Court's conclusion does not, however, absolve Hertz of liability for any breach that occurred before the termination but does preclude any damages allegedly occurring as a result of or after the termination in January 2015.

### ii.  VCC Agreement

On November 8, 2016, Capus emailed Hertz acknowledging that the VCC Agreement for the Sterling location was due to expire in May 2017 and expressed an interest in negotiating the terms of a renewal for another five-year term.[92]  In response, the parties engaged in discussions regarding revised terms of the Agreement.[93]  On June 19, 2017, Hertz sent a proposal for new

---

think that's a fair characterization.").

[90]   JX-1 at §§ 19(f), 20(i).

[91]   H-42 (2/26/15 Email from Todd Harris to ACI) ("In light of today's discussion, I can no longer guarantee our interest in sending cars to [ACI's] offsite location.").

[92]   JX-79 (11/8/16 Email from Capus to Hertz) (asking "to begin a dialogue regarding the renewal" of the VCC Agreement before he bought additional equipment to increase productivity at that location).

[93]   10/29/24 Hr'g Tr. (Capus) at 70:5-71:1, 72:3-74:7 (stating that he had "extensive discussions" with Hertz about extending the VCC Agreement and describing the renewal negotiations); H-53

terms that included increased rates Hertz would pay for vehicle repairs and an increased rent, which ACI found unreasonable.[94] Despite the parties' negotiations, no agreement was reached and the VCC Agreement was ultimately not renewed.[95]

---

(3/17/17 Email from Capus to Hertz) ("Just wanted to check in and see if there was any progress on the renewal and/or the rates."); H-54 (3/21/17 Email from Capus to Hertz) ("Let me know if there is anything else you need as I would like to get the extension in place as soon as possible."); A-47 (6/19/17 Email from Capus to Hertz) ("Any progress on the renewal?"); A-48 (7/24/17 Email from Capus to Hertz) ("In a week it will be 11 months since we began negotiating – that's 5 months past the deadline for renewal per the contract terms."); A-49 (7/24/17 Email from Capus to Hertz) ("We have been negotiating by email and phone for almost a year with Hertz being well aware of my intent to renew given acceptable terms. . . . As far as I'm concerned since negotiations have been in good faith, we both waived that clause [requiring ACI to send a certified letter or hand-deliver a letter to confirm interest in renewal].").

[94]   JX-84 (6/20/27 Email exchange between Erin Helfert, Real Estate Manager for Hertz and Capus) (Hertz offering increased rates ACI could charge for the work it got from Hertz and increasing the rent and Capus responding that it was not reasonable for Hertz to double the rent without a firm commitment to the amount of work Hertz would send to VCC, in light of Hertz's continued failure to send VCC its required quota).

[95]   10/29/24 Hr'g Tr. (Capus) at 72:9-10, 74:3-11, 74:16-18 ("Q. Okay. Was [the Sterling Contract] renewed?" A. "It was not renewed. . . .   Q. How much longer did VCC continue to operate at Sterling?   A. It operated for a few more months.   Q. Okay. And what happened to the shop after they stopped operations?   A. My manager in that shop had been negotiating as well with him and he took over the shop. . . .   Q. Did Hertz provide you with six months of written notice on its attempt to terminate this contract?   A. They did not, no."); 10/30/24 Hr'g Tr. (Dilanian) at 201:3-5 ("So before [Capus] closed the shop, two weeks before, he told me, John, you know, [Hertz] did not renew my lease, we're going to close . . . ."); 10/31 Hr'g Tr. (Mitchell) at 24:16-22 ("Q. Did Hertz's relationship with VCC eventually come to an end, sir?   A. Yes, it did.   Q. And did that happen on or about May 31, 2017?   A. Correct.   Q. And why did it come to an end? A. The contract expired, went into holdover.").

ACI contends that it exercised its right to renew the VCC Agreement through Capus's November 2016 email.  The Reorganized Debtors assert that the email was not an exercise of VCC's renewal rights but only an invitation to negotiate an extension.

The Court agrees with the Reorganized Debtors.  The VCC Agreement provided VCC "two (2) five year options to extend the Term of th[e] [VCC Agreement] upon written notice to [Hertz] which shall be received by [Hertz] at least six (6) months before the expiration of the prior term <u>upon all the same terms and conditions set forth in this Agreement</u>."[96]  Such a notice is effective only if "in writing and given by hand delivery or by mailing by certified or registered mail, postage prepaid, return receipt requested, or by nationally recognized overnight air courier, to the address of the party set forth below."[97]  ACI presented no evidence that VCC complied with those requirements.  Instead, the email from Capus on which ACI relies only invited Hertz to discuss the terms of an extension; it was not an exercise of the right of VCC to extend the lease on its existing terms.  The parties did not reach an agreement on new terms, and Capus admitted that the VCC Agreement was ultimately not renewed.[98]

---

[96]    JX-3 at § 2(b) (emphasis added); D.I. 1608 ¶ 28.

[97]    JX-3 at § 23.

[98]    10/29/24 Hr'g Tr. (Capus) at 74:3-4 ("Q.  Was the contract renewed?  A.  It was not renewed.").  <u>See also</u> 10/30/24 Hr'g Tr.

Consequently, the Court concludes that Hertz did not wrongfully terminate the VCC Agreement. Instead, it expired by its own terms in the Spring of 2017 when VCC failed to renew it on its existing terms. Once again, the Court's conclusion does not absolve Hertz of liability for any breach that occurred before the termination but does preclude any damages allegedly occurring as a result of or after the termination on May 31, 2017).

### iii. 950 ACI Agreement

Hertz stopped sending cars to 950 ACI's Florida locations in April 2015 after receiving an anonymous tip that ACI was stealing and reselling Hertz's parts and, after a surprise visit, discovering excess parts on ACI's premises.[99] The Reorganized Debtors argue that, although the 950 ACI Agreement does not expressly provide for cause-based termination, it would be an absurd reading of the contract to prohibit Hertz's immediate termination upon its discovery of ACI's alleged theft.[100]

---

(Dilanian) at 200:23-201:6 (testifying that Capus informed him that the VCC Agreement had not been renewed prior to ACI leaving the Sterling location).

[99]  D.I. 1608, Ex. 2(C)(i) (Dolobach Dep. at 116:17-118:18) (explaining the circumstances under which the 950 ACI Agreement was terminated by Hertz in April 2015); H-62 (4/5/19 Email from Meza to Dolobach) (attaching images of parts recovered by Hertz from ACI's Florida facilities); 10/30/24 Hr'g Tr. (Meza) at 110:9-111:7, 111:14-22, 113:9-14, 115:1-10 (detailing the circumstances surrounding Hertz's accusation of theft by ACI).

[100]  See Prime Victor Int'l Ltd. v. Simulacra Corp., 682 F. Supp. 3d 428, 445 (D. Del. 2023) (stating that an alternate contractual

ACI contends, however, that the termination of the 950
Agreement was not proper because it was based on an anonymous
phone tip which was largely false.[101]  ACI notes that Hertz
admitted it did <u>not</u> (i) conduct a full investigation, (ii) file a
police report, or (iii) send a notice of termination.[102]  ACI

---

interpretation is warranted when a proposed interpretation would
lead to absurdities).  <u>Cf.</u> <u>Millenium Expressions, Inc. v. Chauss</u>
<u>Mktg., Ltd.</u>, No. 02 Civ. 7545 (JCF), 2007 WL 950070, at *13 n.8
(S.D.N.Y. Mar. 30, 2007) (noting that, in the absence of a
statutory or contractual notice provision, the common law
provides that a material breach of a contract relieves the
nonbreaching party of all of its contractual obligations); <u>In re</u>
<u>Nat'l Coverage Corp.</u>, 610 N.Y.S.2d 191, 191 (N.Y. App. Div. 1994)
(holding that arbitrator could order termination of a contract
based upon a party's misconduct, notwithstanding the contract's
silence on for-cause termination).

[101]   10/29/24 Hr'g Tr. (Capus) at 105:1-106:6 (explaining that
many of the allegedly stolen parts were due to be returned to the
dealers); 10/30/24 Hr'g Tr. (Meza) at 129:5-130:1 ("Q.  Now,
before terminating ACI you had no proof that ACI was selling
those parts, correct?  A.  Correct.  Q.  Never had proof that ACI
was actually consummating sales?  A.  No.  Q.  Never had proof
that ACI was actually receiving funds?  A.  Nope.  Q.  No bank
records, correct?  A.  Not to the IRS, so yeah, no.  Q.  No
receipts?  A.  I don't know anybody that files receipts for
stolen parts.  Q.  No invoices, correct?  A.  Correct.  Q.
Nothing proving that ACI was, in any way, making money from
having those parts, correct?  A.  Doesn't explain why they had
them.  Q.  My question is as follows:  You knew of nothing,
before you terminated ACI, that, in any way, indicated they were
making money from having those parts, correct?  A.  Not off
parts, no.").

