UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

.    Chapter 11
IN RE:                          .
                                .    Case No. 20-11218 (MFW)
THE HERTZ CORPORATION, *et al.,*  .
                                .
                                .    Courtroom No. 3
                                .    824 Market Street
                                .    Wilmington, Delaware 19801
                                .
              Debtors.          .    April 21, 2021
. . . . . . . . . . . . . . . . .    11:30 A.M.

TRANSCRIPT OF TELEPHONIC HEARING
BEFORE THE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY JUDGE

TELEPHONIC APPEARANCES:

For the Debtors:        Mark D. Collins, Esquire
                        Robert J. Stearn, Jr., Esquire
                        John H. Knight, Esquire
                        Brett M. Haywood, Esquire
                        Christopher M. De Lillo, Esquire
                        J. Zachary Noble, Esquire
                        RICHARDS, LAYTON & FINGER, P.A.
                        One Rodney Square
                        920 N. King Street
                        Wilmington, DE 19801


Audio Operator:         Mandy Bartkowski, ECRO


Transcription Company:  Reliable
                        1007 N. Orange Street
                        Wilmington, Delaware 19801
                        (302)654-8080
                        Email: gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

```
 1  TELEPHONIC APPEARANCES (continued):

 2  For the Debtors:          Thomas E Lauria, Esquire
                              Matthew C. Brown, Esquire
 3                            WHITE & CASE LLP
                              200 South Biscayne Boulevard
 4                            Suite 4900
                              Miami, Florida 33131
 5
                              - and -
 6
                              J. Christopher Shore, Esquire
 7                            David M. Turetsky, Esquire
                              Andrea Amulic, Esquire
 8                            Samuel P. Hershey, Esquire
                              1221 Avenue of the Americas
 9                            New York, New York 10020

10                            - and -

11                            Jason N. Zakia, Esquire
                              111 South Wacker Drive
12                            Chicago, Illinois 60606

13                            - and -

14                            Ronald K. Gorsich, Esquire
                              Aaron Colodny, Esquire
15                            Andrew Mackintosh, Esquire
                              Doah Kim, Esquire
16                            555 South Flower Street, Suite 2700
                              Los Angeles, California 90071
17
    For the U.S. Trustee:     Linda Richenderfer, Esquire
18                            UNITED STATES DEPATMENT OF JUSTICE
                              OFFICE OF THE UNITED STATES TRUSTEE
19                            844 King Street, Suite 2207
                              Lockbox 35
20                            Wilmington, Delaware 19801

21  For the Ad Hoc            Rachel Strickland, Esquire
    Bondholder Group:         WILLKIE FARR & GALLAGHER LLP
22                            787 Seventh Avenue
                              New York, New York 10019
23

24

25
```

```
 1  TELEPHONIC APPEARANCES (Continued):

 2
    For the Ad Hoc Equity      Andrew Glenn, Esquire
 3  Committee:                 GLENN AGRE BERGMAN & FUENTES LLP
                               55 Hudson Yards, 20th Floor
 4                             New York, New York 10001

 5                             - and -

 6                             Joseph Barsalona, II, Esquire
                               MORRIS NICHOLS ARSHT & TUNNELL LLP
 7                             1201 North Market Street, 16th Floor
                               P.O. Box 1347
 8                             Wilmington, Delaware 19899

 9  For the Unsecured          Amy Caton, Esquire
    Creditors Committee:       Thomas Mayer, Esquire
10                             KRAMER LEVIN NAFTALIS & FRANKEL LLP
                               1177 6th Avenue
11                             New York, New York 10036

12  For Knighthead and         Stephen Hessler, Esquire
    Certares:                  KIRKLAND & ELLIS LLP
13                             601 Lexington Avenue
                               New York, New York 10022
14
    For Wells Fargo Bank:      Mark Hebbeln, Esquire
15                             FOLEY & LARDNER LLP
                               321 N. Clark Street, Suite 3000
16                             Chicago, Illinois 60654

17  For GAMCO Investors:       Andrew Entwistle, Esquire
                               ENTWISTLE & CAPPUCCI LLP
18                             401 Congress Avenue, Suite 1170
                               Austin, Texas 78701
19

20

21

22

23

24

25
```

1   <u>MATTERS GOING FORWARD</u>:

2   1. Debtors' Motion for Entry of an Order (I) Approving the
3   Disclosure Statement and the Form and Manner of Notice, (II)
    Approving Plan Solicitation and Voting Procedures, (III)
4   Approving Forms of Ballots, (IV) Approving Form, Manner, and
    Scope of Confirmation Notices, (V) Establishing Certain
5   Deadlines in Connection with Approval of the Disclosure
    Statement and Confirmation of the Plan, and (VI) Granting
6   Related Relief [Docket No. 3496 – filed March 29, 2021

7   2. Debtors' Motion for Entry of an Order (I) Authorizing
    Entry Into Equity Purchase and Commitment Agreement, (II)
8   Allowing the HHN Notes Guarantee Claims, and (III)
    Authorizing the Debtors to Grant the HHN Notes Guarantee
9   Confirmations [Docket No. 3497 – filed March 29, 2021]

10  3. Debtors' Motion for Entry of an Order (I) Approving Rights
    Offering Procedures and Related Materials, (II) Authorizing
11  Debtors to Conduct Rights Offering in Connection with
    Debtors' Plan of Reorganization, and (III) Granting Related
12  Relief [Docket No. 3498 – filed March 30, 2021]

13  **Ruling:  118**

14

15  <u>DEBTORS' WITNESS(s)</u>:

16   **WILLIAM DERROUGH**

17      Direct Examination by Mr. Zakia          45

18      Cross Examination by Mr. Glenn           61

19      Redirect Examination by Mr. Zakia        94

20      Re-Cross Examination by Mr. Glenn        101

21

22

23  <u>EXHIBITS</u>:                          ID      Rec'd

24  Declarations of William Derrough                 44

25

1        (Proceedings commenced at 11:30 a.m.)

2            THE COURT:  All right, good morning.  This is

3   Judge Walrath and we're here in the Hertz case.  So I will

4   turn this over to counsel for the debtor.

5            MR. HAYWOOD:  Good morning, Your Honor.  For the

6   record, Brett Haywood of Richards, Layton on behalf of the

7   debtors.  I won't delay things and I will turn things over to

8   our co-counsel, White & Case, for the debtors' continued

9   disclosure statement.

10            THE COURT:  Thank you.

11            MR. LAURIA:  Good morning, Your Honor, Tom Lauria

12   with White & Case, counsel for the debtors.  I'm here joined

13   this morning by a number of colleagues, including Aaron

14   Colodny and Ron Gorsich, and Rob Kampfner, who will be here

15   to talk about disclosure statement modifications and issues.

16            I also have Jason Zakia, who will be presenting

17   evidence with respect to the equity purchase and commitment

18   agreement; and my partner Rob Kampfner will also be available

19   to address issues and questions the Court has with respect to

20   the equity purchase and commitment agreement.

21            Let me start by saying that we apologize to the

22   Court for the late filing of a big pile of paper.  The

23   magnitude of the pages is really not reflective of the

24   quantum of the changes, however, that have been made.

25            We have been engaged in negotiations with the

1  existing plan sponsorship group and the ad hoc bondholder

2  committee, and we have been able to procure, with their

3  cooperation and support, what I think are two important

4  modifications to the plan, and the language around those

5  modifications was finalized only a few moments before the

6  start of today's hearing.

7          So we have filed amended documents reflecting

8  those changes, which I'll describe to the Court in due course

9  here.  We also have as a consequence to the changes agreed to

10  certain amendments to the official committee's joinder to the

11  plan support agreement to procure the committee's support for

12  the existing plan.

13          All of these things have resulted in the late

14  filings and, as I'm sure the Court can appreciate, there are

15  literally hundreds of eyes that have had to go through the

16  papers and review and approve them, and think about them and

17  comment back and forth before we had them in a condition

18  where we were able to file them, but I think that the

19  substance of the changes is relatively limited.  There may be

20  an objection from the ad hoc group of equity holders to the

21  disclosure statement, I'm not sure; I guess we'll find that

22  out in due course.

23          But what we'd like to do is move forward with

24  seeking approval of the disclosure statement, the

25  solicitation procedures, the rights offering procedures, and

1  the timeline for voting, objecting, and having a confirmation

2  hearing, if the Court is okay with that, and then we would

3  turn to the motion for approval of the equity purchase and

4  commitment agreement secondarily where we will have some

5  testimony.

6              THE COURT:  All right, that's good as a procedure.

7              MR. LAURIA:  All right.  Thank you very much.

8              So let me turn to the substance of where we are.

9  As the Court was made aware last week, we are in fact in a

10 position where we have a definitive, fully-documented,

11 committed transaction to fund the company's exit from Chapter

12 11 that un-impairs all of our senior creditors and that

13 enjoys the support of 87 percent of the funded debt unsecured

14 creditors in the case, and continues to enjoy the support of

15 the creditors committee.

16             At the same time, we have also received

17 correspondence from the original plan sponsorship group, now

18 joined by some additional investors, for an alternative

19 proposal.  The board has taken the time that the Court gave

20 us last week to review those alternative materials, which in

21 fact have changed over time since we were here on Friday, and

22 has determined two things -- really three things, sorry.

23             Number one, the board determined that the proposal

24 received constituted a bona fide expression of interest under

25 our plan support agreement.  That means that we were

1  authorized and directed to go engage with the proponents of

2  the alternative proposal to make sure that we understand it,

3  to ask questions and to get clarification, which we did over

4  the weekend.  Subsequently, that proposal was modified, but

5  before it was modified the board made a further determination

6  that the proposal in its existing state, principally because

7  it was incomplete in a number of respects, did not at that

8  time constitute a superior proposal.

9        Having gotten a revised version of the proposal

10  yesterday and having had yet another board meeting yesterday

11  afternoon, the board determined that the revised proposal

12  could lead to a superior proposal and that the failure to

13  pursue it could result in -- could be reasonably expected to

14  result in a claim of breach of fiduciary duty against the

15  board if we fail to pursue it.  So, on that basis, the board

16  resolved that we should proceed and engage and pursue the

17  alternative proposal to see if we can develop it into a

18  superior proposal.

19        With that said, we still face significant timing

20  constraints with respect to the existing proposal.  And the

21  issues under consideration are really the following.

22        Number one -- and I think we'll present evidence

23  on this in connection with the request to approve the EPCA we

24  have a need for financing to come in to Europe in advance of

25  when we would anticipate being able to consummate the

1  debtors' Chapter 11 plan.  The financing need is for

2  approximately $300 million, 250 million Euros.  It would go

3  into the parent, Hertz International Licensing, and that

4  funding could then be transferred to OEMs in connection with

5  orders that are placed for the purchase of the vehicles that

6  would be funded with additional debt coming out of our

7  European ABS financing.  We need to begin placing those

8  orders before the end of the month of April, so that we can

9  start receiving vehicles before the end of June -- in May and

10  before the end of June.

11        So that financing was contingent upon getting

12  through today's hearing and getting both the disclosure

13  statement and the EPCA approved.  So that's one important

14  timing consideration.

15        The second issue is our desire to exit Chapter 11

16  by the end of the second quarter.  And, again, there will be

17  testimony on this in connection with the request to approve

18  the EPCA, but the highlights for the Court are as follows.

19        Number one, we are in a very difficult position

20  where at this time, because of the semiconductor shortage

21  that I'm sure the Court has read about, it's become very

22  difficult to acquire new vehicles from the car manufacturers.

23  And a secondary issue is there are some car manufacturers who

24  just won't take orders from Hertz because we're in Chapter

25  11.  So we need to be in position to have the access to that

1  market as soon as it opens up.  And we don't know when it's

2  going to open up, but we need to be in a position where as

3  soon as we can begin placing orders for new vehicles we can

4  do so and be able to access the full car market to fulfill

5  the company's needs going forward.

6           The ABS that we currently have, the financing that

7  this Court approved, HVIS, as we call it, a $4 billion

8  facility, is financing to permit us to buy cars for 2021,

9  which we have been doing and have done as best we can under

10 the current circumstances, but we really need the new exit

11 ABS to be in a position to buy cars for 2022 and following

12 that for 2023.  And so the only way we're going to have the

13 money and the access to the market is to be out of Chapter 11

14 as quickly as possible.

15          So we've kind of all circled June 30th as the exit

16 date.  And, you know, as the Court knows, there's time that's

17 required to go through the steps to be able to actually

18 consummate a plan on a target date.  And, you know, kind of

19 working backwards, we think of June 10th as an ideal time to

20 have a confirmation hearing, we think of June 1st as an ideal

21 end to the solicitation period and the objection deadline

22 and, to achieve that, we really have to have our solicitation

23 launched by April 30th or May 1st for there to be adequate

24 time for the ballots to get out, for people to consider them,

25 and to vote within the time frame contemplated by the code

1  and rules.

2         So we're sitting here today on the 21st and we're

3  (indiscernible) that we are pushing right up against the edge

4  of our ability to properly get the solicitation materials,

5  the ballots and related materials put together, and get them

6  out and delivered so that the solicitation can in fact be

7  commenced by the end of the month or at the latest May 1st,

8  so that we can properly have our June 1 and June 10th target

9  dates, if the Court determines that those are appropriate.

10         As the timeline slides back, we lose the cushion

11  that we have in that timeline very rapidly to the point where

12  we may well miss our target, which the problem that that

13  presents is that the upside value that everybody sees here is

14  really a function of the company's ability to meet its

15  business plan projections in 2022 and '23.  That depends on

16  having a properly sized and aged fleet in those two years.

17  And if we can't get into the market promptly this summer to

18  buy vehicles, we create a significant risk that we won't --

19  that we'll have a fleet that quite frankly is too small and

20  too old in 2022, and that will probably roll into 2023, and

21  so you will see a denigration in the company's performance

22  and all of the upside that people are so excited about could

23  be lost or at least impaired.

24         So timing is pushing us to move forward quickly

25  even though we are currently entertaining an alternative

1  proposal that the board has determined could lead to a

2  superior proposal.  So what we've tried to do is come up with

3  an approach where we can have our cake and eat it too, where

4  our stakeholders have their cake and eat it too, where the

5  company can have its cake and eat it too, and where the Court

6  can as well.

7         And what we're proposing to do is to borrow a page

8  from what this Court did in the Corner Stores case a little

9  less than two years ago.  We're faced with similar

10 circumstances where a debtor had a deadline and a target for

11 exit but at the same time was continuing to entertain an

12 alternative proposal.  There the Court determined that the

13 debtor could use Bankruptcy Rule 3019 to be able to pivot to

14 an alternative sponsor and to make other modifications to the

15 plan as may be required, as long as those changes did not

16 result in an adverse impact on any voting class and that all

17 of the changes in fact, as would be the case here, actually

18 improved the treatment of voting class.

19        And so we think that that's a mechanic with proper

20 disclosure and disclosure statement, which we have now

21 drafted and proposed, to be able to move forward on what is

22 in effect two paths, a path that is consistent with the

23 company's need to maximize value by exiting in a timely

24 fashion and to continue the discussions with the alternative

25 plan proponents to see if we can get them to a superior

1  proposal and, if we do, to be able to pivot that alternative

2  proposal to drop them into the existing timeline and to not

3  lose the opportunity to exit in a timely fashion.

4        So what are the modifications that we now propose

5  to make?  There are really two.  Number one, we have agreed

6  with the plan sponsors and the bondholder group and the

7  official committee that the cap on the cash distribution to

8  the class of general unsecured claims will be increased from

9  440 million to $550 million.  The importance of that number

10  is that it is consistent with the debtors' good faith

11  estimate of the total amount of claims it expects to be

12  allowed in that class.  Our current estimate is $547 million

13  and that number includes some cushion around certain disputed

14  and contested claims that gets us comfortable in believing in

15  good faith that 547 is a good number, which means that the

16  550 cap will get the holders of claims in that class a full-

17  par, 100 percent cash payment.

18        And the committee's advisers have had an

19  opportunity to again engage with our financial advisers and

20  with FTI to go through our analysis of the claims and to I

21  think get comfortable that at this point the debtors'

22  estimate is in fact a good faith estimate of the claims.  So

23  we've up that cap to 550 to get to what we believe is a full

24  cash payout to the general unsecured claims.

25        The second change that we have made in the plan is

1   with respect to the treatment of equity.  The plan previously

2   provided that equity would get nothing and be deemed to have

3   rejected the plan.  The revision that we have negotiated

4   here, again, with the plan sponsorship group and the ad hoc

5   bondholders, is that instead all shareholders, large and

6   small, whether or not their QIBs or non-QIBs, will receive

7   their pro rata share of new six-year warrants to purchase

8   four percent of the company's common equity, exercisable at a

9   $6.1 billion total enterprise value.  That TEV is reflective

10  of what would be required to pay the unsecured debt in full,

11  post-petition accrued interest at the contract rate, and the

12  make-whole obligations associated with those obligations.

13          This will convert the equity class into a voting

14  class, which -- so we will add the shareholders to the

15  solicitation, and we estimate that the value of the recovery

16  that this warrant package will provide to our shareholders is

17  somewhere on the order of 90 to $100 million, based on the

18  (indiscernible) analysis being performed by our financial

19  adviser Moelis.  This equates to a recovery -- we have about

20  150 million outstanding shares, it equates to a recovery of

21  60 to 70 cents per share, which we think is important and a

22  significant milestone to achieve in this case; where we now

23  have our general unsecured creditors getting a hundred cent

24  recovery; we have our unsecured funded debt receiving a

25  recovery that they have committed to accept, 87 percent of

1  the holders of that debt remain bound by the PSA to support

2  the plan; and everybody else is un-impaired.