[102]   10/30/24 Hr'g Tr. (Meza) at 126:15-127:22, 128:7-129:4 ("Q.
Let's talk about Hertz's alleged termination of the Florida
contracts.  Now, you claim that the purported body part issues
started with an anonymous phone call, right?  A.  Correct.  Q.
You never investigated who made that call, right?  A.  Anonymous
call, no.  Q.  You never investigated afterwards who made the
call, right?  A.  Correct.  Q.  Hertz didn't investigate why
there were parts at the ACI Fort Lauderdale shop, correct?  A.
We did investigate it.  We wanted to know why their parts were

asserts that, as a result, it was never given proper notice that Hertz was terminating the 950 ACI Agreement[103] nor given an opportunity to contest the termination of the Agreement or to defend itself.

The Court agrees with ACI and finds that Hertz did not properly terminate the 950 ACI Agreement because it did not (i) provide any formal notice of termination of the 950 ACI Agreement, (ii) verify the anonymous tip or further investigate the alleged theft, or (iii) file a police report or pursue

---

there.  That's where we pulled all of the vehicles that had been there or the vehicles that were on-site to make sure that none of those parts potentially could have matched up to a vehicle. . . .  Q.  You testified that there were 10 to $30,000 of parts up there, right?  A.  Correct.  Q.  And still it didn't do any kind of police report, right?  A.  That would have fallen on our legal team to figure out.  Q.  And you're not aware of them ever figuring it out, are you?  A.  It wouldn't have been my job responsibility.  Q.  You're not aware of them ever figuring that out correctly?  A.  It wasn't my job responsibility.  Q.  So the answer is no, right?  A.  No. . . .  Q.  You're not aware of any specific term of one of those contracts or any of those amendments being communicated to ACI as part of this alleged termination, correct?  A.  Correct.  Q.  You certainly never communicated a specific contractual provision to ACI, correct?  A.  Correct.  Q.  You had no clue that the contract and each of its amendments had a six-month notice provision in order to terminate the contract, correct?  A.  Yep."); D.I. 1608, Ex. 2(C)(i) (Dolobach Dep. at 116:17-120:10, 124:2-17) (describing the circumstances under which Hertz ceased to send ACI work under the 1050 ACI Agreement, and acknowledging that Hertz never filed a formal police report, issued a formal notice of termination, or spoke with any ACI representatives after accusing it of theft).

[103]   10/29/24 Hr'g Tr. (Capus) at 106:11-14 ("Q.  Did Hertz give ACI any notice of the termination of the Florida agreements?  A. They gave us no notice, that day was the last day we saw cars."); JX-4 ("Either party has the right to cancel this agreement with 6 months written notice.").

charges against ACI.[104]   Therefore, while theft of parts may be cause to terminate the Agreement, the Court cannot conclude that the evidence presented by Hertz was sufficient to establish that cause existed in this case.

As noted above, the Court concludes that (1) the 900 ACI Agreement was properly terminated by its own terms when ACI vacated the Port Newark premises,[105] (2) the VCC Agreement was properly terminated by its own terms when the parties did not agree to its extension,[106] and (3) the 950 ACI Agreement was not properly terminated because no written notice of termination was provided to which ACI could have responded.[107]

### 4.   Damages

ACI seeks damages consisting of lost profits of $12,615,362, pre-petition pre-judgment interest of $7,198,761, and post-petition pre-judgment interest at the rate of $3,311 per day.[108]

#### a.   Standard of Review

To recover damages for breach of contract under New York law, the plaintiff must demonstrate "with certainty that such damages have been caused by the breach and . . . [that] the

---

[104]   See supra note 101.

[105]   See supra notes 78-91 and accompanying text.

[106]   See supra notes 92-98 and accompanying text.

[107]   See supra notes 99-104 and accompanying text.

[108]   JX-103 ¶ 113.  See also D.I. 1691 ¶¶ 243, 246.

alleged loss . . . [is] capable of proof with reasonable certainty."[109]  Reasonable certainty requires that the damages calculation "not be merely speculative, possible or imaginary, but must be reasonably certain and directly traceable to the breach, not remote or the result of other intervening causes."[110] Reasonably certain damages are those that are "capable of measurement based upon known reliable factors without undue speculation."[111]  A damages calculation is not speculative, however, merely because the defendant disagrees with it.[112]

Damages for breach of contract may include lost profits "if they were caused by the contract breach, the alleged loss can be proven with reasonable certainty and they were within the contemplation of the parties at the time the contract was

---

[109]    Kenford Co., Inc. v. Cnty. of Erie, 493 N.E.2d 234, 235 (N.Y. 1986).

[110]    Id.  See also Ashland Mgmt. Inc. v. Janien, 624 N.E.2d 1007, 1010 (N.Y. 1993); LeRoi & Assocs., Inc. v. Bryant, 764 N.Y.S.2d 889, 1145 (N.Y. App. Div. 2003) (reversing and awarding damages because future business profits could be calculated with reasonable certainty); Wittich v. Wallach, 607 N.Y.S.2d 725, 726 (N.Y. App. Div. 1994) (affirming award in part because defendants failed to demonstrate that the damages sought by the plaintiffs were "too speculative or incapable of being proven with any reasonable certainty.").

[111]    Ashland, 624 N.E.2d at 1010.

[112]    Care Travel Co., Ltd. v. Pan Am. World Airways, Inc., 944 F.2d 983, 994-95 (2d Cir. 1991) (holding that the defendant's disagreement with the plaintiff's methodology or underlying assumptions alone does not render the damages calculation speculative).

made."[113]   Lost profits are recoverable only when they were within
the parties' contemplation when the contract is executed.[114]   The
parties' contemplation includes "risks foreseen or which should
have been foreseen [by the breaching party] at the time the
contract was made."[115]   For example, lost profits are recoverable
when the nonbreaching party calculated its lost profits based on
amounts the breaching party had contractually agreed to pay.[116]
Even if lost profits are not expressly contracted for, however,
they may be recoverable when they are a "natural and probable
consequence of [the] defendant's breach."[117]   A business' history
of performance may be used to calculate lost profits.[118]   While

---

[113]   In re Lee v. Ho-Park, 793 N.Y.S.2d 214, 216 (N.Y. App. Div.
2005).

[114]   Ashland, 624 N.E.2d at 1010 ("A party may not recover
damages for lost profits unless they were within the
contemplation of the parties at the time the contract was entered
into. . . .").

[115]   Id.

[116]   Coniber v. Ctr. Point Transfer Station, Inc., 27 N.Y.S.3d
763, 766 (N.Y. App. Div. 2016) (permitting the plaintiff's
recovery of lost profits calculated by "the difference between
the payments specified in the contract and the plaintiff's
performance of that contract").

[117]   Biotronik A.G. v. Conor Medsystems Ireland, Ltd., 11 N.E.3d
676, 682-83 (N.Y. 2014) (holding that lost profits were
recoverable as consequential damages when the seller had reason
to know they would result from its breach of the contract).

[118]   See, e.g., Lee, 793 N.Y.S.2d at 217 (stating that tax
returns and an accountant's testimony were sufficient evidence of
lost profits).

lost profits may be approximated,[119] they are not reasonably certain when based on speculative profitability projections.[120]

Generally, "an expert is permitted to base his opinion on a particular version of disputed facts and the weight to be accorded to that opinion is for the [fact finder]."[121]  Thus, a damages expert may assume liability has been established in calculating lost profits.[122]  However, that assumption must be based on credible evidence in the record.[123]

### b.   Evidence of Damages

In support of its damages claim, ACI presented the testimony of William Metzdorff as its damages expert.  Metzdorff stated

---

[119]   Ashland, 624 N.E.2d at 1010 (citations omitted) ("Damages resulting from the loss of future profits are often an approximation.  The law does not require that they be determined with mathematical precision.  It requires only that damages be capable of measurement based upon known reliable factors without undue speculation.").

[120]   Kenford, 493 N.E.2d at 236 (holding that the multitude of assumptions necessary to determine profitability precluded a finding of reasonable certainty in that case).

[121]   Walker v. Gordon, 46 F. App'x 691, 695-96 (3d Cir. 2002)).