3          So this we think is an extraordinary opportunity

4  both for the company, as I explained at our last hearing, in

5  terms of the financial metrics would have at exit, and for

6  our stakeholders to achieve an outcome that certainly at the

7  beginning of the case, but even a couple of months ago, I

8  don't think anybody really saw in their radar.

9          So the related modifications that we are making to

10 the plan and disclosure statement, first of all, reflect

11 these two changes, and also will reflect our commitment to

12 continue to working with the alternative transaction, subject

13 to the confines and compliance with our obligations of our

14 plan support agreement, but also in furtherance and

15 fulfillment of our fiduciary duties to get the best

16 transaction we can and to maximize value for all of our

17 stakeholders, so that we can at the end of the day stand

18 before the Court and assure the Court we properly fulfill

19 those duties and should be entitled to confirmation of the

20 plan.

21          I should also mention that we agreed to a

22 modification of the PSA joinder with the committee, pursuant

23 to which the committee will continue to support our plan

24 subject to two conditions, both of which have to occur before

25 the committee could reassess and determine to pursue a

1  different path.

2          Number one is that there cannot be a material

3  recovery to equity, and I think it's fair to say that we

4  believe the amended plan does provide a material return to

5  equity.  But the second requirement -- and they both have to

6  be met -- is that the debtors have to modify their good faith

7  assessment of the allowed claims it anticipates in the

8  general --

9          VOICE:  Hi (indiscernible) --

10          MR. LAURIA:  Excuse me?

11          THE COURT:  Could all parties please be muted

12  other than Mr. Lauria?  Thank you.

13          Go ahead.

14          MR. LAURIA:  Again, just to be clear that our good

15  faith assessment of the claims that would become allowed

16  claims in the general unsecured class is adjusted in a

17  fashion that would cause the 550 cap not to result in a full

18  100 percent cash payout of those claims.  And, as I've

19  reflected for the Court, we currently -- our good faith

20  estimate is currently below that threshold, and we've

21  reviewed that with the committee and its advisers, so we do

22  not believe that the second requirement has been triggered.

23          So, Your Honor, I guess I should pause here for a

24  moment and see if we have any remaining objections to

25  address.  And then I guess what it would make sense to do is

1    walk the Court through the solicitation and rights offering

2    procedures and our proposed timeline for getting to

3    confirmation, so that we can address any questions or

4    concerns that the Court has and hopefully lock down not only

5    approval of the disclosure statement, but approval of our

6    proposed solicitation and rights offering procedures and the

7    timeline for us to move forward with confirmation of the

8    plan.

9              THE COURT:  All right.  Let's see if any other

10   party wishes to be heard with any remaining issues or

11   objections to those procedures or the disclosure statement

12   itself.

13             MR. GLENN:  Thank you, Your Honor.

14             THE COURT:  Mr. Glenn?

15             MR. GLENN:  Thank you.  Andrew Glenn Agre Bergman

16   & Fuentes, on behalf of the ad hoc equity committee.

17             I think everything Mr. Lauria reported is good

18   news for shareholders and other stakeholders of this estate

19   and we welcome it, but I think it also shows, Judge, that the

20   process is ongoing.

21             What you've heard from Mr. Lauria is that the

22   general unsecured claims are now getting a par recovery.  I

23   think that substantiates our arguments that equity is the

24   fulcrum class of this bankruptcy, but I think a couple both

25   procedural and substantive issues are important to highlight.

1          First, the break-up fee, we continue to object to

2   that.  And the reason we continue to object to that is we

3   don't think this process has reached its conclusion.  The

4   Knighthead Group submitted a revised proposal over the

5   weekend and that proposal provides for un-impairment of both

6   the bonds and the general unsecured claims, it provides a 50-

7   cent recovery to shareholders, plus the right to subscribe to

8   a $1 billion rights offering.

9          Now, as I understand where we are now, there are

10  two major impediments, and Mr. Lauria and maybe Mr. Derrough

11  will correct me later, but I think the main one is whether

12  our group, the Knighthead Group, has committed bank financing

13  and why it doesn't have that now is largely due to, in our

14  view, process reasons, the inability to speak to the lenders

15  to satisfy that concern by the company.

16         Number two, that 50-cent distribution to the

17  equity would be a cash distribution and that happens to

18  equate, Your Honor, to the amount that is being afforded in

19  cash -- the break-up fee does amounts to that -- the

20  shareholder distribution that Knighthead has proposed.  So I

21  believe 50 cents on the dollar is around 75 million, the

22  break-up fee is around 77.

23         So that's really what's at stake today.  I think

24  Mr. Hessler will tell you and the evidence will show that

25  Knighthead is prepared to move forward immediately without

1  any break-up fee at all, number one; and, number two, it is

2  willing to provide committed financing for this Euro

3  obligation apart from the plan, the Knighthead plan moving

4  forward as a bridge.

5       So we still have the May 1st deadline under the

6  Centerbridge proposal, that hasn't changed.  And our view is

7  we got this proposal, I think, literally just before the

8  hearing, so Knighthead hasn't had an opportunity to react to

9  it, we haven't had the opportunity to study it.

10      So I think what you're hearing now when Ms. Caton

11  indicated that she believed an adjournment would be

12  appropriate so she could study what was on the line for her

13  clients, I think the same thing is now true for the equity.

14  The equity is the fulcrum.  It's unclear to us whether this

15  proposal is better than the Knighthead proposal because we

16  haven't had a chance to study it, but, number two, I don't

17  think the process is over.  I think Knighthead is willing to

18  continue doing work and we still have the May 1st deadline.

19      So I think all this is good news.  We're very

20  happy in the recognition that the equity is fulcrum, but I

21  think what's going on now really is that the GUCs have been

22  almost rendered agnostic to the two proposals.  I think our

23  treatment of the GUCs is completely uncapped, what Mr. Lauria

24  said is there's a cap but it probably doesn't matter.

25      So what you're seeing, Judge, is really now a tug-

1  of-war between the bondholders and the shareholders over who

2  is going to have the upside of this company moving forward.

3  And given that the break-up fee roughly accounts for, at

4  least in our circumstance, the equity recovery, I still think

5  we are where we were last week, which is an ongoing process,

6  a constituency who could be adversely affected by the break-

7  up fee, a bidder who's willing to solve the company's

8  problems.  And what you'll hear from the evidence later is

9  that the reason we haven't been able to finalize our bid and

10  make it the superior offer that Mr. Lauria acknowledges that

11  it might be is due to NDAs with the lenders that --

12         THE COURT:  All right.

13         MR. GLENN:  -- (indiscernible) any conversations.

14         THE COURT:  All right.  And, Mr. Glenn, you're

15  basically saying that you think a little more time is needed

16  and/or deny the break-up fee, those are the -- that's the

17  issue?

18         MR. GLENN:  That's correct, Your Honor.

19         THE COURT:  All right.  Well, let me hear from

20  anybody else who wants to be heard on --

21         MS. RICHENDERFER:  Your Honor --

22         THE COURT:  -- where we are.

23         MS. RICHENDERFER:  -- this is Linda Richenderfer

24  from the Office of the United States Trustee.  I think this

25  is all wonderful news.  More money to creditors, money to

1  equity is always welcomed.  My concern today, though, is I

2  don't have any of the documents.  I just got a copy of the

3  Court's modified second amended plan.  I don't have black

4  lines yet, I don't have a disclosure statement, revised one

5  yet.  I think I just filed -- I think debtors just filed on

6  the docket a revised order from the disclosure statement and

7  solicitation procedures.

8        I did have discussions yesterday with debtors

9  about changing language regarding releases.  I have not had

10  any opportunity, though, to review any of these materials and

11  the United States Trustee has a duty to do so and we'll be

12  exercising that duty.

13        So my concern about the time table here is that

14  without the ability to review the information and perform an

15  analysis of it, I don't see how we can move forward on

16  approval of the documents at this point.  And I'm not saying

17  this has to be moved several days.  Maybe it's later today, I

18  don't know, maybe it's tomorrow.  We have time tomorrow and I

19  don't know what the emergency nature, if any, of moving

20  forward on the other matters tomorrow on the 22nd.  But my

21  concern is just the ability of parties such as myself, the

22  United States Trustee, who hasn't seen these materials, to

23  review them.  That's my concern, Your Honor.

24        THE COURT:  All right, I hear you.

25        Anybody else?

1        MS. CATON:  Yes.  Good morning, Your Honor, Amy

2   Caton from Kramer & Levin on behalf of the unsecured

3   creditors committee.

4        I want to leave to the side for the moment the

5   U.S. Trustee's concerns about reviewing the documents.  I

6   will note that when we received them, we also received them I

7   think late last night and some this morning, and the changes

8   in some respects are fairly minimal.  So we may be able to

9   take care of the U.S. Trustee's request to review the

10  documents fairly quickly, but I certainly understand her

11  concern.

12        But let me just get to the heart of what our views

13  are on the revised plan, because we certainly are not

14  agnostic at this point, unlike what Mr. Glenn said.

15        So, as has been noted, the revised plan

16  essentially trues up the unsecured claims to receiving what

17  is currently projected to be a hundred-cent plan.  So the

18  unsecured claims will get a cash pot of 550 million, which

19  gives a projected additional 18 cents more.  And we note --

20  and I think Mr. Glenn and Mr. Lauria have noted that this is

21  not necessarily a hundred-cent plan as we are taking risk on

22  the debtors' projections on what the claims pool is, and

23  we're also not receiving any post-petition interests.

24        So where we see it is we're sitting here today

25  with one plan before us and one potential proposal that's

1  still evolving in front of us.  And the plan sitting here

2  today is a hundred-cent plan for unsecured creditors,

3  supported by unsecured creditors now across the board, with

4  fully-committed exit financing, and we're ready to move

5  forward towards confirmation.

6         And we appreciate how hard the Knighthead and

7  Certares folks are working.  We hope that their plan evolves

8  and changes into a superior proposal through its iterations

9  with fully committed financing, but the fact is today the

10 plan before Your Honor is a fully-baked plan, it's ready to

11 go out for solicitation and I think, versus the weighing that

12 we were doing last week, we're now on the side of viewing

13 this as it's time to move forward and it is time to pay the

14 break-up fee and (indiscernible) in this plan.  And if it

15 turns out that the Knighthead and Certares plan appears to be

16 a superior plan, as Mr. Lauria says, we can pivot.

17        So the problems that we have today versus what we

18 had last week is there is a deadline of May 1st, we literally

19 -- we're starting to run out of time under the current plan,

20 and our financial advisers do agree with the debtors that

21 getting the debtors out of bankruptcy, making sure that they

22 can move forward with their exit financing, buying vehicles,

23 all of this is critical to make sure that we can actually get

24 the unsecured creditors, meaning the bond creditors, the

25 recovery that they've negotiated for in terms of the value of

1  the stock.

2          So I don't think, given what we've all been

3  through over the past 15 months, that we can say another

4  couple of weeks of delay is meaningless and we should just

5  wait.  I think now, sort of weighing all the balances of a

6  new plan that gave creditors hopefully a hundred cents on the

7  dollar, give something to the equity, and we can continue to

8  negotiate with the Knighthead and Certares folks if they want

9  to stick around, I think, balancing everything, this is the

10 time to move forward.

11         So we fully support the debtors in moving forward

12 today with the approval of the disclosure statement and we

13 hope that Your Honor can enter the disclosure statement order

14 today.

15         THE COURT:  Thank you.

16         Anybody else?

17         MS. STRICKLAND:  Good morning, Your Honor, Rachel

18 Strickland from Willkie Farr & Gallagher on behalf of the

19 note holders.

20         This is not a tug-of-war, as Mr. Glenn said.  The

21 company has a committed, documented proposal in its right

22 hand, sort of asking for Your Honor's approval to begin the

23 solicitation process for, in the other hand it has a three-

24 page PowerPoint.  As of the case on Friday, we can represent

25 that the plan proposed to be solicited is supported by every

1  creditor constituency.  And at this point the bonds are far

2  and away the largest stakeholder in these cases, we have over

3  $2 billion of debt, and we are impaired.

4          So I am also optimistic and happy about the trend

5  that the company is looking at.  We are all hopeful not just

6  for Hertz but for the world that COVID continues going in the

7  right direction, but the reality is that warrants in some

8  creditor -- or, I'm sorry, equity group in this case ends up

9  being in the money is very different from proclaiming someone

10 the fulcrum.  And I won't say any more about that because

11 it's a confirmation issue and it's not for today.

12          The EPCA that is before you for approval is the

13 backbone of the plan.  It ensures that the debtors have the

14 financing commitments to move forward with a finance deal.

15 That our clients have 87 percent of the bonds, they have

16 agreed to vote in favor of this plan; they are also funding

17 $1.6 billion here.  In return, they have not asked for a

18 backstop fee, which would be very typical.  Instead, the EPCA

19 contemplates a three percent break-up fee, which I believe,

20 as Mr. Derrough is going to testify to based on the

21 submissions he's already made with the Court, is well under

22 market and a reasonable expense reimbursement.  These things

23 are reasonable and they're routinely approved.

24          And the other thing about the one more day, one

25 more week, one more month discussion is the company came to

1  us, even though we are creditors of the U.S. debtors, and

2  said we have a problem with another part of the world that

3  impacts the enterprise value, we need emergency financing

4  right now for Europe, please provide it, and we did.  And we

5  raced around with our colleagues across the pond and we gave

6  it to them on a fully committed basis.  And my understanding

7  is that the company believes that has to close today and it's

8  all part and parcel of the deal.

9         Now, we are not -- that's not a huge money-making

10  opportunity for anyone, it's not about fees, it's really

11  about supporting the company and the overall health of the

12  enterprise.  And they asked us to help and we said yes, and

13  it is very, very time sensitive.  So I think all of this

14  other, you know, attempts to create confusion in the record

15  by citing terms that somebody wrote down in a three-page

16  PowerPoint last night are nice, but on behalf of the largest

17  creditor of Hertz, we say we wholeheartedly support the

18  debtors, we think the EPCA is a pure business judgment issue.

19  We anticipate that the record at the conclusion of the

20  hearing will more than support the debtors' business judgment

21  here.  And the disclosure statement, as I think Your Honor

22  efficiently handled at the last hearing, is I believe

23  uncontested.

24         So the only thing that has changed from then is

25  that the fiduciaries in these cases have had an opportunity

1  to review every piece of paper that's before them.  I believe

2  Mr. Lauria has now had three or four board meetings since the

3  last time we spoke, including one this morning.  And people

4  are not just working hard because there's a live auction,

5  people are working hard because they want to make sure that

6  every T is crossed and every I is dotted, and it has been.

7         So there will be time for people to flesh out

8  their three-page PowerPoint into something meatier and, if

9  it's real, great, but if not, we've got to get on with the

10  show.  Knighthead and Certares have been involved since way

11  before our plan was every proposed to the Court, they knew

12  all the time tables, they knew when Your Honor scheduled this

13  hearing in front of all of us that the date was going to be

14  11:30 this morning.  So for them to come and say we just need

15  more time, the breakup fee is this, the expense reimbursement

16  is that, is just noise, in our view.

17         So the bonds, as the stakeholders here, are wholly

18  supportive of Your Honor entering both of the orders and we

19  appreciate it.  Thank you, Your Honor.

20         THE COURT:  Anybody else?

21         MR. HESSLER:  Yes, Your Honor.  Steve Hessler of

22  Kirkland & Ellis on behalf of Knighthead and Certares.  May I

23  be heard?

24         THE COURT:  Yes, you may.

25         MR. HESSLER:  Thank you very much, Your Honor.

1  I'll keep my comments very brief and very targeted, and I'm

2  really going to attempt to address both what Your Honor has

3  said thus far, as well as a number of other parties have sort

4  of said things about what we are and are not doing.  So I

5  would like just to clarify that for the Court and for all

6  stakeholders.

7          First and overwhelmingly most importantly, Your

8  Honor, we are equally committed, as is the company, to the

9  timeline to achieve an emergence from Chapter 11 by the end

10 of June, I want that to be abundantly clear, and I'm going to

11 address those specific ones in a moment.  We absolutely

12 support that.  All and everything we're doing is in

13 furtherance of that goal.  So I hope people take us at our

14 word on that.

15         To further reflect on that, Your Honor -- first of

16 all, with regard to the disclosure statement, which is the

17 specific piece right before you at the moment, we have been

18 engaged in a dialogue with Mr. Lauria and his colleagues that

19 is a constructive dialogue with regard to the disclosure

20 statement, depending on where Your Honor does and does not go

21 this morning, but to the extent --

22         THE COURT:  Mr. Hessler, I think it's your mike

23 that's causing some feedback here.  You have a --

24         MR. HESSLER:  Is this --

25         THE COURT:  That's better.

1    MR. HESSLER:  Okay.  Thank you, Your Honor.  I'm

2    sorry.  I'm not sure what that was.  Can you hear me okay,

3    Your Honor?

4    THE COURT:  I can now.

5    MR. HESSLER:  Okay.  Thank you very much, Your

6    Honor.  Should I start again at the beginning or -- can you

7    hear me, Your Honor, because I'm now not hearing you.

8    THE COURT:  Yes.  It's fine now, you don't have to

9    start over.

10    MR. HESSLER:  Thank you very much, Your Honor.

11    I'll pick up with regard to in furtherance of the theme that

12    we want this to all move as expeditiously as possible.  I'm

13    going to make three discrete points, Your Honor.