[122]   See, e.g., Dorman Prods. v. PACCAR, Inc., 201 F. Supp. 3d 663, 690 (E.D. Pa. 2016) (noting that all damages expert opinions assume proof of liability); Univac Dental Co. v. Dentsply Int'l, Inc., Civ. A. No. 107-CV-0493, 2010 WL 1816745, at *3 (M.D. Pa. Apr. 27, 2010) (holding that a damages expert may assume "all elements of liability, including causation, [is] established").

[123]   See, e.g., Graystone Funding Co., LLC v. Network Funding, L.P., 598 F. Supp. 3d 1228, 1237 (D. Utah 2022) ("For Rule 702 purposes, the accuracy of the factual and causal assumptions underlying an expert's testimony is not at issue, so long as there is some support in the record for the expert's assumptions.").

that his damages calculation was performed to a reasonable degree of accounting certainty.[124]  Metzdorff's analysis was based upon his assessment of what ACI "should" have earned under the Agreements compared to what ACI actually earned.[125]

To calculate "should-have-been" revenue for 900 ACI, Metzdorff used a 2016 Hertz Request for Proposal (the "2016 RFP") listing the annual number of its vehicles requiring repair work, which he assumed was the annual amount of work that 900 ACI should have received from Hertz during the term of its Agreement.[126]  This assumption was premised on Capus's testimony

---

[124]    10/29/24 Hr'g Tr. (Metzdorff) at 212:20-213:3 ("Q. Did you form each of your opinions in this case to a reasonable degree of accounting certainty as the damages expert opining in lost profits? A. Yes, I did. And in my understanding, that means it's a high, but not absolute, level of confidence that my opinions accurately represented the damages incurred by Atlantic based on the allegations in the case and the assumptions that I've made."). On cross examination, Metzdorff clarified that his definition of a "reasonable degree of accounting certainty" was a variance of no more than 10% "plus or minus" from the real damages ACI suffered. 10/30/24 Hr'g Tr. (Metzdorff) at 13:5-14:13.

[125]    10/29/24 Hr'g Tr. (Metzdorff) at 213:6-12, 215:6-11 ("Q. What analysis did you do to form Opinion Number 1? A. The analysis I did was - was to compare what should have happened in terms of the amount of money that Hertz should have paid ACI for the work that ACI should have performed, compare that to what they were actually paid to come up with, a number that I could then take a difference as lost revenues. . . . You start with a should-have-been revenue, you substract actual, you get a difference. To get the profit, I multiplied by the profit percent or margin, which in this case is a gross profit from the tax returns - and I'll talk more about that later, but you get - end up with lost profits using that approach.").

[126]    Id. at 215:12-216:20; A-36; A-56.

that ACI could have handled all of the repair work that Hertz
generated.[127]  Metzdorff did not reflect any decrease in annual
work for the ramp-up period of the 900 ACI Agreement because ACI
had been operating in that location since 2010.[128]

Metzdorff admitted that he was not able to find sufficient
and accurate information related to VCC and, therefore, relied on
Capus's testimony that Hertz estimated VCC could generate $2.5
million in annual revenue in Sterling and calculated VCC's net
revenue from that estimate by subtracting labor costs.[129]  For the
BWI Airport fleet work that the VCC Agreement included, Metzdorff
started with his calculation of revenue for the Port Newark
location, decreased it by 63% to reflect Hertz's smaller BWI

---

[127]   10/30/24 Hr'g Tr. (Metzdorff) at 8:3-7 ("Q.  Let me ask you
a more precise question: Did the 900 ACI locations have the
capacity to handle all the repair work that Hertz wrote at Port
Newark?  A.  My assumption is that they did, and my assumption is
based on the testimony of Mr. [Capus], for instance.").

[128]   10/29/24 Hr'g Tr. (Capus) at 36:5-7; id. (Metzdorff) at
226:11-13, 227:5-12.

[129]   10/29/24 Hr'g Tr. (Metzdorff) at 220:7-220:21 ("Q.  Okay.
And then the basis for your should-have-been revenues [f]or
Virginia Collision Corporation?  A.  For VCC or Virginia
Collision, if you go to the next slide, I was not able to find
sufficient and accurate information related to VCC.  So in this
case, I looked to Mr. [Capus's] testimony and his deposition
where he talked about the expected annual revenue at Sterling.
And if you remember, there's two – sort of two sources of cars
for VCC.  One is Sterling and the other is Baltimore
International Airport.  So for Sterling, I believe he was told
two-and-a-half million was what they spent on car repairs at that
location, and labor would represent 60 percent of that.  So when
you take away the labor, you're left with $1.5 million of annual
revenue, which divided by 12 is 125,000 per month.").

Airport fleet size, and then applied a further 50% "discount" because VCC had a right of first refusal over that work.[130]

To determine the should-have-been revenue for Miami, Metzdorff used information Capus had received from Hertz showing the amount of repair work Hertz had in 2010 at that location.[131] For West Palm Beach and Fort Lauderdale, Metzdorff used 7-months of data of total repairs Hertz had in 2012 at those locations to determine an annual amount, and then subtracted a percentage to reflect the semi-exclusivity of those contracts.[132] Metzdorff performed a similar analysis for Orlando, using information provided by Hertz as to the amount of repairs at that location but using the average cost of repair for Miami because he could

---

[130]   Id. at 220:22-221:13 ("I needed to add something in for Baltimore, and that was the first refusal location. I knew it wasn't as significant as any of the other locations. Mr. [Capus] told me that it would make sense to use a ratio of fleet sizes between Port Newark and BWI, and his understanding was there were 8,000 vehicles in the fleet at BWI, and there were 17,000 at Port Newark. So if you assume that you'd have the same number of repairs per [car], that's about 47.1 percent of what Port Newark would do. So I took the Port Newark revenue, reduced it by some 63 percent, and then I even applied a bigger discount, another 50 percent against that to represent the first refusal, and end up with a monthly average labor for Baltimore calculated at 68,447. So when you add those two together, you get a total of $193,447 of estimated revenue per month" for VCC.).

[131]   Id. at 216:21-218:7. See A-5 (3/25/11 Email from Musick at Hertz to Capus) (forwarding the repair numbers for the Miami location in 2011).

[132]   10/29/24 Hr'g Tr. (Metzdorff) at 218:8-219:10. See A-44.

not find that data for Orlando.[133]  Metzdorff's calculations also

included an increase in the amount of work each ACI site "should

have" received by virtue of Hertz's fleet expansion following the

DTAG acquisition.[134]

On cross-examination, Hertz elicited admissions of numerous

flaws in Metzdorff's analysis.  For example, Metzdorff admitted

that his damages calculation assumed that ACI could handle all of

Hertz's work, relying on Capus's testimony to that effect.[135]

Metzdorff did not test that assumption by using or conducting a

capacity analysis of ACI, because that information was not

available and he did not attempt the analysis.[136]  As a result,

---

[133]   10/29/24 Hr'g Tr. (Metzdorff) at 219:11-220:6.  See A-36, A-
5.

[134]   10/29/24 Hr'g Tr. (Metzdorff) at 226:11-13, 227:15-18,
229:14-17, 231:2-4, 232:1-3, 233:16-18.

[135]   10/30/24 Hr'g Tr. (Metzdorff) at 6:15-25 ("Q.  And one of
the foundational assumptions of your report is that the
conditions for which Hertz could send work to another body shop,
namely, that ACI didn't have the capacity to repair it on a
timely basis, was never achieved, correct?  A.  I have - yeah, I
have not seen information in the record that specifies that, [s]o
I have not included that in my calculation.  Q.  So you assume
there was not even a single day when even a single one of ACI's
shops was unable to repair a Hertz vehicle on a timely basis,
correct?  A.  I think that's correct. . . ."), 11:24-12:5 ("Q.
Instead of doing the analysis or hiring [s]omeone else to do the
analysis, you simply assumed that ACI had the capacity to handle
100 percent of the repairs required by your revenue calculations,
correct, sir?  A.  Well, it's an assumption, but it's based on
the testimony and the facts and circumstances of the case that I
cite to in my report as the basis for my opinion.").

[136]   Id. at 9:3-10:24, 11:10-23 ("Q.  You, sir, didn't personally
conduct any capacity analysis in this case, correct?  A.  That is
correct.  Q.  And not only did you not conduct a capacity

Metzdorff also assumed that ACI could have performed all of Hertz's work at each site without adding any additional space or equipment.[137]  Instead, he testified that he assumed ACI could have achieved his calculated profits simply by running additional shifts.[138]

The Reorganized Debtors also demonstrated several inconsistencies in Metzdorff's use of the data that was available.  For example, while Metzdorff criticized the accuracy and completeness of Hertz's invoice data, he also admitted that he used Hertz's second spreadsheets which were based on that data for some of his calculations.[139]  Metzdorff also conceded that he

---

analysis, but you can't even describe how one would go about even doing the capacity analysis, can you?  A.  Well, I recall you asked me that question in my deposition.  I think I said I'd have to actually do the work to know exactly how to do it, but I gave you [s]ome ideas of maybe where I would start.  But I haven't done the analysis, [s]o I can't say what I would do, if I did it, for instance."), 12:12-13:4 (stating that he asked for capacity information from ACI but it was not available).