14    With regard to the disclosure statement

15    specifically, what I was saying is we had been in

16    communication with Mr. Lauria and his colleague, they sent us

17    some language right before the start of this hearing, which

18    we appreciate, which reinforces what is being provided to the

19    Court with the assurances that if the disclosure was approved

20    today on the existing plan sponsored proposals, that the

21    board of directors will continue to work with us and we're

22    getting assurance that we will have the ability to talk to

23    any financing parties, cooperation and talking with

24    (indiscernible) agencies.

25    So, Your Honor, we are heartened by that and we're

1  in the process of trying to put some language back before

2  White & Case for consideration.  The language we've seen --

3  my understanding and others can correct me as needed, but the

4  language that we're presently proposing some modifications,

5  that itself is not yet on file.  So, Your Honor, it's not a

6  reservation on an objection or anything like that.  I would

7  just note to the Court, hopefully -- and I'm confident on

8  this front -- we'll be able to get to a point where that

9  language does reflect our understanding of the company's

10  commitment to continue to work with our group depending on

11  what happens at the conclusion of today's hearing.  So we

12  extend our thanks on that front.

13          Your Honor, quite specifically, Mr. Glenn made a

14  number of comments, I'm not going to belabor or repeat any of

15  those except to say that, you know, we do agree with most of

16  them.  But the one point that shouldn't be lost, depending on

17  this and whether the Court does get to a consideration of the

18  breakup fee today, again, we're not looking for a delay of

19  (indiscernible) our proposal, we have already committed to go

20  forward without a breakup fee.  I just want that to be in the

21  record so that people aren't representing on our behalf what

22  we're doing.  Our proposal does not turn on a breakup fee and

23  we're not looking for any delay on that front.

24          And then lastly, Your Honor, specifically on the

25  European financing, it's -- we have offered repeatedly to do

1  the financing, this 250 million Euro facility, and we repeat

2  for Your Honor this morning, we will do that financing on

3  terms that are more favorable to the estate.  We've provided

4  a commitment letter, we will do that financing on terms that

5  are more favorable to the estate without it being tied to the

6  board's approval of our plan.

7          So I want to make sure that we're clear on that.

8  We have given a commitment letter to the company, we're not

9  asking for a delay on any front.  We will enter into that

10  financing on terms that are more favorable to the company

11  than are presently before it and it is not tied to the board

12  pivoting towards our plan.  We believe it is an extreme show

13  of good faith that we're committed to the company's goal of

14  an expeditious emergence from Chapter 11 and we do not want

15  there to be any delay in that front, and we believe that this

16  will be in furtherance of continued negotiations around our

17  proposal.

18          So I just don't want there to be any ambiguity or

19  lack of clarity on that, Your Honor, and we're ready,

20  willing, and able to execute that commitment letter today,

21  even if Your Honor does not approve the existing -- not yet

22  approved the existing disclosure statement or the board has

23  not yet pivoted to our proposal.

24          Thank you, Your Honor.  And depending on whether

25  and in what fashion the process goes forward on the EPCA, I

1  may seek to be heard again further, but I appreciate the

2  opportunity to offer those comments at this time.

3           THE COURT:  All right, thank you.

4           Anybody else?

5           MR. ENTWISTLE:  Your Honor, this is Andrew

6  Entwistle.  May I be heard?

7           THE COURT:  You may.

8           MR. ENTWISTLE:  Thank you, Your Honor.

9           As you know, we've been participating since the

10 beginning of the case and have long spoken on behalf of

11 equity and its interests, and have taken the position in

12 other hearings that we felt that ultimately it would prove

13 that equity is, as the saying goes, in the money, and we're

14 glad that that's where the process has led.

15           I'd like to thank Mr. Lauria.  We did reach out;

16 we actually made a suggestion that's something similar to

17 what they ended up doing.  I haven't seen all the details of

18 the terms, but I appreciate the fact that the debtor was

19 responsive in that regard.  And to Mr. Hessler and his team,

20 who spent some time with us on the phone yesterday reviewing

21 what they've been doing, all for the benefit of equity.

22           I'd like to just really make one point and it does

23 speak to some of the statements that were made by the

24 committee, and to Ms. Strickland and others.  Their interests

25 obviously are all obvious, their points are all well taken

1  and well made, but we do still have under the existing

2  proposal until May the 1st for a decision on the EPCA and the

3  incorporated breakup fee.  And I don't think it should be

4  lost on anyone that that $77 million breakup fee is a hurdle

5  for the competing plan bid, assuming that ultimately the

6  company wants to turn to it, at least in the sense of, you

7  know, reducing what equity will ultimately receive here.

8           And I think we've now reached the point where

9  there does need to be a balance, without delaying the process

10 -- and we're very, very attuned to that concern by Mr. Lauria

11 and others -- but I think we've heard that both Ms.

12 Strickland's clients and Mr. Hessler's clients are both

13 committed -- or have both committed to do the equity

14 financing that is required for Europe and that that can all

15 be done today, as is requested.  And so it seems that there's

16 no reason for us not to look forward at least a week and give

17 the parties an opportunity, and give the company a little

18 more fulsome opportunity to evaluate, to see where things

19 stand, and then to see if it wants to pivot under 3019 or

20 otherwise to the alternative plan before we have the

21 impediment of a breakup fee, particularly -- and Your Honor

22 has spoken to this issue in other cases where, as here, we

23 have one plan that does not have a break-up fee, that's the

24 competing plan, and one that does.  And it seems that just

25 looking forward a week would not be -- would not impact any

1  aspect of what's before Your Honor given that we've now

2  satisfied -- or it sounds like the parties have satisfied the

3  equity -- I'm sorry, the lending commitment concern for the

4  ABS in Europe.

5          Thank you, Your Honor.

6          THE COURT:  All right.  Any other party wish to be

7  heard?

8          MR. HEBBELN:  Yes, Your Honor, this is Mark

9  Hebbeln.  May I be heard?

10          THE COURT:  You may.

11          MR. HEBBELN:  Good afternoon, Your Honor, Mark

12  Hebbeln, Foley & Lardner, on behalf of Wells Fargo Bank

13  National Association, which is the indenture trustee for the

14  senior notes, in the aggregate principal note of $2.7

15  billion.  Wells Fargo also serves as a member of the official

16  committee of unsecured creditors.

17          Your Honor, you've heard that the Willkie Farr

18  firm represents holders holding approximately 87 percent in

19  principal amount of the senior unsecured notes, but as

20  indenture trustee it's our job to represent the interests of

21  all holders, the Willkie group and the other 13 percent or

22  so, which equates to about $350 million worth of holders out

23  there.  We won't belabor the points that have been made by

24  others, but in our capacity as the representative of holders

25  of all of the senior notes, we wanted to let you know that we

1  would echo Ms. Strickland's comments and Ms. Caton's comments

2  to the Court today.

3          And we'd also note that, as future equity owners

4  in the company, bondholders, the senior unsecured bondholders

5  are probably the most likely to be hurt by any delay and

6  potential deterioration in the business of Hertz.  So, for

7  those reasons, we would ask Your Honor to approve the motions

8  before you today.

9          And, unless you have any questions, that's all I

10 have, Your Honor.

11         THE COURT:  Any remaining parties with to be heard

12 before I turn back to Mr. Lauria?

13         All right.  Mr. Lauria, any response?

14         MR. LAURIA:  Yes, Your Honor, a number of points.

15         First of all, the comments made by the self-

16 proclaimed ad hoc equity committee.  First of all, we're

17 talking about the disclosure statement right now and I didn't

18 really hear any objection to the approval of the disclosure

19 statement.  I think we're going to make an evidentiary record

20 when we turn to the EPCA and I believe that that record will

21 support under legal principles the Court's approval of the

22 EPCA, including the breakup fee and the expense

23 reimbursement.

24         What we are hearing is the desire that we continue

25 to engage and see if we can get to a place where there's a

1  better recovery for our stakeholder, including the

2  shareholders, on terms that work for the company.  And I

3  couldn't be clearer, I think, that the company is committed

4  to that and that the board of directors has made a

5  determination regarding the possibility that this alternative

6  proposal could become a superior proposal, and that they

7  believe that their fiduciary duties dictate that they should

8  pursue that to see if it can get there.  But we believe,

9  based on the prior experience and in particular the powers

10  that we have under Bankruptcy Rule 3019, that we can do both

11  things at the same time.  We can walk and chew gum, if that's

12  a metaphor that people get.  And that the reality is we have

13  an executed deal before us that if we delay further -- and

14  it's not the May 1 date in the EPCA that requires an order

15  approving it, it's the commencement of the solicitation

16  process, which we are told we are right up against, you know,

17  missing the opportunity to hold our timeline.

18          So we don't really have more days to delay or we

19  start delaying the timeline.  And as the Court knows, you

20  know, time is not a Chapter 11 case's friend.  Cases don't

21  get better, as a general proposition, with the passage of

22  time.  We face an uncertain future.  Everybody is very

23  excited about things that have happened to this point, but

24  the things that have happened to this point that are positive

25  were unexpected just a month or two ago.  And so, you know,

1   I've seen it dozens of times, I'm sure the Court has as well,

2   when you see a curve that goes like this, so often you later

3   see a curve that goes like that.  And we want to try to

4   capitalize on where we are in that curve right now, which is

5   way up here.  And there is no assurance that the continued

6   upward trend is going to continue and I think the fair thing

7   is to say that we've got a lot more downside to worry about

8   than upside to gain.  And I think we're not going to try to

9   get it, that we need to move forward.

10          So I think that the objections to the EPCA we

11  should take up when we have a record on the EPCA, but in the

12  meantime I don't think there really are any pending

13  objections to the disclosure statement.

14          With respect to the U.S. Trustee's concerns -- and

15  I hear them and I'm sensitive to the U.S. Trustee's need to

16  review the documents, I would offer these comments.  Number

17  one, I think that counsel will find that the modifications

18  are very minor when it comes to the substance of the

19  documents.  There are ripple effects and words that have to

20  be changed here and there to make sure that everything is

21  consistent, but that we have addressed the U.S. Trustee's

22  concern regarding the scope of releases, I think that it has

23  been discussed with counsel, and we certainly would make

24  every effort to reserve the U.S. Trustee's rights to confirm

25  that she has no problems with the changes that we've made and

1  that the changes we've made are consistent with the Court's

2  ruling on Friday and satisfactory to the U.S. Trustee.  I

3  don't think that should uphold getting the disclosure

4  statement entered and getting the solicitation procedures and

5  rights offering approved.  We can certainly agree that if the

6  U.S. Trustee has any issues that we will come back at her

7  convenience and at the Court's convenience to make sure

8  they're addressed if we can't address them through a

9  discussion with her.

10        And let me just say with respect to the comments

11 of Mr. Hessler, we're happy to take their further language

12 suggestions regarding how our commitment to cooperate and

13 working with them to see if can develop the proposal into a

14 superior puzzle, subject to making sure that that language is

15 consistent with and does not put us in violation of our plan

16 support obligations.

17        So I would ask that we move forward with approval

18 of the disclosure statement, that we answer any questions the

19 Court has regarding the timeline, the solicitation

20 procedures, et cetera.  Let's get that done and then let's

21 turn to the EPCA, where we will make a record to support the

22 Court's consideration.

23        THE COURT:  Well, let me ask the U.S. Trustee if

24 that type of a procedure could work.  I don't see any

25 blackline document filed yet, though.  Ms. Richenderfer?

1          MS. RICHENDERFER:  Your Honor, I think with the

2   disclosure statement order, it's Exhibit B to what got filed,

3   I have been trying to listen to the discussion and review the

4   blackline.  I've still got a ways to go --

5          THE COURT:  It has been filed?

6          MS. RICHENDERFER:  It is --

7      (Pause)

8          MS. RICHENDERFER:  I'm trying to find the docket

9   item numbers.  If Mr. Haywood is on, he can probably help

10  with this.

11         THE COURT:  Mr. Haywood?

12         MR. HAYWOOD:  Your Honor, maybe I can help here.

13  We supposedly did file a set of changed pages only with

14  respect to the plan and disclosure statement.

15         Can one of my colleague's confirm that that's been

16  done and where that is on the docket?

17         MR. COLODNY:  Your Honor, Aaron Colodny from White

18  & Case.  The blackline is at 4082.

19         MS. RICHENDERFER:  And, Your Honor, I just found

20  at 4079, the document is entitled "Notice of Filing Under

21  Revised DS Order."  Exhibit D to 4079 is a blackline of the

22  disclosure statement order, along with blacklines of

23  solicitation procedures and the ballots.  That's what I've

24  been focusing on first, Your Honor.

25         I don't know if there's a separate motion for the

1  rights offering or where that fits in Mr. Lauria's proposal,

2  because perhaps that can go forward first, and I will commit

3  to continue to reviewing the blacklines here in the meantime.

4  I've got no problem with doing that.  I just didn't want to

5  go straight into disclosure statement without having the

6  ability to work my way through all of the changes to the

7  order and the disclosure statement.  I do believe that -- it

8  may not be substantial, but the documents are large and so it

9  takes a while to get through them, to page through them and

10  look at the changes.

11          So I don't know whether we can do rights offering

12  first, if that's possible, or if the disclosure statement has

13  to go first.

14          MR. GLENN:  Your Honor, may I be heard briefly?

15          THE COURT:  Yes.

16          MR. GLENN:  Thank you.  Just for the record, we

17  don't have any objections to the disclosure statement.  I

18  thought I made that clear last week.  However, I do have a

19  logistical concern that's tied up with the breakup fee and

20  even the solicitation procedures, and maybe there's some

21  practical way to resolve this.  How is it going to work if

22  the Knighthead plan does ultimately go forward when the

23  company has already sent out a solicitation package to one

24  set of stakeholders with one set of rights offering

25  subscription procedures.  And then Knighthead comes in, it

1  has a billion dollar rights offering that will go both to the

2  equity and the bonds.

3           If we pivot, I'm concerned -- I mean, obviously, I

4  want this to pivot and I think that's hopefully where this is

5  going to end up, but mindful of Mr. Lauria's concerns about

6  getting the disclosure statement out, how would this work

7  logistically if we have two sets of rights offerings that are

8  going out.  It just seems to me that will create a tremendous

9  amount of confusion in the stakeholder universe.  Maybe

10  there's some practical solution I'm missing, but I want to

11  make clear we don't object to the disclosure statement, but

12  we also want to ensure that there's a practical pathway that

13  works for Knighthead to come in.

14           THE COURT:  Mr. Lauria, do you want to deal with

15  that?

16           MR. LAURIA:  Yes, sure.  Our thinking, Your Honor,

17  is that, as a practical matter, the back and forth, the

18  effort to come to an alternative deal is going to have to

19  come to an end at some point.  At some point we're going to

20  have to say, hey, we've gone as far as we can, we need to

21  call it.  If at that time we do have a superior proposal,

22  we'll come back in with some supplemental solicitation

23  materials.  And I would expect that what that would include

24  is a structure on the rights offering for the equity is some

25  sort of a short-term warrant.

1          And we believe that this structure may well have

2    benefits to folks because, rather than being treated as a

3    cash payment, we think we may be able to architect around

4    Section 1145 and keep the offer as an exempt offer by doing

5    it that way, which means it will be available to not only

6    QIBs, but also non-QIBs, the moms-and-pops, which we think is

7    important to get value to.  But we'll be back here to make

8    that fix, if we're so lucky to be in a position where a fix

9    like that is appropriate.

10         (Pause)

11         THE COURT:  Well, I'm going to suggest this.  I'm

12   going to -- I think there is not going to be any testimony or

13   other argument regarding the disclosure statement, but I

14   think we have to give the parties and the Court the

15   opportunity to look at the blackline.  And I'm going to

16   suggest that maybe we continue the disclosure statement

17   hearing until 2 o'clock today and go ahead with the EPCA

18   motion and the record you want to present on that.  Does that

19   work for the U.S. Trustee, Ms. Richenderfer?

20         MS. RICHENDERFER:  Yes, Your Honor.  It's my

21   understanding that no changes have been made to the materials

22   concerning the EPCA and, based on that, that would be fine,

23   that would be acceptable, and would give me time to review

24   while I listen.

25         THE COURT:  Well, hopefully, the EPCA will be

1   short and we can take a short break for you to review it.

2   But, Mr. Lauria, why don't you go ahead with the EPCA motion.

3          MR. LAURIA:  Very well, Your Honor.  Thank you.

4   So, Your Honor, we have before the Court a motion seeking

5   approval of the EPCA and I believe we have one pending

6   objection.  That objection has been restated on the record

7   here by counsel for the ad hoc equity group to the approval

8   and authorization of the breakup fee and the expense

9   reimbursement.

10          Rather than going -- making argument upfront at

11   this point, I think the issues have been framed.  What I'd

12   like to propose that we do is go straight to the evidence.

13   My partner Jason Zakia is here to present both the

14   declarations of Mr. Derrough, our financial adviser, and also

15   to offer some supplemental direct testimony and then offer

16   Mr. Derrough for cross-examination.

17          THE COURT:  That's a good procedure.  Let's go

18   ahead.

19          Mr. Zakia?

20          MR. ZAKIA:  Good afternoon, Your Honor.  Jason

21   Zakia of White & Case for the debtors.

22          We will endeavor to move through this quickly and

23   try and salvage some lunchbreak for everybody.

24          Your Honor, as Mr. Lauria indicated, in support of

25   the EPCA motion Mr. Derrough submitted two declarations; the

1   initial declaration which is found at Docket 3497-2, and a

2   supplemental declaration which is found at 3923.  And while

3   we do intend to offer Mr. Derrough's live direct testimony we

4   would suggest it would streamline things if we could also

5   offer the declarations into evidence and would do so at this

6   time.

7           THE COURT:  What was the original declaration

8   docket number?

9           MR. ZAKIA:  3497-2.  I believe it was an exhibit

10  to the EPCA motion.