[137]  Id. at 55:10-57:2 (stating that based on Capus's testimony, he assumed that there would be no change in the amount of space or equipment and that the only change would be adding shifts and employees), 77:11-78:4 (calculating the increased cost of additional work from Hertz to be only the increased labor costs of adding shifts and employees).

[138]  Id. 55:1-25 ("Q.  So to get from 23 million of revenue to $59 million of revenue, in your assumptive world, you wouldn't have to expand your square footage by one extra square foot, would you?  A.  No. I think what Mr. [Capus] testified you have to do is, you'd have to double or triple his -- the shifts that he was using.").

[139]  Id. at 15:6-13 (admitting that he found unreliable the data on which the second spreadsheets are based), 59:24-61:19 (admitting that he relied on the second spreadsheets but only to

selected other data inputs, even when they conflicted with

Capus's testimony or ACI's exhibits, resulting in higher

damages.[140]   Metzdorff acknowledged that he made other assumptions

_____

a limited degree).  The accuracy of Hertz's invoice data arose
pre-trial, when Hertz admitted certain spreadsheets were
inaccurate and sought to use the second spreadsheets which were
derived from underlying data that had not been produced in
discovery, and ACI sought to bar the second spreadsheets.  D.I.
1520, 1527, 1546.  The Court agreed with ACI and barred the use
of the second spreadsheets at the evidentiary hearing, including
use by Hertz's expert witness, Jack Schwager.  D.I. 1565.
Subsequently, the Court clarified that the Reorganized Debtors
could cross-examine Metzdorff on the extent to which he relied
upon the second spreadsheets and that Schwager could testify as a
rebuttal expert.  10/29/24 Hr'g Tr. at 16:6-14.  See also
10/31/24 Hr'g Tr. at 84:7-85:6, 164:17-18 (allowing Schwager to
testify subject to ACI's objection that it was untimely and not
properly disclosed expert opinion testimony and ultimately
overruling that objection after the Court heard the testimony).

[140]   Id. at 21:25-22:21 ("Q.  For the month of April, 2010, your
schedule assumes that ACI should have repaired 723 cars?  A.
Yes.  Q.  On the right-hand side of the screen, we have an e-mail
from your client that said he actually repaired only 213 cars in
the month that you assumed that he would have repaired 723,
correct?  A.  Yes.  Q.  This is a mistake in your report which
should be fixed, right?  A.  Well, it's an inconsistency, and
looking at this document, I'd probably change it.  Q.  And if we
look at May.  In May, you also in your schedule, assume that 723
cars will be repaired, right?  A.  Yes.  Q.  And in May, Mr.
[Capus's] e-mail, which he wrote on May 27th of that year said,
with only a few days left in the month, he was projecting 250
cars, correct?  A.  Yes.  Q.  You would also make a correction
for May, in light of this e-mail, would you not, sir?  A.  Yes.
I would most likely reduce that number.");  31:22-32:13 ("Q.  You
did testify a moment ago that you used the second spreadsheets to
calculate the Port Newark average revenue per-repair, correct?
A.  Yes, I used the second spreadsheets on a very limited basis.
Q.  You're aware, sir, that if you used the second spreadsheets
to calculate the Orlando average revenue per-repair, you would
have arrived at $369.42 per-repair, instead of the $818 that you
used in your calculation, correct?  A.  I mean, I didn't do that
calculation, so I don't know what the answer is to that.  Q.  So
in order to check or triangulate, in your words, the
reasonableness of your assumption that it would cost $818 per-

which had no basis in the underlying evidence causing the damages calculation to be inflated.[141] This led to certain data points in Metzdorff's estimates being grossly different from the volume of work that ACI actually performed, which he admitted he should have corrected.[142]

Metzdorff also admitted that the amount of repair work which Hertz could send to ACI was impacted by seasonal fluctuations (especially in Florida) but that he did not account for those fluctuations in his analysis.[143] He also acknowledged that his calculations would have to be adjusted to include other relevant factors, including the ramp-up period ACI required before it

---

repair, you didn't go look at the second spreadsheets and see what the average cost of repair was in Orlando, sir?  A.  I did not, no, based on my analysis of the overall information.").

[141]   Id. at 35:1-6 ("Q.  Your calculation was based on your assumption that P&L [in A-44] meant paint and labor and not profit and loss, right, sir?  A.  Well, again, I - the e-mail doesn't say what it is, [s]o my assumption is that it's paint and labor.  Again, it's information being provided to Mr. [Capus] for part of his planning to open up . . . a service facility.").  See 10/31/24 Hr'g Tr. (Mitchell) at 40:24-41:6 (testifying that the reference in A-44 to "p and l" did not stand for "parts and labor" but rather "profit and loss" and therefore the damages calculated by Metzdorff were inflated by the cost of labor or at least 40%).

[142]   See supra note 140.

[143]   Id. at 35:22-36:4 ("Q.  And you understand that the car rental business in Florida is highly seasonal, right, sir?  A.  Yes, it is.  And it's seasonal in different times of the year. Q.  You didn't make any adjustments for seasonality, though, using these numbers for a seven-month period to come up with an annual average monthly revenue, did you?  A.  I did not, no.").

could operate at full capacity.[144]   Further, Metzdorff testified

that his calculations assumed that the Agreements would last

until 6 months after they were terminated, because ACI contended

that they had been terminated without that required notice.[145]

The Reorganized Debtors also presented a rebuttal damages

expert, Jack Schwager, who opined that Metzdorff's analysis was

---

[144]   Id. at 23:5-23:15 ("Q.  And this is your slide for Newark,
and at Newark, you chose not to make any ramp-up assumption,
correct?  A.  Yes, that's correct, based on my understanding at
the time that Mr. [Capus] had been operating at this particular
location for a number of months prior to this start date.  Q.
And if we go back to Exhibit H-1, Mr. [Capus]'s e-mail, this
e-mail is very persuasive evidence that Mr. [Capus] and ACI
needed a ramp-up period in Newark, which you did not apply in
your assumptions, right, sir?  A.  That seems correct.  Again,
I'd have to [s]ort of do calculations, see what it shows me.").
Metzdorff did include a four month ramp-up adjustment for the
Florida locations but not for Port Newark or Sterling.  JX-103,
Schedules 2-6.

[145]   10/30/24 Hr'g Tr. (Metzdorff) at 65:19-66:20 ("Q.  Thank
you.  And the accuracy of your calculation relies on the
correctness of these time period assumptions, right?  A.  It
relies on these time periods.  To the extent the time periods
change, you know, the damages could change.  Q.  For example, if
the Court determines that earlier or later start dates is
appropriate for any of these contracts, that could mean a
different amount of lost profits damages, right, sir?  A.  Yes,
if the dates expanded, it would change.  If the dates contracted,
it would change.  Q.  All right.  Let's just take one example.
The end date for the Florida contracts, you have listed as
October 23rd, 2015, correct?  A.  Yes.  Q.  And you understand
it's at least Hertz's position in this litigation, that those
contracts were terminated on April 23rd, 2015, about six months
earlier, right?  A.  Well, to me, yeah, that gets to [s]ort of
what actually happened versus what should have happened perhaps.
But yes, it's my understanding that Hertz has different positions
on these dates.  Q.  But you were here for Mr. [Capus]'s
testimony yesterday when he says he didn't get any additional
work from Hertz after April 23rd, 2015, right?  A.  I believe he
said that, yes, and that's [s]ort of the actual world, I guess.
I'm also interested in the should-have-been world.").

flawed for several additional reasons.  First, he contended that the data on which Metzdorff relied was faulty because he used the second spreadsheets selectively and had no reliable data on ACI's capacity or actual costs to operate because ACI had failed to preserve that data.[146]

Schwager also criticized Metzdorff's assumption that ACI could have handled all of Hertz's repair work without performing any analysis of ACI's capacity or considering contradictory evidence in the record.[147]  Schwager also opined that Metzdorff's

---

[146]    10/31/24 Hr'g Tr. (Schwager) at 103:13-105:4 ("[T]he best approach would be to actually look to Hertz's information, to look to ACI information, and to try to quantify, you know, what actually was potentially vended improperly to non-ACI vendors . . . .  Q.  Is that the approach that Mr. Metzdorff took in this case?  A.  It is not."), 105:18-107:24 (stating that Metzdorff ignored Hertz's invoice data for repairs in the second spreadsheets and instead relied on ACI's tax returns which contained no underlying detail); 114:23-115:12 (criticizing Metzdorff for using the second spreadsheets for some purposes but not for others); 118:22-123:7 (stating that Metzdorff relied on Hertz's projections of repairs for Port Newark without knowing the data on which it was based but ignored Capus's actual repair numbers which resulted in $4 million in additional damages); 128:15-130:19 (stating that Metzdorff relied on an email estimating revenue per repair and ignored Hertz's second spreadsheets which contained actual repair cost figures).  Compare A-5 (3/25/11 Email from Hertz to Capus) (estimating $818/repair revenue in Miami) with H-78 (showing average cost per repair in Miami was actually $362).