11

12          THE COURT:  Okay.  Alright, any objection to those

13  being admitted subject to cross examination?

14          MR. GLENN:  No, Your Honor.  Thank you.

15          THE COURT:  Alright, they are admitted.

16      (Declarations of William Derrough received into

17  evidence)

18          MR. ZAKIA:  Thank you, Your Honor.

19          At this time we call Bill Derrough.

20          THE COURT:  Alright, I will ask the ECRO to give

21  you the oath.

22           WILLIAM DERROUGH, DEBTOR WITNESS, SWORN

23          THE ECRO:  Please state your full name and spell

24  your last name for the record.

25          THE WITNESS:  My full name is William, middle

1    initial Q, Derrough.  Last name is spelled D-E-R-R-O-U-G-H.

2              THE ECRO:  Thank you.

3              MR. ZAKIA:  Thank you, Your Honor.

4              May I proceed?

5              THE COURT:  Yes.

6                         DIRECT EXAMINATION

7    BY MR. ZAKIA:

8    Q    Mr. Derrough, you submitted two declarations in support

9    of the EPCA motion.  Is that correct?

10   A    Correct.

11   Q    And so as to not have to repeat everything that is in

12   there you're familiar with those two declarations?

13

14   A    I am.

15   Q    And is everything that is set forth in those

16   declarations representative of testimony that you would

17   repeat and reaffirm if it was done, same topics, live here

18   today?

19   A    Yes, I would.

20   Q    Anything about them that you need to correct or change?

21   A    No.

22   Q    Okay.  So I don't want to repeat everything that was

23   set forth in the declarations.  I do want to touch on a few

24   topics that are covered.

25

1    First, could you just explain to the court what the

2 EPCA motion -- what the EPCA agreement is and its purpose in

3 the plan process?

4 A    So the EPCA is an agreement between the client sponsors

5 and committed equity investors and the company which lays out

6 the terms of their equity investment and commits them to

7 funding the plan or funding the equity portion of the plan.

8 You know, it's a very detailed document, you know,

9 (indiscernible) date by which it needs to be approved and,

10 obviously, the economic terms.

11

12 Q    We've heard a lot of discussion today about a breakup

13 fee.  Is there a -- is breakup fee one of the terms of the

14 EPCA?

15 A    Yes, it is.

16 Q    And could you just describe for us, please, sir, how

17 that works?

18 A    Sure. The breakup fee is calculated to be about 3

19 percent of the funded equity commitment or the equity

20 commitment. Its payable if an alternative transaction is

21 entered into by the debtors.  So if these investors are not

22 the eventual successful investors is when it would be paid.

23 Q    And in your experience is an investment banker are

24 provisions such as this typical in transactions such as this?

25 A    Absolutely.

1  Q     Could you explain why?

2  A     Sure.  Ultimately what we're doing, as the debtor or

3  the estate, is locking in financing.  We're asking people to

4  commit to finance even though we might pick somebody else

5  down the road.  So I'm trying to thinking of it as an

6  insurance policy very similar to what we're going to be

7  asking the court to do with the debt financing.

8       In my experience I'm trying to think of any example

9  when there wasn't some type of commitment fee, or breakup

10 fee, or termination fee, I guess you could call it here, in

11 exchange for people agreed to commit.

12 Q     Could you explain, please, for the court, sir, just the

13 process and the negotiations that led to the debtors'

14 agreement to include this breakup in the EPCA?

15

16 A     Sure.  So I think it's important, as we've been running

17 a competitive process initially, to three groups, the ad hoc

18 bondholder group represented by Ms. Strickland; the

19 Knighthead and Certares Group; and the Centerbridge, Warburg

20 Groups.  You know, that process, basically, started towards

21 the end of last year in terms of, you know, (indiscernible)

22 engaging with folks.

23      I can't tell you off the top of my head how many rounds

24 we went amongst those three horses, but, you know, my

25 recollection is we started at a recovery level somewhere

1    around maybe 50 cents on the dollar to creditors and the

2    shareholders.  There were multiple rounds along the way.

3    Each of those rounds, the different horses were working for

4    different, you know, types of economic compensation.  In some

5    cases in the forms of significant discounts, plan values,

6    backstop, breakup fees; things like that.

7         I believe towards the end of the last round of

8    negotiations parties were around 5 percent in the aggregate

9    number of breakup fee quantum.  And I think we even filed a

10   motion at one point saying 3 to 5 percent.  Ultimately we

11   negotiated it down to 3 percent which is what we have today.

12        So it was a highly competitive process that was

13   thoroughly negotiated to get to where we are here.

14   Q    I believe you testified a moment ago, sir that the

15   breakup fee would only be paid upon consummation of an

16   alternative transaction.  What would be the source of the

17   funds to pay the breakup fee in the event that it was paid?

18   A    Well I mean the company will emerge with significant

19   cash on hand.  So it will come out of, I guess, directly out

20   of (indiscernible).  In practice you would assume that the

21   price would go up to reflect that at a very minimum.

22   Q    So the proceeds of the alternative transaction would be

23   the source of that?

24   A    Ultimately, yes.

25

1  Q     Okay.  Now you talked about the fee ultimately as a

2  result of your negotiations being agreed at 3 percent.  Did

3  you do any work to determine whether 3 percent was a

4  reasonable fee to repay?

5  A     Yes, I did.

6  Q     Okay.  I think your supplemental declaration sets out

7  some of the details of that, but if you could just generally

8  tell us what you did and what your conclusion was?

9  A     Sure.  So we looked at both termination fees for

10  committed equity rights offerings like this which we think

11  are good corollaries or analogs, we also looked at breakup

12  fees in the context of whole company sales like 363 sales in

13  Chapter 11.  On the former, the backstopped or committed

14  equity funding type transactions, similar to this, typically

15  were significantly higher.  My recollection is on average 6

16  percent.  I'd have to refer to my declaration to refresh my

17  memory for precision.  In general it's significantly higher

18  than the 3 percent we're talking about here.

19      Then, you know, on 363 sales you typically see 3, 4

20  percent.  That is on the overall enterprise value and we're

21  talking about 3 percent on the committed equity amounts.  So

22  when you actually do the math on enterprise value, which I

23  think is another reasonable way to look at it, you're on the

24  plan value here today that this plan represents, I think,

25

1   it's something like 1.4 percent on total enterprise value.

2   That would be analogous to, you know, a 363 sale context when

3   we're talking overall enterprise.

4   Q    So as the debtors' lead investment banker did the work

5   that you do allow you to form a conclusion as to whether you

6   believe that 3 percent fee is reasonable or unreasonable?

7   A    Yes.

8   Q    What was your conclusion?

9   A    My conclusion is that the fee is absolutely reasonable.

10  I think we got to a very good outcome here at 3 percent, 3

11  percent of the equity commitment.

12  Q    So I (indiscernible) that we've heard talk through the

13  course of the hearing and the last hearing about delay.  I'd

14  like to ask you a few questions about delay and impact on the

15  company.

16

17       Could you please explain the connection between the

18  EPCA that we're asking the court to explain the connection

19  between the EPCA that we're asking the court to approve today

20  and the funding of the European business that we have heard?

21  Could you explain what that is?

22  A    Sure.  So upon entering the order approving the EPCA

23  the company will be able to access 250 million euros of

24  bridge financing, effectively, to inject into the European

25

1   business to bolster its liquidity.  That is probably the most

2   important near term issue for the company.

3   Q     And, first, I'd like to ask what's the source of that

4   funding.

5   A     The source of that funding are the plan sponsors tied

6   to the EPCA.

7   Q     And what is the status of that document?  Is that fully

8   documented?  What is the time lag between approval by the

9   court and the ability to execute on that, if any?

10  A     So the documents are fully negotiated and executed.

11  The timing -- my understanding is that the timing is once

12  this is approved the company can, essentially, push a button

13  and get those funds sent over.

14

15  Q     Okay.  I'd like to talk about the meat of those funds.

16  Could you please explain to the court why the company

17  requires that bridge loans and the funds that it provides,

18  and the timing on which that funding is required?

19  A     Sure.  So we have -- I was going to say the word --

20  well, we worked very hard, the company, the management of the

21  company, to keep the European business, you know, all the

22  wheels on the car, if we're going to go with lots of car

23  metaphors here.  We have been very close a number of times.

24

25        Everyone is aware that we negotiated a restructuring in

    the European business at one point that had some objections

1  from folks in terms of the structure of it, but most of that

2  was driven by the need for cash into Europe.  The management

3  team in Europe and, of course, the US management team as the

4  parent had been working incredibly hard to keep those wheels

5  on that car.

6        As Mr. Lauria mentioned earlier, ordering vehicles is

7  very important.  New vehicles are very important for rental

8  car businesses both from a customer perception, you know,

9  people want to rent the newer vehicles, but also from a

10  service and repair perspective.  The older your

11  (indiscernible) gets the more expensive it is to service.

12

13        So ensuring that the European business has liquidity to

14  operate and not be running on fumes, another car metaphor,

15  and is in a position to be able to buy these vehicles we

16  think is very important.  And we think getting that money

17  into the company.  And the near term will ensure that we

18  protect the value of the business.

19  Q     When you say in the near term when does the European

20  operations require that?

21  A     Well we (indiscernible) requires the money essentially

22  immediately. I think next week it's projected to be -- well,

23  I don't know if you want to say it in open court or not from

24  a competitive dynamic perspective, but I would say that it's

25

1  getting tight.  The sooner the company in Europe gets the

2  money the better.

3  Q     Now in addition to the European operations and the

4  effect of any delay we heard some talk about the need for the

5  company, as a whole, to exit bankrutpcy. I'd like to ask you

6  a couple of questions about that.

7        Could you please -- well, first of all, what is the

8  company's current target date for emergence from Chapter 11?

9  A     The current targeted (indiscernible)

10 Q     Could you explain for us, please, sir, what the

11 economic impact for the business would be if that timetable

12 were to be delayed?

13

14 A     Well the obvious first one is the longer a bankruptcy

15 case drags on there's all the cost associated with

16 prosecuting the bankruptcy.  So there's the bankruptcy burn,

17 I guess you would say.  But there's also just the competitive

18 disadvantaged company, as we say, suffered from when you're

19 two biggest competitors, Avis and Enterprise, are not in

20 bankruptcy.

21       What we have been seeing is that it has made it harder

22 for Hertz to buy, to place orders, to get orders for the

23 vehicles they really want relative to their competitors by

24 being in bankruptcy.  You know, the certainty that the OEM's

25 would like to see in terms of a company's liquidity, and

1  capital structure, and ability to make good on their orders

2  is really important.  And with this global ship shortage I

3  think it's estimated that the number of vehicles produced

4  went from (indiscernible) left this year.

5       So that just means there's lots of vehicles for

6  everybody to buy.  And if we're at a disadvantage in terms of

7  our ability to commit or convince people that we're going to

8  be there is only rational, I think, to assume that we're just

9  not going to get offered, you know, everything we want.

10  Someone else is more likely to make a better deal no matter

11  the pay-up in price or things like.

12       So we think we'd be at a disadvantage and then

13  ultimately it's going to --

14

15  Q    Sorry, before we move onto the next point I want to ask

16  one follow-up question on what you just said.  Could you

17  explain to the court what, if any, connection there is

18  between the company's ability to buy new cars and the

19  company's ability to execute on its business plan, and what

20  the impacts could be if it wasn't able to do the first?

21  A    Sure.  So a key element of the company's business plan

22  is an assumption that the company would be able to re-fleet

23  back up to a more normalized competitive level.  As everyone

24  (indiscernible) the company needed to reduce its fleet in

25

order to address its prepetition ABF's structure and ultimate

negotiation we had there.

You know, currently that has put the company at a

disadvantage relative to its two biggest competitors in terms

of available vehicles.  As mentioned, you know, the longer

you keep vehicles and use them the more you're going to have

an out of service and pay costs to repair the vehicles.  So

it ultimately will impact the company's profitability

(indiscernible) the business plan.

Even if everybody is suffering from the global chip

shortage (indiscernible) vehicles it stands to reason that

Hertz will suffer more or not get as good of deals if they

can't -- if some of its suppliers are viewing it to be a less

attractive counterparty.

Q    And I'm sorry, I cut you off before.  Are there any

other damages, or losses or harms that the company would

suffer should its emergence timeline be delayed?

A    Well I mean depending on how long its delayed the

committed equity or exit financing, I don't remember exactly

the timeline on that, but, you know, obviously those letters

need to be approved by the court.  There is a timeline on

that that will burn off at some point.

Q    Let me ask you this question.  In your experience as an

investment banker, I believe 30 years of experience, how

would you describe the current market conditions in the

credit market that have been in place while the current plan

has been put in place?

A     We've been talking about this a lot, not in the sense

of the Hertz dynamic solely, but in general.  I can't recall

a more robust positive credit market in my career in terms of

availability credit pricing.  Its -- you know, the city

(indiscernible) index is trading at a lower yield now then it

was pre-COVID.  So, you know, what the market is demanding

for the same credit quality bucket of the bond securities.

Interest rates in general are lower than they were pre-

COVID even though, as you may recall, reduced interest rates

in 2019 I believe.  So it's hard to imagine it getting any

better than it is right now.  I believe 2020 is not the

highest amount of how (indiscernible) very close to the top

and that's after, obviously, having more at the beginning of

COVID.

So it's like that Jack Nicholas movie As Good as it

Gets.

Q     Well I'm going to ask you a question I think I know the

answer to, but we'll take a shot.  I mean I do you know how

long it's going to last?

A     I do not.  If I knew that I would probably be in a

different business, a different job.

1  Q      And would the company be harmed if the markets were to

2  turn before it had a fully committed lockdown plan in place?

3  A      It is.  One of the (indiscernible) that keeps Mr.

4  Lauria and me up at night every single night.  The answer is

5  yes.  We are incredibly focused on not losing this very

6  attractive, what we believe, exit financing because of delay.

7  It -- well I can (indiscernible) to this SPAC market.  The

8  SPAC market has been hot, hot, hot, hot, hot in 2020 and the

9  first quarter of 2021.  I think 37 percent of all equity

10  deals in the Hertz quarter of 2021 were SPAC.  Now there is a

11  backing up in that market right now.

12

13       So, you know, markets can turn very fast.  It was one

14  of the main (indiscernible) a lot of things, but

15  (indiscernible) probably every day.

16  Q      Mr. Derrough, we heard a lot of talk about the debtors'

17  plan, which is on file, and a potential alternative

18  transaction that's been proposed -- sorry, Knighthead and

19  Certares.  Are those two potential plans at the same stage

20  that we see in place of terms of the debtors' ability to

21  execute on them?

22  A      No, they're not.

23  Q      Could you please explain the difference?

24  A      I think you asked me earlier, you know, about the EPCA

25  the whole thing, the whole proposed plan is ready to go.  My

1  words, fully executed documentation and, essentially, other

2  than meeting the conditions and various documents ready to go

3  the plan and the disclosure statement is ready to go.  We

4  don't have that level of detailed documentation on the other

5  proposal that might have at this point.

6  Q    Is that important?

7  A    Sure, for the same reasons that, you know, making sure

8  we don't lose the committed -- the credit exit financing is

9  important.  Essentially, we have the proverbial bird in the

10  hand right now which, you know, we all look at it as it's a

11  very good deal.  As I mentioned, when we started this

12  process, we stared the competitive process. The initial

13  proposals were around 50 cents on the dollar.  We're now

14  talking about recoveries that are very close to par.

15

16      So having something that is absolutely executable is

17  very important from the debtors' perspective.  It's an

18  insurance policy that we know, again, subject to it meeting

19  the conditions to close that we know we have on hand and we

20  can go with if nothing better comes through.

21  Q    To follow-up on that last point if the court were to

22  approve the debtors' request today and approve the EPCA

23  including the breakup fee would that prevent the debtors from

24  continuing to consider potential alternative transactions be

25

1  it the Knighthead/Certares potential alternative or any other

2  potential alternative.

3  A     No.  It would not prevent us from doing that.  I think

4  we have already demonstrated that we are more than willing

5  and open to anybody coming in with something better.

6  Q     And could you speak about the potential added expense

7  of the breakup fee and how that may or may not impact a

8  potential alternative transaction or a party's willingness to

9  make such a -- to enter into such potential alternative

10 transactions?

11 A     Sure. So the breakup fees is about $75 million

12 approximately.  We're talking about, you know, deal values

13 between, you know, low $5 billion and $6 billion. So I think

14 I said earlier that math works out to something like 1.2 to

15 1.4 percent of total enterprise value since the breakup fee.

16 That doesn't seem to me to be a -- I mean it seems to be a

17 pretty well (indiscernible) when you're talking about, you

18 know, a $5 to $6 billion transaction.

19

20      (Indiscernible) transaction is higher to include the

21 value of the vehicle and the ABS which tends to get put off

22 into the company's balance sheet for (indiscernible)

23 perspective.  So you can even argue that you're really

24 talking about a $12 to $15 billion company.  It doesn't seem

25 to me to be much of an obstacle.

1  Q    So taking into account all the factors that we have

2  discussed here this afternoon do you have a view as to

3  whether the court's approval of the EPCA, including the

4  breakup fee, would be in the best interest of the debtors'

5  estate?

6  A    Yes.  I think it's important for the debtor to have

7  some level of certainty in its financing package as we're

8  trying to get this company out of bankruptcy and approve the

9  EPCA will lock into that certainty for us on the equity

10  funding side just like when we come before the court to talk

11  about the exit debt financing.

12

13           MR. ZAKIA:  Thank you, Mr. Derrough.

14           Your Honor, I have no further questions.

15           THE COURT:  Alright, does the equity committee

16  wish to cross-examine -- the ad hoc equity committee?