[147]    10/31/24 Hr'g Tr. (Schwager) at 118:25-121:6 (noting that Metzdorff relied on the 2016 RFP to assume 900 ACI could handle all of Hertz' 723 repairs in April 2010 while ignoring evidence that Hertz had estimated ACI could do 400 but it had only done 213 repairs that month).  Compare A-36 (estimating 987 repairs per month) with 10/29/24 Hr'g Tr. (Capus) at 109:1-23 (testifying that Hertz had estimated that 900 ACI would be able to repair 400 cars per month but it had only been able to do ramp up to 250 by May) and H-1 (5/27/10 Email from Capus to Hertz) (showing 900 ACI

conclusions were flawed because he failed to consider additional
evidence of factors which impacted ACI's revenues, including that
ACI lacked the ability to do all types of repairs for Hertz's
vehicles[148] and that the Agreements were properly terminated by
Hertz before the end of the damages period used by Metzdorff.[149]

      c.   Arguments and Conclusions

         i.   Admissibility of Expert Opinions

The Reorganized Debtors assert preliminarily[150] that ACI

---

had only repaired 213 cars in April and estimated doing 250 cars
in May). See also 10/31/24 Hr'g Tr. (Schwager) at 123:22-126:24
(stating that Metzdorff relied on Capus's testimony of estimated
revenues at 900 ACI and extended it to BWI Airport based on the
size of the fleets and random percentage adjustments instead of
considering a contemporaneous estimate of revenues that Capus
provided to his insurance company); H-2 (9/2/10 Email from Capus
to his insurance broker) (estimating $800,000 in revenue at VCC).

[148]   10/31/24 Hr'g Tr. (Schwager) at 109:5-11 ("So it's possible
that the variance between what was projected here and what
actually occurred may be due to capacity limitation. And, again,
Mr. Metzdorff has just assumed that away. Further, there were
repairs that I think Mr. [Capus] testified that he turned away.
We heard Mr. Dilanian yesterday also discuss turning away
repairs."), 114:15-16 ("[Metzdorff's] analysis, in addition,
doesn't include capacity, like limitations, whatsoever.");
127:19-24 (noting that Metzdorff ignored Dilanian's testimony
that VCC's capacity was 170-180 vehicles per month which
corroborated the estimate of volume Capus had given his insurance
broker). See H-2.

[149]   10/31/24 Hr'g Tr. (Schwager) at 132:24-133:7.

[150]   Prior to the evidentiary hearing, the Reorganized Debtors
filed a Motion in Limine raising this issue and asking the Court
to exclude Metzdorff's testimony as a result. D.I. 1583. The
Court denied that motion without prejudice to refiling it after
the Court had heard the evidence. 10/22/24 Hr'g Tr. at 7:2-18.
Post-trial, the Reorganized Debtors raised this argument again by
a Post-Trial Motion under Rule 7037(e) for Curative Measures for
ACI's Spoliation of Financial, Accounting, and Workload

failed to preserve its records, which they contend would have demonstrated that ACI did not have the capacity to handle all of Hertz's work.[151]  As a result, the Reorganized Debtors contend that Metzdorff's damages calculation, which relied on the assumption that ACI did have that capacity, must be stricken.[152]

ACI argues preliminarily that Schwager's rebuttal testimony should not be considered by the Court because it presents new, unsound, and improper expert opinions, which differ from his original report.

The Court concludes that it is unnecessary to address either argument.  The Court already considered (and rejected) ACI's arguments to exclude Schwager's rebuttal testimony.[153]  The Court

---

Documents, which has now been fully briefed.  D.I. 1668; D.I. 1698; D.I. 1705.  The Reorganized Debtors also filed a post-trial Motion for Additional Curative Measures Relating to ACI's Quickbooks Data by which they sought to dismiss ACI's claims in toto, contending that the Reorganized Debtors had learned only in July 2025, from a former employee of ACI, that she had provided a backup copy of ACI's QuickBooks records to ACI in August 2023, which had never been produced in discovery.  D.I. 1770.  ACI responded to that motion, contending that the Quickbooks records found by its employee were inaccessible despite its efforts to retrieve the information, and that it had advised Hertz of that in their meet and confer held on March 19, 2024.  D.I. 1777.

[151]   D.I. 1668.

[152]   See Fed. R. Bankr. P. 7037(e) (permitting a court to impose appropriate sanctions where a party fails to preserve relevant electronically stored information which prejudices the other party, including making an inference that the lost information was unfavorable to the party failing to preserve it or even dismissing that party's claims).

[153]   The arguments have a long genesis.  On August 7, 2024, ACI filed a Motion to bar the Reorganized Debtors from using

will also deny the Reorganized Debtors' post-trial Motions for
curative measures, because the Court finds that the Reorganized
Debtors were able to highlight the numerous deficiencies in
Metzdorff's testimony even without ACI's records and that the
Court can weigh that testimony appropriately.[154]

### ii.   Did ACI Satisfy its Burden of Proof?

ACI argues that it has met its burden of proving the damages
that ACI suffered as a result of Hertz's breach of the Agreement

---

documents that they had not produced in discovery and to strike
Schwager's Expert Report which had relied on them.  D.I. 1520;
D.I. 1527; D.I. 1546.  On September 25, 2024, the Court granted
ACI's Motion to Strike, precluding either party from using the
Reorganized Debtors' second spreadsheets and precluding Schwager
from testifying in reliance on them.  D.I. 1565.

ACI filed a Motion in Limine to bar the remaining opinions
of Schwager.  D.I. 1589; D.I. 1605; D.I. 1613.  The Reorganized
Debtors filed a Motion to exclude the testimony of ACI's expert,
Metzdorff.  D.I. 1567; D.I. 1579; D.I. 1607; D.I. 1611.  At the
pre-trial hearing held on October 22, 2024, the Court declined to
grant both motions, ruling that Metzdorff could testify as an
expert and that Schwager could testify as a rebuttal expert and
that the parties could object to any testimony that they felt was
improper at the trial.  See 10/22/24 Hr'g Tr. at 6:13-8:11.  On
the eve of trial, October 27, 2024, the Reorganized Debtors filed
a Motion to Reconsider the Order striking Schwager's Expert
Report.  D.I. 1633; D.I. 1640.  On the first day of the trial,
the Court denied the motion.  10/29/24 Hr'g Tr. at 16:6-14.

On the third day of the trial, ACI again asserted that
Schwager should not be permitted to testify or use his
demonstrative PowerPoints that had only been provided to counsel
for ACI the night before.  10/31/24 Hr'g Tr. at 84:7-87:13.
After considering the testimony and PowerPoints, the Court
overruled ACI's objection to the testimony and PowerPoints.  Id.
at 164:17-18.

[154]   See Walker, 46 F. App'x at 695-96 ("An expert is,
nonetheless, permitted to base his opinion on a particular
version of disputed facts and the weight to be accorded to that
opinion is for the [fact-finder].  It is also . . . a proper
subject for cross-examination.").

with reasonable certainty through fact and expert testimony. ACI
argues that, as an expert, Metzdorff properly relied on Capus's
credible testimony about ACI's capacity to repair all of the
Hertz vehicles contemplated under the Agreements. It further
argues that it provided ample evidence of the total number of car
repairs that Hertz should have vended to ACI during the relevant
period and the cost of those repairs that should properly have
been paid to ACI. ACI finally asserts that Schwager's
methodology improperly relied on unsubstantiated data in the
second spreadsheets and on cherry-picked information in an effort
to reduce the damages calculation properly prepared by
Metzdorff.[155]

The Reorganized Debtors argue that ACI has not met its
burden of establishing that it had any lost profits with
reasonable certainty. They contend that Metzdorff's reliance on

---

[155]   See, e.g., 10/31/24 Hr'g Tr. (Schwager) at 116:19–121:16
(suggesting that the correct figure should be based on a
contemporaneous email from Capus, H-1, which showed only 213 cars
were repaired in April 2010 at Port Newark instead of Hertz's
2016 RFP estimates), 125:10–126:24 (stating that damages should
be based on ACI's estimate of revenues for an insurance quote
rather than Capus's testimony on revenue expectations),
128:11–130:19 (suggesting that the damage calculation should use
the actual revenue per repair for Miami of $363 rather than
Metzdorff's $818 figure from the 2016 RFP), 131:16–134:10
(stating that Metzdorff's figures for Fort Lauderdale and West
Palm Beach should be reduced to $14,000 because Hertz had
terminated their contract early), 134:13–136:14 (suggesting that
the correct figure should be based on a contemporaneous email
from Capus, H-1, which showed actual repairs in April 2010 of
instead of Hertz's 2016 RFP figure of $818, reducing Orlando's
damages to $69,000).