17           MR. GLENN:  Yes, ad hoc.  Your Honor, I would

18  appreciate a short break so we can prepare and do this

19  quickly; just five or ten minutes if that's okay.

20           THE COURT:  Does anybody have an objection or does

21  anybody else which to cross first?

22       (No verbal response)

23           THE COURT:  I'm hearing no objection or other

24  request.  So let's take a ten minute break.  You can stay in

25

1   the room or you can leave.  It is now one o'clock on my time.

2   So let's come back at 1:10.

3            MR. GLENN:  Thank you.

4            THE COURT:  Thank you.

5       (Recess taken at 1:00 p.m.)

6       (Proceedings resumed at 1:14 p.m.)

7            THE COURT:  Alright, are the parties back?

8            MR. GLENN:  Yes, Your Honor.

9            THE COURT:  Alright, I'm going to keep myself on

10  mute because we're having a thunderstorm here.  I will turn

11  it over to Mr. Glenn.

12           MR. GLENN:  Okay.  Thank you, Judge.

13                      CROSS EXAMINATION

14  BY MR. GLENN:

15  Q    Mr. Derrough, are you ready?

16  A    I am ready.

17  Q    Great.  Nice to see you.

18       So for the record Andrew Glenn on behalf of the ad hoc

19  equity committee.

20       Mr. Derrough, you can hear me clearly?

21  A    Loud and clear.

22  Q    Thank you.

23       Alright, I'd like to go through a little bit of the

24  timeframe and background of the cases.  Just generally

25

1  speaking, during the course of these cases you're team at

2  Moelis has been consulting with the debtors and other

3  advisors to determine the debtors' best path for a financial

4  and operational restructuring, correct?

5  A    That's fair, yeah.

6  Q    Okay.  And ultimately the debtors, in consultation with

7  Moelis, determined that the debtors would require a

8  significant capital infusion to emerge from Chapter 11 as a

9  viable business, right?

10  A    That's fair as well.

11  Q    Okay.  Alright, so in November of 2020 the company held

12  a series of meetings with various constituents and plan

13  sponsors to start the competitive process that brings us here

14  today, correct?

15

16  A    I don't remember what month it was. It was towards the

17  end of last year.  I can't tell you whether it was October,

18  November.  November sounds right, Mr. Glenn, but I --

19  Q    Fair enough.

20      And just so we're clear, the potential plan sponsor

21  groups that emerged at that time were the noteholders,

22  themselves, the Knighthead Group, and the Centerbridge,

23  Warburg, Dundon Group, correct?

24  A    Correct.

25

1  Q    Now on March 1st of this year, 2021, the debtors

2  determined, in consultation with you, that the proposal from

3  Knighthead and Certares is the most favorable plan sponsor

4  proposal, correct?

5  A    Again, I'm not going to remember dates exactly.  It

6  sounds about right.  (Indiscernible) calendar wise, but I

7  can't tell you off the top of my head right now if it was

8  March 1st or not.

9  Q    Fair enough, but you agree it was in the early March

10  timeframe, correct?

11  A    Yes.

12  Q    Okay.  And the company then filed a plan with this

13  court that incorporated the Knighthead and Certares plan,

14  correct?

15  A    Correct.

16  Q    And after that the Centerbridge Group submitted an

17  enhanced proposal to the company, correct?

18  A    Yes.

19  Q    Okay.  As an investment banker this is what you want to

20  see in this kind of process.  You want to see competitive

21  tension that leads to the highest and best offer for the plan

22  sponsor, correct?

23  A    Absolutely.

24

25

1    Q      Okay.  But even after Centerbridge came forward with

2    their enhanced bid, Knighthead and Certares told the company

3    that they were willing to continue to enhance their initial

4    proposal, correct?

5    A      I believe so.  I'm trying to -- as I said earlier,

6    we've gone back and forth a lot in terms of rounds and

7    conversations, but something to that effect would have -- you

8    know, it sounds right.

9    Q      Fair enough.

10          Can we agree that during the month of March there was a

11   lot of back and forth negotiations between the company,

12   Centerbridge on the one hand, and the company and Knighthead

13   on the other?

14

15   A      I'd say negotiations and communications, how about

16   that.

17   Q      Fair enough.

18          Then on April 3rd of this month the company decided to

19   go forward with the Centerbridge transaction, correct?

20   A      Again, I don't remember dates exactly, but let's call

21   it early April.

22   Q      Fair enough.

23          The company filed an amended plan with this court also

24   in early April which incorporated the Centerbridge proposal,

25   correct?

A      Yes.

Q      Okay.  At that time the company and the Centerbridge

Group along with, I believe, the bondholders entered into a

plan support agreement, correct?

A      Yes.

Q      Okay.  And ultimately the creditor's committee filed a

joinder to that same plan support agreement, correct?

A      Yes.

Q      Okay.  Now are you aware that the plan support

agreement included what's commonly referred to as a no-shot

provision, correct?

A      Yes.

Q      Okay. Did you hear Mr. Lauria in his opening

presentation refer to the phraseology in that agreement that

the Knighthead proposal could potentially leads to a superior

proposal then the Centerbridge proposal.  Did you hear that?

A      You mean he's talking about the current Knighthead

proposal?

Q      Well I mean I was wondering are you aware how that no-

shot works about, you know, the steps that need to be taken

for the no-shot to be satisfied.

A      I haven't memorized the provisions, Mr. Glenn, but I am

generally familiar with (indiscernible). So I could have

(indiscernible).

1  Q     It is what it is?

2  A     Yes.

3  Q     It is what it is.  It's not a memory test.

4  So are we agreed that the plan support agreement's no-

5  shot provision generally bars the company and advisors from

6  soliciting bids to top Centerbridge?  You are generally aware

7  of that?

8  A     General characterization, yes.

9  Q     Okay.  And you are aware that even after that no-shot

10  was agreed to that Knighthead and Certares continued to work

11  on a modified proposal that would, in their view, top

12  Centerbridge?

13

14  A     Yes.  I'm not sure exactly from the time of the signing

15  the PSA and then hearing from them how long that was, but,

16  you know, ultimately, yes, we have seen them.  It has been

17  communicated to us that they're prepared to do something more

18  than the last proposal.

19  Q     Okay.  Did you see the proposal that Knighthead

20  submitted on or about April 15th that we discussed in court

21  last week?

22  A     Yes.

23  Q     Okay.

24  A     The (indiscernible) was last Friday?

25  Q     Correct.

1  A      Thursday?  Around there.  I don't want to look at my

2  (indiscernible) calendar to figure out what day that was

3  because Mr. Zakia said I can't look at my devices.

4  Q    I wouldn't mind. I honestly wouldn't mind.  The dates

5  are not hugely important.

6      So the proposal from last week from Knighthead provided

7  for certain cash payments to the general unsecured creditors

8  and the holders of the senior notes, correct?

9  A    I am trying to remember.  Yes, I believe that's right.

10 Q    Okay.  And those amounts were higher particularly in

11 the general unsecured creditors case then the Centerbridge

12 proposal that existed right before that offer came in,

13 correct?

14 A    I believe that's right, yes.

15 Q    Okay.  I believe in our numbers the enhancement to the

16 general unsecured creditors was approximately $105 million

17 cash recovery, correct?

18 A    I would have said about $100 million.  So, again, I

19 don't remember the numbers precisely, but that sounds about

20 right.

21 Q    And to be clear, the proposal that we're talking about

22 came in despite the no-shot provision in the plan support

23 agreement, correct?

24 A    Correct.

1   Q    Okay.  And did you conclude that the total enterprise

2   value of the proposal last week by Knighthead was

3   approximately $700 million higher than the Centerbridge

4   proposals total enterprise value?

5   A    I don't remember the increment, Mr. Glenn.  I mean that

6   sounds kind of the right ballpark, but I just don't remember

7   as I'm sitting here.  I didn't prepare for that particular

8   question.

9   Q    Fair enough.

10       Did -- you would agree with me that receipt of the

11  offer contemplating a higher recovery to creditors was a

12  positive development in this bankruptcy, correct?

13

14  A    Yes.

15  Q    Okay.  And after that offer came in the company and its

16  advisors reviewed it, correct?

17  A    Yes.  When we had time to go through everything, yes.

18  Q    Fair enough.

19       So did there come a time when the company determined

20  that the proposal from Knighthead on April 15th was a

21  "bonafide expression of interest under the plan support

22  agreement"?

23  A    Yes.  The company made that determination.

24  Q    And the creditors committee also came to that

25  determination, correct?

1  A     I don't know whether I know whether they did or they

2  didn't.

3  Q     Were you involved in the negotiations with the

4  creditors committee after the Knighthead proposal was

5  submitted to the company last week?

6  A     Well we had at least one call with the creditor's

7  committee's advisors after the proposal.  I wouldn't call it

8  a negotiation.  I just called it a call to discuss the

9  proposal.

10  Q     What did they tell you?

11

12  A     My recollection of that call was we were going through

13  questions and identifying issues to then have a consolidator

14  response back to Knighthead, Certares.

15  Q     Okay.  And are you aware of the circumstances that led

16  the Centerbridge Group to increase their distribution to the

17  general unsecured creditors after the Knighthead proposal

18  came in?

19  A     The same circumstances you were, sort of, referring to,

20  no.  Each company has increased their proposal when they see

21  what the other person has done -- what the other party has

22  done.

23  Q     And that is before anybody was awarded a breakup fee by

24  this court, correct?

25  A     Yes.  No breakup fee has been awarded.

1  Q    Okay.  And the Centerbridge proposal was only increased

2  in terms of the recovery to the general unsecured creditors

3  in response to the Knighthead proposal, correct?

4  A    I can't tell you the reasons why Centerbridge, Warburg,

5  and Dundon did what they did.  I think it would be

6  speculation on my part because I wasn't told by them that's

7  why they were doing it.

8  Q    But you agree with me on the chronology that occurred

9  after the Knighthead proposal came in, correct?

10  A    Yes, I would agree with that.

11  Q    And you worked with Centerbridge and Warburg before,

12  have you not?

13  A    Warburg not so much.  Centerbridge, yes.

14  Q    Okay.  Hedge funds like that tend not to give away $100

15  million of value when they don't have to, correct?  Is that

16  your experience with these hedge funds?

17  A    It is general proposition for any investor.

18  Q    Thank you.

19       So Judge Walrath pushed the hearing to today so that

20  your -- the debtors and their advisors could review the

21  Knighthead proposal, correct?

22  A    Correct.

23

24

25

1  Q     And after that occurred you, in fact, along with White

2  & Case and other advisors did review the Knighthead proposal,

3  correct?

4  A     Correct.

5  Q     Okay.  And is it correct that Knighthead and Certares

6  were presented with a due diligence list from the company on

7  Saturday, April 17th I believe?

8  A     I believe it went out on Saturday, yes.  I don't know

9  if it's a due diligence list, or an (indiscernible) or a

10 question list, whatever you want to call it.

11

12 Q     Fair enough.

13       A list of open items?

14 A     Or questions, yeah.

15 Q     Fair enough.

16 A     Relating to the proposal that we had received early in

17 the morning on Friday.

18 Q     Okay.  And then there was a call on Sunday night among

19 the debtors, Knighthead, and Certares that lasted two hours

20 to discuss the list you have been referring to?

21 A     Yeah, the list was the basic kind of foundation for the

22 call.  There may have been other -- I'm sure there were other

23 things that popped up along the call.

24 Q     Okay.  Now after those calls isn't it correct that

25 Knighthead presented another revised proposal to the debtors?

1  A      Yes.

2  Q      Okay.  And isn't it the case that Knighthead and

3  Certares have told the company they are willing to move

4  forward without any breakup fee at all?

5  A      I believe that was -- yes, that was communicated.

6  Q      Okay.  And isn't it the case that the revised proposal

7  that was presented includes a 50 cent distribution to

8  shareholders?

9  A      It includes (indiscernible) cash (indiscernible).

10  Q      Fair enough.

11      And isn't it the case that the company, in fact, was

12  the party that asked Knighthead to do that in response to its

13  proposal?

14  A      I don't recall the sequence, Mr. Glenn.

15  Q      Okay.  You don't know why, as you sit here today,

16  Knighthead included that 50 cent recovery to shareholders?

17  

18          MR. ZAKIA:  Objection, Your Honor.  It calls for

19  speculation.

20          MR. GLENN:  I asked him whether he knew.

21          THE COURT:  You can answer if you know.

22          THE WITNESS:  I don't know.

23  BY MR. GLENN:

24  Q      And are you aware that the revised Knighthead proposal

25  contemplates a $1 billion rights offering to the shareholders

1  in the first instance and the bondholders if the rights

2  offering amounts are not fully taken by the shareholders?

3  A    Yes.  My understanding had been that it was to the

4  shareholders.  If I heard it was not taken up (indiscernible)

5  bondholders that's a detail I missed.

6  Q    Okay.  Now I want to talk to you about the euro loan

7  briefly and then we'll go back to the latest proposal.

8      Did you hear Mr. Hessler indicate, in his comments,

9  that Knighthead is willing to provide the company with

10  committed financing to satisfy this issue with European

11  liquidity needs?

12  A    I did hear him say that, yes.

13  Q    Okay.  And isn't it the case that consistent with his

14  comments Knighthead delivered and actual commitment letter on

15  terms more economically favorable to the debtors?

16  A    I am aware that Knighthead and Certares delivered a

17  proposal. I am not clear that it was in the form of a

18  commitment letter.

19  Q    You don't know what the proposal is?

20  A    Off the top of my head I don't, Mr. Glenn.  I know

21  (indiscernible).

22  Q    Okay. Do you have any reason to dispute Mr. Hessler's

23  contention that he did deliver a commitment letter to the

24  company?

1  A      I do not.

2          MR. ZAKIA:  Objection, Your Honor.  I was going to

3  say the witness just said he didn't know.

4          THE COURT:  Alright, overruled.

5  BY MR. GLENN:

6  Q     Now you talked earlier in your testimony about the

7  consequences to the company if that financing is not provided

8  immediately.  Do you recall that testimony?

9  A      Yes.

10 Q      I was a little confused by it and I just want to better

11 understand it.  So if that financing is not provided, say,

12 until the end of next week can you identify any actual

13 economic consequences to the company?

14

15 A      Other than the general consequences I discussed before,

16 and I don't know what I can say in court in terms of the

17 expected liquidity and balance sheet next week.  It will get

18 tight and projections are projections, right.  It's never --

19 it's rare that projections are absolutely right in terms of,

20 you know, what ends up happening.

21         So, you know, there could be no negative impact or

22 there could be significant negative impact if projections end

23 up not being accurate and the cash balances are less than the

24 company is anticipating because it's getting very tight.

25 Q      Now --

1   A     I guess it could be the company runs out of money.

2   Q     Could be, but you don't know as you sit here today?

3   A     I don't have a crystal ball.

4   Q     Okay.  Now is it your understanding that Centerbridge

5   is tying the court's approval of that euro loan as a

6   condition to it moving forward with the EPCA today?

7   A     That's my understanding, Mr. Glenn.

8   Q     Alright, so all things being equal as the company's

9   financial advisor would you agree with me that it would be

10  better for the company to move forward with financing that's

11  not tied to a separate outcome on this EPCA?

12

13  A     If we could get financing that we could place on as

14  quickly as the one that we have in place on the form of an

15  agreement that is fully negotiated and acceptable without

16  ties then that would be better for the company.

17  Q     Okay.  Now, but -- strike that.

18        Going back to the Knighthead proposal isn't it the case

19  that the revised Knighthead proposal developed after last

20  week reduced the quantum of preferred equity from $2.5

21  billion to $2.1 billion for a reduction of $400 million

22  through other equity financing?

23  A     I think it was a little bit more than $2.1.  It's like

24  $2.1 something, but, you know, in that (indiscernible), yes.

25

1  Q     Okay.  Now isn't it the case, sir, that there have been

2  multiple offers by both parties without any gaurantee of a

3  breakup fee as we sit here today?

4  A     Yes.  We went through the history.

5  Q     Right.  Okay.  Now isn't it the case as well that

6  Knighthead has told you that it is willing to continue to

7  work, to do work, to provide the company with an even better

8  proposal?

9  A     Better then what?

10 Q     Well let's just -- let me backup. If Knighthead is

11 willing to continue working with the company on resolving any

12 issues with its proposal, isn't that correct?

13

14 A     I can't speak of what Knighthead is willing to do or

15 not willing to do, Mr. Glenn.

16 Q     You don't know, as you sit here today, as the company's

17 investment banker?

18 A     Well I -- Mister (indiscernible) called me, but I don't

19 know -- I am not going to characterize what Knighthead is

20 prepared to do or not prepared to do. I mean they made a

21 proposal, the rest would just be speculation.

22 Q     Okay.  But you are willing to continue to work with

23 Knighthead on that proposal, correct?

24 A     Absolutely.

25 Q     Okay.

1   A      I'm sorry, as long as we are complying with any

2   restrictions and requirements that we have on the PSA.

3   Q      We will get to that.  Thank you.

4        Okay.  But we just got a new proposal from

5   Centerbridge.  When was the Centerbridge proposal presented

6   to the company, the one that was just filed with the court

7   that provides warrants to the equity and the enhanced

8   proposal to the GUCs?

9   A      So when -- can you ask your question again?

10  Q      Okay.  So just to lay the foundation you heard Mr.

11  Lauria present revised terms for the Centerbridge proposal

12  which includes additional cash to the general unsecured

13  creditors and warrants to be provided to the shareholders.