Capus's testimony that ACI was capable of handling all of Hertz's repairs during the relevant period was unreasonable because there was no basis for Capus's assertion and it is rebutted by substantial contrary evidence, which Metzdorff did not consider. The Reorganized Debtors rely on their cross-examination of Metzdorff and the testimony of their rebuttal expert, Schwager, to highlight the numerous errors in Metzdorff's testimony. The Reorganized Debtors alternatively contend that ACI's Claims must fail because the parties did not contemplate that ACI would be entitled to lost profits in the amounts asserted (which are substantially more than ACI ever realized in performing the Agreements).

Based upon the evidence presented, the Court concludes that ACI has not met its burden of establishing that the damages it requests are reasonably certain consequences of the breach of the Agreements by Hertz. This conclusion is based on the numerous error's in ACI's damages calculations and, most importantly, on the fact that those calculations were based on unreasonable assumptions about ACI's capacity to handle all of Hertz's work.[156]

a.   <u>Errors in Metzdorff's Calculations</u>

As noted above, the Reorganized Debtors were able to

---

[156]   <u>Kenford</u>, 493 N.E.2d at 235 (holding that the party seeking damages for breach of contract has the burden to prove those damages with reasonable certainty).

demonstrate numerous errors in Metzdorff's calculation of
damages.[157]  For example, Metzdorff admitted on cross-examination
that his assumption that 900 ACI could have repaired 723 cars in
April 2010 would have to be reduced in light of the fact that it
had only repaired 213 cars that month.[158]  He also used the 2016
RFP to calculate the average revenue per repair for Orlando,
rather than the second spreadsheets (which he had used for 900
ACI), resulting in an increased cost of almost $450 per repair.[159]
Metzdorff also erroneously assumed a reference to "p & l" (in an
estimate of work that ACI could expect) meant "paint and labor"
which increased his calculations of revenue expected from those
estimates by 40%.[160]

The many unreasonable assumptions made by Metzdorff as
demonstrated in his cross examination and Schwager's testimony
are especially harmful because Metzdorff compounded them by using
them as the basis for other assumptions.  For example, he based
VCC's capacity levels and "should-have been" revenue from its BWI
Airport work on his flawed calculation of 900 ACI's capacity and
expected revenues.[161]  In doing so, Metzdorff made no assessment

---

[157]   See supra notes 134-148.

[158]   See supra note 140.

[159]   Id.

[160]   See supra note 141.

[161]   See supra notes 129-130 and accompanying text.  In addition,
Metzdorff included in his calculation of lost profits for 900 ACI

of whether the two facilities were sufficiently similar to warrant that assumption.[162]  Metzdorff acknowledged that his conclusions were hampered by his lack of access to more detailed information about each of the shops because of both parties' failure to preserve or produce information.[163]  Finally, the Court finds that there is no basis for Metzdorff's application of arbitrary percentages to reflect VCC's right of first refusal for cars from BWI Airport, for the Florida shops semi-exclusivity provisions, or for Hertz's fleet size growth.[164]

All of the above errors compel the Court to conclude that Metzdorff's testimony does not provide a reasonably certain calculation of damages suffered by ACI as a result of Hertz's breach of the Agreements.  Even without those errors and discrepancies, however, the Court still concludes that Metzdorff's testimony does not provide a reasonable basis for an award of damages in ACI's favor because his conclusions are all based on an assumption that does not have support in the record:

---

at Port Newark, work that 850 ACI had performed.  10/31/24 Hr'g Tr. (Schwager) at 116:19-121:16.

[162]   See supra note 136 and infra notes 166, 176, 177.

[163]   See 10/29/24 Hr'g Tr. (Metzdorff) at 210:7-211:12, 220:7-11, 221:21-222:21; 10/30/24 Hr'g Tr. (Metzdorff) at 9:8-10:24,12:17-13:4, 15:6-13, 17:9-23, 24:4-23, 25:11-20, 29:12-30:3,30:12-31:6,31:22-32:1, 33:2-9,33:15-34:6, 35:7-11, 36:14-17, 36:20-25, 38:14-21, 40:6-20, 42:21-43:1, 43:10-44:11, 44:15-25, 45:4-15, 48:9-15,49:14-18, 50:10-20, 54:3-15, 59:8-61:19, 62:7-20, 62:25-63:14.

[164]   See supra notes 130, 133-134 and accompanying text.

that ACI had the capacity to perform all of Hertz's repair work that it contends it was required to receive under the Agreements.

### b.   Capacity

Metzdorff's damage calculation is premised entirely on the testimony of Capus that ACI had unlimited capacity at each site to perform all of Hertz's repair work at all times.[165] Metzdorff accepted that testimony without doing any analysis of whether ACI actually had that capacity.[166] Capus's capacity testimony,

---

[165]   10/30/24 Hr'g Tr. (Metzdorff) at 55:19-56:20 (assuming that ACI could have increased its capacity simply by adding more shifts and hiring more employees); 10/29/24 Hr'g Tr. (Capus) at 179:9-12 ("Because I had the option in the contract to work 24/7 and the facility was in an industrial area where nobody would be bothered by us, the sky was the limit as far as productivity."). See also, id. at 39:12-15, 40:6-8, 41:3-6, 63:15-18, 63:23-25, 95:13-15, 95:19-21, 100:14-17, 101:8-10 ("Q.  Was 900 ACI ever unable to handle the volume of repairs that Hertz sent to it in a timely manner, as the contract suggests?  A.  No, we were not. . . .  Q.  Did ACI ever turn down vehicles sent by Hertz to be repaired?  A.  Absolutely not, we took everything they gave us. . . .  Q.  Was there ever any time when 900 [ACI] ever didn't have the capacity to address repairs that Hertz was asking it to do?  A.  Never. . . .  Q.  Was VCC ever unable to handle any volume of repairs that Hertz was sending to it in a timely manner at the Sterling facility?  A.  No, we were not. . . .  Q.  Did VCC ever turn down vehicles sent to it by Hertz for repair at Sterling?  A.  No.  Not that I am aware of. . . .  Q.  Was 1050 ACI ever unable to handle the volume of repairs that Hertz sent to it in a timely manner?  A.  We were never unable to handle the volume. . . .  Q.  Did 1050 ACI ever turn down repair work offered to it by Hertz?  A.  No, we didn't. . . .  Q.  Was 1100 ACI ever unable to handle the volume of repairs that Hertz sent to it in a timely manner from Orlando?  A.  No, we were not. . . .  Q.  Did 1100 ACI ever turn down work from Hertz that was sent to it?  A.  No, we did not.").

[166]   10/30/24 Hr'g Tr. (Metzdorff) at 9:3-7 (admitting he saw no document which contained a capacity analysis), 11:10-23 (admitting he did not personally do a capacity analysis in this or any other case), 11:24-12:5 (admitting he did not hire anyone

however, is contradicted by Hertz employees who testified that no
one body shop could have handled all of the work that Hertz
generated.[167]   It is also contradicted by Dilanian (VCC's manager)
who testified that ACI did not have that capacity and that it was
unreasonable for Metzdorff to assume that VCC could sustain
performance at the highest level it had ever achieved.[168]   The
Court finds more credible the testimony of the Hertz employees,
who knew better than Capus the extent of the work that Hertz had

_____

to do a capacity analysis).