14  Do you recall that?

15  A      Yes.

16  Q      Okay.  When was that first presented to the company?

17  A      I want to say last night.  Sometime yesterday, I just

18  don't remember when yesterday.  I know I was up till about

19  12:30 last night.  So it could have been sometime in the p.m.

20  yesterday.

21  Q      Okay.  And when did the company have a board meeting to

22  resolve to accept to that proposal?

23  A      We had a board meeting this morning at nine o'clock.

1  Q     So this is still an evolving process, correct, Mr.

2  Derrough?

3  A     It has evolved.  I don't know if it's going to continue

4  to evolve or not.

5  Q     Okay.  Now is it the case that one of the reasons why

6  the company determined not to move forward with the

7  Knighthead proposal is that it did not have committed debt

8  financing, senior secured exit financing?

9  A     That was one of the reasons, yes.

10  Q     Okay.  I'd like to talk about that.

11        So isn't it the case that Centerbridge did not have --

12  strike that.

13        Isn't it the case that the Centerbridge plan did not

14  have committed exit financing until April 15th, i.e. last

15  week?

16

17  A     Well we have been running an exit financing process

18  which was really independent.  It was designed to be

19  independent of who the sponsor was going to be.  So it was

20  being run in parallel with the sponsor process.  Then the

21  date in which we, essentially, got commitments that we -- I

22  can't remember exactly, Mr. Glenn.

23  Q     Okay.  So when you said you ran an independent process

24  what do you mean by that?

25

1   A     We set up an exit financing process laying out our

2   needs of the company, and trying to make it as neutral as

3   possible from a sponsor perspective.  You may recall that

4   Knighthead, Certares initial was the sponsor.  So we wanted

5   to make it such that the exit financing process wouldn't be

6   dependent upon one or the other so that we wouldn't be, sort

7   of, overly favoring one or the other.

8   Q     Okay.  And isn't it the case that the company told

9   Knighthead that a defect in its proposal was that it didn't

10  have committed exit financing and those conversations

11  occurred over last weekend?

12

13  A     Well I think it's a more complicated narrative then

14  just that, Mr. Glenn.

15  Q     Well let's just make sure we isolate the point.  Did

16  the company tell Knighthead that a defect in its proposal was

17  that it did not have committed senior debt financing?

18  A     I don't remember whether those words were used, Mr.

19  Glenn.  You are probably aware that the exit financing

20  facility allows us to pivot to Knighthead, Certares if the

21  lenders believe that the structure is, essentially, you know,

22  the same from the credit perspective.  So I don't know -- I

23  don't think I heard those words specifically.

24

25

1    Q    Okay.  So from your perspective it's not a problem that

2    Knighthead does not have committed exit financing as we sit

3    here today?

4    A    Well the issue, Mr. Glenn, is that feedback we've

5    gotten from the banks that we have lined up is that the deal,

6    the structure that Knighthead, Certares has proposed isn't

7    going to work for them.  So, therefore, there is no committed

8    financing if they don't believe it's (indiscernible) under

9    the Knighthead, Certares structure.

10          So you could then take the next step and say well

11   if Knighthead, Certares shows up with their own financing

12   then that would neutralize that issue, but right now we have

13   committed exit financing that we don't want to lose.

14   Q    Okay.  So did Knighthead endeavor to talk to the banks

15   to see if they could obtain the exit financing that the

16   company cited as a reason that the Knighthead proposal is

17   inferior?

18   A    Yes.  They asked to speak to the lead exit lending bank

19   that the company has been working with, as well as ask to

20   speak to another bank that is not currently a party to the

21   exit (indiscernible) that did participate in the process.

22   Q    There were two groups of lenders that it tried to talk

23   to; one was JPMorgan and the second is the existing bank

24   group lead by Barclay's, correct?

25

1   A    I'm not sure if you want to call them groups. I think

2   they were just going to go on with Barclay's on the one hand

3   and then JPMorgan on the other hand.

4   Q    Okay.  And to do that they needed the company's

5   permission, correct?

6   A    They needed the company's permission and I believe we

7   needed to evaluate in terms of the PSA.

8   Q    Okay.  So --

9   A    But they did speak to JPMorgan and Barclay's.

10  Q    I understand that they only spoke to JPMorgan yesterday

11  at 12:15.  Is that consistent with your understanding?

12

13  A    I don't remember what day is today?

14  Q    I don't know.  I don't know.  Toda is Wednesday.

15  A    I believe the JPMorgan conversation happened yesterday.

16  Q    Okay. And this is, you know, four days after they

17  submitted the original proposal, correct?

18  A    The proposal came in Friday.  So, yeah, approximately

19  four days.

20  Q    Okay. And when did this Barclay's conversation occur?

21  A    Yesterday or today.

22  Q    Okay.

23  A    I believe it was in the last day or two.  Again, I have

24  to (indiscernible) because all the days are running together.

25  So that is my belief.

1    Q    Okay.  Now there was a board meeting at 4:30 yesterday

2    to consider the revised Knighthead proposal, correct?

3    A    I think it was at four o'clock there was a board

4    meeting yesterday.

5    Q    So you're testimony is that those conversations were

6    delayed because the company believed that permitting them

7    might violate the no-shot provision we talked about with the

8    Centerbridge Group, correct?

9    A    Sorry which conversation are you referring to?

10   Q    The conversations with the lenders.

11   A    I don't know which provision went through, but I don't

12   think, Mr. Glenn, that they asked to speak to the lenders

13   until maybe Sunday or Monday.  So it's not that they asked on

14   Friday to speak to the lenders.  It is my understanding.  So

15   you're making it sound like there was a much longer time

16   period between the ask and it happening.  But I know that it

17   had to be run down in terms of what we -- whether there is

18   any restriction under the existing agreements.

19   Q    Isn't it the case that Knighthead has been asking to

20   speak with the lenders for weeks?

21   A    I don't know if that's the case or not, Mr. Glenn.  I

22   mean they wanted to speak to the lenders when they were the

23   initial plan proponent and be part of that process.  We said

24   no.  We didn't include Centerbridge and Warburg until much

25

1   later in the process. So I just don't know when they first

2   asked for that, but, you know, as I said, we were running and

3   independent process.  The debtor wanted to maintain control

4   of that and not have one party or the other highjack it.

5   Q     Did you see a letter to the board of directors

6   delivered by Knighthead last Thursday asking for permission

7   to speak to the company's lenders?

8   A     I know they sent a letter.  I don't recall that

9   particular element of it.

10  Q     Are you aware of a letter delivered on Friday to Mr.

11  Lauria in which the Knighthead Group reiterated the request

12  to speak to the company's lenders to resolve this issue?

13

14  A     I don't recall that specifically.

15  Q     I have an email that might refresh your recollection.

16  I would ask the folks at Morris Nichols if they could call

17  that up somehow.

18        Judge, I --

19        MR. BARSALONA:  Good afternoon, Your Honor.  Joe

20  Barsalona for the ad hoc committee.  May I share my screen?

21        THE COURT:  Yes, I think you are -- have that

22  permission.

23        MR. BARSALONA:  Great.  Thank you, Your Honor.

24  I'm going to bring something up right now.

25        (Pause)

1        MR. BARSALONA:  Is that visible, Your Honor?

2        THE COURT:  No, not yet.

3        Okay.  Here we go.

4  BY MR. GLENN:

5  Q    Okay.  We put on the screen an email from Tuesday,

6  April 20th from Mr. Lauria to distribution lists, including

7  you, Mr. Derrough.

8        Do you see that?

9  A    I do.  It's hard to read.  I don't know if you can make

10  it bigger.  I just need to get my glasses out of my coat.

11        Yeah, I can see it now.

12  Q    Okay.  And it says that in the third line down it says

13  in part:

14            "The proposal is not fully documented and funded,

15  such that it is capable of being accepted by the company in

16  its present form."

17        Do you see that?

18  A    Sorry.  Where does it say that?

19  Q    Okay.  The first paragraph --

20  A    Yeah.

21  Q    -- right in the -- I'm just going to read this into the

22  record so we get the full context.  The second two sentences

23  of the first paragraph, it says:

24            "In addition to certain substantive and structural

25  issues, which we've discussed, the proposal is not fully

1  documented and funded, such that it is capable of being

2  accepted by the company --"

3          MR. GLENN:  If you could uncover that for me.

4  BY MR. GLENN:

5  Q    -- "in its present form.  Another issue is that it

6  doesn't include the debt financing needed to make it viable."

7      Do you see that?

8  A    I do.

9  Q    Isn't it the case, sir, that that's the first time that

10 the company told the Knighthead Group that the lack of exit

11 financing for its proposal was an issue?

12 A    I think what Mr. Lauria is saying here is that based

13 upon what we have heard from the exit lenders, it doesn't

14 work.  And unless you have an alternative source of funding

15 for the exit, it's not viable.

16     I think that's what he's trying to say here -- you'd

17 have to ask Mr. Lauria specifically -- but I think that's

18 what he's trying to say.  We heard from Barclays on the

19 Monday morning after.  So the sequence would have been we got

20 the proposals in the middle of the night or the details in

21 the middle of the night Friday, we had the hearing Friday.

22     We then get on the phone, White & Case and Moelis went

23 through what we knew of them at the time, created an issues

24 list, had a long call on Saturday morning to go through it

25 and make sure they all understood where we were, had the call

1  with the UCC, then sent that out.

2       I believe, unless we misunderstood it, it went to the

3  exit financing banks, the lenders, so Saturday night, and I

4  believe we heard by Monday morning-ish, that the banks --

5  that Barclays -- three banks' reaction was negative in terms

6  of its feasibility on the exit financing.  So, I think that's

7  what Mr. Lauria is referring to.

8       And we communicated that feedback, what we were

9  hearing, to Knighthead and Certares on Monday.  That's my

10 recollection.

11 Q    Okay.  I don't think you answered my question.

12      The question is, is this the first time that the

13 company told Knighthead that the lack of exit financing was

14 an issue for its DIP, yes, or no?

15 A    I don't know.

16 Q    Okay.  And then --

17 A    Well, hold on a second -- Mr. Glenn, I mean, lack of

18 exit financing.  If the exit financing that we had to wind up

19 isn't available, then I guess there's a lack of exit

20 financing.

21      And, as I said, I believe we communicated to the folks

22 at Knighthead and Certares that we were getting negative

23 feedback, and that's why I guess you could probably say it

24 was probably Monday that they were hearing it.

25 Q    Okay.  Now, it says here in the next paragraph -- and I

1  won't read this into the record, but you can disagree with me

2  if I'm wrong -- that here, the company is telling Knighthead

3  that it needs permission to speak to JPMorgan, because it

4  remains bound by an NDA.

5        Do you see that?

6  A    Yes.

7  Q    And that's an NDA with you, for your process that

8  requires all those communications to go to the company,

9  correct?

10 A    Correct.

11 Q    Okay.  And it says they also sought permission to speak

12 to Barclays, who is also bound by an NDA.

13       Do you see that?

14 A    Yes.

15 Q    And that's the same NDA that requires all these

16 communications to go through you, correct?

17 A    I mean, I don't know if each of the NDAs are exactly

18 the same, but substantively.

19 Q    Thank you.

20       Now, you testified before that the Barclays financing

21 may not be credible to the Knighthead proposal, do you recall

22 that?

23 A    Yeah.

24 Q    But that doesn't mean that Barclays is refusing,

25 categorically, to provide exit financing to Knighthead,

1  correct?

2  A    Correct.  We've not heard categorically, that they were

3  refusing, no, not those words.

4  Q    Okay.  Now, you're aware that the Knighthead proposal

5  is backed by approximately $5 billion of equity commitments,

6  preferred by preferred plus (indiscernible)?

7  A    Generally, yes.  I mean it's about that number.

8  Q    Okay.  And we know that Knighthead and Certares are in

9  that deal, but Apollo is also providing over $2 billion of

10  financing, correct?

11  A    Correct.

12  Q    And all of this $5 million of debt would be

13  subordinated to the senior debt that Knighthead has proposed,

14  correct?

15  A    I'm sorry, I think -- can you just -- (indiscernible)

16  and equity in (indiscernible).

17  Q    I'm sorry.  Let me rephrase.

18       All of this equity, the $5 billion of equity, is going

19  to be subordinated by its nature to the senior debt that

20  Knighthead needs to consummate its transaction, correct?

21  A    Well, you say Knighthead needs -- the company needs to

22  exit, I would say.  The proposed exit defendant facilities,

23  the equity that's being proposed would be subordinate, yes.

24  Q    Right.  And it would be insurance company for investors

25  to spend all this time to provide $5 billion of equity

1  financing if they didn't believe that raising $1.3 billion of

2  senior secured financing was unachievable.

3        Would you agree with me on that?

4  A    Well, it's not 1.3.  It's 1.3 billion in the term loan

5  and 1.5 in a five-year committed revolver.  So, it's 2.8.

6        And this is a proposal.  They're not funding, taking

7  the risk, you know, whether or not the banks fund or not.

8  It's their own -- it'll only come in if they could exit.  So,

9  I'm not sure that your same impression makes sense in the

10 context.

11 Q    Well, I mean, you test --

12 A    (Indiscernible) your questioning in saying, I think you

13 said there would be a debt (indiscernible), just to be clear.

14 Q    Yeah.  I think the (indiscernible) stands.

15       But you testified on your direct to Mr. Zakia about the

16 frothy capital markets that we're all going to benefit from,

17 do you recall that?

18 A    Yes.

19       But, Mr. Glenn, it was in the context of being

20 concerned that the frothiness may go away.

21 Q    That may be true, but that frothy market is equally

22 available today to Knighthead, correct?

23 A    If it were frothy today, the frothiness should be

24 available to anybody, with the *caveat* being that structure

25 does matter, capital structure does matter.

1  Q     Okay.  Is it your testimony to the Court, to

2  Knighthead, to Certares, to Apollo, to Oaktree, and other

3  members of our group, that they are not going to obtain the

4  exit financing they need to consummate the Knighthead

5  proposal?

6  A     No, that's not my testimony.

7  Q     So, can you identify for me, and the parties in this

8  case, other than the lack of exit financing, what other

9  issues has the company considered as to why night is not the

10 superior proposal today.

11 A     Well, we don't have full documentation yet, Mr. Glenn,

12 about -- and it was Mr. Zakia, not Zakia, just for the

13 record, at least to the -- but we don't have full

14 documentation.

15       And I know we mentioned this before, but until you have

16 that, you don't really know what everything is.  So, and, you

17 know, I didn't count the pages, but I think there's thousands

18 of pages of documents, probably, that have been filed that

19 were fully negotiated through, you know, multiple law firms

20 and lots of eyes to get the Centerbridge (indiscernible) deal

21 where it is.

22       We don't have that yet from the Knighthead and Certares

23 folks, and so, on an apples-to-apples basis, we don't have

24 equally actionable options at this point.

25       Give me one second.  I've got to change the plug on my

1  iPad here, so bear with me for a second.

2        (Pause)

3            THE COURT:  Any further questions, Mr. Glenn?

4            MR. GLENN:  Oh, yes.  I'm sorry, I thought we were

5  waiting for him to --

6            THE COURT:  He's done.

7            MR. GLENN:  Okay.  Thank you.

8  BY MR. GLENN:

9  Q    So, the Centerbridge proposal is actionable unless the

10 Court doesn't approve the EPCA and the break-up fee by

11 May 1st, correct?

12 A    That's my understanding.

13 Q    Okay.  And can you identify any harm to the company by

14 waiting between now and that May 1st hearing for Knighthead

15 to resolve any open issues with their proposal?

16 A    Well, we talked about funding Europe, so if we're going

17 to ignore that issue, I mean, that obviously is an issue, I'm

18 not an expert in the sequencing of things that have to happen

19 in terms of the agreement and putting it in place of

20 (indiscernible) system, blessing it by the Court, and it goes

21 into place.

22        I think the biggest issue is Europe and then, of

23 course, just the certainty that we are moving forward.  I'd

24 have to think about, Mr. Glenn, whether it would have any

25 impact on getting the exit financing committed at this point,

1  to think about that.

2      And what I don't know, Mr. Glenn, is when we would come

3  back to change, let's assume that we did that, today is

4  Wednesday, and the -- what day is today, the 21st? -- that

5  gives us nine days to fully document something else.  I mean,

6  if it was longer, that document (indiscernible) the deal we

7  have on the table.

8      I just don't know when would we come back here?

9  Q    My question is (indiscernible), I'm just asking for the

10 company and its business.  I know we have time frames to deal

11 with, with the Court and, otherwise, but I'm just asking you,

12 from the company's business perspective, can you identify any

13 specific harm to the company if the Court waits to grant the

14 break-up fee until the operative deadline, given by

15 Centerbridge under its own plan support agreement and EPCA

16 and that the company agrees with?

17 A    I mentioned Europe.  The other issue, and I'm not an

18 expert in the noticing and calendar provisions under the

19 Bankruptcy Code and the Local Rules, but it would delay our

20 commencement of solicitation.  And my understanding is that

21 that would, could very well -- I don't know all the

22 details -- but push out the confirmation hearing, potentially

23 pushing it out beyond the end of June.  Again, I'm not an

24 expert in, you know, what's required solicitation days and

25 things like that, but, you know, pushing it out into July,

1  then (indiscernible) going out into July, that's going to

2  impact the calendar of the business that we talked about.  It

3  will make it certainly messy from an accounting perspective.

4  You know, we'd be better to close at the end of the quarter.

5       And then, you know, we've talked about just, a general

6  uncertainty, you know, for (indiscernible).  The longer you

7  push things out, you push things out.  I don't know the

8  snowball effect on all the other timing requirements in

9  bankruptcy, but, again, it's safe to say it's probably not

10 going to be a better timeline; it'll be a worse timeline.