[167]   10/30/24 Hr'g Tr. (Meza) at 100:10-101:5 (opining that
Hertz's work was too much for any one shop to handle); 10/31/24
Hr'g Tr. (Mitchell) at 13:8-12, 24:9-10, 43:23-44:8 (disputing
Metzdorff's assumption that ACI could handle all of Hertz's body
damage work given ACI's capacity limits and stating that no
single body shop could handle all of Hertz's work).   See also
D.I. 1608 at Ex. 2(C)(i) (Dolobach Dep. at 91:5-21) ("[W]ould you
agree that Hertz agreed to send all bodywork for - all the cars
it was repairing at Sterling facility? . . . . A.   Well, again
I'll go back to one of my original answers that, no, it's just
not feasible to send all the work there.   Due to the volume, it
was not going to be able to be turned in a timely manner.   Q.
Did Hertz ever try? . . .   A.   Yeah, we - we would load them up
to the point where they just couldn't take any more."); 10/30/24
Hr'g Tr. (Dilanian) at 175:22-176:9 (testifying that VCC could
not have repaired any more cars than it did during the term of
the Agreement because of the size of the space and only having
one paint booth, even it occasionally did double shifts),
194:16-195:9 (disputing Capus's testimony that 900 ACI could have
repaired 987 cars per month and saying that it maybe could do 300
cars per month if it only did quick, easy repair jobs).

[168]   See, e.g., 10/30/24 Hr'g Tr. (Dilanian) at 225:15-21 ("Q.
Well, you testified with that one long double shift, you could do
20 cars in a day? A.   I testified and I said you could do 20
cars a day, double shift.   We were double shifting.   We did 15
cars in one day and actually one time we did 20 cars in one day.
That's because the day before was seven cars.   That doesn't mean
it's a continuation, 20 cars a day, a day, a day.").   See also
supra note 46.

to refer to ACI, and the testimony of Dilanian who based his conclusions on existing facts not on wild assumptions that the "sky was the limit."[169]

Furthermore, the Court concludes that the fact that ACI occasionally did ask Hertz for more work[170] is not sufficient evidence that ACI always had the capacity to do more.  This is particularly true because Capus himself admitted, and Hertz's witnesses confirmed, that at times ACI was not able to handle even the work that Hertz did give it.[171]  Nonetheless, Metzdorff simply assumed that "there was not even a single day when even a single one of ACI's shops was unable to repair a Hertz vehicle on a timely basis."[172]  That testimony is not a reasonable assumption given the contrary credible evidence.  Further, the Court concludes that Metzdorff ignored other evidence of factors that negatively affected ACI's capacity to perform all of Hertz's repairs.

                i.   <u>Size</u>

Capus admitted that a shop's capacity is primarily limited

---

[169]    See <u>supra</u> note 164.

[170]    See <u>supra</u> notes 39, 47 and accompanying text.

[171]    See <u>supra</u> notes 38, 51 and accompanying text.  <u>See also</u> D.I. 1608 at Ex. 2(C)(i) (Dolobach Dep. at 91:5-21).

[172]    10/30/24 Hr'g Tr. (Metzdorff) at 6:15-7:1.

by its size and layout.[173]  This was confirmed by Hertz's
witnesses.[174]  Capus also admitted that every body shop had a
limit to its capacity, although he could not say what the precise
limit was for each of ACI's shops.[175]  Capus testified about the
size of the shops and equipment limitations at the Florida
sites.[176]  Dilanian, who was the manager at VCC, was able to
testify about VCC's and 900 ACI's capacity limits.[177]  All of

---

[173]   10/29/24 Hr'g Tr. (Capus) at 112:22-25 (Q. "I'm just asking
you, setting aside this document, the most important factor for
capacity of a shop is the size of the shop and the surrounding
parking; right?" A. "Correct.").

[174]   10/30/24 Hr'g Tr. (Meza) at 99:1-101:19 (explaining the size
constraints caused by paint jobs and opining that unless a shop
had 40-50 bays it could not handle all the repairs in any one
area); 10/30/24 Hr'g Tr. (Dilanian) at 141:22-142:6 (explaining
that the inside space of a shop is the key to the ability to do
repairs), 167:17-169:1 (explaining that the number of available
bays dictated how many cars could be repaired).

[175]   10/29/24 Hr'g Tr. (Capus) 111:8-10 ("Q.  You do agree that
every facility has a maximum capacity, right?  A.  Of course,
every facility has a maximum capacity.").  However, Capus stated
that he did not know what ACI's maximum capacity was.  Id. at
113:13-18, 122:11-14, 181:8-17.

[176]   Id. at 84:25-85:21 (Miami had 13,000 square feet with a
spray booth and spray station and could handle 20-30 cars at a
time), 95:1-9 (facility for Fort Lauderdale and West Palm Beach
was 9100 square feet with a spray booth, a spray station and a
frame machine and could handle 20-30 cars at a time), 99:25-100:7
(Orlando was 9,000 square feet with only a spray booth, a spray
station and a frame machine and could handle 20-30 cars at a
time).

[177]   10/30/24 Hr'g Tr. (Dilanian) at 167:17-169:1 (testifying
that VCC's capacity to do work was limited to a maximum of 7 cars
at a time because it only had 7 available bays and 1 paint
booth), 194:2-195:6 (Dilanian) (900 ACI had about 8,000 square
feet but was a long narrow building and only had one paint booth
which limited its capacity to handle repairs); 10/29/24 Hr'g Tr.

those shops were considerably smaller than Meza testified would

be needed to handle all of Hertz's work in a given market.[178]

Furthermore, Capus himself told Hertz that the size of VCC's

facility impaired its ability to handle more work.[179]

        ii.  <u>Adding More Shifts</u>

    In calculating ACI's damages, Metzdorff assumed, based on

Capus's testimony,[180] that ACI had unlimited capacity to handle

---

(Capus) at 38:13-18 (testifying that 900 ACI had 7,000 square
feet and could service 15-17 cars at a time).

[178]   See <u>supra</u> note 174.

[179]   H-50 (5/20/16 Email from ACI to Hertz) ("The size of the
building is what it is and the only way to increase volume is
with more space.").

[180]   10/29/24 Hr'g Tr. (Capus) at 39:9-11 (testifying he was able
to hire the employees he needed to service Hertz's repair
business), 63:6-14 ("Q.  Okay.  Were you always able to hire -
did you ever have any issues hiring employees that you needed to
service Hertz's needs at the Virginia facility?  A.  We did not.
Q.  Did you have a particular source of employees [you] used?  A.
We contacted [sic] earlier on with Sherwin Williams to get a bulk
discount since we knew we were going to buy a significant amount
of paint and they put us in touch with the local stores.  The
local stores had contacts with many of the local people and it
was never an issue.  When we needed help we contacted the stores,
they would reach out to the local shops, they would reach out to
the people they had contacts with and people got in touch with
us."), 86:11-16 (testifying that there "was never an issue hiring
people" in Florida because he could get qualified painters
through Sherwin Williams); 10/31/24 Hr'g Tr. (Capus) at 172:12-19
("Q.  Okay.  Do you also remember Mr. Dilanian's testimony that
it was difficult to hire employees at ACI?  A.  My initial
response would be in the short time that we had ramping up, we
put together a group of close to 100 people.  Q.  Did you have
any problems with getting necessary applicants and qualified
people?  A.  Obviously, like with any other business, there were
certain people that didn't work out, but there were many people
that did.  And the proof that we had enough employees all the
time is in the numbers.  We never got complaints about the

all of Hertz's work during the entire life of the Agreements because it could just hire more employees and add more shifts at all its locations - without testing that assumption.[181]

That assumption is contradicted by testimony that ACI had substantial problems in hiring additional staff at many of its locations.[182] Even Capus admitted that it was difficult to find qualified employees to do Hertz's work.[183] Metzdorff ignored that

---

turnaround time. If we had not had employees, how were we on time with the vehicles all the time?").

[181]   See supra note 165.   See also 10/30/24 (Metzdorff) at 9:3-10:24, 11:10-23 ("Q. You, sir, didn't personally conduct any capacity analysis in this case, correct? A. That is correct. Q. And not only did you not conduct a capacity analysis, but you can't even describe how one would go about even doing the capacity analysis, can you? A. Well, I recall you asked me that question in my deposition. I think I said I'd have to actually do the work to know exactly how to do it, but I gave you [s]ome ideas of maybe where I would start. But I haven't done the analysis, [s]o I can't say what I would do, if I did it, for instance.").

[182]   See, e.g., D.I. 1608 at Ex. 2(B)(i) (Scarpelli Dep. at 166:11-167:13) (testifying about the inability of ACI to get sufficient workers at Port Newark to staff a second shift); 10/30/24 Hr'g Tr. (Dilanian) 220:11-19 (testifying that VCC tried to hire employees to pick up cars from BWI, but it wasn't feasible because they would have to be paid minimum wage for their time and the profit margin on fixing the cars was too low), 187:16-190:6 (explaining it would have been difficult to run more than a single shift in Florida because of the increased expenses due to the heat, the need for a second manager, the difficulty getting employees who would work in that area at night, and the possible need to pay overtime); 177:3-178:13 (testifying that he could not get enough trained workers to work during the day at VCC, let alone at night because they all wanted to work on commission and the Hertz contract did not make that possible).