11           MR. GLENN:  Your Honor, let me have a minute, with

12 your indulgence, just to double-check my outline, and then

13 I'll conclude.

14      (Pause)

15           MR. GLENN:  Your Honor, that concludes my

16 questioning.

17           THE COURT:  All right.  Does anybody else wish to

18 cross-examine Mr. Derrough?

19      (No verbal response)

20           THE COURT:  I hear none.

21           Mr. Zakia, do you want to redirect?

22           MR. ZAKIA:  Quickly, Your Honor.

23           Before I begin, I'll thank Mr. Glenn for proving

24 that I'm not the only lawyer that sometimes misestimates how

25 long my examination will take, so I'm glad I'm in good

1  company in that one; notwithstanding the fact I've been wrong

2  before, I will endeavor to be brief.

3                    REDIRECT EXAMINATION

4  BY MR. ZAKIA:

5  Q     Mr. Derrough, you testified during cross-examination

6  concerning the fact that Knighthead and Certares had recently

7  indicated that its current proposal would be going forward

8  without a break-up fee.

9        Do you remember being asked those questions?

10  A     Yes.

11  Q     Now, Knighthead and Certares was, as I believe you also

12  testified, the original plan sponsor that the debtors

13  initially selected when they filed their original plan,

14  right?

15  A     Yes.

16  Q     Did that deal include a break-up fee?

17  A     Yes, it did.

18  Q     And then, again, and then you testified this on both

19  direct and cross, when the company pivoted to the

20  Centerbridge deal, that also, the company agreed to pay a

21  break-up fee as part of that agreement?

22  A     Yes.

23  Q     And, obviously, because the company was in bankruptcy,

24  all that was always subject to court approval?

25  A     Correct.

1 Q      And I believe Mr. Glenn asked you about whether the

2 competitive activity which occurred with the various back-

3 and-forth and different bids, all occurred before the Court

4 ultimately ruled on the break-up fee, which we're asking the

5 Court to do today, right?

6 A      Correct.

7 Q      Did that activity occur after the company had agreed

8 both, with originally with the original sponsor Knighthead

9 and Certares, and then subsequently with the new sponsor

10 group, to pay the break-up fee?

11 A      Yes.

12 Q      Okay.  And you talked about European financing and the

13 importance of that.  I just want to be clear, as we sit here

14 today, the company -- does the company --

15 A      Mr. Zakia, I'm sorry.  Just to be clear, since all the

16 activity happened after the company agreed to pay a break-up

17 fee, we did have a period where we were running the three

18 groups against each other before picking Knighthead and

19 Certares and agreeing to a break-up fee with them.  So, there

20 was activity before they agreed to the (indiscernible),

21 although everybody was asking for one, I understand.

22 Q      Right.  But all of the negotiations occurred after the

23 first plan and all -- the original pivot and then these new

24 proposals and then the improvement on the proposal.

25 (Indiscernible) talking about the back and forth recently,

1  all happened after the company had agreed, subject to court

2  approval, to pay a break-up fee?

3  A     Yes.

4  Q     Okay.  As we sit here today, does the company have

5  fully executed documents which are ready for an immediate

6  closing with the existing sponsor group, with respect to the

7  European (indiscernible)?

8  A     Yes.

9  Q     Does the company have fully executed documents that are

10  ready to close for the European financing with the

11  (indiscernible) Knighthead and Certares Group?

12  A     Not to my understanding.

13  Q     Does that matter?

14  A     I'm sorry?

15  Q     Is the existence or lack thereof of fully executed

16  documents with regard to the European transaction, is that

17  important?

18  A     Yes, I want to say maybe the opposite.  It's very

19  important to have fully executed documents that you can close

20  upon.  Not having -- if we didn't have that, then we wouldn't

21  know that we have financing available.  It's always subject

22  to final documentation.

23  Q     Which doesn't existing in the case of the Knighthead

24  and Certares proposal, which you were just asked about on

25  cross-examination?

1  A      Correct.

2  Q      Same question with regard to exit financing, the

3  current plan, the proposal put forth by the current

4  sponsorship group, fully committed exit financing as we sit

5  here today?

6  A      Yes.

7  Q      And is that the case with regard to the Knighthead and

8  Certares proposal?

9  A      If it's not fully documented, then there's no way that

10  we could execute, no.

11  Q      You were asked a number of questions about Knighthead

12  and Certares' ability to speak to Barclays and JPMorgan.

13         Do you remember those questions?

14  A      I do.

15  Q      I just want to be clear, I think you said this, but did

16  those discussions, did the debtor provide its permission for

17  those two occur?

18  A      Yes.

19  Q      And did those discussions, in fact, occur?

20  A      To my knowledge, yes.  I was not on those calls, but I

21  think that my colleagues were.

22             MR. ZAKIA:  I'm sorry, Your Honor.  Just one

23  second.

24        (Pause)

25             THE WITNESS:  If you hear anything in the

1  background, Mr. Zakia, the thunderstorm appears to be making

2  its way from Wilmington to New York.

3  BY MR. ZAKIA:

4  Q    So, let me ask a couple other questions.

5       You were asked a number of questions (audio

6  interference).  Mr. Glenn asked you whether the lack of exit

7  financing was a factor that caused the company to judge the

8  Knighthead and Certares proposal to not be superior to the

9  existing proposal.

10      Do you remember that?

11 A    I remember that part of the conversation, yes.

12 Q    And I believe your answer is, that was one factor?

13 A    Yes.

14 Q    Could you describe for the Court were there any other

15 additional factors.

16 A    Well, to the point that you were just going over, that

17 if we didn't have full documentation at that point, I think

18 what we had -- I mean, it's been moving around a lot, but in

19 the most recent round, we got a couple, you know,

20 presentation slides outstanding the proposal, and so it's not

21 actionable on its face right now in the same way the

22 Centerbridge transaction is actionable.

23      There's -- you know, some details have moved around a

24 bit in the last few days.  So, like the point that Mr. Glenn

25 made that the rights offering wouldn't be available in the

1  second instance to bondholders, was not my understanding,

2  certainly, a day or so ago, and that's changed.

3       The point that I'm making is that the details continue

4  to change a little bit, and so, by definition, it's not

5  actionable if we don't have the details.

6  Q     Okay.  Now, after you compare the Knighthead and

7  Certares proposal, the most recent one, to the terms of the

8  current plan, the terms of the current plan, which Mr. Lauria

9  described to the Court this morning, with regard to the

10 recovery to equity, do you have a view as to which of those

11 proposals is currently superior?

12 A     So, the -- I'm sorry, I'm just looking at the

13 thunderstorm out the window -- I happen to be in a room

14 where, fortunately, this is the first time I've seen it where

15 this has happened, but I'm three feet from the window.

16      As Mr. Lauria had described, we ran a Black-Scholes

17 valuation on the warrant structure that the Centerbridge

18 Warburg bondholder group proposed.  And we think the range of

19 value, it's from 91 to maybe $100 million, and though, if you

20 ascribe that value to that warrant package, and that it's

21 going to all shareholders, you know, that would appear to be

22 greater in value than the cash, the 50-cent-per-share amount

23 that the Knighthead and Certares Group is proposing.

24 Q     You said on cross-examination that structure matters

25 with regard to the finance ability of a proposal.  Could you

1  explain to the Court what the difference is in structure

2  between the current plan and the proposed Knighthead and

3  Certares plan and how that may or may not impact the ability

4  to finance.

5  A    The biggest -- I mean, it moved a little bit from what

6  we saw on Friday to what we have today in terms of where debt

7  would be placed from Friday to today, within the corporate

8  structure.

9       But the biggest full difference is the preferred stock

10  instrument, you know, coming from Apollo.  We'll call, I

11  think Mr. Glenn said $2.1 billion, so I'll say 2.1 billion.

12       It does have features of it that people believe may

13  impact the credit rating of the company coming out

14  negatively.

15       And so all things being equal, that's going to make, at

16  least, the exit DIP more (indiscernible) if it is achievable.

17  So, when I say structure matters, it's that element of the

18  proposed structure.  We don't know what massaging they're

19  prepared to do, to address those kinds of issues if those

20  issues remain with the exit banks.

21  Q    Did the Knighthead and Certares proposal, as currently

22  structured, include any fees that are different than provided

23  in the existing plan structure that may be problematic?

24              MR. GLENN:  Objection, Your Honor.

25              This was not brought up on my cross,

1  (indiscernible).

2           THE COURT:  Yeah, I think we are getting beyond

3  the scope of the direct.

4           MR. ZAKIA:  Well, with that, well, Your Honor, I

5  will always take the Court's hint and I will stop.

6           No further questions.  Thank you.

7           THE COURT:  Mr. Glenn, anything further or are we

8  done with the testimony?

9           MR. GLENN:  I'm sorry, I was on mute.

10           Just one last question or two, Judge.

11                   RECROSS-EXAMINATION

12  BY MR. GLENN:

13  Q    You testified, Mr. Derrough, before, that the Black-

14  Scholes valuation analysis was in the ninety-million-dollar

15  range, and that that was superior to 50 cents being offered

16  to shareholders.

17      Do you recall that?

18  A    I said it would appear to be if there was around 90

19  million bucks and I believe that 50 cents is around 75

20  million.

21  Q    Okay.  But shareholders, under the Knighthead proposal

22  that you acknowledged, are getting rights to subscribe to a

23  billion dollars of equity in the Knighthead proposal, in

24  addition to that cash, correct?

25  A    That's my understanding.  We haven't seen all the

1  details, but that's the understanding, yes.

2  Q     Okay.  And do you understand that that would amount to

3  approximately 28 percent of the reorganized equity of the

4  company?

5  A     I haven't done that math, Mr. Glenn.  It sounds about

6  right.  It sounds like in the right (indiscernible).

7  Q     Thank you.

8           MR. GLENN:  Nothing further, Judge.

9           THE COURT:  All right.  Thank you.

10           All right.  I think we're done with Mr. Derrough?

11           MR. ZAKIA:  We are, Your Honor, and Mr. Derrough

12  was our only witness, so at this point, the debtors rest.

13           THE COURT:  Thank you, Mr. Derrough.

14      (Witness excused)

15           THE COURT:  Does anybody else want to present any

16  testimony?

17           MR. GLENN:  We do not, Judge.

18           THE COURT:  All right.  Then I'll close the

19  record.

20           Since we're beyond the two o'clock hour for the

21  disclosure statement, I want to pivot, to use all your terms,

22  pivot to see if the U.S. Trustee had had a chance to look at

23  the disclosure statement changes?

24           MS. RICHENDERFER:  Yes, Your Honor.  I did, Your

25  Honor.  And I got the thunderstorm before you did, because

1 I'm up in Chester County, so, the thunderstorm has already

2 been through here.

3      (Laughter)

4      MS. RICHENDERFER:  Yes, and I do appreciate the

5 Court rearranging things, and I was able to get through all

6 of the blacklines and I do appreciate debtors' counsel

7 sending them to me directly.

8      And, Your Honor, I have no comments or questions

9 on the revised documentation in the form or the disclosure

10 order and the ballots and the disclosure statement, itself,

11 that have been put in front of the Court for approval today.

12      THE COURT:  All right.  Thank you.

13      All right.  Then I'll hear argument on the EPCA

14 issue, if I need anymore.

15      Who's going to speak for the debtor?

16      MR. LAURIA:  Thank you, Your Honor.

17      Tom Lauria from White & Case for the debtors.  I

18 will try to be brief here, because I think a lot of it has

19 been said or addressed one way or the other.

20      I think that with respect to the Court's

21 consideration of whether or not the EPCA should be approved,

22 including the break-up fee and the expense reimbursement,

23 there are really only three issues to consider:  one, whether

24 or not the entry into the agreement, including the break-up

25 fee and expense reimbursement, constitutes a proper exercise

1   of the debtors' business judgment; two, whether or not the

2   size of the break-up fee is appropriate; and three, whether

3   or not the payment of break-up fee constitutes a reasonable

4   and necessary expense of the administration of the Chapter 11

5   case, such that it is appropriate to be treated as an

6   administrative expense under the Code.

7          With respect to inquiry number one, whether or not

8   the entry into the EPCA constitutes a proper exercise of the

9   debtors' business judgment, I think that the record that has

10  been made makes something extraordinarily clear.  That these

11  debtors have, at every juncture, through a process that's

12  been quite difficult and complicated, been very careful and

13  thoughtful in the way they made decisions and the way they

14  shepherded the process forward to a place that is

15  unquestionably a very capable place for the estate and its

16  stakeholders.

17         Just considering the fact that we have a plan

18  today that unimpairs all the senior creditors, administrative

19  and priority claims, that is supported by 87 percent of the

20  holders of funded debt claims, and that will pay 100 cents on

21  the dollar to the general unsecured claims, garnering the

22  support of the official creditors' committee, and as further

23  modified, provides a recovery to shareholders that is, at

24  this time, valued at roughly 60 to 70 cents per share.

25         The process was competitive in getting here.  All

1  bidders required a break-up fee and the reward to a party who

2  actually got to definitive documentation, and there's only

3  one party who's done that, the Centerbridge Group, together

4  with the bondholders, have gotten the definitive

5  documentation regarding their commitments and their

6  financing, and all of the terms on which the plan would be

7  implemented going forward, is that you get to be the stalking

8  horse.  That establishes the floor and that provides great

9  security to the company.  We know that whether or not we can

10  get to a better deal, and we hope, always, to get to a better

11  deal, we know that we have a deal that we can carry-forward

12  to the finish line, provide stability and structure, and it

13  takes risk off the table.

14          And as debtors-in-possession, we're akin to being

15  a trustee, and the trustee's primary job is to not be at the

16  roulette wheel, to mitigate risk, in connection with its

17  efforts to maximize value.  And I think the record makes

18  clear here that that's precisely what these debtors have done

19  through this process of identifying sponsorship and then

20  negotiating and working the various competing parties to a

21  place where we have now, one definitive, actionable

22  transaction.

23          With respect to the appropriateness of the amount

24  of the break-up fee, the testimony is, and the record makes

25  clear, that it's a 3 percent fee on the total amount of the

1  equity commitment, roughly a 1.2 percent fee on the overall

2  size of the transaction, based on a $5.5 billion total

3  enterprise value.  This is completely consistent with past

4  precedent and break-up fees that have been awarded in other

5  cases, which have been as high as 10 percent in some cases, 6

6  percent.  Three percent is, I think, something the Court can

7  view as being squarely in the range of what is appropriate.

8         And with respect to the third question, whether or

9  not the break-up fee clears the burden of being an

10  administrative expense in these cases, the record makes

11  clear, and the contract, itself, makes clear that the break-

12  up fee is only payable from the proceeds of an alternative

13  transaction that closes.  This is consistent with Third

14  Circuit precedent of the appropriateness of avoiding a break-

15  up fee as an administrative expense.

16         I'd like you to turn to precedent for just a

17  moment, and I won't cite unpublished decisions in Delaware,

18  which I know the Court disfavors --

19      (Laughter)

20         MR. LAURIA:  -- but I will cite two published

21  decisions out of the Southern District of New York:  the

22  Integrated Resources case, 147 B.R. 650, and Metaldyne

23  decision at 409 B.R. 661.  In both of those cases, an active,

24  ongoing bidding process was continuing when the debtor went

25  to the Court for approval of a break-up fee in favor of the

1  bidder who, at that time, had the superior proposal.

2          In both of those cases, the Court noted that the

3  break-up fee should be approved, even though the process in

4  the case of Integrated Resources was, in the Court's own

5  words, far from over, and that there was a clear desire for

6  further bidding.  The Court concluded that the fee was

7  reasonable and it was appropriate to provide structure for

8  the process going forward and protection of the downside.

9          Similarly, in Metaldyne, Judge Glenn observed that

10 there was no evidence that the fee will hamper bidding, that

11 by approving the stalking horse bid, a floor was set and a

12 structure would be established for future competing bids.

13         Both those cases are on point to our current

14 circumstances.  I'd also like just to discuss for a moment, a

15 couple of cases that have been cited by the ad hoc equity

16 group: O'Brien and Reliant Energy.

17         In O'Brien, the decision as to whether or not to

18 award a break-up fee was addressed by the Court after the

19 bidding had completed and the bidder seeking the break-up fee

20 had already proved to the Court that the break-up fee was

21 unnecessary because they were willing to continue through the

22 process without the break-up fee's protection.

23         And in Reliant Energy, the Third Circuit was clear

24 to say that there is no per se rule against the break-up fee,

25 but there, the break-up fee was not awarded because the

1  bidder did not require that the break-up fee be approved.

2  The bidder only required that the debtor seek approve of the

3  break-up fee.  The Court, there, held that that showed that

4  it was not necessary to continue the bidding process and to

5  preserve the stalking horse bid.

6          So, Your Honor, we are at juncture in this when

7  the debtors are truly ready to emerge from Chapter 11 and

8  we're doing so at a moment in time when the markets,

9  according to the company, are very favorable to the company.

10 And we have, as a Board, already decided that we have a

11 competing proposal that may, in fact, with further work,

12 become a superior proposal.

13         And, as I think the record demonstrates by the

14 debtors' past ability to have freely pivoted from one

15 transaction to the other, based on its determination of which

16 was superior for the estate and its stakeholders, that's

17 something that we can do again and I can assure the Court

18 that the Board is committed to making sure that it gets the

19 best outcome for the company and the stakeholders.

20         We are prepared to include language in the

21 disclosure statement that makes clear that we will do that.