[183]   JX-69 (11/5/14 Email from Capus to Hertz) ("It took a long time to build a crew that work[ed] to [Hertz's] standards and c[ould] get the turnaround time [Hertz] [was] looking for.");

evidence.

### iii. Types of Repairs

Metzdorff also did not make any adjustments to his

calculations of capacity based on the types of repairs.[184]   He did

---

10/29/24 Hr'g Tr.(Capus) at 155:15-20 ("Q.  Well, there were at
least a few periods of time where you had trouble getting help,
right, sir?  A.  I could - I know the e-mails you're referring
to, and I have to clarify.  Finding help and finding people to
work to the standard [Hertz] wants were not always the same exact
thing."), 158:2-6 ("Q.  It took a long time to put together a
crew where you didn't need to double-check the quality of their
work, right?  A.  I don't know about double-checking the quality
of their work, but certainly better-quality people require less
supervision."), 186:11-16 (admitting that "it's a transient
business, especially in Florida" so he was constantly replacing
staff over the life of the Agreements).

[184]    10/30/24 Hr'g Tr. (Metzdorff) at 47:6-48:15 ("Q.  Whether
the repair work was written at Sterling or BWI, you understood
that there were certain types of repairs that VCC simply was not
equipped to handle, right?  A.  . . . I understand that Mr.
[Capus's] locations did not do all types of repairs that happen
in a particular location.  But I do understand he had the ability
to do many.  Q.  For instance, you understood that Hertz would
need to send its larger repairs out to a different vendor other
than ACI to do bigger jobs, right?  A.  Well, yesterday, I heard
testimony around heavy damage.  I think there's [s]ome other
words.  But as I said, [s]ome of the repairs would not go to VCC.
Q Despite knowing that not all of the repairs could go to VCC
because they couldn't repair all of the types of damage that
Hertz received, you made no attempt to back out any of those
repairs that VCC could not handle from your lost profits
calculation, correct, sir?  A.  Well, again, I'm trying to rely
on information that's related to Mr. [Capus's] location. So to
the extent that doesn't match up, I would have to make an
adjustment.  But my assumption is that it does match up.  Q.  In
calculating the lost revenue for VCC, did you make any attempt to
back out any repairs that VCC simply wasn't equipped to handle?
A.  Well, to the extent the information that I relied on didn't
include those, then I didn't need to back any out.  Q.  You had
no way to quantify what portion of the repairs to Hertz vehicles
that VCC could or couldn't, [s]o you simply made no adjustment
and assumed that VCC could repair them all for purposes of your
lost profits calculation, right, sir?  A.  As I suggested, based

not do so even though there was credible testimony in the record that some of ACI's locations could not handle all types of repairs that Hertz needed done and that handling larger repairs would take longer and reduce the shop's ability to do other repairs.[185]

Given the numerous inaccuracies and unfounded assumptions on which Metzdorff's conclusions are based, the Court cannot conclude that his damages calculation is reasonable. Accordingly, the Court concludes that ACI has not met its burden of proving its entitlement to damages and no damages may be awarded for Hertz's breach of the Agreements.[186]

### 5.    Interest

ACI seeks pre-petition pre-judgment interest of $7,198,761,

---

on the documents I relied on, and my understanding or assumption about whether they included that or not, that's true.").

[185]    10/30/24 Hr'g Tr. (Dilanian) at 162:11-18 ("Q. While you worked for VCC, Mr. Dilanian, what was your understanding of the types of repairs that VCC was equipped to handle for Hertz?  A. Well, in the beginning, we were told we were only going to do minor body damage cars, [s]o we were doing basically small hits. That's what we call them, small damages. As, you know, the time passed, of course, you know, . . . it had gotten bigger and bigger and bigger. . . .  Q. When you handled - when VCC handled bigger hits, did that affect the capacity of the shop in terms of how quickly it could turn repairs?  A.  Well, that's the key.  If the jobs are larger, it takes longer time to repair it.  It's going to affect turnaround time as much as amount of cars.").

[186]    <u>Kenford</u>, 493 N.E.2d at 235.  <u>See also</u> <u>City of New York v. State</u>, 801 N.Y.S.2d 8, 15 (N.Y. 2005) (dismissing claim because party with burden of proof "relied on invalid evidence, made unsupported assumptions, and failed to present the underlying data and documents that purportedly serve as a foundation for their entire calculation of damages").

and post-petition pre-judgment interest at the rate of $3,111 per day.[187]

Because the Court concludes that ACI has not met its burden of proving damages that are reasonably certain and directly traceable to any breach of the Agreements by Hertz,[188] the Court concludes that ACI is not entitled to any award of interest.

6.   Attorneys' Fees

The Reorganized Debtors seek an award of attorneys' fees and expenses under indemnification provisions in the 900 ACI Agreement and VCC Agreement.[189]   ACI contends that the Reorganized Debtors are not entitled to attorneys' fees and expenses because the relevant contractual provision is unclear and relates to litigation brought by a third party against Hertz, instead of disputes between ACI and Hertz.[190]

The Court agrees with ACI that the indemnification provisions are not applicable in this case.   Under New York law, indemnification agreements require unmistakably clear language that the parties intended to indemnify each other for attorneys'

---

[187]   N.Y. CPLR § 5004.   See also D.I. 1691 ¶¶ 243, 246; JX-104.

[188]   Kenford, 493 N.E.2d at 235.

[189]   JX-1 at § 20(e); JX-3 at § 20(e).   The 950 Agreement, as amended, does not include an indemnification agreement.

[190]   Id.

fees.[191]  The indemnification provisions in the 900 ACI Agreement and VCC Agreement appear to provide for an award of attorneys' fees only if Hertz were to sue ACI to enforce the contract or if Hertz is brought into litigation brought by third parties against ACI.[192]  Neither is the case here.  This case involves a claim brought by ACI against the Reorganized Debtors, alleging that Hertz breached the Agreements.  Therefore, the Court concludes that the indemnification provisions are not "unmistakably clear" that the parties agreed that the Reorganized Debtors would be entitled to attorneys' fees under the circumstances of this case.

---

[191]  <u>Rensselaer Polytechnic Inst. v. Cadence Design Sys.</u>, No. 1:13-CV-1210 (DNH/CFH), 2014 WL 12675264, at *2 (N.D.N.Y. July 25, 2014) (internal citations omitted) ("Under New York law, an agreement by a party to a contract to indemnify the other for attorney's fees incurred in litigation between them must be 'unmistakably clear from the language of the promise.'").  <u>See also</u> <u>In re Robertshaw US Holding Corp.</u>, 663 B.R. 65, 85 (Bankr. S.D. Tex. 2024) (holding that there is a "'presumption' against a finding of indemnification of attorney's fees for intra-party litigation" under New York law); <u>Gurewitz v. City of N.Y.</u>, 109 N.Y.S.3d 167, 174 (N.Y. App. Div. 2019) ("A party's right to contractual indemnification depends upon the specific language of the relevant contract.  The promise to indemnify should not be found unless it can be clearly implied from the language and purpose of the entire agreement and the surrounding circumstances.") (internal citations omitted).

[192]  JX-1 at § 20(e) ("[ACI] shall pay, upon demand, all of [Hertz]'s costs, charges and expenses, including, without limitation, the fees of counsel, agents and others retained by [Hertz] and incurred <u>in enforcing [ACI]'s obligations</u> hereunder or under a hold over tenancy or incurred by [Hertz] in any litigation, negotiations <u>or transactions in which [ACI] causes [Hertz], without [Hertz]'s fault, to become involved or concerned.</u>") (emphasis added); JX-3 at § 20(e) (same).

IV.   <u>CONCLUSION</u>

For the reasons set forth above, the Court will grant the
Reorganized Debtors' Substantive Omnibus Objection to Proofs of
Claim Nos. 10492, 10732, 10824, 10891, and 12486, because ACI has
failed to prove the amount of its Claims.   Further, the Court
will deny the Reorganized Debtors' request for attorneys' fees.
The Court will also deny the Reorganized Debtors' Post-Trial
Motion under Rule 7037(e) for Curative Measures for ACI's
Spoliation of Financial, Accounting, and Workload Documents and
Motion for Additional Curative Measures Relating to ACI's
Quickbooks Data.

An appropriate order is attached.


Dated: October 3, 2025          BY THE COURT:

                                Mary F. Walrath
                                United States Bankruptcy Judge