22 That makes clear that we are committed to pursuing the best

23 outcomes for the company.  And that we will rely on

24 Bankruptcy Rule 3019 to go forward with a pivoted

25 transaction, if, in fact, we get to one.  And, by definition,

1  a pivoted transaction, at this point, is going to be one that

2  only improves the treatment of our stakeholders, including,

3  in particular, the shareholders.

4        So, for those reasons, Your Honor, I think it's

5  appropriate to approve the EPCA, including the break-up fee

6  and expense reimbursement, and to, then, turn to the

7  disclosure statement, approve it, and let's start moving this

8  process towards everybody's five chapter of Chapter 11, the

9  end.

10        THE COURT:  Thank you.

11        Mr. Glenn?

12        MR. GLENN:  Yes, Judge.

13        I think this is a tale of two things:  what the

14  argument is, which is what the record says.  I'd like to

15  start with Mr. Lauria's point about whether Centerbridge

16  should be "rewarded" for getting to the definitive

17  documentation first.

18        That is certainly not the standard.  The standards

19  for break-up fees are not that you've done good work, okay,

20  not that you can move the fastest; it's whether the expense

21  satisfies the relatively straightforward analysis in Section

22  503 of the Bankruptcy Code, that is, that it's an actual,

23  that it's a necessary cost or expense of preserving the

24  estate.

25        Second, we heard Mr. Lauria articulate that the

1 break-up fee should be approved under a business judgment

2 analysis.  I think that if the 503 analysis is not satisfied,

3 the business judgment is not applicable.

4         But even if it is, tellingly absent from the

5 record today is any record of what the Board did in this

6 case.  You heard Merrill opine that it's his view that the

7 break-up fee would be better for the estate than not.  But we

8 didn't hear the Board deliberations.  We didn't hear what the

9 facts and circumstances that the Board heard to come to

10 exercise their business judgment.  We didn't even hear from

11 the CEO or the CFO.

12         And so, if we're talking about a business judgment

13 standard, I would ask the Court to search the record to see

14 where that business judgment is in the testimony that

15 Mr. Derrough provided or that the record has put forth before

16 the Court.

17         I think we're in very dangerous territory still,

18 and that territory is this, we have a May 1st deadline, okay.

19 I think that is in the record.  If we were here on

20 April 30th, I think the Court would have a more

21 straightforward decision, because at that time, there would

22 be something actually to lose.  There is nothing to lose

23 today.

24         Now, we heard a few things that drive the timing.

25 Number one is this Euro financing.  We heard Mr. Hessler tell

1  you that he's given a commitment letter to the company.  We

2  heard Mr. Derrough say that he hadn't even heard about that,

3  which is problematic in and of itself.  Be that as it may,

4  there's no evidence in the record of what might happen to

5  this company if that financing waits for next week, other

6  than speculative, unfounded assertions that weren't really

7  clarified by Mr. Derrough.

8         And I think we can tell what's happening here.

9  Centerbridge is using that as, you know, importing its

10  position (indiscernible) as leverage, okay.  And they use the

11  plan support agreement as leverage, because at the end of the

12  day, Mr. Lauria conceded that our proposal, the Knighthead

13  proposal could lead to a higher and better offer.

14         You saw the document.  You heard Mr. Derrough

15  testify that there were two defects with the Knighthead

16  proposal today, not April 30th -- today.  The defects are the

17  documents aren't done, although we dispute that.  They were

18  given a full EPCA last week with financing.  And, number two,

19  that on the bank financing side, which we don't have, there

20  are structural impediments that have been put in place,

21  rightly or wrongly, that have stopped Knighthead from getting

22  across that finish line.  And the company was party to that

23  structural impediment.

24         Informal, in these cases, you can talk to your

25  financing parties, because everybody's best interest is in

1  getting the best deal.  These professionals chose to have all

2  roads go to them, and then they chose to erect roadblocks for

3  other people to talk to them, and we've heard that the PSA

4  parties had to get consent for Knighthead to get their

5  financing.

6         So, I think the problem here is that we're seeing

7  the process, the break-up fee, the lack of access to

8  Knighthead, and these, what I would say, artificial

9  deadlines, as being structural impediments to maximizing

10 value, rather than assuring that we have the proper floor

11 with the maximum value, then, in place.

12        It seems to me that if Your Honor were to approve

13 the break-up fee today, and I don't believe that that's the

14 case that it should be approved, because the record is

15 abundantly clear that in the last week, there have been a

16 series of offers, counter offers, and the last offer occurred

17 as late as last night.  It was approved by the Board only

18 this morning.  So the auction process, Judge, is still

19 underway.

20        And that is a problem under the Reliant Energy

21 case, and it goes back to O'Brien.  And I litigated Reliant

22 Energy case in the Third Circuit and I lost.  I lost.  I

23 represented Kelson in that case.  Kelson did not put in a

24 condition to their transaction that the break-up fee be

25 approved, only that it be sought.

1        But more importantly, there was another party

2   standing in the background, ready to provide more value with

3   no break-up fee.  And you heard Mr. Derrough say today,

4   Judge, that Knighthead is willing to move forward without a

5   break-up fee.  So, at the end of the day, where you have a

6   competitive auction, where the parties continually outbid

7   each other without the benefit of a break-up fee, those are

8   the circumstances, as of April 21st, 2021, that a break-up

9   fee should not be approved.

10        So, the other thing that I think was telling from

11   the record is that there's no testimony, despite the fact

12   that Centerbridge has continued to bid up the assets in

13   response to our proposal, and I think we deserve the benefit

14   of the doubt for that.  We brought more value to this estate

15   by coming forward with our higher offer and that's resulted

16   in tangible value to the general unsecured creditors,

17   tangible value to equity holders.

18        But you didn't hear Centerbridge say that they're

19   walking if you don't approve the break-up fee today, because

20   they can't.  They're bound until the 1st, and there was no

21   testimony at all that they were going to walk away if you

22   didn't approve it.  Why?

23        Because this is a great deal.  This is a

24   phenomenal deal.  You have a company that is so well-poised,

25   so well-positioned to benefit from the recovery that we are

1  experiencing now, and that everybody wants to profit from.

2          And so, while Ms. Strickland said before that this

3  is not a tug-of-war, it absolutely is a tug-of-war, okay;

4  whether the equity gets 28 percent of the upside of the

5  business going forward, options and warrants in coming out.

6  Equity is now the fulcrum security.  There is no other way to

7  look at this.

8          So, what I would urge the Court is to go back to

9  Ms. Caton's words last week.  She was very persuasive to you,

10  as an estate fiduciary, when she told you, not now.  Let this

11  play out.  They're not obligated.

12          And she cited what I told you, which is that if

13  you put in the break-up fee and the bids don't improve, her

14  ox is going to be gored by that.  Today, the equity's ox is

15  going to be gored, if you approve the break-up fee.

16          So, I would respectfully submit that the break-up

17  fee should not be approved today.  It may never be approved

18  if we can prove to the Court and other stakeholders, we're

19  highly confident that Knighthead can get over the finish

20  line, if it's allowed to, and I think the best course of

21  action today is to deny the break-up fee, or at an absolute

22  minimum, give us until April 30th to do the all these Is and

23  across all these Ts, so that any issues that are an

24  impediment to arguably being the stalking horse, are removed.

25          And we're going to need the company's cooperation

1  and we're going to have to move very quickly, but I think,

2  given everything you've heard today, that that would be the

3  most prudent course to pursue.

4          Thank you very much for your time.  That concludes

5  my remarks.

6          THE COURT:  Okay.

7          MS. STRICKLAND:  Your Honor, may I be heard?

8          THE COURT:  You may.

9          MS. STRICKLAND:  Thank you, Your Honor.

10          For the record, Rachel Strickland, Willkie, Farr &

11  Gallagher.  I am reminded by, one, a book that my kids really

12  liked, which is called, If You Give a Cat a Cupcake.  And the

13  second line is, that if you give a cat a cupcake, next, he'll

14  ask you for some sprinkles.  I don't know if you know the

15  book.  It's a good one.

16          On Friday they said, we just need a few more days,

17  Your Honor.  We give it to them.  Here we are.  It's

18  Wednesday.  We gave it to them.

19          Now, they're saying, now we want some sprinkles.

20  We need more time.

21          I'm a little confused, frankly, because Mr. Glenn

22  keeps referring to the Knighthead and Certares proposal as

23  "our proposal," when he started in the beginning saying,

24  we're thrilled, you know, whatever equity ends up with, if

25  they end up ever being in the money, it's great for him, but

1  I'll leave that to the side.

2           The risks of delay are not borne by outside

3  investors that aren't in the capital structure.  They're not

4  borne by Centerbridge, by Warburg, by Knighthead, or by

5  Certares.  With respect to Knighthead and Certares, those

6  folks have three options if there's a delay.  They get to

7  walk if something bad happens to Hertz tomorrow or next week.

8           The risk to my client, with several billion

9  dollars at stake, is not great, and they don't get to walk.

10  So my capacity as the counsel to the lion's share of the

11  creditors in the case, we are asking for no more display.

12  The record more than substantiates the debtors' business

13  judgment and that is clearly the standard here.

14           And in my capacity as counsel for the plan

15  sponsors, who are funding billions of dollars in new capital

16  to put their money where their mouth is, the break-up fee and

17  expense reimbursement is part of the deal.  It is necessary.

18           My client's capital isn't an option; it's

19  committed.  My client's requirement to fund the Euro loan

20  today isn't an option; it's committed.

21           We didn't show up with a three-page deck and we've

22  been in this as long as everybody else.  And we showed up

23  with everything with showed up with, because the company made

24  us do it, and we play by the same rules as everyone else.

25           So, I hear the cat and the cupcake saying, well,

1  if only we had had more cooperation, if only we had been

2  given to this party or that party.  We got the same rules.

3  We didn't have unfettered ability to talk to exit lenders;

4  the company controlled all that process equally for everyone.

5        The company's Board met.  They looked at every

6  piece of paper they had in front of them, every analysis,

7  everybody's advisored up the yin-yang, as you can see.  The

8  company and their Board made an informed decision.  They've

9  come to you exercising their business judgment, and we

10  support that, because leaving aside the plan sponsor hat, the

11  company owes our clients a lot of money.  We are not out of

12  harm's way.  They are running a travel company in the midst

13  of a global pandemic.

14        We are not home free, so the equity should not

15  be -- they should be cautiously optimistic, but they should

16  be cautious, and our clients stand to lose the most.  So,

17  Your Honor, I would ask that we say no to the sprinkles and

18  the cherry on top and everything else, we approve this.

19        Parties are legitimately interested in this

20  company, which everyone seems to be, they'll be back.  This

21  won't be an about the break-up fee, which is not exorbitant.

22  It's not out of market.  If anything, it is lean, yet

23  necessary and appropriate.

24        Thank you, Your Honor.

25        THE COURT:  Thank you.  Anybody else?

1          MR. MAYER:  Yes, Your Honor.

2          Tom Mayer for creditors' committee.  My partner,

3    Amy Caton, had to step out.

4          I won't burden the record.  We join with

5    Ms. Strickland and her clients in support in the approval of

6    the (indiscernible).

7          THE COURT:  All right.  Thank you.

8          Anybody else?

9        (No verbal response)

10          THE COURT:  All right.  Well, then let me rule.

11          First, I agree with the Knighthead -- well, the ad

12    hoc equity committee that 503 is not the appropriate

13    standard, but that shouldn't -- that the business judgment

14    rule is not the appropriate standard and that 503 is the

15    appropriate standard.

16          But let me make a comment, as I follow-up to some

17    comments I made last week.  Based on the testimony and the

18    comments and arguments of counsel, I think it is clear that

19    the debtor is acting in its full fiduciary duty, in

20    compliance with its fiduciary duty, and in compliance with

21    Delaware's enactment of the business judgment rule.  So, my

22    comment that that is not the standard does not suggest that

23    the debtor does not meet that.

24          In evaluating the break-up fee and expense

25    reimbursement, which I understand is really the crux of the

1  objection to the agreement, which is the subject of this

2  motion, the debtor does have to establish it's an actual and

3  necessary expense of the estate.  And while in the O'Brien

4  case, the Court did not approve that fee until after the

5  auction process, I think the courts have made it clear that

6  that is not a necessary requirement, that we wait until the

7  end to approve any break-up fee.

8          And many courts have held that there is value to

9  having a fully committed deal on the table in order to

10  attract other bids and get other bidders to improve their

11  bids.  It benefits the estate.  It is not just to take risk

12  off the table.  It sets a floor and encourages others to bid.

13          And I note that the Center -- that the current bid

14  has already gotten (indiscernible) in the Knighthead bid.

15  There could be an argument that the Knighthead bid has

16  improved the current bid, as reflected in the revisions this

17  last week.  But I think it is significant that the Knighthead

18  bid is not finalized.  Even though that party says it's ready

19  to go, it is not finalized, and there is, again, value to

20  having a fully documented and committed deal.

21          Other factors the Court considers is whether

22  bidders, all of the bidders in the process have asked for a

23  break-up fee and expense reimbursement, similar to that, that

24  I'm being asked to consider.  And in this case, the parties

25  all did, initially, request both of those and in amounts that

1  are more than what the debtor was able to negotiate as the

2  (indiscernible).

3         And Mr. Derrough in his declaration and somewhat

4  in his testimony, made it clear that 3 percent, while it is

5  an unusual percentage of a break-up fee in 363 sale cases, is

6  less and sometimes half of what similar equity deals are

7  seeking and have been approved by the courts and committee to

8  providing commitments for a plan of reorganization process.

9         But like 363 deals and other equity proposals,

10 this break-up fee is not due just for bidding.  It is due and

11 payable only if a better deal is consummated by the debtor.

12 And the courts have been clear that that is the necessary

13 requirement, and I find it is met here.

14        While the Reliant case did not okay the bid, I

15 think this is distinguishable.

16        Again, the Knighthead bid, while Knighthead had

17 been involved in the process, is not fully committed, fully

18 documented, and ready to go today.  And given the debtors'

19 business requirements, both with respect to its European

20 operations and with respect to getting itself in a position

21 to exit from bankruptcy in a timely fashion, that supports

22 its projection and, thereby, results in value for the

23 stakeholders who will remain in this case and who are due to

24 be paid in full, in cash now, those parties represented by

25 the creditors' committee, I think that it is necessary to

1   approve the break-up fee at this point in the process.

2          I appreciate that all of the parties, including

3   Knighthead and Centerbridge, have been working around the

4   clock, and it's not just Mr. Lauria, who had bags under his

5   eyes, I appreciate that all the parties are working to exit

6   Chapter 11 in a manner that is beneficial to all of their

7   respective clients.

8          But I think we are at the point, I did give the

9   parties, I gave my head an additional week to try and get

10  itself to a position that would convince me otherwise, but I

11  think I am prepared to approve the EPCA, as the parties are

12  referring to it, including the break-up fee and the expense

13  reimbursement.  And that is with the *caveat* that the debtor

14  has been complying with its, and will continue to comply with

15  its fiduciary duties, but I see absolutely no evidence that

16  the debtor will not be fully prepared to pivot to another

17  proposal that is a higher and better deal for all of the

18  constituents, that in its fiduciary duty, is now obligated to

19  represent.  So, I will enter an order approving it.

20         And with the U.S. Trustee's and my brief review of

21  the disclosure statement and plan to date, I am willing to

22  approve the disclosure statement, as well, to allow

23  solicitation to proceed.

24         Did I understand, Mr. Lauria, are you going to

25  submit a further revision?

1        MR. LAURIA:  Your Honor, I believe there are a few

2  minor cleanups that were mentioned, so we'll get that to the

3  Court promptly and make sure that everybody has the changed

4  pages tonight.  I think it will be very minor.  They're very

5  limited.

6        THE COURT:  All right.  Oh, good.

7        And you'll file it under certification of counsel

8  and be sure to upload it so that I can direct the entry of

9  it.

10       I had one issue on the rate-offering procedures,

11 and I don't know -- but I did not see any change to it --

12 paragraph 11 says that rights are governed by the EPCA if a

13 DIP from the (indiscernible) of the order or attached

14 procedures and subscription form.

15       And I think that rather than that, I would prefer

16 that the order actually govern if there's any changes,

17 because I do not expect parties to read the entire EPCA when

18 they're getting a notice and procedures and form of order

19 that say one thing.

20       MR. LAURIA:  We'll make that change, Your Honor.

21       THE COURT:  All right.  But that was my only

22 comment on that motion.

23       All right.  If you can do a certification of

24 counsel and upload the three orders or -- yeah, there are two

25 separate orders on here, on the EPCA, if you can submit it

1  under certification of counsel, so we know which one is the

2  final, I'll sign it.

3          MR. LAURIA:  We will do so.

4          THE COURT:  All right.  And I don't want the

5  parties to stop talking.  Go forward and continue to do what

6  you apparently have been doing for the last week, at least.

7  All right.

8          MR. LAURIA:  Well, we might take a nap somewhere,

9  Your Honor, but ...

10      (Laughter)

11          THE COURT:  I understand.

12          All right.  Well, I think that's all I have for

13  today and we'll stand adjourned, then.

14          COUNSEL:  Thank you, Your Honor.

15      (Proceedings concluded at 2:56 p.m.)

16

17

18

19

20

21

22

23

24

25

1

## CERTIFICATE

2

3    I certify that the foregoing is a correct transcript

4 from the electronic sound recording of the proceedings in the

5 above-entitled matter.

6

/s/Mary Zajaczkowski_____        April 21, 2021

7 Mary Zajaczkowski, CET**D-531

8

/s/William J. Garling_____        April 21, 2021

9 William J. Garling, CE/T 543

10

11 /s/ Tracey J. Williams_____        April 21, 2021

12 Tracey J. Williams, CET-914

13

14

15

16

17

18

19

20

21

22

23

24

25